IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KATHERINE BLACK,

            Plaintiff,

v.                                                 Case No.

CHERIE WRIGLEY,
MELISSA COHENSON,
BRIAN A. RAPHAN, P.C., and
PAMELA KERR,

            Defendants.

## COMPLAINT

Katherine L. Black ("Plaintiff"), by and through her attorneys, Halling & Cayo, S.C.,
alleges the following against Cherie Wrigley, Melissa Cohenson, Brian A. Raphan, P.C., and
Pamela Kerr ("Defendants").

## NATURE OF THE ACTION

1.     This action for defamation, intentional infliction of emotional distress, false light,
publicity given to private facts, intrusion upon seclusion, interference with existing or prospective
contractual relations or economic advantage, stalking and cyber-stalking, assault, civil conspiracy,
and concert of action arises out of a series of acts that Defendants undertook against Plaintiff
between 2013 and 2016.

2.     The extended family of Plaintiff's husband has been engaged in a highly
acrimonious fight over inheritance. To date, this fight includes half a dozen lawsuits in three states,
involving multiple individuals.

3.     Plaintiff is not a party to any of these lawsuits and does not stand to personally benefit from their resolution. However, Plaintiff agreed to testify against Defendants and their agents, and provide evidence against them.

4.     Plaintiff informed court-appointed personnel in two courts that she was willing to provide evidence of criminal and civil misconduct by, among others, Defendant Wrigley and her brother, Anthony Dain, and Wrigley's agent, Esaun Pinto.

5.     Defendants, acting in concert, in coordinated efforts spanning many months, sought to coerce Plaintiff not to testify, not to report the crimes they and their agents committed against Plaintiff and others, not to supply evidence to courts and court personnel, and not to participate in litigation otherwise.

6.     Defendants also sought to coerce Plaintiff into not opposing their efforts to seize control of Plaintiff's family assets, and used the threats of harm Plaintiff and her family to coerce Plaintiff's family members to transfer significant assets to Defendants.

7.     Among other things, Defendants: (a) made threats of physical and sexual assault against Plaintiff; (b) threatened to file a false police report against Plaintiff and initiate groundless criminal proceedings against her; (c) threatened to cause Plaintiff's small children to be removed from their home and placed in foster care; (d) threatened to cause their agent, Esaun Pinto, to enter Plaintiff's home and remove assets from it without Plaintiff's consent; (e) threatened to cause Plaintiff to be fired from her job; (f) threatened to ruin Plaintiff's professional reputation and career; (g) threatened to ruin Plaintiff's personal reputation and standing in the community; (h) threatened to file false police reports and initiate groundless criminal proceedings against Plaintiff's immediate family member; (i) threatened to cause ruinous financial damage to Plaintiff's and Plaintiff's immediate family members; (j) threatened careers and professional

reputations of Plaintiffs' immediate family members; (k) threatened personal reputations and standing in the community of Plaintiff's immediate family members.

8.      Defendants went far beyond mere threats.

9.      Defendants, acting in concert, waged a massive onslaught of criminal and tortious actions against Plaintiff, including the following: (a) repeatedly contacted Plaintiff's employer, spreading false, malicious, and highly offensive information about Plaintiff; (b) submitted sealed court documents to Plaintiff's employer; (c) called Plaintiff's colleagues and supervisors and disclosed to them the contents of sealed legal proceedings; (d) falsely told Plaintiff's colleagues that Plaintiff was highly unethical and unfit to do her job; (e) falsely told or intimated to Plaintiff's employer that Plaintiff committed criminal actions; (f) submitted malicious and frivolous complaint against Plaintiff to Plaintiff's employer; (g) threatened Plaintiff's employer with frivolous litigation; (h) falsely intimated to Plaintiff's employer that they were contacting the employer on behalf of the court and with court authorization; (i) demanded that Plaintiff's employer submits formal letters to courts in sealed legal proceedings where neither Plaintiff nor Plaintiff's employer is a party; (j) demanded that Plaintiff's employer starts disciplinary proceedings against Plaintiff on the basis of Defendants' false and malicious complaint; (k) demanded that Plaintiff's employer reports to Defendants on the status of its investigation of Plaintiff and on its decision about the punishment of Plaintiff;   (l) submitted sealed court documents to other third parties who have significant impact on Plaintiff's life.

10.      Defendants' statements made to Plaintiff's employer were not only false and malicious, but defamatory per se. Defendants stated that Plaintiff was unfit for her job, and that she committed criminal violations. Further, these statements prejudiced Plaintiff in her ability to

continue to perform her many responsibilities with her employer, damaged her career, promotions, reputation, and other employment opportunities.

11.     Defendants' statements to Plaintiff's employer were made with actual malice, to coerce Plaintiff not to testify against Defendants.

12.     In January 2016, following the onslaught of Defendants' witness-tampering actions, Plaintiff obtained a Temporary Restraining Order against all Defendants and several of their associates.

13.     Justice Aliotta of the New York Supreme Court enjoined all Defendants from having any further contact with Plaintiff's family, their employers and schools, and from interfering with Plaintiff's family in any way.

14.     In March 2016, the New York Supreme Court held a hearing on Plaintiff's TRO and other related matters.

15.     The judge found that "certainly I see [Defendants' proffered reasons for contacting Plaintiff's employer] being used as an excuse on the part of Miss Wrigley, to attack [Plaintiff and her husband] at his place of employment."

16.     The judge later stated that "I understand why [Plaintiff] would feel violated."

17.     Because of Defendants' witness-tampering actions, the judge reversed his own prior ruling on a related matter in front of him, and ruled against Wrigley. The judge explicitly stated that he was reversing his own prior ruling on a related matter because of Defendants' actions with respect to Plaintiff's employer.

18.     Defendants acted in concert for the purpose of accomplishing an illegal goal: to threaten Plaintiff and prevent her from testifying in court and from supplying evidence against them to court personnel.

19.     Defendants also acted in concert to accomplish their goals through illegal means: by threatening Plaintiff with assault, with filing of a false police report, and with removal of small children from their family. These actions are criminal as they constitute witness tampering, intimidation, and cyber-stalking.

20.     Defendants coordinated and timed their attacks on Plaintiff. They built their numerous communications with Plaintiff's employer on prior communications conducted by their co-Defendants. They exchanged their defamatory materials before submitting them. Wrigley submitted Kerr's defamatory letter to Plaintiff's employer. Cohenson obtained information from Plaintiff's employer and provided it to Wrigley and Kerr for follow-up defamatory actions.

21.     Defendants obtained substantial assistance, guidance, and encouragement from their associates, Anthony Dain and Ira Salzman. Dain and Salzman, both experienced litigators, supported and defended Defendants' witness-tampering conduct during the hearing on the TRO that Plaintiff obtained. Dain and Salzman provided de facto legal representation to all Defendants, even though none of the Defendants were their clients. Dain and Salzman used the TRO proceedings to continue to threaten Plaintiff.

22.     Plaintiff's sister-in-law, Joanne Black, provided assistance and encouragement to Defendants' scheme to intimidate and harass Plaintiff, and to coerce Plaintiff not to testify.

23.     Years of persistent threats of physical and sexual assault, filing of false police reports, removal of small kids from family, and active efforts to cause Plaintiff lose her job, harm her career, and harm her reputation caused significant damage to Plaintiff. Plaintiff suffered significant physical and psychological harm, harm to her ability to successfully do her job, harm to her career, and harm to her quality of life. Plaintiff also suffered significant financial losses

associated with her effort to protect herself and her family from the harm that Defendants threatened, and her inability to concentrate her energies on her work.

24.     Plaintiff is informed and believes that Defendants' conduct constitutes numerous criminal violations of Illinois and federal statutes, including: (a) several Illinois statutes on witness tampering (720 ILCS 5/32-4; 720 ILCS 5/32-4a); (b) intimidation (720 ILCS 5/12-6); (c) assault (720 ILCS 5/12-1); (d) stalking (720 ILCS 5/12-7.3); (e) cyberstalking (720 ILCS 5/12-7.5); (f) compounding a crime (720 ILCS 5/32-1); and (g) simulating legal process (720 ILCS 5/32-7).

### PARTIES, JURISDICTION, AND VENUE

<u>Plaintiff</u>

25.     Plaintiff Katherine Black resides and works in Illinois.

26.     Plaintiff is a private figure for the purpose of establishing defamation liability.

<u>Defendant Cherie Wrigley</u>

27.     Defendant Cherie Wrigley resides in California. She is a cousin of Plaintiff's husband.

28.     Wrigley committed numerous torts within Illinois.

29.     Wrigley placed numerous defamatory phone calls to Plaintiff's employer, located in Illinois.

30.     Wrigley spoke with, and left voicemails for, several Illinois-based employees of Plaintiff's Illinois employer, demanding actions on their part, to be originated and substantially performed in Illinois.

31.     Wrigley submitted a defamatory, malicious, and frivolous complaint against Plaintiff to Plaintiff's Illinois employer.

32.     Wrigley submitted sealed court documents to Plaintiff's Illinois employer, seeking to subject Plaintiff to the hate and ridicule of her colleagues and superiors.

6

33.     Wrigley submitted to Plaintiff's Illinois employer a defamatory and malicious letter written and signed by her accomplice Kerr, at Wrigley's request.

34.     By doing so, Wrigley intentionally triggered a long chain of events in Illinois: she caused numerous Illinois-based employees of a large Illinois employer to read and discuss the documents she submitted, start a formal response process, consider the letter's demand to contact the two courts, draft a letter to the two courts, and send that letter.

35.     Wrigley repeatedly contacted Plaintiff's Illinois employer in prior years, filing false and malicious complaints against Plaintiff's immediate family member, who also works for Plaintiff's Illinois employer.

36.     Wrigley threatened Plaintiff with physical and sexual assault, to be performed at Wrigley's directions in Illinois.

37.     Wrigley threatened to submit a false police report against Plaintiff in Illinois.

38.     Wrigley threatened to contact an Illinois agency responsible with child welfare, submit a false report to them, and cause them removal of Plaintiff's small children from their home in Illinois.

39.     Wrigley reiterated these threats through a phone call and a text message that were intended to be delivered to Illinois, and were delivered there.

40.     Wrigley threatened to bring her associate, Esaun Pinto, to Plaintiff's Illinois home, and to forcibly remove assets from Plaintiff's home, without Plaintiff's consent.

41.     Between 2012 and 2016, Wrigley placed numerous other phone calls to Plaintiff and her immediate family in Illinois. In those phone calls, Wrigley repeatedly threatened Plaintiff and her husband. Wrigley knew that her phone calls were made to Illinois, intended to reach Illinois residents, and intended to trigger the response in Illinois.

42.     Wrigley has made or performed contracts and promises substantially connected with Illinois. Wrigley has been performing numerous services for an Illinois trust, The Supplemental Needs Trust for the Benefit of Joanne Black (the "SNT"). The trust is administered in Illinois and has its assets in Illinois.

