**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KATHERINE BLACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 17-cv-00101 |
| ) | Judge Matthew F. Kennelly |
| CHERIE WRIGLEY, MELISSA ) | |
| COHENSON, BRIAN A. RAPHAN, P.C., ) | |
| and PAMELA KERR, ) | |
| ) | |
| Defendants. ) | |

**PAMELA KERR'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendants/Counter-Plaintiffs, Pamela Kerr ("Kerr") submits this Statement of Material Facts ("SMF"), as to which she contends there is no genuine issue of dispute, in support of her Motion for Summary Judgment.

| **Undisputed Material Fact** | **Reference / Citation** |
|---|---|
| **The Parties** | |
| 1. Katherine Litvak Black ("Katherine") resides and works in Illinois and is married to Bernard Black ("Bernard"). Bernard and Katherine are professors of law at Northwestern University Law School. | Dkt. 121, ¶ 29; Ex. 1 (Decl. of Kerr, ¶ 3); Ex. 2, B. Black Dep. 17:11-4. |
| 2. Cherie Wrigley ("Ms. Wrigley") resides in California and is Bernard's cousin. | Dkt. 71, ¶31; Dkt. 122, ¶31. |

254546/1

| Undisputed Material Fact | Reference / Citation |
|---|---|
| 3. Melissa Cohenson ("Ms. Cohenson") resides in New York and was an attorney for Ms. Wrigley. | Dkt.123, ¶ 59 |
| 4. Brian A. Raphan, P.C. ("Raphan") is a law firm in New York. Ms. Cohenson was employed by Raphan. | Dkt. 124, ¶ 66. |
| 5. Pamela Kerr ("Kerr") resides in Colorado where she is a Certified Public Accountant, a Certified Fraud Examiner and a Forensic Certified Public Accountant in Colorado for Kerr Forensic Accounting, P.C. | Dkt. 121, ¶ 49; Ex. 1, ¶ 2 |
| **Facts Supporting Venue and Jurisdiction** ||
| 6. The cause of action asserted arise from claims that the defendants deliberately reached out to Illinois and caused tortious injuries. While Kerr contests the underlying allegations, she does not challenge personal jurisdiction or venue in this Court. | Dkt. 71, ¶¶ 71-85 |
| 7. As to subject matter jurisdiction, the parties are all residents and citizens of different states with an amount in controversy in excess of $75,000. While Kerr contests the underlying allegations, she does not challenge subject matter jurisdiction in this Court. | Dkt. 71, ¶¶ 86-93 |
| **Background** ||
| 8. The DPC Matter involved Bernard and Joanne Black ("Joanne"). Bernard and Joanne are siblings and the only | Ex. 1, ¶¶ 3-4 |

| Undisputed Material Fact | Reference / Citation |
|---|---|
| children of Renata Black ("Renata"). At the time Renata altered her estate plan, Joanne was suffering from severe mental illness, living on the streets of Denver. | |
| 9. Renata died in May 2012. Bernard and Katherine were expecting to receive one-third of Renata's roughly $4-million-dollar estate upon her death. Before Renata died, however, she altered her estate plan and designated 95% of her assets payable on death ("POD") to her daughter Joanne, leaving Bernard, Katherine and two children entirely disinherited. | Ex. 1, ¶ 3 |
| 10. At the time Renata altered her estate plan, Joanne was suffering from severe mental illness, living on the streets of Denver. | Ex. 1, ¶ 3 |
| 11. Five months after Renata died, Bernard petitioned the DPC to appoint himself Conservator for Joanne which would permit him to manage Joanne's assets. | Ex. 1, ¶ 4.<br><br>Ex. 2, B. Black Dep. 35:24-36:8). |
| 12. After the DPC appointed him Conservator, Bernard, purportedly acting on behalf of Joanne, petitioned the DPC to "disclaim" Renata's designations that triggered the disinheritance of Bernard's family. In doing so, Bernard misrepresented to the DPC, Joanne's counsel, and Joanne's guardian ad litem in the DPC Matter, attorney Gayle Young ("Ms. Young"), the effect of the disclaimer, and thus succeeded in disclaiming more than $3 million dollars of Joanne's POD assets. This effectively caused one-third of the assets designated POD to Joanne, to instead go to Bernard and Katherine's children. | Ex. 1, ¶ 4 |
| 13. In January 2015, Ms. Young contacted Kerr about retaining Kerr to serve as a forensic accountant in the DPC Matter. The Conservator's Report raised concerns about possible misconduct by Bernard as Conservator. In her engagement | Ex. 1, ¶¶ 5, 7, 8 |

