**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **KATHERINE BLACK**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 17- cv- 00101 |
| | ) | |
| | ) | Honorable Matthew F. Kennelly |
| **CHERIE WRIGLEY,** | ) | |
| **MELISSA COHENSON,** | ) | |
| **BRIAN A. RAPHAN, P.C.,** and | ) | |
| **PAMELA KERR,** | ) | |
| | ) | |
| Defendants. | ) | |

<u>**PLAINTIFF KATHERINE BLACK'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

I.    DEFENDANTS COMMITTED DEFAMATION *PER SE* WITH THEIR REPEATED
      DEFAMATORY ATTACKS ON KATHERINE........................................................... 3

   A.  Defendants Conspire to Attack Katherine at Her Place of Employment ......................... 4

   B.  Wrigley's Defamatory Complaints ................................................................... 9

   C.  Kerr's Statements Are Not Substantially True Under Any Reasonable Reading of the
       Colorado Hearing Transcript and Subsequent Order ....................................... 10

   D.  Defendants Bombarded Northwestern with Complaints about Katherine...................... 14

   E.  Kerr's "Draft" Was not A Draft ..................................................................... 16

   F.  Kerr's Statements Are Not Reasonably Capable of an Innocent Construction ............. 18

   G.  Attorney Cohenson Cannot Hide From Her Defamatory Outreach to Northwestern..... 22

   H.  Additional Defamation:  Kerr's Call with Dean Winters .............................................. 25

II.   THE EVIDENCE SUPPORTS THAT WRIGLEY COMMITTED INTENTIONAL
      INFLICTION OF EMOTIONAL DISTRESS ................................................................. 26

   A.  Wrigley Misstates the Record in Order to Deny Her Extreme and Outrageous Behavior .
       ................................................................................................................... 27

   B.  The Evidence Supports Katherine's Claims that Wrigley Caused Katherine to Suffer
       Severe Emotional Distress .............................................................................. 32

   C.  Wrigley Misrepresents Katherine's Economic Damages and Testimony about Her
       Efforts to Protect Her Children From Wrigley ............................................... 37

III.  AIDING & ABETTING DEFAMATION AND FALSE LIGHT ..................................... 38

   A.  Kerr's Knowledge and Substantial Assistance; Developing the Scheme and Providing
       the Pretext for Attacking Katherine at Northwestern..................................... 39

   B.  Cohenson's Knowledge and Substantial Assistance; Providing Sealed Court Documents
       and Counseling Wrigley on Contacting Northwestern ................................... 40

   C.  Defendant Wrigley's Knowledge and Substantial Assistance; Submitted Kerr Letter to
       Northwestern................................................................................................... 42

IV. DEFENDANTS ACTED AS CIVIL CO-CONSPIRATORS IN ASSISTING THE UNDERLYING DEFAMATION OF KATHERINE .......................................................... 43

V.  DEFENDANTS' PRIVILEGE ARGUMENTS REMAIN UNAVAILING ...................... 47

VI. FALSE LIGHT ................................................................................................................. 47

CONCLUSION............................................................................................................................. 47

TABLE OF AUTHORITIES

**Cases**

*Abdullahi* v. *Time Warner Cable, Inc.,*
    2014 U.S. Dist. LEXIS 92146, (D. Me. 2014)................................................................. 20

*Adcock v. Brakegate, Ltd.,*
    164 Ill. 2d 54, 645 N.E.2d 888 (1994) ........................................................................... 45

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)....................................................... 2

*Becker v. Tenenbaum-Hill Associates, Inc.,*
    914 F. 2d 107 (7th Cir. 1990) ...................................................................................... 2

*Bristow v. Drake St. Inc.,*
    41 F.3d 345 (7th Cir. 1994) ...................................................................................... 34

*Bryson v. News America Publications, Inc.,*
    174 Ill.2d 77, 220 Ill.Dec.195, 672 N.E. 2d 1207 (1996)........................................... 3, 21

*Cheatham v. City of Chicago,*
    No. 16 C 3015, 2018 WL 2096373, 2018 U.S. Dist. LEXIS 76440 (N.D. Ill. May 7,
    2018) ........................................................................................................................ 34

*Costello* v. *Capital Cities Communications,* Inc.,
    125 Ill. 2d 402 (1989) ............................................................................................... 19

*Gooch v. Maryland Mechanical Systems, Inc.,*
    81 Md. App. 376, 567 A. 2d 954 (1990)........................................................................ 21

*Green v. Rogers,*
    234 Ill. 2d 478, 917 N.E. 2d 450 (2009) ................................................................. 18, 19

*Hefferman v. Bass,*
    467 F.3d 596 (7th Cir. 2006) ...................................................................................... 39

*Layne v. Builders Plumbing Supply Co.,*
    210 Ill. App. 3d 966, 569 N.E.2d 1104 (1991) .................................................................. 9

*Lott v. Levitt,*
    556 f. 3d 564, 568 (7th Cir. 2009) ............................................................................... 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574, 106 S. Ct. 1348, 89 L.Ed.538 (1986)........................................................ 2

*McClure v. Owens Corning Fiberglas Corp.,*
    188 Ill. 2d 102, 720 N.E.2d 242 (1999) ........................................................................ 43

*McGrath v. Fahey,*
    126 Ill. 2d 78, 533 N.E.2d 806 (1988) ............................................................ 29

*Mittelman v. Witous,*
    135 Ill. 2d 220, 552 N. E. 2d 973 (1989) ........................................................ 19

*Naeem v. McKesson Drug Co.,*
    444 F.3d 593 (7th Cir. 2006) ......................................................................... 34

*Parker v. House O'Lite Corp.,*
    324 Ill. App 3d 1014, 1019, 258 Ill. Dec. 304, 756 N.E. 2d 286 (2001) ........................... 2

*Partipilo v. Jewel Food Stores, Inc.,*
    No. 16 C 4450, 2017 WL 1511461, 2017 US Dist LEXIS 63739 (N.D. Ill. Apr. 27,
    2017), *reconsideration denied in part,* No. 16 C 4450, 2017 WL 5989776 (N.D. Ill. Dec.
    4, 2017) ......................................................................................................... 28

*Patrick v. City of Chicago,*
    213 F. Supp. 3d 1033 (N.D. Ill. 2016) .......................................................... 44

*Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc.,*
    No. 05 C 1137, 2006 WL 2699416, at *13 (N.D. Ill. Sept. 19, 2006).............................. 35

*Stokes v. Bd. of Educ. of the City of Chicago,*
    599 F.3d 617 (7th Cir. 2010) ......................................................................... 32

*United States v. Ruiz,*
    249 F. 3d 643 (7th Cir. 2001) ...................................................................... 9

**<u>Rules</u>**

Fed. R. Evid. 803 ................................................................................................ 9

## INTRODUCTION

Defendants Cherie Wrigley ("Wrigley"), Melissa Cohenson ("Cohenson") and her employer Brian A. Raphan, P.C., (collectively "Cohenson"), and Pamela Kerr ("Kerr") (collectively "Defendants") seek to avoid trial by invoking semantics and arguing that the actual words selected to attack Katherine Black ("Katherine") professionally and the actual distressful words Wrigley used to target her and her children don't really matter. To the contrary, Illinois law confirms that ***WORDS MATTER***. Moreover, ***CONTEXT IS CRUCIAL***. One example, with many others to come below: Kerr defamed Katherine at her non-party employer Northwestern School of Law ("NULS") by stating in a letter approved by all Defendants and submitted to Northwestern that Katherine made a "100% false statement"- in effect, lied - to a New York court. This assertion, reiterated three times in a 2 page letter (once "100% false," twice "completely false"), is irreconcilable short of trial with Kerr a few days later, writing to that same court, saying only that Katherine's statement was merely ██████████████████████████████ ██████████ Thus, to the court, Kerr no longer asserted that Katherine had written anything directly false at all! Ex. 62, Kerr letter to J. Aliotta (Jan. 13, 2016).[1] Too late.

Other past or pending actions in Colorado and New York are material here for the limited factual purpose of the express language of certain orders and transcripts that bear on Defendants' actions here.[2] The Kerr Memorandum of Law (MOL), adopted for defamation and false light by all Defendants, begins with eight references to Bernard Black ("Bernard"), and a single reference

---

[1] All references to exhibits in this Memorandum are to the exhibits to the Homyk Declaration. Each exhibit is briefly described in Plaintiff's Statement of Additional Facts.

[2] The current status of the Colorado judgment: there is a pending petition for certiorari to the Colorado Supreme Court. Case 2018SA193.

to Katherine. While the animus of Defendants toward Bernard lit the fuse, the shots taken at KATHERINE are the ONLY matters at issue before this Court.

Outrageous and distressful 2015 Wrigley threats, aimed at Katherine and her children, demonstrated the animus that grew into defamatory vengeance after Katherine opposed Wrigley's quest to become guardian for Bernard's disabled sister Joanne by writing a January 2016 letter to the New York Supreme Court, which was handling the guardianship proceeding. All Defendants joined in a defamatory attack on Katherine at NULS intended to intimidate her into allowing Wrigley to have her way and to make Katherine "pay professionally" for opposing Wrigley. Why attack Katherine professionally at Northwestern when Defendants had ready recourse – which they also used – in the guardianship proceedings? Wrigley's misguided tunnel vision targeting Katherine manifested itself in 2015 and, as the factual timeline below establishes, culminated in the concerted professional attack on Katherine by all Defendants in early 2016.

Katherine is required to, and has, set forth specific facts showing there is a genuine issue for trial as to each Defendant, sufficient so that "a reasonable jury could return a verdict [in her favor] as the nonmoving party." *Becker v. Tenenbaum-Hill Associates, Inc.,* 914 F. 2d 107, 110 (7th Cir. 1990); *Anderson v. Liberty Lobby, Inc.,* 477 U.S 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). Katherine does not have to prove her case at this stage but "must present some factual basis arguably entitling her to judgment." *Parker v. House O'Lite Corp.,* 324 Ill. App 3d 1014, 1019, 258 Ill. Dec. 304, 756 N.E. 2d 286 (2001). Katherine must "do more than simply show that there is some metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith* Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.538 (1986). She does so, providing below specific facts that would allow a reasonable jury to find in her favor, after drawing

all reasonable inferences in the light most favorable to Katherine, with decisions on weight of evidence and credibility left to the jury.

## ARGUMENT

## I. DEFENDANTS COMMITTED DEFAMATION *PER SE* WITH THEIR REPEATED DEFAMATORY ATTACKS ON KATHERINE

This Court concisely framed the defamation *per se* portion of this dispute at page 26 of its December 8, 2017 Order on Motions to Dismiss, in pertinent part:

> [T]he remaining [actionable] statements are defendants' respective alleged accusations that Katherine lied in her letter to the judge in the New York case by making certain misrepresentations about the Colorado proceedings. As discussed above, those alleged statements are not mere expressions of opinion, and they cannot be conclusively labeled as substantially true. They also contain sufficient detail (at least in the context of the parties' dispute) to allow the Court to assess their defamatory content. And… lying to a court does fall into the category of "prejudice to one's profession" in Katherine's case. Unlike allegations of financial misconduct, allegations that a law professor lied to a court "could lead to unemployment in a profession whose role includes training future attorneys on proper conduct in court proceedings. Those allegations thus support actionable claims for defamation *per se* and false light.

