PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

------------------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

------------------------------------------------------------------

CASE NO. 12 PR 1772

------------------------------------------------------------------

IN THE INTEREST OF:

JOANNE BLACK, Respondent.

------------------------------------------------------------------

        This matter came on for hearing before THE HONORABLE
ELIZABETH D. LEITH, Judge of the Denver Probate Court, on
Thursday, April 2, 2015. The following is a transcript of the
audible portions of that hearing as requested by the ordering
party.

APPEARANCES:   M. CARL GLATSTEIN, Esq., Reg. No. 13738 for
            Bernard Black

            LISA DiPONIO, Esq., Reg. No. 27707, for Joanne
            Black, Respondent

            GAYLE YOUNG, Esq., Reg. No. 17107. Guardian Ad
            Litem for Joanne Black, Respondent

            IRA SALZMAN, Esq., Attorney for Joanne Black,
            Respondent

            ANTHONY DAIN, Trustee/cousin

            CHERIE WRIGLEY, Cousin

BLACK016614

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Thank you, you may be seated.  All
 3    right.  The record is now on and the Court will call up 12 PR
 4    1772, the interest of Joanne Black.  And could I have
 5    appearances for the record, please.
 6              MR. GLATSTEIN:  Good morning, Your Honor, Carl
 7    Glatstein, registration 13738 here on behalf of Bernard
 8    Black, Conservator; Mr. Black is present.
 9              THE COURT:  He is?
10              MR. GLATSTEIN:  Where did he go?
11              UNIDENTIFIED SPEAKER:  (Inaudible).
12              MR. GLATSTEIN:  He is almost present.
13              THE COURT:  Okay.
14              MR. GLATSTEIN:  His spouse Kate Litvak is also
15    present.
16              THE COURT:  Okay.
17              MS. DiPONIO:  Good morning, Your Honor, Lisa
18    DiPonio, 27707, court appointed counsel for Joanne Black.
19    Your Honor, Ira Salzman who is Ms. Black's attorney in New
20    York in the proceedings there.  They--he is on the phone.
21              THE COURT:  Okay.
22              MS. DiPONIO:  And Ms. Black is present with him as
23    well.
24              THE COURT:  Okay.
25              MR. SALZMAN:  Also present--this is Ira Salzman--
```

1    also present is Mr. Esaun Pinto (phonetic).

2              THE COURT:  Okay.

3              MR. DAIN:  Your Honor, Anthony Dain, trustee of the

4    various trusts and an interested party.

5              THE COURT:  Very good.

6              MS. YOUNG:  Good morning, Your Honor, Gayle Young,

7    Guardian ad Litem for Joanne Black.

8              THE COURT:  All right.  Anyone else who wants to

9 ·  enter an appearance?

10             MR. DAIN:  Yeah, go ahead.

11             MR. BLACK:  Bernard Black, Conservator.

12             THE COURT:  Very good.

13             MR. DAIN:  Cherie Wrigley, who is also an

14   interested party.

15             THE COURT:  All right.

16             MS. WRIGLEY:  Joanne Black's cousin.

17             THE COURT:  Right.  Okay.  All right.  So I've

18   reviewed the various reports and it's my understanding first

19   off that you have stipulated to the forensic review by Ms.

20   Kerr; is that correct?

21             MR. GLATSTEIN:  That is correct, Your Honor.

22             THE COURT:  All right.  So I'll sign off on that

23   order.  Did she estimate how long that was going to take?

24             MS. YOUNG:  I think she indicated in an e-mail

25   that--you know, she was supposed to call in and I don't know

1    whether--whether she thought I was going to call her--I gave
2    her the call-in number.
3                THE COURT:  Okay.
4                MS. YOUNG:  But I--I think she anticipated that she
5    could get it done fairly soon, so I was going to ask her--
6    today is April 2nd, in a month or so.
7                THE COURT:  Okay.
8                MS. YOUNG:  So I would ask--
9                THE COURT:  Give or take.
10               MS. YOUNG:  --until May 15th.
11               THE COURT:  All right.  And then can you enlighten
12   me as to what exactly she's going to review?  What accounts
13   is she going to look at?
14               MS. YOUNG:  Okay.  Why don't you--
15               MS. DiPONIO:  I will try my best, Your Honor,
16   because there's a lot here.  And what I'd like to state to
17   the Court upfront--initially this case was presented here--
18               THE COURT:  Right.
19               MS. DiPONIO:  --as a conservatorship.  At that time
20   my client was on--for lack of a better phrase was on the
21   streets.
22               THE COURT:  Right.
23               MS. DiPONIO:  She was not present at the hearing.
24   At some point in time she was moved back to New York where
25   she's been for almost two years.  Proceedings are going on in

BLACK016617

1    New York, I believe in two different--two different courts.
2             We--the attorneys--and I hope I can speak for all
3    of us here in Denver--are recently, within the last couple of
4    months, realizing all these issues that are happening with
5    what's happening in New York and how it affects Ms. Black.
6    There's a lot out there.
7             THE COURT:  Right.
8             MS. DiPONIO:  And so Pam has an extensive amount of
9    work to do.  We are looking--primarily I'm--I want to focus
10   this status conferencing hearing on--on a couple of issues.
11            MR. GLATSTEIN:  Lisa, could you use the mike
12   please.
13            MS. DiPONIO:  I'm sorry?
14            MR. GLATSTEIN:  Could you use the mike?
15            MS. DiPONIO:  Oh, sure.  The first being the
16   disclaimer that was made of the paid on death benefits of the
17   Fidelity and Vanguard accounts.  And Ms. Kerr is looking into
18   that.
19            THE COURT:  Okay.
20            MS. DiPONIO:  The second issue is the 2013 Special
21   Needs Trust that falls under the conservatorship here.
22            THE COURT:  Which we've actually never seen, right?
23            MS. DiPONIO:  Absolutely.  And that's one of the
24   issues, Your Honor, it was never submitted for approval.  And
25   so as Ms. Kerr--and if she's available--hopefully she'll be

BLACK016618

1    available by phone--she can explain to the Court--it sounds
2    like from her investigation so far--and let me just preface
3    also, this is a preliminary report that was filed.  This is
4    by no means conclusive findings or final findings that Ms.
5    Kerr has made, which I believe Ms. Young filed yesterday or
6    the day before.

7              As she's reviewing these things her investigation
8    may become more expansive, so it's kind of hard right now to
9    say--

10             THE COURT:  Okay.

11             MS. DiPONIO:  --exactly what all we're looking at
12   because there's a lot out there with respect to trusts and
13   Renata Black's estate, which is in New York.

14             THE COURT:  But she's not going to do that.

15             MS. DiPONIO:  She is not--unless--

16             THE COURT:  I mean I thought that the Surrogate
17   Court in New York was going to handle that.

18             MS. DiPONIO:  Well--and Mr. Salzman can kind of--
19   and so can Mr. Dain--Mr. Salzman can fill you in on the New
20   York--

21             THE COURT:  Right.

22             MS. DiPONIO:  --court's position with respect to
23   the Denver court's position.  It's almost kind of a who is
24   going to do what.

25             MR. DAIN:  Your Honor, if I could clarify?

BLACK016619

     1              THE COURT:  Right, which is one of the reasons I
     2    wanted to have the status conference--
     3              MS. DiPONIO:  Right.
     4              THE COURT:  --is to figure that out.
     5              MS. DiPONIO:  Right.
     6              MR. DAIN:  I--I can clarify what Ms. Kerr's report
     7    of forensic accounting is going to cover.
     8              THE COURT:  Okay.
     9              MR. DAIN:  She's starting with the date of this
    10    Court's first order, which is I believe is December 11--
    11              THE COURT:  '12.
    12              MR. DAIN:  --2012.  On that date is--she wants to
    13    know what was in Joanne Black's estate so to speak.  And that
    14    includes all of the paid on death benefits, and Vanguard
    15    accounts and Fidelity account and in any other accounts that
    16    the subsequent disclaimers were used to transfer money out.
    17    She starts there.
    18              THE COURT:  Okay.
    19              MR. DAIN:  There were transfers from those
    20    accounts--from the Vanguard, Fidelity, and Chase accounts but
    21    particularly she's looking at the transfers into both the
    22    estate of Renata Black, not interfering with the estate of
    23    Renata Black, but to find out what went in and what came out.
    24              She's looking at what went in to the 2013 Joanne
    25    Black Trust, which is a separate trust, that's not the

BLACK016620

8

1   Supplemental Needs Ttrust; that's the trust that you haven't
2   seen or approved.

3          She's then looking at the account--the amounts--the
4   two-thirds that were placed in the Supplemental Needs Trust
5   of Joanne Black's assets. And then she's looking at the
6   one-third that was placed into this Issue Trust for the
7   benefit of the conservator's children and the conservator.

8          She's also looking at what was recently uncovered
9   that there was a Roth IRA of $300,000 that was paid on death
10  to Joanne Black that hasn't been accounted for. In fact, the
11  full accounting has never been given to the Court, only
12  two-thirds of certain amounts. The $300,000 has not been
13  accounted. Ms. Kerr has not yet been able to determine how--
14          THE COURT: This is the Roth you're talking about
15  now?

16          MR. DAIN: This is the Roth IRA. How much if any
17  has gone into any trust for Joanne Black's benefit.

18          THE COURT: Uh-huh.

19          MR. DAIN: She's going to look at that. She's
20  going to look at all amounts that were paid out including to
21  accountants and various attorneys to--frankly anywhere to
22  determine for this Court where was the money when it started,
23  where should it have gone, and where is it at the end.

24          So it's going to be very expansive but as she goes
25  along she finds more.

BLACK016621

1         THE COURT:  Yeah.

2         MR. DAIN:  And so for instance the Roth IRA was

3    uncovered within the last maybe week to ten days that there

4    was a Roth IRA that had not been reported to this Court.

5         She's also going to issue the report--she issued

6    the interim report which explains that the accounting should

7    have covered all of the assets of Joanne Black not just the

8    two-thirds that this Court is aware of.

9         And so she'll need to--she's talked with me, she's

10   talked with Ms. Wrigley, she's talked with Mr. Black; she'll

11   need to talk with other individuals.  She'll need to get

12   access to the date of death accounts of Vanguard, Fidelity,

13   anywhere else--

14        THE COURT:  Uh-huh.

15        MR. DAIN:  --Roth IRA, and follow it through.

16        THE COURT:  Okay.

17        MR. DAIN:  So I agree that probably would take

18   another month to get a final report.  But the interim report

19   itself is significant that was provided to the Court so far.

20        THE COURT:  Okay.  All right.  Now, Mr. Glatstein,

21   is that your understanding as well?

22        MR. GLATSTEIN:  Yes, Your Honor.  Ms. Kerr has

23   already started on this process and there's been a tremendous

24   amount of information going back and forth between her and

25   Mr. Black.

BLACK016622

