1

PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

-----------------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

-----------------------------------------------------------------

CASE NO. 12 PR 1772

-----------------------------------------------------------------

IN THE INTEREST OF:

JOANNE BLACK, Respondent.

-----------------------------------------------------------------

       This matter came on for hearing before THE
HONORABLE ELIZABETH D. LEITH, Judge of the Denver Probate
Court, on Wednesday, August 5, 2015.  The following is a
transcript of the audible portions of that hearing as
requested by the ordering party.


APPEARANCES:    Bernard A. Poskus, Esq., and Patrick R.
                Thiessen, Esq., for Bernard Black

                LISA DiPONIO, Esq., for Joanne Black,
                Respondent

                GAYLE YOUNG, Esq., Guardian Ad Litem for
                Joanne Black, Respondent

                IRA SALZMAN, Esq., Attorney for Joanne Black,
                Respondent

                ANTHONY DAIN, Esq., Trustee/cousin

                CHERIE WRIGLEY, Cousin



EXHIBIT 5
BLACK
8/23/2018
Tiffany M. Pietrzyk, CSR RPR CRR

2

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Petitioner: | | | | |
| Bernard Black | 18 | 63 | 156,221 | 158,235 |
| Katherine Litvak | 247 | 274 | 282 | 283 |
| For the Respondent: | | | | |
| Cherie Wrigley | 160 | 177 | 187 | |
| Anthony Dain | 192 | 201 | 215 | 220 |

EXHIBITS

| For the Petitioner: | Received |
|---|---|
| 78 | 24 |
| 44 | 28 |
| 45 | 29, 30 |
| 46 | 30 |
| 47 | 30 |
| 48 | 30 |
| 43 | 32 |
| 80 | 108 |
| 109 | 158 |
| 49 | 183 |
| 106 | 204 |
| 68 | 208 |

BLACK000591

3

```
 1                P R O C E E D I N G S
 2          THE COURT:  Thank you, you may be seated.  Okay.
 3  Our record is on this morning, August 5th, 2015, calling up
 4  12PR1772 for continued proceedings.  Go ahead with
 5  appearances for the record today.
 6          MR. POSKUS:  Good morning, Your Honor, Bernard A.
 7  Poskus, number 11975 appearing on behalf of Bernard Black,
 8  Conservator.  Also appearing with me is my co-counsel Mr.
 9  Patrick Thiessen--
10          THE COURT:  Okay.
11          MR. POSKUS:  --number 40185.
12          MR. DAIN:  Good morning, Your Honor, Anthony Dain,
13  Cousin and Trustee of the Supplemental Needs Trust for Joanne
14  Black (inaudible).
15          MS. DiPONIO:  Good morning, Your Honor, Lisa
16  DiPonio, 27707, court appointed counsel for Joanne Black.
17          THE COURT:  Okay.
18          MS. DiPONIO:  Your Honor, also on the telephone is
19  attorney Ira Saltzman who is representing our mutual client
20  in New York.  And we have other folks here I'll let them
21  introduce themselves.
22          THE COURT:  Thank you.
23          MS. YOUNG:  Good morning, Your Honor, Gayle Young,
24  Guardian ad Litem for Joanne Black.
25          THE COURT:  Thank you.  And Ms. Peterson is in the
```

BLACK000592

4

1    back.

2              MS. PETERSON:  35675, special counsel.

3              THE COURT:  Thank you.  All right.  And I know that

4    there's been some filings.  In the meantime there was a

5    flurry of stuff; I've tried to review it as it comes in.  I

6    did deliberately not issue a contempt citation for a bunch of

7    different reasons but I read through that and the supplement

8    that Mr. Dain filed and then I seen Ms. Young's report and

9    Ms. Peterson's report.  Ms. Harper filed a report, and Ms.

10   Kerr filed a response to that and she's asking for her fees

11   to be paid.

12             So--and--and I think after all of that I'm still

13   thinking we need to get through the heart of this evidence

14   and then move on from there if we can.

15             All right.  Is there anything else you want to go

16   over before we get started?

17             MR. DAIN:  Your Honor, I--I'm not sure I understand

18   when you say we need to get to the heart of the evidence, I

19   assume what you mean is we get through that and then we'll

20   deal with all the other--

21             THE COURT:  Right.

22             MR. DAIN:  --(inaudible).  And I know Your Honor

23   has already indicated that you have today and tomorrow.

24             THE COURT:  Blocked off.

25             MR. DAIN:  Blocked off.

BLACK000593

5

1          THE COURT:  Just in case--it was a just in case

2     type of thing.

3          MR. DAIN:  Okay.

4          MR. POSKUS:  Your Honor, two things, number one, I

5     thought that this was just going to be for today so I'm--

6          THE COURT:  Okay.

7          MR. POSKUS:  --I'm not going to be able to make it

8     tomorrow, sorry.  But the second thing is on the contempt

9     citation just so you know, I don't believe that we're in

10    violation of the Court's order.  Having said that my client

11    yesterday deposited a check in my COLTAF account for 115,000

12    which is the amount complained of.  And I will represent to

13    the Court that I will hold on to that until I either get an

14    order from this Court or the New York court telling me what

15    to do with it.

16         THE COURT:  So that was sort of in reimbursement

17    mode kind of?

18         MR. POSKUS:  Yes, yeah, reimbursement mode.  In

19    other words, I think it was okay for him to do what he did

20    but we didn't want that issue to overwhelm the hearing today.

21         THE COURT:  Okay.

22         MR. POSKUS:  We wanted to get to the evidence.

23         THE COURT:  Okay.  And the source of those funds?

24         MR. POSKUS:  Is Bernie Black's personal funds.

25         THE COURT:  All right.  And what's the status of

BLACK000594

6

1   the case in New York in terms of the probate case?  Has that

2   court been advised of anything?

3           MR. DAIN:  Not--it has not, Your Honor, other than

4   that this is a continued hearing so it has continued the

5   hearing until I believe it's October 1st.

6           THE COURT:  So there is a hearing set.

7           MR. DAIN:  There is a hearing set.

8           THE COURT:  And the nature of that hearing?

9           MS. DiPONIO:  Your Honor, Mr. Salzman might be able

10  to fill you in on what is going on in New York.  I know he

11  notified the court--

12          THE COURT:  Okay.

13          MS. DiPONIO:  --about the proceedings and he might

14  be able to--

15          THE COURT:  Okay.  Mr. Salzman, did you hear that?

16          MR. SALZMAN:  I did, Your Honor, I'm on a cell

17  phone so if I'm breaking up (inaudible).  The--basically the

18  New York (inaudible) in (inaudible) thought--

19          THE COURT:  Yeah, you're breaking up really, really

20  badly.

21          MR. SALZMAN:  Okay.  Anyway the New York

22  proceedings have been adjourned (inaudible) the results of

23  your proceedings in Colorado.

24          THE COURT:  So are there any holds or suspensions

25  at that point--in that case?

BLACK000595

1          MR. SALZMAN:  I didn't--I didn't understand the

2     Court's question, what do you mean by holds and suspensions?

3          MR. DAIN:  I can actually address that, Your

4     Honor--

5          THE COURT:  Okay.

6          MR. DAIN:  --because I was in Court.  The Judge

7     instructed Mr. Black's attorney to instruct Mr. Black--and

8     this is as the Court put it--that he strongly advised to make

9     no transfers out of the estate accounts.  Mr. Black's

10    attorney said he would so advise his clients.

11         The Court didn't want at that point to overstep

12    because the matter--there were matters before this Court.

13         THE COURT:  Okay.

14         MR. DAIN:  So that Court has just adjourned its

15    hearing, evidentiary hearing and other hearings, until after

16    this Court rules.

17         THE COURT:  All right.  And is there--is that

18    hearing--the subject of that hearing, is part of it this

19    entire business about--Mr. Black testified that he was trying

20    to avoid in the first instance, which was whether or not his

21    mother had the capacity to change--to put the funds into the

22    POD account?

23         MR. DAIN:  No.  What's being litigated there is Mr.

24    Black has a petition for guardianship which in some

25    ·substances is·the equivalent of this Court's--

BLACK000596

1          THE COURT:  I thought that was a different court

2     though.

3          MR. DAIN:  Well, there are two courts--

4          THE COURT:  Right.

5          MR. DAIN:  --there's the Surrogate Court, there's

6     the court--the estate court.  As far as I know nothing is

7     happening in the estate proceedings until Mr. Black files to

8     either attempt to close them or as we're going to file to

9     address all the issues of payments out of the estate account.

10    That--

11         THE COURT:  Okay.  So he still hasn't--he hasn't

12    been suspended as the PR then?

13         MR. DAIN:  No, no.

14         THE COURT:  Okay.

15         MR. DAIN:  The court we're talking about adjourning

16    is the--is the court that's going to address the guardianship

17    proceedings and Ms. Wrigley also has a petition--

18         THE COURT:  Right.

19         MR. DAIN:  --in New York.

20         THE COURT:  Right, but that's a different court.

21         MR. DAIN:  Different court.

22         THE COURT:  Okay.

23         MR. DAIN:  So nothing has happened--if I could also

24    address one additional thing and again we'll address the

25    contempt issue, you know, the after the fact--Mr. Poskus

9

1   holding 115,000--the amount is actually 130,000, so if

2   there's an issue we can address each of those but it's

3   130,000.

4           THE COURT:  All right.  And then am I going to be

5   taking any--is there any issue with Ms. Kerr's fees at this

6   point?

7           MR. DAIN:  Your Honor, again I know you've read the

8   supplemental pleading, but it's amazing to me that Mr. Black

9   is paying his attorneys to challenge Ms. Kerr, but just

10  paying themselves to do that and then challenging whether she

11  should be paid.

12          There is no issue--I'm a trustee of the trust,

13  everything she has done is for Ms. Black's benefit and

14  beyond.  We would not be here today but for her and Ms. Young

15  bringing all that's happened to the attention of the Court.

16          THE COURT:  Right.

17          MR. DAIN:  Everything she's done has made this

18  happen.  So in its entirety those fees should be paid.  I--

19  the objections are--as I said it's taken a microscope to

20  things that are of no relevance of no significance and just

21  picking at them.

22          So I--I ask the Court to overrule the objections,

23  let's get Ms. Kerr paid.  She's been working for months and

24  months diligently with not a dime of payment.  So if we could

25  address that that would be one thing we could get out of the

BLACK000598

1    way that I think is just a housekeeping matter.

2             THE COURT:  Right.  Okay.  Mr. Poskus, is there any

3    objection to paying Ms. Kerr?

4             MR. POSKUS:  Well, Your Honor, yes, because part of

5    the problem is that if you look at the statute, the cost and

6    compensation statute, some of the factors on which somebody's

7    compensation is based are dependent on the outcome of the

8    case and how whether or not the Court finds Ms. Kerr's report

9    credible; that kind of thing.  And so of necessity we don't

10   know those factors until the accounting issues are decided.

11            THE COURT:  Okay.  But the bill itself?

12            MR. POSKUS:  The bill itself--I mean--I'm not sure

13   what you mean by that is--are we arguing with the time spent

14   and all that?

15            THE COURT:  Right.  Right.

16            MR. POSKUS:  I think a lot of the time that's been

17   spent has been excessive.  You know, Ms. Kerr appears in this

18   Court--has filed pleadings in this Court like she's a party

19   and then bills for it.  I don't think it's appropriate--

20            THE COURT:  So we're going to have another--

21            MR. POSKUS:  --I've never--

22            THE COURT:  --a hearing or evidence on the

23   necessity and reasonableness of her fees; is that what you're

24   telling me?

25            MR. POSKUS:  At this point, yeah, Your Honor, maybe

11

1  we can--if we can sit down and talk--I mean I think a lot of

2  these issues can get resolved if everybody just sits down and

3  talk.

4          THE COURT:  Well, why hasn't that happened then?

5          MS. DiPONIO:  Your Honor, that's--

6          MR. POSKUS:  Hold on I'm trying to speak right now.

7  Your Honor, you'll recall we ended the last hearing saying

8  we'll try to work together on all these.  We said we'll sit

9  down with the accountants and I said we'll sit down with Mr.

10  Dain and try to work through a few of the things so that when

11  we come back before you there will be a narrow--at least

12  there will be a narrowing of the issues.

13          And this is what's happened is Ms. Kerr has refused

14  to sit and talk with Ms. Harper, all she does is file her

15  pleadings with the Court, but she won't sit down with Ms.

16  Harper to work through the differences in their reports.

17          With regard to Mr. Dain we've had a series of four

18  conference calls on which Mr. Dain--well, let me phrase this

19  properly, the first two it was Mr. Dain, myself, Ms.

20  Peterson, and Mr. Frigon at which we were going to try to

21  work through some of the things.  You'll remember Mr. Dain

22  complaining repeatedly at the hearing last time, nobody has

23  cut me in on being trustee of the trust; nobody has given me

24  access to the statements.

25          Mr. Dain participated in the first two conference

BLACK000600

12

1    calls; we gave him all the information on how to get himself
2    on the accounts as a co-trustee of the trust.  As of day
3    before yesterday he's taken no action to do that.
4            And then indeed the last two conference calls that
5    we scheduled he just didn't attend.  And that's reflected in
6    Ms. Peterson's report.
7            Another thing that came out of those conference
8    calls is that Mr. Frigon and I agreed there would be a
9    certain amount of information that we could use from New York
10   in order to determine the proper way to manage Joanne's
11   assets.  And so--and Mr. Frigon, who was their expert, and I
12   agreed that would be good information to know.
13           We agreed that Ms. Peterson would contact Mr.
14   Salzman in New York and find out the answers--or at least
15   ask--maybe he says I don't know--he hasn't returned her
16   calls.
17           So--and then we get to this contempt thing, Your
18   Honor, and rather than call us and say, look, we see these
19   checks coming through what's going on, we don't get a call,
20   we just get a contempt citation.
21           THE COURT:  Uh-huh.
22           MR. POSKUS:  So we've reached out in all sorts of
23   ways to try to start working together and we get rebuffed at
24   every turn and then we come in here and they say Bernie Black
25   does all this bad stuff.

BLACK000601

1    I've been trying to turn the temperature down and

2  all I get is this kind of lack of corporation from the other

3  side. So that's kind of my problem with this, Your Honor, is

4  that we've been trying to work for the benefit of Joanne

5  Black. There could--you can make an argument about did we do

6  exactly the right thing, in hindsight maybe we didn't, maybe

7  we did, but the problem is that we're trying and nobody wants

8  to work with us on the other side. Ms. Peterson has but

9  that's--and Mr. Frigon but that's about it.

10    THE COURT: Uh-huh.

11    MR. POSKUS: So that's my problem with all this,

12  Your Honor. I'm not trying to raise a bunch of fuss but I

13  get a little angry when--when--for instance a pleading gets

14  filed that says I'm thumbing my nose at this Court, which

15  quite frankly I take personal offense at.

16    We're trying to do our best under difficult

17  circumstances and we could use some help from the other side.

18  And I thought when we left this Court the last time we had a

19  commitment from them to do that.

20    THE COURT: Okay.

21    MR. DAIN: Your Honor, let me address Mr.--the

22  issue which is--first which is what the Court asked. To say

23  that--that Ms. Kerr hasn't cooperated I mean is just absurd.

24  What she won't cooperate in is a reinvention of this

25  accounting.

BLACK000602

1        How is it going to help the Court, as the Court

2  said, it needs the numbers to say we'll do a new accounting

3  assuming everything Mr. Black did was appropriate, we'll give

4  him credit for paying his attorneys and paying his expert who

5  never testified with Ms. Black's money and then we'll tell

6  the Court what the net of that is; that doesn't help the

7  Court.

8        Ms. Kerr did an actual accounting.

9        THE COURT:  Uh-huh.

10       MR. DAIN:  And I think the Court agrees that that's

11  helpful to the Court.  So to say what she did is excessive

12  filing pleadings when Mr. Poskus, again, he filed an

13  objection and then didn't even wait, didn't even wait to ask

14  this Court can he be paid for that; just paid himself.

15       Why should I call him when this Court twice issued

16  freeze orders to tell him not to take money.  What about a

17  freeze order don't they understand.  So that's--that's a

18  complete nonissue, it's another red-herring.

19       If the Court accepts that Ms. Kerr's report was

20  helpful, Ms. Kerr's time is appropriate.  She's documented

21  everything she's done and she should be paid in full.  She's

22  asking for $50,000, by the way as I said in my supplemental

23  pleading, she's not been paid, Ms. Wrigley has not yet been

24  paid, I haven't been paid, Ms. DiPonio hasn't been paid, Ms.

25  Young hasn't been paid.  On our side we're playing fair.

BLACK000603

15

```
 1          On their side despite the freeze orders $130,000 to

 2  pay all of these attorneys that Mr. Glatstein himself said

 3  are feeding at the trough.  And then to say we don't

 4  cooperate.  I have not placed my name on that account or

 5  those accounts because Mr. Black is doing what he's doing.  I

 6  cannot be a party to an account he's on and--when he's taking

 7  that money because I don't want later any accusation that I

 8  should have known or I was a party to it.  I will not be on

 9  an account he's on an account.

10          So if--if the Court gets to the point where it

11  unwinds this, gets him off these accounts as a trustee I'll

12  get on the account.  But I know what the result of this would

13  have been, Mr. Poskus would have said, well, Mr. Dain is on

14  this account, he knew we were writing checks to ourselves; it

15  was incumbent upon him to--to do something.

16          So, yeah, I know we're not addressing the contempt

17  motion but I don't know if the Court sees it another way, but

18  you said--remember I even asked--would you make them file a

19  bond and you said we don't need a bond, I've frozen the

20  accounts.  And you asked Mr. Black, I've frozen the accounts,

21  you haven't transferred anything and he told you right there

22  on the stand, no, I haven't transferred anything.

23          Mr. Poskus was silent the whole time.  They've not

24  --they weren't the ones that came forward to you and say,

25  Your Honor, we put 115,000 in my account because maybe we
```

BLACK000604

16

1    were right, maybe we were wrong, they didn't do it.  We had
2    to come forward.  Ms. Kerr had to find out that information.
3    She had to fight with them to get that information.  They
4    kept telling her, no, it cuts off at a certain date.
5           It was her perseverance that even brought that
6    before this Court.  So, you know, this frustrating thing of
7    saying we're not cooperating, I won't cooperate with fraud, I
8    will not do it.
9           I participated in the two--two phone calls--by the
10   way, the last two calls, one I was in Japan, the other I just
11   couldn't make; those weren't--I wasn't personally saying I
12   don't want to participate I just could not make the calls.
13          Mr. Frigon, he is a trust expert, his purpose in--
14   in participating is to decide which trust is best to pay
15   from.  This--this nonsense about New York like we're going to
16   get more involved now and how Mr. Black should manage the
17   assets that's nonsense; I hired Mr. Frigon.  I paid for him
18   out of my own pocket.  He's here to help the Court in
19   assessing which trust should make payments.  And he said the
20   Supplemental Needs Trust should make the payments.
21          Pay Ms. Kerr.  It's not fair.  I know the Court can
22   say I think her time is fair, I think her work is fair and--
23   and pay her.  We'll address everybody else that hasn't been
24   paid--
25          THE COURT:  Right.

BLACK000605

1        MR. DAIN:  --because we'll do it correctly, we'll

2    file with the Court.

3        THE COURT:  Okay.  All right.  I still think at

4    this point then what we need to do is get through the core

5    evidence which is the disclaimer.  I mean that's what we're

6    here about.  So I want to get through all of that and then

7    these other scrimmages we'll take up.

8        All right.  Did you need to make an opening remark,

9    Ms. DiPonio, or--

10        MS. DiPONIO:  No, Your Honor, that's fine.

11        THE COURT:  Okay.  All right.  So the last notes I

12    have when we broke the last time I think Ms. Young had

13    testified.

14        MR. POSKUS:  Yes, Your Honor, where we left off

15    actually Mr. Black was on the witness stand.

16        THE COURT:  Right.  Mr. Black was on the witness

17    stand.  Okay.

18        MR. POSKUS:  And, Your Honor, may I move the podium

19    again?

20        THE COURT:  Sure.

21        MR. POSKUS:  I don't know, doesn't anybody else

22    complain that you can't see the witness stand from here?

23        THE COURT:  No.  Not usually.

24        MR. POSKUS:  Sorry.

25        THE COURT:  So you're still under oath, sir.

BLACK000606

18

1        MR. BLACK:  I understand.

2        (Whereupon, Mr. Black was previously sworn.)

3        THE COURT:  And he was talking about Ms. Joanne

4  Black going from hotel to hotel, making withdrawals on a

5  debit card was the last note I have.

6        MR. POSKUS:  Right.  And actually, Your Honor, at

7  least my notes say that where we left off is we were talking

8  about Mr. Black's contacts with Cherie Wrigley and we might

9  have been talking about Joanne Black's behavior at--

10       THE COURT:  Right.

11       MR. POSKUS:  --that time.

12       THE COURT:  Right.

13          BERNARD BLACK,

14  called as a witness herein, having been previously sworn, was

15  examined and testified as follows:

16          DIRECT EXAMINATION

17  BY MR. POSKUS:

18    Q   And so, Mr. Black, let's--where we left off is we

19  had just discussed--and you can correct me if I'm wrong--I

20  believe we were discussing your collaboration with Ms.

21  Wrigley to get Ms. Black to sign the disclaimer; is that your

22  recollection?

23    A   So I think we were in the middle of discussing our

24  collective response to learning in July of 2012 that there

25  was a POD designation that was--at Vanguard basically 95

BLACK000607

19

1  percent to Joanne Black, which would have left Joanne with--

2  directly receiving $3 million which everybody thought made no

3  sense, must be a mistake, and what do we do about that.

4          And then I started describing my joint effort in

5  collaboration with Ms. Wrigley to talk to everybody involved

6  and figure out what--what the possible responses were to that

7  unexpected information.

8      Q    And we don't need to revisit all your testimony

9  about your conversations with Ms. Wrigley, but let me ask you

10  this, over what period of time were you and Ms. Wrigley

11  working together to try to address the issue of the POD

12  designations and the possibility of a disclaimer?

13      A    I'd say starting from shortly after July 11th of

14  2012, really through the completion of the court hearing in

15  Colorado in December of 2012.

16      Q    And over that period of time in your conversations

17  with Ms. Wrigley how often was the fact that a disclaimer

18  would result in a two-thirds/one-third split discussed?

19      A    I would say multiple times.  You know, again, we're

20  talking about a dozen maybe over that period, two dozen

21  conversations, so certainly multiple times, but exact count I

22  don't have.

23      Q    And Ms. Wrigley volunteered to help you get Joanne

24  to sign the disclaimer?

25      A    Yes.  So I want to call it Ms. Wrigley's idea that

BLACK000608

1  maybe she could go to Colorado and get Joanne simply to sign

2  the disclaimer herself. I always thought that was unlikely

3  and I also had real doubts about whether it would do any good

4  given that we knew that Joanne was crazy but Cherie wanted to

5  try.

6           And so part of our effort was we need to track down

7  Joanne anyway, she was moving from motel to motel, we have to

8  serve process on her; we have to do it for probate, we have

9  to do it for the conservatorship, and so we had a discussion

10  with Cherie about maybe Cherie would go to Colorado and track

11  down Joanne and serve the papers on her and at the same time

12  try to persuade Joanne to voluntarily sign the disclaimer of

13  her POD benefits so they would go back into the estate and go

14  out two-thirds/one-third.

15      Q    Let me ask you a question, what was your

16  understanding of what would happen with the Vanguard accounts

17  if Joanne exercised a disclaimer--or actually let me preface

18  it with this--we discussed this when we were in court

19  previously but I just want to get it on the record again to

20  give us context.

21           The payable on death designation for the Vanguard

22  accounts was--wasn't it 95 percent to Joanne and 1 percent to

23  each of your five older children?

24      A    That's what Vanguard told me, yes.

25      Q    Okay. Now, given that what was your understanding

1  of what would happen if Joanne exercised the disclaimer

2  exclusively and none of the kids did?

3      A    So in July I had no understanding, I imagine that

4  if there was a disclaimer by Joanne the 95 percent would go

5  back into the estate.  Vanguard--Vanguard had a beneficiary

6  expert named William Coykendall, C-O-Y-K-E-N-D-A-L-L, and so

7  I was communicating with him regularly.  And he advised me in

8  early September--

9          MR. DAIN:  Objection, Your Honor, hearsay.

10          MR. POSKUS:  Your Honor, the question was what was

11  his understanding; we're not offering it to show that that's

12  what Vanguard's position was, it's to offer to show what his

13  understanding was and what the basis of his understanding

14  was.

15          THE COURT:  Overruled.

16          THE WITNESS:  I was advised by Mr. Coykendall in

17  early September that no, if Joanne disclaimed the 1 percent

18  that went to each of five kids would blow up to 20 percent

19  each and swallow the whole Vanguard and so that created a new

20  problem for us.

21      Q    (by Mr. Poskus)  And the problem was?

22      A    I thought that the disclaim--the POD was a mistake

23  and I thought it was appropriate to try to get the POD assets

24  back into the estate.  And my kids thought it was a mistake

25  and they were planning to litigate to try to achieve that

22

1   result, but I never thought or intended that all of the

2   Vanguard money would go to my kids.

3        So I could not carry out a disclaimer that would

4   result in all of the Vanguard money going to my kids.  The--

5   my--my understanding was 5 percent should go to my kids

6   directly and the rest should to the estate.

7        MR. POSKUS:  Your Honor, if you can hold on a

8   second.

9        THE COURT:  All right.  I don't really understand

10   what you just said about the Vanguard guy.

11        THE WITNESS:  Okay.  Let me try again.  So what

12   Vanguard said or Coykendall said was if the 95 percent gets

13   disclaimed, it doesn't go back into the estate, instead each

14   of the 1 percents are now--

15        THE COURT:  Oh, sure, in yours--to the other

16   beneficiaries of the account.

17        THE WITNESS:  Yeah, so they would each get 20

18   percent and nothing would go back to the estate and that just

19   --that couldn't happen.

20        MR. POSKUS:  Did that clarify it--

21        THE COURT:  Yeah.

22        MR. POSKUS:  --Your Honor?  And, Your Honor, if I

23   may approach the witness I have an exhibit notebook to give

24   him.  And I--I see that you have yours.

25        THE COURT:  Yes, I managed to hang on to it.

BLACK000611

23

1        MR. POSKUS:  I'm grateful for not having to

2  reproduce.

3      Q   (by Mr. Poskus)  Sir, and I'll ask you to turn in

4  your exhibit notebook to Exhibit 78 if you could.

5      A   All the way back to Exhibit 78.  Yes, I have it.

6      Q   And I'll ask you, sir, can you identify this

7  document?

8      A   Yeah, this is a message that Mr. Coykendall sent to

9  me on December 17th, 2012.

10     Q   This is an e-mail message?

11     A   Yes, it was--it's an e-mail message; it was sent

12  through Vanguard's internal system.  I get an e-mail to my

13  regular e-mail account saying log into Vanguard and you'll

14  see an e-mail.

15     Q   So that's why it doesn't have the typical header

16  for an e-mail?

17     A   That's right, I copied and pasted this--pasted this

18  out of the Vanguard internal e-mail system.

19     Q   And this is a true and correct copy of what Mr.

20  Coykendall sent you?

21     A   Yes, it is.

22     Q   And did you receive it on or about December 17th,

23  2012?

24     A   Yes, I did.

25        MR. POSKUS:  Your Honor, I move to admit Exhibit

BLACK000612

24

1   78.

2           MR. DAIN:  Your Honor, and same objection.  He can

3   testify what his state of mind was, but he can't get in the

4   backdoor hearsay.  So this isn't admissible as an e-mail.  He

5   can state the effect it had on him but the document

6   themselves don't come into evidence.

7           MR. POSKUS:  Your Honor, he's testifying he

8   received it.

9           MR. DAIN:  That's authentication, Your Honor,

10  that's not hearsay.

11          MR. POSKUS:  And it's offered for the same purpose

12  as his prior testimony.  In essence, Your Honor, in the third

13  paragraph the second sentence says, If an alternative

14  beneficiary had not been named by the deceased donor the

15  assets will be divided proportionately among any remaining

16  primary beneficiaries.

17          THE COURT:  I'll admit it.

18          MR. POSKUS:  Thank you, Your Honor.

19          (Petitioner's Exhibit 78 was received in evidence.)

20  Q       (by Mr. Poskus)  Now, did Joanne assist you in--so

21  you had to get disclaimers from the kids or you couldn't do

22  the disclaimer for Joanne, am I correct?

23  A       That's correct.  So once I got this information

24  from Vanguard in September the only solution that we had at

25  the time was to get my children, my five older children, to

BLACK000613

25

1  disclaim their 1 percent so that everything would go back

2  into the estate and go out two-thirds/one-third.

3      Q    And did Ms. Wrigley assist you in getting

4  disclaimers from your children?

5      A    Yes, she did.

6      Q    With which children did she assist you in that

7  process?

8      A    So principally with Sara and Rebecca.  I want to

9  say we divided up the work and, you know, I talked to the

10  boys and she talked to the girls.  And we talked to each of

11  them about--okay, we told you in July hold off on litigation,

12  don't sue yet, we'll try to go for guardianship.  Now, we

13  have to come back to them and say and we want you to give up

14  the 1 percent you thought you were going to get directly but

15  I didn't see any other alternative.

16          And I still thought that this was better than

17  litigation, better for Joanne, better for everybody.  So

18  Cherie and I decided we're going to go try to get our kids--

19  my kids to disclaim the 1 percents down to zero and then they

20  wouldn't blow up to 20 percent.

21      Q    And--and let me ask you this, other than the fact

22  that you talked to the boys and she talked to the girls, why

23  did--why did Cherie agree to do--talk to the girls?  What

24  was--why did you make that division of labor?

25      A    Partly it made sense--partly for Rebecca in

1   particular.  Rebecca was just starting Community College, at

2   Santa Barbara Community College in Santa Barbara.  She lived

3   fairly close to Cherie Wrigley who is in Thousand Oaks,

4   California, slightly to the south of Santa Barbara and was in

5   regular contact with--with Cherie Wrigley.

6          And also increasingly as the fall went on--how do I

7   want to put it--Rebecca had just left home; she was not the

8   best of students; she was not the most diligent of students;

9   she was failing all of her classes and blaming it on her

10  father.  And so I was at that time not on the best of terms

11  with--with Rebecca.  Things have improved a lot since, she's

12  21 and not 18; she has a real job, all that good stuff.  But

13  at the time it was--you know, Rebecca was really, really

14  angry at me and I really needed Cherie to be the intermediary

15  and go to Rebecca and say, you know, your father and I want

16  you to disclaim your 1 percent, you know, the $30,000 that

17  you could get directly we want you to give it up and trust

18  that you'll get one-third of the Issue Trust down the road in

19  trust.

20         And so that was a difficult conversation,

21  especially difficult for me and I really needed Cherie's help

22  with persuading Rebecca that she should disclaim her 1

23  percent down to zero so that the whole package could--could

24  go forward.

25     Q   So let me ask you this, were you guys successful?

BLACK000615

27

1    A    Yes, we were.

2    Q    And so the children all exercised disclaimers?

3    A    The children all exercised disclaimers, yes.

4    Q    Let's turn in your exhibit notebook to Exhibit 44.

5    A    44, okay, got it.

6    Q    And, sir, I'll ask you if you can take a look at

7    Exhibit 44 and ask you can you identify that document?

8    A    Yes.  This is the disclaimer form or I should say

9    forms that my daughter Sara signed.

10   Q    And are you familiar with your daughter's

11   signature?

12   A    Yes, I am.

13   Q    You've had an opportunity to see her signature in

14   the past?

15   A    Yes.

16   Q    And on page 2 where it says disclaimant's

17   signature, is that your daughter's signature?

18   A    Yes, that's my daughter's signature and her

19   signature is also going to appear another two pages down and

20   another page after that.  And there might be more after that

21   I'm not sure, there were a series of--oh, then--then there's

22   my signature acknowledging receipt and then there's a blank

23   page and then an appendix, it looks like she signed in three

24   places.

25   Q    And is this a true and correct copy of the

BLACK000616

1    disclaimer that you received from your daughter?

2        A    Yes.

3            MR. POSKUS:  And, Your Honor, I move to admit

4    Exhibit 44.

5            MR. DAIN:  No objection, Your Honor.

6            THE COURT:  It's admitted.

7            MR. POSKUS:  Thank you, Your Honor.

8            (Petitioner's Exhibit 44 was received in evidence.)

9        Q    (by Mr. Poskus)  And let me ask you something on

10   the very last page of Exhibit 44 indicates that Schiff Hardin

11   prepared a notice of disclaimer and renunciation, did--did

12   Schiff Hardin prepare these documents for Sara's signature?

13       A    So the form language that Vanguard wanted came from

14   Vanguard.  And I also confirmed that the language was

15   acceptable to Fidelity and I believe the rest of the document

16   was prepared by Schiff Hardin at my request.

17       Q    Let's take a look at Exhibit 45.  And I'll ask you,

18   can you identify this document?

19       A    Yes, this is the disclaimer that was signed by--it

20   says Rebecca Black (also known as Becca Black) that was

21   because my mother had listed Rebecca as Becca in her

22   designation of beneficiaries of Vanguard.

23       Q    And you're familiar with your daughter's signature?

24       A    Yes, I am.

25       Q    And if you could look through the document on page

29

1    2 and on page 4 and on page 5, is that your daughter's

2    signature?

3        A    Yes, it is.

4        Q    And of course that's your signature on page 6,

5    isn't it?

6        A    Page 6, yes, is it.

7        Q    Is this a true and correct copy of the disclaimer

8    exercised by your daughter Rebecca?

9        A    Yes, it is.

10       Q    All right.  Thank you.

11            MR. POSKUS:  Move to admit Exhibit 45, Your Honor.

12            MR. DAIN:  No objection.

13            THE COURT:  45 is admitted.

14            (Petitioner's Exhibit 45 was received in evidence.)

15            THE COURT:  I assume you have the rest of them?

16            MR. POSKUS:  Yes, Your Honor.  I could--

17            THE COURT:  I mean how much time do we need to take

18   up with this?

19            MR. POSKUS:  Well, Your Honor, I'm willing to just

20   --if counsel will stipulate to the admission of Exhibits 46,

21   47, and 48, 48 is a little bit different in format but

22   otherwise the testimony would be the same on all three of

23   those.  If counsel stipulate to the admission of those

24   documents I'd just move to admit them now.

25            MR. DAIN:  Yes, just so I understand these are all

1    disclaimers signed by the children?

2              MR. POSKUS:  Yes.

3              MR. DAIN:  Yeah, no objection, Your Honor.

4              THE COURT:  So, 45, 46, 47, and 48--

5              MR. POSKUS:  Thank you, Your Honor.

6              THE COURT:  --we'll admit those.

7              (Petitioner's Exhibits 45, 46, 47, and 48 were

8    received in evidence.)

9        Q    (by Mr. Poskus)  And just so the record is clear,

10   Mr. Black, is there a difference between your son David's

11   disclaimer and your son Benjamin's disclaimer which are at 48

12   and 46 respectively and the other three?

13       A    Yes, there is.

14       Q    And what's the difference?

15       A    So the difference is that in September we thought

16   that my children needed to disclaim entirely so that the bulk

17   of the money would go back into the estate.  And then in

18   December I learned from Mr. Coykendall that there was another

19   possibility which is that they could waive back down to 1

20   percent.

21            So if Joanne waives the 1 percent goes up to 20

22   percent, they could waive back down to 1 percent rather than

23   to zero.  And so I offered my five children the alternative

24   of either you can waive down to 1 percent and take your 1

25   percent or you can waive down to zero and then I will invest

1   that money for you through the Issue Trust.

2       Q    And--so what did Benjamin and David do that was

3   different from the other three children?

4       A    So these were the two oldest children and they

5   decided to take their 1 percent.  And so they later received

6   their 1 percent directly from Vanguard.  And the younger

7   children, Sam, Sara, and Rebecca disclaimed fully.

8       Q    Let me ask you to turn to Exhibit 43.

9       A    Okay.

10      Q    And can you identify this document?

11      A    Yes, this is the disclaimer that I executed on

12  behalf of Joanne as her conservator for the--for the Vanguard

13  and Fidelity assets.

14      Q    And is that your signature on page 2?

15      A    Yes.

16      Q    And 3?

17      A    Yes, it is, I signed it as Bernard Black,

18  Conservator.

19      Q    And indeed also on page 4, I'm sorry?

20      A    Page 2, page 3, page 4, and then probably I got--I

21  guess that's it.  No, we keep going, there's still more--

22  yeah, there's still--there's still more, like four more pages

23  further down, so all of those are my signature.

24      Q    And is this the disclaimer you signed on behalf of

25  Joanne?

32

1    A    Yes, it is.

2    Q    And is it a true and correct copy?

3    A    Yes, it is.

4         MR. POSKUS:  Your Honor, I move to admit Exhibit

5    43.

6         MR. DAIN:  No objection.

7         THE COURT:  Admitted.

8         (Petitioner's Exhibit 43 was received in evidence.)

9    Q    (by Mr. Poskus)  Now, you said you had a number of

10   conversations with Cherie Wrigley about this process and I

11   know last time we did have some testimony and exchange

12   between you and Mr. Dain about a conversation you had with

13   Mr. Dain about this disclaimer issue, did you--

14   A    I remember that testimony.

15   Q    Yeah.  And did you have a direct conversation with

16   Mr. Dain about the idea of exercising a disclaimer on behalf

17   of Joanne Black?

18   A    Yes, I did.

19   Q    When did that conversation occur?

20   A    That would have occurred in July of 2012 shortly

21   after we got the information from Vanguard about the 95

22   percent POD going to Joanne.

23   Q    And was this on the phone or in person with Mr.--

24   A    This was--this was on the phone.

25   Q    All right.  And so tell us about the discussion?

BLACK000621

1     A   So after I got the letter from Vanguard there was

2    a--I'll call it a flurry of activity involving me, Cherie

3    Wrigley, my wife, my children, this is crazy, it makes no

4    sense, what do we do.  And out of that came the idea that one

5    thing we could do--you know, if we did nothing then there

6    would be litigation challenging the disclaimer.

7         One thing--

8         THE COURT:  I'm sorry who would be litigating it?

9         THE WITNESS:  My children and my wife on behalf of

10   my--of her children.

11        THE COURT:  Your wife on behalf of her children?

12        THE WITNESS:  Right.  Because they are

13   beneficiaries of the Issue Trust and there would be no money

14   or very little money for the Issue Trust.

15    Q   (by Mr. Poskus)  I think for clarification, Mr.

16   Black, you ought to say they're children as well.

17    A   Yeah, I'm sorry, my--my children with my second

18   wife, I'm sorry.

19    Q   I could tell that's why the Court was reacting the

20   way it was.

21        THE COURT:  Okay.

22        THE WITNESS:  My children, yes.

23        THE COURT:  All right.  So you had this big family

24   discussion--

25        THE WITNESS:  Yes.

1          THE COURT:  --and you are testifying that you

2    included Mr. Dain and Ms. Wrigley?

3          THE WITNESS:  I'd say that Ms. Wrigley was part of

4    formulating the disclaimer plan as an alternative to

5    litigation--

6          THE COURT:  Okay.

7          THE WITNESS:  Yes.

8          THE COURT:  But what I'm not grasping is why didn't

9    you just talk about the real issue which was the change in

10   the estate plan and the reasons for that and go right to the

11   heart of it and just try to fix it there?  Why all this other

12   machinations and running around?

13         THE WITNESS:  So I just thought this was a mistake.

14         THE COURT:  Right.  So you've testified to that.

15         THE WITNESS:  Right.

16         THE COURT:  So that's why I'm really wondering why

17   instead of just going back to the probate court and putting

18   forth an agreement to put it the way it was supposed to be in

19   your mind, why didn't you just do that?

20         THE WITNESS:  So I actually asked--can--can I talk

21   about conversations with probate counsel?

22         MR. POSKUS:  Well, we've already--I'm sorry--we've

23   --we've already waived with regard to Mr. Glatstein.

24         THE WITNESS:  Yeah.  So--so let me--let me do

25   this--I--I had--

35

1        MR. POSKUS:  Hold on, I want you to answer the

2   Judge's question.

3        THE WITNESS:  --I did ask probate counsel--

4        MR. POSKUS:  Go ahead.

5        THE WITNESS:  --Mr. Lee Hoffman in New York, what

6   we could do.  And then I--you know, maybe I should answer

7   about, you know, then what the information I got was.

8        MR. POSKUS:  Go ahead and tell Judge what

9   information--

10       THE WITNESS:  Right.

11       MR. POSKUS:  --you got from Mr. Hoffman.

12       THE WITNESS:  So he said there's nothing you can do

13   about this in probate court; that the New York probate court

14   had no jurisdiction because the assets were outside, outside

15   the estate, they were in Vanguard.  And if the--if they went

16   out of Vanguard directly to Joanne they'd never come into the

17   estate.

18       So he said look there's really nothing you can do

19   in the estate process, you have to go directly after the

20   designation.  I don't think we figured out whether we would

21   challenge that in New York or in Pennsylvania because

22   Vanguard is in Pennsylvania, but it would be a separate

23   proceeding.  In New York it would be outside the Surrogate's

24   Court, they have a special probate Surrogate's Court similar

25   to your court and he said this is just outside the

36

1   Surrogate's Court.

2           THE COURT:  And they don't take stipulations in New

3   York?

4           THE WITNESS:  You know, you're now asking me a

5   question that I just don't know.  He just said this isn't the

6   way to do it.

7           THE COURT:  Okay.  All right.

8           THE WITNESS:  So I--I did ask the question--that's

9   why--I had the same response as, okay, let's go to the

10  probate court and he said you can't do that.

11      Q    (by Mr. Poskus)  So did he offer any other remedies

12  to you other than doing what you did?

13      A    Really not.  He said this is not probate court

14  jurisdiction.  The assets are not in the probate estate--that

15  was the term that he used--and you can go challenge the POD

16  directly either in New York or in Pennsylvania but that's

17  what you need to do.

18      Q    Well--

19          THE COURT:  And they wouldn't take an agreement

20  about the POD challenge is what he told you?

21          THE WITNESS:  So I didn't ask about an agreement

22  because Joanne was--it was in Colorado, right, so, sure it

23  would be great if we could get everybody to agree including

24  Joanne but I don't know that I was thinking about that at the

25  time.

BLACK000625

1          THE COURT:  All right.

2     Q     (by Mr. Poskus)  Who--who first came up with the

3 idea of the disclaimer?

4     A     You know I don't know, it might have been me, it

5 might have been Cherie Wrigley, it might have been the two of

6 us together; we were talking about what to do.  So I really

7 view the disclaimer and coming to Colorado and seeking the

8 conservatorship as a joint plan that Cherie and I came up

9 together.

10    Q     I mean did you know about the possibility of

11 disclaimers prior to this whole situation arising based on

12 your own legal knowledge?

13    A     No, I didn't.

14    Q     So that's what I'm saying is who planted that idea,

15 do you remember?

16    A     I don't know, I could speculate that it would have

17 been--

18    Q     Speculation is not--

19    A     --Mr. Hoffman.

20    Q     --a good idea.

21    A     Yeah, but I don't know.

22    Q     Okay.  If you don't know you don't know.  But--all

23 right.  So you--Joanne--you--it's your testimony Joanne was

24 in agreement with the idea--

25    A     No, Cherie was in agreement.

BLACK000626

1     Q    I'm sorry Cherie.  I keep doing that, I apologize.

2  That Cherie was in agreement and so you talked to Mr. Dain

3  about the disclaimer?

4     A    Yes, I did.

5     Q    And tell us about that conversation with Mr. Dain.

6     A    So I called Mr. Dain--this would have been, you

7  know, in mid-July period--and said, look, we've got a problem

8  with the POD designations and, you know, I've talked to

9  Cherie and I've talked to--to Kate, my wife, and I've talked

10  to my kids and, you know, maybe I said I talked to probate

11  counsel, I don't recall, and we're trying to figure out what

12  to do.  And here's an idea, and the idea was that we would go

13  to Colorado and try to get guardianship powers as I thought

14  about it--okay, Colorado uses the name conservatorship--we

15  would try to get guardianship over Joanne and we would use

16  that first to get worker's comp benefits for Joanne and then

17  also to disclaim the POD back into the estate so it would go

18  out two-thirds to Joanne's Supplemental Needs Trust and

19  one-third to the--to the Issue Trust for my kids.

20     Q    But let's focus specifically on your conversation

21  with Mr. Dain, this one that occurred in the latter part of

22  July 2012.  Did you--what you just said did you discuss all

23  of that with him?

24     A    Yes, that was part of the conversation.  This was

25  my explaining to him the background from a bunch of other

1   conversations with Cherie Wrigley, with--with my wife, with

2   my children, with probate counsel, and this was a proposal

3   out of that and I was bringing Anthony Dain into the loop and

4   saying here's what we think we should do.

5       Q    And so what was Mr. Dain's response when you

6   proposed all this to him?

7       A    So his response was--you know, he agreed with

8   everybody else's view that it made no sense to send $3

9   million directly to Joanne.  And he supported the idea of

10  going to Colorado and seeking a disclaimer.  He thought that

11  was a better solution than litigation against the disclaimer.

12  And then we talked about how to proceed in Colorado.

13      Q    So let me ask you this, when you came to this court

14  with regard to getting the disclaimer--and by the way let me

15  ask something else about the conversation with Mr. Dain

16  specifically, was the two-thirds/one-third division that

17  existed in your mother's will specifically discussed with Mr.

18  Dain at that time?

19      A    Yes, it was.

20      Q    And did he say no that's wrong that one-third

21  shouldn't go to you and your issue?

22      A    No, quite the contrary, he thought that was the

23  right answer and that's what should happen, that's what my

24  mother always wanted to happen; that's what her estate--her

25  will provided, this is what everybody had expected, you know,

BLACK000628

40

1    back since she wrote her will in 1997.  No, he was in full

2    agreement that this is the right thing to do.  And he also

3    agreed that this was a good solution for Joanne.

4        Q    And so at the time you obtained the order, the

5    March 5th, 2013 order of this Court, in your mind did you

6    think you had agreement from Mr. Dain?

7        A    Absolutely.

8        Q    Did you--in your mind did you think you had

9    agreement from Ms. Wrigley?

10       A    Absolutely.

11       Q    And so--and we had Mr. Glatstein's testimony from

12   previously when he said he spoke to Ms. DiPonio and ran it

13   past her did you think you had her agreement?

14       A    I believe that we had the agreement of Ms. DiPonio

15   and I believe that we had the agreement of Ms. Young.  And I

16   believe that--look I thought we had full understanding from

17   everybody of what we were planning to do and what the

18   consequences were.

19       Q    Now, in your conversation with Mr. Dain that day

20   was there a discussion about him becoming the guardian for

21   Joanne?

22       A    Yes.  I asked him--I asked Mr. Dain if he would be

23   Joanne's guardian in Colorado because I thought he was the

24   logical person to be the guardian.  If you remember at the

25   time I thought he was the trustee of the Supplemental Needs

BLACK000629

1    Trust.   I later learned that I was a co-trustee, a successor

2    to my mother, so I thought he's the trustee, he's going to be

3    handling the money, he is the logical person to be the

4    guardian and so I tried to persuade him that he should be the

5    guardian rather than me; that he should be the one filing the

6    petition in--in Colorado to become Joanne's guardian.

7         Q    What was his response?

8         A    You know, he was--I want to call it hesitant,

9    reluctant, wasn't sure he wanted to do the work, and I was an

10   optimist, I thought I'd be able to persuade him.   He agreed

11   that he would consider it and get back to me.

12        Q    Did he get back to you?

13        A    He did not.

14        Q    When you had the discussion with Mr. Dain was your

15   mother's will specifically discussed with him?

16        A    Yes.

17        Q    And did he agree with your interpretation of the

18   will?

19        A    I don't think anybody had any doubt about the

20   interpretation of the will.   It was--

21        Q    Well, specifically him.

22        A    No, Mr. Dain understands how my mother's will

23   works, there's no question about that.

24        Q    And when you say understands how your mother's will

25   works you're referring to the two-thirds/one-third

42

1    distribution?

2        A    Yes, to the two-thirds/one-third distribution.

3        Q    Now, who are the trustees of this Issue Trust for

4    your children?

5        A    The trustees are me and Anthony Dain.

6        Q    And how do you know that?

7        A    I know it; I'm sure it says so in the trust if I

8    went back to look at it.

9        Q    Did he sign the trust?

10       A    Yes.

11       Q    So you said Mr. Dain never called you back and said

12   I'll be the guardian or--indeed--did he ever say I won't be

13   the guardian?

14       A    No, he didn't call me back at all and so I would

15   have called him again; I waited a couple of weeks; I called

16   him back again probably in early August and left a voicemail

17   and said, you know, we need to resolve this either you need

18   to be the guardian or I need to be the guardian can you give

19   me an answer.  And he didn't respond to--to that voicemail.

20       Q    Did you do anything else to try to get him to

21   respond?

22       A    Yes.  So in early September--by this time I had

23   found Colorado counsel; we were ready to proceed.  We had to

24   decide who was going to be the guardian.  And so I spoke to

25   Cherie Wrigley about what do we do, I can't get Tony to give

BLACK000631

1    me an answer.  And I might have called him a third time, I

2    don't recall specifically but I know that I asked Cherie to

3    call Tony because Cherie is his sister and maybe he'll answer

4    her phone calls.  And Cherie proceeded to call Tony and

5    eventually gave me Tony's response.

6        Q    Did you get a response?

7        A    So Cherie told me that Tony did not want to be the

8    guardian, he was willing to be trustee but he didn't want to

9    be guardian.

10       Q    Now, since our last hearing did you supply Mr. Dain

11   with the information necessary for him to be a

12   co-accountholder on the trust?

13       A    Yes, I did.

14       Q    And has he become a co-trustee?

15       A    No, he was already a co-trustee.

16       Q    Forgive me has he gotten on--has he gotten signed

17   on as a signor on the accounts as co-accountholder?

18       A    To my best knowledge confirmed as of yesterday he

19   has not.

20       Q    You mean day before?

21       A    Yesterday.

22       Q    All right.  Have you ever served as an executor or

23   personal representative before you were appointed in the New

24   York court for your mother?

25       A    No.

BLACK000632

44

1    Q    Have you ever served as a trustee before in--before

2  you began serving as a trustee for the trust--Issue Trust,

3  the SNT, and the 2013 Joanne Black Trust?

4    A    No.

5    Q    You ever served as a guardian or conservator

6  before?

7    A    No.

8    Q    Now, let me ask you this, you--you mentioned it

9  briefly earlier in your testimony that one of the reasons why

10 you felt it important to get--get somebody appointed

11 conservator for Joanne was this worker's compensation issue,

12 am I right?

13   A    Yes.

14   Q    Tell us what--what was the worker's compensation

15 issue?

16   A    So the worker's compensation issue--let me go back

17 a little bit, my father died at work in 1986.  We were able

18 to get survivor--survivor--surviving spouse benefits for my

19 mother for his death at work.  And so she was receiving

20 worker's compensation benefits basically for her lifetime.

21        And then there was a possibility that if we could

22 show that Joanne was disabled at the time of his death in

23 1986, was disabled at the time of my mother's death in 2012

24 and was continuously disabled between 1986 and 2012 that

25 under the Colorado Worker's Comp Rules she would then get

45

1   benefits after my mother's death as a surviving disabled

2   child.

3         So my mother and I had done really 25 years of

4   follow-up to try to make sure we had all the facts lined up

5   so that we could show that Joanne was disabled in 1986, was

6   continuously disabled ever since.  It was a 25 year stack of

7   medical records that my mother and I provided--mostly my

8   mother--to worker's comp counsel in Wofsey Rosen, so that we

9   would be ready to try to transfer benefits from my mother to

10   my sister when my mother died.

11     Q   Why did need to be conservator after your mother

12   died to try to make that happen?

13     A   So after my mother died I got in touch with

14   worker's comp counsel, this was--the lawyer was Judith

15   Rosenberg at the law firm of Wofsey Rosen, W-O-F-S-E-Y,

16   Rosen, R-O-S-E-N, and they were in Stamford, Connecticut,

17   because my father was working in Connecticut.  And said,

18   okay, my mother died, what do we do to try to transfer

19   benefits to--to my sister.  And so we were starting down the

20   process of talking to the worker's comp insurance company and

21   providing them with the information that we had about her

22   disability and she was on SSDI, Social Security agreed that

23   she was disabled and, you know, here's the list of her, you

24   know, many hospitalizations and here's her doctors' letters

25   and all that stuff.

BLACK000634

46

1       And at some point Judy Rosenberg said this is all

2  well and good but Joanne is the client not you.  And so Ms.

3  Rosenberg said I need to get in touch with Joanne and so I

4  gave Ms. Rosenberg Joanne's cell phone number and, you know,

5  Ms. Rosenberg left I guess a series of messages as I

6  understand it.

7       And at some point Joanne got the messages and

8  started calling Judy Rosenberg back, you know, often in the

9  middle of the night, repeatedly leaving message after message

10  after message, you don't represent me, you don't want--I

11  don't want you to represent me.  I'm a billionaire, my

12  husband is a billionaire, he's the richest lawyer in the

13  world; if you represent me I will sue you; I don't want

14  worker's compensation benefits, I'm going to sue you.  And so

15  now we had a real problem.

16    Q   Who did she think her husband was?

17    A   She thought her husband was Bruce Cutler, he's

18  actually a real person; he's a mob lawyer; he represented

19  John Gotti who was a major mobster in New York.

20    Q   You might want to say he's a mob lawyer to the best

21  of your knowledge.  Anyway go ahead.

22    A   I would describe him colloquially as a mob lawyer

23  and it is uncontested that he represented John Gotti, Jr., in

24  John Gotti's criminal trial for murder in New York.

25    Q   But at least he--at least to your knowledge he's a

BLACK000635

47

1   wealthy man?

2       A    I have no idea whether he's a wealthy man.

3       Q    But this is--

4       A    But he's certainly a publicly known person.

5       Q    --but this is who Joanne thinks she's married to?

6       A    Yes.  Or at least at the time she thought she was

7   married to.

8       Q    And she doesn't think--didn't think she needed the

9   worker's comp benefit?

10      A    She didn't think she needed it.  Applying for

11  worker's comp benefits was a slander on her good name and her

12  good looks.  It was--you know, no, she wanted no part of

13  worker's compensation.

14      Q    So once you got appointed conservator what did you

15  do to facilitate the worker's comp benefits?

16      A    So let me--let me step back a little, so Judy

17  Rosenberg who at this point was in her early 70s, so she was

18  partly retired, went to the managing partner or partners of

19  her firm and they said, you know, we want out of this case

20  colloquially, right.  They didn't want any part of taking the

21  risk that Joanne would sue them and they told Judy Rosenberg

22  that she should just stop and drop the case.

23           And I was able to persuade Judy Rosenberg, hang on,

24  just do nothing for a while, I will try to become a

25  conservator in Colorado and if I can become a conservator

BLACK000636

1  then I can act on behalf of Joanne and then we can pick up

2  the worker's comp case and hopefully get the worker's

3  compensation benefits.

4      Q    And were you able to get the worker's compensation

5  benefits?

6      A    Yes, we were able to get the worker's compensation

7  benefits for Joanne.

8      Q    And there--and Joanne--well let me say this, in

9  your capacity as conservator you're receiving them now?

10     A    I am receiving weekly checks for $1,000 and change

11  from the Traveler's Insurance Company for Joanne and we

12  received a retroactive payment back to the date of my

13  mother's death.

14     Q    How much was the retroactive payment?

15     A    It came in some time in 2013 so it would have been

16  $1,000 a week times about a year, so it would have been a

17  total of about 50 or $60,000.

18     Q    Now, you're getting checks today but the Court has

19  suspended your authority, what are you doing with the checks

20  that you get today?

21     A    So I discussed what to do with Ms. Peterson and I

22  think there was testimony about this at the last hearing that

23  we decided the simplest thing to do was not to try to

24  transfer conservatorship from me to Ms. Peterson and then to

25  somebody else in New York and instead I would continue to

BLACK000637

1    sign the checks, Bernard Black, Conservator; I would continue

2    to receive them and then every two or three weeks I will send

3    the checks to Ms. Peterson and then she will deposit them in

4    a conservatorship account.

5        Q    And that's been occurring?

6        A    Yes, it has.

7        Q    Now, tell me what's your understanding of this

8    $1,000 a week, how does that work?

9        A    So, look, this is tax free, it's adjusted for

10    inflation and unless Joanne recovers this is for life.  As

11    long as she's disabled she's going to get these benefits for

12    the rest of her life; this is a very, very big deal.

13        Q    And Joanne also gets Social Security benefits,

14    doesn't she?

15        A    Yes, she also gets Social Security Disability

16    Insurance.

17        Q    And how much does she get from that?

18        A    It's--right now it's between 1,300 and 1,400 a

19    month.  And then she's also eligible for Medicare.

20        Q    Let me ask you this, we--we touched on this earlier

21    so I want to make it--make sure you're clear on it, do you

22    feel that everyone knew what was going to happen if you

23    exercised that disclaimer?  By everyone I mean the attorneys

24    and Ms. Wrigley and Mr. Dain?

25        A    I certainly believe that--look, I know that Mr.

BLACK000638

1   Dain understood, I know that Ms. Wrigley understood, and I

2   certainly believe that Ms. Young and Ms. DiPonio understood

3   or should have understood at the time.

4      Q   What factors in your mind pointed to the fact that

5   everybody understood?

6      A   So let's just walk through what I think all the

7   pieces were.

8      Q   Okay.

9      A   So one piece that they would have had access to

10  would have been the court visitor's report, so you appointed

11  Linda Babcock as court visitor, and so she filed a report

12  with the court.

13        And so I spoke to Ms. Babcock and told her this is

14  what we're trying to do, we're trying to get worker's comp

15  for Joanne and I planned to disclaim Joanne's POD benefits

16  and they're going to go into the estate and then two-thirds

17  are going to go Joanne in trust and one-third are going to go

18  to a trust for my kids or me and my kids, I forget exactly

19  what language I used.

20        So I was very explicit with Ms. Babcock about

21  here's what we want to do, the POD assets will go back into

22  the estate and they'll go out two-thirds to Joanne's SNT and

23  one-third to the Issue Trust for my children.

24      Q   And did that make it into Ms. Babcock's report?

25      A   Yes, it did.

BLACK000639

51

1     Q    What else--what else that you can think of makes

2    you think that everybody knew or at least at the time you

3    exercised the disclaimer?

4     A    So a second piece was that I arranged for Joanne's

5    long-time psychiatrist, Aneil Shirke, A-N-E-I-L S-H-I-R-K-E,

6    to write a letter in support of the conservatorship basically

7    saying Joanne was a paranoid schizophrenic, she had been a

8    paranoid schizophrenic for her entire adult life; the

9    prognosis was not good, she couldn't handle money, but I also

10   told Mr. Shirke what our plans were for the disclaimer

11   because I wanted him to understand what he was writing in

12   support of, so I told him that the plan was for--I would

13   disclaim on behalf of Joanne and then Joanne's POD assets

14   would go into the estate and two-thirds would go to a

15   Supplemental Needs Trust for Joanne and one-third would go

16   to--to a second trust for--again it was my children or me and

17   my children I forget which exact language I used.

18    Q    And so did that make it into the letter that you

19   filed with the court?

20    A    Yes, that was in Dr. Shirke's letter that he filed

21   with the court.

22    Q    And--all right.  So what else other than the--what

23   Dr. Shirke said makes you think that everyone knew?

24    A    So maybe the third piece was that I told Mr.

25   Glatstein here's what I'm hoping to accomplish, the two key

BLACK000640

1    pieces at the time were worker's comp and the disclaimer.

2            Later we learned--I think from Ms. Young or maybe

3    from Ms. Wrigley that Joanne was trying to cancel her own

4    SSDI benefits, so there was a third paragraph in the proposed

5    order that said let me go make sure she doesn't cancel her

6    benefits or if she did cancel them let me restart them.

7            Those were the three pieces and I talked about

8    those with Mr. Glatstein and said here's what we want to

9    accomplish and can you help me do this and give me advice on

10   --on how to do it.

11           So Mr. Glatstein was fully informed about if

12   there's a disclaimer the assets go back into the estate,

13   two-thirds go out to the SNT, one-third goes to the Issue

14   Trust and then I relied on Mr. Glatstein to explain the plan

15   and explain the consequences of disclaimer to Ms. Young and

16   to Ms. DiPonio.

17      Q    What--and we had that testimony from Mr. Glatstein

18   already--what else did you--happen that made you think that

19   every knew what was going to occur?

20      A    So as part of the--the conservatorship process Mr.

21   Glatstein prepared a proposed order of special

22   conservatorship that I then reviewed and I added some

23   additional language to it that I thought made the disclosure

24   even clearer.  And so we submitted that proposed order to the

25   court in November of 2012.

BLACK000641

53

1        We had a hearing on the proposed order in December
2    of 2012.  Mr. Glatstein testified that he spoke to Ms. Young
3    and Ms. DiPonio just before the December hearing and so we
4    should walk through the language of the proposed order.
5        In addition to that Mr. Glatstein put on file put
6    on file with the court so the proposed order said disclaim so
7    that the assets pass under the estate and go through the will
8    and they'll go under Article 4th of the will, and so we filed
9    with the court.  We filed the will and we filed the
10   Supplemental Needs Trust and we filed the Issue Trust.  And,
11   you know, I think Mr. Glatstein's testimony was he didn't
12   want people to take his word for it, he wanted them to look
13   at the actual documents.  And so he wanted to make sure that
14   the documents were on file so that Ms. Young and Ms. DiPonio,
15   potentially the Court, you know, had them.
16   Q    And you heard the testimony that Ms. Young and Ms.
17   DiPonio actually sent an e-mail to the clerk of this court
18   with a copy to Mr. Glatstein saying we have no objection to
19   the form of order that says pass the property--once the
20   disclaimer is exercised it passes under the 4th article of
21   the will, you're aware of that testimony, am I correct?
22   A    Yes.  So the--the full proposed special
23   conservatorship order I think was submitted three times; it
24   was submitted in November and then in December the Court had
25   a hearing and then issued a much shorter general

BLACK000642

54

1   conservatorship order and Mr. Glatstein thought that was not

2   sufficient, might not be sufficient and so wrote back by

3   e-mail the same afternoon saying this might not be sufficient

4   can we get an amended order with the full language.

5          And so there's an e-mail from Mr. Glatstein to the

6   Court copying Ms. Young and Ms. DiPonio saying can we get

7   this amended language and then he attaches as an exhibit the

8   proposed order and then he's highlighted the paragraphs that

9   he wants to have added to the general conservatorship.

10         So that was the second time and again that went,

11  you know, to the Court and Mr. Glatstein testified about

12  that; that went to Ms. Young; that went to Ms. DiPonio.

13         Then the third time that we submitted the same

14  language would have been--I believe it was January 29th of

15  2013, so the Court--I guess you replied in December--Mr.

16  Glatstein's said should we ask for an amended order and then

17  there was reply from court clerk Sumi Lee saying, you know,

18  the Court would like an amended order.

19         Then we had to sort of finish the disclaimer stuff

20  and make sure Vanguard was happy with--with the language of

21  the court order and the holidays intervened and we eventually

22  went back to the Court with the same language in the form of

23  a proposed amended order on January 29th of 2013.

24      Q    And let me ask you something, so the order that the

25  Court finally entered on March 5th, 2013 was different from

BLACK000643

1   that January 29th form of order?  I mean the record reflects

2   that that March 5th order that was actually prepared by Mr.

3   Glatstein as well, isn't it?

4        A    Yes.

5        Q    Wasn't it?

6        A    Yes, it was.

7        Q    And--and it did not include the language that said

8   if the disclaimer gets exercised it goes in accordance with

9   the 4th article of your mother's will; is that correct?

10       A    Under which two-thirds goes to the Supplemental

11  Needs Trust; that's correct.  It did not--it--it removed that

12  language.

13       Q    Why if you know did that language--why did Mr.

14  Glatstein remove that language?

15       A    So here's the history--

16            MR. DAIN:  Your Honor, I have to object, Mr.

17  Glatstein testified, now he's not asking him to (inaudible),

18  he's asking him to testify for Mr. Glatstein.

19            MR. POSKUS:  Mr. Glatstein was his agent and it's

20  indeed his actions that--

21            THE COURT:  I'm going to allow it.  I mean I have a

22  personal memory of this so--

23       Q    (by Mr. Poskus)  Why did Mr. Glatstein change the

24  language?

25       A    So let me give you a little bit of history, during

1    the period between December 11th and January 29th I went back

2    to Mr. Coykendall at Vanguard and said here's the language

3    that we want to propose to the--to the court, is this--does

4    this work for you.  Vanguard had already given me the

5    disclaimer language but they also needed to see the court

6    language.

7              And so he reviewed that and came back and said this

8    is fine with me and so based on his saying it was fine with

9    me we submitted the language to the court on January 29th.

10             I then went back to Mr. Coykendall and asked him,

11   you know, just to be sure will you check with legal counsel

12   too.  And so he did that and came back I think the next day

13   and said legal counsel wants the paragraph on disclaimer to

14   be shorter and here's the language that they want.

15        Q    And what did they change?

16        A    Basically they took out the words whatever the

17   difference is between January 29th and January 31st those were

18   words that they wanted taken out and there's an e-mail from

19   me to Mr. Glatstein saying Vanguard wants this language out

20   can you shorten the proposed order.

21        Q    Let's take a look in the exhibit book, turn to tab

22   81, where it has been marked as Exhibit 81.

23        A    Okay.

24        Q    Is this the e-mail that you were just referring to?

25        A    Yes, it is.

1          MR. POSKUS:  Your Honor, if I may it's my

2   understanding you may not have a copy of 81.

3          THE COURT:  I do not.

4          MR. POSKUS:  You don't.  If I may approach we'll

5   hand a copy to counsel.

6          THE COURT:  But I have it marked in from June 17th.

7          MR. POSKUS:  You do?

8          THE COURT:  I do.  So--

9          (Pause.)

10         MR. POSKUS:  Exhibit 81 was admitted, you're

11  correct, Your Honor.

12         THE COURT:  Okay.

13         MR. POSKUS:  It was admitted during the course of

14  Mr. Glatstein's testimony.

15         THE COURT:  Right.  It's just not in the book but--

16         MR. POSKUS:  Yeah, I apologize, Your Honor.

17         THE COURT:  That's fine.

18         MR. POSKUS:  I got confused.

19      Q    (by Mr. Poskus)  And so this is the e-mail you sent

20  to Mr. Glatstein?

21      A    Yes.  And it contains as an attachment a--a markup

22  of the amended order from January 29th.

23      Q    And with this change is this identical--I mean

24  assuming that language on page 3 of 3 of the form order is

25  stricken, is that identical to the order that the Court

BLACK000646

58

1    eventually signed?

2        A    Yes.  So if you look at--at Exhibit 81, at the

3    appendix paragraph 9a, you'll see that some of the language

4    is stricken out.  And that was the language that I was asked

5    by Vanguard to--to take out to shorten the disclaimer

6    paragraph.  And so I wrote back to Mr. Glatstein saying, you

7    know, can--can we ask for shorter language.

8        Q    And let me ask you this, is there anything else in

9    your e-mail to Mr. Glatstein that you'd like to point out to

10   the Court?

11       A    Yes.

12       Q    What is it?

13       A    So if I can read the e-mail--the text of the e-mail

14   is--so the subject line is comments from Vanguard.  And then

15   the text of the e-mail is, "They would like the new paragraph

16   9 shortened.  See attached.  Maybe you can take the deleted

17   text, and put it in a cover letter to the court, if you think

18   we need it."

19       Q    And why did you say that to Mr. Glatstein?

20       A    Because I wanted to make sure that no one thought

21   we were changing anything in substance.  Substance the

22   disclaimer was the same and I don't think--you know, as a

23   legal matter it's still the same disclaimer so the substance

24   has to be the same but I didn't want anyone to think we were

25   changing anything in substance about the disclaimer plan, it

```
 1   was still we're going to disclaim into the estate, it's going
 2   to pay us under the will, it's going to pay us under Article
 3   4th of the will, it's going to go out two-thirds to the SNT
 4   and one-third to the Issue Trust because that's what Article
 5   4th says.
 6           So basically I asked Mr. Glatstein in the interest
 7   of full disclosure, if you think we should, you should add as
 8   a cover letter to the Court here's why--why we took this
 9   language out.
10       Q    Do you think that doing the disclaimer was in
11   Joanne's best interest?
12       A    Absolutely.
13       Q    Why?
14       A    So the disclaimer plan, if I can call it that, had
15   --had a number of pieces.  First, you know, we avoided
16   litigation against the POD designation that I think would
17   have been successful.  It might have been quickly successful,
18   it might have been slowly successful, I don't know, but given
19   that the disclaimer--the POD made no sense to anybody I
20   thought the odds that the litigation would succeed were--were
21   very high.
22           And frankly I didn't--I thought there was real
23   doubt about whether Joanne would be able to defend that
24   litigation; she would probably end up losing by default or,
25   you know--at the time in 2012 you'll recall she had an issue
```

60

1   with trespass and she filed a 33 page rambling letter with
2   the trespass court--or the court hearing trespass, she'd
3   filed something like that with--with New York or Pennsylvania
4   and just persuade the court that no one would ever want to
5   give her $3 million.
6           And in the meantime as long as litigation took
7   everything would be frozen and there would be no way to get
8   money to Joanne, there would be no way to rescue Joanne, she
9   would continue to be effectively homeless and on the streets.
10          I was worried that maybe the estate assets would be
11  frozen as well because what I was doing during this period
12  was using the estate assets to send money to Joanne every
13  week.  So she got SSDI and then I was also sending her $500 a
14  week, first it was 280 and then I raised it to 500.  The 280
15  was my mother's amount.
16          Joanne had a debit card at Chase and so every week
17  I would move $500 into the debit account at Chase and then
18  Joanne would take that money out and spend it and this was
19  what she used, you know, to pay rent at the motels that she
20  shuttled between and to pay for food and to pay whatever
21  else.
22          And so I was worried she would even lose that and
23  then she would be really homeless.  At least right now she
24  had a motel to stay in.  And look, her health could not be
25  good, all right.  She was walking around, you know, dressed

BLACK000649

61

1   in ten layers of clothes, you know, in the middle of a Denver

2   summer we were told.  She was doing the same thing in all

3   likelihood when it got colder and so I wanted a way to, you

4   know, to--to intervene and do something to help Joanne.  I

5   don't think we could do that until the POD issue was resolved

6   one way or another.

7          And so litigation would be slow and it would be

8   expensive and it would probably come to the same outcome as

9   the disclaimer.  So one thing I thought we were doing was

10  getting to a good outcome faster.  And overall for Joanne I

11  was also getting her the worker's comp, right, which, you

12  know, sort of that was on hold until I could do the

13  conservatorship.

14         So for me this was all wrapped up in a--in a

15  package of look if we do the conservatorship Joanne is going

16  to have two million in SNT actually with more--more assets

17  coming in it's going to be closer to three million, she's

18  going to have worker's comp, she's going to have SSDI, she is

19  going to be in great shape, this is a great outcome for

20  Joanne and we'll be able to, you know, hopefully intervene to

21  do something to help her.

22         You know, I couldn't force her to be hospitalized,

23  I knew that, but we wanted to do what we could, we meaning I

24  think me and Cherie principally were anxious to do what we

25  could to try to help Joanne and litigation was not the way to

BLACK000650

62

1   do that.

2       Q    Are you surprised to be litigating this disclaimer

3   issue two and a half years later?

4       A    I am very surprised.

5       Q    Why?

6       A    Because we, meaning me and Cherie and Anthony and--

7   were all in agreement that this was the right thing to do for

8   Joanne.  We knew what it was, the proposal was, we knew the

9   money was going to go back into the estate, we knew it was

10  going to go out two-thirds to the SNT, we knew it was going

11  to go out one-third to the Issue Trust.  I was trying to

12  avoid litigation over the POD, I wasn't trying to get into a

13  big court fight in--in Colorado years later.

14          MR. POSKUS:  I've got no further questions at this

15  time for Mr. Black, Your Honor.

16          THE COURT:  Okay.  Do you want to go right into

17  cross or do you want to take a five minute break, what do you

18  want to do?

19          MR. POSKUS:  Why don't we take a break, Your Honor.

20          THE COURT:  Is that all right?

21          MR. DAIN:  That's fine.

22          THE COURT:  All right.

23          (Whereupon, a recess was taken.)

24          THE COURT:  All right.

25          MR. DAIN:  I'm ready if Mr. Black is.

1           THE COURT:  Thank you.

2                       CROSS-EXAMINATION

3  BY MR. DAIN:

4      Q    Mr. Black, you mentioned that there was going to be

5  litigation over the POD designation.

6      A    I expected that if we didn't pursue the disclaimer

7  there would be litigation over the POD, yes.

8      Q    Okay.  So I want to talk a moment about conflicts

9  and--and you certainly understand being a lawyer what legal

10 conflict is, right?

11     A    I'm not sure what you have in mind, we talked about

12 this yesterday, I don't want to walk into--I don't know what

13 the definition of a quote legal conflict is.

14     Q    Okay.  Let me--

15     A    I agreed last time that I had a conflict of

16 interest in proposing the disclaimer in Colorado.

17     Q    You agreed to that?

18     A    I agreed to that.

19     Q    So the litigation that you're talking about--you

20 first mentioned your wife would sue on behalf of you and your

21 wife's two children, right?

22     A    What I expected to happen was there would be a

23 general lawsuit on behalf of all of my children with my wife

24 representing the two minor children.  Maybe it wouldn't have

25 been precisely all of them but it would have been all or

1   most.

2       Q    And you would have been giving them guidance in

3   that, right?

4       A    We never got that far.

5       Q    I'm asking, you would have been giving them

6   guidance if you had gotten that far?

7       A    You know, I don't know what I would have done; I

8   was trying to avoid litigation.  I was an executor of the

9   estate and so I think the first thing I would have done was

10  to say, okay, I'm a fiduciary to the estate, I'm also a

11  parent of my children, what do I do here.  So I don't--

12      Q    You step out--you step out, right?

13      A    I don't know what I would have done.  I would have

14  sought advice on--on what would have been appropriate to do

15  and what--what the alternatives were.

16      Q    Well, you clearly couldn't represent your wife and

17  children and also be the conservator of Joanne Black, right?

18      A    I would agree that those would be inconsistent

19  roles, yes.

20      Q    Okay.  So rather than getting advice on that or

21  rather than stepping out from your position as conservator

22  you decided you would avoid litigation by putting together a

23  scheme in which you and your children would get one-third of

24  the POD designated assets, right?

25      A    No.

65

```
 1      Q    Oh, actually more.  You--you also got one-third of
 2 the POD assets plus the Roth IRA.
 3      A    Totally wrong.
 4      Q    Okay.  Totally wrong.
 5      A    Totally wrong.
 6      Q    I'll--I'll give you the forum, tell me why I'm
 7 totally wrong?
 8      A    What I asked for was the power to disclaim Vanguard
 9 and Fidelity--
10      Q    Uh-huh.
11      A    --where the assets would then pass under my
12 mother's will, Article 4ᵗʰ, under her will.  Two-thirds of
13 everything would go to Joanne's SNT and one-third of
14 everything would go to the Issue Trust.
15           The Roth IRA was part of everything.  Joanne had to
16 get two-thirds of everything.  If she didn't get two-thirds
17 of the Roth IRA and I later decided that it was tax efficient
18 to send the Roth IRA directly to my children, she had to get
19 compensating assets because she still had to get two-thirds
20 of everything.
21      Q    Okay.  Let's--let's break that down before we move
22 on.  The Roth IRA you gave 100 percent to your children,
23 correct?
24      A    Yes.
25      Q    The tax information that you say you got who did
```

BLACK000654

1   you get that from again?

2        A    So I was trying to explore what the tax--

3        Q    No, no, my question was who did you get that from?

4             MR. POSKUS:  Your Honor, I'm going to object, he

5   needs to let--give him a chance to answer the question, he

6   got three words out.

7             MR. DAIN:  Allow me to--to just point out

8   something, when the answer starts with so that's going to be

9   a narrative.  I asked him the question who--

10            MR. POSKUS:  That's--

11            MR. DAIN:  --and that's a name.

12            MR. POSKUS:  I disagree with that.

13            THE WITNESS:  Not a single name.

14       Q    (by Mr. Dain)  Okay.

15       A    From a collection of sources.

16       Q    And you--you testified before I think that this was

17  informal advice you'd gotten?

18       A    I don't recall.

19       Q    Give us the names, who gave you this tax advice?

20       A    So again I'm not going to give you names; I can

21  describe the process and answer the question that you cut me

22  off the last time.

23       Q    You don't have any names of people who gave you the

24  advice?

25       A    I don't--in--in my mind at this point I do not have

BLACK000655

67

1  names of specific people.

2      Q    And you know the Roth IRA was--the way a Roth works

3  is you pay the taxes before you put it into the IRA, right?

4      A    The Roth IRA contribution is not tax deductible so

5  the income that forms the basis for the money that you put

6  into the Roth IRA is taxed.  And then the money that you take

7  out is not taxed.

8      Q    Okay.  I think--so you agree with me, right, it was

9  already--taxes were already paid on that $432,000?

10         MR. POSKUS:  Your Honor, I'm going to object at

11  this point.  You started the hearing by saying we're going to

12  take evidence on the disclaimer, but the stuff he's asking

13  about first of all is beyond the scope of direct.  And second

14  of all he's asking about how he administered the estate after

15  the disclaimer was exercised; that's part two of this.  It

16  has nothing to do with the issue and--which is whether or not

17  the disclaimer was appropriate, whether or not he breached

18  his fiduciary duties, whether or not a surcharge ought to be

19  imposed for his exercise of the disclaimer.

20         It's beyond the scope of direct and it's not

21  relevant to the issue as you framed it this morning.

22         MR. DAIN:  Your Honor, first Roth IRA came up in

23  testimony today.  The 432,000 is clearly part of the issue of

24  surcharge if not civil theft which is before this Court.

25         Mr. Black angrily said I had it wrong and he

BLACK000656

68

1   explained just now what his--my words scheme was--and that
2   included the Roth IRA; that came out of his mouth.
3               THE COURT:  Right.  I'll allow it.  The objection
4   is overruled.
5       Q    (by Mr. Dain)  Do you remember the question?
6       A    No.
7       Q    Nor do I.  So let's start again, the Roth IRA had
8   amounts--had been taxed before they were put into the Roth
9   IRA, right?
10      A    Whatever amounts my mother originally contributed
11  were not tax deductible.
12      Q    When the amounts were distributed to your children
13  were they taxed?
14      A    No.
15      Q    And they wouldn't have been taxed as you now know
16  had been distributed to Joanne?
17      A    The tax advantage from distributing the Roth IRA to
18  my children directly rather than distributing to trust had to
19  do with the Roth IRA rules on distributions and how fast the
20  money would have to be withdrawn.
21      Q    How fast the money would have to be withdrawn--and
22  this comes from tax advice that you can't remember who you
23  got it from?
24      A    No, tax advice that I can describe and you've cut
25  me off the two times that I've offered to describe it.

BLACK000657

1     Q   And the 432,000 you said was part of the overall

2  two-thirds/one-third you were going to distribute?

3     A   The Roth IRA went into the estate after the

4  disclaimer and therefore it was subject to an overall

5  two-thirds to one-third division.  And given that Joanne's

6  SNT did not get two-thirds of the Roth IRA funds she had to

7  get--and I believe she has gotten substitute funds.

8     Q   And you've read your own expert, Melinda Harper's

9  report?

10     A   I have.

11     Q   And she says you're how many hundreds of thousands

12  short in making that two-thirds/one-third that you say--

13     A   As of the date of her report she shows me as being

14  short--I believe it's $130,000; that's a snapshot at a point

15  in time.  I do not believe I am short today and I do not

16  believe that I will be short when I finally close out the

17  estate.  It's my job to get to two-thirds/one-third before I

18  close out the estate.

19     Q   You going to put cash back in?

20     A   If I have to I will put cash back in or I will

21  arrange to transfer money from the Issue Trust to the SNT to

22  the extent that too much went to kids and too little went to

23  Joanne.  There are various ways to make sure that I get to

24  two-thirds/one-third.

25     Q   The--the issue that--that you said you talked with

BLACK000658

70

1   Ms. Wrigley about, are you saying--telling this Court Ms.

2   Wrigley may have been the one who first proposed a

3   disclaimer?

4        A    I don't recall.  The idea came out of joint

5   conversations between me and Ms. Wrigley and I can't tell you

6   today was it my idea, was it her idea, did it come out of the

7   joint conversations; I view this as a joint idea.

8        Q    You're the lawyer, right?  Ms. Wrigley is not a

9   lawyer.

10       A    Ms. Wrigley is not a lawyer.

11       Q    You researched disclaimers?

12       A    No.

13       Q    You didn't?

14       A    No.

15       Q    You had no idea how they work?

16       A    That's not a fair statement either.  I didn't go

17  and research disclaimers; we looked at options.  Where the

18  disclaimer idea came from in first instance sitting here

19  today, it's three years later I don't recall.

20       Q    You remember--did you review Mr. Glatstein's

21  testimony in this case?

22       A    I was here for the hearing last time.

23       Q    And you know Mr. Glatstein said you were the first

24  to mention to him a disclaimer?

25       A    I came to him with the disclaimer idea, yes.

71

1  Q And yet you're not sure how that came about?

2  A I don't recall exactly where the disclaimer idea

3 came from, no.

4  Q And this conversation that you had with me, how

5 long did that take place, how many minutes?

6  A I don't recall, you know--

7  Q You searched for phone records of course, right?

8  A No.

9  Q Why?

10  A Why would I do that?

11  Q To prove that the conversation took place.

12  A There's no doubt that a conversation took place you

13 said as much in your questioning of me at the last hearing.

14 We just may disagree on the content of the conversation.

15  Q You have any e-mails that support that

16 conversation?

17  A I do not have e-mails with you.  I have a letter

18 with Vanguard dated July 20th that is consistent with my

19 recollection of the conversation.

20  Q Let me show you another letter from Vanguard.

21   MR. DAIN:  And, Your Honor, I apologize I don't

22 know if this is an exhibit, it's July 11th, 2012, from

23 Vanguard to Mr. Black.  And just in the interim I'll show it

24 to you.

25   (Pause.)

1          MR. POSKUS:  Your Honor, we think it's 42.

2          THE COURT:  Okay.

3          MR. POSKUS:  If Mr. Dain will confirm then we can

4    just use the exhibit.

5          MR. DAIN:  Yes, it's 42, Your Honor.

6          THE COURT:  Thank you.

7      Q    (by Mr. Dain)  Do you see that, Mr. Black?

8      A    I'm at Exhibit 42.

9      Q    And that's the letter that you received from

10   Vanguard which indicated that the Roth IRA was 100 percent

11   designated to Joanne Black.  And that the remainder of the

12   nonretirement assets that were POD were 95 percent to Joanne

13   Black and 1 percent to each of your adult children?

14     A    Yes.

15     Q    Okay.  And you say you thought this was crazy, you

16   didn't think your mother would do this?

17     A    I thought this made no sense.

18     Q    Okay.  I want to show you an e-mail that you sent

19   to Ms. Kerr on April 14th, 2015.

20         MR. DAIN:  I don't have copies, Your Honor, but I'm

21   showing it to counsel and I'll show--

22         THE WITNESS:  You went through this in your

23   cross-examination of me last time, do you really want to do

24   it again?

25         MR. DAIN:  Is this an Exhibit?

```
 1              (No audible response.)
 2              MR. DAIN:  I'm going to show it to Mr. Black.
 3         Q    (by Mr. Dain)  Do you recall that?
 4         A    You asked me questions about this last time.
 5         Q    And in that e-mail you told Ms. Kerr that she
 6    should assume that this letter that instructs that the Roth
 7    IRA is 100 percent to Joanne Black and the remainder is 95
 8    percent to Joanne Black were the instructions of your mother?
 9         A    That's what I told Ms. Kerr to assume as part of
10    her work; as I testified last time I do not believe that this
11    was my mother's intent; I believe it was a mistake, maybe it
12    was fraud, I don't know, this was an e-mail to Ms. Kerr
13    saying this is how I believe you should conduct your
14    investigation because I don't think the disclaimer issue is
15    before Ms. Kerr.  Ms. Kerr is an accountant.
16         Q    But you state that she should assume those were the
17    instructions of your mother?
18         A    The e-mail says what it says; I don't have it in
19    front of me right now.
20         Q    You didn't qualify it, you didn't say I don't
21    believe that's correct, that's the entirety of your
22    discussion about that issue with--
23         A    That was one of 150 e-mails that I sent to Ms. Kerr
24    and I wasn't trying to parse words and I wasn't trying to
25    offer Ms. Kerr legal advice and I wasn't trying to offer Ms.
```

74

1    Kerr my opinion about the truth; I was trying--this was part
2    of my effort to say to Ms. Kerr, look, the disclaimer is not
3    your issue.
4          MR. DAIN:  Your Honor, I'm not sure what's the
5    defense next in order?
6          THE COURT:  I'm sorry?
7          MR. DAIN:  Defense--what am I doing--the--I don't
8    know what this would--
9          MS. DiPONIO:  D I believe it is, Your Honor.
10         MR. DAIN:  D--what--I don't want to say the--
11         THE COURT:  Oh, you're asking for an exhibit?
12         MR. DAIN:  Yeah, an exhibit.
13         THE COURT:  Yeah, D.
14         MR. DAIN:  Okay.  And the reason--only reason I
15   remember it's letters so I'm used to that being defense, but
16   at any rate--
17         MR. POSKUS:  Your Honor, if I may Exhibits A, B,
18   and C from the last hearing were never uploaded so we don't
19   have a good record.
20         MS. DiPONIO:  Oh, Your Honor, I apologize I thought
21   I uploaded them.
22         MR. POSKUS:  We looked and they're not uploaded.
23         MR. DAIN:  You--
24         THE COURT:  Okay.
'25        MS. DiPONIO:  They will be uploaded this afternoon.

BLACK000663

1          THE COURT:  Okay.  So Exhibit A was an e-mail chain

2     from April 14th, 2015, the same date as this.  I don't know

3     if it included this particularly.

4          MS. DiPONIO:  Your Honor, some of the exhibits that

5     we've entered are--were already a part of the upload, I

6     believe there were two that were not.

7          THE COURT:  Okay.  So I had A as the e-mail chain,

8     B was the affidavit from Lamberti, and then C was from June

9     17th and it was court appointed counsel's bill statement.

10         MS. DiPONIO:  Right.  So the affidavit from Mr.

11    Lamberti is already put in the court record; it was prior to

12    us (inaudible) as an exhibit.

13         THE COURT:  Okay.

14         MS. DiPONIO:  And the other two I will have

15    uploaded (inaudible).

16         THE COURT:  Okay.  So do we know if this part of--

17         MS. DiPONIO:  Oh, that e-mail is part of the record

18    according to Ms. Kerr.

19         THE COURT:  So is it part of that e-mail chain?

20         MS. DiPONIO:  I'm sure it is in one of her

21    responses or something that Ms. Young probably filed that is

22    already part of the record.

23         MR. POSKUS:  Your Honor, it's easy to say it's part

24    of the record but before we--just to make sure we have a

25    clean record, maybe what we need to do is stop and look at

BLACK000664

1  what they consider Exhibits A, B, and C are for sure.

2          MR. DAIN:  We can do that at a recess, Your Honor.

3          MS. DiPONIO:  Yeah, sure.

4          THE COURT:  Yeah.

5          MS. DiPONIO:  I know what exhibits--

6          MR. POSKUS:  If they're going to say that this is

7  part of A then that concerns me.  If they want to mark it D

8  then it's not a problem.

9          MS. DiPONIO:  We'll just mark--

10          MR. POSKUS:  I'm just trying to--

11          THE COURT:  Well, A was already admitted.

12          MR. POSKUS:  I--I realize that.  I just don't know

13  what A was anymore because they only had one copy and it

14  wasn't uploaded.  I tried to download them before we got to

15  this hearing today and they're not there.

16          MS. DiPONIO:  Your Honor, just to make it simple

17  for Mr. Poskus, we will mark that as Exhibit D, even if it's

18  already part of the record so there's no confusion.

19          MR. DAIN:  Should I give it back to Your Honor or--

20          THE COURT:  No, it is.  It's the first page of A.

21          MR. DAIN:  Okay.  So it's--it's Exhibit A?

22          THE COURT:  Yeah.

23      Q   (by Mr. Dain)  You mentioned something--Mr. Black,

24  you said you don't--you didn't want to parse words, you

25  stated you believed that everyone understood that this

BLACK000665

1 disclaimer would result in you and your children receiving

2 one-third of the POD assets that were disclaimed into the

3 Issue Trust, right?

4     A   I would frame it differently.  I would say that I

5 believe that everybody understood that the effect of the

6 disclaimer would that the assets would go back into the

7 estate; that's number one.  And that everybody understood

8 that under the will of Renata Black the residual of the

9 estate would pass under Article 4th of her will.  And Article

10 4th said two-thirds to the Supplemental Needs Trust and

11 one-third to the Issue Trust.

12     Q   If you were so sure everyone understood why is it

13 that of all the things you filed, everything that you filed

14 in this case, the one thing that you didn't include was that

15 one-third of those disclaimed assets would go into an Issue

16 Trust?

17     A   If I had to do it over again I would make even a

18 longer paragraph one and I would say under--two-thirds go to

19 the Supplemental Needs Trust and one-third goes to the Issue

20 Trust.  I was relying on Mr. Glatstein's draft for what

21 language we should provide and what language he thought was

22 sufficient to inform everyone in the court proceeding with

23 regard to your knowledge and Cherie Wrigley's knowledge you

24 had direct knowledge.

25     Q   That's your testimony?

BLACK000666

78

1    A    That's my testimony.

2    Q    And why is it that of all the things you filed you

3  never disclosed in a report or an account that one-third of

4  those disclaimed assets were placed in an Issue Trust?

5    A    I did disclose it to Ms. Babcock and it's in her

6  court visitor report.  I did disclose this to Dr. Shirke and

7  it is in his letter to the Court.

8    Q    This is probably then--I won't make it an exhibit

9  because it's--because it's probably in the court file, the

10  visitor's report--in the visitor's report you say you

11  disclosed that the disclaimed assets would be going

12  two-thirds/one-third?

13    A    So I didn't write the visitor's report; I disclosed

14  that information to Ms. Babcock and she wrote the report.

15    Q    Understood but you're saying everyone understood

16  this because it's in the visitor's report?

17    A    No, everybody had five different sources of

18  information and the visitor's report was one of them.

19    Q    I'll show you the visitor's report.

20    MR. POSKUS:  Your Honor, for the record it's

21  Exhibit 2 so everybody can look at that.

22    Q    (by Mr. Dain)  Exhibit 2.

23    A    Okay.  I'm at Exhibit 2.

24    Q    Turn to page 2--or actually turn to page 5.

25    A    Okay.  I'm at page 5.

1      Q      Do you see under paragraph 4 why was this petition

2   initiated?

3      A      Yes.

4      Q      This is what you told the court visitor, right?

5   This is what you're talking about?

6      A      This is her rendition of what I told her, yes.

7      Q      Okay.  But again her rendition is what informs

8   everybody else, right?

9      A      Yes.

10     Q      So if this is one of the items you're relying on

11  that disclosed this disclaimer of two-thirds to the

12  Supplemental Needs Trust and one-third to the Issue Trust, it

13  should be in here, right?

14     A      What you--what you have been saying is I was

15  somehow hiding that one-third was going to the Issue Trust

16  and I was not hiding that one-third was going to the Issue

17  Trust.  I said it to Linda Babcock and it's in her court

18  visitor report; I said it to Dr. Shirke and it's in his

19  letter and I said it to you; I said it to Cherie Wrigley, and

20  I relied on Mr. Glatstein to speak directly to Ms. Young and

21  Ms. DiPonio.

22     Q      You said it in the court visitor's report you're

23  saying or to the court visitor and to Dr. Shirke.  You didn't

24  put one-third to the Issue Trust in anything you filed with

25  the Court, your petition, your proposed order never said

80

1    one-third to the Issue Trust?

2        A    One-third to the Issue Trust is not included in the

3    proposed order and if I had to go back and do it again I

4    would put that language in too and it is not there, we know

5    it's not there.

6        Q    And if you had put it in there you would have

7    assumed that would have been an item of discussion for the

8    Court and all the parties in a hearing, right?

9        A    No.

10           MR. POSKUS:  Objection, Your Honor, speculation.

11           THE WITNESS:  I thought that everybody understood

12   exactly what we proposed and that Ms. Young and Ms. DiPonio

13   agreed with what we proposed.  And I thought that the

14   language of the proposed order was clear as it was and I

15   didn't think there was any doubt as to what would happen to

16   the remaining one-third that wasn't specifically labeled, but

17   was--look, it starts out saying under Article 4th, here's the

18   will, here are the two trusts, go look at Article 4th.  We

19   are not hiding the ball here.

20       Q    (by Mr. Dain)  Just before I get to the court

21   visitor's report, you know there's another will out there you

22   didn't probate, right?

23       A    Yes.

24       Q    You know in that will there's no distribution under

25   Article 4th, two-thirds/one-third, right?

BLACK000669

1    A    If you want to bring in the will--the informal will

2   as I call it, you're welcome to do so.  I'm aware of the will

3   and I don't have it--have it in my head exactly what it

4   provided.

5    Q    And you know--what you do know that it provided

6   differently than the will that you choose to probate?

7    A    That's correct.

8    Q    And in doing that you informed the court in New

9   York there was no other will, right?

10   A    I did not inform the court about the informal will,

11  that's correct.

12   Q    Okay.  So the will that you chose to probate is the

13  one that gives you one-third to the Issue Trust, right?

14   A    I probated the official will.

15   Q    The official will--you probated one of two wills

16  that you choose to probate.

17   A    No.

18   Q    It's official because you did so, right?

19   A    I obtained advice of counsel and I probated the

20  official will.

21   Q    And you know Ms. Wrigley didn't agree to the will

22  you probated, right?

23   A    No, totally--I totally disagree with that.

24   Q    You know I didn't agree to that.

25   A    You knew about both wills and you agreed that I

1    should probate the official will.  Ms. Wrigley knew about

2    both wills, she agreed that I should probate the official

3    will.  There was no doubt about that either.

4        Q    Am--am I a party to the probate proceeding?

5        A    No.

6        Q    Is Ms. Wrigley?

7        A    No.

8        Q    Let's go to the court visitor's report, page 5,

9    item four.  You start out my sister has been a paranoid

10   schizophrenic since she was 20 years old.  My mother in her

11   will left two-thirds of her estate to Joanne in a trust and

12   one-third will go to me and my kids.  Do you see that?

13       A    So first of all I want to reiterate that this is a

14   conversation with Linda Babcock, it's put in quotes.  I don't

15   know whether it's a direct quote or not but if you want to

16   read this as Ms. Babcock's language put in quotes then I'm

17   happy to see whether you read it correctly?

18       Q    I'm not--I'm just reading from it, you're saying

19   this is what informed everybody, it's one of the things that

20   informed everybody.

21       A    I believe that the court visitor report was one of

22   the documents that informed everybody.  What I was objecting

23   to was your saying that you wrote or you said.

24       Q    Where in this article or paragraph 4 does it

25   mention anything ·about a disclaimer?

83

1    A    It does not.

2    Q    But you're saying you told that to Ms. Babcock?

3    A    I did.

4    Q    And you're saying that in here that's what informed

5  everyone about the disclaimer going two-thirds/one-third?

6    A    No, but this has a reference in it to two-thirds

7  goes to Joanne's SNT and one-third goes to the Issue Trust

8  and therefore it goes to whether I was trying to hide that

9  one-third was in the Issue Trust.  If I was trying to hide it

10  why did I say it to Ms. Babcock.

11    Q    Did you say anything about one-third of the

12  disclaimed assets going into the Issue Trust to Ms. Babcock?

13    A    To my recollection I did, but it's three years ago

14  and I don't remember my exact words.

15    Q    And even though you say that you told Ms. Babcock

16  this you didn't tell the Court that in your petition, right?

17    A    At this point we've gone over the petition, the

18  petition said what it said, the proposed order for special

19  conservatorship was much more explicit about what we wanted

20  and I thought was clear enough and Mr. Glatstein thought was

21  more than clear enough.

22    Q    All the people that need to know that you're going

23  --that your intent is to disclaim these assets so that

24  one-third of those POD assets goes into an Issue Trust, of

25  all the people you needed to disclose that to the most

84

1   important is the court, right?

2       A    I don't know that I even thought about it that way.

3   I was trying to disclose.  I don't know who's more important.

4       Q    You mentioned that Ms. Babcock's visitor report was

5   one of the things, you also said there was a hearing on

6   December 11th, 2012, that was another important disclosure,

7   right?

8       A    No, I don't think in my direct testimony I said

9   anything about the hearing.

10      Q    You didn't?

11      A    But we certainly had a hearing on December 11th.

12      Q    And was Ms. Wrigley present at the hearing?

13      A    No.

14      Q    Was I?

15      A    No.

16      Q    And have you gone through the transcript?

17      A    I have reviewed the transcript from December 11th,

18  yes, I have.

19      Q    And you know that you mentioned that the intent was

20  that Ms. Black's assets would go into an Issue Trust in which

21  I was a trustee?

22      A    I don't remember the language of the December 11th

23  transcript but if you want to show it to me I'll look at it.

24           MR. DAIN:  (Inaudible).

25           MR. POSKUS:  It's in the exhibit book, Your Honor.

BLACK000673

1        THE COURT:  What exhibit?

2        MS. POSKUS:  I'll try to find it.  Your Honor, it's

3   Exhibit 51.

4        (Pause.)

5    Q    (by Mr. Dain)  Do you have that in front of you,

6   sir?

7    A    I do.

8    Q    Can you turn to page 7?  Actually why don't we

9   start at page 6 and go down to line 25.  And do you see this

10  is you're--you're at the hearing speaking, do you see that?

11   A    Yes.

12   Q    And you say the basic purpose--and then go to page

13  7--of the financial guardianship is to make sure she has

14  money to get, money from my mother into a trust, do you see

15  that?

16   A    And then it continues semicolon, my cousin will

17  then be the trustee so she'll have financial support.

18   Q    Okay.  This is another point you made in terms of

19  informing everybody, disclosing to everybody what the intent

20  was of the disclaimer, right?

21   A    We had a hearing and I testified to what I

22  testified to.

23   Q    And what you said to this Court is there was a

24  trust, right?

25   A    There was a trust for Joanne, yes.

BLACK000674

86

1    Q    You didn't say anything about an Issue Trust for me

2  and my children, did you?

3    A    In this particular snippet of testimony I did not.

4    Q    In any snippet of testimony on December 11th?

5    A    In this hearing I did not.

6    Q    And you said my cousin will then be the trustee so

7  she'll have financial support, you said that, right?

8    A    Yes.

9    Q    You didn't say there are two trusts, we'll be

10  receiving some, the other she'll get some financial support

11  from, correct?

12    A    At the hearing I did not say that.

13    Q    So this is not a--an item in your favor to say I

14  disclosed what was happening with the disclaimer, right?

15    MR. POSKUS:  Objection, Your Honor, he's arguing

16  with the witness now about what's in his statement and what--

17  he needs to rephrase the question.

18    MR. DAIN:  Your Honor, he testified earlier this

19  was the basis he believes everyone was on notice.  Go ahead.

20    THE WITNESS:  I did not testify that the hearing

21  was the basis on which I believe everyone was on notice.

22    Q    (by Mr. Dain)  You said it was one of the bases?

23    A    I actually don't think I said that.

24    THE COURT:  You said there were five things.

25    THE WITNESS:  I wish had been more explicit at the

1  hearing but I said there were a bunch of things and I don't

2  recall listing this as one of them.

3      Q    (by Mr. Dain)  Okay.

4      A    I wish the hearing had been more explicit.

5      Q    Thank you.

6          MR. DAIN:  I'm sorry you got caught off.

7          THE COURT:  He just testified that there were five

8  bases.

9      Q    (by Mr. Dain)  And one of them you said was a

10  visitor's report?

11     A    Yes.

12     Q    Another you said was the hearing?

13     A    No.

14     Q    What were you--

15     A    I don't recall saying that.  Why don't we go back

16  to, you know--I guess we don't have a live feed--I don't

17  recall saying that.

18     Q    Give me the other four.

19     A    One was the court visitor's report, the second was

20  Dr. Shirke's letter, the third would have been the proposed

21  order for special conservatorship.  The fourth would have

22  been Carl Glatstein's direct conversations with Ms. Young and

23  Ms. DiPonio.  A fifth would have been my direct conversations

24  with you and Ms. Wrigley.  And sixth would have been we

25  submitted the will and the two trusts to the Court as

1   exhibits in advance of the hearing so now I'm up to six.

2       Q    Okay.  In the--the hearing--so now you said you

3   could have been more explicit in explaining this to the

4   Court, right?

5       A    Yes.

6       Q    And when you say you could have been explicit you

7   mean mention the fact that there was a trust in which you and

8   your children would be getting one-third?

9       A    I wish that I had attended the hearing in person.

10  Mr. Glatstein advised look there's no objection, this is

11  going to be a short hearing, there's no reason for you to

12  come out to Denver and I think it was a mistake.  I think I

13  should have been here; I should have testified directly; we

14  should have had a longer hearing.  We should have had full Q

15  and A.

16          And, you know, at the time he said I didn't need to

17  and the hearing was, in fact, you know very short and I wish

18  there had been a longer hearing and I had said more, I do.

19      Q    Well, let's if we could go to page 17.

20          MR. POSKUS:  Of Exhibit 51?

21          MR. DAIN:  Yes.

22          THE WITNESS:  Okay.  I'm at page 17.

23      Q    (by Mr. Dain)  Now, let me ask you this--and again

24  you're a lawyer, you're coming to the court with a petition

25  to be named conservator and within it you want a disclaimer,

89

1   are you following me so far?

2       A    I have a petition to become a conservator, I am a

3   lawyer, and I'm asking the Court to approve a disclaimer,

4   yes.

5       Q    And in addition to being explicit to the Court in

6   what your intent is, you'd agree with me it's also important

7   that if the Court appears to be under any misapprehension

8   about what your intent is you should make it clear, right?

9       A    I don't know that I have an opinion on--on that, I

10  was there to answer questions.

11      Q    Okay.  Well, let's go to page 17 and here you're--

12  you're having a colloquy with the Court.  And the Court says,

13  The Court finds that the statute requires in Colorado that a

14  90 day initial report, the inventory and financial plan must

15  be filed with the Court, do you see that?

16      A    Yes, I do.

17      Q    And certainly the progress on moving the funds into

18  the trust can be reported on as well and that will take care

19  of that, do you see that?

20      A    Yes, I do.

21      Q    Did you feel obligated while having that colloquy

22  to say, Your Honor, it's not just the trust, there are really

23  two trusts and let me explain to you how they operate?

24      A    So here's how I would interpret this language, I

25  would say--

1    Q   Before you do that, I'll let you--

2    A   Excuse me, you interrupted me.

3    MR. POSKUS:  Your Honor--

4    MR. DAIN:  Your Honor--

5    THE COURT:  No, I'm going to let Mr. Dain clarify

6 what he's trying to get out of the witness.  If you want to

7 do redirect you're welcome to.

8    MR. POSKUS:  Okay.  I just wish you'd let the

9 witness finish answering the question.

10    THE COURT:  Well--

11    MR. DAIN:  It's a yes or no, I'm sorry, Your Honor.

12 We'll be here all day.

13    Q   (by Mr. Dain)  You--let--let me ask you, yes or no,

14 did you think it was important at that time when the Court

15 said the progress on moving the funds into the trust did you

16 think it was important, yes or no, to explain to the Court

17 it's not really the trust, there is another trust in which

18 I'm going to be getting one-third along with my children?

19    A   That did not occur to me at the time; I thought

20 everybody understood what the proposal was.

21    Q   Am I correct that what also didn't occur to you a

22 little later is given that the Court said you must in your

23 inventory and financial plan report on the progress of moving

24 the funds into the trust that at that time you didn't explain

25 to the Court that there was another trust in which you

BLACK000679

91

1  received one-third along with your children?

2      A   So I'm sorry I'm not sure I'm following the

3  question.

4      Q   The Court here is telling you that within 90 days

5  you have to file an inventory and financial plan, right?

6      A   That's right.

7      Q   And saying you should report on the progress of

8  moving the funds into the trust, correct?

9      A   That's correct, that's what the words say.

10     Q   At the time you filed the inventory and financial

11 plan did it occur to you to explain to the Court that there's

12 another trust in which I and my children are getting

13 one-third?

14     A   I think that I was reporting the inventory and

15 financial plan on Joanne's assets, I wasn't reporting on

16 other assets.  So I don't know why it would occur to me to

17 put in Joanne's inventory that there are other assets in my

18 mother's estate at this point that aren't Joanne's assets.

19     Q   Now, I know we've been through this before but you

20 know that the inventory and report required you to include

21 all assets that existed on December 11th, 2012, right?

22     A   We went through this at great length and I

23 understand that, you know, if that's what nunc pro tunc means

24 I'll accept that.  I relied on Mr. Glatstein's advice for

25 what I should report in my inventory and financial report.

BLACK000680

1    And the inventory and financial report says very clearly that

2    we're reporting the Supplemental Needs Trust as of March

3    31st, 2013.

4        Q    You know that Mr. Glatstein testified and did not

5    mention anywhere that he advised you not to include assets

6    that existed on December 11th, 2012?

7        A    I provided full information on the assets to Mr.

8    Glatstein.  I think my first effort to fill out the inventory

9    and financial plan he said this is just a mess or words to

10   that effect, let me do it or let me have my paralegal do it

11   and then we went back and forth starting with his draft of

12   the inventory and financial plan.  And I provided additional

13   financial information to Mr. Glatstein to help fill out the

14   form in the manner that he thought it should be filled out.

15       Q    All done?

16       A    Yes.

17       Q    You said you provided full information on the

18   assets, the assets you provided full information on to Mr.

19   Glatstein were only the two-thirds that were going into the

20   Supplemental Needs Trust, right?

21       A    Incorrect.  I provided information to Mr. Glatstein

22   on all of the assets coming from Vanguard.

23       Q    So then you knew--you knew that you had to provide

24   information on all of the paid on death assets, correct?

25       A    No, I was providing this information to Mr.

1  Glatstein and if he thought it should go in the inventory and

2  financial report it would have gone in.

3      Q    Did you--

4      A    I provided it to him and he decided that it doesn't

5  go in so he didn't put it in.

6      Q    But you know he never said that in his testimony

7  that he decided it shouldn't go in?  You've heard--you've

8  written--heard and--

9      A    I don't remember exactly what questions were asked

10 but I'm going to tell you I provided full information to Mr.

11 Glatstein; I have an e-mail in my files that says here's all

12 the assets and then he used that information to complete the

13 inventory and financial plan.

14     Q    And the assets included all of the assets, all of

15 the POD assets even those that were the one-third that

16 ultimately went to your issue trust?

17     A    Yes, it did.

18     Q    Okay.  So you knew that you had to give him that

19 information, right?

20     A    I thought that was relevant information for him to

21 have.  Did I know that I had to, no, I was giving him

22 information; I don't know what the specific rules are for

23 filling out the inventory and financial report other than he

24 was convinced I had made a hash of it.

25     Q    I know this is an exhibit too, the inventory and

94

1    financial report, you've read it, right?

2       A    Yeah.

3       Q    Did you sign anything related to that inventory and

4    financial report?

5       A    I'm confident that I signed it.

6            MR. POSKUS:  Exhibit 27, Your Honor.

7            THE COURT:  Yeah.

8            (Pause.)

9       Q    (by Mr. Dain)  Okay.  You signed it under penalty

10   of perjury, right?

11      A    If that's what it says I signed it and you got a

12   copy of it.

13      Q    Well, it's not what it says, I'm asking you, you've

14   got it there, did you sign it under penalty of perjury?

15      A    I don't see the word perjury but if you want to

16   read the verification page on page 8 you can.

17      Q    I understand that penalties for perjury follow

18   deliberate falsification of the facts stated herein.

19      A    I see, okay, yes, I signed it; I submitted it to

20   the Court and I sent copies to you and Ms. Wrigley among

21   other people.

22      Q    You've read it you just said that right?

23      A    Yes.

24      Q    You see that at the very beginning it says date of

25   appointment December 11th, 2012, right?

1    A    I do.

2    Q    Inventory values as of date December 11--that

3    should be 2012 but you typed in 22, do you agree with me that

4    that's what that says?

5    A    I agree that Mr. Glatstein made a typo and it says

6    2022 instead of 2012.

7    Q    Yeah, I guess thank you but you're missing my

8    point; that the inventory values are as of the date of

9    December 11th, 2012?

10   A    I agree that that's what this says and Mr.

11   Glatstein made the judgment that we should report the assets

12   in the Supplemental Needs Trust as of March 31st 2013 and

13   that's what the body of this report does.

14   Q    So you're saying it was solely his decision to not

15   include in his inventory report what the Judge has asked for

16   on December 11th, 2012?

17   A    I relied on Mr. Glatstein with regard to what

18   assets should be disclosed.  I now have advice from counsel

19   that the Supplemental Needs Trust isn't really part of the

20   conservatorship assets either.

21   Q    Oh, this comes from Mr. Poskus?

22   A    No comment.

23        MR. DAIN:  Your Honor, I--he's got to cause he just

24   waived the attorney/client privilege.  He can't use this as a

25   sword and then--and then throw up the shield.  I ask you to

1   order Mr. Black to answer that question.

2           THE COURT:  Go ahead, Mr. Black.

3       Q   (by Mr. Dain)  Who?

4       A   Mr. Poskus advised me that the--really the

5   Supplemental Needs Trust should not have been listed in this

6   inventory to begin with because it wasn't part of the

7   conservatorship of the estate it was part of Joanne's assets

8   but it wasn't part of the conservatorship.

9       Q   So Mr. Poskus told you there just shouldn't have

10  been an inventory and account because there's really nothing

11  to account for; is that correct?

12      A   No, that's not what he said.

13      Q   What did he say should be included?

14      A   Whatever belongs to the conservatorship.

15      Q   You came to this Court and you said there are paid

16  on death assets, 100 percent of some to Ms. Black, 95 percent

17  of others to Ms. Black, I want to disclaim those.  So you

18  asked this Court, the conservatorship court, to allow you to

19  disclaim, are you saying Mr. Poskus now is saying that never

20  should have happened because these assets weren't even part

21  of the estate?

22          MR. POSKUS:  Your Honor, regardless of how I

23  advised my client, how is this relevant advice I gave him two

24  and a half years after the fact has anything to do with what

25  occurred in (inaudible).

BLACK000685

1        MR. DAIN:  Your Honor, Mr. Black's credibility is

2   at issue here.  If he's going to be blaming everything on his

3   attorneys I'm allowed to probe into that.

4        THE COURT:  Well, for that part of it I think it's

5   a valid question.  It's to, you know, the advice itself it

6   really isn't probative, I agree.

7        Q    (by Mr. Dain)  So again, are you telling this Court

8   that even though you came to this Court to allow you to re--

9   to divert and--or divest and redirect a third of the assets

10  that were paid on death to Ms. Black that those assets never

11  should have been part of the estate?

12       A    No.

13       Q    Mr. Poskus just told you that only the--the assets

14  you put into the Supplemental Needs Trust didn't need to be

15  reported?

16       A    No.

17       Q    What did Mr. Poskus tell you?

18       A    Mr. Poskus advised me that in his judgment the

19  Supplemental Needs Trust is not part of the "conservatorship"

20  that has not--that is not the same thing as what gets

21  reported in particular document.  I did not have that

22  discussion with Mr. Poskus.  This document was prepared by

23  Mr. Glatstein with information from me.

24       Q    So you're saying that the Supplemental Needs Trust

25  that has two-thirds of those disclaimed assets is not a part

1    of this conservatorship proceeding, that's your

2    understanding?

3        A    I have no opinion one way or the other.  It's

4    reported in this inventory and financial plan because Mr.

5    Glatstein thought it should be reported.

6        Q    And the inventory and financial plan--again, did

7    you think if Mr. Glatstein told you that you should only

8    report the assets as of March 31st, did you question that

9    based on what you saw on the document itself?

10       A    I don't recall doing so, I thought it made sense to

11   me because that was after the disclaimer so that was after

12   assets had already been segregated and identified as going

13   into the Supplemental Needs Trust.

14       Q    On December 11th, 2012, you didn't have--you hadn't

15   disclaimed the assets, right?

16       A    That's correct.

17       Q    Okay.  And so the values as of December 11th, 2012

18   are everything because you hadn't disclaimed anything yet,

19   you knew that, right?

20       A    I don't know that I focused on it, but I would

21   agree that as of December 11th, 2012 the POD assets were

22   three million and there were--and out of that two million

23   was--under the disclaimer would go into the Supplemental

24   Needs Trust.

25       Q    Okay.  And so we have the letter from Dr. Shirke,

99

1    the proposed order--and by the way you also know that--you or
2    Mr. Glatstein put in the order that issued that you could
3    serve without bond because respondent's assets will be placed
4    into a Supplemental Needs Trust, you didn't--
5        A    Where--where are you?
6            MR. DAIN:  What exhibit again is the amended order?
7    12?  Do you want to try turning the page--I mean to Exhibit
8    12.
9            MR. POSKUS:  Yeah, 12.
10           THE WITNESS:  I'm at Exhibit 12.
11       Q    (by Mr. Dain)  Turn to page 3.
12       A    Okay.
13       Q    Do you see there under item 6 in bold, respondent's
14   assets will be placed into a Supplemental Needs Trust?
15       A    It continues for respondent's benefit.  (See
16   below.)  Yes.
17       Q    Right.  And respondent is Ms. Black, right?
18       A    That's right.
19       Q    You didn't think it would be important to let the
20   Court know that not all of the assets of respondent are being
21   placed in the Supplemental Needs Trust?
22       A    This feels to me like play with words.  We knew--I
23   believed everybody knew that Joanne's POD benefits would be
24   disclaimed into the estate and out of the estate two-thirds
25   would go into the Supplemental Needs Trust.  Those assets

BLACK000688

100

1    would be placed in a Supplemental Needs Trust for Joanne's
2    benefit.
3        Q    And you--these are your words, you said, this seems
4    like playing with words, right?
5        A    It seems like you're playing with words with me,
6    yes.
7        Q    Not including the fact that you had a conflict
8    because I think earlier you testified, yes, you recognize you
9    had a conflict.  Not including the fact--the fact that
10   one-third of these disclaimed assets are going into an Issue
11   Trust.  Not including the fact that under a bond respondent's
12   assets will be placed into a Supplemental Needs Trust.
13           At the hearing, hearing the Court say these trust
14   and you said the trust--
15           MR. POSKUS:  Objection, Your Honor, it's a compound
16   question.
17           MR. DAIN:  No, I'm just--I'm laying out all the
18   foundation for it--these are all the things that occurred.
19       Q    (by Mr. Dain)  You don't think you were playing
20   with words and not making clear to the Court that one-third
21   of those assets are going to you, the conservator, and your
22   children?
23       A    I did not think I was playing with words.  I
24   thought we provided full disclosure.
25       Q    Just going back again to--to Ms. Wrigley, you said

BLACK000689

101

1  they had--you had all these conversations, are you saying
2  that Ms. Wrigley was on a conversation that you had with your
3  wife?

4      A    I don't think I testified to a three-way
5  conversation.  I think I testified to multiple conversations
6  with Cherie Wrigley.  I'd have to think about whether I have
7  any specific memory of a conversation in which my wife
8  participated, but that wasn't my testimony.

9      Q    Okay.  How--and in how many e-mails have you sent
10  to Cherie Wrigley since your mother passed and since this
11  issue came up before this Court, how many e-mails?

12      A    During the period from my mother's death until
13  through about September 2012 I would bet there are hundreds
14  of e-mails.

15      Q    100?

16      A    Probably more than a 100, probably more than 200,
17  somewhere--you know, not a thousand but hundreds.

18      Q    And in those hundreds of e-mails you'd agree with
19  me there is never once, nowhere a mention of a disclaimer--

20      A    Absolutely there is.  And we went through this the
21  last time.

22      Q    Wait a minute you haven't let me finish the
23  question before you get angry.  There's no mention of a
24  disclaimer that would result in one-third of the assets going
25  into an Issue Trust?

BLACK000690

102

1    A    We went through exactly this testimony last time

2    and I explained why I thought that the e-mail conversations,

3    e-mails from me to Cherie about Rebecca were consistent with

4    that and inconsistent with any other interpretation.

5    Q    I'm not asking that.

6    A    If you want to go back to that testimony go back to

7    it.

8    Q    No, I'm asking you would you agree with me that

9    there is no mention in any of those hundreds of e-mails of a

10   disclaimer that will have the effect of one-third of the

11   disclaimed assets going to an Issue Trust for the benefit of

12   you and your children?

13   A    Effectively there is, yes.

14   Q    The words--those words are in the e-mail?

15   A    The words Issue Trust are not in there, what is in

16   there is an e-mail from me to Cherie saying here's the

17   disclaimer for Rebecca.  There's an e-mail from me to Cherie

18   saying here are the arguments you can give to Rebecca so you

19   can get her to disclaim her 1 percent so it doesn't blow up

20   to 20 percent so that it goes out into the estate and

21   one-third comes out and she's going to get a share of

22   one-third; that's probably more words than the e-mail has but

23   that's the content of the e-mail.

24   Q    I know that has more words than the e-mail has

25   because the e-mail doesn't include the one-third that's going

BLACK000691

103

1  to come out, right?

2      A   If you want to go back to that e-mail we'll go back

3  to the e-mail.

4      Q   Just--you know what it says, it doesn't--

5      A   I don't have--I don't have a precise memory but I

6  have a memory of an e-mail that I thought was very clear as

7  to Cherie's understanding and my understanding that why would

8  Rebecca waive 1 percent.  She would waive 1 percent because

9  then she was going to get her share of one-third.

10      Q   No, no, don't--I'm not asking you why you're--about

11  your logic, I'm asking you what's in the e-mail.

12      A   You're not showing me the e-mail.

13      Q   And follow me--follow me on this.  No, I've asked

14  you in the hundreds of e-mails and you mentioned an e-mail.

15      A   I've mentioned two e-mails.

16      Q   Okay.

17      A   We also have e-mails from me to Cherie attaching a

18  disclaimer for Joanne.  We have lots of e-mails talking about

19  would Joanne go--would Cherie go to Colorado to try to get

20  Joanne to sign the disclaimer.  So there's a lot of e-mail

21  trails.  They're not e-mails with you they're e-mails with

22  Cherie.

23      Q   Without playing with words do any of those e-mails

24  contain the statement that the disclaimer will have the

25  effect of me and my children, meaning you, Bernard Black,

1    receiving one-third of those disclaimed assets?

2        A    I have told you that I believe that the e-mail from

3    me to Cherie with regard to Rebecca effectively says that.

4        Q    Have you made that e-mail an exhibit to this Court?

5        A    Have you?

6             MR. DAIN:  Your Honor--

7             THE COURT:  Yes or no, Mr. Black.

8             THE WITNESS:  I don't recall whether it's an

9    exhibit.  I don't think we included it in my direct

10   testimony.

11       Q    (by Mr. Dain)  And I think you just pretty much

12   just said it, you don't have an e-mail to me where you say

13   that?

14       A    I agree I do not have an e-mail to you where I said

15   that.  I explained what I have for you.

16            MR. POSKUS:  For the record, Your Honor, Exhibit 79

17   is in the record; that's the e-mail to Ms. Wrigley asking

18   about Joanne signing a disclaimer.  Exhibit 80 is the e-mail

19   from Mr. Black to Cherie Wrigley with forms for Rebecca to

20   sign.  I do not recall that we got that into the record.

21            MR. DAIN:  So let's go over Exhibit 79 and 80.

22            (Pause.)

23            MR. DAIN:  You said 80?

24            MR. POSKUS:  80.

25            MR. DAIN:  I don't have that one.  You can make a

BLACK000693

105

1    copy--but in the meantime let's go over Exhibit 79.

2         Q    (by Mr. Dain)  And I--

3              MR. DAIN:  Your Honor, do you have that in front of

4    you?

5              THE COURT:  I do.

6              MR. DAIN:  Okay.

7         Q    (by Mr. Dain)  Cherie, here is the form I'll need

8    Joanne to sign, do you see that?

9         A    I see Exhibit 79, yes.

10        Q    Anywhere in this e-mail--this e-mail, we'll get to

11   the attachment in a minute--but anywhere in this e-mail you

12   see what--you just said that there was effectively a

13   statement that the disclaimer would operate such that you and

14   your children would get one-third of the assets?

15        A    I was referring to an e-mail with regard to Rebecca

16   not to this e-mail.

17        Q    That would be I guess the next one, the disclaimer

18   regarding--

19        A    Actually not, Exhibit 80 is attaching the

20   disclaimer form for Rebecca and there's a separate e-mail

21   where I write to Cherie and say here--in effect here are the

22   arguments that you can make to try and get Rebecca to sign.

23        Q    And you--you've supplied that e-mail to your

24   counsel?

25        A    I believe that counsel has a copy and I believe

106

1   through discovery you have a copy.

2      Q   You have--but you have no way of knowing whether,

3   in fact, a copy has been given to me?

4      A   Do you want me to go look at the discovery record,

5   I can go look?

6      Q   I'd like you to get the e-mail--

7      A   I have no reason to think that it's not.

8      Q   --at a break if you could.  Say it again?

9      A   I have no reason to think that that e-mail was not

10  provided to you as part of discovery.

11     Q   And certainly you want to have that e-mail before

12  the Court so you could prove this discussion you had with Ms.

13  Wrigley about the disclaimer effectively giving you and your

14  children one-third, right?

15     A   That e-mail is responsive to your question.

16     Q   Okay.  This e-mail--let's work with this one first,

17  nothing in this e-mail, right?

18     A   Which e-mail are you on?

19     Q   79.

20     A   That's correct.

21     Q   Let's go to the disclaimer.  Show me where in the

22  disclaimer that it says to Ms. Wrigley, hey, one-third of

23  this is going into an Issue Trust for me and my children?

24     A   Are you on Exhibit 79 still?

25     Q   Yes.

107

1    A    The disclaimer doesn't say that.  The disclaimer
2  just says I disclaim.
3    Q    So clearly this isn't the e-mail, right?
4    A    We've already established that.
5    Q    Okay.
6         MR. DAIN:  Your Honor, I move Exhibit 79 into
7  evidence.
8         MR. POSKUS:  It's already in evidence.
9         THE COURT:  It was admitted.
10         MR. DAIN:  Oh, it is, I'm sorry.  Is 80 already in
11  evidence?
12         THE COURT:  No, just 81.
13         MS. DiPONIO:  We don't know what 80 is.
14         MR. DAIN:  Is there--if you go to Exhibit 80, do
15  you have one in your binder?
16         THE WITNESS:  I have Exhibit 80 in my binder.
17         MR. DAIN:  Your Honor, do you?
18         (No audible response.)
19    Q    (by Mr. Dain)  Is there--this is an e-mail from you
20  to Ms. Wrigley November 4th, 2012, do you see that?
21    A    Yes.
22    Q    Is says forms for Becca to sign.  You didn't even
23  include any discussion in this e-mail, right?
24    A    As I've testified the discussion was in a separate
25  e-mail.

BLACK000696

1       Q     Okay.  In this e-mail in which you sent the

2    disclaimer could you please go through the disclaimer, all

3    the pages there, and tell me where in here it says that

4    one-third of the disclaimed assets are going to you and your

5    children?

6       A     It doesn't.  It's just a disclaimer that says I

7    disclaim.

8       Q     Okay.  So it--

9             MR. DAIN:  And, Your Honor, I move Exhibit 80 into

10   evidence.

11            THE COURT:  Objection?

12            MR. POSKUS:  No--no objection, Your Honor.

13            (Petitioner's Exhibit 80 was received in evidence.)

14      Q     (by Mr. Dain)  So it's--you're certain there's

15   another e-mail in which you say to Ms. Wrigley that one-third

16   of the assets are going to go to me and my children?

17      A     There's another e-mail where--let me call it a

18   talking points e-mail where I say here are the--here's the

19   argument that I think makes sense to make for Rebecca in

20   order to get her to disclaim the 1 percent of the Vanguard

21   assets that she was otherwise entitled to.

22      Q     No, no, that's not my question.  The 1 percent that

23   Becca would disclaim doesn't answer what's happening to the

24   one-third of the asset.

25      A     Yes, it does.

109

1     Q     How?

2     A     Because why would Rebecca want to disclaim her 1

3     percent?

4     Q     I don't know but I'm asking you what about--

5           MR. POSKUS:  Your Honor--

6     Q     (by Mr. Dain)  --contents of the e-mail, anywhere

7     in that e-mail that you're saying it--it exists does it say

8     that through this process of getting Becca to disclaim and

9     Joanne to disclaim one-third of those assets will go to me

10    and my children?

11    A     Effectively it does.  There was no basis for asking

12    any of my kids to disclaim their 1 percent interest except

13    that if they did that then the assets would go into the

14    estate and one-third would go out to the Issue Trust; that

15    was the argument for all of my children.  Please disclaim

16    because otherwise 95 percent is going to go to Joanne and

17    that--you know, that--that--direct to Joanne didn't work and

18    I couldn't submit the disclaimer and have their 1 percents

19    blow up to 20 percent so I was saying to each of them or for

20    Sara and Rebecca, Cherie was saying to them, please disclaim

21    the 1 percent that's in Vanguard down to zero so that the

22    whole process can go forward and so that we can avoid

23    litigation.

24    Q     And just so we're clear, the words weren't in

25    there, you're saying it--the purpose of this was--the words

BLACK000698

110

1   were not in there, right?

2       A    They're not in where?

3       Q    In the e-mail to Ms. Wrigley.  The words that

4   one-third of the assets will go to me and my children.

5       A    I don't remember where the exact words one-third

6   went but the argument was disclaim the 1 percent so that

7   you'll get more through the Issue Trust, that's what I

8   remember.

9       Q    So the words Issue Trust were clearly in there?

10      A    I don't remember that either.  Rebecca would not

11  have known Issue Trust.  She would have known grandkids

12  trust.

13      Q    Here's the point, I'm asking you words in the

14  e-mail.  I'm not asking--

15      A    I'm not remembering.

16      Q    Pardon?

17      A    Why don't we wait if you're going to go through

18  lunch and show me the damn e-mail--excuse my language.

19      Q    I--

20      A    Show me the e-mail.  Rather than my guessing about

21  an e-mail that I wrote two and a half years ago about exactly

22  what the words were.  I remember an e-mail where I wrote to

23  Cherie and said here are--here is how you can persuade

24  Rebecca to disclaim her 1 percent by promising her that if

25  she disclaims she'll get more implicitly or explicitly

BLACK000699

111

1   through the Issue Trust.

2       Q    Okay.  And over the lunch break you'll find that
3   e-mail?

4       A    I imagine that over the lunch break we can find the
5   e-mail.

6       Q    And you've said that--you started out this--this
7   whole--your initial testimony--you started out by saying that
8   when you saw these POD designations you became upset, right?

9       A    I thought this was wrong; this made no sense.

10      Q    So--so your primary purpose was to correct that
11  wrong, right?

12      A    I don't know that I had a primary purpose but I
13  thought that this was wrong and it made no sense.

14      Q    And you recognize again that if you're Joanne
15  Black's conservator and what you're trying to do is remake
16  the estate plan of your mother from the POD benefits to what
17  is in her will--

18           MR. POSKUS:  Objection to the form of the question,
19  Your Honor, what is the estate plan of mother is--is
20  delineated by the will that's been admitted to the Court in
21  New York; that's her estate plan.

22           Now, if he wants to talk about the POD designations
23  being the estate plan, the witness has testified that the
24  legitimacy of those designations is up in the air.  He can't
25  ask the question in the form of this is the estate plan

112

1  you're trying to redo, that issue is in dispute.  So he needs
2  to rephrase the question.
3          THE COURT:  Well, part of the problem I'm having--
4  and I tried to ask that at the outset today is--there is--
5  where is this dispute being litigated?  Apparently nowhere.
6          MR. POSKUS:  But it hasn't been litigated because
7  the exercise of the disclaim eliminated the need to litigate.
8          MR. DAIN:  No.
9          MR. POSKUS:  That was the whole point to it.
10         THE COURT:  Right.  But to obtain the validity for
11 the declaimer it has to be--it has to be aired in some forum.
12 And no other forum has been approached at this point is what
13 I understand.
14         MR. POSKUS:  No other forum has been approached to
15 litigate the legitimacy of the POD designation, that's
16 correct.  But like I said this was everybody's agreement to
17 avoid that litigation including Mr. Dain's and Ms. Wrigley's.
18         THE COURT:  All right.
19         MR. DAIN:  I'm sorry is he testifying or is he just
20 saying--
21         THE COURT:  There is--well, that's what we're
22 talking about here is whether or not there actually was an
23 agreement--
24         MR. POSKUS:  That is what we're talking about, I'll
25 agree with you.

113

1         THE COURT: --or the disclosure.

2         MR. POSKUS: I agree with you.

3         THE COURT: Okay. So the real--and then the

4 question then becomes why was this done; he talked about it a

5 little bit before. And the question Mr. Dain is asking

6 actually goes to that.

7         MR. POSKUS: Okay. So--but let him phrase the

8 question properly that it's not the estate plan, let him

9 phrase the question he did this in order to avoid the POD

10 designation. It's not--

11         THE COURT: Well, but it's--

12         MR. POSKUS: --put in any--

13         THE COURT: --it is related to the estate plan

14 though.

15         MR. POSKUS: Well, it's related to the issue of

16 what is the estate plan and the parties all agree that rather

17 than litigate it we'll do the disclaimer.

18         MR. DAIN: Oh, I guess--

19         THE COURT: But they didn't agree, Mr. Poskus--

20         MS. DiPONIO: Your Honor, I object to that.

21         THE COURT: --and that's why we're here. If there

22 was an agreement they would have given it to the Court, the

23 Surrogate's Court and the Surrogate's Court would have

24 affirmed the agreement and they would have done it. They

25 didn't do that.

BLACK000702

114

1    MR. POSKUS: Well, Your Honor, the thing is they
2  thought they had all the interested parties' agreement that's
3  his testimony.

4    MR. DAIN: Well, that's his testimony that's why
5  I'm asking questions. If you want to replace him, replace
6  him, otherwise argue it later.

7    MR. POSKUS: No, Your Honor, all I was objecting to
8  was the form of the question.

9    THE COURT: Okay. Well, I guess the objection is
10  overruled because I don't know how else to resolve this thing
11  fully if we don't hear about it. Unless you want me to just
12  do what my plan A is and then just solely resolve the issue
13  of the breach and then send it on for further litigation in
14  New York.

15    MR. POSKUS: Well, Your Honor, we--at some point
16  I'd like an opportunity to address the Court on that issue,
17  but this is--that may be for closing argument.

18    THE COURT: Well, it will be too late then. I mean
19  I have to deal with this either now under this Court's
20  equitable powers or I have to be very narrow in my ruling and
21  send it back to New York State for them to deal with it.

22    MR. POSKUS: If you want me to address the Court on
23  the issue now, Your Honor, I'll do it. I didn't--all I was
24  doing was objecting to the way he phrased the question. If
25  Mr. Dain wants to hold off on his questioning for a little

1   bit and you and I can have this colloquy--which I assume Mr.

2   Dain can respond to then we can do that.

3       MR. DAIN:  Let's do that now, we can continue after

4   lunch, we've got ten minutes.  Let's have the colloquy.

5   Because I do think if he's got an issue with the Court's

6   stated issues let's hear it.

7       MR. POSKUS:  It's up to you, Your Honor, however

8   you want to handle it.  I'm prepared to address it now if you

9   want.

10      THE COURT:  Well, seeing as how it's going to

11  direct what testimony we get we probably should address it

12  now.  All right.

13      MR. POSKUS:  Fine with me, Your Honor.

14      THE COURT:  All right.  So basically I framed the

15  issue at the outset because it appeared to me at that time--

16  and it still does--and we need to clarify whether or not

17  there was a breach of fiduciary duty.

18      MR. POSKUS:  Right.

19      THE COURT:  Okay.

20      MR. POSKUS:  Your Honor, since we're probably going

21  to do this and then take a break maybe Mr. Black can go ahead

22  and take a seat.

23      THE COURT:  That's fine.

24      MR. POSKUS:  You Honor, and you're right previously

25  in--in our hearings on June 16th and 17th we did elude to what

BLACK000704

1   are the issues in this case and I took it off of your--your

2   April 2nd order at paragraph 13 where you identified two

3   issues and then you went to--and you said kind of as part of

4   these proceedings the Court will determine whether the

5   allegations of breach of fiduciary duty are supported by the

6   evidence and whether any disgorgement or unwinding of

7   fiduciary actions, including the creation of the trust is

8   appropriate.

9           So the way I interpret that order is you wanted to

10  hear evidence on the first two issues you identified and then

11  as a result of the evidence of that you'd determine whether

12  or not these allegations are true.

13          So to me, Your Honor, the two main issues--the

14  first one is--and I'll quote at least that order in part--

15  "Whether the disclaimer should have acted to divest Ms. Black

16  of one-third of these nonprobate assets." And to me, Your

17  Honor, the answer is having the--having exercised the

18  disclaimer there was no choice.

19          Remember that the law on disclaimers is that a

20  disclaimant cannot control how the disclaimed funds are

21  distributed once the disclaimer was exercised. Once we

22  exercise the disclaimer we're locked into what happens as if

23  --in this case Joanne Black predeceased her mother.

24          So the fact of the matter is that in this case once

25  the disclaimer was exercised the Vanguard and Fidelity funds

117

1  had to go into Renata Black's estate; we don't have any
2  choice in the matter because of the way disclaimers work.
3       I know you're looking at me like you think we might
4  have a choice, but I'm not sure how we would because the
5  second the disclaimant exercises any control over the
6  disclaimed assets the disclaimer becomes invalid.  Once the
7  disclaimer is exercised it sets in motion a set of
8  circumstances that can't be changed.
9       And so to me the answer to your first question
10 whether the disclaimer obtained by Mr. Black should have
11 acted to divest Joanne Black of one-third, the answer has got
12 to be in the affirmative; it's just a straight technical
13 legal question.
14      THE COURT:  Uh-huh.
15      MR. POSKUS:  It can't go anywhere else.  Now, later
16 in paragraph 13 you said you would consider--as I start out
17 saying you would consider whether any disgorgement or
18 unwinding of fiduciary actions including the creation of the
19 trust is appropriate.
20      Well, when you said that I'm assuming you're not
21 speaking about the SNT and the Issue Trust because those were
22 both created long ago by Renata Black.  That was filed with
23 the Court on December 9th and those were created by Ms.--Ms.
24 --Mrs. Black back in the late '90s.
25      So now the Joanne Black 2013 trust was created by

BLACK000706

118

1    my client as conservator so I can see that you can unwind

2    that, but none of the disputed funds, the two-thirds/

3    one-third ended up in that trust.

4           So I'm assuming when we're talking about the

5    disputed trust you can't actually unwind the trust because

6    she created it and nobody is disputing that.  The only thing

7    you can presumably unwind is the deposit of the estate funds

8    into those two trusts.

9           THE COURT:  Uh-huh.

10          MR. POSKUS:  But that gets back to the issue of

11    what I said earlier, number one, we can't control where the

12    property goes once you disclaim.  And number two, the probate

13    code says once a disclaimer is exercised it's irrevocable.

14          THE COURT:  Okay.  So then basically we're back to

15    surcharge?

16          MR. POSKUS:  Well, okay, and maybe we are.  But

17    let's talk about that; let's talk about that.  And you're--

18    you're absolutely correct we--if that's the way you would

19    rule we are just back to surcharge because the issue trust

20    for example which is where presumably--if you would rule

21    there was a breach of trust the money would come from,

22    there's beneficiaries of that trust that are now current

23    beneficiaries and they're not before the Court so we don't

24    have any ability to affect them.

25          So that--you're right that would be the only

BLACK000707

119

1  remedy.  So I agree with you, it gets down to whether or not
2  you can order Bernie Black to pay the one-third back himself.
3  I think that's what we're boiling it down to.
4          And the thing is, is I don't think you can.  And
5  let me explain why.  Mr. Dain has made a lot out of the idea
6  that Bernie Black was in a conflict of interest and he's said
7  very--very candidly, yes, I was in a conflict of interest.  I
8  don't dispute that.  What I do dispute is just because he's
9  in a conflict of interest that this can't happen and here's
10 why--
11         THE COURT:  That what can't happen?
12         MR. POSKUS:  That he can't exercise--he can't
13 participate in a transaction that benefits himself even
14 though he's the conservator and he benefits from it.
15         In other words, the probate code specifically
16 allows a fiduciary to participate in a transaction that
17 benefits himself if certain conditions are present.  And in
18 this case it's 15-14-423 which allows such a transaction if
19 the conservator is expressly authorized by the Court.
20         Now, the March 5th, 2013 order expressly authorizes
21 Bernie Black to exercise the disclaimer.  And like I said
22 once he exercises the disclaimer--
23         THE COURT:  Okay.
24         MR. POSKUS:  --the train is set in motion and we
25 can't back away from that.  So the question is can you hold

BLACK000708

120

1    somebody liable for doing an act that he was expressly

2    authorized to do by this Court.

3           THE COURT:  Well, I think the answer is yes, if a

4    full disclosure wasn't made.

5           MR. POSKUS:  And you're right, that--that's the

6    issue because--and that gets to your second issue in your

7    paragraph 13 order is whether or not--the way you phrased it

8    is, the hearing will also determine whether it was properly

9    disclosed that Mr. Black intended or had authority to

10   redirect one-third of these probate assets; that's how I

11   think it's got to go.

12          And--and to be quite honest remember in the first

13   hearing where you said our trial brief was a red-herring, I

14   wasn't sure what--how you--what you meant when you phrased

15   the first issue.  I know you said it was clear; I didn't get

16   it; I thought you were actually considering voiding the order

17   two and a half years later and for some of the reasons I

18   stated today--

19          THE COURT:  Uh-huh.

20          MR. POSKUS:  --I don't think that's possible.  If

21   you're going to say it was a breach of fiduciary duty you're

22   only--I shouldn't say your own remedy, but the Court's only

23   avenue is to do a surcharge that part I agree with.

24          And so we get to your second issue of whether or

25   not there was adequate notice.  So--you know, and at this

BLACK000709

121

1   point, Your Honor, I'll start arguing what--I'd end up

2   starting to argue what the evidence shows.

3         THE COURT:  Uh-huh.

4         MR. POSKUS:  I mean Mr. Black testified this

5   morning that he thought there were a variety of reasons why

6   everybody knew what was going on.

7         Mr. Glatstein testified that he thought everybody

8   knew what was going on.  And indeed, Your Honor, I think the

9   evidence shows--I'm assuming that Mr. Dain and Mr. Wrigley

10  (sic) would dispute--I don't know they haven't testified--I'm

11  assuming they would dispute the conversations that Bernard

12  Black has testified he's had with them.

13        I mean but right now the state of the evidence is

14  he told them so at least insofar as they're concerned the

15  state of the evidence is they knew.  So then the question

16  becomes what about Lisa DiPonio and Gayle Young did they

17  know.

18        And, Your Honor, I'd submit and you'll recall we

19  had a little bit of exchange about this when Ms. Young was on

20  the stand and Mr. Dain objected saying well he's trying to

21  show that she should have known, that Ms. Young should have

22  known what the disclaimer was going to do and I said, no,

23  Your Honor, I'm trying to prove that she did know.

24        And you'll remember that the testimony from both of

25  them was that they got Mr. Glatstein's filing of December 9th

BLACK000710

1  that included the will and both trusts.  And their testimony

2  was--in Ms. Young's case--that she spent two hours reviewing

3  those documents and that Ms. DiPonio spent a half hour

4  reviewing the documents.

5       And then you'll recall Carl Glatstein's testimony

6  that he spoke to both of them and you'll recall their

7  testimony, both of them saying I don't remember.  So neither

8  one of them said he didn't say it to me.  I mean Ms. Young

9  kind of said I don't--I couldn't--I can't imagine that he

10  said it to me because I wouldn't have agreed to this but

11  neither one of them disputed that he said it.

12       But--directly--but the biggest evidence is the fact

13  that they had direct knowledge was the fact that Exhibit 17

14  is that January 29th e-mail exchange between Mr. Glatstein,

15  Ms. DiPonio, and Ms. Young, and Ms. Sumi Lee of this court in

16  which Ms. Young and DiPonio looking at that January 29th

17  order say we don't object.  And--

18       THE COURT:  That's the one--that's the third order.

19       MR. POSKUS:  That's the third proposed order, but--

20       THE COURT:  Right.  Because it took the other

21  language out that was explicit.

22       MR. POSKUS:  No, that--no that's--I'm sorry, Your

23  Honor, I don't mean to dispute you but the order that they

24  were approving is the one that was explicit about if the

25  disclaimer gets exercised it goes under Article 4--4th of the

BLACK000711

123

```
 1    will.
 2              THE COURT:  That's not my understanding.
 3              MR. POSKUS:  All right.  Well--
 4              THE COURT:  The one that didn't get signed--
 5              MR. POSKUS:  Well, you know, Your Honor, what I can
 6    do is over the break I can find it in the trans--I--I agree
 7    the order didn't get signed, but what I'm talking about is we
 8    offered that evidence to show the fact that Ms. DiPonio and
 9    Ms. Young had actual knowledge of--
10              THE COURT:  Was it that order--
11              MR. POSKUS:  --what would happen.
12              THE COURT:  --or the third order that the exhibit
13    refers to?
14              MR. POSKUS:  The--they had actual knowledge of the
15    amended proposed order filed on--on January 29th and what it
16    said; that's Exhibit 25 for the record, Your Honor.  And
17    indeed Ms. Young even testified that Exhibit 25--I'm sorry--
18              (Pause.)
19              THE COURT:  Okay.
20              MR. POSKUS:  And if you look on page 3 of 3 it says
21    that the conservator is specifically authorized to disclaim
22    respondent's interest as beneficiary under all payable on
23    death or transferrable on death accounts with Vanguard and
24    Fidelity.  And then I'll skip down, allowing respondent's
25    share to pass under Article 4th of the last will and
```

124

1    testament of Renata Black.

2              And then, Your Honor, if you look at Exhibit 17.

3              (Pause.)

4              THE COURT:  This is the one that didn't get signed.

5              MR. POSKUS:  No, I agree, Your Honor, I'm not

6    offering it for that purpose, I'm offering it to show you

7    that there was notice given because Ms. Black--Ms. Black--Ms.

8    DiPonio and Ms. Young had actual knowledge of what the

9    disclaimer was going to do because they approved this form of

10   order.

11             If you look at Exhibit 17 it's--and none of them

12   objected to this and Ms. Young said, yes, Exhibit 25 was the

13   one she--the proposed order she was referring to.  Ms. Young

14   says the proposed amended letters and amended order are fine

15   with me.  And right below that you see an e-mail from Ms.

16   DiPonio to Ms. Lee and Mr. Glatstein--excuse me--I have no

17   objection with this just being issued.

18             And so the fact of the matter is, Your Honor--

19   you'll recall this is done on January 29th and then on

20   December 9th--in other words, almost two months before this

21   they were given the will.  And so they're approving the idea

22   that the disclaimer will act to pass the assets under the 4th

23   Article of the will.

24             THE COURT:  What's the date on that second--on the

25   third order?

BLACK000713

125

 1          MR. POSKUS:  On--on--

 2          THE COURT:  When was that transmitted?

 3          MR. POSKUS:  Oh, the one that you eventually

 4    signed?

 5          THE COURT:  Right.

 6          MR. POSKUS:  Hang on a second and I can find that.

 7          MS. DiPONIO:  Your Honor, that was in March some

 8    time I believe.

 9          MR. POSKUS:  March 2nd, Your Honor.

10          THE COURT:  Okay.

11          MR. DAIN:  And the order was signed March 5th.

12          MR. POSKUS:  And--and if you look, Your Honor,

13    there's actually--Mr. Glatstein filed a pleading on March

14    2nd, 2013 that was filed along with the order that you

15    actually eventually signed asking for entry of that order.

16    And if you look at that pleading that Mr. Glatstein filed on

17    March 2nd, 2013, he--he says in paragraph four that he had

18    previously discussed this language with Ms. DiPonio and Ms.

19    Young.  Neither is opposed to entry of this order and--so in

20    other--and nobody objected to this, Your Honor, and everybody

21    including Mr. Dain and Ms. Wrigley were given copies of all

22    of this documentation.

23          THE COURT:  Okay.

24          MR. POSKUS:  So--

25          THE COURT:  Well, Ms. DiPonio and Ms. Young have

1    already testified that that's not their understanding of the

2    way this was going to work.

3          MR. POSKUS:  Well, I--I agree that that's what they

4    testified to and I have to tell you that I don't--then I

5    guess I have to question what did they mean in their--in

6    their April--or January 29th e-mail in which they say that

7    one order you didn't sign is fine with me.  What did they

8    mean when they said it's fine with me that the disclaimer be

9    exercised to allow respondent's share to pass under Article

10   4th of the last will and testament; that's what they were

11   saying in writing at the time; that's a contemporaneous

12   statement.

13         We're now talking two and a half years later when

14   apparently--I don't know why they're testifying the way they

15   are, but I think it's pretty solid that they had actual

16   knowledge because we--the record is also very clear that they

17   had this will in their possession and they knew what the will

18   did.

19         THE COURT:  I mean, you know, part of the problem

20   okay is I have my own independent memory of all this.

21         MR. POSKUS:  And I guess--I'm dying to ask you what

22   is it?

23         THE COURT:  And I have to tell you it's really in

24   accord with what everyone else is saying.  I absolutely did

25   not have any understanding that a third of these assets were

BLACK000715

1   going to go to somebody else.

2           MR. POSKUS:  Uh-huh.

3           THE COURT:  It was my understanding that the

4   disclaimer would go, the money would go into the estate and

5   then all go back out into her trust.

6           MR. POSKUS:  And then 100 percent would go to--

7           THE COURT:  Right.

8           MR. POSKUS:  And I appreciate your candidly sharing

9   that with me, Your Honor

10          THE COURT:  And I think you also need to understand

11  that the--when that second amended order came in that

12  specifically said only two-thirds--

13          MR. POSKUS:  Right.

14          THE COURT:  --that there was a lag between the

15  January and March because I didn't understand why that would

16  be and that's not what was explained and that's not what I

17  understood, so I hung on to it.

18          MR. POSKUS:  Uh-huh.

19          THE COURT:  And then the other order came along

20  about the beginning of March and it said basically what I

21  understood it to be so I signed it.  And I didn't

22  deliberately--did not sign that second order, it was not an

23  oversight and it was not lost in the shuffle of paperwork

24  here at the court, it was because I didn't understand and

25  nobody was explaining to it--explaining it to me.

BLACK000716

128

1        So--you know, and I appreciate Mr. Black's
2   testimony about his problems that he was having in terms of
3   what happened with his mom and this business about why he
4   didn't understand why she would do that and it was a last
5   minute change relatively.  I--I do appreciate all of that
6   information but the bear fact of the matter in terms of the
7   disclaimer is that it was not disclosed fully or
8   forthrightly.
9        MR. POSKUS:  Well, and so here's my response to
10  that, Your Honor, and I--like I said I appreciate you telling
11  me, I've been wondering through the whole two days that we've
12  been in Court what was she thinking.  I mean it's the natural
13  thing to think about, so let me respond to your statement by
14  saying this, so in your mind you didn't--you didn't think
15  this.
16       So I guess my point to you then is looking at it--
17  and I have--I have to say we--we've all said if we could have
18  done it differently we would loved to have done it; it's kind
19  of like spilled milk, but here's the thing, when you look at
20  what Carl Glatstein and Bernie Black were looking at back in
21  2012 I don't find it unreasonable that given the fact that
22  they had submitted the will and the trust to the court file
23  and given that these--that both Ms. Young and Ms. DiPonio
24  said they agreed with it--and then you'll recall the
25  testimony was the reason why they submitted the third order

129

1   was they didn't--in all honesty, Your Honor, they did not
2   receive a directive from you saying I don't like the way this
3   order reads, nothing happened.
4           And then they were told by Vanguard we don't want
5   that stuff in there.  And I can tell you from dealing with
6   these companies they do that all the time.  They're afraid if
7   you stick stuff in there about what happens after the one act
8   that they're charged to perform then if it does--if the money
9   doesn't go to the two-thirds to the Supplemental Needs Trust
10  they're afraid they'll get sued, so they want that stuff
11  taken out.
12          THE COURT:  Uh-huh.
13          MR. POSKUS:  And so that's why they changed the
14  order.  In their minds it was reasonable for them to have
15  assumed that everybody knew given what they said.  I mean--
16          THE COURT:  It wasn't enough.
17          MR. POSKUS:  Well, if that's going to be your
18  ruling there's not much I--
19          THE COURT:  It has to be.  I have--I have a
20  definite memory of this and I just explained that to you.
21          MR. POSKUS:  No, and I agree you explained it to
22  me.
23          THE COURT:  So--
24          MR. POSKUS:  I'm just saying that under--at least I
25  think--I mean to--you would certainly agree with me and maybe

BLACK000718

130

1    you feel--and maybe you're going to tell me different--do you
2    believe that Mr. Black and Mr. Glatstein were proceeding in
3    bad faith?
4           MR. DAIN:  Your Honor, before you engage in that
5    I'd like a chance to argue to--to present the rest of the
6    evidence.
7           THE COURT:  Well, that's just it, I haven't heard
8    from you directly or Ms. Wrigley as to those conversations
9    and I--
10          MR. DAIN:  Those--those aside--
11          THE COURT:  --got from all of your body language
12   that that was not your understanding of what was going to
13   happen, but this is the thing and this is where the piece
14   about the change comes in, it softens it somewhat and it
15   makes it more understandable--
16          MR. POSKUS:  Uh-huh.
17          THE COURT:  --and not just a flat out grab--
18          MR. POSKUS:  Yeah.
19          THE COURT:  --if you will.
20          MR. POSKUS:  Yeah.
21          THE COURT:  Okay.  So that's why I appreciate that
22   information.
23          MR. POSKUS:  Uh-huh.
24          THE COURT:  So then for me the question becomes
25   then what to do about that and that's why it was a huge

BLACK000719

131

1  mistake not to take this right to the Surrogate's Court in
2  New York.
3          MR. POSKUS:  Your Honor, I--
4          THE COURT:  I mean it wasn't fully disclosed here
5  and all the reasons for it.  There was never any information
6  about what was going on with the estate, what was going on
7  with the mom, you know, I just hear today that there was
8  another will; that there could have--I don't know if there
9  was a revocation or what the story is with that.
10         So--I mean there's obviously a bigger story going
11  on here and I'm just getting a little snippet of it.  And the
12  tiny snippet that I got from Mr. Glatstein and Mr. Black at
13  the appointment hearing is woefully inadequate.
14         MR. POSKUS:  Uh-huh.
15         THE COURT:  I guess I'll just put it that way.  You
16  know, based on the ramifications of what they understood--
17  well what they wanted to do and why.
18         MR. POSKUS:  Uh-huh.
19         THE COURT:  Even just saying well go look at the
20  will is woefully inadequate.  It was not full disclosure, it
21  was not clear, it was not understandable in any easy sense;
22  it required digging and that's not what my understanding of
23  candor to the Court means.
24         MR. POSKUS:  Uh-huh.
25         THE COURT:  I don't believe that me and my staff

132

1   are supposed to go through line by line and figure out the

2   hidden intent of something like this.  It needed to have been

3   plain, straightforward and put out there and then we can have

4   a discussion about it.

5          MR. DAIN:  And, Your Honor, if--the only thing I

6   would add because I understand so I won't belabor that unless

7   there's other argument the Court needs, but saying that it

8   softens it is one thing, but then when it comes to reporting

9   an accounting there's no argument that could be made--

10         THE COURT:  Right.

11         MR. DAIN:  --that Mr. Glatstein and Mr. Black

12   didn't think they had to report to you the entire assets

13   because by not reporting that--

14         THE COURT:  Right.

15         MR. DAIN:  --you--absolutely what you said, you

16   believed your order correctly allowed 100 percent to go to

17   Ms. Black as it should because you can't allow them to act on

18   that conflict and they deliberately didn't report it.

19         Now, I mean my--my point of cross-examination is

20   perhaps Mr. Black deliberately didn't give Mr. Glatstein all

21   the information but if he did I have no idea how Mr.

22   Glatstein could think he didn't have to report that.

23         THE COURT:  Well, right.  And then when it was

24   discovered the uproar ensued.

25         MR. DAIN:  Right.

BLACK000721

133

1        MR. POSKUS:  Well, Your Honor, I can ask--I can

2    have Mr. Black testify to what happened once all this started

3    up, I'm not sure if that's the reason why Mr. Black thinks

4    the uproar ensued, as a matter of fact I know it's not.  I

5    mean his testimony would be that they knew about it and this

6    dispute started up when they didn't like a request for

7    reimbursement that Cherie Wrigley made.

8        MR. DAIN:  Your--Your Honor--

9        MR. POSKUS:  And that's what started the whole--in

10   other words Cherie Wrigley wanted reimbursement for a number

11   of expenses she allegedly incurred on the--

12       THE COURT:  The one that was recently stipulated

13   to?

14       MR. POSKUS:  That was part--well, we stipulated to

15   the parts--there was no objection--but there's--there were

16   more reimbursement requests even beyond the ones that Ms.

17   Peterson said we didn't agree to.  This goes back--like you

18   said this is--we're dealing with snippets.

19       MR. DAIN:  Your Honor, I--I--you know, and it's

20   funny, I can put Ms. Wrigley on the stand and if we have to I

21   will, but you don't need that, just because Mr. Black

22   testifies as Mr. Poskus seems to imply, you don't have to

23   believe his incredible statements.  They're not corroborated

24   by anything.  Some of his statements just belie, you know,

25   common knowledge and truth.

134

1        So, yes, he can say oh, I told everybody but that

2   may be--and maybe that's in his mind, but the circumstantial

3   evidence supports no he didn't.

4        And the fact that after the disclaimer he didn't

5   properly report is the key to saying it isn't that way.  And

6   I don't know about Mr. Glatstein who clearly when he

7   testified didn't say I had all the information or didn't have

8   all the information; he danced around it.

9        But there's no question that should have been

10   reported; there's no question.  And having not done that

11   that--that just put a lie to everything Mr. Black is saying

12   about I thought everyone knew.

13        MR. POSKUS:  I--

14        MR. DAIN:  He covered it up after the fact.

15        MR. POSKUS:  --I think that's--that's stretching it

16   too far, Your Honor.  I mean if they wanted to cover it up

17   why did they say these are the values as of March 31st.

18        You know, it goes back to something I said in my

19   trial brief, if they were trying to cover stuff up they were

20   doing an awfully damn bad job of it.  There's better ways to

21   have done it than the way they did it.

22        I mean they were--they were quite--

23        THE COURT:  Well, by reporting values in March

24   though after the disclaimer occurred meant that there was

25   never any indication in the documentation that there was

BLACK000723

1   another million dollars sitting out there that technically

2   were in this estate or part of this whole proceeding.

3           MR. POSKUS:  Your Honor, I hate to say it but--

4           MR. DAIN:  Oh, and not the Roth IRA either.

5           MS. DiPONIO:  That--Your Honor, that's--

6           MR. POSKUS:  Your Honor, I hate to say it but it's

7   actually in the record that there was another million dollars

8   out there.  And indeed I was going to ask Mr. Black--

9           THE COURT:  It's on the inventory?

10          MR. POSKUS:  No, it's actually in the initial

11  petition.

12          THE COURT:  Well, see that's the point though.

13          MR. POSKUS:  Yeah.

14          THE COURT:  It's in the petition; it's not in the

15  inventory--

16          MR. POSKUS:  Yeah.

17          THE COURT:  --so it's like sort of here, sort of

18  there, it's--it's sort of everywhere but it's nowhere, that's

19  the problem.  It's never, you know, up-front straightforward.

20  It's like well you look for a piece of it here, and you look

21  for a piece of it there and then everybody is supposed to

22  cobble it together and I think the intent of the statute is

23  that it be fully disclosed, there be full candor--

24          MR. POSKUS:  Uh-huh.

25          THE COURT:  --and you get a ruling based on an

136

```
 1   honest and full disclosure and that did not happen here.
 2            MR. POSKUS:  Your Honor, you know, I would agree
 3   with you on full, I don't know if I would agree with you on
 4   honesty.  I don't know if there's evidence here that you can
 5   find that Mr. Glatstein and Mr. Black were somehow trying--
 6   deliberately trying to mislead the Court.
 7            THE COURT:  Well, let me put it a different way.
 8            MR. POSKUS:  Okay.
 9            THE COURT:  The only thing that I have in the
10   record--
11            MR. POSKUS:  Right.
12            THE COURT:  --even as it's developed to this
13   point--
14            MR. POSKUS:  Uh-huh.
15            THE COURT:  --in writing is the order I didn't
16   sign--
17            MR. POSKUS:  Uh-huh.
18            THE COURT:  --that really says what was going on.
19            MR. POSKUS:  Right.  I agree with it.
20            THE COURT:  That's it.  It's nowhere.  There's
21   not--
22            MR. POSKUS:  Well--
23            THE COURT:  --there's not an e-mail, there's not a
24   letter, there's bits and pieces everywhere but nowhere--
25            MR. DAIN:  And--and, Your Honor, I'm sorry--
```

137

1          MR. POSKUS:  But--and I agree with that, but the
2     question then becomes is, was it--I don't think it was
3     deliberate; I don't think there's evidence here that you can
4     construe it as deliberate.
5          THE COURT:  Well, it certainly wasn't forthright.
6          MR. DAIN:  And, Your Honor, could I just add even
7     that proposed order if you recall still have the--item number
8     six, the monies going into the Supplemental Needs Trust and
9     didn't say what happened to the other one-third.
10         THE COURT:  No.
11         MR. DAIN:  So even if you looked at that you think
12    okay, maybe he's putting two-thirds into a trust and holding
13    the liquid another one-third, but it didn't fully disclose
14    even then and that's the only piece of evidence to support
15    that.
16         MS. DiPONIO:  Your Honor, in addition if you go
17    back and look at the transcript from last time, I
18    specifically asked Mr. Black if he disclosed to us all of
19    Joanne's assets.  I believe he said (inaudible), yes, I did.
20         When Mr. Glatstein was on the stand Mr. Dain asked
21    him about the Roth IRA, he had no idea about the Roth IRA.
22    So--
23         MR. DAIN:  That's correct.
24         MS. DiPONIO:  --there's a disconnect somewhere; I
25    don't know who or what but obviously Joanne Black's assets

BLACK000726

138

1    were not fully disclosed to Mr. Glatstein when he was

2    preparing that inventory back (inaudible) that Roth IRA

3    (inaudible)--

4          MR. POSKUS:  Your Honor, I don't agree--

5          MS. DiPONIO:  --(inaudible).

6          MR. POSKUS:  --I don't agree with her

7    characterization of his testimony on that point.

8          THE COURT:  Well, the only thing that's problematic

9    is Mr. Black's testimony about shifting the assets to make it

10   right.

11         MR. POSKUS:  Right.

12         THE COURT:  And that's problematic in--in itself.

13         MR. POSKUS:  I know.  But, Your Honor, one of the

14   things is that--see now we're going to get into the

15   accounting issues, but one of the assets that's in the estate

16   that eventually needs to be part of the SNT is this McKeel

17   Street property and there's a specific provision in the will

18   that says that needs to--it--it--that needs to be Joanne's

19   home.  If she doesn't want to live there then get her a

20   substitute home, so Mr. Black decides for tax reasons why he

21   said he did that with the IRA.  Mr. Black always had it in

22   the back of his mind that at some point or other the SNT was

23   going to get 100 percent of an asset.

24         And so at some point or other there needed to be a

25   balancing off of two-thirds/one-third provision.

BLACK000727

139

```
1              THE COURT:  Well--

2              MR. POSKUS:  And so there's--there's--once again

3    we're dealing with snippets but that's a lot of why that

4    happened.  I mean you can't--if you say two-thirds has to go

5    one way and one-third another you don't split the house down

6    at a one-third level, you've got to make up for it some other

7    way and that's what his thought process was.

8              MR. DAIN:  Your Honor, both accountants agree--Ms.

9    Harper even agrees with Ms. Kerr that even with the McKeel

10   house and even including crediting which we'll get to--it's

11   just absurd Mr. Poskus and a sleuth of other attorneys saying

12   that should credit the amount he's short so Ms.--Ms. Black

13   gets punished twice.  He's still short $200,000.

14             THE COURT:  Uh-huh.

15             MR. DAIN:  He's still admitted on the stand if he

16   has to he'll put in his own money; that's not the way this

17   works.  Just as--again, we'll get to the fact that it's not

18   the way it works that you pay all your people and then maybe

19   you have to pay it back when the Court says that's not how it

20   works.

21             But the bottom line is even short of the estate--so

22   this idea that his intent was always good and he's going to

23   do two-thirds/one-third, even belies the argument that he had

24   no control over the disclaimed assets, he did.

25             MR. POSKUS:  Well--
```

BLACK000728

140

1    MR. DAIN:  They were disclaimed and he gave 100
2    percent of the Roth IRA to his children.  He shorted the
3    estate $200,000; he had full control.
4        MR. POSKUS:  He didn't short the estate 200,000
5    that's not what Ms. Harper's report says, Your Honor.  And
6    we--we're getting into that accounting issue and I guess we
7    can have testimony on that if you want.
8        I just want to--I just wanted to get back to this
9    issue we've been discussing.  I understand your point and I
10   think you and I both know that if we could do it over--and by
11   we I mean me, Mr. Glatstein, and my client, we would do it
12   differently.
13       But I guess my other point is I don't think the
14   record has been made--I--I think it was reasonable for them
15   to assume that they--the testimony so far has been they had
16   everybody's agreement.  And--and like I said I know what you
17   said Ms. DiPonio and Ms. Young say they said, but they don't
18   --they're not able to refute Mr. Glatstein's testimony about
19   his telephone conference with them.
20       And so my--at least in my opinion, Your Honor, it's
21   reasonable for them to have assumed that they had everybody's
22   agreement.  I understand your point that in your mind they
23   didn't have your agreement, which is the most important one,
24   and like I said I'd like to fix that but I can't go back and
25   do that.

141

1   But at least insofar as what they did--although
2 they--although you can argue about how they did it, but I
3 think it's reasonable for them to assume they thought they
4 had everybody's agreement.
5   THE COURT:  Well--
6   MR. DAIN:  Your Honor, can I argue in opposition to
7 that.
8   MR. POSKUS:  Well, we can't--you can't even make a
9 finding until we have all the evidence in on that, Your
10 Honor.
11   MR. DAIN:  Well, on the--on the first point without
12 the accounting which is really a second question how much to
13 surcharge, we can argue--I can argue just what Mr. Poskus was
14 arguing what the evidence should be.
15   THE COURT:  Right.
16   MR. DAIN:  And what we need to make clear here when
17 Mr. Poskus says oh we recognize there's a conflict but the
18 statute allows him to benefit too, he's misinterpreting the
19 statute and--and misstating it.  If there is a conflict it
20 must be addressed to the Court as Your Honor said in a full
21 open hearing.  So this--so the Court can determine despite
22 that conflict does it not harm Ms. Black.  Can Mr.--like if
23 they had a business dealing can Mr. Black also profit.  He
24 cannot profit at the expense of Ms. Black.  Absolutely.  The
25 statute is clear on that.  So that's misleading to say that

BLACK000730

142

1  he was expressly authorized.

2          MR. POSKUS:  I'm sorry which statute are you

3  referring to?

4          MR. DAIN:  15-14-423 does not--does not permit Mr.

5  Black to prosper at the benefit of Ms. Black if he has a

6  conflict.

7          MR. POSKUS:  Where does it say that--where does it

8  say there has to be a hearing.

9          MR. DAIN:  I--you--a conflict--you have to have a

10 hearing on a conflict, it doesn't need to say it in that

11 statute.

12         MR. POSKUS:  But the statute doesn't say that.

13         THE COURT:  All right.  But the point here is--

14         MR. POSKUS:  Yeah.

15         THE COURT:  --the disclosures weren't made; it

16 wasn't clear; it just didn't happen.  And, you know, the

17 rationale for that or the reasons for that or whoever thought

18 what, perhaps but I--you know, we've all worked together for

19 a while now--

20         MR. POSKUS:  Right.

21         THE COURT:  --and Ms. DiPonio and Ms. Young don't

22 get exercised about much and they're pretty exercised about

23 this.

24         MR. POSKUS:  Uh-huh.

25         THE COURT:  So I'm satisfied that they really

143

1   didn't know it and neither did I.  So I cannot--I have to
2   find and I do that the disclosure was completely inadequate;
3   it wasn't up-front, it wasn't clear; didn't explain it, and
4   really he obtained an order for disclaimer without disclosing
5   the underlying reasons and what was going to happen with it;
6   he just didn't.
7           MR. POSKUS:  Well, if that's going to be your
8   ruling--
9           THE COURT:  It has to be.  And none of this
10  documentary evidence that you've got in the notebook supports
11  that.  There is no explicit explanation of it in any way,
12  shape, or form.  It just doesn't exist because it isn't
13  there; it didn't happen.
14          Unless there's something else that you want to pull
15  out and show, but it's just not here.  I don't have in the
16  notebook; I don't have it in any of these exhibits, it's not
17  in the transcript of the December hearing.  It's not in the
18  written form of the orders that I signed.
19          MR. POSKUS:  Uh-huh.
20          THE COURT:  So I don't have anything to--to
21  indicate to me otherwise that I misunderstood something or
22  that I missed something that was said.  And basically, you
23  know, what you're faced with is you've got the GAL, the court
24  appointed counsel and the Court under a misapprehension.
25          MR. POSKUS:  Uh-huh.

BLACK000732

144

```
 1          THE COURT:  And there was no effort made to explain
 2   it away or to do anything.
 3          MR. POSKUS:  Well, Your Honor, you're free to--I
 4   have to deal with you in more cases than this one so I'm
 5   going to--
 6          THE COURT:  I know--and I know you are under a
 7   disadvantage, Mr. Poskus, and I get that, but I mean--like I
 8   say I have my memory of it; I have the specific memory of not
 9   signing that other order because it wasn't in accord with
10   what I understood what was going on.
11          MR. POSKUS:  And I appreciate that, Your Honor, and
12   I can't argue with what your perception of it was.  I--I have
13   to say--I want to choose my words carefully--I'm disturbed--
14   yeah--
15          THE COURT:  You know, maybe I missed the whole
16   point, maybe--
17          MR. POSKUS:  No, I--
18          THE COURT:  --but--
19          MR. POSKUS:  --see, Your Honor, your--your memory
20   of what happened is something that I didn't know until this
21   moment.
22          THE COURT:  Right.
23          MR. POSKUS:  But you need to know this, I did
24   depose Ms. Young--
25          THE COURT:  Uh-huh.
```

1          MR. POSKUS:  --and then of course we had Ms.

2     DiPonio's testimony.  And I understand your point about you

3     don't see them get angry about much but they're angry about

4     this.

5          And quite frankly this is the first I've ever dealt

6     with them.  I've never had them in a case of mine before.

7     But--

8          THE COURT:  Well, that's because they're always on

9     the guardianship cases.

10          MR. POSKUS:  I do--

11          THE COURT:  And the conservator--by and large--

12          MR. POSKUS:  Yeah.

13          THE COURT:  --their work is not in trust and

14     estates it's in guardianships and conservatorships and

15     looking after the physical well being of people, getting them

16     out of hoarding situations with bedbugs and--and--

17          MR. POSKUS:  Uh-huh.

18          THE COURT:  --and, you know, that sort of thing.

19          MR. POSKUS:  Yeah, I know and I--

20          THE COURT:  It's not this sort of stuff that we

21     deal with mostly when they're in front of me.

22          MR. POSKUS:  And I--and I get that, I get that.

23     But what I'm disturbed about is their refusal to concede at

24     any point that they might have known because even as an

25     attorney inexperienced in the area of say disclaimers, if

BLACK000734

146

1   they're being given that will that says this is how it's
2   going to go and then they get told and approve that order
3   that says we're going to exercise a disclaimer that's going
4   to go--make it go under Article 4th, I can't--I just cannot
5   accept that they didn't know that's what was going to happen.
6           MS. DiPONIO:  Your Honor--
7           MR. POSKUS:  And they approved that.
8           MS. DiPONIO:  --and I'm disturbed by Mr. Poskus'
9   comments, as an officer of the court I take my job very
10  seriously.  If I had any (inaudible) to know I wouldn't have
11  gotten on the stand and said I had no idea.  I mean--
12          THE COURT:  Uh-huh.
13          MS. DiPONIO:  --to think that I would even accept
14  the fact that my client would lose out on benefits her mom
15  gave her and approve that is just--
16          THE COURT:  Right.
17          MS. DiPONIO:  The Court knows I'm not--
18          THE COURT:  And the--the reason--
19          MS. DiPONIO:  --about that.
20          THE COURT:  --I mean the discussion that Mr. Black
21  has never had with any Court is the one he testified he was
22  trying to avoid.  And that's why I said at the close of the
23  last hearing that he had big problems; that needed to be done
24  and it still hasn't been done and apparently there's no plans
25  to do it at this point.

BLACK000735

147

1   So--I--I don't know what the remedy is then for
2 that because that's the only thing that could change this is
3 that discussion.
4   MR. POSKUS:  You're talking about the discussion
5 about the legitimacy of the payable on death benefit?
6   THE COURT:  Right.
7   MR. POSKUS:  Yeah.
8   THE COURT:  Otherwise it's a straightforward
9 self-dealing brief of fiduciary duty and a surcharge case.
10   MR. DAIN:  And--and, Your Honor, I'm sorry again
11 there's--the evidence of that is--is (inaudible).  But
12 remember Mr. Black still also hasn't corrected that he filed
13 an affidavit with the New York Surrogate Court saying he had
14 explicit authorization from you citing an order that doesn't
15 exist even beyond a proposed order, a third--fourth order.
16   THE COURT:  Right.
17   MR. DAIN:  And--and again--
18   THE COURT:  At best that was disingenuous but that
19 was disturbing.
20   MR. POSKUS:  Well, I can--you know, my problem with
21 that, Your Honor, is it goes back to what I said near at the
22 beginning, it was an act he was explicitly authorized to do
23 and once it happens you can't change the result.
24   THE COURT:  Right.  But as--we're talking about
25 right now he obtained that order for the explicit act without

148

1   full disclosure.  So the order was issued under

2   misapprehension.

3         MR. POSKUS:  Uh-huh.  Well, I apparently can't talk

4   you out of that, Your Honor, so I--I guess let me--I don't

5   know what to do at this point except maybe we ought to take a

6   break.

7         THE COURT:  Yeah, I think we should.

8         MR. POSKUS:  Okay.  What time do you want us back?

9         THE COURT:  Like we'll come back at 1:30 and--

10        MR. POSKUS:  Can we make it--let's--since we're

11  going a little late can we make it 1:45.

12        THE COURT:  That's fine.

13        MR. POSKUS:  Because we've got to--

14        MR. DAIN:  Your Honor, given that Mr. Poskus is not

15  going to be here, I'll rest at this point and not ask any

16  further questions of Mr. Black because I think at this point

17  it's beating a dead horse, not Mr. Black but the issue.  But

18  we could spend then the afternoon getting to the bottom of

19  what the surcharge should be given the brief; we can address

20  the contempt because if we're not going to be here tomorrow

21  what I don't want to do, and I'm really afraid of, if we

22  continue this again--we don't know what happened in July; the

23  estate account is virtually gone.

24        THE COURT:  Okay.

25        MR. POSKUS:  The estate account has 70 something

BLACK000737

149

1   thousand in it--
2           MR. DAIN:  No, no, it does not.
3           MR. POSKUS:  --and one other asset.
4           MR. DAIN:  There was another 30,000 paid out.
5           THE COURT:  And it was represented to have about
6   100 in June.
7           MR. DAIN:  It has 30,000--
8           MR. POSKUS:  Well, like I said, Your Honor, my
9   client has put--given me the 115 and by the other way the
10  other 15 to make it 130 is in Mr. Glatstein's trust account.
11          THE COURT:  Right.
12          MR. DAIN:  And--and, Your Honor, doesn't that also
13  go to credibility if Your Honor issued those orders clearly
14  saying they're frozen to take another 130,000?
15          MR. POSKUS:  The--
16          THE COURT:  Well--
17          MR. POSKUS:  --like I said I--I could argue that.
18          THE COURT:  --we'll flush it out I suppose in the
19  afternoon, but, you know, the other related to this is like,
20  you know, there's been no indication from your client that he
21  sat down with his cousins who are to be co-trustees and work
22  with her to deal with this.
23          MR. POSKUS:  But, Your Honor, I--I--
24          THE COURT:  If there's only been discussions about
25  this disclaimer aspect and what to do, but--

BLACK000738

150

1    MR. POSKUS:  That's because that's what the issue
2    was.  I mean remember I did make a representation to the
3    Court that after the last hearing I'd work with Mr. Dain to
4    start trying to smooth some of this over and make it happen
5    and he hasn't done that.
6           THE COURT:  Right.
7           MR. POSKUS:  Now, I know he said he didn't do it
8    because he didn't want to be a party to fraud, ask him, did
9    he ever contact me after I gave him--
10          THE COURT:  Well, but I--I agree--
11          MR. DAIN:  Your Honor--
12          THE COURT:  --I mean I understand completely what
13   Mr. Dain was saying so--
14          MR. POSKUS:  But then he needs to tell me that.
15          MR. DAIN:  No, no, and let me add--let me add, Mr.
16   Poskus--I'll bring them now--I sent two e-mails, I begged Mr.
17   Poskus to end this.  Have Mr. Black address what he owed and
18   resolve this and twice Mr. Poskus blew it off saying, oh, we
19   think the Court is agreeing with us on the issue of the Rule
20   60, they want this filed.
21          If Mr. Black is surcharged and pays back, we're
22   fine, but that has to be part of sitting down, he can't just
23   say I want to keep all this money.
24          But to say I--I ignored it is absurd.  I sent him
25   e-mails and I literally begged, I beseeched him to end this

BLACK000739

1  thing.  Because we--I said it will not end well for Mr. Black

2  to keep digging this hole.  What I didn't know is he's taking

3  more of Ms. Black's money to pay for digging this hole, but

4  I've reached out to Mr. Poskus twice.

5          THE COURT:  All right.

6          MR. DAIN:  This is just so disturbing.  Everything

7  that's coming from their side they're trying to say, Your

8  Honor, I don't understand, this is all good faith, we're

9  doing everything.  No, you just spent a ton of your client's

10  money; you fought this thing into the ground and I told you

11  how it would end.

12          MR. POSKUS:  Now, wait a minute--

13          MR. DAIN:  I told you not to do it.

14          MR. POSKUS:  --wait a minute, did you ever tell me

15  --why didn't you come to one of the other conference calls

16  and do this with me.

17          MR. DAIN:  I was in Japan.

18          MR. POSKUS:  And did you ever tell me that you

19  weren't going to sign on as a co-trustee because you didn't

20  want to be a party to fraud?

21          MR. DAIN:  I didn't know then because you hadn't

22  given that accounting to Ms. Kerr.  At the time you--you made

23  a statement to me, Mr. Poskus, you said the professionals

24  have to wait to get paid when I asked about Ms. Kerr.  Oh,

25  no, no, the Court was clear the professionals have to wait to

BLACK000740

1  be paid knowing you had been paid.  At that time knowing you

2  had been paid $45,000, knowing that other people had been

3  paid of what amounts to a total of 130,000.  You did not tell

4  me that.

5        So to say did I come to you and say, no, I don't

6  want to be on the trust, once I found out that money had been

7  stolen, absolutely I will not be on that trust.

8            MR. POSKUS:  Well, this is the first I've heard of

9  it.

10           THE COURT:  All right.  So let's take a break.

11           MR. POSKUS:  Uh-huh.

12           THE COURT:  Everybody needs to go to a breather.

13           MR. POSKUS:  Okay.

14           THE COURT:  And we'll--

15           MR. POSKUS:  Timeout, are we going to timeout, Your

16  Honor?

17           THE COURT:  We're all going to go to our different

18  corners and have a break.

19           MR. POSKUS:  So what time should we be back, it's

20  now 12:40?

21           THE COURT:  So 1:45--yeah--

22           MR. POSKUS:  Can we make it two?

23           THE COURT:  Do you want to do two?

24           MR. POSKUS:  Yeah, just because I'm thinking it

25  takes us awhile just to walk down the street and get lunch.

BLACK000741

153

```
 1          THE COURT:  All right.  Two o'clock.
 2          MR. POSKUS:  All right.
 3          (Whereupon, the lunch recess was taken.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

154

1                    AFTERNOON SESSION

2          THE COURT:  Okay.  The record is back on.  All

3    right.  So where are we at at this point.

4          MR. DAIN:  Well, first I want to apologize for

5    raising my voice before the end of the session that was

6    inappropriate and I do apologize.

7          Second, I have no further questions of Mr. Black.

8          THE COURT:  All right.

9          MR. DAIN:  And so I don't know--oh, and then let me

10   bring this up as well, I know the Court had scheduled two

11   days.  We had anticipated two days because we thought there

12   was no way this thing could be completed.

13          I know Mr. Thiessen is here even if Mr. Poskus

14   can't be--the problem is we're--now, we're going to have to

15   schedule out again and have me flying back in at another date

16   either--my hope is we can complete this today or not

17   depending on what happens tomorrow.  Mr. Thiessen has filed

18   numerous pleadings, he's been involved from day one, I don't

19   know why some of these (inaudible)--

20          THE COURT:  Well--all right.  Let's not--

21          MR. DAIN:  --(inaudible).

22          THE COURT:  --get into scheduling--let's see what

23   we're going to do for the rest of the day and--

24          MR. DAIN:  Okay.

25          THE COURT:  --see where we end up with that.

BLACK000743

155

1      MR. POSKUS:  Your Honor, for the record I don't--we
2  have no knowledge of how this got scheduled for tomorrow in
3  all honesty.  If you look on the transcript of the hearing
4  that we had on the 17th we talked--that's when we scheduled
5  this.
6      THE COURT:  Yeah.
7      MR. POSKUS:  And we said August 5th and--I don't
8  recall anything in there that says August 6th.  Our notice of
9  hearing said August 5th.  If--believe me if this had been
10  scheduled for two days I wouldn't have committed to what I'm
11  committed to tomorrow.
12      THE COURT:  That's okay.
13      MR. POSKUS:  So--okay.  Well, anywhere, Your Honor
14  --I'm sorry?
15      MR. DAIN:  I was just wondering can we move then
16  into the issue of the amount of the surcharge?
17      THE COURT:  Well, that's what I'm going to--that's
18  what we're going to figure out right now.
19      MR. DAIN:  Okay.
20      MR. POSKUS:  Your Honor, I think I need to make a
21  record so I need to do redirect on Mr. Black.
22      THE COURT:  Okay.  And how long do you think that's
23  going to take?
24      MR. POSKUS:  I actually don't think it's going to
25  take very long at all?

156

1          THE COURT:  And then what do you want to do after

2     that?

3          MR. POSKUS:  I think at that point I'd rest and

4     then the question is does he want to offer rebuttal.

5          THE COURT:  Okay.

6          MR. POSKUS:  So, Mr. Black, could you take the

7     stand.

8                      REDIRECT EXAMINATION

9     BY MR. POSKUS:

10         Q    Sir, on cross-examination you were asked about the

11    inventory and financial plan that you filed with the Court.

12         A    Yes.

13         Q    Do you recall that testimony?

14         A    Yes.

15         Q    And let me ask you this, you had also testified

16    that you had told Carl Glatstein all the--your testimony--

17    well, actually I'll let you say what your testimony was

18    about--how did the inventory and financial plan come about?

19         A    I prepared a draft; I sent it to Carl Glatstein; he

20    said this is not what you should be doing under the Colorado

21    statute.  He said he or he and his paralegal would prepare

22    the next draft.  And then we went through, you know, some

23    delay and then eventually, you know, a draft.  And I sent

24    some information to him and I said I sent information to Mr.

25    Glatstein about the full three million not just two million.

1  And that it was Mr. Glatstein's decision to report the two

2  million and not separately report the third million; that was

3  his decision and not mine; I provided the information to him.

4      Q   I believe you testified that you provided the

5  information to him in an e-mail?

6      A   Yes.

7      Q   All right.

8          MR. POSKUS:  Your Honor, if I may approach the

9  witness.

10         THE COURT:  Thank you.

11     Q   (by Mr. Poskus)  Sir, I'm handing you what I've

12  marked as Exhibit 109.  I've tendered a copy to the Court and

13  tendered a copy to counsel.  And I'll ask you, sir, can you

14  identify that document?

15     A   Yes.  This is an e-mail from me to Carl Glatstein

16  dated May 25th, 2013, subject re documents attached.

17     Q   And go ahead and take a look through it, is this

18  the--do you recall sending this e-mail to Mr. Glatstein?

19     A   Yes.

20     Q   And then down below there's an e-mail from Mr.

21  Glatstein to you from the day before, do you recall receiving

22  that from him?

23     A   Yes.

24     Q   And then before that e-mail there's another e-mail

25  from you to him on May 13th, do you recall sending that

158

1   e-mail to Mr. Glatstein?

2       A    Yes, I do.

3       Q    And is this a true and correct copy of the e-mail

4   that you sent to Mr. Glatstein?

5       A    It's a true and correct copy of this e-mail chain,

6   yes.

7       Q    E-mail chain I misspoke, thank you.

8            MR. POSKUS:  Your Honor, I move the admission of

9   Exhibit 109.

10           THE COURT:  Objection?

11           MR. DAIN:  No objection.

12           THE COURT:  Okay.  Admitted.

13           (Petitioner's Exhibit 109 was received in

14   evidence.)

15           MR. POSKUS:  Just one second, Your Honor.

16           (Pause.)

17           MR. POSKUS:  Nothing further, Your Honor.

18           THE COURT:  All right.

19           MR. DAIN:  Briefly (inaudible).

20           THE COURT:  All right.

21                      RECROSS-EXAMINATION

22   BY MR. DAIN:

23       Q    Mr. Black, so what discussion did you have then

24   with Mr. Glatstein about why he wasn't--or he didn't want to

25   report the one million in the accounts for Bernie--the Bernie

BLACK000747

159

1     kids and the 394,000 then in the Roth IRA?

2          A     I did not discuss this with Mr. Glatstein; I

3     provided him information and he decided how to report for the

4     initial inventory and financial plan.

5          Q     I know.  What I'm asking is when you signed it

6     didn't you look and say there's something missing?

7          A     No, I relied on Mr. Glatstein to know what should

8     be reported and what doesn't need to be reported.

9                MR. DAIN:  No further questions, Your Honor.

10               THE COURT:  Okay.  Thank you.  Anything else, Mr.

11    Poskus?

12               MR. POSKUS:  Nothing further, Your Honor.

13               THE COURT:  All right.  Thank you.

14               MR. POSKUS:  Okay.  At this point, Your Honor, we

15    rest about this issue.

16               THE COURT:  Okay.  So, Mr. Dain, were you and Ms.

17    Wrigley going to testify today originally?

18               MR. DAIN:  No.

19               THE COURT:  As to--but before we had our

20    discussion--

21               MR. DAIN:  I--I--before we had our discussion, yes,

22    I was going to have Ms. Wrigley testify.

23               THE COURT:  Okay.

24               MR. DAIN:  If the Court thinks it still needs to

25    hear from Ms. Wrigley I can put her on the stand, but from

BLACK000748

1   the indication the Court has given I don't think (inaudible).

2           THE COURT:  Well--

3           MR. DAIN:  It sounds like you're concerned.

4           THE COURT:  Well, I just want my record to be--

5           MR. DAIN:  Absolutely.

6           THE COURT:  --thorough.

7           MR. DAIN:  Absolutely.  Why don't you go up and

8   take the stand.

9           THE COURT:  So would you raise your right hand

10  first please.

11          MS. WRIGLEY:  Should I stand?

12          (Whereupon, Ms. Wrigley was sworn in.)

13                  CHERIE WRIGLEY,

14  called as a witness herein, having been first duly sworn, was

15  examined and testified as follows:

16          THE COURT:  Thank you.

17          THE WITNESS:  Am I talking all right?

18          THE COURT:  There you go.

19          THE WITNESS:  Okay.  Okay.

20                  DIRECT EXAMINATION

21  BY MR. DAIN:

22      Q   Good morning, Ms. Wrigley.

23      A   Good morning, Mr. Dain.

24      Q   So you heard Mr. Black testify that he had

25  conversations with you about this disclaimer?

BLACK000749

161

1     A     I did.

2     Q     Before--when--when was the first time that you had

3     a conversation that you recall with Mr. Black regarding a

4     disclaimer?

5     A     It would have been somewhere in 2012--

6     Q     And--

7     A     --the words disclaimer were used.

8     Q     --and who first brought up those words?

9     A     Bernard Black.

10    Q     Did you prior to that know what a disclaimer was?

11    A     No, other than disclaim means to negate or to not

12    allow.

13    Q     Okay.  Why don't you tell the Court briefly what

14    your background is in terms of education and employment.

15    A     Yeah, I'm a retired high school resource

16    specialist, which is a combination counselor, teacher.  I

17    work with--I worked with--I worked with special needs

18    children, behavioral--kids with behavioral problems, helping

19    them find their way in life.  I had a multitude of tasks that

20    I had to engage in.

21          And I have two masters degrees and I do a lot of

22    pro--not pro bono work, I do a lot of volunteering and I work

23    with people who are mentally ill and I volunteer at the

24    homeless shelter where my specific work is dealing with

25    people who are mentally ill.

162

```
 1      Q    Okay.  I've heard the word CASA before what does
 2  that mean?
 3      A    Oh, that's right and I--for two and a half years I
 4  was CASA--which is in the state of California it's similar to
 5  what a GAL is, it's a Court Appointed Special Advocate where
 6  I'm the eyes and ears of the court for a child who is being
 7  held and needs--a foster child who needs special help when
 8  they've been taken away from their parents.
 9      Q    Okay.  You've obviously known Joanne Black most of
10  your life.
11      A    Exactly.
12      Q    Have you known her through childhood before she
13  began showing signs of schizophrenia?
14      A    Yes, I--I met her when she was like nine--I'm four
15  years older--so I met her when she was nine.
16      Q    And you've been involved in her life until today?
17      A    Correct.
18      Q    Had there been times that for instance where you
19  and I have helped have her committed to--while she was in New
20  York to one or more hospitals?
21      A    Yes.  Basically, yes.
22      Q    You've dealt with her through commitments at
23  Bellevue Hospital--
24      A    Yes.
25      Q    --in New York and other hospitals in New York and
```

163

1   New Jersey?

2       A    Yes.

3       Q    And in your work experience you're familiar with

4   people who suffer from schizophrenia, the--the symptoms and

5   the issues that--that come up?

6       A    Yes.

7       Q    Okay.  So now going back to when Bernard Black

8   first brought up the word disclaimer how did he--how did the

9   conversation come about, how did he bring that up?

10      A    Well, he brought it up because he was very

11  concerned, he told me that my aunt Renata, his mother, had

12  left the entire amount of Vanguard funds to Joanne.  He

13  didn't even mention at that time that 1 percent to each of

14  his five older children.  And he was very, very upset.

15           He didn't--and then that's how he first mentioned

16  it and--and he wasn't sure what to do.

17      Q    Was he--

18      A    So then--

19      Q    I'm sorry.

20      A    --then the disclaimer later came out.

21      Q    Okay.  When you had this first conversation was his

22  concern that--was his main concern that the money was being

23  left outright to Joanne or that he and his children weren't

24  getting a part of that money?

25      A    No, mostly that it was being left outright to

164

1    Joanne and how would she handle that.

2        Q    And--and you were also concerned that Joanne not

3    have $3 million outright?

4        A    Of course.

5        Q    At that time when Renata passed away did you know

6    where Joanne was?

7        A    I had suspicions that she might be in Colorado.

8        Q    And how did you have those suspicions?

9        A    Before Aunt Renata died she had given me some of

10   her phone bills and it was noticed on there that she had been

11   calling from Colorado.

12       Q    And how did you track down Joanne?

13       A    With a great deal of sleuthing.  I--I took those

14   phone bills and I kind of tracked her down and I found out

15   that she had purchased a phone and had sent it to a motel and

16   so I was kind of following her in that way, figuring out

17   where she was getting--she was buying new phones on a

18   consistent basis.

19       Q    And eventually you were involved in tracking her

20   down and helping Mr. Esaun Pinto get her back to the New

21   York, New Jersey area?

22       A    Correct.

23       Q    Where she was hospitalized for a period of time?

24       A    Uh-huh.

25       Q    Then in terms of the disclaimer--just getting right

BLACK000753

165

1   to it--did Mr. Black ever have a conversation with you in

2   which he said the intent or purpose of the disclaimer was to

3   transfer the paid on death assets so that Joanne Black would

4   get only two-thirds of the assets and Mr. Black and his

5   children would get one-third?

6      A   Never.

7      Q   Have you looked through all the e-mails that you

8   exchanged with Mr. Black?

9      A   I have looked through every e-mail that I exchanged

10   with Mr. Black and Becca and the few that I had with Sara.

11   I've never talked to Sara on the telephone.

12      Q   Okay.  So now when you mentioned Becca, that's

13   Rebecca, one of Mr. Black's children by his first marriage?

14      A   Correct.

15      Q   And you mentioned Sara that's another child by his

16   first marriage?

17      A   Yes.

18      Q   So you've gone through all those e-mails, did you

19   find in any of those e-mails an explanation from Mr. Black

20   that explained that one-third of the disclaimed assets were

21   going to go to an Issue Trust for the benefit of him and his

22   children?

23      A   Absolutely not.

24      Q   Did Mr. Black tell you how he came up with the

25   concept of a disclaimer?

BLACK000754

166

1      A    No.

2      Q    Did he explain to you what he intended the

3   disclaimer to do?

4      A    No.  I mean if--if anything, I only assumed he

5   wanted to take care of the sister and put the money in a

6   special needs trust until she got better.

7      Q    Now, he sent you a disclaimer for Joanne to sign.

8   What did you understand he was asking you to do?

9      A    I agree on that point that I was going to try to

10  get Joanne to sign something from Vanguard.  It was a simple

11  thing that just said you are disclaiming some assets.  And I

12  assumed that if I could get her to sign that, Bernie would

13  put it in the Special Needs Trust that you would have control

14  over.

15     Q    And you've seen--you've been in court when you

16  heard the testimony--I mean the statement at the December

17  11th hearing in which Mr. Black explained the basic purpose

18  was to put the money in a trust where I was the trustee to

19  financially support Joanne?

20     A    Right.

21     Q    And was that your understanding?

22     A    Absolutely.

23     Q    Now, why did Bernie Black ask you to try to get

24  Joanne Black to sign?

25     A    Because I was the one--if she was going to trust

167

1    anybody in this world, it would have been me.

2        Q    And was the idea is that you were going to come to

3    Colorado to have her sign that?

4        A    Yes.

5        Q    And why is it that that never occurred?

6        A    Well, I was going to, and then she was kind of

7    moving from hotel to hotel, and he kind of said I've got

8    another way I might be able to do this, and it just kind of

9    fell by the wayside until much later.

10       Q    And during this time was your main concern that

11   Joanne not have all the paid-on-death assets outright but

12   that they be placed in a special or Supplemental Needs Trust?

13       A    I had no idea that Bernard had moved the money.  I

14   thought they were sitting safely in Vanguard.  I didn't find

15   out for a year and a half to two years that he had done

16   anything with the money.  I thought they were still in

17   Vanguard, and I have e-mails showing that I still thought

18   they were at Vanguard.  I never knew he moved them.  Not only

19   did I not know he disclaimed them, I never knew he moved them

20   from Vanguard.

21       Q    Now, did you ever have a conversation with Bernard

22   Black's wife in which the subject of a disclaimer came up?

23       A    I have never spoken to Kate Black--or Litvak Black

24   except at the funeral and on the phone to say, "Excuse me,

25   could I please speak to Bernie."

BLACK000756

168

```
 1      Q    Now, when you--you said you spoke to Sara on the
 2  phone, what--
 3      A    I'm not sure we did speak on the phone.  I think--
 4      Q    Oh, I'm sorry, you said you never talked to her on
 5  the phone.
 6      A    Right, we talked via e-mail.
 7      Q    E-mail.  In any of those e-mail exchanges with Sara
 8  Black did you discuss the affect of a disclaimer?
 9      A    No, we only spoke about money once that I can
10  remember.
11      Q    Did--and same with Rebecca Black; did you discuss
12  the affect of a disclaimer?
13      A    We talked about a paper that her dad wanted her to
14  sign.
15      Q    Tell us what that conversation was.  I said, "Your
16  dad really wants"--something to the effect of your dad really
17  wants to see you.  She said I don't want to go see my dad.
18  This was a constant battle.  She didn't want to go see her
19  dad.
20          THE COURT:  This is Sara or--
21          THE WITNESS:  Becca.
22          THE COURT:  Becca.
23          THE WITNESS:  Yeah, they did not have the best of
24  relationships.  And I just said, okay, your dad wants to see
25  you; he wants you to sign a paper.  I basically told Bernie
```

BLACK000757

169

1    I'm not going to drag her by her hair to come see you; do you

2    want to come to Thousand Oaks, which he usually didn't want

3    to do.  It's an hour drive.  And I don't remember--he did

4    come once to visit her in Thousand Oaks.  I don't remember

5    if--I don't remember if he had her sign a paper there.  I

6    don't think so, because it wouldn't have been notarized.  But

7    I had no idea what the paper was.  I didn't really read it.

8    And to be honest with you, if I had known what it was, I

9    would have told Becca to take her one percent and run.

10       Q    (by Mr. Dain)  And so what I'm getting at with

11   respect to disclaimer, did you have any understanding that

12   the disclaimer of the one percent that Becca and Sara had had

13   any affect on the 95 percent that Joanne was supposed to

14   receive?

15       A    I never spoke to Bernie.  He would give me two

16   minutes of his time, and the two minutes I had were to talk

17   about give Joanne more money.  He started out giving her 280

18   a week and I had him raise it to 500 a week.

19       Q    Oh, you mean the conversation was you telling him

20   to give Joanne more money?

21       A    Yeah.  We didn't talk disclaimer.  We didn't talk

22   any amount of money, about his children.  We only talked the

23   few minutes that I could talk to him--I don't know what his

24   200 phone calls were, but I have phone records.  We did not

25   talk near what he's saying we talked.

BLACK000758

170

1      Q    And--

2      A    And it wasn't about a disclaimer or where that

3   money would go.

4      Q    Now, when he sent you these form disclaimers that

5   he wanted you to have Becca sign and Joanne sign, we've seen

6   from the e-mails there's nothing explaining them.  Did he

7   have any phone conversation with you in which he explained

8   them?

9      A    Absolutely not.

10     Q    So in the end, did you have Joanne sign a

11  disclaimer?

12     A    Absolutely not.

13     Q    Did you have Becca or Rebecca sign a disclaimer?

14     A    No.

15     Q    Did you have Sara sign a disclaimer?

16     A    I've never talked to Sara.  She lives in New York;

17  I live in California.

18     Q    Now, in terms of Mr. Black saying it was clear to

19  him that you understood that he was going to get one-third of

20  the assets that were disclaimed, what's your response to

21  that?

22     A    Well, I would say that that is preposterous.  I

23  didn't--I never knew that he would be getting one-third of

24  any of Joanne's POD accounts.  All of those I would think

25  that would be saved for her.  I did know that one of the

BLACK000759

171

1    wills said that he would get one-third--he and his children,
2    and I mean five children, not seven.  It was very explicit
3    that Renata did not want his two little kids to get any money
4    whatsoever.  Five children and Bernard would get one-third of
5    her estate minus the McKeel house and the Holston House,
6    which were to go to Joanne.
7         Q    Now, you said you understood that the assets--these
8    paid-on-death assets were at Vanguard.  Did you have
9    conversations with Renata Black about why she put assets in
10   Vanguard for Joanne Black?
11        A    Did I have--say it again.
12        Q    Did you ever have conversations with Renata Black
13   about why she put assets in Vanguard for Joanne Black?
14             MR. POSKUS:  Objection.  Hearsay, Your Honor.
15             THE COURT:  We have--
16             MR. DAIN:  Same--I'm sorry, before you do that,
17   same point goes to her state of mind since this is what is at
18   issue whether she understood the effect of this disclaimer.
19   Mr. Black has also raised that this was not his mother's
20   intent, so I think it's important that we understand from her
21   view what she understood his mother's intent to be.
22             MR. POSKUS:  He needs to rephrase the question
23   though.
24             MR. DAIN:  I don't know that I do.
25             THE COURT:  Overruled.

BLACK000760

172

```
 1          THE WITNESS:  I do know that Renata always promised
 2   Joanne that she would be well taken care of and that she
 3   would have plenty of money for the rest of her life.  I did
 4   not know that she would leave it all to Joanne, okay, in cash
 5   without having put some of it into the special needs trust.
 6   I really thought you were going to be handling that.  So that
 7   surprised me.  But she died suddenly.  But I do know that she
 8   expected Joanne to have the huge majority of her assets.
 9          Yes, we spoke about the fact that Joanne--that
10   Bernie was only to get $50,000; he knew that.  That only five
11   of the grandchildren were to receive a small amount and that
12   Joanne was to get the rest.  She--it was surprising to me, I
13   have to say, that she would have left Joanne the money
14   unattended.  That was a surprise, and I did speak to Bernie
15   about that.  We both were in agreement to leave her the money
16   outright without some kind of--
17       Q    (by Mr. Dain)  Protection?
18       A    --protection, of course, was--was a little off.
19       Q    Okay.  And was your understanding of the purpose of
20   the conservatorship to set up a method to--to marshal those
21   paid-on-death assets and have some protection from the Court
22   and a conservator over those assets?
23       A    Absolutely.  That's why I've been--I was working
24   with him all the way until he claims when it became a dispute
25   over my asking for some reimbursement.  I worked with him all
```

BLACK000761

173

1   the way because I thought he was going to take care of his
2   sister.  When I saw that he wasn't, that's when we had a
3   dispute.  And I begged him in phone conversations and in e-
4   mails to please not do what he was doing, and that's when I
5   found out he had already moved the money from Vanguard and he
6   had done a lot of deceitful things.
7        Q    And in terms of the wills that have come up, you're
8   aware now that there is a will that Mr. Black probated?
9        A    Yes.
10       Q    That's the one you're referring to that has this
11  article 4 and--
12       A    Right, it's an old will from 1997.
13       Q    And you become aware that--or became aware at some
14  point there's a second will that Mr. Black did not probate?
15       A    Right.  I always knew there was a second will.  I
16  just didn't know that I would find a copy of it signed and
17  everything.  It was in papers that I had not unearthed yet.
18       Q    And tell us about that?
19       A    Okay.  Well, I was helping to clean out the house
20  as a favor to Bernie and I put a bunch of papers from
21  Joanne's room into boxes; most I sent to his basement and a
22  couple boxes I took because I thought, well, I'll probably
23  see Joanne maybe before he does.  And as I was unearthing it,
24  and that was like maybe a year later or so, I found a signed
25  copy of the will and I told him about it and, you know, he

174

1    wasn't happy that I had it. I don't think he knew it was an
2    original signed will, but--
3        Q    Where is that will now?
4        A    It's in my home.
5        Q    Okay. And you know that--how do you know that Mr.
6    Black has a copy of it?
7        A    Well, because he--he showed it to me right after
8    his mom died.
9        Q    Okay.
10       A    And he--he showed it to others too.
11       Q    Okay. Were you a part of the--or were you a
12   party to the probate of the estate?
13       A    No.
14       Q    So were you receiving any notices from Mr. Black or
15   the court regarding the probate of the estate?
16       A    No, I had no idea what he was probating.
17       Q    When did you first learn that Mr. Black had put
18   one-third of the paid-on-death assets other than the Roth IRA
19   into an issue trust?
20       A    I think when Pam started uncovering all of this. I
21   didn't know any of this until right around then.
22       Q    When you received the account and report that Mr.
23   Black filed after the conservatorship, did you see anything
24   in there that indicated to you that he had put one-third into
25   an issue trust?

BLACK000763

175

1    A    No.

2    Q    And did you know that there was a Roth IRA that he

3  had distributed 100 percent to his children?

4    A    Absolutely not.  And let me just also say, Joanne

5  when she was still in a psychotic state kept telling me about

6  all this money that Bernie had stolen from her.  But when

7  she's in a state--you know, she told me her mom's thing was

8  worth eight million, so I never know what's true and what's

9  not, so I didn't follow up on it.

10   Q    But you did question Mr. Black when you saw in the

11 accounting report that there was 2.4 million.  In fact, did

12 you not question him that you thought he had lost money?

13   A    I did.  I questioned his financial expertise and

14 wondered what he was doing when the market had been going up

15 20 percent year after year.  I questioned his--he calls

16 himself a financial expert, genius, whatever, and we had some

17 discussions about that.

18   Q    Did he tell you at that time, well, I've

19 transferred a third of the assets into a trust?

20   A    Absolutely not.  And he told me it was none of my

21 business, that he would discuss it with you, since you were

22 the trustee.

23   Q    Okay.  And when did this conversation take place?

24   A    I have the e-mail.  I would say somewhere in late

25 2013, maybe '14, but that--I still thought--I even wrote--I

BLACK000764

176

1   still thought the money was in Vanguard.  Maybe 2014.  He

2   never told me he had moved the money.

3       Q    And obviously you're here today, but if you had

4   known at the time that he was applying to be the conservator

5   that he was going to take a third of those paid-on-death

6   assets, transfer them to an issue trust, and then take the

7   Roth IRA and transfer it to his children, would you have

8   objected at that time?

9       A    I would have objected immediately at that time.

10          MR. DAIN:  Okay.  Thank you, Your Honor, I have no

11   further questions.

12          THE COURT:  Okay.

13          THE WITNESS:  Is somebody going to cross?

14          THE COURT:  Do we know what the date is on the

15   other will?

16          THE WITNESS:  Yes, 2010.  I have--you have a copy

17   actually of that will, because I--when I objected, I put it

18   in my exhibit.  I objected to one of Bernie's wanting to be

19   the guardian.  So I--it was in February of 2015, and I sent

20   an exhibit of the will.

21          THE COURT:  Okay.

22          THE WITNESS:  It's three pages and it's signed by

23   three people.

24       (Pause.)

25          THE COURT:  Well, I don't know which is which.

177

1    Sorry.

2              MR. DAIN:  It's okay, Your Honor.

3              THE WITNESS:  I think I've only--oh, you're close.

4              THE COURT:  That's not it.

5              THE WITNESS:  No, that's the letter my aunt wrote

6    to Bernie telling him that some of the jewelry is mine--I

7    mean my mother's, which at first he said yes it was and then

8    he said no it wasn't.  But it will be in that.  I have like

9    four exhibits, so it's one of those exhibits.  There.

10        (Pause.)

11             THE COURT:  Okay.  Okay.

12                      CROSS-EXAMINATION

13   BY MR. THIESSEN:

14        Q    Good afternoon, Ms. Wrigley.

15        A    Good afternoon.

16        Q    You testified you had a conversation with Bernard

17   Black in the summer of 2012?

18        A    Yes.

19        Q    And you in fact had multiple conversations with

20   him?

21        A    Yeah.

22        Q    And you testified that it was his main concern was

23   that Joanne not receive the funds outright?

24        A    His main concern that she not receive the funds

25   outright, yes.

BLACK000766

178

1    Q    And this was his main concern, correct?

2    A    Yes.

3    Q    When you had these discussions with Mr. Black, you

4  specifically discussed the two-third, one-third distribution

5  under the estate of Renata Black, didn't you?

6    A    Not that I recall.

7    Q    You had in fact discussed it on multiple occasions,

8  didn't you?

9    A    Not that I recall.

10    Q    And you specifically discussed that of the three

11  million, only two million was to go to the SNT for Joanne

12  Black?

13    A    Not that I recall.

14    Q    And you--you did not have more than one

15  conversation with him about the two-thirds distribution to

16  the SNT for Joanne Black?

17         MR. DAIN:  Well, Your Honor, I'm going to object.

18  That's a compound sentence regarding--

19         MR. THIESSEN:  Sure, I'll rephrase.

20         THE COURT:  All right.

21         THE WITNESS:  I mean if I wrote an e-mail and you

22  have it, then apparently my memory is off, but I don't

23  remember having any kind of conversation like that with

24  Bernie Black.

25    Q    (by Mr. Thiessen)  Do you recall having a

179

1    conversation about the disclaimer?

2           MS. DiPONIO:  Your Honor, I believe this has been

3    asked and answered.

4           MR. THIESSEN:  Your Honor, I'm allowed to examine

5    her on cross.

6           THE COURT:  I thought that was your first question.

7           MR. THIESSEN:  No, the first question was what was

8    Bernard Black's main concern giving--

9           THE COURT:  Right, and then you asked about--

10          MR. THIESSEN:  --funds outright.

11          THE COURT:  --the disclaimer.

12          MR. THIESSEN:  I'll--I think it's fair to ask again

13   with respect to some exhibits.  I will not belabor the issue,

14   Your Honor.

15          THE COURT:  All right.

16   Q    (by Mr. Thiessen)  You in fact had a discussion

17   with Mr. Black about the disclaimer, correct?

18   A    Yes.

19   Q    And in fact he sent you an e-mail with a disclaimer

20   form for Joanne Black?

21   A    Yes.

22   Q    And it was your idea to go to Denver to have Joanne

23   Black sign the disclaimer?

24   A    I suggested--yes, I suggested that I might be able

25   to go to Denver and have her sign something like that.

180

1      Q    And he also sent you an e-mail with respect to a

2  disclaimer for Becca Black?

3      A    He sent me some papers; I didn't look at it.

4      Q    Can you turn to Exhibit 80, please?

5      A    Sure.  I think it's right here.  Forms for Becca to

6  sign.

7      Q    Do you recall receiving that e-mail?

8      A    If there's an attachment--

9      Q    Feel free to look at it.

10     A    Okay.  Yeah, so I probably didn't open up the

11  attachment, but yeah, I mean--yeah, I didn't open up the

12  attachment because he just said a form for Becca to sign, and

13  I think he wanted me to take her to a notary or something

14  like that.  I don't recall.  Did I do that?

15     Q    I don't know, did you?

16     A    No, not that I recall.

17     Q    Okay.  Did he--

18     A    I do remember, you know, yeah, I got this e-mail,

19  but did I discuss anything further with that?  No, I didn't

20  know--I didn't pay attention.  I don't remember opening up an

21  e-mail, I don't remember printing it, if she did.

22     Q    During your testimony, you said that you and Mr.

23  Black spoke about the five grandchildren receiving a small

24  amount from the estate of Renata Black; is that correct?

25     A    Well, small.  I mean whatever would be left over

181

1    after all the expenses were paid, taxes and everything were

2    supposed to be paid out of the estate, not from Joanne's

3    part.

4         Q    You also testified to having exchanges--at least

5    one e-mail exchange with Ms. Sara Black?

6         A    Oh, I had several exchanges with Sara.

7         Q    And that would have been in the summer of 2012?

8         A    Yeah, and maybe even one later.

9         Q    Could you please turn to Exhibit 52?  I'm sorry,

10   it's not--it's not 52; I'm sorry, it's 49.  And is this an e-

11   mail from your e-mail address, cheriewrigley@yahoo.com?

12        A    Yeah, it's one of--I have way more e-mails than

13   this in my--

14        Q    And is it dated July 21st, 2012?

15        A    Yes.

16        Q    And is it to Sara Black?

17        A    Yes.

18        Q    and if you'll take a look the sort of second

19   paragraph where it starts with "I".

20        A    Yeah.

21        Q    Could you please--and you've scrolled to the end of

22   that sentence it says, "I don't want to spoil any good news,

23   but I'm sure your dad has told you that once your

24   grandmother's estate goes through probate shortly you will

25   have more than enough to pay for all your schooling needs."

BLACK000770

182

1    A    Um-hum.

2    Q    And so in fact you were--you were telling her that

3  it wasn't--she wasn't going to receive a small interest?

4    A    I thought she was going to get about $25,000,

5  $30,000.  She was going to graduate school for a year.

6    Q    And in your mind that was--that was sufficient for

7  graduate school, to pay for more than enough of her schooling

8  needs?

9    A    Yeah, that's what approximately I was told that

10  they would get.  Either Bernie had told me that's what

11  Benjamin and the other one, David, were going to be getting.

12  That that would be what he approximated they would be

13  getting.  He didn't say to me it was one percent.  He just

14  said that's about what it would be.  And so, you know, that's

15  about what I thought she would get too.  You know, I'm not

16  going to go any further than that, but--I have many more from

17  Sara discussing things with her, but not money, just

18  discussing her general wellbeing.  But I've never spoken to

19  her on the phone.

20    Q    You--and is that e-mail Exhibit 49, is that a true

21  and correct copy of the e-mail you sent?

22        MR. DAIN:  There's no objection if he wants to

23  admit.

24        THE WITNESS:  Yeah, I'm sure it is.

25        MR. THIESSEN:  I move to admit Exhibit 49, Your

183

1    Honor.

2                THE COURT:  Admitted.

3                (Petitioner's Exhibit 49 was received in evidence.)

4        Q    (by Mr. Thiessen)  You also expressed that you were

5    surprised that the--I believe these were your words, the

6    money was left to Joanne unattended.

7        A    Yeah, that it was left outside of the special needs

8    trust.

9        Q    And so you needed--you needed to speak with Bernard

10   Black about how to arrange for those funds to be not left to

11   Joanne outright, correct?

12       A    No.

13       Q    You testified that you've never had a phone

14   conversation with Ms. Kate Litvak; is that correct?

15       A    Yes, to the best of my knowledge.

16       Q    One moment, ma'am.

17            (Pause.)

18       Q    Sorry.  You testified that Renata expressed concern

19   about Joanne's ability to manage the funds on her own; is

20   that correct?

21       A    Yes.

22       Q    And when you talk about a trust for Joanne, what do

23   you mean?

24       A    Renata had wanted to have a special needs trust

25   that my brother would help take care of.

184

1      Q    Well, you also exchanged e-mails with Mr. Black
2  around--in 2012.  You testified specifically you reviewed all
3  the e-mails.

4      A    Of course.

5      Q    Do you recall an e-mail from November of 2012 where
6  Mr. Black would have explained to you with respect to Becca's
7  disclaimer the reasons that Becca should disclaim?

8      A    No, I don't, so you would have to show that to me.

9      Q    Sure, I would be happy to do that.

10          MR. THIESSEN:  Your Honor, I apologize, but we do
11  only have it on the laptop.  We'll certainly print it.  We
12  can admit it later, but I think it's fair for her to at least
13  view the e-mail.  If Mr. Dain wants to view it, certainly.

14          THE COURT:  And what is this?

15          MR. THIESSEN:  This is an--this is an e-mail from
16  Mr. Black to Cherie Wrigley dated November 5th, 2012.

17          MR. DAIN:  Yeah, I mean is this the total of the e-
18  mail?

19          MR. THIESSEN:  Yes, it is.

20          MR. DAIN:  I have no objection as long as he prints
21  out whatever it is--

22          THE COURT:  Okay.

23          MR. DAIN:  --and show it to the Court too.

24          MR. THIESSEN:  Sure.

25          THE COURT:  Show it to Ms. Wrigley.

BLACK000773

1        THE WITNESS:  Could you make it a little bit

2 bigger?

3    Q   (by Mr. Thiessen)  Certainly.  I'll try.

4    A   You can read it.

5    Q   Is that better?

6    A   Um-hum.

7    Q   Do you recall?

8    A   Did I respond to this e-mail?

9    Q   Did you?

10    A   I don't remember reading this e-mail.  So did I

11 respond to it?  You know, I do get, you know, e-mails not

12 necessarily from Bernie a lot, but I don't remember getting

13 that e-mail because I do remember informing him about his

14 daughter having issues with a therapist and I don't remember

15 --I don't remember that e-mail though.

16    Q   And just for the record, I'll read the relevant

17 portion.  I'm not--I don't have very much further, Your

18 Honor.

19        THE COURT:  What's the date?

20        MR. THIESSEN:  The date is November 5th, 2012.  It

21 is an e-mail from Bernard Black to Cherie Wrigley.  The

22 subject line is "Becca documents."  There is no one copied.

23 The second paragraph is, "For the waiver, please stress to

24 Becca that this is for her benefit and her siblings period

25 which is, because with no waivers, 95 percent goes to Joanne.

186

1   I'll make sure she gets the benefit of her one percent share,

2   and more, this is for her benefit."  Do you recall that

3   explanation Bernie Black gave you?

4       A   I don't, but it still doesn't negate the fact that

5   95 percent would have gone to Joanne.

6       Q   Right, but--but specifically with respect to the

7   statement Becca would receive one percent--her one percent

8   share and more; that's consistent with Mr. Black's testimony

9   that you and he were attempting to convince Becca to sign the

10   disclaimer so that all funds could be disclaimed and funded

11   two-thirds, one-third into the estate?

12       A   No, it doesn't.  First of all, I don't remember

13   that particular e-mail, and it doesn't say two-thirds, one-

14   third, it just says that Becca is going to (inaudible) one

15   percent.

16       Q   But what--

17       A   What I'm more concerned about is how he was about

18   the therapist.  That his own daughter was suicidal and he was

19   disregarding it.  Read the part about the therapist.

20       Q   With all due respect, that doesn't have anything to

21   do with today's proceedings.

22       A   Of course it doesn't.

23       MR. DAIN:  Wow, wow, wow, why don't we just have

24   the--

25       THE WITNESS:  Because that's all Bernie--that's

1   what I talk to Bernie about.  Whether I read any of the rest

2   of that, let me tell you, when his daughter was suicidal,

3   that's all I cared about.  I didn't read the rest of that.

4          MR. THIESSEN:  Thank you, Your Honor.  Nothing

5   further.

6          THE COURT:  Okay.

7          MR. DAIN:  If you would just leave that up there,

8   so I can--

9          MR. THIESSEN:  Oh, certainly.  Certainly.

10         THE WITNESS:  I don't remember reading the rest of

11  it, and I don't remember responding to the rest of it.  I do

12  remember having conferences with him and his therapist--about

13  her therapist.

14         MR. DAIN:  Thank you.

15         THE WITNESS:  That's the important issue.

16                   REDIRECT EXAMINATION

17  BY MR. DAIN:

18      Q    While we're waiting on that e-mail, you were aware

19  that Renata had real property, correct?

20      A    Yes.

21      Q    And Mr. Black sending you an e-mail saying that

22  Rebecca will get one percent and more.  Did you have any

23  understanding whether she was going to get anything from the

24  remainder of the estate of Renata Black?

25      A    Yeah, I assumed that she was going to get something

188

1    from--the estate included like three houses--I mean she had

2    five houses; two were supposed to go to Joanne outright, a

3    condo and McKeel, that's still in the possession right now.

4    The three houses, one that she lived in and I think two

5    others, were supposed to be then divvied up two-thirds/one-

6    third.

7        Q    Okay.  So let's read the whole e-mail; it's not

8    very long.  I'll read it to you.  It's Monday, November 5th,

9    2012.  So this is now just three weeks before this hearing on

10   the conservatorship.  First line, "I will bring Becca's birth

11   certificate and SS card.  For the waiver, please stress to

12   Becca that this is for her benefit and her siblings."  And

13   you understood her siblings to be her brothers and sisters?

14       A    Yeah, I mean--

15       Q    Bernard's other children?

16       A    Yeah, I really don't remember reading that.

17       Q    Okay.

18       A    Okay.

19       Q    "Which it is, because with now waivers 95 percent

20   goes to Joanne.  I'll make sure she gets the benefit of her

21   one percent share and more this is for her benefit"--all one

22   sentence.  Mr. Black says, "I'll make sure she gets the

23   benefit of her one-percent share."  Did Mr. Black explain to

24   you why he couldn't try to explain this to Rebecca himself?

25       A    No, other than the fact that they had a very poor

BLACK000777

189

1   relationship.

2        Q    But again, as you said before, this says nothing

3   about one-third of--

4        A    No.  No.

5        Q    --the 95 percent going to a--an issue trust?

6        A    And I had no idea what one percent he was talking

7   about even.

8        Q    Okay.  Now, the paragraph you mentioned that you

9   were focused on is "Separately, if the therapist is in fact

10  saying the things that Becca reports based on very partial

11  information after one visit, this is a very bad sign.  I'm

12  willing to believe for a little bit that Becca is

13  misreporting, but I will need comfort on this soon or else we

14  will need a new therapist.  Bernie."

15             That's what you're saying you were concerned about,

16  that part of the e-mail?

17       A    That--I remember vaguely that part, but we had

18  numerous conversations about Becca, therapy, and how he was

19  treating his daughter.

20       Q    So assuming this is the e-mail that Mr. Black was

21  talking about that conveyed what his intent was for the

22  disclaimer, my first question is to you: you understood there

23  were disclaimers that the children were executing, right?

24       A    No.

25       Q    Okay.  So even with respect to that, with respect

190

1    to the first paragraph, do you recall any e-mail or
2    conversation with Bernard Black in which he explained exactly
3    the purpose of the disclaimer?
4        A    No.
5        Q    So the only thing he's conveyed to you here is that
6    he'll make sure she gets the benefit of her one-percent
7    share?  Do you know whether you ever conveyed that to her?
8        A    I don't think Becca was willing to listen to me
9    about anything regarding her dad.  She did not want to go.
10   She didn't want to hear about what her dad was going to give
11   her.  She--it was a very difficult relationship.
12       Q    So at this time, when they're talking about a
13   therapist, you had conveyed to Mr. Black that she was
14   suicidal?
15       A    That she had been suicidal.  She complained about a
16   lot of other things too.
17       Q    And his response was to you--was for you to try to
18   get her to waive her one percent?
19       A    Yes, apparently.  There were other things.  He
20   would say she's making this up, numerous things.
21            MR. THIESSEN:  Okay.  I have no further questions.
22            THE COURT:  Okay.
23            MR. THIESSEN:  Just one more, Your Honor.
24            THE COURT:  Okay.
25            MR. THIESSEN:  I would move to admit that November

191

1   5, 2012 e-mail--

2           THE COURT:  All right.

3           MR. THIESSEN:  --and make it Exhibit 111.  Exhibit

4   111.

5           THE COURT:  Okay.

6           MR. DAIN:  No--no objection, Your Honor.

7           MS. DiPONIO:  And, Your Honor, just so the record

8   is clear, I wanted to state this for the record that the date

9   of the will that has been referenced, this other will, is

10  January 31st, 2010.

11          THE COURT:  Right.

12          MR. DAIN:  Is that a copy?

13          MS. DiPONIO:  This is a copy, yes.

14          MR. DAIN:  Would the Court like that copy?

15          THE COURT:  I actually have it.

16          MR. DAIN:  Oh, okay.  I have no further questions

17  for this witness.

18          THE COURT:  All right.  Thank you, ma'am.

19          MR. DAIN:  Then, Your Honor, in terms of my

20  testimony, how do you want to do this?  I obviously can

21  either give you a narrative or--

22          THE COURT:  If you wouldn't mind, I'll just swear

23  you in and you can sit in the witness box and give me the

24  narrative and that will facilitate any cross-examination that

25  they want to provide.

```
 1            (Whereupon, Mr. Dain was sworn.)
 2                       ANTHONY DAIN,
 3    called as a witness herein, having been first duly sworn, was
 4    examined and testified as follows:
 5                    DIRECT EXAMINATION
 6            THE COURT:  Go ahead, Mr. Dain.
 7            THE WITNESS:  So, firstly, with respect to the
 8    issue of having a phone conversation with Mr. Black regarding
 9    his intent on the disclaimer, I've had very few phone
10    conversations with Mr. Black over the years.  In fact, I've
11    had very few e-mails with Mr. Black over the years, and this
12    goes back probably 20 or 30 years.  We haven't had a close
13    relationship.  We don't--we don't call each other; we don't
14    communicate.
15            There've been times when I'm traveling or in trial
16    that I end up in the same city where he is.  One happened in
17    Austin, Texas when he was at the University of Texas, so we
18    had dinner--he and his wife and me and my wife--and we just
19    talked generally.  But I don't recall any conversation in
20    July of 2012.  It's possible there was a phone call.  I don't
21    recall it, but what I know for sure is we never had a
22    discussion about a disclaimer or the effect of a disclaimer.
23    I'm an attorney.  I've been an attorney for 34 years.  I
24    don't have an understanding of probate law of guardianship or
25    conservatorship law.  I didn't understand the term disclaimer
```

193

1    other than I've seen it in my experience in litigation, which

2    is that you would indemnify someone or not sue them for some

3    reason.  So the--I never had a conservation with Mr. Black

4    about a disclaimer.

5            What I did get is the filings that Mr. Black and

6    Mr. Glatstein made, not all of them, and I complained to Mr.

7    Glatstein that I wasn't being served with everything and

8    absolutely not timely.  Sometimes eight days would go by,

9    sometimes two weeks.  I called Mr. Glatstein twice; one to

10   explain that neither Ms. Wrigley nor I had received certain

11   of their filings, and another time to complain that they were

12   coming--the ones that were were coming late.

13           Mr. Glatstein--and I believe he testified to that--

14   got back to me on the 1st one saying he apologized, it was

15   inadvertent and he sent me whatever that pleading was.

16           THE COURT:  And what kind of law do you practice?

17           THE WITNESS:  Litigation, mostly--

18           THE COURT:  Like civil litigation?

19           THE WITNESS:  --patent litigation.

20           THE COURT:  Patent litigation.

21           THE WITNESS:  I'm a registered patent attorney, so

22   mostly patent litigation, but also banking.  I represent the

23   FDIC, so it's technically not banking, it's violations of the

24   regulations.

25  .          THE COURT:  Okay.

BLACK000782

194

1        THE WITNESS:  And when I received--I recall
2  receiving the order.  Actually I recall I think receiving the
3  first and the third order, and I call them that because the
4  second one never was issued by the Court.  I don't ever
5  recall seeing the proposed order, but my take on what Mr.
6  Black was doing was that--and in fact I have to say I didn't
7  even focus on the words disclaimer in that order.  My
8  understanding on reading that order was all of the money that
9  had been left to Joanne, paid on death was going into a
10  Supplemental Needs Trust of which I and Mr. Black would be
11  trustees.
12        I had no conversation with Mr. Black about the
13  issue trust.  I had assumed during--I had assumed that with
14  respect to the probate that at some point some of the money
15  out of the residual estate would go into an issue trust, but
16  Mr. Black never informed me that he had transferred that or
17  that he had funded that, so I wasn't even aware he had funded
18  the issue trust.  I had thought all of the money had gone
19  into Supplemental Needs Trust pursuant to the order Your
20  Honor had issued.  And so my understanding was the same I
21  think as the Court's understanding, and that is whatever
22  authorities you gave him, the result was he was going to
23  transfer everything on paid-on-death benefits into a
24  Supplemental Needs Trust release, hold it for Joanne's
25  benefit.

BLACK000783

195

1    I was under the impression that there was only two
2    million, or thereabouts in those assets because Mr. Black had
3    never given me a copy of an account statement, had never told
4    me how much was in there, and I did request to know that.  I
5    saw the account and report and my thought was that it had
6    gone from about two million to 2.4 million, so I thought it
7    had increased in value.  I had discussions with Ms. Wrigley
8    where she was saying she thought it had gone down in value.
9    But I had no idea there was $3 million in the paid-on-death
10   accounts.  I had no idea there was a Roth IRA.  I had no idea
11   that Mr. Black had transferred the Roth IRA assets to his
12   children, and he never told me anything about that, never
13   explained ever that he was going to take those paid-on-death
14   benefits and transfer a third of them to his and his
15   children's benefit or to an issue trust.  I know conflicts,
16   and I would have told him immediately you can't do that.
17         The first I learned that he had transferred money
18   into an issue trust was in 2014, and I actually think it was
19   late 2014, when suddenly he started sending me e-mails asking
20   that I improve--I approve reimbursements to him for his
21   children's tuition, student loans--no, actually not tuition,
22   I'm sorry student loans and other expenses.  And he--he
23   didn't actually--I think what he said was out of the Issue
24   Trust.  And that's the first time I had heard of it, so I
25   think I inquired internally.  I might have called Cherie.  I

BLACK000784

196

```
 1    might have called Ira Salzman at the time, because I was
 2    confused.  I didn't even know there was any money in an Issue
 3    Trust.  So I e-mailed Bernie--Bernard Black back saying I
 4    don't approve of this because I don't think there should be
 5    any money in these trusts and--because I thought all of the
 6    money had gone into a Supplemental Needs Trust, and I never
 7    heard back from him.
 8              I know that I've never had an e-mail exchange with
 9    him regarding his transfer of those paid-on-death benefits to
10    himself or his children, and I know what my intent was.  My
11    wife and I had made a number of trips in the years before
12    Renata had died to visit Renata.  And almost every one of
13    those trips, including just a few months before she died, she
14    wanted to discuss how Joanne would be taken care of in the
15    event of her death.
16              MR. POSKUS:  Objection, Your Honor, he's talking--
17    it's hearsay what his wife would have heard from Joanne.
18    That's actually double--from Renata.  That's actual double
19    hearsay.
20              THE WITNESS:  No, I'm saying my wife was with me on
21    those trips.  I'm saying what I heard, not what my wife
22    heard.
23              THE COURT:  Okay.
24              THE WITNESS:  Not from my wife; from Renata.
25              MR. POSKUS:  Okay.  I misunderstood that.
```

BLACK000785

1          THE WITNESS:  And this is my understanding from

2     what Renata conveyed to me.  She told me when I--we had a

3     discussion, I asked her why she hadn't funded the

4     Supplemental Needs Trust, and she told me that--that

5     eventually she would get around to it but that she had the

6     assets in Vanguard.  And she told me that she had left them

7     100 percent to Joanne Black.  I on two occasions, two of the

8     visits, I told her that that--that she has to move those into

9     a Supplemental Needs Trust.  I mean I didn't want to discuss

10    with her, you know, you're going to die.  But I said, look,

11    at some point if you pass away and those aren't in a

12    Supplemental Needs Trust, they'll go out right to Joanne.

13          On all of those occasions, she made it clear that

14    she wanted to make sure the money went to Joanne.  She didn't

15    want it to go to Bernie.  She didn't want it to go to his

16    children.  And ask Ms. Wrigley testified, she especially

17    didn't want it to go to the two youngest because that was a

18    second marriage and she believed both Bernard and his wife

19    could take care of those children.

20          On the very last visit, which was just I think two

21    or three months before she died, I had told her she needs to

22    --she needs to do something about those paid-on-death

23    benefits.  And after that, I think it was two weeks before

24    she died, she--we had a phone call.  We told her we're coming

25    out again and we talked about, you know, we would go for long

BLACK000786

198

```
 1   walks.  She liked to walk.  She mentioned--or not mentioned,
 2   she stated to me that she had changed the designations from
 3   100 percent to Joanne Black to 95 percent to Joanne Black and
 4   left one percent to each of the five children from his first
 5   marriage.  I told her that I--while I appreciate she's
 6   leaving one percent to each of those children, the bigger
 7   issue is that she shouldn't leave that outright to Joanne,
 8   and she was just adamant that she wanted to make sure Joanne
 9   had it.  She said if I die, you'll take care of it, Cherie
10   will take care of it.  You'll make sure she won't waste that
11   money.  And then of course we made plans to go out there.
12          But my understanding--that's what I was working off
13   of is that she actually had changed it from 100 percent to
14   Joanne Black to 95 percent, and I think that's consistent
15   with the Roth IRA.  She just hadn't changed that one; it was
16   still 100 percent.  So I never had a concept that any of that
17   money was going to go one-third to Bernard Black.  And if he
18   had ever mentioned that to me in a phone call afterwards, I
19   would have told him what his mother had said.  The times when
20   I went out to help also clean out the house after Renata
21   died, we discussed it, and I told him that his mother wanted
22   to leave all that money to Joanne Black.  And frankly, I also
23   didn't think it was all that fair.  I thought that he--you
24   know, that--that she should trust Bernard more.  But she made
25   it clear to me in all our conversations she did not trust
```

BLACK000787

199

1   him; she did not trust his wife.  She thought they would find
2   a way to take that money from Joanne and protect them and
3   their children, and that's why she had left the money in
4   Vanguard outright.  That was my understanding, so I know if
5   we ever had a discussion about a disclaimer that would have
6   given Bernard and his children one-third, I would have not
7   gone ballistic, but I would have absolutely told him that's
8   not true.  That's not what your mother wanted.  And again, I
9   didn't disagree--I didn't agree with her, but I know that's
10  what she told me she wanted.
11          And so, again, I had no concept of where that money
12  went.  And when I saw the pleadings, I absolutely read those
13  as all of the money is in--is being transferred to Joanne one
14  way or another.  It wasn't until Ms. Young started
15  questioning some of the accounts--accountings and reports of
16  Mr. Black that I started getting suspicious.  And I even
17  remember having conversations where I said he wouldn't do
18  that; there's no way he would do that.  And then when Ms.
19  Black--when Ms. Young hired Ms. Kerr, that was absolutely the
20  first time I realized he had taken one-third of those assets
21  and put them into an Issue Trust, because again I never
22  received a statement.  That was the first time, and I was
23  astonished that he had done that.  And even then I didn't
24  know about the Roth RA--when--IRA.  When I found out about
25  that, again, that was the first time I learned of that.

BLACK000788

1        With respect to the will, I had also known there
2   was another will because in the last--one of the last visits
3   to Renata Black, she had my wife and I sign an addendum.  She
4   hadn't shown me the will, but she showed me the addendum.
5   And the one discussion I had with Mr. Black is I signed that
6   addendum, my wife signed that addendum, but I did tell him I
7   don't understand it.  I still don't quite understand the
8   addendum, but she wanted us to sign it and we did sign it.
9        Subsequently, I saw a copy of--and maybe even the
10  original when we were--I think I saw the original of the will
11  that went with the addendum.  I was not part of the estate
12  process.  Mr. Black--you know, that was him, so I have no
13  idea how he decided which will to probate or why the one he
14  probated.  I had no part in that.  Nor did I really have an
15  issue with whatever the residue of the estate was.  If that's
16  to go two-thirds/one-third, I think that's fair.  I had no
17  issue with that.  Or whatever the other will said; I hadn't
18  looked at it in quite a while.  My understanding is whatever
19  the property that was left over, any other assets, that can
20  go whatever the will says.  If that's two-thirds/one-third,
21  that's fine.  I didn't really pay attention to that.  But I
22  knew those paid-on-death assets were supposed to go, the last
23  time I talked to Renata Black, 95 percent to Renata Black and
24  I never had another understanding about that until Ms. Kerr's
25  account.  So with that, I'll take your cross-examination

BLACK000789

201

```
 1   questions.

 2               THE COURT:  Okay.  Questions?

 3               MR. POSKUS:  Sure, Your Honor.

 4                       CROSS-EXAMINATION

 5   BY MR. POSKUS:

 6       Q    Let me just make sure I got your testimony

 7   straight.  I believe you said you never had a concept that

 8   any of the Vanguard money would go one-thirds, did I hear

 9   that correctly?

10       A    Never had a concept after I found--

11       Q    That's what I think you said.  I'm just trying to

12   clarify that you said that.

13       A    Not until we discovered it had gone that way.

14       Q    Not until you discovered after the disclaimer was

15   exercised?

16       A    Yes.

17       Q    Okay.

18       A    Yes.

19       Q    And you also testified that your mother--your

20   mother, I'm sorry, your aunt told you that she left the

21   Vanguard and the Fidelity 100 percent to Joanne Black?

22       A    Not quite.

23       Q    Okay.  I'm just--

24       A    I didn't know about Fidelity.  I didn't know she

25   had assets with Fidelity.  I only knew she had assets at
```

202

1   Vanguard because I also have assets at Vanguard and so I knew
2   just from conversing with her that we had the same person
3   that assists you there.   There's people that they assign to
4   you.
5        Q    When did you have this conversation with Renata?
6        A    I had a number of conversations with Renata over
7   probably the years 2010 to--well, let me back up.   From the
8   time we did the estate plan, I was part of that estate plan.
9        Q    Well, let me--let me just interrupt and say I meant
10  your conversation when she said I made the POD on the
11  Vanguard 100 percent to Joanne.   When did you have that
12  conversation?
13       A    Probably like maybe late 2011, early 2012.
14       Q    So not too long before her death?
15       A    Probably--it was definitely within a year before
16  her death, I'm pretty--well, no, I shouldn't say I'm pretty
17  sure.   I think within a year before her death, but we
18  probably had a total of five to ten conversations about it.
19       Q    So--
20       A    She called me all the time, by the way.
21       Q    So at the time of her death, it would have been
22  pretty fresh in your mind that she had said that, right?
23       A    Time of her death--
24       Q    Let's state on the record, when did she die?
25       A    I think it was May 1st or 2nd, 2012.

BLACK000791

203

1    Q    I'm told it's May 1st, so--

2    A    Yes.

3    Q    Okay.

4    A    Yeah, I think it would have been pretty fresh.   In

5  fact I know we had that conversation two weeks before she

6  died.

7    Q    Okay.  So let me ask you to take a look in the

8  exhibit notebook at Exhibit 106.

9    A    Yes.

10   Q    And can you identify this document?

11   A    It looks like an e-mail from Bernie to me.

12   Q    All right.  And that's the one at the top from

13  Bernie to you, Wednesday, May 2nd at 7:33 p.m.?

14   A    Yes.

15   Q    Okay.  And then below that there's what appears to

16  be an e-mail from you to Bernie May 2nd, the same date,

17  indeed just nine minutes before that.  Do you see that?

18   A    Yeah.

19   Q    And then before that, there's an e-mail from Bernie

20  from earlier that afternoon.

21   A    Yeah.

22   Q    Do you recall participating in this e-mail

23  exchange?

24   A    No, but I have no idea I did.  I'm not denying

25  that's an e-mail exchange we had, so--

204

1    Q    Okay.

2    A    --yeah.

3         MR. POSKUS:  Your Honor, I move to admit Exhibit

4    106.

5         THE WITNESS:  And I don't object.

6         THE COURT:  Okay.

7         THE WITNESS:  And in fact that--now that brings to

8    light the eyewitness handwritten addendum last December.

9         (Petitioner's Exhibit 106 was received in

10   evidence.)

11   Q    (by Mr. Poskus)  So this e-mail was sent the day

12   after Renata's death?

13   A    Yes.

14   Q    And at this time, it was fairly fresh in your mind

15   that she had sent 100--she had delineated 100 percent of the

16   Vanguard over to Joanne; is that correct?

17   A    No, that's not correct.

18   Q    I said it was fairly fresh in your mind?

19   A    No, no, no.  What she had told me is she changed

20   the designations, that she was leaving one percent to each of

21   his children.  And as a matter of fact, let me add to that.

22   Q    Oh.

23   A    I objected that the other children should also get

24   some money, and I didn't agree with the one percent.  But she

25   told me I changed it to one percent to each of the children,

BLACK000793

1    the adult children, and 95 percent to Joanne.

2         Q    Okay.  So and--so that knowledge was on your mind

3    on May 2nd, 2012, when you sent this e-mail; is that correct?

4         A    Apparently--that's not the subject of this, but

5    yeah I--I knew that, yes.

6         Q    And you didn't think to tell Mr. Black that the

7    Vanguard funds had been changed, at least to the best of your

8    knowledge?

9         A    I had no way of knowing whether Mr. Black knew it

10   or not.  I assume he would know that.  That's not the subject

11   of this e-mail.

12        Q    And indeed--

13        A    And by the way, let me add, this was--this then is

14   the day after she died.

15        Q    Um-hum.

16        A    So actually we were probably making plans to go out

17   for her funeral.  So, yeah, I knew that.  Did I include that

18   in this?  I'll read it, but maybe not.

19        Q    Indeed, the third to the last sentence says,

20   "Generally, Joanne has a life estate in a fixed amount and

21   then there appears to be a two-thirds/one-third split between

22   Joanne and your first five children with some conditional

23   provisions for you."  Do you recall writing that?

24        A    Yeah, this is related to the will.  I'm telling

25   him--I'm essentially reading it out to him in an e-mail.

BLACK000794

206

1    Q    But you left out the fact that Joanne was going to
2  get 95 percent of the Vanguard; is that correct?
3    A    That wasn't even part of this discussion.  Yeah--
4    Q    Okay.
5    A    --I mean I guess--let me say that to be fair, yes I
6  did leave that out.  What this is, is I'm asking him if he
7  has a copy of this, because just--we're now talking May.  So
8  six months before that she had my wife and I sign this
9  handwritten addendum, and I'm explaining to him her
10 handwriting isn't clear to me.  And I was explaining to him
11 what was in that, because I didn't know he had it.
12   Q    Let me ask you something else.  This is another
13 part of your testimony, and tell me if I've got it wrong.
14 You said the first time you heard of the Issue Trust was when
15 you got the tuition--
16   A    No.
17   Q    --request from Bernie Black?
18   A    No, no, no.
19   Q    Okay.  So--
20   A    That--
21   Q    --tell me what your testimony was.
22   A    I knew about the Issue Trust in 1997.  I was part
23 of the process of setting up the estate plan.  What Renata
24 had not done--and again, my wife and I made so many trips out
25 there and variably in many of them it would come up, are you

207

1    ever going to fund these things.  And so my understanding

2    was, from what she told me, she had minimally funded them

3    just to keep them active in accounts at Vanguard.  But--so I

4    knew about the Issue Trust.  What I'm telling you is the

5    first I learned that Bernie had funded that Issue Trust, that

6    he had put this paid-on-death a third of those assets into

7    it, was when he started sending me e-mails asking me to

8    approve reimbursements.

9         Q    I see.

10        A    So that's the first I knew he had transferred, but

11   I knew about the Issue Trust in 1997.

12        Q    Okay.  Then I misunderstood your testimony.  Let me

13   ask you this: So did--you said you had no idea that he had

14   funded the trust; am I correct?

15        A    I had no idea, frankly--no, that's correct.  Yeah,

16   I'm sorry.

17        Q    And did you know--have any idea of where the Issue

18   Trust accounts were?

19        A    Absolutely not.

20        Q    Absolutely not, okay.  Let's take a look at Exhibit

21   68.  I'll ask you, sir, do you recognize that document?

22        A    Yeah, I absolutely recognize that document.

23        Q    What is this document?

24        A    That's a document--and there's--

25        Q    Just tell me do--tell me what the document is.

BLACK000796

1      A    It's a document I received from Chase which would

2  allow Bernard and I, as I understood it, to open up an

3  account, and there should be another one for the Supplemental

4  Needs Trust.

5      Q    But is that your signature there?

6      A    That--yes, that's my signature.

7      Q    So a moment ago when you said you had no idea where

8  the accounts were for the Issue Trust, would you want to

9  change that testimony?

10     A    No, I don't want to change that testimony.

11     Q    And did you sign this document on May 4th, 2013?

12     A    I absolutely--well, I doubt it would have been May

13 4th, because that's not my handwriting on the date, but

14 probably around then.

15     Q    Around then?

16     A    Yeah.

17     Q    All right.  So this is the document that you

18 signed?

19     A    Yes.

20     Q    And that's your signature?

21     A    Yes.

22          MR. POSKUS:  Your Honor, I move to admit Exhibit

23 68.

24          THE COURT:  Admitted.

25          (Petitioner's Exhibit 68 was received in evidence.)

209

1           THE WITNESS:  But this isn't an account opening

2    document.

3           MR. POSKUS:  Excuse me, Your Honor, move to strike,

4    non-responsive.

5           THE WITNESS:  I guess I'll do it in a narrative

6    when you're done.

7           THE COURT:  That's fine.

8           MR. POSKUS:  Thank you, Your Honor.

9      Q    (by Mr. Poskus)  What's your--what's your mailing

10   address, sir?

11     A    My home mailing address?

12     Q    Well, what--well, perhaps I ought to ask it this

13   way.

14          THE WITNESS:  And, Lisa, would you get me my tea?

15   Thanks.

16          THE COURT:  I'm sorry?

17          THE WITNESS:  My tea.

18          MR. POSKUS:  My tea.

19          THE WITNESS:  Yeah, thanks.  I just would get out,

20   but I'll probably trip getting out of this thing.  I didn't

21   mean to make you a--thank you.

22     Q    (by Mr. Poskus)  Mr. Dain, my question is, if I

23   were to send you mail to 13272 Capstone Drive, San Diego,

24   California 92130; is that--would it get to you?

25     A    I don't know.  That's the point I had with Mr.

210

1   Glatstein.  You can say you're sending it, but Mr. Glatstein

2   admitted to me that they had omitted sending me something,

3   so--

4       Q   Well, hold on.  That's not--

5       A   --it should get there.

6       MR. POSKUS:  Your Honor, move to strike; non-

7   responsive.

8       THE COURT:  Let's just assume for the moment.

9       THE WITNESS:  Okay.  It should get there, yes.

10      Q   (by Mr. Poskus)  It should get there.  That's your

11  correct mailing address?

12      A   It is.

13      Q   All right.  Now, did you receive a copy of the

14  initial petition that was filed by Mr. Glatstein?

15      A   To be honest with you, I don't recall receiving

16  that.  I--my recollection is of the order.

17      Q   You received the order but you didn't receive the

18  initial petition; is that correct?

19      A   No, not--not correct.  I don't recall receiving the

20  petition.  I could have received it; I'm not going to say I

21  did or didn't.  What I--my memory is of reading particularly

22  the March 5th order.

23      Q   So you're--we're talking about stuff that happened

24  now, like two years and eight months ago, so your memory of

25  that wouldn't be clear?

1      A    No, I'm just saying I don't recall receiving the

2  petition.  I do recall the order.  That I remember.

3      Q    Did you receive anything else other than the order?

4      A    Oh, I received--I believe I received that account

5  report.  The first one I know for sure.

6      Q    Okay.  Did you receive an amended petition for

7  appointment of special conservator?

8      A    Don't have a recollection of that.

9      Q    You don't have--

10     A    I don't know whether I did or not.

11     Q    --a recollection of that.  Let me ask you this.

12  Let me ask you to turn to Exhibit 10.  Did you receive that

13  pleading?

14     A    I have no recollection of that.

15     Q    Okay.  Turn to page 2 of Exhibit 10.  And would you

16  agree with me that under Certificate of Service the address

17  that's listed for your name is the address you and I just

18  discussed?

19     A    Yes.

20     Q    So you were receiving pleadings sporadically.  Did

21  you--strike that.  Strike that.  You began your testimony by

22  saying you don't recall having a telephone conference with

23  Bernie Black in July of 2012, as he testified to.  Do you

24  recall--do you remember that testimony?

25     A    Yeah, I don't have a recollection of any phone call

1    in July of 2012.

2         Q    All right.  Okay.  Now I'm going to read to you a

3    question and answer that you had with my client on the 16th

4    of June, and I'll ask you if you'll recall this exchange.

5         A    Okay.

6         Q    The question from you--and for the record, this is

7    on page 29 of the transcript of the July 16th hearing

8    starting at Line 17.  Question, "Okay.  And how did that

9    first come to you that you decided to seek court approval to

10   disclaim assets so they would go into the estate of your

11   mother?"  Answer, "So, again, I don't want to think about

12   this as just how did it come to me.  This evolved out of a

13   series of discussion with partly my question, partly with

14   Cherie Wrigley.  I had one conversation with you that I

15   recall as to what the alternatives were and what the--what

16   the consequences to Joanne were of different alternatives."

17   Question, "And you recall from your conversation with me that

18   I said you should go to court and ask the court to freeze or

19   block the assets, correct?"

20             Does that refresh your memory regarding having that

21   conversation with my client?

22        A    That wasn't a conversation we had in July.

23        Q    Okay.  But was it--

24        A    I can tell you when that conversation was.

25        Q    Okay.  Tell me when that conversation was.

1    A    It was shortly after either--I think it was a
2    little after the funeral for Renata, when we were discussing
3    that there was money that had been left outright to Joanne.
4    I didn't know where Joanne was.  And we discussed a concern
5    about how to protect that money.  And my only concept--I
6    didn't think guardianship, conservatorship particularly, was
7    you should go to court and get the money frozen so that it
8    doesn't go directly to Joanne.  That was not a July
9    conversation to my knowledge.  And again, my focus was more
10   on just making sure Joanne was protected, so that's what--
11   Q    But you did have--
12   A    --that conversation was.
13   Q    --But did you have a conversation with Mr. Black,
14   as he testified, that you discussed what the alternatives
15   were and what the consequences to Joanne were, the different
16   consequences?
17   A    Not alternatives.
18   Q    Okay.
19   A    Not alternatives.  The only thing we discussed was
20   going to court to freeze the assets.  And in fact that was
21   my--that would--that's my kind of a concept, because I don't
22   know how you do it, but you could get them frozen.  I was
23   thinking a blocked account or a frozen account of some kind.
24        MR. POSKUS:  Just one second, Your Honor.
25        (Pause.)

214

1    Q    (by Mr. Poskus)  And a moment ago you said that the

2  funeral you were talking about how Joanne had gotten money

3  directly, outright.  And who did you have those conversations

4  with?

5    A    I know I had a conversation with Bernard, but here

6  --you want to know the exact conversation?

7    Q    Well, no, I want--first of all, answer my question.

8  Who did you have the conversation with?  You said you had one

9  with Bernard.

10    A    For sure with Bernard.

11    Q    And anyone else?

12    A    I don't know.  I don't know whether I discussed it

13  with my sister or not, but I--if you want to know the

14  conversation, I can explain it to you.

15    Q    But--and so at that--at that time, I believe your

16  testimony a moment ago is you said that Joanne was going to

17  get money outright; am I correct?

18    A    That was my assumption.  I hadn't seen the

19  accounts, didn't know how much was in there, didn't have

20  access to them, couldn't verify--as I said, I knew nothing

21  about Fidelity.  But I discussed with him what Renata had

22  discussed with me.

23    Q    And you did that, and you did that based solely on

24  your discussion with Renata, as you've testified to, right?

25    A    Discussions.

215

1    Q   Okay.  Discussions.  But yet you didn't raise it

2 with Mr. Black in your May 2nd e-mail, which would have been

3 sent just a few days before the funeral?

4    A   No, and that was because--

5    Q   Okay.

6    A   --I was concerned--I knew he was the executor.  I

7 was not the executor of her estate, so that would have been a

8 conversation about does he have a will.

9    MR. POSKUS:  Nothing further, Your Honor.

10    THE COURT:  Okay.

11    THE WITNESS:  Can I respond then?

12    THE COURT:  Just one second.

13              REDIRECT EXAMINATION

14    THE WITNESS:  So Exhibit 68--an let me give you the

15 kind of background of that.  As Ms. Wrigley testified, I

16 understood the paid-on-death accounts with Vanguard, so what

17 I was understanding is that Mr. Black wanted to open up new

18 accounts at Chase that would be used--and this one I think is

19 the trust for the benefit of the issue of Renata Black and

20 one for the Supplemental Needs Trust.

21    This was, in my understanding, for two things.

22 This Issue Trust was for his estate, the estate of Renata

23 Black, because he wanted the money at Chase, not at Vanguard.

24 So this is not actually an account opening statement; it's

25 just--

BLACK000804

216

```
 1              THE COURT:  I see it.  I see that at Paragraph 3.
 2              THE WITNESS:  Yeah.  And so what he never did was
 3      show me any evidence that he actually opened one; that was my
 4      point.  So I'd assumed when this probate--when the probate
 5      estate closed, there would be some money that would go into
 6      the Issue Trust, but this doesn't in any way reflect that I
 7      knew he would open up an account where he would put a third
 8      of the assets.
 9              THE COURT:  Right.
10              THE WITNESS:  The other thing, with respect to the
11      conversation, I think the reason--and I can't remember the
12      details of why the will came up on May 2$^{nd}$, but I think what
13      was worrying me was six months before we had signed that
14      addendum--and I don't know if Renata had ever given it to
15      Bernard or if he knew what was in it, and I thought--I forget
16      what our exchange was, but I know at some point I told him we
17      just talked to her two weeks ago and--and so I can't remember
18      if there was something that prefaced this, but this was more
19      to tell him just in case you need to know, there is a will--
20      there's a will and an addendum and we had just signed it.
21      And I think if you read that I was explaining to him that.
22      That in this addendum and the will that I recalled that's
23      where the two-thirds/one-third is being discussed, and then
24      he responded to me about that.
25              But then when we came out for the funeral, I know I
```

BLACK000805

217

1    discussed with him my concern that there was some money I

2    understood at Vanguard had been left primarily to Joanne and

3    in small part to his children.  So I may have said 95

4    percent/5 percent or I may have just in general, but we did

5    talk about how to protect that money from going outright to

6    Joanne.  And I know that refreshes my recollection.  I would

7    have used the word "freeze" or "block," because those are two

8    things I would have thought of; can we block those accounts

9    or freeze those accounts.

10          THE COURT:  All right.

11          THE WITNESS:  Okay.

12          THE COURT:  And--and--so based on what you're

13    saying then, there really isn't any question about whether

14    your aunt made a mistake?

15          THE WITNESS:  Not in my mind.  Absolutely not.

16    Now, understand, when you're saying mistake, do I think it

17    was fair?  I really didn't at the time.  I understand it now.

18    I do, but not a mistake.  She absolutely was in her right

19    mind and she knew what she was doing.  And she was upset with

20    Bernie.  She didn't like his new marriage.  She didn't like

21    his wife.  Frankly, she didn't like his old wife either.  And

22    I mean part of that's on her.  I don't think--I don't want to

23    blame--

24          THE COURT:  Has nothing to do--

25          THE WITNESS:  Yeah.

218

```
1            THE COURT:  --particularly with Mr. Black or his
2    wives.
3            THE WITNESS:  Right.  And I was telling her, I
4    don't think--I told her, you're micromanaging these things.
5    I don't think it's fair.  And I know she said, you know, I
6    want to leave something to--to Bernie's children by the first
7    marriage.  I told her I thought that was mean, she should
8    leave something to all her--all his children, but she did
9    make it clear to me that she had done that.  That went from
10   100 to 95.  And again, I don't want to say what my wife told
11   her, but I told her two things.  One, I didn't think that was
12   fair; I thought it should have been more.  I didn't tell her
13   how much more.  And--but I understood why she was worried
14   about Joanne, and I understand it more now.  But I also told
15   her she should put it into the Supplemental Needs Trust, and
16   two weeks later she died.
17           THE COURT:  Okay.  So you were saying you thought
18   the grandchildren should have gotten more?
19           THE WITNESS:  I do, but again I--
20           THE COURT:  I mean in terms of what you told her
21   that day?
22           THE WITNESS:  Yes.  Yeah, I can--okay.
23           THE COURT:  And you were talking about all her--the
24   seven grandchildren?
25           THE WITNESS:  I can tell you, I could--I remember
```

BLACK000807

219

1   it so vividly because my wife and I had just pulled into a
2   Costco where we live and we were talking to Renata.  We--she
3   called me all the time and we called her.  We were worried
4   about her.  She was in her 80s and she lived alone, and her
5   boyfriend was older than she was.  So we were talking and we
6   were in the parking lot stopped and we were having this
7   conversation.  And we said we were going to come out there
8   and she mentioned that she had taken our advice and had
9   changed the designations.  And she told me, "I left one
10  percent to each of the adult children."  That's what she
11  said.  And I said, okay, I appreciate that you've done that.
12  I don't think it's fair.  I won't say what my wife said,
13  although it was supportive of me.  I said I don't think it's
14  fair that, you know--we never discussed how much she had in
15  there, by the way.  But I said, you know, one percent just to
16  me didn't sound right.
17          She never--by the way, this was all part of it, she
18  did not want to leave any money to Bernie; that's why it was
19  always the kids.  And I said, but you should also leave it to
20  all seven.  And she explained to me why she's--she said
21  Bernie and his wife can take care of their children.  They
22  both have teaching jobs.  Those children are protected.  I'm
23  worried about the five other children, that they should get
24  something.  But again, the discussion then went on about
25  where is Joanne and how worried she was about Joanne and

BLACK000808

1    could she--and then she said, don't worry about me.  If

2    anything happens, I know you or Cherie will make sure that

3    Joanne doesn't squander the money.  And then we talked about

4    we would be out there in two--we were going to come out there

5    I think it was about two or three weeks, so she died right

6    around the time we were planning to come out there to visit.

7            But it was not a mistake.  I know--I know Renata.

8    I--I--

9            THE COURT:  Okay.  Any other questions based on

10   what I've just asked?

11           MR. POSKUS:  Yes, Your Honor, real briefly.

12                    RECROSS-EXAMINATION

13   BY MR. POSKUS:

14        Q    Would you agree with the statement that Joanne

15   shouldn't manage money on her own?

16        A    Absolutely.  Well, wait a minute, let me back up.

17        Q    Sure.

18        A    Today or then?

19        Q    Well, let's start with then.

20        A    Then, absolutely.

21        Q    Absolutely she should or should not manage?

22        A    Should not have.

23        Q    Okay.  And was Renata aware of Joanne's

24   difficulties, her mental difficulties?

25        A    Yes, Renata was aware.

BLACK000809

1    Q    And you testified that she said you guys will make

2  sure Joanne doesn't squander the money.  But even on this

3  other will you talk about, who did she name as the personal

4  representative or executor?

5    A    At my insistence, Bernard.

6    Q    I see, it was at your insistence?

7    A    Same reason he's also a trustee on these trusts.

8    Q    Okay.

9    A    I believed in him more than she did.

10          MR. POSKUS:  Nothing further, Your Honor.

11          THE COURT:  Okay.

12          THE WITNESS:  Thank you, Your Honor.

13          THE COURT:  Okay.  Any further evidence at this

14  point?

15          MR. DAIN:  Your Honor, I'm going to call for a

16  brief surrebuttal.  First of Bernard Black.

17          THE COURT:  Okay.

18                    BERNARD BLACK,

19  called as a witness herein, having been previously sworn, was

20  examined and testified as follows:

21                  REDIRECT EXAMINATION

22  BY MR. POSKUS:

23    Q    Mr. Black, you just heard Mr. Dain testify that he

24  told you, and I believe it was at the funeral or right after,

25  about these POD designations.  Do you recall that testimony?

BLACK000810

222

1      A     I recall the testimony.

2      Q     And tell me what your side of that story is.  Did

3   you have the conversation with him that he says you had?

4      A     That testimony is a complete fiction.

5      Q     Okay.  Did you have any kind of a conversation with

6   him at the funeral over what was going to happen to Renata's

7   funds?

8      A     Yes, I did.

9      Q     And what was that conversation at--and by the way,

10  at the funeral, you testified earlier that you didn't know

11  about the POD designations until you heard from Vanguard.  So

12  at the funeral, what was your conversation with him at that

13  time?

14     A     So his--his conversation with me was that he felt

15  bad that two-thirds of my mother's estate was going to go to

16  Joanne, and he always thought it should be 50/50.  And I

17  said, no, I knew about two-thirds/one-third.  I agreed with

18  two-thirds/one-third.  I thought Joanne needed to be taken

19  care of first because I was fine on my own and I was

20  perfectly happy with two-thirds/one-third.  There was no

21  mention of POD benefits.  I had no knowledge of POD benefits.

22  His recollection is a complete fiction.

23     Q     Was there anything else in his testimony that you--

24  with regard to at least his interactions with you that you

25  feel you would like to respond to?

BLACK000811

223

1      A     Yes.  So I spent three-plus months in 2013 trying

2  to get Anthony Dain to sign forms, among other things, to

3  open up bank accounts at Chase so that I could move funds

4  from Vanguard to Chase and put money into the Supplemental

5  Needs Trust and the Issue Trust, because they were at Chase.

6  My mother had put them at Chase.  The trusts were at Chase,

7  and I decided to leave them there.

8          And I had a series of e-mails, phone calls saying,

9  "Tony, I need you to move, right."  At this point we were

10 spending huge amounts of money on--mostly on Esaun Pinto, on

11 a rescue of Joanne, and that money was supposed to come out

12 of the Supplemental Needs Trust.  And I was leaving messages

13 saying I need you to sign the account open forms so that I

14 can move money from Vanguard to the trusts at Chase.  This

15 was a reference to trusts plural, to the Supplemental Needs

16 Trust and the Issue Trust.

17     Q     So let me ask you this.  Take a look at Exhibit 68

18 that we've been referring to.

19     A     Yes.

20     Q     There's a signature on there that appears to be

21 yours.  Is that yours?

22     A     Yes, it is.

23     Q     Was that one of the forms you were trying to get

24 Mr. Dain to sign?

25     A     Yes, this was an account opening form that Chase

BLACK000812

224

1    needed for the Issue Trust, and it was a similar form for the

2    Supplemental Needs Trust, and it was a similar form for the

3    Joanne Black 2013 Trust.

4         Q    Did he sign those?

5         A    Yes, he did.

6         Q    Did he sign any other documents to enable you to

7    open up the accounts for those three trusts?

8         A    So we also went through creating the Joanne Black

9    2013 Trust, which is a little bit off to the side, and adding

10   Samuel Black as a co-trustee to the Supplemental Needs Trust

11   and then having the same three co-trustees of the Joanne

12   Black 2013 Trust.

13             I'm not recalling other account opening documents.

14   No, yeah, there was.  And I don't know what there was, but I

15   remember it was this and then Chase wanted something else, so

16   I had to send him more documents to sign, and that was

17   another big hassle to get him to sign.  I just don't remember

18   exactly.

19        Q    So who sent him Exhibit 68?

20        A    I did.

21        Q    It was you?

22        A    Yeah.

23        Q    Did he call you back or contact you and say what's

24   this for because I don't know about any Issue Trust?

25        A    No.

BLACK000813

225

1    Q    And were you able to have any discussion with him
2    about what that was all about?
3    A    No, just a series of pleading e-mails and phone
4    calls saying please sign this; I've got to get the accounts
5    open; I've got to get the money moved from Vanguard into the
6    trust at Chase; please sign this, we're running out of time
7    to do this.
8    Q    And did he do it?
9    A    Eventually he did, after many urgent requests.
10   Q    Okay.  Anything else in his testimony you would
11   like to respond to?
12   A    I was just listening and thinking this guy is such
13   a slippery liar.  This is such a complete pack of fiction.
14   His sister is as bad or worse.  We worked with Cherie
15   extensively on the disclaimers, on what we should do about
16   the POD designation.  We did this in 2012.  I remember a
17   letter that I wrote to Vanguard on July 20th, 2012, shortly
18   after I got the July 11th letter from Vanguard about the 95
19   percent POD basically saying to Vanguard we're either going
20   to challenge the POD or, in effect, a little bit less
21   clearly, but we're going to go get--you know, get a
22   disclaimer in--of the POD benefits.  This was an attempt to
23   get Vanguard to freeze the accounts.  In that letter, I say
24   the most likely conservator or was guardian--I forget the
25   term--is Anthony Dain, and that was based on my phone

BLACK000814

226

1   conversation with Anthony Dain where I asked him to be the
2   conservator so that he could petition to disclaim Joanne
3   Black's assets into the Renata Black estate.  And he knew
4   perfectly well how the Renata Black estate worked; it went
5   two-thirds/one-third.
6           I'm also remembering that he testified in New York
7   --or he didn't testify; he got up and made a speech saying to
8   the New York Court, we all understood that the Supplemental
9   Needs Trust was only going to get two-thirds.  He then went
10  on and said we thought Joanne would get the third third in
11  some other way.  But he was very clear in New York.  He
12  understood that the Supplemental Needs Trust was only going
13  to get two-thirds of the disclaimed assets.  And it's readily
14  apparent from the documents that he received that there is no
15  other third.  There is two million plus market appreciation
16  in the Supplemental Needs Trust.  There is no third million
17  anywhere else.  My account inventory shows two million in the
18  Supplemental Needs Trust.  There is no third million.  He
19  received that inventory.  He didn't raise an objection.
20  Cherie Wrigley received that inventory; she didn't raise an
21  objection.  They received the probate petition that said
22  three million payable-on-death benefits.  They received the
23  inventory that said two million in the Supplemental Needs
24  Trust.  Nobody raised an objection.
25          Gail Young knew about three million in POD benefits

BLACK000815

227

1  and two million in the Supplemental Needs Trust, didn't raise

2  an objection.  Lisa DiPonio knew about three million in POD

3  benefits, two million in the Supplemental Needs Trust; she

4  didn't raise an objection.  All of this is consistent with

5  everybody understood and I believe that everybody understood

6  that under the disclaimer the assets would go into the

7  estate, they would go under Article 4th.  And then as it says

8  very clearly in the proposed order, two-thirds will go into

9  the Supplemental Needs Trust.  So I'm just puzzled as to how

10 anyone could possibly think that three-thirds would go into

11 the Supplemental Needs Trust.  That doesn't make any sense as

12 an explanation of what we wrote in the proposed order.

13         If three-thirds were going to go to Joanne, we

14 would have said three-thirds were going to Joanne.  I

15 explicitly wanted to say two-thirds to make it doubly clear

16 that Joanne wasn't going to get 100 percent; she was only

17 going to get two-thirds.  And Anthony Dain saw the two-thirds

18 language, otherwise he wouldn't have spoke the way he did in

19 New York.  I don't understand how he can ever think that

20 three-thirds was going to go into the Supplemental Needs

21 Trust.

22    Q    Let me ask you something about Ms. Wrigley's

23 testimony.  Ms. Wrigley did testify that you and her had

24 talked about Joanne exercising the disclaimer; am I correct?

25    A    Yes.

BLACK000816

228

1     Q    Okay.  And she also testified that you had some
2  conferences regarding money payments that you were making I
3  believe either weekly or monthly for--so that Joanne would
4  have some money to live on?
5     A    Yes.  So at the time of her death, my mother was
6  sending $280 a week to Joanne.  And I continue that initially
7  and then decided $280 a week really isn't that much, okay,
8  plus Social Security Disability.  And I chose on my own--this
9  was not Cherie asking; this was me doing it--I chose--like I
10  want Joanne to have more money to live on, so I raised that
11  amount to $500 per week, and that would have been sometime
12  during 2012.  I don't remember exactly when.
13     Q    Now--now, Ms. Wrigley cast some doubt on the idea
14  that this whole dispute arose when you denied a reimbursement
15  request for her.  Do you recall that testimony?
16     A    Yes, I do.
17     Q    Okay.  So tell us first of all what the
18  reimbursement request was and why did you deny it.  First of
19  all, let me ask you this.  Is that when all this started when
20  you denied that particular reimbursement request?
21     A    Yes.  Until I denied Cherie Wrigley's reimbursement
22  requests, I was working with Cherie Wrigley, not always
23  without conflict but cooperatively.  I was concerned about
24  the level of spending on Esaun Pinto, but I was working with
25  Cherie Wrigley.

229

1      Q      And indeed she made some trips from California to

2  New York to help Joanne out; am I correct?

3      A      So Joanne was hospitalized in June of 2013--

4      Q      Um-hum.

5      A      --and remained hospitalized until late October of

6  2014.  For a long part of that period, she didn't want to see

7  anybody.  As she gradually improved, and Joanne's history is

8  it takes a long time for the medication to get hold--take

9  hold, then she gradually gets better.  Then she gets out and

10 eventually goes off medication and spirals down again.  But

11 she was gradually improving.  And I arranged with Ms. Wrigley

12 and with Esaun Pinto for Cherie to go out and visit Joanne in

13 July of 2013.  This was a short visit.  She spent three days

14 in New York, and she did that with my approval, that I would

15 fund it out of Joanne's assets.

16         And maybe a month later, she sent me back a--let me

17 call it an expense demand, and I would have looked at that,

18 you know, some number of days after she sent it.  And frankly

19 that expense demand completely floored me.  She--

20     Q      What floored you about it?

21     A      She wanted reimbursement of almost $7,000 for a

22 three-day trip.  She wanted reimbursement of $2,600 for first

23 class travel.  I was paying Esaun Pinto 8,000 a month, which

24 I thought was crazy and was trying to bring down over his

25 objection and her objection.  She wanted to pay Esaun another

230

1   $2,300 on top of the 8,000 basically for going with her to
2   visit Joanne and being her chauffeur in New York for three
3   days.  That was at least as outrageous as the first class
4   travel.  She wanted $200 in unallocated per diem.  And then
5   she wanted some more reasonable things, like hotel and, you
6   know, taxis and so on.  The total was $6,900.  And I wrote
7   her when I saw this--she was about to take a second trip
8   again with my approval, and I wrote her an e-mail on
9   September 1st saying I will not approve first class travel.
10  I think, you know, more to come, but I didn't want her to be
11  any doubt that her second trip I was willing to pay for first
12  class travel.
13          We have not had a civil conversation since.  I
14  attempted initially in September to say to Anthony Dain let's
15  talk.  I thought he was a reasonable person.  Cherie
16  Wrigley's expense demand nobody as a conservator can pay
17  that.  That's just crazy.
18      Q    Tell me, when was the trip Cherie Wrigley made that
19  this dispute arose out of?  When was that?
20      A    Late July of 2014.
21      Q    Okay.  And was there any dispute about how you were
22  handling things prior to that?
23      A    There was no dispute about what I was paying for
24  and what I was not paying for.  In late June, Cherie got
25  upset that the trusts were at Chase instead of at Vanguard,

BLACK000819

1    and so she had--you know, let me call it a screaming phone

2    call with me where she claimed that this was completely wrong

3    and it was against my mother's will and how dare you move the

4    money from Vanguard to Chase, and Renata would never have

5    wanted this, and I can prove it in writing.  All of that is

6    complete fiction too because the trusts were at Chase.  And

7    what I did is I took the assets, which were at Vanguard, and

8    moved them in kind to sit underneath the trusts.

9         Q    Let's be clear, because I'm not sure if this came

10   out on June 16th and 17th.  Who is Esaun Pinto and how is he

11   involved in all of this?  And before you answer, let me see

12   if I've got the spelling correct.  Is it E-S-U-A-N?

13        A    E-S-A-U-N.

14        Q    And then P-I-N-T-O?

15        A    Yes.

16        Q    Okay.  Just so that the record is clear.  And who

17   is he and how is he involved in this?

18        A    He is a private investigator of some sort.  He has

19   his own firm called CPI Investigations in New York.  And from

20   somewhere in the past he apparently had some connection with

21   Joanne.  And Ms. Wrigley found Esaun Pinto and arranged for

22   Esaun to go out to Denver and basically talk Joanne into

23   coming back to the East Coast.  And then I just started

24   getting let me call them astronomical bills from Esaun Pinto

25   and I engaged in a year-and-a-half fight to try to bring him

BLACK000820

232

1   down to a reasonable level.  I learned afterwards that on top
2   of his outrageous bills he was stealing money from Joanne.  I
3   learned that on top of his outrageous bills, which were
4   supposedly for visiting three times a week, he was actually
5   only visiting about once a week.
6           I was fighting during that entire period to bring
7   his expenses down.
8       Q    Were you fighting with Mr. Pinto or were you
9   fighting with anybody else?
10      A    I was fighting with both Mr. Pinto and Mr. Wrigley.
11      Q    Ms. Wrigley?
12      A    Ms. Wrigley.  And I now thing that, you know, he
13  was just a scam artist from day one and I was never going to
14  succeed until I just cut him off.
15      Q    And when Ms. Wrigley--Ms. Wrigley testified that
16  she never--that you never told her during your--that two or
17  three month period where she was helping you get the
18  disclaimers from the kids and she was trying to--she was
19  considering helping you get a disclaimer from Joanne, she
20  testified that you did not tell her about the two-thirds/one-
21  third division.  What is your response to her testimony?
22      A    That's false.  We discussed it.  The disclaimer
23  plan as an alternative to litigation was a joint plan.  We
24  discussed it extensively.  We had multiple phone
25  conversations over a period of months.  And with regard to

BLACK000821

233

1    Rebecca, we had multiple phone calls over Rebecca because
2    Rebecca was a linchpin of the whole plan.  Because if Rebecca
3    wouldn't sign her one percent down to zero, there was going
4    to be no disclaimer, right.  I couldn't--I needed all five
5    older children to go down from one percent to zero or nothing
6    was going to happen.  So that was a difficult conversation it
7    was hard for me to have directly with Becca, so I asked
8    Cherie to intercede.  I then sent Cherie, here's the
9    disclaimer.  Then I think a day later I sent her this talking
10   points e-mail.  This was in early November of 2007.  And as
11   part of that, we arranged for Rebecca to take the train down
12   from Santa Barbara to Thousand Oaks, where Cherie was, and
13   the Cherie drove Rebecca to meet me in Los Angeles, because I
14   was at a business meeting in Los Angeles.  And so Cherie
15   brought Rebecca to me.  I brought, as the e-mail said, her
16   Social Security card and her birth certificate.
17          Cherie came--Cherie and Becca came to the law firm
18   office where I was.  I had her come there because there was a
19   notary there and I needed to get Rebecca to sign and then get
20   her signature notarized.  And we were able to get Rebecca to
21   sign the disclaimer, to sign the disclaimer of her one
22   percent.  And then I confirmed that in an e-mail to Cherie on
23   November 7th talking about, you know, difficult conversation
24   with Rebecca.  But the most important thing that had to
25   happen happened, which was the disclaimer.

234

1      Q   And then this e-mail that we're going to have to

2   print out, Exhibit 111. When you said to Cherie, "Get her to

3   sign so she'll get more--her one percent and more," what did

4   you mean by that more? What was more?

5      A   More was her share of the Issue Trust, because

6   under the overall disclaimer plan, the Issue Trust was going

7   to one-third of the Vanguard assets. So I've got seven kids;

8   she's going to get one-seventh of one-third, so call that

9   five percent. And five percent is more than one percent. So

10   the argument for Rebecca, and this is partly in an e-mail and

11   partly in phone calls, was the way we persuade Becca is you

12   can get one percent now, but if you wait you'll get more, and

13   I promise you you won't lose the one percent.

14      Q   Did Cherie call you and say what do you mean by

15   that and more?

16      A   No, we had conversations about how Cherie was going

17   to get Becca to me in Los Angeles, you know, whether it made

18   sense for me to come up to Thousand Oaks, and it didn't

19   because we didn't have a good way to get a notary in Thousand

20   Oaks, but we thought about that as a possibility--discussed

21   that as a possibility, and then we decided it was better to

22   bring Becca down to Los Angeles because I had a notary on

23   premises at the law firm in Los Angeles.

24      MR. POSKUS: Nothing further, Your Honor.

25      THE COURT: Anything?

235

```
 1            MR. DAIN:  Yes, Your Honor.
 2                      RECROSS-EXAMINATION
 3    BY MR. DAIN:
 4       Q    Now, you're testifying today under penalty of
 5    perjury?
 6       A    Yes.
 7       Q    You said I made a statement in New York that the
 8    disclaimed assets were going to go two-thirds into a
 9    Supplemental Needs Trust and one-third into an Issue Trust;
10    you said that just now?
11       A    No, that's not what I said.
12       Q    Please again say it.
13       A    You made a statement to the New York court that, as
14    I recall--and we can pull up the New York transcript if you
15    like--"We all understood that the disclaimer and the two-
16    thirds," and then you continued, "we all thought the third-
17    third was going to go to Joanne in another way."  But you
18    specifically referred to two-thirds in your statement to the
19    New York court.  You said, "We all understood."  Now, I don't
20    know who "we all" is, but we all certainly includes Cherie,
21    given the overall context of this case.
22       Q    So let's start with you weren't there, correct?
23       A    I was not physically there, that's right.  This is
24    from the transcript.
25       Q    Okay.  And you have the transcript?
```

BLACK000824

236

1        MR. DAIN:  Counsel, do you have the transcript?

2        MR. POSKUS:  Yes, it's Exhibit 107, and the

3   exchange that he's referring to I believe is on page 18.

4        THE COURT:  Okay.  I don't have that part of it.

5        MR. POSKUS:  You don't?

6        MR. DAIN:  Say exhibit what again?

7        MR. POSKUS:  107.

8        THE COURT:  This book only goes up to 78.

9        MR. POSKUS:  Your Honor, we've added some exhibits

10  since the last hearing, and that's why we keep coming up.  If

11  I may approach, Your Honor.  Actually, Mr. Black, do you have

12  a copy in your notebook?

13       THE WITNESS:  Yes, I do.

14       THE COURT:  Thank you.

15       MR. DAIN:  I'm trying--do you have it there?  Thank

16  you.

17       (Pause.)

18       MR. DAIN:  The exchange is where?

19       MR. POSKUS:  I believe it's page 18, but you'll

20  have to ask the witness.  That's my guess.

21    Q    (by Mr. Dain)  Oh, my--this--on page 18, do you

22  understand--you weren't there, so you don't know what the

23  reference was to when you took this little paragraph out of

24  context, did you?

25       A    Do you want to give me the context by--

237

1    Q    Sure.

2    A    --going back to page 17?

3    Q    Yeah, let's--what Mr. Black did say is two-thirds

4  is going into Supplemental Needs Trust.  This is the

5  statement you made to the Court; that's what we're talking

6  about.  That in your proposed order, the one that you're

7  saying disclosed everything, you said two-thirds are going

8  into the other--into the Supplemental Needs Trust.  The

9  statement goes on.  "Implying the other third, as we all

10 thought, would be maintained for the use of Ms. Black's needs

11 outside of the Supplemental Needs Trust," meaning you told

12 the Court in a proposed order that two-thirds was going to

13 Supplemental Needs Trust.  You did not tell the Court that a

14 third was going into an Issue Trust.

15          In your earlier testimony--

16          MR. POSKUS:  Excuse me, is there a question in

17 there?

18          MR. DAIN:  Yes.

19    Q    (by Mr. Dain)  In your earlier testimony, do you--

20 did you imply to this Court that I made a statement to the

21 court in New York that I understood one-third was going into

22 the Issue Trust?

23    A    That was not my testimony.

24    Q    Let me just read exactly what is here, and I do

25 want to get the preface.  Going back to page 17, on Line 17--

BLACK000826

238

1    I'm sorry, let me even go back.  Do you see up here--I want

2    you to look at this so I can ask you a question about it.

3    Page 17, Line 10.  Are you there?

4         A    Yes.

5         Q    The statement, Mr. Lamberti actually has provided

6    your court with what Mr. Black told the Colorado court, and

7    it's very deceptive.  What he stated was, "I want to disclaim

8    those assets so that I can place them in the Renata Black

9    estate where two-thirds of the funds will go into a

10   Supplemental Needs Trust for the benefit of Joanne Black."

11   That's what he told the court.  This was in the affidavit you

12   filed in the New York court.  Do you recall that?

13        A    I'm not recalling specific affidavit, but I'm not

14   disagreeing with what Mr. Lamberti said on page 17.

15        Q    What you told the New York court was that you

16   intended to place two-thirds of the assets into a

17   Supplemental Needs Trust, correct?

18        A    No.

19        Q    What did you tell the New York court?

20        A    So I'm not remember the affidavit, but the powers

21   that I asked for and believe that I received in Colorado were

22   to disclaim Joanne's POD so that the money would go back into

23   the estate, it would go under Article 4th of Renata Black's

24   will.  And under Article 4th, two-thirds would go to the

25   Supplemental Needs Trust and one-third would go to the Issue

BLACK000827

239

1   Trust.

2        Q    Let's--let's break that down, because I want to ask

3   you questions about reading this in context and not taking it

4   out of context.  You told this court in your petition, the

5   one you're saying--never mind, sorry petition, my--withdraw

6   that.  In your proposed order to this court, the one you

7   testified about earlier--do you recall that?

8        A    Yes, I do.

9        Q    You use the word two-thirds of those funds will go

10  into a Supplemental Needs Trust for Joanne Black; do you

11  recall that?

12       A    I--the proposed order says that two-thirds of

13  Renata Black's estate will go into a Supplemental Needs Trust

14  for Joanne--

15       Q    Right.

16       A    --Black.

17       Q    And you said--

18       A    I agree with that.

19       Q    And you said it couldn't have been clearer that

20  that meant only two-thirds, and the other one-third was going

21  into an Issue Trust.  You testified to that just earlier?

22       A    No.  I said I thought it was clear, and I agree

23  that in hindsight it could have been clearer.  I regret that

24  it was not made clearer.  But I thought it was really clear

25  because you disclaim--you go into the estate, Article 4th,

240

```
1    here's what Article 4th says.  So if there was any doubt, all
2    anybody needed to do, all Joanne's counsel needed to do, all
3    Joanne's GAL needed to do, all you needed to do, you're all
4    lawyers, is go look at the will.  And they had to look at the
5    trust to see who the beneficiaries were, but you didn't even
6    need to do that.  You knew who the beneficiaries were.
7        Q    Let me know when you're done.  You finished?
8        A    I'm done.
9        Q    Okay.  But you told this Court, you took out of
10   context, you said Mr. Dain made a statement to the New York
11   court.  Your purpose in telling the court today in your
12   testimony was that I stated to the New York court that I
13   understood the disclaimer would be two-thirds to the
14   Supplemental Needs Trust and one-third to the Issue Trust.
15       A    That's not what I said in my testimony.  Do you
16   want--do you want to have me restate what I said?
17       Q    No, I don't want you to restate it.  The record is
18   clear.  What you're--when you read this--read page 17 and
19   page 18, what that statement was is saying that you lied to
20   the New York court and that what you told this court was that
21   two-thirds would go into Supplemental Needs Trust, but you
22   didn't tell the court that the other one-third was going into
23   the Issue Trust.  That was the statement I made.  Go ahead
24   and read it and tell me if I'm wrong.
25       A    That is not the statement that you made.
```

BLACK000829

241

1    Q    What Mr. Black did say is two-thirds is going into

2    the Supplemental Needs Trust, implying the other third, as we

3    all thought, would be maintained for the use of Ms. Black's

4    needs outside of the Supplemental Needs Trust.  The point is,

5    nobody on this side of the room was under any illusion that

6    the other one-third was going into an Issue Trust.  You knew

7    that when you made this--when you testified today.  You knew

8    that everybody on this side of the courtroom believed that

9    all of the money was going to be held for Joanne Black's

10   benefit, didn't you?

11   A    I have heard testimony to that effect.  I do not

12   believe that is honest testimony, not coming from you and not

13   coming from Cherie Wrigley.  And I do not understand how Ms.

14   Young can look at a disclosure that says two-thirds is going

15   to the Supplemental Needs Trust and think three-thirds is

16   going to the Supplemental Needs Trust.  She's a lawyer.

17   She's Joanne's GAL.  If she has any doubt about this, she

18   ought to figure it out.  She gave testimony that's frankly

19   incredible.  It says two-third and I thought it meant 100

20   percent.  I don't get it.

21   Q    So Ms. Young is a liar, Ms. DiPonio is a liar, I'm

22   a liar, Ms. Wrigley's a liar?

23   A    Ms. DiPonio just said she didn't remember.  Ms.

24   Young said she assumed that all of the money was going to go

25   into the Supplemental Needs Trust.  I don't see how that is a

BLACK000830

242

1   plausible reading of the proposed order that we asked for
2   that she said she was fine with.  That's just not a plausible
3   reading.  It says two-thirds goes to the Supplemental Needs
4   Trust.  At least in New York you're saying you understood
5   that two-thirds was going to the Supplemental Needs Trust and
6   saying some other way Joanne was going to get the third
7   third, right?  You're not saying three-thirds was going to go
8   into the Supplemental Needs Trust.
9        Q    This is an argument.  You understood--you read that
10  and understood that I was accepting that only two-thirds was
11  going to go to Joanne?
12       A    No, you said--
13       Q    That's what you--
14       A    --that only two-thirds was going to go into the
15  Supplemental Needs Trust.  And you were imagining that the
16  third third was going to go to Joanne in some other way.
17  That's what this says.
18       Q    The point is, you even--when you were testifying
19  today, you understood my position is all of the money was
20  going to Joanne, all of the paid-on-death benefits, that 95
21  percent was going to Joanne?
22       A    That is consistent with your testimony to New York
23  and that is consistent with my testimony in this court.  My
24  testimony was that you understood that only two-thirds would
25  go to the Supplemental Needs Trust, which is consistent with

BLACK000831

243

1   your having read and understood at least that much of the

2   proposed order.

3        Q    Could you go to Exhibit 68 and tell the Court what

4   the date of that document from Chase is.

5             (Pause.)

6        A    May 4th, 2013.

7        Q    So only two months after you received the March 3rd

8   order, correct?

9        A    Approximately, yes.

10       Q    And you said you--months and months you were going

11  --having this argument with me over signing documents; two

12  months after you received that order?

13       A    I was trying to get you to sign documents from May

14  --from February into June.

15       Q    Why would you have--

16       A    Certainly into late May.

17       Q    You wanted me to sign documents in February, before

18  you had received an order from the Court?

19       A    Yes.

20       Q    And would that have been for the estate?

21       A    Now, I would have to go figure out which documents

22  I asked you to sign and when.  That might have been for the

23  2013 trust.  I don't remember which documents I asked you to

24  sign when.  I just remember a series of e-mails and phone

25  calls trying to get you to sign documents.  Chase didn't give

BLACK000832

244

1  me all the documents all at once, and just follow-up after

2  follow-up after follow-up, which started in early February

3  and didn't end at least until late May or early June.

4      Q    Okay.  That document signed in May, right?

5      A    That document is signed May 4th.

6      Q    Do you remember the document that I didn't want to

7  sign was the one where you wanted to add Samuel Black as an

8  additional trustee; do you recall that?

9      A    No.

10     Q    You don't recall adding Samuel Black as an

11  additional trustee?

12     A    I don't recall your not wanting to sign that

13  document.  I recall that you signed it.

14     Q    Do you remember--remember sending me an e-mail in

15  which you said Sam's only for backup in case you or I are not

16  available?  Do you recall that?

17     A    I believe that was with regard to the 2013 trust,

18  but yes I recall that e-mail.

19     Q    And do you recall that the reluctance was adding

20  Samuel Black as a third trustee given that he was also

21  conflicted?

22     A    No, I never got anything back from you other than

23  not returning e-mails and not returning phone calls and not

24  returning documents.

25     Q    By the way, have you yet filed anything with the

BLACK000833

245

1    New York court in which you've correct your statement that
2    this court gave you specific authority and quoting that that
3    authority was to transfer two thirds into a Supplemental
4    Needs Trust and one-third into an Issue Trust?
5        A    That's the authority that I believe I received from
6    this Court.
7        Q    No, no, no.  You quoted an order.  Did you correct
8    that in the New York court to this date?
9        A    I haven't filed anything recently in New York
10   because New York is on hold.
11       Q    When you quote something, do you attribute that to
12   an exact statement by someone else?
13       A    I'm not sure I understand the question.
14       Q    In the affidavit which is of record here, you told
15   the court in New York in your affidavit that you received the
16   following order, and you quoted it.  You gave a date of
17   November 2013--or 2000--I don't remember.  It's 2012 or 2013.
18   You quoted it and said this is the order I received.  You
19   said it was specific authority granted by the court in
20   Colorado.  Have you corrected that?
21       A    This was the authority that I believed that I
22   received from the Colorado court.
23       Q    No, no, no.  You're not answering my question.
24       A    The Court can decide that I didn't receive that
25   authority, but that's what I thought I received.  And so in

1    my mind, I'm not sure what it is I'm supposed to correct in

2    New York other than a statement this the authority I believe

3    I had in Colorado.

4          MR. DAIN:  Do you know what exhibit that is, the

5    affidavit in New York?

6          (Pause.)

7      Q    (by Mr. Dain)  So when you told the Court I

8    received an order and you quoted an order, now you're saying

9    that that's just based on what you believed you got?

10      A    That's what I believed at the time, yes.

11      Q    Okay.  You've seen the March 5th, 2013, order, the

12    one that actually issued?

13      A    Yes, I have.

14      Q    Doesn't say anything that you put in those quotes,

15    does it?

16      A    I'm not recalling the exact quotes, but what I'm

17    suspecting is I quote from the fuller proposed order and not

18    the final March 5th order.  That's my best speculation as to

19    what your line of questioning is about.

20      Q    So let's get back to what I was saying.  Just so I

21    know, you have not filed anything in New York that in any way

22    corrects the affidavit you filed in New York regarding the

23    authority you've received, yes or no?

24      A    I have not.

25          MR. DAIN:  Okay.  I have no further questions, Your

BLACK000835

247

```
 1   Honor.
 2            THE COURT:  All right.
 3            MR. POSKUS:  No redirect, Your Honor.
 4            THE COURT:  Thank you.
 5            All right.  Thank--
 6            MS. DiPONIO:  Your Honor, may we take a five-minute
 7   recess?
 8            THE COURT:  --Mr. Black.
 9            Yeah, that's fine.
10            MS. DiPONIO:  Thank you.
11            (Whereupon, a recess was taken.)
12            THE COURT:  Do we have further witnesses?
13            MR. THIESSEN:  Yes, Your Honor, we would call Ms.
14   Kate Litvak.
15            THE COURT:  Raise your right hand.
16            (Whereupon, Ms. Litvak was sworn.)
17                      KATHERINE LITVAK,
18   called as a witness herein, having been first duly sworn, was
19   examined and testified as follows:
20                      DIRECT EXAMINATION
21   BY MR. THIESSEN:
22       Q    Would you state your name, please?
23       A    My name is Kate Litvak--Katherine Litvak.
24       Q    And what's your profession?
25       A    I'm a professor of law at Northwestern University
```

BLACK000836

248

1    School of Law.

2        Q    What's your relationship to Bernard Black?

3        A    I'm his wife.

4        Q    How long have you been married?

5        A    For about 12 years.

6        Q    Did you ever meet Renata Black?

7        A    Yes, I have met her many, many times.  I have also

8    spoken on the phone with her almost weekly for as long as we

9    were married and she was alive.

10       Q    What did you talk about?

11       A    All kinds of things.  She liked to talk.  We were--

12   she loved me because I was Ukrainian Jew and she was

13   Ukrainian Jew, so she often liked to tell stories about her

14   past, and I like to tell stories about my past, and we

15   compared.  She was from a small town in Ukraine where I've

16   been many times, so we really had a lot in common.  We often

17   spoke in Russian.  I--when our grandmother was alive, I--I'm

18   sorry, when I say our mother and our grandmother, I'm

19   referring to Renata Black and her mother.

20       Q    Sure.

21       A    Renata Black specifically requested as soon as we

22   got married that I call her mother.  She insisted that I do

23   and I always did.  So when I say our mother, that's mother.

24   And my own mother is mom for me.

25            So we often--so when--I spoke with our grandmother

249

1   in Ukrainian.  I spoke with Renata in Russian.  We discussed

2   all kinds of things about the past.  She liked to talk about

3   children and my children how I'm raising them properly.  She

4   loved to talk about nutrition and health and what I should be

5   eating.  And every now and then she would call just to say

6   that she just read some popular magazine that I should eat

7   almonds and not other nuts and such, so we were very close.

8          She also liked to give me various advice, including

9   financial advice.  And one of the things we discussed many

10  times is her estate and her disposition of assets.

11     Q    What was your understanding of her intent with

12  respect to her estate?

13     A    She told me that her estate will be divided two-

14  thirds to her disabled daughter and one-third to the

15  grandchildren from--from her son.  She said Bernie had

16  repeatedly asked her not to leave anything to him because he

17  is making a good living and he doesn't need this, and so he--

18  and I think everyone believed it would be tax preferential to

19  have a generation skipping tax, not leaving any money to

20  Bernie directly and instead leave it directly to

21  grandchildren.  So that was her plan.

22          And she also told me that she had already set up

23  two trusts; one for her disabled daughter and one for the

24  grandchildren but didn't fund them.  And so of course I asked

25  why you didn't fund your trust, and she said basically

BLACK000838

250

```
 1   because I don't trust Tony.  She said Tony is the only co-
 2   trustee on the trust.  Bernie was not a co-trustee.  Bernie
 3   was a replacement trustee for the time when she dies.  So her
 4   only co-trustee on the trust was Tony, and she says if I put
 5   money in a trust, I lose control, because he's a co-trustee.
 6   He can--they--they veto every decision I make.  Why should I
 7   lose control over my money if I instead can keep full control
 8   of my money.
 9              And so I told her that if she's certain that the
10   money that she has is going to go to trust after she dies,
11   and she says, Sure.  All of my money are (sic) in unallocated
12   assets.  That is what she--that's how she called it.  She
13   said non-allocated assets.  She said I specifically keep it
14   non-allocated so that when I die that it will go to the trust
15   under my will and so I will get exactly the same outcome this
16   way as I would have gotten if I directly funded the trust.
17   But the attraction of doing what I'm doing is that I keep
18   full control of my money and I don't have to be at mercy of
19   Tony because I don't know what he would do if he becomes a
20   co-trustee and he will be able to veto every decision I want
21   to make with my own money.  And that's what she was saying,
22   my own money, my trust, my decisions.
23              I actually asked her why she wouldn't put Bernie as
24   a co-trustee instead of putting Tony, and she said there is a
25   law in New York that if she wants--if you want the trust to
```

BLACK000839

1    be tax preferential then at least one co-trustee has to be a
2    non-beneficiary.  So she says that if she puts Bernie on the
3    trust, Bernie is a beneficiary on the children's trust and a
4    residual beneficiary on Joanne's trust.  If she puts Bernie
5    as a co-trustee, then they could lose the tax preferential
6    treatment at death.  So she said I have to keep Tony; I don't
7    have anybody else.  I don't have any other family member who
8    knows financial affairs or is a lawyer, and I don't trust
9    outsiders to be trustees.  And so because she didn't trust
10   Tony, she didn't fund the trust and she specifically told me
11   the scheme of estate planning was not to allocate any assets
12   directly so that upon her death they will go under the will
13   directly into the trust as she had planned all along.
14        Q    And when was the last conversation you had with
15   her?
16        A    Shortly before her death.
17        Q    And did any of these topics come up?
18        A    Not in a conversation shortly before her death, but
19   we had discussed these topics maybe a month before her death
20   or two months and she had not made any indication that she
21   had made any changes in her estate planning.
22        Q    Did she discuss the allocation between the trusts?
23        A    Excuse me while I get some water.  Well, one trust
24   gets two-thirds of the estate and the other gets one-third of
25   the estate.

BLACK000840

252

1      Q    Did she tell you that specifically?

2      A    Yes, this was well known in the family.  The kids

3   knew this.  I knew this.  This was not a secret.

4      Q    And what was her--did she tell you anything about

5   the trust for the grandchildren and how it was to be used?

6      A    She specifically wanted it to be used for

7   education.  She was very high on education.  She particularly

8   wanted at least some grandchild to be a doctor.  She had told

9   me a very sad story about her life, how she--when she escaped

10   the Holocaust and lived in Germany for a very short amount of

11   time immediately after the war she studied to be a doctor and

12   then she immigrated to the United States and then the

13   doctor's credit of education that she collected in Germany

14   did not transfer to the U.S.  So she could not become a

15   doctor, or at least not easily.

16       However, she could easily become a dentist, so she

17   had become a dentist.  And this was a pain of her life that

18   she never became a doctor.  She insisted that every child in

19   the family becomes a doctor.  It turns out that only one

20   wanted to do it.  Then she started insisting that every other

21   child in the family becomes a lawyer.  For example, she--so

22   for the doctor, the one who decided to become a doctor, she

23   specifically promised she would pay for the medical school.

24   She paid for a year of his preparatory studies to qualify for

25   the medical school admissions.  She paid a lot of his

BLACK000841

253

1    expenses when he was preparing to become a medical student.

2            For the other son, she just badgered him into going

3    to law school.  She gave him the money to take a preparatory

4    test for LSAT.  When that result was not quite good, she was

5    very upset.  She kept saying, you know, if he gets his

6    results better, you know, she would pay him a lot more money

7    to do it again.  So her view was the entire grandchildren's

8    trust is to be spent on education.

9            She also promised to pay down all student loans for

10   all of Bernie's adult children, and that is hundreds and

11   thousands of dollars for each, I believe.

12       Q    Did you attend Renata Black's funeral?

13       A    Yes, I did.

14       Q    And did you have any conversations related to

15   Renata's estate?

16       A    Yes, I did.  We held the funeral at our mother's

17   house and we were there the entire day except the day where

18   we were at the cemetery.  And at some point during that day

19   at our mother's house, Anthony--Anthony Dain approached me

20   and said that he wanted to talk to me about an important

21   matter, and so we stepped outside.  And he said you should

22   know how Aunt Renata's estate is distributed.  It's one-third

23   to the grandchildren and two-thirds to Joanne.  And I said I

24   knew that.  Everybody knew that.  That's not news.  And so he

25   just kept poking.  He kept saying, Don't you think it's

BLACK000842

254

```
1   unfair.  I just want to make sure you don't think it's
2   unfair.  I just want to make sure you're not upset.  And I
3   said I cannot understand why I should be upset.  And he said
4   I just want to make sure there would be no litigation, that
5   you will not be challenging the will, you will not be
6   challenging any estate matters.  And I kept saying no I'm not
7   upset.  He said you know Bernie doesn't inherit directly.  I
8   said I know, everybody knows this.  He specifically told her
9   that he does not want to inherit because that would just be
10  inherits from her and then that same money would then be
11  passed to his children and taxed, so why.  So we had
12  discussed this.  I assured him that I had no interest in
13  suing anybody.  I was not upset.  He said great.  We parted
14  friends.  He offered to take me to the airport, and he did.
15      Q    Did Mr. Dain raise an issue with respect to Renata
16  Black's beneficiary designations on any of the account?
17      A    He had not said a word about this, no.
18      Q    And did your--did you--what was your understanding
19  later with respect to the beneficiary designations on the
20  Vanguard accounts?
21      A    I--as I said, our mother told me her estate plan
22  was to leave all assets unallocated and funds unfunded and so
23  that when she dies funds get funded automatically from the
24  estate.  That is the only reason--this is the reason why she
25  was able not to fund the trust, because she was not worried,
```

BLACK000843

255

1   they would trusted--funded exactly the same way anyway.

2          So when--sometime in mid-July of 2012, we received

3   a letter from Vanguard saying that 95 percent--the account

4   was actually allocated, contrary to everything she's ever

5   told me and contrary to every detail of her estate plan that

6   the account was allocated.  And only five weeks before she

7   died the allocation was made.  And the allocation was made 95

8   percent to Joanne and five percent to the adult children from

9   the first marriage; one percent each.

10          THE COURT:  You got a letter from Vanguard?

11          THE WITNESS:  We received a letter from Vanguard in

12   mid-July of 2012.

13          THE COURT:  So you did know about it?

14          THE WITNESS:  In 2012, but I did not know about

15   this before then.  Yeah, before then she--

16          THE COURT:  So you knew that the allocation was

17   made in 2012 and that there was a change five weeks before

18   she died?

19          THE WITNESS:  Correct, that's what I said.  I'm

20   sorry if I'm not clear.

21          THE COURT:  Okay.

22          THE WITNESS:  So I did not--I apologize if I

23   misunderstood the question.  Before we received the letter

24   from Vanguard, I was certain that all assets are not

25   allocated and they're not allocated on purpose.  That is how

BLACK000844

256

1  she planned to fund the trust.

2          THE COURT:  Right.  But you got the letter in 2012?

3          THE WITNESS:  Correct.  And when I received the

4  letter in 2012, I said, oh, oh, when did this allocation

5  happen, and the only thing Vanguard would tell us is that the

6  allocation happened only five weeks before she died.

7          THE COURT:  Okay.  That's not--that's not making

8  any sense.

9          THE WITNESS:  This is--

10         THE COURT:  I'm sorry, you're saying first that you

11 knew--

12         THE WITNESS:  I'm not sure I--

13         THE COURT:  --in 2012, that you got a letter from

14 Vanguard which said the accounts were allocated?

15         THE WITNESS:  Correct.

16         THE COURT:  Then you're saying that it got changed

17 five weeks before she died?

18         THE WITNESS:  That's what Vanguard letter told us.

19         THE COURT:  Right.

20         THE WITNESS:  Yes.

21         THE COURT:  I'm missing something.

22         MR. THIESSEN:  What's the exhibit?

23         THE WITNESS:  I'm not sure I understand the

24 confusion.

25         THE COURT:  Well, what I'm understanding from what

BLACK000845

257

1   you're telling me is that you knew about the account

2   designations from 2012.

3                MR. THIESSEN:  In--

4                THE WITNESS:  I don't--

5        Q    (by Mr. Thiessen)  Would you want to turn to

6   Exhibit 42, which is the Vanguard letter.  Perhaps we can

7   clear it up.

8        A    Okay.

9             (Pause.)

10       Q    Are you there?

11       A    Yeah, I'm there.

12       Q    I believe it's been admitted.  Did you ever see

13   this?

14       A    Yeah.  Yeah, I saw this when I received it.

15       Q    Is this the letter you're referring to?

16       A    Yeah.

17       Q    And--

18       A    Yeah.

19       Q    And would you mind elaborating on your testimony

20   with respect to what you knew about the beneficiary

21   designations?

22       A    Yeah.  So as I said, I believed from our mother's

23   statements to me that the--the assets were unallocated so

24   they can flow into the estate.  And in July of 2012, we

25   received this letter from Vanguard, and it says assets are

BLACK000846

258

1    allocated; 95 to Joanne, 5 to children.  And the allocation--
2    I was looking at this, "Our records indicate that on March
3    23rd we received a request to designate the (inaudible)
4    beneficiaries."  So this is what I meant.  I thought the
5    assets were not allocated until March 23rd.  I didn't know
6    differently, but this was my belief at the time that the
7    assets were allocated in this matter on March 23rd, and I
8    found out about this in July of 2012 when we received the
9    letter.
10            THE COURT:  Okay.
11            THE WITNESS:  Am I clear?
12            THE COURT:  Um-hum.
13            THE WITNESS:  I'm sorry, sometimes I get too fast
14   or confused or something.
15       Q    (by Mr. Thiessen)  Thanks, Ms. Litvak.  And so when
16   you received this July 11th--or when you learned of the July
17   12th--11th, 2012 notice, what was your response?
18       A    I said this is obviously a mistake by our mother,
19   because at this time in March 23rd, 2012, Joanne was in a
20   state of profound psychiatric disarray.  She was living on
21   the street.  She was unable to understand who she was, who
22   her family was.  She believed she was married to a mobster.
23   She believed that the mob kidnapped her husband and demanded
24   ransom.  She was running away and hiding.  How could anybody
25   in her right mind leave that much money directly at that time

259

1　to a person who is so profoundly mentally ill.  This makes no

2　sense.

3　　　　Now, I will tell you honestly I thought sure it is

4　possible, although I think not likely, but possible that our

5　mother decided to disinherit everybody.  It's possible.  I

6　think not likely, but possible.  But it is absolutely not

7　possible that she would leave this money directly to Joanne

8　at that time.  That was absolutely not possible.  Our mother

9　was a wise and very cautious woman.  If she had made any

10　changes at that time to her designation of beneficiaries, no

11　matter what the designation was before that, she would have

12　made sure that money does not go to a woman who lives on the

13　street and believes she's married to a mobster.  That is

14　absolutely not possible.  So I thought it was a mistake.  I

15　thought our mother clicked the wrong button somewhere and

16　misunderstood something and clearly that could not be what

17　she intended.

18　　　Q　Did you--

19　　　A　I--go ahead.

20　　　Q　Did you have any telephone calls with respect to

21　what you believed to be this mistake?

22　　　A　Yes.  So in mid-July, we were all in kind of a

23　frazzled state of how could our mother possibly do this; it's

24　obviously a mistake.  And so before I go to phone calls, my

25　immediate reaction was there has to be some legal doctrine to

BLACK000848

 1   invalidate this.  I don't know this body of law.  I'm not a
 2   practicing attorney.  I am an academic studies, (inaudible)
 3   at the law school, but I know some law.  And in other bodies
 4   of law, if you make a material mistake, that material mistake
 5   invalidates the document.  So, for example, in the contract
 6   law, if you make a material mistake of fact, then the
 7   contract is invalid.  In securities law, if you make a
 8   material mistake in the public offering, then the public
 9   offering maybe invalid.  So I said to myself, that's okay.
10   This designation is insane in such profound way that it is
11   obviously a mistake, so there has to be a body of law
12   somewhere in trust and estate doctrine that invalidates
13   obviously erroneous assignments of beneficiary.
14           So I said, you know, we should sue.  You know, I
15   wasn't serious at the time, but I thought I was going to sue.
16   And then I had a conversation with Cherie.  And, Your Honor,
17   I am stunned that Cherie would testify that she had not
18   spoken with me on the phone because she actually has.  And
19   she had also talked on the phone with Bernie's son Ben and
20   Bernie's daughter Sara.  So the first time Cherie called us
21   and I picked up the phone and she said, Oh, it's you.  I need
22   to talk to Bernie, but, you know, can you believe the
23   designation.  And so we went through this sort of puzzled
24   exchange, I can't believe it.  So Cherie was equally puzzled.
25   She said, you know, Aunt Renata has done a lot of strange

BLACK000849

1    things in her life, but this so far beyond anything one could

2    imagine.  You know, leaving that much money directly to a

3    person on the street at the time when she was already on the

4    street is simply, clearly a mistake.  And so we spoke

5    shortly, but we both agreed it was a mistake.

6           And they said, you know, I'm glad everybody agrees

7    it's a mistake.  I talked to everybody.  Everybody says

8    mistake, so I'm going to sue.  And so that was the--that was

9    the first conversation.

10         Q    And when was that?

11         A    Shortly after we received the letter sometime in

12   July, mid-July probably.

13         Q    What did you do next?

14         A    I had gone to conduct legal research, preliminary

15   research before I decide to hire a lawyer.  So I went on

16   (Inaudible) Law or I don't recall Lexus or Cornell database

17   of legal documents.  And I have researched what happens when

18   the designation of beneficiary is made in mistake.

19         And I was wondering what the remedy is for mistake.

20   I have no doubt that we can establish mistake.  I was

21   wondering about remedy.  I thought maybe if the remedy is

22   that the court will try to do what the beneficiary--what the

23   assigner might have wanted, then it will be protected in the

24   complaint in the complex litigation.  But all research that

25   I've done shows that the remedy is if the assignment is a

262

1    mistake, then the assignment is removed and the assets flow
2    back into the estate.
3            And I said, well, this is an easy law case.
4    Everybody agrees this is a mistake. I have not seen anybody
5    who didn't. Tony today testified he thought it wasn't. This
6    is the first time ever I hear anybody saying that when a
7    woman at the time when her daughter is living on the street
8    makes an assignment to her directly, it's not an obvious
9    mistake. I thought this was completely insane and everybody
10   thought it was insane. And remedy for mistake is that assets
11   flow--the designation is removed and assets are flowing into
12   the estate.
13           I said great. Let's hire a lawyer. So I went on
14   to investigate lawyers. We needed to figure out where to
15   sue, in which court and in which state. It could have been
16   in New York; it could have been in Pennsylvania where
17   Vanguard was. So it took me some time. I had to ask a
18   couple people. I asked colleagues. We started collecting
19   information. And then I decided it was important for me to
20   obtain an agreement from Bernie's adult children for what I'm
21   doing.
22           When I say I was going to sue, I meant I was going
23   to sue on behalf of my minor children, who are the
24   beneficiaries in an Issue Trust, so they would have been
25   harmed by this designation.

BLACK000851

1          So I wanted to see whether Bernie's adult children
2    would support me in litigation, so I called them.  I called
3    Sara, I called Ben.  I had a lengthy discussion with Ben.  I
4    told him about the content of the letter.  And he was deeply
5    puzzled and outraged--
6          MR. DAIN:  I'm going to object with this long
7    narrative.  I'm not sure what the relevance is anymore.  What
8    is the relevance of her going through all these discussions
9    she's saying she had with other children?  Is her state of
10   mind at issue here?
11         THE WITNESS:  I'm planning--I was planning to sue
12   and I wanted to show that I believed I had a very strong
13   claim.  And I believe my plan to file a lawsuit was the
14   single most important reason why Bernie and Cherie obtained
15   the disclaimer.  So let me show you--
16         MR. THIESSEN:  Your Honor, I'll direct the witness
17   more specifically.
18         THE COURT:  Okay.
19    Q    (by Mr. Thiessen)  What was the outcome of your
20   call with Ben Blake?
21    A    Ben very enthusiastically supported litigation.  He
22   said let's go right away, right now.  Let's do it.  Let's do
23   it.
24    Q    Did you have any further conversations with Ms.
25   Cherie Wrigley?

BLACK000852

1      A     Yes.  A few days later, she called again.  And I
2   said, "Great news.  We are suing.  I already have an
3   agreement from Ben and I'm going to talk to other children
4   and litigation is happening."  This is--you know, and I think
5   everybody agreed that money needs to be removed from Joanne's
6   hands so I thought everybody will think great plan.  And at
7   this time, Cherie said, "Well, this is what I wanted to talk
8   to you about.  It's really not a great plan.  You know, think
9   about what happens if you sue.  If you sue, then the estate
10  is frozen and the money is frozen in Vanguard and, you know,
11  everything is frozen, there is no money.  And you should
12  understand that Joanne lives on the street and there is no
13  money to save her.  It will take us tens of thousands and
14  maybe hundreds of thousands of dollars to save her.  And if
15  you freeze all this money for years of litigation, Joanne
16  will live in terrible state on the streets and she might as
17  well die on the streets."  And so I said, "I don't understand
18  what you want me to do.  I feel very bad about Joanne, but I
19  have responsibility to my minor children.  And if I don't sue
20  now, then they will lose their inheritance, so what can I do
21  that will be better than suing?"  And Cherie said, "Well,
22  Bernie and I have discussed this great plan about
23  disclaimers."  This was no about complicated disclaimers in
24  court.  Cherie said I can simply go to Colorado and convince
25  Joanne to disclaim.  And I said, "This makes no sense.  How

1   are you planning to convince Joanne to disclaim the money?

2   Why would she disclaim the money voluntarily?" And Cherie

3   said, "Trust me, I know how to talk to people and I know

4   Joanne and I know Joanne's weaknesses and Joanne is very

5   concerned with her appearances. And if I go to Colorado and

6   take her to a nice store and show her nice things and tell

7   her sign this piece of paper and you can have this

8   immediately, and if you don't sign it then there will be

9   litigation frozen and you will get no money." And I thought

10  this was unclean. I thought convincing a crazy woman to sign

11  significant documents was bizarre, but Cherie was convinced

12  she can get it signed. But I thought this was bizarre. It

13  was conduct unbecoming. And I also thought this would be no

14  successful with Joanne. And I also thought that no court--if

15  sometime later this would come up in court, no court would

16  ever consider that signature of an insane woman to be a valid

17  legal disclaimer, so I said this plan is absurd.

18          And Cherie just started putting this guilt trip on

19  me. She says she and Bernie has a great plan about

20  disclaimers, you know, they will get Joanne to disclaim in

21  some way. If--you know, I can get what I want and Joanne

22  will get money immediately and how can I be such a heartless

23  person who doesn't care about Joanne and just wants to sue.

24  And I just wanted to sue. I thought we had an excellent

25  claim and I wanted it to be a litigation. And she was

BLACK000854

266

1    playing the thing, you are the younger second wife.  You

2    don't know this family.  People don't like you already.  If

3    you do this, then everybody will hate you.  Family litigation

4    is terrible and how can you put this family into months and

5    maybe years of litigation when Joanne is in such state.  I

6    said, you know, fine.  I can give you a few--maybe a couple

7    months delay.  I'm not going to not sue.  I'm just going to

8    give you a chance to do something else.

9          And she said she and Bernie together will get the

10   disclaimers and these disclaimers will produce what I want.

11   They will put money into the estate and distribute a third to

12   grandchildren so that I get what I want and Joanne gets what

13   she needs.  It will be now.  It will be fast and nobody will

14   be hurt.  And I said, okay.  I'm not losing anything if I'm

15   only waiting a couple of months.  So I said fine.

16   Q   And specifically did you discuss what would happen

17   with the assets if they were disclaimed?

18   A   Absolutely.  That was the whole point.  The

19   disclaimer discussion was a specific substitute to

20   litigation.  I thought I had a claim.  I'm now very

21   disappointed that I didn't just say to all of them forget it,

22   I'm going to sue.  I had the perfect claim.  I could have

23   been done in a few months.  Joanne was not able to defend

24   that claim; she was living on the street.  She did not have

25   court appointed counsel.  She did not have money to pursue

1   this litigation.  She was not entitled to any money to any

2   money to pursue litigation.  I would have won back then, I

3   have no doubt.  And I only deferred for a few months because

4   I thought I don't want to be the evil bitch young wife who

5   puts the family through litigation.  And I thought if I only

6   wait for a couple months, maybe they'll succeed and the

7   family will not hate me.  And if they don't succeed, I can

8   still sue and I will win.

9        Q    What if anything did Ms. Wrigley say specifically

10  about her understanding of the effect of the disclaimer?

11       A    She told me that she was going to fly to Colorado

12  and get Joanne to disclaim her part in the account and then

13  these--this designation will not exist and then the money

14  will go to the trust.

15            And by the way, Ms. Wrigley had been telling me her

16  extensive expertise in courts in the matters related to

17  disabled persons and otherwise incapacitated persons, that

18  she was very proud, that she's also part of a legal

19  (inaudible).  She had been telling me that she knows all ins

20  and outs on how these things are done and because she was a

21  court appointed--not court appointed counsel, she was a

22  Guardian ad Litem for years and she had to supervise disabled

23  children for years.  Joanne--I'm sorry, Cherie had asked us

24  to help her become a Guardian ad Litem for Joanne in

25  Colorado.  So I assumed she understood exactly what was going

BLACK000856

268

1    on.  This was not a random high school teacher.  This is a
2    person--Cherie is a person who is very well familiar with the
3    legal system.  She wanted to be Guardian ad Litem for Joanne.
4    She knew how things worked.  She was very convincing.
5         Q    Did you specifically discuss anything with respect
6    to the two-thirds/one-third distribution?
7         A    Yes.  I specifically told her that my interest in
8    this litigation is a third of the account that will go into
9    the grandchildren's trust.  And she had told me, "Don't
10   worry.  We will get what you would have gotten to you--what
11   you would have gotten through litigation but without
12   litigation."  She was completely clear.  She said, "When this
13   assignments are invalidated, everything goes to the estate.
14   It's as though this assignment doesn't exist."  At the time,
15   we had not thought about the five other grandchildren; we
16   just talked about Joanne.  She said the minute Joanne
17   disclaims, it's as though this assignment never existed.
18        Q    And what did you do following this phone call?
19        A    I now had to convince Ben and Sara not to sue.  And
20   Sara was fine.  Ben was very upset.  He wanted to sue.  He
21   did not like this plan.  He was gung-ho, wanted to sue, not
22   going to stop.  And so I had to convince.  I said we are not
23   stopping.  We are not giving up our legal right to this
24   excellent legal claim.  We are simply postponing.  It's okay
25   to postpone by a couple of months, and he agreed to postpone

BLACK000857

269

1   by a couple of months.

2        Q    What happened next?

3        A    We had more conversations with Cherie.  I was

4   waiting and waiting and waiting for the developments in

5   Colorado.  I thought--I frankly did not think it was likely

6   she would have obtained a signature of Joanne.  I did not

7   think that she had magic powers of convincing.  But sometime

8   in August we had another conversation and she said, "Oh, that

9   didn't work.  Joanne on the phone did not agree to sign and I

10  don't want to go to Colorado because we're going to spook

11  her.  She's going to be afraid and run away and we don't want

12  her to run away, so change of plans.  Instead of getting

13  Joanne to sign anything, we are going to have the court

14  announce her to be incapacitated and have her guardian to

15  sign the same thing that Joanne would have signed on her

16  behalf."

17            So--and she had gazillion different plans.  Her

18  other plan was to have Joanne involuntarily committed into a

19  mental institution or threaten and Joanne will be so

20  terrified of this that she would sign anything.  And I

21  listened to this stream of plans, and there were some other

22  plans I don't remember, and I thought this is just--you know,

23  I like it less and less.  I have a perfectly good legal

24  claim, why am I sitting on it.  But she said, "But we already

25  put these things in motion.  We're already looking for an

BLACK000858

270

1    attorney in Colorado.  We're already looking for--you know,
2    to appoint a Guardian ad Litem, et cetera, for Joanne.  Just
3    wait a little bit more, just a little bit more."  And I said,
4    well, okay, I guess I'm going to wait a little bit more.
5    That's okay.  So I waited more.
6        Q    What happened next?
7        A    And next we had another conversation in October.
8    In October--
9        Q    What year?
10       A    2012.  In October, we learned that it's not enough
11   for Joanne to disclaim, it also was required that all other
12   listed beneficiaries would need to disclaim, which means
13   every one of the five grandchildren listed would also have to
14   disclaim.  At this point, I was just absolutely livid.  I was
15   so mad that I allowed them to drag this process for so long
16   and stop me from filing a lawsuit that I had.  It was clean;
17   it was good.  Now I also--they also had to convince Bernie's
18   five children to disclaim and some of them were more
19   reasonable and would disclaim and some were less reasonable
20   and would not disclaim.  And meanwhile, this process had
21   extended for very long.  And, you know, I just thought this
22   was infuriating.  And I thought at least one of the five is
23   going to say no I'm not disclaiming and then the entire
24   system is going to break down.
25       Q    Specifically with respect to this adult child

1    disclaimer issue, did you have any conversations with Ms.

2    Wrigley about that issue?

3        A    Yes.  The biggest worry was Rebecca Black, the

4    youngest.  Rebecca was an 18-year-old party girl.  She was

5    just in a constant state of partying, and she had all kinds

6    of other problems.  She barely finished high school.  She,

7    you know, went to community college and was partying day and

8    night and not studying and claiming that she--you know, when

9    her bad grades came in, she was claiming it was all her

10   father's fault or else she was depressed.

11           And I said why in the world would Rebecca Black

12   disclaim $40,000 cash falling on her lap.  This is an 18-

13   year-old party girl.  She wants money today.  If you tell her

14   that in exchange for $40,000 she can get more money in trust

15   controlled by her father, who she thinks is the problem of

16   her life, she would never agree to that exchange.  So Rebecca

17   was the big worry.  I was--I thought she would not sign.  I

18   thought she just wants the money and run.

19       Q    So in your conversation with Ms. Wrigley, what was

20   her response with respect to this specific issue with Becca?

21       A    We--again, Cherie said she's highly experienced in

22   dealing with difficult teenagers.  This is her job.  She

23   knows how to deal with them.  She believes she can establish

24   a rapport with Rebecca.  She--she said she can convince

25   Rebecca to do--to sign the disclaimer.  And I said how?  This

BLACK000860

272

1    is an 18-year-old looking at $40,000.  And Cherie said I will

2    explain and tell her the truth.  I will explain to her that

3    if she disclaims, she will get a lot more money in trust.  So

4    we actually talked about the way to explain it to her.  So

5    the way I would explain it to Ben, for example, or to Sam, I

6    would have said, Look, today you're getting one percent.  If

7    you disclaim, you're getting one-seventh of one-third, which

8    is 1/24ths, which is five percent.  It's better to get five

9    percent than one percent so disclaim.

10           Rebecca is not quite that sophisticated, or at

11    least at he time she was not, so it was difficult to discuss

12    specific numbers with her.  And so we would try to come up

13    with some explanation for how if you give up cash today you

14    will get so much more in trust that it would make sense for

15    you.  So as you understand, exchanging $40--$40,000 in cash

16    today for $40,000 in trust sometime later under control of

17    your father, that is not the kind of exchange doesn't make

18    sense to her.  And it was completely clear.

19           So we had to explain that in trust she gets five

20    times as much and so these--we did not say, you know, please

21    let's do the calculation.  We had to say you will get a lot

22    more in trust.  That is the only reason why a party girl, 18-

23    year-old would give up $40,000 in cash.

24    Q    Did you specifically discuss the one percent versus

25    the five percent--

BLACK000861

```
 1      A      Absolutely--
 2      Q      --issue with Ms. Wrigley?
 3      A      --we did.  Absolutely we did.  Of course.  We had
 4   to explain to Rebecca why she's giving up one percent,
 5   $40,000.  I was just totaled when Cherie said, "Oh, I just
 6   told her give away $40,000 in exchange for nothing."  What--
 7   like who possibly would do that?  Who would agree to that?
 8   Or even give away $40,000 in cash today for $40,000 in trust
 9   controlled by your father sometime in the future.  Who would
10   possibly disclaim on those terms?  It makes no sense.  The
11   only way to convince was to say there will be a lot more in
12   trust waiting for you, and that is exactly the conversation
13   we had.  At every moment in this process Ms. Wrigley was
14   referring to this as think of it as a settlement.  You have a
15   good claim.  We care about Joanne.  If we just do it
16   together, we will get what you want.  You will get exactly
17   what you think you will get in litigation without litigation.
18   Think of it as a settlement.  And this was exactly how we
19   proceeded.
20          And, Your Honor, I'm just--I was just shaking when
21   I heard her say that she didn't know.  I'm completely
22   astonished.  How could she possibly convince an 18-year-old
23   party girl to give away $40,000 in exchange for nothing or in
24   exchange for $40,000 in trust?  How?  There is no way.  No
25   way.
```

BLACK000862

274

```
 1          MR. THIESSEN:  Thank you, Your Honor.  Nothing
 2   further.
 3          THE COURT:  All right.
 4                      CROSS-EXAMINATION
 5   BY MR. DAIN:
 6      Q    Ms. Litvak, you said you had a lot of conversations
 7   with Renata Black?
 8      A    Yes, I did.
 9      Q    In fact you said you had one just a few weeks
10   before she died?
11      A    I don't recall how many weeks, but shortly before
12   she died, yes.
13      Q    And what was that conversation about?
14      A    Nothing significant.
15      Q    No, just--about what?
16      A    How are you?  How is the weather?  I'm not feeling
17   well.  I think I'm not feeling well.  Let me talk about--on
18   her part, let me tell you how I'm not feeling well.  On the
19   other hand, you should eat more green vegetables.  This kind
20   of conversation.
21      Q    She was--you were discussing with her her health,
22   right?
23      A    Yeah, sort of--unremarkable things.
24      Q    And then the conversation--last conversation you
25   had before that one, how many weeks or months before she
```

275

1  died?

2      A    We spoke almost weekly or biweekly, so that was--

3  you know, so a couple of weeks or three weeks before she

4  died, so another couple of weeks before then and then--

5      Q    You had good conversations with her?

6      A    Yes, I did.

7      Q    And what kinds of things would you discuss?

8      A    Usually I just keep quiet and she talks about

9  health and well-being and sometimes money management.  And

10 let me let you know--let me tell you how to live your life.

11 Sometimes she was talking about Joanne.  Sometimes she was

12 talking how she was very proud of her grandchildren and her

13 son and just all kinds of things.

14     Q    So she wasn't crazy?

15     A    She was not crazy, no.

16     Q    No.  So her decision then to leave 95 percent to

17 Joanne, you didn't think she was crazy?

18     A    I did not plan to argue incapacity.  I was planning

19 to argue mistake.

20     Q    Okay.  So then she just made a mistake in--

21     A    Correct.

22     Q    --designating it?

23     A    I--

24     Q    Okay.

25     A    --believe she did not understand what the

BLACK000864

276

1    consequences were of her actions.

2       Q    Did you know what the designation of the paid-on-

3    death accounts were before she changed it to 95 percent/five

4    percent?

5       A    I did not know firsthand, but she had told me it

6    was not designated.

7       Q    How old are your children?

8       A    They are now seven and nine.

9       Q    So at the time that Renata Black signed this

10   January 25, 2010 will, your children were already born?

11      A    Yes, of course.  They were five and what--

12      Q    And you know--yes.

13      A    I'm sorry, four and six.

14      Q    Do you know that at the time--I mean you've seen

15   this will where she leaves residual money only to the five

16   grandchildren, not to your two grandchildren?

17      A    Yes.  I'm glad you asked this.  I don't know how

18   much the Court wants to hear of this discussion, but--

19      Q    No, I'm just asking did you know about this.

20      A    Yes.  Yes, I did.  And I actually had detailed

21   discussion about that will with our mother.  She had

22   explained to me why she had written this.  This was her tax

23   evasion scheme.  Do you want me to tell you more?

24      Q    No, I don't.

25      A    Yes.

BLACK000865

277

1  Q  What I want you to tell me is that you knew about

2 this will--

3  A  Yes, I did.

4  Q  --before she died?

5  A  Absolutely I did.  She had told me about it.

6  Q  Did you discuss with Mr. Black that you should tell

7 the court in New York about this will?

8  A  I'm--I'm thinking, but I should say we consulted a

9 counsel whether this would waive some kind of privilege of

10 somebody, but yes absolutely we had discussed this with a

11 counsel who had told us this will is legally invalid in New

12 York.

13  Q  And you knew that in this will there was specific

14 statements about not wanting to leave you money or the

15 children money?

16  A  Correct.  It's even better.  If Bernie divorces me,

17 he gets all the money directly.

18  Q  And she loved you dearly?

19  A  Yes, she absolutely--do you want me to tell you

20 what it was?  It was a tax evasion scheme.  I can tell you a

21 lot more.  Do you want me to tell you?

22  Q  Did you think she was mentally ill?

23  A  No, I did not.  I thought she was gullible.  She

24 was trying to evade estate taxes.  She went on crazy websites

25 of crazy tax avoidance people and she thought that she had

BLACK000866

278

1  come up with a perfect scheme in which she would leave a
2  bunch of money directly to Bernie in some strange tax hidden
3  account and that money would go to our minor children.  And
4  the money for the big children will go to some other thing
5  that is in her will.  I had told her that I wanted to take no
6  part in this crazy scheme.  And I also told her it's invalid
7  and illegal.  And I had told her that--oh, and the reason she
8  put in that will that she wants--if we get divorced, he gets
9  all the money is because she wanted to make sure that I don't
10  grab the money in case we get divorced, because he had a bad
11  experience with his prior wife.  The money was supposed to be
12  left to him in an account that nobody should know about.
13      Q    The first you learned about this will was when
14  exactly?
15      A    I believe in 2010, or something like this.  I don't
16  recall exactly.
17      Q    Did you know there was an addendum to the will?
18      A    She had told me some details.  She apparently wrote
19  multiple drafts and she had started consulting me on multiple
20  drafts, and I kept telling her this is illegal on multiple
21  ways and I don't want to discuss the details.  So I don't
22  remember if she told me about the addendum.
23      Q    And when--your plan was to take advantage of the
24  fact that Joanne was incapacitated, wouldn't understand your
25  lawsuit, didn't have money to hire an attorney, and then you

BLACK000867

279

1 would win?

2     A    Absolutely not. I would go to court in front of a

3 judge and I would litigate the case against an opponent who

4 cannot defend herself, but I am not (inaudible) to my

5 opponent. And I felt bad for Joanne, but what was I supposed

6 to do. People litigate against people who are much less

7 sophisticated all the time.

8     Q    Much less sophisticated?

9     A    Yes.

10     Q    She is mentally ill?

11     A    She was, but she was not helpless. She was, for

12 example, able to get $80,000 out of Fidelity against Bernie's

13 opposition. So a law professor, crazy woman; crazy woman

14 wins. She was able to get herself out of a criminal charge

15 in Colorado all by herself. She was schizophrenic; she's not

16 retarded. She knows how to--she's trained as a paralegal.

17 She knows where to (inaudible). She knows how to sue. She

18 managed to get her law firm in Connecticut terrified and drop

19 the--what is it, worker's compensation claim by making magic,

20 saying magic words. I'm not your client; I will sue. And

21 then she knew exactly on what grounds she would sue. So,

22 yes, I thought I had a superior hand. I felt uncomfortable,

23 but she was not helpless. She's not retarded. She's

24 schizophrenic.

25     Q    But you intended by that to sue and you said--I

280

1   thought you said she would default.

2       A    I thought she--it was very likely that she would

3   default, yes.

4       Q    And what did you want the outcome to be?

5       A    The designation of beneficiaries invalidated as a

6   mistake, money flowing into the estate and funds trusted--or

7   trusts are funded exactly as our mother intended.

8       Q    As our mother intended?

9       A    Joanne--I'm sorry, she had requested I call her

10  mother, and I call her mother by habit.

11      Q    And you say you called Ms. Wrigley and said great

12  news; I'm going to bring litigation?

13      A    I don't recall who--I don't recall who called whom.

14  It's possible that Bernie called her and talked and then he

15  gave me his phone and I spoke with her after that.

16      Q    And I'm just curious, though, do you use e-mail?

17      A    Yes, I do.

18      Q    Why is it that all of these things that you're

19  talking about now and that Mr. Black is talking about there

20  are no documented e-mails of that?  All these conversations,

21  did you ever send an e-mail in which anything you just said

22  is set forth?

23      A    Let me honestly tell you Ms. Wrigley is not an

24  important part of my life and was never an important part of

25  my life.  These conversations were mostly in difference to

BLACK000869

281

1    her in trying to keep a family member happy with me the

2    young, evil wife.  So I didn't actually need to talk to her,

3    but I felt that it would be nice to talk to her, so I did.

4         Q    Did you just say you were the young, evil wife?

5         A    Well, this is a cultural stereotype to which I was

6    referring.  I am not evil, I am relatively young, definitely

7    wife.

8         Q    Okay.  I'm just--I'm stunned.  How--how which you

9    were going to do benefit Joanne?

10       A    As it was explained to me--and I actually thought

11    it was plausible--if I file a lawsuit, the estate is frozen,

12    Vanguard account is frozen, everything is frozen.  There is a

13    nasty, big extended litigation that might--I believed it was

14    short and simple, but you know that no litigation is every

15    short and simple.  And I kind of knew this too in the bottom

16    of my heart.  It could have easily lasted year or two years

17    or three years.  For these years, Joanne will have no money

18    at all.

19         Another point was--

20         Q    Wait, wait, let me stop.

21         A    Yes.

22         Q    Let me stop.  Joanne would have no money at all.

23    So you wanted that because you wanted to sue?

24         A    I did not want the outcome.  I wanted to win the

25    litigation so that my children would get what they're

BLACK000870

282

1    entitled to under the will.  I did not want Joanne to suffer.

2    And because I did not want her to suffer, I agreed to

3    postpone a litigation which I believed I would win easily.

4         Q    Okay.  So now we're getting to it.  What you wanted

5    was what your children--that your children would get what

6    they were entitled to; that was your motivation?

7         A    Of course, it's always been my motivation.

8         Q    It wasn't to help Joanne?

9         A    Absolutely not.

10        Q    Okay.

11        A    There was another--

12             MR. DAIN:  I have--I have no further questions.

13             THE WITNESS:  There was another important

14   motivation for why I postponed litigation.

15             MR. DAIN:  Thank you, I'm good.

16             THE WITNESS:  No, okay.

17             MR. DAIN:  Thank you.

18             No further questions.

19                        REDIRECT EXAMINATION

20   BY MR. THIESSEN:

21        Q    And, Ms. Litvak, if Ms. Joanne Black didn't default

22   with respect to the litigation, what were your plans?

23        A    Well, I was planning to sue to invalidate the

24   assignment of beneficiaries.  So if she didn't default, that

25   means we have litigation, and then we go to litigation and I

BLACK000871

283

1    may win, I may lose, but I thought I would win.  I thought I

2    had a very strong case.

3        Q    On what grounds?

4        A    On the grounds that everybody I knew agreed it must

5    have been a mistake to leave that much money to a mentally

6    ill woman living on the street believing she's married to a

7    mobster.

8            MR. THIESSEN:  Nothing further.

9            MR. DAIN:  Okay.  Sorry, just on that question I

10   had a question.

11                       RECROSS-EXAMINATION

12   BY MR. DAIN:

13       Q    The mistake was leaving her money outright--

14       A    Correct.

15       Q    --not--not giving your kids some of that money?

16       A    Correct.  I've actually talked about this in the

17   middle of my testimony.  The mistake was leaving her money

18   outright.  But as my legal research has shown, the only

19   remedy in mistake for the assignment of beneficiary is

20   invalidation of the assignment.  When the assignment is

21   invalidated, the money flows into the estate.

22           MR. DAIN:  Okay.  No further questions.

23           THE COURT:  Okay.  Thank you.

24           THE WITNESS:  Thank you, Your Honor.

25           MR. POSKUS:  Your Honor, I think we're done.

284

 1          THE COURT:  Okay.

 2          MR. DAIN:  Okay.  So phase one we've all rested on?

 3          THE COURT:  I think so.

 4          MR. DAIN:  Okay.  Now I know you want to stop

 5    (inaudible) before.  It's 20 to six.  What do you want to do?

 6          THE COURT:  I know.  So we have to talk about it

 7    now, right.  All right.  And so and there's--there's a real

 8    disagreement about the amount of money we're talking about

 9    here?

10          MR. POSKUS:  I think so, yes.

11          MR. DAIN:  There isn't a disagreement about the

12    amount of money; there's a disagreement of what credits Mr.

13    Black should get.  The money everyone knows.  But what

14    apparently this accounting is saying--Ms. Parker's accounting

15    says, well, let's assume that everything Mr. Black did was

16    appropriate, give him credits for everything he's spent,

17    including (inaudible), and here's what's left.

18          THE COURT:  Okay.  But that's not really what we're

19    doing.

20          MR. DAIN:  Right.  That's why the only--the next

21    step I think is you either need--we either need to go from

22    Ms. Kerr's report--

23          THE COURT:  Right.

24          MR. DAIN:  --and get to the numbers.  We can do

25    that by testimony or if the Court has her report, if the

BLACK000873

285

1    Court has questions, but that should be the next step.

2              MR. POSKUS:  I agree that should be the next step,

3    but I think I should be allowed the opportunity to call Ms.

4    Harper and refute the parts of Ms. Kerr's report.

5              THE COURT:  About what parts of her report?

6              MR. POSKUS:  Of a variety of them.  There are some

7    errors in her reports.  There are some major disagreements,

8    but I have to be honest, Your Honor, I have to go back and

9    (inaudible).

10             MR. DAIN:  You see the disagreements are not on the

11   numbers.  The numbers are what they are.  The disagreements

12   are--

13             THE COURT:  About the assumptions that went into

14   it?

15             MR. DAIN:  Exactly.  The disagreement is the

16   assumption from Mr. Poskus and Ms. Harper is that Mr. Black

17   didn't breach his fiduciary duties, the--the disclaimers were

18   all appropriate, everything including the account should have

19   gone two-third/one-third, and then any discrepancies in the

20   estate, well, let's give him all these credits for paying his

21   attorneys to fight this.  Once we do that, we're left with

22   120-some thousand.  Mr. Black will pay that back in and

23   we'll--

24             MR. POSKUS:  That's not a correct statement of her

25   report or the testimony.

BLACK000874

286

```
 1          MR. DAIN:  It's pretty good.  Pretty close.
 2          So--so I guess the issue is do we go through all of
 3  that again or, again is this just digging--
 4          MR. POSKUS:  Well, we haven't been through it once
 5  yet, so--
 6          MR. DAIN:  Well, we went through this whole
 7  exercise of making this record on the first portion.  It's up
 8  to you, Your Honor.  If you want to hear from Ms. Kerr, we
 9  can do that.  I think you have all the evidence, but I--I
10  don't want to belabor that point.
11          THE COURT:  Right.  Right.  It's not helpful for me
12  at this point to go through a report that isn't just a
13  straightforward accounting; it's just not.  That's not what
14  we're trying to do here.  That's not what this case is about.
15  The case is about determining how much money was left and
16  where it went, and that's it.  And there's not supposed to be
17  any assumption about who was right, who was wrong or anything
18  else like that.
19          MR. POSKUS:  So, Your Honor, if you're telling me
20  that there will be no--I guess the question I've got to ask,
21  perhaps I need to ask Mr. Dain this as well--is the issue
22  then is just going to be how much Joanne Black should have
23  gotten had the disclaimer not been exercised?
24          THE COURT:  Right.
25          MR. POSKUS:  And that's it?
```

BLACK000875

287

1          THE COURT:  That's all it is.

2          MR. POSKUS:  That's all it is.

3          MR. DAIN:  Well--

4          THE COURT:  And, you know, what's happened to the

5     money since then is part of it--

6          MR. DAIN:  Thank you.

7          THE COURT:  --but it's not a question of should it

8     have happened or should it have not happened.  That should

9     not be an accounting.  There's no point to an accounting like

10    that.

11         MR. DAIN:  Well, there is that issue about what

12    should have happened to it afterwards, but that's--

13         THE COURT:  But that's not to come out through an

14    accounting.

15         MR. DAIN:  Pardon?

16         THE COURT:  It shouldn't be coming out through an

17    accounting.

18         MR. POSKUS:  Well, I'm not sure how else it would

19    come out what's happened to the estate.  And I will say this,

20    the issue of what happened to the money I think is an issue

21    for the estate, the court that has jurisdiction over the

22    estate.  You'll recall at the very beginning of June 16th I

23    said I think it's clear that this Court has jurisdiction over

24    the conservatorship.

25         THE COURT:  Um-hum.

BLACK000876

288

 1      MR. POSKUS:  But I'm not sure if you have

 2 jurisdiction--subject matter jurisdiction over how Mr. Black

 3 discharged his duties as personal--as executor.

 4      THE COURT:  Well--

 5      MR. POSKUS:  And I actually see a lot of what Ms.

 6 Kerr said and what Ms. Harper responded to as dealing with

 7 that issue.

 8      MR. DAIN:  Your Honor, actually if he sits as

 9 conservator, wherever the money is he still owes a fiduciary

10 duty.  He also has a fiduciary duty as executor.

11      THE COURT:  Yeah.

12      MR. DAIN:  If the fact that these are Ms. Black's

13 assets, this Court has jurisdiction over that and has

14 jurisdiction over Mr. Black.  So we--the point is, we

15 shouldn't be accounting as--or they shouldn't be accounting

16 as if they're right because now that the Court has decided,

17 as I understand, they're wrong, there was a breach of

18 fiduciary duty and we are going to have to find out just how

19 much is properly transferred, then only Ms. Kerr's accounting

20 is valid, because that strictly shows where all the money

21 went, how much is left, how much was paid to attorneys, how

22 much was paid for personal expenses of Mr. Black, and that

23 helps the Court get to the bottom line, which is how much is

24 owed.

25      MR. POSKUS:  So basically what Mr. Dain has just

BLACK000877

289

1    said, he gets to have Ms. Kerr testify regarding the
2    accounting issues because that's what she's qualified to do
3    theoretically, but I don't get to call my own expert to
4    refute anything that she says.  And he's saying--
5            THE COURT:  Well, is she--
6            MR. POSKUS:  --there's nothing--
7            THE COURT:  --is she refuting the accounting or is
8    she doing something else on her own?
9            MR. POSKUS:  She's refuting some of the accounting
10   data.  Yes, she is.
11           Ms. DiPONIO:  Your Honor, we stipulated.  The
12   parties stipulated to Ms. Kerr's and Ms. (Inaudible)
13   accounting.  This is just a waste.  This is a waste of the
14   Court's time as well as a waste of everybody's time.
15           THE COURT:  You know, I guess at the end of the
16   day, if Mr. Black wants to pay someone out of his own money,
17   not coming out of the estate to do this, I suppose he has the
18   right to do it.  But he doesn't have the right to use
19   Joanne's money--
20           MR. POSKUS:  I agree.  Then he's--
21           THE COURT:  --to do it.
22           MR. POSKUS:  We've fixed that, Your Honor.
23           THE COURT:  How did you fix that?
24           MR. POSKUS:  Well, I've got the money that he paid
25   Ms. Harper in my client trust account.  So he's not using

BLACK000878

290

1   his--any estate money, because that's what was used estate

2   money.

3           MR. DAIN:  No, no.

4           MR. POSKUS:  Yes.

5           MR. DAIN:  Joanne's money.

6           MS. DiPONIO:  That's right.

7           MR. POSKUS:  No, no, no.  No, that's not--that's

8   not the case.  There's no order yet that's been entered that

9   says that's Joanne's money; that's the estate's money.

10          MR. DAIN:  Ms. Harper agrees it's--

11          MS. DiPONIO:  That's right.

12          MR. DAIN:  Let's not play word games here.  That's

13  the--

14          MR. POSKUS:  Oh, I'm not.

15          MR. DAIN:  But I accept it now he was paid 150,000

16  back, and Mr. Glatstein is saying he's holding 15,000.  If

17  the Court trusts that that 130,000 remains stable, I don't

18  know how the Court can now trust that Mr. Black won't spend

19  the other 38,000 left of Joanne's money.

20          THE COURT:  Right.  Well, I'll attempt to remedy.

21  But okay.  So basically we'll pick a date, it's going to be

22  another day, to deal with the accounting piece of it.  But--

23  and I intend to file a written order on this, but basically

24  I--based on this testimony, the elements of the breach are

25  met resoundingly so.

BLACK000879

1       Mr. Black is a fiduciary specifically to Ms. Black;
2    he breached his duties.  There have been damages and losses
3    and his breach has been the cause of her injuries and
4    damages.
5       I think Ms. Litvak had the right instinct and I
6    tried to say this multiple times throughout these
7    proceedings.  This should have never come this way.  It
8    should have gone right back to the probate court in New York
9    at the very first instance to hash this out.  And this
10   (phonetic) with the disclaimer and all the rest of it has
11   really served to muddy the water, create a significant amount
12   of family discord when it could have been just a simple
13   dispute over whether or not she had an intent to do these POD
14   designations.  I'm not satisfied that there has been full
15   disclosure.  And as we indicated before around the noon hour,
16   I find that there has not been full disclosure to this Court
17   as to what the intent was, what the effect was going to be,
18   and that is what candor to the Court is supposed to be all
19   about.  The Court is not supposed to try to figure out from
20   myriads of documents what it is that everybody means and what
21   is intended.
22       The Court's not supposed to have their staff do all
23   the legal research for the lawyers or the parties or force,
24   you know, court appointed counsel to do it or the GAL.  And
25   this testimony I, frankly, do not accept and don't believe it

BLACK000880

1  that all of this was up front and it was just, you know, a

2  way to effectuate the terms of the will.  I just don't find

3  that credible.  And I do not find credible this testimony

4  that everything was disclosed, everybody knew, everybody was

5  on the same page.  Then if everybody was on the same page,

6  why does nobody seem to know about it?  And as I said, I will

7  go through and I will make specific findings on all of the

8  elements.  But the thrust of my order is that he's definitely

9  breached his duties and that there--and that a surcharge is

10 appropriate.  Because, based on your disclaimer argument, I

11 am left with no other option to remedy the situation.

12         So--and I will get an order out.  It's in October.

13 I do not--I am very dismayed that what I would do or so is

14 misrepresented to any other court.  I was extremely dismayed

15 to hear this half truth given to the court in New York.  And

16 it was demonstrated again on the record just a little while

17 ago with the transcript colloquy between Mr. Dain and Mr.

18 Black about the hearing, it looks like it was February 19th

19 of 2015.  I mean Mr. Black clearly did not represent to the

20 court in New York that he understood--or Mr. Dain did not

21 represent to the court that he understood what Mr. Black was

22 trying to do.  That's not what the transcript shows.  And

23 it's the same sort of thing that went on with my order.

24         So in order to try to prevent all of this, to the

25 extent that this court has authority to do so, I am ordering.

BLACK000881

293

1    And to the extent that this court may not have authority, I
2    am recommending to another court that Mr. Black--he's revoked
3    as conservator.  That he should not have any other fiduciary
4    responsibilities at all with respect to any money which may
5    come into Joanne Black either through the estate, through
6    guardianship, through conservatorship, through any other
7    proceeding.
8            There is some conflicting evidence about it in
9    terms of who called what--who called who and who said what to
10   who and what the time periods were, but the bottom line is
11   that there was not disclosure to this court and this court
12   entered an order approving the disclaimer under false
13   pretenses, and that is unconscionable, especially from a man
14   of this stature and attorneys of the statute that we had in
15   this court as well.  It's just unacceptable and it cannot be
16   condoned.
17           So Ms. Peterson, at this point, is the Colorado
18   conservator, and she has the only fiduciary duty, as far as
19   I'm concerned, with respect to Joanne Black's funds in this
20   state or in any other state where Joanne Black has money.  If
21   the court in New York chooses to appoint someone out, I am
22   making this my recommendation and suggestion then.  But it
23   should not be her brother, Bernard Black.  There's a clear
24   conflict of interest, there always was as demonstrated by the
25   testimony from his wife.  You know, there was a problem with

BLACK000882

294

1    the two younger children; she was upset about it.  I agree
2    that the 2010 will is difficult to understand, if it can be
3    understood, but there was clearly another will that she tried
4    to revoke the '97 will.  The probate court in New York wasn't
5    told about that will.  The decisions were made.  There hasn't
6    been candor to any court as far as I can tell at this point.
7    So it's just not--it's not right.
8            And the other part of it is, is that whatever went
9    on in the family, it was clearly no family agreement about
10   what was fair, what wasn't fair, what grandma meant, what she
11   didn't mean, whether or not she made a mistake or any of it.
12   And if there was an agreement, because heirs and
13   beneficiaries can override these instruments.  And if there
14   was a full agreement, they would have done that.  They would
15   have gone to the court in New York and said, okay, this is
16   what she said and this is why we don't agree and this is what
17   we want to do and this is what fair to everybody, but no one
18   did that.
19           And that's why I've been trying to probe whether or
20   not there was any intention to do that.  And I find that
21   there wasn't.  There just flat out wasn't.  So whatever was
22   said or not said, it did not result in a family agreement
23   about what to do about the POD designations.  And there was
24   no family agreement about what to do about the POD
25   designations.  And there was no family agreement that I'm

BLACK000883

295

1   able to discern as to what to do about the effect of the POD

2   designations.  And I don't know that there's really

3   disagreement that Joanne Black in a psychotic state on the

4   streets in Denver should have been the recipient of 3 million

5   in cash.  I also wonder how Vanguard would have known--would

6   have known where to pay it to her, but I suppose as a

7   practical matter how she would have gotten it.  But anyway,

8   the bottom line is there's no family agreement on this and

9   this court wasn't told.  So for those reasons, generally, I

10  am revoking Mr. Black's appointment as conservator for his

11  sister and I'm ordering that he not have any fiduciary

12  responsibilities whatsoever with regard to any of her money

13  or the determination as to what should be part of her money.

14          Whether or not I think I have any other authority

15  in terms of it, you know, I'll keep mulling that over as I go

16  through my written order, but I'm hoping to a written order

17  out that's fully detailed before this scheduled hearing in

18  October or whenever it is.  So that the court in New York

19  there won't be any question about what I thought or what I

20  did or what I ordered.

21          We will set the hearing at this point to determine

22  what the amount of the surcharge should be.

23          MS. DiPONIO:  Your Honor, I also have a motion

24  pending for (inaudible) damages.  I would ask that the Court

25  consider that as well with the surcharge.

296

```
 1          THE COURT:  Okay.
 2          MR. DAIN:  Your Honor, at least as to the--well, I
 3    shouldn't say that.  But with respect to the Roth IRA, I
 4    think there's (inaudible) of that, but additionally I want to
 5    ask the Court one more thing, and I know the Court has been
 6    patient, but Ms. Kerr needs--absolutely needs to get paid.
 7    She's been doing this without any compensation.  It's
 8    basically breaking her in terms of her ability to continue
 9    functioning--
10          THE COURT:  Okay.
11          MR. DAIN:  --not just in this case but in her
12    practice.  I mean this is a huge amount of her time and
13    effort.  And if you read the objections, there's nothing in
14    there that specific saying this amount of time should be
15    reduced to this or anything else.  And again, I--as a trustee
16    of the trust, I would have otherwise paid this.  It's
17    absolutely reasonable.  The accounting is, again, detailed,
18    it's--she's persistent in getting all the information.  She
19    needs to get paid.  I mean she can't--she can speak for
20    herself, but she can't continue practicing like this.
21          THE COURT:  Um-hum.
22          MR. DAIN:  And again I state, you know, even though
23    they gave the money back, the attorneys had no problem; we
24    pay ourselves.  But she's been doing this for months.  I mean
25    I assume that Ms. DiPonio and Ms. Young will submit their
```

BLACK000885

1    requests.  I also--I don't know--okay, I know Ms. Wrigley

2    hasn't been paid.  I'm going to submit at least a request for

3    Mr. (Inaudible), but just Ms. Kerr.  Maybe we could get Mr.

4    Poskus to agree that even though he doesn't like the

5    accounting--her efforts given the outcome that the Court has

6    come to, were beneficial to Ms. Black.

7         MR. POSKUS:  Let me make a suggestion, Your Honor.

8    If Mr. Dain is willing to speak to me sometime next week,

9    maybe he and I can talk on the phone and see if we can work

10   out a number that we agree on.

11        MR. DAIN:  No.

12        THE COURT:  Well, I think what I'm going to do is--

13   the bill was, what, 46,000?

14        MR. DAIN:  It's actually--

15        UNIDENTIFIED SPEAKER:  It's--I think the balance is

16   about 46,000 through June 24th.

17        THE COURT:  Right.  So what I'm going to do is I'll

18   order 40,000 paid; that will leave you some wiggle room with

19   the six.

20        UNIDENTIFIED SPEAKER:  There is no 40,000 in any of

21   the accounts still.

22        THE COURT:  Well, he's got 100 sitting in his trust

23   account.

24        UNIDENTIFIED SPEAKER:  Did he transfer that to Ms.

25   Peterson?

BLACK000886

298

1          THE COURT:  So--

2          MR. POSKUS:  Well, Your Honor, I said I would do

3     whatever you ordered.  I'll meet that.  Give me a few days to

4     make sure the check cleared otherwise I get in trouble with

5     the Supreme Court.  But once it clears, I'll do whatever you

6     order me to do.

7          THE COURT:  Within ten days.

8          MR. POSKUS:  Within ten days, okay.

9          THE COURT:  40,000 to be released from Mr.--

10         MR. POSKUS:  Okay.

11         THE COURT:  --Poskus' trust account to go through

12    Ms. Peterson and then to Ms. Kerr.

13         MR. DAIN:  Actually I'm unclear, Your Honor, why--

14    if Ms. Peterson is now the conservator, why isn't this whole

15    115,000 to Ms. Peterson?  It shouldn't be in Mr. Poskus'

16    account.

17         THE COURT:  Well, I'm not sure that I disagree with

18    that, but we're not going to spend more time today talking

19    about it.

20         MR. DAIN:  Okay.  So next date, I guess.

21         THE COURT:  Right.

22         (Pause.)

23         THE COURT:  I have this Friday the 7th, and I have

24    Tuesday the 18th and Monday the 24th.

25         MR. POSKUS:  Pardon me, Your Honor.

299

1          MR. DAIN:  I'm sorry, say that again, Your Honor.

2          THE COURT:  This--this Friday, which is the 7th, I

3     have--

4          MR. DAIN:  Oh.

5          THE COURT:  --the 18th, which is a Tuesday, and

6     Monday, August 24th.

7          MR. DAIN:  Monday, August 24th, would be the best--

8     funny, actually I'm here next week on another case, Thursday

9     and Friday, I think one of those is that day.  When is--

10          UNIDENTIFIED SPEAKER:  Thursday is the 13th.

11          MR. DAIN:  13th and 14th, and then you said you have

12     the 17th?

13          THE COURT:  18th.

14          MR. DAIN:  Or 18th.  Why don't we do the 18th?

15          THE COURT:  Does that work for anybody else?

16          MR. POSKUS:  Sorry, Your Honor, I was checking to

17     see if Ms. Harper can be here on the 18th, and she can be

18     here.

19          MS. DiPONIO:  Your Honor, I have a conflict.  I

20     have another matter in Jefferson County.

21          THE COURT:  What about the 24th?

22          MR. POSKUS:  The problem is that Ms. Harper can't

23     be here on the 24th.  She's already scheduled for a

24     deposition.

25          MS. DiPONIO:  Your Honor, that's okay.  Mr. DiPonio

BLACK000888

1    can come on the 18th and I can be here for awhile and then

2    would have to leave.  He could be here in my absence, if

3    that's okay.

4           THE COURT:  On the 18th of this month?

5           MS. DiPONIO:  Yes.

6           THE COURT:  You have a conflict?

7           UNIDENTIFIED SPEAKER:  17th.

8           THE COURT:  But not here; somewhere else?

9           UNIDENTIFIED SPEAKER:  In Denver.

10          THE COURT:  Okay.  All right.  So that's not going

11   to work then.

12          UNIDENTIFIED SPEAKER:  I could do it through the

13   24th.

14          MS. DiPONIO:  And likewise, Your Honor.

15          UNIDENTIFIED SPEAKER:  Tomorrow.

16          MR. DAIN:  Tomorrow I can do, but--you know what, I

17   can fly back.  I mean if we can do it the 7th, maybe I'll

18   just--if we fly out tonight, I'll fly back tomorrow night.

19          MR. POSKUS:  Well, I can't do it the 7th, Your

20   Honor.  I'm sorry.

21          THE COURT:  All right.  So--

22          MR. DAIN:  And there's nothing on the 15th?  The 7th

23   is--

24          THE COURT:  But Mr. Poskus is out.

25          MR. POSKUS:  I can't be here.

BLACK000889

301

1        THE COURT:  Well, so then if we're into September,
2  the first date I have in September is the 10th?
3        MR. DAIN:  I'm in--let me make sure of that.
4        THE COURT:  Or the 11th.
5        MR. DAIN:  I'm in Japan, Your Honor.  I'm sorry,
6  the--
7        MS. DiPONIO:  can you do the 25th?
8        MR. DAIN:  Of?
9        MS. DiPONIO:  August.
10       MR. DAIN:  She--
11       MS. DiPONIO:  Your Honor, could she be available by
12  telephone if--
13       MR. DAIN:  She's (inaudible).
14       THE COURT:  All right.
15       MR. DAIN:  You can't change that deposition?
16       THE COURT:  September 18th?
17       MR. POSKUS:  See, the 18th we can do.
18       THE COURT:  Okay.  Of September?
19       MR. POSKUS:  Oh, I'm sorry, September.  Forgive me.
20       MR. DAIN:  And I'm sorry, Your Honor, that's when
21  I'm in Japan.
22       THE COURT:  Okay.
23       MR. DAIN:  And I'll be out of town.
24       THE COURT:  The 28th?
25       MR. DAIN:  September 28th.  And remember, Your

BLACK000890

302

1   Honor, we have to be--well, we have to be in New York for the
2   1st.
3           THE COURT:  When is the next New York court date?
4           MS. DiPONIO:  October 1st, Your Honor.
5           THE COURT:  Okay.
6           MR. POSKUS:  Your Honor, Mr. Black is not available
7   on September 28th.
8           THE COURT:  Or the 29th?
9           MR. POSKUS:  What about the 29th?  We could make
10  the 29th, Your Honor.  We have too many moving parts.
11          (Pause.)
12          THE COURT:  Well, I--it looks like we could
13  actually do September 8th, if that makes a difference.
14          MR. DAIN:  I'm sorry, say it again?
15          THE COURT:  September 8th.
16          MR. DAIN:  September 8.
17          MS. DiPONIO:  That is--
18          MR. DAIN:  We could do September 8th, Your Honor.
19          THE COURT:  Does that work for everybody else?
20          MR. DAIN:  Okay.  This is going to be outstanding,
21  because I have to be here on the 9th and 10th on that other
22  case, so we can do it the 8th and lock it in right now.
23          THE COURT:  Okay.
24          MR. DAIN:  We'll go with September 8th.
25          THE COURT:  September 8th.  Ms. Kerr is going to be

BLACK000891

1   out of town; is that what you're saying?

2          UNIDENTIFIED SPEAKER:  Yes.

3          MR. DAIN:  Can we--here's what I was wondering,

4   Your Honor.

5          THE COURT:  Does it have to be before the 1st?

6          MR. DAIN:  No, that part before October 1st, the

7   actual surcharge--

8          MS. DiPONIO:  That's the proceeding in New York.

9          THE COURT:  But that's the appointment for a

10  guardian, right?

11         MR. DAIN:  Right.

12         MS. DiPONIO:  Well, I think the New York--and Mr.

13  Salzman can correct me if I'm wrong.  I think they're waiting

14  on a total ruling from the court here.  I could be wrong,

15  but--

16         MS. KERR:  (Inaudible).

17         MR. DAIN:  Thank you, Ms. Kerr.  And let's do it

18  before anyone else checks their calendar.

19         THE COURT:  All right.  Okay.

20         MS. DiPONIO:  At 9 o'clock then?

21         MR. DAIN:  I think we're agreed on the 8th.

22         THE COURT:  Okay.

23         MR. DAIN:  Thank you.

24         THE COURT:  All right.

25         MR. DAIN:  And I'm sorry, there's just one last--I

BLACK000892

304

1    think the parties have all stipulated, we still have an issue

2    with the (inaudible), but if Ms. Wrigley--there was no

3    objection to 31,000 of her--

4              THE COURT:  I'm ordering 40.

5              MR. DAIN:  Oh, no, not Kerr.

6              MR. POSKUS:  We're talking about the reimbursement

7    to Cherie Wrigley.

8              THE COURT:  Oh.

9              MR. DAIN:  It's already been stipulated.  I just--

10             MR. POSKUS:  There was a motion filed.  It's been--

11   the motion indicates--Ms. Peterson filed a motion and

12   indicated we had no objection of--

13             MR. DAIN:  I'm just wondering how we get it if

14   there's no money in the account.

15             UNIDENTIFIED SPEAKER:  Not in the--

16             MR. DAIN:  Oh, no, there's money in the trust

17   account.  The problem--

18             UNIDENTIFIED SPEAKER:  There's only $13,000.

19             MR. DAIN:  Oh, in the estate.  Could we just ask

20   Mr. Poskus to deliver that amount, too, to Ms. Peterson, the

21   amount that we had stipulated to in addition to the 40 out of

22   the (inaudible) account and then she'll have the assets

23   payable to--

24             MR. POSKUS:  You know, Your Honor, I think we all

25   agree--and this is the conference that Mr. Dain wasn't a part

BLACK000893

305

1    of at the recommendation of Ms. (Inaudible) he thought there
2    would be an accident paying that out of the SNT.  If that's
3    what--
4              MR. DAIN:  No, no, you're right.  That is
5    important.
6              UNIDENTIFIED SPEAKER:  No, the SNT.
7              MR. DAIN:  No, there is money--no, there's money--
8              UNIDENTIFIED SPEAKER:  The SNT has $2 million in
9    it.
10             MR. DAIN:  But how do we do that?  I know you've
11   relieved Mr. Black of his--well, not relieved, but you
12   revoked his fiduciary duties, but he's the only one that
13   still has the checkbook on this Supplemental Needs Trust.
14   So--
15             THE COURT:  Well, it needs to be turned over then--
16             MR. DAIN:  Yes.
17             THE COURT:  --to Ms. Peterson.
18             MR. DAIN:  That's what I was going to say.
19             THE COURT:  I'm recommending that the Surrogate's
20   Court spend its authority as the executor and that a non-
21   family executor be appointed.
22             MS. DiPONIO:  And, Your Honor, as soon as your
23   order comes out, I will make sure Mr. (Inaudible) has a copy
24   of that order so that he can provide that to the court in New
25   York--

306

 1          THE COURT:  All right.

 2          MR. DiPONIO:  --and they can take it whatever.

 3          THE COURT:  All right.  But I think the other court

 4     should be on notice as of today that he's suspended.  This

 5     can't go on.  And there's no end in sight.

 6          MR. DAIN:  Just--we were speaking of (inaudible).

 7     The problem is, I'm thinking in the Supplemental Needs Trust

 8     you've got to sell stock or assets in order to make that

 9     payment that might (inaudible).  There is 30-something

10     thousand in the estate, and that could be transferred to the

11     Supplemental Needs Trust.

12          MR. POSKUS:  I'm sorry, say that again.  I'm--

13          MR. DAIN:  Doesn't the Supplemental Needs Trust

14     have assets that would need to be sold.

15          MR. POSKUS:  I--Bernie?

16          MR. BLACK:  depending on the amount, we might have

17     a need to sell assets; it's about--

18          MR. DAIN:  It's about supplemental needs.  It's

19     about 31,000.

20          MR. POSKUS:  Yeah, but that might be that much of a

21     good asset.

22          THE COURT:  All right.  So, Mr. Black needs to turn

23     over all account checkbooks, statements, everything to Ms.

24     Peterson.  So information and checkbooks or other--whatever

25     it is that gives him authority to withdraw money.  Also

BLACK000895

307

1    within the next ten days, with no withdrawals in the meantime
2    I'll authorize $40,000 to Ms. Kerr and--
3            (Pause.)
4            THE COURT:  And I definitely wouldn't recommend if
5    I don't have authority to order that he not be appointed as
6    guardian.  Okay.  And then we'll have the hearing on the
7    actual amount of the surcharge at this point on September
8    8th.  And I will take Ms. DiPonio's request under
9    consideration on the civil theft.
10           MS. DiPONIO:  Thank you.
11           THE COURT:  Okay.  Anything else as far as orders
12   go?
13           MR. DAIN:  Nothing.
14           UNIDENTIFIED SPEAKER:  (Inaudible).
15           THE COURT:  Right, and that seems to be working for
16   the moment.
17           UNIDENTIFIED SPEAKER:  Yes.
18           THE COURT:  So I'll just continue to authorize what
19   you've been doing, if there's no change with them and you
20   just transfer it to Ms. Peterson.  Okay.
21           MR. DAIN:  Thank you, Your Honor.
22           THE COURT:  That will be the order of the Court
23   then.
24           MS. DiPONIO:  Thank you.
25           MR. DAIN:  Thank you, so much.

BLACK000896

308

```
 1          MR. POSKUS:  Thank you, Your Honor.
 2          (Whereupon, the hearing was adjourned.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BLACK000897

309

---

CERTIFICATE

---

STATE OF COLORADO  )

                 :

COUNTY OF DENVER   )


       I, Suzanne H. Ben Majed, Transcriptionist for the Denver Probate Court, in the State of Colorado, do hereby certify that the above and foregoing is a transcript of the recorded proceedings, based upon the quality of the recording and my ability to understand it, taken at the date and time set forth on Page One hereof.

       DATED at Denver, Colorado, this 4th day of September, 2015.


                          /s/Suzanne H. Ben Majed

                          Suzanne H. Ben Majed
                          Official Transcriber
                          Federal Reporting Service
                          17454 E. Asbury Place
                          Aurora, CO  80013

BLACK000898