43.     Wrigley acquired ownership, possession or control of assets present within Illinois when that ownership, possession or control was acquired. For her services to a beneficiary of the Illinois trust, Wrigley received tens of thousands of dollars, paid directly from the Illinois trust's bank accounts, through checks written from an Illinois branch of the Illinois trust's bank.

44.     As such, Wrigley obtained tens of thousands of dollars of assets that were located in Illinois immediately before being transferred to Wrigley.

<u>Defendant Pamela Kerr</u>

45.     Defendant Pamela Kerr resides in Colorado. She is currently an accountant working for one of the parties in litigation involving Plaintiff's extended family.

46.     Kerr committed numerous torts within Illinois.

47.     Kerr initiated a series of phone calls to Plaintiff's employer, located in Illinois. During those calls, Kerr made defamatory statements about Plaintiff, released the contents of sealed legal proceedings to Plaintiff's employer, threatened Plaintiff's employer with litigation, and offered to release more sealed court documents to Plaintiff's employer.

48.     In addition, Kerr wrote a defamatory formal letter against Plaintiff, addressing her letter to Plaintiff's employer in Illinois. Kerr wrote Plaintiff's employer's Illinois address on the heading of her letter.

49.     In her letter, and during her phone call, Kerr demanded that Plaintiff's Illinois employer formally contact at least two courts, explaining the employer's position in an acrimonious inheritance litigation.

50.     Also in her letter, and during her phone call, Kerr demanded that Plaintiff's Illinois employer send a formal request to Kerr to transfer numerous sealed court documents to Plaintiff's Illinois employer, and promised that she would transfer such documents to Illinois upon such request. Kerr's "offer" was illegal. Kerr never sought, nor was she granted, the legal power to contact Plaintiff's employer in Illinois or transfer any sealed court documents to anyone.

51.     As such, Kerr intentionally triggered a long chain of events in Illinois: she caused numerous Illinois-based employees of a large Illinois employer to read and discuss her letter, consider her demand to contact the courts, draft a letter to the courts, and send that letter.

52.     Responding to Kerr's false representation that she was acting in her official court capacity, Plaintiff's Illinois employer wrote formal letters to two courts.

53.     Kerr has made or performed contracts and promises substantially connected with Illinois. Kerr's contacts with Plaintiff's Illinois employer were done in the course of Kerr's employment, ostensibly for the benefit of Kerr's client, who is a beneficiary of the Illinois trust, the SNT.

54.     For her various services, Kerr has been paid tens of thousands of dollars from the assets of the Illinois trust, SNT, written from the trust's Illinois bank account. As such, Kerr acquired ownership, possession or control of assets present within Illinois when ownership, possession or control was acquired.

<u>Defendant Melissa Cohenson</u>

55.     On information and belief, Defendant Melissa Cohenson resides in New York. She was formerly an attorney for Wrigley and an active participant in Wrigley's witness tampering scheme.

56.     Cohenson committed torts within Illinois. Cohenson initiated a series of phone calls to Plaintiff's employer, located in Illinois. During those calls, Cohenson made false and defamatory statements about Plaintiff.

57.     Cohenson released the contents of sealed legal proceedings to Plaintiff's Illinois employer.

58.     Cohenson's communications with Plaintiff's Illinois employer were made in the normal course of Cohenson's business. Cohenson was paid for these "services" to her client, Wrigley.

59.     Cohenson was paid in part with assets that Wrigley withdrew from an Illinois account of an Illinois trust.

60.     As such, Cohenson has made or performed contracts and promises substantially connected with Illinois.

61.     Cohenson acquired ownership, possession or control of assets present within Illinois when ownership, possession or control was acquired.

<u>Defendant Brian A. Raphan</u>

62.     Brian Raphan is a former employer of Defendant Melissa Cohenson. Raphan operates his law firm in New York.

63.     Raphan's employee, Cohenson, engaged in her tortious conduct in Illinois while employed as an associate by Raphan and while working under Raphan's supervision and control,

on his premises, using his equipment and materials, representing the client whom Raphan engaged (Wrigley). As a respondeat superior, Raphan is responsible for the torts committed by Cohenson within the scope of her employment

64.     Both Cohenson and Raphan received significant compensation for the tortious acts that Cohenson committed in Illinois.

65.     Raphan and Cohenson acquired ownership, possession or control of assets present within Illinois when ownership, possession or control was acquired. Wrigley paid Raphan and Cohenson with the assets removed from the Illinois bank account of an Illinois trust (the SNT).

66.     Raphan has conducted business in Illinois.

67.     Raphan has made or performed contracts and promises substantially connected with Illinois.

68.     Raphan's law firm is located in New York, but has clients in multiple states. For example, Wrigley is a resident of California; Raphan's website also lists clients from Virginia and New Jersey. On information and belief, Raphan has represented residents and citizens of Illinois in the past.

<u>Personal Jurisdiction</u>

69.     This Court has specific personal jurisdiction over all Defendants under Illinois long-arm statute, 735 ILCS 5/2-209.

70.     The causes of action asserted in this Complaint arise from the fact that Defendants deliberately reached out to Illinois and caused tortious injuries in Illinois.

71.     Each defendant intended to harm an Illinois resident, cause her severe emotional distress, cause her to lose her job in Illinois, and cause her to lose her standing in the community in Illinois.

72.     All Defendants committed tortious acts in Illinois and intended for their tortious actions to have consequences in Illinois.

73.     All Defendants were compensated for their tortious actions in Illinois by receiving assets from an Illinois bank account of an Illinois trust.

74.     All Defendants have made or performed contracts and promises substantially connected with Illinois.

75.     All Defendants acquired ownership, possession or control of assets present within Illinois when ownership, possession or control was acquired.

76.     Defendants knew that Plaintiff was a resident of Illinois and that Plaintiff's employer was an Illinois institution. As such, Defendants' numerous acts of making defamatory statements manifest their intent to aim their defamatory statements into Illinois and Illinois audience.

77.     Defendants knew that Plaintiff was a resident of Illinois and that her small children resided in Illinois. Thus, Defendants numerous threats of assault, filing false police reports, and removing small children from home manifest their intent to aim their tortious acts into Illinois, including Illinois state actors, such as the police, child protective services, and the courts.

78.     The contacts between Defendants and Illinois have been purposeful. Defendants purposefully contacted numerous parties in Illinois (such as Plaintiff herself and Plaintiff's employer) to conduct their tortious activities.

79.     Defendants' contacts with Illinois are systematic and continuous. All Defendants have been receiving assets from an Illinois bank account of an Illinois trust for many months.

80.     Defendants' contacts with Illinois and the underlying cause of action are closely related. They are all a part of Defendants' scheme to transfer millions of dollars from the Illinois trusts owned by Plaintiff's family to themselves.

81.     Witnesses and evidence of Defendants' tortious actions are easily and conveniently available in Illinois.

<u>Subject Matter Jurisdiction and Venue</u>

82.     The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a)(1), as this dispute is between "citizens of different States."

83.     Jurisdiction is based on diversity. Plaintiff is a resident and citizen of the state of Illinois.

84.     Defendant Cherie Wrigley is a resident and citizen of the state of California.

85.     Defendants Melissa I. Cohenson and Brian A. Raphan are residents and citizens of the state of New York.

86.     Defendant Pamela Kerr is a resident and citizen of the state of Colorado.

87.     The amount in controversy, without interest and costs, exceeds $150,000.

88.     Venue is proper in the [Northern] District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.

89.     This complaint seeks both equitable relief and damages.  A jury trial is demanded for the damages claims.

## FACTUAL BACKGROUND

**Wrigley Makes Numerous Threats against Plaintiff and Plaintiff's Immediate Family to Coerce them into Transferring Millions of Dollars to Wrigley's Control and Use**

90. In 2012, Plaintiff's mother-in-law died, leaving a sizable inheritance.

91. Wrigley was not named an heir and has no legitimate claim on the estate assets.

92. Soon thereafter, Wrigley, together with her brother, Anthony Dain, hatched a scheme to transfer most of the inheritance to their own control and use.

93. Plaintiff's sister-in-law, Joanne Black, actively assisted Wrigley and Dain in this plan.

94. Dain and Wrigley, directly and through proxies, hired numerous individuals to instigate multi-state litigation and advance their scheme.

95. The fight, instigated by Dain and Wrigley, is currently pursued by a dozen individuals, in three states (Colorado, Illinois, and New York), in several courts, and involves millions of dollars in claims.

96. Plaintiff is not an heir to the estate and does not stand to personally benefit from the inheritance fight.

97. Both Wrigley and Dain threatened Plaintiff, Plaintiff's husband, and the adult children of Plaintiff's husband with devastating personal consequences to coerce them to transfer millions of assets to Dain's and Wrigley's control and use.

98. Over the span of many months, Wrigley threatened (a) to organize a physical assault against Plaintiff and her immediate family members; (b) to hire a someone to burglarize Plaintiff's home; and (c) to steal a car parked on Plaintiff's driveway.

14

99.     In August-September of 2014, Plaintiff's family refused Dain's and Wrigley's demands to transfer significant assets to them and informed them that they would participate in litigation against them.

100.     Plaintiff's family notified Wrigley that they would be presenting evidence of Wrigley's severe misconduct to the court.

**Plaintiff Contacts Two Court-Appointed Personnel in Colorado and Offers to Provide Evidence against Wrigley; Wrigley Responds by Threatening Plaintiff with Sexual and Physical Assault, and by Threatening Plaintiff's Husband with Physical Assault**

101.     In March 2015, Plaintiff sought a meeting with two court-appointed personnel, Gayle Young and Lisa DiPonio, to supply them evidence of illegal conduct by Wrigley and her accomplices.

102.     Gayle Young was a guardian ad litem, the position often described as the eyes and the ears of the court. Plaintiff believed that by communicating with Young, she was communicating with the court.

103.     Lisa DiPonio is a court-appointed counsel for a member of Plaintiff's family, who is not a party to this litigation.

104.     The meeting was arranged by the attorney for Plaintiff's husband, Carl Glatstein, and was to be held in his office.

105.     Plaintiff was told that this meeting was confidential, and its contents were confidential. The only two parties invited to the meeting were two court-appointed personnel, plus Plaintiff's husband and his attorney.

106.     None of the parties to the meeting represented Wrigley or any of the other Defendants in this action.

107.     Plaintiff brought to the meeting several binders full of documents.

108.    Plaintiff's documents demonstrated that Wrigley and Pinto repeatedly lied to the court and to court personnel with whom Plaintiff was meeting.

109.    Plaintiff's documents showed that Wrigley and Pinto engaged in other illegal conduct, including fraud and extortion, and victimized several members of Plaintiff's family.