3

| Undisputed Material Fact | Reference / Citation |
|---|---|
| letter to Ms. Young, Kerr stated that she would "review the Inventory and Conservator's Reports" filed by Bernard, the Court appointed Conservator, in the DPC Matter. Neither Ms. Young nor anyone else ever asked Kerr to investigate Esaun Pinto ("Mr. Pinto"), and Kerr's engagement letter makes no mention of investigating Mr. Pinto. | |
| 14. On February 2, 2015, Ms. Young filed a motion in the DPC (the "Motion") seeking approval for Kerr to conduct a forensic accounting. In the Motion, Ms. Young focused on "irregularities with regard to the actions of the Conservator, Bernard Black," but she made no mention of Mr. Pinto. | Ex. 1, ¶ 10; Ex. 2, B. Black Dep. 57:15-21). |
| 15. Kerr was retained by Ms. Young, the guardian *ad litem* and not court appointed. | Ex.2, B. Black Dep. 55:15 – 56:18 and Dep. Ex. 6. |
| 16. Mr. Pinto provided private investigative and protective services through his company, CPI Investigations, and he provided services to Joanne. Joanne's cousin, co-defendant Cherie Wrigley ("Ms. Wrigley"), hired Mr. Pinto to assist in protecting Joanne and supervising her affairs and well-being. | Ex. 1, ¶ 9; Ex. 2, B. Black Dep. 47:9-13 |
| 17. At an April 2, 2015 status conference in the DPC Matter, the parties stipulated to Kerr's forensic review as requested in Ms. Young's Motion. During this conference, Bernard acknowledged that Kerr's forensic review was already underway and he claimed that he was getting Kerr documents "as fast as [he] can, as fast as [Kerr] ask[ed] for them." | Ex. 1, ¶ 11. |
| 18. Mr. Pinto also attended the conference by telephone, along with Joanne's counsel in New York, Ira Salzman ("Mr. Salzman"). During the conference, Judge Elizabeth Leith ("Judge Leith") addressed a collateral issue of who should be the representative | Ex. 1, ¶ 12; Ex.2, B. Black Dep. 48:2- |

4

| Undisputed Material Fact | Reference / Citation |
|---|---|
| payee for Joanne's social security payments. | 15). |
| 19. For a period from mid-2014 to early January 2015, Mr. Pinto was Joanne's representative payee for social security benefits (i.e., because of her diminished capacity, he was authorized to receive benefits on her behalf), until Bernard redirected her social security payments to himself. | Ex. 1, ¶ 9 |
| 20. Bernard and his counsel raised concerns about certain funds Mr. Pinto had received on behalf of Joanne in the past. In response to the comments of Bernard and his counsel, Mr. Pinto volunteered to provide to Kerr a full accounting.   And, on the record, Judge Leith stated that Pinto was "to provide a full accounting."   However, at no time during the conference did Judge Leith order or "authorize" Kerr to "investigate" Mr. Pinto. | Ex.1, ¶¶ 12-14 |
| 21. Following the status conference, the Court entered an order which stated, in part: "The parties have stipulated to a forensic accounting of the Conservatorship estate . . . in short, a complete review of all funds and assets related to Joanne Black both before and after the disclaimer, by Pamela Kerr, CPA." In one of the fourteen paragraphs of the Status Order, Judge Leith stated: "Mr. Pinto shall provide a complete accounting with documentation of all funds that were held under his control to Ms. Kerr…"   Nowhere in the Status Order did Judge Leith order Kerr to "investigate" Mr. Pinto. | Ex.1, ¶ 15;<br><br>Ex. 3, K. Black Dep. 102:9-105:5). |
| 22. Mr. Pinto sent Kerr an accounting describing his involvement with Joanne's accounts at Chase and Wells Fargo, and Bernard sent Kerr invoices from CPI Investigations, Mr. Pinto's company. | Ex. 1, ¶ 16 |
| 23. On June 2, 2015, Kerr issued a report in which she found that in his dual roles as Conservator for Joanne and Executor of | Ex. 1, ¶¶ 17, 19 |