Katherine is not required to prove actual damage to her reputation to recover damages for the reason that "statements that fall within these actionable *per se* categories are thought to be so obviously and materially harmful to the plaintiff that injury to her reputation may be presumed." *Bryson v. News America Publications, Inc.*, 174 Ill.2d 77, 87, 220 Ill.Dec.195, 672 N.E. 2d 1207 (1996). *Bryson* also confirms that Illinois courts recognize that "it is often extremely difficult, if not impossible, to present evidence to support an award of compensatory damages based on the actual harm sustained" and have therefore included damages for mental suffering, personal humiliation, impairment of professional reputation and standing in the community and economic loss among presumed damages.

### A.  Defendants Conspire to Attack Katherine at Her Place of Employment

Defendants have intentionally ignored the contextual details of the timeline here. Katherine's January 7, 2016 letter (Ex. 2) was forwarded to presiding New York Supreme Court Justice Aliotta by Bernard's NY counsel in the guardianship proceeding.  Cohenson received a copy as Wrigley's counsel of record in that action. Ex. 6, Cohenson Jan. Aff. ¶ 17.  Cohenson in turn –in undisputed derogation of the Sealing Order in place for all submissions in the guardianship case, Ex. 48, Sealing Order (sealing "the entire contents of the file of this proceeding and record"), forwarded Katherine's letter to nonparties Kerr, Gayle Young (Joanne's Colorado guardian-ad-litem) and Lisa Diponio (Joanne's Colorado court-appointed counsel) (Ex, 28, Defendants' Jan. 7 Emails¶ ). Cohenson MOL, pp. 10-11. Cohenson is mistaken in stating that "Plaintiff cannot show that Cohenson provided Kerr with any sealed documents" and that "Plaintiff cannot provide any evidence that any documents were sealed." *Id*.  Cohenson's own email sending Katherine's sealed letter to Kerr disproves the first claim, and the sealing order disproves the second.

Kerr <u>had not even read </u>of Katherine's letter when she encouraged "someone" to retaliate by contacting Katherine's employer. Cohenson, as Wrigley's counsel, jumped on that suggestion and placed a telephone call to NULS that very day, speaking first with a Dean's assistant who answered telephones, and then with Special Assistant to the Dean and Director of Special Projects, attorney Katherine Schulte. Ex. 28A-D, Defendants' Jan. 8 Emails.  This grossly exceeded professional bounds:  there was zero legitimate professional rationale for family law lawyer Cohenson to telephone Katherine's employer for any reason.  Building on the impetus from Cohenson's call, hostile reaction to Katherine's letter escalated rapidly, as evidenced in the January 7 email string including Cohenson, Wrigley, Kerr, Diponio and Young, with Young stating ██████ ██████████████████████████ Wrigley exclaiming ████████████ and then advising the group that ██████████████████████████████████████████████ Ex. 28A, Defendants'

Jan. 7 Emails.  By 3:29 p.m., Kerr was commenting ████████████████████████

████████████████ still without having read the letter, since she wrote the next day that ███████

████████████████████████████ Ex. 28B, Defendants' Jan. 8 Emails.

Hostile intent and actions leading to defamation poured over into an early morning January

8 email from DiPonio to Cohenson, Wrigley and Kerr, stating that ████████████████████

████████████████████████████████████████████████████████████████

████████████ Ex. 28C, Defendants' Jan. 8 Emails. Make no mistake. Rather than rejecting

the tone and plain meaning of that remark, or declining to act on it, Kerr, Wrigley and Cohenson

had each already contacted Katherine's with her employer consistent with making Katherine ███

████████

 Rapid fire recital of other January 8 actions alone- sandwiched  around finalization of the

Kerr letter – demonstrates a blizzard of joint planning and activity that demands full contextual

presentation to a jury as to the defamatory statements ultimately published:

(1) by 9:03 a.m., Wrigley was reaching out to Kerr under the email subject of "***Info for

letter to dean & Investigational opening to ETHICS DEPT***" already congratulating her on an

██████████████ Ex. 28C, Defendants' Jan. 8 Emails;

(2) Wrigley submitted a complaint to the Northwestern University Ethics Point complaint

system, asserting, as the ostensible basis for her complaint, that Katherine's letter was

impermissibly written on NULS letterhead, yet uploaded to the complaint system Katherine's

entire sealed letter, a sealed transcript from that guardianship proceeding in disregard of the

Sealing Order, ex. 48, along with a Colorado court order, neither of which was pertinent to the

professed "letterhead" use;[3]

---

[3] Justice Aliotta had no difficulty understanding that the letterhead issue was ██████████████████████

(3) Wrigley telephoned the Dean of the Kellogg School of Management regarding Katherine, even though Katherine had no connection with Kellogg;[4]

(4) Wrigley telephoned former Associate Law School Dean and current Professor David Dana, leaving a voicemail stating that she was calling to inform Northwestern that Katherine had acted illegally and unethically in court, that Katherine had just submitted a letter to the court in which she lied, that "there is a lot more to this story," and left her number and asked for a return call, a voicemail Katherine personally observed as transcribed into an email message on Professor Dana's phone screen. Ex. 1, Katherine Decl. ¶ 86;

(5) before 9:25 a.m., Kerr telephoned the NULS Dean's Office, initially speaking with Administrative Assistant to the Dean Aileen Reid, who promptly recorded that conversation in an email string involving three NULS employees as follows:

> We received a call from Pam Kerr a Forensic Accountant in Denver. She is upset because she is mentioned in the letter on NU Letterhead sent to a judge in NY. She also mentioned that the context in which she was mentioned was a ***lie***."

Ex. 35, Aileen Reid email (Jan. 8, 2016) (emphasis added);

(6) Kerr followed up at 9:25 a.m. with a group email, "***RE: Info for letter to dean,***" confirming the call and her conversation with Aileen Reid, and stating in pertinent part:



Ex. 8, NY guardianship transcript, Mar. 21, 2016, at 112, 114. Janet Bice, who received both Wrigley's 2016 complaint against Katherine and her 2015 complaint about Bernard's use of letterhead, similarly concluded with regard to the 2015 complaint, "To me, it seems like the reporter is just trying to make trouble for him with his employer." EX, 61, Email from Janet Bice to Marcia Isaacson (Jan. 8, 2016). The true purpose for Wrigley's complaint is, at best, a jury question.

[4] Ex. 28C, Defendants' Jan. 8 Emails.

████████████████████████████████████████████████ Ex.
28C.

(7) by 12:51 p.m. the same day, Kerr emailed Wrigley with an expanded subject line, ***"Info for letter to dean & Investigational opening to ETHICS DEPT"*** and stated ████████
████████████████████████████ Ex. 28C. Kerr then sent a separate message with the same subject line, this time copying Cohenson, Wrigley's brother Anthony Dain, and others, to ████████████████████████████████████ Ex. 28D, Defendants' Jan. 8 Emails.[5]

(8) In short, *Kerr prepared her own letter containing the disputed defamatory content, specifically directed to NULS Dean Daniel Rodriguez, on letterhead, signed off on it, indicated that Katherine's letter to the NY court sent in a sealed proceeding was attached, and forwarded it to multiple* people.  Ex. 29, Kerr Letter.

(9) *Kerr's letter aggressively declares "her duty to inform" Katherine's employer of a "100% false statement" made by Katherine and also prominently repeats the words "completely false statement" twice more in a two-page letter, all directed at a single, isolated sentence on page 17 of Katherine's letter to the New York court, discussing one aspect of Kerr's professional forensic accounting services in the Colorado matter*;

(10) *separate and distinctly apart from the repeated, categorical "false statement" and "100% false" attacks, Kerr's letter to Katherine's employer states her "opinion," but also her "unequivocal" view that " I have never, in my entire professional career, listened to a less credible testimony than [Katherine's]"*; and so

---

[5] Cohenson SOF ¶ 72 states that Wrigley never told her that the Kerr letter was provided to Wrigley. Wrigley did not need to tell Cohenson this because Cohenson and Wrigley received the same Kerr email, on Jan. 8, 2016, containing the Kerr letter.

(11) by the end of January 8, Kerr had written a signed, complete letter, sent a group email alerting Wrigley, Cohenson, and others that "here is my letter that I plan to send to Northwestern...[a]ny thoughts?"; Wrigley gleefully repeated her earlier remark by reiterating █ █████████████████████ and then asked Kerr, with Cohenson copied,



Ex. 28D, Defendants' Jan. 8 Emails.

Two packed days of actions and planning aimed at punishing Katherine through the avenue of her employer were now firmly in place. To put the day in full factual context, it ended with Cohenson expressing zero reservations about Kerr sending the attacking letter directly to Katherine's employer as a follow up to her call the day before, and with Wrigley wholeheartedly endorsing Kerr sending her letter to Katherine's employer. Indeed, Cohenson and Wrigley both believed Kerr had *in fact* sent her completed, signed letter to Dean Rodriguez. As Cohenson stated in an affidavit filed with the New York court on January 11, 2016, the very next business day:

Ex. 6 Cohenson Jan. Aff.; ¶ 19 (emphasis added).[6]

And as Wrigley wrote when she uploaded Kerr's letter to the Northwestern Ethics Point system, "I have just uploaded another letter/complaint that was sent to your school regarding this matter." Ex. 25, Wrigley 2016 Ethics Point Complaint, entry for Jan. 23, 2016.

---

[6] Cohenson SOF ¶ 71 incorrectly states that Cohenson learned, on January 11, 2016, that Wrigley uploaded the letter, but Wrigley in fact uploaded the letter on Jan. 23. Cohenson in fact testified that she learned that Wrigley uploaded Kerr's letter "after" January 11. *See* Plaintiff's response to Cohenson SOF 71.

One highly revealing communication of the day was Kerr's call to NULS. In speaking with Assistant to the Dean Aileen Reid, Kerr "mentioned that the context in which she was mentioned [in Katherine's letter] was a lie." Ex. 35.[7]

Kerr, with enthusiastic support from Wrigley and Cohenson, had succeeded in selecting one largely vanilla fact relating to her professional engagement in Colorado and turned it into defamatory payback. THIS DEFAMATORY STATEMENT, REITERATED THREE TIMES, is sufficient to establish defamation *per se*. In its Order on Motions to Dismiss at 16, this Court highlighted the sentence in Katherine's Amended Complaint ¶ 214 that supports an inference that Kerr provided the letter to Wrigley with the knowledge that she would send it to Northwestern. [citing *Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966, 975, 569 N.E.2d 1104, 1110 (1991)]:

> ("Kerr did not explain how her signed, formal letter, addressed to the employer and demanding employer's actions, happened to land in Plaintiff's employers hands if Kerr never sent it."). That allegation is sufficient to satisfy the publication element for defamation claims against Kerr based on statements contained in the letter.

### B. Wrigley's Defamatory Complaints

Wrigley submitted the Kerr Letter to Northwestern, but that was not Wrigley's only contribution to the defamatory attacks on Katherine at Northwestern. On January 8, the same day that Defendants were exchanging information on contacting Northwestern, Wrigley created an Ethics Point complaint against Katherine. The first document that Wrigley submitted to

---

[7] This email is admissible as a present sense impression of Reid's conversation with Kerr. "[An] out-of-court statement that is not excludable as hearsay . . . if the statement describe[es] or explain[s] an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." *United States* v. *Ruiz*, 249 F. 3d 643, 646 (7th Cir. 2001); Fed. R. Evid. 803, and was "without calculated narration." *Ruiz*, at 646-47. There was no "calculated narration" here; Reid is merely informing her co-worker of the call. Reid personally took the call and promptly sent her email.