```
 1              THE COURT:  Okay.

 2              MR. GLATSTEIN:  Transparency is something that we

 3   think is necessary and appropriate here.  We've worked with

 4   Ms. Kerr before.  My concern is that with the preliminary

 5   reports they are not complete.  She has concerns and we've

 6   yet had a chance to address those concerns, but they are all

 7   being addressed.

 8              We are continuing with the forensic review.  All

 9   accounts are available and there has been no interference

10   with providing her with information that she needs.

11              THE COURT:  Uh-huh.

12              MR. GLATSTEIN:  What we need is, you know, when she

13   has questions that she let's us know.

14              THE COURT:  Uh-huh.

15              MR. GLATSTEIN:  And that process has been underway

16   for a couple of weeks already.  When her reports come out we

17   don't necessarily see it first.  And she's sounded an alarm

18   but I think once she's got information and the narrative of

19   what--what has happened, most of those issues will certainly

20   fall by the wayside; that's why there needs to be a full

21   review, measured review--

22              THE COURT:  Uh-huh.

23              MR. GLATSTEIN:  --with everybody having access to

24   the information and what her concerns are and her findings

25   when she has completed it, not as it is in process.
```

BLACK016623

1           THE COURT:  Uh-huh.  Okay.  And does Mr. Black
2    understand that under this process he can be required to
3    disgorge money?  I--I don't--
4           MR. BLACK:  So--so--you know it--
5           THE COURT:  --this--this--I read some of the stuff
6    that went on in New York and this nonsense about not being
7    able to unwind, it doesn't fly in Colorado; it's pretty
8    simple.  So the forensic review is important.
9           MR. BLACK:  So the forensic review is underway; I'm
10   getting Pam Kerr documents as fast as I can, as fast as she
11   asks for them.  There is a substantive question, which is we
12   came here and asked for authority to disclaim Joanne's
13   payable on death benefits into the estate of Renata Black.
14          THE COURT:  Uh-huh.
15          MR. BLACK:  I did so.  Once they're in the estate
16   of Renata Black, two-thirds are supposed to go out to Joanne.
17   Most of that will go to the Supplemental Needs Trust, some of
18   it has been paid directly on expenses for Joanne out of the
19   estate, but two-thirds of the total has to go to Joanne.  And
20   I'm happy to prepare--to document that two-thirds of the
21   total did go to Joanne.
22          THE COURT:  I guess that's one of the issues that
23   needs to be resolved.
24          MR. BLACK:  The--the only question I have there is
25   I fully expect given that everything I'm doing is being

1    challenged that there will be a challenge in New York to my
2    accounting for the estate and I'd like to have that challenge
3    in one place, Your Honor, and not both.

4                 THE COURT:   I don't--

5                 MR. BLACK:   So if we're going to have a full review
6    of the estate I don't want to have it in both places.

7                 THE COURT:   --I don't know that we can avoid that.

8                 MR. DAIN:   Your Honor, and--and the reason that
9    this is so important--Your Honor, hit the nail on the head
10   about disgorgement, the order that this Court issued did not
11   discuss putting money into the estate of Renata Black such
12   that two-thirds--only two-thirds of Joanne Black's--protected
13   person's money would go to her and one-third would go to Mr.
14   Black's children and him.

15                When Mr. Black came to this Court and the first
16   order that this Court issued said all the money will go into
17   a Supplemental Needs Trust for Joanne Black.  There was a
18   proposed amended order which had some confusing language
19   which was never entered.  The Court entered a second amended
20   order Nunc Pro Tunc, that's what Pam Kerr, the forensic
21   accountant is recognizing--

22                THE COURT:   Uh-huh.

23                MR. DAIN:   --to December 11th, 2012, which said all
24   of the money is being placed in a Supplemental Needs Trust,
25   in bold, and below said as part of your ability to do this

1    you can disclaim among other things.

2            THE COURT:  Uh-huh.

3            MR. DAIN:  The Court--the disclaimer itself is not

4    the issue, the Court was saying you need to marshal those

5    assets.  What Mr. Black then did--and to this Court--is he

6    never accounted for that one-third he took.  He had to come

7    to this Court first--

8            THE COURT:  Uh-huh.

9            MR. DAIN:  --before he could act on this

10   irremediable conflict.  So he never accounted, this Court, I,

11   Ms. Black, Ms. DiPonio, Ms. Young, Ms. Wrigley, all assumed

12   all of the money that he was accounting for was before this

13   Court.  He never told this Court I've taken a third of that

14   and potentially all or a third of the Roth IRA, which has

15   never been accounted, and--and put it in a trust for my

16   benefit and my children's benefit.

17           Then--and this is what is so egregious to this

18   Court--he went to New York and in an affidavit said I was

19   given specific authorization from the Colorado court to

20   transfer this money into the estate of Renata Black where

21   two-thirds would go to Joanne Black, one-third to my children

22   in trust, specific authorization.  And he cited an order

23   provision which does not exist.  This Court never issued that

24   order.

25           Then he told that Court it's not your job to second

1   guess the Colorado court because clearly if all these assets
2   are Joanne Black's, any court would question how you take a
3   third out and gift it to your children.  But he told that
4   court don't second guess a Colorado court.  So he perpetrated
5   a fraud on this Court and further perpetrated it on that
6   court using this Court.

7           THE COURT:  Uh-huh.

8           MR. DAIN:  That is before this Court because as
9   conservator he's incapable of one more day acting.  He's
10  acted on a fraud and he's--he's irremediably conflicted; he
11  cannot continue to act.

12          So this is not a New York issue; this is an issue
13  of what he's done to this Court.  If you look throughout the
14  docket you will find even today there has not been an
15  accounting for that one-third.  It was never mentioned.  I
16  requested multiple times give us a complete accounting to the
17  Court and to me as trustee and he said look at the
18  accountings I've done and the accountings he did do not
19  mention the one-third he took; that's a material
20  misrepresentation for this Court.

21          THE COURT:  Uh-huh.

22          MR. DAIN:  It's an absolute fraud.  Mr. Glatstein
23  is continuing to advocate for Mr. Black to remain as
24  conservator pending this accounting.  Now, that Mr. Glatstein
25  knows that there was no accounting to this Court of that

BLACK016627

1    one-third, never did it until he was caught and still hasn't

2    done it, and that he misrepresented to the New York court; we

3    provided him that order, we provided that to the Court, his

4    filing, he can't continue to advocate for Mr. Black because

5    there is now a conflict in his representation of Mr. Black.

6             I've looked at the ethical laws of Colorado and he

7    can't have Mr. Black continue to say I will act in the best

8    interest of Joanne Black when he's already breached his

9    fiduciary duty.

10            So before this Court--I know it's a status

11   conference--is this Court has to determine right now to

12   remove him as conservator, place a temporary conservator in

13   place pending the accounting and freeze these assets because

14   the Court doesn't know where they all are.

15            THE COURT:  Okay.  My main concern though and I've

16   gone back and forth on cases like this with the New York

17   courts before because I know you litigate in more than one

18   court on any given issue, which is unfortunate, but I--the

19   will has to be construed by the Surrogate's Court, doesn't

20   it?

21            MR. DAIN:  Oh, the will absolutely does, but--

22            THE COURT:  And I've read some of the stuff that's

23   been filed and it's anything but clear.  So I thought that

24   that court would need to make a determination.

25            MR. DAIN:  Oh, the Court will make a determination,

BLACK016628

1    but what Mr. Black didn't--it wasn't in the will, what Mr.
2    Black had before this Court is paid on death benefits outside
3    the estate of Joanne Black.

4              THE COURT:  Right.

5              MR. DAIN:  He then put them into that.  Absolutely
6    when all this is transferred to New York it will be unwound
7    there.  Absolutely once that court recognizes the fraud
8    perpetrated on it.

9              But what this Court has to do--it has before it Mr.
10   Black, it has to say I can order you to cease all activities;
11   I can terminate your conservatorship and appoint a
12   supplemental one and I can freeze the assets before me so
13   that Ms. Kerr can get to the bottom of this completely
14   without any interference.

15             There is an attorney, Mr. Salzman, in New York.
16             THE COURT:  Uh-huh.

17             MR. DAIN:  There is an attorney here, Ms. DiPonio
18   here, there is a Guardian ad Litem here, there is no risk
19   that Joanne Black will somehow get money that Mr.--Mr. Black
20   would not want her to have.

21             But the key is how can Mr. Black continue to act as
22   conservator when you know from what you've read that he
23   deceived this Court and then used this Court as a vehicle to
24   deceive the New York court, he can't.

25             THE COURT:  Okay.  All right.

1           MR. GLATSTEIN:  Your Honor--

2           MS. YOUNG:  Excuse me, Pamela Kerr has been trying

3    17 times she has called in to indicate that--she would like

4    to participate and she has a--

5           MR. SALZMAN:  I'm having a little trouble hearing

6    here.

7           THE COURT:  I think there's a limit, I don't know

8    if she can at this point.

9           UNIDENTIFIED SPEAKER:  (Inaudible).

10          UNIDENTIFIED SPEAKER:  (Inaudible).

11          THE COURT:  But will it drop everybody else?  I

12   don't want that to happen.

13          MS. DiPONIO:  Your Honor, what we've done in the

14   past in this situation is actually had somebody call in on a

15   cell phone and it's really difficult and then we put the cell

16   phone by a speaker--

17          THE COURT:  Do we need her--

18          MS. DiPONIO:  --and we've had to do that.

19          THE COURT:  --to chime in at this point?

20          MS. YOUNG:  If you want to know how long it might

21   take.

22          THE COURT:  It will take what it takes.

23          MS. YOUNG:  Okay.

24          THE COURT:  So go ahead, Mr. Glatstein.

25          MR. GLATSTEIN:  Your Honor, I wanted to object here

BLACK016630

18

1   since this is getting first lies and my actions are also

2   being impugned, but this is a status conference not an

3   evidentiary hearing.  There are issues that certainly the

4   parties do not agree upon and that needs to be set for notice

5   of hearing and we can deal with it at that point.

6         But I also don't want the Court to lose sight of is

7   that this is not just a matter of the disclaimer; this is a

8   matter of making sure there is the ongoing support of a

9   conservatorship.

10         THE COURT:  Uh-huh.

11         MR. GLATSTEIN:  We have talked with the Guardian ad

12   Litem and we have no issue about a special conservator being

13   appointed.  Ms. Peterson is very well experienced with a lot

14   of issues that Ms. Kerr doesn't quite track.

15         And what we have suggested and would suggest to the

16   Court is that Ms. Peterson be added as a special conservator.

17   There will be no movement of money, no payments or

18   distributions without special conservator's prior approval so

19   that we don't dismantle the entire conservatorship and the

20   safety net structured and start again from scratch; that does

21   not serve Ms. Black her--her interest or anybody other than

22   attorneys who are now feeding at the trough here because

23   there are significant assets.

24         Certain issues need to be resolved by this Court

25   first.

BLACK016631

1           THE COURT:  Okay.

2           MR. GLATSTEIN:  And certain issues will have to be

3    addressed by the New York court obviously.  The purpose of

4    the status conference this morning was to determine what

5    stays here and what does have to get resolved.

6           In talking with court appointed counsel and the

7    Guardian ad Litem I think there is agreement that the 2013

8    Trust should be submitted to this formally for review and

9    determination whether that needs to be--needs to stand or be

10   reformed.

11          THE COURT:  Apparently there's two trusts--three

12   trusts.

13          MR. GLATSTEIN:  If I could--I can walk the Court

14   through--through things just briefly.  There is the original

15   1997 Trust that Renata Black had created at the same time

16   that her '97 will was created.  That same time the Issue

17   Trust was created; those were all provided to the Court.

18          The 2013 Trust was one created after Mr. Black was

19   appointed and I will take responsibility here for not having

20   submitted that to the Court for approval first; that was

21   draft by Mr. (Inaudible).

22          MR. BLACK:  It was drafted by law (Inaudible).

23          THE COURT:  And does it provide for payment of

24   Medicaid?

25          MR. GLATSTEIN:  It--it has trigger trust provisions

BLACK016632

1  in it.  It can be converted to that.  These are things that
2  need to be reviewed by the Court.  If the funds were not in--
3  in a trust they would be in the conservatorship.  These are
4  not the protected funds.

5       In doing what would essentially be a self-settled
6  trust, the conservator doing it on behalf of Joanne, there
7  must be a Medicaid payback provision regardless of what state
8  she's in.

9       THE COURT:  Right.

10      MR. GLATSTEIN:  And I should correct also one
11 misstatement that was in one of the pleadings I think by Ms.