110.    During the meeting, Young and DiPonio received Plaintiff's folders and looked through them. Each of them received their own folder with documents.

111.    Young requested that Plaintiff puts all documents into a PDF file and email them to Young. Young told Plaintiff that she would work through the documents and get back to Plaintiff shortly for further discussions.

112.    Plaintiff promised that she would email electronic versions of all documents to Young.

113.    Unbeknownst to Plaintiff, Young had maintained months-long ex parte communications with Wrigley. Young notified Wrigley and Dain about her meeting with Plaintiff in advance.

114.    After the meeting, Young notified Wrigley about the contents of the meeting.

115.    A day later, after a short court hearing, Wrigley approached Plaintiff and Plaintiff's husband.

116.    Wrigley told Plaintiff that she learned that Plaintiff supplied evidence of Wrigley's illegal actions to Young. Wrigley told Plaintiff that Plaintiff must cease any contacts with court personnel, must not provide any evidence to court, and must not testify against Wrigley or her accomplices.

117.    Wrigley told Plaintiff that if Plaintiff continued to provide evidence or testify, Wrigley would arrange for Plaintiff to be sexually and physically assaulted.

16

118. After threatening Plaintiff, Wrigley turned to Plaintiff's husband and threatened him with physical assault as well.

119. Pinto styles himself as a "private investigator." Plaintiff knew that, on Wrigley's instructions, Pinto traveled broadly around the country, following a member of Plaintiff's family without that person's knowledge or permission.

120. Pinto admitted, in his sworn court testimony, that he had also stalked a member of Plaintiff's family in the past. By Pinto's own admission, his stalking activities against members of the Plaintiff's family spanned many years.

121. Plaintiff knew that Wrigley paid hundreds of thousands of dollars to Pinto and his associates to perform various "jobs" for her.

122. Plaintiff knew that Wrigley and Pinto have been demanding hundreds of thousands of dollars from Plaintiff's family.

123. In the past, Wrigley threatened Plaintiff with hiring Pinto to enter Plaintiff's home and remove assets from it.

124. When Plaintiff heard Wrigley's threats of physical and sexual assault, Plaintiff knew that Wrigley had means and opportunity to implement them.

125. Wrigley's threats were intended to cause significant emotional distress in Plaintiff, and they did. Plaintiff was terrified.

126. Plaintiff knew that her presence at the courthouse was known to Wrigley in advance, and therefore known to Pinto and his accomplices.

127. Plaintiff believed that either Pinto or his accomplices were present nearby and would assault Plaintiff promptly if she did not promise to Wrigley that she would not provide evidence to court personnel.

17

**Wrigley Threatens to File False Police Report Against Plaintiff and Threatens to Cause Plaintiff's Small Children to be Removed from Their Home**

128.    Several hours later, Plaintiff ran into Wrigley in the Admirals Club of the Denver International Airport.

129.    Wrigley approached Plaintiff and repeated her threat. Wrigley told Plaintiff that if Plaintiff agrees to testify or provide evidence, Wrigley would file a false police report, claiming that Plaintiff was abusing her small children. There has never been any basis for such report, and Wrigley knew it.

130.    Wrigley told Plaintiff that Wrigley had spent years as a court-appointed special advocate for abused children in California courts, and that Wrigley knew how to write a police report that Plaintiff would not be able to easily rebut.

131.    Wrigley said that she was trained to manipulate this system. Wrigley said, "If I get to it, you will not get your kids back for a year."

132.    Plaintiff knew these were not idle threats. Plaintiff knew that in the past, Wrigley successfully manipulated mental-health and related systems to her advantage.

133.    Plaintiff also knew that Wrigley had years of experience in child-protection fields, and bragged about having friends within the system in many states.

134.    Plaintiff was shocked and terrified when she heard these threats.

135.    Plaintiff responded only by saying that, "I will pretend I did not hear this."

136.    Wrigley replied that she had a way of making sure that Plaintiff hears her clearly.

137.    Shortly after that conversation, Wrigley called Plaintiff's husband and left a voicemail.

138.    In her voicemail, Wrigley stated that she was sitting in the airport lounge with her brother, Dain, referred to her recent conversation with Plaintiff (during which she threatened

18

Plaintiff's children), and said that Plaintiff needed a hearing aid. Her language repeated very closely the threat she just made to Plaintiff in person.

139.    At roughly the same time, Wrigley also sent a text message to Plaintiff's husband. The message said: "Tell your wife to get a hearing aid."

140.    Wrigley had no reasons to communicate with Plaintiff's husband and discuss Plaintiff with him. Wrigley had no reasons to mention a hearing aid except to reiterate the threat she made to Plaintiff shortly before sending these communications.

141.    Plaintiff interpreted these communications as reiterations of the threats that Wrigley made at the Denver airport and at the courthouse.

142.    Wrigley's inclusion of Dain in her voicemail to Plaintiff's husband led Plaintiff to believe that Dain participated in Wrigley's threats or at least was aware of them.

143.    Wrigley's threats, in person, via phone, and via text, were intended to terrorize Plaintiff, to cause severe emotional distress, and to prevent Plaintiff from testifying in court.

144.    Wrigley's threats succeeded, as they were intended. Plaintiff was shocked and terrified.

### Responding to Wrigley's Threats, Plaintiff Refuses to Testify and Provide Evidence to Court

145.    Shortly after the conversations with Wrigley in Denver, Plaintiff felt violently ill, shaking, and throwing up.

146.    The threat to the safety of Plaintiff's small children, and to Plaintiff's own physical safety, caused Plaintiff to suffer significant physical, emotional, and psychological trauma.

147.    After Plaintiff learned that Wrigley reiterated her threats through voicemail and text message, Plaintiff decided not to supply any evidence and refused to testify in court, despite her earlier promises to Gayle Young.

148.    As a result of Wrigley's treats, Plaintiff refused to attend the next court hearing, in June 2015.

### Wrigley and Her Accomplices Threaten Plaintiff Against Participating in Court Proceedings in New York

149.    Eventually, Plaintiff decided that she would not allow Wrigley and her accomplices terrorize her, and agreed to renew her participation in the legal proceedings as a witness.

150.    In September 2015, Plaintiff and her family informed the New York Supreme Court that they were prepared to testify against Wrigley and Dain.

151.    Neither Plaintiff nor any member of Plaintiff's immediate family were a party to that litigation. Their participation was solely as witnesses.

152.    When Wrigley learned about Plaintiff's renewed offer to testify, she and her brother Dain renewed their threats against Plaintiff's family.

153.    Because of the threats from Wrigley, Dain, and their associates, Plaintiff again refused to participate in the court proceedings and refused to continue communications with court personnel.

### Wrigley Continues to Defraud and Threaten Plaintiff and Her Family

154.    Because of the threats from Dain and Wrigley, none of the members of Plaintiff's family was willing to attend the court hearing in September 2015.

155.    In the absence of any representation by Plaintiff and her family, the court issued a limited ruling in favor of Wrigley.

156.    Wrigley immediately contacted Plaintiff's family and falsely told them that she obtained the court's permission to transfer tens of thousands of dollars of assets to herself. Wrigley knew that this was not true.

157.    Wrigley threatened that if Plaintiff and her family did not immediately transfer the assets to Wrigley, she would send her accomplice, Esaun Pinto, to Plaintiff's home and remove those assets against their will.

158.    For the next several months, Wrigley, her brother Dain, Cohenson, and their agents repeatedly threatened Plaintiff and her family, lied, illegally refused to release legal documents, and illegally doctored documents that they did release to them.

159.    Throughout that period, Wrigley and her associates continued to threaten Plaintiff and her family, demanding that they acquiesce to Wrigley's demand to transfer millions of dollars to Wrigley and Dain.

**Plaintiff Contacts the Court and Reports Dain's, Wrigley's, and Pinto's Illegal Actions, as Well as Misconduct by Their Agents and Associates**

160.    In late December of 2015, the attorney for Plaintiff's husband formally requested a new court hearing, citing numerous illegal actions by Wrigley and her associates, including witness intimidation and tampering.

161.    On January 7, 2016, Plaintiff wrote a letter to J. Aliotta, requesting a new hearing, and informing the court that she was willing to testify against Wrigley and Dain.

162.    In her letter, Plaintiff meticulously documented numerous illegal conduct by Wrigley, Dain, and Pinto.

163.    Plaintiff's letter contained a section extensively documenting Wrigley's perjury in prior proceedings.

164.    Plaintiff requested an opportunity to testify about this misconduct in court.

**Wrigley, Kerr, and Cohenson Contact Plaintiff's Employer, Make Numerous Defamatory Statements, Seeking to Get Plaintiff Fired and Harm Her Career and Reputation**

165.    Plaintiff sent her letter to the court and, pursuant to court rules, forwarded a copy to Wrigley, Dain, Cohenson, and Salzman.

166. On the same day, January 7, Cohenson called Plaintiff's employer and requested to speak with someone in the position of power.

167. Cohenson eventually spoke with a senior administrator at Plaintiff's employer, Ms. Schulte.

168. Cohenson informed Plaintiff's employer that Plaintiff wrote a letter to J. Aliotta. Cohenson had no right to do so. Legal proceedings for which Plaintiff's letter was written were sealed, which Cohenson, as an attorney to a party in those proceedings, knew.

169. Cohenson went on to provide detailed personal information about Plaintiff to Plaintiff's employer.

170. Cohenson falsely told Plaintiff's employer that, in her letter, Plaintiff represented to the court that Plaintiff was writing with the support of her employer.

171. Plaintiff's letter to the court started with clearly identifying Plaintiff as a member of the family engaged in an inheritance fight. Plaintiff never said or hinted that her employer had any interest in the family litigation, in which Plaintiff herself was not even a party. There is no plausible claim that Plaintiff's employer could possibly have in the family fight over inheritance, where Plaintiff is not even a party.

172. The goal of Cohenson's phone call was to release sealed court information to Plaintiff's employer and to engage in witness tampering.

173. Cohenson falsely told Plaintiff's employer that Plaintiff used an official employer's letterhead in her communications with the court.

174. Plaintiff did not use the official employer's letterhead. Plaintiff used her own self-designed letterhead, which was very different, and did not even use the correct name of her

employer. The two letterheads are nothing alike; Defendants knew it or at least were grossly negligent in not knowing.

175.     Plaintiff's personal letterhead uses a different color than the official employer's letterhead does (blue, rather than purple); different font; different logo; and different albeit recognizable name of the employer.

176.     At all times, Cohenson concealed from Plaintiff's employer that the communications which she was disclosing were sealed, and that Cohenson had no right to disclose them.

177.     The next day, January 8, 2016, Wrigley submitted a complaint against Plaintiff to Plaintiff's employer. The basis of Wrigley's written complaint was identical to Cohenson's oral complaint: the false claim that Plaintiff improperly used her employer's letterhead.