5

| Undisputed Material Fact | Reference / Citation |
|---|---|
| Renata's estate, Bernard disclaimed funds that were initially payable on death to Joanne, transferred them to Renata's estate and then distributed a portion of the funds to his children. | |
| 24. On September 28, 2015, based in part on the conduct outlined in Kerr's report, Judge Leith found Bernard had breached his fiduciary duty to Joanne and ordered him removed as Conservator. In addition, Judge Leith found Bernard guilty of civil theft and surcharged him $1,511,356.00. | Ex.1, ¶ 20 |
| 25. While the DPC Matter was pending, litigation ensued in other courts around the country, including a proceeding in New York where Bernard and Ms. Wrigley each petitioned to become Joanne's guardian (the "NY Guardianship"). | Ex. 1, ¶ 21; Ex. 2, B. Black Dep. 31:14-22 |
| 26. On January 7, 2016, Katherine emailed a letter ("Katherine's Letter") addressed to the Honorable Thomas P. Aliotta of the Supreme Court, Richmond County, who was presiding over the NY Guardianship. | Ex. 1, ¶ 21 |
| 27. Katherine's Letter was twenty pages long and drafted on what appeared to Kerr to be NULS letterhead. ████████ | Ex. 1, ¶ 23; Ex. 3, K. Black Decl. 97:4-24 |
| 28. Kerr learned of the Katherine's Letter on January 7, 2016 when Ms. Cohenson forwarded a copy she had received from Bernard's lawyer in the NY Guardianship. | Ex. 1, ¶ 22 |

6

| Undisputed Material Fact | Reference / Citation |
|---|---|
| 29. Because the letter was seemingly drafted on NULS letterhead, Kerr believed the school had become involved in the matter and supported ███████████████████████████████████ | Ex.1, ¶ 24 |
| 30. On January 8, 2016, Ms. Wrigley submitted a complaint to EthicsPoint, a site where people can confidentially submit ethics complaints and inquiries to Northwestern University, including NULS. | Ex. 4, Winters Dep. 18:11-24; 43:1-8; and Ex. 5 thereto – NW000273-275; Ex. 3, K. Black Dep. 121:6-124:9). |
| 31. In her complaint, Ms. Wrigley claimed that Bernard and Katherine misused letterhead for a personal civil matter. | Ex. 4, Winters Dep. 43:23 – 44:4 |
| 32. Ms. Wrigley claimed that Katherine used her status at NULS and her affiliation with the university for leverage in a personal civil matter. | Ex. 4, Winters Dep. 44:5-9 |
| 33. NULS agreed that the use of letterhead in this fashion implied that Bernard and Katherine were involved in the matters in their official capacity at NULS rather than in a personal capacity. | Ex. 4, Winters Dep. 72:3-7; Ex. 5, Rodriguez Dep. Vol. II, 16:23-17:21 |
| 34. On January 8, 2016, Kerr drafted a letter (the "Kerr Draft") to the Dean of NULS, Daniel Rodriguez ("Mr. Rodriguez"). Kerr | Ex. 1, ¶ 25 |