Northwestern was Katherine's Letter with the description "Professor from your school using your letterhead to slander people and fight a personal case." Ex. 25.

Wrigley emphasizes that her complaint about "slander" didn't use the word "lie." *See* Order on Motions to Dismiss at 26; Wrigley MOL, p. 9. True, but besides the point; accusing Katherine of slander is still defamatory. Wrigley argues that it was substantially true that Katherine's letter slandered people, while ignoring that Katherine's letter was (i) protected, because submitted to court; and (ii) sealed. Defendants, not Katherine, circulated Katherine's letter outside the sealed New York proceeding. Thus, Katherine's letter cannot be slanderous even *if* it were not truthful. Wrigley has no legitimate argument that accusing Katherine of slander was substantially true.

### C. Kerr's Statements Are Not Substantially True Under Any Reasonable Reading of the Colorado Hearing Transcript and Subsequent Order

This Court succinctly identified the crux of the "substantial truth" defense asserted by Defendants, in Order on Motions to Dismiss at 18-19:

> Defendants maintain that their alleged statements accusing Katherine of lying to the court are also substantially true. Kerr contends that Katherine inaccurately told the judge in the New York state court that the Colorado court had authorized investigation of Pinto's conduct. According to Kerr, no such authorization exists. Katherine, however, points to the Colorado court's order that "Pinto shall provide a complete accounting with documentation of all funds that were held under his control to Ms. Kerr…." Order of April 2, 2015, In re the Interest of: Joanne Black, Case No. 12 PR 1772 (Denver Probate Court)…Katherine maintains that that order authorized Kerr to investigate Pinto. Because, at this stage, a reasonable jury could find that the substantial truth of Kerr's statement that Katherine lied has not been established, the alleged statement is actionable."

The Court was correct then and should reject that defense again. The substantial truth defense asserted, that the "gist" or "sting" of Kerr's statements are true, does not hold up. At the Colorado April 2, 2015 status conference, Ex. 20, at 29-30 establishes that:

> Bernard's counsel, Carl Glatstein: "There were a variety of concerns with respect to what was happening with [Joanne Black's] Social Security; that's part of what we think an evidentiary hearing would be good for the court to know. Funds were being withdrawn from her account by Pinto not for her benefit that we could discern

10

and he would not account to the conservator for those funds." [The Court interjected]: "Right. I know there was a big dispute about that." [Glatstein continued:] "And [forensic accountant] Ms. Kerr will be provided all that information so she can also from a forensic accounting perspective see where everything went, what the concerns and issues were. Funds were being withdrawn from Joanne's personal account by Mr. Pinto when she's on a locked psych unit. And no accountability on that to anybody. We would be very concerned about Mr. Pinto being put back into a position as a rep payee; there needs to be accountability on that as well as everything else for Joanne's benefit." …

Mr. Salzman: Mr. Pinto has just advised me that he will provide a full accounting of all the funds that he withdrew to Ms. Kerr.  The Court: OK…

The discussion returned to Mr. Pinto at transcript page 42:

The Court: At this point I am satisfied that I don't think Mr. Pinto should become— be rep payee. There's too many issues surrounding whatever expenses – he's got to provide a full accounting…

And at transcript page 50:

The Court: … Mr. Pinto will provide a full accounting of funds under his control to Ms. Kerr and cooperate with the transferring the representative payee.

The Denver court also wrote, in its post-hearing order, as quoted in Katherine's letter, that "Mr. Pinto shall provide a **complete accounting with documentation** of all funds that held under his control to Ms. Kerr."  Ex. 21, Status Conference Order, at 21 ¶ 8.  The trier of fact should determine whether Kerr was "authorized" to examine Pinto's dealings with Joanne Black's money.

The post-status-conference order also contained broad overall instructions for Kerr's forensic review process, which covered *all* funds and assets related to Joanne, including those which Pinto controlled and withdrew funds from.  Ex. 21, Status Conference Order, at 1:

The parties have stipulated to the forensic accounting of the Conservatorship estate, including the affected trusts, the disclaimer of Fidelity and Vanguard accounts, POD benefits for all accounts which disclaimers were used to transfer funds into the Renata Black Estate, the Roth IRA, all amounts paid to attorneys and accounts – in short, a complete review of all funds and assets related to Joanne Black both before and after the disclaimer, by Pamela Kerr, CPA.

This case is a virtual polar opposite to the context-based ruling in *Gist*, where a lack of technical accuracy in every detail did not negate substantial truth. Kerr categorically stated and

emphasized that the sentence which Kerr extracted from Katherine's letter excerpt was false in every detail. It wasn't. It was instead simply true – or at least a jury could so find. Defendants "gist" argument fails on any plain reading of the status conference transcript, together with the corresponding court order. The Court instructed Pinto to provide a "complete accounting with documentation" to Kerr as part of Kerr's broad, overall forensic "review" of all funds and assets related to Joanne Black and the entire Conservatorship estate, including the roles of both Bernard and Pinto. Kerr was to review and yes -– investigate -– both of them, in her court-authorized forensic accounting role. Katherine's letter never said Kerr's role did not include Bernard; it said only that Kerr's job included Pinto. Kerr was cannot persuasively argue that she was authorized to "investigate" Bernard, but had lesser authority – what that might be, she has never specified -- as to Pinto. This is another instance of Defendants' wordplay regarding Kerr's the defamatory statements. NOWHERE in the Colorado transcript or Court order does the Court define the scope of Kerr's "forensic accounting" and "complete review" differently for Black than for Pinto.

Kerr's asserted "substantial truth" defense here is that for Kerr to call Katherine's statement "100%" and "completely" false, fails because Katherine's statement was substantially true. The status conference transcript and order provide powerful evidence that Katherine's statement was true, and Kerr's attack on it was false, ample for a reasonable jury to so find.

The transcript, the order, and the ACTUAL WORK undertaken that Kerr as to Pinto confirm otherwise. The most compelling evidence of that investigatory work undertaken by Kerr as to Pinto (and his company CPI Investigations) is memorialized in her May 18, 2015 email to Wrigley and Bernard, Ex. 59, Subject: *CPI Investigations invoices, payments, etc.,* and begins by stating that "I am sending this schedule and information to both of you because between the two of you, I need better documentation [regarding Esaun]." That detailed email, was supported by a

detailed spreadsheet that Kerr prepared and attached to the email detailing her findings. Ex. 60, Kerr spreadsheet re Pinto (May 18, 2015). This email deserves a careful reading in its entirety to appreciate its importance in the context of this case. Kerr exhaustively questions past, present and future aspects of the Joanne Black/Pinto relationship, including:

> (1) overpayments; (2) duplicate payments; (3) flat fee monthly payment charges that Kerr "would absolutely dispute"; (4) fact specific questions regarding invoice charges exceeding $250,000.00 during an 18-month period in 2013-2014; (5) the basis for Pinto charging a "flat rate" of "$5,000.00 **a week**" to watch Joanne ?"; (6) Kerr's statement that "I will be asking [Joanne's GAL and/or lawyer] to request documentation from the hospital and Joanne's doctors regarding Esaun's involvement in Joanne's life"; and (7) her request for invoices because she did not have "any invoices from November 2014 on, and question, "Is he not doing anything with Joanne anymore?

Kerr states in her email that "I would absolutely dispute some of [Pinto's] charges" and concludes the email by stating that in her report to the Denver court, "I will be listing a receivable from Esaun Pinto for $41,470.50 at a minimum." After those substantial, apparently unfinished efforts, how can Kerr take the position that this was anything less than an attempted forensic investigation of Pinto? How can she assert that it was "100% false" for Katherine to say that Kerr was authorized to investigate Pinto? She can't, at least not without material dispute.

It is hard to imagine a reasonable reading of this email, and the extensive work that went into it and into Kerr's spreadsheet, as anything other than a forensic accountant engaging in a professional examination of Pinto's conduct. Whether one calls this a "forensic accounting" and "complete review," as the court did, or an investigation (as Katherine did for Pinto, and Kerr did for Bernard) is wordplay, not substance. In combination, (1) the status conference discussion, shown in the transcript; (2) the subsequent court order; and (3) the specific investigatory tasks Kerr actually performed are consistent with Katherine's statement of what Kerr was authorized to do – **and did**. Katherine's letter stated the truth- that "the Colorado Judge Found those Allegations Credible Enough to Authorize an Investigation of Pinto's Conduct by a Forensic Accountant."

Katherine's statement was surely, or at the very least arguably, **not** "100% false" or "completely false." In short, the accusations in the Kerr letter cannot be substantially true.

Kerr was so desperate to avoid these clear statements that she sought to get the Denver court to rewrite history, in a petition she filed even after this Court called her effort "bizarre":[8]

> You're now talking about a procedure under which a judge is going to come back three-and-a-half years after the fact and say, this is what I meant. That's bizarre. That's really bizarre.

Kerr, however, persisted in seeking to revise history. She filed an ex parte motion, seeking to get the Denver court to "explain" its 2015 order in a manner more to Kerr's liking. The Denver court declined to do so, writing that:

> The Court finds that its April 2, 2015 Order as well as the record in this case speak for themselves and are the best evidence regarding the meaning and scope of the Court's April 2, 2015 Order. Indeed, the fact that Ms. Kerr states that she wants this Court to only "confirm" its order and not clarify or amend it demonstrates that the Order speaks for itself. . . . The Court finds that confirming or clarifying a prior Order for the purpose of assisting a party with litigation in another court would be improper… [T]he April 2, 2015 Order issued over three years ago and no party has ever argued that the Order was unclear; nor did any party seek reconsideration or clarification of that Order. The Court finds that Ms. Kerr has admitted the Court's April 2, 2015 Order is clear Ex. 64, Denver court order, (Jan. 7, 2019) (citation and footnote omitted).

### D. Defendants Bombarded Northwestern with Complaints about Katherine

By indiscriminately involving NULS personnel from the Law School Dean level, to the administrative assistant level and levels in in between in the form of telephone calls, the defamatory letter and Ethics Point inquiry, Defendants literally immersed the Northwestern Law School community, central Northwestern University staff, and even the Kellogg School of Management in making Katherine pay professionally. The known list of Northwestern employees involved in Northwestern's response to the barrage of complaints totaled at least thirteen, including

---

[8] Ex. 65, Transcript of conference before this Court (Sept. 13, 2018), at 18-19.

Dean Rodriguez, Marcia Isaacson, Janet Bice, Katherine Schulte, Associate Dean Rita Winters, Professor and former Associate Dean David Dana, Aileen Reid in the dean's office, someone in the Kellogg School of Management, four other users with access to Wrigley's Ethics Point Complaint,[9] and additional persons in Northwestern's office of legal counsel, whom Dean Rodriguez and Dean Winters consulted.[10] Already armed with knowledge that Wrigley had initiated an online complaint with Northwestern that same day, Kerr unhesitatingly provided Wrigley with additional ammunition. On January 23, Wrigley used that ammunition, uploading Kerr's letter to the Northwestern complaint system, with nothing in the record indicating that Kerr had not already sent the letter (as Cohenson and Wrigley believed), or intended to limit its use.