12 Young, there is no provision in there that allows Mr. Black
13 to make distributions or payments to anybody other than
14 Joanne for her benefit.  He cannot pay himself out of that,
15 he cannot pay his children; he's not the sole trustee.  Mr.
16 Dain is also a trustee, he signed off on that agreement.

17      MR. DAIN:  Your Honor, that's incorrect and I can
18 explain.  Mr. Black has requested of me just recently that he
19 be allowed to reimburse himself for his children's student
20 loan through the Issue Trust; that's improper because those
21 are Joanne Black's assets.

22      So I--I know there are provisions, I'm the trustee
23 on these trusts.

24      THE COURT:  Uh-huh.

25      MR. DAIN:  I know there are provisions through

BLACK016633

    1    which he can gain access to enrich his children.  On the
    2    Supplemental Needs Trust he added his son through another
    3    misrepresentation who also has a conflict because he
    4    benefits.  We have to stop this, those trusts--the assets
    5    have to be frozen at this time so that Ms. Kerr can get
    6    access.

    7             We need--we have the proposed supplemental or
    8    temporary trust conservator in court today, ready to take
    9    over and act.  The only attorneys who are feeding at the
   10    trough are the attorneys that Mr. Black is paying to defend
   11    him here and New York and to perpetrate these acts; that
   12    needs to be frozen and stopped.

   13             That's the important point, it's not about Mr.
   14    Black, it's about Ms. Black, the protected person, that's
   15    who--that's who this case is about.  And we have to freeze
   16    these, get a new conservator in and get this accounting done,
   17    then this Court can decide what to do in terms of
   18    transferring it to New York.

   19             THE COURT:  Uh-huh.

   20             MR. BLACK:  If I may, I'm sitting here listening to
   21    this astonishing collection of falsehoods and
   22    misrepresentations by Anthony Dain.  I respectfully request
   23    that--let's make this a status conference, let's let counsel
   24    for Joanne appear, counsel for Joanne said the forensic audit
   25    is underway; it's complicated, it will take awhile, we will

1  see what it comes out with.

2        I am confident that the forensic audit will show

3  that everything that I said to this Court I would do I did;

4  that all the money is accounted for.  There have been no

5  improprieties, no misdeeds, no misspending of money.  I'm not

6  quite sure what to do other than Anthony Dain is making

7  claims of fraud and misrepresentation that are just a

8  complete concoction.  Let's have a hearing and let's get Mr.

9  Dain on the stand under oath and see what he's willing to say

10 under oath.

11        THE COURT:  Okay.

12        MR. BLACK:  Because I am just outraged.

13        THE COURT:  All right.  So I still want to

14 understand and it needs to be clear so is the probate--or the

15 Surrogate Court still going to decide this two-thirds,

16 one-thirds business?

17        MR. SALZMAN:  If I may be heard on that, Your

18 Honor, I'm Ira Salzman in New York.

19        THE COURT:  Thank you.

20        MR. SALZMAN:  All right.  We have--there are two

21 separate proceedings pending in New York, there's--

22        THE COURT:  Right.

23        MR. SALZMAN:  --a guardianship proceeding which is

24 pending in Supreme Court I believe that is roughly the

25 equivalent of your Superior Court in Colorado.  And then we

1    have the estate of Renata Black that is pending in the

2    Surrogate Court.

3            THE COURT:  Right.

4            MR. SALZMAN:  The--I don't think that anybody is

5    contesting at this point the actual interpretation of the

6    will of the late Renata Black.  I think it is--it is clear

7    under the will that if there is a probate asset under the

8    remainder clause of that asset that there is, in fact, a

9    two-thirds, one-third split.

10           Now, as I believe Mr. Black stated before he may,

11   in fact, have a duty to account in New York with regards to

12   his actions concerning the estate, but I have to (inaudible)

13   state that I don't believe that there's a real issue with

14   regard to construction of the will.

15           MR. DAIN:  And, Your Honor, the--the other action

16   is where this is going to occur that it has to be unwound;

17   it's not--you can't take ill-gotten gains, put them into the

18   estate and say well we're stuck with now a third gets to go

19   to Mr. Black's children; that's going to be determined first

20   at this Court--this Court has the right to say, no, you acted

21   in violation of my orders--

22           THE COURT:  Okay.

23           MR. DAIN:  --you return that money because it's not

24   an issue of the estate.  The Court in that case never should

25   have had the money.  So this Court can make the

1    determination, the New York court of guardianship court can

2    make that determination.

3           As Mr. Salzman says it's not going to be an issue

4    of whether the estate was probated there were other assets in

5    the estate.  The issue is Joanne Black's money never should

6    have been in that because this Court never ordered it to go

7    there such that a third could go to Mr. Black's children;

8    that will be reversed before the probate court even addresses

9    any issues because that estate had other assets to deal with

10   as well, real estate assets as well.

11          MS. DiPONIO:  Your Honor, if I may--

12          THE COURT:  Yeah.

13          MS. DiPONIO:  --yes, Renata Black's will

14   (inaudible) were as (inaudible).  I think what the issue is

15   as far as conflict here and I believe in conversations that

16   I've had with Mr. Salzman is that the language does exist in

17   the second amended order regarding the two-thirds or the

18   disclaimer.

19          THE COURT:  The disclaimer not the two thirds?

20          MS. DiPONIO:  The one-third disclaimer or the

21   disclaimer that was made in the second amended order.

22          MR. DAIN:  There's no--nothing--

23          MS. DiPONIO:  Oh, that wasn't in there, it was in--

24   it was just a disclaimer--

25          THE COURT:  Right.

BLACK016637

1        MS. DiPONIO:  --it doesn't mention the will.  I

2    think the issue is though a motion wasn't filed that wasn't

3    fully explained to this Court what was going to happen with

4    that disclaimer and I think that's the issue.

5        THE COURT:  Yeah.

6        MS. DiPONIO:  So once that was disclaimed of course

7    it's going to fall into the residuaries of the estate and

8    the--

9        THE COURT:  Subject to division, right.

10        MS. DiPONIO:  Absolutely.  So I think the issue we

11   have is that that disclosure was never fully made

12   (inaudible), to the Guardian ad Litem, to the Court and

13   that's the issue we're having.

14        THE COURT:  Okay.  That's fine.  All right.  So at

15   this point then what I am doing is I am suspending Mr. Black

16   as conservator; his letters expire this month anyway, they

17   will not reissue until further order from the Court.

18        In order to provide continuity under the

19   conservatorship itself Ms. Peterson is being appointed as the

20   special conservator.  The assets are frozen.  And then what

21   is Ms. Peterson going to use to pay the living expenses and

22   whatnot?

23        MR. DAIN:  Your Honor, Ms. Black currently gets

24   Social Security and worker's comp.

25        THE COURT:  Right.

BLACK016638

1      MR. DAIN:  Until recently Mr. Black redirected that
2   money.  If that money--if the Court can order that she
3   continue to receive those assets--she's able to pay for her
4   own housing; she's able to pay for her own bills.  We can
5   either have a special order where Ms. Peterson can say these
6   are the living expenses and allow that to be transferred; I
7   didn't mean by frozen that we freeze Ms. Black out.

8      But Mr. Salzman may be able to say--give us more
9   input as to exactly how much, but those amounts are
10  appropriate and as a trustee of the Supplemental Needs Trust
11  I've been authorizing it and will continue to authorize that
12  so we can pull out of that trust if necessary to supplement
13  her assistance that she's receiving and housing.

14     So there's a vehicle to do that and I think it can
15  be done either by ex parte requests with nonopposition I
16  assume or through any vehicle that the Court wants but that
17  amount one way or another we should ensure she has.  And Mr.
18  Salzman may be able to say whether independently she has
19  enough coming in from those sources.

20     MR. SALZMAN:  May I--may I be heard, Your Honor?
21          THE COURT:  All right.

22     MR. SALZMAN:  Ms. Black is currently receiving I
23  believe $500 per week which is being deposited into an
24  account and she makes cash withdrawals from and uses those
25  funds to pay substantially all of her bills.

BLACK016639

1          THE COURT:  And what is the nature of those funds?
2          MR. SALZMAN:  I'm sorry I didn't understand the
3    Court's question.
4          THE COURT:  Are they the Social Security or the
5    workmen's comp or what is that?
6          MR. SALZMAN:  Well, I--we--again, these are funds
7    that are being deposited into the account--
8          THE COURT:  From where?
9          MR. GLATSTEIN:  Your Honor--
10         MR. SALZMAN:  By the current conservator.
11         MR. GLATSTEIN:  --the conservator is making those
12   deposits.
13         THE COURT:  What's the source of the money?
14         MS. DiPONIO:  The Chase account, Your Honor.
15         THE COURT:  What--what--
16         MR. BLACK:  The--the correct source is the
17   Supplemental Needs Trust.
18         THE COURT:  So you're taking 500 a week out of the
19   Supplemental Needs Trust?
20         MR. BLACK:  I can switch to the 2013 Trust if you'd
21   like.  The idea is we're trying to get Joanne money from
22   somewhere.
23         THE COURT:  Well, why can't she use her Social
24   Security and the workmen's comp?
25         MR. BLACK:  The--the worker's comp is going into

BLACK016640

1    the 2013 Trust, I'm happy to use the 2013 Trust to pay the
2    $500 a week; that's fine.  The Social Security--
3              THE COURT:  So you're putting her monthly benefits
4    going into a trust, is that what I'm understanding?
5              MR. BLACK:  So right now the Social Security
6    benefits were going to a representative payee whom I believe
7    to be Mr. Pinto.  I arranged to have them come to me; they
8    came to me for one month.  They went into the 2013 Trust from
9    which they could be spent on Joanne's benefit.
10             Joanne then arranged to have those benefits
11   suspended I believe and so right now they're piling up at
12   Social Security.  There's plenty of money, the question is
13   what's a reasonable amount of money to pay to Joanne and
14   where should we pay it from and I don't have any strong view
15   on that.
16             MR. SALZMAN:  Your Honor, may--may I be heard?
17             THE COURT:  Yeah.
18             MR. SALZMAN:  The--Mr. Pinto by the way is present
19   with me in my office at the moment, was the representative
20   payee on the Social Security until the beginning of this
21   year.
22             During the pendency of this proceeding and over my
23   client's objection Mr. Black arranged for himself to become
24   the representative payee of those funds.  At this point we
25   lost track of them.  This is the first we're hearing that

BLACK016641

1    the--that the payments of those funds have been suspended.

2           Now, we would be more than happy to have Mr. Pinto

3    return as the representative payee of the trust--of the

4    Social Security rather but certainly this is something that

5    needs to be investigated.  This is the first I'm learning of

6    it.

7           MR. GLATSTEIN:  Your Honor, there were a variety of

8    concerns with respect to what was happening with her Social

9    Security; that's part of what we think an evidentiary hearing

10   would be good for the Court to know.  Funds were being

11   withdrawn from her account by Mr. Pinto not for her benefit

12   that we could discern and he would not account to the

13   conservator for those funds.

14          THE COURT:  Right.  I know there was a big dispute

15   about that.

16          MR. GLATSTEIN:  Right.  And Ms. Kerr will be

17   provided all that information so she can also from a forensic

18   accounting perspective see where everything went, what the

19   concerns and issues were.

20          Funds were being withdrawn from Joanne's personal

21   account by Mr. Pinto when she's on a locked psych unit.  And

22   no accountability on that to anybody.  We would be very

23   concerned about Mr. Pinto being put back into a position as a

24   rep payee; there needs to be accountability on that as well

25   as everything else for Joanne's benefit.

BLACK016642

1          MR. SALZMAN:  Mr. Pinto has just advised me that he

2    will provide a full accounting of all the funds that he

3    withdrew to Ms. Kerr.

4          THE COURT:  Okay.

5          MR. BLACK:  Your Honor, if I may speak, I want to

6    ask that you think about what orders you want to issue and

7    try to explain some of the context behind that.  So one might

8    ask why do Anthony Dain and Cherie Wrigley care so much about

9    suspending my powers as conservator given that there's been

10   no showing and not even a claim that I have done anything

11   improper in spending money.

12         If you look at their objections to my 2013

13   accounting there is not a single substantive objection to

14   anything I did.  If you look at their objections to the 2014

15   accounting there's not a single substantive objection to

16   anything I did.  All you're hearing about is a complaint

17   about the disclaimers in 2012 which we believe were fully

18   disclosed and fully approved.

19         THE COURT:  Uh-huh.

20         MR. BLACK:  As conservator I have very limited

21   tasks.  I get the weekly check from Travelers and I put it

22   into the new 2013 Trust.

23         THE COURT:  And what's the source of the Travelers

24   money?

25         MR. BLACK:  This is the worker's comp money that

BLACK016643