178.     Wrigley had no right to disclose any information about Plaintiff's letter to the court because the letter was submitted in sealed legal proceedings, which Wrigley knew.

179.     Wrigley's complaint falsely stated that Plaintiff represented to the court that she was acting with her employer's imprimatur and that Plaintiff used the employer's official letterhead in her communication with the court.

180.     Wrigley knew this was false.

181.     Justice Aliotta, who later reviewed Wrigley's claim that she thought Plaintiff's employer was somehow involved because of the letterhead, found it to be not credible.

182.     On the following working day, January 11, or around that time, Wrigley called Plaintiff's colleague, Mr. Dana, at his work. On information and belief, Wrigley believed that Dana was Plaintiff's supervisor.

183.     Wrigley left a malicious and defamatory voicemail on Dana's work phone.

184.    In her voicemail, Wrigley said that she knew that Plaintiff was a highly regarded employee, but Wrigley wanted to notify Plaintiff's employer that Plaintiff was very unethical during the legal proceedings that Wrigley observed. Wrigley said that Plaintiff lied to the court. Wrigley said that Plaintiff was unfit to work for her employer.

185.    Wrigley proceeded to give details of the sealed legal proceedings.

186.    Wrigley left her contact information and offered to provide more information demonstrating the lapses in Plaintiff's ethics and Plaintiff's unfitness for her job. Wrigley requested that Dana call her back to obtain more information about the legal proceedings that she discussed.

187.    Wrigley failed to notify Dana that the legal proceedings that she was discussing were sealed.

188.    On approximately the same day, January 11, 2016, Kerr also called Plaintiff's employer and demanded to speak with someone in the position of power.

189.    Eventually, Kerr spoke with Ms. Winters, a senior administrator in Plaintiff's employer.

190.    Kerr represented herself as court personnel and falsely intimated that she was calling in her official capacity and on behalf of the court.

191.    At a later court hearing, Kerr testified that never sought a court permission to make any such contacts with Plaintiff's employer, nor to represent herself as acting on behalf of the court, nor to release any information about sealed proceedings to the employer,.

192.    Kerr falsely told Plaintiff's employer that Plaintiff lied to the court.

193.    Kerr falsely intimated that Plaintiff committed other criminal violations, for which Plaintiff was investigated or sued. Kerr said that she was not allowed to discuss such details with

Plaintiff's employer over the phone, despite having disclosed other details of the sealed proceedings.

194.    Kerr falsely told Plaintiff's employer that the employer had now become a party to legal proceedings because of the way Plaintiff's personal letterhead looked in her sealed letter to the judge.

195.    Kerr knew this was false. Kerr is a highly experienced court-appointed expert, who participated in numerous legal proceedings. Kerr knows that nobody can be forced to become a party to legal proceedings without notice and jurisdiction, simply because someone mentions their name in a private letter written to the judge.

196.    Kerr's statements to Plaintiff's employer were false and malicious. Kerr's goal was to threaten Plaintiff's employer into hiring legal representation and to immerse itself into the legal proceedings where not only the employer was not a party, but even Plaintiff herself was not a party. Kerr sought to pressure Plaintiff's employer to protect itself by taking actions against Plaintiff, or to retaliate against Plaintiff for the legal costs and trouble that Kerr imposed on Plaintiff's employer.

197.    Kerr also falsely stated or intimated that she was investigating Plaintiff's financial misconduct in her capacity as a court-appointed expert. This was false. Kerr never investigated Plaintiff. Plaintiff was never a party to any proceedings in which Kerr was involved (except for Plaintiff's subsequent TRO against Kerr).

198.    Kerr repeatedly and strongly intimated that there were facts about Plaintiff that Kerr was unable to disclose to Plaintiff's employer, and that those facts were extremely damaging to Plaintiff's reputation and career.

199.    Kerr knew this to be false.

200. Kerr revealed to Plaintiff's employer other details from the sealed legal proceedings.

201. Approximately a day later, on January 12, 2016, Wrigley sent several documents to Plaintiff's employer, ostensibly in support of her frivolous "ethics complaint" against Plaintiff for the use of the letterhead.

202. Only one of the documents that Wrigley submitted had any relationship to the ostensible purpose of her communication – the letterhead "ethics complaint."

203. All other documents that Wrigley sent were sealed court documents entirely unrelated to Wrigley's "ethics complaint."

204. The documents that Wrigley forwarded to Plaintiff's employer contained no information about Plaintiff. Instead, they contained highly sensitive, sealed court information about legal disputes among numerous members of Plaintiff's family.

205. Wrigley knew that Plaintiff desperately wanted to contain the scandal and reduce the harm to the reputations of her family members. In the past, Wrigley threatened to release these sorts of documents to the public as a leverage to pressure Plaintiff not to testify in court against Wrigley. Now, after Plaintiff finally volunteered to testify against Wrigley, Wrigley released some of the documents to Plaintiff's employer, for the purpose of causing Plaintiff severe emotional distress, harming Plaintiff's career and reputation, causing Plaintiff to withdraw her agreement to testify, and causing other members of Plaintiff's family to withdraw their agreement to testify.

206. On January 23, 2016, Wrigley submitted to Plaintiff's employer a letter from Kerr.

207. Kerr's letter was dated January 8, 2016, signed by Kerr, and addressed to Plaintiff's immediate supervisor, who was listed by name. Kerr listed the official address of Plaintiff's immediate supervisor as the delivery address.

208. After Plaintiff's employer received the letter, a senior administrator called Kerr to verify the letter's authenticity.

209. Kerr informed Plaintiff's employer that she wrote the letter, signed it, and addressed it to the employer, but then did not send it on the advice of her counsel. Kerr did not explain how her signed, formal letter, addressed to the employer and demanding employer's actions, happened to land in Plaintiff's employer's hands if Kerr never sent it.

**Kerr Writes Defamatory Letter to Plaintiff's Employer, and Wrigley Submits It**

210. During her phone conversation with Plaintiff's employer, Kerr promised to forward sealed court documents if the employer made a written request. The employer did not make such a request.

211. Prior to her telephone call, Kerr wrote a letter to Plaintiff's employer that Wrigley would later send.

212. In her letter, Kerr presenting herself as a court personnel writing in her official capacity, and responding to a court submission that she received in her official capacity.

213. During a court hearing in March 2016, Kerr admitted that she never sought or obtained a court approval to contact anyone in such capacity. Her representation was false.

214. Kerr had no formal role in the proceedings for which Plaintiff wrote a letter to the judge. Because those proceedings were sealed, Kerr had no right to see Plaintiff's letter to the court. Kerr obtained Plaintiff's letter illegally, from her accomplice Wrigley, for the specific purpose to engage in witness intimidation and tampering.

215. Kerr's letter contained a long list of defamatory falsehoods, including the claim that Plaintiff lied in her letter to the New York court about whether Kerr was instructed by another court to investigate Wrigley's associate, Esaun Pinto.

216. Kerr knew that her claim was false. Plaintiff's letter to the court provided detailed citations to court transcripts and orders, backing up her claims and documenting the court's instructions to investigate Pinto.

217. Plaintiff's letter quoted a status conference court order, both of which addressed the investigation into Pinto.

218. Kerr was present at the hearing where the judge made these decisions; she personally witnessed the oral ruling, and she received a copy of the written order that stated: "Mr. Pinto shall provide a complete accounting with documentation of all funds that were held under his control to Ms. Kerr and Ms. Peterson, who shall ensure copies are provided to Counsel of record including [list of involved individuals]."

219. Further, not only did the court instruct Kerr to investigate Pinto, but Kerr in fact conducted an investigation of Pinto. Kerr summarized her preliminary findings in a letter that she sent to numerous parties to the Colorado proceedings. Kerr stated that she found that Pinto misappropriated tens of thousands of dollars and engaged in other financial misconduct, including overbilling.

220. Kerr's letter to Plaintiff's employer made other defamatory accusations against Plaintiff, stating:

> I do not feel that I am at liberty to disclose the outcome of my forensic investigation, but as I am sure, as a licensed attorney and the head of a [Plaintiff's employer, a large institution], you know that the facts are the facts. I am a licensed CPA, a Certified Fraud Examiner and a Forensic Certified Public Accountant and am require to provide a factual report based on the financial and other documents provided. I have provided such a report to the Denver Probate Court, who is the trier of fact in this matter. An Order was issued… with results of many months of hearings in this matter. I can tell you unequivocally that the Order in no way reflect [Plaintiff's] allegations.

28

221. This statement is false, highly misleading, and malicious. It intimates that Plaintiff engaged in some unspecified financial fraud, for which Kerr was investigating Plaintiff. Plaintiff never committed fraud and was never investigated, by Kerr or by any other court personnel.

222. Kerr's statement also intimates that Plaintiff engaged in some other severe misconduct that was tried during those proceedings. This too is false. Plaintiff was not a party to those proceedings.

223. Most importantly, Plaintiff's only participation was that of a witness. There was nothing in the facts of the sealed proceedings that Kerr was claimed she was eager to release to Plaintiff's employer that would support Kerr's insinuation that Plaintiff committed any sort of criminal or civil offense.

224. Further, the letter falsely claims that Plaintiff committed perjury.

225. Kerr's goal was to cause Plaintiff lose her job, to coerce Plaintiff not to testify against Defendants in court, and to persuade her family to transfer significant assets to Defendants.

226. Kerr's letter threatened Plaintiff's employer with litigation, stating that Plaintiff's use of her self-designed letterhead somehow turned the employer into a party.

227. This statement is false and made with actual malice. At the very least, Kerr is extremely reckless in making this statement. Kerr is a highly experienced forensic accountant who routinely works in litigation with attorneys and judges. Kerr's accomplices Dain, Cohenson, and Salzman are all attorneys. Kerr testified that she consulted some "attorney" before sending her defamatory letter to Plaintiff's employer.

228. Kerr threatened Plaintiff's employer with litigation to coerce the employer into taking actions against Plaintiff. Wrigley made the same threats, more explicitly, during her phone conversations with Plaintiff's employer.

229. Kerr's letter made numerous other defamatory and false statements.

230. Finally, Kerr repeated the false claim that she was writing in her official capacity as court-appointed expert, and demanded that Plaintiff's employer write to the court to explain its position in family litigation.

231. Kerr had no legal status in the New York proceedings, was not authorized to see any documents in those proceedings, was not authorized to read Plaintiff's sealed letter, much less forward it to Plaintiff's employer, much less threaten Plaintiff's employer with litigation and demand that Plaintiff's employer contact a court for which Kerr has never worked.

232. Kerr's threats against Plaintiff's employer were deliberate and malicious. Her goal was to pressure Plaintiff's employer to take action against Plaintiff by hinting that the employer can easily end up a defendant in a nasty family fight if they don't follow Kerr's instructions.