| Undisputed Material Fact | Reference / Citation |
|---|---|
| did not submit the Kerr Draft to Mr. Rodriguez or anyone else at NULS. | |
| 35. The only statements in the Kerr Draft that remain at issue in this case are Kerr's challenge to the accuracy of one statement in Katherine's Letter, namely:<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.″<br><br>"Not only is this a 100% false statement, but in fact, the Colorado court authorized me to conduct an investigation into the actions of her husband, another professor at Northwestern Law School, Bernard Black." | Ex. 1, ¶ 25; Dkt. 120, p. 26 |
| 36. While the Kerr Draft bears an electronic facsimile of Kerr's signature, the template Kerr uses to type letters has her electronic signature already input. | Ex. 1, ¶ 25 |
| 37. Katherine acknowledged that accusing someone of making a false statement does not accuse them of scienter. | Ex. 3, K. Black Dep. 115:15-17; 117:5-8. |
| 38. On January 8, Kerr sought advice of her counsel and also emailed a copy of the Kerr Draft to Ms. DiPonio, Ms. Young, Ms. Wrigley, Ms. Cohenson, Mr. Dain, and Mr. Salzman, all of whom were involved in the Black family litigation on behalf of Joanne Black. | Ex. 1, ¶ 25 |
| 39. As to the DPC Matter, Ms. DiPonio is Joanne's counsel, Ms. Young, is an attorney and Joanne's guardian *ad litem* and Mr. Dain is an attorney and trustee. As to the NY Guardianship, Ms. Wrigley is a party, Ms. Cohenson is Ms. Wrigley's attorney and Mr. Salzman is Joanne's attorney (collectively, the "Black | Ex. 1, ¶¶ 4, 9, 12, 22, 23, |

8

| Undisputed Material Fact | Reference / Citation |
|---|---|
| Family Litigation Group"). | |
| 40. On January 19, 2016, on advice of counsel, Kerr decided not to send the Kerr Draft to NULS or anywhere. | Ex. 1, ¶ 28 |
| 41. On January 23, 2016, without Kerr's knowledge or consent, ███████████████████████████████████████. | Ex. 1, ¶ 29<br><br>Ex. 4, Winters Dep, 18:11-24 |
| 42. On January 8, 2016, Kerr called NULS to speak with Mr. Rodriguez. Mr. Rodriguez was unavailable, but Kerr spoke briefly to an administrative assistant. She said she would follow up with a letter to the Dean. | Ex. 1, ¶ 26 |
| 43. On January 8, 2016, she emailed Ms. DiPonio and Ms. Young and copied Mr. Dain, Ms. Wrigley, Mr. Salzman and Ms. Cohenson to summarize her brief call to NULS. | Ex. 1, ¶ 26 |
| 44. On January 13, 2016, Kerr received a call from Rita Winters, an Associate Dean at NULS ("Ms. Winters). | Ex. 1, ¶ 27;<br><br>Ex. 4, Winters Dep, 16:22-17:3 |
| 45. Kerr told Ms. Winters that Kerr was considering sending a letter to Mr. Rodriguez. At no time during this call did Kerr accuse Ms. Litvak Black of lying to a court. | Ex. 1, ¶ 27 |
| 46. Ms. Winters recalled little of the conversation other than Kerr stating she wanted to provide a document to NULS and that Ms. | Ex. 4, Winters Dep. 52:18- |

9

| Undisputed Material Fact | Reference / Citation |
|---|---|
| Winters believed Kerr was calling in good faith. | 54:9 |
| 47. Ms. Winters had no recollection of Kerr ever telling her that Katherine lied to the court or used her employer's letterhead to enable her to lie to the court. Ms. Winters informed Katherine about the conversation Ms. Winters had with Kerr, but Ms. Winters could not recall what she told Katherine. Ms. Winters did not recall sharing with others at Northwestern information about her call with Kerr, nor was she aware whether Kerr had conversations with others at Northwestern. | Ex.4 ,Winters Dep. 125:1-14,15-21; 129:3-5; 130:2-5 |
| 48. Katherine had no personal knowledge of what was said during the call between Kerr and Ms. Winters. | Ex. 3, K. Black Dep. 81:14-82:21 |
| 49. Following the call, Ms. Kerr and Ms. Winters traded brief, thank-you emails, neither of which accused Katherine of anything. Ms. Kerr affirmed in her email that she was waiting to hear back from her lawyer about the Kerr Draft. | Ex. 1, ¶ 27; Ex. 4, Winters Dep. 55:1 - 56:19; Ex. 7 thereto; Ex. 6, Kerr Dep. Ex. 27; KERR0001669-170 |
| 50. After January 23, 2016, Kerr received a call from Marcia Isaacson ("Ms. Isaacson"), who was head of compliance for Northwestern University. Ms. Isaacson asked Kerr if she had submitted the Kerr Draft to NULS. Kerr told her that on advice of her lawyer, Kerr did not. | Ex. 1, ¶ 29; Ex. 4, Winters Dep. 19:24-20:9 |
| 51. On February 5, 2016, Mr. Rodriguez emailed Bernard and Katherine to admonish them about the use of university letterhead for personal matters. | Ex. 4, Winters Dep. 97:10-24, Ex. 14  Ex.5, Rodriguez Dep. 203:19 – 204-17; Ex. 3, K. Black Dep. |