The campaign to harm Katherine's professional reputation continued full steam ahead in the coming days, with Kerr speaking with Dean Winters on January 13. Kerr asserts without support that she was advised by counsel not to send the letter to Dean Rodriguez, but Wrigley uploaded Kerr's letter to Northwestern Ethics Point system, believing Kerr had already sent the letter, and (as discussed below) reasonably believing Kerr had authorized her to do so. Neither Cohenson nor Wrigley can contest their belief that the final, signed Kerr letter went out as planned, and NOT by an innocent mistake in the wrong document, as Wrigley claimed in her deposition and asserts as a material "fact." Wrigley SOF ¶ 41. Wrigley's January 23, 2016 Ethics Point post, where she uploaded Kerr's letter, confirms that this was no mistake.[11] Wrigley wrote, "I have just

---

[9] Additional persons with access to the Ethics Point complaint were Dana Bradley, Melanie Earle, Pamela Beemer, and Stephanie Griffin. Ex. 26, Wrigley 2016 Ethics Point Complaint.

[10] Dean Winters consulted Northwestern's counsel concerning whether she should sign an affidavit about her telephone call with Kerr. Ex. 38, Winters Memo. Persons involved include, at a minimum, Stephanie Graham. See Ex. 66, Email from Dean Winters to Ms. Graham (Feb. 2, 2016).

[11] Wrigley's asserted mistake in uploading Kerr's letter is a jury issue. She can, seek to persuade a jury that the upload was a mistake, despite her plain words explaining it. But if Wrigley did not mean to upload Kerr's letter, whose letter did she mean to upload?

uploaded **another** letter/complaint that was sent to your school regarding this matter." (emphasis added). Ex. 25, Wrigley 2016 Ethics Point Complaint. And Cohenson stated in a January 11, 2016 affidavit that Kerr's letter had been "filed" (past tense) with Dean Rodriguez. Ex. 6, Cohenson Jan. Aff., ¶ 19.

The reasonable inference that Kerr provided the letter to Wrigley with the understanding that it would be published to Northwestern should be tested before a trier of fact. After circulating her complete, signed letter to Wrigley, Cohenson, and others, expressly identifying it as █████████ ████████████████████████████████████████████████████████████████ Kerr provided **no** caution or stop sign to Wrigley to prevent or dissuade her from uploading Kerr's letter into the Northwestern Ethics Point system, directed at further harming Katherine. To the contrary, a reasonable jury could infer that, in context, Kerr provided her letter to Wrigley and others with a green light to use it against Katherine at Northwestern.

### E. Kerr's "Draft" Was not A Draft

Kerr seeks to label her letter as a "draft" in her MOL. Attaching that conclusory label post-litigation and restating it many times cannot change the undisputable fact that Kerr circulated a final letter, signed and on letterhead, and did so in response to Wrigley's email asking for █████ ████████████████████████████████████████ as part of Wrigley's complaint on Northwestern's Ethics Point System. Ex. 28D, Defendants' Jan. 8 Emails. As noted above, Cohenson and Wrigley believed the letter as final and assumed Kerr had sent it to Dean Rodriguez. If, as Kerr asserts with no support beyond her own say so, Kerr thought this was a draft, with a computer-generated signature, it was incumbent on this seasoned forensic accounting professional not to circulate it on signed letterhead paper, to avoid the natural inference, which Cohenson and Wrigley drew, that it was final. To claim she circulated a draft, without taking any other

precautions when sending a signed letter on letterhead, defies common sense and customary professional practice.

The record is silent as to ANY communications WHATSOEVER to partners Wrigley and Cohenson, saying they should not use the letter. On the contrary, Kerr sent the letter ███████████ ██████████████████████████████████████████████████████████ This conveys consent that Wrigley could use it. Kerr now asserts that she was sufficiently concerned about the contents of the letter to seek legal advice, and counsel advised her against publication, yet she took no steps to prevent publication, not then or even after Northwestern's Compliance Officer, Marcia Isaacson, called Kerr to inquire about the letter. Ex. 41, Isaacson letter.

Why did Kerr abjectly fail to guard against publication given the strong attack on Katherine in the letter, Wrigley's request for supporting documents, and the volatile circumstances? Why, once Kerr learned in March 2016, that Wrigley had published the letter to Northwestern, did Kerr take no steps to retract the letter? Did she recklessly disregard the letter's content, or did she simply not care if her defamatory letter was published beyond those she initially sent it to? This is for a jury to decide. Her supposed "surprise and upset" upon learning in March that Wrigley had published her letter to Northwestern, requires trial to properly assess. A jury can take into account the circumstances under which Kerr provided the letter to Wrigley, and Kerr's taking no steps to withdraw the letter, not even after she was directly asked to withdraw it in the New York guardianship hearing and Justice Aliotta also asked Wrigley if she would withdraw her complaint but Wrigley refused. Ex. 9, NY guardianship transcript (Mar. 22, 2016), at 375-377 (request from Bernard to Kerr to withdraw the letter; request from J. Aliotta to withdraw Wrigley's complaint; Wrigley's refusal).

**F.  Kerr's Statements Are Not Reasonably Capable of an Innocent Construction**

A jury could infer that Kerr intended, and indeed delighted in, the harm to Katherine that her letter, and the campaign against Katherine, which Kerr had instigated, had caused.  As Kerr wrote to Cohenson, with copy to Wrigley, Dain and others on March 12, with apparent glee:



Ex. 63, Kerr email (Mar. 12, 2016).

This Court previously ruled, in Order on Motions to Dismiss at 26, that:

> It appears that the only remaining statements are defendants' respective alleged accusations that Katherine lied in her letter to the judge in the New York case by making certain misrepresentations about the Colorado proceedings. As discussed above, those alleged statements are not mere expressions of opinion, and they cannot be conclusively labeled as substantially true. They also contain sufficient detail (at least in the context of the parties' dispute) to allow the court to assess their defamatory content. And although the alleged accusations of perjury are inadequate to place the alleged statements in the commission-of-a-crime category, lying to a court does fall into the category of "prejudice to one's profession in Katherine's case. Unlike allegations of financial misconduct, allegations that a law professor lied to a court "could lead to unemployment "in a profession whose role includes training future attorneys on proper conduct in court proceedings. Those statements thus support actionable claims for defamation *per se* and false light.

Kerr now argues that her thrice-repeated "100% false" and "completely false" statements" can be read under Illinois defamation law as suggesting an innocent or mistaken, but not intentionally false statement.  Kerr MOL, pp. 11-12.  This is plainly belied by reading the repeated defamatory statements in context. Reviewing Kerr's forceful and attention-grabbing words in full context, no wordplay argument can persuasively attach an innocent construction or substantial truth to the carefully thought out and specific word usage. *See Green v. Rogers*, 234 Ill. 2d 478, 334 Ill. Dec. 624, 917 N.E. 2d 450 (2009). Katherine agrees with the general proposition that "courts must draw from the context of the statement and give words their 'natural and obvious meaning.'" *Lott v. Levitt*, 556 f. 3d 564, 568 (7th Cir. 2009).  But Defendants' reliance on various

18

cases applying this general rule to wildly divergent factual circumstances provides little guidance to this Court.

The Illinois Supreme Court explicitly recognized this deficiency in *Mittelman v. Witous*, 135 Ill. 2d 220, 552 N. E. 2d 973 (1989). The *Mittelman* Court began by acknowledging its previous decision in *Costello* v. *Capital Cities Communications*, Inc., 125 Ill. 2d 402, 416 (1989). *Costello* flatly rejected the reasoning that criticism of an individual's conduct in only a particular instance was nonactionable. The *Mittelman* Court then held that "[o]bviously, a charge that someone lied to his constituency or mishandled an important case could have devastating consequences for the person so maligned…[t]o say that such a charge does not reflect adversely upon that person's character or ability is to ignore reality." *Mittelman* at 248. After considering the context in which the statement there was made, and the context in which statements of fact are made, the *Mittelman* Court found that there was no innocent, nondefamatory construction existed for the alleged statement. *Id*. The Court offered cautionary guidance that is particularly suitable to the precise defamatory words that Kerr deliberately used here:

> We decline, as did the appellate court…[Defendant's] invitation to consider prior decisions for purposes of factual comparison… Given the **diverse circumstances to be found in each case**, the time spent in such an analysis would be substantial and the benefit to be derived meager. Id.

Sage advice from our Illinois Supreme Court. Defamatory content must be determined in context.

Here, Kerr made multiple, apparently defamatory statements. A jury should decide, in context, whether those statements met the defamation per se standard of "(3) words that impute a person . . . lacks integrity . . . or (4) . . . "prejudices a person in his or her profession." Order on Motions to Dismiss at 10 (quoting *Green v. Rogers*, 234 Ill.2d 478, 491-92, 917 N.E.2d 450, 459 (2009)). Kerr believed her words accomplished exactly this, and that Katherine would be ████



██████" Ex. 63, Kerr email (Mar. 12, 2016). So did Gayle Young, who wrote to Wrigley, Kerr, Cohenson and others, referring to Kerr's letter, that:

Ex. 50, Young email (Mar. 12, 2016) (emphasis added).

Northwestern also understood Kerr's letter as attacking Katherine's credibility and integrity. As Northwestern's Marcia Isaacson wrote to the New York and Colorado courts, "[Kerr's] letter . . . continued on to attack [Katherine's] credibility." Ex. 41, Isaacson Letter (Mar. 2, 2016). A reasonable jury could find that Kerr intended her words to have the effect that she, Young, and Northwestern believed they had. Her intent is, at a minimum, a disputed factual issue.

The rationale for judicial wariness to rule on the meaning of words, outside context, is supported by Defendants' efforts to twist the facts of very different Maine and Maryland state court cases to appear similar to this case. In *Abdullahi* v. *Time Warner Cable, Inc.,* 2014 U.S. Dist. LEXIS 92146, (D. Me. 2014), where the claimed slanderous statement was that Plaintiff employee "had not mailed out the equipment and that his [Plaintiff's] email was thus false," that court resorted to dictionary definitions to find nothing actionable on the pleadings :

> Stripped of any additional explanatory or contextual information, the statement can be reasonably understood by people of ordinary intelligence to mean that [plaintiff's] email was either <u>untrue or intentionally untrue</u>. See Merriam-Webster's Collegiate Dictionary, 11th ed., at 451 (defining "false" as including "1: not genuine…2a: intentionally untrue…2b: adjusted or made so as meaning to deceive…3: not true[.]" ); Black's Law Dictionary, 7th ed. (defining "false" as meaning "1. Untrue…2. Deceitful; lying….") While the latter meaning could give rise to a slanderous statement if the statement if the statement is proven false, the former does not." (emphasis added).

Here, by contrast, a reasonable jury could find, from Kerr's letter as a whole, that the natural interpretation of Kerr's multiple claims of "100% false" and "completely false" statements is that Kerr sought to cast Katherine as deliberately lying to the New York court. As this excerpt makes

clear, one core meaning of "false" is "intentionally untrue." Another is "deceitful." A third is "lying." It should be for the jury to assess, in context, whether those are the right meanings to apply to Kerr's statements.