```
 1   was so crucial to obtain in 2012 and was an important part of
 2   why the disclaimers were part of the package in 2012 because
 3   as we will explain at a hearing there was no way to get the
 4   worker's comp money except as part of a package--
 5              THE COURT:  Okay.  So do I--
 6              MR. BLACK:  --with the disclaimers.
 7              THE COURT:  --I guess we need to pull the
 8   transcript then from your appointment hearing about this
 9   business with the disclaimer.  Because the two-third,
10   one-third thing I don't have in my notes, so--
11              MR. BLACK:  So we--we can--
12              THE COURT:  --we'll pull the transcripts.
13              MR. BLACK:  --we can go through--through the
14   history, right, but--but my understanding was that the
15   two-thirds, one-third--and I think we--we can walk you
16   through the disclosure was fully disclosed, there were
17   proposed orders, there were more proposed orders, there was
18   an approved order, everybody knew about the two-thirds,
19   one-third.
20              I don't--I really think there was no doubt about
21   what was being proposed to the Court and what I planned to do
22   and wanted to do with the disclaimer of the payment on death
23   beneficiaries.  And I think we can show you a very extensive
24   paper trail on that.
25              THE COURT:  Okay.
```

1          MR. BLACK:  With regard to the conservatorship the
2    issue is that in the fall you basically told us, look, Joanne
3    is in New York go to New York.  We went to New York; I
4    applied to transfer my conservatorship to New York.  You
5    might ask why are we still fighting over everything under the
6    sun here and I think a principal answer is that Anthony Dain
7    an Cherie Wrigley are doing their best to throw mud at me in
8    Colorado and then they're going to go to New York and say,
9    see, (inaudible) throwing mud at Bernie Black in Colorado.

10         It would be I think a major victory for them if you
11   were to suspend my conservatorship because then the New York
12   Court will assume that there was something underneath it.

13         And, Your Honor, I ask that there has been no
14   showing that I have done anything whatsoever wrong in
15   managing Joanne's money except to follow what I believe was
16   fully approved in 2012.

17         And so what I would propose instead in order to
18   avoid sending this adverse inference to the New York court is
19   leave me in place, extend my powers, add a special
20   conservator, I'll continue to get the weekly checks, I'll
21   continue to put them in trusts for Joanne, I'll continue to
22   communicate with Travelers and make sure that the benefits
23   continue to come because every so often they ask me to
24   confirm various things about Joanne including that she's
25   alive and where she is.

BLACK016645

1       I'll file income taxes for Joanne.  I won't spend

2   anything without approval of the special conservator and that

3   way we can avoid sending a message to New York that I think

4   is just unwarranted because I think I have, in fact, done

5   nothing wrong.  I have, in fact, behaved properly and I am

6   completely convinced that Ms. Kerr's forensic audit will

7   simply confirm that I did what I said I was going to do; I

8   did what I said I was going to do for the disclaimer.  I

9   spent the money as conservator in the ways that I've reported

10  to the Court that I can--spent it; I spent it in no other

11  ways.

12      I think that's what the forensic audit is going to

13  show and we have preliminary evidence on that now.  And I

14  really want to avoid the adverse inference that I've done

15  anything wrong without an evidentiary hearing and without any

16  showing that I've done anything wrong where we will come in

17  and show you the full paper trail on the disclaimer and

18  two-thirds, one-third.  We will show you the very important

19  reasons why this was the best solution for Joanne at the

20  time, not just that it was disclosed, not just that it was

21  approved but it was in substance the best decision for

22  Joanne.  It was a carefully thought through decision in very

23  complex circumstances.

24      And, Your Honor, I ask for a hearing at which we

25  can show you all this rather than suspending my powers where

1    I think there is no evidence that I've done anything wrong.

2              MR. DAIN:  Your Honor, I'm sorry--

3              MR. SALZMAN:  May I be heard briefly?  To the

4    extent that Mr. Dain and Ms. Wrigley are acting in--in

5    Colorado, the instigator is me because it was--as a result of

6    my conversations and interviews with Joanne that I first

7    became concerned about this issue of the disclaimer and I

8    independently attempted to research Colorado law.

9              It was my thought based on my review of Colorado

10   law that these were not New York issues they were Colorado

11   issues.  I communicated with Ms. DiPonio; I spoke to Mr.

12   Dain, and I think that is the impetus to this proceeding and

13   to the extent that Mr. Black needs to be mad at somebody it's

14   not Mr. Dain and Ms. Wrigley, it's me.

15             THE COURT:  Okay.

16             MR. DAIN:  Your Honor--

17             THE COURT:  Mr. Dain?

18             MR. DAIN:  --when Mr. Black--he doesn't get it when

19   he says I've done nothing wrong.  Before the Court is

20   ordering his admission he's not arguing that--that he took

21   one-third to the benefit of his children; that is a conflict.

22   To say to this Court that I got authorization for that, I did

23   everything I'm supposed to do, Your Honor says you don't have

24   the note; the order that he says he had says nothing of the

25   sort that this is going into the estate.  Your Honor could

BLACK016647

1   have never issued him an order that allowed him to take

2   one-third of Ms. Black's money, however, the vehicle was and

3   put it to his and his children's benefit; that's a conflict

4   he can't act on and this Court never could have given him

5   that authority.

6          I'd love to go back and look at the transcript.

7   I'd love to go back and look at the history.  I've given you

8   the history of the orders.

9          THE COURT:  Right.

10         MR. DAIN:  And the reason Ms. DiPonio, Ms. Young,

11  Ms. Wrigley, myself didn't object to his accountings is he

12  was only accounting for two-thirds of the money and we didn't

13  at that time have any evidence or know there was additional

14  money had had taken.

15         If you come to this Court and you say there are $3

16  million, I take one and I account for two, we're going to say

17  well that's all we know exists because he never---I'm a

18  trustee and he never gave me statements, you think okay,

19  well, two--two million is still there.

20         If we had known there was $3 million--over $3

21  million and a third was suddenly missing there would have

22  been objections everywhere including Your Honor.

23         So I--we can have an evidentiary hearing, I'd love

24  that, but Your Honor has to continue with the order it

25  initially---

BLACK016648