233. Kerr's claims that Plaintiff improperly used her letterhead, that Plaintiff intentionally misled the court into thinking the employer was a part of litigation, that Plaintiff lied to the court with respect to Kerr's duties were all false. These claims were also defamatory per se because they implicated that Plaintiff does not possess the character or ethics of an employee that are necessary for her position. They were made with actual malice, and for an illegal purpose – to coerce Plaintiff not to testify against Wrigley and Dain in ongoing legal proceedings.

234. Kerr closely cooperated with Wrigley and Cohenson to make virtually identical claims against Plaintiff to Plaintiff's employer, and to submit them at the same time.

**Defendants' Claim that They Were Confused by Plaintiff's Self-Designed Letterhead Is Obviously False, and the New York Supreme Court Correctly Found It to Be Not Credible and Pretextual**

235. Defendants attempted to justify their witness tampering campaign by claiming that, when they saw Plaintiff's obviously unofficial self-designed letterhead, they were "confused" into

thinking that Plaintiff's employer stood behind her letter in family litigation. This is an obvious falsehood and refuted by Defendants' own actions.

236.     Dain routinely used his law firm's letterhead to send letters to two different courts throughout the course of this family litigation. Unlike Plaintiff, who used a self-designed, obviously non-official letterhead, Dain used an official letterhead of his law firm.

237.     Dain used his law firm's official letterhead to send letters to the New York court, dated December 30, 2015 and December 10, and to the Colorado court dated October 13, 2015, and 2015.

238.     Dain has been acting solely in his individual capacity, as an "interested person", throughout these proceedings. Dain was not a counsel for any party here, and his law firm had no official involvement in these proceedings. Still, Dain, acting in his private capacity, used his law firm's official letterhead, and his law firm's address, phone, and email to direct communication to him.

239.     Much of Dain's correspondence was sent to the courts by an employee of his law firm, a paralegal or secretary, apparently acting within the scope of her employment, on Dain's instructions.

240.     None of Defendants ever complained that Dain's use of his law firm's letterhead, stationary, and staff somehow confused the courts into thinking that his law firm is a party to this family litigation.

241.     On information and belief, Wrigley, Kerr, and Cohenson: (a) did not contact Dain's law firm to report his unauthorized use of the real, official letterhead and firm's staff; (b) did not file any complaints with Dain's law firm about his use of the letterhead; (c) did not demand that

Dain's law firm contacts two different courts and explains its position in the family litigation; and (d) did not forward any sealed court documents to Dain's law firm.

242. In March 2016, Defendants submitted their absurd claims of confusion about the letterhead to J. Aliotta. J. Aliotta found Defendants' claims to be not credible, expressly stated that Defendants used the letterhead as an excuse to harm Plaintiff's and Plaintiff's family member at their place of employment; stated that he understands why Plaintiff would feel violated by these actions, and ruled against Wrigley.

## Plaintiff Obtains TRO Against All Defendants

243. When Plaintiff learned that Defendants started to release sealed court documents to her employer, Plaintiff sought a restraining order from the New York Supreme Court.

244. On January 29, 2016, in the face of unequivocal evidence of witness tampering, witness intimidation, and other misconduct by Defendants, J. Aliotta issued a TRO.

245. The TRO provided the following:

"Upon reading [Plaintiff's Affidavit for the TRO], from which it appears that the integrity of these proceedings and the welfare of witnesses… in these proceedings are imminently threatened by Cherie Wrigley, Pamela Kerr, and Melissa Cohenson, and that Wrigley, Kerr, Cohenson, and their associates should therefore be restrained from further witness tampering and intimidation, by way of a Temporary Restraining Order…

ORDERED, pending hearing and determination before this Court, that [Defendants] must stay away from the home, school, business, or place of employment of each member of [Plaintiff's family; and it is further

ORDERED, pending hearing and determination before this Court, that [Defendants] must not harass, intimidate, threaten, or otherwise interfere with [Plaintiff's family]; and it is further

ORDERED that, pending hearing and determination before this Court, [Defendants] must not communicate with [Plaintiff's family's] employers, schools, supervisors, colleagues, teachers, professional associations, or any other individual or organization that exercises any control over, or has significant impact on, the employment, education, or civic activities of any member of the [Plaintiff's family].

**In Preparation for the TRO Hearing, Dain and Salzman Continue to Intimidate and
Harass Plaintiff, Seeking to Stop Her from Testifying**

246.     Dain and Salzman responded to the TRO by continuing to threaten and intimidate
Plaintiff, seeking to prevent her from testifying against Defendants.

247.     One of Plaintiff's main complaints to J. Aliotta was that Dain coerced Plaintiff and
her family not to testify against Defendants by threatening to cause the imposition of ruinous
financial sanctions if they do so.

248.     After Plaintiff reported these threats to J. Aliotta and obtained the TRO, Dain
sought sanctions against Plaintiff from J. Aliotta, the very judge who had just granted the TRO,
for Plaintiff's audacity to seek the TRO.

249.     Dain, as an experienced litigator, knew that his motion for sanctions was frivolous.
He used it solely to further intimidate Plaintiff.

250.     Dain also repeatedly threatened to disclose more sealed court documents to various
parties if Plaintiff continues to be willing to testify, and threatened Plaintiff with frivolous
defamation lawsuit for communicating with the judge in an ongoing legal proceeding.

251.     Dain, as an experienced litigator, knew that witness testimony and victim
statements to court are absolutely protected from defamation claims. He also knew that he had no
right to reveal the contents of sealed legal proceedings. His threats were the threats of illegal
actions and an ongoing witness tampering.

252.     Dain's threats of defamation lawsuits and sanctions were particularly egregious
because he was making them while the TRO against him was in full force.

253.     Wrigley's and Dain's associate, Salzman, in his response to Plaintiff's motion for
permanent injunction, also sought sanctions against Plaintiff for Plaintiff's audacity to seek a TRO.

254. Salzman threatened to continue contacting Plaintiff's employer and to attempt to garnish Plaintiff's wages. Salzman, as an experienced litigator, knew that he could not garnish Plaintiff's wages absent a judgment against Plaintiff. Plaintiff has never been involved in any litigation prior to seeking the TRO against Defendants.

255. Threats and intimidation against witnesses and even fellow attorneys are Defendants' standard behavior.

256. Before the TRO was put in place, Dain repeatedly threatened Plaintiff and members of Plaintiff's family, telling them that if they agreed to testify against Dain or other Defendants, Dain would cause them ruinous financial, professional, and personal damage.

257. Both Dain and Salzman threatened attorneys working for various members of Plaintiff's family.

**In Preparation for the TRO Hearing, and During the Hearing, Dain and Salzman Acted as De Facto Counsel for all Defendants, even though They Were Not Counsel of Any of Them**

258. For many months, Dain and Salzman have been providing full legal, organizational, and strategic support to Defendants' ongoing pattern of witness-tampering, coercion, and extortion schemes. On information and belief, Dain and Salzman encouraged other Defendants to engage in tortious activities against Plaintiff for months and counseled them on approaches to do so.

259. Dain and Salzman provided full legal and organizational support to all Defendants after Kerr, Wrigley, and Cohenson were caught with witness tampering, and after J. Aliotta issued a TRO against all Defendants.

260. In reliance on Dain's and Salzman's full legal support, Kerr did not even bother to submit any responses to the TRO issued against her, or to the Motion for Permanent Injunction issued against her. This is striking, given that Kerr was one of the key participants in the stream of witness tampering activities directed at Plaintiff and Plaintiff's employer.

261. Cohenson was ostensibly an attorney for Wrigley. However, Cohenson's response to Plaintiff's Motion for Permanent Injunction did not even bother to defend Wrigley. Cohenson's motion defended only Cohenson herself. She did not address Wrigley's illegal actions.

262. Dain's response to Plaintiff's Motion for Permanent Injunction is almost entirely dedicated to the defense of Wrigley's, Kerr's, and Cohenson's communications with Plaintiff's employer, their forwarding of sealed court documents, spreading defamatory information, and their threats. Dain does not even pretend that he is writing for his own benefit, defending his own actions in the Motion for Permanent Injunction.

263. Salzman's response to Plaintiff's Motion for Permanent Injunction contains only a small portion defending Salzman himself. The bulk of Salzman's response is dedicated to defensding Wrigley, Kerr, and Cohenson, none of whom are his clients.

**At the TRO Hearing, J. Aliotta Finds Defendants' Excuses for Witness Tampering to Be Not Credible and Mere Pretexts to Justify Illegal Conduct**

264. In March 2016, the New York Supreme Court held a hearing on Plaintiff's TRO and other related matters. The parties submitted an extensive set of motions and responses.

265. In their numerous submissions to the court, and orally during the hearing, Defendants advanced numerous bizarre, false, and misleading arguments to justify Defendants' illegal conduct.

266. Having seen all of Defendants' excuses, J. Aliotta of the NY Supreme Court found them to be not credible.

267. The judge's final order described Defendants' conduct as "disturbing at best."

268. The judge found that Defendants' excuses for contacting Plaintiff's employer were mere pretexts to justify their witness tampering.

269. In reference to Defendants contacting Plaintiff's employer, J. Aliotta said:

I understand that you [Plaintiff] feel even violated and you're upset about what has happened. Quite frankly, I think that, you know, most professionals would recognize that seeing a letterhead, a Judge doesn't assume that [imprimatur of the employer] is lent to the contents of these letters.

I mean, we've been around the block a few time and we see correspondence and people use letterhead and they shouldn't use letterhead to contact the Court and the like. But I think that in this case a lot of it was over the top, was unnecessary and I can understand [Plaintiff] being upset about it.

270. The judge received the letter that Plaintiff's employer wrote to the court, in response to Defendants' malicious demand to contact the court. Because of the information contained in the employer's letter and in Plaintiff's Affirmation for the TRO, the court ruled against Defendants on the primary issue of the proceeding – reversing his own prior ruling in the proceeding, issued when Plaintiff and her immediate family members were not present because of Defendants' threats and intimidation.

**After the TRO Hearing, J. Aliotta Agrees to Discontinue the TRO, Explicitly on the Condition that Defendants Do Not Contact Employers of Plaintiff and Plaintiff's Family**

271. After the hearing, J. Aliotta resolved all underlying issues and, because of that, discontinued the TRO. The TRO was based on witness tampering with respect to the underlying case, and the resolution of the underlying case removed the witness tampering issue from J. Aliotta.

272. The judge explicitly warned Defendants against continuing to engage in witness tampering.

273. The judge explicitly conditioned his decision to discontinue the TRO on the promise by all Defendants not to contact any employers of Plaintiff or Plaintiff's family again.