| Undisputed Material Fact | Reference / Citation |
|---|---|
| | 90:21-92:1. |
| 52. Other than this admonition, NULS took no other action against Katherine. | Ex. 4, Winters Dep. 146:17-147:16; Ex. 5, Rodriguez Dep. 204:12-17. |
| 53. On March 2, 2016, Ms. Isaacson sent a letter to Judge Leith and Judge Aliotta clarifying that although Bernard and Katherine used University letterhead, the University took no position with regard to the merits of the issues that have been raised. | Ex. 4, Winters Dep. 139:5-18, Ex. 18 |
| 54. Ms. Isaacson attached the Kerr Draft to her letter to the judges. | Ex. 1, ¶ 30; Ex. 4, Winters Dep. 139:5-18; Ex. 18 thereto |
| 55. Kerr ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | Ex. 1, ¶ 30 |
| 56. Later, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | Ex. 1, ¶ 30 |
| 57. At no time did Kerr publish the Kerr Draft to Mr. Rodriguez, NULS, EthicsPoint or anyone at Northwestern University. | Ex. 1, ¶ 30 |
| 58. Katherine had no evidence that Kerr, Ms. Wrigley or Ms. Cohenson communicated about sending an order of September 28, 2015 to NULS. | Ex.3, K. Black Dep. 145:3-145:12 |

11

| Undisputed Material Fact | Reference / Citation |
|---|---|
| 59. Bernard testified that the defendants' so-called "campaign" intensified in 2016. | Ex. 2, B. Black Dep. 88:12-24; 99:17-100:5 |
| 60. Katherine assumed based on court filing and how Mr. Dain, Mr. Salzman and Mr. Pinto presented themselves that they must be working together. | Ex. 3, K. Black Dep. 361:21-363:7 |
| 61. Katherine was unaware whether Kerr and Ms. Cohenson communicated by phone, email or in person. | Ex. 3, K. Black Dep. 363:17-366:1 |
| 62. Katherine asserted several times in Katherine's Letter that Mr. Pinto was a "convicted felon" but acknowledged that she may have "mistakenly" concluded that Pinto was a felon. | Ex. 3, K. Black Dep. 322:20-328:10 |
| 63. Katherine has no affirmative evidence that someone considered Kerr's communications and took negative action against Katherine. | Ex. 3, K. Black Dep. 129:19-23). |
| 64. In her deposition, Katherine was unable to point to any specific examples of how Kerr was aware of her role or substantially assisted her co-defendants. | Ex. 4, K. Black Dep. 145:3-145:12; 361:21-363:7; 363:17-366:1) |

Dated: March 18, 2019

Respectfully submitted,

By: /s/ Steven P. Mandell

Steven P. Mandell (ARDC No. 6183729)
Steven L. Baron (ARDC No. 6200868)
Natalie A. Harris (ARDC No. 6272361)
Mandell Menkes LLC
1 North Franklin Street, Suite 3600
Chicago, IL 60606
Phone: (312) 251-1000

E-mail:
smandell@mandellmenkes.com
sbaron@mandellmenkes.com
nharris@mandellmenkes.com

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that a copy of the foregoing document has been served on March 18, 2019 via the Court's CM/ECF system on all counsel of record who have consented to electronic service.

<u>/s/ Steven P. Mandell</u>