Similarly, the Maryland court in *Gooch v. Maryland Mechanical Systems, Inc.*, 81 Md. App. 376, 567 A. 2d 954 (1990), analyzed a vastly different content from that here. The *Gooch* court found a statement that "[w]e are of the opinion that you were the victim of false information" was reasonably capable of innocent construction. While "false" is one of the words at issue both there and here, any similarity for precedential purposes ends there. This Court would have reached the same result as in *Gooch*, perhaps on different grounds, because it has found that a statement of opinion, even if strongly phrased (as Kerr did in saying that "I can tell you unequivocally that I have never, in my entire professional career, listed to a less credible testimony than Ms. Litvak's)." Opinion Motions to Dismiss at 17-18. But as this Court also found, Kerr's actionable statements are not expressions of opinion. The *Mittleman* Court would surely consider *Gooch* a classic example of "diverse circumstances" unworthy of attention, and this Court should as well.

Also instructive is *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 93, 220 Ill. Dec.195, 672 N. E. 2d 1207 (1996), holding that "[w]hen a defamatory meaning was clearly intended and conveyed, this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibelous under the innocent construction rule." The natural construction of Kerr's letter is that Kerr consciously said Katherine's statement was "100% false" and "completely false" three times in a short letter, because she wanted to remove any doubt that Katherine's statement was knowingly false.

This Court has determined that additional pejorative statements contained in the Kerr letter are nonactionable statements of opinion, including:

"As a matter of fact, Ms. Litvak testified at these [Colorado] hearings' and I can tell you unequivocally that I have never, in my entire professional career, listened to a less credible testimony than Ms. Litvak's. However, that is a personal opinion but is relevant given Ms. Litvak's allegations in the attached letter."

Although not separately actionable, Kerr's strongly worded "opinion," can support a jury interpreting her "100% false" and "completely false" assertions as defamatory.

A further aspect of context: Kerr lifted a single sentence from Katherine's letter out of context, and misquoted even that sentence. Katherine provided to the court the actual testimony at the Denver hearing, plus the court's own statement of what Kerr was to do. Katherine then summarized her understanding of what the Denver court had ordered. In context, Katherine's summary sentence cannot be 100% false. Ex. 2, Katherine Letter, at 17. A jury could find that Kerr took this sentence out of context for the purpose of attacking Katherine's credibility.

An innocent construction defense is also unavailable for Kerr's statement to Aileen Reid concerning Katherine's "lies", and Wrigley's assertion of "slander."

### G. Attorney Cohenson Cannot Hide From Her Defamatory Outreach to Northwestern

As Cohenson stated in an affirmation she filed on Jan. 11, 2016, with the New York court to which Katherine wrote her letter:



---

[12] This accusation appears to refer to Katherine's Letter, which Cohenson's affidavit asserts in ¶ 20 (quoted below) that Bernard wrote.



As Cohenson described her call to Ms. Schulte others as part of their email exchange:



Ex. 28B, Defendants' Jan. 8 Emails.  Cohenson provided further details on what she said to Ms.

Schulte in a March 2016 affirmation filed with the New York court:



Ex. 49, Cohenson March Aff. & Reply.  The "behavior" that Cohenson refers to in ¶¶ 15-16

appears, based on ¶ 14, to be ███████████████████████████████████████

███████████████████████████

Cohenson asserts that the sole "purpose of [her] call was to inquire about Northwestern's

policy regarding the use of school letterhead."  Cohenson MOL, p. 2.  This contradicts Cohenson's

affidavit to the New York court, where she explained that her goal was to ██████████████

██████████████████████████).  Ex. 49, Cohenson March Aff. & Reply, ¶ 14

23

(quoted in full above). To the extent that the call concerned use of letterhead, a reasonable jury could find, as did the New York Court, that this was a pretext for the call's true purpose, was to attack and intimidate Katherine. As the New York Court stated, ████████████████ ████████████████████████████████████████ for the Northwestern attack. Ex. 8, NY guardianship transcript, Mar. 21, 2016, at 114.

A reasonable jury could find, from all the facts and circumstances, including Cohenson's report to her co-defendants that Northwestern was now ████████████████ ███████████ activity, that Cohenson did not merely "inquire" about Northwestern policies, but instead threatened Northwestern with litigation. *See* Ex. 28B, Defendants' Jan. 8 Emails; *see also* Ex. 34 (Dean Rodriguez email (Jan. 20, 2016) ████████████████████████ █████████████████████████████████████████████████ ███████

Precisely what Cohenson said to Katherine Schulte is not known. But a jury could reasonably conclude from what *is known*, including Cohenson's description of her call in her affidavits (quoted above), that Cohenson made defamatory statements. We know from Cohenson's affidavit that in her view, Katherine's letter ████████████████████ ████████████████████████████ Ex. 3, Cohenson Jan. Affidavit ¶ 16 (attributing the statements in Katherine's letter to Bernard). Cohenson believed Kerr's letter was sent to Northwestern, and that it ████████████████████████████████████ █████████████████████████ *Id*. ¶ 19. Cohenson, in her call to Ms. Schulte, put Northwestern "on notice," presumably about potential litigation against Northwestern. Ex. 28B, Defendants' Jan. 8 Emails. Cohenson, in her call, sought to defend Wrigley against a ███████ █████████████████████████████████████████████ Ex. 49,

Cohenson March Aff. & Reply ¶ 14. And we know that Kerr told the Northwestern Dean's office that Katherine had ██████████████ Ex. 35, Aileen Reid Email (Jan. 8, 2016), and the defamatory content of Kerr's letter. A reasonable jury could find that, given the close coordination among Defendants for their calls and the content of these calls, that Cohenson made statements similar to Kerr and Wrigley, and thus defamed Katherine.

### H. Additional Defamation: Kerr's Call with Dean Winters

Kerr Letter provides a specific embodiment of her defamatory statements. However, Kerr made other defamatory statements as well. As noted above, she told Aileen Reid in the Dean's office that Katherine "lie[d]" in her letter to the New York court. Ex. 35. Kerr also made defamatory statements to Associate Law School Dean Rita Winters, similar to those in her letter. For this call, Kerr denies that "she accused Katherine of making any false statement to a judge", and asserts that "there is no evidence to contradict Kerr's account of what she told Winters." Kerr MOL, pp. 10, 14.

This is incorrect. That evidence exists. After this call, Dean Winters reported to Katherine what Kerr had said, Katherine took notes, and summarized the Kerr-Winters conversation in a draft affidavit she provided soon thereafter for Dean Winters to sign. Ex. 37, Winters Draft Aff. Dean Winters confirmed to Katherine the substance of the affidavit, but said she (Winters) needed to speak with counsel first, and ultimately did not sign the affidavit. Ex. 1, Katherine Decl. ¶¶ 71-74. But the draft was contemporaneously prepared and is credible; Katherine would not have asked Winters to sign an affidavit that did not reflect what Winters said.[13] It says, in part:

---

[13] A further indication of credibility is the close consistency between the affidavit and Kerr's letter, whose contents Katherine did not then know. Katherine obtained Kerr's letter only in March 2016, when Northwestern's Chief Compliance Officer, Marcia Isaacson, wrote to Justice Aliotta and attached Kerr's letter. Ex. 41, Isaacson Letter.

3. [Kerr] introduced herself as Pamela Kerr, a forensic accountant who was appointed by the court as an expert. . . .

5. Ms. Kerr told me that Katherine Litvak, who is a Professor of Law at Northwestern Law School, sent a letter to a judge, and that her letter contained numerous false statements.

6. Ms. Kerr told me that she wanted to submit her own letter to Northwestern University discussing Ms. Litvak's letter to the court . . . [which] would demonstrate that Ms. Litvak's statements to the court were false.

10. Ms. Kerr told me that she wrote an official report for the court, and submitted it as a part of her job as a court-appointed expert . . . . [and] that she wanted to send this report to me. . . .

14. In sum, in the course of the conversation, Ms. Kerr told me that Ms. Litvak had submitted a letter containing multiple false statements, and offered to send me: (a) Ms. Litvak's letter to the court; (b) Ms. Kerr's letter disputing statements in Ms. Litvak's letter, and (c) Ms. Kerr's official report that she submitted to the court in her capacity as a court-appointed expert and forensic accountant. . . .

Kerr thus told Dean Winters that Katherine had made "numerous false statements" to a court, and that Kerr had written both a letter and "an official report for the court" detailing those false statements (a clear lie, no such report about Katherine exists). Even if Kerr's statements to Dean Winters were not specific enough to be defamation *per se* by themselves, they confirm that Kerr was attacking Katherine's professional credibility and standing at Northwestern.

## II.     THE EVIDENCE SUPPORTS THAT WRIGLEY COMMITTED INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Wrigley, in support of her motion for summary judgment, ignores core facts supporting liability for Intentional Infliction of Emotional Distress ("IIED"), and misstates and mischaracterizes the facts she discusses. There is ample evidence from which a jury could find that Wrigley's threats against Katherine meet the IIED standard of "extreme and outrageous" conduct, that this conduct was intentional, and that it caused "severe emotional distress." *See* Order on Motions to Dismiss at 27 (stating elements of IIED claim). Fundamentally, nothing has changed since this court found that Katherine's IIED allegations were sufficient to survive

Wrigley's motion to dismiss. Instead, discovery has confirmed that substantial evidence supports Katherine's allegations.

### A. Wrigley Misstates the Record in Order to Deny Her Extreme and Outrageous Behavior

Wrigley denies Katherine's allegation that on April 2, 2015, after a contentious court hearing, Wrigley threatened to file a false complaint with child protective services, and have Katherine's small children removed from her home. Wrigley also denies threatening earlier that day to arrange an involuntary sex change operation for Katherine. Wrigley's denials are not "undisputed facts." Her denials can create triable issues of fact, but cannot support summary judgment.

The threats that Wrigley cannot deny, she treats as isolated incidents, even stating that her "statements were isolated." Wrigley MOL, p. 1. Multiple threats or, as Wrigley calls them, "statements," are not isolated, but instead form a pattern of threatening behavior. That pattern, coupled with Wrigley retaliating against Katherine with her attacks on Katherine at Northwestern, does meet the IIED standard, even if some of the individual threats, if taken alone, would not. As this court found, "the duration of Wrigley's alleged conduct and her attempts to add credibility to her objectively deplorable threats" creates a jury issue on whether her threats and actions, taken together, were extreme and outrageous. Order on Motions to Dismiss at 28. Wrigley's conclusion that her specific threats, treated in isolation, are not actionable is incorrect, but also irrelevant.

Wrigley further treats the Wrigley-Kerr-Cohenson attack on Katherine's integrity at Northwestern as unrelated to IIED. It is highly relevant, as a cumulative cause of Katherine's distress and evidence that Wrigley was willing to carry through on her threats to retaliate if Katherine opposed Wrigley's quest to become Joanne's guardian.

### *(1) Wrigley Threatened Physical Violence against Katherine*

To argue that she did not behave in an extreme and outrageous way towards Katherine, Wrigley misstates the record and credits her own testimony as established facts. Katherine testified that Wrigley threated violence against her, saying to Katherine "you continue [to provide evidence or testify], it will be bad for you, you need a sex change operation, I will arrange one for you, you like it or not." Katherine dep. 243:5-7. This is a targeted statement of what Wrigley will cause to be done to Katherine. To argue that this was not a threat, Defendant misstates the facts in *Partipilo v. Jewel Food Stores, Inc.*, No. 16 C 4450, 2017 WL 1511461, at *2, 2017 US Dist LEXIS 63739 (N.D. Ill. Apr. 27, 2017), *reconsideration denied in part,* No. 16 C 4450, 2017 WL 5989776 (N.D. Ill. Dec. 4, 2017). In *Partipilo*, the plaintiff alleged that a co-worker said "that she wanted to stick the banana up [the plaintiff]'s "hole," " which the court termed "bawdy talk." *Id*. at *6. However, "want" is not a statement of intent to act. "I will arrange [a sex change operation] for you" is a statement of intent to act and tells Katherine what type of violence to expect, to heighten Katherine's fear. Moreover, as Defendant notes, the *Partipilo* court stated that the "banana" comment could be a threat, but would be "an isolated threat that cannot support a claim for [IIED]." *Id*. at *4. Wrigley's threat of violence against Katherine was not a single isolated incident, but was one of a series of threats against Katherine and her children, backed up by actions, including Wrigley's attack on Katherine at Northwestern.