```
 1              THE COURT:  Right.

 2              MR. DAIN:  --decided.

 3              THE COURT:  So who is being proposed to be the

 4    conservator then if not Mr. Black in New York?

 5              MR. DAIN:  In here or--

 6              THE COURT:  I thought you said you initiated--

 7              MS. DiPONIO:  In New York.

 8              MR. DAIN:  Oh, in New York--it calls it a

 9    guardianship rather than a conservatorship.

10              THE COURT:  Oh, of the person and the property.

11              MR. DAIN:  It is Ms. Wrigley and that's who was

12    nominated by Ms. Black and that's why the court there is

13    considering that.

14              THE COURT:  I see.

15              MR. DAIN:  But here Ms. Peterson--we're--we're more

16    than happy to have her appointed as an independent special

17    conservator.

18              MR. BLACK:  Your Honor, at a hearing we will show

19    that Cherie Wrigley knew about the disclaimer plan, knew

20    about the plan for two-thirds to go to the Supplemental Needs

21    Trust and the other one-third to go to the Issue Trust,

22    approved it, endorsed me, and helped me get it done.

23              Your Honor, at a hearing we will show you that

24    Anthony Dain--

25              THE COURT:  Okay.
```

BLACK016649

1    MR. BLACK:  --knew about the two-thirds, one-third
2  and said nothing, was uninvolved, was totally uninterested,
3  left everything to Cherie and me.  I tried t get Mr. Dain to
4  come in and be the conservator in Colorado instead of me, he
5  wasn't interested.

6    I tried to get him to manage the money under
7  Joanne's Supplemental Needs Trust, he wasn't interested.  I
8  could not get Mr. Dain to lift a finger on Joanne's behalf
9  until I had a fight with Cherie Wrigley, his sister, over
10 Cherie Wrigley's outrageous spending demands on Joanne's
11 money and now Anthony Dain is coming in and being active on
12 behalf of Cherie Wrigley.

13    Your Honor, this case is fundamentally about
14 whether Cherie Wrigley and Anthony Dain can grab Joanne's
15 money so that Cherie can spend it and spend it and spend it
16 until there is nothing left.

17    THE COURT:  Well, maybe you should have--

18    MR. BLACK:  And, Your Honor, at a hearing we will
19 show you all this.

20    THE COURT:  --a professional fiduciary then deal
21 with this instead of a family member, maybe that's the
22 answer.

23    MS. DiPONIO:  And, Your Honor, (inaudible) it's
24 all irrelevant what's happening here.  What's--what's most
25 important here is (inaudible) what was disclosed to this

BLACK016650

```
1    Court--

2             THE COURT:  Uh-huh.

3             MS. DiPONIO:  --(inaudible) with regard to

4    (inaudible) and that's as I had indicated before it wasn't a

5    disclosure--a full disclosure as to what was (inaudible).

6             MR. SALZMAN:  I'm having a little trouble hearing.

7             MS. DiPONIO:  Oh, I'm sorry.

8             THE COURT:  She's just clarifying what she believes

9    the real issue is in terms of the disclaimer and the

10   disclosure of the disclaimer.  All right.

11            MR. BLACK:  Your Honor, we'd be happy to walk you

12   through the paper trail on what was disclosed and when it was

13   disclosed today, we'll be happy to do it in an evidentiary

14   hearing.

15            THE COURT:  Yeah.  We'll need a full evidentiary

16   hearing for that; I want to get the transcript of the

17   appointment hearing before we do any of that.