274. The judge put the same no-contact condition in the oral ruling from the bench, and in his written orders.

## DAMAGES

275.    Defendants' long-term, egregious misconduct, aimed at witness tampering, gives rise to several types of damages.

### Presumed Damages and Emotional Distress Damages

276.    For the defamation claim, Plaintiff is entitled to presumed damages because the defamation was per se. Plaintiffs falsely told numerous employees of Plaintiff's employer that Plaintiff had committed criminal violations, lied to the court, is unethical, and is unfit to do her job. As a result, Plaintiff suffered severe mental suffering, harm to her professional and personal reputations and to her standing in the community, personal humiliation, embarrassment, anguish and anxiety. Many of these consequences have well-documented physical evidence, such as the harm to Plaintiff's health caused by severe mental suffering.

277.    Plaintiff never experienced mental health problems before she was attacked by Defendants.

278.    Plaintiff's psychical, mental, and emotional health severely deteriorated as a result of months of persistent threats from Defendants, and as a result of their defamatory actions.

279.    As a result of Defendants' threats and defamatory conduct, Plaintiff developed severe anxiety, fear, and depression.

280.    Because of Wrigley's threats against Plaintiff's children, Plaintiff now suffers from persistent fear of someone forcibly removing her children from their home, attacking her children at school and forcibly moving them to a state-run institution, and assaulting her children at a state-run institution.

281.    Plaintiff started to obsessively check on her children at all times, to ensure their safety, even in environments where she would normally not have any doubts about their safety – such as in bed at night, or at school during normal school hours.

282.    Because of Wrigley's threats to cause Pinto or other criminal associates to enter Plaintiff's home against Plaintiff's will and remove things from it, Plaintiff suffers from anxiety. Plaintiff is afraid to be at home alone.

283.    As a result of Defendants' defamatory actions, and their persistent threats, Plaintiff started suffering from insomnia and nightmares, racing heartbeat, extreme fatigue, sweating, and panic attacks.

284.    Plaintiff now has difficulty concentrating.

285.    Plaintiff has been feeling sad, hopeless, and agitated.

286.    The overall quality of Plaintiff's life is severely damaged.

## Economic Damages

287.    Because Wrigley threatened to file a false police report against Plaintiff, Plaintiff was compelled to document every step she made with respect to her children, and to assemble witnesses for the eventual fight to retain her children at home.

288.    For this purpose, Plaintiff had to retain two individuals to supervise and monitor her children at all times, in addition to Plaintiff's own monitoring and the school's monitoring. Plaintiff paid more than $50,000 to those individuals, whose services would not have been needed but for the need to respond to Wrigley's threats.

289.    To obtain a Temporary Restraining Order, Plaintiff had to hire an attorney. Plaintiff represented herself in the TRO, but she had to consult an attorney for procedural guidance, to help with filing of court documents, and to help prepare for cross-examination of witnesses during the hearing. Plaintiff also had to retain other assistants to help with paralegal-type work like preparation of exhibits. Plaintiff also had to consult an attorney to respond to Defendants' and their agents' frivolous motions for sanctions.

290.    The hearing for the TRO and related matters was scheduled to take a week. For this, Plaintiff had to miss a week of work. Plaintiff had to travel from Chicago to New York and pay all associated expenses for a week of stay in New York for a scheduled four-day hearing.

291.    Plaintiff incurred other significant expenses, such as a child care for the week that she had to be in New York for a hearing.

292.    Because of Defendants' defamatory statements to Plaintiff's employer, Plaintiff suffered harm to her career and professional advancement. Plaintiff lost opportunities for professional growth and promotions. Plaintiff lost prestigious assignments at work and lost the opportunity to influence the direction of her department.

293.    Plaintiff suffered a significant harm to her work and career. Because of her persistent anxiety, Plaintiff is unable to take up new projects at work. Her job performance suffered. Plaintiff's ability to earn extra income from taking up summer jobs or consulting project is harmed.

**Damages for Physical Injury**

294.    Plaintiff suffered significant physical harm from Defendants' conduct. Within four months after the onslaught of Wrigley's assaults, threats against Plaintiff's children, and other threats, Plaintiff suffered such severe anxiety that she lost almost 60 pounds of weight.

295.    As a result of rapid changes in her body, Plaintiff developed significant back pain and shoulder pain. Plaintiff never experienced those problems in the past. These problems still continue, despite Plaintiff's effort to alleviate them. For example, as a result of this injury, Plaintiff now is unable to sit in a regular car seat for more than about 20 minutes, and needs to use numerous orthopedic devices.

296.    Because of the sudden shock and associated weight loss, Plaintiff was unable to walk and stand up normally. Plaintiff had to use a chiropractor for the first time in her life. Plaintiff continues to use a chiropractor and a physical therapist for her persistent pain.

297.    Plaintiff experiences numerous other physical effects caused by mental anguish that Defendants' misconduct triggered.

**Punitive Damage**

298.    Defendants' conduct was willful, wanton, and outrageous. Defendants acted with actual malice. Defendants sought to advance illegal purposes. For these reasons, Plaintiff should be awarded punitive damages.

**COUNT ONE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND CIVIL CONSPIRACY TO ENGAGE IN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, FOR THREATS OF PHYSICAL AND SEXUAL ASSAULT, THREATS TO FILE A FALSE POLICE REPORT, THREATS TO CAUSE REMOVAL OF PLAINTIFF'S CHILDREN FROM HOME, THREATS TO BRING FRIVOLOUS LITIGATION AGAINST PLAINTIFF AND PLAINTIFF'S FAMILY MEMBERS, THREATS TO CAUSE PLAINTIFF LOSE HER JOB AND HAVE HER CAREER RUINED, THREATS TO PLAINTIFF'S PERSONAL AND PROFESSIONAL REPUTATION, AND DEFENDANTS' ACTUAL ACTIONS TO HARM PLAINTIFF'S CAREER AND REPUTATION**

299.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

300.    Between 2014 and 2016, Wrigley and her associates have been threatening Plaintiff and Plaintiff's immediate family members, with the goal of coercing them not to testify in court and to extort millions of dollars from Plaintiff's family.

301.    Wrigley repeatedly threatened Plaintiff and Plaintiff's family that Wrigley, together with her associate Pinto and her family members, would travel to Chicago, enter Plaintiff's home, and remove assets from Plaintiff's home without Plaintiff's consent.

302.    In March 2015, one day after Plaintiff supplied documents to court personnel showing Wrigley's misconduct, Wrigley approached Plaintiff in a courthouse and threatened Plaintiff with physical and sexual assault if Plaintiff continued to provide information to the court.

303.    Plaintiff knew that Wrigley's threats of assault were not idle. Wrigley had an associate, Esaun Pinto, to whom Wrigley paid hundreds of thousands of dollars to perform various "job" for her.

304.    Wrigley's threats were intended to cause significant emotional distress in Plaintiff, and they did.

305.    Shortly after Wrigley's courthouse threats of physical assault towards Plaintiff and her husband, Wrigley and Plaintiff ran into each other at the Denver International Airport, where Wrigley then threatened Plaintiff with filing a false police report against her, and with causing Plaintiff's small children to be removed from their home and placed into a state custody.

306.    Wrigley then followed up on her threats and reiterated them to Plaintiff's husband via voicemail and text message.

307.    Wrigley's threats to file a false police report and harm Plaintiff's children were intended to cause significant emotional distress in Plaintiff, and they did.

308.    Plaintiff knew that Wrigley's threats were not idle: Wrigley was a highly experienced court personnel working with abused and neglected children. Wrigley had motive, opportunity, and training to file such report and to cause severe harm to Plaintiff's children.

309.    Plaintiff believed her children were in severe danger from Wrigley.

310.    Throughout 2014-2016, Wrigley and her associates made other threats against Plaintiff, including threats to ruin Plaintiff's career, reputation, and standing in the community, and threats to file a false police report against Plaintiff's immediate family member.

311.    When Wrigley learned that Plaintiff was not deterred by repeated threats, Wrigley, together with Kerr and Cohenson, started to implement some of the threats.

312.    Wrigley, Kerr, and Cohenson repeatedly contacted Plaintiff's employer, released sealed court information, and made numerous defamatory statements to Plaintiff's employer. These actions were deliberately calculated to cause severe emotional distress in Plaintiff, with the ultimate goal of coercing Plaintiff not to testify against Defendants.

313.    After Plaintiff obtained a TRO against Defendants, Wrigley, Dain, and Salzman threatened to continue contacting Plaintiff's employer and release defamatory information to Plaintiff's employer and other third parties.

314.    Even while restrained by the TRO, Dain and Salzman continued to threated Plaintiff with frivolous sanctions and frivolous litigation. Their goal was to cause emotional distress in Plaintiff, to prevent Plaintiff from testifying against Defendants.

315.    On information and belief, Defendants' associate, Joanne Black, provided support and encouragement to Defendants' effort to harass and threaten Plaintiff, and sought to benefit from Defendants' illegal actions.

316.    The acts and conduct of the Defendants as set forth above were extreme and outrageous. Defendant intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

317.    Defendants actions and conduct did directly and proximately cause severe emotional distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

318.    Defendants actions were undertaken with malice, willfulness, and reckless indifference to the rights of others.

319.     As a proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## COUNT TWO – CIVIL CONSPIRACY

320.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

321.     Defendants, acting in concert with each other and with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose, and lawful purpose by unlawful means.

322.     One purpose of Defendants' conspiracy was witness tampering and witness intimidation. Defendants acted together and used multiple channels to threaten and intimidate Plaintiff, and to defame Plaintiff, with an aim at coercing Plaintiff and members of Plaintiff's family not to testify in court and not to participate in legal proceedings.

323.     The second purpose of Defendants' conspiracy was extortion. They acted together to terrorize Plaintiff, and to defame Plaintiff, with an aim of forcing Plaintiff's family to transfer millions of dollars to Wrigley's and her associates' control and use.

324.     One of Defendants' unlawful means was defamation. Defendants used threats of defamation, and defamation itself, to accomplish their witness-tampering and extortion goals.

325.     Another unlawful means was intentional infliction of emotional distress. Defendants used intentional infliction of emotional distress to accomplish their witness tampering and extortion goals.

326.     Defendants Wrigley, Kerr, and Cohenson, acting in concert with other associates, repeatedly contacted Plaintiff's employer, transmitted sealed court documents, revealed information from sealed court proceedings, and made numerous defamatory statements, with the

intermediate goal of harming Plaintiff's career and reputation, and the ultimate goal of coercing Plaintiff, and other members of Plaintiff's family, not to testify against Defendants.

327.    Defendant's Cohenson and Wrigley, or their associates Dain and Salzman, provided Defendant Kerr with documents from a sealed court case.

328.    Defendant Kerr wrote and signed a letter to Plaintiff's employer that was then sent to Plaintiff's employer by Defendant Wrigley.