Wrigley denies this threat, and offers instead the unsupported claim that she instead complimented Katherine on her boots, specifically, "[Dr.] Marten[s] brand boots."[14] Wrigley MOL, p. 2. *Id*. Whether Wrigley or Katherine is more credible is a jury question.

---

[14] Katherine wore dress shoes to the court hearing and does not own Dr. Martens boots. Ex. 1, Katherine Decl. ¶¶ 47-48.

### (2) Wrigley Denies Threatening Katherine and Her Children, and Mischaracterizes the Evidence on this Threat

Katherine's Complaint stated that when she and Wrigley ran into each other at an airport, Wrigley threatened to file a false report with the police and with child protective services against Katherine and cause her children to be taken away. *E.g.*, Am. Compl. ¶ 42, 305:

> Wrigley threatened to contact an Illinois agency responsible with child welfare, submit a false report to them, and cause them removal of Plaintiff's small children from their home in Illinois.

> Wrigley told Plaintiff that she had worked for years in fields related to child protection; that she knew how to manufacture false complaints, and that, if Plaintiff continued to participate in litigation, Wrigley would cause the removal of Plaintiff's small children from their home.

At deposition, Wrigley asked Katherine almost no questions about this core allegation, which stands unrebutted.[15]

"Threats . . . are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out." *McGrath v. Fahey*, 126 Ill. 2d 78, 87, 533 N.E.2d 806, 809 (1988). Wrigley told Katherine that, as an experienced, court-appointed advocate for abused children, she knew how to write a persuasive report on child abuse. Am. Compl. ¶¶ 126-27. Wrigley thus ensured that Katherine knew Wrigley had the ability to carry out her threat. Katherine responded by saying "I will pretend not to hear this." Katherine dep. 262:22-263:1.

Wrigley then reinforced her threat with voicemail and text messages, sent later that day to Katherine's husband. Katherine dep. at 263-64. Defendant asserts that the transcribed voicemail "does not contain any threats whatsoever." Wrigley MOL, p. 4. This is only true if the voicemail is considered in a vacuum. When taken in the context of Wrigley's airport threat and Katherine's

---

[15] Counsel asked Katherine about a "police report" in connection with the threat to Katherine's children. Katherine dep. at 258-259. Katherine confirmed that Wrigley had made such a threat, and counsel did not ask for details.

response, the voicemail reinforced Wrigley's threat to file a complaint against Katherine with child

protective services:

> Well Bernie, I'm sitting here chuckling with my brother. I think your wife needs a
> hearing aid. Very paranoid because I understand that you're again assaulting me or
> whatever with your words. Whatever she heard I have no idea . . . And yes this is
> definitely on a recorded line. I'm happy to tell you that. But as far as your wife, and
> bringing her to the hearing, I find that a little funny. Whatever she heard, I think
> you need to work on that. That's all, bye-bye.

Wrigley asserts that because this voicemail did not contain an overt threat, this somehow

shows that Wrigley did not threaten Katherine. Wrigley MOL, p. 4. All this "establishes" is that

Wrigley is smart enough not to leave a blatant threat on a "definitely recorded line." Put in context,

Wrigley threatened physical violence against Katherine and threatened to have her children taken

from her, and Katherine responded that she would pretend she hadn't heard this. Wrigley then left

a voicemail message in which she was "chuckling" and underscored the seriousness of her threats

by advising that Katherine "needs a hearing aid." Wrigley further drove home her seriousness by

texting Katherine's husband to "Have your wife get a hearing aid." Ex. 22, Wrigley text message

(Apr. 2, 2015). Wrigley offers no explanation for her voicemail and text message, let alone one

inconsistent with the natural explanation that these were intended to reinforce Wrigley's threats

against Katherine and her children, while chuckling.

Wrigley states that Katherine failed to report Wrigley's threats and harassment "to anyone

except her husband." Wrigley MOL, p.5; *see also id.* at 5 n.4 (Katherine "failed to describe

Wrigley's alleged threats in the New York proceedings"). This is simply false. Katherine filed a

sworn affidavit with the New York court, which informed the Court of Wrigley's threats that " if

[Katherine] participates in legal proceedings, Wrigley will file a complaint against [Katherine] for

child abuse, and will use Wrigley's contacts with Chicago's child protective services to remove

[Katherine]'s small children from home pending investigation" Ex. 4, Katherine TRO Aff. ¶¶ 73-

83. Katherine also discussed Wrigley's threats with Northwestern Associate Dean Rita Winters, who contemporaneously recorded this in a memo. Ex. 38, Winters Memo ("Cherie had at one point threatened to contact [Department of Child and Family Services].").

Wrigley goes on to state that because Katherine did not report Wrigley's threat to anyone, this somehow "precludes a fact-finder from concluding that it could have been (objectively) received as legitimate." Wrigley MOL, p. 5. To the contrary, Katherine's reports of Wrigley's threat demonstrate how serious she perceived that threat to be. Moreover, the implications and significance of when and to whom Katherine reported Wrigley's threat are for the jury to decide.

### (3) Wrigley Repeatedly Threatened Katherine with Burglary

Wrigley argues that she did not threaten Katherine with burglary, because the threat was contained in an October 2015 email, selectively quoted. In this email, Wrigley states that she will send Esaun Pinto to pick up Joanne's things from Katherine's house, "likely" on Nov. 17th or 18th, and warns that "if I don't hear from you within 48 hours I will just continue on my own timeline."[16] This was only one of Wrigley's recurring threats; Wrigley ignores the others. Katherine testified to other threats on phone calls, for example, that "I will send Esaun to have a shot with you, you will be sorry." Katherine dep. 245:7-9.

For the October 2015 threat, Wrigley quotes part of the email, in which Wrigley asked "what day or days work best," to suggest that this was not a real threat, while omitting the immediately following sentence, "if I don't hear from you within 48 hours I will just continue on my own timeline." Ex. 53. If this was a request, not a threat, Wrigley would not have stated her intent to sending Pinto, a physically huge man, from New York to Katherine's house to take

---

[16] Wrigley email to Bernard, cc to Dain and Peterson, *Guardianship* (Oct. 3, 2015), quoted in full I Wrigley SOF 20.

jewelry and other items "on my own timeline," and would have no reason to say that she would send Pinto from New York to Chicago to pick up items that could readily be shipped.

Wrigley argues that this threat was reasonable because she "was acting in good faith." Wrigley MOL, p. 4. That Wrigley wrongly believed that she had been appointed as Joanne's guardian, with no signed order, and further believed, with no evidence, that she was also a "CO-TRUSTEE of all of [Joanne's] funds including the SNT of 1997," Wrigley SOF 20 (quoting Wrigley's email) reinforced rather than excused the threat. Wrigley wrongly believed she was a guardian, wrongly believed she was a co-trustee of the SNT, and appeared to wrongly believe that she had the right to send Pinto take things from Katherine's house, with or without permission to enter. A reasonable jury could find that Wrigley's misguided belief in her own authority increased, rather than decreased, the extreme nature of her threat.

To support Wrigley's argument that Wrigley's threat was made in "good faith" and therefore "not actionable" Wrigley cites an inapposite case in which a school principal had to react in real-time to a chaotic, emergency situation that "jeopardized the physical safety of [kindergarten] students." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 625 (7th Cir. 2010). Wrigley faced no emergency, and was not acting to diffuse a dangerous situation, but to instigate a dangerous situation.

### B. The Evidence Supports Katherine's Claims that Wrigley Caused Katherine to Suffer Severe Emotional Distress

To argue that Katherine did not suffer severe emotional distress, Wrigley plays the same game of ignoring the evidence she dislikes, and misstating and treating in isolation the evidence she addresses.

### (1) Substantial Record Evidence of Katherine's Emotional Distress, Which Wrigley Ignores

Wrigley completely ignores Dr. Galatzer-Levy's expert report and testimony, in which he found that Wrigley's threats in April 2015 ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████  Dr. Galatzer-Levy also concluded that Wrigley's Jan. 2016 attack on Katherine at Northwestern ████████████████████████████  Ex. 57, Galatzer-Levy dep., at 159:20-21.  Psychological tests by *Defendants'* neuro-psychological expert confirmed that:



Ex. 56, Report of Dr. Yuri Rassovsky (Feb. 20, 2019), at 2, 5.

Wrigley also ignores evidence that her threats and attacks caused Katherine to leave the country to protect herself and her family, and reduce her anxiety that her children would be taken away. Ex. 45, Galatzer-Levy Report at 13; *see also* Ex. 58B, Rodriguez dep. at 86:5-8 ("part of their impetus for leaving Northwestern for this year was to . . . get the hell out of Dodge."  Wrigley also ignores Katherine's allegations, which thus stand unrebutted that:

> Because of Wrigley's threats against Plaintiff's children, Plaintiff now suffers from persistent fear of someone forcibly removing her children from their home . . .  Am. Compl. ¶ 278.
>
> As a result of Defendants' defamatory actions, and their persistent threats, Plaintiff started suffering from insomnia and nightmares, racing heartbeat, extreme fatigue, sweating, and panic attacks.  Am. Compl. ¶ 281.
>
> Plaintiff now has difficulty concentrating, Am. Compl. ¶ 282, and is unable to work on her research, Am. Compl. ¶ 292; Ex. 1, Katherine Decl. ¶¶ 28, 31.

Plaintiff has been feeling sad, hopeless, and agitated. Am. Compl. ¶ 283, confirmed by Dr. Galatzer-Levy's finding of major depression.

This court previously found that Katherine sufficiently alleged severe emotional distress. Order on Motions to Dismiss at 29. Those allegations are not only unrebutted, they are strengthened by the evaluations by Dr. Galatzer-Levy and Dr. Rassovsky, which confirm her severe distress and anxiety.

### (2) Katherine Was Not Required to Seek Mental Health Treatment

Defendant misstates the law, stating Katherine's claims for intentional infliction of emotional distress are "meritless" because Katherine did not seek "treatment from a mental health professional." Wrigley MOL, p. 6. However, seeking psychiatric treatment is not necessary to prove that Katherine suffered extreme emotional distress, as this Court has already ruled. Opinion on Motions to Dismiss at 29 (a reasonable jury could "find that Katherine suffered severe emotional distress as a result of Wrigley's threats"; seeking psychiatric treatment was not required); *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 606 (7th Cir. 2006) ("we previously have held that seeking psychiatric help is not a necessary condition to a finding that a defendant actually suffered from severe emotional distress."); *Bristow v. Drake St. Inc.*, 41 F.3d 345, 350 (7th Cir. 1994) ("[Plaintiff] did not consult a psychiatrist, but if that were a requirement for liability the only effect would be to increase psychiatrists' incomes. She did present medical evidence, though that was not required either."). Here, similar to *Bristow*, Katherine has presented medical evidence, even though not required to prove her severe emotional distress.