18            Yes, Ms. Wrigley?

19            MS. WRIGLEY:  Shall I come to the mike?

20            THE COURT:  Yeah.

21            MS. WRIGLEY:  Your Honor, I feel I at least

22   deserve--first of all, I'm here on behalf of Joanne Black, my

23   cousin.  She asked me to come specifically.  The main reason

24   that I'm here is because as her advocate and hopefully soon

25   to be her guardian in New York, whether it just be of her
```

BLACK016651

1   person or both person and property.

2           I have been close to her her--most of her life.  I
3   did side with Bernie when she was in an extremely difficult
4   psychotic place when she was here in--as a transient in-
5   Denver for numerous months.  And I sided with her brother
6   because I didn't know what else to do.  She needed help.

7           And I assumed at that time that after his mother
8   died that I knew she had inherited a tremendous amount of
9   money that he was going to hold that money safe for her.  I
10  was never ever informed that any of the money from Vanguard
11  that was POD to her and Fidelity was ever going to be divided
12  two-thirds, one-third.  I knew that the real estate was going
13  to be divided two-thirds, one-third, but I assume that all of
14  the money in Vanguard and Fidelity was going to be held in
15  safety for her.

16          I did not find out until last summer that there was
17  any question that that money had not been held.  And we had a
18  big argument about that and he knows that.  I was furious
19  that he had even removed the money from Vanguard, I had no
20  idea he moved it to Chase; he completely ignored my--you
21  know, my being upset.  And Joanne and I were estranged during
22  this time because she thought I was part of Bernie's plan to
23  take her money.

24          We became close again through Esaun who was working
25  closely with her and that was all set up by me with Bernie's

BLACK016652

1    assistance.  And I've been in close contact this entire time
2    with her doctors; I've set up an entire support system and
3    program.  Joanne and I speak almost daily.

4         Let's see, Bernard has no relationship whatsoever
5    with Joanne.  She does not want him in her life; she is
6    completely lucid, competent, capable of taking care of most
7    of her--you know, most of the things in her life with a
8    tremendous support team behind her.  She does not want
9    Bernard to be a conservator nor be a part of her life at this
10   point.  He has never been--taken an active role in her life.

11        I have no interest in her money.  He has not paid
12   me a penny to reimburse me for anything that I have done.  I
13   have paid all of her dental, medical bills, until December
14   30th I was paying for all of her food, all of her expenses,
15   everything out of my own pocket.

16        Her--the lawyer fees that she had requested me to
17   take on, anything you can think of were all paid out of
18   pocket by me.  He has not paid me back for anything.  So what
19   he's talking about my spending and spending, I have no clue
20   because he's not paid me back--I have not been paid back
21   anything.

22        And, you know, I'm financially solvent; I have no
23   need.  Everything that I have done has been documented with
24   the attorneys in New York.  Let me see there's one last
25   thing, both my brother and I love Joanne deeply.  We have

1   always had a very close relationship with her.

2          All the doctors and the entire family knows this

3   and I don't have any idea what Bernie wants from this, all I

4   know is that I am here representing Joanne. I have always

5   been behind Joanne whether she has been with me--that's

6   another story--but right now she is on medication, she is--

7   this is the best recovery she has ever had.

8          I am paying for--aside from Nissan (phonetic)--we

9   won't get into that, but I am paying for Lois Orlin, who is a

10  psychiatric case manager--everything is coming out of my own

11  pocket.

12         THE COURT: And why can't you authorize this out of

13  the Supplemental Needs Trust?

14         MR. DAIN: I have authorized it, Your Honor, and

15  we've documented it, Mr. Black--

16         MR. BLACK: Excuse me, there has been no request of

17  any payment out of the Supplemental Needs Trust with the

18  following exception, Cherie requested reimbursement for

19  dental bills and refused to provide me with a receipt.

20         MS. WRIGLEY: I have sent him two different

21  receipts from the doctor's office and he--

22         THE COURT: Okay.

23         MS. WRIGLEY: --claimed that they weren't correct.

24         THE COURT: All right.

25         MR. DAIN: Your Honor, just--

BLACK016654

```
 1                 THE COURT:  No, just a second.
 2                 MR. DAIN:  Okay.
 3                 THE COURT:  Mr. Salzman?
 4                 MR. SALZMAN:  Yes, Your Honor.
 5                 THE COURT:  Is there anyone in New York that can
 6     handle being the rep payee and that sort of thing?
 7                 MR. SALZMAN:  An entity or--
 8                 THE COURT:  Or--is there some--he we have a trust
 9     organization that--that does that sort of thing, is there
10     anything similar or a fiduciary relationship, entity or
11     person that you're aware of that can step in for that?
12                 MR. SALZMAN:  Not just--not just to serve as rep
13     payee, no, Your Honor.
14                 THE COURT:  All right.  All right.  At this--all
15     right--thank you, Ms. Wrigley.
16                 MS. WRIGLEY:  Okay.
17                 THE COURT:  At this point I am satisfied that I
18     don't think Mr. Pinto should become--be the rep payee.
19     There's too many issues surrounding whatever expenses--he's
20     got to provide a full accounting.  Someone needs to be the
21     rep payee and get any backed up funds as Mr. Black has
22     represented.
23                 But what I'm ordering is that everything is frozen
24     except for the Social Security and the workmen's comp funds
25     from Travelers, they need to go into a separate
```

BLACK016655

1   conservatorship account that's going to be managed by Ms.

2   Peterson that will go to pay her monthly living expenses.

3            There's clearly a huge dispute regarding who is

4   going to be the conservator going forward; that issue does

5   need to be handled by the court in New York. So it will be--

6   from what I'm hearing today there is--Mr. Black wants to

7   continue, Ms. Wrigley wants to be appointed--or maybe that

8   court needs to consider a professional fiduciary and take the

9   family out of it all together. But I will leave that

10  specific decision to that court.

11           MR. SALZMAN: Your Honor, the issue here is timing;

12  we are currently scheduled to be heard on--on April 30th and

13  May 1st with regard to this case.

14           THE COURT: Okay.

15           MR. SALZMAN: If there is--lacking your permission

16  we cannot go forward here in New York, we have--I--as has

17  Colorado--we have Uniform Adult Guardianship and Protective

18  Proceedings Jurisdiction Act. So as long as there is a

19  pending--an actual conservator in Colorado we don't have

20  jurisdiction here in New York without your permission or

21  instructions with regard to how we should proceed.

22           THE COURT: All right. So I'll include in the

23  order that the special conservator here is just an interim

24  person pending the proceedings and determination in New York

25  who should act as the conservator going forward.

BLACK016656

```
 1            MR. SALZMAN:  Thank you, Your Honor.
 2            THE COURT:  Is that sufficient?
 3            MR. SALZMAN:  I think that would be sufficient,
 4   Your Honor.
 5            THE COURT:  Could it be construed in another way?
 6            MR. SALZMAN:  I don't believe so.  I mean I--I
 7   would like to see what Mr. Glatstein has to say, if he--if he
 8   would agree with that.
 9            THE COURT:  Okay.
10            MR. GLATSTEIN:  Your Honor, I think the New York
11   court is appropriately respecting the authority of this
12   Court.  And under the Jurisdiction Act there is--part of the
13   reason for that is to make sure there is not a gap.
14            And if the Court appoints Ms. Peterson as a special
15   conservator here under the Jurisdiction Act she could easily
16   register in New York--unless Mr. Salzman tells me they
17   haven't adopted that part--so if there is anything in New
18   York pending further determination--
19            THE COURT:  Why does she need to register?
20            MR. GLATSTEIN:  If--if New York--
21            THE COURT:  Why can't she just hand it over to
22   whoever gets appointed?
23            MR. GLATSTEIN:  Well, once they get it appointed,
24   yes, if there's any gap at New York or anything that needs to
25   be done if that hearing is continued because this Court
```

1   hasn't terminated the registration is a possibility, I just
2   put it out there. That there should not be any gap and that
3   hearing should not be further delayed because this Court may
4   have further review matters.

5          MR. SALZMAN:  If the Court could indicate that, you
6   know, it desires the New York court to proceed with the
7   understanding that once the New York court makes a decision
8   there would then be the usual transfer of procedures under
9   the Uniform Act once the accountings are completed in
10  Colorado I think that would be sufficient and I think satisfy
11  all procedural niceties.

12          THE COURT:  Okay.

13          MR. BLACK:  Your Honor, I am being shot at in two
14  states, Ms. Dain (sic) and Ms. Wrigley are attempting to
15  defund both the Issue Trust and the Supplemental Needs Trust
16  because that would be the consequence of reversing the
17  disclaimer.

18          I ask that I have permission to use conservatorship
19  funds to defend my actions as conservator.  I request that I
20  have permission to pay reasonable legal fees to continue to
21  defend my actions as conservator.

22          I'll be happy to pay on Joanne but I don't think
23  it's fair for them to be shooting at me in two states and
24  causing me to incur substantial legal expense.  I believe
25  that those are appropriate uses of the trusts and I believe

BLACK016658

1    that those are appropriate uses of the conservatorship funds.
2    And I ask that you allow me to continue to pay reasonable
3    legal expenses to defend against what I believe are
4    completely made up, inflated, false claims in two states.

5              MR. SALZMAN:  Your Honor, I would ask that the  .
6    Court delay that decision in a resolution of this matter and
7    I think depending on the findings of fact both of this Court
8    in New York I think that that--those would be relevant in
9    terms of whether or not Mr. Black would be entitled for
10   reimbursement for his fees.

11             Certainly if there was significant malfeasance
12   under New York law he would not.  I'm guessing your procedure
13   would not be terribly dissimilar.

14             THE COURT:  Right.  Well, I guess what I'm--what
15   I'm hearing is there most likely is not going to be any
16   problem with the actual accounting.  The real issue is this
17   business about the disclaimer.  And that remains to be seen.

18             But I agree I think I need to hold that in
19   abeyance, but I won't--I won't order it now, but I'll take
20   that under advisement pending the results of the--Ms. Kerr's
21   accounting, forensic accounting, and the evidentiary hearing
22   that we're going to have with regard to this disclaimer
23   business, but I see that as two separate things if you will.

24             MR. BLACK:  So let me understand, if I can, I'm
25   authorized to continue to pay legal fees, obviously subject