329.    Defendants' associates, Dain and Salzman, acting in concert with Defendants, repeatedly threatened Plaintiff and her family members with frivolous sanctions and litigation, and threatened to reveal more sealed court information to Plaintiff's employer and other parties.

330.    On information and belief, Defendants' associate Joanne Black supported and encouraged Defendants' defamatory actions and harassment, and expected to benefit from these actions.

331.    In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity.

332.    Defendants' misconduct was undertaken with malice, willfulness, and reckless indifference to the rights of others.

### COUNT THREE: DEFAMATION, AND CIVIL CONSPIRACY TO ENGAGE IN DEFAMATION, FOR MAKING FALSE AND MALICIOUS STATEMENTS TO PLAINTIFF'S EMPLOYER WITH THE INTENT TO PRESSURE PLAINTIFF NOT TO TESTIFY AGAINST DEFENDANTS

333.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

334.    Plaintiff is a private figure for the purpose of establishing defamation liability. Plaintiff is not a government employee, nor a celebrity of any sort. She is a manifestly private

figure who was simply going about living her life prior to the onslaught of Defendants' vicious attacks on her reputation.

335.    Plaintiff never voluntarily thrust herself into any particular controversies related to the matters that Defendants fabricated against her. Plaintiff did not seek to deliberately shape or influence any debates on any public issues related to the contents of Defendants' defamatory actions.

336.    As such, Plaintiff is a private figure under Illinois state law and federal First Amendment law principles.

337.    In January 2016, Wrigley, Kerr, and Cohenson began a campaign of telephone calls and letters to Plaintiff's employer and making false accusations and insinuations against Plaintiff.

338.    On January 7, 2016, Cohenson called Plaintiff's employer and falsely stated that (a) Plaintiff represented to the court that she was acting with the imprimatur of her employer; (b) that Plaintiff used the employer's official letterhead to enable her to lie to the court; and (c) that Plaintiff acted unethically during court proceedings.

339.    By stating that Plaintiff lied to the court and acted unethically in litigation, Cohenson attributed to Plaintiff conduct unfit for Plaintiff's profession as a law professor, prejudicing Plaintiff in her career.

340.    Cohenson's false accusation that Plaintiff lied to court about her employer's role in litigation also attributes to Plaintiff potentially criminal conduct.

341.    Cohenson knew her accusations to be false.  Cohenson made these statements with actual malice. At the very least, Cohenson was grossly negligent in making those statements. Cohenson's goal was to pressure Plaintiff not to testify against Defendants in ongoing legal proceedings.

342.    Cohenson's false statements to Plaintiff's employer, imputing Plaintiff's professional integrity and conduct, prejudicing her in her profession, and accusing her of criminal acts, are defamatory per se.

343.    On January 8, 2016, Wrigley filed a complaint against Plaintiff with Plaintiff's employer. Wrigley's complaint falsely represented that (a) that Plaintiff was acting unethically in court proceedings; (b) that Plaintiff lied to the court; (c) that Plaintiff falsely represented to the court that her employer was supporting her actions in litigation; (d) that Plaintiff was using her employer's official letterhead to enable her to lie to the court, and (e) that Plaintiff is therefore unfit to do her job.

344.    On or about January 11, 2016, Wrigley called Plaintiff's colleague, Mr. Dana, and told him that Plaintiff engaged in misbehavior in the course of legal proceedings; that Plaintiff is unethical and unfit to do her job.

345.    By stating that Plaintiff lied to the court and acted unethically in litigation and that she was unfit for her job, Wrigley attributed to Plaintiff conduct unfit for Plaintiff's profession as a law professor, prejudicing Plaintiff in her career.

346.    Cohenson's false accusation that Plaintiff lied to court about her employer's role in litigation also attributes to Plaintiff potentially criminal conduct.

347.    Wrigley knew her accusations were false.  Wrigley made these statements with actual malice and the goal of pressuring Plaintiff not to testify against Defendants in ongoing legal proceedings. At the very least, Wrigley was grossly negligent in making these statements.

348.    As such, Wrigley's statements to Plaintiff's employer, imputing her professional integrity and conduct, prejudicing her in her profession, and accusing her of criminal acts, are defamatory per se.

349.    On or about January 8, 2016, Kerr wrote a letter to Plaintiff's employer, which Defendant Wrigley later sent to Plaintiff's employer. Kerr wrote the letter on her official letterhead, signed it, and addressed it to Plaintiff's supervisor by name, and listed the supervisor's work address.

350.    Kerr's letter contained a long list of defamatory statements, similar to those she also made in a phone call to Plaintiff's employer. Kerr's letter stated, among other things, that: (a) Plaintiff committed a criminal offense (perjury) in one court; (b) Plaintiff lied to a different court in her description of Kerr's duties in prior litigation; (c) Plaintiff lied to the court by claiming that Plaintiff's employer supports Plaintiff in family litigation; (d) Plaintiff used employer's official letterhead to enable her to lie to the court, and (f) Plaintiff acted unethically in litigation. Kerr's letter also strongly intimated that Plaintiff committed other criminal violations, vaguely related to financial misconduct.

351.    On or about January 11, 2016, Kerr called Plaintiff's employer. Kerr told Plaintiff's employer that (a) Plaintiff lied to the court when discussing the scope of Kerr's job assignment; (b) Plaintiff committed criminal violations; (c) Plaintiff is being investigated for some sort of criminal or civil misconduct; (d) that Plaintiff lied to the court by representing that her employer supports her actions in private family litigation; (e) that Plaintiff used her employer's letterhead to enable her to lie to the court.

352.    By stating that Plaintiff lied to the court and acted unethically in litigation, Kerr attributed to Plaintiff conduct unfit for Plaintiff's profession as a law professor, prejudicing Plaintiff in her profession.

353.    Kerr's false accusation that Plaintiff lied to court also attributes to Plaintiff potentially criminal conduct.

354.     All of Kerr's accusations were false, and Kerr knew it or was grossly negligent in not knowing it. Kerr acted with actual malice when making these statements. Kerr's goal was to pressure Plaintiff not to testify against Defendants in ongoing legal proceedings.  As Kerr knew, Plaintiff was not a party to the litigation that Kerr described, or to any litigation in which Kerr participated (except for Plaintiff's own action to obtain a TRO against Kerr). There was nothing in the facts of the sealed proceedings to which Kerr was alluding that would support Kerr's view that Plaintiff committed perjury. To lend credibility to her false statements, Kerr falsely told Plaintiff's employer that she was calling in her official capacity as court personnel.

355.     Kerr's false statements to Plaintiff's employer, imputing her professional integrity and conduct, prejudicing her in her profession, and accusing her of criminal acts, are defamatory per se.

356.     On January 26, 2016, Wrigley submitted Kerr's letter to Plaintiff's employer.

357.     Wrigley knew or was grossly negligent in not knowing that the facts contained in Kerr's letter that she was submitting were false.

358.     Wrigley acted with actual malice in submitting the letter to Plaintiff's employer. Wrigley's goal was to coerce Plaintiff not to testify against Defendants in ongoing legal proceedings.

359.     As a result of Defendants' defamatory conduct, Plaintiff suffered significant mental anguish, anxiety, personal humiliation and embarrassment, loss of professional and personal reputation, loss of career advancement, and loss of standing in her professional community.

**COUNT FOUR: INTERFERENCE WITH CONTRACTUAL RELATIONS, INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, AND CIVIL CONSPIRACY TO DO BOTH, FOR DELIBERATE EFFORT TO GET PLAINTIFF FIRED FROM HER JOB OR TO HARM PLAINTIFF'S CAREER ADVANCEMENT**

360.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

361.    Before Defendants' onslaught of communications with Plaintiff's employer, Plaintiff had a valid and enforceable employment contract.

362.    Plaintiff had expectance of reasonable career advancement within her employer.

363.    Plaintiff held positions of significant prestige and responsibility within her employer.

364.    Defendants knew of the contract between Plaintiff and her employer, and knew that Plaintiff expected a reasonable pattern of promotions and career advancement.

365.    Defendants acted intentionally, maliciously, and unjustifiably with specific purpose to cause Plaintiff to be fired from her job, or, at the very least, to cause damage to Plaintiff's career and professional advancement.

366.    Defendants' actions partially succeeded. In response to Defendants' frivolous complaint, letters, threats to bring Plaintiff's employer into litigation, the stream of sealed court documents that Defendants submitted, and numerous phone calls targeting Plaintiff's colleagues, supervisors, and administrators, Plaintiff's employer initiated a formal, lengthy, and invasive investigation process.

367.    Plaintiff's supervisor officially notified Plaintiff that the process was initiated in response to Defendants' actions, and demanded specific responses from Plaintiff.

368.    As a result of Defendants' actions, Plaintiff's advancement at her job was harmed. That included the loss of compensation, promotion, to her advancement in administrative ranks,

49

to her ability to hold powerful committee positions that she has held in the past. Plaintiff suffered the loss of an opportunity to perform job-related tasks that are considered prestigious, desirable, and high-visibility, even though she has performed those tasks for many years in the past with success.

369.    Due to Defendants' intentional misconduct, Plaintiff was denied professional advancement, removed from positions of responsibility and prestige that she occupied for years, and suffered significant loss to her professional advancement and professional reputation.

### COUNT FIVE – INTRUSION UPON SECLUSION AND CIVIL CONSPIRACY TO ENGAGE IN INTRUSION UPON SECLUSION, FOR THE ILLEGAL TRANSFER OF NUMEROUS SEALED COURT DOCUMENTS TO PLAINTIFF'S EMPLOYER.

370.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

371.    Plaintiff participated in sealed legal proceedings. She had a reasonable expectation of privacy: she expected that the contents of sealed proceedings will not be made public, and surely will not be shared with Plaintiff's employer.

372.    Plaintiff wrote a letter to the judge, in her capacity as a witness in ongoing sealed legal proceedings, with an understanding that the letter is sealed, as are the rest of court documents in this case.

373.    Kerr obtained Plaintiff's sealed letter illegally. Wrigley transmitted Plaintiff's sealed letter to Kerr for no reason other than to participate in a witness-tampering scheme. Kerr, Wrigley, and Cohenson acted in concert to reveal the contents of Plaintiff's sealed letter to Plaintiff's employer in phone conversations, Kerr's letter, and Wrigley's complaint, and later to transmit Plaintiff's sealed letter to Plaintiff's employer. This constitutes intentional intrusion into Plaintiff's private affairs and concerns.

374.    The actions of Kerr, Wrigley, and Cohenson are highly offensive to a reasonable person. People have a reasonable expectation that sealed court documents remain sealed. Intentional violation of a court seal is always offensive. It harms the proper operation of the legal system, undermines citizens' faith in legal institutions, and reduces witnesses' willingness to cooperate with law enforcement and courts.

375.    This violation is particularly egregious because it is made for an illegal purpose – to engage in witness tampering, as Kerr, Wrigley, and Cohenson did.