Wrigley also misrepresents the cases she cites. Defendant cites *Cheatham v. City of Chicago*, which found that the plaintiff's "alleged emotional distress [was] insufficient as a matter of law." No. 16 C 3015, 2018 WL 2096373, at *7, 2018 U.S. Dist. LEXIS 76440 (N.D. Ill. May 7, 2018). This court, in contrast, has already held that Katherine sufficiently alleged IIED.

34

*Cheatham* distinguished its facts from other IIED claims in which the victim also did not seek psychiatric treatment, noting that, "Cheatham [did] not allege such an extreme physical reaction to her fear." Here, Katherine alleges, and medical records support, a severe reaction, both physical and emotional. Katherine alleges becoming unable to eat and losing 60 pounds in a short period in late 2015 and in 2016. Docket Entry No. 267-3, Katherine dep. at 348:17-350:19. ███████

████████████████████████████████████████████████████████████████

███████████ Ex. 54, Northwestern Medicine records at NWMG17.[17] Katherine also sought treatment in mid-2016 for back and shoulder pain that had intensified to the point where it interfered with work, exercise, and social activities. Ex. 55, Trifactive medical records, at TRI00011.

Wrigley similarly mischaracterizes, and misleadingly truncates the quote from another case she cites. In *Ponticiello v. Aramark Unif. & Career Apparel Servs., Inc.*, the court stated that "Plaintiff did not seek out any mental health treatment, medication or medical help nor does she feel that she needs to do so. In general, severe emotional distress requires some medical treatment." No. 05 C 1137, 2006 WL 2699416, at *13 (N.D. Ill. Sept. 19, 2006). Defendant quotes this statement beginning after the words "In general," suggesting that medical treatment is an absolute requirement. Even that would not bar Katherine's claims, as Katherine did seek medical treatment for the physical manifestations of her distress.[18] Dr. Galatzer-Levy testified with regard to Katherine not having sought mental health treatment that:

████████████████████████████████████████████████████████████

---

[17] Dr. Smith's notes indicate that the weight loss was "intentional," Ex. 54 at NWMG000017, but Katherine testified that she did not use this term, and declined to explain the reasons for her weight loss during a routine prescription-refill visit. A reasonable jury could find that Wrigley's threats were the proximate cause of Katherine's severe weight loss.

[18] Defendants other additional cases cited for this proposition are similarly mischaracterized.

███████████████████████████████████████████████

Ex. 57, Galatzer-Levy dep. at 224.

### *(3)* *Wrigley's Attack on Katherine at Northwestern Can Support IIED as Part of Wrigley's Systematic Harassment of Katherine*

Wrigley ignores the importance of her attack on Katherine at Northwestern, both as a separate cause of distress, and as showing that Wrigley could and would retaliate if Katherine opposed Wrigley's effort to become Joanne's guardian. To support doing so, Wrigley misstates this Court's Order on Motions to Dismiss. This Court dismissed the IIED claims against Defendant Kerr because IIED could not be "based *solely* on her alleged defamatory statements to Northwestern." Order on Motions to Dismiss at 29. Wrigley asserts that "this Court already ruled that [the Northwestern attack] could not form the basis of an IIED claim." Wrigley MOL, p. 6. Under this Court's ruling, the Northwestern attack cannot be the *sole* basis of an IIED claim, but it can form part of a pattern of conduct, which taken together, was extreme and outrageous and caused severe emotional distress.

Defendant misstates testimony by Katherine's husband, asserting that he noticed her distress only in 2016. Wrigley MOL, p. 6. Bernard testified that Katherine's physical symptoms "intensif[ied] in early 2016; and to an "important intensifying of my wife's reaction in early 2016."

By contacting Northwestern, Wrigley demonstrated that she was willing to follow through on her threats, adding credibility to her other previous threats, including threats of violence and threats against Katherine's children. ██████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████████

Ex. 45, Galatzer-Levy Report at 2-3 (Summary of Professional Opinions); *see also* Ex. 57, Galatzer-Levy dep., at 159:20-21 (Northwestern attack ████████████████████████████ ██████

### *(4) Wrigley Misrepresents Katherine's Physical Health Changes*

Wrigley argues that because Katherine didn't disclose her emotional distress *to her chiropractor*, that means that Wrigley's threats and actions did not lead to Katherine's intensified shoulder and back pain that led her to seek treatment for these problems. Wrigley MOL, pp. 7-8. This does not follow. A reasonable jury could find that stress from Wrigley's attacks, combined with Katherine's large weight loss in a short period, due to her emotional distress, caused intensification of previously minor shoulder and bank pain, to the point where it interfered with work, exercise, and social activities, which it previously had not. *See* Ex. 55, Trifactive Medical Records, at TRI00011.[19]

### C. Wrigley Misrepresents Katherine's Economic Damages and Testimony about Her Efforts to Protect Her Children From Wrigley

Wrigley never addresses the largest source of Katherine's economic damages – Katherine moving her family to Israel for two years, to escape from Wrigley's threats and the reduce the extreme anxiety those threats caused her. Instead, Wrigley picks at a small part of Katherine's economic damages, by misquoting Katherine. Wrigley asserts that Katherine claimed that "she

---

[19] Defendant argues that on a *form concerned with establishing payment responsibility*, that Katherine signed the pre-written form saying that said her treatment was not "associated with any third party, and no party other than myself is responsible or liable for the cost of my treatment." Wrigley MOL, p. 8. Wrigley misstates both the purpose of this form, and what Katherine signed. The form does not address whether a third party "caused" Katherine's injury, but only whether a third party was responsible for paying the chiropractic bills, and offers as examples that might cause a third-party to be responsible for payment, "auto accident, work injury, or slip and fall due to someone else's negligence." Ex. 55, Trifactive Medical Records, at TRI00006.

was forced to remove her children from public school and place them in private school." Wrigley MOL, p. 8 (citing Katherine dep. at 264-67). Katherine never stated this. Katherine testified that she "would have sent [her children] to a free public school," but kept them in a small private school so that they would be monitored more closely. Katherine dep. at 266:5-11.

Wrigley takes issue with Katherine's decisions on how to monitor her children, noting that it involved lessons and activities. Wrigley MOL, p. 8. Katherine sought to ensure adult monitoring of her children at all times. Katherine's sought to keep her children safe, not to terrify them or emotionally scar them with armed guards. One activity that Wrigley takes issue with is piano lessons. Katherine testified that her children were with their piano teacher twice a week. Katherine dep. at 270:8-9. Katherine also testified that her children no longer play the piano. *Id*. at 271:3-4. Once Katherine took her children to Israel, where Wrigley's threats could not reach them, they no longer needed constant monitoring, so Katherine did not renew piano lessons in Israel. That Katherine chose to monitor her children with lessons and activities, rather than bodyguards, does not indicate that she was not protecting them from Wrigley. A reasonable jury could find that the associated cost is part of her overall damages.

Wrigley's argument for summary judgment on IIED relies on a combination of her own denials, misstating established facts, and misstating the law. Katherine's core IIED allegations, which this Court found created a triable issues of fact, Order on Motions to Dismiss at 28-29, remain undisputed.

### III. AIDING & ABETTING DEFAMATION AND FALSE LIGHT

To support their arguments for summary judgment on aiding and abetting each other's defamation, Defendants continue to distort and misrepresent established facts. "Under Illinois law, to state a claim for aiding and abetting, one must allege (1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he

provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citation omitted).

As to the first element, the evidence supports a finding that Defendants Kerr and Wrigley defamed Katherine was addressed above; the evidence for Cohenson is discussed below.

That Defendants were aware of their roles when providing their assistance is amply supported by the extensive email correspondence discussed above, in which Defendants coordinated their calls and Wrigley's Ethics Point complaint. As Gayle Young noted in an email including all Defendants, ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ Ex. 50. To which Kerr responded, acknowledging that she started the attacks against Katherine at Northwestern, ████████████████████████████

████████████ *Id.* There is no question that Defendants knew that they were attacking Katherine's ████████████████████ *Id.*

Defendants were in close contact, well aware of what each of them was doing in contacting Northwestern, encouraging each other to make calls and write letters to Northwestern, provided documents to each other, and made closely similar complaints. Their coordinated action amply meets the knowledge and substantial assistance elements of aiding and abetting liability.

### A. Kerr's Knowledge and Substantial Assistance; Developing the Scheme and Providing the Pretext for Attacking Katherine at Northwestern

Kerr argues that Katherine "can point to no document email or line of deposition testimony to prove (or raise a genuine issue of material fact about) an agreement to defame or place Katherine in a false light." Kerr MOL, p. 19. The standard, however, is knowledge and substantial assistance,

not a formal agreement that "let's all agree to defame Katherine." Kerr ignores both what is known from documents obtained during discovery and numerous allegations that remain unrebutted.[20]

As Kerr acknowledged in an email, she initiated the coordinated attacks on Katherine at Northwestern. *See* Ex. 50 ███████████████████████. Kerr suggested calling Northwestern on January 7, 2016, soon after Cohenson distributed Katherine's sealed letter, without even bothering to read the letter first. Ex. 28A, Defendants' Jan. 7 Emails. Kerr also provided the pretext for all Defendants to use, ████████████████████████ ████████████████████████████████████████ ██████████████████████████ Ex. 28A. The next morning, Kerr circulated contact information so others could also make their own calls and send letters. Ex. 28C (including the Dean's name, office telephone number, and mailing address).

Additionally, when Wrigley emailed their group, informing them that she opened a new Ethics Point complaint against Katherine and that ████████████████████████ ████████████████ Kerr responded by sending her letter. Ex. 28D.

### B. Cohenson's Knowledge and Substantial Assistance; Providing Sealed Court Documents and Counseling Wrigley on Contacting Northwestern

Cohenson repeatedly cites Katherine's deposition testimony that Katherine, at that time, did not know how defendants communicated. Cohenson MOL, pp. 8-11. Katherine's deposition was taken before Defendants disclosed their email communications. What Katherine did not know then is known now, and it is unseemly for Cohenson to ignore this evidence. Cohenson also asserts that "Wrigley never told Cohenson that Kerr had provided [Kerr's] letter to Wrigley." Cohenson MOL, p. 3. However, Kerr sent the Kerr Letter to Wrigley and to Cohenson *in the same email*.

---

[20] Notably, many of the allegations in the Amended Complaint have been confirmed by documents obtained in discovery.

Ex. 28D, Defendants' Jan 8 Emails (Kerr email, attaching Kerr Letter, ███████████ ██████████████████████ ).

Cohenson provided further substantial assistance to Kerr's defamatory attack on Katherine at Northwestern, in a variety of ways. First, as noted above, Cohenson circulated Katherine's sealed letter to Kerr and other persons who were not entitled to receive it. Ex. 28A, Defendants' Jan. 7 Emails. Cohenson falsely asserts that "plaintiff cannot provide any evidence that any documents were sealed or otherwise deemed confidential." Cohenson MOL, p. 11. There is abundant evidence that the guardianship proceeding is sealed, including the sealing order itself. Ex. 48, Sealing Order ("Ordered that the entire contents of the file of this proceeding and record thereof are hereby sealed"); *see also* Ex. 10, NY Guardianship Order (June 7, 2016), at 4. Cohenson also sent to Kerr and others multiple other documents from this sealed proceeding. *E.g.* Ex. 42 (Cohenson email forwarding to Kerr and others an email attaching documents filed in the guardianship proceeding (March 16, 2016)).