```
 1   to a requirement that if there's misconduct I have to return
 2   them?
 3            THE COURT:  No, I'm not authorizing payment for
 4   legal fees at this point.  I'm holding it in abeyance pending
 5   the results of the accounting and the evidentiary hearing to
 6   determine whether or not it's appropriate.
 7            MS. DiPONIO:  Your Honor, if I may, Ms. Young and I
 8   have not submitted an invoice in this case since 2013 about--
 9   when we were first appointed.
10            THE COURT:  Uh-huh.
11            MS. DiPONIO:  I would ask that legal fees be
12   allowed, should we submit an invoice for work that has been
13   done to date and that Ms. Peterson be allowed to pay those
14   from the conservator account?
15            THE COURT:  I don't--I mean she's got limited funds
16   to work with.
17            MS. DiPONIO:  Right.
18            THE COURT:  She's only got the two things, the
19   Social Security and the Travelers workmen's comp going into
20   that.
21            MS. DiPONIO:  So we will have to wait to submit our
22   invoices until after the evidentiary hearing or--
23            THE COURT:  I think so at this point, uh-huh.  And
24   --yeah, it's probably the best way to deal with it.
25            MS. DiPONIO:  Okay.
```

```
 1              THE COURT:  Okay.  Do we want to try and set a
 2    hearing at this point or do we just want to wait until the
 3    accounting and the transcripts come in?
 4              MR. GLATSTEIN:  Your Honor, I think it would be
 5    best to get the accounting.  Ms. Kerr is working very quickly
 6    but--
 7              THE COURT:  Okay.
 8              MR. GLATSTEIN:  --it's hard to gauge.
 9              THE COURT:  All right.  Let me yield some
10    resolution--I'll get the transcript ordered this week as
11    well.
12              MR. GLATSTEIN:  Your Honor, I ordered a transcript
13    already, we will be happy to make that available to the
14    Court.
15              THE COURT:  Of the appointment hearing?
16              MR. GLATSTEIN:  Right.
17              THE COURT:  Okay.  And the other parties as well?
18              MR. GLATSTEIN:  Anyone that requests it.
19              MS. DiPONIO:  Your Honor, I would like a copy of
20    the transcript as well.
21              MR. DAIN:  And, Your Honor, we weren't--I wasn't at
22    the hearing, so, yeah, I'll need a copy.
23              THE COURT:  All right.
24              MS. YOUNG:  I did not request it, but I do--would
25    like a copy.
```

1          THE COURT: All right. So that will be provided to
2    Court, counsel. Okay. All right. So this what I've got
3    folks, I'll just recap, I'm granting the request to appoint
4    Nancy Peterson as special conservator pending conclusion of
5    these proceedings and the appointment of a conservator in New
6    York State.

7          Mr. Black's letters will not be reissued by this
8    Court at this time. And his conservatorship is suspended
9    pending completion of these proceedings.

10         And I will--I'm happy to make it very clear that
11   these orders are more proactive in nature just to set this
12   case on an even keel so that there's a clean slate going in.

13         The New York court will take its evidence and make
14   its decision but the suspension is not to be considered as a
15   black mark standing alone against Mr. Black.

16         An individual needs to be identified for
17   appointment in New York State, either Mr. Black, Ms. Wrigley,
18   or a professional fiduciary or someone else. All of the
19   assets except for the Social Security and the workmen's comp
20   are frozen at this point.

21         If there needs to be any distributions from the
22   Supplemental Needs Trust beyond what these two funding
23   sources provide we're going to have to have a motion before
24   this Court.

25         MR. SALZMAN: Your Honor, may--may I make an

1    inquiry?

2            THE COURT:   Just a minute.   The Social Security

3    representative payee needs to be changed either to Ms.

4    Peterson or another individual.   And the Social Security

5    funds and the workmen's comp funds are to be redirected into

6    a conservatorship account that Ms. Peterson will open so that

7    she can pay the--Ms. Black's monthly living expenses.

8            Any overage she'll manage and keep track of.   Mr.

9    Pinto will provide a full accounting of funds under his

10   control to Ms. Kerr and cooperate with transferring the

11   representative payee.

12           MR. BLACK:   Your Honor, may I request that the--you

13   allow the Supplemental Needs Trust, the Issue Trust, and the

14   2013 Trust to pay income taxes and to pay the reasonable fees

15   of an income tax accountant, those need to be paid?

16           THE COURT:   Any objections?

17           MS. DiPONIO:   No objection.

18           MR. DAIN:   Well, I would have no objection, Your

19   Honor, but Ms. Kerr in her report indicates there as a

20   payment of $20,000 to an accounting firm which she can't

21   understand for a tax return--why it was that significant.   So

22   as long as it's without prejudice and disgorgement and, in

23   fact, there is some overpayment of these accounting things--

24   or these tax returns.

25           THE COURT:   All right.   So that request is granted.

BLACK016663

1   So the trusts funds at this point in time are frozen except
2   for the payment of legal accounting fees and related income
3   taxes.
4              MR. BLACK:  I have one more request--
5              THE COURT:  Can I finish my order first?
6              MR. BLACK:  Yeah.
7              THE COURT:  Thank you.  All right.  The--Mr.
8   Glatstein has indicated that he has already either ordered or
9   obtained a transcript of the appointment hearing that was
10  held before this Court in 2012.  He will provide a copy to
11  the Court and to all counsel of record.
12             At this point pending the results of Ms. Kerr's
13  accounting which issues have yet to be identified, if any,
14  the issue before this Court is whether or not the disclaimer
15  should have acted to divest Joanne Black of one-third of the
16  nonprobate assets that she received from her mother.  If
17  anyone thinks that that should be worded a little bit
18  differently I'm happy to hear that.
19             And the trust can pay--again the legal and
20  accounting fees and the income taxes accrued during this time
21  period.
22             Okay.  Yes, Mr. Black?
23             MR. BLACK:  There may be the need to pay additional
24  fees to Pam Kerr.  I don't know--we paid her so far $10,000,
25  there may be additional fees, so I would request approval--

BLACK016664

```
 1               THE COURT:   I'm sure she'll be happy to--
 2               MR. BLACK:   --to pay those as well.
 3               THE COURT:   --generate a bill and we'll take that
 4     up as well.
 5               Mr. Salzman, you had another clarification
 6     question?
 7               MR. SALZMAN:  When the Court says the term all
 8     assets, I assume what the Court means is the 1997 Issue Trust
 9     and the 1997--a trust for the benefit of Joanne Black; is
10     that correct?
11               THE COURT:   Three trusts, right?
12               MR. SALZMAN:  Oh--
13               THE COURT:   Supplemental Needs Trust, Issue Trust,
14     and she's got another trust.
15               MR. SALZMAN:  Right.  Now, is the--now, with regard
16     to the 2013 Trust is that frozen or is that to be transferred
17     to Ms. Peterson?
18               THE COURT:   No, we're not transferring any trusts
19     to Ms. Peterson.
20               MR. SALZMAN:  Or the proceeds in the account, okay.
21     Now--so--so does that mean that the--so in that--that trust
22     has not been approved, are those assets now considered
23     guardianship assets?
24               THE COURT:   No.  At this point I'm just freezing.it
25     until we figure it out.  I'm not transferring anything.  And
```

BLACK016665

1    if money in trust--other than what I've stated on the record
2    --needs to be used a motion is to be filed here and I'm just
3    going to hang on to everything until the New York court
4    decides who is going to be in charge of the funds.  Because
5    you--you don't have an appointment yet, right?
6         MR. SALZMAN:  Correct, Your Honor, thank you very
7    much.
8         THE COURT:  Right.  Okay.
9         MS. DiPONIO:  Your Honor, if I may--if we could
10   add--and I apologize (inaudible) of this, if we could add to
11   your order also that the 2013 Special Needs Trust be
12   submitted to the Court for approval since that was never
13   submitted.
14        THE COURT:  Okay.
15        MR. DAIN:  It's actually called the 2013 Joanne
16   Black Trust.
17        THE COURT:  Okay.  So, Mr. Glatstein, copies of all
18   these--I know that there's one of record in here.
19        MR. GLATSTEIN:  Correct.
20        THE COURT:  You submitted one of the trusts in
21   2012, but can you just resubmit all three of them?
22        MR. GLATSTEIN:  Certainly.  Certainly.
23        THE COURT:  And then if anyone thinks it's
24   beneficial that I have a discussion about the jurisdictional
25   aspects with the New York court I'm happy to entertain that

1    if you folks want to set that up or approach the judge out
2    there.

3              MR. SALZMAN:  I can--or I will--I discussed that
4    with the judge but I think that with an appropriate order
5    from you I think he'll be more than happy to go forward.

6              THE COURT:  Okay.  Yes.  It's not my intention to
7    keep him from going forward because it's clear that this
8    can't stay in Colorado.  It has to be moved to New York State
9    where she lives.

10             MS. DiPONIO:  And, Your Honor, I will work with Mr.
11   Salzman and get any of the Court documents from New York and
12   provide them to you so that you have knowledge of what the
13   court is doing out there and I'll keep you updated if--if Mr.
14   Salzman agrees that that would (inaudible)--

15             THE COURT:  Uh-huh.

16             MS. DiPONIO:  --well that way you know what--what
17   is entered and you're privy to that.

18             THE COURT:  Okay.  Mr. Dain, anything else?

19             MR. DAIN:  Just in terms of the suspension of the
20   conservatorship, we have--I no intention--of New York saying
21   in and of itself that means--means anything, but this--this
22   statement of a black mark, I assume that's was a concept not
23   actually stating--

24             THE COURT:  Right.

25             MR. DAIN:  --yes.  Okay.  Then--then I'm fine,

BLACK016667

```
 1   nothing else.  Thank you very much, Your Honor.