376.    This violation is further more egregious because it was committed by experienced court personnel. Cohenson is an attorney and an officer of the court. Kerr routinely serves as a court-appointed expert (as served as one in a different proceeding in this family fight). Wrigley often serves as a court-appointed children's advocate. All three have had extensive training and court experience; they know proper conduct in litigation, and know how to deal with sealed court documents. All three deliberately chose to violate their duties to engage in witness tampering.

377.    Wrigley transmitted sealed court documents to Plaintiff's employer without court authorization or without notifying the court or Plaintiff.

378.    Defendants concealed from Plaintiff's employer the fact that the documents they were transmitting were from two sealed legal proceedings.

379.    Because Plaintiff's employer was not aware of the sealed nature of the proceeding, numerous individuals within the employer were allowed to read those documents and make various decisions on the basis of those documents affecting Plaintiff's employment and other relevant matters.

**COUNT SIX – PUBLICATION OF PRIVATE ACTS AND CIVIL CONSPIRACY TO ENGAGE IN PUBLICATION OF PRIVATE ACTS, FOR THE ILLEGAL TRANSFER OF NUMEROUS SEALED COURT DOCUMENTS TO PLAINTIFF'S EMPLOYER.**

380.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

381.    Defendants engaged in series of connected acts for an illegal goal: to prevent Plaintiff from testifying in court as a witness.

382.    To accomplish this goal, Defendants acted in concert to give publicity to private facts related to Plaintiff – the facts related to two sealed lawsuits where Plaintiff participated as a witness, and to the contents to Plaintiff's participation in those sealed lawsuits.

383.    The contents of sealed legal proceedings that Defendants publicized were private and not public facts because they were sealed.

384.    Defendants made the contents of these private proceedings public in a manner that is highly offensive to a reasonable person. This is so because (a) the violation of a court seal is always offensive to the public and threatening proper operation of our legal system, and (b) because Defendants sent these documents to Plaintiff's employer for the criminal purpose of witness tampering – they tried to coerce Plaintiff against testifying in court.

385.    The contents of Plaintiff's sealed letter to the judge, which Defendants forwarded to Plaintiff's employer, were not newsworthy and not a matter of legitimate public concern. This letter was written in Plaintiff's capacity as a witness, in sealed legal proceedings. Plaintiff discussed, among other things, the fact that she and her family members were personally victimized by Wrigley and her brother Dain. There is no public value in releasing the contents of this letter to Plaintiff's employer. Plaintiff was not even a party to those proceedings.

386.    Likewise, Kerr's letter to Plaintiff's employer discussed Plaintiff's testimony in different sealed proceedings. Plaintiff was not a party to those proceedings, and only testified as

a minor witness. Likewise, Plaintiff's testimony was not a matter of public concern as it related to an inheritance fight among her family members.

387.    Plaintiff's letter to the judge and other court documents that Defendants released to Plaintiff's employer were sealed. As such, they were not public documents, and could not have been obtained from searches of public documents.

388.    Plaintiff never consented to the release of sealed court documents to her employer.

389.    Plaintiff, or anyone else that she is aware of, never released to the public eye the contents of the documents that Defendants' submitted to her employer.

390.    Plaintiff is not a public figure, nor a celebrity, nor a politician.

391.    Defendants' disclosures of Plaintiff's letter to the court, her testimony, and other related documents, were public disclosures. They were made by several individuals (Wrigley, Kerr, Cohenson), during several separate, but coordinated, communications with several employees of Plaintiff's employer.

392.    These disclosures culminated in Wrigley's submission of a long list of sealed documents through a centralized "ethics complaint" system. Wrigley knew, and intended, for these documents to be seen by numerous employees of Plaintiff's employer. They were indeed read by numerous employees of Plaintiff's employer, from secretaries and support staff to senior administrators, attorneys, Plaintiff's immediate supervisor and his own support staff.

393.    Wrigley personally followed up with a phone call and inquired whether the disclosures received sufficiently broad publication. Wrigley demanded that employees of Plaintiff's employer report to her on the actions they were planning to take with respect to Plaintiff in connection to having received the sealed documents that Wrigley submitted.

394.     Defendants numerous contacts with Plaintiff's employer were intended to multiply the number of individuals who received access to sealed court documents, and they accomplished their goal.

395.     As a result of Defendants' actions, numerous employees of Plaintiff's employer, easily dozens, had access to sealed court documents.

396.     The only purpose of Defendants' illegal release of information was an illegal one: to coerce Plaintiff to not testify against Defendants in court.

397.     The submission of Plaintiff's communications with the judge and other related documents to Plaintiff's employer is highly offensive to a reasonable person of ordinary sensibilities. This is particularly so because this publication had only one goal – witness tampering and intimidation.

## COUNT SEVEN – STALKING AND CYBER-STALKING, AND CIVIL CONSPIRACY TO COMMIT STALKING AND CYBER-STALKING, FOR THE ILLEGAL TRANSFER OF NUMEROUS SEALED COURT DOCUMENTS TO PLAINTIFF'S EMPLOYER.

398.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

399.     Throughout 2014-2016, Defendants engaged in numerous actions seeking to intimidate Plaintiff, to prevent Plaintiff from testifying in court against them. For this purpose, they engaged in a course of conduct using electronic communication directed at Plaintiff, while knowing or should have known, that this would cause a reasonable person to fear for her safety or safety of others, and suffer emotional distress.

400.     In 2014-2015, Wrigley placed numerous phone calls to Plaintiff and her household members, threatening them, demanding numerous actions from them, and disrupting their daily routines.

401.    In prior months, Wrigley's associate, Joanne Black, also repeatedly called Plaintiff's immediate family member and made graphic threats of death and assault against Plaintiff and her family.

402.    In April 2015, Wrigley approached and confronted Plaintiff in person in a courthouse and threatened Plaintiff with physical and sexual assault.

403.    Also in April 2015, on a separate occasion, Wrigley approached and confronted Plaintiff in person at the airport and threatened to file a false police report and cause Plaintiff's small children to be removed from home.

404.    Wrigley sent several threatening electronic communications to Plaintiff's husband, directing them explicitly at Plaintiff, and intentionally placing Plaintiff in reasonable apprehension of future bodily harm directed at Plaintiff and her small children.

405.    For many months, Wrigley repeatedly used electronic communications to threaten Plaintiff that Wrigley would fly from her home in Los Angeles to Plaintiff's home near Chicago; that she and her associates would come to Plaintiff's house, and remove valuable assets from Plaintiff's house without Plaintiff's consent. This placed Plaintiff in reasonable fear of future bodily harm or restraint.

406.    Some of Wrigley's threats came as emails or texts; others as phone calls.

407.    Plaintiff repeatedly informed Wrigley that her threats to come to Plaintiff's house and remove assets from it were unwelcome. Plaintiff told Wrigley that Wrigley must stop threatening Plaintiffs with all other illegal actions.

408.    During the summer of 2014, Wrigley threatened to bring a family member with her to the Plaintiff's home. Wrigley stated that her family member would aid Wrigley with removing from Plaintiff's home certain assets worth tens of thousands of dollars, without Plaintiff's consent.

409.     In September of 2015, Wrigley threatened to bring her associate, Esaun Pinto, with her to Plaintiff's home. Wrigley stated that she and Pinto would arrive at Plaintiff's home to remove tens of thousands of dollars worth of assets from it, without Plaintiff's consent.

410.     Plaintiff's family member notified Wrigley that she must stop her threats and contacts. Wrigley ignored it.

411.     Wrigley knew that Plaintiff knew that Pinto is a dangerous man. Wrigley used the threat of bringing Pinto with her to Plaintiff's home to cause Plaintiff fear for her own safety and for the safety of her family.

412.     Wrigley's latest threat to bring Pinto to Plaintiff's house and remove assets occurred several months after Wrigley threatened Plaintiff with physical and sexual assault.

413.     As a result of relentless threats from Defendants, Plaintiff feared for her own safety and the safety of her family. Plaintiff suffered emotional distress, mental suffering, and anxiety. Plaintiff considered relocating.

414.     Defendants knew or should have known that her threats caused Plaintiff to fear for her safety, safety of her family, and caused her emotional distress.

### COUNT EIGHT – ASSAULT, FOR THREATS OF PHYSICAL AND SEXUAL ASSAULT AGAINST PLAINTIFF

415.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

416.     Shortly before Wrigley threatened Plaintiff with filing a false police report at the airport, Wrigley also explicitly threatened Plaintiff with assault at the courthouse.

417.     From months of prior interactions with Wrigley, Plaintiff knew that Wrigley was unstable and dangerous.

418.    Plaintiff knew that Wrigley's accomplice Pinto, and his accomplices had travelled to Denver in the past, at Wrigley's request.

419.    Plaintiff believed that either Pinto or his accomplices were present nearby and would assault Plaintiff.

420.    Plaintiff believed the threat of assault was imminent.

421.    Plaintiff was terrified.

422.    Wrigley's threats to Plaintiff at the airport had the same effect. Plaintiff believed that Wrigley's accomplices were nearby and would assault Plaintiff.

## COUNT NINE – RESPONDEAT SUPERIOR

423.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

424.    In committing the acts alleged in the preceding paragraphs, Defendant Cohenson was employee and agent of Raphan, and agent of Wrigley, acting at all relevant times within the scope of her employment.

425.    Defendant Raphan is liable as principal for all torts committed by his agent.

## SUMMARY OF RELIEF SOUGHT BY PLAINTIFF

426.    WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor, and against Defendants, as follows:

(1)    Awarding Plaintiff no less than $500,000.00 for presumed damages, compensatory damages, and actual damages for harm and injury to Plaintiff's reputation, for her emotional distress, to the damage to her career and professional advancement;

(2)    Awarding Plaintiff punitive damages of not less than $1,000,000.00;

(3)    Awarding Plaintiff all expenses and costs, including attorneys' fees; and

(4)    Such other and further relief as the Court deems appropriate.

A JURY TRIAL IS DEMANDED.

Dated this 6th day of January, 2017.

KATHERINE BLACK,

By: ___/s/ Michael H. Schaalman___
       One of her attorneys

Michael H. Schaalman (ARDC #02467879)*
HALLING & CAYO, S.C.
320 E. Buffalo Street, Suite 700
Milwaukee, WI 53202
Telephone:  (414) 271-3400
Facsimile:   (414) 271-3841
Email:  mhs@hallingcayo.com
*(pro hac vice and/or general bar admission request to follow)

Brad Berish (ARDC #06200891)**
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Boulevard, Suite 1050
Chicago, Illinois  60604-3701
Telephone:  (312) 435-1050
Facsimile:   (312) 435-1059
Email:  bberish@ag-ltd.com
**Designated as Local Counsel per LR83.15

COUNSEL FOR PLAINTIFF