Cohenson fully supported the coordinated attack on Katherine at Northwestern. Cohenson made her own call to Northwestern in response to Kerr's suggestion that "someone should contact Northwestern," discussed the call with Wrigley, and emailed details about the call to Wrigley, Kerr and others.[21] Ex. 28A-B, Defendants' Jan. 7 & Jan. 8 Emails. She coordinated her own attack with, and supported, Wrigley's and Kerr's attacks in these and other emails cited above. Cohenson downloaded information about the Northwestern Ethics Point complaint system. Ex. 52 (Ethics Point documents produced by Cohenson). A reasonable jury could find that Cohenson

---

[21] Hours after Kerr's suggestion to call Northwestern, Wrigley reported back that Cohenson called. Ex.28A. Cohenson and Raphan have failed to comply with discovery, so it is unknown whether Wrigley and Cohenson emailed about Cohenson's call or if they spoke by telephone; Katherine has principally emails in which Kerr also participated. However, it is clear that they discussed calling Northwestern. Cohenson, as Wrigley's attorney, should have counseled Wrigley against attacking a witness at her place of employment, and instead encouraged her and joined the attack.

substantially assisted Wrigley and Kerr's defamatory complaints and calls to Northwestern by encouraging these calls, making her own call which reinforced the impact of their calls, advised them on those calls, advising Wrigley on use of the Ethics Point system, and provided supporting documents, some of which were sealed.

Cohenson asserts that she "had no involvement in Kerr's letter to Northwestern or the lodging of a complaint to the EthicsPoint website," and that "Cohenson also was unaware that Wrigley filed a complaint through the EthicsPoint system." Cohenson MOL, p. 3. The record contradicts this claim. Cohenson was part of the group encouraging each other to complain to Northwestern, called the NULS Dean's office, and spoke to Katherine Schulte. The attack *started* with Cohenson circulating Katherine's letter – a sealed document in a sealed proceeding – to persons with no right to receive it, including Kerr. Ex. 28A, Defendants' Jan. 7 Emails.[22]

As part of Wrigley's and Dain's plan to threaten anyone who opposed Wrigley's guardianship, Dain wrote and circulated his own letter to Dean Winters, further defaming Katherine and threatening to sue Northwestern for defamation.[23] Ex. 30, Dain Letter to Northwestern, pp. 4-8. Cohenson carefully reviewed and marked up Dain's draft. Ex. 31.

### C. Defendant Wrigley's Knowledge and Substantial Assistance; Submitted Kerr Letter to Northwestern

Wrigley does not provide *any* even supposedly undisputed facts to rebut Wrigley's substantial assistance to Kerr and Cohenson. If Kerr instigated the attack, Wrigley was the

---

[22] Cohenson falsely asserts that "plaintiff cannot show that Cohenson provided Kerr with any sealed documents," Cohenson MOL, p. 10, and even denies that there is any evidence that Kerr and Cohenson communicated at all. *Id.* ("The record is devoid of any admissible evidence [on communications aiding and abetting] . . . Assuming, *arguendo*, that there were communications [between Cohenson and Kerr] . . ."). These assertions are contradicted by the extensive email correspondence among Cohenson, Kerr and others. Ex. 28A-D. The only support Cohenson offers for her claims is Katherine's testimony at deposition, *before document discovery*, that she did not know how Cohenson and Kerr communicated.

[23] Dain ultimately never sent the letter to Northwestern.

ringleader -- an enthusiastic participant and the intended beneficiary of the attack on a witness who opposed Wrigley's guardianship. There is ample evidence that Wrigley substantially assisted Kerr's and Cohenson's attacks. After Kerr sent her letter to Wrigley, in response to Wrigley's email seeking help in obtaining documents to provide to Northwestern, Wrigley submitted Kerr's letter to Northwestern. Ex. 28D, Defendants' Jan. 8 Emails; Ex. 25, Wrigley 2016 Ethics Point Complaint. This alone is substantial assistance for the defamation contained in Kerr's letter. Kerr did not herself submit her letter to Northwestern, which she asserts was based on legal advice. Ex. 9, NY Guardianship Transcript (March 22, 2016) at 365:15-18. A reasonable jury could find that by sending her letter to Wrigley, Kerr authorized Wrigley to submit it.

## IV. DEFENDANTS ACTED AS CIVIL CO-CONSPIRATORS IN ASSISTING THE UNDERLYING DEFAMATION OF KATHERINE

Last in this Response, but far from least in importance, are the civil conspiracy allegations against Defendants. "A conspiracy is almost never susceptible to direct proof. Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134, 720 N.E.2d 242, 258 (1999) (citations and internal quotation marks omitted).

A civil conspiracy claim requires that a defendant "knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner . . . A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives . . . is liable as a conspirator for any tortious act committed in furtherance of the conspiracy." *Adcock*, 164 Ill. 2d at 64. Therefore, to be liable for the defamatory statements in the Kerr Letter, it is not necessary for Kerr or Cohenson to have directly published the Kerr Letter to Northwestern. Similarly, it is not

necessary for them to have directly published to Northwestern to be liable for Wrigley's defamatory Ethics Point complaints, to which they each encouraged Wrigley and provided documents to Wrigley.

"An express agreement among the conspirators is not necessary; the participants must simply share the same general conspiratorial objective." *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016) (citation omitted). Here, Defendants' unlawful objective for their attacks against Katherine at Northwestern was to intimidate her into not testifying against Wrigley's guardianship, which Katherine asked the New York Court for permission to do in her letter. Ex. 2, Katherine Letter. Defendants' also had a secondary goal, for Katherine to █████ █████████████ and personally for opposing Wrigley's guardianship. Ex. 28C. This is witness tampering and intimidation, which is not only highly improper but criminal. Defendants' actions, with each of them calling Northwestern to complain about Katherine, amply meet the single "overt act" requirement for civil conspiracy.

Defendants have offered a variety of excuses for contacting Northwestern. They have said they needed to defend themselves to Northwestern. Ex. 49, Cohenson March Aff. & Reply ¶ 14 (Cohenson asserts that she contacted Northwestern ██████████████████████ ██████████████); Docket Entry No. 267-6, Kerr dep. at 158:23-24 ("When I wrote the letter, my duty was to defend my reputation."). These excuses are flimsy indeed. Cohenson had to "defend" Wrigley and Kerr had to "defend" herself to Northwestern against allegations that Northwestern would have never heard if Defendants had not provided Katherine's sealed letter to Northwestern. Moreover, nothing in Katherine's letter even remotely attacks Kerr's reputation; Katherine merely asserted neutrally – and truthfully – that Kerr was authorized to investigate Pinto. Ex. 2, Katherine Letter, at 17-18.

Wrigley asserts she contacted Northwestern because of her concern that Northwestern resources were being wasted. Docket Entry No. 261-11, Wrigley dep. at 143:7-17. But Wrigley had no genuine interest in the trivial cost, if any, to Northwestern from Katherine using an electronic Northwestern logo (not even printed letterhead paper), and imposed substantial costs on Northwestern through her complaints. Note too that, after contacting Northwestern, Cohenson reported to her co-Defendants that Northwestern was now ████████████████████ ███████████ activity. Ex. 28B, Defendants' Jan. 8 Emails. A reasonable jury could find that Defendants' evolving explanations for contacting Northwestern were a pretext for their true goals, to defame and intimidate Katherine at her place of employment, and make her ███████████ for opposing Wrigley. A reasonable jury could find that Cohenson did not merely "inquire" about Northwestern policies, but in putting Northwestern ████████ threatened litigation. *See* Ex. 28B, Defendants' Jan. 8 Emails; *see also* Ex. 34 (Dean Rodriguez email (Jan. 20, 2016) ███████████ ████████████████████████████████████████████████████ ███████████████████████████.

Defendants had a conspiratorial objective, which extends liability "beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62, 645 N.E.2d 888, 894 (1994). While a civil conspiracy can be established from circumstantial evidence alone, Defendants emails and close communication, summarized in Part I, provide ample direct evidence of joint planning and actions.

The extensive email correspondence among the Defendants and a few others, shows Defendants' knowledge and apparent approval, that:

(i)     Kerr had written a letter to Northwestern Law School;

(ii)    Cohenson, Kerr, and Wrigley had all called the Dean's offices and other people at Northwestern Law School and the Kellogg School of Management to complain about Katherine's letter;

(iii)    Wrigley had filed a complaint with the Ethics Point system █████████████

(iv)    The goal of the campaign against Katherine, as stated by in the email exchange, ███████████████████████

Ex. 28A-D, Defendants' Jan. 7 and Jan. 8 Emails.  Defendants offer no explanation for why a *witness*, who had written a letter to a Court, an absolutely protected activity, should pay professionally or monetarily for doing so.

Defendants planned to continue attacking Katherine even after she testified in the guardianship case, and the court found Wrigley unfit to be guardian, seeking to punish Katherine for her testimony.  They discussed a plan to sue Kate and Northwestern.  On March 22, 2016, Joanne's counsel, Ira Salzman wrote to Wrigley, Cohenson, Kerr, and others about this plan.  Kerr responded that they needed ██████████████████████████████ ███████████ Ex. 51A, Defendants' March 22, 2016 emails about sanctions.  Kerr and Cohenson also planned to seek sanctions against Katherine, apparently in the guardianship proceedings.  Kerr wrote that █████████████████████████████ *Id*.  To which Cohenson responded ███████████ *Id*.; *see also* Ex. 51B, Defendants' March 22, 2016 emails about sanctions (Wrigley responding █████████████████████████ ██████████████ ).

In short, Defendants' email exchanges reveal that they worked together to attack Katherine at Northwestern, intimidate her against testifying against Wrigley, and make her pay for doing so.  They provided each other with information that facilitated their joint attack.  They reported back to each other about what each had said and might say.  Ex. 28A-D, Defendants' Jan. 7 & Jan. 8 Emails.  A reasonable jury could find from this and the other evidence recited above that Defendants conspired to attack Katherine at Northwestern to intimidate her and punish her for

testifying in the New York guardianship proceeding. That attack included defamation, but the conspiracy for an unlawful purpose existed independently of the defamation, which was only one means that Defendants used toward their unlawful goal.

### V.     DEFENDANTS' PRIVILEGE ARGUMENTS REMAIN UNAVAILING

Defendants' various claims of privilege were addressed and rejected by this Court in its previous Order on Motions to Dismiss. Discovery has in no way altered the reasoning relied upon at that time, and these attempts to deflect attention from the facts in dispute should once again be rejected.

### VI.     FALSE LIGHT

Lastly, notwithstanding Defendants' actual malice and highly offensive conduct replete in this record, Katherine by this Response voluntarily dismisses her false light claims. This withdrawal will allow the Court and jury to fully focus on Katherine's remaining triable causes of action.

### CONCLUSION

Defendants' Motions for Summary Judgment rely on a combination of making disputed claims, asserting demonstrably false "facts," and ignoring other facts, many indisputable. When limited to actually undisputed facts, Defendants have no argument to support summary judgment, which should be denied.

Dated: May 8, 2019

Respectfully submitted,

Donald L. Homyk

47

Law Office of Donald L. Homyk (#6181998)
6944 North Ionia Avenue
Chicago, Illinois 60646
donaldhomyk@gmail.com
(773) 805-4393