 2            THE COURT:  Okay.  Mr. Glatstein, anything?

 3            MR. GLATSTEIN:  No, Your Honor?

 4            THE COURT:  Ms. Young?

 5            MS. YOUNG:  (No audible response.)

 6            THE COURT:  Ms. DiPonio?

 7            MS. DiPONIO:  No, Your Honor.

 8            THE COURT:  And, Mr. Salzman, anything else?

 9            MR. SALZMAN:  Nothing else, thank you very much for

10   allowing us to participate by phone.

11            THE COURT:  Of course.  All right.  Then I think

12   then we're done for the day and we will at this point look

13   for copies of everything that I've ordered and Ms. Kerr's--

14            MS. DiPONIO:  Your Honor--

15            THE COURT:  --accounting.

16            MS. DiPONIO:  --are we going to set a date?

17            THE COURT:  I heard that you wanted to wait until

18   the accounting was received before setting a date.

19            MR. DAIN:  Maybe we could just--and I hate to use

20   the word placeholder because that's insulting to the Court's

21   calendar but I--Ms. Wrigley and I come from California; I'm

22   an attorney as well.

23            THE COURT:  Okay.

24            MR. DAIN:  And if we don't have a date certain--

25   whatever date that the Court might set is going to--you know,
```

BLACK016668

```
1    it might just cause a snowball problem, so is there any way
2    that we could just do that maybe six weeks out or--
3             (Pause.)
4             THE COURT:  Can you--do you have access to it--you
5    don't?
6             MR. DAIN:  No.
7             THE COURT:  All right.  I'll have to--the problem
8    is the electronic calendar is not on this terminal so--
9             MR. DAIN:  Okay.
10            THE COURT:  --if you--we can certainly fly some
11   dates but if--I'll go off the record and get some though.
12            MR. DAIN:  If--if Your Honor would that would be
13   great.
14            THE COURT:  All right.  Thank you.
15            (Whereupon, a recess was taken.)
16            THE COURT:  Back on the record and you wanted a
17   full day, right?
18            MR. DAIN:  Yes, Your Honor.
19            MR. GLATSTEIN:  Yes.
20            THE COURT:  Okay.  So here we go, starting on May
21   20th--so the 20, 21, 22, 26, 28, 29 in May.
22            MR. GLATSTEIN:  Your Honor, Mr. Black is out of the
23   country from May 15, till June 8th or 9th?
24            MR. BLACK:  8th.
25            THE COURT:  Okay.  So none of those are going to
```

```
 1   work then.  And then we're probably into July after that.
 2              MR. GLATSTEIN:  End of June?
 3              UNIDENTIFIED SPEAKER:  (Inaudible).
 4              THE COURT:  Is there any late June dates?
 5              UNIDENTIFIED SPEAKER:  (Inaudible).
 6              THE COURT:  What about the week of the 15th of
 7   June?
 8              MR. GLATSTEIN:  You leave--
 9              MR. DAIN:  May 15th?
10              THE COURT:  June.
11              MR. DAIN:  Oh, June.
12              MR. GLATSTEIN:  June 15th.
13              MR. BLACK:  Yeah, that's fine.
14              THE COURT:  Yes?
15              MR. GLATSTEIN:  Yes.
16              MR. DAIN:  Yes.
17              MS. DiPONIO:  That's fine, Your Honor.
18              THE COURT:  Okay.  So any day that week will work,
19   the 15th.
20              MR. DAIN:  Any of those dates will work for me;
21   that's fine.
22              THE COURT:  Mr. Glatstein, any preferences?
23              MR. GLATSTEIN:  Friday, June 19th would be best on
24   my calendar or Monday.
25              MR. DAIN:  I'm sorry which Monday?
```

BLACK016670

```
1              MR. GLATSTEIN:  Monday--

2              THE COURT:  Monday the 15th?

3              MR. GLATSTEIN:  Monday the 15th.

4              UNIDENTIFIED SPEAKER:  15th or (inaudible).

5              UNIDENTIFIED SPEAKER:  (Inaudible).

6              MR. GLATSTEIN:  Earlier in the week?

7              THE COURT:  Monday the 15th?

8              UNIDENTIFIED SPEAKER:  (Inaudible).

9              THE COURT:  No.  Tuesday the 16th?

10             UNIDENTIFIED SPEAKER:  I can do (inaudible).

11             THE COURT:  Any takers for Tuesday the 16th?

12             MR. DAIN:  Let's do the 15th; we'll just have to do

13     it on Mr. Glatstein's calendar--the 15th.

14             THE COURT:  All right.

15             UNIDENTIFIED SPEAKER:  (Inaudible).

16             MS. DiPONIO:  And what time, Your Honor, 9?

17             THE COURT:  Yeah.  All right.  So Monday, June

18     15th, shall we set some time aside like a half day on the

19     Tuesday just in case?

20             MR. DAIN:  Yeah, that would be---

21             MS. DiPONIO:  Probably it would be safe to do.

22             THE COURT:  Morning or afternoon?

23             MS. DiPONIO:  Morning.

24             THE COURT:  Okay.

25             MS. DiPONIO:  Ira, did you hear those dates?  Are
```

BLACK016671

59

1   those okay with you?

2          MR. SALZMAN:  The 15th is--is not great for me.  I

3   can--it's my 40th wedding anniversary, I was supposed to be

4   home that night.

5          MS. DiPONIO:  Oh, no.

6          MR. SALZMAN:  Any other day that week would be

7   fine.

8          MS. DiPONIO:  Then we can--16th okay?

9          UNIDENTIFIED SPEAKER:  We couldn't fly out if he

10  had t be home that night, so--

11         MS. DiPONIO:  Oh, you'd be planning on coming out,

12  you wouldn't do it by phone?

13         MR. SALZMAN:  It's unclear at this point, you know,

14  unclear.

15         THE COURT:  Well, by then there should be a

16  conservatorship appointment in New York, correct?

17         MR. SALZMAN:  Yeah.

18         THE COURT:  Is that right?

19         MR. SALZMAN:  I would hope so, yes.

20         THE COURT:  Okay.

21         MR. DAIN:  Okay.  So that way--that would alleviate

22  the need--so then, Ira, maybe if you participated it would

23  just be by phone.

24         MR. SALZMAN:  But, I guess even if I'm by phone,

25  you know, you're going to run late for me.  Look, I don't

BLACK016672

1    want to stand in the way, I'll work around it.

2               THE COURT:  Okay.

3               MR. SALZMAN:  But obviously any other day that week

4    would be better.

5               MR. DAIN:  Mr. Glatstein, what were the other days

6    that week?

7               MR. GLATSTEIN:  16th or the 17th are fine.

8               MR. DAIN:  Could we do the 17th and the morning of

9    the 18th then?

10              MR. GLATSTEIN:  The 18th is problematic for me.

11   15, 16, 17th, work.

12              MR. DAIN:  Okay.  16 and the 17th, is that okay,

13   Your Honor?

14              THE COURT:  That's fine.

15              MR. DAIN:  Okay.

16              THE COURT:  Okay.  So you want to do the full day

17   on the 16th then?

18              MR. DAIN:  Yes, Your Honor.

19              THE COURT:  Okay.

20              MS. DiPONIO:  And then maybe reserve--

21              THE COURT:  In the morning of the 17th?

22              MS. DiPONIO:  --morning on the 17th.

23              THE COURT:  Okay.  We'll schedule it--of course if

24   you enter into some kind of other stipulations before then,

25   you know, advise the Court and we'll deal with that when it

BLACK016673

61

```
1   comes up.  Okay.
2              MR. DAIN:  Thank you so much, Your Honor.
3              THE COURT:  Okay.
4              MS. DiPONIO:  Thank you, Your Honor.
5              THE COURT:  Thank you, Mr. Salzman.
6              MR. SALZMAN:  Your Honor, thank you very much.
7              (Whereupon, the proceeding was concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BLACK016674

---------------------------------------------------------------
CERTIFICATE

---------------------------------------------------------------

STATE OF COLORADO   )

                    :

COUNTY OF DENVER    )

         I, Theresa Ornelas, Transcriptionist for the Denver

Probate Court, in the State of Colorado, do hereby

certify that the above and foregoing is a transcript of

the recorded proceedings, based upon the quality of

the recording and my ability to understand it, taken at the

date and time set forth on Page One hereof.

         DATED at Denver, Colorado, this 14th day of April,

2015.


                         /s/Theresa Ornelas

                         Theresa Ornelas
                         Official Transcriber
                         Federal Reporting Service
                         17454 E. Asbury Place
                         Aurora, CO  80013

BLACK016675