**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KATHERINE BLACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.  17-cv-00101 |
| | ) | |
| CHERIE WRIGLEY and | ) | |
| PAMELA KERR, | ) | Honorable Matthew F. Kennelly |
| | ) | |
| Defendants. | ) | |

## APPENDIX TO DEFENDANT PAMELA KERR'S PROFFER OF EXHIBITS RELATED TO BERNARD BLACK, THE DENVER PROBATE COURT PROCEEDINGS AND/OR THE NEW YORK PROCEEDINGS

# EXHIBIT 7

# LAST WILL AND TESTAMENT

DATE FILED: May 28, 2015 9:01 AM
FILING ID: D6E397BE14C41
CASE NUMBER: 2012PR1772

## OF

## RENATA BLACK

I, RENATA BLACK, currently residing at 36 Gordon Avenue, Briarcliff Manor, Westchester County, New York, do hereby make, publish and declare this as my LAST WILL AND TESTAMENT as follows:

**FIRST:**     I hereby revoke any and all Wills and Codicils heretofore executed by me.

**SECOND:**     I direct that funeral and testamentary expenses be paid by my Executor hereinafter named as soon after my decease as is practicable. I further direct that all estate, succession and inheritance taxes be paid as an expense of administration and without apportionment.

**THIRD:**     I give and bequeath the sum of Fifty Thousand Dollars ($50,000.00) to my son, BERNARD BLACK, currently residing at 7 Goodwin Street, Hastings-on-Hudson, New York, less the amount of any executor's commissions paid to BERNARD BLACK.

**FOURTH:**     I give, bequeath and devise all the rest, residue and remainder of my estate as follows:

>     (A)     Two-thirds (2/3) to the Trustees of the *Supplemental Needs Trust for the Benefit of Joanne Black*, IN TRUST, said Trust Agreement having

EXHIBIT
2

been executed on the 19th day of December, 1997, as said Trust may be amended from time to time;

(B)    The balance to the Trustees of the *Irrecovable Trust for the Benefit of the Issue of Renata Black*, IN TRUST, said Trust Agreement having been executed on the 19th day of December, 1997, as said Trust may be amended from time to time.

**FIFTH:**    My Executor shall place the residential property at 26 McKeel Avenue, or, if this property is no longer part of my estate or is unsuitable, another suitable residential property, as determined by the recommendation of the Trustee of the *Supplemental Needs Trust for the Benefit of Joanne Black* into said *Supplemental Needs Trust* to provide a residence for JOANNE BLACK.

**SIXTH:**    I nominate, constitute and appoint BERNARD BLACK as Executor of this, my WILL. In the event, however, that BERNARD BLACK does not survive me or is unable to perform the duties of Executor, I nominate, constitute and appoint ANTHONY DAIN, c/o DAIN & LI, Emerald Shapery Center, 402 W. Broadway, San Diego, California, as Executor of this, my WILL. In the event, however, that ANTHONY DAIN does not survive me or is unable to perform the duties of Executor, I nominate, constitute and appoint HELENE M. DAIN, currently residing at 330 Windtree, Thousand Oaks, California, as Executor of this, my WILL. I direct that the Executor of this, my WILL, shall not be required to furnish any bond or other security in any jurisdiction for the faithful performance of the duties of Executor. I direct that any Executor or Successor Executor named in this will, other than BERNARD BLACK,

(2)

BLACK012227

shall waive statutory executor's commissions, and that BERNARD BLACK shall waive

statutory executor's commissions in excess of $50,000.00.

**IN WITNESS WHEREOF**, I have hereunto subscribed my name and affixed my

seal this *19th* day of *December* , 1997 .

*Renata Black*
RENATA BLACK

Subscribed by RENATA BLACK, the Testatrix named in the foregoing
LAST WILL AND TESTAMENT, in the presence of each of us and, at the
time of making such subscription, the above instrument was declared by
the said Testatrix to be her LAST WILL AND TESTAMENT and each of
us, at the request of said Testatrix, and in her presence and in the
presence of each other, signed our names and witnesses thereto.

residing at *221 Piermont Ave*
*South Nyack NY*

*Lynda Karalandra* residing at *97 Highview Place*
*White Plains, NY 10604*

*Laraine Plaumore* residing at *17 Scott Drive*
*New City, NY 10956*

(3)

BLACK012228

STATE OF NEW YORK         )
                                   : ss.:

COUNTY OF WESTCHESTER    )

LEE A. HOFFMAN, JR., currently residing at 221 Piermont Avenue, South Nyack, New York;

LYNDA LASALANDRA, currently residing at 97 Highview Place, White Plains, New York 10604; and

LORRAINE GIANNONE, currently residing at 17 Scott Drive, New City, New York;

each being duly sworn, depose and say:

      They witnessed the execution of the Will of **RENATA BLACK**, dated December 19, 1997, consisting of three (3) pages.

      The Will was executed at the law offices of HOFFMAN, WACHTELL, KOSTER, MAIER & MANDEL, 399 Knollwood Road, White Plains, New York, under the supervision of LEE A. HOFFMAN, JR., an attorney-at-law, in accordance with the EPTL, and this affidavit is made at the request of the Testatrix;

      The Testatrix, in our presence, subscribed her name to the Will at the end thereof and, at the time of making such subscription, published and declared the same to be her LAST WILL AND TESTAMENT; thereupon, we, at her request and in her presence and in the presence of each other, signed our names thereto as subscribing witnesses;

      The said Testatrix, at the time of such execution, was more than eighteen (18) years of age and, in our opinion, of sound mind, memory and understanding, not under any restraint or in any respect incompetent to make a Will;

      The Testatrix indicated to us that she had read the Will, knew the contents thereof and that the provisions therein contained expressed the manner in which her Estate was to be administered and distributed upon her death;

      The Testatrix could read, write and converse in the English language, and was suffering from no defect of sight, which would affect her capacity to make a valid Will;

      The Testatrix signed only one (1) copy of the said Will on said occasion.

_____
LEE A. HOFFMAN, JR.

_____
LYNDA LASALANDRA

_____
LORRAINE GIANNONE

Sworn to before me this

23 day of Dec, 1997

_____
Notary Public

**CHRISTOPHER E. RAO**
Notary Public, State of New York
No. 02RA5076033
Qualified in Putnam County
Commission Expires April 14, 1999

# EXHIBIT 8

Will by end of Renata Black   1/25/2010      Page one of two

This WILL supercedes the WILL from Dec.1997 and all other previous wills. If any instructions are in conflict with any previous WILLS the current Will is the controlling one.
Previous will mentions that 2/3rds go to Joanne and 1/3rd to 5 grandchildren
Prior to any division 26 Mc Keel Ave House and Halston House Condo , (apt 1E), are to go to Joanne Black . Same goes for any bonds left in Joanne's and my name, which go automatically to her.  Bonds (2 EE Bonds, purchase price 5000.00 each, value today 13600.00 each, and inflation protected I Bonds in the name of both Renata Black and Joanne Black.  Bonds although purchased in 08 and 09, or after, were given as a gift  IN STAGES OVER SEVERAL YEARS while I was alive, and are not part of 2/3rds , 1/3rd division (as most of this money was given to me for her by her grandmother before her death)
Deed transfers to Joanne  for above properties are in top drawer green cabinet, signed by me.
The new car (Matrix) and all possessions that she wants, like jewelry, computers, printers, T.V sets, pictures, furniture, etc, go to Joanne as well not part of 2/3 thirds, 1/3 third
*Bernie also is to receive one payment of $50,000.00 as executor,* prior to any 2/3, 1/3 distribution.
The remaining properties (46 Bacon Hill Rd  and 47 Juniper Rd) are to be sold, proceeds added to total money left. From that money to be paid are prior to division : all inheritance taxes including on 26 Mc Keel Ave, and on Halston House condo, Roth Ira in Vanguard)
The remaining money upon my death, is to be used as follows:$2,000, 000.00 (two million)  placed in a TIAA CREFF TESTAMENTARY trust fund  for Joanne Black , or in a revocable living trust if one was opened, while I was still alive. The $1,333,333.33  is to be taken from Joanne's two thirds, the $666,666.66 is to be taken out of the one third for the grandchildren, unconditionally, in all events, as long as Joanne is alive( this money they will be getting at the time of Joanne's death, at which time they will get much larger sum, double or triple, in time for their retirement.
Any money remaining above the 2000000.00 is to be divided as follows:1/3rd to 5 grandchildren, 2/3d s to Joanne. From Joanne's 2/3ds she is to get $25,000.00 to put in her savings and/or checking bank account  Also a separate account should be opened with $25,000.00, placed in a separate bank account opened in Joanne's name. Money in that account is to be used by Trustee Ernie Domingos ,(and replenished by Joanne as needed from either Joannes account or sale of some shares of Vanguard fund,) to pay major bills, which Tia Creff is not paying. Although Joanne has access, she should use the account with caution for any Major needs, preferably just leave it for major bill payment for Ernie Domingos.
Remaining money that goes to Joanne, can be left under her name in Vanguard 's total stock market fund, she is free to spend this money as she wants to.
Terms of the above testamentary trust fund (or if opened revocable living trust) are as follows:
**The yearly fee that Tia Creff charges is not deducted from Joanne, 6 percent.**
**The money necessary for bill payment is deducted by Tiaa Creff automatically  from total yearly amount  1,200,000. 00 she gets distributed to her.** Tia Creff should strive to maintain balance  as close to $ 2,000,000.00 as possible, but not above.
Joanne should get minimum 6 percent (a year), of $2,000,000.00, which is minimum $ 120,000.00 Yearly (Above amount is to include, all dividends and capital gains), which is to be distributed to her prorated by Tia Creff every 2 weeks if possible, or even weekly ,( However prior to  transferring the money to Joanne 's account Tia creff  will hold back [part] of that money for their bill payment, as deemed necessary.
  The balance the  trust fund immediately transfers out of the trust fund to Joanne's bank account , so Taxes are paid at individual not trust's tax bracket. The difference that the money in trust fund really brought in income, if it is less then 6%, will be supplemented by encroaching upon the principal. (and at later date if income is above 6%, added back on to principal, to replenish the total principal balance, to the sum of $2,000,000.00  ( not above it)( At the end of the year or more often ,if they can, the trust must distribute any excess amount above $ 2,000,000.00 and transfer immediately to Joanne's bank account

EXHIBIT
BBlack 14
Planet Depos, LLC

Page two of two

The bank account will be supervised by Ernie and checked 2 times a year by Bernie and or Tony or Sam if he is local. The principal does not belong to Joanne and it can not be attacked by any creditors or government. Upon Joanne's death the entire amount is to be distributed equally to: Five Grandchildren from Bernie's first marriage. David, Ben, Sam, Sarah, Ekora

Ernie Domingo is to be made a Trustee of Joanne's part of the money. He will receive $3,500.00 yearly salary as trustee for performing trustee's work: Collecting all distributions from Tia Cref into the bank account, making sure that the money is **immediately paid out of the Tiaa Creef trust so taxes are paid at Joanne's tax income rate not trust's.** Ernie will also be paid hourly wages with yearly cost of living increases to run Joanne's household financially, same as he did mine. He will be paying all the bills, seeing to it that no bill payments are forgotten or missed, that Joanne is all right, ( **which is integral part of his responsibility of being the trustee).**

Paying the major bills, like taxes, insurance, etc. may possibly be done by Tiaa Cref , so the trust fund is grandfathered from the beginning to pay her bills,( just in case of future changes in their bylaws and they no longer accept new paying bills accounts).

Ernie Domingo can be asked **not** to perform his duties as per above **only if all four (if alive) : Tony Dain, Bernard Black, Sam Black, and Dustin Patenaude agree that he is doing a bad job,( If all 4 are not alive 3 out of four is sufficient)**

**Capital placed in the above funds is not Joanne's property and as such she can never take it out, neither can it be subject to creditors, as she does not own it.**

The remaining money is to be distributed 2/3 to Joanne and 1/3rd to Bernard's 5 children from first marriage in event that Bernard is permanently disabled and his net worth is less than four million, I/d I/d of the 1/3rd inheritance goes to him , unless he waves his part. If Bernie is sick or no longer married to Kate the entire balance of 1/3 rd, **after taking out first the $ 666,666.66 for Joanne's testamentary fund** goes to him .

Balance of Joannes two thirds from inheritance money can be kept in Vanguard's total stock market fund, which she can do with whatever she wants, and draw upon as needed to supplement the original money placed in Checking accounts.

In the event, **and only in that event** that the taxes on the income *will have to be paid at the trusts tax bracket,* and rather than **Joanne's tax bracket,** it may be more economical to purchase annuities for her, from the above mentioned 2,000,000.00, rather then putting the money in the trust . The annuity will continue after her death for the grandchildren, and therefore Joanne gets less income during her lifetime, it would be similar to the funds, where part of the money came from their 1/3rd to start with. Bernie must compare the monthly amount payable by annuity, minus taxes, versus monthly amount payable by the fund minus taxes. The choice will be made depending whichever is more beneficial for her.

George Riedel if alive will have to be consulted and approve of the wisdom of purchasing annuities versus funds.

p.s. The Baron Hill House was purchased with grandmother's down payment, and wishes that it be for Joanne financially, I am substituting the McKeel Ave House and Holston House Condo, as this seems more practical, and she can use them for residence at one time or another.

BLACK015837

Page 3

Duties that Ernie Domingos is nto perform:
1. See Joanne every two weeks or if needed more often.
2. Helping her to
   a. take care of bills not paid by Tian Creef
   b. To balance her checkbook
   c. Making sure her credit card is paid off on time.
   d. her health insurance is paid for and is ok.
   . Arranging wherever possible for automatic withdrawals from bank account he is managing, and that Joanne has to and is supplementing the money in it.
3. Making sure that her Taxes and insurance bills, if not paid by Tian Creef, are paid on time. And even if Tia Creef is paying them, just making sure, that it is all taken care of. and the insurance. etc ,from time to time

.For the above he will be paid separately on hourly basis. hourly

Ernie is also as her trustee to keep checking on Joanne separately, if needed every week, to make sure that she is all right, that she is taking care off of her responsibilities, keeping her living quarters in good shape. taking care of her appearance,
He is to make sure that all the above things above are done not just by him but together with her, so she is capable to do them if needed on her own, and to manage her life on her own ,when she has to.

# EXHIBIT 9

1

HON. RONALD B. LEIGHTON

2

FILED_____LODGED
_____RECEIVED

3

MAR 3 1 2009

4

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____DEPUTY

FILED_____LODGED
_____RECEIVED

MAR 3 1 2009

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____DEPUTY

5

6

7

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

8

9

UNITED STATES OF AMERICA,                    )        NO.   CR07-5775RBL

10

Plaintiff,                )

11

v.                                           )        SUPERSEDING INFORMATION

12

PATRICK A. BOMBINO, and                      )        [Misdemeanor: 18 U.S.C. § 641,
ESAUN G. PINTO SR.                           )        Conversion of Government Records]

13

)

Defendants.               )

14

15

THE UNITED STATES ATTORNEY CHARGES THAT:

16

### COUNT 1
### (18 U.S.C. § 641)

17

On or about March 20, 2007, in Belfair, Washington, within the Western District

18

of Washington and elsewhere, the defendants, PATRICK A. BOMBINO and ESAUN G.

19

PINTO, SR., wilfully and knowingly did aid and abet in the conveyance without lawful

20

authority of a government record, specifically, an Internal Revenue Service Wage and

21

Income Transcript, the value of which was less than $1,000, and which belonged to the

22

Internal Revenue Service, an agency of the United States.

23

//

24

//

25

//

26

//

27

//

28

//

EXHIBIT 28
BLACK
8/23/2018
Tiffany M. Pietryck, CSR RPR CRR

Superseding Information (Bombino and Pinto) 1

1    All in violation of Title 18, United States Code, Sections 641 and 2.

2

3    DATED _30th_ day of _March_, 2009.

4

5

6    JEFFREY C. SULLIVAN
     United States Attorney

7

8

9    CARL BLACKSTONE
     Assistant United States Attorney

10

11   KATHERYN KIM FRIERSON
     Assistant United States Attorney

12

13

14   TESSA GORMAN
     Assistant United States Attorney

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Superseding Information (Bombino and Pinto) 2

# EXHIBIT 10

Hon. Ronald B. Leighton

```
  FILED_____LODGED
         ____RECEIVED

       MAR 3 1 2009

     CLERK U.S. DISTRICT COURT
 WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                          DEPUTY
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA, )
        Plaintiff, )    NO.   CR07-5775RBL
        v. )    PLEA AGREEMENT
ESAUN G. PINTO, SR., )
        Defendant. )

The United States of America, by and through Jeffrey C. Sullivan, United States Attorney for the Western District of Washington, along with Katheryn Kim Frierson and Tessa Gorman, Assistant United States Attorneys for said District, and the defendant, Esaun G. Pinto, and his attorney, Keith A. MacFie, enter into the following Agreement, pursuant to Federal Rule of Criminal Procedure 11(c):

    1.   <u>Waiver of Indictment</u>.  Defendant, having been advised of the right to be charged by Indictment, agrees to waive that right and enter a plea of guilty to the charge brought by the United States Attorney in an Information.

    2.   <u>The Charge</u>.  Defendant, having been advised of the right to have this matter tried before a jury, agrees to waive that right and enter a plea of guilty to Unlawful Conveyance of Government Records, as charged in Count One of the Superseding Information, in violation of Title 18, United States Code, Section 641 and 2. By entering this plea of guilty, Defendant hereby waives all objections to the form of the charging document.

EXHIBIT 27
BLACK
8/23/2018
Tiffany M. Pietrzyk, CSR RPR CRR

PLEA AGREEMENT/
Esaun Pinto - 1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    Defendant further understands that before entering his plea of guilty,

2    Defendant will be placed under oath.  Any statement given by Defendant under oath may

3    be used by the government in a prosecution for perjury or false statement.

4    3.    Elements of the Offense.  The elements of the offense of Unlawful

5    Conveyance of Government Records, in violation of Title 18, United States Code, Section

6    641 and 2, are as follows:

7    First, that defendant did wilfully and knowingly, without lawful authority,

8    conveyed and aided and abetted in the conveyance; and

9    Second, of a government record, to wit, an Internal Revenue Service Wage

10   and Income Transcript.

11   4.    The Penalties.  Defendant understands that the statutory penalties for the

12   offense of Unlawful Conveyance of a Government Record, in violation of Title 18,

13   United States Code, Section 641, involving records the collective value of which is less

14   than one thousand dollars ($1,000), are imprisonment for up to one (1) year, a fine of up

15   to one hundred thousand dollars ($100,000.00), a period of supervision following release

16   from prison of up to one (1) year, and a twenty five dollar ($25.00) penalty assessment.

17   Defendant agrees that any monetary penalty the Court imposes, including

18   the special assessment, fine, costs or restitution, is due and payable immediately, and

19   further agrees to submit a completed Financial Statement of Debtor form as requested by

20   the United States Attorney's Office.

21   Defendant understands that supervised release is a period of time following

22   imprisonment during which he will be subject to certain restrictions and requirements.

23   Defendant further understands that if supervised release is imposed and he violates one or

24   more of its conditions, he could be returned to prison for all or part of the term of

25   supervised release that was originally imposed.  This could result in Defendant serving a

26   total term of imprisonment greater than the statutory maximum stated above.

27   Defendant understands that if he receives a sentence of probation, the

28   probationary period could be up to five (5) years.

PLEA AGREEMENT/
Esaun Pinto - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1        5.    Rights Waived by Pleading Guilty. Defendant understands that, by

2    pleading guilty, he knowingly and voluntarily waives the following rights:

3              a.    The right to plead not guilty, and to persist in a plea of not guilty;

4              b.    The right to a speedy and public trial before a jury of Defendant's

5    peers;

6              c.    The right to the effective assistance of counsel at trial, including, if

7    Defendant could not afford an attorney, the right to have the Court appoint one for

8    Defendant;

9              d.    The right to be presumed innocent until guilt has been established at

10   trial, beyond a reasonable doubt;

11             e.    The right to confront and cross-examine witnesses against Defendant

12   at trial;

13             f.    The right to compel or subpoena witnesses to appear on Defendant's

14   behalf at trial;

15             g.    The right to testify or to remain silent at trial, at which trial such

16   silence could not be used against Defendant;

17             h.    The right to appeal a finding of guilt or any pretrial rulings;

18             i.    The right, to the extent required by law, to have sentencing factors

19   charged in the Indictment or determined by a jury beyond a reasonable doubt.

20       6.    United States Sentencing Guidelines.  Defendant understands and

21   acknowledges that, at sentencing, the Court must consider the sentencing range calculated

22   under the United States Sentencing Guidelines, together with the other factors set forth in

23   Title 18, United States Code, Section 3553(a), including: (1) the nature and circumstances

24   of the offenses; (2) the history and characteristics of the defendant; (3) the need for the

25   sentence to reflect the seriousness of the offense, to promote respect for the law, and to

26   provide just punishment for the offense; (4) the need for the sentence to afford adequate

27   deterrence to criminal conduct; (5) the need for the sentence to protect the public from

28   further crimes of the defendant; (6) the need to provide the defendant with educational

1    and vocational training, medical care, or other correctional treatment in the most effective

2    manner; (7) the kinds of sentences available; (8) the need to provide restitution to victims;

3    and (9) the need to avoid unwarranted sentence disparity among defendants involved in

4    similar conduct who have similar records.  Accordingly, Defendant understands and

5    acknowledges that:

6           a.      The Court will determine Defendant's applicable Sentencing

7    Guidelines range at the time of sentencing;

8           b.      After consideration of the Sentencing Guidelines and the other

9    factors in 18 U.S.C. 3553(a), the Court may impose any sentence authorized by law, up to

10   the maximum term authorized by law;

11          c.      The Court is not bound by any recommendation regarding the

12   sentence to be imposed, or by any calculation or estimation of the Sentencing Guidelines

13   range offered by the parties, or by the United States Probation Department; and

14          d.      Defendant may not withdraw a guilty plea solely because of the

15   sentence imposed by the Court.

16   7.     Ultimate Sentence.  Defendant acknowledges that no one has promised or

17   guaranteed what sentence the Court will impose.

18   8.     Statement of Facts.  The parties agree on the following facts in support of

19   Defendant's guilty plea and sentencing.  Defendant admits he is guilty of the charged

20   offense and expressly waives any right to have these facts determined by a jury beyond a

21   reasonable doubt.

22          a.      Defendant Esaun G. Pinto worked as a private investigator with

23   AAA Investigations, a Brooklyn, New York based private investigations company owned

24   and operated by co-defendant Patrick A. Bombino.  In 2007, Esaun Pinto engaged another

25   private investigations company known as BNT Investigations, based in Belfair,

26   Washington, operated by Alex Torrella, to obtain financial information regarding certain

27   individuals who were being investigated by AAA Investigations.

28

PLEA AGREEMENT/
Esaun Pinto - 4

1          b.     Specifically, in March 2007, Esaun Pinto retained Alex Torrella to

2    uncover federal income tax information about J.C. In fulfillment of the request, Alex

3    Torrella instructed an employee of BNT Investigations to telephone the Internal Revenue

4    Service, pose as J.C., and fraudulently and without authority obtain detailed tax

5    information regarding J.C., including a physical copy of a Internal Revenue Service

6    record known as a Wage and Income Transcript. The Wage and Income Transcript is a

7    specific type of record utilized by the Internal Revenue Service to document wages and

8    other types of earnings reported by different sources as to each taxpayer.

9          c.     Once BNT Investigations obtained the IRS record, Alex Torrella,

10   with the consent and knowledge of Esaun Pinto, conveyed by facsimile a physical copy of

11   the Internal Revenue Service Wage and Income Transcript to AAA Investigations for use

12   by AAA Investigations. Esaun Pinto knew Alex Torrella did not possess lawful authority

13   to convey the government record to AAA Investigations, and Esaun Pinto knew that he

14   lacked lawful authority to instruct the conveyance of the Internal Revenue Wage and

15   Income Transcript.

16         d.     The parties agree and stipulate for purposes of sentencing that the

17   monetary value of the IRS record did not exceed one thousand dollars ($1,000.00).

18         9.     <u>Non-Prosecution of Additional Offenses</u>. As part of this Plea Agreement

19   and conditioned upon his fulfillment of all conditions of this Plea Agreement, the United

20   States Attorney's Office for the Western District of Washington agrees to dismiss at the

21   time of sentencing the charges in the Second Superseding Indictment, and not to

22   prosecute Defendant for any additional offenses known to it as of the time of this

23   Agreement that are based upon evidence in its possession at this time, or that arise out of

24   the conduct giving rise to this investigation. In this regard, Defendant recognizes that the

25   United States has agreed not to prosecute all of the criminal charges that the evidence

26   establishes were committed by Defendant solely because of the promises made by

27   Defendant in this Agreement. Defendant acknowledges and agrees, however, that for

28   purposes of preparing the Presentence Report, the United States Attorney's Office will

1  provide the United States Probation Office with evidence of all relevant conduct
2  committed by Defendant.

3        Defendant agrees that any charges to be dismissed before or at the time of
4  sentencing were substantially justified in light of the evidence available to the United
5  States, were not vexatious, frivolous or taken in bad faith, and do not provide Defendant
6  with a basis for any future claims under the "Hyde Amendment," Pub.L. No. 105-
7  119(1997).

8        10.    Voluntariness of Plea.  Defendant acknowledges that he has entered into
9  this Plea Agreement freely and voluntarily, and that no threats or promises, other than the
10  promises contained in this Plea Agreement, were made to induce Defendant to enter this
11  plea of guilty.

12        11.    Waiver of Appeal   As part of this Plea Agreement and on the condition that
13  the Court imposes a custodial sentence that is within or below the Sentencing Guidelines
14  range (or the statutory mandatory minimum, if greater than the Guidelines range) that is
15  determined by the Court at the time of sentencing, Defendant waives to the full extent of
16  the law:

17        a.    any right conferred by Title 18, United States Code, Section 3742 to
18              appeal the sentence, including any restitution order imposed; and

19        b.    any right to bring a collateral attack against the conviction and
20              sentence, including any restitution order imposed, except as it may
21              relate to the effectiveness of legal representation.

22        Furthermore, this waiver does not preclude Defendant from bringing an
23  appropriate motion pursuant to 28 U.S.C. § 2241, to address the conditions of his
24  confinement or the decisions of the Bureau of Prisons regarding the execution of his
25  sentence.

26        If Defendant breaches this Plea Agreement at any time by appealing or
27  collaterally attacking (except as to effectiveness of legal representation) the conviction or
28  sentence in any way, the United States may prosecute Defendant for any counts, including

PLEA AGREEMENT/
Esaun Pinto - 6

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   those with mandatory minimum sentences, that were dismissed or not charged pursuant to

2   this Plea Agreement.

3        12.   <u>Statute of Limitations</u>.  In the event that this Agreement is not accepted by

4   the Court for any reason, or Defendant has breached any of the terms of this Plea

5   Agreement, the statute of limitations shall be deemed to have been tolled from the date of

6   the Plea Agreement to:  (1) 30 days following the date of non-acceptance of the Plea

7   Agreement by the Court; or (2) 30 days following the date on which a breach of the Plea

8   Agreement by Defendant is discovered by the United States Attorney's Office.

9        13.   <u>Post-Plea Conduct</u>.  Defendant understands that the terms of this Plea

10   Agreement apply only to conduct that occurred prior to the execution of this Agreement.

11   If, after the date of this Agreement, Defendant should engage in illegal conduct, or

12   conduct that is in violation of her conditions of release (examples of which include, but

13   are not limited to: obstruction of justice, failure to appear for a court proceeding, criminal

14   conduct while pending sentencing, and false statements to law enforcement agents, the

15   Pretrial Services Officer, Probation Officer or Court), the United States is free under this

16   Agreement to seek a sentence that takes such conduct into consideration. Such a sentence

17   could include, to the extent the United States Sentencing Guidelines are applicable, a

18   sentencing enhancement or upward departure.

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

PLEA AGREEMENT/
Esaun Pinto - 7

1     14.   <u>Completeness of Agreement</u>.  The United States and Defendant

2  acknowledge that these terms constitute the entire Plea Agreement between the parties.

3  This Agreement only binds the United States Attorney's Office for the Western District of

4  Washington.  It does not bind any other United States Attorney's Office or any other

5  office or agency of the United States, or any state or local prosecutor.

6     Dated this ____ day of _____ 2009.

ESAUN G. PINTO, SR.
Defendant

KEITH A. MACFIE
Attorney for Defendant

KATHERYN KIM FRIERSON
Assistant United States Attorney

TESSA GORMAN
Assistant United States Attorney

# EXHIBIT 16

Vanguard

July 11, 2012

DATE FILED: June 10, 2015 4:30 PM
Valley Forge, PA 19482-2600
FILING ID: 2FF15CL59CD278
CASE NUMBER: 2012PR1772
www.vanguard.com

BERNARD BLACK
2829 SHERIDAN PLACE
EVANSTON, IL 60201

Estate of Renata Black

Dear Mr. Black:

As requested, we're writing to verify the beneficiary designation for Renata Black's Vanguard rollover and Roth IRA accounts.

Our records indicate that on March 11, 2011, we received a request to designate the following as beneficiaries of both accounts:

| Name | Percentage |
|---|---|
| JOANNE LESLIE BLACK | 100 |

The designation was updated through a verbal request; no forms were submitted for this request.

We have no record of a subsequent request from Renata Black to update this designation prior to May 1, 2012.

With regards to Renata Black's individual non-retirement account(s), our records indicate that on March 23, 2012, we received a request to designate the following as beneficiaries of this account:

| Name | Percentage |
|---|---|
| JOANNE BLACK | 95 |
| BEKAH BLACK | 1 |
| BENJAMIN BLACK | 1 |
| DAVID BLACK | 1 |
| SAMUEL BLACK | 1 |
| SARAH BLACK | 1 |



EXHIBIT
BBlack 12
Planet Depos, LLC

BLACK012370

The designation was updated online through our secure website; no forms were submitted for this request.

If you have any questions, please call me at **800-379-1727**, Ext. ~~20646~~, on business days from 8:30 a.m. to 5 p.m., Arizona time. 27083

Sincerely,

Jessica Novotny
Beneficiary Specialist
jn

52093353

*Case xferred to*
*Bill Koikin*
*Cuytendall*

BLACK012371

# EXHIBIT 21

| | |
|---|---|
| Probate Court, City and County of Denver, State of Colorado<br>1437 Bannock Street<br>Denver, Colorado 80202<br><br>In the Interest of:<br><br>**JOANNE BLACK,**<br><br>**Ward/Protected Person.** | DATE FILED: June 23, 2014 5:09 PM<br>FILING ID: 45E9EC38EFF9B<br>CASE NUMBER: 2012PR1772<br><br><br>▲   COURT USE ONLY   ▲ |
| Attorney for Conservator, Bernard Black:<br>M. Carl Glatstein, Esq.<br>Glatstein & O'Brien LLP<br>2696 S. Colorado Blvd., Suite 350<br>Denver, CO  80222<br>Tel.: 303-757-4342          Email: carl@denverprobatelaw.com<br>Fax:  303-757-4570     Atty. Reg. #:  13738 | Case Number:<br><br><br>**12 PR 1772** |

## CONSERVATOR'S REPORT   ❑ ADULT   ❑ MINOR

☑ANNUAL REPORT ❑AMENDED REPORT
**CURRENT REPORTING PERIOD FROM 12/11/2012 TO 12/31/2013**

❑INTERIM REPORT DUE ON March 11, 2014❑FINAL REPORT
If Final Report, indicate why:  ❑Protected Person deceased ❑Minor turned 21 ❑Judicial Order

**PART A:          CONTACT INFORMATION**

          **Protected Person's Information:**          ❑ Check if Updated Information from last Report

Name: **Joanne Black**          Date of Birth: **November 14, 1956**
          **c/o South Beach Psychiatric Center**
          **777 Seaview Avenue**
          **Staten Island, NY 10305**
          Tel.:    **718-668-8088**          Last 4 digits of Social Security #  (deferred)

          **Conservator's Information:**          ❑Check if Updated Information from last Report

Name: **Bernard Black**          Date of Birth: **November 13, 1953**

Have you had any criminal charges filed against you or convictions entered since  the last report? ❑Yes  ☑ No

If Yes, explain:

Occupation: **Law Professor**          Your Relationship to Protected Person: **Brother**

Address: **2829 Sheridan Place**

City: **Evanston** State: **Illinois** Zip Code: **60201** E-Mail Address: **bblack@northwestern.edu**

Telephone Numbers: Home **847-869-6735** Work **312-503-2784** Cell **847-807-9599**

          Last 4 digits of Social Security #  (deferred)

**\*\*\* Notice to Interested Persons:**  Interested persons have the responsibility to protect their own rights and interests within the time and in the manner provided by the Probate Code, including the appropriateness of disbursements, the compensation of fiduciaries, attorneys, and others, and the distribution of estate assets. Interested persons may file an objection with the Court.  The Court will not review or adjudicate these or other matters unless specifically requested to do so by an interested person.

BLACK015466

**PART B:**     **CONSERVATORSHIP ISSUES**

1.     Is there a continued need for the Conservatorship?  ☑**Yes** ☐**No**    If **No**, describe why and what steps should be taken.  If you would like the Court to take action, you *must* file a motion with the Court. <u>Joanne Black is mentally disable, and she has been in a psychiatric hospital since 2013.</u>

2.     Are the remaining assets in the estate sufficient to provide for the present and future care of the protected person?  ☑**Yes** ☐**No**    If **No**, describe why and what steps should be taken. If you would like the Court to take action, you *must* file a motion with the Court.

_____

_____

3.     Should there be a change in scope of the Conservatorship? ☑**Yes** ☐**No**  If **Yes**, describe why and what steps should be taken. If you would like the Court to take action, you *must* file a motion with the Court. <u>I plan to file for full guardianship separately</u>

4.     **Attach a copy of the Bond to this Report, unless the Bond was waived or not required by the Court.**  What is the amount of the Bond? $ <u>Not Applicable</u>.  Is the amount of the Bond sufficient to cover all unrestricted assets? ☐**Yes** ☐**No**    If **No**, describe why and what steps should be taken.  If you are requesting a change to the Bond, you *must* file a motion with the Court.

_____

_____

**INSTRUCTIONS ON HOW TO COMPLETE THIS FORM**

The Conservator's Report must be filed annually pursuant to §15-14-420, C.R.S.  Part C of this report concerns the information necessary to satisfy the court that the Conservator has maintained a complete accounting of all financial transactions and managed the Protected Person's estate responsibly.

**Step 1** is a financial transaction detail and should be completed for each bank or investment account.  A spreadsheet or report from personal accounting software may also be submitted in lieu of completing the transaction detail.

**Steps 2 and 3** summarize the income and expense for the reporting period and compares those amounts to the previous period or the Financial Plan.  Explain the cause for any changes between the current period amounts and amounts from the prior period or the Financial Plan.

**Step 4** reports additional detail for fees paid to professionals including the hourly rate, number of hour worked, and description of services provided.

**Steps 5 and 6** summarize assets and liabilities as of the reporting date, and compares those amounts to the previous period or the Inventory.  In addition to explaining the cause for any changes between the current period amounts and amounts from the prior period or the Inventory, provide specific detail regarding any asset purchases or sales.

**Step 7** is a summary.  Transfer the respective income and expense totals from Steps 2 and 3 as well as the asset and liability totals in steps 5 and 6 to the appropriate lines in Step 7 to calculate the net income and net worth.

**Part C: FINANCIAL INFORMATION**

**Step 1:**     **Detail Listing of Receipts/Income and Disbursements/Expenses**

**Complete this Detail for all bank accounts**. Make additional copies of this form as necessary. Alternatively, Check Register form JDF871, a spreadsheet, or a report from personal accounting software may be attached. Please list all transactions, including Income (deposits) and Expenses (withdrawals), for the entire reporting period. Each Receipt/Income item should be listed in the Amount Received column and each

BLACK015467

Disbursement/Expense item should be listed in the Amount Disbursed column. ** **Note:** This report should resemble a check register for <u>each</u> bank account.

**Name of Bank:** Chase **Account Number** (last 4-digits only): 5674

| Date | Check or I.D. No. | Description of item Received or Disbursed, include Name of Payee (if Disbursement) | Amount Received | Amount Disbursed |
|------|-------------------|-----------------------------------------------------------------------------------|-----------------|------------------|
|      |                   | See Exhibit A Attached                                                             |                 |                  |
|      |                   |                                                                                   |                 |                  |
| Page _____ of _____ <br> May continue entries on Check Register Form JDF 871 | | | $ | $ |

❑ Check here if additional detailed spreadsheets are attached to this report.

**Individual Bank Account Summary**

| | | |
|---|---|---|
| **Beginning Cash Balance** | $ 0.00 | (Balance from prior year Report or Inventory) |
| **Add: Total Amount of Income** | + $ 3,002.05 | (Total Income received from detail above) |
| **Add: Total Amount Received as Transfer** | + $ 8,100.00 | (Total transferred from other bank accounts) |
| **Less: Total Amount Disbursed** | - $ 6,031.18 | (Total disbursements from detail above) |
| **Less:  Total Amount Transferred out** | - $ _____ | (Total transfers moved to other accounts) |
| **Ending Cash Balance** | = $ 5,070.87 | (Transfer this account balance to Step 5.) |
|  | | (This will be the beginning balance on next year's report) |

**Name of Bank:** Chase **Account Number** (last 4-digits only): 8776

| Date | Check or I.D. No. | Description of item Received or Disbursed, include Name of Payee (if Disbursement) | Amount Received | Amount Disbursed |
|------|-------------------|-----------------------------------------------------------------------------------|-----------------|------------------|
|      |                   | See Exhibit B                                                                     |                 |                  |
|      |                   |                                                                                   |                 |                  |
| Page _____ of _____ <br> May continue entries on Check Register Form JDF 871 | | | $ | $ |

❑ Check here if additional detailed spreadsheets are attached to this report.

**Individual Bank Account Summary**

| | | |
|---|---|---|
| **Beginning Cash Balance** | $ 55,364.48 | (Balance from prior year Report or Inventory) |
| **Add: Total Amount of Income** | + $ 112,520.30 | (Total Income received from detail above) |
| **Add: Total Amount Received as Transfer** | + $ _____ | (Total transferred from other bank accounts) |
| **Less: Total Amount Disbursed** | - $ _____ | (Total disbursements from detail above) |
| **Less:  Total Amount Transferred out** | - $ 8,100.00 | (Total transfers moved to other accounts) |
| **Ending Cash Balance** | = $ 159,784.78 | (Transfer this account balance to Step 5.) |
|  | | (This will be the beginning balance on next year's report) |

BLACK015468

**Name of Bank:** Chase  **Account Number** (last 4-digits only): 5372

| Date | Check or I.D. No. | Description of item Received or Disbursed, include Name of Payee (if Disbursement) | Amount Received | Amount Disbursed |
|---|---|---|---|---|
| | | See Exhibit C | | |
| | | | | |
| Page _____ of _____ May continue entries on Check Register Form JDF 871 | | | $ | $ |

❑ Check here if additional detailed spreadsheets are attached to this report.

**Individual Bank Account Summary**

| | | | |
|---|---|---|---|
| **Beginning Cash Balance** | $ | 0.00 | (Balance from prior year Report or Inventory) |
| **Add: Total Amount of Income** | + $ | 34,868.47 | (Total Income received from detail above) |
| **Add: Total Amount Received as Transfer** | + $ | _____ | (Total transferred from other bank accounts) |
| **Less: Total Amount Disbursed** | - $ | 34,334.00 | (Total disbursements from detail above) |
| **Less: Total Amount Transferred out** | - $ | _____ | (Total transfers moved to other accounts) |
| **Ending Cash Balance** | = $ | 537.47 | (Transfer this account balance to Step 5.) |
| | | | (This will be the beginning balance on next year's report) |

**Step 2:     Receipts and Income**

**Column A:** Is this the first Annual Conservator's Report filed? ❑Yes ❑No

If **Yes**, use the amounts from the Inventory with Financial Plan (JDF 882) to complete Column A that is marked with an asterisk (*) below.   If **No**, use the amounts from the prior Conservator's Report filed to complete Column A that is marked with an asterisk (*) below.

**Column B:** Transfer all individual income category totals from completed Detail Listing in Step 1 or attached spread sheet.

**Column C:** Calculate and record the difference between Column A and Column B.

| Description of Receipt/Income Category  List Total Receipts/Income from Detail Listing (From Step 1 or Separate Spreadsheet) | Column A  *Total Amount of Receipts / Income from ❑*Prior* Reporting Period or ☑Financial Plan | Column B  Total Amount of Receipts / Income for *Current* Reporting Period | Column C  *Change* in Amount of Receipt/ Income  *Indicate +/-* |
|---|---|---|---|
| Wages | | | |
| Social Security | 13,200.00 | 13,200.00 | |
| Interest / Dividends | | | |
| Pensions / Retirement Plan Distributions | | | |
| Tax Refunds | | | |
| Proceeds from Sales of Assets | | | |
| Rental Income | | | |
| Gifts from Others | | | |

BLACK015469

| Disability, Unemployment or Worker's Compensation | 48,000.00 | 86,449.00 | |
|---|---|---|---|
| Other Public Assistance | | | |
| Other Receipts / Income  mother's probate | | | |
| | | | |
| **TOTALS →** | **61,200.00** | **99,649.00** | |

↑ ↑
Move these totals to Step 7

**Have Total Receipts/Income in Column B changed from the Prior Reporting Period or Financial Plan totals in Column A ?** ☐Yes ☐No

If **Yes,** explain the changes below. Please include a description of any changes or unanticipated transactions.  If income and expenses are anticipated to differ going forward, it may be necessary to file an Amended Inventory with Financial Plan and Motion for Approval (JDF 882) or a separate petition for approval with the court.

_____

_____

_____

**Step 3:    Disbursements/Expenses**

**Column A:** Use the amounts from the Inventory with Financial Plan (JDF 882) or from the prior Conservators Report filed to complete Column A that is marked with an asterisk (*) below.

**Column B:** Transfer all individual expense category "totals" from completed Detail Listing in Step 1 or attached spread sheet.

**Column C:** Calculate and record the difference between Column A and Column B.

| **Description of Disbursement / Expense Category** <br><br> List Total Disbursements/Expenses from Detail Listing (From Step 1 or Separate Spreadsheet) | **Column A** <br> *Total Amount of Disbursement / Expense from ☐***Prior*** Reporting Period  or ☑Financial Plan | **Column B** <br> Total Amount of Disbursement / Expense for ***Current*** Reporting Period | **Column C** <br> ***Change*** in amount of Disbursement/ Expense <br><br> *Indicate* +/- |
|---|---|---|---|
| Total Professional Fees Paid (From Step 4) | 4,992.00 | 41,203.00 | |
| Conservator fees | | | |
| Guardian fees | | | |
| Guardian ad litem Gayle Young | | 4,998.00 | |
| Legal Fees for Protected Party  - Lisa DiPonio | | 728.00 | |
| Legal Fees for Conservator – Carl Glatstein | | 5,000.00 | |
| Legal Fees for Mother's probate estate – Howard Dubs, Esq. | | 3,225.00 | |
| Cherie Wrigley conservatorship process | | 7,477.00 | |
| Accountant / CPA | | | |
| Other:  Describe Wofsey Rosen (workers comp) | | 6,031.00 | |
| Other:  Describe Schiff Hardin, Esq. | | 13,754.00 | |
| Distributions to Protected Person | 39,204.00 | 26,000.00 | |
| Income Taxes | | | |

BLACK015470

| | | | |
|---|---|---|---|
| FICA and Medicare Taxes | | | |
| Health Care (include insurance & medication) | | | |
| Other Insurance | | | |
| Rent or Mortgage | 31,200.00 | 0.00 | |
| Property Taxes and Assessments | | | |
| Repairs and Maintenance | | | |
| Utilities, including phones | | | |
| Home Furnishings | | | |
| Food and Household Supplies | | | |
| Clothing | | | |
| Personal Care | | | |
| Auto Expenses | | | |
| Education | | | |
| Entertainment, Vacations and Travel | | | |
| Gifts | | | |
| Other: CPI Investigations | | 166,797.00 | |
| **TOTALS →** | **75,396.00** | **234,010.00** | |

↑       ↑
**Move these totals to Step 7**

**Step 4:    Professional Fees Detail**

**Please list all professionals paid.** The sum of total hourly fees and other costs charged for each professional _listed in the chart in Step 3_ should equal the total amount paid in the current reporting period under Total Professional Fees Paid.

| Name of Professional (Listed in Step 3) | Hourly Rate (Range) | No. of Hours Worked | Total Hourly Fees | Other Costs Charged | Brief Description of Services Provided and Benefit to the Estate |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Have Total Disbursements/Expenses in Step 3, Column B ☐ Increased or ☐ Decreased from the Prior Reporting Period or Financial Plan in Step 3, Column A?**

Explain the changes below. Please include a description of any changes or unanticipated transactions. A separate petition for approval may need to be filed with the court for significant changes outside the amounts allowed in the Inventory and Financial Plan.

**All other disbursements on Joanne's behalf came from the Estate of Renata Black, for which I am executor. These disbursements were authorized by me as executor of the estate, not as guardian of Joanne Black.**

BLACK015471

**Step 5:** **Assets**

**Column A:** List the last 4 digits of all bank, investment or other financial accounts.

**Column B:** List name of the bank or financial institution that accounts are being held, or describe specific asset.

**Column C:** Use amounts from the original Inventory with Financial Plan (JDF 882)  **or** from the prior Conservator's Report filed, to complete Column C marked with an asterisk (*) below.

**Column D:** List all cash and investment account balances.  These should coincide and be transferred from the Ending Cash Balances on the Detail Listing in Step 1.

**Column E:** Calculate and record the difference between Column C and Column D.

Vehicles, real estate, and all other assets should be valued at what the asset could be sold for in its current condition (i.e. Fair Market Value).

| Description of Asset (Identify all accounts) | Column A Account Number (last 4 digits) | Column B Name of Financial Institution or Description of Asset | Column C * Fair Market Value ☐as of Last Day of *Prior* Reporting Period or ☑Inventory | Column D Fair Market Value (as of Last Day of *Current* Reporting Period) | Column E *Change* in Value of Asset  *Indicate* +/- |
|---|---|---|---|---|---|
| Supplemental Needs Trust | 2425 | Chase | 540.00 | 0.00 | |
| Supplemental Needs Trust | 5641 | Chase Checking | 0.00 | 100.00 | |
| Supplemental Needs Trust | 8743 | Chase Savings | 0.00 | 441.00 | |
| Supplemental Needs Trust | 1116 | Chase Brokerage Account | 0.00 | 2,241,380.00 | |
| Joanne Black Trust | 8776 | Chase savings | 55,364.48 | 159,784.70 | |
| Joanne Black Trust | 5674 | Chase checking | 0.00 | 5,070.87 | |
| spending account | 5372 | Chase | 0.00 | 534.47 | |
| Stocks | | | | | |
| Bonds | | | | | |
| Mutual Funds | | | | | |
| Financial Investments Investment | 4488 | Vangard | 1,459,244.00 | 0.00 | |
| Financial Investments Brokerage | 4488 | Vangard | 716,212.00 | 0.00 | |
| Life Insurance (Cash Value) | | | | | |
| Pension & Retirement (vested portion) | | | | | |
| IRA's / 401(k)'s | | | | | |
| Annuities | | | | | |
| Motor Vehicles | | | | | |
| Home Furnishings | | | | | |
| | | TOTALS → | 2,231,360.48 | 2,407,310.34 | |

**Move these totals to Step 7**

BLACK015472

**Have Total Assets in Step 5, Column D changed from the last day of the Prior Reporting Period or Inventory in Step 5, Column C?** ☐Yes ☐No

Provide additional detail for any assets on the preceding schedule that were purchased during the reporting period. Include a description of the asset purchased, the purchase price, purchase date, and source of funding for the purchase (e.g. cash, loan, sale of another other asset, etc.).

| Description of Asset | Purchase Price | Purchase Date | Purchase method |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Provide detail for any assets on the preceding schedule that were sold during the reporting period. Include a description of the asset sold, the sale price, sale date, and use of funds proceeds from the sale (e.g. living expenses, extinguish debt, purchase of another asset, etc.).

| Description of Asset | Sale Price | Sale Date | Use of Proceeds |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Please include a description of any other changes to the value of estate assets.

_____

_____

**Step 6:    Liabilities/Debts**

**Column A:** List the last 4 digits of all account or loan numbers.

**Column B:** List the name of the bank or financial institution that loans or debts are being paid.

**Column C:** Use amounts from the original Inventory with Financial Plan (JDF 882) **or** from the prior Conservator's Report filed, to complete Column C marked with an asterisk (*) below.

**Column D:** List all *current* balances due on loans and debts.

**Column E:** Calculate and record the difference between Column C and Column D.

| Description of Liability/Debt (Identify all accounts) | Column A<br>Account Number<br>(last 4-digits only) | Column B<br>Name of Financial Institution | Column C<br>*Balance Due on Last day of ☐*Prior* Reporting Period or ☐Inventory | Column D<br>Balance Due on Last Day of *Current* Reporting Period | Column E<br>*Change* in Amount of Liability<br><br>*Indicate* +/- |
|---|---|---|---|---|---|
| Mortgages (principal due only) | | | | | |
| Car Loans | | | | | |
| Home Improvement Loans | | | | | |

BLACK015473

| | | | | |
|---|---|---|---|---|
| Student Loans/Tuition | | | | |
| Credit Card Debt | | | | |
| Federal Taxes Owed | | | | |
| State and Local Taxes Owed | | | | |
| Other Liabilities/Debts | | | | |
| Accrued Expenses associated with this proceeding | | | | |
| | | | | |
| | | | | |
| | TOTALS → | | 0.00 | 0.00 |

Move these totals to Step 7

**Have Total Liabilities/Debts changed from the last day of the Prior Reporting Period or Inventory?**
☐**Yes** ☑**No** If **Yes**, explain the changes below. Please include a description of any changes or unanticipated transactions. A separate petition for approval may need to be filed with the court for significant changes outside the amounts allowed in the Inventory and Financial Plan.

_____

_____

_____

**Step 7:** **Summary**

**Summary of Financial Activity**

| | | *Prior* Reporting Period (or Financial Plan) | *Current* Reporting Period |
|---|---|---|---|
| (A) | Total Receipts/Income from Step 2 | $ 61,200.00 | $ 99,649.00 |
| (B) | Total Disbursements/Expenses from Step 3 | $ 75,396.00 | $ 234,010.00 |
| **(A) minus (B) = Net Income** | | $ -14,196.00 | $ -134.361.00 |

**Summary of Net Worth**
**Fair Market Value of Assets Minus Liabilities/Debts**

| | *Last Day of Prior* Reporting Period (or Inventory) | Last Day of *Current* Reporting Period |
|---|---|---|
| (A) Total Assets from Step 5 | $ 2,231,360.48 | $ 2,407,310.34 |
| (B) Total Liabilities/Debts from Step 6 | $ 0.00 | $ 0.00 |
| **(A) minus (B) = Net Worth** | $ 2,231,360.48 | $ 2,407,310.34 |

BLACK015474

## VERIFICATION

I state under penalty of perjury that this is a true and complete report of the administration of this estate, during the period shown, both dates inclusive, to the best of my knowledge, information and belief. I understand that this report is subject to audit and verification.

I understand that I am required to maintain supporting documentation for all receipts and disbursements including detailed billing statements from any professional. The Court or any Interested Persons as identified in the Order Appointing Conservator may request copies at any time.

/s/ Bernard Black
*Original Signature on File*

Date:  6/23/2014.

_____
Conservator

********
**REPORT MUST BE SIGNED AND DATED BY ALL CONSERVATORS
AND SERVED ON THE PROTECTED PERSON AND ALL INTERESTED PARTIES
AS INDICATED BY THE ATTACHED CERTIFICATE OF SERVICE**
********

### IMPORTANT

**THIS SECTION MUST BE COMPLETED CORRECTLY AND SIGNED
OR THE REPORT MAY BE REJECTED.**

Colorado Law **REQUIRES** that the Conservator's Report be served on the **PROTECTED PERSON AND INTERESTED PERSONS** pursuant to Order Appointing Conservator, including minors 12 years of age or older (§15-14-404(4), C.R.S.). In the space below, list the names, addresses, and method of delivery for each party listed on the Order Appointing Conservator and provide each party with a copy of this Report.

## Certificate of Service

I certify that on June 24, 2014, the original **Annual Conservator's Report** was e-filed/filed with the Court and a copy of this Conservator's Report was served on each of the following at the indicated address by first class U.S. mail postage pre-paid:

| Name of Person and address | Relationship to Respondent | Manner of Service* |
|---|---|---|
| Joanne Black<br>(address unknown) | Respondent | N/A |
| Lisa DiPonio, Esq.<br>7931 S. Broadway, Suite 348<br>Littleton, CO  80122 | Court Appointed Counsel | E-Service |
| Gayle Young, Esq.<br>PO Box 307<br>Littleton, CO  80160 | Guardian ad Litem | E-Service |
| Cherie Wrigley<br>1946 Roadrunner Avenue<br>Thousand Oaks, CO 91320 | Cousin | 1st class mail |

BLACK015475

| Anthony Dain<br>13272 Capstone Drive<br>San Diego, CA 92130 | Cousin / Trustee | 1st class mail |
| Bernard S. Black<br>2829 Sheridan Place<br>Evanston, IL 60201-1725 | Petitioner | 1st class mail |

*/s/ Constance M. Eberly*
*Original Signature on File*

Signature

BLACK015476

# EXHIBIT 22

District Court  Denver Probate Court
      County, Colorado
Court Address:

    1437 Bannock Street, Room 230
    Denver, CO 80202

FILED IN PROBATE COURT
CITY & COUNTY OF DENVER, CO

FEB 02 2015

DATE FILED: February 2, 2015
CASE NUMBER: 2012PR1772

**In the Interest of:**
**In the Matter of the Estate of:**

**JOANNE BLACK**

**COURT USE ONLY**

Attorney or Party Without Attorney (Name and Address):
Cherie Wrigley (without Attorney)
1946 Roadrunner Ave.
Thousand Oaks, CA 91320

Phone Number: (805) 492-1502   E-mail: cheriewrigley@yahoo.com

FAX Number:    Atty. Reg. #:

Case Number:

12 PR 1772

Division  1    Courtroom  230

## OBJECTION

I, Cherie Wrigley, as Cousin and served interested person, am a party to this case and object to the documents identified below filed on January 8, 2015.  These include:

      Petition to Continue Conservatorship by Bernard Black through the year 2016

      The Conservator's Report of 1/1/2014 to 12/31/2014

      Bernard Black's personal letter to the Honorable Judge, Elizabeth Leith on 11/24/2014

**The grounds for my objection are as follows:**

**\*SEE ALL ATTACHED DOCUMENTS**

Date:    January 21, 2015

*Cherie Wrigley*
                Signature

## CERTIFICATE OF SERVICE

I certify that on    (date) a copy of this Objection was served on each of the following:

| Name of Person to Whom You are Sending this Document | Relationship | Address | Manner of Service* |
|---|---|---|---|
| Joanne Black | Respondent | Center of Independent Living 805 East New York Ave., #5-M Brooklyn, NY 11203 | 1st Class Mail |
| Carl Glatstein | Attorney for Petitioner | 2696 S. Colorado Blvd., Suite 350 Denver, CO 80222 | 1st Class Mail |
| Lisa DiPonio, Esq. | Court Appointed Counsel | 7931 S. Broadway, Suite 348 Littleton, CO 80122 | 1st Class Mail |

JDF 723T  9/08   OBJECTION

BLACK015814

| Gayle Young, Esq. | Guardian ad Litem | PO Box 307<br>Littleton, CO 80160 | E-Mail |
| Anthony Dain | Cousin/<br>Co-Trustee | 13272 Capstone Drive<br>San Diego, CA 92130 | E-Mail |
| Samuel Black | Nephew/<br>Co-Trustee? | 121 S Fremont Ave., Apt. 506<br>Baltimore, MD 21201 | 1st Class Mail |
| Bernie Black | Brother/<br>Co-Trustee | 2829 Sheridan Place<br>Evanston, Illinois 60201 | 1st Class Mail |

*Insert one of the following: **Hand Delivery, First-Class Mail, Certified Mail, E-Served or Faxed.**

Chérie Wrigley
Signature

JDF 723T    9/08    OBJECTION

BLACK015815

1

**\*Attachment re: Case # 12 PR 1772**

Objections:

My name is Cherie Dain Wrigley.  I am Joanne Black's first cousin, and I am applying for guardianship, both personal and financial, in the state of New York.  I was in the process of applying for co-guardianship, with Bernard Black, through Carl Glatstein, when they chose to remove me involuntarily in late July of 2014 (See "Objection #2" below and Exhibit A).  I wish to briefly describe my relationship with Joanne so that those concerned with this case have a better understanding of why I am having to file objections to Bernard Black's (aka Bernie) petition of conservatorship.  Joanne Black is my cousin, and we have had a close relationship since we were young.  While there have been times that Joanne's mental illness has caused us to have some disagreements, I have always been available to support Joanne.  I have extensive knowledge and experience with those afflicted with mental illness, and a special place in my heart for those struggling.  Joanne is my family, and I have every intention of helping her live the most happy and healthy life she can, under the circumstances.  Over the years she has expressed her gratitude that I have been of emotional and mental support to her.  In the last six months, since she has been medication compliant, she has voiced great desire that I continue to guide her and become her guardian in every possible way.  Unfortunately, she has never had a close relationship with her brother, Bernie.  He has never demonstrated any affection or caring or desire to spend time with her.  Joanne has voiced great concern over Bernie wanting to be a part of her life now.  A more full explanation of both my and Joanne's reasons for not wanting her brother to be guardian or conservator are included in my Application of Guardianship, filed with the New York courts.

1.  Financial Objections:

- When Joanne's mother, Renata Black, died, Joanne inherited, in several Vanguard Accounts, as sole beneficiary, approximately $3.5 million.  This has never been appropriately accounted for or documented by Bernard Black.  He repeatedly attempts to confuse the Colorado Court by mixing the accounting of the Estate of Renata Black with Joanne's Supplemental Needs Trust, and the Joanne Black Trust 2013.  I did not object to certain payments during 2013 because they were written from checks from the Estate of Renata Black and at the time I did not feel it was taking away funds from what was rightfully Joanne's.  In 2013, when I first confronted Bernie about the confusion, he said, "Not to worry, [he] was taking care of everything."  I continued to voice my concern through 2014.  Not only was he not taking care of everything, he misled all parties involved, including his probate attorney, Lee Hoffman, by failing to disclose that there was a more recent will that had been written by my aunt, Renata Black in 2010.  In addition there is a strong possibility that there is an even more current will in existence, according to Joanne.  I am under the belief that Bernard had not told Carl Glatstein the truth the about the wills, prior to October.  I now know, that Carl Glatstein is aware of the 2010 Will and of Bernie's choice to only provide one Will to be probated, since an email I sent him on October 1, 2014, included this information.  (See Exhibit B and C).  These blatant misleadings, cause me to believe that he has purposely mismanaged the entire estate, and knowingly ignored my aunt, Renata Black's, wishes for her daughter, Joanne. (See Exhibit B - Will).

- Bernard has failed to include any of my aunt's real estate assets into Joanne's trusts.  The approximate value upon her death was Two Million Dollars.  He has accounted to no one

BLACK015816

2

for the missing money. Bernard Black states in his "Response to Order" of October 27, 2014, #21, that no funds from the Joanne Black 2013 Trust had been used for the benefit of his children. (See Exhibit D). That trust consists of her Fidelity Account inheritance and her Worker's Compensation. In question is, how much of the 3.5 million dollars in Vanguard funds, left solely to Joanne, and the whole of Renata's real estate, have been used for Bernie's personal needs.

- Bernard's repeated references to my family's jewelry, my "lavish spending," and my "expensive failed" attempts to save Joanne, are all ridiculous distractions from helping Joanne lead a meaningful, healthy, stress-free life. I have spent more than $60,000 of my own money to provide for Joanne's personal needs, including a psychiatric case manager, much needed dental services, almost two years of phone bills, food, clothing, furniture and payments to her long standing confidant, and primary case manager, Esaun Pinto. Contrary to what Bernard has submitted to his attorney and the courts, I am not flying "first class;" I am not asking for a per diem; and I do not expect to be compensated for my time and effort in helping my dear cousin Joanne with her chronic mental illness. Bernard has repeatedly referred to these issues in both his legal responses to the court, as well as the personal rant he sent to the Honorable Elizabeth Leith, on November 14, 2014 (Exhibit E). In the attached document, he has blatantly lied in #6 and #7. In direct reference to #6, it is not true that Bernie has funded any of Joanne's medical, dental or phone bills for well over 18 months, nor given Joanne any of her money for food, clothing, etc., until December 30th, when he then "dropped" by her apartment, without Joanne's permission, to give her a debit card. At that time Joanne had been out of the hospital for approximately 10 weeks without receiving a penny from him. In the general accounting for 2014, it should be noted that the only people that have been paid, are Bernie himself, and his auxiliary professional personnel, against the wishes of the alleged Protected Person. Bernie alleges that Joanne will never be able to live on her own without continued assistance; something we all agree on to a certain extent. I presently have a team in place that I have diligently worked on for months, to help her achieve that goal. The state of New York has also worked with her for the last year and a half to help her achieve that goal. In regards to these things, Bernie has shown no interest in involvement or understanding what it takes to get a mentally ill individual stable and functioning. He does not feel that the house left to her, by her mother, has any sentimental value to Joanne, which Joanne vehemently disagrees with, and hopes that in one years time, she will be able to live there, with some support, which we will handle when the time comes.

2. Objection to Bernie's intention to be sole guardian:

- As of May 7, 2014 I was under the impression that Carl Glatstein was representing me, as well as Bernard Black. I have attached an email and documents sent on this date that show Carl and Bernie's request that I sign documents for co-guardianship. Until Joanne expressed a desire for me to be her sole guardian, Bernard had no objections to my involvement in Joanne's affairs, and in fact welcomed all of my help. Suddenly after my visit with Joanne in July 2014, Bernard and Carl Glatstein, without further notice to me, chose to stop almost all communication and failed to issue a Certificate of Service that Bernard was immediately filing for sole guardianship in Colorado; although as documented in several emails (Exhibit A) that Carl Glatstein agreed New York was the appropriate place to file. Shortly thereafter Bernard also chose to retain attorneys in New York at Joanne's personal expense, against her wishes.

BLACK015817

3

- Joanne has been deemed mentally competent by all mental health professionals involved with her in New York state. Everyone agrees that Bernard is not an appropriate conservator/guardian. This is well documented in both New York and the state of Colorado.

- During the time of 2013 to 2014 I had repeatedly expressed concerns to Carl Glatstein and Bernard that Colorado was not the place to request guardianship, and that it should be done in New York, where Joanne was residing. As shown to the court previously, Joanne has been a resident of New York for the majority of her life. Both Carl Glatstein and Bernie have been misleading the court as to Colorado being her residence, which continues to make me very uncomfortable. Several documents were issued to the court with Joanne's address listed as unknown during 2013. When I spoke to Carl Glatstein and told him Joanne's address, his answer was, "It's easier this way." At that time, Joanne was in one of the three hospitals, that she was to be in, over the next seventeen months. The same scenario took place throughout the year.

BLACK015818

# EXHIBIT 23

# Kerr Forensic Accounting, PC

Exhibit A

650 S. Cherry Street ♦ Suite 235 ♦ Denver, Colorado 80246 ♦ (303) 696-3700 ♦ Fax (303) 696-5711

January 27, 2015

Gayle Young
Young & Zen, LLC
PO Box 307
Littleton, CO  80160

Sent via email to:      d.zen@q.com

Re:    Proposal for Forensic Accounting
Services
In the Interest of Joanne Black
Denver Probate Court
Case No. 12PR1772

Dear Ms. Young,

*Kerr Forensic Accounting, PC* ("Kerr") is providing this proposal to you for forensic accounting services In the Interests of Joanne Black, Ward/Protected Person, for whom you have been appointed Guardian ad Litem by the Denver Probate Court.   This proposal is intended to detail the terms and objectives of our engagement, and the nature and limitations of services we expect to provide.

### Scope of Services

It is Kerr's understanding that the scope of these services includes, but is not limited to, review of the Inventory and all Conservator's Reports filed for the period from 12/11/2012 through 12/31/2013 and 1/1/2014 through 12/31/2014 by the Court appointed Conservator, Bernard S. Black.

### Timetable

Our services will begin upon receipt of the signed Engagement Letter and retainer.

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

## Engagement Considerations

The results of our engagement will be documented in a written report provided to the client. It is understood by Kerr that this report may be shared with other related parties engaged in this matter.

We have no responsibility to update our report for events and circumstances which occur after the date of report issuance, or to incorporate additional information which is obtained through the discovery process, although we reserve the right to do so. Note that if for any reason we are unable to complete the engagement, we will not issue a written or verbal report.

We make no representation concerning the successful outcome of any contested claim or negotiation, or the favorable outcome of any legal action for which we are providing services. We have not and will not provide any legal advice to anyone related to this matter, nor are we in control of the preparation and/or management of any legal matters. All parties to this agreement understand that our involvement is limited to such actions as may legally be undertaken by Kerr in its capacity of providing services in this engagement.

In order to complete our proposed services, we will utilize information and documentation provided by the client. Our report will detail the nature of any reservations we have with respect to the accuracy and completeness of such information and documentation. All original documents in our possession will be returned to the appropriate party upon client's request, while the work papers and other materials created by Kerr during this engagement will remain the property of Kerr and maintained in our files for five (5) years. We wish you to know that Kerr does not keep working drafts; only the final report of our findings.

Client agrees that it will not require or agree to a settlement requiring Kerr to destroy or otherwise relinquish control of our work papers. Furthermore, if the admissibility of our expert testimony or opinion is challenged as matter of law (e.g., motion(s) in Limine, Daubert or Schreck challenges) client will notify Kerr immediately and consent to and pay for our participation in the defense of these matters.

## Fees and Out-of-Pocket Expenses:

It is difficult to estimate the amount of time that this engagement may require. The time involved depends upon the extent and nature of available information. Fees for our services are based on standard hourly rates for all of our services whether or not the engagement is completed or its results utilized. In addition, we will bill for any out-of-pocket costs (copies, travel, etc.) Please see the fee schedule attached for hourly rates. We respectfully request a retainer of $3,000.00 before beginning work, which will be applied to the time incurred. When the retainer has been exhausted, we will issue an invoice for the time incurred to date and request an additional retainer

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

of $3,000.00. Invoices are payable upon receipt and work may be suspended until the additional retainer has been received. Interest of 8% will accrue on all unpaid invoices. It is also my customary practice to request that all fees be paid before receipt of the written report. No verbal report will be issued.

## **Other Matters**

Any disputes or disagreements as to services or fees will be submitted to the Denver Probate Court for review and approval.

Kerr will not be liable for any claim for damages arising out of or in connection with this engagement in an amount greater than the amount of fees actually paid to Kerr with respect to the services directly relating to and forming the basis of such claim.

You hereby agree to hold us harmless, and indemnify us for any loss, in the event that we find it necessary to discontinue our services due to non-payment of our fees, or for any other violation of this agreement.

It is the intention of the parties hereto that this Agreement, the performance hereunder, or any matter arising there from, shall be governed under the laws of the State of Colorado, and that in any legal action or proceeding that may be brought arising out of, in connections with, or by reason of this Agreement, the laws, rules and regulations of the State of Colorado shall be applicable and shall govern to the exclusion of the laws, rules and regulations of any other forum. Further, the parties hereby agree that venue and exclusive jurisdiction for any legal action brought by either party against another party concerning this agreement, the performance there under, or any matter arising there from, shall be in the District Court or County Court in and for the County of Denver, State of Colorado, and no other court will have proper venue or jurisdiction.

You acknowledge your awareness that information transmitted electronically through facsimile, e-mail and the Internet is at risk of being intercepted by unauthorized persons; furthermore, from time to time we may retain services of third parties to assist us in our work. You have considered these risks and give us permission to communicate with you and your designees electronically and to retain third party services where we deem appropriate.

Either party may stop this engagement at any time by notifying the other in writing at the addresses noted in this letter without any explanation being requested.

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

## Your Understanding and Agreement

If the above terms are acceptable to you, and the services outlined are in accordance with your understanding, please sign and return to us a duplicate copy of this engagement letter. We appreciate the opportunity to assist you and hope that our services will prove to be useful to you.

Very truly yours,

*Kerr Forensic Accounting, PC*

Pamela M. Kerr, CPA, FCPA, CFE

Approved and accepted:

Gayle Young

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

## FEE SCHEDULE - 2015

| | |
|---|---|
| Pamela M. Kerr – hourly | $200.00 |
| Pamela M. Kerr – hourly deposition and testimony | 250.00 |
| Staff – CPA | 155.00 |
| Staff – Non CPA | 130.00 |
| Administrative | 75.00 |

Travel time – 50% of standard hourly rate

# EXHIBIT 24

| DENVER PROBATE COURT, DENVER COUNTY, COLORADO | |
|---|---|
| Court Address: 1437 Bannock Street, Denver, CO 80202 | DATE FILED: February 3, 2015 8:56 AM<br>FILING ID: 9A51F12C7B711<br>CASE NUMBER: 2012PR1772 |
| In the Interest of: JOANNE BLACK,<br>Protected Person. | COURT USE ONLY |
| Attorney: Young & Zen, LLC<br>Gayle Y.L. Young, #17107<br>P.O. Box 307<br>Littleton, CO 80160; Email: d.zen@q.com<br>(303) 738-9546; fax: (303) 795-7378<br>Guardian ad Litem | Case No.: 12PR1772<br><br>Division: 1 , Courtroom 224 |
| MOTION FOR INDEPENDENT FORENSIC REVIEW OF FINANCIAL RECORDS AND FOR PAYMENT OF FORENSIC ACCOUNTANT | |

Gayle Young, Guardian ad Litem for Joanne Black, requests an Order authorizing a independent forensic review of the financial records in this matter and for payment of a forensic accountant. In support of this motion the Guardian ad Litem states the following:

1. Issues have been raised by the Court, the Guardian ad Litem, counsel for Joanne Black in both Colorado and New York, and other interested parties concerning irregularities with regard to the actions of the Conservator, Bernard Black, as it pertains to alleged financial exploitation and his fiduciary responsibilities to his sister and protected person, Joanne Black.

2. Due to the complexity of the issues at hand, i.e., the unapproved 2013 trust and the Conservator disclaiming Ms. Black's interests as beneficiary to Vanguard and Fidelity accounts upon her mother's death, and most recently the concerns raised in the pleadings filed by Anthony Dain and Cherie Wrigley, a forensic accounting is appropriate to determine whether there has been wrongdoing on the Conservator's part.

3. The Guardian ad Litem recommends that Pam Kerr of Kerr Forensic Accounting, PC conduct a forensic accounting review which includes examination of the documents relating to this matter including but not limited to the Conservator's Reports, Inventory, Financial Plan, bank and trust records; assets and documents from the Estate of Renata Black at the time of her death, all statements from Vanguard and Fidelity which reflect the amount of money in these accounts prior to the death of Renata Black and the amount removed by the Conservator from those accounts after the disclaimer of the protected person's interests, copies of all bank and financial statements which show the income these funds have earned since they were removed from these accounts; accounts currently in the name of Joanne Black; the Joanne Black 2013 Trust Agreement and all bank and financial statements from distributions of the 2013 Trust Document; the irrevocable trust for the benefit of the issue of Renata Black dated December 19, 1997 and the

Supplemental Needs Trust for the benefit of Joanne Black dated December 19,1997, and all other records the forensic accountant deems appropriate in investigating this matter.

4.     Attached as Exhibit A is the Proposal for Forensic Accounting Services and Exhibit B, Pam Kerr's Curriculum Vitae.  Ms. Kerr is requesting a retainer of $3000.00 to begin her review of the financial records.

WHEREFORE, the Guardian ad Litem for Joanne Black respectfully requests that the Court approve a forensic accounting in this matter, that Kerr Forensic Accounting, PC be approved to conduct a forensic review, and that an initial retainer in the amount of $3000.00 be paid from the estate of Joanne Black.

Respectfully submitted this 2nd day of February, 2015.

YOUNG & ZEN, LLC

*/s/ Gayle Young*

Gayle Y.L. Young, #17107
P.O. Box 307
Littleton, CO 80160
(303) 738-9546
Counsel for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of February, 2015, I have electronically mailed or placed a true and correct copy of the within MOTION AND ORDER FOR INDEPENDENT FORENSIC REVIEW OF FINANCIAL RECORDS AND FOR PAYMENT OF FORENSIC ACCOUNTANT  in the U.S. mail, first-class postage pre-paid, and properly addressed to the following:

M.Carl Glatstein, Esq.
Glatstein and O'Brien LLP
2696 S. Colorado Blvd., Suite 350
Denver, CO  80222
Counsel for Conservator

Lisa DiPonio, Esq.
DiPonio & DiPonio
7931 S. Broadway, #348
Littleton, CO  80112
Counsel for Protected Person

Cherie Wrigley
1946 Roadrunner Avenue
Thousand Oaks, CO 91320
Cousin

Anthony Dain, Esq.
13272 Capstone Drive
San Diego, CA 92130
Cousin/Trustee of Supplemental Needs Trust

*/s/ Gayle Young*

_____

# Kerr Forensic Accounting, PC

EXHIBIT A

650 S. Cherry Street ♦ Suite 235 ♦ Denver, Colorado 80246 ♦ (303) 696-3700 ♦ Fax (303) 696-5711

DATE FILED: February 2, 2015 5:05 PM
FILING ID: 8F92B55745E3A
CASE NUMBER: 2012PR1772

January 27, 2015

Gayle Young
Young & Zen, LLC
PO Box 307
Littleton, CO 80160

Sent via email to:     d.zen@q.com

Re:     Proposal for Forensic Accounting
        Services
        In the Interest of Joanne Black
        Denver Probate Court
        Case No. 12PR1772

Dear Ms. Young,

**Kerr Forensic Accounting, PC** ("Kerr") is providing this proposal to you for forensic accounting services In the Interests of Joanne Black, Ward/Protected Person, for whom you have been appointed Guardian ad Litem by the Denver Probate Court.   This proposal is intended to detail the terms and objectives of our engagement, and the nature and limitations of services we expect to provide.

## Scope of Services

It is Kerr's understanding that the scope of these services includes, but is not limited to, review of the Inventory and all Conservator's Reports filed for the period from 12/11/2012 through 12/31/2013 and 1/1/2014 through 12/31/2014 by the Court appointed Conservator, Bernard S. Black.

## Timetable

Our services will begin upon receipt of the signed Engagement Letter and retainer.

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

## Engagement Considerations

The results of our engagement will be documented in a written report provided to the client. It is understood by Kerr that this report may be shared with other related parties engaged in this matter.

We have no responsibility to update our report for events and circumstances which occur after the date of report issuance, or to incorporate additional information which is obtained through the discovery process, although we reserve the right to do so. Note that if for any reason we are unable to complete the engagement, we will not issue a written or verbal report.

We make no representation concerning the successful outcome of any contested claim or negotiation, or the favorable outcome of any legal action for which we are providing services. We have not and will not provide any legal advice to anyone related to this matter, nor are we in control of the preparation and/or management of any legal matters. All parties to this agreement understand that our involvement is limited to such actions as may legally be undertaken by Kerr in its capacity of providing services in this engagement.

In order to complete our proposed services, we will utilize information and documentation provided by the client. Our report will detail the nature of any reservations we have with respect to the accuracy and completeness of such information and documentation. All original documents in our possession will be returned to the appropriate party upon client's request, while the work papers and other materials created by Kerr during this engagement will remain the property of Kerr and maintained in our files for five (5) years. We wish you to know that Kerr does not keep working drafts; only the final report of our findings.

Client agrees that it will not require or agree to a settlement requiring Kerr to destroy or otherwise relinquish control of our work papers. Furthermore, if the admissibility of our expert testimony or opinion is challenged as matter of law (e.g., motion(s) in Limine, Daubert or Schreck challenges) client will notify Kerr immediately and consent to and pay for our participation in the defense of these matters.

## Fees and Out-of-Pocket Expenses:

It is difficult to estimate the amount of time that this engagement may require. The time involved depends upon the extent and nature of available information. Fees for our services are based on standard hourly rates for all of our services whether or not the engagement is completed or its results utilized. In addition, we will bill for any out-of-pocket costs (copies, travel, etc.) Please see the fee schedule attached for hourly rates. We respectfully request a retainer of $3,000.00 before beginning work, which will be applied to the time incurred. When the retainer has been exhausted, we will issue an invoice for the time incurred to date and request an additional retainer

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

of $3,000.00. Invoices are payable upon receipt and work may be suspended until the additional retainer has been received. Interest of 8% will accrue on all unpaid invoices. It is also my customary practice to request that all fees be paid before receipt of the written report. No verbal report will be issued.

**Other Matters**

Any disputes or disagreements as to services or fees will be submitted to the Denver Probate Court for review and approval.

Kerr will not be liable for any claim for damages arising out of or in connection with this engagement in an amount greater than the amount of fees actually paid to Kerr with respect to the services directly relating to and forming the basis of such claim.

You hereby agree to hold us harmless, and indemnify us for any loss, in the event that we find it necessary to discontinue our services due to non-payment of our fees, or for any other violation of this agreement.

It is the intention of the parties hereto that this Agreement, the performance hereunder, or any matter arising there from, shall be governed under the laws of the State of Colorado, and that in any legal action or proceeding that may be brought arising out of, in connections with, or by reason of this Agreement, the laws, rules and regulations of the State of Colorado shall be applicable and shall govern to the exclusion of the laws, rules and regulations of any other forum. Further, the parties hereby agree that venue and exclusive jurisdiction for any legal action brought by either party against another party concerning this agreement, the performance there under, or any matter arising there from, shall be in the District Court or County Court in and for the County of Denver, State of Colorado, and no other court will have proper venue or jurisdiction.

You acknowledge your awareness that information transmitted electronically through facsimile, e-mail and the Internet is at risk of being intercepted by unauthorized persons; furthermore, from time to time we may retain services of third parties to assist us in our work. You have considered these risks and give us permission to communicate with you and your designees electronically and to retain third party services where we deem appropriate.

Either party may stop this engagement at any time by notifying the other in writing at the addresses noted in this letter without any explanation being requested.

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

## Your Understanding and Agreement

If the above terms are acceptable to you, and the services outlined are in accordance with your understanding, please sign and return to us a duplicate copy of this engagement letter. We appreciate the opportunity to assist you and hope that our services will prove to be useful to you.

Very truly yours,

*Kerr Forensic Accounting, PC*

Pamela M. Kerr, CPA, FCPA, CFE

Approved and accepted:

Gayle Young

# Kerr Forensic Accounting, PC

Proposal for Forensic Accounting Services re: In the Interests of Joanna Black
January 27, 2015

## FEE SCHEDULE - 2015

| | |
|---|---|
| Pamela M. Kerr – hourly | $200.00 |
| Pamela M. Kerr – hourly deposition and testimony | 250.00 |
| Staff – CPA | 155.00 |
| Staff – Non CPA | 130.00 |
| Administrative | 75.00 |

Travel time – 50% of standard hourly rate

# Kerr Forensic Accounting, PC

EXHIBIT B

650 S. Cherry Street ◆ Suite 235 ◆ Denver, Colorado 80246 ◆ (303) 696-3700 ◆ Fax (303) 696-5711

*Curriculum Vitae*

DATE FILED: February 2, 2015 5:05 PM
FILING ID: 8F92B55745E3A
CASE NUMBER: 2012PR1772

## Pamela M. Kerr, CPA, FCPA, CFE

**Current:** President – **Kerr Forensic Accounting, PC (pka Fraud Consultants, Inc.)**

Forensic Accounting Firm: Established in 2007 providing professional services in the following areas:

Forensic Accounting, Financial and Fraud Investigations, Litigation Support, Financial Analysis, Estate and Trust Disputes, Partnership Disputes, Marital Dissolutions, Financial Records Reconstruction, Fraud Prevention and Fraud Risk Analysis.

**Prior History:**

Consultant - Clifton Gunderson, Arrow Electronics, Predovich & Company, Adelphia Communications, Red Robin Gourmet Burgers, NTT Verio, GHP Financial Group (2002 – 2007)

Projects included forensic audits, fraud investigations, fraud risk assessments, Sarbanes Oxley reviews and Litigation Support.

Finance Manager, Reporting Manager and Corporate Accounting Manager First Data Corporation (2000 - 2002)

Management of Corporate Accounting Department; Management of Reporting for Western Union North America; Financial Analyst for Retail Money Order.

Accounting Manager - T-Netix, Inc. (1998 – 2000)

Responsible for financial statement preparation and supervision of corporate accounting staff, financial analysis and budget preparation.

Senior Accountant - TCD North, Inc. dba/The Denver Tech Center (1994 – 1995)

Responsible for month end close and financial reporting for TCD North and 16 joint ventures; supervised staff of 5.

Auditor - Deloitte & Touche (1990 – 1993)

Responsible for financial and compliance audits.

Owner - PMC Services (1980 – 1986)

Accounting and Bookkeeping Service

**Professional Credentials:**

- Certified Public Accountant – Colorado
- Certified Fraud Examiner - Association of Certified Fraud Examiners
- Forensic Certified Public Accountant- Forensic CPA Society

# Kerr Forensic Accounting, PC

**650 S. Cherry Street   ◆   Suite 235   ◆   Denver, Colorado 80246   ◆   (303) 696-3700   ◆   Fax (303) 696-5711**

**Testimony & Depositions (most recent listed first)**

1. Montrose County District Court
   Probate Case #2012PR8
   Court Testimony-Qualified as Expert
   Montrose, CO

2. Larimer County District Court
   Domestic Relations Case #11DR1493
   Court Testimony-Qualified as Expert
   Ft. Collins, CO

3. Arapahoe County District Court
   Domestic Relations Case #06DR2330
   Court Testimony-Qualified as Expert
   Centennial, CO

4. Jefferson County District Court
   Probate Case #11PR1050
   Court Testimony-Qualified as Expert
   Golden, CO

5. Denver County Probate Court
   Probate Case #01PR864
   Deposed by Holland & Hart (case settled prior to trial)
   Denver, CO

6. Arapahoe County District Court
   Probate Case #06 PR 267
   Court Testimony-Qualified as Expert
   Centennial, CO

7. Boulder County District Court
   Criminal Case #08 CR 688
   PEOPLE vs. LISA NOVAK
   Trial Testimony-Qualified as Expert
   Boulder, CO

**Education**
- Bachelor of Science, Accounting, Metropolitan State University of Denver, *magna cum laude*
  *Outstanding Student – School of Business*

# Kerr Forensic Accounting, PC

**650 S. Cherry Street    ◆    Suite 235    ◆    Denver, Colorado  80246    ◆    (303) 696-3700    ◆    Fax (303) 696-5711**

**Professional Memberships & Boards:**

- Association of Certified Fraud Examiners (ACFE)
- American Institute of Certified Public Accountants (AICPA)
- Forensic Certified Public Accountant Society (FCPA)
- Colorado Chapter of Association of Certified Fraud Examiners
- Colorado Bar Association, Patron member (CBA)
    - Member of Trust & Estate, Elder Law, Litigation and Family Law Sections
- Colorado Women's Bar Association (CWBA)
- Colorado Chapter of Association of Certified Fraud Examiners
    - Past Vice President, Past Training Director
- Denver Probate Court Guardian Ad Litem Committee – past member

**Articles Published**

"When Fraud Hits Home"    July 2010    Out Front Colorado

**Training & Presentations Given:**

**2014**

5280 Professional Alliance –Member of Panel– "Financial Exploitation of the Elderly"

**2013**

Colorado Guardianship Association – "Financial Exploitation-When it Becomes Criminal-What to Do About it" – co-presented with Candace Black, Elder Abuse Unit, Jefferson County District Attorney's office

**2012**

Jefferson County TRIAD – "Financial Exploitation of the Elderly"
Denver East Coalition – "Financial Exploitation of the Elderly"
Professional Private Investigators' Association of Colorado – "Financial Elder Fraud"

**2011**

Women's Estate Planning Council - "Fraud Prevention for Trusts and Estates"
Denver Foundation – "Fraud Prevention for Non-Profits"
Colorado Springs Chapter of the ACFE – "Forensic Accounting & Financial Exploitation of the Elderly"
Rocky Mountain Paralegal Association and Colorado Bar Association-Member of panel "Processes and Procedures in Probate and Guardianship/Conservatorship Matters in 2011"
Rocky Mountain Paralegal Association - "A Forensic Accountants Role in Probate, Civil and Criminal Matters"

# Kerr Forensic Accounting, PC

650 S. Cherry Street  ♦  Suite 235  ♦  Denver, Colorado  80246  ♦  (303) 696-3700  ♦  Fax (303) 696-5711

**2010**

Denver Police Department Financial Crimes Unit - "Forensic Accounting – Financial Exploitation of the Elderly"

Holme Roberts & Owen, LLP Private Client Services Group -"Is Your Trust or Estate at Risk?"

National Association of Tax Professionals-"Fraud Prevention in Tax Preparation"

Boulder County Aging Services - Elder Abuse Training for Detectives & Investigators
    "Forensic Accounting - Financial Exploitation of the Elderly"

AARP Metro Council - "Financial Exploitation of the Elderly""

Colorado Bankers Association Fraud Prevention Summit - Panel Speaker – "Internal Fraud"

Colorado State Fiscal Managers Association 2010 Spring Conference -"Fraud Prevention and Detection"

American Payroll Association Loveland Chapter -  "Payroll Fraud Prevention and Detection"

Hindman Sanchez Law Firm - "Fraud Awareness and Prevention in an HOA Environment"

Colorado State University (Prof. Laurence Johnson) -"Fraud Prevention Education (ACT541, Forensic Accounting and Fraud Auditing)"

**2009**

EKS&H Accounting Firm - "Red Flags of Fraud in an Audit Environment"

Vectra Bank – Business for Breakfast - "Fraud Prevention within Your Business"

2009 Rocky Mountain Regional Payroll Conference - Payroll Fraud and Payroll Fraud Prevention

**Continuing Education:**

- Collecting Judgments-Strategies for Success – Colorado Bar Association
- Making Crime Pay – Association of Certified Fraud Examiners (ACFE)
- Money Laundering – Colorado Chapter of the ACFE
- How to Catch a Tax Cheat Using Advanced Analytics - ACFE
- Advanced Elder Law Institute – Colorado Bar Association
- Trustee's Duty to Inform Under the Colorado Probate Code – Colorado Bar Association
- Measuring Lost Profits in Litigation – Colorado Bar Association
- Trust & Estate Annual Fall Update 2013, 2012, 2009  – Colorado Bar Association
- Deposition Primer:  Probate Procedures – Colorado Bar Association
- 2012, 2010 and 2009 Annual Conference – Colorado Chapter of the ACFE
- 2013, 2012, 2011, 2010 Elder Law Retreat – Colorado Bar Association
- 2014, 2013, 2012 Estate Planning Retreat – Colorado Bar Association
- Probate Litigation Basics – Colorado Bar Association
- Family Law Institute – Colorado Bar Association
- Mastering the Court Processes and Procedures in Probate and Guardianship/Conservatorship Matters in 2011
- Estate Administration Basic Skills – Colorado Bar Association
- Advanced Elder Law Institute – Colorado Bar Association
- The Fraud Trial - Association of Certified Fraud Examiners
- Elder Abuse Training for Detectives and Investigators – Boulder County Aging Services
- Making Ethics Count – Colorado Society of Certified Public Accountants

# Kerr Forensic Accounting, PC

**650 S. Cherry Street** ◆ **Suite 235** ◆ **Denver, Colorado  80246** ◆ **(303) 696-3700** ◆ **Fax (303) 696-5711**

**Continuing Education (continued)**

- The Role of the Forensic Accountant from Start to Finish
- Counseling Clients on the Expanding Requirements of the Uniform Principal and Income Act and the Uniform Prudent Investor Act - Colorado Bar Association
- Uniform Power of Attorney Laws – Colorado Department of Human Services
- Trust and Estate Law Update – Colorado Bar Association
- Ethics – Colorado Rules & Regulations – American Society of Women Accountants
- Conservatorship's Training Class – Denver Probate Court
- Fraud & White Collar Crime Training Seminar – Colorado State Investigators Association
- Mock Trial: "Opportunity Strikes Again" – Colorado Springs Chapter of the Association of Certified Fraud Examiners
- Money Laundering:  Tracing Illicit Funds – Association of Certified Fraud Examiners


**Community Involvement:**

- Past Volunteer Coach for Denver Probate Court
- Past Volunteer – Adopt-A-Senior - HealthSET
- Volunteer – Epworth Foundation
- Past Member – Board of Directors-Mile High Child Care Centers
- Past Member – Board of Directors-Colorado Association of Gifted & Talented
- Previous United Way Loaned Executive
- Past Volunteer and volunteer coordinator for Colorado Special Olympics
- Creator/Organizer of The Ann Brockway Memorial Swim
- Creator – Share a Dream Foundation (1990-1992)
- Big Sister - Denver Public Schools-Denver Kids Program (1992-1994)

# Kerr Forensic Accounting, PC

**650 S. Cherry Street ♦ Suite 235 ♦ Denver, Colorado 80246 ♦ (303) 696-3700 ♦ Fax (303) 696-5711**

## *REPRESENTATIVE PROJECT EXPERIENCE*

### *Forensic Accounting and Financial Investigations*

- Probate matter regarding actions of attorney acting as attorney, business partner and trustee. Performed forensic review of documents related to Estate of individual involved in multiple LLC's. Reviewed over 10,000 pages of documents provided by opposing counsel including LLC tax returns and related LLC documents; closing statements from sales of multiple properties including Section 1031 Exchanges; reconstructed accounting records of multiple LLC's created to develop properties; and reviewed final accounting prepared by legal counsel. Prepared Calculation of Loss for mediation

- Performed forensic audit of Estate related to alleged theft of funds by Personal Representative. Qualified and testified as an expert at jury trial.

- Performed forensic review of documents related to business partnership and potential misappropriate of funds. Provided Calculation of Potential Loss. Assisted client in preparation of questions for deposition of partner suspected of misappropriation of funds. Matter settled prior to trial.

- Performed forensic review of documents related to business partnership and potential misappropriation of funds by partner. Prepared Calculation of Loss and provided report for potential criminal charges and civil lawsuit.

- Performed forensic review of books and records of apartment complex due to the alleged theft by property manager, including payments by multiple government agencies. Provided Calculation of loss to client and insurance company to support loss claim.

- Reviewed accounting documents with regards to alleged theft by Property Management Company. Provided Calculation of loss to client and insurance company to support loss claim.

- Reviewed documents related to alleged improper actions of Conservator. Matter settled during trial.

- Reviewed accounting documents of multiple LLC's with regards to transfer of ownership after death of partner and subsequent transfers of ownership and calculation of capital accounts.

- Performed forensic audit of Trust related to alleged theft of funds from trust including multiple accounts and trustees. Provided report of findings to Probate Court. Qualified and testified as an expert. Previous trustees were ordered to repay the Trust ~$185,000.00. Provided report to law enforcement in support of criminal charged filed.

- Filed Writ of Garnishment in relation to judgments obtained for client and assisted in legal counsel's successful argument against Claim of Exemption. Filed Interrogatories and property liens in relation to collection of judgments obtained for client. Worked with legal counsel to execute Sheriff's sale on property for satisfaction of judgments.

- Reviewed trust documents for potential misuse of trust funds and issued report of findings.

# Kerr Forensic Accounting, PC

**650 S. Cherry Street ◆ Suite 235 ◆ Denver, Colorado 80246 ◆ (303) 696-3700 ◆ Fax (303) 696-5711**

- Performed forensic audit of trust and estate documents related to breach of fiduciary duty by Trustee. Provided report of findings and Calculation of Damages. Provided report to law enforcement in support of potential criminal charges.

- Reviewed documentation regarding criminal charges for theft. Prepared Calculation of Restitution for hearing.

- Performed forensic audit of non-profit related to misappropriation of assets by former employee. Provided report to Board of Directors for calculation of damages and potential criminal charges.

- Appointed as Power of Attorney and performed review of assets held by Principal. Filed report with Insurance Commissioner related to inappropriate actions related to sale of Annuity to Principal.

- Performed forensic audit of nationwide association including the investigation of specific accounts and documentation. Provided report of findings and recommendations for improvement of accounting policies and procedures to Board of Directors.

- Performed review of financial documents provided in a domestic relations matter for suspected hidden assets. Provided report of findings for hearing. Qualified and testified as an expert.

- Multiple instances of review of accounting documents relating to Homeowners' Association. Prepared Calculation of Loss and presented findings to Board of Directors

- Reviewed accounting documents related to Investigation of small business with regards to alleged misappropriation of assets in spouses business.

- Performed forensic audit of financial documents related to potential abuse of Power of Attorney by family member. Provided report to law enforcement in support of criminal charges being filed. Family member was charged with felony theft by Jefferson County, Colorado.

- Prepared analysis of accounting documents relating to Conservatorship. Qualified and testified as an expert at trial.

- Prepared analysis of accounting documents relating to Conservatorship of Protected Person. Reviewed and analyzed 9 years of court documents filed, bank and investment statements, and supporting documentation. Prepared Calculation of Damages for settlement of damages.

- Prepared analysis of spouses' financial needs for Modification of Spousal Support. Reviewed Petitioner's Expert's report, prepared analysis and issued rebuttal.

- Reviewed 7 years of clients' investment portfolio and brokerage statements. Prepared Calculation of Damages for FINRA investigation.

# Kerr Forensic Accounting, PC

**650 S. Cherry Street ♦ Suite 235 ♦ Denver, Colorado 80246 ♦ (303) 696-3700 ♦ Fax (303) 696-5711**

- Examined financial information regarding suspected fraud by a non-profit organization. Provided a full report to the Boulder District attorney's office in support of a successful criminal prosecution. Qualified and testified as an expert at jury trial.

- Examined bank documents and accounting records regarding suspected forgery by former employee. Prepared calculation of damages and Crime Loss Report for client's insurance claim. Report also prepared for law enforcement in support of criminal prosecution.

- Investigated suspected student financial aid fraud in a community college environment. Examined financial information regarding suspected fraud. Prepared and presented a full report to the Attorney General's office in support of criminal prosecution.

- Reviewed Conservator reports filed with Probate Court as volunteer Guardian Ad Litem for the Denver Probate Court. Assisted conservators with correcting and amending reports.

- Examined 4 years of accounting records regarding potential misappropriation of funds by a Board member of a quasi-governmental entity. Prepared analysis of transactions and report of findings of irregularities for current Board of Directors.

- Reviewed 15 years of partnership tax returns, general ledgers and bank records included in a trust. Prepared financial schedules including cash analysis, capital account analysis and bank activity analysis in support of civil litigation. Claimants settled prior to trial.

- Investigated allegations of potential conflicts of interest within a law firm. Examined financial information and calculation of estimate of losses due to self-dealing.

- Investigated allegations of potential illegal activities by a city official including travel and entertainment expenses and issuance of contracts with potential conflicts of interest.

## _Fraud Risk and Internal Control Assessments:_

- Prepared a Fraud Risk Assessment for a $4 billion Cable Company, including Code of Ethics, Hiring & Promotion, Accounting & Financial Reporting and Information Technology Policies and Procedures. Tested and evaluated controls in place to mitigate fraud risk.

- Prepared an internal control assessment for a County Sheriff's Office, specifically covering controls around inmate cash funds. Presented recommendations for internal controls to mitigate future potential fraud.

- Performed testing and evaluation of internal controls for a $400 million restaurant chain. Prepared Policies and Procedures book to assist in future training for internal controls and procedures.

# EXHIBIT 25

## Bernard Black

| | |
|---|---|
| **From:** | cherie wrigley <cheriewrigley@yahoo.com> |
| **Sent:** | Saturday, June 13, 2015 5:52 PM |
| **To:** | Bernie Poskus |
| **Subject:** | Fw: Joanne Black - Motion for Forensic Review |

----- Forwarded Message -----
**From:** cherie wrigley <cheriewrigley@yahoo.com>
**To:** "Dain, Anthony J." <anthony.dain@procopio.com>; Young/Zen <d.zen@q.com>
**Cc:** Pamela Kerr <pam@kerrfa.com>; Ira Salzman <salzman@seniorlaw.com>; Lisa Diponio
<diponiolawfirm@comcast.net>
**Sent:** Wednesday, February 11, 2015 11:17 PM
**Subject:** Re: Joanne Black - Motion for Forensic Review

Wow! I just came home from an all day conference about *Support For The Mentally Ill*.
Lots of emails for me to read. A few points I would like to bring up.
1st-Bernie originally said that Joanne was worth aprox. 3mill. to the Colorado courts. His accounting
doesn't explain why it would dwindle down to 2.4 less than 2 years later when the stock market has
made such substantial gains in the last two years. Bernie told me that Joanne's funds were equity
based until just recently.Even from 2.8 to 2.4....where are her profits?
2nd-Isn't Joanne entitled to 2/3 of the real estate? In reality the full amount of the *Benedict* condo
should have gone into her SNT.
3rd-It is hard for me to trust anything Bernie says or does now that I see some large omissions in his
inventory records to the State of NY. There is no mention of the jewelry that belonged to his mother
and the jewelry that belongs to my family. Either way State Estate taxes should have been paid. My
Aunt Renata also owned some very expensive furnishings,rugs and art work.Those objects that
Joanne should have inherited are not listed and I might assume taxes were not paid?
Cherie

---

**From:** "Dain, Anthony J." <anthony.dain@procopio.com>
**To:** Young/Zen <d.zen@q.com>
**Cc:** Pamela Kerr <pam@kerrfa.com>; Ira Salzman <salzman@seniorlaw.com>; cherie wrigley
<cheriewrigley@yahoo.com>; Lisa Diponio <diponiolawfirm@comcast.net>
**Sent:** Wednesday, February 11, 2015 2:58 PM
**Subject:** Re: Joanne Black - Motion for Forensic Review

I guess we'll find out from the forensic accounting how much he placed in the Issue Trust.  It is
definitely funded in that he has asked me for authority to reimburse himself from it for student loans
he paid for his kids.  Also, there is only around $2.4 in the Supplemental Needs Trust.  However, if
there was $2.8 in Vanguard, absent other funds,he couldn't have put 1/3 in the Issue Trust.

Sent from my Verizon Wireless 4G LTE DROID

Young/Zen <d.zen@q.com> wrote:

Hi Pam:

1

Lisa and I spoke with Carl this afternoon.  I will be sending him a list of the documents you are requesting as well as other documents we are interested in having you review.  I will try to make it as comprehensive as possible utilizing Ira's comments as well as everyone else's. Carl will review it with Bernie.  We would like an estimate as to how long it will take for you to arrive at your findings.  We realize that much of it will depend on your receipt of this information.

I will be drafting  a stipulation of the forensic review and payment of your services with the court.  We will set a hearing after your review is completed.  We may set a hearing earlier depending on what is going on in the case.

Gayle Young

Sent from my iPhone

On Feb 10, 2015, at 4:50 PM, Pamela Kerr <pam@kerrfa.com<mailto:pam@kerrfa.com>> wrote:

Hi Gayle,

Yes, I actually spoke to Carl this afternoon and he is on board for the forensic review.

In addition to the documents I have already received, here is a list of additional documents I will need:


  1.  The best thing I could get would be Bernard Blacks electronic files of his Exhibits for the Conservator reports.  That would save me from having to reconstruct everything.
  2.  The Original 2013 Conservator Report; I have the Amended but not the Original.
  3.  Copies of the Vanguard and Fidelity Statements from the date of death of Renata to the date of transfer of the funds.
  4.  Copies of the bank statements for all accounts listed on the 2013 and 2014 Conservator Reports filed by Bernard Black, including Joann's accounts and all brokerage accounts.  IF the bank statements include check copies, that would be ideal.  If they do not, see #3 and #4 below.
  5.  Check copies for payments to legal and accounting professionals and Cherie;  if any other check copies are available, please provide them.  If I need other check copies, I will request them once I have had a chance to begin the reconstruction of the banking activity.
  6.  Check copies to CPI Investigations.  Also request a W-9 from Esaun Pinto and if a 1099 was issued to CPI Investigations, please provide a copy of that.
  7.  Any statement from Workers Comp that will reflect all of the payments that Joanna has received.  She would probably have received a year end statement for both 2013 and 2014.
  8.  Any statement from Social Security that will reflect all of the payments that Joanna has received.  She would probably have received a year end statement for both 2013 and 2014.
  9.  A listing of all Savings Bonds in the Safety Deposit Box (payment was made for the Safety Deposit Box on 7/25/2013) and if they were cashed, the disposition of them.
  10. Copy of all trust documents including the Supplemental Needs and the "2013 Trust"


For now, that is what I can come up with.  I may very well have additional items that I'll need but I'm sure Carl will help us get whatever documents we need.

Pam

Pamela M. Kerr, CPA, FCPA, CFE

Kerr Forensic Accounting PC
650 S. Cherry Street  Suite 235
Denver, Colorado  80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com<http://www.kerrforensicaccounting.com/>

"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain

Privileged/Confidential Information and IRS Disclosure:  This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

-----Original Message-----
From: Young/Zen [mailto:d.zen@q.com]
Sent: Tuesday, February 10, 2015 9:26 AM
To: Pamela Kerr
Subject: Fwd: Joanne Black - Motion for Forensic Review

As you can see from the emails below, Carl is in agreement proceeding with the forensic accounting.  Lisa and I may be speaking with Carl tomorrow.  I want to make sure that you have what you need to undertake the forensic review.  Besides what I requested in my proposed Order for Forensic Accounting, what other related areas should we delve into and what other specific documents should we ask for?  Any suggestions as to how we should proceed?

Begin forwarded message:

> From: "Ira Salzman" <salzman@seniorlaw.com<mailto:salzman@seniorlaw.com>>
> Subject: RE: Joanne Black - Motion for Forensic Review
> Date: February 8, 2015 at 9:51:17 AM MST
> To: "'Young/Zen'" <d.zen@q.com<mailto:d.zen@q.com>>, "'Lisa Diponio'"
> <diponiolawfirm@comcast.net<mailto:diponiolawfirm@comcast.net>>
>
> This is great news.
>
> I hope that when you speak to him you can enter into a clear agreement
> about the areas that will be subject to the accounting and the
> documents that will be produced.
>
> Ira Salzman
> Goldfarb Abrandt Salzman & Kutzin LLP

> 350 Fifth Avenue - Suite 4310
> New York, New York 10118
> Tel. 212-387-8400  ext. 231
> Fax  212-387-8404
> Web Site  www.seniorlaw.com<http://www.seniorlaw.com>
>
> -----Original Message-----
> From: Young/Zen [mailto:d.zen@q.com]
> Sent: Saturday, February 07, 2015 11:26 PM
> To: Lisa Diponio; Ira Salzman
> Subject: Re: Joanne Black - Motion for Forensic Review
>
> Lisa:
>
>       I forgot to mention that you should be included in the telephone
> conversation I have with Carl.  I'll advise Carl.
>
> Gayle
>
> On Feb 7, 2015, at 9:00 PM, Young/Zen <d.zen@q.com<mailto:d.zen@q.com>> wrote:
>
>> Lisa & Ira:
>>
>>       Bernie appears to be in agreement with a forensic accounting.  I
> don't have a problem waiving any conflict of interest with regard to
> Pam Kerr unless either of you think it is a problem.
>>
>>       At this time, my major concern is Bernie continuing to take
> liberties in his role as conservator such as becoming representative
> payee of Joanne's social security disability checks and, as a result,
> having Joanne's checks sent to him.
>>
>> Gayle
>>
>> Begin forwarded message:
>>
>>> From: Carl Glatstein <Carl@denverprobatelaw.com<mailto:Carl@denverprobatelaw.com>>
>>> Subject: Joanne Black - Motion for Forensic Review
>>> Date: February 7, 2015 at 4:00:19 PM MST
>>> To: "d.zen@q.com<mailto:d.zen@q.com>" <d.zen@q.com<mailto:d.zen@q.com>>
>>>
>>> Hi Gayle -
>>>
>>> Do you have time on Monday for a phone call with me?  Bernie is not
> opposed to a forensic accounting.  I think that will do much to clear
> the air.
>>>
>>> I do have to disclose that Arlene has represented Pam Kerr in her
> capacity as agent under a financial POA for one of her elderly
> clients.  We also engaged Pam's services as a forensic accountant in a
> decedent's estate/trust matter a few years.

4

>>>
>>> I have confidence in her skills and professionalism, but if such
> representation poses any concerns on your part for conflict of
> interest, let's discuss it before we go forward with Pam.
>>>
>>>
>>> M. Carl Glatstein
>>> Glatstein & O'Brien LLP
>>> 2696 S. Colorado Blvd., Suite 350
>>> Denver, CO  80222
>>> Tel.:  303-757-4342  / Fax:  303-757-4570
>>>
www.DenverProbateLaw.com<http://www.denverprobatecourt.com/<http://www.DenverProbateLaw.com<http://www.denverprobatecourt.com/>>
>>> carl@DenverProbateLaw.com<mailto:carl@DenverProbateLaw.com>
>>>
>>> NOTICE: This e-mail message is the property of Glatstein & O'Brien LLP.
> This e-mail message and any attachments may contain confidential
> information that is protected by law under attorney-client privilege,
> attorney-work-product doctrine, and/or other applicable privileges.
> If you are not the intended recipient of this message, please forward
> a copy to
carl@DenverProbateLaw.com<mailto:carl@DenverProbateLaw.com<mailto:carl@DenverProbateLaw.com<mailto:carl@DenverProbateLaw.com>>


> and delete the message and its attachments from your computer.
>>>
>>> IRS Circular 230 Disclosure: To ensure compliance with requirements
> imposed by the IRS, we inform you that any tax advice contained in
> this communication (including any attachments) is not intended or
> written to be used, and may not be used, for  the purpose of (i)
> avoiding penalties under the Internal Revenue Code or (ii) promoting,
> marketing or recommending to another party who is not the original
> addressee of this communication any transaction or matter addressed herein.

>>>
>

mailgw01.procopio.com made the following annotations
------------------------------------------------------------------
Wed Feb 11 2015 14:58:12

This is an email from Procopio, Cory, Hargreaves & Savitch LLP, Attorneys at Law. This email and any attachments hereto may contain information that is confidential and/or protected by the attorney-client privilege and attorney work product doctrine. This email is not intended for transmission to, or receipt by, any unauthorized persons. Inadvertent disclosure of the contents of this email or its attachments to unintended recipients is not intended to and does not constitute a waiver of attorney-

client privilege or attorney work product protections. If you have received this email in error, immediately notify the sender of the erroneous receipt and destroy this email, any attachments, and all copies of same, either electronic or printed. Any disclosure, copying, distribution, or use of the contents or information received in error is strictly prohibited.

--------------------------------------------------------------------

# EXHIBIT 27

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Saturday, March 14, 2015 4:06 PM
**To:** Young/Zen; Lisa Diponio; Carl Glatstein
**Cc:** Pamela Kerr
**Subject:** Joanne Black

I will copy all three of you on any communication I have from this point forward.  If that is not satisfactory, please let me know.  Given that you will probably have to bill for reading these emails, I will keep them to a bare minimum unless I need something.

I have read through some of the documents I have received from Gayle so far.  The number one document that I think is necessary right now is the document that shows if there was a POD on either the Vanguard or Fidelity account.  If what I have read so far is correct, and Joanne was the POD for these accounts, it will affect my analysis.  It will also impact the trust that Bernard Black has established, but that is a legal matter that I won't be addressing.  However, I do need to know what the starting assets should have been for Joanne.  Carl, can you please facilitate getting those documents from Bernard?

The detailed list that I provided to Gayle and Carl (and Carl forwarded to Bernard) included all bank statements.  However, I am attaching a detailed list of the specific bank accounts that I need copies of the bank statements and if available, copies of checks. It will be the most efficient use of my time if I get all of these before I begin my work on reconstructing the activity of the funds of Joanne Black from the date of Renata's death to the present.

I am curious as to why the real estate that was left to Joanne Black in Renata's will is not listed on the Conservator Report for either 2013 or 2014.

Please feel free to contact me if you have any questions.  Thank you.

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street  Suite 235
Denver, Colorado  80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:**  This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was

PLAINTIFF001191

not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

_____ Information from ESET NOD32 Antivirus, version of virus signature database 11323 (20150315) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

_____ Information from ESET NOD32 Antivirus, version of virus signature database 11327 (20150316) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

PLAINTIFF001192

# EXHIBIT 28

**Bernard Black**

| | |
|---|---|
| **From:** | Pamela Kerr <pam@kerrfa.com> |
| **Sent:** | Monday, March 16, 2015 9:03 PM |
| **To:** | Bernard Black |
| **Cc:** | d.zen@q.com; Carl Glatstein; Anthony J. Dain; Lisa Diponio |
| **Subject:** | RE: Joanne Black |

I am copying Anthony Dain on this email since he is the co-trustee of the SNT and this email relates largely to the SNT.

Bernard, I have received your other 5 emails with various bank statements.  I will begin working on these documents today.

*Please make sure to forward the statements from Vanguard and Fidelity as of the date of death of Renata Black forward to the date that the funds were transferred out, as well as the statements for all other accounts, including the funds for the Issue trust.  I have read your response below regarding your reasoning for the transfer of the 1/3 to the Issue trust, but I need to be able to account to the Court all funds that initially belonged to Joanne Black, whether or not they were waived by you on her behalf.  In fact, the Court will need to know exactly what was waived by you on her behalf as you are stating that this action was approved by the Court.*

In addition to reconstructing the bank accounts for the funds owned by Joanne Black, I will need to review all invoices for payment of expenses, specifically those paid for legal fees, accounting fees and fees paid to Esaun Pinto.  If I need others, I will request them from you.  Anthony, can you please coordinate getting copies of invoices from Esaun Pinto for me.   Bernard, I understand that you have provided an explanation next to the payments on the Conservator Report, but I will need to review the legal and accounting invoices so that I can report to the Court the details behind the various legal and accounting fees.  My report will not only provide to the court and all parties involved a detailed accounting of the funds of Joanne Black, but it will also be used for a (potential) revised Financial Plan going forward.

*Bernard, can you also provide copies of the tax returns for the SNT as I see that there were two payments made for "SNT income taxes for 2013 and 2014."*

This will be much more time consuming than anticipated. I have already spent many hours just reading the documents provided and reading emails.  I am therefore requesting an additional $7,000.00 retainer.  However, this is not stating that the investigation will not exceed $10,000.00 ($3,000 initial and $7,000 additional requested) I am just requesting this additional retainer at this point.

I will be out of town from 3/30 through 4/5.  I will provide a copy of my invoice with time charged through 3/29 to you all before I leave.

Please let me know if you have any questions.

Thank you all,

*Pam Kerr*

Pamela M. Kerr, CPA, FCPA, CFE

*Kerr Forensic Accounting PC*

650 S. Cherry Street  Suite 235
Denver, Colorado  80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:**  This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Sunday, March 15, 2015 5:59 AM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Carl Glatstein
**Subject:** FW: Joanne Black

Ms. Kerr: A few logistical requests if I may.
1. If you will email me directly, and cc whomever you want, that might expedite communication.
2. If you will send documents in native format, such as the attached (as you requested of me), that will be easier on my end.
3. I did not cc Lisa DiPonio because I do not have her email address; can you provide it?
4. Going forward, if you can provide some additional information when making requests, that will help me.  For example, if you could have explained why you wanted information on an account ending in 2425 [what other document refers to this] that would have helped me track down this account.  [I was able to do so, but began with head scratching, because the information you provided was so limited.]

With regard to payment on death from my mother's accounts at Vanguard and Fidelity, I will see what documents I can find.   However, my best understanding is as follows:
Fidelity:  Payable on death 100% to Joanne Black
These funds went from Renata Black, to an account for Joanne Black.  As conservator, I then placed these funds in the Joanne Black 2013 Trust.

Vanguard:  Payable on death 95% to Joanne Black and 1% each to my 5 older children.
As conservator, I waived (on behalf of Joanne) the payment from Vanguard to her.

This action was approved by the Colorado court.  That approval is now being challenged, but I believed then and believe even more strongly today that this action was in Joanne's interests, because it resulted in two-thirds of the funds that would otherwise have gone to Joanne going into the Supplemental Needs Trust, where they would be protected from government and other claims.  The alternative of having all of Joanne's funds outside the testamentary SNT would have left all of her funds exposed to government claims.  In any event, as you note, the reasons for that action do not directly affect your work.

This, without more, would have resulted in each if the 1% shares for my older children, blowing up to 20%.  To prevent this:
    Of my five older children, the two oldest (David and Benjamin) waived back down to 1%.
    The other three older children (Samuel, Sarah, and Rebekah) waived completely, but with the understanding that they were, in effect, reinvesting their 1% and had a future "moral" claim on the 1%, which I expected to come through distributions from the Issue Trust, for their benefit, when they wanted the funds.
This left 98% of the Vanguard assets with POD waived.  Those assets went into the Renata Black estate.

My overall job as executor was to distribute the overall assets in the estate 2/3 to the Supplemental Needs Trust and 1/3 to the Issue Trust.  As part of that overall job, I instructed Vanguard to divide the funds in my mother's principal Vanguard account into two accounts, with 2/3 of the assets in one account and 1/3 in the other account.

I then instructed Vanguard to transfer the account with 2/3 of the funds to be "under" the Supplemental Needs Trust, which was at Chase Bank, and to transfer the account with 1/3 of the funds to be "under" the Issue Trust, which was also at Chase Bank.  I should be able to provide documents for that funds flow.

I have not included my mother's house at 26 McKeel Avenue in my conservator report because it remains in the Estate of Renata Black. I am attempting to sell this house and place the proceeds in the Supplemental Needs Trust; Joanne (and Cherie Wrigley and Anthony Dain) are attempting to block the sale, that matter is before the New York family court.  Either way, the house (or the proceeds from sale) will be contributed to the Supplemental Needs Trust, and will form part of Joanne's overall 2/3 share.

Very truly yours,

Bernard Black
*************************************************************
Bernard S. Black
bblack@northwestern.edu

3

Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*************************************************************

---

**From:** Carl Glatstein [mailto:Carl@denverprobatelaw.com]
**Sent:** Saturday, March 14, 2015 6:51 PM
**To:** Bernard Black
**Subject:** FW: Joanne Black

This was received this afternoon from Pam Kerr:


M. Carl Glatstein
Glatstein & O'Brien LLP
2696 S. Colorado Blvd., Suite 350
Denver, CO 80222
Tel.: 303-757-4342 / Fax: 303-757-4570
www.DenverProbateLaw.com
carl@DenverProbateLaw.com

---

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Saturday, March 14, 2015 4:06 PM
**To:** Young/Zen; Lisa Diponio; Carl Glatstein
**Cc:** Pamela Kerr
**Subject:** Joanne Black

I will copy all three of you on any communication I have from this point forward. If that is not satisfactory, please let me know. Given that you will probably have to bill for reading these emails, I will keep them to a bare minimum unless I need something.

I have read through some of the documents I have received from Gayle so far. <u>The number one document that I think is necessary right now is the document that shows if there was a POD on either the Vanguard or Fidelity account.</u> If what I have read so far is correct, and Joanne was the POD for these accounts, it will affect my analysis. It will also impact the trust that Bernard Black has established, but that is a legal matter that I won't be addressing. However, I do need to know what the starting assets should have been for Joanne. Carl, can you please facilitate getting those documents from Bernard?

The detailed list that I provided to Gayle and Carl (and Carl forwarded to Bernard) included all bank statements. However, <u>I am attaching a detailed list of the specific bank accounts that I need copies of the bank statements and if available, copies of checks.</u> It will be the most efficient use of my time if I get all of these before I begin my work on reconstructing the activity of the funds of Joanne Black from the date of Renata's death to the present.

I am curious as to why the real estate that was left to Joanne Black in Renata's will is not listed on the Conservator Report for either 2013 or 2014.

Please feel free to contact me if you have any questions. Thank you.

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street  Suite 235
Denver, Colorado  80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:**  This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

_____  Information from ESET NOD32 Antivirus, version of virus signature database 11323 (20150315) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

_____ Information from ESET NOD32 Antivirus, version of virus signature database 11327 (20150316) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

# EXHIBIT 29

PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

------------------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

------------------------------------------------------------------

CASE NO. 12 PR 1772

------------------------------------------------------------------

IN THE INTEREST OF:

JOANNE BLACK, Respondent.

------------------------------------------------------------------

      This matter came on for hearing before THE HONORABLE
ELIZABETH D. LEITH, Judge of the Denver Probate Court, on
Thursday, April 2, 2015. The following is a transcript of the
audible portions of that hearing as requested by the ordering
party.

APPEARANCES:   M. CARL GLATSTEIN, Esq., Reg. No. 13738 for
              Bernard Black

              LISA DiPONIO, Esq., Reg. No. 27707, for Joanne
              Black, Respondent

              GAYLE YOUNG, Esq., Reg. No. 17107. Guardian Ad
              Litem for Joanne Black, Respondent

              IRA SALZMAN, Esq., Attorney for Joanne Black,
              Respondent

              ANTHONY DAIN, Trustee/cousin

              CHERIE WRIGLEY, Cousin

BLACK016614

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Thank you, you may be seated.  All
 3   right.  The record is now on and the Court will call up 12 PR
 4   1772, the interest of Joanne Black.  And could I have
 5   appearances for the record, please.
 6            MR. GLATSTEIN:  Good morning, Your Honor, Carl
 7   Glatstein, registration 13738 here on behalf of Bernard
 8   Black, Conservator; Mr. Black is present.
 9            THE COURT:  He is?
10            MR. GLATSTEIN:  Where did he go?
11            UNIDENTIFIED SPEAKER:  (Inaudible).
12            MR. GLATSTEIN:  He is almost present.
13            THE COURT:  Okay.
14            MR. GLATSTEIN:  His spouse Kate Litvak is also
15   present.
16            THE COURT:  Okay.
17            MS. DiPONIO:  Good morning, Your Honor, Lisa
18   DiPonio, 27707, court appointed counsel for Joanne Black.
19   Your Honor, Ira Salzman who is Ms. Black's attorney in New
20   York in the proceedings there.  They--he is on the phone.
21            THE COURT:  Okay.
22            MS. DiPONIO:  And Ms. Black is present with him as
23   well.
24            THE COURT:  Okay.
25            MR. SALZMAN:  Also present--this is Ira Salzman--
```

BLACK016615

```
 1   also present is Mr. Esaun Pinto (phonetic).

 2              THE COURT:  Okay.

 3              MR. DAIN:  Your Honor, Anthony Dain, trustee of the

 4   various trusts and an interested party.

 5              THE COURT:  Very good.

 6              MS. YOUNG:  Good morning, Your Honor, Gayle Young,

 7   Guardian ad Litem for Joanne Black.

 8              THE COURT:  All right.  Anyone else who wants to

 9 · enter an appearance?

10              MR. DAIN:  Yeah, go ahead.

11              MR. BLACK:  Bernard Black, Conservator.

12              THE COURT:  Very good.

13              MR. DAIN:  Cherie Wrigley, who is also an

14   interested party.

15              THE COURT:  All right.

16              MS. WRIGLEY:  Joanne Black's cousin.

17              THE COURT:  Right.  Okay.  All right.  So I've

18   reviewed the various reports and it's my understanding first

19   off that you have stipulated to the forensic review by Ms.

20   Kerr; is that correct?

21              MR. GLATSTEIN:  That is correct, Your Honor.

22              THE COURT:  All right.  So I'll sign off on that

23   order.  Did she estimate how long that was going to take?

24              MS. YOUNG:  I think she indicated in an e-mail

25   that--you know, she was supposed to call in and I don't know
```

BLACK016616

4

1    whether--whether she thought I was going to call her--I gave

2    her the call-in number.

3                THE COURT:  Okay.

4                MS. YOUNG:  But I--I think she anticipated that she

5    could get it done fairly soon, so I was going to ask her--

6    today is April 2nd, in a month or so.

7                THE COURT:  Okay.

8                MS. YOUNG:  So I would ask--

9                THE COURT:  Give or take.

10               MS. YOUNG:  --until May 15th.

11               THE COURT:  All right.  And then can you enlighten

12   me as to what exactly she's going to review?  What accounts

13   is she going to look at?

14               MS. YOUNG:  Okay.  Why don't you--

15               MS. DiPONIO:  I will try my best, Your Honor,

16   because there's a lot here.  And what I'd like to state to

17   the Court upfront--initially this case was presented here--

18               THE COURT:  Right.

19               MS. DiPONIO:  --as a conservatorship.  At that time

20   my client was on--for lack of a better phrase was on the

21   streets.

22               THE COURT:  Right.

23               MS. DiPONIO:  She was not present at the hearing.

24   At some point in time she was moved back to New York where

25   she's been for almost two years.  Proceedings are going on in

BLACK016617

1    New York, I believe in two different--two different courts.

2         We--the attorneys--and I hope I can speak for all

3    of us here in Denver--are recently, within the last couple of

4    months, realizing all these issues that are happening with

5    what's happening in New York and how it affects Ms. Black.

6    There's a lot out there.

7         THE COURT:  Right.

8         MS. DiPONIO:  And so Pam has an extensive amount of

9    work to do.  We are looking--primarily I'm--I want to focus

10   this status conferencing hearing on--on a couple of issues.

11        MR. GLATSTEIN:  Lisa, could you use the mike

12   please.

13        MS. DiPONIO:  I'm sorry?

14        MR. GLATSTEIN:  Could you use the mike?

15        MS. DiPONIO:  Oh, sure.  The first being the

16   disclaimer that was made of the paid on death benefits of the

17   Fidelity and Vanguard accounts.  And Ms. Kerr is looking into

18   that.

19        THE COURT:  Okay.

20        MS. DiPONIO:  The second issue is the 2013 Special

21   Needs Trust that falls under the conservatorship here.

22        THE COURT:  Which we've actually never seen, right?

23        MS. DiPONIO:  Absolutely.  And that's one of the

24   issues, Your Honor, it was never submitted for approval.  And

25   so as Ms. Kerr--and if she's available--hopefully she'll be

BLACK016618

1  available by phone--she can explain to the Court--it sounds
2  like from her investigation so far--and let me just preface
3  also, this is a preliminary report that was filed. This is
4  by no means conclusive findings or final findings that Ms.
5  Kerr has made, which I believe Ms. Young filed yesterday or
6  the day before.

7          As she's reviewing these things her investigation
8  may become more expansive, so it's kind of hard right now to
9  say--

10         THE COURT: Okay.

11         MS. DiPONIO: --exactly what all we're looking at
12  because there's a lot out there with respect to trusts and
13  Renata Black's estate, which is in New York.

14         THE COURT: But she's not going to do that.

15         MS. DiPONIO: She is not--unless--

16         THE COURT: I mean I thought that the Surrogate
17  Court in New York was going to handle that.

18         MS. DiPONIO: Well--and Mr. Salzman can kind of--
19  and so can Mr. Dain--Mr. Salzman can fill you in on the New
20  York--

21         THE COURT: Right.

22         MS. DiPONIO: --court's position with respect to
23  the Denver court's position. It's almost kind of a who is
24  going to do what.

25         MR. DAIN: Your Honor, if I could clarify?

BLACK016619

1           THE COURT:  Right, which is one of the reasons I
2   wanted to have the status conference--
3           MS. DiPONIO:  Right.
4           THE COURT:  --is to figure that out.
5           MS. DiPONIO:  Right.
6           MR. DAIN:  I--I can clarify what Ms. Kerr's report
7   of forensic accounting is going to cover.
8           THE COURT:  Okay.
9           MR. DAIN:  She's starting with the date of this
10  Court's first order, which is I believe is December 11--
11          THE COURT:  '12.
12          MR. DAIN:  --2012.  On that date is--she wants to
13  know what was in Joanne Black's estate so to speak.  And that
14  includes all of the paid on death benefits, and Vanguard
15  accounts and Fidelity account and in any other accounts that
16  the subsequent disclaimers were used to transfer money out.
17  She starts there.
18          THE COURT:  Okay.
19          MR. DAIN:  There were transfers from those
20  accounts--from the Vanguard, Fidelity, and Chase accounts but
21  particularly she's looking at the transfers into both the
22  estate of Renata Black, not interfering with the estate of
23  Renata Black, but to find out what went in and what came out.
24          She's looking at what went in to the 2013 Joanne
25  Black Trust, which is a separate trust, that's not the

BLACK016620

8

1    Supplemental Needs Ttrust; that's the trust that you haven't
2    seen or approved.

3             She's then looking at the account--the amounts--the
4    two-thirds that were placed in the Supplemental Needs Trust
5    of Joanne Black's assets. And then she's looking at the
6    one-third that was placed into this Issue Trust for the
7    benefit of the conservator's children and the conservator.

8             She's also looking at what was recently uncovered
9    that there was a Roth IRA of $300,000 that was paid on death
10   to Joanne Black that hasn't been accounted for. In fact, the
11   full accounting has never been given to the Court, only
12   two-thirds of certain amounts. The $300,000 has not been
13   accounted. Ms. Kerr has not yet been able to determine how--
14            THE COURT: This is the Roth you're talking about
15   now?

16            MR. DAIN: This is the Roth IRA. How much if any
17   has gone into any trust for Joanne Black's benefit.

18            THE COURT: Uh-huh.

19            MR. DAIN: She's going to look at that. She's
20   going to look at all amounts that were paid out including to
21   accountants and various attorneys to--frankly anywhere to
22   determine for this Court where was the money when it started,
23   where should it have gone, and where is it at the end.

24            So it's going to be very expansive but as she goes
25   along she finds more.

BLACK016621

9

1          THE COURT:  Yeah.

2          MR. DAIN:  And so for instance the Roth IRA was
3  uncovered within the last maybe week to ten days that there
4  was a Roth IRA that had not been reported to this Court.

5          She's also going to issue the report--she issued
6  the interim report which explains that the accounting should
7  have covered all of the assets of Joanne Black not just the
8  two-thirds that this Court is aware of.

9          And so she'll need to--she's talked with me, she's
10  talked with Ms. Wrigley, she's talked with Mr. Black; she'll
11  need to talk with other individuals.  She'll need to get
12  access to the date of death accounts of Vanguard, Fidelity,
13  anywhere else--

14          THE COURT:  Uh-huh.

15          MR. DAIN:  --Roth IRA, and follow it through.

16          THE COURT:  Okay.

17          MR. DAIN:  So I agree that probably would take
18  another month to get a final report.  But the interim report
19  itself is significant that was provided to the Court so far.

20          THE COURT:  Okay.  All right.  Now, Mr. Glatstein,
21  is that your understanding as well?

22          MR. GLATSTEIN:  Yes, Your Honor.  Ms. Kerr has
23  already started on this process and there's been a tremendous
24  amount of information going back and forth between her and
25  Mr. Black.

BLACK016622

1           THE COURT:  Okay.

2           MR. GLATSTEIN:  Transparency is something that we

3  think is necessary and appropriate here.  We've worked with

4  Ms. Kerr before.  My concern is that with the preliminary

5  reports they are not complete.  She has concerns and we've

6  yet had a chance to address those concerns, but they are all

7  being addressed.

8           We are continuing with the forensic review.  All

9  accounts are available and there has been no interference

10  with providing her with information that she needs.

11          THE COURT:  Uh-huh.

12          MR. GLATSTEIN:  What we need is, you know, when she

13  has questions that she let's us know.

14          THE COURT:  Uh-huh.

15          MR. GLATSTEIN:  And that process has been underway

16  for a couple of weeks already.  When her reports come out we

17  don't necessarily see it first.  And she's sounded an alarm

18  but I think once she's got information and the narrative of

19  what--what has happened, most of those issues will certainly

20  fall by the wayside; that's why there needs to be a full

21  review, measured review--

22          THE COURT:  Uh-huh.

23          MR. GLATSTEIN:  --with everybody having access to

24  the information and what her concerns are and her findings

25  when she has completed it, not as it is in process.

BLACK016623

11

1          THE COURT:  Uh-huh.  Okay.  And does Mr. Black
2   understand that under this process he can be required to
3   disgorge money?  I--I don't--

4          MR. BLACK:  So--so--you know it--

5          THE COURT:  --this--this--I read some of the stuff
6   that went on in New York and this nonsense about not being
7   able to unwind, it doesn't fly in Colorado; it's pretty
8   simple.  So the forensic review is important.

9          MR. BLACK:  So the forensic review is underway; I'm
10  getting Pam Kerr documents as fast as I can, as fast as she
11  asks for them.  There is a substantive question, which is we
12  came here and asked for authority to disclaim Joanne's
13  payable on death benefits into the estate of Renata Black.

14         THE COURT:  Uh-huh.

15         MR. BLACK:  I did so.  Once they're in the estate
16  of Renata Black, two-thirds are supposed to go out to Joanne.
17  Most of that will go to the Supplemental Needs Trust, some of
18  it has been paid directly on expenses for Joanne out of the
19  estate, but two-thirds of the total has to go to Joanne.  And
20  I'm happy to prepare--to document that two-thirds of the
21  total did go to Joanne.

22         THE COURT:  I guess that's one of the issues that
23  needs to be resolved.

24         MR. BLACK:  The--the only question I have there is
25  I fully expect given that everything I'm doing is being

1    challenged that there will be a challenge in New York to my
2    accounting for the estate and I'd like to have that challenge
3    in one place, Your Honor, and not both.
4              THE COURT:  I don't--
5              MR. BLACK:  So if we're going to have a full review
6    of the estate I don't want to have it in both places.
7              THE COURT:  --I don't know that we can avoid that.
8              MR. DAIN:  Your Honor, and--and the reason that
9    this is so important--Your Honor, hit the nail on the head
10   about disgorgement, the order that this Court issued did not
11   discuss putting money into the estate of Renata Black such
12   that two-thirds--only two-thirds of Joanne Black's--protected
13   person's money would go to her and one-third would go to Mr.
14   Black's children and him.
15             When Mr. Black came to this Court and the first
16   order that this Court issued said all the money will go into
17   a Supplemental Needs Trust for Joanne Black.  There was a
18   proposed amended order which had some confusing language
19   which was never entered.  The Court entered a second amended
20   order Nunc Pro Tunc, that's what Pam Kerr, the forensic
21   accountant is recognizing--
22             THE COURT:  Uh-huh.
23             MR. DAIN:  --to December 11th, 2012, which said all
24   of the money is being placed in a Supplemental Needs Trust,
25   in bold, and below said as part of your ability to do this

BLACK016625

1   you can disclaim among other things.

2           THE COURT:  Uh-huh.

3           MR. DAIN:  The Court--the disclaimer itself is not

4   the issue, the Court was saying you need to marshal those

5   assets.  What Mr. Black then did--and to this Court--is he

6   never accounted for that one-third he took.  He had to come

7   to this Court first--

8           THE COURT:  Uh-huh.

9           MR. DAIN:  --before he could act on this

10  irremediable conflict.  So he never accounted, this Court, I,

11  Ms. Black, Ms. DiPonio, Ms. Young, Ms. Wrigley, all assumed

12  all of the money that he was accounting for was before this

13  Court.  He never told this Court I've taken a third of that

14  and potentially all or a third of the Roth IRA, which has

15  never been accounted, and--and put it in a trust for my

16  benefit and my children's benefit.

17          Then--and this is what is so egregious to this

18  Court--he went to New York and in an affidavit said I was

19  given specific authorization from the Colorado court to

20  transfer this money into the estate of Renata Black where

21  two-thirds would go to Joanne Black, one-third to my children

22  in trust, specific authorization.  And he cited an order

23  provision which does not exist.  This Court never issued that

24  order.

25          Then he told that Court it's not your job to second

1  guess the Colorado court because clearly if all these assets
2  are Joanne Black's, any court would question how you take a
3  third out and gift it to your children. But he told that
4  court don't second guess a Colorado court. So he perpetrated
5  a fraud on this Court and further perpetrated it on that
6  court using this Court.

7          THE COURT:  Uh-huh.

8          MR. DAIN:  That is before this Court because as
9  conservator he's incapable of one more day acting. He's
10 acted on a fraud and he's--he's irremediably conflicted; he
11 cannot continue to act.

12         So this is not a New York issue; this is an issue
13 of what he's done to this Court. If you look throughout the
14 docket you will find even today there has not been an
15 accounting for that one-third. It was never mentioned.  I
16 requested multiple times give us a complete accounting to the
17 Court and to me as trustee and he said look at the
18 accountings I've done and the accountings he did do not
19 mention the one-third he took; that's a material
20 misrepresentation for this Court.

21         THE COURT:  Uh-huh.

22         MR. DAIN:  It's an absolute fraud. Mr. Glatstein
23 is continuing to advocate for Mr. Black to remain as
24 conservator pending this accounting. Now, that Mr. Glatstein
25 knows that there was no accounting to this Court of that

BLACK016627

1   one-third, never did it until he was caught and still hasn't

2   done it, and that he misrepresented to the New York court; we

3   provided him that order, we provided that to the Court, his

4   filing, he can't continue to advocate for Mr. Black because

5   there is now a conflict in his representation of Mr. Black.

6          I've looked at the ethical laws of Colorado and he

7   can't have Mr. Black continue to say I will act in the best

8   interest of Joanne Black when he's already breached his

9   fiduciary duty.

10         So before this Court--I know it's a status

11  conference--is this Court has to determine right now to

12  remove him as conservator, place a temporary conservator in

13  place pending the accounting and freeze these assets because

14  the Court doesn't know where they all are.

15         THE COURT:  Okay.  My main concern though and I've

16  gone back and forth on cases like this with the New York

17  courts before because I know you litigate in more than one

18  court on any given issue, which is unfortunate, but I--the

19  will has to be construed by the Surrogate's Court, doesn't

20  it?

21         MR. DAIN:  Oh, the will absolutely does, but--

22         THE COURT:  And I've read some of the stuff that's

23  been filed and it's anything but clear.  So I thought that

24  that court would need to make a determination.

25         MR. DAIN:  Oh, the Court will make a determination,

BLACK016628

16

1    but what Mr. Black didn't--it wasn't in the will, what Mr.
2    Black had before this Court is paid on death benefits outside
3    the estate of Joanne Black.

4              THE COURT:   Right.

5              MR. DAIN:   He then put them into that.   Absolutely
6    when all this is transferred to New York it will be unwound
7    there.   Absolutely once that court recognizes the fraud
8    perpetrated on it.

9              But what this Court has to do--it has before it Mr.
10   Black, it has to say I can order you to cease all activities;
11   I can terminate your conservatorship and appoint a
12   supplemental one and I can freeze the assets before me so
13   that Ms. Kerr can get to the bottom of this completely
14   without any interference.

15             There is an attorney, Mr. Salzman, in New York.

16             THE COURT:   Uh-huh.

17             MR. DAIN:   There is an attorney here, Ms. DiPonio
18   here, there is a Guardian ad Litem here, there is no risk
19   that Joanne Black will somehow get money that Mr.--Mr. Black
20   would not want her to have.

21             But the key is how can Mr. Black continue to act as
22   conservator when you know from what you've read that he
23   deceived this Court and then used this Court as a vehicle to
24   deceive the New York court, he can't.

25             THE COURT:   Okay.   All right.

BLACK016629

```
1              MR. GLATSTEIN:  Your Honor--
2              MS. YOUNG:  Excuse me, Pamela Kerr has been trying
3    17 times she has called in to indicate that--she would like
4    to participate and she has a--
5              MR. SALZMAN:  I'm having a little trouble hearing
6    here.
7              THE COURT:  I think there's a limit, I don't know
8    if she can at this point.
9              UNIDENTIFIED SPEAKER:  (Inaudible).
10             UNIDENTIFIED SPEAKER:  (Inaudible).
11             THE COURT:  But will it drop everybody else?  I
12   don't want that to happen.
13             MS. DiPONIO:  Your Honor, what we've done in the
14   past in this situation is actually had somebody call in on a
15   cell phone and it's really difficult and then we put the cell
16   phone by a speaker--
17             THE COURT:  Do we need her--
18             MS. DiPONIO:  --and we've had to do that.
19             THE COURT:  --to chime in at this point?
20             MS. YOUNG:  If you want to know how long it might
21   take.
22             THE COURT:  It will take what it takes.
23             MS. YOUNG:  Okay.
24             THE COURT:  So go ahead, Mr. Glatstein.
25             MR. GLATSTEIN:  Your Honor, I wanted to object here
```

1   since this is getting first lies and my actions are also

2   being impugned, but this is a status conference not an

3   evidentiary hearing. There are issues that certainly the

4   parties do not agree upon and that needs to be set for notice

5   of hearing and we can deal with it at that point.

6           But I also don't want the Court to lose sight of is

7   that this is not just a matter of the disclaimer; this is a

8   matter of making sure there is the ongoing support of a

9   conservatorship.

10          THE COURT: Uh-huh.

11          MR. GLATSTEIN: We have talked with the Guardian ad

12  Litem and we have no issue about a special conservator being

13  appointed. Ms. Peterson is very well experienced with a lot

14  of issues that Ms. Kerr doesn't quite track.

15          And what we have suggested and would suggest to the

16  Court is that Ms. Peterson be added as a special conservator.

17  There will be no movement of money, no payments or

18  distributions without special conservator's prior approval so

19  that we don't dismantle the entire conservatorship and the

20  safety net structured and start again from scratch; that does

21  not serve Ms. Black her--her interest or anybody other than

22  attorneys who are now feeding at the trough here because

23  there are significant assets.

24          Certain issues need to be resolved by this Court

25  first.

1            THE COURT:  Okay.

2            MR. GLATSTEIN:  And certain issues will have to be

3     addressed by the New York court obviously.  The purpose of

4     the status conference this morning was to determine what

5     stays here and what does have to get resolved.

6            In talking with court appointed counsel and the

7     Guardian ad Litem I think there is agreement that the 2013

8     Trust should be submitted to this formally for review and

9     determination whether that needs to be--needs to stand or be

10    reformed.

11           THE COURT:  Apparently there's two trusts--three

12    trusts.

13           MR. GLATSTEIN:  If I could--I can walk the Court

14    through--through things just briefly.  There is the original

15    1997 Trust that Renata Black had created at the same time

16    that her '97 will was created.  That same time the Issue

17    Trust was created; those were all provided to the Court.

18           The 2013 Trust was one created after Mr. Black was

19    appointed and I will take responsibility here for not having

20    submitted that to the Court for approval first; that was

21    draft by Mr. (Inaudible).

22           MR. BLACK:  It was drafted by law (Inaudible).

23           THE COURT:  And does it provide for payment of

24    Medicaid?

25           MR. GLATSTEIN:  It--it has trigger trust provisions

BLACK016632

1    in it.  It can be converted to that.  These are things that
2    need to be reviewed by the Court.  If the funds were not in--
3    in a trust they would be in the conservatorship.  These are
4    not the protected funds.

5              In doing what would essentially be a self-settled
6    trust, the conservator doing it on behalf of Joanne, there
7    must be a Medicaid payback provision regardless of what state
8    she's in.

9              THE COURT:  Right.

10             MR. GLATSTEIN:  And I should correct also one
11   misstatement that was in one of the pleadings I think by Ms.
12   Young, there is no provision in there that allows Mr. Black
13   to make distributions or payments to anybody other than
14   Joanne for her benefit.  He cannot pay himself out of that,
15   he cannot pay his children; he's not the sole trustee.  Mr.
16   Dain is also a trustee, he signed off on that agreement.

17             MR. DAIN:  Your Honor, that's incorrect and I can
18   explain.  Mr. Black has requested of me just recently that he
19   be allowed to reimburse himself for his children's student
20   loan through the Issue Trust; that's improper because those
21   are Joanne Black's assets.

22             So I--I know there are provisions, I'm the trustee
23   on these trusts.

24             THE COURT:  Uh-huh.

25             MR. DAIN:  I know there are provisions through

BLACK016633

1    which he can gain access to enrich his children.  On the
2    Supplemental Needs Trust he added his son through another
3    misrepresentation who also has a conflict because he
4    benefits.  We have to stop this, those trusts--the assets
5    have to be frozen at this time so that Ms. Kerr can get
6    access.

7           We need--we have the proposed supplemental or
8    temporary trust conservator in court today, ready to take
9    over and act.  The only attorneys who are feeding at the
10   trough are the attorneys that Mr. Black is paying to defend
11   him here and New York and to perpetrate these acts; that
12   needs to be frozen and stopped.

13          That's the important point, it's not about Mr.
14   Black, it's about Ms. Black, the protected person, that's
15   who--that's who this case is about.  And we have to freeze
16   these, get a new conservator in and get this accounting done,
17   then this Court can decide what to do in terms of
18   transferring it to New York.

19          THE COURT:  Uh-huh.

20          MR. BLACK:  If I may, I'm sitting here listening to
21   this astonishing collection of falsehoods and
22   misrepresentations by Anthony Dain.  I respectfully request
23   that--let's make this a status conference, let's let counsel
24   for Joanne appear, counsel for Joanne said the forensic audit
25   is underway; it's complicated, it will take awhile, we will

BLACK016634

1    see what it comes out with.

2          I am confident that the forensic audit will show

3    that everything that I said to this Court I would do I did;

4    that all the money is accounted for.  There have been no

5    improprieties, no misdeeds, no misspending of money.  I'm not

6    quite sure what to do other than Anthony Dain is making

7    claims of fraud and misrepresentation that are just a

8    complete concoction.  Let's have a hearing and let's get Mr.

9    Dain on the stand under oath and see what he's willing to say

10   under oath.

11          THE COURT:  Okay.

12          MR. BLACK:  Because I am just outraged.

13          THE COURT:  All right.  So I still want to

14   understand and it needs to be clear so is the probate--or the

15   Surrogate Court still going to decide this two-thirds,

16   one-thirds business?

17          MR. SALZMAN:  If I may be heard on that, Your

18   Honor, I'm Ira Salzman in New York.

19          THE COURT:  Thank you.

20          MR. SALZMAN:  All right.  We have--there are two

21   separate proceedings pending in New York, there's--

22          THE COURT:  Right.

23          MR. SALZMAN:  --a guardianship proceeding which is

24   pending in Supreme Court I believe that is roughly the

25   equivalent of your Superior Court in Colorado.  And then we

BLACK016635

1    have the estate of Renata Black that is pending in the

2    Surrogate Court.

3              THE COURT:  Right.

4              MR. SALZMAN:  The--I don't think that anybody is

5    contesting at this point the actual interpretation of the

6    will of the late Renata Black.  I think it is--it is clear

7    under the will that if there is a probate asset under the

8    remainder clause of that asset that there is, in fact, a

9    two-thirds, one-third split.

10             Now, as I believe Mr. Black stated before he may,

11   in fact, have a duty to account in New York with regards to

12   his actions concerning the estate, but I have to (inaudible)

13   state that I don't believe that there's a real issue with

14   regard to construction of the will.

15             MR. DAIN:  And, Your Honor, the--the other action

16   is where this is going to occur that it has to be unwound;

17   it's not--you can't take ill-gotten gains, put them into the

18   estate and say well we're stuck with now a third gets to go

19   to Mr. Black's children; that's going to be determined first

20   at this Court--this Court has the right to say, no, you acted

21   in violation of my orders--

22             THE COURT:  Okay.

23             MR. DAIN:  --you return that money because it's not

24   an issue of the estate.  The Court in that case never should

25   have had the money.  So this Court can make the

BLACK016636

1    determination, the New York court of guardianship court can

2    make that determination.

3           As Mr. Salzman says it's not going to be an issue

4    of whether the estate was probated there were other assets in

5    the estate.  The issue is Joanne Black's money never should

6    have been in that because this Court never ordered it to go

7    there such that a third could go to Mr. Black's children;

8    that will be reversed before the probate court even addresses

9    any issues because that estate had other assets to deal with

10   as well, real estate assets as well.

11          MS. DiPONIO:  Your Honor, if I may--

12          THE COURT:  Yeah.

13          MS. DiPONIO:  --yes, Renata Black's will

14   (inaudible) were as (inaudible).  I think what the issue is

15   as far as conflict here and I believe in conversations that

16   I've had with Mr. Salzman is that the language does exist in

17   the second amended order regarding the two-thirds or the

18   disclaimer.

19          THE COURT:  The disclaimer not the two thirds?

20          MS. DiPONIO:  The one-third disclaimer or the

21   disclaimer that was made in the second amended order.

22          MR. DAIN:  There's no--nothing--

23          MS. DiPONIO:  Oh, that wasn't in there, it was in--

24   it was just a disclaimer--

25          THE COURT:  Right.

BLACK016637

1        MS. DiPONIO:  --it doesn't mention the will.  I
2    think the issue is though a motion wasn't filed that wasn't
3    fully explained to this Court what was going to happen with
4    that disclaimer and I think that's the issue.
5        THE COURT:  Yeah.
6        MS. DiPONIO:  So once that was disclaimed of course
7    it's going to fall into the residuaries of the estate and
8    the--
9        THE COURT:  Subject to division, right.
10       MS. DiPONIO:  Absolutely.  So I think the issue we
11   have is that that disclosure was never fully made
12   (inaudible), to the Guardian ad Litem, to the Court and
13   that's the issue we're having.
14       THE COURT:  Okay.  That's fine.  All right.  So at
15   this point then what I am doing is I am suspending Mr. Black
16   as conservator; his letters expire this month anyway, they
17   will not reissue until further order from the Court.
18           In order to provide continuity under the
19   conservatorship itself Ms. Peterson is being appointed as the
20   special conservator.  The assets are frozen.  And then what
21   is Ms. Peterson going to use to pay the living expenses and
22   whatnot?
23       MR. DAIN:  Your Honor, Ms. Black currently gets
24   Social Security and worker's comp.
25       THE COURT:  Right.

1          MR. DAIN:   Until recently Mr. Black redirected that
2     money.   If that money--if the Court can order that she
3     continue to receive those assets--she's able to pay for her
4     own housing; she's able to pay for her own bills.   We can
5     either have a special order where Ms. Peterson can say these
6     are the living expenses and allow that to be transferred; I
7     didn't mean by frozen that we freeze Ms. Black out.

8          But Mr. Salzman may be able to say--give us more
9     input as to exactly how much, but those amounts are
10    appropriate and as a trustee of the Supplemental Needs Trust
11    I've been authorizing it and will continue to authorize that
12    so we can pull out of that trust if necessary to supplement
13    her assistance that she's receiving and housing.

14         So there's a vehicle to do that and I think it can
15    be done either by ex parte requests with nonopposition I
16    assume or through any vehicle that the Court wants but that
17    amount one way or another we should ensure she has.   And Mr.
18    Salzman may be able to say whether independently she has
19    enough coming in from those sources.

20         MR. SALZMAN:   May I--may I be heard, Your Honor?
21              THE COURT:   All right.

22         MR. SALZMAN:   Ms. Black is currently receiving I
23    believe $500 per week which is being deposited into an
24    account and she makes cash withdrawals from and uses those
25    funds to pay substantially all of her bills.

BLACK016639

```
1              THE COURT:  And what is the nature of those funds?
2              MR. SALZMAN:  I'm sorry I didn't understand the
3   Court's question.
4              THE COURT:  Are they the Social Security or the
5   workmen's comp or what is that?
6              MR. SALZMAN:  Well, I--we--again, these are funds
7   that are being deposited into the account--
8              THE COURT:  From where?
9              MR. GLATSTEIN:  Your Honor--
10             MR. SALZMAN:  By the current conservator.
11             MR. GLATSTEIN:  --the conservator is making those
12  deposits.
13             THE COURT:  What's the source of the money?
14             MS. DiPONIO:  The Chase account, Your Honor.
15             THE COURT:  What--what--
16             MR. BLACK:  The--the correct source is the
17  Supplemental Needs Trust.
18             THE COURT:  So you're taking 500 a week out of the
19  Supplemental Needs Trust?
20             MR. BLACK:  I can switch to the 2013 Trust if you'd
21  like.  The idea is we're trying to get Joanne money from
22  somewhere.
23             THE COURT:  Well, why can't she use her Social
24  Security and the workmen's comp?
25             MR. BLACK:  The--the worker's comp is going into
```

BLACK016640

1    the 2013 Trust, I'm happy to use the 2013 Trust to pay the
2    $500 a week; that's fine.  The Social Security--
3            THE COURT:  So you're putting her monthly benefits
4    going into a trust, is that what I'm understanding?
5            MR. BLACK:  So right now the Social Security
6    benefits were going to a representative payee whom I believe
7    to be Mr. Pinto.  I arranged to have them come to me; they
8    came to me for one month.  They went into the 2013 Trust from
9    which they could be spent on Joanne's benefit.
10           Joanne then arranged to have those benefits
11   suspended I believe and so right now they're piling up at
12   Social Security.  There's plenty of money, the question is
13   what's a reasonable amount of money to pay to Joanne and
14   where should we pay it from and I don't have any strong view
15   on that.
16           MR. SALZMAN:  Your Honor, may--may I be heard?
17           THE COURT:  Yeah.
18           MR. SALZMAN:  The--Mr. Pinto by the way is present
19   with me in my office at the moment, was the representative
20   payee on the Social Security until the beginning of this
21   year.
22           During the pendency of this proceeding and over my
23   client's objection Mr. Black arranged for himself to become
24   the representative payee of those funds.  At this point we
25   lost track of them.  This is the first we're hearing that

BLACK016641

1    the--that the payments of those funds have been suspended.

2         Now, we would be more than happy to have Mr. Pinto

3    return as the representative payee of the trust--of the

4    Social Security rather but certainly this is something that

5    needs to be investigated.  This is the first I'm learning of

6    it.

7         MR. GLATSTEIN:  Your Honor, there were a variety of

8    concerns with respect to what was happening with her Social

9    Security; that's part of what we think an evidentiary hearing

10   would be good for the Court to know.  Funds were being

11   withdrawn from her account by Mr. Pinto not for her benefit

12   that we could discern and he would not account to the

13   conservator for those funds.

14        THE COURT:  Right.  I know there was a big dispute

15   about that.

16        MR. GLATSTEIN:  Right.  And Ms. Kerr will be

17   provided all that information so she can also from a forensic

18   accounting perspective see where everything went, what the

19   concerns and issues were.

20        Funds were being withdrawn from Joanne's personal

21   account by Mr. Pinto when she's on a locked psych unit.  And

22   no accountability on that to anybody.  We would be very

23   concerned about Mr. Pinto being put back into a position as a

24   rep payee; there needs to be accountability on that as well

25   as everything else for Joanne's benefit.

BLACK016642

1        MR. SALZMAN:  Mr. Pinto has just advised me that he
2    will provide a full accounting of all the funds that he
3    withdrew to Ms. Kerr.

4        THE COURT:  Okay.

5        MR. BLACK:  Your Honor, if I may speak, I want to
6    ask that you think about what orders you want to issue and
7    try to explain some of the context behind that.  So one might
8    ask why do Anthony Dain and Cherie Wrigley care so much about
9    suspending my powers as conservator given that there's been
10   no showing and not even a claim that I have done anything
11   improper in spending money.

12       If you look at their objections to my 2013
13   accounting there is not a single substantive objection to
14   anything I did.  If you look at their objections to the 2014
15   accounting there's not a single substantive objection to
16   anything I did.  All you're hearing about is a complaint
17   about the disclaimers in 2012 which we believe were fully
18   disclosed and fully approved.

19       THE COURT:  Uh-huh.

20       MR. BLACK:  As conservator I have very limited
21   tasks.  I get the weekly check from Travelers and I put it
22   into the new 2013 Trust.

23       THE COURT:  And what's the source of the Travelers
24   money?

25       MR. BLACK:  This is the worker's comp money that

1   was so crucial to obtain in 2012 and was an important part of

2   why the disclaimers were part of the package in 2012 because

3   as we will explain at a hearing there was no way to get the

4   worker's comp money except as part of a package--

5              THE COURT:   Okay.   So do I--

6              MR. BLACK:   --with the disclaimers.

7              THE COURT:   --I guess we need to pull the

8   transcript then from your appointment hearing about this

9   business with the disclaimer.   Because the two-third,

10  one-third thing I don't have in my notes, so--

11             MR. BLACK:   So we--we can--

12             THE COURT:   --we'll pull the transcripts.

13             MR. BLACK:   --we can go through--through the

14  history, right, but--but my understanding was that the

15  two-thirds, one-third--and I think we--we can walk you

16  through the disclosure was fully disclosed, there were

17  proposed orders, there were more proposed orders, there was

18  an approved order, everybody knew about the two-thirds,

19  one-third.

20             I don't--I really think there was no doubt about

21  what was being proposed to the Court and what I planned to do

22  and wanted to do with the disclaimer of the payment on death

23  beneficiaries.   And I think we can show you a very extensive

24  paper trail on that.

25             THE COURT:   Okay.

```
 1            MR. BLACK:  With regard to the conservatorship the
 2   issue is that in the fall you basically told us, look, Joanne
 3   is in New York go to New York.  We went to New York; I
 4   applied to transfer my conservatorship to New York.  You
 5   might ask why are we still fighting over everything under the
 6   sun here and I think a principal answer is that Anthony Dain
 7   an Cherie Wrigley are doing their best to throw mud at me in
 8   Colorado and then they're going to go to New York and say,
 9   see, (inaudible) throwing mud at Bernie Black in Colorado.
10            It would be I think a major victory for them if you
11   were to suspend my conservatorship because then the New York
12   Court will assume that there was something underneath it.
13            And, Your Honor, I ask that there has been no
14   showing that I have done anything whatsoever wrong in
15   managing Joanne's money except to follow what I believe was
16   fully approved in 2012.
17            And so what I would propose instead in order to
18   avoid sending this adverse inference to the New York court is
19   leave me in place, extend my powers, add a special
20   conservator, I'll continue to get the weekly checks, I'll
21   continue to put them in trusts for Joanne, I'll continue to
22   communicate with Travelers and make sure that the benefits
23   continue to come because every so often they ask me to
24   confirm various things about Joanne including that she's
25   alive and where she is.
```

BLACK016645

1       I'll file income taxes for Joanne.  I won't spend
2   anything without approval of the special conservator and that
3   way we can avoid sending a message to New York that I think
4   is just unwarranted because I think I have, in fact, done
5   nothing wrong.  I have, in fact, behaved properly and I am
6   completely convinced that Ms. Kerr's forensic audit will
7   simply confirm that I did what I said I was going to do; I
8   did what I said I was going to do for the disclaimer.  I
9   spent the money as conservator in the ways that I've reported
10  to the Court that I can--spent it; I spent it in no other
11  ways.

12      I think that's what the forensic audit is going to
13  show and we have preliminary evidence on that now.  And I
14  really want to avoid the adverse inference that I've done
15  anything wrong without an evidentiary hearing and without any
16  showing that I've done anything wrong where we will come in
17  and show you the full paper trail on the disclaimer and
18  two-thirds, one-third.  We will show you the very important
19  reasons why this was the best solution for Joanne at the
20  time, not just that it was disclosed, not just that it was
21  approved but it was in substance the best decision for
22  Joanne.  It was a carefully thought through decision in very
23  complex circumstances.

24      And, Your Honor, I ask for a hearing at which we
25  can show you all this rather than suspending my powers where

 1  I think there is no evidence that I've done anything wrong.

 2          MR. DAIN:  Your Honor, I'm sorry--

 3          MR. SALZMAN:  May I be heard briefly?  To the

 4  extent that Mr. Dain and Ms. Wrigley are acting in--in

 5  Colorado, the instigator is me because it was--as a result of

 6  my conversations and interviews with Joanne that I first

 7  became concerned about this issue of the disclaimer and I

 8  independently attempted to research Colorado law.

 9          It was my thought based on my review of Colorado

10  law that these were not New York issues they were Colorado

11  issues.  I communicated with Ms. DiPonio; I spoke to Mr.

12  Dain, and I think that is the impetus to this proceeding and

13  to the extent that Mr. Black needs to be mad at somebody it's

14  not Mr. Dain and Ms. Wrigley, it's me.

15          THE COURT:  Okay.

16          MR. DAIN:  Your Honor--

17          THE COURT:  Mr. Dain?

18          MR. DAIN:  --when Mr. Black--he doesn't get it when

19  he says I've done nothing wrong.  Before the Court is

20  ordering his admission he's not arguing that--that he took

21  one-third to the benefit of his children; that is a conflict.

22  To say to this Court that I got authorization for that, I did

23  everything I'm supposed to do, Your Honor says you don't have

24  the note; the order that he says he had says nothing of the

25  sort that this is going into the estate.  Your Honor could

BLACK016647

1    have never issued him an order that allowed him to take

2    one-third of Ms. Black's money, however, the vehicle was and

3    put it to his and his children's benefit; that's a conflict

4    he can't act on and this Court never could have given him

5    that authority.

6              I'd love to go back and look at the transcript.

7    I'd love to go back and look at the history. I've given you

8    the history of the orders.

9              THE COURT: Right.

10             MR. DAIN: And the reason Ms. DiPonio, Ms. Young,

11   Ms. Wrigley, myself didn't object to his accountings is he

12   was only accounting for two-thirds of the money and we didn't

13   at that time have any evidence or know there was additional

14   money had had taken.

15             If you come to this Court and you say there are $3

16   million, I take one and I account for two, we're going to say

17   well that's all we know exists because he never---I'm a

18   trustee and he never gave me statements, you think okay,

19   well, two--two million is still there.

20             If we had known there was $3 million--over $3

21   million and a third was suddenly missing there would have

22   been objections everywhere including Your Honor.

23             So I--we can have an evidentiary hearing, I'd love

24   that, but Your Honor has to continue with the order it

25   initially---

BLACK016648

```
 1                    THE COURT:  Right.

 2              MR. DAIN:  --decided.

 3              THE COURT:  So who is being proposed to be the

 4    conservator then if not Mr. Black in New York?

 5              MR. DAIN:  In here or--

 6              THE COURT:  I thought you said you initiated--

 7              MS. DiPONIO:  In New York.

 8              MR. DAIN:  Oh, in New York--it calls it a

 9    guardianship rather than a conservatorship.

10              THE COURT:  Oh, of the person and the property.

11              MR. DAIN:  It is Ms. Wrigley and that's who was

12    nominated by Ms. Black and that's why the court there is

13    considering that.

14              THE COURT:  I see.

15              MR. DAIN:  But here Ms. Peterson--we're--we're more

16    than happy to have her appointed as an independent special

17    conservator.

18              MR. BLACK:  Your Honor, at a hearing we will show

19    that Cherie Wrigley knew about the disclaimer plan, knew

20    about the plan for two-thirds to go to the Supplemental Needs

21    Trust and the other one-third to go to the Issue Trust,

22    approved it, endorsed me, and helped me get it done.

23              Your Honor, at a hearing we will show you that

24    Anthony Dain--

25              THE COURT:  Okay.
```

BLACK016649

1        MR. BLACK:  --knew about the two-thirds, one-third

2   and said nothing, was uninvolved, was totally uninterested,

3   left everything to Cherie and me.  I tried t get Mr. Dain to

4   come in and be the conservator in Colorado instead of me, he

5   wasn't interested.

6        I tried to get him to manage the money under

7   Joanne's Supplemental Needs Trust, he wasn't interested.  I

8   could not get Mr. Dain to lift a finger on Joanne's behalf

9   until I had a fight with Cherie Wrigley, his sister, over

10  Cherie Wrigley's outrageous spending demands on Joanne's

11  money and now Anthony Dain is coming in and being active on

12  behalf of Cherie Wrigley.

13       Your Honor, this case is fundamentally about

14  whether Cherie Wrigley and Anthony Dain can grab Joanne's

15  money so that Cherie can spend it and spend it and spend it

16  until there is nothing left.

17       THE COURT:  Well, maybe you should have--

18       MR. BLACK:  And, Your Honor, at a hearing we will

19  show you all this.

20       THE COURT:  --a professional fiduciary then deal

21  with this instead of a family member, maybe that's the

22  answer.

23       MS. DiPONIO:  And, Your Honor, (inaudible) it's

24  all irrelevant what's happening here.  What's--what's most

25  important here is (inaudible) what was disclosed to this

BLACK016650

1    Court--

2              THE COURT:  Uh-huh.

3              MS. DiPONIO:  --(inaudible) with regard to

4    (inaudible) and that's as I had indicated before it wasn't a

5    disclosure--a full disclosure as to what was (inaudible).

6              MR. SALZMAN:  I'm having a little trouble hearing.

7              MS. DiPONIO:  Oh, I'm sorry.

8              THE COURT:  She's just clarifying what she believes

9    the real issue is in terms of the disclaimer and the

10   disclosure of the disclaimer.  All right.

11             MR. BLACK:  Your Honor, we'd be happy to walk you

12   through the paper trail on what was disclosed and when it was

13   disclosed today, we'll be happy to do it in an evidentiary

14   hearing.

15             THE COURT:  Yeah.  We'll need a full evidentiary

16   hearing for that; I want to get the transcript of the

17   appointment hearing before we do any of that.

18             Yes, Ms. Wrigley?

19             MS. WRIGLEY:  Shall I come to the mike?

20             THE COURT:  Yeah.

21             MS. WRIGLEY:  Your Honor, I feel I at least

22   deserve--first of all, I'm here on behalf of Joanne Black, my

23   cousin.  She asked me to come specifically.  The main reason

24   that I'm here is because as her advocate and hopefully soon

25   to be her guardian in New York, whether it just be of her

BLACK016651

1   person or both person and property.

2            I have been close to her her--most of her life.  I
3   did side with Bernie when she was in an extremely difficult
4   psychotic place when she was here in--as a transient in-
5   Denver for numerous months.  And I sided with her brother
6   because I didn't know what else to do.  She needed help.

7            And I assumed at that time that after his mother
8   died that I knew she had inherited a tremendous amount of
9   money that he was going to hold that money safe for her.  I
10  was never ever informed that any of the money from Vanguard
11  that was POD to her and Fidelity was ever going to be divided
12  two-thirds, one-third.  I knew that the real estate was going
13  to be divided two-thirds, one-third, but I assume that all of
14  the money in Vanguard and Fidelity was going to be held in
15  safety for her.

16           I did not find out until last summer that there was
17  any question that that money had not been held.  And we had a
18  big argument about that and he knows that.  I was furious
19  that he had even removed the money from Vanguard, I had no
20  idea he moved it to Chase; he completely ignored my--you
21  know, my being upset.  And Joanne and I were estranged during
22  this time because she thought I was part of Bernie's plan to
23  take her money.

24           We became close again through Esaun who was working
25  closely with her and that was all set up by me with Bernie's

BLACK016652

40

1    assistance.  And I've been in close contact this entire time
2    with her doctors; I've set up an entire support system and
3    program.  Joanne and I speak almost daily.

4            Let's see, Bernard has no relationship whatsoever
5    with Joanne.  She does not want him in her life; she is
6    completely lucid, competent, capable of taking care of most
7    of her--you know, most of the things in her life with a
8    tremendous support team behind her.  She does not want
9    Bernard to be a conservator nor be a part of her life at this
10   point.  He has never been--taken an active role in her life.

11           I have no interest in her money.  He has not paid
12   me a penny to reimburse me for anything that I have done.  I
13   have paid all of her dental, medical bills, until December
14   30th I was paying for all of her food, all of her expenses,
15   everything out of my own pocket.

16           Her--the lawyer fees that she had requested me to
17   take on, anything you can think of were all paid out of
18   pocket by me.  He has not paid me back for anything.  So what
19   he's talking about my spending and spending, I have no clue
20   because he's not paid me back--I have not been paid back
21   anything.

22           And, you know, I'm financially solvent; I have no
23   need.  Everything that I have done has been documented with
24   the attorneys in New York.  Let me see there's one last
25   thing, both my brother and I love Joanne deeply.  We have

1   always had a very close relationship with her.

2          All the doctors and the entire family knows this

3   and I don't have any idea what Bernie wants from this, all I

4   know is that I am here representing Joanne. I have always

5   been behind Joanne whether she has been with me--that's

6   another story--but right now she is on medication, she is--

7   this is the best recovery she has ever had.

8          I am paying for--aside from Nissan (phonetic)--we

9   won't get into that, but I am paying for Lois Orlin, who is a

10  psychiatric case manager--everything is coming out of my own

11  pocket.

12         THE COURT: And why can't you authorize this out of

13  the Supplemental Needs Trust?

14         MR. DAIN: I have authorized it, Your Honor, and

15  we've documented it, Mr. Black--

16         MR. BLACK: Excuse me, there has been no request of

17  any payment out of the Supplemental Needs Trust with the

18  following exception, Cherie requested reimbursement for

19  dental bills and refused to provide me with a receipt.

20         MS. WRIGLEY: I have sent him two different

21  receipts from the doctor's office and he--

22         THE COURT: Okay.

23         MS. WRIGLEY: --claimed that they weren't correct.

24         THE COURT: All right.

25         MR. DAIN: Your Honor, just--

BLACK016654

```
 1               THE COURT:  No, just a second.
 2               MR. DAIN:  Okay.
 3               THE COURT:  Mr. Salzman?
 4               MR. SALZMAN:  Yes, Your Honor.
 5               THE COURT:  Is there anyone in New York that can
 6      handle being the rep payee and that sort of thing?
 7               MR. SALZMAN:  An entity or--
 8               THE COURT:  Or--is there some--he we have a trust
 9      organization that--that does that sort of thing, is there
10      anything similar or a fiduciary relationship, entity or
11      person that you're aware of that can step in for that?
12               MR. SALZMAN:  Not just--not just to serve as rep
13      payee, no, Your Honor.
14               THE COURT:  All right.  All right.  At this--all
15      right--thank you, Ms. Wrigley.
16               MS. WRIGLEY:  Okay.
17               THE COURT:  At this point I am satisfied that I
18      don't think Mr. Pinto should become--be the rep payee.
19      There's too many issues surrounding whatever expenses--he's
20      got to provide a full accounting.  Someone needs to be the
21      rep payee and get any backed up funds as Mr. Black has
22      represented.
23               But what I'm ordering is that everything is frozen
24      except for the Social Security and the workmen's comp funds
25      from Travelers, they need to go into a separate
```

43

1    conservatorship account that's going to be managed by Ms.

2    Peterson that will go to pay her monthly living expenses.

3           There's clearly a huge dispute regarding who is

4    going to be the conservator going forward; that issue does

5    need to be handled by the court in New York.  So it will be--

6    from what I'm hearing today there is--Mr. Black wants to

7    continue, Ms. Wrigley wants to be appointed--or maybe that

8    court needs to consider a professional fiduciary and take the

9    family out of it all together.  But I will leave that

10   specific decision to that court.

11          MR. SALZMAN:  Your Honor, the issue here is timing;

12   we are currently scheduled to be heard on--on April 30th and

13   May 1st with regard to this case.

14          THE COURT:  Okay.

15          MR. SALZMAN:  If there is--lacking your permission

16   we cannot go forward here in New York, we have--I--as has

17   Colorado--we have Uniform Adult Guardianship and Protective

18   Proceedings Jurisdiction Act.  So as long as there is a

19   pending--an actual conservator in Colorado we don't have

20   jurisdiction here in New York without your permission or

21   instructions with regard to how we should proceed.

22          THE COURT:  All right.  So I'll include in the

23   order that the special conservator here is just an interim

24   person pending the proceedings and determination in New York

25   who should act as the conservator going forward.

BLACK016656

44

```
 1              MR. SALZMAN:  Thank you, Your Honor.
 2              THE COURT:  Is that sufficient?
 3              MR. SALZMAN:  I think that would be sufficient,
 4   Your Honor.
 5              THE COURT:  Could it be construed in another way?
 6              MR. SALZMAN:  I don't believe so.  I mean I--I
 7   would like to see what Mr. Glatstein has to say, if he--if he
 8   would agree with that.
 9              THE COURT:  Okay.
10              MR. GLATSTEIN:  Your Honor, I think the New York
11   court is appropriately respecting the authority of this
12   Court.  And under the Jurisdiction Act there is--part of the
13   reason for that is to make sure there is not a gap.
14              And if the Court appoints Ms. Peterson as a special
15   conservator here under the Jurisdiction Act she could easily
16   register in New York--unless Mr. Salzman tells me they
17   haven't adopted that part--so if there is anything in New
18   York pending further determination--
19              THE COURT:  Why does she need to register?
20              MR. GLATSTEIN:  If--if New York--
21              THE COURT:  Why can't she just hand it over to
22   whoever gets appointed?
23              MR. GLATSTEIN:  Well, once they get it appointed,
24   yes, if there's any gap at New York or anything that needs to
25   be done if that hearing is continued because this Court
```

BLACK016657

1    hasn't terminated the registration is a possibility, I just
2    put it out there.  That there should not be any gap and that
3    hearing should not be further delayed because this Court may
4    have further review matters.

5         MR. SALZMAN:  If the Court could indicate that, you
6    know, it desires the New York court to proceed with the
7    understanding that once the New York court makes a decision
8    there would then be the usual transfer of procedures under
9    the Uniform Act once the accountings are completed in
10   Colorado I think that would be sufficient and I think satisfy
11   all procedural niceties.

12        THE COURT:  Okay.

13        MR. BLACK:  Your Honor, I am being shot at in two
14   states, Ms. Dain (sic) and Ms. Wrigley are attempting to
15   defund both the Issue Trust and the Supplemental Needs Trust
16   because that would be the consequence of reversing the
17   disclaimer.

18        I ask that I have permission to use conservatorship
19   funds to defend my actions as conservator.  I request that I
20   have permission to pay reasonable legal fees to continue to
21   defend my actions as conservator.

22        I'll be happy to pay on Joanne but I don't think
23   it's fair for them to be shooting at me in two states and
24   causing me to incur substantial legal expense.  I believe
25   that those are appropriate uses of the trusts and I believe

1    that those are appropriate uses of the conservatorship funds.
2    And I ask that you allow me to continue to pay reasonable
3    legal expenses to defend against what I believe are
4    completely made up, inflated, false claims in two states.
5            MR. SALZMAN:  Your Honor, I would ask that the
6    Court delay that decision in a resolution of this matter and
7    I think depending on the findings of fact both of this Court
8    in New York I think that that--those would be relevant in
9    terms of whether or not Mr. Black would be entitled for
10   reimbursement for his fees.
11           Certainly if there was significant malfeasance
12   under New York law he would not.  I'm guessing your procedure
13   would not be terribly dissimilar.
14           THE COURT:  Right.  Well, I guess what I'm--what
15   I'm hearing is there most likely is not going to be any
16   problem with the actual accounting.  The real issue is this
17   business about the disclaimer.  And that remains to be seen.
18           But I agree I think I need to hold that in
19   abeyance, but I won't--I won't order it now, but I'll take
20   that under advisement pending the results of the--Ms. Kerr's
21   accounting, forensic accounting, and the evidentiary hearing
22   that we're going to have with regard to this disclaimer
23   business, but I see that as two separate things if you will.
24           MR. BLACK:  So let me understand, if I can, I'm
25   authorized to continue to pay legal fees, obviously subject

BLACK016659

47

1    to a requirement that if there's misconduct I have to return
2    them?

3         THE COURT:  No, I'm not authorizing payment for
4    legal fees at this point.  I'm holding it in abeyance pending
5    the results of the accounting and the evidentiary hearing to
6    determine whether or not it's appropriate.

7         MS. DiPONIO:  Your Honor, if I may, Ms. Young and I
8    have not submitted an invoice in this case since 2013 about--
9    when we were first appointed.

10        THE COURT:  Uh-huh.

11        MS. DiPONIO:  I would ask that legal fees be
12   allowed, should we submit an invoice for work that has been
13   done to date and that Ms. Peterson be allowed to pay those
14   from the conservator account?

15        THE COURT:  I don't--I mean she's got limited funds
16   to work with.

17        MS. DiPONIO:  Right.

18        THE COURT:  She's only got the two things, the
19   Social Security and the Travelers workmen's comp going into
20   that.

21        MS. DiPONIO:  So we will have to wait to submit our
22   invoices until after the evidentiary hearing or--

23        THE COURT:  I think so at this point, uh-huh.  And
24   --yeah, it's probably the best way to deal with it.

25        MS. DiPONIO:  Okay.

BLACK016660

```
 1              THE COURT:  Okay.  Do we want to try and set a
 2    hearing at this point or do we just want to wait until the
 3    accounting and the transcripts come in?
 4              MR. GLATSTEIN:  Your Honor, I think it would be
 5    best to get the accounting.  Ms. Kerr is working very quickly
 6    but--
 7              THE COURT:  Okay.
 8              MR. GLATSTEIN:  --it's hard to gauge.
 9              THE COURT:  All right.  Let me yield some
10    resolution--I'll get the transcript ordered this week as
11    well.
12              MR. GLATSTEIN:  Your Honor, I ordered a transcript
13    already, we will be happy to make that available to the
14    Court.
15              THE COURT:  Of the appointment hearing?
16              MR. GLATSTEIN:  Right.
17              THE COURT:  Okay.  And the other parties as well?
18              MR. GLATSTEIN:  Anyone that requests it.
19              MS. DiPONIO:  Your Honor, I would like a copy of
20    the transcript as well.
21              MR. DAIN:  And, Your Honor, we weren't--I wasn't at
22    the hearing, so, yeah, I'll need a copy.
23              THE COURT:  All right.
24              MS. YOUNG:  I did not request it, but I do--would
25    like a copy.
```

BLACK016661

1           THE COURT: All right. So that will be provided to
2   Court, counsel. Okay. All right. So this what I've got
3   folks, I'll just recap, I'm granting the request to appoint
4   Nancy Peterson as special conservator pending conclusion of
5   these proceedings and the appointment of a conservator in New
6   York State.

7           Mr. Black's letters will not be reissued by this
8   Court at this time. And his conservatorship is suspended
9   pending completion of these proceedings.

10          And I will--I'm happy to make it very clear that
11  these orders are more proactive in nature just to set this
12  case on an even keel so that there's a clean slate going in.

13          The New York court will take its evidence and make
14  its decision but the suspension is not to be considered as a
15  black mark standing alone against Mr. Black.

16          An individual needs to be identified for
17  appointment in New York State, either Mr. Black, Ms. Wrigley,
18  or a professional fiduciary or someone else. All of the
19  assets except for the Social Security and the workmen's comp
20  are frozen at this point.

21          If there needs to be any distributions from the
22  Supplemental Needs Trust beyond what these two funding
23  sources provide we're going to have to have a motion before
24  this Court.

25          MR. SALZMAN: Your Honor, may--may I make an

BLACK016662

1  inquiry?

2  THE COURT: Just a minute. The Social Security

3  representative payee needs to be changed either to Ms.

4  Peterson or another individual. And the Social Security

5  funds and the workmen's comp funds are to be redirected into

6  a conservatorship account that Ms. Peterson will open so that

7  she can pay the--Ms. Black's monthly living expenses.

8  Any overage she'll manage and keep track of. Mr.

9  Pinto will provide a full accounting of funds under his

10  control to Ms. Kerr and cooperate with transferring the

11  representative payee.

12  MR. BLACK: Your Honor, may I request that the--you

13  allow the Supplemental Needs Trust, the Issue Trust, and the

14  2013 Trust to pay income taxes and to pay the reasonable fees

15  of an income tax accountant, those need to be paid?

16  THE COURT: Any objections?

17  MS. DiPONIO: No objection.

18  MR. DAIN: Well, I would have no objection, Your

19  Honor, but Ms. Kerr in her report indicates there as a

20  payment of $20,000 to an accounting firm which she can't

21  understand for a tax return--why it was that significant. So

22  as long as it's without prejudice and disgorgement and, in

23  fact, there is some overpayment of these accounting things--

24  or these tax returns.

25  THE COURT: All right. So that request is granted.

BLACK016663

1    So the trusts funds at this point in time are frozen except

2    for the payment of legal accounting fees and related income

3    taxes.

4              MR. BLACK:   I have one more request--

5              THE COURT:   Can I finish my order first?

6              MR. BLACK:   Yeah.

7              THE COURT:   Thank you.  All right.  The--Mr.

8    Glatstein has indicated that he has already either ordered or

9    obtained a transcript of the appointment hearing that was

10   held before this Court in 2012.  He will provide a copy to

11   the Court and to all counsel of record.

12             At this point pending the results of Ms. Kerr's

13   accounting which issues have yet to be identified, if any,

14   the issue before this Court is whether or not the disclaimer

15   should have acted to divest Joanne Black of one-third of the

16   nonprobate assets that she received from her mother.  If

17   anyone thinks that that should be worded a little bit

18   differently I'm happy to hear that.

19             And the trust can pay--again the legal and

20   accounting fees and the income taxes accrued during this time

21   period.

22             Okay.  Yes, Mr. Black?

23             MR. BLACK:   There may be the need to pay additional

24   fees to Pam Kerr.  I don't know--we paid her so far $10,000,

25   there may be additional fees, so I would request approval--

BLACK016664

52

1            THE COURT:   I'm sure she'll be happy to--

2            MR. BLACK:   --to pay those as well.

3            THE COURT:   --generate a bill and we'll take that

4     up as well.

5            Mr. Salzman, you had another clarification

6     question?

7            MR. SALZMAN:   When the Court says the term all

8     assets, I assume what the Court means is the 1997 Issue Trust

9     and the 1997--a trust for the benefit of Joanne Black; is

10    that correct?

11           THE COURT:   Three trusts, right?

12           MR. SALZMAN:   Oh--

13           THE COURT:   Supplemental Needs Trust, Issue Trust,

14    and she's got another trust.

15           MR. SALZMAN:   Right.  Now, is the--now, with regard

16    to the 2013 Trust is that frozen or is that to be transferred

17    to Ms. Peterson?

18           THE COURT:   No, we're not transferring any trusts

19    to Ms. Peterson.

20           MR. SALZMAN:   Or the proceeds in the account, okay.

21    Now--so--so does that mean that the--so in that--that trust

22    has not been approved, are those assets now considered

23    guardianship assets?

24           THE COURT:   No.  At this point I'm just freezing.it

25    until we figure it out.  I'm not transferring anything.  And

BLACK016665

1    if money in trust--other than what I've stated on the record

2    --needs to be used a motion is to be filed here and I'm just

3    going to hang on to everything until the New York court

4    decides who is going to be in charge of the funds.  Because

5    you--you don't have an appointment yet, right?

6           MR. SALZMAN:  Correct, Your Honor, thank you very

7    much.

8           THE COURT:  Right.  Okay.

9           MS. DiPONIO:  Your Honor, if I may--if we could

10   add--and I apologize (inaudible) of this, if we could add to

11   your order also that the 2013 Special Needs Trust be

12   submitted to the Court for approval since that was never

13   submitted.

14          THE COURT:  Okay.

15          MR. DAIN:  It's actually called the 2013 Joanne

16   Black Trust.

17          THE COURT:  Okay.  So, Mr. Glatstein, copies of all

18   these--I know that there's one of record in here.

19          MR. GLATSTEIN:  Correct.

20          THE COURT:  You submitted one of the trusts in

21   2012, but can you just resubmit all three of them?

22          MR. GLATSTEIN:  Certainly.  Certainly.

23          THE COURT:  And then if anyone thinks it's

24   beneficial that I have a discussion about the jurisdictional

25   aspects with the New York court I'm happy to entertain that

BLACK016666

54

1    if you folks want to set that up or approach the judge out
2    there.

3         MR. SALZMAN:  I can--or I will--I discussed that
4    with the judge but I think that with an appropriate order
5    from you I think he'll be more than happy to go forward.

6         THE COURT:  Okay.  Yes.  It's not my intention to
7    keep him from going forward because it's clear that this
8    can't stay in Colorado.  It has to be moved to New York State
9    where she lives.

10        MS. DiPONIO:  And, Your Honor, I will work with Mr.
11   Salzman and get any of the Court documents from New York and
12   provide them to you so that you have knowledge of what the
13   court is doing out there and I'll keep you updated if--if Mr.
14   Salzman agrees that that would (inaudible)--

15        THE COURT:  Uh-huh.

16        MS. DiPONIO:  --well that way you know what--what
17   is entered and you're privy to that.

18        THE COURT:  Okay.  Mr. Dain, anything else?

19        MR. DAIN:  Just in terms of the suspension of the
20   conservatorship, we have--I no intention--of New York saying
21   in and of itself that means--means anything, but this--this
22   statement of a black mark, I assume that's was a concept not
23   actually stating--

24        THE COURT:  Right.

25        MR. DAIN:  --yes.  Okay.  Then--then I'm fine,

BLACK016667

```
 1   nothing else.  Thank you very much, Your Honor.
 2             THE COURT:  Okay.  Mr. Glatstein, anything?
 3             MR. GLATSTEIN:  No, Your Honor?
 4             THE COURT:  Ms. Young?
 5             MS. YOUNG:  (No audible response.)
 6             THE COURT:  Ms. DiPonio?
 7             MS. DiPONIO:  No, Your Honor.
 8             THE COURT:  And, Mr. Salzman, anything else?
 9             MR. SALZMAN:  Nothing else, thank you very much for
10   allowing us to participate by phone.
11             THE COURT:  Of course.  All right.  Then I think
12   then we're done for the day and we will at this point look
13   for copies of everything that I've ordered and Ms. Kerr's--
14             MS. DiPONIO:  Your Honor--
15             THE COURT:  --accounting.
16             MS. DiPONIO:  --are we going to set a date?
17             THE COURT:  I heard that you wanted to wait until
18   the accounting was received before setting a date.
19             MR. DAIN:  Maybe we could just--and I hate to use
20   the word placeholder because that's insulting to the Court's
21   calendar but I--Ms. Wrigley and I come from California; I'm
22   an attorney as well.
23             THE COURT:  Okay.
24             MR. DAIN:  And if we don't have a date certain--
25   whatever date that the Court might set is going to--you know,
```

```
 1   it might just cause a snowball problem, so is there any way

 2   that we could just do that maybe six weeks out or--

 3              (Pause.)

 4              THE COURT:  Can you--do you have access to it--you

 5   don't?

 6              MR. DAIN:  No.

 7              THE COURT:  All right.  I'll have to--the problem

 8   is the electronic calendar is not on this terminal so--

 9              MR. DAIN:  Okay.

10              THE COURT:  --if you--we can certainly fly some

11   dates but if--I'll go off the record and get some though.

12              MR. DAIN:  If--if Your Honor would that would be

13   great.

14              THE COURT:  All right.  Thank you.

15              (Whereupon, a recess was taken.)

16              THE COURT:  Back on the record and you wanted a

17   full day, right?

18              MR. DAIN:  Yes, Your Honor.

19              MR. GLATSTEIN:  Yes.

20              THE COURT:  Okay.  So here we go, starting on May

21   20th--so the 20, 21, 22, 26, 28, 29 in May.

22              MR. GLATSTEIN:  Your Honor, Mr. Black is out of the

23   country from May 15, till June 8th or 9th?

24              MR. BLACK:  8th.

25              THE COURT:  Okay.  So none of those are going to
```

```
 1  work then.  And then we're probably into July after that.
 2              MR. GLATSTEIN:  End of June?
 3              UNIDENTIFIED SPEAKER:  (Inaudible).
 4              THE COURT:  Is there any late June dates?
 5              UNIDENTIFIED SPEAKER:  (Inaudible).
 6              THE COURT:  What about the week of the 15th of
 7  June?
 8              MR. GLATSTEIN:  You leave--
 9              MR. DAIN:  May 15th?
10              THE COURT:  June.
11              MR. DAIN:  Oh, June.
12              MR. GLATSTEIN:  June 15th.
13              MR. BLACK:  Yeah, that's fine.
14              THE COURT:  Yes?
15              MR. GLATSTEIN:  Yes.
16              MR. DAIN:  Yes.
17              MS. DiPONIO:  That's fine, Your Honor.
18              THE COURT:  Okay.  So any day that week will work,
19  the 15th.
20              MR. DAIN:  Any of those dates will work for me;
21  that's fine.
22              THE COURT:  Mr. Glatstein, any preferences?
23              MR. GLATSTEIN:  Friday, June 19th would be best on
24  my calendar or Monday.
25              MR. DAIN:  I'm sorry which Monday?
```

BLACK016670

58

```
 1          MR. GLATSTEIN:  Monday--

 2          THE COURT:  Monday the 15th?

 3          MR. GLATSTEIN:  Monday the 15th.

 4          UNIDENTIFIED SPEAKER:  15th or (inaudible).

 5          UNIDENTIFIED SPEAKER:  (Inaudible).

 6          MR. GLATSTEIN:  Earlier in the week?

 7          THE COURT:  Monday the 15th?

 8          UNIDENTIFIED SPEAKER:  (Inaudible).

 9          THE COURT:  No.  Tuesday the 16th?

10          UNIDENTIFIED SPEAKER:  I can do (inaudible).

11          THE COURT:  Any takers for Tuesday the 16th?

12          MR. DAIN:  Let's do the 15th; we'll just have to do

13   it on Mr. Glatstein's calendar--the 15th.

14          THE COURT:  All right.

15          UNIDENTIFIED SPEAKER:  (Inaudible).

16          MS. DiPONIO:  And what time, Your Honor, 9?

17          THE COURT:  Yeah.  All right.  So Monday, June

18   15th, shall we set some time aside like a half day on the

19   Tuesday just in case?

20          MR. DAIN:  Yeah, that would be---

21          MS. DiPONIO:  Probably it would be safe to do.

22          THE COURT:  Morning or afternoon?

23          MS. DiPONIO:  Morning.

24          THE COURT:  Okay.

25          MS. DiPONIO:  Ira, did you hear those dates?  Are
```

BLACK016671

```
 1   those okay with you?
 2              MR. SALZMAN:  The 15ᵗʰ is--is not great for me.  I
 3   can--it's my 40ᵗʰ wedding anniversary, I was supposed to be
 4   home that night.
 5              MS. DiPONIO:  Oh, no.
 6              MR. SALZMAN:  Any other day that week would be
 7   fine.
 8              MS. DiPONIO:  Then we can--16ᵗʰ okay?
 9              UNIDENTIFIED SPEAKER:  We couldn't fly out if he
10   had t be home that night, so--
11              MS. DiPONIO:  Oh, you'd be planning on coming out,
12   you wouldn't do it by phone?
13              MR. SALZMAN:  It's unclear at this point, you know,
14   unclear.
15              THE COURT:  Well, by then there should be a
16   conservatorship appointment in New York, correct?
17              MR. SALZMAN:  Yeah.
18              THE COURT:  Is that right?
19              MR. SALZMAN:  I would hope so, yes.
20              THE COURT:  Okay.
21              MR. DAIN:  Okay.  So that way--that would alleviate
22   the need--so then, Ira, maybe if you participated it would
23   just be by phone.
24              MR. SALZMAN:  But, I guess even if I'm by phone,
25   you know, you're going to run late for me.  Look, I don't
```

BLACK016672

60

 1    want to stand in the way, I'll work around it.

 2               THE COURT:  Okay.

 3               MR. SALZMAN:  But obviously any other day that week

 4    would be better.

 5               MR. DAIN:  Mr. Glatstein, what were the other days

 6    that week?

 7               MR. GLATSTEIN:  16th or the 17th are fine.

 8               MR. DAIN:  Could we do the 17th and the morning of

 9    the 18th then?

10               MR. GLATSTEIN:  The 18th is problematic for me.

11    15, 16, 17th, work.

12               MR. DAIN:  Okay.  16 and the 17th, is that okay,

13    Your Honor?

14               THE COURT:  That's fine.

15               MR. DAIN:  Okay.

16               THE COURT:  Okay.  So you want to do the full day

17    on the 16th then?

18               MR. DAIN:  Yes, Your Honor.

19               THE COURT:  Okay.

20               MS. DiPONIO:  And then maybe reserve--

21               THE COURT:  In the morning of the 17th?

22               MS. DiPONIO:  --morning on the 17th.

23               THE COURT:  Okay.  We'll schedule it--of course if

24    you enter into some kind of other stipulations before then,

25    you know, advise the Court and we'll deal with that when it

BLACK016673

61

```
1    comes up.   Okay.
2                MR. DAIN:   Thank you so much, Your Honor.
3                THE COURT:   Okay.
4                MS. DiPONIO:   Thank you, Your Honor.
5                THE COURT:   Thank you, Mr. Salzman.
6                MR. SALZMAN:   Your Honor, thank you very much.
7                (Whereupon, the proceeding was concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BLACK016674

62

---
CERTIFICATE
---

STATE OF COLORADO )

                :

COUNTY OF DENVER )

       I, Theresa Ornelas, Transcriptionist for the Denver
Probate Court, in the State of Colorado, do hereby
certify that the above and foregoing is a transcript of
the recorded proceedings, based upon the quality of
the recording and my ability to understand it, taken at the
date and time set forth on Page One hereof.

       DATED at Denver, Colorado, this 14th day of April,
2015.


                 /s/Theresa Ornelas

                 Theresa Ornelas
                 Official Transcriber
                 Federal Reporting Service
                 17454 E. Asbury Place
                 Aurora, CO  80013

BLACK016675

# EXHIBIT 30

| District Court, Denver County, Colorado<br>Court Address:<br>1437 Bannock Street, Denver, Colorado 80202<br>**In re the Interest of:**<br><br>**JOANNE BLACK,**<br>                          **Protected Peson.** | DATE FILED: April 2, 2015 1:07 PM<br>CASE NUMBER: 2012PR1772<br><br><br>▲ **COURT USE ONLY** ▲ |
|---|---|
| Attorney or Party Without Attorney (Name and Address)<br><br>Phone Number:         Email:<br>FAX Number:          Atty. Reg. #: | Case Number:<br>12 PR 1772<br><br>Courtroom 224 |
| **STATUS CONFERENCE ORDER** ||

THIS MATTER came before the Court for a Status Conference on April 2, 2015. Present in person were: Lisa DiPonio, Esq. Court Appointed Counsel for the Protected Person (PP) Joanne Black; Conservator Bernard Black with Counsel Carl Glatstein, Esq.; Guardian *ad Litem* (GAL) for the PP Gayle Young, Esq.; Interested Persons and Cousins Anthony Dain, Esq. and Cherie Wrigley; Special Conservator Nominee Nancy Peterson, Esq. Present by telephone were: PP Joanne Black with New York Counsel Ira Saltzman, Esq.; Esan Pinto.

Discussion was held on the record to clarify the case status for this matter and the cases in New York State Supreme Court and Surrogate Courts. The parties represent there is no dispute as to the interpretation of Renata Black's Will. Objections have been asserted as to Bernard Black's management of his sister's funds and particularly with respect to the division of POD accounts left to Joanne Black by her mother, Renata Black. The parties have stipulated to a forensic accounting of the Conservatorship estate, including the affected trusts, the disclaimer of Fidelity and Vanguard accounts, POD benefits for all accounts which disclaimers were used to transfer funds into the Renata Black Estate, the Roth IRA, all amounts paid to attorneys and accounts – in short, a complete review of all funds and assets related to Joanne Black both before and after the disclaimer, by Pamela Kerr, CPA. This Court has reviewed the record including the various reports, responses, objections, exhibits and attachments, as well as relevant authority and enters the following Orders pending an evidentiary hearing:

1. Bernard Black is the subject of allegations of misconduct by the PP and her cousins which he vigorously denies. It appears to the Court to be prudent to suspend his authority pending an evidentiary hearing and the results of Ms. Kerr's forensic accounting review. This suspension is not a determination of misconduct, but rather an attempt by this Court to address concerns raised by the PP, her cousins, the GAL and Ms. Black's attorneys, and to allow the PP to continue to receive funds for her monthly

1

living expenses and other necessary expenses without contributing to the family conflict.

2. This Court finds it should finalize the current allegations in Colorado prior to transfer of the conservatorship to New York State, where the PP resides. The Court is informed that a hearing for the appointment of a guardian and conservator (Guardian of the Person and Property) is scheduled in the New York Supreme Court on April 30 and May 1, 2015. This Court finds that proceeding should continue and it is proper for the New York Court to make a determination as to whether Mr. Black should continue to manage his sister's funds as guardian of her property, which is the equivalent of a conservator in Colorado, or whether Ms. Wrigley or a professional fiduciary or another individual should be appointed to that role going forward. There is no guardian/guardian of the person appointed for Joanne Black in the State of Colorado, as Mr. Black's petition for such appointment was dismissed by this Court on October 27, 2014 in deference to the New York Court's jurisdiction where Ms. Black resides.

3. Accordingly, the Court Suspends Bernard Black as Conservator, pending further hearing. Mr. Black's Letters expire April 11, 2015 and shall not be reissued.

4. The Court finds the appointment of a Special Conservator pursuant to 15-14-112, C.R.S. to serve in an interim capacity, pending the appointment of a permanent conservator or Guardian of the Property in New York is appropriate. The Court appoints Nancy Peterson, Esq. to serve as Special Conservator. Letters may issue and shall expire upon completion of these proceedings in Colorado and transfer to the fiduciary appointed by the Court in New York.

5. Ms. Peterson shall have the responsibility to manage Ms. Black's Social Security and Workmen's Compensation benefits and to pay Ms. Black's reasonable and necessary expenses. Ms. Peterson shall secure the benefits and cause them to be deposited into a conservatorship account, from which Ms. Peterson shall pay Ms. Black's monthly living and other reasonable expenses. Mr. Black shall cooperate with redirecting the funds from these two sources into the conservatorship account which Ms. Peterson shall establish. All funds managed by Ms. Peterson shall be turned over to the conservator/guardian of the property appointed by the Court in New York upon completion of the proceedings in Colorado. It is not this Court's intention that Ms. Peterson be required to obtain court approval for Ms. Black's regular monthly living expenses or for her necessary physician, mental health or similar expenses.

6. All other assets related to Ms. Black are frozen, pending final hearing. Should there be any requests for funds from the supplemental needs or

2

BLACK016677

other trust to benefit Ms. Black which cannot be paid from the conservatorship account, the request may be submitted to the Trustee, who shall in turn obtain permission from this court to disburse funds before any payment is made. All requests for funds to be paid from the conservatorship account or from any trust shall be supported by written documentation. Ms. Peterson shall obtain copies of any rental or other agreements to document Ms. Black's ongoing monthly living expenses.

    a. Mr. Black's request for an exception to pay for taxes is granted. Trust funds may be used to pay for legal and accounting fees related to the preparation of tax returns and to pay any taxes due for Ms. Black. Full documentation of the fees, costs and tax payments shall be provided to Ms. Kerr.

7. It has been suggested to the Court that no one is currently named as the Representative Payee for Ms. Black's social security benefits. It appears the former Representative Payee was Esan Pinto, but the funds were redirected by Mr. Black into one of the Trusts he established for Ms. Black. Mr. Black represents there are social security payments currently being held by the Social Security Administration due to the lack of a Representative Payee. The parties shall confer regarding who should serve as the Representative Payee or whether Ms. Peterson should serve in that capacity, pending a final determination. Regardless of who is named to serve as Representative Payee, that individual if other than Ms. Peterson, shall cooperate and ensure the social security benefits are retrieved and deposited into the conservatorship account to be managed by Ms. Peterson.

8. Mr. Pinto shall provide a complete accounting with documentation of all funds that were held under his control to Ms. Kerr and Ms. Peterson, who shall ensure copies are provided to Counsel of record including Mr. Saltzman, the GAL, Mr. Dain and Ms. Wrigley.

9. Mr. Glatstein has represented that he has obtained a transcript of the proceedings held before this Court to appoint Mr. Black as conservator. Mr. Glatstein shall file a copy of the transcript with this Court and provide copies to Counsel of record including Mr. Saltzman, the GAL, Mr. Dain and Ms. Wrigley.

10. Mr. Black has requested trust and/or conservatorship funds to pay for his attorney fees and costs for defending his actions as conservator. The GAL and CAC DiPonio also request funds to pay their fees. The Court finds there are sufficient funds in the conservatorship estate to pay these fees and costs, but finds it is more appropriate to resolve the fee issues after the results of the forensic accounting are known and the evidentiary hearing on the disclaimer issue has been held. Accordingly, the payment

3

BLACK016678

of attorney fees and costs is held in abeyance pending further proceedings in this Court.

11. Mr. Glatstein shall provide complete copies of all trusts involving Ms. Black to the Court, Counsel, GAL, Mr. Dain and Ms. Wrigley, including the Issue Trust, the 2013 Trust and the Supplemental Needs Trust, however they may be titled as well as any other trusts affecting Ms. Black.

12. Ms. Wrigley asserts she has been paying for Ms. Black's living expenses and needs from her own, personal funds, has provided documentation to Mr. Black but has not received any reimbursement. It is unclear to the Court why it would be necessary for Ms. Wrigley to pay any of Ms. Black's expenses from her own funds. Regardless, Ms. Wrigley is directed to provide an itemization of all amounts paid by her with copies of receipts, statements and the like to support those expenses to Ms. Peterson for review, and include copies to all counsel, the GAL and Mr. Dain. Objections shall be brought to Ms. Peterson's attention, who shall determine whether the expenses or any one of them should be reimbursed. Ms. Peterson may file a petition for approval before disbursing any of the funds under her control to Ms. Wrigley. Any reimbursements which cannot be paid from the funds under Ms. Peterson's control may be paid from Trust funds, after a specific request has been made to this Court by the Trustee as previously described.

13. The Court finds an evidentiary hearing is required to resolve what the Court has identified as the fundamental issues in this matter: whether the disclaimer obtained by Mr. Black as to the accounts at Fidelity and Vanguard POD to Joanne Black should have acted to divest Ms. Black of 1/3 of these non-probate assets. Hearing will also determine whether it was properly disclosed that Mr. Black intended or had authority to redirect one-third of these non-probate assets, left in their entirety to Ms. Black, to persons other than Ms. Black. As part of these proceedings, the Court will determine whether the allegations of breach of fiduciary duty are supported by the evidence and whether any disgorgement or unwinding of fiduciary actions, including the creation of trusts is appropriate. Hearing on these issues is scheduled on June 16 and 17, 2015 commencing at 9:00 a.m.

4

BLACK016679

14. It is this Court's intention to resolve the issues identified in this Order and to then transfer the conservatorship to the jurisdiction of the Court in New York, under the fiduciary appointed by that Court.

DONE IN OPEN COURT this 2nd day of April, 2015.

BY THE COURT:

Elizabeth D. Leith
JUDGE
Denver Probate Court

5

BLACK016680

# EXHIBIT 33



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

KERR0003834



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

KERR0003835

# EXHIBIT 34

# Kerr Forensic Accounting, PC

**650 S. Cherry Street ♦ Suite 235 ♦ Denver, Colorado 80246 ♦ (303) 696-3700 ♦ Fax (303) 696-5711**

June 2, 2015

Gayle Young
Young & Zen, LLC
P.O. Box 307
Littleton, CO 80160

Sent via email to:  dzen@q.com

Re:     In the Interest of Joanne Black
Denver Probate Court
Case No. 12PR1772

Dear Ms. Young:

You engaged *Kerr Forensic Accounting, PC* ("Kerr") to perform a forensic review of the reports filed by Bernard Black, acting as Conservator for Joanne Black, Protected Person, in the above referenced matter.

However at the hearing on this matter on April 2, 2015, the Court ordered the following:

> *"The parties have stipulated to a forensic accounting of the Conservatorship estate, including the affected trusts, the disclaimer of Fidelity and Vanguard accounts, POD benefits for all accounts, which disclaimers were used to transfer funds into the Renata Black Estate, the Roth IRA, all amounts paid to attorneys and accounts (sic) – in short, a complete review of all funds and assets related to Joanne Black both before and after the disclaimer, by Pamela Kerr, CPA."*

Based on the above stipulation, I have completed a forensic review of the funds that were owned by the Protected Person ("Protected Person") as of 12/11/2012, and the activity in all accounts between 12/11/2012 and 12/31/2014.  This report does not address the validity of the Disclaimer used by Bernard Black to transfer the assets of the Protected Person, but rather reports the transfers made, from which accounts and where the funds were transferred.

## SUMMARY OF FINDINGS

Using his dual roles as Conservator of Joanne Black and as executor of the Estate of Renata Black, Bernard Black transferred funds that were Payable on Death to Joanne Black into estate accounts that were, in part, then transferred into accounts in which Bernard Black and his children were beneficiaries. Funds that were due to the Supplemental Needs Trust for the Benefit of Joanne Black ("SNT") from the Estate of Renata Black were not deposited into the SNT.

There are insufficient funds remaining in the Estate of Renata Black to pay the Protected Person the two-thirds (2/3) of the net estate due to the Protected Persons' SNT and/or the funds due from Roth IRA that was improperly distributed to Bernard Black's children.

Documents filed with the Denver Probate Court by Bernard Black did not include details or accurate information that would have disclosed this information to the Court or to the Protected Person.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

## BACKGROUND & CHRONOLOGY OF EVENTS

On 12/11/2012 Bernard Black was appointed Conservator of Joanne Black, Protected Person.

On 4/2/2015 Bernard Black was suspended as Conservator, pending further hearing.

On 3/5/2013 an *Amended Order Appointing Conservator for Adult* ("Amended Order") was issued by the Denver Probate Court. The Amended Order stated that "The Conservator shall file…a Conservator's Inventory with Financial Plan on or before March 11, 2013. <u>The value of the assets must be reported as of the date of this Order."</u> The Amended Order was dated *nunc pro tunc* December 11, 2012.

On 3/18/2013 using the disclaimer added to the Amended Order, Bernard Black, acting as Conservator to the Protected Person, disclaimed the <u>Vanguard Investment accounts</u> that were Payable on Death to the Protected Person and transferred the funds into an Estate investment account. Acting as executor of the Estate of Renata Black ("executor") Bernard Black then transferred approximately two-thirds (2/3) of the estate investment account into the SNT and approximately one-third (1/3) of the these assets into a second estate account and then into an Irrevocable Trust for the benefit of the Issue of Renata Black ("Issue Trust").

On 3/18/2013 using the disclaimer added to the Amended Order, Bernard Black, acting as Conservator to the Protected Person, disclaimed the <u>Vanguard Roth IRA</u> account that was Payable on Death to the Protected Person and transferred the funds into an Estate Roth IRA account.

Acting as executor, Bernard Black then (October – December 2013) transferred the balance of the Estate Roth IRA account to his children.

The Fidelity account was not disclaimed and therefore not transferred to an Estate account.

**See Exhibit 1 – "Flowchart of Accounts Payable on Death to Joanne Black" for details.**

On 7/1/2013 Bernard Black, as Conservator, filed the *Conservator's Inventory and Financial Plan and Motion for Approval.* Rather than listing the <u>value of the assets as of December 11, 2012</u> on the Inventory, Bernard Black listed the value of the Vanguard accounts as of 3/31/2013, which was after the funds were disclaimed and transferred into estate accounts.

The value of the Vanguard and Fidelity accounts that should have been reported as of 12/11/2012 was approximately $3,000,000. The value of the Vanguard accounts reported on the Inventory was $2,175,456. The assets reported on the Inventory did not include the Fidelity Account, the Roth IRA, the McKeel property, the Savings Bonds or any value due to the Protected Person from the Estate of Renata Black. (See Schedule 1 for details of assets totaling $4,320,689 owned or due to the Protected Person as of 12/11/2012.)

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

On 6/23/2014 the former Conservator filed the *Conservator's Report for the period from 12/11/2012 to 12/31/2013.*

On 9/28/2014 the former Conservator filed an Amended *Conservator's Report for the period from 12/11/2012 to 12/31/2013.*

> Consistent with the filing of the Inventory, the Assets section did not properly list the correct assets of the Protected Person as of the date of appointment as Conservator. If the assets had been properly reported on the Inventory as of 12/11/2012, and the Conservator Report properly completed, the loss of one-third (1/3) of the Protected Persons assets out of the Vanguard accounts would have been evident to the Court and to the Protected Person.

On 10/8/2014 the Guardian Ad Litem ("GAL") for the Protected Person filed a *Supplemental Guardian Ad Litem Report* with the Court. The report stated that when the GAL informed the Protected Person that *"…her brother, Bernard Black, had applied to the Court for appointment as her Guardian, and (the Protected Person) hotly expressed her opposition to this."*

On 10/27/2014 the Court issued an *Order* dismissing Bernard Black's Petition for Appointment of Guardian and issued a Show Cause Order as to why the Conservatorship should not be terminated and an accounting be ordered.

On 11/24/2014 Bernard Black wrote a letter to Hon. Elizabeth Leith, Probate Court, City and County of Denver regarding "Need for Continued Financial Conservatorship over Joanne Black."

> Kerr reviewed the letter from Bernard Black to Judge Leith. It was noted that Mr. Black stated "Joanne has various recurring expenses, including medical and dental bills, phone bills and beyond. In the last two years, I have been paying these bills. …" Kerr noted that neither the 2013 or 2014 Conservator Reports included any expenses listed for these items, nor were there any payments out of the Conservatorship accounts of the Protected Person for these expenses.

> While the letter to Hon. Elizabeth Leith discussed the "battle for control of Joanne's funds" at length, Mr. Black did not disclose the transfer of 1/3 of the Protected Person's funds to the Issue Trust in which Mr. Black and his children are beneficiaries. Mr. Black also failed to disclose or discuss the fact that he had distributed 100% of the Roth IRA to his children when it was originally Payable on Death to the Protected Person. Mr. Black wrote in an email dated 4/13/2015 "I divided the Roth IRA into 7 pieces (for 7 children)." As noted on Exhibit 1, the total distributed to Mr. Black's children was $432,648.

On 12/22/2014 the GAL filed a *Reply to Conservator's Response to Order of October 27, 2014* regarding the former Conservator's allegation that the GAL had exceeded the scope of her duties as GAL in making recommendations to the Court as to the appropriateness of a conservatorship in Colorado.

On 12/22/2014, Anthony Dain, Cousin of the Protected Person and Trustee of the original Supplemental Needs Trust FBO Joanne Black filed a *Reply to Conservator's Response to Order of October 27, 2014.*

On 1/8/2015 legal counsel for Bernard Black filed a *Conservator's Further Response to Order of 10/27/2014.*

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

On 1/8/2015 the former Conservator filed *Conservator's Report from 1/1/2014 to 12/31/2014.*

See details below with regard to the overall errors noted on the 2014 (and 2013) Conservator Reports filed by Bernard Black as Conservator.

Bernard Black reported the activity in Account #5641 on the 2014 Conservator Report, which is one of the SNT checking accounts. The activity for Account #5641 properly reported a total of $62,922 transferred into the account. However, the account from which these funds were transferred, the SNT Brokerage Account #1116, was not reported on the Conservator Report.

By not reporting the activity of the SNT Brokerage Account #1116 on the Conservator Report, income earned by the Protected Person in the SNT of $177,110 was not reported on the Conservator Reports.

Bernard Black did not report the activity of the SNT checking account #5641 on the 2013 Conservator Report.

On the 2014 Conservator Report, Bernard Black reported on the activity page for Account #5372: *"Through September 2014, Esaun Pinto had possession of Joanne's debit card for this account (with my knowledge), and used the card to withdraw funds. He did not report all withdrawals to me and thus was overpaid by $7,300 (net of estimated actual spending on Joanne.)"* Account #5372 is in the name of Bernard Black only and is "attached" to Bernard Black's personal checking account #5451. Therefore, Mr. Black had full access to all activity in these accounts and could have been aware of these withdrawals. See discussion below regarding the payment of funds to Esaun Pinto by Bernard Black out of the estate of Renata Black. None of the total of $174,695 paid to Esaun Pinto (CPI Investigations) was reported as expenses of the Protected Person on either the 2013 or 2014 Conservator Reports.

On 1/20/2015 Gayle Young, as GAL for the Protected Person contacted Kerr Forensic Accounting, PC with regards to the potential need for forensic accounting services.

On 1/27/2015 Gayle Young, as GAL for the Protected Person, engaged Kerr Forensic Accounting, PC to perform a forensic review of the Inventory and Conservator Reports filed in this matter.

On 2/19/2015 the Court issued an *Order Re: Status Conference* granting a request for a status conference.

On 3/24/2015 Anthony Dain filed a *"Supplemental Objection to Conservator's Report of 1/1/2014 to 12/31/2014 and Reply to the Conservator's Further Response to Order of 10/27/2014."*

On 4/2/2015 the Status Conference was heard and the *Status Conference Order* was issued.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

## DOCUMENTS RELIED UPON AND PROCEDURES PERFORMED

As noted in communications with the GAL in January 2015, Kerr believed this forensic review to originally be a rather simple review of the documents filed by the former Conservator. However, as Kerr was provided with the documentation and began the forensic review, it was evident that this was a much more complicated and involved matter.

This review included a total of twenty-five (25) bank and investment accounts – 7 Estate accounts, 2 Roth IRA accounts, 9 Trust accounts (5 for the Supplemental Needs Trust, and 3 for the 2013 Trust; and 1 for the Issue Trust), and 7 checking accounts (6 for the Protected Person, and 1 for Bernard Black.[1]  See Documents Relied Upon for a complete listing of documents relied upon for completion of this report.

Kerr was provided copies of bank statements for all known accounts for the Protected Person including the SNT's and 2013 Trust accounts as well as the checking accounts for the Estate of Renata Black and copies of cancelled estate checking account checks. Kerr then reconstructed all banking and investment activity in order to trace the transfers between accounts, and to determine the income, receipts, disbursements and expenses of the Protected Person and the Estate of Renata Black.  Kerr then prepared a Summary sheet that linked all transfers and activity to summarize the receipts and disbursements and to compute the ending balance in all accounts as of 12/31/2014.

Kerr obtained and reviewed the documents related to and filed on behalf of the Estate of Renata Black, including the Petition for Probate filed by Bernard Black as executor; the Estate Income Tax Return for the Estate of Renata Black; and the Estate of Renata Black Income Tax Returns for 5/2/2012 – 4/30/2013 and 5/1/2013 – 4/30/2014.  Kerr prepared a schedule of the Income and Receipts and Disbursements and Expenses of the Estate of Renata Black to determine what was due to the Protected Person as of 12/31/2014.

Kerr obtained and reviewed the Financial Plan and Inventory filed by the former Conservator, as well as the Conservator Report from 12/11/2012 – 12/31/2013, the Amended Conservator Report from 12/11/2012 – 12/31/2013, and the Conservator Report from 1/1/2014 – 12/31/2014.  Kerr also reviewed all documents filed with the Denver Probate Court related to this matter.

Kerr obtained, reviewed and analyzed the invoices provided by the former Conservator for CPI Investigations (Esaun Pinto) and the receipts provided by the former Conservator for payments made to Cherie Wrigley.

Kerr obtained and reviewed the invoices (some redacted) from the former Conservator for legal and accounting fees.  During the forensic review, the former Conservator stated that many of the legal and accounting fees paid out of the Estate of Renata Black were for the benefit of the Protected Person.

---

[1] Bernard Black forwarded account statements to Kerr indicating that they were statements for Joanne Black's "new debit card."  However, the statements included two (2) accounts, one in the name of Bernard Black that Bernard Black stated was the "new debit card account" (Acct #5372) for Joanne Black and Bernard Black's personal account.  Kerr was not informed that this was Bernard Black's personal account until 4/11/2015.  Both accounts were in the name of Bernard Black.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

The former Conservator attached a schedule to the 2014 Conservator Report (but did not include any of the amounts <u>on</u> the 2014 Conservator Report) listing payments for legal and accounting fees as expenses paid on behalf of the Protected Person out of the Estate of Renata Black. Kerr attempted to obtain the invoices for these legal and accounting fees in order to determine if these expenses "allocated" to the Protected Person were supported by proper documentation.

On 5/22/2015, legal counsel for Bernard Black stated *"I believe that delineating how the funds were expended would be to merely state that funds out of a certain account were paid to a vendor or provider of services. In terms of your statement as to your need to determine what expenditures were "estate" expenditures, you only need to say (for example) that estate funds went to pay the GAL's fees for her services in the Colorado conservatorship case. However, it is when you go beyond that analysis, to say that the particular expense in question is properly attributable to the estate, or to the SNT, or whatever, that I take issue. That is a legal question, not a forensic accounting question."* Therefore, Kerr took the position as of 5/22/2015 that any payments out of the Estate for legal and accounting fees were estate expenses and did not attempt to reconcile what payments Bernard Black wished to allocate to the "benefit of Joanne Black" to determine the balance due to the Protected Person from the Estate of Renata Black.

## The Estate of Renata Black

The estate of Renata Black was estimated to be $4,742,000 as reported to the New York Probate Court on 5/21/2012 by Bernard Black as Executor. However, $3,000,000 of the total were the investments that were Payable on Death to Joanne Black and $350,000 was property that was to go to Joanne Black. The balance of $1,392,000 represented three real estate properties and bank accounts owned by Renata Black.

The Will of Renata Black states: "I give and bequeath the sum of Fifty Thousand Dollars ($50,000.00) to my son, BERNARD BLACK, …less the amount of any executor's commissions paid to Bernard Black; ...I give, bequeath and devise all the rest, residue and remainder of my Estate as follows: (A) Two-thirds (2/3) to the Trustees of the Supplemental Needs Trust for the Benefit of Joanne Black, IN TRUST,…(B) The balance to the Trustee of the Irrevocable Trust for the Benefit of the Issue of Renata Black, IN TRUST…"

No funds from the rest, residue and remainder of the Estate of Renata Black ("the estate") were transferred to the Supplemental Needs Trust ("SNT") of the Protected Person as required by the Will of Renata Black ("the Will")

Rather than transferring the "rest, residue and remainder" due to the Issue Trust as required by the Will, beginning on 7/2/2012 Bernard Black began writing checks for the benefit of his children and to himself out of the Estate checking account. Between 7/2/2012 and 12/31/2014 a total of $453,465 was disbursed out of the Estate to or for the benefit of Bernard Black. These payments and transfers included $160,000 in estimated tax payments for Bernard Black's personal taxes; $169,600 to Bernard

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

Black and/or his children; $76,204 to Roycemore School for Bernard Black's children's school (Daniel & Jacob); $32,187 to pay Student Loans; and $12,771 in expenses for his daughter's Sarah and Rebekah, including rent, electric, cable, and medical bills.

Due to the fact that no funds were actually distributed to either the SNT or the Issue Trust from the Estate of Renata Black, Kerr prepared a schedule of the receipts and income in the Estate of Renata Black and the expenses that were not related to payments for Bernard Black or his children or the Protected Person to estimate the balance due to the Protected Person from the estate as of 12/31/2014. It is estimated that as of 12/31/2014 the funds due to the Protected Person range from $509,710 to $282,538. **See Schedule 2 – Calculation of Balance in Estate of Renata Black attached and supporting Schedules 2a and 2b**.

It is Kerr's recommendation that the payments made out of the estate to CPI Investigations and Cherie Wrigley be approved by the New York Probate Court as part of the proceedings related to the administration of the estate of Renata Black. In an email dated 4/13/2013 Bernard Black stated (in part-see copy of email attached as support for this decision):

*"…My job as Executor was to do the best overall job for all beneficiaries. I endeavored to do so. Any challenge to those actions as Executor should be brought in New York, not in Colorado, as I see it. I believe that your role does include verifying that Joanne received 2/3rds of the disclaimed Vanguard assets, directly, or through substitute assets. But I believe that the wisdom of the overall disclaimer is before the court, and that the wisdom of my specific actions as Executor is for the New York courts."*

As of 12/31/2014 the balance in the checking account of the Estate of Renata Black was $117,027.50. There are insufficient funds remaining in the Estate of Renata Black to pay the Protected Person the 2/3 of the net estate due to the Protected Persons SNT, or the funds due to the Protected Person from the Disclaimed Roth IRA.

In an email dated 3/26/2015, Bernard Black stated:

*"…I have not, at this point, contributed other assets from the Estate of Renate Black to either Trust. I will eventually contribute the house at McKeel Avenue, or its value if sold, to the SNT. I do not expect there to be substantial additional contributions from the Estatte (sic) of Renata Black to either trust. Instead, I have chosen to spend Estate funds directly, maintaining the rough 2/3rdd (sic) to 1/3rd balance of total value to flow to the SNT (or directly to Joanne) versus value to flow to the Issue Trust (or directly to my children)."*

Due to the disclaimer of the Payable on Death assets and subsequent transfer of these funds into the estate of Renata Black, additional New York State Income taxes were paid of approximately $210,000. Per the United States Estate Tax Return, Form 706, the value of the assets of Renata Black at her date of death was $4,862,044 and estimated expenses were $92,986 equaling a taxable estate of $4,402,324. There was no federal estate tax due on the Estate of Renata Black. Based on this value that included the POD Investments, the Estate of Renata Black paid New York Estate Taxes of $365,734 or a tax rate of approximately 7.7%. The disclaimed assets were approximately $2,800,000.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

## SUPPLEMENTAL NEEDS TRUST

### Multiplicity of accounts & Anthony Dain as co-trustee

As stated above in the Documents Relied Upon and Procedures Performed, there were a total of five (5) Supplemental Needs Trust checking, savings, brokerage and brokerage sweep accounts. The original SNT account was in existence as of 12/31/2012. In an email from Bernard Black dated 4/15/2015 in response to the need for a new SNT checking account, Bernard Black wrote:

*Pam: This account (x2425) is an "old" SNT savings account. I closed it in 2013 and opened a "new" account x8768 because Chase decided it was the wrong kind of account for the SNT. I don't remember the details – I think it was in their system as a "business" trust account, rather than a personal trust account. Here are the SNT savings statements that I have sent to you. In 2014.09, I closed the "new" SNT savings account, and transferred funds to the SNT checking account, just to simplify the multiplicity of accounts.*

Kerr responded: But then the balance of account #8768 is zero as of 9/30/2014. ??

*Bernard Black responded (email of same date): Yes, I closed this account (x8768) and moved the funds to the SNT checking account (x5641). The transfer should show on the statements for both accounts.*

Per the Supplemental Need Trust for the Benefit of Joanne Black, Anthony Dain is listed as the co-trustee. Kerr noted that neither Account #8768 or #5641 listed Anthony Dain as a co-trustee on the statements. Account #5641 is an SNT checking account into which funds from the sale of investments in the SNT Brokerage account were transferred. Checks were then written to Schiff Hardin for legal fees, the Estate of Renata Black to reimburse the estate for legal fees to Schiff Hardin, the "tax accountants" and a total of $21,500 for SNT income taxes.

The two (2) remaining SNT accounts are the JP Morgan Brokerage Account #1116 and the sweep account for this brokerage account. This SNT account was opened by Bernard Black, as Trustee of the SNT. Kerr noted that Anthony Dain was also not listed on this account as a co-trustee. When Kerr inquired of this to Mr. Black, the response in an email dated 5/11/2015 was:

*"Anthony Dain is a co-trustee, but I am the only one who filled out account forms, so I am the only trustee listed on the account.*

*Anthony Dain signed forms for Chase to allow me to open the trust accounts at Chase."*

See further discussion of the non-reporting of the SNT sweep account on the Conservator Reports below. The sweep account included $177,010 in income that was not reported as income of the Protected Person on the 2013 or 2014 Conservator Reports.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

**<u>Transfers from Estate into non-SNT accounts:</u>**

As detailed on Schedule 2a (Accounting Reconstruction of Estate Checking Account #6179) Bernard Black, as executor, transferred funds from the Estate of Renata Black directly into two (2) different non-SNT accounts. The majority if these transfers (Total of $55,620) were transferred into account #5372, which is an account in the name of Bernard Black only. Per the email from Bernard Black: *"The account is in my name because Joanne has never come in to Chase to cosign…"* The transfer of these funds into non SNT accounts not only contradicts what the Will states, but because these funds were not transferred directly into the SNT and then distributions made to the Protected Person to pay the expenses, income taxes were incurred on the income of the SNT, without the deduction of Distributable Net Income to reduce the taxes.

Bernard Black reported these transfers of $55,620 into account #5372 out of the estate as income on the 2013 & 2014 Conservator Reports. As stated on the 2014 Conservator Report, Bernard Black was fully aware that Esaun Pinto had the debit card to this account and was making withdrawals. Due to the incorrect completion of the Conservator Reports, it is difficult to determine if these ATM withdrawals were included on the Conservator Reports. Due to the fact that the "disbursements" listed on the activity in the individual accounts reported on the Conservator Reports does not agree to the total "expenses" on the Conservator Reports, it is difficult to determine exactly how these ATM withdrawals were reported or if they were included in the "Distributions to Protected Person" reported as an expense item on the Conservator Reports.

Additional transfers were made out of the estate of Renata Black into another non-SNT accounts as well. These transfers went into accounts #8365 (titled Joanne Leslie Black by Bernard Black Conservator) and totaled $10,020. For reasons unknown to Kerr, this account was not reported on either the 2013 or 2014 Conservator Report.

In January 2014, Bernard Black, as the only trustee on the new SNT Brokerage Account #1116, began selling investments out of the SNT Brokerage account. A total of $101,472 in securities were sold. These funds were then transferred into the SNT Checking account (new SNT account in which Bernard Black is the only listed trustee) and a total of $33,170 was used to pay legal and accounting fees. (See discussion of these fees below). Due to the fact that the Protected Person was due funds from the estate of Renata Black, the sale of securities was not necessary. Acting as executor of the estate and trustee of the SNT, Bernard Black should have transferred funds from the estate (that were due to the SNT) and paid the expenses with those funds.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

**Legal and accounting fees paid from SNT:**

A total of $28,970 was paid out of the SNT and the 2013 Trust for legal fees. Some of these legal fees were paid directly and some funds were transferred from the SNT to the estate to "reimburse" the estate for legal fees. The breakdown is as follows:

- Total of $16,939 paid to Schiff Hardin ($13,239 directly and $3,700 transferred to estate)
- $6,000 transferred to the estate to reimburse for Carl Glatstein fees
- Total of $6,031 paid to Wofsey Rosen

With regards to the Schiff Hardin bills: Kerr reviewed the invoices provided by Carl Glatstein as legal counsel for Bernard Black. Although the invoices were partially redacted Kerr was able to determine the following:

- Invoice dated October 16, 2014 for $9,224.50 (September 2014 charges)

  o Paid 50% by SNT by Bernard Black as Trustee
  o Paid 50% by 2013 Trust by Bernard Black as Trustee
- Invoice dated November 11, 2014 for $3,994.50 (October 2014 charges)

  o Paid 50% by SNT by Bernard Black as Trustee
  o Paid 50% by 2013 Trust by Bernard Black as Trustee

An analysis of these invoices shows:

- On the invoice totaling $9,224.50 a total of six (6) attorneys billed for their time as follows:

| Attorney | Hours | Hourly Rate | Total | |
|---|---|---|---|---|
| David C. Blickenstaff | 0.90 | $ 680.00 | $ 612.00 | |
| Thomas W. Abendroth | 1.20 | $ 710.00 | $ 852.00 | |
| Robert M. Freedman | 1.30 | $ 575.00 | $ 747.50 | |
| William R. Franzen | 2.40 | $ 600.00 | $ 1,440.00 | |
| Jeffrey M. Bergman | 0.20 | $ 430.00 | $ 86.00 | |
| Lucy D. Bickford | 18.20 | $ 385.00 | $ 7,007.00 | $ 10,744.50 |

A total of $1,500 was given as a credit for the net $9,224.50

Analysis of the invoices reflected that:

- On 9/17/2014 two (2) attorneys incurred time totaling $2,225
- On 9/18/2014 four (4) attorneys incurred time totaling $3,772
- On 9/19/2014 four (4) attorneys incurred time totaling $2,501

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

Although it is difficult to determine what these charges were for with the redactions, the phrase "…about Guardianship and Trust dispute (beneficiary and IP under Colorado Conservatorship is on Staten Island). …Discussed options…" were included on these invoices.

- On the invoice totaling $3,994.50 a total of five (5) attorneys billed for their time as follows:

| | | | | |
|---|---|---|---|---|
| Larry Lutzky | 3.00 | $ 470.00 | $ 1,410.00 | |
| Thomas W. Abendroth | 0.20 | $ 710.00 | $ 142.00 | |
| Robert M. Freedman | 2.70 | $ 575.00 | $ 1,552.50 | |
| William R. Franzen | 0.20 | $ 600.00 | $ 120.00 | |
| Lucy D. Bickford | 2.00 | $ 385.00 | $ 770.00 | $ 3,994.50 |

Although it is difficult to determine what these charges were for with the redactions, some of the charges have the following words "…family tree,…guardianship issues, and distribution of estate."

As is noted in the Background and Chronology of events, these charges were for time in September and October. It was in October 2014 that the GAL informed the Protected Person that Bernard Black was applying for Guardianship of the Protected Person.

## Conservatorship Reports filed by former Conservator

The Inventory and Financial Plan, as well as both Conservator Reports, did not report correct information.

The total assets Bernard Black reported as owned by the Protected Person on the Inventory was approximately $2,100,000 less than the actual assets owned ($4,320,689 per Schedule 1 compared to $2,230,996 per Inventory). See the details above in Background and Chronology of Events for details regarding the reporting of the Vanguard accounts.

The Inventory did not include the balance of $90,192 in the Fidelity account that was POD to the Protected Person.

The Inventory did not include any estimate of the value of the estate of Renata Black due to the Protected Person. Based on the value of the estate of $1,392,000 (as per the Petition for Probate filed by Bernard Black as executor) and an estimate of $100,000 in expenses, an estimated net value would have been $1,292,000. The Protected Person was entitled to two-thirds (2/3) of this balance or $861,333.

The Inventory included a total of $55,000.00 in the 2013 Trust, which was not in existence as of 12/11/2012. The balance of $55,000 was Workers Compensation benefits that were not received until 5/21/2013.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

The Inventory did not include the jewelry that was to be given to the Protected Person from Renata Black. The total value was later reported on the 2014 Conservator Report as $30,000.

The Financial Plan filed with the Court did not list all income sources available to the Protected Person or all expected expenses of the Protected Person. On assets of approximately $2,000,000 an estimated income from these resources should have been included as income sources. As of the date of the filing of the Inventory & Financial Plan a total of $63,000 had been paid to Cherie Wrigley and CPI Investigations (Esaun Pinto). If these expenses had been included on the Financial Plan it would have alerted the Court and any readers of the Financial Plan of these expenses. The total amount paid to CPI Investigations and Cherie Wrigley between 2013 and 2014 was $219,695.00.

The Financial Plan listed "$600 per week rent to hotel when Protected Persons whereabouts are known and she is not in hospital." The Projected monthly amount was listed as $2,600.00 and $31,200 annually. However, no living expenses were ever reported on the Conservator Reports and there are no debts listed on the Conservator Reports for any living expenses.

All three (3) of the Conservator Reports (12/11/2012 – 12/31/2013, the Amended 12/11/2012 – 12/31/2013, and the 1/1/2014 – 12/31/2014) were incorrectly completed and did not report the actual income or expenses of the Protected Person. There is no correlation between the receipts/income or disbursements/transfers listed on the individual accounts reported and the total amounts categorized for income and expenses.

For example, on the 2013 Amended Conservator Report, the Total Amount of Income or Amount Received of the three (3) bank accounts reported was $158,490 but the total Receipts/Income reported in the section of categorized Income was only $99,649 ($13,200 in Social Security and $86,449 from Workers Compensation). The "Total Amount Disbursed" of the three bank accounts was $48,465 but the total Disbursements/Expenses reported in the categorized section was only $32,032 (Accountant /CPA $6,031 and Distributions to Protected Person $26,000).

The Conservator Reports filed for the period from 12/11/2012 to 12/31/2013 ("2013") and 1/1/2014 – 12/31/2014 ("2014") did not report all income earned by the Protected Person or all disbursements made on behalf of the Protected Person. The most significant disbursement made on behalf of the Protected Person and not reported on the Conservator Reports were the payments to CPI Investigations and Cherie Wrigley out of the Estate checking account. Although Bernard Black reports that these expenses were on behalf of the Protected Person (and it is not disputed that they are) none of these payments were reported on either the 2013 or 2014 Conservator Reports. However, the supporting documentation provided by Bernard Black for these expenses were not sufficient to determine what the services provided were or exactly when the services were provided. There were also no receipts to substantiate the expenses included on the invoices. See discussion of these expenses under Estate of Renata Black.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

## Roth Ira

As Executor of the Estate of Renata Black, Bernard Black created a new account at Vanguard (Account #6201) entitled Bernard S. Black Executor of Renata Black Roth IRA. As Conservator of the Protected Person, Bernard Black disclaimed the Roth IRA that was 100% POD to the Protected Person.

The funds in the Roth IRA would have been non-taxable to the Protected Person when they were withdrawn as the taxes on a Roth IRA are paid prior to depositing funds into a Roth IRA. As stated above, 100% of the Roth IRA funds that were transferred into this new Estate Roth IRA account were then distributed to Bernard Black's children rather than to the Protected Person. When the Roth IRA was distributed to the Bernard Black's children, the value had increased from the date of death value of $316,870 to $432,638 – an increase in value of $115,768 in 15 months.

In an email dated 4/13/2015 Bernard Black wrote to Kerr:

*Pam: The Court authorized me to disclaim Joanne's share of the Vanguard funds into the Estate. I believe the disclaimer was in Joanne's interests, but that will be for the court to revisit, or not. I am not presenting to you the many reasons why the alternatives for Joanne were far worse, but will do so to the court. I think you need to \*assume\* for purposes of your report that the disclaimer is valid, and in Joanne's interests. Once disclaimed, the Vanguard assets went into the estate. From there, it was my obligation as Executor to ensure that 2/3rds of the total estate assets went to Joanne. I made the secondary decision as Executor that Joanne should receive 2/3rds of the main Renata Black accounts, in trust, in the SNT, but would not receive 2/3rds of the Roth IRA funds, because putting them in trust would not be tax-efficient. I instead provided her with substitute assets, as part of ensuring that she received 2/3rds of the overall value of the Estate. I have provided you with evidence of distribution, on behalf of Joanne, if that amount of assets. My job as Executor was to do the best overall job for all beneficiaries. I endeavored to do so. Any challenge to those actions as Executor should be brought in New York, not in Colorado, as I see it.*

This section intentionally left blank

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

## INCOME, EXPENSES AND ASSETS REMAINING OF THE PROTECTED PERSON

As stated above, the assets owned or due to the Protected Person as of the date of appointment of Bernard Black as Conservator (12/11/2012) totaled $4,320,689. The following Schedule reflects the increases/income and decreases/expenses of the activity in the accounts owned by the Protected Person from 12/11/2012 through 12/31/2014:

| | |
|---|---|
| Value as of 12/11/2012 | $ 4,320,689 |
| Change in Value of Investments | 668,250 |
| Dividends & Other Income on Investments | 177,110 |
| Workers Compensation Income | 141,419 |
| Transfer from Estate Account to Joanne's Personal Account | 59,200 |
| Unrealized Gain on Transfer | 47,322 |
| Social Security Income | 19,478 |
| 2/3 Rental Real Estate, etc. | 7,163 |
| Unknown Deposits | 6,500 |
| Transfer to SNT Brokerage | 5,433 |
| Transfer from Bernard Black's Personal Account | 3,000 |
| Transfer from Old Vanguard Accounts | 2,645 |
| ATM Deposits | 1,527 |
| Interest Income | 195 |
| Transfer to Issue Trust | (1,002,635) |
| Transfer to Bernard Black's Children | (432,638) |
| 2/3 of Estate Taxes | (249,084) |
| Sale of Real Estate less than Value on 706 (2/3) | (77,730) |
| AMT Withdrawals after 4/11/2013 | (63,938) |
| Change in Value of Estate | (31,973) |
| SNT Income Taxes | (21,500) |
| Legal Fees - Schiff Hardin | (16,939) |
| Legal Fees - Wolfsey, Rosen etc. | (6,031) |
| Legal Fees - Carl Glatstein | (6,000) |
| Accounting Fees | (2,165) |
| AMT Withdrawals Prior to 4/11/2013 | (6,611) |
| Miscellaneous Withdrawal | (4,002) |
| Purchases with ATM Card | (3,748) |
| Miscellaneous | (2,224) |
| Transfer to Account #8011 to #7482 Prior to 5/1/2013 | (1,249) |
| Accounting Fees (Transferred to Estate) | (625) |
| Fees (ATM & Safe Deposit Box) | (80) |
| Balance at 12/31/2014 | $ 3,530,758 |
| Difference - other beneficiaries %'s on Vanguard accounts | 59,095 |
| Total Balance of all accounts of Protected Person | $ 3,589,853 |

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

The account balances and remaining assets of the Protected Person as of 12/31/2014 are:

|  | Balance at 12/31/2014 |
|---|---|
| Account #1116 SNT FBO Joanne Black Bernard Black TTEE | $ 2,410,051 |
| 2/3 of Estate Due to Joanne Black | 509,710 |
| McKeel Property | 350,000 |
| Municipal Bonds | 105,286 |
| Account #5674 2013 Trust Checking | 96,867 |
| Savings Bonds | 67,000 |
| Account #5641 SNT for Joanne Black Bernard Black Trustee | 30,294 |
| Account #1116 SNT FBO Joanne - Sweep Account Black Bernard Black TTEE | 8,996 |
| Account #5372 Bernard S Black Joanne's "New Debit Card" | 8,267 |
| Account #5459 Joanne Leslie Black | 3,137 |
| Account #7482 Joanne Leslie Black | 201 |
| Account #1035 2013 Trust Municipal Bonds | 44 |
|  | $ 3,589,853 |

Based on the forensic review performed of the assets of the Protected Person from 12/11/2012 to 12/31/2014 the balance of funds due to Joanne Black, Protected Person as of 12/31/2014 from Bernard Black are as follows:

| | |
|---|---|
| Two-thirds (2/3) of "rest, residue and remainder" of Estate of Renata Black * | $ 509,710 |
| Roth IRA 2/3 - plus unknown increase in value and income earned | 288,425 |
| Amount due to Protected Person * | 798,135 |
| Disclaimed Vanguard accounts plus accrued interest (Value as of 12/31/2014 - actual amount not determinable as of yet) | 1,139,731 |
| Potential Total Funds Due to Protected Person as of 12/31/2014 | $ 1,937,866 |
| | |

*If the payments to Esaun Pinto and Cherie Wrigley are approved by the New York Probate Court as reasonable payments from the estate on behalf of Joanne Black, this amount would be $282,538 and the balance due would be $570,963. However, the issue of these payments being made directly out of the Estate rather than the funds being transferred into the SNT and the expenses paid from the SNT remain.

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

## CONCLUSION

As stated above, Bernard Black used his role as Conservator for the Protected Person to disclaim funds that were originally Payable on Death to the Protected Person and then transferred these funds into estate accounts. Using his role as executor of the Estate of Renata Black, Bernard Black then transferred funds that were due to the Protected Person (both from the estate and the Estate Roth IRA) to himself and his children, to the detriment of the Protected Person. As a result of these actions, the estate of Renata Black has insufficient funds to pay the "rest, residue and remainder" of the estate funds to the Protected Person including the Roth IRA. The shortage is estimated to be between $570,963 and $798,135.

While the disclosure of the effects of the disclaimer (1/3 going to accounts for the former Conservator and his children) is a legal matter to be decided by the courts, Kerr believes that if the correct assets of the Protected Person were reported as of the date of appointment (as the Conservator was required to do) and the Inventory and Conservator Reports had been properly completed and reported, the loss of one-third (1/3) of the Vanguard Investment accounts would have been evident to the Court, the Protected Person and the readers of the reports filed as part of the Conservatorship of the Protected Person.

If Bernard Black had reported the Roth IRA as an asset of the Protected Person on the Inventory and the balance of zero ($0) as an asset of the Protected Person on the Conservator Report, it too would have been evident to the Court, the Protected Person and the readers of the Conservatorship reports that this account was, in fact, distributed to someone other than the Protected Person.

While the legal ramifications are beyond the scope of this report, it is evident that funds that were clearly designated for the Protected Person were not distributed or held in the name of the Protected Person. Bernard Black used his fiduciary role as executor to distribute these funds to persons other than the rightful owners. Further investigation may be warranted with regards to these actions.

This section intentionally left blank

# Kerr Forensic Accounting, PC

Forensic Accounting Report – In the Interest of Joanne Black
Denver Probate Court – Case No. 12PR1772
June 2, 2015

## OTHER MATTERS

This report may be used only in connection with the matter defined above and is not intended for, and may not be used for, other purposes or by anyone not directly involved in this matter. It is based solely upon the information received to date, which is believed to be accurate and reliable. To the extent that additional information becomes available, revisions to this report may be appropriate.


Very truly yours,

*Kerr Forensic Accounting, PC*


Pamela M. Kerr, CPA, FCPA, CFE

Attachments:  Exhibit 1 – Flowchart of Accounts POD to Joanne Black
Schedule 1 – Schedule of Assets Owned by Joanne Black as of 12/11/2012
Schedule 2 – Calculation of Net Estate of Renata Black
Schedule 2a – Accounting Reconstruction of Estate Checking Account #6179
Schedule 2b – Accounting Reconstruction of Estate Checking Account #1350

Documents Relied Upon
Copy of email from Bernard Black dated 4/13/2015

# EXHIBIT 36

1

PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

------------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

------------------------------------------------------------

CASE NO. 12 PR 1772

------------------------------------------------------------

IN THE INTEREST OF:

JOANNE BLACK, Respondent.

------------------------------------------------------------

       This matter came on for hearing before THE
HONORABLE ELIZABETH D. LEITH, Judge of the Denver Probate
Court, on Wednesday, August 5, 2015.  The following is a
transcript of the audible portions of that hearing as
requested by the ordering party.


APPEARANCES:    Bernard A. Poskus, Esq., and Patrick R.
              Thiessen, Esq., for Bernard Black

              LISA DiPONIO, Esq., for Joanne Black,
              Respondent

              GAYLE YOUNG, Esq., Guardian Ad Litem for
              Joanne Black, Respondent

              IRA SALZMAN, Esq., Attorney for Joanne Black,
              Respondent

              ANTHONY DAIN, Esq., Trustee/cousin

              CHERIE WRIGLEY, Cousin



EXHIBIT 5
BLACK
8/23/2018
Tiffany M. Pietrzyk, CSR RPR CRR

BLACK000590

2

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Petitioner: | | | | |
| Bernard Black | 18 | 63 | 156,221 | 158,235 |
| Katherine Litvak | 247 | 274 | 282 | 283 |
| For the Respondent: | | | | |
| Cherie Wrigley | 160 | 177 | 187 | |
| Anthony Dain | 192 | 201 | 215 | 220 |

EXHIBITS

| For the Petitioner: | Received |
|---|---|
| 78 | 24 |
| 44 | 28 |
| 45 | 29, 30 |
| 46 | 30 |
| 47 | 30 |
| 48 | 30 |
| 43 | 32 |
| 80 | 108 |
| 109 | 158 |
| 49 | 183 |
| 106 | 204 |
| 68 | 208 |

BLACK000591

3

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Thank you, you may be seated.  Okay.
 3   Our record is on this morning, August 5th, 2015, calling up
 4   12PR1772 for continued proceedings.  Go ahead with
 5   appearances for the record today.
 6          MR. POSKUS:  Good morning, Your Honor, Bernard A.
 7   Poskus, number 11975 appearing on behalf of Bernard Black,
 8   Conservator.  Also appearing with me is my co-counsel Mr.
 9   Patrick Thiessen--
10          THE COURT:  Okay.
11          MR. POSKUS:  --number 40185.
12          MR. DAIN:  Good morning, Your Honor, Anthony Dain,
13   Cousin and Trustee of the Supplemental Needs Trust for Joanne
14   Black (inaudible).
15          MS. DiPONIO:  Good morning, Your Honor, Lisa
16   DiPonio, 27707, court appointed counsel for Joanne Black.
17          THE COURT:  Okay.
18          MS. DiPONIO:  Your Honor, also on the telephone is
19   attorney Ira Saltzman who is representing our mutual client
20   in New York.  And we have other folks here I'll let them
21   introduce themselves.
22          THE COURT:  Thank you.
23          MS. YOUNG:  Good morning, Your Honor, Gayle Young,
24   Guardian ad Litem for Joanne Black.
25          THE COURT:  Thank you.  And Ms. Peterson is in the
```

BLACK000592

4

1   back.

2           MS. PETERSON:  35675, special counsel.

3           THE COURT:  Thank you.  All right.  And I know that

4   there's been some filings.  In the meantime there was a

5   flurry of stuff; I've tried to review it as it comes in.  I

6   did deliberately not issue a contempt citation for a bunch of

7   different reasons but I read through that and the supplement

8   that Mr. Dain filed and then I seen Ms. Young's report and

9   Ms. Peterson's report.  Ms. Harper filed a report, and Ms.

10  Kerr filed a response to that and she's asking for her fees

11  to be paid.

12          So--and--and I think after all of that I'm still

13  thinking we need to get through the heart of this evidence

14  and then move on from there if we can.

15          All right.  Is there anything else you want to go

16  over before we get started?

17          MR. DAIN:  Your Honor, I--I'm not sure I understand

18  when you say we need to get to the heart of the evidence, I

19  assume what you mean is we get through that and then we'll

20  deal with all the other--

21          THE COURT:  Right.

22          MR. DAIN:  --(inaudible).  And I know Your Honor

23  has already indicated that you have today and tomorrow.

24          THE COURT:  Blocked off.

25          MR. DAIN:  Blocked off.

BLACK000593

5

```
1          THE COURT:  Just in case--it was a just in case
2   type of thing.
3          MR. DAIN:  Okay.
4          MR. POSKUS:  Your Honor, two things, number one, I
5   thought that this was just going to be for today so I'm--
6          THE COURT:  Okay.
7          MR. POSKUS:  --I'm not going to be able to make it
8   tomorrow, sorry.  But the second thing is on the contempt
9   citation just so you know, I don't believe that we're in
10  violation of the Court's order.  Having said that my client
11  yesterday deposited a check in my COLTAF account for 115,000
12  which is the amount complained of.  And I will represent to
13  the Court that I will hold on to that until I either get an
14  order from this Court or the New York court telling me what
15  to do with it.
16         THE COURT:  So that was sort of in reimbursement
17  mode kind of?
18         MR. POSKUS:  Yes, yeah, reimbursement mode.  In
19  other words, I think it was okay for him to do what he did
20  but we didn't want that issue to overwhelm the hearing today.
21         THE COURT:  Okay.
22         MR. POSKUS:  We wanted to get to the evidence.
23         THE COURT:  Okay.  And the source of those funds?
24         MR. POSKUS:  Is Bernie Black's personal funds.
25         THE COURT:  All right.  And what's the status of
```

6

1   the case in New York in terms of the probate case?  Has that

2   court been advised of anything?

3          MR. DAIN:  Not--it has not, Your Honor, other than

4   that this is a continued hearing so it has continued the

5   hearing until I believe it's October 1st.

6          THE COURT:  So there is a hearing set.

7          MR. DAIN:  There is a hearing set.

8          THE COURT:  And the nature of that hearing?

9          MS. DiPONIO:  Your Honor, Mr. Salzman might be able

10  to fill you in on what is going on in New York.  I know he

11  notified the court--

12         THE COURT:  Okay.

13         MS. DiPONIO:  --about the proceedings and he might

14  be able to--

15         THE COURT:  Okay.  Mr. Salzman, did you hear that?

16         MR. SALZMAN:  I did, Your Honor, I'm on a cell

17  phone so if I'm breaking up (inaudible).  The--basically the

18  New York (inaudible) in (inaudible) thought--

19         THE COURT:  Yeah, you're breaking up really, really

20  badly.

21         MR. SALZMAN:  Okay.  Anyway the New York

22  proceedings have been adjourned (inaudible) the results of

23  your proceedings in Colorado.

24         THE COURT:  So are there any holds or suspensions

25  at that point--in that case?

BLACK000595

7

```
 1          MR. SALZMAN:  I didn't--I didn't understand the

 2    Court's question, what do you mean by holds and suspensions?

 3          MR. DAIN:  I can actually address that, Your

 4    Honor--

 5          THE COURT:  Okay.

 6          MR. DAIN:  --because I was in Court.  The Judge

 7    instructed Mr. Black's attorney to instruct Mr. Black--and

 8    this is as the Court put it--that he strongly advised to make

 9    no transfers out of the estate accounts.  Mr. Black's

10    attorney said he would so advise his clients.

11          The Court didn't want at that point to overstep

12    because the matter--there were matters before this Court.

13          THE COURT:  Okay.

14          MR. DAIN:  So that Court has just adjourned its

15    hearing, evidentiary hearing and other hearings, until after

16    this Court rules.

17          THE COURT:  All right.  And is there--is that

18    hearing--the subject of that hearing, is part of it this

19    entire business about--Mr. Black testified that he was trying

20    to avoid in the first instance, which was whether or not his

21    mother had the capacity to change--to put the funds into the

22    POD account?

23          MR. DAIN:  No.  What's being litigated there is Mr.

24    Black has a petition for guardianship which in some

25    substances is the equivalent of this Court's--
```

BLACK000596

8

```
1           THE COURT:  I thought that was a different court
2   though.
3           MR. DAIN:  Well, there are two courts--
4           THE COURT:  Right.
5           MR. DAIN:  --there's the Surrogate Court, there's
6   the court--the estate court.  As far as I know nothing is
7   happening in the estate proceedings until Mr. Black files to
8   either attempt to close them or as we're going to file to
9   address all the issues of payments out of the estate account.
10  That--
11          THE COURT:  Okay.  So he still hasn't--he hasn't
12  been suspended as the PR then?
13          MR. DAIN:  No, no.
14          THE COURT:  Okay.
15          MR. DAIN:  The court we're talking about adjourning
16  is the--is the court that's going to address the guardianship
17  proceedings and Ms. Wrigley also has a petition--
18          THE COURT:  Right.
19          MR. DAIN:  --in New York.
20          THE COURT:  Right, but that's a different court.
21          MR. DAIN:  Different court.
22          THE COURT:  Okay.
23          MR. DAIN:  So nothing has happened--if I could also
24  address one additional thing and again we'll address the
25  contempt issue, you know, the after the fact--Mr. Poskus
```

BLACK000597

9

1    holding 115,000--the amount is actually 130,000, so if

2    there's an issue we can address each of those but it's

3    130,000.

4            THE COURT:  All right.  And then am I going to be

5    taking any--is there any issue with Ms. Kerr's fees at this

6    point?

7            MR. DAIN:  Your Honor, again I know you've read the

8    supplemental pleading, but it's amazing to me that Mr. Black

9    is paying his attorneys to challenge Ms. Kerr, but just

10   paying themselves to do that and then challenging whether she

11   should be paid.

12           There is no issue--I'm a trustee of the trust,

13   everything she has done is for Ms. Black's benefit and

14   beyond.  We would not be here today but for her and Ms. Young

15   bringing all that's happened to the attention of the Court.

16           THE COURT:  Right.

17           MR. DAIN:  Everything she's done has made this

18   happen.  So in its entirety those fees should be paid.  I--

19   the objections are--as I said it's taken a microscope to

20   things that are of no relevance of no significance and just

21   picking at them.

22           So I--I ask the Court to overrule the objections,

23   let's get Ms. Kerr paid.  She's been working for months and

24   months diligently with not a dime of payment.  So if we could

25   address that that would be one thing we could get out of the

BLACK000598

10

1    way that I think is just a housekeeping matter.

2           THE COURT:  Right.  Okay.  Mr. Poskus, is there any

3    objection to paying Ms. Kerr?

4           MR. POSKUS:  Well, Your Honor, yes, because part of

5    the problem is that if you look at the statute, the cost and

6    compensation statute, some of the factors on which somebody's

7    compensation is based are dependent on the outcome of the

8    case and how whether or not the Court finds Ms. Kerr's report

9    credible; that kind of thing.  And so of necessity we don't

10   know those factors until the accounting issues are decided.

11          THE COURT:  Okay.  But the bill itself?

12          MR. POSKUS:  The bill itself--I mean--I'm not sure

13   what you mean by that is--are we arguing with the time spent

14   and all that?

15          THE COURT:  Right.  Right.

16          MR. POSKUS:  I think a lot of the time that's been

17   spent has been excessive.  You know, Ms. Kerr appears in this

18   Court--has filed pleadings in this Court like she's a party

19   and then bills for it.  I don't think it's appropriate--

20          THE COURT:  So we're going to have another--

21          MR. POSKUS:  --I've never--

22          THE COURT:  --a hearing or evidence on the

23   necessity and reasonableness of her fees; is that what you're

24   telling me?

25          MR. POSKUS:  At this point, yeah, Your Honor, maybe

BLACK000599

11

1    we can--if we can sit down and talk--I mean I think a lot of
2    these issues can get resolved if everybody just sits down and
3    talk.
4            THE COURT:  Well, why hasn't that happened then?
5            MS. DiPONIO:  Your Honor, that's--
6            MR. POSKUS:  Hold on I'm trying to speak right now.
7    Your Honor, you'll recall we ended the last hearing saying
8    we'll try to work together on all these.  We said we'll sit
9    down with the accountants and I said we'll sit down with Mr.
10   Dain and try to work through a few of the things so that when
11   we come back before you there will be a narrow--at least
12   there will be a narrowing of the issues.
13           And this is what's happened is Ms. Kerr has refused
14   to sit and talk with Ms. Harper, all she does is file her
15   pleadings with the Court, but she won't sit down with Ms.
16   Harper to work through the differences in their reports.
17           With regard to Mr. Dain we've had a series of four
18   conference calls on which Mr. Dain--well, let me phrase this
19   properly, the first two it was Mr. Dain, myself, Ms.
20   Peterson, and Mr. Frigon at which we were going to try to
21   work through some of the things.  You'll remember Mr. Dain
22   complaining repeatedly at the hearing last time, nobody has
23   cut me in on being trustee of the trust; nobody has given me
24   access to the statements.
25           Mr. Dain participated in the first two conference

BLACK000600

12

1  calls; we gave him all the information on how to get himself
2  on the accounts as a co-trustee of the trust.  As of day
3  before yesterday he's taken no action to do that.
4       And then indeed the last two conference calls that
5  we scheduled he just didn't attend.  And that's reflected in
6  Ms. Peterson's report.
7       Another thing that came out of those conference
8  calls is that Mr. Frigon and I agreed there would be a
9  certain amount of information that we could use from New York
10  in order to determine the proper way to manage Joanne's
11  assets.  And so--and Mr. Frigon, who was their expert, and I
12  agreed that would be good information to know.
13       We agreed that Ms. Peterson would contact Mr.
14  Salzman in New York and find out the answers--or at least
15  ask--maybe he says I don't know--he hasn't returned her
16  calls.
17       So--and then we get to this contempt thing, Your
18  Honor, and rather than call us and say, look, we see these
19  checks coming through what's going on, we don't get a call,
20  we just get a contempt citation.
21       THE COURT:  Uh-huh.
22       MR. POSKUS:  So we've reached out in all sorts of
23  ways to try to start working together and we get rebuffed at
24  every turn and then we come in here and they say Bernie Black
25  does all this bad stuff.

BLACK000601

13

```
 1          I've been trying to turn the temperature down and
 2    all I get is this kind of lack of corporation from the other
 3    side.  So that's kind of my problem with this, Your Honor, is
 4    that we've been trying to work for the benefit of Joanne
 5    Black.  There could--you can make an argument about did we do
 6    exactly the right thing, in hindsight maybe we didn't, maybe
 7    we did, but the problem is that we're trying and nobody wants
 8    to work with us on the other side.  Ms. Peterson has but
 9    that's--and Mr. Frigon but that's about it.
10          THE COURT:  Uh-huh.
11          MR. POSKUS:  So that's my problem with all this,
12    Your Honor.  I'm not trying to raise a bunch of fuss but I
13    get a little angry when--when--for instance a pleading gets
14    filed that says I'm thumbing my nose at this Court, which
15    quite frankly I take personal offense at.
16          We're trying to do our best under difficult
17    circumstances and we could use some help from the other side.
18    And I thought when we left this Court the last time we had a
19    commitment from them to do that.
20          THE COURT:  Okay.
21          MR. DAIN:  Your Honor, let me address Mr.--the
22    issue which is--first which is what the Court asked.  To say
23    that--that Ms. Kerr hasn't cooperated I mean is just absurd.
24    What she won't cooperate in is a reinvention of this
25    accounting.
```

BLACK000602

14

1       How is it going to help the Court, as the Court
2  said, it needs the numbers to say we'll do a new accounting
3  assuming everything Mr. Black did was appropriate, we'll give
4  him credit for paying his attorneys and paying his expert who
5  never testified with Ms. Black's money and then we'll tell
6  the Court what the net of that is; that doesn't help the
7  Court.
8       Ms. Kerr did an actual accounting.
9       THE COURT:  Uh-huh.
10      MR. DAIN:  And I think the Court agrees that that's
11 helpful to the Court.  So to say what she did is excessive
12 filing pleadings when Mr. Poskus, again, he filed an
13 objection and then didn't even wait, didn't even wait to ask
14 this Court can he be paid for that; just paid himself.
15      Why should I call him when this Court twice issued
16 freeze orders to tell him not to take money.  What about a
17 freeze order don't they understand.  So that's--that's a
18 complete nonissue, it's another red-herring.
19      If the Court accepts that Ms. Kerr's report was
20 helpful, Ms. Kerr's time is appropriate.  She's documented
21 everything she's done and she should be paid in full.  She's
22 asking for $50,000, by the way as I said in my supplemental
23 pleading, she's not been paid, Ms. Wrigley has not yet been
24 paid, I haven't been paid, Ms. DiPonio hasn't been paid, Ms.
25 Young hasn't been paid.  On our side we're playing fair.

BLACK000603

15

1        On their side despite the freeze orders $130,000 to

2    pay all of these attorneys that Mr. Glatstein himself said

3    are feeding at the trough.  And then to say we don't

4    cooperate.  I have not placed my name on that account or

5    those accounts because Mr. Black is doing what he's doing.  I

6    cannot be a party to an account he's on and--when he's taking

7    that money because I don't want later any accusation that I

8    should have known or I was a party to it.  I will not be on

9    an account he's on an account.

10        So if--if the Court gets to the point where it

11    unwinds this, gets him off these accounts as a trustee I'll

12    get on the account.  But I know what the result of this would

13    have been, Mr. Poskus would have said, well, Mr. Dain is on

14    this account, he knew we were writing checks to ourselves; it

15    was incumbent upon him to--to do something.

16        So, yeah, I know we're not addressing the contempt

17    motion but I don't know if the Court sees it another way, but

18    you said--remember I even asked--would you make them file a

19    bond and you said we don't need a bond, I've frozen the

20    accounts.  And you asked Mr. Black, I've frozen the accounts,

21    you haven't transferred anything and he told you right there

22    on the stand, no, I haven't transferred anything.

23        Mr. Poskus was silent the whole time.  They've not

24    --they weren't the ones that came forward to you and say,

25    Your Honor, we put 115,000 in my account because maybe we

BLACK000604

16

1    were right, maybe we were wrong, they didn't do it.  We had

2    to come forward.  Ms. Kerr had to find out that information.

3    She had to fight with them to get that information.  They

4    kept telling her, no, it cuts off at a certain date.

5         It was her perseverance that even brought that

6    before this Court.  So, you know, this frustrating thing of

7    saying we're not cooperating, I won't cooperate with fraud, I

8    will not do it.

9         I participated in the two--two phone calls--by the

10   way, the last two calls, one I was in Japan, the other I just

11   couldn't make; those weren't--I wasn't personally saying I

12   don't want to participate I just could not make the calls.

13        Mr. Frigon, he is a trust expert, his purpose in--

14   in participating is to decide which trust is best to pay

15   from.  This--this nonsense about New York like we're going to

16   get more involved now and how Mr. Black should manage the

17   assets that's nonsense; I hired Mr. Frigon.  I paid for him

18   out of my own pocket.  He's here to help the Court in

19   assessing which trust should make payments.  And he said the

20   Supplemental Needs Trust should make the payments.

21        Pay Ms. Kerr.  It's not fair.  I know the Court can

22   say I think her time is fair, I think her work is fair and--

23   and pay her.  We'll address everybody else that hasn't been

24   paid--

25        THE COURT:  Right.

BLACK000605

17

```
1        MR. DAIN:  --because we'll do it correctly, we'll
2   file with the Court.
3        THE COURT:  Okay.  All right.  I still think at
4   this point then what we need to do is get through the core
5   evidence which is the disclaimer.  I mean that's what we're
6   here about.  So I want to get through all of that and then
7   these other scrimmages we'll take up.
8        All right.  Did you need to make an opening remark,
9   Ms. DiPonio, or--
10       MS. DiPONIO:  No, Your Honor, that's fine.
11       THE COURT:  Okay.  All right.  So the last notes I
12  have when we broke the last time I think Ms. Young had
13  testified.
14       MR. POSKUS:  Yes, Your Honor, where we left off
15  actually Mr. Black was on the witness stand.
16       THE COURT:  Right.  Mr. Black was on the witness
17  stand.  Okay.
18       MR. POSKUS:  And, Your Honor, may I move the podium
19  again?
20       THE COURT:  Sure.
21       MR. POSKUS:  I don't know, doesn't anybody else
22  complain that you can't see the witness stand from here?
23       THE COURT:  No.  Not usually.
24       MR. POSKUS:  Sorry.
25       THE COURT:  So you're still under oath, sir.
```

BLACK000606

18

```
 1            MR. BLACK:  I understand.
 2            (Whereupon, Mr. Black was previously sworn.)
 3            THE COURT:  And he was talking about Ms. Joanne
 4    Black going from hotel to hotel, making withdrawals on a
 5    debit card was the last note I have.
 6            MR. POSKUS:  Right.  And actually, Your Honor, at
 7    least my notes say that where we left off is we were talking
 8    about Mr. Black's contacts with Cherie Wrigley and we might
 9    have been talking about Joanne Black's behavior at--
10            THE COURT:  Right.
11            MR. POSKUS:  --that time.
12            THE COURT:  Right.
13                        BERNARD BLACK,
14    called as a witness herein, having been previously sworn, was
15    examined and testified as follows:
16                    DIRECT EXAMINATION
17    BY MR. POSKUS:
18        Q    And so, Mr. Black, let's--where we left off is we
19    had just discussed--and you can correct me if I'm wrong--I
20    believe we were discussing your collaboration with Ms.
21    Wrigley to get Ms. Black to sign the disclaimer; is that your
22    recollection?
23        A    So I think we were in the middle of discussing our
24    collective response to learning in July of 2012 that there
25    was a POD designation that was--at Vanguard basically 95
```

19

1   percent to Joanne Black, which would have left Joanne with--
2   directly receiving $3 million which everybody thought made no
3   sense, must be a mistake, and what do we do about that.
4            And then I started describing my joint effort in
5   collaboration with Ms. Wrigley to talk to everybody involved
6   and figure out what--what the possible responses were to that
7   unexpected information.
8       Q    And we don't need to revisit all your testimony
9   about your conversations with Ms. Wrigley, but let me ask you
10  this, over what period of time were you and Ms. Wrigley
11  working together to try to address the issue of the POD
12  designations and the possibility of a disclaimer?
13      A    I'd say starting from shortly after July 11th of
14  2012, really through the completion of the court hearing in
15  Colorado in December of 2012.
16      Q    And over that period of time in your conversations
17  with Ms. Wrigley how often was the fact that a disclaimer
18  would result in a two-thirds/one-third split discussed?
19      A    I would say multiple times.  You know, again, we're
20  talking about a dozen maybe over that period, two dozen
21  conversations, so certainly multiple times, but exact count I
22  don't have.
23      Q    And Ms. Wrigley volunteered to help you get Joanne
24  to sign the disclaimer?
25      A    Yes.  So I want to call it Ms. Wrigley's idea that

BLACK000608

20

1    maybe she could go to Colorado and get Joanne simply to sign

2    the disclaimer herself. I always thought that was unlikely

3    and I also had real doubts about whether it would do any good

4    given that we knew that Joanne was crazy but Cherie wanted to

5    try.

6            And so part of our effort was we need to track down

7    Joanne anyway, she was moving from motel to motel, we have to

8    serve process on her; we have to do it for probate, we have

9    to do it for the conservatorship, and so we had a discussion

10   with Cherie about maybe Cherie would go to Colorado and track

11   down Joanne and serve the papers on her and at the same time

12   try to persuade Joanne to voluntarily sign the disclaimer of

13   her POD benefits so they would go back into the estate and go

14   out two-thirds/one-third.

15       Q    Let me ask you a question, what was your

16   understanding of what would happen with the Vanguard accounts

17   if Joanne exercised a disclaimer--or actually let me preface

18   it with this--we discussed this when we were in court

19   previously but I just want to get it on the record again to

20   give us context.

21           The payable on death designation for the Vanguard

22   accounts was--wasn't it 95 percent to Joanne and 1 percent to

23   each of your five older children?

24       A    That's what Vanguard told me, yes.

25       Q    Okay. Now, given that what was your understanding

BLACK000609

21

1    of what would happen if Joanne exercised the disclaimer

2    exclusively and none of the kids did?

3        A    So in July I had no understanding, I imagine that

4    if there was a disclaimer by Joanne the 95 percent would go

5    back into the estate.  Vanguard--Vanguard had a beneficiary

6    expert named William Coykendall, C-O-Y-K-E-N-D-A-L-L, and so

7    I was communicating with him regularly.  And he advised me in

8    early September--

9            MR. DAIN:  Objection, Your Honor, hearsay.

10           MR. POSKUS:  Your Honor, the question was what was

11   his understanding; we're not offering it to show that that's

12   what Vanguard's position was, it's to offer to show what his

13   understanding was and what the basis of his understanding

14   was.

15           THE COURT:  Overruled.

16           THE WITNESS:  I was advised by Mr. Coykendall in

17   early September that no, if Joanne disclaimed the 1 percent

18   that went to each of five kids would blow up to 20 percent

19   each and swallow the whole Vanguard and so that created a new

20   problem for us.

21       Q    (by Mr. Poskus)  And the problem was?

22       A    I thought that the disclaim--the POD was a mistake

23   and I thought it was appropriate to try to get the POD assets

24   back into the estate.  And my kids thought it was a mistake

25   and they were planning to litigate to try to achieve that

22

1   result, but I never thought or intended that all of the
2   Vanguard money would go to my kids.
3           So I could not carry out a disclaimer that would
4   result in all of the Vanguard money going to my kids.  The--
5   my--my understanding was 5 percent should go to my kids
6   directly and the rest should to the estate.
7           MR. POSKUS:  Your Honor, if you can hold on a
8   second.
9           THE COURT:  All right.  I don't really understand
10  what you just said about the Vanguard guy.
11          THE WITNESS:  Okay.  Let me try again.  So what
12  Vanguard said or Coykendall said was if the 95 percent gets
13  disclaimed, it doesn't go back into the estate, instead each
14  of the 1 percents are now--
15          THE COURT:  Oh, sure, in yours--to the other
16  beneficiaries of the account.
17          THE WITNESS:  Yeah, so they would each get 20
18  percent and nothing would go back to the estate and that just
19  --that couldn't happen.
20          MR. POSKUS:  Did that clarify it--
21          THE COURT:  Yeah.
22          MR. POSKUS:  --Your Honor?  And, Your Honor, if I
23  may approach the witness I have an exhibit notebook to give
24  him.  And I--I see that you have yours.
25          THE COURT:  Yes, I managed to hang on to it.

BLACK000611

23

1          MR. POSKUS:  I'm grateful for not having to

2     reproduce.

3          Q    (by Mr. Poskus)  Sir, and I'll ask you to turn in

4     your exhibit notebook to Exhibit 78 if you could.

5          A    All the way back to Exhibit 78.  Yes, I have it.

6          Q    And I'll ask you, sir, can you identify this

7     document?

8          A    Yeah, this is a message that Mr. Coykendall sent to

9     me on December 17th, 2012.

10         Q    This is an e-mail message?

11         A    Yes, it was--it's an e-mail message; it was sent

12    through Vanguard's internal system.  I get an e-mail to my

13    regular e-mail account saying log into Vanguard and you'll

14    see an e-mail.

15         Q    So that's why it doesn't have the typical header

16    for an e-mail?

17         A    That's right, I copied and pasted this--pasted this

18    out of the Vanguard internal e-mail system.

19         Q    And this is a true and correct copy of what Mr.

20    Coykendall sent you?

21         A    Yes, it is.

22         Q    And did you receive it on or about December 17th,

23    2012?

24         A    Yes, I did.

25         MR. POSKUS:  Your Honor, I move to admit Exhibit

BLACK000612

24

1   78.

2         MR. DAIN:  Your Honor, and same objection.  He can

3   testify what his state of mind was, but he can't get in the

4   backdoor hearsay.  So this isn't admissible as an e-mail.  He

5   can state the effect it had on him but the document

6   themselves don't come into evidence.

7         MR. POSKUS:  Your Honor, he's testifying he

8   received it.

9         MR. DAIN:  That's authentication, Your Honor,

10  that's not hearsay.

11        MR. POSKUS:  And it's offered for the same purpose

12  as his prior testimony.  In essence, Your Honor, in the third

13  paragraph the second sentence says, If an alternative

14  beneficiary had not been named by the deceased donor the

15  assets will be divided proportionately among any remaining

16  primary beneficiaries.

17        THE COURT:  I'll admit it.

18        MR. POSKUS:  Thank you, Your Honor.

19        (Petitioner's Exhibit 78 was received in evidence.)

20   Q    (by Mr. Poskus)  Now, did Joanne assist you in--so

21  you had to get disclaimers from the kids or you couldn't do

22  the disclaimer for Joanne, am I correct?

23   A    That's correct.  So once I got this information

24  from Vanguard in September the only solution that we had at

25  the time was to get my children, my five older children, to

25

1   disclaim their 1 percent so that everything would go back

2   into the estate and go out two-thirds/one-third.

3        Q    And did Ms. Wrigley assist you in getting

4   disclaimers from your children?

5        A    Yes, she did.

6        Q    With which children did she assist you in that

7   process?

8        A    So principally with Sara and Rebecca.  I want to

9   say we divided up the work and, you know, I talked to the

10  boys and she talked to the girls.  And we talked to each of

11  them about--okay, we told you in July hold off on litigation,

12  don't sue yet, we'll try to go for guardianship.  Now, we

13  have to come back to them and say and we want you to give up

14  the 1 percent you thought you were going to get directly but

15  I didn't see any other alternative.

16            And I still thought that this was better than

17  litigation, better for Joanne, better for everybody.  So

18  Cherie and I decided we're going to go try to get our kids--

19  my kids to disclaim the 1 percents down to zero and then they

20  wouldn't blow up to 20 percent.

21       Q    And--and let me ask you this, other than the fact

22  that you talked to the boys and she talked to the girls, why

23  did--why did Cherie agree to do--talk to the girls?  What

24  was--why did you make that division of labor?

25       A    Partly it made sense--partly for Rebecca in

BLACK000614

26

1   particular.  Rebecca was just starting Community College, at
2   Santa Barbara Community College in Santa Barbara.  She lived
3   fairly close to Cherie Wrigley who is in Thousand Oaks,
4   California, slightly to the south of Santa Barbara and was in
5   regular contact with--with Cherie Wrigley.

6          And also increasingly as the fall went on--how do I
7   want to put it--Rebecca had just left home; she was not the
8   best of students; she was not the most diligent of students;
9   she was failing all of her classes and blaming it on her
10   father.  And so I was at that time not on the best of terms
11   with--with Rebecca.  Things have improved a lot since, she's
12   21 and not 18; she has a real job, all that good stuff.  But
13   at the time it was--you know, Rebecca was really, really
14   angry at me and I really needed Cherie to be the intermediary
15   and go to Rebecca and say, you know, your father and I want
16   you to disclaim your 1 percent, you know, the $30,000 that
17   you could get directly we want you to give it up and trust
18   that you'll get one-third of the Issue Trust down the road in
19   trust.

20          And so that was a difficult conversation,
21   especially difficult for me and I really needed Cherie's help
22   with persuading Rebecca that she should disclaim her 1
23   percent down to zero so that the whole package could--could
24   go forward.

25     Q   So let me ask you this, were you guys successful?

BLACK000615

27

```
 1     A     Yes, we were.

 2     Q     And so the children all exercised disclaimers?

 3     A     The children all exercised disclaimers, yes.

 4     Q     Let's turn in your exhibit notebook to Exhibit 44.

 5     A     44, okay, got it.

 6     Q     And, sir, I'll ask you if you can take a look at

 7  Exhibit 44 and ask you can you identify that document?

 8     A     Yes.  This is the disclaimer form or I should say

 9  forms that my daughter Sara signed.

10     Q     And are you familiar with your daughter's

11  signature?

12     A     Yes, I am.

13     Q     You've had an opportunity to see her signature in

14  the past?

15     A     Yes.

16     Q     And on page 2 where it says disclaimant's

17  signature, is that your daughter's signature?

18     A     Yes, that's my daughter's signature and her

19  signature is also going to appear another two pages down and

20  another page after that.  And there might be more after that

21  I'm not sure, there were a series of--oh, then--then there's

22  my signature acknowledging receipt and then there's a blank

23  page and then an appendix, it looks like she signed in three

24  places.

25     Q     And is this a true and correct copy of the
```

BLACK000616

28

```
 1   disclaimer that you received from your daughter?
 2        A    Yes.
 3             MR. POSKUS:  And, Your Honor, I move to admit
 4   Exhibit 44.
 5             MR. DAIN:  No objection, Your Honor.
 6             THE COURT:  It's admitted.
 7             MR. POSKUS:  Thank you, Your Honor.
 8             (Petitioner's Exhibit 44 was received in evidence.)
 9        Q    (by Mr. Poskus)  And let me ask you something on
10   the very last page of Exhibit 44 indicates that Schiff Hardin
11   prepared a notice of disclaimer and renunciation, did--did
12   Schiff Hardin prepare these documents for Sara's signature?
13        A    So the form language that Vanguard wanted came from
14   Vanguard.  And I also confirmed that the language was
15   acceptable to Fidelity and I believe the rest of the document
16   was prepared by Schiff Hardin at my request.
17        Q    Let's take a look at Exhibit 45.  And I'll ask you,
18   can you identify this document?
19        A    Yes, this is the disclaimer that was signed by--it
20   says Rebecca Black (also known as Becca Black) that was
21   because my mother had listed Rebecca as Becca in her
22   designation of beneficiaries of Vanguard.
23        Q    And you're familiar with your daughter's signature?
24        A    Yes, I am.
25        Q    And if you could look through the document on page
```

BLACK000617

29

```
 1    2 and on page 4 and on page 5, is that your daughter's
 2    signature?
 3        A    Yes, it is.
 4        Q    And of course that's your signature on page 6,
 5    isn't it?
 6        A    Page 6, yes, is it.
 7        Q    Is this a true and correct copy of the disclaimer
 8    exercised by your daughter Rebecca?
 9        A    Yes, it is.
10        Q    All right.  Thank you.
11             MR. POSKUS:  Move to admit Exhibit 45, Your Honor.
12             MR. DAIN:  No objection.
13             THE COURT:  45 is admitted.
14             (Petitioner's Exhibit 45 was received in evidence.)
15             THE COURT:  I assume you have the rest of them?
16             MR. POSKUS:  Yes, Your Honor.  I could--
17             THE COURT:  I mean how much time do we need to take
18    up with this?
19             MR. POSKUS:  Well, Your Honor, I'm willing to just
20    --if counsel will stipulate to the admission of Exhibits 46,
21    47, and 48, 48 is a little bit different in format but
22    otherwise the testimony would be the same on all three of
23    those.  If counsel stipulate to the admission of those
24    documents I'd just move to admit them now.
25             MR. DAIN:  Yes, just so I understand these are all
```

30

```
 1   disclaimers signed by the children?
 2              MR. POSKUS:  Yes.
 3              MR. DAIN:  Yeah, no objection, Your Honor.
 4              THE COURT:  So, 45, 46, 47, and 48--
 5              MR. POSKUS:  Thank you, Your Honor.
 6              THE COURT:  --we'll admit those.
 7              (Petitioner's Exhibits 45, 46, 47, and 48 were
 8   received in evidence.)
 9       Q    (by Mr. Poskus)  And just so the record is clear,
10   Mr. Black, is there a difference between your son David's
11   disclaimer and your son Benjamin's disclaimer which are at 48
12   and 46 respectively and the other three?
13       A    Yes, there is.
14       Q    And what's the difference?
15       A    So the difference is that in September we thought
16   that my children needed to disclaim entirely so that the bulk
17   of the money would go back into the estate.  And then in
18   December I learned from Mr. Coykendall that there was another
19   possibility which is that they could waive back down to 1
20   percent.
21              So if Joanne waives the 1 percent goes up to 20
22   percent, they could waive back down to 1 percent rather than
23   to zero.  And so I offered my five children the alternative
24   of either you can waive down to 1 percent and take your 1
25   percent or you can waive down to zero and then I will invest
```

BLACK000619

31

1  that money for you through the Issue Trust.

2      Q    And--so what did Benjamin and David do that was

3  different from the other three children?

4      A    So these were the two oldest children and they

5  decided to take their 1 percent.  And so they later received

6  their 1 percent directly from Vanguard.  And the younger

7  children, Sam, Sara, and Rebecca disclaimed fully.

8      Q    Let me ask you to turn to Exhibit 43.

9      A    Okay.

10     Q    And can you identify this document?

11     A    Yes, this is the disclaimer that I executed on

12  behalf of Joanne as her conservator for the--for the Vanguard

13  and Fidelity assets.

14     Q    And is that your signature on page 2?

15     A    Yes.

16     Q    And 3?

17     A    Yes, it is, I signed it as Bernard Black,

18  Conservator.

19     Q    And indeed also on page 4, I'm sorry?

20     A    Page 2, page 3, page 4, and then probably I got--I

21  guess that's it.  No, we keep going, there's still more--

22  yeah, there's still--there's still more, like four more pages

23  further down, so all of those are my signature.

24     Q    And is this the disclaimer you signed on behalf of

25  Joanne?

32

1      A     Yes, it is.

2      Q     And is it a true and correct copy?

3      A     Yes, it is.

4            MR. POSKUS:  Your Honor, I move to admit Exhibit

5     43.

6            MR. DAIN:  No objection.

7            THE COURT:  Admitted.

8            (Petitioner's Exhibit 43 was received in evidence.)

9      Q     (by Mr. Poskus)  Now, you said you had a number of

10    conversations with Cherie Wrigley about this process and I

11    know last time we did have some testimony and exchange

12    between you and Mr. Dain about a conversation you had with

13    Mr. Dain about this disclaimer issue, did you--

14     A     I remember that testimony.

15     Q     Yeah.  And did you have a direct conversation with

16    Mr. Dain about the idea of exercising a disclaimer on behalf

17    of Joanne Black?

18     A     Yes, I did.

19     Q     When did that conversation occur?

20     A     That would have occurred in July of 2012 shortly

21    after we got the information from Vanguard about the 95

22    percent POD going to Joanne.

23     Q     And was this on the phone or in person with Mr.--

24     A     This was--this was on the phone.

25     Q     All right.  And so tell us about the discussion?

33

```
 1      A    So after I got the letter from Vanguard there was
 2   a--I'll call it a flurry of activity involving me, Cherie
 3   Wrigley, my wife, my children, this is crazy, it makes no
 4   sense, what do we do.  And out of that came the idea that one
 5   thing we could do--you know, if we did nothing then there
 6   would be litigation challenging the disclaimer.
 7           One thing--
 8           THE COURT:  I'm sorry who would be litigating it?
 9           THE WITNESS:  My children and my wife on behalf of
10   my--of her children.
11           THE COURT:  Your wife on behalf of her children?
12           THE WITNESS:  Right.  Because they are
13   beneficiaries of the Issue Trust and there would be no money
14   or very little money for the Issue Trust.
15      Q    (by Mr. Poskus)  I think for clarification, Mr.
16   Black, you ought to say they're children as well.
17      A    Yeah, I'm sorry, my--my children with my second
18   wife, I'm sorry.
19      Q    I could tell that's why the Court was reacting the
20   way it was.
21           THE COURT:  Okay.
22           THE WITNESS:  My children, yes.
23           THE COURT:  All right.  So you had this big family
24   discussion--
25           THE WITNESS:  Yes.
```

34

1          THE COURT:  --and you are testifying that you
2    included Mr. Dain and Ms. Wrigley?
3          THE WITNESS:  I'd say that Ms. Wrigley was part of
4    formulating the disclaimer plan as an alternative to
5    litigation--
6          THE COURT:  Okay.
7          THE WITNESS:  Yes.
8          THE COURT:  But what I'm not grasping is why didn't
9    you just talk about the real issue which was the change in
10   the estate plan and the reasons for that and go right to the
11   heart of it and just try to fix it there?  Why all this other
12   machinations and running around?
13         THE WITNESS:  So I just thought this was a mistake.
14         THE COURT:  Right.  So you've testified to that.
15         THE WITNESS:  Right.
16         THE COURT:  So that's why I'm really wondering why
17   instead of just going back to the probate court and putting
18   forth an agreement to put it the way it was supposed to be in
19   your mind, why didn't you just do that?
20         THE WITNESS:  So I actually asked--can--can I talk
21   about conversations with probate counsel?
22         MR. POSKUS:  Well, we've already--I'm sorry--we've
23   --we've already waived with regard to Mr. Glatstein.
24         THE WITNESS:  Yeah.  So--so let me--let me do
25   this--I--I had--

35

```
 1          MR. POSKUS:  Hold on, I want you to answer the
 2   Judge's question.
 3          THE WITNESS:  --I did ask probate counsel--
 4          MR. POSKUS:  Go ahead.
 5          THE WITNESS:  --Mr. Lee Hoffman in New York, what
 6   we could do.  And then I--you know, maybe I should answer
 7   about, you know, then what the information I got was.
 8          MR. POSKUS:  Go ahead and tell Judge what
 9   information--
10          THE WITNESS:  Right.
11          MR. POSKUS:  --you got from Mr. Hoffman.
12          THE WITNESS:  So he said there's nothing you can do
13   about this in probate court; that the New York probate court
14   had no jurisdiction because the assets were outside, outside
15   the estate, they were in Vanguard.  And if the--if they went
16   out of Vanguard directly to Joanne they'd never come into the
17   estate.
18          So he said look there's really nothing you can do
19   in the estate process, you have to go directly after the
20   designation.  I don't think we figured out whether we would
21   challenge that in New York or in Pennsylvania because
22   Vanguard is in Pennsylvania, but it would be a separate
23   proceeding.  In New York it would be outside the Surrogate's
24   Court, they have a special probate Surrogate's Court similar
25   to your court and he said this is just outside the
```

BLACK000624

36

1    Surrogate's Court.

2            THE COURT:  And they don't take stipulations in New

3    York?

4            THE WITNESS:  You know, you're now asking me a

5    question that I just don't know.  He just said this isn't the

6    way to do it.

7            THE COURT:  Okay.  All right.

8            THE WITNESS:  So I--I did ask the question--that's

9    why--I had the same response as, okay, let's go to the

10   probate court and he said you can't do that.

11       Q    (by Mr. Poskus)  So did he offer any other remedies

12   to you other than doing what you did?

13       A    Really not.  He said this is not probate court

14   jurisdiction.  The assets are not in the probate estate--that

15   was the term that he used--and you can go challenge the POD

16   directly either in New York or in Pennsylvania but that's

17   what you need to do.

18       Q    Well--

19           THE COURT:  And they wouldn't take an agreement

20   about the POD challenge is what he told you?

21           THE WITNESS:  So I didn't ask about an agreement

22   because Joanne was--it was in Colorado, right, so, sure it

23   would be great if we could get everybody to agree including

24   Joanne but I don't know that I was thinking about that at the

25   time.

37

1          THE COURT:  All right.

2      Q    (by Mr. Poskus)  Who--who first came up with the

3  idea of the disclaimer?

4      A    You know I don't know, it might have been me, it

5  might have been Cherie Wrigley, it might have been the two of

6  us together; we were talking about what to do.  So I really

7  view the disclaimer and coming to Colorado and seeking the

8  conservatorship as a joint plan that Cherie and I came up

9  together.

10      Q    I mean did you know about the possibility of

11  disclaimers prior to this whole situation arising based on

12  your own legal knowledge?

13      A    No, I didn't.

14      Q    So that's what I'm saying is who planted that idea,

15  do you remember?

16      A    I don't know, I could speculate that it would have

17  been--

18      Q    Speculation is not--

19      A    --Mr. Hoffman.

20      Q    --a good idea.

21      A    Yeah, but I don't know.

22      Q    Okay.  If you don't know you don't know.  But--all

23  right.  So you--Joanne--you--it's your testimony Joanne was

24  in agreement with the idea--

25      A    No, Cherie was in agreement.

38

1      Q     I'm sorry Cherie.  I keep doing that, I apologize.
2   That Cherie was in agreement and so you talked to Mr. Dain
3   about the disclaimer?
4      A     Yes, I did.
5      Q     And tell us about that conversation with Mr. Dain.
6      A     So I called Mr. Dain--this would have been, you
7   know, in mid-July period--and said, look, we've got a problem
8   with the POD designations and, you know, I've talked to
9   Cherie and I've talked to--to Kate, my wife, and I've talked
10  to my kids and, you know, maybe I said I talked to probate
11  counsel, I don't recall, and we're trying to figure out what
12  to do.  And here's an idea, and the idea was that we would go
13  to Colorado and try to get guardianship powers as I thought
14  about it--okay, Colorado uses the name conservatorship--we
15  would try to get guardianship over Joanne and we would use
16  that first to get worker's comp benefits for Joanne and then
17  also to disclaim the POD back into the estate so it would go
18  out two-thirds to Joanne's Supplemental Needs Trust and
19  one-third to the--to the Issue Trust for my kids.
20     Q     But let's focus specifically on your conversation
21  with Mr. Dain, this one that occurred in the latter part of
22  July 2012.  Did you--what you just said did you discuss all
23  of that with him?
24     A     Yes, that was part of the conversation.  This was
25  my explaining to him the background from a bunch of other

39

1     conversations with Cherie Wrigley, with--with my wife, with

2     my children, with probate counsel, and this was a proposal

3     out of that and I was bringing Anthony Dain into the loop and

4     saying here's what we think we should do.

5         Q    And so what was Mr. Dain's response when you

6     proposed all this to him?

7         A    So his response was--you know, he agreed with

8     everybody else's view that it made no sense to send $3

9     million directly to Joanne. And he supported the idea of

10    going to Colorado and seeking a disclaimer. He thought that

11    was a better solution than litigation against the disclaimer.

12    And then we talked about how to proceed in Colorado.

13        Q    So let me ask you this, when you came to this court

14    with regard to getting the disclaimer--and by the way let me

15    ask something else about the conversation with Mr. Dain

16    specifically, was the two-thirds/one-third division that

17    existed in your mother's will specifically discussed with Mr.

18    Dain at that time?

19        A    Yes, it was.

20        Q    And did he say no that's wrong that one-third

21    shouldn't go to you and your issue?

22        A    No, quite the contrary, he thought that was the

23    right answer and that's what should happen, that's what my

24    mother always wanted to happen; that's what her estate--her

25    will provided, this is what everybody had expected, you know,

BLACK000628

40

1   back since she wrote her will in 1997.  No, he was in full

2   agreement that this is the right thing to do.  And he also

3   agreed that this was a good solution for Joanne.

4        Q    And so at the time you obtained the order, the

5   March 5th, 2013 order of this Court, in your mind did you

6   think you had agreement from Mr. Dain?

7        A    Absolutely.

8        Q    Did you--in your mind did you think you had

9   agreement from Ms. Wrigley?

10       A    Absolutely.

11       Q    And so--and we had Mr. Glatstein's testimony from

12  previously when he said he spoke to Ms. DiPonio and ran it

13  past her did you think you had her agreement?

14       A    I believe that we had the agreement of Ms. DiPonio

15  and I believe that we had the agreement of Ms. Young.  And I

16  believe that--look I thought we had full understanding from

17  everybody of what we were planning to do and what the

18  consequences were.

19       Q    Now, in your conversation with Mr. Dain that day

20  was there a discussion about him becoming the guardian for

21  Joanne?

22       A    Yes.  I asked him--I asked Mr. Dain if he would be

23  Joanne's guardian in Colorado because I thought he was the

24  logical person to be the guardian.  If you remember at the

25  time I thought he was the trustee of the Supplemental Needs

BLACK000629

41

```
 1   Trust.  I later learned that I was a co-trustee, a successor
 2   to my mother, so I thought he's the trustee, he's going to be
 3   handling the money, he is the logical person to be the
 4   guardian and so I tried to persuade him that he should be the
 5   guardian rather than me; that he should be the one filing the
 6   petition in--in Colorado to become Joanne's guardian.
 7        Q    What was his response?
 8        A    You know, he was--I want to call it hesitant,
 9   reluctant, wasn't sure he wanted to do the work, and I was an
10   optimist, I thought I'd be able to persuade him.  He agreed
11   that he would consider it and get back to me.
12        Q    Did he get back to you?
13        A    He did not.
14        Q    When you had the discussion with Mr. Dain was your
15   mother's will specifically discussed with him?
16        A    Yes.
17        Q    And did he agree with your interpretation of the
18   will?
19        A    I don't think anybody had any doubt about the
20   interpretation of the will.  It was--
21        Q    Well, specifically him.
22        A    No, Mr. Dain understands how my mother's will
23   works, there's no question about that.
24        Q    And when you say understands how your mother's will
25   works you're referring to the two-thirds/one-third
```

BLACK000630

42

1   distribution?

2        A    Yes, to the two-thirds/one-third distribution.

3        Q    Now, who are the trustees of this Issue Trust for

4   your children?

5        A    The trustees are me and Anthony Dain.

6        Q    And how do you know that?

7        A    I know it; I'm sure it says so in the trust if I

8   went back to look at it.

9        Q    Did he sign the trust?

10       A    Yes.

11       Q    So you said Mr. Dain never called you back and said

12  I'll be the guardian or--indeed--did he ever say I won't be

13  the guardian?

14       A    No, he didn't call me back at all and so I would

15  have called him again; I waited a couple of weeks; I called

16  him back again probably in early August and left a voicemail

17  and said, you know, we need to resolve this either you need

18  to be the guardian or I need to be the guardian can you give

19  me an answer.  And he didn't respond to--to that voicemail.

20       Q    Did you do anything else to try to get him to

21  respond?

22       A    Yes.  So in early September--by this time I had

23  found Colorado counsel; we were ready to proceed.  We had to

24  decide who was going to be the guardian.  And so I spoke to

25  Cherie Wrigley about what do we do, I can't get Tony to give

BLACK000631

43

1   me an answer.  And I might have called him a third time, I

2   don't recall specifically but I know that I asked Cherie to

3   call Tony because Cherie is his sister and maybe he'll answer

4   her phone calls.  And Cherie proceeded to call Tony and

5   eventually gave me Tony's response.

6       Q   Did you get a response?

7       A   So Cherie told me that Tony did not want to be the

8   guardian, he was willing to be trustee but he didn't want to

9   be guardian.

10       Q   Now, since our last hearing did you supply Mr. Dain

11   with the information necessary for him to be a

12   co-accountholder on the trust?

13       A   Yes, I did.

14       Q   And has he become a co-trustee?

15       A   No, he was already a co-trustee.

16       Q   Forgive me has he gotten on--has he gotten signed

17   on as a signor on the accounts as co-accountholder?

18       A   To my best knowledge confirmed as of yesterday he

19   has not.

20       Q   You mean day before?

21       A   Yesterday.

22       Q   All right.  Have you ever served as an executor or

23   personal representative before you were appointed in the New

24   York court for your mother?

25       A   No.

BLACK000632

44

1    Q   Have you ever served as a trustee before in--before

2  you began serving as a trustee for the trust--Issue Trust,

3  the SNT, and the 2013 Joanne Black Trust?

4    A   No.

5    Q   You ever served as a guardian or conservator

6  before?

7    A   No.

8    Q   Now, let me ask you this, you--you mentioned it

9  briefly earlier in your testimony that one of the reasons why

10  you felt it important to get--get somebody appointed

11  conservator for Joanne was this worker's compensation issue,

12  am I right?

13    A   Yes.

14    Q   Tell us what--what was the worker's compensation

15  issue?

16    A   So the worker's compensation issue--let me go back

17  a little bit, my father died at work in 1986.  We were able

18  to get survivor--survivor--surviving spouse benefits for my

19  mother for his death at work.  And so she was receiving

20  worker's compensation benefits basically for her lifetime.

21       And then there was a possibility that if we could

22  show that Joanne was disabled at the time of his death in

23  1986, was disabled at the time of my mother's death in 2012

24  and was continuously disabled between 1986 and 2012 that

25  under the Colorado Worker's Comp Rules she would then get

BLACK000633

45

1    benefits after my mother's death as a surviving disabled
2    child.
3            So my mother and I had done really 25 years of
4    follow-up to try to make sure we had all the facts lined up
5    so that we could show that Joanne was disabled in 1986, was
6    continuously disabled ever since.  It was a 25 year stack of
7    medical records that my mother and I provided--mostly my
8    mother--to worker's comp counsel in Wofsey Rosen, so that we
9    would be ready to try to transfer benefits from my mother to
10   my sister when my mother died.
11       Q    Why did need to be conservator after your mother
12   died to try to make that happen?
13       A    So after my mother died I got in touch with
14   worker's comp counsel, this was--the lawyer was Judith
15   Rosenberg at the law firm of Wofsey Rosen, W-O-F-S-E-Y,
16   Rosen, R-O-S-E-N, and they were in Stamford, Connecticut,
17   because my father was working in Connecticut.  And said,
18   okay, my mother died, what do we do to try to transfer
19   benefits to--to my sister.  And so we were starting down the
20   process of talking to the worker's comp insurance company and
21   providing them with the information that we had about her
22   disability and she was on SSDI, Social Security agreed that
23   she was disabled and, you know, here's the list of her, you
24   know, many hospitalizations and here's her doctors' letters
25   and all that stuff.

BLACK000634

46

1       And at some point Judy Rosenberg said this is all
2  well and good but Joanne is the client not you.  And so Ms.
3  Rosenberg said I need to get in touch with Joanne and so I
4  gave Ms. Rosenberg Joanne's cell phone number and, you know,
5  Ms. Rosenberg left I guess a series of messages as I
6  understand it.
7       And at some point Joanne got the messages and
8  started calling Judy Rosenberg back, you know, often in the
9  middle of the night, repeatedly leaving message after message
10 after message, you don't represent me, you don't want--I
11 don't want you to represent me.  I'm a billionaire, my
12 husband is a billionaire, he's the richest lawyer in the
13 world; if you represent me I will sue you; I don't want
14 worker's compensation benefits, I'm going to sue you.  And so
15 now we had a real problem.
16     Q    Who did she think her husband was?
17     A    She thought her husband was Bruce Cutler, he's
18 actually a real person; he's a mob lawyer; he represented
19 John Gotti who was a major mobster in New York.
20     Q    You might want to say he's a mob lawyer to the best
21 of your knowledge.  Anyway go ahead.
22     A    I would describe him colloquially as a mob lawyer
23 and it is uncontested that he represented John Gotti, Jr., in
24 John Gotti's criminal trial for murder in New York.
25     Q    But at least he--at least to your knowledge he's a

47

1   wealthy man?

2        A    I have no idea whether he's a wealthy man.

3        Q    But this is--

4        A    But he's certainly a publicly known person.

5        Q    --but this is who Joanne thinks she's married to?

6        A    Yes.  Or at least at the time she thought she was

7   married to.

8        Q    And she doesn't think--didn't think she needed the

9   worker's comp benefit?

10       A    She didn't think she needed it.  Applying for

11  worker's comp benefits was a slander on her good name and her

12  good looks.  It was--you know, no, she wanted no part of

13  worker's compensation.

14       Q    So once you got appointed conservator what did you

15  do to facilitate the worker's comp benefits?

16       A    So let me--let me step back a little, so Judy

17  Rosenberg who at this point was in her early 70s, so she was

18  partly retired, went to the managing partner or partners of

19  her firm and they said, you know, we want out of this case

20  colloquially, right.  They didn't want any part of taking the

21  risk that Joanne would sue them and they told Judy Rosenberg

22  that she should just stop and drop the case.

23            And I was able to persuade Judy Rosenberg, hang on,

24  just do nothing for a while, I will try to become a

25  conservator in Colorado and if I can become a conservator

BLACK000636

48

1    then I can act on behalf of Joanne and then we can pick up

2    the worker's comp case and hopefully get the worker's

3    compensation benefits.

4        Q    And were you able to get the worker's compensation

5    benefits?

6        A    Yes, we were able to get the worker's compensation

7    benefits for Joanne.

8        Q    And there--and Joanne--well let me say this, in

9    your capacity as conservator you're receiving them now?

10       A    I am receiving weekly checks for $1,000 and change

11   from the Traveler's Insurance Company for Joanne and we

12   received a retroactive payment back to the date of my

13   mother's death.

14       Q    How much was the retroactive payment?

15       A    It came in some time in 2013 so it would have been

16   $1,000 a week times about a year, so it would have been a

17   total of about 50 or $60,000.

18       Q    Now, you're getting checks today but the Court has

19   suspended your authority, what are you doing with the checks

20   that you get today?

21       A    So I discussed what to do with Ms. Peterson and I

22   think there was testimony about this at the last hearing that

23   we decided the simplest thing to do was not to try to

24   transfer conservatorship from me to Ms. Peterson and then to

25   somebody else in New York and instead I would continue to

BLACK000637

49

1  sign the checks, Bernard Black, Conservator; I would continue

2  to receive them and then every two or three weeks I will send

3  the checks to Ms. Peterson and then she will deposit them in

4  a conservatorship account.

5      Q    And that's been occurring?

6      A    Yes, it has.

7      Q    Now, tell me what's your understanding of this

8  $1,000 a week, how does that work?

9      A    So, look, this is tax free, it's adjusted for

10  inflation and unless Joanne recovers this is for life.  As

11  long as she's disabled she's going to get these benefits for

12  the rest of her life; this is a very, very big deal.

13     Q    And Joanne also gets Social Security benefits,

14  doesn't she?

15     A    Yes, she also gets Social Security Disability

16  Insurance.

17     Q    And how much does she get from that?

18     A    It's--right now it's between 1,300 and 1,400 a

19  month.  And then she's also eligible for Medicare.

20     Q    Let me ask you this, we--we touched on this earlier

21  so I want to make it--make sure you're clear on it, do you

22  feel that everyone knew what was going to happen if you

23  exercised that disclaimer?  By everyone I mean the attorneys

24  and Ms. Wrigley and Mr. Dain?

25     A    I certainly believe that--look, I know that Mr.

50

1   Dain understood, I know that Ms. Wrigley understood, and I

2   certainly believe that Ms. Young and Ms. DiPonio understood

3   or should have understood at the time.

4      Q   What factors in your mind pointed to the fact that

5   everybody understood?

6      A   So let's just walk through what I think all the

7   pieces were.

8      Q   Okay.

9      A   So one piece that they would have had access to

10   would have been the court visitor's report, so you appointed

11   Linda Babcock as court visitor, and so she filed a report

12   with the court.

13      And so I spoke to Ms. Babcock and told her this is

14   what we're trying to do, we're trying to get worker's comp

15   for Joanne and I planned to disclaim Joanne's POD benefits

16   and they're going to go into the estate and then two-thirds

17   are going to go Joanne in trust and one-third are going to go

18   to a trust for my kids or me and my kids, I forget exactly

19   what language I used.

20      So I was very explicit with Ms. Babcock about

21   here's what we want to do, the POD assets will go back into

22   the estate and they'll go out two-thirds to Joanne's SNT and

23   one-third to the Issue Trust for my children.

24      Q   And did that make it into Ms. Babcock's report?

25      A   Yes, it did.

BLACK000639

51

1    Q    What else--what else that you can think of makes

2 you think that everybody knew or at least at the time you

3 exercised the disclaimer?

4    A    So a second piece was that I arranged for Joanne's

5 long-time psychiatrist, Aneil Shirke, A-N-E-I-L S-H-I-R-K-E,

6 to write a letter in support of the conservatorship basically

7 saying Joanne was a paranoid schizophrenic, she had been a

8 paranoid schizophrenic for her entire adult life; the

9 prognosis was not good, she couldn't handle money, but I also

10 told Mr. Shirke what our plans were for the disclaimer

11 because I wanted him to understand what he was writing in

12 support of, so I told him that the plan was for--I would

13 disclaim on behalf of Joanne and then Joanne's POD assets

14 would go into the estate and two-thirds would go to a

15 Supplemental Needs Trust for Joanne and one-third would go

16 to--to a second trust for--again it was my children or me and

17 my children I forget which exact language I used.

18    Q    And so did that make it into the letter that you

19 filed with the court?

20    A    Yes, that was in Dr. Shirke's letter that he filed

21 with the court.

22    Q    And--all right.  So what else other than the--what

23 Dr. Shirke said makes you think that everyone knew?

24    A    So maybe the third piece was that I told Mr.

25 Glatstein here's what I'm hoping to accomplish, the two key

BLACK000640

52

1   pieces at the time were worker's comp and the disclaimer.

2           Later we learned--I think from Ms. Young or maybe

3   from Ms. Wrigley that Joanne was trying to cancel her own

4   SSDI benefits, so there was a third paragraph in the proposed

5   order that said let me go make sure she doesn't cancel her

6   benefits or if she did cancel them let me restart them.

7           Those were the three pieces and I talked about

8   those with Mr. Glatstein and said here's what we want to

9   accomplish and can you help me do this and give me advice on

10  --on how to do it.

11          So Mr. Glatstein was fully informed about if

12  there's a disclaimer the assets go back into the estate,

13  two-thirds go out to the SNT, one-third goes to the Issue

14  Trust and then I relied on Mr. Glatstein to explain the plan

15  and explain the consequences of disclaimer to Ms. Young and

16  to Ms. DiPonio.

17      Q   What--and we had that testimony from Mr. Glatstein

18  already--what else did you--happen that made you think that

19  every knew what was going to occur?

20      A   So as part of the--the conservatorship process Mr.

21  Glatstein prepared a proposed order of special

22  conservatorship that I then reviewed and I added some

23  additional language to it that I thought made the disclosure

24  even clearer.  And so we submitted that proposed order to the

25  court in November of 2012.

BLACK000641

53

1       We had a hearing on the proposed order in December

2  of 2012.  Mr. Glatstein testified that he spoke to Ms. Young

3  and Ms. DiPonio just before the December hearing and so we

4  should walk through the language of the proposed order.

5       In addition to that Mr. Glatstein put on file put

6  on file with the court so the proposed order said disclaim so

7  that the assets pass under the estate and go through the will

8  and they'll go under Article 4th of the will, and so we filed

9  with the court.  We filed the will and we filed the

10  Supplemental Needs Trust and we filed the Issue Trust.  And,

11  you know, I think Mr. Glatstein's testimony was he didn't

12  want people to take his word for it, he wanted them to look

13  at the actual documents.  And so he wanted to make sure that

14  the documents were on file so that Ms. Young and Ms. DiPonio,

15  potentially the Court, you know, had them.

16    Q   And you heard the testimony that Ms. Young and Ms.

17  DiPonio actually sent an e-mail to the clerk of this court

18  with a copy to Mr. Glatstein saying we have no objection to

19  the form of order that says pass the property--once the

20  disclaimer is exercised it passes under the 4th article of

21  the will, you're aware of that testimony, am I correct?

22    A   Yes.  So the--the full proposed special

23  conservatorship order I think was submitted three times; it

24  was submitted in November and then in December the Court had

25  a hearing and then issued a much shorter general

54

1   conservatorship order and Mr. Glatstein thought that was not

2   sufficient, might not be sufficient and so wrote back by

3   e-mail the same afternoon saying this might not be sufficient

4   can we get an amended order with the full language.

5           And so there's an e-mail from Mr. Glatstein to the

6   Court copying Ms. Young and Ms. DiPonio saying can we get

7   this amended language and then he attaches as an exhibit the

8   proposed order and then he's highlighted the paragraphs that

9   he wants to have added to the general conservatorship.

10          So that was the second time and again that went,

11  you know, to the Court and Mr. Glatstein testified about

12  that; that went to Ms. Young; that went to Ms. DiPonio.

13          Then the third time that we submitted the same

14  language would have been--I believe it was January 29th of

15  2013, so the Court--I guess you replied in December--Mr.

16  Glatstein's said should we ask for an amended order and then

17  there was reply from court clerk Sumi Lee saying, you know,

18  the Court would like an amended order.

19          Then we had to sort of finish the disclaimer stuff

20  and make sure Vanguard was happy with--with the language of

21  the court order and the holidays intervened and we eventually

22  went back to the Court with the same language in the form of

23  a proposed amended order on January 29th of 2013.

24      Q   And let me ask you something, so the order that the

25  Court finally entered on March 5th, 2013 was different from

BLACK000643

55

1    that January 29th form of order?  I mean the record reflects

2    that that March 5th order that was actually prepared by Mr.

3    Glatstein as well, isn't it?

4         A    Yes.

5         Q    Wasn't it?

6         A    Yes, it was.

7         Q    And--and it did not include the language that said

8    if the disclaimer gets exercised it goes in accordance with

9    the 4th article of your mother's will; is that correct?

10        A    Under which two-thirds goes to the Supplemental

11   Needs Trust; that's correct.  It did not--it--it removed that

12   language.

13        Q    Why if you know did that language--why did Mr.

14   Glatstein remove that language?

15        A    So here's the history--

16             MR. DAIN:  Your Honor, I have to object, Mr.

17   Glatstein testified, now he's not asking him to (inaudible),

18   he's asking him to testify for Mr. Glatstein.

19             MR. POSKUS:  Mr. Glatstein was his agent and it's

20   indeed his actions that--

21             THE COURT:  I'm going to allow it.  I mean I have a

22   personal memory of this so--

23        Q    (by Mr. Poskus)  Why did Mr. Glatstein change the

24   language?

25        A    So let me give you a little bit of history, during

BLACK000644

56

1  the period between December 11th and January 29th I went back
2  to Mr. Coykendall at Vanguard and said here's the language
3  that we want to propose to the--to the court, is this--does
4  this work for you.  Vanguard had already given me the
5  disclaimer language but they also needed to see the court
6  language.
7          And so he reviewed that and came back and said this
8  is fine with me and so based on his saying it was fine with
9  me we submitted the language to the court on January 29th.
10         I then went back to Mr. Coykendall and asked him,
11 you know, just to be sure will you check with legal counsel
12 too.  And so he did that and came back I think the next day
13 and said legal counsel wants the paragraph on disclaimer to
14 be shorter and here's the language that they want.
15     Q    And what did they change?
16     A    Basically they took out the words whatever the
17 difference is between January 29th and January 31st those were
18 words that they wanted taken out and there's an e-mail from
19 me to Mr. Glatstein saying Vanguard wants this language out
20 can you shorten the proposed order.
21     Q    Let's take a look in the exhibit book, turn to tab
22 81, where it has been marked as Exhibit 81.
23     A    Okay.
24     Q    Is this the e-mail that you were just referring to?
25     A    Yes, it is.

BLACK000645

57

1          MR. POSKUS:  Your Honor, if I may it's my

2   understanding you may not have a copy of 81.

3          THE COURT:  I do not.

4          MR. POSKUS:  You don't.  If I may approach we'll

5   hand a copy to counsel.

6          THE COURT:  But I have it marked in from June 17th.

7          MR. POSKUS:  You do?

8          THE COURT:  I do.  So--

9          (Pause.)

10          MR. POSKUS:  Exhibit 81 was admitted, you're

11  correct, Your Honor.

12          THE COURT:  Okay.

13          MR. POSKUS:  It was admitted during the course of

14  Mr. Glatstein's testimony.

15          THE COURT:  Right.  It's just not in the book but--

16          MR. POSKUS:  Yeah, I apologize, Your Honor.

17          THE COURT:  That's fine.

18          MR. POSKUS:  I got confused.

19      Q   (by Mr. Poskus)  And so this is the e-mail you sent

20  to Mr. Glatstein?

21      A   Yes.  And it contains as an attachment a--a markup

22  of the amended order from January 29th.

23      Q   And with this change is this identical--I mean

24  assuming that language on page 3 of 3 of the form order is

25  stricken, is that identical to the order that the Court

BLACK000646

58

1   eventually signed?

2       A    Yes.  So if you look at--at Exhibit 81, at the

3   appendix paragraph 9a, you'll see that some of the language

4   is stricken out.  And that was the language that I was asked

5   by Vanguard to--to take out to shorten the disclaimer

6   paragraph.  And so I wrote back to Mr. Glatstein saying, you

7   know, can--can we ask for shorter language.

8       Q    And let me ask you this, is there anything else in

9   your e-mail to Mr. Glatstein that you'd like to point out to

10  the Court?

11      A    Yes.

12      Q    What is it?

13      A    So if I can read the e-mail--the text of the e-mail

14  is--so the subject line is comments from Vanguard.  And then

15  the text of the e-mail is, "They would like the new paragraph

16  9 shortened.  See attached.  Maybe you can take the deleted

17  text, and put it in a cover letter to the court, if you think

18  we need it."

19      Q    And why did you say that to Mr. Glatstein?

20      A    Because I wanted to make sure that no one thought

21  we were changing anything in substance.  Substance the

22  disclaimer was the same and I don't think--you know, as a

23  legal matter it's still the same disclaimer so the substance

24  has to be the same but I didn't want anyone to think we were

25  changing anything in substance about the disclaimer plan, it

BLACK000647

59

1    was still we're going to disclaim into the estate, it's going

2    to pay us under the will, it's going to pay us under Article

3    4th of the will, it's going to go out two-thirds to the SNT

4    and one-third to the Issue Trust because that's what Article

5    4th says.

6          So basically I asked Mr. Glatstein in the interest

7    of full disclosure, if you think we should, you should add as

8    a cover letter to the Court here's why--why we took this

9    language out.

10   Q    Do you think that doing the disclaimer was in

11   Joanne's best interest?

12   A    Absolutely.

13   Q    Why?

14   A    So the disclaimer plan, if I can call it that, had

15   --had a number of pieces.  First, you know, we avoided

16   litigation against the POD designation that I think would

17   have been successful.  It might have been quickly successful,

18   it might have been slowly successful, I don't know, but given

19   that the disclaimer--the POD made no sense to anybody I

20   thought the odds that the litigation would succeed were--were

21   very high.

22          And frankly I didn't--I thought there was real

23   doubt about whether Joanne would be able to defend that

24   litigation; she would probably end up losing by default or,

25   you know--at the time in 2012 you'll recall she had an issue

BLACK000648

60

1   with trespass and she filed a 33 page rambling letter with

2   the trespass court--or the court hearing trespass, she'd

3   filed something like that with--with New York or Pennsylvania

4   and just persuade the court that no one would ever want to

5   give her $3 million.

6          And in the meantime as long as litigation took

7   everything would be frozen and there would be no way to get

8   money to Joanne, there would be no way to rescue Joanne, she

9   would continue to be effectively homeless and on the streets.

10         I was worried that maybe the estate assets would be

11   frozen as well because what I was doing during this period

12   was using the estate assets to send money to Joanne every

13   week.  So she got SSDI and then I was also sending her $500 a

14   week, first it was 280 and then I raised it to 500.  The 280

15   was my mother's amount.

16         Joanne had a debit card at Chase and so every week

17   I would move $500 into the debit account at Chase and then

18   Joanne would take that money out and spend it and this was

19   what she used, you know, to pay rent at the motels that she

20   shuttled between and to pay for food and to pay whatever

21   else.

22         And so I was worried she would even lose that and

23   then she would be really homeless.  At least right now she

24   had a motel to stay in.  And look, her health could not be

25   good, all right.  She was walking around, you know, dressed

BLACK000649

61

1   in ten layers of clothes, you know, in the middle of a Denver
2   summer we were told.  She was doing the same thing in all
3   likelihood when it got colder and so I wanted a way to, you
4   know, to--to intervene and do something to help Joanne.  I
5   don't think we could do that until the POD issue was resolved
6   one way or another.
7           And so litigation would be slow and it would be
8   expensive and it would probably come to the same outcome as
9   the disclaimer.  So one thing I thought we were doing was
10  getting to a good outcome faster.  And overall for Joanne I
11  was also getting her the worker's comp, right, which, you
12  know, sort of that was on hold until I could do the
13  conservatorship.
14          So for me this was all wrapped up in a--in a
15  package of look if we do the conservatorship Joanne is going
16  to have two million in SNT actually with more--more assets
17  coming in it's going to be closer to three million, she's
18  going to have worker's comp, she's going to have SSDI, she is
19  going to be in great shape, this is a great outcome for
20  Joanne and we'll be able to, you know, hopefully intervene to
21  do something to help her.
22          You know, I couldn't force her to be hospitalized,
23  I knew that, but we wanted to do what we could, we meaning I
24  think me and Cherie principally were anxious to do what we
25  could to try to help Joanne and litigation was not the way to

BLACK000650

62

1    do that.

2        Q    Are you surprised to be litigating this disclaimer

3    issue two and a half years later?

4        A    I am very surprised.

5        Q    Why?

6        A    Because we, meaning me and Cherie and Anthony and--

7    were all in agreement that this was the right thing to do for

8    Joanne.  We knew what it was, the proposal was, we knew the

9    money was going to go back into the estate, we knew it was

10   going to go out two-thirds to the SNT, we knew it was going

11   to go out one-third to the Issue Trust.  I was trying to

12   avoid litigation over the POD, I wasn't trying to get into a

13   big court fight in--in Colorado years later.

14             MR. POSKUS:  I've got no further questions at this

15   time for Mr. Black, Your Honor.

16             THE COURT:  Okay.  Do you want to go right into

17   cross or do you want to take a five minute break, what do you

18   want to do?

19             MR. POSKUS:  Why don't we take a break, Your Honor.

20             THE COURT:  Is that all right?

21             MR. DAIN:  That's fine.

22             THE COURT:  All right.

23             (Whereupon, a recess was taken.)

24             THE COURT:  All right.

25             MR. DAIN:  I'm ready if Mr. Black is.

BLACK000651

63

```
 1           THE COURT:  Thank you.
 2                      CROSS-EXAMINATION
 3 BY MR. DAIN:
 4      Q    Mr. Black, you mentioned that there was going to be
 5 litigation over the POD designation.
 6      A    I expected that if we didn't pursue the disclaimer
 7 there would be litigation over the POD, yes.
 8      Q    Okay.  So I want to talk a moment about conflicts
 9 and--and you certainly understand being a lawyer what legal
10 conflict is, right?
11      A    I'm not sure what you have in mind, we talked about
12 this yesterday, I don't want to walk into--I don't know what
13 the definition of a quote legal conflict is.
14      Q    Okay.  Let me--
15      A    I agreed last time that I had a conflict of
16 interest in proposing the disclaimer in Colorado.
17      Q    You agreed to that?
18      A    I agreed to that.
19      Q    So the litigation that you're talking about--you
20 first mentioned your wife would sue on behalf of you and your
21 wife's two children, right?
22      A    What I expected to happen was there would be a
23 general lawsuit on behalf of all of my children with my wife
24 representing the two minor children.  Maybe it wouldn't have
25 been precisely all of them but it would have been all or
```

64

1    most.

2         Q    And you would have been giving them guidance in

3    that, right?

4         A    We never got that far.

5         Q    I'm asking, you would have been giving them

6    guidance if you had gotten that far?

7         A    You know, I don't know what I would have done; I

8    was trying to avoid litigation.  I was an executor of the

9    estate and so I think the first thing I would have done was

10   to say, okay, I'm a fiduciary to the estate, I'm also a

11   parent of my children, what do I do here.  So I don't--

12        Q    You step out--you step out, right?

13        A    I don't know what I would have done.  I would have

14   sought advice on--on what would have been appropriate to do

15   and what--what the alternatives were.

16        Q    Well, you clearly couldn't represent your wife and

17   children and also be the conservator of Joanne Black, right?

18        A    I would agree that those would be inconsistent

19   roles, yes.

20        Q    Okay.  So rather than getting advice on that or

21   rather than stepping out from your position as conservator

22   you decided you would avoid litigation by putting together a

23   scheme in which you and your children would get one-third of

24   the POD designated assets, right?

25        A    No.

65

```
 1      Q    Oh, actually more.  You--you also got one-third of
 2   the POD assets plus the Roth IRA.
 3      A    Totally wrong.
 4      Q    Okay.  Totally wrong.
 5      A    Totally wrong.
 6      Q    I'll--I'll give you the forum, tell me why I'm
 7   totally wrong?
 8      A    What I asked for was the power to disclaim Vanguard
 9   and Fidelity--
10      Q    Uh-huh.
11      A    --where the assets would then pass under my
12   mother's will, Article 4ᵗʰ, under her will.  Two-thirds of
13   everything would go to Joanne's SNT and one-third of
14   everything would go to the Issue Trust.
15           The Roth IRA was part of everything.  Joanne had to
16   get two-thirds of everything.  If she didn't get two-thirds
17   of the Roth IRA and I later decided that it was tax efficient
18   to send the Roth IRA directly to my children, she had to get
19   compensating assets because she still had to get two-thirds
20   of everything.
21      Q    Okay.  Let's--let's break that down before we move
22   on.  The Roth IRA you gave 100 percent to your children,
23   correct?
24      A    Yes.
25      Q    The tax information that you say you got who did
```

66

1    you get that from again?

2        A    So I was trying to explore what the tax--

3        Q    No, no, my question was who did you get that from?

4            MR. POSKUS:  Your Honor, I'm going to object, he

5    needs to let--give him a chance to answer the question, he

6    got three words out.

7            MR. DAIN:  Allow me to--to just point out

8    something, when the answer starts with so that's going to be

9    a narrative.  I asked him the question who--

10           MR. POSKUS:  That's--

11           MR. DAIN:  --and that's a name.

12           MR. POSKUS:  I disagree with that.

13           THE WITNESS:  Not a single name.

14       Q    (by Mr. Dain)  Okay.

15       A    From a collection of sources.

16       Q    And you--you testified before I think that this was

17   informal advice you'd gotten?

18       A    I don't recall.

19       Q    Give us the names, who gave you this tax advice?

20       A    So again I'm not going to give you names; I can

21   describe the process and answer the question that you cut me

22   off the last time.

23       Q    You don't have any names of people who gave you the

24   advice?

25       A    I don't--in--in my mind at this point I do not have

BLACK000655

67

1   names of specific people.

2        Q    And you know the Roth IRA was--the way a Roth works

3   is you pay the taxes before you put it into the IRA, right?

4        A    The Roth IRA contribution is not tax deductible so

5   the income that forms the basis for the money that you put

6   into the Roth IRA is taxed.  And then the money that you take

7   out is not taxed.

8        Q    Okay.  I think--so you agree with me, right, it was

9   already--taxes were already paid on that $432,000?

10       MR. POSKUS:  Your Honor, I'm going to object at

11  this point.  You started the hearing by saying we're going to

12  take evidence on the disclaimer, but the stuff he's asking

13  about first of all is beyond the scope of direct.  And second

14  of all he's asking about how he administered the estate after

15  the disclaimer was exercised; that's part two of this.  It

16  has nothing to do with the issue and--which is whether or not

17  the disclaimer was appropriate, whether or not he breached

18  his fiduciary duties, whether or not a surcharge ought to be

19  imposed for his exercise of the disclaimer.

20       It's beyond the scope of direct and it's not

21  relevant to the issue as you framed it this morning.

22       MR. DAIN:  Your Honor, first Roth IRA came up in

23  testimony today.  The 432,000 is clearly part of the issue of

24  surcharge if not civil theft which is before this Court.

25       Mr. Black angrily said I had it wrong and he

BLACK000656

68

1    explained just now what his--my words scheme was--and that

2    included the Roth IRA; that came out of his mouth.

3              THE COURT:  Right.  I'll allow it.  The objection

4    is overruled.

5        Q    (by Mr. Dain)  Do you remember the question?

6        A    No.

7        Q    Nor do I.  So let's start again, the Roth IRA had

8    amounts--had been taxed before they were put into the Roth

9    IRA, right?

10       A    Whatever amounts my mother originally contributed

11   were not tax deductible.

12       Q    When the amounts were distributed to your children

13   were they taxed?

14       A    No.

15       Q    And they wouldn't have been taxed as you now know

16   had been distributed to Joanne?

17       A    The tax advantage from distributing the Roth IRA to

18   my children directly rather than distributing to trust had to

19   do with the Roth IRA rules on distributions and how fast the

20   money would have to be withdrawn.

21       Q    How fast the money would have to be withdrawn--and

22   this comes from tax advice that you can't remember who you

23   got it from?

24       A    No, tax advice that I can describe and you've cut

25   me off the two times that I've offered to describe it.

BLACK000657

69

1     Q    And the 432,000 you said was part of the overall

2  two-thirds/one-third you were going to distribute?

3     A    The Roth IRA went into the estate after the

4  disclaimer and therefore it was subject to an overall

5  two-thirds to one-third division.  And given that Joanne's

6  SNT did not get two-thirds of the Roth IRA funds she had to

7  get--and I believe she has gotten substitute funds.

8     Q    And you've read your own expert, Melinda Harper's

9  report?

10    A    I have.

11    Q    And she says you're how many hundreds of thousands

12 short in making that two-thirds/one-third that you say--

13    A    As of the date of her report she shows me as being

14 short--I believe it's $130,000; that's a snapshot at a point

15 in time.  I do not believe I am short today and I do not

16 believe that I will be short when I finally close out the

17 estate.  It's my job to get to two-thirds/one-third before I

18 close out the estate.

19    Q    You going to put cash back in?

20    A    If I have to I will put cash back in or I will

21 arrange to transfer money from the Issue Trust to the SNT to

22 the extent that too much went to kids and too little went to

23 Joanne.  There are various ways to make sure that I get to

24 two-thirds/one-third.

25    Q    The--the issue that--that you said you talked with

BLACK000658

70

1  Ms. Wrigley about, are you saying--telling this Court Ms.

2  Wrigley may have been the one who first proposed a

3  disclaimer?

4      A    I don't recall.  The idea came out of joint

5  conversations between me and Ms. Wrigley and I can't tell you

6  today was it my idea, was it her idea, did it come out of the

7  joint conversations; I view this as a joint idea.

8      Q    You're the lawyer, right?  Ms. Wrigley is not a

9  lawyer.

10     A    Ms. Wrigley is not a lawyer.

11     Q    You researched disclaimers?

12     A    No.

13     Q    You didn't?

14     A    No.

15     Q    You had no idea how they work?

16     A    That's not a fair statement either.  I didn't go

17  and research disclaimers; we looked at options.  Where the

18  disclaimer idea came from in first instance sitting here

19  today, it's three years later I don't recall.

20     Q    You remember--did you review Mr. Glatstein's

21  testimony in this case?

22     A    I was here for the hearing last time.

23     Q    And you know Mr. Glatstein said you were the first

24  to mention to him a disclaimer?

25     A    I came to him with the disclaimer idea, yes.

BLACK000659

71

1      Q   And yet you're not sure how that came about?

2      A   I don't recall exactly where the disclaimer idea

3 came from, no.

4      Q   And this conversation that you had with me, how

5 long did that take place, how many minutes?

6      A   I don't recall, you know--

7      Q   You searched for phone records of course, right?

8      A   No.

9      Q   Why?

10     A   Why would I do that?

11     Q   To prove that the conversation took place.

12     A   There's no doubt that a conversation took place you

13 said as much in your questioning of me at the last hearing.

14 We just may disagree on the content of the conversation.

15     Q   You have any e-mails that support that

16 conversation?

17     A   I do not have e-mails with you.  I have a letter

18 with Vanguard dated July 20th that is consistent with my

19 recollection of the conversation.

20     Q   Let me show you another letter from Vanguard.

21         MR. DAIN:  And, Your Honor, I apologize I don't

22 know if this is an exhibit, it's July 11th, 2012, from

23 Vanguard to Mr. Black.  And just in the interim I'll show it

24 to you.

25         (Pause.)

72

1          MR. POSKUS:  Your Honor, we think it's 42.

2          THE COURT:  Okay.

3          MR. POSKUS:  If Mr. Dain will confirm then we can

4    just use the exhibit.

5          MR. DAIN:  Yes, it's 42, Your Honor.

6          THE COURT:  Thank you.

7     Q    (by Mr. Dain)  Do you see that, Mr. Black?

8     A    I'm at Exhibit 42.

9     Q    And that's the letter that you received from

10   Vanguard which indicated that the Roth IRA was 100 percent

11   designated to Joanne Black.  And that the remainder of the

12   nonretirement assets that were POD were 95 percent to Joanne

13   Black and 1 percent to each of your adult children?

14   A     Yes.

15   Q     Okay.  And you say you thought this was crazy, you

16   didn't think your mother would do this?

17   A     I thought this made no sense.

18   Q     Okay.  I want to show you an e-mail that you sent

19   to Ms. Kerr on April 14th, 2015.

20          MR. DAIN:  I don't have copies, Your Honor, but I'm

21   showing it to counsel and I'll show--

22          THE WITNESS:  You went through this in your

23   cross-examination of me last time, do you really want to do

24   it again?

25          MR. DAIN:  Is this an Exhibit?

BLACK000661

73

```
 1            (No audible response.)
 2            MR. DAIN:  I'm going to show it to Mr. Black.
 3      Q     (by Mr. Dain)  Do you recall that?
 4      A     You asked me questions about this last time.
 5      Q     And in that e-mail you told Ms. Kerr that she
 6   should assume that this letter that instructs that the Roth
 7   IRA is 100 percent to Joanne Black and the remainder is 95
 8   percent to Joanne Black were the instructions of your mother?
 9      A     That's what I told Ms. Kerr to assume as part of
10   her work; as I testified last time I do not believe that this
11   was my mother's intent; I believe it was a mistake, maybe it
12   was fraud, I don't know, this was an e-mail to Ms. Kerr
13   saying this is how I believe you should conduct your
14   investigation because I don't think the disclaimer issue is
15   before Ms. Kerr.  Ms. Kerr is an accountant.
16      Q     But you state that she should assume those were the
17   instructions of your mother?
18      A     The e-mail says what it says; I don't have it in
19   front of me right now.
20      Q     You didn't qualify it, you didn't say I don't
21   believe that's correct, that's the entirety of your
22   discussion about that issue with--
23      A     That was one of 150 e-mails that I sent to Ms. Kerr
24   and I wasn't trying to parse words and I wasn't trying to
25   offer Ms. Kerr legal advice and I wasn't trying to offer Ms.
```

BLACK000662

74

1    Kerr my opinion about the truth; I was trying--this was part

2    of my effort to say to Ms. Kerr, look, the disclaimer is not

3    your issue.

4           MR. DAIN:  Your Honor, I'm not sure what's the

5    defense next in order?

6           THE COURT:  I'm sorry?

7           MR. DAIN:  Defense--what am I doing--the--I don't

8    know what this would--

9           MS. DiPONIO:  D I believe it is, Your Honor.

10          MR. DAIN:  D--what--I don't want to say the--

11          THE COURT:  Oh, you're asking for an exhibit?

12          MR. DAIN:  Yeah, an exhibit.

13          THE COURT:  Yeah, D.

14          MR. DAIN:  Okay.  And the reason--only reason I

15   remember it's letters so I'm used to that being defense, but

16   at any rate--

17          MR. POSKUS:  Your Honor, if I may Exhibits A, B,

18   and C from the last hearing were never uploaded so we don't

19   have a good record.

20          MS. DiPONIO:  Oh, Your Honor, I apologize I thought

21   I uploaded them.

22          MR. POSKUS:  We looked and they're not uploaded.

23          MR. DAIN:  You--

24          THE COURT:  Okay.

'25          MS. DiPONIO:  They will be uploaded this afternoon.

BLACK000663

75

1          THE COURT:  Okay.  So Exhibit A was an e-mail chain
2   from April 14th, 2015, the same date as this.  I don't know
3   if it included this particularly.
4          MS. DiPONIO:  Your Honor, some of the exhibits that
5   we've entered are--were already a part of the upload, I
6   believe there were two that were not.
7          THE COURT:  Okay.  So I had A as the e-mail chain,
8   B was the affidavit from Lamberti, and then C was from June
9   17th and it was court appointed counsel's bill statement.
10         MS. DiPONIO:  Right.  So the affidavit from Mr.
11  Lamberti is already put in the court record; it was prior to
12  us (inaudible) as an exhibit.
13         THE COURT:  Okay.
14         MS. DiPONIO:  And the other two I will have
15  uploaded (inaudible).
16         THE COURT:  Okay.  So do we know if this part of--
17         MS. DiPONIO:  Oh, that e-mail is part of the record
18  according to Ms. Kerr.
19         THE COURT:  So is it part of that e-mail chain?
20         MS. DiPONIO:  I'm sure it is in one of her
21  responses or something that Ms. Young probably filed that is
22  already part of the record.
23         MR. POSKUS:  Your Honor, it's easy to say it's part
24  of the record but before we--just to make sure we have a
25  clean record, maybe what we need to do is stop and look at

```
 1   what they consider Exhibits A, B, and C are for sure.
 2              MR. DAIN:  We can do that at a recess, Your Honor.
 3              MS. DiPONIO:  Yeah, sure.
 4              THE COURT:  Yeah.
 5              MS. DiPONIO:  I know what exhibits--
 6              MR. POSKUS:  If they're going to say that this is
 7   part of A then that concerns me.  If they want to mark it D
 8   then it's not a problem.
 9              MS. DiPONIO:  We'll just mark--
10              MR. POSKUS:  I'm just trying to--
11              THE COURT:  Well, A was already admitted.
12              MR. POSKUS:  I--I realize that.  I just don't know
13   what A was anymore because they only had one copy and it
14   wasn't uploaded.  I tried to download them before we got to
15   this hearing today and they're not there.
16              MS. DiPONIO:  Your Honor, just to make it simple
17   for Mr. Poskus, we will mark that as Exhibit D, even if it's
18   already part of the record so there's no confusion.
19              MR. DAIN:  Should I give it back to Your Honor or--
20              THE COURT:  No, it is.  It's the first page of A.
21              MR. DAIN:  Okay.  So it's--it's Exhibit A?
22              THE COURT:  Yeah.
23        Q    (by Mr. Dain)  You mentioned something--Mr. Black,
24   you said you don't--you didn't want to parse words, you
25   stated you believed that everyone understood that this
```

BLACK000665

77

1    disclaimer would result in you and your children receiving
2    one-third of the POD assets that were disclaimed into the
3    Issue Trust, right?
4        A    I would frame it differently.  I would say that I
5    believe that everybody understood that the effect of the
6    disclaimer would that the assets would go back into the
7    estate; that's number one.  And that everybody understood
8    that under the will of Renata Black the residual of the
9    estate would pass under Article 4th of her will.  And Article
10   4th said two-thirds to the Supplemental Needs Trust and
11   one-third to the Issue Trust.
12       Q    If you were so sure everyone understood why is it
13   that of all the things you filed, everything that you filed
14   in this case, the one thing that you didn't include was that
15   one-third of those disclaimed assets would go into an Issue
16   Trust?
17       A    If I had to do it over again I would make even a
18   longer paragraph one and I would say under--two-thirds go to
19   the Supplemental Needs Trust and one-third goes to the Issue
20   Trust.  I was relying on Mr. Glatstein's draft for what
21   language we should provide and what language he thought was
22   sufficient to inform everyone in the court proceeding with
23   regard to your knowledge and Cherie Wrigley's knowledge you
24   had direct knowledge.
25       Q    That's your testimony?

78

 1      A    That's my testimony.

 2      Q    And why is it that of all the things you filed you

 3 never disclosed in a report or an account that one-third of

 4 those disclaimed assets were placed in an Issue Trust?

 5      A    I did disclose it to Ms. Babcock and it's in her

 6 court visitor report.  I did disclose this to Dr. Shirke and

 7 it is in his letter to the Court.

 8      Q    This is probably then--I won't make it an exhibit

 9 because it's--because it's probably in the court file, the

10 visitor's report--in the visitor's report you say you

11 disclosed that the disclaimed assets would be going

12 two-thirds/one-third?

13      A    So I didn't write the visitor's report; I disclosed

14 that information to Ms. Babcock and she wrote the report.

15      Q    Understood but you're saying everyone understood

16 this because it's in the visitor's report?

17      A    No, everybody had five different sources of

18 information and the visitor's report was one of them.

19      Q    I'll show you the visitor's report.

20           MR. POSKUS:  Your Honor, for the record it's

21 Exhibit 2 so everybody can look at that.

22      Q    (by Mr. Dain)  Exhibit 2.

23      A    Okay.  I'm at Exhibit 2.

24      Q    Turn to page 2--or actually turn to page 5.

25      A    Okay.  I'm at page 5.

BLACK000667

79

1    Q    Do you see under paragraph 4 why was this petition
2  initiated?
3    A    Yes.
4    Q    This is what you told the court visitor, right?
5  This is what you're talking about?
6    A    This is her rendition of what I told her, yes.
7    Q    Okay.  But again her rendition is what informs
8  everybody else, right?
9    A    Yes.
10    Q    So if this is one of the items you're relying on
11  that disclosed this disclaimer of two-thirds to the
12  Supplemental Needs Trust and one-third to the Issue Trust, it
13  should be in here, right?
14    A    What you--what you have been saying is I was
15  somehow hiding that one-third was going to the Issue Trust
16  and I was not hiding that one-third was going to the Issue
17  Trust.  I said it to Linda Babcock and it's in her court
18  visitor report; I said it to Dr. Shirke and it's in his
19  letter and I said it to you; I said it to Cherie Wrigley, and
20  I relied on Mr. Glatstein to speak directly to Ms. Young and
21  Ms. DiPonio.
22    Q    You said it in the court visitor's report you're
23  saying or to the court visitor and to Dr. Shirke.  You didn't
24  put one-third to the Issue Trust in anything you filed with
25  the Court, your petition, your proposed order never said

BLACK000668

80

1    one-third to the Issue Trust?

2        A    One-third to the Issue Trust is not included in the

3    proposed order and if I had to go back and do it again I

4    would put that language in too and it is not there, we know

5    it's not there.

6        Q    And if you had put it in there you would have

7    assumed that would have been an item of discussion for the

8    Court and all the parties in a hearing, right?

9        A    No.

10           MR. POSKUS:  Objection, Your Honor, speculation.

11           THE WITNESS:  I thought that everybody understood

12   exactly what we proposed and that Ms. Young and Ms. DiPonio

13   agreed with what we proposed.  And I thought that the

14   language of the proposed order was clear as it was and I

15   didn't think there was any doubt as to what would happen to

16   the remaining one-third that wasn't specifically labeled, but

17   was--look, it starts out saying under Article 4th, here's the

18   will, here are the two trusts, go look at Article 4th.  We

19   are not hiding the ball here.

20       Q    (by Mr. Dain)  Just before I get to the court

21   visitor's report, you know there's another will out there you

22   didn't probate, right?

23       A    Yes.

24       Q    You know in that will there's no distribution under

25   Article 4th, two-thirds/one-third, right?

BLACK000669

81

1     A   If you want to bring in the will--the informal will

2  as I call it, you're welcome to do so.  I'm aware of the will

3  and I don't have it--have it in my head exactly what it

4  provided.

5     Q   And you know--what you do know that it provided

6  differently than the will that you choose to probate?

7     A   That's correct.

8     Q   And in doing that you informed the court in New

9  York there was no other will, right?

10     A   I did not inform the court about the informal will,

11  that's correct.

12     Q   Okay.  So the will that you chose to probate is the

13  one that gives you one-third to the Issue Trust, right?

14     A   I probated the official will.

15     Q   The official will--you probated one of two wills

16  that you choose to probate.

17     A   No.

18     Q   It's official because you did so, right?

19     A   I obtained advice of counsel and I probated the

20  official will.

21     Q   And you know Ms. Wrigley didn't agree to the will

22  you probated, right?

23     A   No, totally--I totally disagree with that.

24     Q   You know I didn't agree to that.

25     A   You knew about both wills and you agreed that I

82

1  should probate the official will.  Ms. Wrigley knew about

2  both wills, she agreed that I should probate the official

3  will.  There was no doubt about that either.

4      Q    Am--am I a party to the probate proceeding?

5      A    No.

6      Q    Is Ms. Wrigley?

7      A    No.

8      Q    Let's go to the court visitor's report, page 5,

9  item four.  You start out my sister has been a paranoid

10 schizophrenic since she was 20 years old.  My mother in her

11 will left two-thirds of her estate to Joanne in a trust and

12 one-third will go to me and my kids.  Do you see that?

13     A    So first of all I want to reiterate that this is a

14 conversation with Linda Babcock, it's put in quotes.  I don't

15 know whether it's a direct quote or not but if you want to

16 read this as Ms. Babcock's language put in quotes then I'm

17 happy to see whether you read it correctly?

18     Q    I'm not--I'm just reading from it, you're saying

19 this is what informed everybody, it's one of the things that

20 informed everybody.

21     A    I believe that the court visitor report was one of

22 the documents that informed everybody.  What I was objecting

23 to was your saying that you wrote or you said.

24     Q    Where in this article or paragraph 4 does it

25 mention anything about a disclaimer?

BLACK000671

83

1    A    It does not.

2    Q    But you're saying you told that to Ms. Babcock?

3    A    I did.

4    Q    And you're saying that in here that's what informed

5    everyone about the disclaimer going two-thirds/one-third?

6    A    No, but this has a reference in it to two-thirds

7    goes to Joanne's SNT and one-third goes to the Issue Trust

8    and therefore it goes to whether I was trying to hide that

9    one-third was in the Issue Trust.  If I was trying to hide it

10   why did I say it to Ms. Babcock.

11   Q    Did you say anything about one-third of the

12   disclaimed assets going into the Issue Trust to Ms. Babcock?

13   A    To my recollection I did, but it's three years ago

14   and I don't remember my exact words.

15   Q    And even though you say that you told Ms. Babcock

16   this you didn't tell the Court that in your petition, right?

17   A    At this point we've gone over the petition, the

18   petition said what it said, the proposed order for special

19   conservatorship was much more explicit about what we wanted

20   and I thought was clear enough and Mr. Glatstein thought was

21   more than clear enough.

22   Q    All the people that need to know that you're going

23   --that your intent is to disclaim these assets so that

24   one-third of those POD assets goes into an Issue Trust, of

25   all the people you needed to disclose that to the most

BLACK000672

84

```
 1   important is the court, right?
 2       A    I don't know that I even thought about it that way.
 3   I was trying to disclose.  I don't know who's more important.
 4       Q    You mentioned that Ms. Babcock's visitor report was
 5   one of the things, you also said there was a hearing on
 6   December 11ᵗʰ, 2012, that was another important disclosure,
 7   right?
 8       A    No, I don't think in my direct testimony I said
 9   anything about the hearing.
10       Q    You didn't?
11       A    But we certainly had a hearing on December 11ᵗʰ.
12       Q    And was Ms. Wrigley present at the hearing?
13       A    No.
14       Q    Was I?
15       A    No.
16       Q    And have you gone through the transcript?
17       A    I have reviewed the transcript from December 11ᵗʰ,
18   yes, I have.
19       Q    And you know that you mentioned that the intent was
20   that Ms. Black's assets would go into an Issue Trust in which
21   I was a trustee?
22       A    I don't remember the language of the December 11ᵗʰ
23   transcript but if you want to show it to me I'll look at it.
24            MR. DAIN:  (Inaudible).
25            MR. POSKUS:  It's in the exhibit book, Your Honor.
```

BLACK000673

85

```
 1              THE COURT:  What exhibit?
 2              MS. POSKUS:  I'll try to find it.  Your Honor, it's
 3     Exhibit 51.
 4              (Pause.)
 5        Q     (by Mr. Dain)  Do you have that in front of you,
 6     sir?
 7        A     I do.
 8        Q     Can you turn to page 7?  Actually why don't we
 9     start at page 6 and go down to line 25.  And do you see this
10     is you're--you're at the hearing speaking, do you see that?
11        A     Yes.
12        Q     And you say the basic purpose--and then go to page
13     7--of the financial guardianship is to make sure she has
14     money to get, money from my mother into a trust, do you see
15     that?
16        A     And then it continues semicolon, my cousin will
17     then be the trustee so she'll have financial support.
18        Q     Okay.  This is another point you made in terms of
19     informing everybody, disclosing to everybody what the intent
20     was of the disclaimer, right?
21        A     We had a hearing and I testified to what I
22     testified to.
23        Q     And what you said to this Court is there was a
24     trust, right?
25        A     There was a trust for Joanne, yes.
```

86

1      Q    You didn't say anything about an Issue Trust for me
2  and my children, did you?
3      A    In this particular snippet of testimony I did not.
4      Q    In any snippet of testimony on December 11th?
5      A    In this hearing I did not.
6      Q    And you said my cousin will then be the trustee so
7  she'll have financial support, you said that, right?
8      A    Yes.
9      Q    You didn't say there are two trusts, we'll be
10 receiving some, the other she'll get some financial support
11 from, correct?
12     A    At the hearing I did not say that.
13     Q    So this is not a--an item in your favor to say I
14 disclosed what was happening with the disclaimer, right?
15         MR. POSKUS:  Objection, Your Honor, he's arguing
16 with the witness now about what's in his statement and what--
17 he needs to rephrase the question.
18         MR. DAIN:  Your Honor, he testified earlier this
19 was the basis he believes everyone was on notice.  Go ahead.
20         THE WITNESS:  I did not testify that the hearing
21 was the basis on which I believe everyone was on notice.
22     Q    (by Mr. Dain)  You said it was one of the bases?
23     A    I actually don't think I said that.
24         THE COURT:  You said there were five things.
25         THE WITNESS:  I wish had been more explicit at the

BLACK000675

87

1    hearing but I said there were a bunch of things and I don't
2    recall listing this as one of them.
3        Q    (by Mr. Dain)   Okay.
4        A    I wish the hearing had been more explicit.
5        Q    Thank you.
6             MR. DAIN:   I'm sorry you got caught off.
7             THE COURT:   He just testified that there were five
8    bases.
9        Q    (by Mr. Dain)   And one of them you said was a
10   visitor's report?
11       A    Yes.
12       Q    Another you said was the hearing?
13       A    No.
14       Q    What were you--
15       A    I don't recall saying that.  Why don't we go back
16   to, you know--I guess we don't have a live feed--I don't
17   recall saying that.
18       Q    Give me the other four.
19       A    One was the court visitor's report, the second was
20   Dr. Shirke's letter, the third would have been the proposed
21   order for special conservatorship.  The fourth would have
22   been Carl Glatstein's direct conversations with Ms. Young and
23   Ms. DiPonio.  A fifth would have been my direct conversations
24   with you and Ms. Wrigley.  And sixth would have been we
25   submitted the will and the two trusts to the Court as

BLACK000676

88

1  exhibits in advance of the hearing so now I'm up to six.

2      Q    Okay.  In the--the hearing--so now you said you

3  could have been more explicit in explaining this to the

4  Court, right?

5      A    Yes.

6      Q    And when you say you could have been explicit you

7  mean mention the fact that there was a trust in which you and

8  your children would be getting one-third?

9      A    I wish that I had attended the hearing in person.

10 Mr. Glatstein advised look there's no objection, this is

11 going to be a short hearing, there's no reason for you to

12 come out to Denver and I think it was a mistake.  I think I

13 should have been here; I should have testified directly; we

14 should have had a longer hearing.  We should have had full Q

15 and A.

16          And, you know, at the time he said I didn't need to

17 and the hearing was, in fact, you know very short and I wish

18 there had been a longer hearing and I had said more, I do.

19     Q    Well, let's if we could go to page 17.

20          MR. POSKUS:  Of Exhibit 51?

21          MR. DAIN:  Yes.

22          THE WITNESS:  Okay.  I'm at page 17.

23     Q    (by Mr. Dain)  Now, let me ask you this--and again

24 you're a lawyer, you're coming to the court with a petition

25 to be named conservator and within it you want a disclaimer,

89

1   are you following me so far?

2        A    I have a petition to become a conservator, I am a

3   lawyer, and I'm asking the Court to approve a disclaimer,

4   yes.

5        Q    And in addition to being explicit to the Court in

6   what your intent is, you'd agree with me it's also important

7   that if the Court appears to be under any misapprehension

8   about what your intent is you should make it clear, right?

9        A    I don't know that I have an opinion on--on that, I

10  was there to answer questions.

11       Q    Okay.  Well, let's go to page 17 and here you're--

12  you're having a colloquy with the Court.  And the Court says,

13  The Court finds that the statute requires in Colorado that a

14  90 day initial report, the inventory and financial plan must

15  be filed with the Court, do you see that?

16       A    Yes, I do.

17       Q    And certainly the progress on moving the funds into

18  the trust can be reported on as well and that will take care

19  of that, do you see that?

20       A    Yes, I do.

21       Q    Did you feel obligated while having that colloquy

22  to say, Your Honor, it's not just the trust, there are really

23  two trusts and let me explain to you how they operate?

24       A    So here's how I would interpret this language, I

25  would say--

90

1      Q      Before you do that, I'll let you--

2      A      Excuse me, you interrupted me.

3             MR. POSKUS:  Your Honor--

4             MR. DAIN:  Your Honor--

5             THE COURT:  No, I'm going to let Mr. Dain clarify

6      what he's trying to get out of the witness.  If you want to

7      do redirect you're welcome to.

8             MR. POSKUS:  Okay.  I just wish you'd let the

9      witness finish answering the question.

10            THE COURT:  Well--

11            MR. DAIN:  It's a yes or no, I'm sorry, Your Honor.

12     We'll be here all day.

13     Q      (by Mr. Dain)  You--let--let me ask you, yes or no,

14     did you think it was important at that time when the Court

15     said the progress on moving the funds into the trust did you

16     think it was important, yes or no, to explain to the Court

17     it's not really the trust, there is another trust in which

18     I'm going to be getting one-third along with my children?

19     A      That did not occur to me at the time; I thought

20     everybody understood what the proposal was.

21     Q      Am I correct that what also didn't occur to you a

22     little later is given that the Court said you must in your

23     inventory and financial plan report on the progress of moving

24     the funds into the trust that at that time you didn't explain

25     to the Court that there was another trust in which you

BLACK000679

91

1    received one-third along with your children?

2        A    So I'm sorry I'm not sure I'm following the

3    question.

4        Q    The Court here is telling you that within 90 days

5    you have to file an inventory and financial plan, right?

6        A    That's right.

7        Q    And saying you should report on the progress of

8    moving the funds into the trust, correct?

9        A    That's correct, that's what the words say.

10       Q    At the time you filed the inventory and financial

11   plan did it occur to you to explain to the Court that there's

12   another trust in which I and my children are getting

13   one-third?

14       A    I think that I was reporting the inventory and

15   financial plan on Joanne's assets, I wasn't reporting on

16   other assets.  So I don't know why it would occur to me to

17   put in Joanne's inventory that there are other assets in my

18   mother's estate at this point that aren't Joanne's assets.

19       Q    Now, I know we've been through this before but you

20   know that the inventory and report required you to include

21   all assets that existed on December 11th, 2012, right?

22       A    We went through this at great length and I

23   understand that, you know, if that's what nunc pro tunc means

24   I'll accept that.  I relied on Mr. Glatstein's advice for

25   what I should report in my inventory and financial report.

BLACK000680

92

1    And the inventory and financial report says very clearly that
2    we're reporting the Supplemental Needs Trust as of March
3    31st, 2013.
4         Q    You know that Mr. Glatstein testified and did not
5    mention anywhere that he advised you not to include assets
6    that existed on December 11th, 2012?
7         A    I provided full information on the assets to Mr.
8    Glatstein.  I think my first effort to fill out the inventory
9    and financial plan he said this is just a mess or words to
10   that effect, let me do it or let me have my paralegal do it
11   and then we went back and forth starting with his draft of
12   the inventory and financial plan.  And I provided additional
13   financial information to Mr. Glatstein to help fill out the
14   form in the manner that he thought it should be filled out.
15        Q    All done?
16        A    Yes.
17        Q    You said you provided full information on the
18   assets, the assets you provided full information on to Mr.
19   Glatstein were only the two-thirds that were going into the
20   Supplemental Needs Trust, right?
21        A    Incorrect.  I provided information to Mr. Glatstein
22   on all of the assets coming from Vanguard.
23        Q    So then you knew--you knew that you had to provide
24   information on all of the paid on death assets, correct?
25        A    No, I was providing this information to Mr.

BLACK000681

93

1   Glatstein and if he thought it should go in the inventory and
2   financial report it would have gone in.
3        Q    Did you--
4        A    I provided it to him and he decided that it doesn't
5   go in so he didn't put it in.
6        Q    But you know he never said that in his testimony
7   that he decided it shouldn't go in?  You've heard--you've
8   written--heard and--
9        A    I don't remember exactly what questions were asked
10  but I'm going to tell you I provided full information to Mr.
11  Glatstein; I have an e-mail in my files that says here's all
12  the assets and then he used that information to complete the
13  inventory and financial plan.
14       Q    And the assets included all of the assets, all of
15  the POD assets even those that were the one-third that
16  ultimately went to your issue trust?
17       A    Yes, it did.
18       Q    Okay.  So you knew that you had to give him that
19  information, right?
20       A    I thought that was relevant information for him to
21  have.  Did I know that I had to, no, I was giving him
22  information; I don't know what the specific rules are for
23  filling out the inventory and financial report other than he
24  was convinced I had made a hash of it.
25       Q    I know this is an exhibit too, the inventory and

BLACK000682

94

1    financial report, you've read it, right?

2        A    Yeah.

3        Q    Did you sign anything related to that inventory and

4    financial report?

5        A    I'm confident that I signed it.

6            MR. POSKUS:  Exhibit 27, Your Honor.

7            THE COURT:  Yeah.

8            (Pause.)

9        Q    (by Mr. Dain)  Okay.  You signed it under penalty

10   of perjury, right?

11       A    If that's what it says I signed it and you got a

12   copy of it.

13       Q    Well, it's not what it says, I'm asking you, you've

14   got it there, did you sign it under penalty of perjury?

15       A    I don't see the word perjury but if you want to

16   read the verification page on page 8 you can.

17       Q    I understand that penalties for perjury follow

18   deliberate falsification of the facts stated herein.

19       A    I see, okay, yes, I signed it; I submitted it to

20   the Court and I sent copies to you and Ms. Wrigley among

21   other people.

22       Q    You've read it you just said that right?

23       A    Yes.

24       Q    You see that at the very beginning it says date of

25   appointment December 11th, 2012, right?

95

1    A    I do.

2    Q    Inventory values as of date December 11--that

3    should be 2012 but you typed in 22, do you agree with me that

4    that's what that says?

5    A    I agree that Mr. Glatstein made a typo and it says

6    2022 instead of 2012.

7    Q    Yeah, I guess thank you but you're missing my

8    point; that the inventory values are as of the date of

9    December 11th, 2012?

10    A    I agree that that's what this says and Mr.

11    Glatstein made the judgment that we should report the assets

12    in the Supplemental Needs Trust as of March 31st 2013 and

13    that's what the body of this report does.

14    Q    So you're saying it was solely his decision to not

15    include in his inventory report what the Judge has asked for

16    on December 11th, 2012?

17    A    I relied on Mr. Glatstein with regard to what

18    assets should be disclosed.  I now have advice from counsel

19    that the Supplemental Needs Trust isn't really part of the

20    conservatorship assets either.

21    Q    Oh, this comes from Mr. Poskus?

22    A    No comment.

23        MR. DAIN:  Your Honor, I--he's got to cause he just

24    waived the attorney/client privilege.  He can't use this as a

25    sword and then--and then throw up the shield.  I ask you to

BLACK000684

96

1    order Mr. Black to answer that question.

2              THE COURT:  Go ahead, Mr. Black.

3        Q    (by Mr. Dain)  Who?

4        A    Mr. Poskus advised me that the--really the

5    Supplemental Needs Trust should not have been listed in this

6    inventory to begin with because it wasn't part of the

7    conservatorship of the estate it was part of Joanne's assets

8    but it wasn't part of the conservatorship.

9        Q    So Mr. Poskus told you there just shouldn't have

10   been an inventory and account because there's really nothing

11   to account for; is that correct?

12       A    No, that's not what he said.

13       Q    What did he say should be included?

14       A    Whatever belongs to the conservatorship.

15       Q    You came to this Court and you said there are paid

16   on death assets, 100 percent of some to Ms. Black, 95 percent

17   of others to Ms. Black, I want to disclaim those.  So you

18   asked this Court, the conservatorship court, to allow you to

19   disclaim, are you saying Mr. Poskus now is saying that never

20   should have happened because these assets weren't even part

21   of the estate?

22             MR. POSKUS:  Your Honor, regardless of how I

23   advised my client, how is this relevant advice I gave him two

24   and a half years after the fact has anything to do with what

25   occurred in (inaudible).

BLACK000685

97

```
 1          MR. DAIN:  Your Honor, Mr. Black's credibility is
 2   at issue here.  If he's going to be blaming everything on his
 3   attorneys I'm allowed to probe into that.
 4          THE COURT:  Well, for that part of it I think it's
 5   a valid question.  It's to, you know, the advice itself it
 6   really isn't probative, I agree.
 7     Q     (by Mr. Dain)  So again, are you telling this Court
 8   that even though you came to this Court to allow you to re--
 9   to divert and--or divest and redirect a third of the assets
10   that were paid on death to Ms. Black that those assets never
11   should have been part of the estate?
12     A     No.
13     Q     Mr. Poskus just told you that only the--the assets
14   you put into the Supplemental Needs Trust didn't need to be
15   reported?
16     A     No.
17     Q     What did Mr. Poskus tell you?
18     A     Mr. Poskus advised me that in his judgment the
19   Supplemental Needs Trust is not part of the "conservatorship"
20   that has not--that is not the same thing as what gets
21   reported in particular document.  I did not have that
22   discussion with Mr. Poskus.  This document was prepared by
23   Mr. Glatstein with information from me.
24     Q     So you're saying that the Supplemental Needs Trust
25   that has two-thirds of those disclaimed assets is not a part
```

BLACK000686

98

1    of this conservatorship proceeding, that's your

2    understanding?

3        A    I have no opinion one way or the other.  It's

4    reported in this inventory and financial plan because Mr.

5    Glatstein thought it should be reported.

6        Q    And the inventory and financial plan--again, did

7    you think if Mr. Glatstein told you that you should only

8    report the assets as of March 31st, did you question that

9    based on what you saw on the document itself?

10       A    I don't recall doing so, I thought it made sense to

11   me because that was after the disclaimer so that was after

12   assets had already been segregated and identified as going

13   into the Supplemental Needs Trust.

14       Q    On December 11th, 2012, you didn't have--you hadn't

15   disclaimed the assets, right?

16       A    That's correct.

17       Q    Okay.  And so the values as of December 11th, 2012

18   are everything because you hadn't disclaimed anything yet,

19   you knew that, right?

20       A    I don't know that I focused on it, but I would

21   agree that as of December 11th, 2012 the POD assets were

22   three million and there were--and out of that two million

23   was--under the disclaimer would go into the Supplemental

24   Needs Trust.

25       Q    Okay.  And so we have the letter from Dr. Shirke,

99

1    the proposed order--and by the way you also know that--you or

2    Mr. Glatstein put in the order that issued that you could

3    serve without bond because respondent's assets will be placed

4    into a Supplemental Needs Trust, you didn't--

5         A     Where--where are you?

6               MR. DAIN:   What exhibit again is the amended order?

7    12?  Do you want to try turning the page--I mean to Exhibit

8    12.

9               MR. POSKUS:   Yeah, 12.

10              THE WITNESS:   I'm at Exhibit 12.

11        Q     (by Mr. Dain)   Turn to page 3.

12        A     Okay.

13        Q     Do you see there under item 6 in bold, respondent's

14   assets will be placed into a Supplemental Needs Trust?

15        A     It continues for respondent's benefit.   (See

16   below.)  Yes.

17        Q     Right.  And respondent is Ms. Black, right?

18        A     That's right.

19        Q     You didn't think it would be important to let the

20   Court know that not all of the assets of respondent are being

21   placed in the Supplemental Needs Trust?

22        A     This feels to me like play with words.  We knew--I

23   believed everybody knew that Joanne's POD benefits would be

24   disclaimed into the estate and out of the estate two-thirds

25   would go into the Supplemental Needs Trust.  Those assets

BLACK000688

100

1    would be placed in a Supplemental Needs Trust for Joanne's

2    benefit.

3        Q    And you--these are your words, you said, this seems

4    like playing with words, right?

5        A    It seems like you're playing with words with me,

6    yes.

7        Q    Not including the fact that you had a conflict

8    because I think earlier you testified, yes, you recognize you

9    had a conflict.  Not including the fact--the fact that

10   one-third of these disclaimed assets are going into an Issue

11   Trust.  Not including the fact that under a bond respondent's

12   assets will be placed into a Supplemental Needs Trust.

13            At the hearing, hearing the Court say these trust

14   and you said the trust--

15            MR. POSKUS:  Objection, Your Honor, it's a compound

16   question.

17            MR. DAIN:  No, I'm just--I'm laying out all the

18   foundation for it--these are all the things that occurred.

19       Q    (by Mr. Dain)  You don't think you were playing

20   with words and not making clear to the Court that one-third

21   of those assets are going to you, the conservator, and your

22   children?

23       A    I did not think I was playing with words.  I

24   thought we provided full disclosure.

25       Q    Just going back again to--to Ms. Wrigley, you said

BLACK000689

101

1  they had--you had all these conversations, are you saying
2  that Ms. Wrigley was on a conversation that you had with your
3  wife?

4      A    I don't think I testified to a three-way
5  conversation.  I think I testified to multiple conversations
6  with Cherie Wrigley.  I'd have to think about whether I have
7  any specific memory of a conversation in which my wife
8  participated, but that wasn't my testimony.

9      Q    Okay.  How--and in how many e-mails have you sent
10 to Cherie Wrigley since your mother passed and since this
11 issue came up before this Court, how many e-mails?

12     A    During the period from my mother's death until
13 through about September 2012 I would bet there are hundreds
14 of e-mails.

15     Q    100?

16     A    Probably more than a 100, probably more than 200,
17 somewhere--you know, not a thousand but hundreds.

18     Q    And in those hundreds of e-mails you'd agree with
19 me there is never once, nowhere a mention of a disclaimer--

20     A    Absolutely there is.  And we went through this the
21 last time.

22     Q    Wait a minute you haven't let me finish the
23 question before you get angry.  There's no mention of a
24 disclaimer that would result in one-third of the assets going
25 into an Issue Trust?

BLACK000690

102

```
1       A    We went through exactly this testimony last time
2   and I explained why I thought that the e-mail conversations,
3   e-mails from me to Cherie about Rebecca were consistent with
4   that and inconsistent with any other interpretation.
5       Q    I'm not asking that.
6       A    If you want to go back to that testimony go back to
7   it.
8       Q    No, I'm asking you would you agree with me that
9   there is no mention in any of those hundreds of e-mails of a
10  disclaimer that will have the effect of one-third of the
11  disclaimed assets going to an Issue Trust for the benefit of
12  you and your children?
13      A    Effectively there is, yes.
14      Q    The words--those words are in the e-mail?
15      A    The words Issue Trust are not in there, what is in
16  there is an e-mail from me to Cherie saying here's the
17  disclaimer for Rebecca.  There's an e-mail from me to Cherie
18  saying here are the arguments you can give to Rebecca so you
19  can get her to disclaim her 1 percent so it doesn't blow up
20  to 20 percent so that it goes out into the estate and
21  one-third comes out and she's going to get a share of
22  one-third; that's probably more words than the e-mail has but
23  that's the content of the e-mail.
24      Q    I know that has more words than the e-mail has
25  because the e-mail doesn't include the one-third that's going
```

BLACK000691

103

1    to come out, right?

2        A    If you want to go back to that e-mail we'll go back

3    to the e-mail.

4        Q    Just--you know what it says, it doesn't--

5        A    I don't have--I don't have a precise memory but I

6    have a memory of an e-mail that I thought was very clear as

7    to Cherie's understanding and my understanding that why would

8    Rebecca waive 1 percent.  She would waive 1 percent because

9    then she was going to get her share of one-third.

10       Q    No, no, don't--I'm not asking you why you're--about

11   your logic, I'm asking you what's in the e-mail.

12       A    You're not showing me the e-mail.

13       Q    And follow me--follow me on this.  No, I've asked

14   you in the hundreds of e-mails and you mentioned an e-mail.

15       A    I've mentioned two e-mails.

16       Q    Okay.

17       A    We also have e-mails from me to Cherie attaching a

18   disclaimer for Joanne.  We have lots of e-mails talking about

19   would Joanne go--would Cherie go to Colorado to try to get

20   Joanne to sign the disclaimer.  So there's a lot of e-mail

21   trails.  They're not e-mails with you they're e-mails with

22   Cherie.

23       Q    Without playing with words do any of those e-mails

24   contain the statement that the disclaimer will have the

25   effect of me and my children, meaning you, Bernard Black,

104

1    receiving one-third of those disclaimed assets?

2        A    I have told you that I believe that the e-mail from

3    me to Cherie with regard to Rebecca effectively says that.

4        Q    Have you made that e-mail an exhibit to this Court?

5        A    Have you?

6             MR. DAIN:  Your Honor--

7             THE COURT:  Yes or no, Mr. Black.

8             THE WITNESS:  I don't recall whether it's an

9    exhibit.  I don't think we included it in my direct

10   testimony.

11       Q    (by Mr. Dain)  And I think you just pretty much

12   just said it, you don't have an e-mail to me where you say

13   that?

14       A    I agree I do not have an e-mail to you where I said

15   that.  I explained what I have for you.

16            MR. POSKUS:  For the record, Your Honor, Exhibit 79

17   is in the record; that's the e-mail to Ms. Wrigley asking

18   about Joanne signing a disclaimer.  Exhibit 80 is the e-mail

19   from Mr. Black to Cherie Wrigley with forms for Rebecca to

20   sign.  I do not recall that we got that into the record.

21            MR. DAIN:  So let's go over Exhibit 79 and 80.

22            (Pause.)

23            MR. DAIN:  You said 80?

24            MR. POSKUS:  80.

25            MR. DAIN:  I don't have that one.  You can make a

105

1  copy--but in the meantime let's go over Exhibit 79.

2      Q    (by Mr. Dain)  And I--

3          MR. DAIN:  Your Honor, do you have that in front of

4  you?

5          THE COURT:  I do.

6          MR. DAIN:  Okay.

7      Q    (by Mr. Dain)  Cherie, here is the form I'll need

8  Joanne to sign, do you see that?

9      A    I see Exhibit 79, yes.

10     Q    Anywhere in this e-mail--this e-mail, we'll get to

11 the attachment in a minute--but anywhere in this e-mail you

12 see what--you just said that there was effectively a

13 statement that the disclaimer would operate such that you and

14 your children would get one-third of the assets?

15     A    I was referring to an e-mail with regard to Rebecca

16 not to this e-mail.

17     Q    That would be I guess the next one, the disclaimer

18 regarding--

19     A    Actually not, Exhibit 80 is attaching the

20 disclaimer form for Rebecca and there's a separate e-mail

21 where I write to Cherie and say here--in effect here are the

22 arguments that you can make to try and get Rebecca to sign.

23     Q    And you--you've supplied that e-mail to your

24 counsel?

25     A    I believe that counsel has a copy and I believe

106

1     through discovery you have a copy.

2          Q     You have--but you have no way of knowing whether,

3     in fact, a copy has been given to me?

4          A     Do you want me to go look at the discovery record,

5     I can go look?

6          Q     I'd like you to get the e-mail--

7          A     I have no reason to think that it's not.

8          Q     --at a break if you could.  Say it again?

9          A     I have no reason to think that that e-mail was not

10    provided to you as part of discovery.

11         Q     And certainly you want to have that e-mail before

12    the Court so you could prove this discussion you had with Ms.

13    Wrigley about the disclaimer effectively giving you and your

14    children one-third, right?

15         A     That e-mail is responsive to your question.

16         Q     Okay.  This e-mail--let's work with this one first,

17    nothing in this e-mail, right?

18         A     Which e-mail are you on?

19         Q     79.

20         A     That's correct.

21         Q     Let's go to the disclaimer.  Show me where in the

22    disclaimer that it says to Ms. Wrigley, hey, one-third of

23    this is going into an Issue Trust for me and my children?

24         A     Are you on Exhibit 79 still?

25         Q     Yes.

BLACK000695

107

```
 1      A    The disclaimer doesn't say that.  The disclaimer
 2 just says I disclaim.
 3      Q    So clearly this isn't the e-mail, right?
 4      A    We've already established that.
 5      Q    Okay.
 6           MR. DAIN:  Your Honor, I move Exhibit 79 into
 7 evidence.
 8           MR. POSKUS:  It's already in evidence.
 9           THE COURT:  It was admitted.
10           MR. DAIN:  Oh, it is, I'm sorry.  Is 80 already in
11 evidence?
12           THE COURT:  No, just 81.
13           MS. DiPONIO:  We don't know what 80 is.
14           MR. DAIN:  Is there--if you go to Exhibit 80, do
15 you have one in your binder?
16           THE WITNESS:  I have Exhibit 80 in my binder.
17           MR. DAIN:  Your Honor, do you?
18           (No audible response.)
19      Q    (by Mr. Dain)  Is there--this is an e-mail from you
20 to Ms. Wrigley November 4th, 2012, do you see that?
21      A    Yes.
22      Q    Is says forms for Becca to sign.  You didn't even
23 include any discussion in this e-mail, right?
24      A    As I've testified the discussion was in a separate
25 e-mail.
```

BLACK000696

108

```
 1        Q     Okay.  In this e-mail in which you sent the
 2   disclaimer could you please go through the disclaimer, all
 3   the pages there, and tell me where in here it says that
 4   one-third of the disclaimed assets are going to you and your
 5   children?
 6        A     It doesn't.  It's just a disclaimer that says I
 7   disclaim.
 8        Q     Okay.  So it--
 9              MR. DAIN:  And, Your Honor, I move Exhibit 80 into
10   evidence.
11              THE COURT:  Objection?
12              MR. POSKUS:  No--no objection, Your Honor.
13              (Petitioner's Exhibit 80 was received in evidence.)
14        Q     (by Mr. Dain)  So it's--you're certain there's
15   another e-mail in which you say to Ms. Wrigley that one-third
16   of the assets are going to go to me and my children?
17        A     There's another e-mail where--let me call it a
18   talking points e-mail where I say here are the--here's the
19   argument that I think makes sense to make for Rebecca in
20   order to get her to disclaim the 1 percent of the Vanguard
21   assets that she was otherwise entitled to.
22        Q     No, no, that's not my question.  The 1 percent that
23   Becca would disclaim doesn't answer what's happening to the
24   one-third of the asset.
25        A     Yes, it does.
```

BLACK000697

109

```
 1     Q    How?

 2     A    Because why would Rebecca want to disclaim her 1

 3 percent?

 4     Q    I don't know but I'm asking you what about--

 5          MR. POSKUS:  Your Honor--

 6     Q    (by Mr. Dain)  --contents of the e-mail, anywhere

 7 in that e-mail that you're saying it--it exists does it say

 8 that through this process of getting Becca to disclaim and

 9 Joanne to disclaim one-third of those assets will go to me

10 and my children?

11     A    Effectively it does.  There was no basis for asking

12 any of my kids to disclaim their 1 percent interest except

13 that if they did that then the assets would go into the

14 estate and one-third would go out to the Issue Trust; that

15 was the argument for all of my children.  Please disclaim

16 because otherwise 95 percent is going to go to Joanne and

17 that--you know, that--that--direct to Joanne didn't work and

18 I couldn't submit the disclaimer and have their 1 percents

19 blow up to 20 percent so I was saying to each of them or for

20 Sara and Rebecca, Cherie was saying to them, please disclaim

21 the 1 percent that's in Vanguard down to zero so that the

22 whole process can go forward and so that we can avoid

23 litigation.

24     Q    And just so we're clear, the words weren't in

25 there, you're saying it--the purpose of this was--the words
```

BLACK000698

110

1   were not in there, right?

2       A    They're not in where?

3       Q    In the e-mail to Ms. Wrigley.  The words that

4   one-third of the assets will go to me and my children.

5       A    I don't remember where the exact words one-third

6   went but the argument was disclaim the 1 percent so that

7   you'll get more through the Issue Trust, that's what I

8   remember.

9       Q    So the words Issue Trust were clearly in there?

10      A    I don't remember that either.  Rebecca would not

11  have known Issue Trust.  She would have known grandkids

12  trust.

13      Q    Here's the point, I'm asking you words in the

14  e-mail.  I'm not asking--

15      A    I'm not remembering.

16      Q    Pardon?

17      A    Why don't we wait if you're going to go through

18  lunch and show me the damn e-mail--excuse my language.

19      Q    I--

20      A    Show me the e-mail.  Rather than my guessing about

21  an e-mail that I wrote two and a half years ago about exactly

22  what the words were.  I remember an e-mail where I wrote to

23  Cherie and said here are--here is how you can persuade

24  Rebecca to disclaim her 1 percent by promising her that if

25  she disclaims she'll get more implicitly or explicitly

111

1   through the Issue Trust.

2      Q   Okay.  And over the lunch break you'll find that

3   e-mail?

4      A   I imagine that over the lunch break we can find the

5   e-mail.

6      Q   And you've said that--you started out this--this

7   whole--your initial testimony--you started out by saying that

8   when you saw these POD designations you became upset, right?

9      A   I thought this was wrong; this made no sense.

10      Q   So--so your primary purpose was to correct that

11   wrong, right?

12      A   I don't know that I had a primary purpose but I

13   thought that this was wrong and it made no sense.

14      Q   And you recognize again that if you're Joanne

15   Black's conservator and what you're trying to do is remake

16   the estate plan of your mother from the POD benefits to what

17   is in her will--

18      MR. POSKUS:  Objection to the form of the question,

19   Your Honor, what is the estate plan of mother is--is

20   delineated by the will that's been admitted to the Court in

21   New York; that's her estate plan.

22      Now, if he wants to talk about the POD designations

23   being the estate plan, the witness has testified that the

24   legitimacy of those designations is up in the air.  He can't

25   ask the question in the form of this is the estate plan

BLACK000700

112

1   you're trying to redo, that issue is in dispute.  So he needs
2   to rephrase the question.
3          THE COURT:  Well, part of the problem I'm having--
4   and I tried to ask that at the outset today is--there is--
5   where is this dispute being litigated?  Apparently nowhere.
6          MR. POSKUS:  But it hasn't been litigated because
7   the exercise of the disclaim eliminated the need to litigate.
8          MR. DAIN:  No.
9          MR. POSKUS:  That was the whole point to it.
10         THE COURT:  Right.  But to obtain the validity for
11  the declaimer it has to be--it has to be aired in some forum.
12  And no other forum has been approached at this point is what
13  I understand.
14         MR. POSKUS:  No other forum has been approached to
15  litigate the legitimacy of the POD designation, that's
16  correct.  But like I said this was everybody's agreement to
17  avoid that litigation including Mr. Dain's and Ms. Wrigley's.
18         THE COURT:  All right.
19         MR. DAIN:  I'm sorry is he testifying or is he just
20  saying--
21         THE COURT:  There is--well, that's what we're
22  talking about here is whether or not there actually was an
23  agreement--
24         MR. POSKUS:  That is what we're talking about, I'll
25  agree with you.

BLACK000701

113

1          THE COURT:  --or the disclosure.

2          MR. POSKUS:  I agree with you.

3          THE COURT:  Okay.  So the real--and then the

4     question then becomes why was this done; he talked about it a

5     little bit before.  And the question Mr. Dain is asking

6     actually goes to that.

7          MR. POSKUS:  Okay.  So--but let him phrase the

8     question properly that it's not the estate plan, let him

9     phrase the question he did this in order to avoid the POD

10    designation.  It's not--

11         THE COURT:  Well, but it's--

12         MR. POSKUS:  --put in any--

13         THE COURT:  --it is related to the estate plan

14    though.

15         MR. POSKUS:  Well, it's related to the issue of

16    what is the estate plan and the parties all agree that rather

17    than litigate it we'll do the disclaimer.

18         MR. DAIN:  Oh, I guess--

19         THE COURT:  But they didn't agree, Mr. Poskus--

20         MS. DiPONIO:  Your Honor, I object to that.

21         THE COURT:  --and that's why we're here.  If there

22    was an agreement they would have given it to the Court, the

23    Surrogate's Court and the Surrogate's Court would have

24    affirmed the agreement and they would have done it.  They

25    didn't do that.

BLACK000702

114

1        MR. POSKUS:  Well, Your Honor, the thing is they
2   thought they had all the interested parties' agreement that's
3   his testimony.
4        MR. DAIN:  Well, that's his testimony that's why
5   I'm asking questions.  If you want to replace him, replace
6   him, otherwise argue it later.
7        MR. POSKUS:  No, Your Honor, all I was objecting to
8   was the form of the question.
9        THE COURT:  Okay.  Well, I guess the objection is
10  overruled because I don't know how else to resolve this thing
11  fully if we don't hear about it.  Unless you want me to just
12  do what my plan A is and then just solely resolve the issue
13  of the breach and then send it on for further litigation in
14  New York.
15       MR. POSKUS:  Well, Your Honor, we--at some point
16  I'd like an opportunity to address the Court on that issue,
17  but this is--that may be for closing argument.
18       THE COURT:  Well, it will be too late then.  I mean
19  I have to deal with this either now under this Court's
20  equitable powers or I have to be very narrow in my ruling and
21  send it back to New York State for them to deal with it.
22       MR. POSKUS:  If you want me to address the Court on
23  the issue now, Your Honor, I'll do it.  I didn't--all I was
24  doing was objecting to the way he phrased the question.  If
25  Mr. Dain wants to hold off on his questioning for a little

115

1  bit and you and I can have this colloquy--which I assume Mr.
2  Dain can respond to then we can do that.
3        MR. DAIN:  Let's do that now, we can continue after
4  lunch, we've got ten minutes.  Let's have the colloquy.
5  Because I do think if he's got an issue with the Court's
6  stated issues let's hear it.
7        MR. POSKUS:  It's up to you, Your Honor, however
8  you want to handle it.  I'm prepared to address it now if you
9  want.
10       THE COURT:  Well, seeing as how it's going to
11 direct what testimony we get we probably should address it
12 now.  All right.
13       MR. POSKUS:  Fine with me, Your Honor.
14       THE COURT:  All right.  So basically I framed the
15 issue at the outset because it appeared to me at that time--
16 and it still does--and we need to clarify whether or not
17 there was a breach of fiduciary duty.
18       MR. POSKUS:  Right.
19       THE COURT:  Okay.
20       MR. POSKUS:  Your Honor, since we're probably going
21 to do this and then take a break maybe Mr. Black can go ahead
22 and take a seat.
23       THE COURT:  That's fine.
24       MR. POSKUS:  You Honor, and you're right previously
25 in--in our hearings on June 16th and 17th we did elude to what

116

1    are the issues in this case and I took it off of your--your

2    April 2nd order at paragraph 13 where you identified two

3    issues and then you went to--and you said kind of as part of

4    these proceedings the Court will determine whether the

5    allegations of breach of fiduciary duty are supported by the

6    evidence and whether any disgorgement or unwinding of

7    fiduciary actions, including the creation of the trust is

8    appropriate.

9         So the way I interpret that order is you wanted to

10   hear evidence on the first two issues you identified and then

11   as a result of the evidence of that you'd determine whether

12   or not these allegations are true.

13        So to me, Your Honor, the two main issues--the

14   first one is--and I'll quote at least that order in part--

15   "Whether the disclaimer should have acted to divest Ms. Black

16   of one-third of these nonprobate assets." And to me, Your

17   Honor, the answer is having the--having exercised the

18   disclaimer there was no choice.

19        Remember that the law on disclaimers is that a

20   disclaimant cannot control how the disclaimed funds are

21   distributed once the disclaimer was exercised. Once we

22   exercise the disclaimer we're locked into what happens as if

23   --in this case Joanne Black predeceased her mother.

24        So the fact of the matter is that in this case once

25   the disclaimer was exercised the Vanguard and Fidelity funds

BLACK000705

117

1  had to go into Renata Black's estate; we don't have any

2  choice in the matter because of the way disclaimers work.

3         I know you're looking at me like you think we might

4  have a choice, but I'm not sure how we would because the

5  second the disclaimant exercises any control over the

6  disclaimed assets the disclaimer becomes invalid.  Once the

7  disclaimer is exercised it sets in motion a set of

8  circumstances that can't be changed.

9         And so to me the answer to your first question

10  whether the disclaimer obtained by Mr. Black should have

11  acted to divest Joanne Black of one-third, the answer has got

12  to be in the affirmative; it's just a straight technical

13  legal question.

14         THE COURT:  Uh-huh.

15         MR. POSKUS:  It can't go anywhere else.  Now, later

16  in paragraph 13 you said you would consider--as I start out

17  saying you would consider whether any disgorgement or

18  unwinding of fiduciary actions including the creation of the

19  trust is appropriate.

20         Well, when you said that I'm assuming you're not

21  speaking about the SNT and the Issue Trust because those were

22  both created long ago by Renata Black.  That was filed with

23  the Court on December 9th and those were created by Ms.--Ms.

24  --Mrs. Black back in the late '90s.

25         So now the Joanne Black 2013 trust was created by

118

1   my client as conservator so I can see that you can unwind

2   that, but none of the disputed funds, the two-thirds/

3   one-third ended up in that trust.

4         So I'm assuming when we're talking about the

5   disputed trust you can't actually unwind the trust because

6   she created it and nobody is disputing that.  The only thing

7   you can presumably unwind is the deposit of the estate funds

8   into those two trusts.

9         THE COURT:  Uh-huh.

10        MR. POSKUS:  But that gets back to the issue of

11  what I said earlier, number one, we can't control where the

12  property goes once you disclaim.  And number two, the probate

13  code says once a disclaimer is exercised it's irrevocable.

14        THE COURT:  Okay.  So then basically we're back to

15  surcharge?

16        MR. POSKUS:  Well, okay, and maybe we are.  But

17  let's talk about that; let's talk about that.  And you're--

18  you're absolutely correct we--if that's the way you would

19  rule we are just back to surcharge because the issue trust

20  for example which is where presumably--if you would rule

21  there was a breach of trust the money would come from,

22  there's beneficiaries of that trust that are now current

23  beneficiaries and they're not before the Court so we don't

24  have any ability to affect them.

25        So that--you're right that would be the only

BLACK000707

119

1 remedy. So I agree with you, it gets down to whether or not

2 you can order Bernie Black to pay the one-third back himself.

3 I think that's what we're boiling it down to.

4   And the thing is, is I don't think you can. And

5 let me explain why. Mr. Dain has made a lot out of the idea

6 that Bernie Black was in a conflict of interest and he's said

7 very--very candidly, yes, I was in a conflict of interest. I

8 don't dispute that. What I do dispute is just because he's

9 in a conflict of interest that this can't happen and here's

10 why--

11   THE COURT: That what can't happen?

12   MR. POSKUS: That he can't exercise--he can't

13 participate in a transaction that benefits himself even

14 though he's the conservator and he benefits from it.

15   In other words, the probate code specifically

16 allows a fiduciary to participate in a transaction that

17 benefits himself if certain conditions are present. And in

18 this case it's 15-14-423 which allows such a transaction if

19 the conservator is expressly authorized by the Court.

20   Now, the March 5th, 2013 order expressly authorizes

21 Bernie Black to exercise the disclaimer. And like I said

22 once he exercises the disclaimer--

23   THE COURT: Okay.

24   MR. POSKUS: --the train is set in motion and we

25 can't back away from that. So the question is can you hold

BLACK000708

120

1    somebody liable for doing an act that he was expressly
2    authorized to do by this Court.
3            THE COURT:  Well, I think the answer is yes, if a
4    full disclosure wasn't made.
5            MR. POSKUS:  And you're right, that--that's the
6    issue because--and that gets to your second issue in your
7    paragraph 13 order is whether or not--the way you phrased it
8    is, the hearing will also determine whether it was properly
9    disclosed that Mr. Black intended or had authority to
10   redirect one-third of these probate assets; that's how I
11   think it's got to go.
12           And--and to be quite honest remember in the first
13   hearing where you said our trial brief was a red-herring, I
14   wasn't sure what--how you--what you meant when you phrased
15   the first issue.  I know you said it was clear; I didn't get
16   it; I thought you were actually considering voiding the order
17   two and a half years later and for some of the reasons I
18   stated today--
19           THE COURT:  Uh-huh.
20           MR. POSKUS:  --I don't think that's possible.  If
21   you're going to say it was a breach of fiduciary duty you're
22   only--I shouldn't say your own remedy, but the Court's only
23   avenue is to do a surcharge that part I agree with.
24           And so we get to your second issue of whether or
25   not there was adequate notice.  So--you know, and at this

BLACK000709

121

1    point, Your Honor, I'll start arguing what--I'd end up

2    starting to argue what the evidence shows.

3              THE COURT:  Uh-huh.

4              MR. POSKUS:  I mean Mr. Black testified this

5    morning that he thought there were a variety of reasons why

6    everybody knew what was going on.

7              Mr. Glatstein testified that he thought everybody

8    knew what was going on.  And indeed, Your Honor, I think the

9    evidence shows--I'm assuming that Mr. Dain and Mr. Wrigley

10   (sic) would dispute--I don't know they haven't testified--I'm

11   assuming they would dispute the conversations that Bernard

12   Black has testified he's had with them.

13             I mean but right now the state of the evidence is

14   he told them so at least insofar as they're concerned the

15   state of the evidence is they knew.  So then the question

16   becomes what about Lisa DiPonio and Gayle Young did they

17   know.

18             And, Your Honor, I'd submit and you'll recall we

19   had a little bit of exchange about this when Ms. Young was on

20   the stand and Mr. Dain objected saying well he's trying to

21   show that she should have known, that Ms. Young should have

22   known what the disclaimer was going to do and I said, no,

23   Your Honor, I'm trying to prove that she did know.

24             And you'll remember that the testimony from both of

25   them was that they got Mr. Glatstein's filing of December 9th

BLACK000710

122

1    that included the will and both trusts.  And their testimony
2    was--in Ms. Young's case--that she spent two hours reviewing
3    those documents and that Ms. DiPonio spent a half hour
4    reviewing the documents.
5        And then you'll recall Carl Glatstein's testimony
6    that he spoke to both of them and you'll recall their
7    testimony, both of them saying I don't remember.  So neither
8    one of them said he didn't say it to me.  I mean Ms. Young
9    kind of said I don't--I couldn't--I can't imagine that he
10   said it to me because I wouldn't have agreed to this but
11   neither one of them disputed that he said it.
12       But--directly--but the biggest evidence is the fact
13   that they had direct knowledge was the fact that Exhibit 17
14   is that January 29th e-mail exchange between Mr. Glatstein,
15   Ms. DiPonio, and Ms. Young, and Ms. Sumi Lee of this court in
16   which Ms. Young and DiPonio looking at that January 29th
17   order say we don't object.  And--
18       THE COURT:  That's the one--that's the third order.
19       MR. POSKUS:  That's the third proposed order, but--
20       THE COURT:  Right.  Because it took the other
21   language out that was explicit.
22       MR. POSKUS:  No, that--no that's--I'm sorry, Your
23   Honor, I don't mean to dispute you but the order that they
24   were approving is the one that was explicit about if the
25   disclaimer gets exercised it goes under Article 4--4th of the

BLACK000711

123

1  will.

2           THE COURT:  That's not my understanding.

3           MR. POSKUS:  All right.  Well--

4           THE COURT:  The one that didn't get signed--

5           MR. POSKUS:  Well, you know, Your Honor, what I can

6  do is over the break I can find it in the trans--I--I agree

7  the order didn't get signed, but what I'm talking about is we

8  offered that evidence to show the fact that Ms. DiPonio and

9  Ms. Young had actual knowledge of--

10          THE COURT:  Was it that order--

11          MR. POSKUS:  --what would happen.

12          THE COURT:  --or the third order that the exhibit

13 refers to?

14          MR. POSKUS:  The--they had actual knowledge of the

15 amended proposed order filed on--on January 29th and what it

16 said; that's Exhibit 25 for the record, Your Honor.  And

17 indeed Ms. Young even testified that Exhibit 25--I'm sorry--

18          (Pause.)

19          THE COURT:  Okay.

20          MR. POSKUS:  And if you look on page 3 of 3 it says

21 that the conservator is specifically authorized to disclaim

22 respondent's interest as beneficiary under all payable on

23 death or transferrable on death accounts with Vanguard and

24 Fidelity.  And then I'll skip down, allowing respondent's

25 share to pass under Article 4th of the last will and

BLACK000712

124

1   testament of Renata Black.

2           And then, Your Honor, if you look at Exhibit 17.

3           (Pause.)

4           THE COURT:  This is the one that didn't get signed.

5           MR. POSKUS:  No, I agree, Your Honor, I'm not

6   offering it for that purpose, I'm offering it to show you

7   that there was notice given because Ms. Black--Ms. Black--Ms.

8   DiPonio and Ms. Young had actual knowledge of what the

9   disclaimer was going to do because they approved this form of

10  order.

11          If you look at Exhibit 17 it's--and none of them

12  objected to this and Ms. Young said, yes, Exhibit 25 was the

13  one she--the proposed order she was referring to.  Ms. Young

14  says the proposed amended letters and amended order are fine

15  with me.  And right below that you see an e-mail from Ms.

16  DiPonio to Ms. Lee and Mr. Glatstein--excuse me--I have no

17  objection with this just being issued.

18          And so the fact of the matter is, Your Honor--

19  you'll recall this is done on January 29th and then on

20  December 9th--in other words, almost two months before this

21  they were given the will.  And so they're approving the idea

22  that the disclaimer will act to pass the assets under the 4th

23  Article of the will.

24          THE COURT:  What's the date on that second--on the

25  third order?

BLACK000713

125

1           MR. POSKUS:  On--on--

2           THE COURT:  When was that transmitted?

3           MR. POSKUS:  Oh, the one that you eventually

4    signed?

5           THE COURT:  Right.

6           MR. POSKUS:  Hang on a second and I can find that.

7           MS. DiPONIO:  Your Honor, that was in March some

8    time I believe.

9           MR. POSKUS:  March 2nd, Your Honor.

10          THE COURT:  Okay.

11          MR. DAIN:  And the order was signed March 5th.

12          MR. POSKUS:  And--and if you look, Your Honor,

13   there's actually--Mr. Glatstein filed a pleading on March

14   2nd, 2013 that was filed along with the order that you

15   actually eventually signed asking for entry of that order.

16   And if you look at that pleading that Mr. Glatstein filed on

17   March 2nd, 2013, he--he says in paragraph four that he had

18   previously discussed this language with Ms. DiPonio and Ms.

19   Young.  Neither is opposed to entry of this order and--so in

20   other--and nobody objected to this, Your Honor, and everybody

21   including Mr. Dain and Ms. Wrigley were given copies of all

22   of this documentation.

23          THE COURT:  Okay.

24          MR. POSKUS:  So--

25          THE COURT:  Well, Ms. DiPonio and Ms. Young have

BLACK000714

126

 1    already testified that that's not their understanding of the

 2    way this was going to work.

 3              MR. POSKUS:  Well, I--I agree that that's what they

 4    testified to and I have to tell you that I don't--then I

 5    guess I have to question what did they mean in their--in

 6    their April--or January 29th e-mail in which they say that

 7    one order you didn't sign is fine with me.  What did they

 8    mean when they said it's fine with me that the disclaimer be

 9    exercised to allow respondent's share to pass under Article

10    4th of the last will and testament; that's what they were

11    saying in writing at the time; that's a contemporaneous

12    statement.

13              We're now talking two and a half years later when

14    apparently--I don't know why they're testifying the way they

15    are, but I think it's pretty solid that they had actual

16    knowledge because we--the record is also very clear that they

17    had this will in their possession and they knew what the will

18    did.

19              THE COURT:  I mean, you know, part of the problem

20    okay is I have my own independent memory of all this.

21              MR. POSKUS:  And I guess--I'm dying to ask you what

22    is it?

23              THE COURT:  And I have to tell you it's really in

24    accord with what everyone else is saying.  I absolutely did

25    not have any understanding that a third of these assets were

127

1   going to go to somebody else.

2          MR. POSKUS:  Uh-huh.

3          THE COURT:  It was my understanding that the

4   disclaimer would go, the money would go into the estate and

5   then all go back out into her trust.

6          MR. POSKUS:  And then 100 percent would go to--

7          THE COURT:  Right.

8          MR. POSKUS:  And I appreciate your candidly sharing

9   that with me, Your Honor

10         THE COURT:  And I think you also need to understand

11  that the--when that second amended order came in that

12  specifically said only two-thirds--

13         MR. POSKUS:  Right.

14         THE COURT:  --that there was a lag between the

15  January and March because I didn't understand why that would

16  be and that's not what was explained and that's not what I

17  understood, so I hung on to it.

18         MR. POSKUS:  Uh-huh.

19         THE COURT:  And then the other order came along

20  about the beginning of March and it said basically what I

21  understood it to be so I signed it.  And I didn't

22  deliberately--did not sign that second order, it was not an

23  oversight and it was not lost in the shuffle of paperwork

24  here at the court, it was because I didn't understand and

25  nobody was explaining to it--explaining it to me.

BLACK000716

128

1         So--you know, and I appreciate Mr. Black's
2   testimony about his problems that he was having in terms of
3   what happened with his mom and this business about why he
4   didn't understand why she would do that and it was a last
5   minute change relatively.  I--I do appreciate all of that
6   information but the bear fact of the matter in terms of the
7   disclaimer is that it was not disclosed fully or
8   forthrightly.
9         MR. POSKUS:  Well, and so here's my response to
10  that, Your Honor, and I--like I said I appreciate you telling
11  me, I've been wondering through the whole two days that we've
12  been in Court what was she thinking.  I mean it's the natural
13  thing to think about, so let me respond to your statement by
14  saying this, so in your mind you didn't--you didn't think
15  this.
16        So I guess my point to you then is looking at it--
17  and I have--I have to say we--we've all said if we could have
18  done it differently we would loved to have done it; it's kind
19  of like spilled milk, but here's the thing, when you look at
20  what Carl Glatstein and Bernie Black were looking at back in
21  2012 I don't find it unreasonable that given the fact that
22  they had submitted the will and the trust to the court file
23  and given that these--that both Ms. Young and Ms. DiPonio
24  said they agreed with it--and then you'll recall the
25  testimony was the reason why they submitted the third order

BLACK000717

129

1    was they didn't--in all honesty, Your Honor, they did not

2    receive a directive from you saying I don't like the way this

3    order reads, nothing happened.

4            And then they were told by Vanguard we don't want

5    that stuff in there.  And I can tell you from dealing with

6    these companies they do that all the time.  They're afraid if

7    you stick stuff in there about what happens after the one act

8    that they're charged to perform then if it does--if the money

9    doesn't go to the two-thirds to the Supplemental Needs Trust

10   they're afraid they'll get sued, so they want that stuff

11   taken out.

12           THE COURT:  Uh-huh.

13           MR. POSKUS:  And so that's why they changed the

14   order.  In their minds it was reasonable for them to have

15   assumed that everybody knew given what they said.  I mean--

16           THE COURT:  It wasn't enough.

17           MR. POSKUS:  Well, if that's going to be your

18   ruling there's not much I--

19           THE COURT:  It has to be.  I have--I have a

20   definite memory of this and I just explained that to you.

21           MR. POSKUS:  No, and I agree you explained it to

22   me.

23           THE COURT:  So--

24           MR. POSKUS:  I'm just saying that under--at least I

25   think--I mean to--you would certainly agree with me and maybe

BLACK000718

130

1   you feel--and maybe you're going to tell me different--do you

2   believe that Mr. Black and Mr. Glatstein were proceeding in

3   bad faith?

4           MR. DAIN:  Your Honor, before you engage in that

5   I'd like a chance to argue to--to present the rest of the

6   evidence.

7           THE COURT:  Well, that's just it, I haven't heard

8   from you directly or Ms. Wrigley as to those conversations

9   and I--

10          MR. DAIN:  Those--those aside--

11          THE COURT:  --got from all of your body language

12  that that was not your understanding of what was going to

13  happen, but this is the thing and this is where the piece

14  about the change comes in, it softens it somewhat and it

15  makes it more understandable--

16          MR. POSKUS:  Uh-huh.

17          THE COURT:  --and not just a flat out grab--

18          MR. POSKUS:  Yeah.

19          THE COURT:  --if you will.

20          MR. POSKUS:  Yeah.

21          THE COURT:  Okay.  So that's why I appreciate that

22  information.

23          MR. POSKUS:  Uh-huh.

24          THE COURT:  So then for me the question becomes

25  then what to do about that and that's why it was a huge

131

1   mistake not to take this right to the Surrogate's Court in

2   New York.

3         MR. POSKUS: Your Honor, I--

4         THE COURT: I mean it wasn't fully disclosed here

5   and all the reasons for it. There was never any information

6   about what was going on with the estate, what was going on

7   with the mom, you know, I just hear today that there was

8   another will; that there could have--I don't know if there

9   was a revocation or what the story is with that.

10        So--I mean there's obviously a bigger story going

11   on here and I'm just getting a little snippet of it. And the

12   tiny snippet that I got from Mr. Glatstein and Mr. Black at

13   the appointment hearing is woefully inadequate.

14        MR. POSKUS: Uh-huh.

15        THE COURT: I guess I'll just put it that way. You

16   know, based on the ramifications of what they understood--

17   well what they wanted to do and why.

18        MR. POSKUS: Uh-huh.

19        THE COURT: Even just saying well go look at the

20   will is woefully inadequate. It was not full disclosure, it

21   was not clear, it was not understandable in any easy sense;

22   it required digging and that's not what my understanding of

23   candor to the Court means.

24        MR. POSKUS: Uh-huh.

25        THE COURT: I don't believe that me and my staff

BLACK000720

132

```
 1   are supposed to go through line by line and figure out the
 2   hidden intent of something like this.  It needed to have been
 3   plain, straightforward and put out there and then we can have
 4   a discussion about it.
 5          MR. DAIN:  And, Your Honor, if--the only thing I
 6   would add because I understand so I won't belabor that unless
 7   there's other argument the Court needs, but saying that it
 8   softens it is one thing, but then when it comes to reporting
 9   an accounting there's no argument that could be made--
10          THE COURT:  Right.
11          MR. DAIN:  --that Mr. Glatstein and Mr. Black
12   didn't think they had to report to you the entire assets
13   because by not reporting that--
14          THE COURT:  Right.
15          MR. DAIN:  --you--absolutely what you said, you
16   believed your order correctly allowed 100 percent to go to
17   Ms. Black as it should because you can't allow them to act on
18   that conflict and they deliberately didn't report it.
19          Now, I mean my--my point of cross-examination is
20   perhaps Mr. Black deliberately didn't give Mr. Glatstein all
21   the information but if he did I have no idea how Mr.
22   Glatstein could think he didn't have to report that.
23          THE COURT:  Well, right.  And then when it was
24   discovered the uproar ensued.
25          MR. DAIN:  Right.
```

BLACK000721

133

```
 1          MR. POSKUS:  Well, Your Honor, I can ask--I can
 2    have Mr. Black testify to what happened once all this started
 3    up, I'm not sure if that's the reason why Mr. Black thinks
 4    the uproar ensued, as a matter of fact I know it's not.  I
 5    mean his testimony would be that they knew about it and this
 6    dispute started up when they didn't like a request for
 7    reimbursement that Cherie Wrigley made.
 8          MR. DAIN:  Your--Your Honor--
 9          MR. POSKUS:  And that's what started the whole--in
10    other words Cherie Wrigley wanted reimbursement for a number
11    of expenses she allegedly incurred on the--
12          THE COURT:  The one that was recently stipulated
13    to?
14          MR. POSKUS:  That was part--well, we stipulated to
15    the parts--there was no objection--but there's--there were
16    more reimbursement requests even beyond the ones that Ms.
17    Peterson said we didn't agree to.  This goes back--like you
18    said this is--we're dealing with snippets.
19          MR. DAIN:  Your Honor, I--I--you know, and it's
20    funny, I can put Ms. Wrigley on the stand and if we have to I
21    will, but you don't need that, just because Mr. Black
22    testifies as Mr. Poskus seems to imply, you don't have to
23    believe his incredible statements.  They're not corroborated
24    by anything.  Some of his statements just belie, you know,
25    common knowledge and truth.
```

1        So, yes, he can say oh, I told everybody but that

2   may be--and maybe that's in his mind, but the circumstantial

3   evidence supports no he didn't.

4        And the fact that after the disclaimer he didn't

5   properly report is the key to saying it isn't that way.  And

6   I don't know about Mr. Glatstein who clearly when he

7   testified didn't say I had all the information or didn't have

8   all the information; he danced around it.

9        But there's no question that should have been

10  reported; there's no question.  And having not done that

11  that--that just put a lie to everything Mr. Black is saying

12  about I thought everyone knew.

13        MR. POSKUS:  I--

14        MR. DAIN:  He covered it up after the fact.

15        MR. POSKUS:  --I think that's--that's stretching it

16  too far, Your Honor.  I mean if they wanted to cover it up

17  why did they say these are the values as of March 31st.

18        You know, it goes back to something I said in my

19  trial brief, if they were trying to cover stuff up they were

20  doing an awfully damn bad job of it.  There's better ways to

21  have done it than the way they did it.

22        I mean they were--they were quite--

23        THE COURT:  Well, by reporting values in March

24  though after the disclaimer occurred meant that there was

25  never any indication in the documentation that there was

BLACK000723

135

 1  another million dollars sitting out there that technically

 2  were in this estate or part of this whole proceeding.

 3          MR. POSKUS:  Your Honor, I hate to say it but--

 4          MR. DAIN:  Oh, and not the Roth IRA either.

 5          MS. DiPONIO:  That--Your Honor, that's--

 6          MR. POSKUS:  Your Honor, I hate to say it but it's

 7  actually in the record that there was another million dollars

 8  out there.  And indeed I was going to ask Mr. Black--

 9          THE COURT:  It's on the inventory?

10          MR. POSKUS:  No, it's actually in the initial

11  petition.

12          THE COURT:  Well, see that's the point though.

13          MR. POSKUS:  Yeah.

14          THE COURT:  It's in the petition; it's not in the

15  inventory--

16          MR. POSKUS:  Yeah.

17          THE COURT:  --so it's like sort of here, sort of

18  there, it's--it's sort of everywhere but it's nowhere, that's

19  the problem.  It's never, you know, up-front straightforward.

20  It's like well you look for a piece of it here, and you look

21  for a piece of it there and then everybody is supposed to

22  cobble it together and I think the intent of the statute is

23  that it be fully disclosed, there be full candor--

24          MR. POSKUS:  Uh-huh.

25          THE COURT:  --and you get a ruling based on an

136

```
 1   honest and full disclosure and that did not happen here.
 2           MR. POSKUS:  Your Honor, you know, I would agree
 3   with you on full, I don't know if I would agree with you on
 4   honesty.  I don't know if there's evidence here that you can
 5   find that Mr. Glatstein and Mr. Black were somehow trying--
 6   deliberately trying to mislead the Court.
 7           THE COURT:  Well, let me put it a different way.
 8           MR. POSKUS:  Okay.
 9           THE COURT:  The only thing that I have in the
10   record--
11           MR. POSKUS:  Right.
12           THE COURT:  --even as it's developed to this
13   point--
14           MR. POSKUS:  Uh-huh.
15           THE COURT:  --in writing is the order I didn't
16   sign--
17           MR. POSKUS:  Uh-huh.
18           THE COURT:  --that really says what was going on.
19           MR. POSKUS:  Right.  I agree with it.
20           THE COURT:  That's it.  It's nowhere.  There's
21   not--
22           MR. POSKUS:  Well--
23           THE COURT:  --there's not an e-mail, there's not a
24   letter, there's bits and pieces everywhere but nowhere--
25           MR. DAIN:  And--and, Your Honor, I'm sorry--
```

BLACK000725

137

```
 1        MR. POSKUS:  But--and I agree with that, but the
 2   question then becomes is, was it--I don't think it was
 3   deliberate; I don't think there's evidence here that you can
 4   construe it as deliberate.
 5        THE COURT:  Well, it certainly wasn't forthright.
 6        MR. DAIN:  And, Your Honor, could I just add even
 7   that proposed order if you recall still have the--item number
 8   six, the monies going into the Supplemental Needs Trust and
 9   didn't say what happened to the other one-third.
10        THE COURT:  No.
11        MR. DAIN:  So even if you looked at that you think
12   okay, maybe he's putting two-thirds into a trust and holding
13   the liquid another one-third, but it didn't fully disclose
14   even then and that's the only piece of evidence to support
15   that.
16        MS. DiPONIO:  Your Honor, in addition if you go
17   back and look at the transcript from last time, I
18   specifically asked Mr. Black if he disclosed to us all of
19   Joanne's assets.  I believe he said (inaudible), yes, I did.
20        When Mr. Glatstein was on the stand Mr. Dain asked
21   him about the Roth IRA, he had no idea about the Roth IRA.
22   So--
23        MR. DAIN:  That's correct.
24        MS. DiPONIO:  --there's a disconnect somewhere; I
25   don't know who or what but obviously Joanne Black's assets
```

BLACK000726

138

1   were not fully disclosed to Mr. Glatstein when he was
2   preparing that inventory back (inaudible) that Roth IRA
3   (inaudible)--
4           MR. POSKUS:  Your Honor, I don't agree--
5           MS. DiPONIO:  --(inaudible).
6           MR. POSKUS:  --I don't agree with her
7   characterization of his testimony on that point.
8           THE COURT:  Well, the only thing that's problematic
9   is Mr. Black's testimony about shifting the assets to make it
10  right.
11          MR. POSKUS:  Right.
12          THE COURT:  And that's problematic in--in itself.
13          MR. POSKUS:  I know.  But, Your Honor, one of the
14  things is that--see now we're going to get into the
15  accounting issues, but one of the assets that's in the estate
16  that eventually needs to be part of the SNT is this McKeel
17  Street property and there's a specific provision in the will
18  that says that needs to--it--it--that needs to be Joanne's
19  home.  If she doesn't want to live there then get her a
20  substitute home, so Mr. Black decides for tax reasons why he
21  said he did that with the IRA.  Mr. Black always had it in
22  the back of his mind that at some point or other the SNT was
23  going to get 100 percent of an asset.
24          And so at some point or other there needed to be a
25  balancing off of two-thirds/one-third provision.

BLACK000727

139

```
 1            THE COURT:  Well--
 2            MR. POSKUS:  And so there's--there's--once again
 3       we're dealing with snippets but that's a lot of why that
 4       happened.  I mean you can't--if you say two-thirds has to go
 5       one way and one-third another you don't split the house down
 6       at a one-third level, you've got to make up for it some other
 7       way and that's what his thought process was.
 8            MR. DAIN:  Your Honor, both accountants agree--Ms.
 9       Harper even agrees with Ms. Kerr that even with the McKeel
10       house and even including crediting which we'll get to--it's
11       just absurd Mr. Poskus and a sleuth of other attorneys saying
12       that should credit the amount he's short so Ms.--Ms. Black
13       gets punished twice.  He's still short $200,000.
14            THE COURT:  Uh-huh.
15            MR. DAIN:  He's still admitted on the stand if he
16       has to he'll put in his own money; that's not the way this
17       works.  Just as--again, we'll get to the fact that it's not
18       the way it works that you pay all your people and then maybe
19       you have to pay it back when the Court says that's not how it
20       works.
21            But the bottom line is even short of the estate--so
22       this idea that his intent was always good and he's going to
23       do two-thirds/one-third, even belies the argument that he had
24       no control over the disclaimed assets, he did.
25            MR. POSKUS:  Well--
```

BLACK000728

140

1          MR. DAIN:  They were disclaimed and he gave 100
2    percent of the Roth IRA to his children.  He shorted the
3    estate $200,000; he had full control.
4          MR. POSKUS:  He didn't short the estate 200,000
5    that's not what Ms. Harper's report says, Your Honor.  And
6    we--we're getting into that accounting issue and I guess we
7    can have testimony on that if you want.
8          I just want to--I just wanted to get back to this
9    issue we've been discussing.  I understand your point and I
10   think you and I both know that if we could do it over--and by
11   we I mean me, Mr. Glatstein, and my client, we would do it
12   differently.
13         But I guess my other point is I don't think the
14   record has been made--I--I think it was reasonable for them
15   to assume that they--the testimony so far has been they had
16   everybody's agreement.  And--and like I said I know what you
17   said Ms. DiPonio and Ms. Young say they said, but they don't
18   --they're not able to refute Mr. Glatstein's testimony about
19   his telephone conference with them.
20         And so my--at least in my opinion, Your Honor, it's
21   reasonable for them to have assumed that they had everybody's
22   agreement.  I understand your point that in your mind they
23   didn't have your agreement, which is the most important one,
24   and like I said I'd like to fix that but I can't go back and
25   do that.

BLACK000729

141

```
1          But at least insofar as what they did--although
2     they--although you can argue about how they did it, but I
3     think it's reasonable for them to assume they thought they
4     had everybody's agreement.
5          THE COURT:  Well--
6          MR. DAIN:  Your Honor, can I argue in opposition to
7     that.
8          MR. POSKUS:  Well, we can't--you can't even make a
9     finding until we have all the evidence in on that, Your
10    Honor.
11         MR. DAIN:  Well, on the--on the first point without
12    the accounting which is really a second question how much to
13    surcharge, we can argue--I can argue just what Mr. Poskus was
14    arguing what the evidence should be.
15         THE COURT:  Right.
16         MR. DAIN:  And what we need to make clear here when
17    Mr. Poskus says oh we recognize there's a conflict but the
18    statute allows him to benefit too, he's misinterpreting the
19    statute and--and misstating it.  If there is a conflict it
20    must be addressed to the Court as Your Honor said in a full
21    open hearing.  So this--so the Court can determine despite
22    that conflict does it not harm Ms. Black.  Can Mr.--like if
23    they had a business dealing can Mr. Black also profit.  He
24    cannot profit at the expense of Ms. Black.  Absolutely.  The
25    statute is clear on that.  So that's misleading to say that
```

BLACK000730

142

1    he was expressly authorized.

2              MR. POSKUS:  I'm sorry which statute are you

3    referring to?

4              MR. DAIN:  15-14-423 does not--does not permit Mr.

5    Black to prosper at the benefit of Ms. Black if he has a

6    conflict.

7              MR. POSKUS:  Where does it say that--where does it

8    say there has to be a hearing.

9              MR. DAIN:  I--you--a conflict--you have to have a

10   hearing on a conflict, it doesn't need to say it in that

11   statute.

12             MR. POSKUS:  But the statute doesn't say that.

13             THE COURT:  All right.  But the point here is--

14             MR. POSKUS:  Yeah.

15             THE COURT:  --the disclosures weren't made; it

16   wasn't clear; it just didn't happen.  And, you know, the

17   rationale for that or the reasons for that or whoever thought

18   what, perhaps but I--you know, we've all worked together for

19   a while now--

20             MR. POSKUS:  Right.

21             THE COURT:  --and Ms. DiPonio and Ms. Young don't

22   get exercised about much and they're pretty exercised about

23   this.

24             MR. POSKUS:  Uh-huh.

25             THE COURT:  So I'm satisfied that they really

BLACK000731

143

1   didn't know it and neither did I.  So I cannot--I have to

2   find and I do that the disclosure was completely inadequate;

3   it wasn't up-front, it wasn't clear; didn't explain it, and

4   really he obtained an order for disclaimer without disclosing

5   the underlying reasons and what was going to happen with it;

6   he just didn't.

7              MR. POSKUS:  Well, if that's going to be your

8   ruling--

9              THE COURT:  It has to be.  And none of this

10  documentary evidence that you've got in the notebook supports

11  that.  There is no explicit explanation of it in any way,

12  shape, or form.  It just doesn't exist because it isn't

13  there; it didn't happen.

14             Unless there's something else that you want to pull

15  out and show, but it's just not here.  I don't have in the

16  notebook; I don't have it in any of these exhibits, it's not

17  in the transcript of the December hearing.  It's not in the

18  written form of the orders that I signed.

19             MR. POSKUS:  Uh-huh.

20             THE COURT:  So I don't have anything to--to

21  indicate to me otherwise that I misunderstood something or

22  that I missed something that was said.  And basically, you

23  know, what you're faced with is you've got the GAL, the court

24  appointed counsel and the Court under a misapprehension.

25             MR. POSKUS:  Uh-huh.

144

```
 1              THE COURT:  And there was no effort made to explain
 2    it away or to do anything.
 3              MR. POSKUS:  Well, Your Honor, you're free to--I
 4    have to deal with you in more cases than this one so I'm
 5    going to--
 6              THE COURT:  I know--and I know you are under a
 7    disadvantage, Mr. Poskus, and I get that, but I mean--like I
 8    say I have my memory of it; I have the specific memory of not
 9    signing that other order because it wasn't in accord with
10    what I understood what was going on.
11              MR. POSKUS:  And I appreciate that, Your Honor, and
12    I can't argue with what your perception of it was.  I--I have
13    to say--I want to choose my words carefully--I'm disturbed--
14    yeah--
15              THE COURT:  You know, maybe I missed the whole
16    point, maybe--
17              MR. POSKUS:  No, I--
18              THE COURT:  --but--
19              MR. POSKUS:  --see, Your Honor, your--your memory
20    of what happened is something that I didn't know until this
21    moment.
22              THE COURT:  Right.
23              MR. POSKUS:  But you need to know this, I did
24    depose Ms. Young--
25              THE COURT:  Uh-huh.
```

BLACK000733

145

1          MR. POSKUS:  --and then of course we had Ms.
2     DiPonio's testimony.  And I understand your point about you
3     don't see them get angry about much but they're angry about
4     this.
5          And quite frankly this is the first I've ever dealt
6     with them.  I've never had them in a case of mine before.
7     But--
8          THE COURT:  Well, that's because they're always on
9     the guardianship cases.
10         MR. POSKUS:  I do--
11         THE COURT:  And the conservator--by and large--
12         MR. POSKUS:  Yeah.
13         THE COURT:  --their work is not in trust and
14    estates it's in guardianships and conservatorships and
15    looking after the physical well being of people, getting them
16    out of hoarding situations with bedbugs and--and--
17         MR. POSKUS:  Uh-huh.
18         THE COURT:  --and, you know, that sort of thing.
19         MR. POSKUS:  Yeah, I know and I--
20         THE COURT:  It's not this sort of stuff that we
21    deal with mostly when they're in front of me.
22         MR. POSKUS:  And I--and I get that, I get that.
23    But what I'm disturbed about is their refusal to concede at
24    any point that they might have known because even as an
25    attorney inexperienced in the area of say disclaimers, if

BLACK000734

146

```
 1    they're being given that will that says this is how it's
 2    going to go and then they get told and approve that order
 3    that says we're going to exercise a disclaimer that's going
 4    to go--make it go under Article 4th, I can't--I just cannot
 5    accept that they didn't know that's what was going to happen.
 6              MS. DiPONIO:  Your Honor--
 7              MR. POSKUS:  And they approved that.
 8              MS. DiPONIO:  --and I'm disturbed by Mr. Poskus'
 9    comments, as an officer of the court I take my job very
10    seriously.  If I had any (inaudible) to know I wouldn't have
11    gotten on the stand and said I had no idea.  I mean--
12              THE COURT:  Uh-huh.
13              MS. DiPONIO:  --to think that I would even accept
14    the fact that my client would lose out on benefits her mom
15    gave her and approve that is just--
16              THE COURT:  Right.
17              MS. DiPONIO:  The Court knows I'm not--
18              THE COURT:  And the--the reason--
19              MS. DiPONIO:  --about that.
20              THE COURT:  --I mean the discussion that Mr. Black
21    has never had with any Court is the one he testified he was
22    trying to avoid.  And that's why I said at the close of the
23    last hearing that he had big problems; that needed to be done
24    and it still hasn't been done and apparently there's no plans
25    to do it at this point.
```

147

```
 1          So--I--I don't know what the remedy is then for
 2   that because that's the only thing that could change this is
 3   that discussion.
 4          MR. POSKUS:  You're talking about the discussion
 5   about the legitimacy of the payable on death benefit?
 6          THE COURT:  Right.
 7          MR. POSKUS:  Yeah.
 8          THE COURT:  Otherwise it's a straightforward
 9   self-dealing brief of fiduciary duty and a surcharge case.
10          MR. DAIN:  And--and, Your Honor, I'm sorry again
11   there's--the evidence of that is--is (inaudible).  But
12   remember Mr. Black still also hasn't corrected that he filed
13   an affidavit with the New York Surrogate Court saying he had
14   explicit authorization from you citing an order that doesn't
15   exist even beyond a proposed order, a third--fourth order.
16          THE COURT:  Right.
17          MR. DAIN:  And--and again--
18          THE COURT:  At best that was disingenuous but that
19   was disturbing.
20          MR. POSKUS:  Well, I can--you know, my problem with
21   that, Your Honor, is it goes back to what I said near at the
22   beginning, it was an act he was explicitly authorized to do
23   and once it happens you can't change the result.
24          THE COURT:  Right.  But as--we're talking about
25   right now he obtained that order for the explicit act without
```

BLACK000736

148

1   full disclosure.  So the order was issued under

2   misapprehension.

3          MR. POSKUS:  Uh-huh.  Well, I apparently can't talk

4   you out of that, Your Honor, so I--I guess let me--I don't

5   know what to do at this point except maybe we ought to take a

6   break.

7          THE COURT:  Yeah, I think we should.

8          MR. POSKUS:  Okay.  What time do you want us back?

9          THE COURT:  Like we'll come back at 1:30 and--

10         MR. POSKUS:  Can we make it--let's--since we're

11  going a little late can we make it 1:45.

12         THE COURT:  That's fine.

13         MR. POSKUS:  Because we've got to--

14         MR. DAIN:  Your Honor, given that Mr. Poskus is not

15  going to be here, I'll rest at this point and not ask any

16  further questions of Mr. Black because I think at this point

17  it's beating a dead horse, not Mr. Black but the issue.  But

18  we could spend then the afternoon getting to the bottom of

19  what the surcharge should be given the brief; we can address

20  the contempt because if we're not going to be here tomorrow

21  what I don't want to do, and I'm really afraid of, if we

22  continue this again--we don't know what happened in July; the

23  estate account is virtually gone.

24         THE COURT:  Okay.

25         MR. POSKUS:  The estate account has 70 something

BLACK000737

149

1    thousand in it--
2              MR. DAIN:  No, no, it does not.
3              MR. POSKUS:  --and one other asset.
4              MR. DAIN:  There was another 30,000 paid out.
5              THE COURT:  And it was represented to have about
6    100 in June.
7              MR. DAIN:  It has 30,000--
8              MR. POSKUS:  Well, like I said, Your Honor, my
9    client has put--given me the 115 and by the other way the
10   other 15 to make it 130 is in Mr. Glatstein's trust account.
11             THE COURT:  Right.
12             MR. DAIN:  And--and, Your Honor, doesn't that also
13   go to credibility if Your Honor issued those orders clearly
14   saying they're frozen to take another 130,000?
15             MR. POSKUS:  The--
16             THE COURT:  Well--
17             MR. POSKUS:  --like I said I--I could argue that.
18             THE COURT:  --we'll flush it out I suppose in the
19   afternoon, but, you know, the other related to this is like,
20   you know, there's been no indication from your client that he
21   sat down with his cousins who are to be co-trustees and work
22   with her to deal with this.
23             MR. POSKUS:  But, Your Honor, I--I--
24             THE COURT:  If there's only been discussions about
25   this disclaimer aspect and what to do, but--

BLACK000738

150

1          MR. POSKUS:  That's because that's what the issue

2     was.  I mean remember I did make a representation to the

3     Court that after the last hearing I'd work with Mr. Dain to

4     start trying to smooth some of this over and make it happen

5     and he hasn't done that.

6          THE COURT:  Right.

7          MR. POSKUS:  Now, I know he said he didn't do it

8     because he didn't want to be a party to fraud, ask him, did

9     he ever contact me after I gave him--

10          THE COURT:  Well, but I--I agree--

11          MR. DAIN:  Your Honor--

12          THE COURT:  --I mean I understand completely what

13     Mr. Dain was saying so--

14          MR. POSKUS:  But then he needs to tell me that.

15          MR. DAIN:  No, no, and let me add--let me add, Mr.

16     Poskus--I'll bring them now--I sent two e-mails, I begged Mr.

17     Poskus to end this.  Have Mr. Black address what he owed and

18     resolve this and twice Mr. Poskus blew it off saying, oh, we

19     think the Court is agreeing with us on the issue of the Rule

20     60, they want this filed.

21          If Mr. Black is surcharged and pays back, we're

22     fine, but that has to be part of sitting down, he can't just

23     say I want to keep all this money.

24          But to say I--I ignored it is absurd.  I sent him

25     e-mails and I literally begged, I beseeched him to end this

BLACK000739

151

1    thing.  Because we--I said it will not end well for Mr. Black

2    to keep digging this hole.  What I didn't know is he's taking

3    more of Ms. Black's money to pay for digging this hole, but

4    I've reached out to Mr. Poskus twice.

5            THE COURT:  All right.

6            MR. DAIN:  This is just so disturbing.  Everything

7    that's coming from their side they're trying to say, Your

8    Honor, I don't understand, this is all good faith, we're

9    doing everything.  No, you just spent a ton of your client's

10   money; you fought this thing into the ground and I told you

11   how it would end.

12           MR. POSKUS:  Now, wait a minute--

13           MR. DAIN:  I told you not to do it.

14           MR. POSKUS:  --wait a minute, did you ever tell me

15   --why didn't you come to one of the other conference calls

16   and do this with me.

17           MR. DAIN:  I was in Japan.

18           MR. POSKUS:  And did you ever tell me that you

19   weren't going to sign on as a co-trustee because you didn't

20   want to be a party to fraud?

21           MR. DAIN:  I didn't know then because you hadn't

22   given that accounting to Ms. Kerr.  At the time you--you made

23   a statement to me, Mr. Poskus, you said the professionals

24   have to wait to get paid when I asked about Ms. Kerr.  Oh,

25   no, no, the Court was clear the professionals have to wait to

BLACK000740

152

1    be paid knowing you had been paid.  At that time knowing you

2    had been paid $45,000, knowing that other people had been

3    paid of what amounts to a total of 130,000.  You did not tell

4    me that.

5            So to say did I come to you and say, no, I don't

6    want to be on the trust, once I found out that money had been

7    stolen, absolutely I will not be on that trust.

8            MR. POSKUS:  Well, this is the first I've heard of

9    it.

10           THE COURT:  All right.  So let's take a break.

11           MR. POSKUS:  Uh-huh.

12           THE COURT:  Everybody needs to go to a breather.

13           MR. POSKUS:  Okay.

14           THE COURT:  And we'll--

15           MR. POSKUS:  Timeout, are we going to timeout, Your

16   Honor?

17           THE COURT:  We're all going to go to our different

18   corners and have a break.

19           MR. POSKUS:  So what time should we be back, it's

20   now 12:40?

21           THE COURT:  So 1:45--yeah--

22           MR. POSKUS:  Can we make it two?

23           THE COURT:  Do you want to do two?

24           MR. POSKUS:  Yeah, just because I'm thinking it

25   takes us awhile just to walk down the street and get lunch.

BLACK000741

153

```
 1        THE COURT:  All right.  Two o'clock.
 2        MR. POSKUS:  All right.
 3        (Whereupon, the lunch recess was taken.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BLACK000742

154

<u>AFTERNOON SESSION</u>

1

2          THE COURT:  Okay.  The record is back on.  All

3    right.  So where are we at at this point.

4          MR. DAIN:  Well, first I want to apologize for

5    raising my voice before the end of the session that was

6    inappropriate and I do apologize.

7          Second, I have no further questions of Mr. Black.

8          THE COURT:  All right.

9          MR. DAIN:  And so I don't know--oh, and then let me

10   bring this up as well, I know the Court had scheduled two

11   days.  We had anticipated two days because we thought there

12   was no way this thing could be completed.

13         I know Mr. Thiessen is here even if Mr. Poskus

14   can't be--the problem is we're--now, we're going to have to

15   schedule out again and have me flying back in at another date

16   either--my hope is we can complete this today or not

17   depending on what happens tomorrow.  Mr. Thiessen has filed

18   numerous pleadings, he's been involved from day one, I don't

19   know why some of these (inaudible)--

20         THE COURT:  Well--all right.  Let's not--

21         MR. DAIN:  --(inaudible).

22         THE COURT:  --get into scheduling--let's see what

23   we're going to do for the rest of the day and--

24         MR. DAIN:  Okay.

25         THE COURT:  --see where we end up with that.

1        MR. POSKUS:  Your Honor, for the record I don't--we

2  have no knowledge of how this got scheduled for tomorrow in

3  all honesty.  If you look on the transcript of the hearing

4  that we had on the 17th we talked--that's when we scheduled

5  this.

6        THE COURT:  Yeah.

7        MR. POSKUS:  And we said August 5th and--I don't

8  recall anything in there that says August 6th.  Our notice of

9  hearing said August 5th.  If--believe me if this had been

10  scheduled for two days I wouldn't have committed to what I'm

11  committed to tomorrow.

12        THE COURT:  That's okay.

13        MR. POSKUS:  So--okay.  Well, anywhere, Your Honor

14  --I'm sorry?

15        MR. DAIN:  I was just wondering can we move then

16  into the issue of the amount of the surcharge?

17        THE COURT:  Well, that's what I'm going to--that's

18  what we're going to figure out right now.

19        MR. DAIN:  Okay.

20        MR. POSKUS:  Your Honor, I think I need to make a

21  record so I need to do redirect on Mr. Black.

22        THE COURT:  Okay.  And how long do you think that's

23  going to take?

24        MR. POSKUS:  I actually don't think it's going to

25  take very long at all?

BLACK000744

156

1        THE COURT:  And then what do you want to do after

2    that?

3        MR. POSKUS:  I think at that point I'd rest and

4    then the question is does he want to offer rebuttal.

5        THE COURT:  Okay.

6        MR. POSKUS:  So, Mr. Black, could you take the

7    stand.

8                    REDIRECT EXAMINATION

9    BY MR. POSKUS:

10       Q    Sir, on cross-examination you were asked about the

11   inventory and financial plan that you filed with the Court.

12       A    Yes.

13       Q    Do you recall that testimony?

14       A    Yes.

15       Q    And let me ask you this, you had also testified

16   that you had told Carl Glatstein all the--your testimony--

17   well, actually I'll let you say what your testimony was

18   about--how did the inventory and financial plan come about?

19       A    I prepared a draft; I sent it to Carl Glatstein; he

20   said this is not what you should be doing under the Colorado

21   statute.  He said he or he and his paralegal would prepare

22   the next draft.  And then we went through, you know, some

23   delay and then eventually, you know, a draft.  And I sent

24   some information to him and I said I sent information to Mr.

25   Glatstein about the full three million not just two million.

BLACK000745

157

1    And that it was Mr. Glatstein's decision to report the two

2    million and not separately report the third million; that was

3    his decision and not mine; I provided the information to him.

4        Q    I believe you testified that you provided the

5    information to him in an e-mail?

6        A    Yes.

7        Q    All right.

8            MR. POSKUS:  Your Honor, if I may approach the

9    witness.

10           THE COURT:  Thank you.

11       Q    (by Mr. Poskus)  Sir, I'm handing you what I've

12   marked as Exhibit 109.  I've tendered a copy to the Court and

13   tendered a copy to counsel.  And I'll ask you, sir, can you

14   identify that document?

15       A    Yes.  This is an e-mail from me to Carl Glatstein

16   dated May 25th, 2013, subject re documents attached.

17       Q    And go ahead and take a look through it, is this

18   the--do you recall sending this e-mail to Mr. Glatstein?

19       A    Yes.

20       Q    And then down below there's an e-mail from Mr.

21   Glatstein to you from the day before, do you recall receiving

22   that from him?

23       A    Yes.

24       Q    And then before that e-mail there's another e-mail

25   from you to him on May 13th, do you recall sending that

158

1  e-mail to Mr. Glatstein?

2      A    Yes, I do.

3      Q    And is this a true and correct copy of the e-mail

4  that you sent to Mr. Glatstein?

5      A    It's a true and correct copy of this e-mail chain,

6  yes.

7      Q    E-mail chain I misspoke, thank you.

8          MR. POSKUS:  Your Honor, I move the admission of

9  Exhibit 109.

10          THE COURT:  Objection?

11          MR. DAIN:  No objection.

12          THE COURT:  Okay.  Admitted.

13          (Petitioner's Exhibit 109 was received in

14  evidence.)

15          MR. POSKUS:  Just one second, Your Honor.

16          (Pause.)

17          MR. POSKUS:  Nothing further, Your Honor.

18          THE COURT:  All right.

19          MR. DAIN:  Briefly (inaudible).

20          THE COURT:  All right.

21                    RECROSS-EXAMINATION

22  BY MR. DAIN:

23      Q    Mr. Black, so what discussion did you have then

24  with Mr. Glatstein about why he wasn't--or he didn't want to

25  report the one million in the accounts for Bernie--the Bernie

159

1   kids and the 394,000 then in the Roth IRA?

2       A    I did not discuss this with Mr. Glatstein; I

3   provided him information and he decided how to report for the

4   initial inventory and financial plan.

5       Q    I know.  What I'm asking is when you signed it

6   didn't you look and say there's something missing?

7       A    No, I relied on Mr. Glatstein to know what should

8   be reported and what doesn't need to be reported.

9           MR. DAIN:  No further questions, Your Honor.

10          THE COURT:  Okay.  Thank you.  Anything else, Mr.

11  Poskus?

12          MR. POSKUS:  Nothing further, Your Honor.

13          THE COURT:  All right.  Thank you.

14          MR. POSKUS:  Okay.  At this point, Your Honor, we

15  rest about this issue.

16          THE COURT:  Okay.  So, Mr. Dain, were you and Ms.

17  Wrigley going to testify today originally?

18          MR. DAIN:  No.

19          THE COURT:  As to--but before we had our

20  discussion--

21          MR. DAIN:  I--I--before we had our discussion, yes,

22  I was going to have Ms. Wrigley testify.

23          THE COURT:  Okay.

24          MR. DAIN:  If the Court thinks it still needs to

25  hear from Ms. Wrigley I can put her on the stand, but from

BLACK000748

160

1   the indication the Court has given I don't think (inaudible).

2           THE COURT:  Well--

3           MR. DAIN:  It sounds like you're concerned.

4           THE COURT:  Well, I just want my record to be--

5           MR. DAIN:  Absolutely.

6           THE COURT:  --thorough.

7           MR. DAIN:  Absolutely.  Why don't you go up and

8   take the stand.

9           THE COURT:  So would you raise your right hand

10  first please.

11          MS. WRIGLEY:  Should I stand?

12          (Whereupon, Ms. Wrigley was sworn in.)

13                     CHERIE WRIGLEY,

14  called as a witness herein, having been first duly sworn, was

15  examined and testified as follows:

16          THE COURT:  Thank you.

17          THE WITNESS:  Am I talking all right?

18          THE COURT:  There you go.

19          THE WITNESS:  Okay.  Okay.

20                     DIRECT EXAMINATION

21  BY MR. DAIN:

22      Q   Good morning, Ms. Wrigley.

23      A   Good morning, Mr. Dain.

24      Q   So you heard Mr. Black testify that he had

25  conversations with you about this disclaimer?

161

```
 1      A    I did.

 2      Q    Before--when--when was the first time that you had

 3  a conversation that you recall with Mr. Black regarding a

 4  disclaimer?

 5      A    It would have been somewhere in 2012--

 6      Q    And--

 7      A    --the words disclaimer were used.

 8      Q    --and who first brought up those words?

 9      A    Bernard Black.

10      Q    Did you prior to that know what a disclaimer was?

11      A    No, other than disclaim means to negate or to not

12  allow.

13      Q    Okay.  Why don't you tell the Court briefly what

14  your background is in terms of education and employment.

15      A    Yeah, I'm a retired high school resource

16  specialist, which is a combination counselor, teacher.  I

17  work with--I worked with--I worked with special needs

18  children, behavioral--kids with behavioral problems, helping

19  them find their way in life.  I had a multitude of tasks that

20  I had to engage in.

21           And I have two masters degrees and I do a lot of

22  pro--not pro bono work, I do a lot of volunteering and I work

23  with people who are mentally ill and I volunteer at the

24  homeless shelter where my specific work is dealing with

25  people who are mentally ill.
```

BLACK000750

162

1      Q    Okay.  I've heard the word CASA before what does
2  that mean?
3      A    Oh, that's right and I--for two and a half years I
4  was CASA--which is in the state of California it's similar to
5  what a GAL is, it's a Court Appointed Special Advocate where
6  I'm the eyes and ears of the court for a child who is being
7  held and needs--a foster child who needs special help when
8  they've been taken away from their parents.
9      Q    Okay.  You've obviously known Joanne Black most of
10  your life.
11      A    Exactly.
12      Q    Have you known her through childhood before she
13  began showing signs of schizophrenia?
14      A    Yes, I--I met her when she was like nine--I'm four
15  years older--so I met her when she was nine.
16      Q    And you've been involved in her life until today?
17      A    Correct.
18      Q    Had there been times that for instance where you
19  and I have helped have her committed to--while she was in New
20  York to one or more hospitals?
21      A    Yes.  Basically, yes.
22      Q    You've dealt with her through commitments at
23  Bellevue Hospital--
24      A    Yes.
25      Q    --in New York and other hospitals in New York and

BLACK000751

163

1    New Jersey?

2         A    Yes.

3         Q    And in your work experience you're familiar with

4    people who suffer from schizophrenia, the--the symptoms and

5    the issues that--that come up?

6         A    Yes.

7         Q    Okay.  So now going back to when Bernard Black

8    first brought up the word disclaimer how did he--how did the

9    conversation come about, how did he bring that up?

10        A    Well, he brought it up because he was very

11   concerned, he told me that my aunt Renata, his mother, had

12   left the entire amount of Vanguard funds to Joanne.  He

13   didn't even mention at that time that 1 percent to each of

14   his five older children.  And he was very, very upset.

15             He didn't--and then that's how he first mentioned

16   it and--and he wasn't sure what to do.

17        Q    Was he--

18        A    So then--

19        Q    I'm sorry.

20        A    --then the disclaimer later came out.

21        Q    Okay.  When you had this first conversation was his

22   concern that--was his main concern that the money was being

23   left outright to Joanne or that he and his children weren't

24   getting a part of that money?

25        A    No, mostly that it was being left outright to

164

```
 1   Joanne and how would she handle that.
 2       Q    And--and you were also concerned that Joanne not
 3   have $3 million outright?
 4       A    Of course.
 5       Q    At that time when Renata passed away did you know
 6   where Joanne was?
 7       A    I had suspicions that she might be in Colorado.
 8       Q    And how did you have those suspicions?
 9       A    Before Aunt Renata died she had given me some of
10   her phone bills and it was noticed on there that she had been
11   calling from Colorado.
12       Q    And how did you track down Joanne?
13       A    With a great deal of sleuthing.  I--I took those
14   phone bills and I kind of tracked her down and I found out
15   that she had purchased a phone and had sent it to a motel and
16   so I was kind of following her in that way, figuring out
17   where she was getting--she was buying new phones on a
18   consistent basis.
19       Q    And eventually you were involved in tracking her
20   down and helping Mr. Esaun Pinto get her back to the New
21   York, New Jersey area?
22       A    Correct.
23       Q    Where she was hospitalized for a period of time?
24       A    Uh-huh.
25       Q    Then in terms of the disclaimer--just getting right
```

BLACK000753

165

1    to it--did Mr. Black ever have a conversation with you in
2    which he said the intent or purpose of the disclaimer was to
3    transfer the paid on death assets so that Joanne Black would
4    get only two-thirds of the assets and Mr. Black and his
5    children would get one-third?
6        A    Never.
7        Q    Have you looked through all the e-mails that you
8    exchanged with Mr. Black?
9        A    I have looked through every e-mail that I exchanged
10   with Mr. Black and Becca and the few that I had with Sara.
11   I've never talked to Sara on the telephone.
12       Q    Okay.  So now when you mentioned Becca, that's
13   Rebecca, one of Mr. Black's children by his first marriage?
14       A    Correct.
15       Q    And you mentioned Sara that's another child by his
16   first marriage?
17       A    Yes.
18       Q    So you've gone through all those e-mails, did you
19   find in any of those e-mails an explanation from Mr. Black
20   that explained that one-third of the disclaimed assets were
21   going to go to an Issue Trust for the benefit of him and his
22   children?
23       A    Absolutely not.
24       Q    Did Mr. Black tell you how he came up with the
25   concept of a disclaimer?

BLACK000754

166

```
 1      A    No.

 2      Q    Did he explain to you what he intended the

 3  disclaimer to do?

 4      A    No.  I mean if--if anything, I only assumed he

 5  wanted to take care of the sister and put the money in a

 6  special needs trust until she got better.

 7      Q    Now, he sent you a disclaimer for Joanne to sign.

 8  What did you understand he was asking you to do?

 9      A    I agree on that point that I was going to try to

10  get Joanne to sign something from Vanguard.  It was a simple

11  thing that just said you are disclaiming some assets.  And I

12  assumed that if I could get her to sign that, Bernie would

13  put it in the Special Needs Trust that you would have control

14  over.

15      Q    And you've seen--you've been in court when you

16  heard the testimony--I mean the statement at the December

17  11ᵗʰ hearing in which Mr. Black explained the basic purpose

18  was to put the money in a trust where I was the trustee to

19  financially support Joanne?

20      A    Right.

21      Q    And was that your understanding?

22      A    Absolutely.

23      Q    Now, why did Bernie Black ask you to try to get

24  Joanne Black to sign?

25      A    Because I was the one--if she was going to trust
```

BLACK000755

167

1    anybody in this world, it would have been me.

2        Q    And was the idea is that you were going to come to

3    Colorado to have her sign that?

4        A    Yes.

5        Q    And why is it that that never occurred?

6        A    Well, I was going to, and then she was kind of

7    moving from hotel to hotel, and he kind of said I've got

8    another way I might be able to do this, and it just kind of

9    fell by the wayside until much later.

10       Q    And during this time was your main concern that

11   Joanne not have all the paid-on-death assets outright but

12   that they be placed in a special or Supplemental Needs Trust?

13       A    I had no idea that Bernard had moved the money.  I

14   thought they were sitting safely in Vanguard.  I didn't find

15   out for a year and a half to two years that he had done

16   anything with the money.  I thought they were still in

17   Vanguard, and I have e-mails showing that I still thought

18   they were at Vanguard.  I never knew he moved them.  Not only

19   did I not know he disclaimed them, I never knew he moved them

20   from Vanguard.

21       Q    Now, did you ever have a conversation with Bernard

22   Black's wife in which the subject of a disclaimer came up?

23       A    I have never spoken to Kate Black--or Litvak Black

24   except at the funeral and on the phone to say, "Excuse me,

25   could I please speak to Bernie."

BLACK000756

168

1      Q    Now, when you--you said you spoke to Sara on the
2  phone, what--
3      A    I'm not sure we did speak on the phone.  I think--
4      Q    Oh, I'm sorry, you said you never talked to her on
5  the phone.
6      A    Right, we talked via e-mail.
7      Q    E-mail.  In any of those e-mail exchanges with Sara
8  Black did you discuss the affect of a disclaimer?
9      A    No, we only spoke about money once that I can
10  remember.
11      Q    Did--and same with Rebecca Black; did you discuss
12  the affect of a disclaimer?
13      A    We talked about a paper that her dad wanted her to
14  sign.
15      Q    Tell us what that conversation was.  I said, "Your
16  dad really wants"--something to the effect of your dad really
17  wants to see you.  She said I don't want to go see my dad.
18  This was a constant battle.  She didn't want to go see her
19  dad.
20          THE COURT:  This is Sara or--
21          THE WITNESS:  Becca.
22          THE COURT:  Becca.
23          THE WITNESS:  Yeah, they did not have the best of
24  relationships.  And I just said, okay, your dad wants to see
25  you; he wants you to sign a paper.  I basically told Bernie

BLACK000757

169

```
 1   I'm not going to drag her by her hair to come see you; do you
 2   want to come to Thousand Oaks, which he usually didn't want
 3   to do.  It's an hour drive.  And I don't remember--he did
 4   come once to visit her in Thousand Oaks.  I don't remember
 5   if--I don't remember if he had her sign a paper there.  I
 6   don't think so, because it wouldn't have been notarized.  But
 7   I had no idea what the paper was.  I didn't really read it.
 8   And to be honest with you, if I had known what it was, I
 9   would have told Becca to take her one percent and run.
10       Q    (by Mr. Dain)  And so what I'm getting at with
11   respect to disclaimer, did you have any understanding that
12   the disclaimer of the one percent that Becca and Sara had had
13   any affect on the 95 percent that Joanne was supposed to
14   receive?
15       A    I never spoke to Bernie.  He would give me two
16   minutes of his time, and the two minutes I had were to talk
17   about give Joanne more money.  He started out giving her 280
18   a week and I had him raise it to 500 a week.
19       Q    Oh, you mean the conversation was you telling him
20   to give Joanne more money?
21       A    Yeah.  We didn't talk disclaimer.  We didn't talk
22   any amount of money, about his children.  We only talked the
23   few minutes that I could talk to him--I don't know what his
24   200 phone calls were, but I have phone records.  We did not
25   talk near what he's saying we talked.
```

BLACK000758

170

1        Q    And--

2        A    And it wasn't about a disclaimer or where that

3    money would go.

4        Q    Now, when he sent you these form disclaimers that

5    he wanted you to have Becca sign and Joanne sign, we've seen

6    from the e-mails there's nothing explaining them.  Did he

7    have any phone conversation with you in which he explained

8    them?

9        A    Absolutely not.

10       Q    So in the end, did you have Joanne sign a

11   disclaimer?

12       A    Absolutely not.

13       Q    Did you have Becca or Rebecca sign a disclaimer?

14       A    No.

15       Q    Did you have Sara sign a disclaimer?

16       A    I've never talked to Sara.  She lives in New York;

17   I live in California.

18       Q    Now, in terms of Mr. Black saying it was clear to

19   him that you understood that he was going to get one-third of

20   the assets that were disclaimed, what's your response to

21   that?

22       A    Well, I would say that that is preposterous.  I

23   didn't--I never knew that he would be getting one-third of

24   any of Joanne's POD accounts.  All of those I would think

25   that would be saved for her.  I did know that one of the

BLACK000759

171

1   wills said that he would get one-third--he and his children,

2   and I mean five children, not seven.  It was very explicit

3   that Renata did not want his two little kids to get any money

4   whatsoever.  Five children and Bernard would get one-third of

5   her estate minus the McKeel house and the Holston House,

6   which were to go to Joanne.

7       Q     Now, you said you understood that the assets--these

8   paid-on-death assets were at Vanguard.  Did you have

9   conversations with Renata Black about why she put assets in

10  Vanguard for Joanne Black?

11      A     Did I have--say it again.

12      Q     Did you ever have conversations with Renata Black

13  about why she put assets in Vanguard for Joanne Black?

14            MR. POSKUS:  Objection.  Hearsay, Your Honor.

15            THE COURT:  We have--

16            MR. DAIN:  Same--I'm sorry, before you do that,

17  same point goes to her state of mind since this is what is at

18  issue whether she understood the effect of this disclaimer.

19  Mr. Black has also raised that this was not his mother's

20  intent, so I think it's important that we understand from her

21  view what she understood his mother's intent to be.

22            MR. POSKUS:  He needs to rephrase the question

23  though.

24            MR. DAIN:  I don't know that I do.

25            THE COURT:  Overruled.

172

```
 1          THE WITNESS:  I do know that Renata always promised
 2   Joanne that she would be well taken care of and that she
 3   would have plenty of money for the rest of her life.  I did
 4   not know that she would leave it all to Joanne, okay, in cash
 5   without having put some of it into the special needs trust.
 6   I really thought you were going to be handling that.  So that
 7   surprised me.  But she died suddenly.  But I do know that she
 8   expected Joanne to have the huge majority of her assets.
 9          Yes, we spoke about the fact that Joanne--that
10   Bernie was only to get $50,000; he knew that.  That only five
11   of the grandchildren were to receive a small amount and that
12   Joanne was to get the rest.  She--it was surprising to me, I
13   have to say, that she would have left Joanne the money
14   unattended.  That was a surprise, and I did speak to Bernie
15   about that.  We both were in agreement to leave her the money
16   outright without some kind of--
17      Q     (by Mr. Dain)  Protection?
18      A     --protection, of course, was--was a little off.
19      Q     Okay.  And was your understanding of the purpose of
20   the conservatorship to set up a method to--to marshal those
21   paid-on-death assets and have some protection from the Court
22   and a conservator over those assets?
23      A     Absolutely.  That's why I've been--I was working
24   with him all the way until he claims when it became a dispute
25   over my asking for some reimbursement.  I worked with him all
```

BLACK000761

173

1    the way because I thought he was going to take care of his

2    sister.  When I saw that he wasn't, that's when we had a

3    dispute.  And I begged him in phone conversations and in e-

4    mails to please not do what he was doing, and that's when I

5    found out he had already moved the money from Vanguard and he

6    had done a lot of deceitful things.

7         Q    And in terms of the wills that have come up, you're

8    aware now that there is a will that Mr. Black probated?

9         A    Yes.

10        Q    That's the one you're referring to that has this

11   article 4 and--

12        A    Right, it's an old will from 1997.

13        Q    And you become aware that--or became aware at some

14   point there's a second will that Mr. Black did not probate?

15        A    Right.  I always knew there was a second will.  I

16   just didn't know that I would find a copy of it signed and

17   everything.  It was in papers that I had not unearthed yet.

18        Q    And tell us about that?

19        A    Okay.  Well, I was helping to clean out the house

20   as a favor to Bernie and I put a bunch of papers from

21   Joanne's room into boxes; most I sent to his basement and a

22   couple boxes I took because I thought, well, I'll probably

23   see Joanne maybe before he does.  And as I was unearthing it,

24   and that was like maybe a year later or so, I found a signed

25   copy of the will and I told him about it and, you know, he

174

1   wasn't happy that I had it.  I don't think he knew it was an

2   original signed will, but--

3        Q    Where is that will now?

4        A    It's in my home.

5        Q    Okay.  And you know that--how do you know that Mr.

6   Black has a copy of it?

7        A    Well, because he--he showed it to me right after

8   his mom died.

9        Q    Okay.

10       A    And he--he showed it to others too.

11       Q    Okay.  Were you a part of the--or were you a

12   party to the probate of the estate?

13       A    No.

14       Q    So were you receiving any notices from Mr. Black or

15   the court regarding the probate of the estate?

16       A    No, I had no idea what he was probating.

17       Q    When did you first learn that Mr. Black had put

18   one-third of the paid-on-death assets other than the Roth IRA

19   into an issue trust?

20       A    I think when Pam started uncovering all of this.  I

21   didn't know any of this until right around then.

22       Q    When you received the account and report that Mr.

23   Black filed after the conservatorship, did you see anything

24   in there that indicated to you that he had put one-third into

25   an issue trust?

BLACK000763

175

```
 1     A    No.

 2     Q    And did you know that there was a Roth IRA that he

 3   had distributed 100 percent to his children?

 4     A    Absolutely not.  And let me just also say, Joanne

 5   when she was still in a psychotic state kept telling me about

 6   all this money that Bernie had stolen from her.  But when

 7   she's in a state--you know, she told me her mom's thing was

 8   worth eight million, so I never know what's true and what's

 9   not, so I didn't follow up on it.

10     Q    But you did question Mr. Black when you saw in the

11   accounting report that there was 2.4 million.  In fact, did

12   you not question him that you thought he had lost money?

13     A    I did.  I questioned his financial expertise and

14   wondered what he was doing when the market had been going up

15   20 percent year after year.  I questioned his--he calls

16   himself a financial expert, genius, whatever, and we had some

17   discussions about that.

18     Q    Did he tell you at that time, well, I've

19   transferred a third of the assets into a trust?

20     A    Absolutely not.  And he told me it was none of my

21   business, that he would discuss it with you, since you were

22   the trustee.

23     Q    Okay.  And when did this conversation take place?

24     A    I have the e-mail.  I would say somewhere in late

25   2013, maybe '14, but that--I still thought--I even wrote--I
```

BLACK000764

176

1     still thought the money was in Vanguard.  Maybe 2014.  He

2     never told me he had moved the money.

3         Q    And obviously you're here today, but if you had

4     known at the time that he was applying to be the conservator

5     that he was going to take a third of those paid-on-death

6     assets, transfer them to an issue trust, and then take the

7     Roth IRA and transfer it to his children, would you have

8     objected at that time?

9         A    I would have objected immediately at that time.

10          MR. DAIN:  Okay.  Thank you, Your Honor, I have no

11     further questions.

12          THE COURT:  Okay.

13          THE WITNESS:  Is somebody going to cross?

14          THE COURT:  Do we know what the date is on the

15     other will?

16          THE WITNESS:  Yes, 2010.  I have--you have a copy

17     actually of that will, because I--when I objected, I put it

18     in my exhibit.  I objected to one of Bernie's wanting to be

19     the guardian.  So I--it was in February of 2015, and I sent

20     an exhibit of the will.

21          THE COURT:  Okay.

22          THE WITNESS:  It's three pages and it's signed by

23     three people.

24         (Pause.)

25          THE COURT:  Well, I don't know which is which.

177

```
 1   Sorry.
 2              MR. DAIN:  It's okay, Your Honor.
 3              THE WITNESS:  I think I've only--oh, you're close.
 4              THE COURT:  That's not it.
 5              THE WITNESS:  No, that's the letter my aunt wrote
 6   to Bernie telling him that some of the jewelry is mine--I
 7   mean my mother's, which at first he said yes it was and then
 8   he said no it wasn't.  But it will be in that.  I have like
 9   four exhibits, so it's one of those exhibits.  There.
10        (Pause.)
11              THE COURT:  Okay.  Okay.
12                        CROSS-EXAMINATION
13   BY MR. THIESSEN:
14        Q    Good afternoon, Ms. Wrigley.
15        A    Good afternoon.
16        Q    You testified you had a conversation with Bernard
17   Black in the summer of 2012?
18        A    Yes.
19        Q    And you in fact had multiple conversations with
20   him?
21        A    Yeah.
22        Q    And you testified that it was his main concern was
23   that Joanne not receive the funds outright?
24        A    His main concern that she not receive the funds
25   outright, yes.
```

178

1      Q      And this was his main concern, correct?

2      A      Yes.

3      Q      When you had these discussions with Mr. Black, you

4   specifically discussed the two-third, one-third distribution

5   under the estate of Renata Black, didn't you?

6      A      Not that I recall.

7      Q      You had in fact discussed it on multiple occasions,

8   didn't you?

9      A      Not that I recall.

10     Q      And you specifically discussed that of the three

11   million, only two million was to go to the SNT for Joanne

12   Black?

13     A      Not that I recall.

14     Q      And you--you did not have more than one

15   conversation with him about the two-thirds distribution to

16   the SNT for Joanne Black?

17           MR. DAIN:  Well, Your Honor, I'm going to object.

18   That's a compound sentence regarding--

19           MR. THIESSEN:  Sure, I'll rephrase.

20           THE COURT:  All right.

21           THE WITNESS:  I mean if I wrote an e-mail and you

22   have it, then apparently my memory is off, but I don't

23   remember having any kind of conversation like that with

24   Bernie Black.

25     Q      (by Mr. Thiessen)  Do you recall having a

BLACK000767

179

1    conversation about the disclaimer?

2            MS. DiPONIO:  Your Honor, I believe this has been

3    asked and answered.

4            MR. THIESSEN:  Your Honor, I'm allowed to examine

5    her on cross.

6            THE COURT:  I thought that was your first question.

7            MR. THIESSEN:  No, the first question was what was

8    Bernard Black's main concern giving--

9            THE COURT:  Right, and then you asked about--

10           MR. THIESSEN:  --funds outright.

11           THE COURT:  --the disclaimer.

12           MR. THIESSEN:  I'll--I think it's fair to ask again

13   with respect to some exhibits.  I will not belabor the issue,

14   Your Honor.

15           THE COURT:  All right.

16       Q    (by Mr. Thiessen)  You in fact had a discussion

17   with Mr. Black about the disclaimer, correct?

18       A    Yes.

19       Q    And in fact he sent you an e-mail with a disclaimer

20   form for Joanne Black?

21       A    Yes.

22       Q    And it was your idea to go to Denver to have Joanne

23   Black sign the disclaimer?

24       A    I suggested--yes, I suggested that I might be able

25   to go to Denver and have her sign something like that.

BLACK000768

180

```
 1      Q    And he also sent you an e-mail with respect to a
 2 disclaimer for Becca Black?
 3      A    He sent me some papers; I didn't look at it.
 4      Q    Can you turn to Exhibit 80, please?
 5      A    Sure.  I think it's right here.  Forms for Becca to
 6 sign.
 7      Q    Do you recall receiving that e-mail?
 8      A    If there's an attachment--
 9      Q    Feel free to look at it.
10      A    Okay.  Yeah, so I probably didn't open up the
11 attachment, but yeah, I mean--yeah, I didn't open up the
12 attachment because he just said a form for Becca to sign, and
13 I think he wanted me to take her to a notary or something
14 like that.  I don't recall.  Did I do that?
15      Q    I don't know, did you?
16      A    No, not that I recall.
17      Q    Okay.  Did he--
18      A    I do remember, you know, yeah, I got this e-mail,
19 but did I discuss anything further with that?  No, I didn't
20 know--I didn't pay attention.  I don't remember opening up an
21 e-mail, I don't remember printing it, if she did.
22      Q    During your testimony, you said that you and Mr.
23 Black spoke about the five grandchildren receiving a small
24 amount from the estate of Renata Black; is that correct?
25      A    Well, small.  I mean whatever would be left over
```

181

1    after all the expenses were paid, taxes and everything were

2    supposed to be paid out of the estate, not from Joanne's

3    part.

4        Q    You also testified to having exchanges--at least

5    one e-mail exchange with Ms. Sara Black?

6        A    Oh, I had several exchanges with Sara.

7        Q    And that would have been in the summer of 2012?

8        A    Yeah, and maybe even one later.

9        Q    Could you please turn to Exhibit 52?  I'm sorry,

10   it's not--it's not 52; I'm sorry, it's 49.  And is this an e-

11   mail from your e-mail address, cheriewrigley@yahoo.com?

12       A    Yeah, it's one of--I have way more e-mails than

13   this in my--

14       Q    And is it dated July 21st, 2012?

15       A    Yes.

16       Q    And is it to Sara Black?

17       A    Yes.

18       Q    and if you'll take a look the sort of second

19   paragraph where it starts with "I".

20       A    Yeah.

21       Q    Could you please--and you've scrolled to the end of

22   that sentence it says, "I don't want to spoil any good news,

23   but I'm sure your dad has told you that once your

24   grandmother's estate goes through probate shortly you will

25   have more than enough to pay for all your schooling needs."

BLACK000770

182

```
 1      A    Um-hum.
 2      Q    And so in fact you were--you were telling her that
 3  it wasn't--she wasn't going to receive a small interest?
 4      A    I thought she was going to get about $25,000,
 5  $30,000.  She was going to graduate school for a year.
 6      Q    And in your mind that was--that was sufficient for
 7  graduate school, to pay for more than enough of her schooling
 8  needs?
 9      A    Yeah, that's what approximately I was told that
10  they would get.  Either Bernie had told me that's what
11  Benjamin and the other one, David, were going to be getting.
12  That that would be what he approximated they would be
13  getting.  He didn't say to me it was one percent.  He just
14  said that's about what it would be.  And so, you know, that's
15  about what I thought she would get too.  You know, I'm not
16  going to go any further than that, but--I have many more from
17  Sara discussing things with her, but not money, just
18  discussing her general wellbeing.  But I've never spoken to
19  her on the phone.
20      Q    You--and is that e-mail Exhibit 49, is that a true
21  and correct copy of the e-mail you sent?
22           MR. DAIN:  There's no objection if he wants to
23  admit.
24           THE WITNESS:  Yeah, I'm sure it is.
25           MR. THIESSEN:  I move to admit Exhibit 49, Your
```

BLACK000771

183

1    Honor.

2                THE COURT:  Admitted.

3                (Petitioner's Exhibit 49 was received in evidence.)

4        Q    (by Mr. Thiessen)  You also expressed that you were

5    surprised that the--I believe these were your words, the

6    money was left to Joanne unattended.

7        A    Yeah, that it was left outside of the special needs

8    trust.

9        Q    And so you needed--you needed to speak with Bernard

10   Black about how to arrange for those funds to be not left to

11   Joanne outright, correct?

12       A    No.

13       Q    You testified that you've never had a phone

14   conversation with Ms. Kate Litvak; is that correct?

15       A    Yes, to the best of my knowledge.

16       Q    One moment, ma'am.

17            (Pause.)

18       Q    Sorry.  You testified that Renata expressed concern

19   about Joanne's ability to manage the funds on her own; is

20   that correct?

21       A    Yes.

22       Q    And when you talk about a trust for Joanne, what do

23   you mean?

24       A    Renata had wanted to have a special needs trust

25   that my brother would help take care of.

184

1     Q    Well, you also exchanged e-mails with Mr. Black

2  around--in 2012.  You testified specifically you reviewed all

3  the e-mails.

4     A    Of course.

5     Q    Do you recall an e-mail from November of 2012 where

6  Mr. Black would have explained to you with respect to Becca's

7  disclaimer the reasons that Becca should disclaim?

8     A    No, I don't, so you would have to show that to me.

9     Q    Sure, I would be happy to do that.

10     MR. THIESSEN:  Your Honor, I apologize, but we do

11  only have it on the laptop.  We'll certainly print it.  We

12  can admit it later, but I think it's fair for her to at least

13  view the e-mail.  If Mr. Dain wants to view it, certainly.

14     THE COURT:  And what is this?

15     MR. THIESSEN:  This is an--this is an e-mail from

16  Mr. Black to Cherie Wrigley dated November 5th, 2012.

17     MR. DAIN:  Yeah, I mean is this the total of the e-

18  mail?

19     MR. THIESSEN:  Yes, it is.

20     MR. DAIN:  I have no objection as long as he prints

21  out whatever it is--

22     THE COURT:  Okay.

23     MR. DAIN:  --and show it to the Court too.

24     MR. THIESSEN:  Sure.

25     THE COURT:  Show it to Ms. Wrigley.

BLACK000773

185

1          THE WITNESS:  Could you make it a little bit
2    bigger?

3      Q     (by Mr. Thiessen)  Certainly.  I'll try.

4      A     You can read it.

5      Q     Is that better?

6      A     Um-hum.

7      Q     Do you recall?

8      A     Did I respond to this e-mail?

9      Q     Did you?

10     A     I don't remember reading this e-mail.  So did I
11   respond to it?  You know, I do get, you know, e-mails not
12   necessarily from Bernie a lot, but I don't remember getting
13   that e-mail because I do remember informing him about his
14   daughter having issues with a therapist and I don't remember
15   --I don't remember that e-mail though.

16     Q     And just for the record, I'll read the relevant
17   portion.  I'm not--I don't have very much further, Your
18   Honor.

19          THE COURT:  What's the date?

20          MR. THIESSEN:  The date is November 5th, 2012.  It
21   is an e-mail from Bernard Black to Cherie Wrigley.  The
22   subject line is "Becca documents."  There is no one copied.
23   The second paragraph is, "For the waiver, please stress to
24   Becca that this is for her benefit and her siblings period
25   which is, because with no waivers, 95 percent goes to Joanne.

186

1   I'll make sure she gets the benefit of her one percent share,

2   and more, this is for her benefit." Do you recall that

3   explanation Bernie Black gave you?

4       A   I don't, but it still doesn't negate the fact that

5   95 percent would have gone to Joanne.

6       Q   Right, but--but specifically with respect to the

7   statement Becca would receive one percent--her one percent

8   share and more; that's consistent with Mr. Black's testimony

9   that you and he were attempting to convince Becca to sign the

10   disclaimer so that all funds could be disclaimed and funded

11   two-thirds, one-third into the estate?

12       A   No, it doesn't. First of all, I don't remember

13   that particular e-mail, and it doesn't say two-thirds, one-

14   third, it just says that Becca is going to (inaudible) one

15   percent.

16       Q   But what--

17       A   What I'm more concerned about is how he was about

18   the therapist. That his own daughter was suicidal and he was

19   disregarding it. Read the part about the therapist.

20       Q   With all due respect, that doesn't have anything to

21   do with today's proceedings.

22       A   Of course it doesn't.

23       MR. DAIN:  Wow, wow, wow, why don't we just have

24   the--

25       THE WITNESS:  Because that's all Bernie--that's

BLACK000775

187

1   what I talk to Bernie about.  Whether I read any of the rest
2   of that, let me tell you, when his daughter was suicidal,
3   that's all I cared about.  I didn't read the rest of that.
4           MR. THIESSEN:  Thank you, Your Honor.  Nothing
5   further.
6           THE COURT:  Okay.
7           MR. DAIN:  If you would just leave that up there,
8   so I can--
9           MR. THIESSEN:  Oh, certainly.  Certainly.
10          THE WITNESS:  I don't remember reading the rest of
11  it, and I don't remember responding to the rest of it.  I do
12  remember having conferences with him and his therapist--about
13  her therapist.
14          MR. DAIN:  Thank you.
15          THE WITNESS:  That's the important issue.
16                    REDIRECT EXAMINATION
17  BY MR. DAIN:
18      Q    While we're waiting on that e-mail, you were aware
19  that Renata had real property, correct?
20      A    Yes.
21      Q    And Mr. Black sending you an e-mail saying that
22  Rebecca will get one percent and more.  Did you have any
23  understanding whether she was going to get anything from the
24  remainder of the estate of Renata Black?
25      A    Yeah, I assumed that she was going to get something

188

1  from--the estate included like three houses--I mean she had

2  five houses; two were supposed to go to Joanne outright, a

3  condo and McKeel, that's still in the possession right now.

4  The three houses, one that she lived in and I think two

5  others, were supposed to be then divvied up two-thirds/one-

6  third.

7       Q    Okay.  So let's read the whole e-mail; it's not

8  very long.  I'll read it to you.  It's Monday, November 5th,

9  2012.  So this is now just three weeks before this hearing on

10 the conservatorship.  First line, "I will bring Becca's birth

11 certificate and SS card.  For the waiver, please stress to

12 Becca that this is for her benefit and her siblings."  And

13 you understood her siblings to be her brothers and sisters?

14      A    Yeah, I mean--

15      Q    Bernard's other children?

16      A    Yeah, I really don't remember reading that.

17      Q    Okay.

18      A    Okay.

19      Q    "Which it is, because with now waivers 95 percent

20 goes to Joanne.  I'll make sure she gets the benefit of her

21 one percent share and more this is for her benefit"--all one

22 sentence.  Mr. Black says, "I'll make sure she gets the

23 benefit of her one-percent share."  Did Mr. Black explain to

24 you why he couldn't try to explain this to Rebecca himself?

25      A    No, other than the fact that they had a very poor

BLACK000777

189

```
1   relationship.
2        Q    But again, as you said before, this says nothing
3   about one-third of--
4        A    No.  No.
5        Q    --the 95 percent going to a--an issue trust?
6        A    And I had no idea what one percent he was talking
7   about even.
8        Q    Okay.  Now, the paragraph you mentioned that you
9   were focused on is "Separately, if the therapist is in fact
10  saying the things that Becca reports based on very partial
11  information after one visit, this is a very bad sign.  I'm
12  willing to believe for a little bit that Becca is
13  misreporting, but I will need comfort on this soon or else we
14  will need a new therapist.  Bernie."
15            That's what you're saying you were concerned about,
16  that part of the e-mail?
17       A    That--I remember vaguely that part, but we had
18  numerous conversations about Becca, therapy, and how he was
19  treating his daughter.
20       Q    So assuming this is the e-mail that Mr. Black was
21  talking about that conveyed what his intent was for the
22  disclaimer, my first question is to you: you understood there
23  were disclaimers that the children were executing, right?
24       A    No.
25       Q    Okay.  So even with respect to that, with respect
```

190

1    to the first paragraph, do you recall any e-mail or

2    conversation with Bernard Black in which he explained exactly

3    the purpose of the disclaimer?

4        A    No.

5        Q    So the only thing he's conveyed to you here is that

6    he'll make sure she gets the benefit of her one-percent

7    share?  Do you know whether you ever conveyed that to her?

8        A    I don't think Becca was willing to listen to me

9    about anything regarding her dad.  She did not want to go.

10   She didn't want to hear about what her dad was going to give

11   her.  She--it was a very difficult relationship.

12       Q    So at this time, when they're talking about a

13   therapist, you had conveyed to Mr. Black that she was

14   suicidal?

15       A    That she had been suicidal.  She complained about a

16   lot of other things too.

17       Q    And his response was to you--was for you to try to

18   get her to waive her one percent?

19       A    Yes, apparently.  There were other things.  He

20   would say she's making this up, numerous things.

21            MR. THIESSEN:  Okay.  I have no further questions.

22            THE COURT:  Okay.

23            MR. THIESSEN:  Just one more, Your Honor.

24            THE COURT:  Okay.

25            MR. THIESSEN:  I would move to admit that November

191

```
 1   5, 2012 e-mail--
 2              THE COURT:  All right.
 3              MR. THIESSEN:  --and make it Exhibit 111.  Exhibit
 4   111.
 5              THE COURT:  Okay.
 6              MR. DAIN:  No--no objection, Your Honor.
 7              MS. DiPONIO:  And, Your Honor, just so the record
 8   is clear, I wanted to state this for the record that the date
 9   of the will that has been referenced, this other will, is
10   January 31st, 2010.
11              THE COURT:  Right.
12              MR. DAIN:  Is that a copy?
13              MS. DiPONIO:  This is a copy, yes.
14              MR. DAIN:  Would the Court like that copy?
15              THE COURT:  I actually have it.
16              MR. DAIN:  Oh, okay.  I have no further questions
17   for this witness.
18              THE COURT:  All right.  Thank you, ma'am.
19              MR. DAIN:  Then, Your Honor, in terms of my
20   testimony, how do you want to do this?  I obviously can
21   either give you a narrative or--
22              THE COURT:  If you wouldn't mind, I'll just swear
23   you in and you can sit in the witness box and give me the
24   narrative and that will facilitate any cross-examination that
25   they want to provide.
```

192

```
 1              (Whereupon, Mr. Dain was sworn.)
 2                        ANTHONY DAIN,
 3   called as a witness herein, having been first duly sworn, was
 4   examined and testified as follows:
 5                     DIRECT EXAMINATION
 6              THE COURT:  Go ahead, Mr. Dain.
 7              THE WITNESS:  So, firstly, with respect to the
 8   issue of having a phone conversation with Mr. Black regarding
 9   his intent on the disclaimer, I've had very few phone
10   conversations with Mr. Black over the years.  In fact, I've
11   had very few e-mails with Mr. Black over the years, and this
12   goes back probably 20 or 30 years.  We haven't had a close
13   relationship.  We don't--we don't call each other; we don't
14   communicate.
15              There've been times when I'm traveling or in trial
16   that I end up in the same city where he is.  One happened in
17   Austin, Texas when he was at the University of Texas, so we
18   had dinner--he and his wife and me and my wife--and we just
19   talked generally.  But I don't recall any conversation in
20   July of 2012.  It's possible there was a phone call.  I don't
21   recall it, but what I know for sure is we never had a
22   discussion about a disclaimer or the effect of a disclaimer.
23   I'm an attorney.  I've been an attorney for 34 years.  I
24   don't have an understanding of probate law of guardianship or
25   conservatorship law.  I didn't understand the term disclaimer
```

193

1 other than I've seen it in my experience in litigation, which

2 is that you would indemnify someone or not sue them for some

3 reason.  So the--I never had a conservation with Mr. Black

4 about a disclaimer.

5    What I did get is the filings that Mr. Black and

6 Mr. Glatstein made, not all of them, and I complained to Mr.

7 Glatstein that I wasn't being served with everything and

8 absolutely not timely.  Sometimes eight days would go by,

9 sometimes two weeks.  I called Mr. Glatstein twice; one to

10 explain that neither Ms. Wrigley nor I had received certain

11 of their filings, and another time to complain that they were

12 coming--the ones that were were coming late.

13    Mr. Glatstein--and I believe he testified to that--

14 got back to me on the 1st one saying he apologized, it was

15 inadvertent and he sent me whatever that pleading was.

16    THE COURT:  And what kind of law do you practice?

17    THE WITNESS:  Litigation, mostly--

18    THE COURT:  Like civil litigation?

19    THE WITNESS:  --patent litigation.

20    THE COURT:  Patent litigation.

21    THE WITNESS:  I'm a registered patent attorney, so

22 mostly patent litigation, but also banking.  I represent the

23 FDIC, so it's technically not banking, it's violations of the

24 regulations.

25    THE COURT:  Okay.

194

```
 1          THE WITNESS:  And when I received--I recall
 2    receiving the order.  Actually I recall I think receiving the
 3    first and the third order, and I call them that because the
 4    second one never was issued by the Court.  I don't ever
 5    recall seeing the proposed order, but my take on what Mr.
 6    Black was doing was that--and in fact I have to say I didn't
 7    even focus on the words disclaimer in that order.  My
 8    understanding on reading that order was all of the money that
 9    had been left to Joanne, paid on death was going into a
10    Supplemental Needs Trust of which I and Mr. Black would be
11    trustees.
12          I had no conversation with Mr. Black about the
13    issue trust.  I had assumed during--I had assumed that with
14    respect to the probate that at some point some of the money
15    out of the residual estate would go into an issue trust, but
16    Mr. Black never informed me that he had transferred that or
17    that he had funded that, so I wasn't even aware he had funded
18    the issue trust.  I had thought all of the money had gone
19    into Supplemental Needs Trust pursuant to the order Your
20    Honor had issued.  And so my understanding was the same I
21    think as the Court's understanding, and that is whatever
22    authorities you gave him, the result was he was going to
23    transfer everything on paid-on-death benefits into a
24    Supplemental Needs Trust release, hold it for Joanne's
25    benefit.
```

BLACK000783

195

 1      I was under the impression that there was only two
 2  million, or thereabouts in those assets because Mr. Black had
 3  never given me a copy of an account statement, had never told
 4  me how much was in there, and I did request to know that.  I
 5  saw the account and report and my thought was that it had
 6  gone from about two million to 2.4 million, so I thought it
 7  had increased in value.  I had discussions with Ms. Wrigley
 8  where she was saying she thought it had gone down in value.
 9  But I had no idea there was $3 million in the paid-on-death
10  accounts.  I had no idea there was a Roth IRA.  I had no idea
11  that Mr. Black had transferred the Roth IRA assets to his
12  children, and he never told me anything about that, never
13  explained ever that he was going to take those paid-on-death
14  benefits and transfer a third of them to his and his
15  children's benefit or to an issue trust.  I know conflicts,
16  and I would have told him immediately you can't do that.
17      The first I learned that he had transferred money
18  into an issue trust was in 2014, and I actually think it was
19  late 2014, when suddenly he started sending me e-mails asking
20  that I improve--I approve reimbursements to him for his
21  children's tuition, student loans--no, actually not tuition,
22  I'm sorry student loans and other expenses.  And he--he
23  didn't actually--I think what he said was out of the Issue
24  Trust.  And that's the first time I had heard of it, so I
25  think I inquired internally.  I might have called Cherie.  I

BLACK000784

196

```
 1   might have called Ira Salzman at the time, because I was
 2   confused.  I didn't even know there was any money in an Issue
 3   Trust.  So I e-mailed Bernie--Bernard Black back saying I
 4   don't approve of this because I don't think there should be
 5   any money in these trusts and--because I thought all of the
 6   money had gone into a Supplemental Needs Trust, and I never
 7   heard back from him.
 8               I know that I've never had an e-mail exchange with
 9   him regarding his transfer of those paid-on-death benefits to
10   himself or his children, and I know what my intent was.  My
11   wife and I had made a number of trips in the years before
12   Renata had died to visit Renata.  And almost every one of
13   those trips, including just a few months before she died, she
14   wanted to discuss how Joanne would be taken care of in the
15   event of her death.
16               MR. POSKUS:  Objection, Your Honor, he's talking--
17   it's hearsay what his wife would have heard from Joanne.
18   That's actually double--from Renata.  That's actual double
19   hearsay.
20               THE WITNESS:  No, I'm saying my wife was with me on
21   those trips.  I'm saying what I heard, not what my wife
22   heard.
23               THE COURT:  Okay.
24               THE WITNESS:  Not from my wife; from Renata.
25               MR. POSKUS:  Okay.  I misunderstood that.
```

BLACK000785

197

```
 1          THE WITNESS:  And this is my understanding from
 2   what Renata conveyed to me.  She told me when I--we had a
 3   discussion, I asked her why she hadn't funded the
 4   Supplemental Needs Trust, and she told me that--that
 5   eventually she would get around to it but that she had the
 6   assets in Vanguard.  And she told me that she had left them
 7   100 percent to Joanne Black.  I on two occasions, two of the
 8   visits, I told her that that--that she has to move those into
 9   a Supplemental Needs Trust.  I mean I didn't want to discuss
10   with her, you know, you're going to die.  But I said, look,
11   at some point if you pass away and those aren't in a
12   Supplemental Needs Trust, they'll go out right to Joanne.
13          On all of those occasions, she made it clear that
14   she wanted to make sure the money went to Joanne.  She didn't
15   want it to go to Bernie.  She didn't want it to go to his
16   children.  And ask Ms. Wrigley testified, she especially
17   didn't want it to go to the two youngest because that was a
18   second marriage and she believed both Bernard and his wife
19   could take care of those children.
20          On the very last visit, which was just I think two
21   or three months before she died, I had told her she needs to
22   --she needs to do something about those paid-on-death
23   benefits.  And after that, I think it was two weeks before
24   she died, she--we had a phone call.  We told her we're coming
25   out again and we talked about, you know, we would go for long
```

BLACK000786

198

```
 1    walks.  She liked to walk.  She mentioned--or not mentioned,
 2    she stated to me that she had changed the designations from
 3    100 percent to Joanne Black to 95 percent to Joanne Black and
 4    left one percent to each of the five children from his first
 5    marriage.  I told her that I--while I appreciate she's
 6    leaving one percent to each of those children, the bigger
 7    issue is that she shouldn't leave that outright to Joanne,
 8    and she was just adamant that she wanted to make sure Joanne
 9    had it.  She said if I die, you'll take care of it, Cherie
10    will take care of it.  You'll make sure she won't waste that
11    money.  And then of course we made plans to go out there.
12          But my understanding--that's what I was working off
13    of is that she actually had changed it from 100 percent to
14    Joanne Black to 95 percent, and I think that's consistent
15    with the Roth IRA.  She just hadn't changed that one; it was
16    still 100 percent.  So I never had a concept that any of that
17    money was going to go one-third to Bernard Black.  And if he
18    had ever mentioned that to me in a phone call afterwards, I
19    would have told him what his mother had said.  The times when
20    I went out to help also clean out the house after Renata
21    died, we discussed it, and I told him that his mother wanted
22    to leave all that money to Joanne Black.  And frankly, I also
23    didn't think it was all that fair.  I thought that he--you
24    know, that--that she should trust Bernard more.  But she made
25    it clear to me in all our conversations she did not trust
```

BLACK000787

199

1   him; she did not trust his wife.  She thought they would find

2   a way to take that money from Joanne and protect them and

3   their children, and that's why she had left the money in

4   Vanguard outright.  That was my understanding, so I know if

5   we ever had a discussion about a disclaimer that would have

6   given Bernard and his children one-third, I would have not

7   gone ballistic, but I would have absolutely told him that's

8   not true.  That's not what your mother wanted.  And again, I

9   didn't disagree--I didn't agree with her, but I know that's

10  what she told me she wanted.

11          And so, again, I had no concept of where that money

12  went.  And when I saw the pleadings, I absolutely read those

13  as all of the money is in--is being transferred to Joanne one

14  way or another.  It wasn't until Ms. Young started

15  questioning some of the accounts--accountings and reports of

16  Mr. Black that I started getting suspicious.  And I even

17  remember having conversations where I said he wouldn't do

18  that; there's no way he would do that.  And then when Ms.

19  Black--when Ms. Young hired Ms. Kerr, that was absolutely the

20  first time I realized he had taken one-third of those assets

21  and put them into an Issue Trust, because again I never

22  received a statement.  That was the first time, and I was

23  astonished that he had done that.  And even then I didn't

24  know about the Roth RA--when--IRA.  When I found out about

25  that, again, that was the first time I learned of that.

BLACK000788

200

1       With respect to the will, I had also known there
2  was another will because in the last--one of the last visits
3  to Renata Black, she had my wife and I sign an addendum.  She
4  hadn't shown me the will, but she showed me the addendum.
5  And the one discussion I had with Mr. Black is I signed that
6  addendum, my wife signed that addendum, but I did tell him I
7  don't understand it.  I still don't quite understand the
8  addendum, but she wanted us to sign it and we did sign it.
9       Subsequently, I saw a copy of--and maybe even the
10  original when we were--I think I saw the original of the will
11  that went with the addendum.  I was not part of the estate
12  process.  Mr. Black--you know, that was him, so I have no
13  idea how he decided which will to probate or why the one he
14  probated.  I had no part in that.  Nor did I really have an
15  issue with whatever the residue of the estate was.  If that's
16  to go two-thirds/one-third, I think that's fair.  I had no
17  issue with that.  Or whatever the other will said; I hadn't
18  looked at it in quite a while.  My understanding is whatever
19  the property that was left over, any other assets, that can
20  go whatever the will says.  If that's two-thirds/one-third,
21  that's fine.  I didn't really pay attention to that.  But I
22  knew those paid-on-death assets were supposed to go, the last
23  time I talked to Renata Black, 95 percent to Renata Black and
24  I never had another understanding about that until Ms. Kerr's
25  account.  So with that, I'll take your cross-examination

201

 1   questions.

 2              THE COURT:  Okay.  Questions?

 3              MR. POSKUS:  Sure, Your Honor.

 4                      CROSS-EXAMINATION

 5   BY MR. POSKUS:

 6       Q    Let me just make sure I got your testimony

 7   straight.  I believe you said you never had a concept that

 8   any of the Vanguard money would go one-thirds, did I hear

 9   that correctly?

10       A    Never had a concept after I found--

11       Q    That's what I think you said.  I'm just trying to

12   clarify that you said that.

13       A    Not until we discovered it had gone that way.

14       Q    Not until you discovered after the disclaimer was

15   exercised?

16       A    Yes.

17       Q    Okay.

18       A    Yes.

19       Q    And you also testified that your mother--your

20   mother, I'm sorry, your aunt told you that she left the

21   Vanguard and the Fidelity 100 percent to Joanne Black?

22       A    Not quite.

23       Q    Okay.  I'm just--

24       A    I didn't know about Fidelity.  I didn't know she

25   had assets with Fidelity.  I only knew she had assets at

202

1    Vanguard because I also have assets at Vanguard and so I knew
2    just from conversing with her that we had the same person
3    that assists you there.   There's people that they assign to
4    you.
5         Q    When did you have this conversation with Renata?
6         A    I had a number of conversations with Renata over
7    probably the years 2010 to--well, let me back up.   From the
8    time we did the estate plan, I was part of that estate plan.
9         Q    Well, let me--let me just interrupt and say I meant
10   your conversation when she said I made the POD on the
11   Vanguard 100 percent to Joanne.   When did you have that
12   conversation?
13        A    Probably like maybe late 2011, early 2012.
14        Q    So not too long before her death?
15        A    Probably--it was definitely within a year before
16   her death, I'm pretty--well, no, I shouldn't say I'm pretty
17   sure.  I think within a year before her death, but we
18   probably had a total of five to ten conversations about it.
19        Q    So--
20        A    She called me all the time, by the way.
21        Q    So at the time of her death, it would have been
22   pretty fresh in your mind that she had said that, right?
23        A    Time of her death--
24        Q    Let's state on the record, when did she die?
25        A    I think it was May 1st or 2nd, 2012.

BLACK000791

203

```
 1      Q    I'm told it's May 1st, so--

 2      A    Yes.

 3      Q    Okay.

 4      A    Yeah, I think it would have been pretty fresh.   In

 5   fact I know we had that conversation two weeks before she

 6   died.

 7      Q    Okay.  So let me ask you to take a look in the

 8   exhibit notebook at Exhibit 106.

 9      A    Yes.

10      Q    And can you identify this document?

11      A    It looks like an e-mail from Bernie to me.

12      Q    All right.  And that's the one at the top from

13   Bernie to you, Wednesday, May 2nd at 7:33 p.m.?

14      A    Yes.

15      Q    Okay.  And then below that there's what appears to

16   be an e-mail from you to Bernie May 2nd, the same date,

17   indeed just nine minutes before that.  Do you see that?

18      A    Yeah.

19      Q    And then before that, there's an e-mail from Bernie

20   from earlier that afternoon.

21      A    Yeah.

22      Q    Do you recall participating in this e-mail

23   exchange?

24      A    No, but I have no idea I did.  I'm not denying

25   that's an e-mail exchange we had, so--
```

204

1     Q     Okay.

2     A     --yeah.

3           MR. POSKUS:  Your Honor, I move to admit Exhibit

4    106.

5           THE WITNESS:  And I don't object.

6           THE COURT:  Okay.

7           THE WITNESS:  And in fact that--now that brings to

8    light the eyewitness handwritten addendum last December.

9           (Petitioner's Exhibit 106 was received in

10   evidence.)

11    Q     (by Mr. Poskus)  So this e-mail was sent the day

12   after Renata's death?

13    A     Yes.

14    Q     And at this time, it was fairly fresh in your mind

15   that she had sent 100--she had delineated 100 percent of the

16   Vanguard over to Joanne; is that correct?

17    A     No, that's not correct.

18    Q     I said it was fairly fresh in your mind?

19    A     No, no, no.  What she had told me is she changed

20   the designations, that she was leaving one percent to each of

21   his children.  And as a matter of fact, let me add to that.

22    Q     Oh.

23    A     I objected that the other children should also get

24   some money, and I didn't agree with the one percent.  But she

25   told me I changed it to one percent to each of the children,

BLACK000793

1    the adult children, and 95 percent to Joanne.

2       Q    Okay.  So and--so that knowledge was on your mind

3    on May 2nd, 2012, when you sent this e-mail; is that correct?

4       A    Apparently--that's not the subject of this, but

5    yeah I--I knew that, yes.

6       Q    And you didn't think to tell Mr. Black that the

7    Vanguard funds had been changed, at least to the best of your

8    knowledge?

9       A    I had no way of knowing whether Mr. Black knew it

10   or not.  I assume he would know that.  That's not the subject

11   of this e-mail.

12      Q    And indeed--

13      A    And by the way, let me add, this was--this then is

14   the day after she died.

15      Q    Um-hum.

16      A    So actually we were probably making plans to go out

17   for her funeral.  So, yeah, I knew that.  Did I include that

18   in this?  I'll read it, but maybe not.

19      Q    Indeed, the third to the last sentence says,

20   "Generally, Joanne has a life estate in a fixed amount and

21   then there appears to be a two-thirds/one-third split between

22   Joanne and your first five children with some conditional

23   provisions for you."  Do you recall writing that?

24      A    Yeah, this is related to the will.  I'm telling

25   him--I'm essentially reading it out to him in an e-mail.

206

1    Q   But you left out the fact that Joanne was going to

2  get 95 percent of the Vanguard; is that correct?

3    A   That wasn't even part of this discussion.  Yeah--

4    Q   Okay.

5    A   --I mean I guess--let me say that to be fair, yes I

6  did leave that out.  What this is, is I'm asking him if he

7  has a copy of this, because just--we're now talking May.  So

8  six months before that she had my wife and I sign this

9  handwritten addendum, and I'm explaining to him her

10  handwriting isn't clear to me.  And I was explaining to him

11  what was in that, because I didn't know he had it.

12    Q   Let me ask you something else.  This is another

13  part of your testimony, and tell me if I've got it wrong.

14  You said the first time you heard of the Issue Trust was when

15  you got the tuition--

16    A   No.

17    Q   --request from Bernie Black?

18    A   No, no, no.

19    Q   Okay.  So--

20    A   That--

21    Q   --tell me what your testimony was.

22    A   I knew about the Issue Trust in 1997.  I was part

23  of the process of setting up the estate plan.  What Renata

24  had not done--and again, my wife and I made so many trips out

25  there and variably in many of them it would come up, are you

BLACK000795

207

1 ever going to fund these things. And so my understanding
2 was, from what she told me, she had minimally funded them
3 just to keep them active in accounts at Vanguard. But--so I
4 knew about the Issue Trust. What I'm telling you is the
5 first I learned that Bernie had funded that Issue Trust, that
6 he had put this paid-on-death a third of those assets into
7 it, was when he started sending me e-mails asking me to
8 approve reimbursements.

9        Q    I see.

10       A    So that's the first I knew he had transferred, but
11 I knew about the Issue Trust in 1997.

12       Q    Okay.  Then I misunderstood your testimony.  Let me
13 ask you this: So did--you said you had no idea that he had
14 funded the trust; am I correct?

15       A    I had no idea, frankly--no, that's correct.  Yeah,
16 I'm sorry.

17       Q    And did you know--have any idea of where the Issue
18 Trust accounts were?

19       A    Absolutely not.

20       Q    Absolutely not, okay.  Let's take a look at Exhibit
21 68.  I'll ask you, sir, do you recognize that document?

22       A    Yeah, I absolutely recognize that document.

23       Q    What is this document?

24       A    That's a document--and there's--

25       Q    Just tell me do--tell me what the document is.

BLACK000796

208

1      A    It's a document I received from Chase which would

2   allow Bernard and I, as I understood it, to open up an

3   account, and there should be another one for the Supplemental

4   Needs Trust.

5      Q    But is that your signature there?

6      A    That--yes, that's my signature.

7      Q    So a moment ago when you said you had no idea where

8   the accounts were for the Issue Trust, would you want to

9   change that testimony?

10     A    No, I don't want to change that testimony.

11     Q    And did you sign this document on May 4th, 2013?

12     A    I absolutely--well, I doubt it would have been May

13  4th, because that's not my handwriting on the date, but

14  probably around then.

15     Q    Around then?

16     A    Yeah.

17     Q    All right.  So this is the document that you

18  signed?

19     A    Yes.

20     Q    And that's your signature?

21     A    Yes.

22          MR. POSKUS:  Your Honor, I move to admit Exhibit

23  68.

24          THE COURT:  Admitted.

25          (Petitioner's Exhibit 68 was received in evidence.)

209

```
 1              THE WITNESS:  But this isn't an account opening

 2    document.

 3              MR. POSKUS:  Excuse me, Your Honor, move to strike,

 4    non-responsive.

 5              THE WITNESS:  I guess I'll do it in a narrative

 6    when you're done.

 7              THE COURT:  That's fine.

 8              MR. POSKUS:  Thank you, Your Honor.

 9         Q    (by Mr. Poskus)  What's your--what's your mailing

10    address, sir?

11         A    My home mailing address?

12         Q    Well, what--well, perhaps I ought to ask it this

13    way.

14              THE WITNESS:  And, Lisa, would you get me my tea?

15    Thanks.

16              THE COURT:  I'm sorry?

17              THE WITNESS:  My tea.

18              MR. POSKUS:  My tea.

19              THE WITNESS:  Yeah, thanks.  I just would get out,

20    but I'll probably trip getting out of this thing.  I didn't

21    mean to make you a--thank you.

22         Q    (by Mr. Poskus)  Mr. Dain, my question is, if I

23    were to send you mail to 13272 Capstone Drive, San Diego,

24    California 92130; is that--would it get to you?

25         A    I don't know.  That's the point I had with Mr.
```

210

1   Glatstein.  You can say you're sending it, but Mr. Glatstein
2   admitted to me that they had omitted sending me something,
3   so--
4        Q     Well, hold on.  That's not--
5        A     --it should get there.
6              MR. POSKUS:  Your Honor, move to strike; non-
7   responsive.
8              THE COURT:  Let's just assume for the moment.
9              THE WITNESS:  Okay.  It should get there, yes.
10       Q     (by Mr. Poskus)  It should get there.  That's your
11  correct mailing address?
12       A     It is.
13       Q     All right.  Now, did you receive a copy of the
14  initial petition that was filed by Mr. Glatstein?
15       A     To be honest with you, I don't recall receiving
16  that.  I--my recollection is of the order.
17       Q     You received the order but you didn't receive the
18  initial petition; is that correct?
19       A     No, not--not correct.  I don't recall receiving the
20  petition.  I could have received it; I'm not going to say I
21  did or didn't.  What I--my memory is of reading particularly
22  the March 5ᵗʰ order.
23       Q     So you're--we're talking about stuff that happened
24  now, like two years and eight months ago, so your memory of
25  that wouldn't be clear?

BLACK000799

211

1    A    No, I'm just saying I don't recall receiving the

2    petition.  I do recall the order.  That I remember.

3    Q    Did you receive anything else other than the order?

4    A    Oh, I received--I believe I received that account

5    report.  The first one I know for sure.

6    Q    Okay.  Did you receive an amended petition for

7    appointment of special conservator?

8    A    Don't have a recollection of that.

9    Q    You don't have--

10   A    I don't know whether I did or not.

11   Q    --a recollection of that.  Let me ask you this.

12   Let me ask you to turn to Exhibit 10.  Did you receive that

13   pleading?

14   A    I have no recollection of that.

15   Q    Okay.  Turn to page 2 of Exhibit 10.  And would you

16   agree with me that under Certificate of Service the address

17   that's listed for your name is the address you and I just

18   discussed?

19   A    Yes.

20   Q    So you were receiving pleadings sporadically.  Did

21   you--strike that.  Strike that.  You began your testimony by

22   saying you don't recall having a telephone conference with

23   Bernie Black in July of 2012, as he testified to.  Do you

24   recall--do you remember that testimony?

25   A    Yeah, I don't have a recollection of any phone call

BLACK000800

212

```
 1   in July of 2012.
 2        Q    All right.  Okay.  Now I'm going to read to you a
 3   question and answer that you had with my client on the 16th
 4   of June, and I'll ask you if you'll recall this exchange.
 5        A    Okay.
 6        Q    The question from you--and for the record, this is
 7   on page 29 of the transcript of the July 16th hearing
 8   starting at Line 17.  Question, "Okay.  And how did that
 9   first come to you that you decided to seek court approval to
10   disclaim assets so they would go into the estate of your
11   mother?"  Answer, "So, again, I don't want to think about
12   this as just how did it come to me.  This evolved out of a
13   series of discussion with partly my question, partly with
14   Cherie Wrigley.  I had one conversation with you that I
15   recall as to what the alternatives were and what the--what
16   the consequences to Joanne were of different alternatives."
17   Question, "And you recall from your conversation with me that
18   I said you should go to court and ask the court to freeze or
19   block the assets, correct?"
20             Does that refresh your memory regarding having that
21   conversation with my client?
22        A    That wasn't a conversation we had in July.
23        Q    Okay.  But was it--
24        A    I can tell you when that conversation was.
25        Q    Okay.  Tell me when that conversation was.
```

BLACK000801

213

1    A    It was shortly after either--I think it was a
2  little after the funeral for Renata, when we were discussing
3  that there was money that had been left outright to Joanne.
4  I didn't know where Joanne was.  And we discussed a concern
5  about how to protect that money.  And my only concept--I
6  didn't think guardianship, conservatorship particularly, was
7  you should go to court and get the money frozen so that it
8  doesn't go directly to Joanne.  That was not a July
9  conversation to my knowledge.  And again, my focus was more
10 on just making sure Joanne was protected, so that's what--
11   Q    But you did have--
12   A    --that conversation was.
13   Q    --But did you have a conversation with Mr. Black,
14 as he testified, that you discussed what the alternatives
15 were and what the consequences to Joanne were, the different
16 consequences?
17   A    Not alternatives.
18   Q    Okay.
19   A    Not alternatives.  The only thing we discussed was
20 going to court to freeze the assets.  And in fact that was
21 my--that would--that's my kind of a concept, because I don't
22 know how you do it, but you could get them frozen.  I was
23 thinking a blocked account or a frozen account of some kind.
24        MR. POSKUS:  Just one second, Your Honor.
25        (Pause.)

214

1    Q    (by Mr. Poskus)  And a moment ago you said that the
2  funeral you were talking about how Joanne had gotten money
3  directly, outright.  And who did you have those conversations
4  with?
5    A    I know I had a conversation with Bernard, but here
6  --you want to know the exact conversation?
7    Q    Well, no, I want--first of all, answer my question.
8  Who did you have the conversation with?  You said you had one
9  with Bernard.
10   A    For sure with Bernard.
11   Q    And anyone else?
12   A    I don't know.  I don't know whether I discussed it
13  with my sister or not, but I--if you want to know the
14  conversation, I can explain it to you.
15   Q    But--and so at that--at that time, I believe your
16  testimony a moment ago is you said that Joanne was going to
17  get money outright; am I correct?
18   A    That was my assumption.  I hadn't seen the
19  accounts, didn't know how much was in there, didn't have
20  access to them, couldn't verify--as I said, I knew nothing
21  about Fidelity.  But I discussed with him what Renata had
22  discussed with me.
23   Q    And you did that, and you did that based solely on
24  your discussion with Renata, as you've testified to, right?
25   A    Discussions.

BLACK000803

215

```
 1      Q    Okay.  Discussions.  But yet you didn't raise it
 2  with Mr. Black in your May 2nd e-mail, which would have been
 3  sent just a few days before the funeral?
 4      A    No, and that was because--
 5      Q    Okay.
 6      A    --I was concerned--I knew he was the executor.  I
 7  was not the executor of her estate, so that would have been a
 8  conversation about does he have a will.
 9           MR. POSKUS:  Nothing further, Your Honor.
10           THE COURT:  Okay.
11           THE WITNESS:  Can I respond then?
12           THE COURT:  Just one second.
13                     REDIRECT EXAMINATION
14           THE WITNESS:  So Exhibit 68--an let me give you the
15  kind of background of that.  As Ms. Wrigley testified, I
16  understood the paid-on-death accounts with Vanguard, so what
17  I was understanding is that Mr. Black wanted to open up new
18  accounts at Chase that would be used--and this one I think is
19  the trust for the benefit of the issue of Renata Black and
20  one for the Supplemental Needs Trust.
21           This was, in my understanding, for two things.
22  This Issue Trust was for his estate, the estate of Renata
23  Black, because he wanted the money at Chase, not at Vanguard.
24  So this is not actually an account opening statement; it's
25  just--
```

BLACK000804

216

```
 1              THE COURT:  I see it.  I see that at Paragraph 3.
 2              THE WITNESS:  Yeah.  And so what he never did was
 3     show me any evidence that he actually opened one; that was my
 4     point.  So I'd assumed when this probate--when the probate
 5     estate closed, there would be some money that would go into
 6     the Issue Trust, but this doesn't in any way reflect that I
 7     knew he would open up an account where he would put a third
 8     of the assets.
 9              THE COURT:  Right.
10              THE WITNESS:  The other thing, with respect to the
11     conversation, I think the reason--and I can't remember the
12     details of why the will came up on May 2$^{nd}$, but I think what
13     was worrying me was six months before we had signed that
14     addendum--and I don't know if Renata had ever given it to
15     Bernard or if he knew what was in it, and I thought--I forget
16     what our exchange was, but I know at some point I told him we
17     just talked to her two weeks ago and--and so I can't remember
18     if there was something that prefaced this, but this was more
19     to tell him just in case you need to know, there is a will--
20     there's a will and an addendum and we had just signed it.
21     And I think if you read that I was explaining to him that.
22     That in this addendum and the will that I recalled that's
23     where the two-thirds/one-third is being discussed, and then
24     he responded to me about that.
25              But then when we came out for the funeral, I know I
```

217

1   discussed with him my concern that there was some money I
2   understood at Vanguard had been left primarily to Joanne and
3   in small part to his children.  So I may have said 95
4   percent/5 percent or I may have just in general, but we did
5   talk about how to protect that money from going outright to
6   Joanne.  And I know that refreshes my recollection.  I would
7   have used the word "freeze" or "block," because those are two
8   things I would have thought of; can we block those accounts
9   or freeze those accounts.
10          THE COURT:  All right.
11          THE WITNESS:  Okay.
12          THE COURT:  And--and--so based on what you're
13  saying then, there really isn't any question about whether
14  your aunt made a mistake?
15          THE WITNESS:  Not in my mind.  Absolutely not.
16  Now, understand, when you're saying mistake, do I think it
17  was fair?  I really didn't at the time.  I understand it now.
18  I do, but not a mistake.  She absolutely was in her right
19  mind and she knew what she was doing.  And she was upset with
20  Bernie.  She didn't like his new marriage.  She didn't like
21  his wife.  Frankly, she didn't like his old wife either.  And
22  I mean part of that's on her.  I don't think--I don't want to
23  blame--
24          THE COURT:  Has nothing to do--
25          THE WITNESS:  Yeah.

BLACK000806

218

```
 1          THE COURT:  --particularly with Mr. Black or his
 2   wives.
 3          THE WITNESS:  Right.  And I was telling her, I
 4   don't think--I told her, you're micromanaging these things.
 5   I don't think it's fair.  And I know she said, you know, I
 6   want to leave something to--to Bernie's children by the first
 7   marriage.  I told her I thought that was mean, she should
 8   leave something to all her--all his children, but she did
 9   make it clear to me that she had done that.  That went from
10   100 to 95.  And again, I don't want to say what my wife told
11   her, but I told her two things.  One, I didn't think that was
12   fair; I thought it should have been more.  I didn't tell her
13   how much more.  And--but I understood why she was worried
14   about Joanne, and I understand it more now.  But I also told
15   her she should put it into the Supplemental Needs Trust, and
16   two weeks later she died.
17          THE COURT:  Okay.  So you were saying you thought
18   the grandchildren should have gotten more?
19          THE WITNESS:  I do, but again I--
20          THE COURT:  I mean in terms of what you told her
21   that day?
22          THE WITNESS:  Yes.  Yeah, I can--okay.
23          THE COURT:  And you were talking about all her--the
24   seven grandchildren?
25          THE WITNESS:  I can tell you, I could--I remember
```

219

 1    it so vividly because my wife and I had just pulled into a
 2    Costco where we live and we were talking to Renata.  We--she
 3    called me all the time and we called her.  We were worried
 4    about her.  She was in her 80s and she lived alone, and her
 5    boyfriend was older than she was.  So we were talking and we
 6    were in the parking lot stopped and we were having this
 7    conversation.  And we said we were going to come out there
 8    and she mentioned that she had taken our advice and had
 9    changed the designations.  And she told me, "I left one
10    percent to each of the adult children."  That's what she
11    said.  And I said, okay, I appreciate that you've done that.
12    I don't think it's fair.  I won't say what my wife said,
13    although it was supportive of me.  I said I don't think it's
14    fair that, you know--we never discussed how much she had in
15    there, by the way.  But I said, you know, one percent just to
16    me didn't sound right.
17            She never--by the way, this was all part of it, she
18    did not want to leave any money to Bernie; that's why it was
19    always the kids.  And I said, but you should also leave it to
20    all seven.  And she explained to me why she's--she said
21    Bernie and his wife can take care of their children.  They
22    both have teaching jobs.  Those children are protected.  I'm
23    worried about the five other children, that they should get
24    something.  But again, the discussion then went on about
25    where is Joanne and how worried she was about Joanne and

220

```
 1   could she--and then she said, don't worry about me.  If
 2   anything happens, I know you or Cherie will make sure that
 3   Joanne doesn't squander the money.  And then we talked about
 4   we would be out there in two--we were going to come out there
 5   I think it was about two or three weeks, so she died right
 6   around the time we were planning to come out there to visit.
 7             But it was not a mistake.  I know--I know Renata.
 8   I--I--
 9             THE COURT:  Okay.  Any other questions based on
10   what I've just asked?
11             MR. POSKUS:  Yes, Your Honor, real briefly.
12                      RECROSS-EXAMINATION
13   BY MR. POSKUS:
14        Q    Would you agree with the statement that Joanne
15   shouldn't manage money on her own?
16        A    Absolutely.  Well, wait a minute, let me back up.
17        Q    Sure.
18        A    Today or then?
19        Q    Well, let's start with then.
20        A    Then, absolutely.
21        Q    Absolutely she should or should not manage?
22        A    Should not have.
23        Q    Okay.  And was Renata aware of Joanne's
24   difficulties, her mental difficulties?
25        A    Yes, Renata was aware.
```

BLACK000809

```
 1        Q    And you testified that she said you guys will make
 2   sure Joanne doesn't squander the money.  But even on this
 3   other will you talk about, who did she name as the personal
 4   representative or executor?
 5        A    At my insistence, Bernard.
 6        Q    I see, it was at your insistence?
 7        A    Same reason he's also a trustee on these trusts.
 8        Q    Okay.
 9        A    I believed in him more than she did.
10             MR. POSKUS:  Nothing further, Your Honor.
11             THE COURT:  Okay.
12             THE WITNESS:  Thank you, Your Honor.
13             THE COURT:  Okay.  Any further evidence at this
14   point?
15             MR. DAIN:  Your Honor, I'm going to call for a
16   brief surrebuttal.  First of Bernard Black.
17             THE COURT:  Okay.
18                       BERNARD BLACK,
19   called as a witness herein, having been previously sworn, was
20   examined and testified as follows:
21                    REDIRECT EXAMINATION
22   BY MR. POSKUS:
23        Q    Mr. Black, you just heard Mr. Dain testify that he
24   told you, and I believe it was at the funeral or right after,
25   about these POD designations.  Do you recall that testimony?
```

222

1      A    I recall the testimony.

2      Q    And tell me what your side of that story is.  Did

3    you have the conversation with him that he says you had?

4      A    That testimony is a complete fiction.

5      Q    Okay.  Did you have any kind of a conversation with

6    him at the funeral over what was going to happen to Renata's

7    funds?

8      A    Yes, I did.

9      Q    And what was that conversation at--and by the way,

10   at the funeral, you testified earlier that you didn't know

11   about the POD designations until you heard from Vanguard.  So

12   at the funeral, what was your conversation with him at that

13   time?

14     A    So his--his conversation with me was that he felt

15   bad that two-thirds of my mother's estate was going to go to

16   Joanne, and he always thought it should be 50/50.  And I

17   said, no, I knew about two-thirds/one-third.  I agreed with

18   two-thirds/one-third.  I thought Joanne needed to be taken

19   care of first because I was fine on my own and I was

20   perfectly happy with two-thirds/one-third.  There was no

21   mention of POD benefits.  I had no knowledge of POD benefits.

22   His recollection is a complete fiction.

23     Q    Was there anything else in his testimony that you--

24   with regard to at least his interactions with you that you

25   feel you would like to respond to?

223

1      A     Yes.  So I spent three-plus months in 2013 trying

2  to get Anthony Dain to sign forms, among other things, to

3  open up bank accounts at Chase so that I could move funds

4  from Vanguard to Chase and put money into the Supplemental

5  Needs Trust and the Issue Trust, because they were at Chase.

6  My mother had put them at Chase.  The trusts were at Chase,

7  and I decided to leave them there.

8           And I had a series of e-mails, phone calls saying,

9  "Tony, I need you to move, right."  At this point we were

10 spending huge amounts of money on--mostly on Esaun Pinto, on

11 a rescue of Joanne, and that money was supposed to come out

12 of the Supplemental Needs Trust.  And I was leaving messages

13 saying I need you to sign the account open forms so that I

14 can move money from Vanguard to the trusts at Chase.  This

15 was a reference to trusts plural, to the Supplemental Needs

16 Trust and the Issue Trust.

17     Q     So let me ask you this.  Take a look at Exhibit 68

18 that we've been referring to.

19     A     Yes.

20     Q     There's a signature on there that appears to be

21 yours.  Is that yours?

22     A     Yes, it is.

23     Q     Was that one of the forms you were trying to get

24 Mr. Dain to sign?

25     A     Yes, this was an account opening form that Chase

224

1   needed for the Issue Trust, and it was a similar form for the

2   Supplemental Needs Trust, and it was a similar form for the

3   Joanne Black 2013 Trust.

4        Q    Did he sign those?

5        A    Yes, he did.

6        Q    Did he sign any other documents to enable you to

7   open up the accounts for those three trusts?

8        A    So we also went through creating the Joanne Black

9   2013 Trust, which is a little bit off to the side, and adding

10  Samuel Black as a co-trustee to the Supplemental Needs Trust

11  and then having the same three co-trustees of the Joanne

12  Black 2013 Trust.

13           I'm not recalling other account opening documents.

14  No, yeah, there was.  And I don't know what there was, but I

15  remember it was this and then Chase wanted something else, so

16  I had to send him more documents to sign, and that was

17  another big hassle to get him to sign.  I just don't remember

18  exactly.

19       Q    So who sent him Exhibit 68?

20       A    I did.

21       Q    It was you?

22       A    Yeah.

23       Q    Did he call you back or contact you and say what's

24  this for because I don't know about any Issue Trust?

25       A    No.

225

1    Q    And were you able to have any discussion with him
2    about what that was all about?
3    A    No, just a series of pleading e-mails and phone
4    calls saying please sign this; I've got to get the accounts
5    open; I've got to get the money moved from Vanguard into the
6    trust at Chase; please sign this, we're running out of time
7    to do this.
8    Q    And did he do it?
9    A    Eventually he did, after many urgent requests.
10   Q    Okay.  Anything else in his testimony you would
11   like to respond to?
12   A    I was just listening and thinking this guy is such
13   a slippery liar.  This is such a complete pack of fiction.
14   His sister is as bad or worse.  We worked with Cherie
15   extensively on the disclaimers, on what we should do about
16   the POD designation.  We did this in 2012.  I remember a
17   letter that I wrote to Vanguard on July 20th, 2012, shortly
18   after I got the July 11th letter from Vanguard about the 95
19   percent POD basically saying to Vanguard we're either going
20   to challenge the POD or, in effect, a little bit less
21   clearly, but we're going to go get--you know, get a
22   disclaimer in--of the POD benefits.  This was an attempt to
23   get Vanguard to freeze the accounts.  In that letter, I say
24   the most likely conservator or was guardian--I forget the
25   term--is Anthony Dain, and that was based on my phone

BLACK000814

226

1    conversation with Anthony Dain where I asked him to be the
2    conservator so that he could petition to disclaim Joanne
3    Black's assets into the Renata Black estate.  And he knew
4    perfectly well how the Renata Black estate worked; it went
5    two-thirds/one-third.
6            I'm also remembering that he testified in New York
7    --or he didn't testify; he got up and made a speech saying to
8    the New York Court, we all understood that the Supplemental
9    Needs Trust was only going to get two-thirds.  He then went
10   on and said we thought Joanne would get the third third in
11   some other way.  But he was very clear in New York.  He
12   understood that the Supplemental Needs Trust was only going
13   to get two-thirds of the disclaimed assets.  And it's readily
14   apparent from the documents that he received that there is no
15   other third.  There is two million plus market appreciation
16   in the Supplemental Needs Trust.  There is no third million
17   anywhere else.  My account inventory shows two million in the
18   Supplemental Needs Trust.  There is no third million.  He
19   received that inventory.  He didn't raise an objection.
20   Cherie Wrigley received that inventory; she didn't raise an
21   objection.  They received the probate petition that said
22   three million payable-on-death benefits.  They received the
23   inventory that said two million in the Supplemental Needs
24   Trust.  Nobody raised an objection.
25           Gail Young knew about three million in POD benefits

BLACK000815

227

1    and two million in the Supplemental Needs Trust, didn't raise
2    an objection.  Lisa DiPonio knew about three million in POD
3    benefits, two million in the Supplemental Needs Trust; she
4    didn't raise an objection.  All of this is consistent with
5    everybody understood and I believe that everybody understood
6    that under the disclaimer the assets would go into the
7    estate, they would go under Article 4th.  And then as it says
8    very clearly in the proposed order, two-thirds will go into
9    the Supplemental Needs Trust.  So I'm just puzzled as to how
10   anyone could possibly think that three-thirds would go into
11   the Supplemental Needs Trust.  That doesn't make any sense as
12   an explanation of what we wrote in the proposed order.
13          If three-thirds were going to go to Joanne, we
14   would have said three-thirds were going to Joanne.  I
15   explicitly wanted to say two-thirds to make it doubly clear
16   that Joanne wasn't going to get 100 percent; she was only
17   going to get two-thirds.  And Anthony Dain saw the two-thirds
18   language, otherwise he wouldn't have spoke the way he did in
19   New York.  I don't understand how he can ever think that
20   three-thirds was going to go into the Supplemental Needs
21   Trust.
22      Q   Let me ask you something about Ms. Wrigley's
23   testimony.  Ms. Wrigley did testify that you and her had
24   talked about Joanne exercising the disclaimer; am I correct?
25      A   Yes.

BLACK000816

228

1      Q   Okay.  And she also testified that you had some
2  conferences regarding money payments that you were making I
3  believe either weekly or monthly for--so that Joanne would
4  have some money to live on?
5      A   Yes.  So at the time of her death, my mother was
6  sending $280 a week to Joanne.  And I continue that initially
7  and then decided $280 a week really isn't that much, okay,
8  plus Social Security Disability.  And I chose on my own--this
9  was not Cherie asking; this was me doing it--I chose--like I
10  want Joanne to have more money to live on, so I raised that
11  amount to $500 per week, and that would have been sometime
12  during 2012.  I don't remember exactly when.
13      Q   Now--now, Ms. Wrigley cast some doubt on the idea
14  that this whole dispute arose when you denied a reimbursement
15  request for her.  Do you recall that testimony?
16      A   Yes, I do.
17      Q   Okay.  So tell us first of all what the
18  reimbursement request was and why did you deny it.  First of
19  all, let me ask you this.  Is that when all this started when
20  you denied that particular reimbursement request?
21      A   Yes.  Until I denied Cherie Wrigley's reimbursement
22  requests, I was working with Cherie Wrigley, not always
23  without conflict but cooperatively.  I was concerned about
24  the level of spending on Esaun Pinto, but I was working with
25  Cherie Wrigley.

BLACK000817

229

1    Q    And indeed she made some trips from California to
2  New York to help Joanne out; am I correct?
3    A    So Joanne was hospitalized in June of 2013--
4    Q    Um-hum.
5    A    --and remained hospitalized until late October of
6  2014.  For a long part of that period, she didn't want to see
7  anybody.  As she gradually improved, and Joanne's history is
8  it takes a long time for the medication to get hold--take
9  hold, then she gradually gets better.  Then she gets out and
10 eventually goes off medication and spirals down again.  But
11 she was gradually improving.  And I arranged with Ms. Wrigley
12 and with Esaun Pinto for Cherie to go out and visit Joanne in
13 July of 2013.  This was a short visit.  She spent three days
14 in New York, and she did that with my approval, that I would
15 fund it out of Joanne's assets.
16        And maybe a month later, she sent me back a--let me
17 call it an expense demand, and I would have looked at that,
18 you know, some number of days after she sent it.  And frankly
19 that expense demand completely floored me.  She--
20   Q    What floored you about it?
21   A    She wanted reimbursement of almost $7,000 for a
22 three-day trip.  She wanted reimbursement of $2,600 for first
23 class travel.  I was paying Esaun Pinto 8,000 a month, which
24 I thought was crazy and was trying to bring down over his
25 objection and her objection.  She wanted to pay Esaun another

230

1    $2,300 on top of the 8,000 basically for going with her to
2    visit Joanne and being her chauffeur in New York for three
3    days.  That was at least as outrageous as the first class
4    travel.  She wanted $200 in unallocated per diem.  And then
5    she wanted some more reasonable things, like hotel and, you
6    know, taxis and so on.  The total was $6,900.  And I wrote
7    her when I saw this--she was about to take a second trip
8    again with my approval, and I wrote her an e-mail on
9    September 1st saying I will not approve first class travel.
10   I think, you know, more to come, but I didn't want her to be
11   any doubt that her second trip I was willing to pay for first
12   class travel.
13           We have not had a civil conversation since.  I
14   attempted initially in September to say to Anthony Dain let's
15   talk.  I thought he was a reasonable person.  Cherie
16   Wrigley's expense demand nobody as a conservator can pay
17   that.  That's just crazy.
18       Q    Tell me, when was the trip Cherie Wrigley made that
19   this dispute arose out of?  When was that?
20       A    Late July of 2014.
21       Q    Okay.  And was there any dispute about how you were
22   handling things prior to that?
23       A    There was no dispute about what I was paying for
24   and what I was not paying for.  In late June, Cherie got
25   upset that the trusts were at Chase instead of at Vanguard,

231

```
1    and so she had--you know, let me call it a screaming phone
2    call with me where she claimed that this was completely wrong
3    and it was against my mother's will and how dare you move the
4    money from Vanguard to Chase, and Renata would never have
5    wanted this, and I can prove it in writing.  All of that is
6    complete fiction too because the trusts were at Chase.  And
7    what I did is I took the assets, which were at Vanguard, and
8    moved them in kind to sit underneath the trusts.
9         Q    Let's be clear, because I'm not sure if this came
10   out on June 16ᵗʰ and 17ᵗʰ.  Who is Esaun Pinto and how is he
11   involved in all of this?  And before you answer, let me see
12   if I've got the spelling correct.  Is it E-S-U-A-N?
13        A    E-S-A-U-N.
14        Q    And then P-I-N-T-O?
15        A    Yes.
16        Q    Okay.  Just so that the record is clear.  And who
17   is he and how is he involved in this?
18        A    He is a private investigator of some sort.  He has
19   his own firm called CPI Investigations in New York.  And from
20   somewhere in the past he apparently had some connection with
21   Joanne.  And Ms. Wrigley found Esaun Pinto and arranged for
22   Esaun to go out to Denver and basically talk Joanne into
23   coming back to the East Coast.  And then I just started
24   getting let me call them astronomical bills from Esaun Pinto
25   and I engaged in a year-and-a-half fight to try to bring him
```

BLACK000820

232

 1   down to a reasonable level.  I learned afterwards that on top
 2   of his outrageous bills he was stealing money from Joanne.  I
 3   learned that on top of his outrageous bills, which were
 4   supposedly for visiting three times a week, he was actually
 5   only visiting about once a week.
 6            I was fighting during that entire period to bring
 7   his expenses down.
 8        Q    Were you fighting with Mr. Pinto or were you
 9   fighting with anybody else?
10        A    I was fighting with both Mr. Pinto and Mr. Wrigley.
11        Q    Ms. Wrigley?
12        A    Ms. Wrigley.  And I now thing that, you know, he
13   was just a scam artist from day one and I was never going to
14   succeed until I just cut him off.
15        Q    And when Ms. Wrigley--Ms. Wrigley testified that
16   she never--that you never told her during your--that two or
17   three month period where she was helping you get the
18   disclaimers from the kids and she was trying to--she was
19   considering helping you get a disclaimer from Joanne, she
20   testified that you did not tell her about the two-thirds/one-
21   third division.  What is your response to her testimony?
22        A    That's false.  We discussed it.  The disclaimer
23   plan as an alternative to litigation was a joint plan.  We
24   discussed it extensively.  We had multiple phone
25   conversations over a period of months.  And with regard to

233

1    Rebecca, we had multiple phone calls over Rebecca because
2    Rebecca was a linchpin of the whole plan. Because if Rebecca
3    wouldn't sign her one percent down to zero, there was going
4    to be no disclaimer, right. I couldn't--I needed all five
5    older children to go down from one percent to zero or nothing
6    was going to happen. So that was a difficult conversation it
7    was hard for me to have directly with Becca, so I asked
8    Cherie to intercede. I then sent Cherie, here's the
9    disclaimer. Then I think a day later I sent her this talking
10   points e-mail. This was in early November of 2007. And as
11   part of that, we arranged for Rebecca to take the train down
12   from Santa Barbara to Thousand Oaks, where Cherie was, and
13   the Cherie drove Rebecca to meet me in Los Angeles, because I
14   was at a business meeting in Los Angeles. And so Cherie
15   brought Rebecca to me. I brought, as the e-mail said, her
16   Social Security card and her birth certificate.
17           Cherie came--Cherie and Becca came to the law firm
18   office where I was. I had her come there because there was a
19   notary there and I needed to get Rebecca to sign and then get
20   her signature notarized. And we were able to get Rebecca to
21   sign the disclaimer, to sign the disclaimer of her one
22   percent. And then I confirmed that in an e-mail to Cherie on
23   November 7th talking about, you know, difficult conversation
24   with Rebecca. But the most important thing that had to
25   happen happened, which was the disclaimer.

234

1      Q    And then this e-mail that we're going to have to
2   print out, Exhibit 111.  When you said to Cherie, "Get her to
3   sign so she'll get more--her one percent and more," what did
4   you mean by that more?  What was more?
5      A    More was her share of the Issue Trust, because
6   under the overall disclaimer plan, the Issue Trust was going
7   to one-third of the Vanguard assets.  So I've got seven kids;
8   she's going to get one-seventh of one-third, so call that
9   five percent.  And five percent is more than one percent.  So
10  the argument for Rebecca, and this is partly in an e-mail and
11  partly in phone calls, was the way we persuade Becca is you
12  can get one percent now, but if you wait you'll get more, and
13  I promise you you won't lose the one percent.
14     Q    Did Cherie call you and say what do you mean by
15  that and more?
16     A    No, we had conversations about how Cherie was going
17  to get Becca to me in Los Angeles, you know, whether it made
18  sense for me to come up to Thousand Oaks, and it didn't
19  because we didn't have a good way to get a notary in Thousand
20  Oaks, but we thought about that as a possibility--discussed
21  that as a possibility, and then we decided it was better to
22  bring Becca down to Los Angeles because I had a notary on
23  premises at the law firm in Los Angeles.
24          MR. POSKUS:  Nothing further, Your Honor.
25          THE COURT:  Anything?

BLACK000823

235

```
 1          MR. DAIN:  Yes, Your Honor.
 2                     RECROSS-EXAMINATION
 3   BY MR. DAIN:
 4      Q    Now, you're testifying today under penalty of
 5   perjury?
 6      A    Yes.
 7      Q    You said I made a statement in New York that the
 8   disclaimed assets were going to go two-thirds into a
 9   Supplemental Needs Trust and one-third into an Issue Trust;
10   you said that just now?
11      A    No, that's not what I said.
12      Q    Please again say it.
13      A    You made a statement to the New York court that, as
14   I recall--and we can pull up the New York transcript if you
15   like--"We all understood that the disclaimer and the two-
16   thirds," and then you continued, "we all thought the third-
17   third was going to go to Joanne in another way."  But you
18   specifically referred to two-thirds in your statement to the
19   New York court.  You said, "We all understood."  Now, I don't
20   know who "we all" is, but we all certainly includes Cherie,
21   given the overall context of this case.
22      Q    So let's start with you weren't there, correct?
23      A    I was not physically there, that's right.  This is
24   from the transcript.
25      Q    Okay.  And you have the transcript?
```

BLACK000824

236

1           MR. DAIN:  Counsel, do you have the transcript?

2           MR. POSKUS:  Yes, it's Exhibit 107, and the

3    exchange that he's referring to I believe is on page 18.

4           THE COURT:  Okay.  I don't have that part of it.

5           MR. POSKUS:  You don't?

6           MR. DAIN:  Say exhibit what again?

7           MR. POSKUS:  107.

8           THE COURT:  This book only goes up to 78.

9           MR. POSKUS:  Your Honor, we've added some exhibits

10   since the last hearing, and that's why we keep coming up.  If

11   I may approach, Your Honor.  Actually, Mr. Black, do you have

12   a copy in your notebook?

13          THE WITNESS:  Yes, I do.

14          THE COURT:  Thank you.

15          MR. DAIN:  I'm trying--do you have it there?  Thank

16   you.

17          (Pause.)

18          MR. DAIN:  The exchange is where?

19          MR. POSKUS:  I believe it's page 18, but you'll

20   have to ask the witness.  That's my guess.

21     Q    (by Mr. Dain)  Oh, my--this--on page 18, do you

22   understand--you weren't there, so you don't know what the

23   reference was to when you took this little paragraph out of

24   context, did you?

25     A    Do you want to give me the context by--

BLACK000825

237

1      Q      Sure.

2      A      --going back to page 17?

3      Q      Yeah, let's--what Mr. Black did say is two-thirds

4  is going into Supplemental Needs Trust.  This is the

5  statement you made to the Court; that's what we're talking

6  about.  That in your proposed order, the one that you're

7  saying disclosed everything, you said two-thirds are going

8  into the other--into the Supplemental Needs Trust.  The

9  statement goes on.  "Implying the other third, as we all

10  thought, would be maintained for the use of Ms. Black's needs

11  outside of the Supplemental Needs Trust," meaning you told

12  the Court in a proposed order that two-thirds was going to

13  Supplemental Needs Trust.  You did not tell the Court that a

14  third was going into an Issue Trust.

15             In your earlier testimony--

16             MR. POSKUS:  Excuse me, is there a question in

17  there?

18             MR. DAIN:  Yes.

19      Q      (by Mr. Dain)  In your earlier testimony, do you--

20  did you imply to this Court that I made a statement to the

21  court in New York that I understood one-third was going into

22  the Issue Trust?

23      A      That was not my testimony.

24      Q      Let me just read exactly what is here, and I do

25  want to get the preface.  Going back to page 17, on Line 17--

238

1   I'm sorry, let me even go back.  Do you see up here--I want
2   you to look at this so I can ask you a question about it.
3   Page 17, Line 10.  Are you there?
4        A    Yes.
5        Q    The statement, Mr. Lamberti actually has provided
6   your court with what Mr. Black told the Colorado court, and
7   it's very deceptive.  What he stated was, "I want to disclaim
8   those assets so that I can place them in the Renata Black
9   estate where two-thirds of the funds will go into a
10  Supplemental Needs Trust for the benefit of Joanne Black."
11  That's what he told the court.  This was in the affidavit you
12  filed in the New York court.  Do you recall that?
13       A    I'm not recalling specific affidavit, but I'm not
14  disagreeing with what Mr. Lamberti said on page 17.
15       Q    What you told the New York court was that you
16  intended to place two-thirds of the assets into a
17  Supplemental Needs Trust, correct?
18       A    No.
19       Q    What did you tell the New York court?
20       A    So I'm not remember the affidavit, but the powers
21  that I asked for and believe that I received in Colorado were
22  to disclaim Joanne's POD so that the money would go back into
23  the estate, it would go under Article 4th of Renata Black's
24  will.  And under Article 4th, two-thirds would go to the
25  Supplemental Needs Trust and one-third would go to the Issue

BLACK000827

239

1    Trust.

2         Q    Let's--let's break that down, because I want to ask

3    you questions about reading this in context and not taking it

4    out of context.  You told this court in your petition, the

5    one you're saying--never mind, sorry petition, my--withdraw

6    that.  In your proposed order to this court, the one you

7    testified about earlier--do you recall that?

8         A    Yes, I do.

9         Q    You use the word two-thirds of those funds will go

10   into a Supplemental Needs Trust for Joanne Black; do you

11   recall that?

12        A    I--the proposed order says that two-thirds of

13   Renata Black's estate will go into a Supplemental Needs Trust

14   for Joanne--

15        Q    Right.

16        A    --Black.

17        Q    And you said--

18        A    I agree with that.

19        Q    And you said it couldn't have been clearer that

20   that meant only two-thirds, and the other one-third was going

21   into an Issue Trust.  You testified to that just earlier?

22        A    No.  I said I thought it was clear, and I agree

23   that in hindsight it could have been clearer.  I regret that

24   it was not made clearer.  But I thought it was really clear

25   because you disclaim--you go into the estate, Article 4th,

240

1   here's what Article 4th says.  So if there was any doubt, all
2   anybody needed to do, all Joanne's counsel needed to do, all
3   Joanne's GAL needed to do, all you needed to do, you're all
4   lawyers, is go look at the will.  And they had to look at the
5   trust to see who the beneficiaries were, but you didn't even
6   need to do that.  You knew who the beneficiaries were.
7        Q    Let me know when you're done.  You finished?
8        A    I'm done.
9        Q    Okay.  But you told this Court, you took out of
10  context, you said Mr. Dain made a statement to the New York
11  court.  Your purpose in telling the court today in your
12  testimony was that I stated to the New York court that I
13  understood the disclaimer would be two-thirds to the
14  Supplemental Needs Trust and one-third to the Issue Trust.
15       A    That's not what I said in my testimony.  Do you
16  want--do you want to have me restate what I said?
17       Q    No, I don't want you to restate it.  The record is
18  clear.  What you're--when you read this--read page 17 and
19  page 18, what that statement was is saying that you lied to
20  the New York court and that what you told this court was that
21  two-thirds would go into Supplemental Needs Trust, but you
22  didn't tell the court that the other one-third was going into
23  the Issue Trust.  That was the statement I made.  Go ahead
24  and read it and tell me if I'm wrong.
25       A    That is not the statement that you made.

241

1  Q What Mr. Black did say is two-thirds is going into

2 the Supplemental Needs Trust, implying the other third, as we

3 all thought, would be maintained for the use of Ms. Black's

4 needs outside of the Supplemental Needs Trust.  The point is,

5 nobody on this side of the room was under any illusion that

6 the other one-third was going into an Issue Trust.  You knew

7 that when you made this--when you testified today.  You knew

8 that everybody on this side of the courtroom believed that

9 all of the money was going to be held for Joanne Black's

10 benefit, didn't you?

11  A I have heard testimony to that effect.  I do not

12 believe that is honest testimony, not coming from you and not

13 coming from Cherie Wrigley.  And I do not understand how Ms.

14 Young can look at a disclosure that says two-thirds is going

15 to the Supplemental Needs Trust and think three-thirds is

16 going to the Supplemental Needs Trust.  She's a lawyer.

17 She's Joanne's GAL.  If she has any doubt about this, she

18 ought to figure it out.  She gave testimony that's frankly

19 incredible.  It says two-third and I thought it meant 100

20 percent.  I don't get it.

21  Q So Ms. Young is a liar, Ms. DiPonio is a liar, I'm

22 a liar, Ms. Wrigley's a liar?

23  A Ms. DiPonio just said she didn't remember.  Ms.

24 Young said she assumed that all of the money was going to go

25 into the Supplemental Needs Trust.  I don't see how that is a

242

1    plausible reading of the proposed order that we asked for

2    that she said she was fine with.  That's just not a plausible

3    reading.  It says two-thirds goes to the Supplemental Needs

4    Trust.  At least in New York you're saying you understood

5    that two-thirds was going to the Supplemental Needs Trust and

6    saying some other way Joanne was going to get the third

7    third, right?  You're not saying three-thirds was going to go

8    into the Supplemental Needs Trust.

9        Q    This is an argument.  You understood--you read that

10   and understood that I was accepting that only two-thirds was

11   going to go to Joanne?

12       A    No, you said--

13       Q    That's what you--

14       A    --that only two-thirds was going to go into the

15   Supplemental Needs Trust.  And you were imagining that the

16   third third was going to go to Joanne in some other way.

17   That's what this says.

18       Q    The point is, you even--when you were testifying

19   today, you understood my position is all of the money was

20   going to Joanne, all of the paid-on-death benefits, that 95

21   percent was going to Joanne?

22       A    That is consistent with your testimony to New York

23   and that is consistent with my testimony in this court.  My

24   testimony was that you understood that only two-thirds would

25   go to the Supplemental Needs Trust, which is consistent with

243

1    your having read and understood at least that much of the
2    proposed order.
3         Q    Could you go to Exhibit 68 and tell the Court what
4    the date of that document from Chase is.
5              (Pause.)
6         A    May 4th, 2013.
7         Q    So only two months after you received the March 3rd
8    order, correct?
9         A    Approximately, yes.
10        Q    And you said you--months and months you were going
11   --having this argument with me over signing documents; two
12   months after you received that order?
13        A    I was trying to get you to sign documents from May
14   --from February into June.
15        Q    Why would you have--
16        A    Certainly into late May.
17        Q    You wanted me to sign documents in February, before
18   you had received an order from the Court?
19        A    Yes.
20        Q    And would that have been for the estate?
21        A    Now, I would have to go figure out which documents
22   I asked you to sign and when.  That might have been for the
23   2013 trust.  I don't remember which documents I asked you to
24   sign when.  I just remember a series of e-mails and phone
25   calls trying to get you to sign documents.  Chase didn't give

BLACK000832

244

1    me all the documents all at once, and just follow-up after

2    follow-up after follow-up, which started in early February

3    and didn't end at least until late May or early June.

4        Q    Okay.  That document signed in May, right?

5        A    That document is signed May 4th.

6        Q    Do you remember the document that I didn't want to

7    sign was the one where you wanted to add Samuel Black as an

8    additional trustee; do you recall that?

9        A    No.

10       Q    You don't recall adding Samuel Black as an

11   additional trustee?

12       A    I don't recall your not wanting to sign that

13   document.  I recall that you signed it.

14       Q    Do you remember--remember sending me an e-mail in

15   which you said Sam's only for backup in case you or I are not

16   available?  Do you recall that?

17       A    I believe that was with regard to the 2013 trust,

18   but yes I recall that e-mail.

19       Q    And do you recall that the reluctance was adding

20   Samuel Black as a third trustee given that he was also

21   conflicted?

22       A    No, I never got anything back from you other than

23   not returning e-mails and not returning phone calls and not

24   returning documents.

25       Q    By the way, have you yet filed anything with the

BLACK000833

245

1    New York court in which you've correct your statement that
2    this court gave you specific authority and quoting that that
3    authority was to transfer two thirds into a Supplemental
4    Needs Trust and one-third into an Issue Trust?
5        A    That's the authority that I believe I received from
6    this Court.
7        Q    No, no, no.  You quoted an order.  Did you correct
8    that in the New York court to this date?
9        A    I haven't filed anything recently in New York
10   because New York is on hold.
11       Q    When you quote something, do you attribute that to
12   an exact statement by someone else?
13       A    I'm not sure I understand the question.
14       Q    In the affidavit which is of record here, you told
15   the court in New York in your affidavit that you received the
16   following order, and you quoted it.  You gave a date of
17   November 2013--or 2000--I don't remember.  It's 2012 or 2013.
18   You quoted it and said this is the order I received.  You
19   said it was specific authority granted by the court in
20   Colorado.  Have you corrected that?
21       A    This was the authority that I believed that I
22   received from the Colorado court.
23       Q    No, no, no.  You're not answering my question.
24       A    The Court can decide that I didn't receive that
25   authority, but that's what I thought I received.  And so in

246

1  my mind, I'm not sure what it is I'm supposed to correct in

2  New York other than a statement this the authority I believe

3  I had in Colorado.

4         MR. DAIN:  Do you know what exhibit that is, the

5  affidavit in New York?

6         (Pause.)

7      Q    (by Mr. Dain)  So when you told the Court I

8  received an order and you quoted an order, now you're saying

9  that that's just based on what you believed you got?

10      A    That's what I believed at the time, yes.

11      Q    Okay.  You've seen the March 5th, 2013, order, the

12  one that actually issued?

13      A    Yes, I have.

14      Q    Doesn't say anything that you put in those quotes,

15  does it?

16      A    I'm not recalling the exact quotes, but what I'm

17  suspecting is I quote from the fuller proposed order and not

18  the final March 5th order.  That's my best speculation as to

19  what your line of questioning is about.

20      Q    So let's get back to what I was saying.  Just so I

21  know, you have not filed anything in New York that in any way

22  corrects the affidavit you filed in New York regarding the

23  authority you've received, yes or no?

24      A    I have not.

25         MR. DAIN:  Okay.  I have no further questions, Your

247

```
 1   Honor.
 2            THE COURT:  All right.
 3            MR. POSKUS:  No redirect, Your Honor.
 4            THE COURT:  Thank you.
 5            All right.  Thank--
 6            MS. DiPONIO:  Your Honor, may we take a five-minute
 7   recess?
 8            THE COURT:  --Mr. Black.
 9            Yeah, that's fine.
10            MS. DiPONIO:  Thank you.
11            (Whereupon, a recess was taken.)
12            THE COURT:  Do we have further witnesses?
13            MR. THIESSEN:  Yes, Your Honor, we would call Ms.
14   Kate Litvak.
15            THE COURT:  Raise your right hand.
16            (Whereupon, Ms. Litvak was sworn.)
17                    KATHERINE LITVAK,
18   called as a witness herein, having been first duly sworn, was
19   examined and testified as follows:
20                    DIRECT EXAMINATION
21   BY MR. THIESSEN:
22        Q    Would you state your name, please?
23        A    My name is Kate Litvak--Katherine Litvak.
24        Q    And what's your profession?
25        A    I'm a professor of law at Northwestern University
```

248

```
 1   School of Law.
 2        Q     What's your relationship to Bernard Black?
 3        A     I'm his wife.
 4        Q     How long have you been married?
 5        A     For about 12 years.
 6        Q     Did you ever meet Renata Black?
 7        A     Yes, I have met her many, many times.  I have also
 8   spoken on the phone with her almost weekly for as long as we
 9   were married and she was alive.
10        Q     What did you talk about?
11        A     All kinds of things.  She liked to talk.  We were--
12   she loved me because I was Ukrainian Jew and she was
13   Ukrainian Jew, so she often liked to tell stories about her
14   past, and I like to tell stories about my past, and we
15   compared.  She was from a small town in Ukraine where I've
16   been many times, so we really had a lot in common.  We often
17   spoke in Russian.  I--when our grandmother was alive, I--I'm
18   sorry, when I say our mother and our grandmother, I'm
19   referring to Renata Black and her mother.
20        Q     Sure.
21        A     Renata Black specifically requested as soon as we
22   got married that I call her mother.  She insisted that I do
23   and I always did.  So when I say our mother, that's mother.
24   And my own mother is mom for me.
25              So we often--so when--I spoke with our grandmother
```

BLACK000837

249

1    in Ukrainian.  I spoke with Renata in Russian.  We discussed

2    all kinds of things about the past.  She liked to talk about

3    children and my children how I'm raising them properly.  She

4    loved to talk about nutrition and health and what I should be

5    eating.  And every now and then she would call just to say

6    that she just read some popular magazine that I should eat

7    almonds and not other nuts and such, so we were very close.

8            She also liked to give me various advice, including

9    financial advice.  And one of the things we discussed many

10   times is her estate and her disposition of assets.

11       Q    What was your understanding of her intent with

12   respect to her estate?

13       A    She told me that her estate will be divided two-

14   thirds to her disabled daughter and one-third to the

15   grandchildren from--from her son.  She said Bernie had

16   repeatedly asked her not to leave anything to him because he

17   is making a good living and he doesn't need this, and so he--

18   and I think everyone believed it would be tax preferential to

19   have a generation skipping tax, not leaving any money to

20   Bernie directly and instead leave it directly to

21   grandchildren.  So that was her plan.

22           And she also told me that she had already set up

23   two trusts; one for her disabled daughter and one for the

24   grandchildren but didn't fund them.  And so of course I asked

25   why you didn't fund your trust, and she said basically

250

1   because I don't trust Tony.  She said Tony is the only co-
2   trustee on the trust.  Bernie was not a co-trustee.  Bernie
3   was a replacement trustee for the time when she dies.  So her
4   only co-trustee on the trust was Tony, and she says if I put
5   money in a trust, I lose control, because he's a co-trustee.
6   He can--they--they veto every decision I make.  Why should I
7   lose control over my money if I instead can keep full control
8   of my money.
9            And so I told her that if she's certain that the
10  money that she has is going to go to trust after she dies,
11  and she says, Sure.  All of my money are (sic) in unallocated
12  assets.  That is what she--that's how she called it.  She
13  said non-allocated assets.  She said I specifically keep it
14  non-allocated so that when I die that it will go to the trust
15  under my will and so I will get exactly the same outcome this
16  way as I would have gotten if I directly funded the trust.
17  But the attraction of doing what I'm doing is that I keep
18  full control of my money and I don't have to be at mercy of
19  Tony because I don't know what he would do if he becomes a
20  co-trustee and he will be able to veto every decision I want
21  to make with my own money.  And that's what she was saying,
22  my own money, my trust, my decisions.
23           I actually asked her why she wouldn't put Bernie as
24  a co-trustee instead of putting Tony, and she said there is a
25  law in New York that if she wants--if you want the trust to

BLACK000839

251

```
 1    be tax preferential then at least one co-trustee has to be a
 2    non-beneficiary.  So she says that if she puts Bernie on the
 3    trust, Bernie is a beneficiary on the children's trust and a
 4    residual beneficiary on Joanne's trust.  If she puts Bernie
 5    as a co-trustee, then they could lose the tax preferential
 6    treatment at death.  So she said I have to keep Tony; I don't
 7    have anybody else.  I don't have any other family member who
 8    knows financial affairs or is a lawyer, and I don't trust
 9    outsiders to be trustees.  And so because she didn't trust
10    Tony, she didn't fund the trust and she specifically told me
11    the scheme of estate planning was not to allocate any assets
12    directly so that upon her death they will go under the will
13    directly into the trust as she had planned all along.
14         Q    And when was the last conversation you had with
15    her?
16         A    Shortly before her death.
17         Q    And did any of these topics come up?
18         A    Not in a conversation shortly before her death, but
19    we had discussed these topics maybe a month before her death
20    or two months and she had not made any indication that she
21    had made any changes in her estate planning.
22         Q    Did she discuss the allocation between the trusts?
23         A    Excuse me while I get some water.  Well, one trust
24    gets two-thirds of the estate and the other gets one-third of
25    the estate.
```

252

1    Q   Did she tell you that specifically?

2    A   Yes, this was well known in the family.  The kids

3 knew this.  I knew this.  This was not a secret.

4    Q   And what was her--did she tell you anything about

5 the trust for the grandchildren and how it was to be used?

6    A   She specifically wanted it to be used for

7 education.  She was very high on education.  She particularly

8 wanted at least some grandchild to be a doctor.  She had told

9 me a very sad story about her life, how she--when she escaped

10 the Holocaust and lived in Germany for a very short amount of

11 time immediately after the war she studied to be a doctor and

12 then she immigrated to the United States and then the

13 doctor's credit of education that she collected in Germany

14 did not transfer to the U.S.  So she could not become a

15 doctor, or at least not easily.

16    However, she could easily become a dentist, so she

17 had become a dentist.  And this was a pain of her life that

18 she never became a doctor.  She insisted that every child in

19 the family becomes a doctor.  It turns out that only one

20 wanted to do it.  Then she started insisting that every other

21 child in the family becomes a lawyer.  For example, she--so

22 for the doctor, the one who decided to become a doctor, she

23 specifically promised she would pay for the medical school.

24 She paid for a year of his preparatory studies to qualify for

25 the medical school admissions.  She paid a lot of his

BLACK000841

253

1   expenses when he was preparing to become a medical student.

2          For the other son, she just badgered him into going

3   to law school.  She gave him the money to take a preparatory

4   test for LSAT.  When that result was not quite good, she was

5   very upset.  She kept saying, you know, if he gets his

6   results better, you know, she would pay him a lot more money

7   to do it again.  So her view was the entire grandchildren's

8   trust is to be spent on education.

9          She also promised to pay down all student loans for

10  all of Bernie's adult children, and that is hundreds and

11  thousands of dollars for each, I believe.

12      Q    Did you attend Renata Black's funeral?

13      A    Yes, I did.

14      Q    And did you have any conversations related to

15  Renata's estate?

16      A    Yes, I did.  We held the funeral at our mother's

17  house and we were there the entire day except the day where

18  we were at the cemetery.  And at some point during that day

19  at our mother's house, Anthony--Anthony Dain approached me

20  and said that he wanted to talk to me about an important

21  matter, and so we stepped outside.  And he said you should

22  know how Aunt Renata's estate is distributed.  It's one-third

23  to the grandchildren and two-thirds to Joanne.  And I said I

24  knew that.  Everybody knew that.  That's not news.  And so he

25  just kept poking.  He kept saying, Don't you think it's

254

```
 1    unfair.  I just want to make sure you don't think it's
 2    unfair.  I just want to make sure you're not upset.  And I
 3    said I cannot understand why I should be upset.  And he said
 4    I just want to make sure there would be no litigation, that
 5    you will not be challenging the will, you will not be
 6    challenging any estate matters.  And I kept saying no I'm not
 7    upset.  He said you know Bernie doesn't inherit directly.  I
 8    said I know, everybody knows this.  He specifically told her
 9    that he does not want to inherit because that would just be
10    inherits from her and then that same money would then be
11    passed to his children and taxed, so why.  So we had
12    discussed this.  I assured him that I had no interest in
13    suing anybody.  I was not upset.  He said great.  We parted
14    friends.  He offered to take me to the airport, and he did.
15        Q    Did Mr. Dain raise an issue with respect to Renata
16    Black's beneficiary designations on any of the account?
17        A    He had not said a word about this, no.
18        Q    And did your--did you--what was your understanding
19    later with respect to the beneficiary designations on the
20    Vanguard accounts?
21        A    I--as I said, our mother told me her estate plan
22    was to leave all assets unallocated and funds unfunded and so
23    that when she dies funds get funded automatically from the
24    estate.  That is the only reason--this is the reason why she
25    was able not to fund the trust, because she was not worried,
```

BLACK000843

255

1    they would trusted--funded exactly the same way anyway.

2              So when--sometime in mid-July of 2012, we received

3    a letter from Vanguard saying that 95 percent--the account

4    was actually allocated, contrary to everything she's ever

5    told me and contrary to every detail of her estate plan that

6    the account was allocated.  And only five weeks before she

7    died the allocation was made.  And the allocation was made 95

8    percent to Joanne and five percent to the adult children from

9    the first marriage; one percent each.

10             THE COURT:  You got a letter from Vanguard?

11             THE WITNESS:  We received a letter from Vanguard in

12   mid-July of 2012.

13             THE COURT:  So you did know about it?

14             THE WITNESS:  In 2012, but I did not know about

15   this before then.  Yeah, before then she--

16             THE COURT:  So you knew that the allocation was

17   made in 2012 and that there was a change five weeks before

18   she died?

19             THE WITNESS:  Correct, that's what I said.  I'm

20   sorry if I'm not clear.

21             THE COURT:  Okay.

22             THE WITNESS:  So I did not--I apologize if I

23   misunderstood the question.  Before we received the letter

24   from Vanguard, I was certain that all assets are not

25   allocated and they're not allocated on purpose.  That is how

BLACK000844

256

1   she planned to fund the trust.

2              THE COURT:  Right.  But you got the letter in 2012?

3              THE WITNESS:  Correct.  And when I received the

4   letter in 2012, I said, oh, oh, when did this allocation

5   happen, and the only thing Vanguard would tell us is that the

6   allocation happened only five weeks before she died.

7              THE COURT:  Okay.  That's not--that's not making

8   any sense.

9              THE WITNESS:  This is--

10             THE COURT:  I'm sorry, you're saying first that you

11  knew--

12             THE WITNESS:  I'm not sure I--

13             THE COURT:  --in 2012, that you got a letter from

14  Vanguard which said the accounts were allocated?

15             THE WITNESS:  Correct.

16             THE COURT:  Then you're saying that it got changed

17  five weeks before she died?

18             THE WITNESS:  That's what Vanguard letter told us.

19             THE COURT:  Right.

20             THE WITNESS:  Yes.

21             THE COURT:  I'm missing something.

22             MR. THIESSEN:  What's the exhibit?

23             THE WITNESS:  I'm not sure I understand the

24  confusion.

25             THE COURT:  Well, what I'm understanding from what

257

1   you're telling me is that you knew about the account

2   designations from 2012.

3           MR. THIESSEN:  In--

4           THE WITNESS:  I don't--

5   Q     (by Mr. Thiessen)  Would you want to turn to

6   Exhibit 42, which is the Vanguard letter.  Perhaps we can

7   clear it up.

8   A     Okay.

9           (Pause.)

10  Q     Are you there?

11  A     Yeah, I'm there.

12  Q     I believe it's been admitted.  Did you ever see

13  this?

14  A     Yeah.  Yeah, I saw this when I received it.

15  Q     Is this the letter you're referring to?

16  A     Yeah.

17  Q     And--

18  A     Yeah.

19  Q     And would you mind elaborating on your testimony

20  with respect to what you knew about the beneficiary

21  designations?

22  A     Yeah.  So as I said, I believed from our mother's

23  statements to me that the--the assets were unallocated so

24  they can flow into the estate.  And in July of 2012, we

25  received this letter from Vanguard, and it says assets are

BLACK000846

258

1   allocated; 95 to Joanne, 5 to children.  And the allocation--
2   I was looking at this, "Our records indicate that on March
3   23rd we received a request to designate the (inaudible)
4   beneficiaries."  So this is what I meant.  I thought the
5   assets were not allocated until March 23rd.  I didn't know
6   differently, but this was my belief at the time that the
7   assets were allocated in this matter on March 23rd, and I
8   found out about this in July of 2012 when we received the
9   letter.
10              THE COURT:  Okay.
11              THE WITNESS:  Am I clear?
12              THE COURT:  Um-hum.
13              THE WITNESS:  I'm sorry, sometimes I get too fast
14  or confused or something.
15       Q    (by Mr. Thiessen)  Thanks, Ms. Litvak.  And so when
16  you received this July 11th--or when you learned of the July
17  12th--11th, 2012 notice, what was your response?
18       A    I said this is obviously a mistake by our mother,
19  because at this time in March 23rd, 2012, Joanne was in a
20  state of profound psychiatric disarray.  She was living on
21  the street.  She was unable to understand who she was, who
22  her family was.  She believed she was married to a mobster.
23  She believed that the mob kidnapped her husband and demanded
24  ransom.  She was running away and hiding.  How could anybody
25  in her right mind leave that much money directly at that time

259

1    to a person who is so profoundly mentally ill.  This makes no

2    sense.

3              Now, I will tell you honestly I thought sure it is

4    possible, although I think not likely, but possible that our

5    mother decided to disinherit everybody.  It's possible.  I

6    think not likely, but possible.  But it is absolutely not

7    possible that she would leave this money directly to Joanne

8    at that time.  That was absolutely not possible.  Our mother

9    was a wise and very cautious woman.  If she had made any

10   changes at that time to her designation of beneficiaries, no

11   matter what the designation was before that, she would have

12   made sure that money does not go to a woman who lives on the

13   street and believes she's married to a mobster.  That is

14   absolutely not possible.  So I thought it was a mistake.  I

15   thought our mother clicked the wrong button somewhere and

16   misunderstood something and clearly that could not be what

17   she intended.

18        Q    Did you--

19        A    I--go ahead.

20        Q    Did you have any telephone calls with respect to

21   what you believed to be this mistake?

22        A    Yes.  So in mid-July, we were all in kind of a

23   frazzled state of how could our mother possibly do this; it's

24   obviously a mistake.  And so before I go to phone calls, my

25   immediate reaction was there has to be some legal doctrine to

BLACK000848

260

1   invalidate this.  I don't know this body of law.  I'm not a
2   practicing attorney.  I am an academic studies, (inaudible)
3   at the law school, but I know some law.  And in other bodies
4   of law, if you make a material mistake, that material mistake
5   invalidates the document.  So, for example, in the contract
6   law, if you make a material mistake of fact, then the
7   contract is invalid.  In securities law, if you make a
8   material mistake in the public offering, then the public
9   offering maybe invalid.  So I said to myself, that's okay.
10  This designation is insane in such profound way that it is
11  obviously a mistake, so there has to be a body of law
12  somewhere in trust and estate doctrine that invalidates
13  obviously erroneous assignments of beneficiary.
14          So I said, you know, we should sue.  You know, I
15  wasn't serious at the time, but I thought I was going to sue.
16  And then I had a conversation with Cherie.  And, Your Honor,
17  I am stunned that Cherie would testify that she had not
18  spoken with me on the phone because she actually has.  And
19  she had also talked on the phone with Bernie's son Ben and
20  Bernie's daughter Sara.  So the first time Cherie called us
21  and I picked up the phone and she said, Oh, it's you.  I need
22  to talk to Bernie, but, you know, can you believe the
23  designation.  And so we went through this sort of puzzled
24  exchange, I can't believe it.  So Cherie was equally puzzled.
25  She said, you know, Aunt Renata has done a lot of strange

BLACK000849

261

1   things in her life, but this so far beyond anything one could
2   imagine.  You know, leaving that much money directly to a
3   person on the street at the time when she was already on the
4   street is simply, clearly a mistake.  And so we spoke
5   shortly, but we both agreed it was a mistake.

6           And they said, you know, I'm glad everybody agrees
7   it's a mistake.  I talked to everybody.  Everybody says
8   mistake, so I'm going to sue.  And so that was the--that was
9   the first conversation.

10      Q    And when was that?

11      A    Shortly after we received the letter sometime in
12  July, mid-July probably.

13      Q    What did you do next?

14      A    I had gone to conduct legal research, preliminary
15  research before I decide to hire a lawyer.  So I went on
16  (Inaudible) Law or I don't recall Lexus or Cornell database
17  of legal documents.  And I have researched what happens when
18  the designation of beneficiary is made in mistake.

19          And I was wondering what the remedy is for mistake.
20  I have no doubt that we can establish mistake.  I was
21  wondering about remedy.  I thought maybe if the remedy is
22  that the court will try to do what the beneficiary--what the
23  assigner might have wanted, then it will be protected in the
24  complaint in the complex litigation.  But all research that
25  I've done shows that the remedy is if the assignment is a

BLACK000850

1   mistake, then the assignment is removed and the assets flow

2   back into the estate.

3           And I said, well, this is an easy law case.

4   Everybody agrees this is a mistake.  I have not seen anybody

5   who didn't.  Tony today testified he thought it wasn't.  This

6   is the first time ever I hear anybody saying that when a

7   woman at the time when her daughter is living on the street

8   makes an assignment to her directly, it's not an obvious

9   mistake.  I thought this was completely insane and everybody

10  thought it was insane.  And remedy for mistake is that assets

11  flow--the designation is removed and assets are flowing into

12  the estate.

13          I said great.  Let's hire a lawyer.  So I went on

14  to investigate lawyers.  We needed to figure out where to

15  sue, in which court and in which state.  It could have been

16  in New York; it could have been in Pennsylvania where

17  Vanguard was.  So it took me some time.  I had to ask a

18  couple people.  I asked colleagues.  We started collecting

19  information.  And then I decided it was important for me to

20  obtain an agreement from Bernie's adult children for what I'm

21  doing.

22          When I say I was going to sue, I meant I was going

23  to sue on behalf of my minor children, who are the

24  beneficiaries in an Issue Trust, so they would have been

25  harmed by this designation.

BLACK000851

263

```
 1        So I wanted to see whether Bernie's adult children
 2   would support me in litigation, so I called them.  I called
 3   Sara, I called Ben.  I had a lengthy discussion with Ben.  I
 4   told him about the content of the letter.  And he was deeply
 5   puzzled and outraged--
 6        MR. DAIN:  I'm going to object with this long
 7   narrative.  I'm not sure what the relevance is anymore.  What
 8   is the relevance of her going through all these discussions
 9   she's saying she had with other children?  Is her state of
10   mind at issue here?
11        THE WITNESS:  I'm planning--I was planning to sue
12   and I wanted to show that I believed I had a very strong
13   claim.  And I believe my plan to file a lawsuit was the
14   single most important reason why Bernie and Cherie obtained
15   the disclaimer.  So let me show you--
16        MR. THIESSEN:  Your Honor, I'll direct the witness
17   more specifically.
18        THE COURT:  Okay.
19        Q    (by Mr. Thiessen)  What was the outcome of your
20   call with Ben Blake?
21        A    Ben very enthusiastically supported litigation.  He
22   said let's go right away, right now.  Let's do it.  Let's do
23   it.
24        Q    Did you have any further conversations with Ms.
25   Cherie Wrigley?
```

264

```
1      A    Yes.  A few days later, she called again.  And I
2  said, "Great news.  We are suing.  I already have an
3  agreement from Ben and I'm going to talk to other children
4  and litigation is happening."  This is--you know, and I think
5  everybody agreed that money needs to be removed from Joanne's
6  hands so I thought everybody will think great plan.  And at
7  this time, Cherie said, "Well, this is what I wanted to talk
8  to you about.  It's really not a great plan.  You know, think
9  about what happens if you sue.  If you sue, then the estate
10 is frozen and the money is frozen in Vanguard and, you know,
11 everything is frozen, there is no money.  And you should
12 understand that Joanne lives on the street and there is no
13 money to save her.  It will take us tens of thousands and
14 maybe hundreds of thousands of dollars to save her.  And if
15 you freeze all this money for years of litigation, Joanne
16 will live in terrible state on the streets and she might as
17 well die on the streets."  And so I said, "I don't understand
18 what you want me to do.  I feel very bad about Joanne, but I
19 have responsibility to my minor children.  And if I don't sue
20 now, then they will lose their inheritance, so what can I do
21 that will be better than suing?"  And Cherie said, "Well,
22 Bernie and I have discussed this great plan about
23 disclaimers."  This was no about complicated disclaimers in
24 court.  Cherie said I can simply go to Colorado and convince
25 Joanne to disclaim.  And I said, "This makes no sense.  How
```

BLACK000853

265

1    are you planning to convince Joanne to disclaim the money?
2    Why would she disclaim the money voluntarily?"  And Cherie
3    said, "Trust me, I know how to talk to people and I know
4    Joanne and I know Joanne's weaknesses and Joanne is very
5    concerned with her appearances.  And if I go to Colorado and
6    take her to a nice store and show her nice things and tell
7    her sign this piece of paper and you can have this
8    immediately, and if you don't sign it then there will be
9    litigation frozen and you will get no money."  And I thought
10   this was unclean.  I thought convincing a crazy woman to sign
11   significant documents was bizarre, but Cherie was convinced
12   she can get it signed.  But I thought this was bizarre.  It
13   was conduct unbecoming.  And I also thought this would be no
14   successful with Joanne.  And I also thought that no court--if
15   sometime later this would come up in court, no court would
16   ever consider that signature of an insane woman to be a valid
17   legal disclaimer, so I said this plan is absurd.
18          And Cherie just started putting this guilt trip on
19   me.  She says she and Bernie has a great plan about
20   disclaimers, you know, they will get Joanne to disclaim in
21   some way.  If--you know, I can get what I want and Joanne
22   will get money immediately and how can I be such a heartless
23   person who doesn't care about Joanne and just wants to sue.
24   And I just wanted to sue.  I thought we had an excellent
25   claim and I wanted it to be a litigation.  And she was

266

1  playing the thing, you are the younger second wife.  You

2  don't know this family.  People don't like you already.  If

3  you do this, then everybody will hate you.  Family litigation

4  is terrible and how can you put this family into months and

5  maybe years of litigation when Joanne is in such state.  I

6  said, you know, fine.  I can give you a few--maybe a couple

7  months delay.  I'm not going to not sue.  I'm just going to

8  give you a chance to do something else.

9          And she said she and Bernie together will get the

10  disclaimers and these disclaimers will produce what I want.

11  They will put money into the estate and distribute a third to

12  grandchildren so that I get what I want and Joanne gets what

13  she needs.  It will be now.  It will be fast and nobody will

14  be hurt.  And I said, okay.  I'm not losing anything if I'm

15  only waiting a couple of months.  So I said fine.

16      Q    And specifically did you discuss what would happen

17  with the assets if they were disclaimed?

18      A    Absolutely.  That was the whole point.  The

19  disclaimer discussion was a specific substitute to

20  litigation.  I thought I had a claim.  I'm now very

21  disappointed that I didn't just say to all of them forget it,

22  I'm going to sue.  I had the perfect claim.  I could have

23  been done in a few months.  Joanne was not able to defend

24  that claim; she was living on the street.  She did not have

25  court appointed counsel.  She did not have money to pursue

BLACK000855

267

 1  this litigation.  She was not entitled to any money to any

 2  money to pursue litigation.  I would have won back then, I

 3  have no doubt.  And I only deferred for a few months because

 4  I thought I don't want to be the evil bitch young wife who

 5  puts the family through litigation.  And I thought if I only

 6  wait for a couple months, maybe they'll succeed and the

 7  family will not hate me.  And if they don't succeed, I can

 8  still sue and I will win.

 9      Q    What if anything did Ms. Wrigley say specifically

10  about her understanding of the effect of the disclaimer?

11      A    She told me that she was going to fly to Colorado

12  and get Joanne to disclaim her part in the account and then

13  these--this designation will not exist and then the money

14  will go to the trust.

15          And by the way, Ms. Wrigley had been telling me her

16  extensive expertise in courts in the matters related to

17  disabled persons and otherwise incapacitated persons, that

18  she was very proud, that she's also part of a legal

19  (inaudible).  She had been telling me that she knows all ins

20  and outs on how these things are done and because she was a

21  court appointed--not court appointed counsel, she was a

22  Guardian ad Litem for years and she had to supervise disabled

23  children for years.  Joanne--I'm sorry, Cherie had asked us

24  to help her become a Guardian ad Litem for Joanne in

25  Colorado.  So I assumed she understood exactly what was going

BLACK000856

268

1   on.  This was not a random high school teacher.  This is a

2   person--Cherie is a person who is very well familiar with the

3   legal system.  She wanted to be Guardian ad Litem for Joanne.

4   She knew how things worked.  She was very convincing.

5       Q    Did you specifically discuss anything with respect

6   to the two-thirds/one-third distribution?

7       A    Yes.  I specifically told her that my interest in

8   this litigation is a third of the account that will go into

9   the grandchildren's trust.  And she had told me, "Don't

10   worry.  We will get what you would have gotten to you--what

11   you would have gotten through litigation but without

12   litigation."  She was completely clear.  She said, "When this

13   assignments are invalidated, everything goes to the estate.

14   It's as though this assignment doesn't exist."  At the time,

15   we had not thought about the five other grandchildren; we

16   just talked about Joanne.  She said the minute Joanne

17   disclaims, it's as though this assignment never existed.

18       Q    And what did you do following this phone call?

19       A    I now had to convince Ben and Sara not to sue.  And

20   Sara was fine.  Ben was very upset.  He wanted to sue.  He

21   did not like this plan.  He was gung-ho, wanted to sue, not

22   going to stop.  And so I had to convince.  I said we are not

23   stopping.  We are not giving up our legal right to this

24   excellent legal claim.  We are simply postponing.  It's okay

25   to postpone by a couple of months, and he agreed to postpone

269

1  by a couple of months.

2      Q    What happened next?

3      A    We had more conversations with Cherie.  I was

4  waiting and waiting and waiting for the developments in

5  Colorado.  I thought--I frankly did not think it was likely

6  she would have obtained a signature of Joanne.  I did not

7  think that she had magic powers of convincing.  But sometime

8  in August we had another conversation and she said, "Oh, that

9  didn't work.  Joanne on the phone did not agree to sign and I

10  don't want to go to Colorado because we're going to spook

11  her.  She's going to be afraid and run away and we don't want

12  her to run away, so change of plans.  Instead of getting

13  Joanne to sign anything, we are going to have the court

14  announce her to be incapacitated and have her guardian to

15  sign the same thing that Joanne would have signed on her

16  behalf."

17          So--and she had gazillion different plans.  Her

18  other plan was to have Joanne involuntarily committed into a

19  mental institution or threaten and Joanne will be so

20  terrified of this that she would sign anything.  And I

21  listened to this stream of plans, and there were some other

22  plans I don't remember, and I thought this is just--you know,

23  I like it less and less.  I have a perfectly good legal

24  claim, why am I sitting on it.  But she said, "But we already

25  put these things in motion.  We're already looking for an

BLACK000858

270

1    attorney in Colorado.  We're already looking for--you know,

2    to appoint a Guardian ad Litem, et cetera, for Joanne.  Just

3    wait a little bit more, just a little bit more."  And I said,

4    well, okay, I guess I'm going to wait a little bit more.

5    That's okay.  So I waited more.

6         Q    What happened next?

7         A    And next we had another conversation in October.

8    In October--

9         Q    What year?

10         A    2012.  In October, we learned that it's not enough

11   for Joanne to disclaim, it also was required that all other

12   listed beneficiaries would need to disclaim, which means

13   every one of the five grandchildren listed would also have to

14   disclaim.  At this point, I was just absolutely livid.  I was

15   so mad that I allowed them to drag this process for so long

16   and stop me from filing a lawsuit that I had.  It was clean;

17   it was good.  Now I also--they also had to convince Bernie's

18   five children to disclaim and some of them were more

19   reasonable and would disclaim and some were less reasonable

20   and would not disclaim.  And meanwhile, this process had

21   extended for very long.  And, you know, I just thought this

22   was infuriating.  And I thought at least one of the five is

23   going to say no I'm not disclaiming and then the entire

24   system is going to break down.

25         Q    Specifically with respect to this adult child

BLACK000859

271

1   disclaimer issue, did you have any conversations with Ms.
2   Wrigley about that issue?
3        A    Yes.  The biggest worry was Rebecca Black, the
4   youngest.  Rebecca was an 18-year-old party girl.  She was
5   just in a constant state of partying, and she had all kinds
6   of other problems.  She barely finished high school.  She,
7   you know, went to community college and was partying day and
8   night and not studying and claiming that she--you know, when
9   her bad grades came in, she was claiming it was all her
10  father's fault or else she was depressed.
11       And I said why in the world would Rebecca Black
12  disclaim $40,000 cash falling on her lap.  This is an 18-
13  year-old party girl.  She wants money today.  If you tell her
14  that in exchange for $40,000 she can get more money in trust
15  controlled by her father, who she thinks is the problem of
16  her life, she would never agree to that exchange.  So Rebecca
17  was the big worry.  I was--I thought she would not sign.  I
18  thought she just wants the money and run.
19       Q    So in your conversation with Ms. Wrigley, what was
20  her response with respect to this specific issue with Becca?
21       A    We--again, Cherie said she's highly experienced in
22  dealing with difficult teenagers.  This is her job.  She
23  knows how to deal with them.  She believes she can establish
24  a rapport with Rebecca.  She--she said she can convince
25  Rebecca to do--to sign the disclaimer.  And I said how?  This

BLACK000860

272

```
 1   is an 18-year-old looking at $40,000.  And Cherie said I will
 2   explain and tell her the truth.  I will explain to her that
 3   if she disclaims, she will get a lot more money in trust.  So
 4   we actually talked about the way to explain it to her.  So
 5   the way I would explain it to Ben, for example, or to Sam, I
 6   would have said, Look, today you're getting one percent.  If
 7   you disclaim, you're getting one-seventh of one-third, which
 8   is 1/24ths, which is five percent.  It's better to get five
 9   percent than one percent so disclaim.
10           Rebecca is not quite that sophisticated, or at
11   least at he time she was not, so it was difficult to discuss
12   specific numbers with her.  And so we would try to come up
13   with some explanation for how if you give up cash today you
14   will get so much more in trust that it would make sense for
15   you.  So as you understand, exchanging $40--$40,000 in cash
16   today for $40,000 in trust sometime later under control of
17   your father, that is not the kind of exchange doesn't make
18   sense to her.  And it was completely clear.
19           So we had to explain that in trust she gets five
20   times as much and so these--we did not say, you know, please
21   let's do the calculation.  We had to say you will get a lot
22   more in trust.  That is the only reason why a party girl, 18-
23   year-old would give up $40,000 in cash.
24      Q    Did you specifically discuss the one percent versus
25   the five percent--
```

BLACK000861

273

```
1      A      Absolutely--

2      Q      --issue with Ms. Wrigley?

3      A      --we did.  Absolutely we did.  Of course.  We had

4   to explain to Rebecca why she's giving up one percent,

5   $40,000.  I was just totaled when Cherie said, "Oh, I just

6   told her give away $40,000 in exchange for nothing."  What--

7   like who possibly would do that?  Who would agree to that?

8   Or even give away $40,000 in cash today for $40,000 in trust

9   controlled by your father sometime in the future.  Who would

10  possibly disclaim on those terms?  It makes no sense.  The

11  only way to convince was to say there will be a lot more in

12  trust waiting for you, and that is exactly the conversation

13  we had.  At every moment in this process Ms. Wrigley was

14  referring to this as think of it as a settlement.  You have a

15  good claim.  We care about Joanne.  If we just do it

16  together, we will get what you want.  You will get exactly

17  what you think you will get in litigation without litigation.

18  Think of it as a settlement.  And this was exactly how we

19  proceeded.

20           And, Your Honor, I'm just--I was just shaking when

21  I heard her say that she didn't know.  I'm completely

22  astonished.  How could she possibly convince an 18-year-old

23  party girl to give away $40,000 in exchange for nothing or in

24  exchange for $40,000 in trust?  How?  There is no way.  No

25  way.
```

BLACK000862

274

```
 1          MR. THIESSEN:  Thank you, Your Honor.  Nothing
 2   further.
 3          THE COURT:  All right.
 4                      CROSS-EXAMINATION
 5   BY MR. DAIN:
 6      Q    Ms. Litvak, you said you had a lot of conversations
 7   with Renata Black?
 8      A    Yes, I did.
 9      Q    In fact you said you had one just a few weeks
10   before she died?
11      A    I don't recall how many weeks, but shortly before
12   she died, yes.
13      Q    And what was that conversation about?
14      A    Nothing significant.
15      Q    No, just--about what?
16      A    How are you?  How is the weather?  I'm not feeling
17   well.  I think I'm not feeling well.  Let me talk about--on
18   her part, let me tell you how I'm not feeling well.  On the
19   other hand, you should eat more green vegetables.  This kind
20   of conversation.
21      Q    She was--you were discussing with her her health,
22   right?
23      A    Yeah, sort of--unremarkable things.
24      Q    And then the conversation--last conversation you
25   had before that one, how many weeks or months before she
```

275

1    died?

2         A    We spoke almost weekly or biweekly, so that was--

3    you know, so a couple of weeks or three weeks before she

4    died, so another couple of weeks before then and then--

5         Q    You had good conversations with her?

6         A    Yes, I did.

7         Q    And what kinds of things would you discuss?

8         A    Usually I just keep quiet and she talks about

9    health and well-being and sometimes money management.  And

10   let me let you know--let me tell you how to live your life.

11   Sometimes she was talking about Joanne.  Sometimes she was

12   talking how she was very proud of her grandchildren and her

13   son and just all kinds of things.

14        Q    So she wasn't crazy?

15        A    She was not crazy, no.

16        Q    No.  So her decision then to leave 95 percent to

17   Joanne, you didn't think she was crazy?

18        A    I did not plan to argue incapacity.  I was planning

19   to argue mistake.

20        Q    Okay.  So then she just made a mistake in--

21        A    Correct.

22        Q    --designating it?

23        A    I--

24        Q    Okay.

25        A    --believe she did not understand what the

BLACK000864

276

1  consequences were of her actions.

2      Q     Did you know what the designation of the paid-on-

3  death accounts were before she changed it to 95 percent/five

4  percent?

5      A     I did not know firsthand, but she had told me it

6  was not designated.

7      Q     How old are your children?

8      A     They are now seven and nine.

9      Q     So at the time that Renata Black signed this

10  January 25, 2010 will, your children were already born?

11      A     Yes, of course.  They were five and what--

12      Q     And you know--yes.

13      A     I'm sorry, four and six.

14      Q     Do you know that at the time--I mean you've seen

15  this will where she leaves residual money only to the five

16  grandchildren, not to your two grandchildren?

17      A     Yes.  I'm glad you asked this.  I don't know how

18  much the Court wants to hear of this discussion, but--

19      Q     No, I'm just asking did you know about this.

20      A     Yes.  Yes, I did.  And I actually had detailed

21  discussion about that will with our mother.  She had

22  explained to me why she had written this.  This was her tax

23  evasion scheme.  Do you want me to tell you more?

24      Q     No, I don't.

25      A     Yes.

BLACK000865

277

1    Q    What I want you to tell me is that you knew about

2  this will--

3    A    Yes, I did.

4    Q    --before she died?

5    A    Absolutely I did.  She had told me about it.

6    Q    Did you discuss with Mr. Black that you should tell

7  the court in New York about this will?

8    A    I'm--I'm thinking, but I should say we consulted a

9  counsel whether this would waive some kind of privilege of

10  somebody, but yes absolutely we had discussed this with a

11  counsel who had told us this will is legally invalid in New

12  York.

13    Q    And you knew that in this will there was specific

14  statements about not wanting to leave you money or the

15  children money?

16    A    Correct.  It's even better.  If Bernie divorces me,

17  he gets all the money directly.

18    Q    And she loved you dearly?

19    A    Yes, she absolutely--do you want me to tell you

20  what it was?  It was a tax evasion scheme.  I can tell you a

21  lot more.  Do you want me to tell you?

22    Q    Did you think she was mentally ill?

23    A    No, I did not.  I thought she was gullible.  She

24  was trying to evade estate taxes.  She went on crazy websites

25  of crazy tax avoidance people and she thought that she had

BLACK000866

278

1    come up with a perfect scheme in which she would leave a
2    bunch of money directly to Bernie in some strange tax hidden
3    account and that money would go to our minor children.  And
4    the money for the big children will go to some other thing
5    that is in her will.  I had told her that I wanted to take no
6    part in this crazy scheme.  And I also told her it's invalid
7    and illegal.  And I had told her that--oh, and the reason she
8    put in that will that she wants--if we get divorced, he gets
9    all the money is because she wanted to make sure that I don't
10   grab the money in case we get divorced, because he had a bad
11   experience with his prior wife.  The money was supposed to be
12   left to him in an account that nobody should know about.
13        Q    The first you learned about this will was when
14   exactly?
15        A    I believe in 2010, or something like this.  I don't
16   recall exactly.
17        Q    Did you know there was an addendum to the will?
18        A    She had told me some details.  She apparently wrote
19   multiple drafts and she had started consulting me on multiple
20   drafts, and I kept telling her this is illegal on multiple
21   ways and I don't want to discuss the details.  So I don't
22   remember if she told me about the addendum.
23        Q    And when--your plan was to take advantage of the
24   fact that Joanne was incapacitated, wouldn't understand your
25   lawsuit, didn't have money to hire an attorney, and then you

BLACK000867

279

1    would win?

2         A    Absolutely not.  I would go to court in front of a

3    judge and I would litigate the case against an opponent who

4    cannot defend herself, but I am not (inaudible) to my

5    opponent.  And I felt bad for Joanne, but what was I supposed

6    to do.  People litigate against people who are much less

7    sophisticated all the time.

8         Q    Much less sophisticated?

9         A    Yes.

10        Q    She is mentally ill?

11        A    She was, but she was not helpless.  She was, for

12   example, able to get $80,000 out of Fidelity against Bernie's

13   opposition.  So a law professor, crazy woman; crazy woman

14   wins.  She was able to get herself out of a criminal charge

15   in Colorado all by herself.  She was schizophrenic; she's not

16   retarded.  She knows how to--she's trained as a paralegal.

17   She knows where to (inaudible).  She knows how to sue.  She

18   managed to get her law firm in Connecticut terrified and drop

19   the--what is it, worker's compensation claim by making magic,

20   saying magic words.  I'm not your client; I will sue.  And

21   then she knew exactly on what grounds she would sue.  So,

22   yes, I thought I had a superior hand.  I felt uncomfortable,

23   but she was not helpless.  She's not retarded.  She's

24   schizophrenic.

25        Q    But you intended by that to sue and you said--I

280

1   thought you said she would default.

2      A   I thought she--it was very likely that she would

3   default, yes.

4      Q   And what did you want the outcome to be?

5      A   The designation of beneficiaries invalidated as a

6   mistake, money flowing into the estate and funds trusted--or

7   trusts are funded exactly as our mother intended.

8      Q   As our mother intended?

9      A   Joanne--I'm sorry, she had requested I call her

10   mother, and I call her mother by habit.

11      Q   And you say you called Ms. Wrigley and said great

12   news; I'm going to bring litigation?

13      A   I don't recall who--I don't recall who called whom.

14   It's possible that Bernie called her and talked and then he

15   gave me his phone and I spoke with her after that.

16      Q   And I'm just curious, though, do you use e-mail?

17      A   Yes, I do.

18      Q   Why is it that all of these things that you're

19   talking about now and that Mr. Black is talking about there

20   are no documented e-mails of that?  All these conversations,

21   did you ever send an e-mail in which anything you just said

22   is set forth?

23      A   Let me honestly tell you Ms. Wrigley is not an

24   important part of my life and was never an important part of

25   my life.  These conversations were mostly in difference to

BLACK000869

281

1    her in trying to keep a family member happy with me the

2    young, evil wife.  So I didn't actually need to talk to her,

3    but I felt that it would be nice to talk to her, so I did.

4         Q    Did you just say you were the young, evil wife?

5         A    Well, this is a cultural stereotype to which I was

6    referring.  I am not evil, I am relatively young, definitely

7    wife.

8         Q    Okay.  I'm just--I'm stunned.  How--how which you

9    were going to do benefit Joanne?

10        A    As it was explained to me--and I actually thought

11   it was plausible--if I file a lawsuit, the estate is frozen,

12   Vanguard account is frozen, everything is frozen.  There is a

13   nasty, big extended litigation that might--I believed it was

14   short and simple, but you know that no litigation is every

15   short and simple.  And I kind of knew this too in the bottom

16   of my heart.  It could have easily lasted year or two years

17   or three years.  For these years, Joanne will have no money

18   at all.

19             Another point was--

20        Q    Wait, wait, let me stop.

21        A    Yes.

22        Q    Let me stop.  Joanne would have no money at all.

23   So you wanted that because you wanted to sue?

24        A    I did not want the outcome.  I wanted to win the

25   litigation so that my children would get what they're

BLACK000870

282

1   entitled to under the will.  I did not want Joanne to suffer.

2   And because I did not want her to suffer, I agreed to

3   postpone a litigation which I believed I would win easily.

4        Q    Okay.  So now we're getting to it.  What you wanted

5   was what your children--that your children would get what

6   they were entitled to; that was your motivation?

7        A    Of course, it's always been my motivation.

8        Q    It wasn't to help Joanne?

9        A    Absolutely not.

10       Q    Okay.

11       A    There was another--

12            MR. DAIN:  I have--I have no further questions.

13            THE WITNESS:  There was another important

14   motivation for why I postponed litigation.

15            MR. DAIN:  Thank you, I'm good.

16            THE WITNESS:  No, okay.

17            MR. DAIN:  Thank you.

18            No further questions.

19                      REDIRECT EXAMINATION

20   BY MR. THIESSEN:

21       Q    And, Ms. Litvak, if Ms. Joanne Black didn't default

22   with respect to the litigation, what were your plans?

23       A    Well, I was planning to sue to invalidate the

24   assignment of beneficiaries.  So if she didn't default, that

25   means we have litigation, and then we go to litigation and I

283

1    may win, I may lose, but I thought I would win.  I thought I

2    had a very strong case.

3        Q    On what grounds?

4        A    On the grounds that everybody I knew agreed it must

5    have been a mistake to leave that much money to a mentally

6    ill woman living on the street believing she's married to a

7    mobster.

8            MR. THIESSEN:  Nothing further.

9            MR. DAIN:  Okay.  Sorry, just on that question I

10   had a question.

11                    RECROSS-EXAMINATION

12   BY MR. DAIN:

13       Q    The mistake was leaving her money outright--

14       A    Correct.

15       Q    --not--not giving your kids some of that money?

16       A    Correct.  I've actually talked about this in the

17   middle of my testimony.  The mistake was leaving her money

18   outright.  But as my legal research has shown, the only

19   remedy in mistake for the assignment of beneficiary is

20   invalidation of the assignment.  When the assignment is

21   invalidated, the money flows into the estate.

22           MR. DAIN:  Okay.  No further questions.

23           THE COURT:  Okay.  Thank you.

24           THE WITNESS:  Thank you, Your Honor.

25           MR. POSKUS:  Your Honor, I think we're done.

BLACK000872

284

```
 1              THE COURT:  Okay.

 2              MR. DAIN:  Okay.  So phase one we've all rested on?

 3              THE COURT:  I think so.

 4              MR. DAIN:  Okay.  Now I know you want to stop

 5   (inaudible) before.  It's 20 to six.  What do you want to do?

 6              THE COURT:  I know.  So we have to talk about it

 7   now, right.  All right.  And so and there's--there's a real

 8   disagreement about the amount of money we're talking about

 9   here?

10              MR. POSKUS:  I think so, yes.

11              MR. DAIN:  There isn't a disagreement about the

12   amount of money; there's a disagreement of what credits Mr.

13   Black should get.  The money everyone knows.  But what

14   apparently this accounting is saying--Ms. Parker's accounting

15   says, well, let's assume that everything Mr. Black did was

16   appropriate, give him credits for everything he's spent,

17   including (inaudible), and here's what's left.

18              THE COURT:  Okay.  But that's not really what we're

19   doing.

20              MR. DAIN:  Right.  That's why the only--the next

21   step I think is you either need--we either need to go from

22   Ms. Kerr's report--

23              THE COURT:  Right.

24              MR. DAIN:  --and get to the numbers.  We can do

25   that by testimony or if the Court has her report, if the
```

BLACK000873

285

1    Court has questions, but that should be the next step.

2            MR. POSKUS:  I agree that should be the next step,

3    but I think I should be allowed the opportunity to call Ms.

4    Harper and refute the parts of Ms. Kerr's report.

5            THE COURT:  About what parts of her report?

6            MR. POSKUS:  Of a variety of them.  There are some

7    errors in her reports.  There are some major disagreements,

8    but I have to be honest, Your Honor, I have to go back and

9    (inaudible).

10           MR. DAIN:  You see the disagreements are not on the

11   numbers.  The numbers are what they are.  The disagreements

12   are--

13           THE COURT:  About the assumptions that went into

14   it?

15           MR. DAIN:  Exactly.  The disagreement is the

16   assumption from Mr. Poskus and Ms. Harper is that Mr. Black

17   didn't breach his fiduciary duties, the--the disclaimers were

18   all appropriate, everything including the account should have

19   gone two-third/one-third, and then any discrepancies in the

20   estate, well, let's give him all these credits for paying his

21   attorneys to fight this.  Once we do that, we're left with

22   120-some thousand.  Mr. Black will pay that back in and

23   we'll--

24           MR. POSKUS:  That's not a correct statement of her

25   report or the testimony.

BLACK000874

286

 1          MR. DAIN:  It's pretty good.  Pretty close.

 2          So--so I guess the issue is do we go through all of

 3     that again or, again is this just digging--

 4          MR. POSKUS:  Well, we haven't been through it once

 5     yet, so--

 6          MR. DAIN:  Well, we went through this whole

 7     exercise of making this record on the first portion.  It's up

 8     to you, Your Honor.  If you want to hear from Ms. Kerr, we

 9     can do that.  I think you have all the evidence, but I--I

10     don't want to belabor that point.

11          THE COURT:  Right.  Right.  It's not helpful for me

12     at this point to go through a report that isn't just a

13     straightforward accounting; it's just not.  That's not what

14     we're trying to do here.  That's not what this case is about.

15     The case is about determining how much money was left and

16     where it went, and that's it.  And there's not supposed to be

17     any assumption about who was right, who was wrong or anything

18     else like that.

19          MR. POSKUS:  So, Your Honor, if you're telling me

20     that there will be no--I guess the question I've got to ask,

21     perhaps I need to ask Mr. Dain this as well--is the issue

22     then is just going to be how much Joanne Black should have

23     gotten had the disclaimer not been exercised?

24          THE COURT:  Right.

25          MR. POSKUS:  And that's it?

BLACK000875

287

```
 1              THE COURT:  That's all it is.

 2              MR. POSKUS:  That's all it is.

 3              MR. DAIN:  Well--

 4              THE COURT:  And, you know, what's happened to the

 5    money since then is part of it--

 6              MR. DAIN:  Thank you.

 7              THE COURT:  --but it's not a question of should it

 8    have happened or should it have not happened.  That should

 9    not be an accounting.  There's no point to an accounting like

10    that.

11              MR. DAIN:  Well, there is that issue about what

12    should have happened to it afterwards, but that's--

13              THE COURT:  But that's not to come out through an

14    accounting.

15              MR. DAIN:  Pardon?

16              THE COURT:  It shouldn't be coming out through an

17    accounting.

18              MR. POSKUS:  Well, I'm not sure how else it would

19    come out what's happened to the estate.  And I will say this,

20    the issue of what happened to the money I think is an issue

21    for the estate, the court that has jurisdiction over the

22    estate.  You'll recall at the very beginning of June 16th I

23    said I think it's clear that this Court has jurisdiction over

24    the conservatorship.

25              THE COURT:  Um-hum.
```

BLACK000876

288

1          MR. POSKUS:  But I'm not sure if you have

2   jurisdiction--subject matter jurisdiction over how Mr. Black

3   discharged his duties as personal--as executor.

4          THE COURT:  Well--

5          MR. POSKUS:  And I actually see a lot of what Ms.

6   Kerr said and what Ms. Harper responded to as dealing with

7   that issue.

8          MR. DAIN:  Your Honor, actually if he sits as

9   conservator, wherever the money is he still owes a fiduciary

10  duty.  He also has a fiduciary duty as executor.

11         THE COURT:  Yeah.

12         MR. DAIN:  If the fact that these are Ms. Black's

13  assets, this Court has jurisdiction over that and has

14  jurisdiction over Mr. Black.  So we--the point is, we

15  shouldn't be accounting as--or they shouldn't be accounting

16  as if they're right because now that the Court has decided,

17  as I understand, they're wrong, there was a breach of

18  fiduciary duty and we are going to have to find out just how

19  much is properly transferred, then only Ms. Kerr's accounting

20  is valid, because that strictly shows where all the money

21  went, how much is left, how much was paid to attorneys, how

22  much was paid for personal expenses of Mr. Black, and that

23  helps the Court get to the bottom line, which is how much is

24  owed.

25         MR. POSKUS:  So basically what Mr. Dain has just

289

1    said, he gets to have Ms. Kerr testify regarding the

2    accounting issues because that's what she's qualified to do

3    theoretically, but I don't get to call my own expert to

4    refute anything that she says.  And he's saying--

5            THE COURT:  Well, is she--

6            MR. POSKUS:  --there's nothing--

7            THE COURT:  --is she refuting the accounting or is

8    she doing something else on her own?

9            MR. POSKUS:  She's refuting some of the accounting

10   data.  Yes, she is.

11           Ms. DiPONIO:  Your Honor, we stipulated.  The

12   parties stipulated to Ms. Kerr's and Ms. (Inaudible)

13   accounting.  This is just a waste.  This is a waste of the

14   Court's time as well as a waste of everybody's time.

15           THE COURT:  You know, I guess at the end of the

16   day, if Mr. Black wants to pay someone out of his own money,

17   not coming out of the estate to do this, I suppose he has the

18   right to do it.  But he doesn't have the right to use

19   Joanne's money--

20           MR. POSKUS:  I agree.  Then he's--

21           THE COURT:  --to do it.

22           MR. POSKUS:  We've fixed that, Your Honor.

23           THE COURT:  How did you fix that?

24           MR. POSKUS:  Well, I've got the money that he paid

25   Ms. Harper in my client trust account.  So he's not using

290

1   his--any estate money, because that's what was used estate

2   money.

3        MR. DAIN:  No, no.

4        MR. POSKUS:  Yes.

5        MR. DAIN:  Joanne's money.

6        MS. DiPONIO:  That's right.

7        MR. POSKUS:  No, no, no.  No, that's not--that's

8   not the case.  There's no order yet that's been entered that

9   says that's Joanne's money; that's the estate's money.

10        MR. DAIN:  Ms. Harper agrees it's--

11        MS. DiPONIO:  That's right.

12        MR. DAIN:  Let's not play word games here.  That's

13   the--

14        MR. POSKUS:  Oh, I'm not.

15        MR. DAIN:  But I accept it now he was paid 150,000

16   back, and Mr. Glatstein is saying he's holding 15,000.  If

17   the Court trusts that that 130,000 remains stable, I don't

18   know how the Court can now trust that Mr. Black won't spend

19   the other 38,000 left of Joanne's money.

20        THE COURT:  Right.  Well, I'll attempt to remedy.

21   But okay.  So basically we'll pick a date, it's going to be

22   another day, to deal with the accounting piece of it.  But--

23   and I intend to file a written order on this, but basically

24   I--based on this testimony, the elements of the breach are

25   met resoundingly so.

BLACK000879

291

1          Mr. Black is a fiduciary specifically to Ms. Black;
2     he breached his duties.  There have been damages and losses
3     and his breach has been the cause of her injuries and
4     damages.
5          I think Ms. Litvak had the right instinct and I
6     tried to say this multiple times throughout these
7     proceedings.  This should have never come this way.  It
8     should have gone right back to the probate court in New York
9     at the very first instance to hash this out.  And this
10    (phonetic) with the disclaimer and all the rest of it has
11    really served to muddy the water, create a significant amount
12    of family discord when it could have been just a simple
13    dispute over whether or not she had an intent to do these POD
14    designations.  I'm not satisfied that there has been full
15    disclosure.  And as we indicated before around the noon hour,
16    I find that there has not been full disclosure to this Court
17    as to what the intent was, what the effect was going to be,
18    and that is what candor to the Court is supposed to be all
19    about.  The Court is not supposed to try to figure out from
20    myriads of documents what it is that everybody means and what
21    is intended.
22         The Court's not supposed to have their staff do all
23    the legal research for the lawyers or the parties or force,
24    you know, court appointed counsel to do it or the GAL.  And
25    this testimony I, frankly, do not accept and don't believe it

292

1    that all of this was up front and it was just, you know, a
2    way to effectuate the terms of the will. I just don't find
3    that credible. And I do not find credible this testimony
4    that everything was disclosed, everybody knew, everybody was
5    on the same page. Then if everybody was on the same page,
6    why does nobody seem to know about it? And as I said, I will
7    go through and I will make specific findings on all of the
8    elements. But the thrust of my order is that he's definitely
9    breached his duties and that there--and that a surcharge is
10   appropriate. Because, based on your disclaimer argument, I
11   am left with no other option to remedy the situation.
12          So--and I will get an order out. It's in October.
13   I do not--I am very dismayed that what I would do or so is
14   misrepresented to any other court. I was extremely dismayed
15   to hear this half truth given to the court in New York. And
16   it was demonstrated again on the record just a little while
17   ago with the transcript colloquy between Mr. Dain and Mr.
18   Black about the hearing, it looks like it was February 19th
19   of 2015. I mean Mr. Black clearly did not represent to the
20   court in New York that he understood--or Mr. Dain did not
21   represent to the court that he understood what Mr. Black was
22   trying to do. That's not what the transcript shows. And
23   it's the same sort of thing that went on with my order.
24          So in order to try to prevent all of this, to the
25   extent that this court has authority to do so, I am ordering.

BLACK000881

293

1    And to the extent that this court may not have authority, I
2    am recommending to another court that Mr. Black--he's revoked
3    as conservator.  That he should not have any other fiduciary
4    responsibilities at all with respect to any money which may
5    come into Joanne Black either through the estate, through
6    guardianship, through conservatorship, through any other
7    proceeding.

8         There is some conflicting evidence about it in
9    terms of who called what--who called who and who said what to
10   who and what the time periods were, but the bottom line is
11   that there was not disclosure to this court and this court
12   entered an order approving the disclaimer under false
13   pretenses, and that is unconscionable, especially from a man
14   of this stature and attorneys of the statute that we had in
15   this court as well.  It's just unacceptable and it cannot be
16   condoned.

17        So Ms. Peterson, at this point, is the Colorado
18   conservator, and she has the only fiduciary duty, as far as
19   I'm concerned, with respect to Joanne Black's funds in this
20   state or in any other state where Joanne Black has money.  If
21   the court in New York chooses to appoint someone out, I am
22   making this my recommendation and suggestion then.  But it
23   should not be her brother, Bernard Black.  There's a clear
24   conflict of interest, there always was as demonstrated by the
25   testimony from his wife.  You know, there was a problem with

BLACK000882

294

```
 1   the two younger children; she was upset about it.  I agree
 2   that the 2010 will is difficult to understand, if it can be
 3   understood, but there was clearly another will that she tried
 4   to revoke the '97 will.  The probate court in New York wasn't
 5   told about that will.  The decisions were made.  There hasn't
 6   been candor to any court as far as I can tell at this point.
 7   So it's just not--it's not right.
 8             And the other part of it is, is that whatever went
 9   on in the family, it was clearly no family agreement about
10   what was fair, what wasn't fair, what grandma meant, what she
11   didn't mean, whether or not she made a mistake or any of it.
12   And if there was an agreement, because heirs and
13   beneficiaries can override these instruments.  And if there
14   was a full agreement, they would have done that.  They would
15   have gone to the court in New York and said, okay, this is
16   what she said and this is why we don't agree and this is what
17   we want to do and this is what fair to everybody, but no one
18   did that.
19             And that's why I've been trying to probe whether or
20   not there was any intention to do that.  And I find that
21   there wasn't.  There just flat out wasn't.  So whatever was
22   said or not said, it did not result in a family agreement
23   about what to do about the POD designations.  And there was
24   no family agreement about what to do about the POD
25   designations.  And there was no family agreement that I'm
```

BLACK000883

295

1    able to discern as to what to do about the effect of the POD

2    designations.  And I don't know that there's really

3    disagreement that Joanne Black in a psychotic state on the

4    streets in Denver should have been the recipient of 3 million

5    in cash.  I also wonder how Vanguard would have known--would

6    have known where to pay it to her, but I suppose as a

7    practical matter how she would have gotten it.  But anyway,

8    the bottom line is there's no family agreement on this and

9    this court wasn't told.  So for those reasons, generally, I

10   am revoking Mr. Black's appointment as conservator for his

11   sister and I'm ordering that he not have any fiduciary

12   responsibilities whatsoever with regard to any of her money

13   or the determination as to what should be part of her money.

14         Whether or not I think I have any other authority

15   in terms of it, you know, I'll keep mulling that over as I go

16   through my written order, but I'm hoping to a written order

17   out that's fully detailed before this scheduled hearing in

18   October or whenever it is.  So that the court in New York

19   there won't be any question about what I thought or what I

20   did or what I ordered.

21         We will set the hearing at this point to determine

22   what the amount of the surcharge should be.

23         MS. DiPONIO:  Your Honor, I also have a motion

24   pending for (inaudible) damages. I would ask that the Court

25   consider that as well with the surcharge.

BLACK000884

296

```
1              THE COURT:  Okay.

2              MR. DAIN:  Your Honor, at least as to the--well, I

3      shouldn't say that.  But with respect to the Roth IRA, I

4      think there's (inaudible) of that, but additionally I want to

5      ask the Court one more thing, and I know the Court has been

6      patient, but Ms. Kerr needs--absolutely needs to get paid.

7      She's been doing this without any compensation.  It's

8      basically breaking her in terms of her ability to continue

9      functioning--

10             THE COURT:  Okay.

11             MR. DAIN:  --not just in this case but in her

12     practice.  I mean this is a huge amount of her time and

13     effort.  And if you read the objections, there's nothing in

14     there that specific saying this amount of time should be

15     reduced to this or anything else.  And again, I--as a trustee

16     of the trust, I would have otherwise paid this.  It's

17     absolutely reasonable.  The accounting is, again, detailed,

18     it's--she's persistent in getting all the information.  She

19     needs to get paid.  I mean she can't--she can speak for

20     herself, but she can't continue practicing like this.

21             THE COURT:  Um-hum.

22             MR. DAIN:  And again I state, you know, even though

23     they gave the money back, the attorneys had no problem; we

24     pay ourselves.  But she's been doing this for months.  I mean

25     I assume that Ms. DiPonio and Ms. Young will submit their
```

BLACK000885

297

1   requests.  I also--I don't know--okay, I know Ms. Wrigley

2   hasn't been paid.  I'm going to submit at least a request for

3   Mr. (Inaudible), but just Ms. Kerr.  Maybe we could get Mr.

4   Poskus to agree that even though he doesn't like the

5   accounting--her efforts given the outcome that the Court has

6   come to, were beneficial to Ms. Black.

7           MR. POSKUS:  Let me make a suggestion, Your Honor.

8   If Mr. Dain is willing to speak to me sometime next week,

9   maybe he and I can talk on the phone and see if we can work

10  out a number that we agree on.

11          MR. DAIN:  No.

12          THE COURT:  Well, I think what I'm going to do is--

13  the bill was, what, 46,000?

14          MR. DAIN:  It's actually--

15          UNIDENTIFIED SPEAKER:  It's--I think the balance is

16  about 46,000 through June 24th.

17          THE COURT:  Right.  So what I'm going to do is I'll

18  order 40,000 paid; that will leave you some wiggle room with

19  the six.

20          UNIDENTIFIED SPEAKER:  There is no 40,000 in any of

21  the accounts still.

22          THE COURT:  Well, he's got 100 sitting in his trust

23  account.

24          UNIDENTIFIED SPEAKER:  Did he transfer that to Ms.

25  Peterson?

BLACK000886

298

```
1              THE COURT:  So--

2              MR. POSKUS:  Well, Your Honor, I said I would do

3    whatever you ordered.  I'll meet that.  Give me a few days to

4    make sure the check cleared otherwise I get in trouble with

5    the Supreme Court.  But once it clears, I'll do whatever you

6    order me to do.

7              THE COURT:  Within ten days.

8              MR. POSKUS:  Within ten days, okay.

9              THE COURT:  40,000 to be released from Mr.--

10             MR. POSKUS:  Okay.

11             THE COURT:  --Poskus' trust account to go through

12   Ms. Peterson and then to Ms. Kerr.

13             MR. DAIN:  Actually I'm unclear, Your Honor, why--

14   if Ms. Peterson is now the conservator, why isn't this whole

15   115,000 to Ms. Peterson?  It shouldn't be in Mr. Poskus'

16   account.

17             THE COURT:  Well, I'm not sure that I disagree with

18   that, but we're not going to spend more time today talking

19   about it.

20             MR. DAIN:  Okay.  So next date, I guess.

21             THE COURT:  Right.

22             (Pause.)

23             THE COURT:  I have this Friday the 7th, and I have

24   Tuesday the 18th and Monday the 24th.

25             MR. POSKUS:  Pardon me, Your Honor.
```

299

```
 1          MR. DAIN:  I'm sorry, say that again, Your Honor.
 2          THE COURT:  This--this Friday, which is the 7th, I
 3   have--
 4          MR. DAIN:  Oh.
 5          THE COURT:  --the 18th, which is a Tuesday, and
 6   Monday, August 24th.
 7          MR. DAIN:  Monday, August 24th, would be the best--
 8   funny, actually I'm here next week on another case, Thursday
 9   and Friday, I think one of those is that day.  When is--
10          UNIDENTIFIED SPEAKER:  Thursday is the 13th.
11          MR. DAIN:  13th and 14th, and then you said you have
12   the 17th?
13          THE COURT:  18th.
14          MR. DAIN:  Or 18th.  Why don't we do the 18th?
15          THE COURT:  Does that work for anybody else?
16          MR. POSKUS:  Sorry, Your Honor, I was checking to
17   see if Ms. Harper can be here on the 18th, and she can be
18   here.
19          MS. DiPONIO:  Your Honor, I have a conflict.  I
20   have another matter in Jefferson County.
21          THE COURT:  What about the 24th?
22          MR. POSKUS:  The problem is that Ms. Harper can't
23   be here on the 24th.  She's already scheduled for a
24   deposition.
25          MS. DiPONIO:  Your Honor, that's okay.  Mr. DiPonio
```

300

1  can come on the 18th and I can be here for awhile and then
2  would have to leave.  He could be here in my absence, if
3  that's okay.
4          THE COURT:  On the 18th of this month?
5          MS. DiPONIO:  Yes.
6          THE COURT:  You have a conflict?
7          UNIDENTIFIED SPEAKER:  17th.
8          THE COURT:  But not here; somewhere else?
9          UNIDENTIFIED SPEAKER:  In Denver.
10         THE COURT:  Okay.  All right.  So that's not going
11  to work then.
12         UNIDENTIFIED SPEAKER:  I could do it through the
13  24th.
14         MS. DiPONIO:  And likewise, Your Honor.
15         UNIDENTIFIED SPEAKER:  Tomorrow.
16         MR. DAIN:  Tomorrow I can do, but--you know what, I
17  can fly back.  I mean if we can do it the 7th, maybe I'll
18  just--if we fly out tonight, I'll fly back tomorrow night.
19         MR. POSKUS:  Well, I can't do it the 7th, Your
20  Honor.  I'm sorry.
21         THE COURT:  All right.  So--
22         MR. DAIN:  And there's nothing on the 15th?  The 7th
23  is--
24         THE COURT:  But Mr. Poskus is out.
25         MR. POSKUS:  I can't be here.

BLACK000889

301

```
1              THE COURT:  Well, so then if we're into September,
2    the first date I have in September is the 10th?
3              MR. DAIN:  I'm in--let me make sure of that.
4              THE COURT:  Or the 11th.
5              MR. DAIN:  I'm in Japan, Your Honor.  I'm sorry,
6    the--
7              MS. DiPONIO:  can you do the 25th?
8              MR. DAIN:  Of?
9              MS. DiPONIO:  August.
10             MR. DAIN:  She--
11             MS. DiPONIO:  Your Honor, could she be available by
12   telephone if--
13             MR. DAIN:  She's (inaudible).
14             THE COURT:  All right.
15             MR. DAIN:  You can't change that deposition?
16             THE COURT:  September 18th?
17             MR. POSKUS:  See, the 18th we can do.
18             THE COURT:  Okay.  Of September?
19             MR. POSKUS:  Oh, I'm sorry, September.  Forgive me.
20             MR. DAIN:  And I'm sorry, Your Honor, that's when
21   I'm in Japan.
22             THE COURT:  Okay.
23             MR. DAIN:  And I'll be out of town.
24             THE COURT:  The 28th?
25             MR. DAIN:  September 28th.  And remember, Your
```

BLACK000890

302

1    Honor, we have to be--well, we have to be in New York for the

2    1st.

3              THE COURT:  When is the next New York court date?

4              MS. DiPONIO:  October 1st, Your Honor.

5              THE COURT:  Okay.

6              MR. POSKUS:  Your Honor, Mr. Black is not available

7    on September 28th.

8              THE COURT:  Or the 29th?

9              MR. POSKUS:  What about the 29th?  We could make

10   the 29th, Your Honor.  We have too many moving parts.

11             (Pause.)

12             THE COURT:  Well, I--it looks like we could

13   actually do September 8th, if that makes a difference.

14             MR. DAIN:  I'm sorry, say it again?

15             THE COURT:  September 8th.

16             MR. DAIN:  September 8.

17             MS. DiPONIO:  That is--

18             MR. DAIN:  We could do September 8th, Your Honor.

19             THE COURT:  Does that work for everybody else?

20             MR. DAIN:  Okay.  This is going to be outstanding,

21   because I have to be here on the 9th and 10th on that other

22   case, so we can do it the 8th and lock it in right now.

23             THE COURT:  Okay.

24             MR. DAIN:  We'll go with September 8th.

25             THE COURT:  September 8th.  Ms. Kerr is going to be

BLACK000891

303

```
 1    out of town; is that what you're saying?
 2                UNIDENTIFIED SPEAKER:  Yes.
 3                MR. DAIN:  Can we--here's what I was wondering,
 4    Your Honor.
 5                THE COURT:  Does it have to be before the 1st?
 6                MR. DAIN:  No, that part before October 1st, the
 7    actual surcharge--
 8                MS. DiPONIO:  That's the proceeding in New York.
 9                THE COURT:  But that's the appointment for a
10    guardian, right?
11                MR. DAIN:  Right.
12                MS. DiPONIO:  Well, I think the New York--and Mr.
13    Salzman can correct me if I'm wrong.  I think they're waiting
14    on a total ruling from the court here.  I could be wrong,
15    but--
16                MS. KERR:  (Inaudible).
17                MR. DAIN:  Thank you, Ms. Kerr.  And let's do it
18    before anyone else checks their calendar.
19                THE COURT:  All right.  Okay.
20                MS. DiPONIO:  At 9 o'clock then?
21                MR. DAIN:  I think we're agreed on the 8th.
22                THE COURT:  Okay.
23                MR. DAIN:  Thank you.
24                THE COURT:  All right.
25                MR. DAIN:  And I'm sorry, there's just one last--I
```

304

1   think the parties have all stipulated, we still have an issue
2   with the (inaudible), but if Ms. Wrigley--there was no
3   objection to 31,000 of her--
4           THE COURT:  I'm ordering 40.
5           MR. DAIN:  Oh, no, not Kerr.
6           MR. POSKUS:  We're talking about the reimbursement
7   to Cherie Wrigley.
8           THE COURT:  Oh.
9           MR. DAIN:  It's already been stipulated.  I just--
10          MR. POSKUS:  There was a motion filed.  It's been--
11  the motion indicates--Ms. Peterson filed a motion and
12  indicated we had no objection of--
13          MR. DAIN:  I'm just wondering how we get it if
14  there's no money in the account.
15          UNIDENTIFIED SPEAKER:  Not in the--
16          MR. DAIN:  Oh, no, there's money in the trust
17  account.  The problem--
18          UNIDENTIFIED SPEAKER:  There's only $13,000.
19          MR. DAIN:  Oh, in the estate.  Could we just ask
20  Mr. Poskus to deliver that amount, too, to Ms. Peterson, the
21  amount that we had stipulated to in addition to the 40 out of
22  the (inaudible) account and then she'll have the assets
23  payable to--
24          MR. POSKUS:  You know, Your Honor, I think we all
25  agree--and this is the conference that Mr. Dain wasn't a part

BLACK000893

305

1  of at the recommendation of Ms. (Inaudible) he thought there

2  would be an accident paying that out of the SNT. If that's

3  what--

4          MR. DAIN: No, no, you're right. That is

5  important.

6          UNIDENTIFIED SPEAKER: No, the SNT.

7          MR. DAIN: No, there is money--no, there's money--

8          UNIDENTIFIED SPEAKER: The SNT has $2 million in

9  it.

10         MR. DAIN: But how do we do that? I know you've

11  relieved Mr. Black of his--well, not relieved, but you

12  revoked his fiduciary duties, but he's the only one that

13  still has the checkbook on this Supplemental Needs Trust.

14  So--

15         THE COURT: Well, it needs to be turned over then--

16         MR. DAIN: Yes.

17         THE COURT: --to Ms. Peterson.

18         MR. DAIN: That's what I was going to say.

19         THE COURT: I'm recommending that the Surrogate's

20  Court spend its authority as the executor and that a non-

21  family executor be appointed.

22         MS. DiPONIO: And, Your Honor, as soon as your

23  order comes out, I will make sure Mr. (Inaudible) has a copy

24  of that order so that he can provide that to the court in New

25  York--

BLACK000894

306

```
 1          THE COURT:  All right.
 2          MR. DiPONIO:  --and they can take it whatever.
 3          THE COURT:  All right.  But I think the other court
 4  should be on notice as of today that he's suspended.  This
 5  can't go on.  And there's no end in sight.
 6          MR. DAIN:  Just--we were speaking of (inaudible).
 7  The problem is, I'm thinking in the Supplemental Needs Trust
 8  you've got to sell stock or assets in order to make that
 9  payment that might (inaudible).  There is 30-something
10  thousand in the estate, and that could be transferred to the
11  Supplemental Needs Trust.
12          MR. POSKUS:  I'm sorry, say that again.  I'm--
13          MR. DAIN:  Doesn't the Supplemental Needs Trust
14  have assets that would need to be sold.
15          MR. POSKUS:  I--Bernie?
16          MR. BLACK:  depending on the amount, we might have
17  a need to sell assets; it's about--
18          MR. DAIN:  It's about supplemental needs.  It's
19  about 31,000.
20          MR. POSKUS:  Yeah, but that might be that much of a
21  good asset.
22          THE COURT:  All right.  So, Mr. Black needs to turn
23  over all account checkbooks, statements, everything to Ms.
24  Peterson.  So information and checkbooks or other--whatever
25  it is that gives him authority to withdraw money.  Also
```

BLACK000895

307

```
 1    within the next ten days, with no withdrawals in the meantime
 2    I'll authorize $40,000 to Ms. Kerr and--
 3            (Pause.)
 4            THE COURT:  And I definitely wouldn't recommend if
 5    I don't have authority to order that he not be appointed as
 6    guardian.  Okay.  And then we'll have the hearing on the
 7    actual amount of the surcharge at this point on September
 8    8th.  And I will take Ms. DiPonio's request under
 9    consideration on the civil theft.
10            MS. DiPONIO:  Thank you.
11            THE COURT:  Okay.  Anything else as far as orders
12    go?
13            MR. DAIN:  Nothing.
14            UNIDENTIFIED SPEAKER:  (Inaudible).
15            THE COURT:  Right, and that seems to be working for
16    the moment.
17            UNIDENTIFIED SPEAKER:  Yes.
18            THE COURT:  So I'll just continue to authorize what
19    you've been doing, if there's no change with them and you
20    just transfer it to Ms. Peterson.  Okay.
21            MR. DAIN:  Thank you, Your Honor.
22            THE COURT:  That will be the order of the Court
23    then.
24            MS. DiPONIO:  Thank you.
25            MR. DAIN:  Thank you, so much.
```

BLACK000896

308

1         MR. POSKUS:  Thank you, Your Honor.

2         (Whereupon, the hearing was adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BLACK000897

309

```
-----------------------------------------------------------
CERTIFICATE
-----------------------------------------------------------
```

STATE OF COLORADO  )
                   :
COUNTY OF DENVER   )


      I, Suzanne H. Ben Majed, Transcriptionist for the Denver Probate Court, in the State of Colorado, do hereby certify that the above and foregoing is a transcript of the recorded proceedings, based upon the quality of the recording and my ability to understand it, taken at the date and time set forth on Page One hereof.

      DATED at Denver, Colorado, this 4th day of September, 2015.


      /s/Suzanne H. Ben Majed

      Suzanne H. Ben Majed
      Official Transcriber
      Federal Reporting Service
      17454 E. Asbury Place
      Aurora, CO  80013

BLACK000898

# EXHIBIT 39

1

PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

------------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

------------------------------------------------------------

CASE NO. 12 PR 1772

------------------------------------------------------------

IN THE INTEREST OF:

JOANNE BLACK, Respondent.

------------------------------------------------------------

   This matter came on for hearing before THE
HONORABLE ELIZABETH D. LEITH, Judge of the Denver Probate
Court, on Tuesday, September 8, 2015.  The following is a
transcript of the audible portions of that hearing as
requested by the ordering party.


APPEARANCES:  PATRICK R. THIESSEN, Esq., and BERNARD A.
        POSKUS, Esq., for Bernard Black

        LISA DiPONIO, Esq., for Joanne Black,
        Respondent

        GAYLE YOUNG, Esq., Guardian ad Litem for
        Joanne Black, Respondent

        IRA SALZMAN, Esq., Attorney for Joanne Black,
        Respondent

        ANTHONY DAIN, Esq., Trustee/cousin

        CHERIE WRIGLEY, Cousin



EXHIBIT 7
BLACK
8/23/2018
Tiffany M. Pietryak, CSR RPR CRR

2

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Respondent: | | | | |
| Pamela Kerr | 6 | 91 | 106 | 109 |

EXHIBITS

| For the Petitioner: | Received |
|---|---|

| For the Respondent: | |
|---|---|
| D | 14 |
| E through J | 64 |
| K | 73 |
| L | 78 |
| M | 79 |

BLACK000907

3

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Okay, our record is now on and the
 3   Court will call up 12 PR 1772 in the interest of Black for
 4   continued proceedings.
 5            Go ahead with appearances for the record.
 6            MR. DAIN:  Good morning, Your Honor, Anthony Dain
 7   appearing as the presence for the protected person and an
 8   interested party.
 9            THE COURT:  Thank you.
10            MS. DiPONIO:  Good morning, Your Honor, Lisa
11   DiPonio, Registration 27707, court appointed counsel for
12   Joanne Black, who is not present by telephone, Your Honor.  I
13   believe her counsel in New York, Ira Salzman, is present via
14   telephone.
15            THE COURT:  Okay.
16            MS. YOUNG:  Good morning, Your Honor, Gayle Young,
17   Guardian ad Litem, Registration number is 7217.
18            THE COURT:  Very good.
19            MR. THIESSEN:  Your Honor, Patrick Thiessen,
20   Attorney Registration 40185, appearing on behalf of Bernard
21   Black, who is seated to my right.  Also appearing is Bernard
22   A. Poskus, Registration 11975.
23            THE COURT:  Okay.  All right.  And we are here
24   today for proceedings to determine the financial aspect of
```

4

1    the surcharge claims.

2            MR. POSKUS:  Your Honor?

3            THE COURT:  Don't get up, Mr. Poskus.  I'm so

4    sorry; I know about your knee, and I am so sorry about your

5    mother.

6            MR. POSKUS:  Thank you, Your Honor.  I appreciate

7    it.  It's not been an easy past few weeks, and I just wanted

8    to make a record on something if I could.

9            THE COURT:  Very good.

10           MR. POSKUS:  My presence today shouldn't be

11   construed as a waiver of our objection to having the hearing

12   today.  I'm not able, obviously, to be lead counsel or--I've

13   helped Mr. Thiessen over the weekend somewhat, but I just

14   can't--

15           THE COURT:  Right.

16           MR. POSKUS:  --be up to (inaudible).

17           THE COURT:  And I understand that, but between the

18   out-of-state witnesses and the press of the hearing at the

19   end of this month, I just felt that I couldn't continue it

20   especially since we had such a hard time clearing this date

21   as it was.

22           MR. POSKUS:  I understand, Your Honor; I just

23   wanted to make my record.

24           THE COURT:  That's fine.

25           MR. POSKUS:  Thank you.

BLACK000909

5

```
1            THE COURT:  All right.  So how are we going to
2    proceed then in terms of--I believe we're going to start with
3    Ms. Kerr; is that right?
4            MR. DAIN:  Yes, Your Honor.  We'll present Ms.
5    Kerr, who's filed the report, but we'll go through her report
6    also to back up documents, cover any other issues, and then
7    she, in the end, will summarize what she believes the losses
8    to Ms. Black are.  And then I assume that Mr. Black is going
9    to put on his forensic accountant, Ms. Farley (phonetic),
10   unless there are other witnesses.
11           MR. THIESSEN:  I'm not aware of other witnesses
12   that may testify.
13           THE COURT:  Okay.  All right then.  Go ahead, Mr.
14   Dain.
15           MR. DAIN:  Okay, thank you, Your Honor.  So, Ms.
16   Kerr.
17           Your Honor, can I give you a binder that would help
18   today?
19           THE COURT:  All right.
20           (Whereupon, Ms. Kerr was sworn in.)
21           Thank you.  You may be seated, and then you can
22   adjust the mic as you need.
23                     MS. PAMELA KERR,
24   called as a witness herein, having been previously sworn, was
25   examined and testified as follows:
```

BLACK000910

6

1                    DIRECT EXAMINATION

2    BY MR. DAIN:

3        Q    Good morning. Ms. Kerr.

4        A    Good morning.

5        Q    And I don't know whether in your report that you

6    submitted with the Court you included a CV or--

7        A    There is a CV that was filed with my engagement

8    letter.

9        Q    Okay.  Can you just briefly go--to update

10   everybody, give us a general background of your education,

11   your experience, and testifying as an expert.

12       A    Yes.  I'm a certified public accountant since 2002,

13   a certified fraud examiner since January of 2006, and a

14   forensic CPA since July of 2009.  I have a degree from Metro

15   State University in accounting.  I've been practicing as a

16   CPA since 2000--excuse me--1990.  I've had my own business

17   for forensic accounting since 2007.  I do exclusively

18   forensic accounting, and the majority of my practice is in

19   the probate area.

20       Q    And have you testified in the past, whether in

21   deposition or in court, as an expert witness in terms of

22   forensic accounting?

23       A    Yes, I have.

24       Q    And can you briefly describe that?

25       A    I've testified in family court, probate court, and

BLACK000911

7

1   criminal cases.

2       Q    Okay.  And in this case do you know how your

3   appointment came about to perform a forensic accounting for

4   the assistance of the Court?

5       A    Yes.  The Guardian ad Litem, Gayle Young, was aware

6   of my services, actually through Carl Glatstein, and Gayle

7   contacted me at the end of January and asked me to review the

8   conservator reports, that she had some concerns about what

9   she had been provided.

10      Q    And is your understanding that your appointment as

11  a forensic accountant in this case was by stipulation of all

12  parties?

13      A    Yes, it was.

14      Q    So why don't we start with the report that I

15  believe I have as Tab A in the binder that you submitted to

16  everybody, and why don't you, if you could, run us through

17  this report which is dated June 2nd, 2015.

18      A    Okay.

19           THE COURT:  So are you offering her as an expert or

20  not?

21           MR. DAIN:  I am, Your Honor.  I didn't know there

22  was any dispute because of the stipulation, but formally I

23  am.

24           THE COURT:  All right.

25           MR. THIESSEN:  No objection.

8

```
 1          THE COURT:  All right.  And in forensic accounting?
 2  Is that--
 3          MR. THIESSEN:  Yes, Your Honor.  I apologize.
 4          THE COURT:  Go ahead.
 5          THE WITNESS:  Okay.  So the report--the tabs are
 6  set up so that A is the initial report, Tab B is the addendum
 7  that I filed, and Tab C is the motion for an accounting
 8  status hearing, which included updated schedules.  My report
 9  listed my findings and had supporting schedules:  Exhibit 1,
10  Schedule 1, Schedule 2, Schedule 2-A, and 2-B, and the
11  documents relied upon listing.
12          The addendum was prepared because after I issued
13  the report and reviewed it with Counsel, a few items were
14  brought to my attention that were in error, so I prepared the
15  addendum to correct those errors.
16          Tab C is the motion to request a status conference,
17  which includes Exhibit A-1 and A-2, which were the main
18  schedules that show the flow of the transfers from the
19  Vanguard funds and the Roth IRA.
20      Q   (by Mr. Dain)  Okay.  And in going through the Tab
21  A and B and the various schedules then, can you tell us what
22  you did in terms of conducting a forensic accounting to
23  determine from the date of death of Renata Black the assets
24  that were to go to Joanne Black and then following through to
25  as current as your report is where those assets went, where
```

BLACK000913

9

1   they are, and how the transfers were made?

2       A    Yes.  I received copies of all of the bank

3   statements and investment accounts that were provided to me

4   by Bernard Black and prepared what we call an accounting

5   reconstruction.  So, we list the date, the check number, the

6   deposit, the amount, and the ending balance so that we can

7   reconcile the ending balance of that activity to the final

8   bank statement.  As a result of reconstructing the 25 bank

9   accounts, I prepared a summary schedule that summarized all

10  of that activity.

11      Q    And that summary schedule is?

12      A    Actually in that tube right there.  If I may?  And

13  I apologize; this is huge, but it was the only way to get it

14  printed.

15          THE COURT:  There were 25 bank accounts?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.

18      Q    (by Mr. Dain)  And before you do that, because that

19  did come up, can you just tell us a little bit about--if you

20  can--why there were 25 bank accounts, where generally these

21  accounts were, and the function of those 25 accounts?

22      A    There were four--well, if you don't mind, this is--

23  I have one of these for--

24      Q    Do you have copies for everyone?

25      A    Yes, I do.  And again I apologize, but (inaudible)

10

1   Anthony and opposing counsel.

2      Q    And, by-the-way, is this larger document a document

3   within your binder anywhere or--

4      A    It is not.

5      Q    Okay.

6      A    There was no way to put it in a document that I

7   could scan in.

8         MR. DAIN:  Can we mark this as--Exhibit D I think

9   would be the next in order, Your Honor?

10         THE COURT:  All right.

11         MR. THIESSEN:  I'm going to need some more--

12   Objection, Your Honor.  Foundation.

13         MR. DAIN:  Well, yeah, I'm just marking it for

14   identification.

15         THE COURT:  Okay.

16         MR. THIESSEN:  What is it?  I'm sorry.

17         MR. DAIN:  D.

18         MR. THIESSEN:  Thank you.

19      Q    (by Mr. Dain)  And so getting to Mr. Thiessen's

20   objection, let's lay the foundation.  Can you tell the Court

21   and the parties what this is?

22      A    Yes.  This is a summary of all of the activity of

23   the 25 accounts that I was provided, and this only goes

24   through December 31st, 2014, because prior to the June

25   hearing I was not provided any activity for 2015.

11

1    Q    Do you know why that was you were not provided any

2    activity?

3    A    Mr. Black told me that was outside of the scope of

4    my audit.

5    Q    Okay.  So, as of the period through December 31st,

6    2014, tell the Court if you could, going through this, what

7    these are, what the columns are and the rows are.

8    A    Okay.  So, Columns D through I were--excuse me--D

9    through F were the original accounts held by Renata Black.

10   The Fidelity account, the original Vanguard account; you'll

11   hear me reference Account number 0635, Account 2985, and the

12   Roth IRA, which is Account number 9277.

13   Q    I'm sorry, the Fidelity account is in Column C

14   actually, right?

15   A    Yes.

16   Q    Okay, so--

17   A    C through F.

18   Q    Okay.  So as of the date of death of Renata Black,

19   if you go down to Row 6 where it says, "Beginning balance,"

20   and you follow C, D, E, and F, those would be the liquid

21   accounts that were held by Renata Black outside of the estate

22   of Renata Black.

23   A    Correct.

24   Q    Okay.

25   A    Those were the accounts that were all payable on

12

1    death to Joanne Black.

2         Q    Okay.

3         A    The next two accounts were accounts that were

4    listed on the inventory--well, Account number 2425.  So,

5    these are all other bank accounts, and I can walk through the

6    activity in each one.

7              The account in Column K and L are the two estate

8    accounts that were opened by Bernard Black to receive the

9    Vanguard funds from Account number 0635 and 2985.

10        Q    So, Columns D and E?

11        A    Correct.

12        Q    Okay.

13        A    Column M is the estate Roth IRA account that was

14   opened to receive the original Roth IRA funds in Column F,

15   Account number 9277.

16             Columns N and O are the estate accounts of Renata

17   Black.  Column--

18        Q    Just before you go--do you know why there were two

19   additional estate accounts?

20        A    I do not know that.

21        Q    Okay.

22        A    There were transfers from one to the other, but I

23   don't know why Account number 4978 in Column L was opened.

24        Q    Okay.

25        A    Column Q is a 2013 trust checking account that was

BLACK000917

13

1    opened by Bernard Black as well as Column R, which is another

2    2013 trust account.

3         Column S is an account opened by Bernard Black in

4    his name, and he had stated multiple times that the reason it

5    was in his name and not Joanne Black's name is that she had

6    never gone into the bank to add her name to the account.

7         Account numbers--excuse me--Columns U through W are

8    accounts that Joanne Black opened personally that are in her

9    name only.

10        Column X is the Supplemental Needs Trust that was

11   opened by Bernard Black--one of the Supplemental Needs Trust

12   accounts that was opened by Bernard Black for Joanne Black.

13        Column Y and Z are the Supplemental Needs Trust

14   brokerage accounts that received the two-thirds of the

15   Vanguard Account 0635 and 2985.

16        Column AA is the Supplemental Needs Trust checking

17   account opened by Bernard Black for Joanne Black.

18        Column AB is the second Fidelity account opened in

19   which the funds from the original Fidelity account were

20   transferred into.

21        And Column AF is the Issue Trust into which the

22   funds from the Vanguard Accounts 0635 and 2985 were

23   transferred into.

24   Q    Okay.  And then if you go down the rows tell us

25   what they--I mean, I don't know that you have to go down

BLACK000918

14

1  through each single one, but what's the purpose of the rows
2  on the left-hand side?
3      A    It might be easier if I go through this.  The
4  columns in the Vanguard accounts are actually on a schedule
5  included under Tab C.  That might be a lot easier to see.
6      Q    Okay, do you want to do that first?
7      A    If you want to do that, that's fine.
8      Q    However you want to do it.
9      A    Yeah, it's easier to look at.
10          MR. DAIN:  Okay.  But before we do that, Your
11  Honor, unless there's an objection can we admit Exhibit D as
12  a summary spreadsheet of the 25 accounts made by Ms. Kerr?
13          MR. THIESSEN:  I'm sorry, Tony; did you move to
14  admit it?
15          MR. DAIN:  Yes.
16          MR. THIESSEN:  No objection.
17          MR. DAIN:  Okay.
18          THE COURT:  D is admitted.
19          (Respondent's Exhibit D was received in evidence.)
20      Q    (by Mr. Dain)  Okay, so now you said you wanted to
21  go to Tab C.
22      A    Correct.  Exhibit A-1, which lists the transfer of
23  all the Vanguard accounts into the estate--the second estate
24  account.  So, we will be looking at Columns D, E, K, and L.
25  So it's Tab C, Schedule A-1.

BLACK000919

15

```
 1      Q    Okay, and why don't you then go through that.
 2           MR. THIESSEN:  I'm sorry; I lost which one.
 3           THE WITNESS:  Tab C, which is the Motion for a
 4  Status Conference.
 5           MR. THIESSEN:  Yes.  Thank you.
 6           THE WITNESS:  And behind that is a scheduled
 7  titled, "Schedule A-1."
 8           MR. THIESSEN:  Thank you.
 9           THE WITNESS:  You're welcome.
10           THE COURT:  Mr. Dain, I think it would make a
11  little more sense if she summarized it first before we get
12  into the specifics.
13           MR. DAIN:  Okay.
14           THE COURT:  I think it'll just flow a little easier
15  if we all understand where we're going with it.
16           MR. DAIN:  Okay.
17           THE COURT:  Thank you.
18           THE WITNESS:  Exhibit A-1 is the flow of the assets
19  from the accounts that were payable on death to Joanne Black
20  on the date of death out of those accounts into the first
21  estate account then into the second estate account and then
22  two-thirds into Joanne's Supplemental Needs Trust and
23  one-third into the Issue Trust.
24      Q    (by Mr. Dain)  So, is it fair to say--I notice that
25  if you look on the left on Column B down where it says,
```

BLACK000920

16

1    "3/18/2013," which is March 18th, 2013, it indicates that

2    there's a transfer of approximately two million one hundred

3    sixty-two thousand.  Do you see that?

4        A    Correct.

5        Q    So, is it fair to say that these are the

6    first--these are the transfers that occurred on or about the

7    time when the disclaimer was acted upon?

8        A    Correct.

9            MR. DAIN:  Okay.  I'm sorry; go ahead.

10           And, Your Honor, just for fairness, because this is

11   a forensic report that was prepared by a stipulation for the

12   parties and the Court, at any time if you want a summary or

13   if you need more information, that's the purpose of this.

14           THE COURT:  All right.

15           MR. DAIN:  So, please feel free to--

16           THE COURT:  Let me just clarify.  So there's an

17   actual dispute about the number at this point?  Is that it?

18           MR. DAIN:  No.  As far as we can tell, Your Honor,

19   the problem arises in that the defense wanted an accounting

20   that assumed that the transfers pursuant to the disclaimer

21   were proper and therefore all that should be accounted for is

22   what wasn't two-thirds/one-third pursuant to the disclaimer.

23           Then there's a second issue that the defense is

24   claiming that there were some errors or disagreements in how

25   the accounts--or monies were allocated.  In other words, if

17

1    there were attorneys' fees spent by Mr. Black does he get
2    credit for those, or are those on his own dime?  So, in other
3    words, if Mr. Black pays Mr. Glatstein, Mr. Callahan in New
4    York, does he get a credit for that?  I think that's where
5    all these disputes arise.
6              THE COURT:  Okay.
7              MR. DAIN:  But we don't honestly know, and maybe if
8    Mr. Poskus or Mr. Thiessen can say what their exact issues
9    are, the numbers as I see them, as Ms. Kerr put them together
10   are just factual.
11             THE COURT:  Yeah.
12             MR. DAIN:  They just show where the money went.
13   And if the Court finds that there was a breach of fiduciary
14   duty, the Court can follow these numbers and say this is the
15   amount that needs to go back.  Of course, there are interest
16   issues and things like that.
17             THE COURT:  Yeah.
18             MR. DAIN:  I'm just doing this because--you have
19   the report because I'm not really sure what other issues the
20   defense has.
21             THE COURT:  All right.  Let's take a moment then
22   and try to get this nailed down.
23             MR. DAIN:  Okay.
24             THE COURT:  All right?
25             MR. DAIN:  Yes.

BLACK000922

18

```
 1          THE COURT:  So, Mr. Thiessen, what's going on with
 2     this?
 3          MR. THIESSEN:  I would say we don't know where Ms.
 4     Kerr's number is, Your Honor.  I think there's apparently--
 5          THE COURT:  What do you mean?  What's the dispute?
 6          MR. THIESSEN:  Her report--
 7          THE COURT:  Is there a dispute about--
 8          MR. THIESSEN:  --doesn't ever state a summary of
 9     the damages that Bernard Black caused.  There is no summary.
10     The closest she gets is in the first one June 2nd, where she
11     says the damages were in a range of five hundred-some
12     thousand to seven hundred forty-eight thousand.  There is no
13     other summary conclusion of damages in her other reports,
14     Your Honor.
15          MR. DAIN:  Your Honor, if it would help--that was
16     going to be our final point.  And we talked about this.  We
17     were concerned this might take all morning going through all
18     this.  All of this the Court should have, all of this as
19     backup.  What we can do is cut to the chase, and we have a
20     document that essentially is a calculation of damages that
21     Ms. Kerr can present to the Court, to the defense.  We can go
22     through that first and Mr. Thiessen and Mr. Poskus can see
23     exactly how these damages are calculated.  But if that's the
24     only issue, or the main issue, let's do that first.
25          MR. THIESSEN:  We've never seen that document, Your
```

BLACK000923

19

 1   Honor.

 2            MR. DAIN:  Well, but it's all based on just the

 3   straight numbers--

 4            THE COURT:  Yeah.

 5            MR. DAIN:  --which we have.  The only dispute has

 6   been do they agree that the one-third, for instance, that was

 7   transferred to the Issue Trust from Vanguard is somehow

 8   subject to the Court's unwinding or order of surcharge.

 9            Let us go through it, and if they have an issue,

10   they can point out where they disagree.  That will make it so

11   much easier, and then we could just--they can look through

12   all of these exhibits that I believe are part of the--they're

13   not part of the court record; they're certainly summaries of

14   what's part of the court record.

15            MR. THIESSEN:  I think the fundamental difference,

16   Your Honor, is there's two pots of money.  There's the amount

17   that was POD that the disclaimer dealt with.  Then there's an

18   amount that the estate received to which Joanne Black is only

19   entitled to two-thirds under the will.  There's over a

20   million dollars in assets that were in the estate of Renata

21   Black in which the disclaimer issue did not affect.  So, I

22   think there's--aside from the calculation of the damages as a

23   result of the disclaimer, we have fundamental disagreements

24   with Ms. Kerr's calculation of what the estate was

25   constituted of and Joanne Black's--the calculation of the

BLACK000924

20

1    two-thirds that should have gone to the S and T for Joanne

2    Black.

3           MR. DAIN:  So let me address that.  Then the easier

4    part, of course, is the amount that came from the paid on

5    death benefits.  That should be pretty easy to figure out,

6    two-thirds/one-third; the Roth IRA, those are easy to figure

7    out.

8           THE COURT:  Right.

9           MR. DAIN:  I think what Mr. Thiessen is saying is

10   that the residual assets that were in the estate were

11   supposed to go pursuant to the will, which Your Honor

12   recognized, we all agree, two-third/one-third.

13         THE COURT:  Right.

14         MR. DAIN:  What is not disputed is that Ms. Kerr

15   and Ms. Harper both find there's a shortfall there.  It

16   didn't go two-thirds/one-third.  Here's where the rubber

17   meets the road.  Ms. Kerr has gone through that and said,

18   Here are the amounts that should have gone.  We're not

19   crediting payments to New York attorneys to fight for

20   guardianship, payments for Mr. Black's taxes, payments that

21   are for his attorneys that are not for the benefit of Joanne

22   Black.  And the only difference is I think Ms. Harper comes

23   out to about a hundred-and-some thousand and Ms. Kerr comes

24   out to two hundred-and-some thousand.

25         Additionally, Ms. Kerr has gone through and done

21

```
 1    tax analysis where, under the will and the trust, Mr. Black
 2    was required to minimize the taxes.  So, what he did is he'd
 3    make a payment out of the estate that should have been made
 4    in a payment out of the trust.  The trust didn't get the
 5    benefit of a write-off, so it paid additional taxes, so she'd
 6    send those analyses.  We can get to the heart of that if
 7    that's the only issue.  But there's no disagreement that the
 8    estate itself--the residual estate still fell short to Joanne
 9    Black.
10            MR. THIESSEN:  No, I disagree.
11            MR. DAIN:  Well, we'll see.  We'll see.  I mean, I
12    looked at Ms. Harper's reports.  She doesn't deny it.
13            THE COURT:  All right.  Well, let's start with the
14    easy thing first then.  Let's deal with the Vanguard, the
15    stuff that was in the POD accounts.
16            MR. DAIN:  Okay.
17            THE COURT:  Is there a dispute there, Mr. Thiessen?
18            MR. THIESSEN:  Yes, Your Honor.
19            THE COURT:  What's the dispute?
20            MR. THIESSEN:  The dispute is how you value what
21    was transferred to the Issue Trust.
22            THE COURT:  What's the value?  Why do we have to
23    value it?
24            MR. THIESSEN:  Your Honor, there's multiple assets
25    that were transferred and different dates on which they were
```

BLACK000926

22

```
 1   transferred.
 2            THE COURT:  So?
 3            MR. THIESSEN:  That impacts the amount that Joanne
 4   Black would have received--that Joanne Black was damaged
 5   pursuant to your Court's order.  It isn't a simple accounting
 6   these are the numbers, Your Honor--
 7            THE COURT:  Why not?
 8            MR. THIESSEN:  --with all due respect.
 9            THE COURT:  But why not?
10            MR. THIESSEN:  Because the transfers were not that
11   clear.  Additionally, Your Honor, Joanne Black was only
12   entitled to 95 percent of the POD that was transferred.  The
13   amount that was transferred to the Issue Trust was 98
14   percent, so there needs to be a reduction for that 3 percent.
15            In the reports that Ms. Kerr's provided, to my
16   knowledge she hasn't accounted for that.  I wish it were that
17   simple, Your Honor, that it was a straight accounting, but it
18   is not.
19            THE COURT:  But I don't understand--I mean, what is
20   the value?  I don't understand what your issue with the value
21   is.
22            MR. THIESSEN:  Well, so Mr. Black transferred
23   money, as I believe Ms. Kerr testified, from Renata Black--
24            THE COURT:  Yeah.
25            MR. THIESSEN:  -- into estate accounts in March of
```

23

```
 1   2013.
 2              THE COURT:  Right.
 3              MR. THIESSEN:  Pursuant to the disclaimer.
 4              THE COURT:  Those were hard numbers.
 5              MR. THIESSEN:  Yes.  He then after, in May of
 6   2013--excuse me, June of 2013, transferred--divided what was
 7   then in the estate, two-thirds to the SNT, one-third to the
 8   Issue Trust in June of 2013.  I don't believe Ms. Kerr
 9   calculates that amount correctly, but that issue aside--
10              THE COURT:  How could it not be calculated
11   correctly?
12              MR. THIESSEN:  I believe she erred, Your Honor.
13              THE COURT:  In terms of the--
14              MR. THIESSEN:  I'll get to that in my cross-
15   examination.
16              THE COURT:  Are you talking about plus and minus
17   errors?
18              MR. THIESSEN:  Virtually.  She doesn't disclose--
19   honestly, Your Honor, it's going to come out on cross-
20   examination, but she doesn't tell me the dates in which she's
21   valuing what the Issue Trust received.  She doesn't put that
22   in her prior reports.  I believe she has--
23              THE COURT:  Valuing.
24              MR. THIESSEN:  --a revised schedule that I'm seeing
25   for the first time now.
```

24

```
 1          THE COURT:  Yeah, I'm having a hard time
 2   understanding what you mean by valuing.  Valuing to me means
 3   something different than I took five dollars out of this
 4   account and put five dollars out of that account.
 5          MR. THIESSEN:  Right.  No, it--perhaps I'm misusing
 6   the term "value."  It is the date--our expert will present
 7   testimony as to the value of what the Issue Trust received,
 8   which Your Honor can use as a damages calculation for the
 9   one-third.
10          THE COURT:  Value of what it--but what is the--I
11   don't understand this value thing, okay?  A value--
12          MR. THIESSEN:  The amount.  The amount, Your Honor.
13          THE COURT:  Okay.
14          MR. THIESSEN:  The amount we used versus what they
15   use are different.
16          THE COURT:  Okay.  Because the five dollars changed
17   somehow when it got transferred?
18          MR. THIESSEN:  The five dollars is being valued at
19   a different--the amount that is being used to determine is as
20   of a different date.
21          THE COURT:  Five dollars is still five dollars.  I
22   don't understand.
23          MR. THIESSEN:  Well, it circles back to the larger
24   concept that we're trying to achieve, pursuant to your
25   Court's order, in making Joanne Black whole.
```

BLACK000929

25

```
1          THE COURT:  I'm just interested in what the numbers
2    are.  I really am not understanding the value thing.
3          MR. THIESSEN:  Well, with all due respect, Your
4    Honor, I would like to know Ms. Kerr's number before I make a
5    statement with respect to that.  I don't know her number.
6    What is she going to say the Issue Trust received that Joanne
7    Black should have received?
8          THE COURT:  Okay.  So maybe that's what we need to
9    do.  Let's just nail down the hard numbers.
10         MR. DAIN:  Okay.  So let me just ask Ms. Kerr
11   what's the best way for you to nail down the hard numbers,
12   what was transferred from Vanguard--the various Vanguard
13   accounts into the Issue Trust or into the estate and then
14   somehow didn't get to the Issue Trust that was transferred
15   otherwise.
16         THE WITNESS:  Schedule A-1 under Tab C, which
17   opposing counsel would have received when it was filed with
18   the Court.
19         THE COURT:  Okay.
20         MR. DAIN:  And that would show--
21         THE WITNESS:  It is so clear.
22         MR. DAIN:  Yeah.  It would show--
23         MR. THIESSEN:  Excuse me.
24         MR. DAIN:  --the dates of transfer--
25         MR. THIESSEN:  Excuse me.  Sorry to interrupt.  You
```

BLACK000930

26

1   were saying Exhibit A-1?

2               THE WITNESS:  Um-hm.

3               MR. THIESSEN:  Okay.

4               THE WITNESS:  No--yes.

5               MR. DAIN:  No, no, no.

6               THE WITNESS:  Exhibit A-1 under Tab C.  Correct.

7               MR. DAIN:  Yeah, and Tab C was the report that you

8   initially filed with the Court or--

9               THE WITNESS:  No.

10              MR. DAIN:  --subsequent?

11              THE WITNESS:  The Tab C is the request for a status

12  conference on the accounting matters.  It was my effort to

13  lay out what I considered to be the accounting matters.  Here

14  are the transfers, here are--this is where the money started,

15  this is where the money ended, and these are the values of

16  the dollar of the transfers.  It's dollars.

17              THE COURT:  Straight dollars.

18              THE WITNESS:  It's straight dollars.

19              MR. DAIN:  And that was provided to the Court and

20  the parties--

21              THE WITNESS:  Correct.

22              MR. DAIN:  --months ago.  Okay.  So this is not a

23  new document.

24              THE WITNESS:  This was filed on July 15th.

25              MR. DAIN:  Okay.

BLACK000931

27

```
 1            THE WITNESS:  But it was also part of the original
 2    report, which is Exhibit A in the original report.
 3            MR. DAIN:  Okay.  But why don't we then just go
 4    through Schedule A-1 and see what the actual numbers are that
 5    were transferred, and we'll get to the bottom of where Mr.
 6    Thiessen agrees, whether he calls it value or amounts, but
 7    why don't we walk through this.
 8            And, Your Honor, again I would hope this is an
 9    iterative and interactive process, because we all want to
10    make sure we have the right numbers.
11            THE COURT:  Okay.
12        Q    (by Mr. Dain)  So, go ahead and start and tell us.
13        A    Okay.  Column D on Exhibit A-1 under Tab C is the
14    activity in the original Vanguard account number 0635.  The
15    original amount, the increase in the value, the ending
16    balance, transfer--the first transfer to Bernard Black's
17    child, the increase in value, the ending balance as of
18    3/17/2013 is on Line 7, the increase in value prior to the
19    transfer and the transfer to the estate account number 3864.
20        Q    Okay, so let's stop right there.  So, on March
21    18th, 2013, from the paid on death benefits in the account
22    number 0635, $2,162,932 was transferred into this estate
23    account, 3864, by Mr. Black.
24        A    Correct.
25            THE COURT:  Okay, but Line 5, the transfer, is that
```

28

1    the 5 percent or whatever?

2              THE WITNESS:  That's 1 percent.

3              THE COURT:  That's 1 percent.

4              THE WITNESS:  And if you look at Tab E, you'll see

5    the detail of this account activity reflecting this.

6       Q     (by Mr. Dain)  Okay.  So, Tab E is just a more

7    detail of day-by-day transactions in the account?

8       A     Excuse me--yes, it's Tab D.

9       Q     D?

10             THE COURT:  But is there an agreement that 95

11   percent was to go to Joanne and the 5 percent was to go to--

12             MR. DAIN:  There's an agreement that that's what

13   the paid on death benefits called for, yes.

14             THE COURT:  Okay.

15             MR. DAIN:  And what happened is you--I believe you

16   heard the testimony, Your Honor, is two of the children said,

17   We want our money now, the 1 percent, and then three of them

18   signed another type of disclaimer in order to get it at a

19   later date.

20             THE COURT:  Right.

21             MR. DAIN:  So this would--21,000 would have been

22   the transfer to one of the children.

23             THE COURT:  Oh, I thought that they got them all

24   signed.  That was not correct then?

25             MR. DAIN:  No.  They were--

BLACK000933

29

```
1           MR. THIESSEN:  They've all signed--
2           MR. DAIN:  I'm sorry; Mr. Thiessen?
3           MR. THIESSEN:  Your Honor, Exhibits 45 through 49
4      are the disclaimers.  What happened, Exhibit forty--have to
5      look--46 and 48 I believe, under those Benjamin Black and
6      David Black received their 1 percent but disclaimed the
7      remaining balance from the POD accounts.  Because, you may
8      remember, there was testimony that if there was only the
9      disclaimer of Joanne Black, it would blow up to 20 percent
10     for each of the five children.  They disclaimed that
11     remaining amount.  The other three children disclaimed the
12     interest entirely and Mr. Black had those flow into the Issue
13     Trust, the 3 percent that were not disclaimed by the other
14     three children.  So, in other words, the Issue Trust received
15     3 percent that it shouldn't have--that Joanne Black should
16     not have received, because she only got 95 percent of the POD
17     account.
18          Q    (by Mr. Dain)  Okay.  So, as I understand it, what
19     this issue is is that 98% of the paid on death benefits that
20     went into the estate account were then distributed apparently
21     two-thirds/one-third I'm understanding, so we'll just go by
22     the issues.  One issue is there may be a claim that there's
23     another 3 percent that goes to the children, 1 percent each.
24     And, Ms. Kerr, you're aware of that.
25          A    I understand now what he was saying, yes.
```

30

1          THE COURT:  Part of the problem I'm having is that
2     the probate court in New York is going to have to sort
3     through some of this.
4          MR. DAIN:  Right.
5          THE COURT:  And I think my job really is to, if I
6     can, determine what the numbers were supposed to be had the
7     disclaimer not occurred.
8          MR. DAIN:  Right.
9          THE COURT:  And then the finer details of this
10    other piece that Mr. Thiessen is describing I think is going
11    to have to be dealt with by probate court.
12         MR. DAIN:  Right, because as it happens now there's
13    a disclaimer, and so the 98 percent was what was transferred.
14    But at least we've identified that one issue.
15         THE COURT:  Right.
16         MR. DAIN:  Okay.  So now we know--
17         THE COURT:  I'm sorry; Mr. Thiessen's trying to--
18         MR. THIESSEN:  Thank you.  I appreciate your
19    comment, Your Honor.  Then there's not going to be a final
20    judgment if we're relying on the New York court to deal with
21    the finer details.
22         THE COURT:  Well right, and that's what I was
23    trying to say the last time.  I mean, to a certain extent
24    I've been boxed in here.  I can't make any other equitable
25    determinations based on your position, which is fine.  So,

BLACK000935

31

1    somebody is going to have to decide that at some point or you
2    guys are going to have to work it out.
3              MR. THIESSEN:  Right.
4              THE COURT:  I don't see it getting worked out
5    outside of court proceedings at this point, so I think what
6    I'm going to have to do is I'm going to have to proceed as if
7    the disclaimer hadn't occurred, nail down those numbers as
8    best I can, and then just the finer details of these other
9    transactions as to what children disclaimed and received or
10   didn't or what percentage--because that part of it actually
11   went through the estate, right?
12             MR. THIESSEN:  Yes.
13             THE COURT:  Right, so I think that court is going
14   to have to make those determinations.
15             MR. THIESSEN:  And I'll be very brief, Your Honor.
16   The issue, though, is to make Joanne Black whole, I believe,
17   pursuant to your Court order, and Mr. Black made--once he had
18   the disclaimer, he made decisions with respect to the estate
19   based on that and in calculating the two-thirds/one-third
20   that Joanne should otherwise receive.  So, I'll sit down, but
21   that's going to be our position.
22             THE COURT:  But I don't think I can do anything
23   about that.
24             MR. DAIN:  Your Honor, I--
25             THE COURT:  It's been made quite clear to me that I

BLACK000936

1    don't have jurisdiction.  I thought I did have some--I still

2    do think I have some jurisdiction, but because of the way

3    it's being postured at this point, I don't have authority to

4    make any decisions about how the New York estate is being

5    divvied up.  That court is going to have to deal with it.

6            MR. DAIN:  And, Your Honor, so I recognize there

7    are two possibilities that can happen.  One, if we agree that

8    3 percent is somehow owed to the children, that's a

9    calculation.  That could be done by stipulation; we're fine

10   with that if that's what--

11           THE COURT:  But we're not getting any stipulations

12   on this case.

13           MR. DAIN:  I know.  Well, but that 3 percent if

14   that in fact turns out to be their issue and we agree with

15   that, I don't know, we'll both do the calculations.

16           THE COURT:  Right.

17           MR. DAIN:  We could, but--

18           THE COURT:  Let's just go through this as if the

19   disclaimer hadn't occurred.

20           MR. DAIN:  Yeah.  I just need to say the other

21   issue is that he made decisions like paying his children's

22   student loans.  That's on him; that's not a hard calculation

23   of numbers.  That's an entirely separate issue.

24           MR. THIESSEN:  But, Your Honor, if I might suggest

25   it's at least possible we could take an hour, learn what

33

1   their number is, and make some stipulations.  It's possible.

2   It sounds like we reached some ground on the 3 percent at

3   least.

4           MR. DAIN:  Well, I don't know yet.  Let's do it at

5   lunch.  We're okay with that if we can.  Let's just get

6   through these hard numbers.

7           THE COURT:  Yeah, I think we need to make the

8   record, Mr. Thiessen, because otherwise we're going to be

9   another hour behind.

10          MR. THIESSEN:  Okay.

11      Q    (by Mr. Dain)  Okay, so where we were is I believe

12  there was the $21,500 and that you show in Column D as

13  transferred to one child.  What was left after that that was

14  transferred out on March 18th, 2013, was 2,162,932, so follow

15  from there.

16      A    Correct.  The details of that are listed under Tab

17  D that--never mind.

18          So, Column E is the second Vanguard account, number

19  2985, that was also the original balance, the increase, and

20  on March 18th was also transferred to the new estate account,

21  number 3864, on Line 10.

22      Q    Okay.  And before that I see there's a transfer to

23  Bernard Black's children on Line 5 in that account as well?

24      A    Correct.

25      Q    Or to child--

BLACK000938

34

1    A    That's the 1 percent on Line 5--

2    Q    Okay, this--

3    A    --and--

4    Q    Sorry; this one is 7,421?

5    A    Correct.

6    Q    Okay.  Do you know why that's different from the

7  other two?  I mean from the 21,000 that was in Column D?

8    A    I do not know how he calculated the amounts

9  transferred.

10   Q    Okay.  So now we have two transfers then into the

11  estate account from these paid on death.  One was 2,162,932;

12  the other was 723,292.

13   A    Correct.

14   Q    Okay.  Continue from there.

15   A    So, the balance that was transferred is on Line 17,

16  2,886.224.  On 3/25, $718,000 was transferred into a new

17  estate account, number 4978, which I don't know why the

18  second estate account was opened.

19   Q    Okay.

20   A    Again, increase in value, the balance according to

21  the account statements, another transfer into the estate

22  account number 4978.  And again in June, on Line 26, June

23  17th, 18th, and 25, balances were transferred out of the

24  second estate account, Column I, into the Issue Trust, and

25  balances on June 17th were transferred out of the original

BLACK000939

35

1    estate account, 3864, into Joanne Black's account.

2              Let me take a step back.  When I was trying to

3    reconcile this, the transfers out of Account number 3864 and

4    4978 they didn't have dollar amount transfers.  A lot of

5    times they just had the stocks transferred or--and they went

6    into various accounts.  I never had a statement that showed

7    me from this account--Vanguard used what they call like

8    interim accounts.  So, the funds went from the two estate

9    accounts into the Issue Trust and the Supplemental Needs

10   Trust, but as you'll see on Lines 32, there was a difference

11   between what was transferred out and what was originally--

12   what was started out in the Issue Trust and the Supplemental

13   Needs Trust, and I could never get those accounts to

14   reconcile 100 percent.

15        Q    And was this because there were stock transfers and

16   then there either were differences in value after that, or

17   the stocks were sold and they're--

18        A    There were no stocks sold.  The stocks transferred.

19   You can look at the individual tabs to see the activity, but

20   basically the majority of the account in 3864, Column H, was

21   transferred into the Supplemental Needs Trust and the balance

22   that went into Account number 4978 was transferred into the

23   Issue Trust.

24        Q    Okay.

25        A    So, for some reason a second account, Account

BLACK000940

36

1   number 4978, was opened and that is what was used to transfer

2   the money into the Issue Trust.

3       Q    Okay.  So, if we go down to Columns 32, 33, and 34

4   and we start--I mean, Column L and Row 32, 33, 34, you'll see

5   that there's a balance in the Issue Trust of 1,002,635, and

6   then there's a difference in the transfer of 12,979, and

7   that's how you get to 1,015,614.

8       A    Correct.

9       Q    Okay.

10      A    And if you look at Tab H, you'll see the beginning

11  balance for the Issue Trust of 1,015,614.

12      Q    Okay.  So, that's the hard number that was

13  transferred that you're noting was transferred into the Issue

14  Trust and that's the opening balance?

15      A    Correct.

16      Q    Okay.  And then the other one, on Column M, is what

17  was transferred into the Supplemental Needs Trust account for

18  Joanne Black.

19      A    Correct.  And if you look at Column I, you'll see a

20  statement that reflects that balance as well.

21      Q    Did you say Column I or Tab?

22      A    Excuse me--Tab I.

23      Q    Okay.  So, the hard numbers we're talking about is

24  the 1,015,614 from the paid on death benefits to Joanne

25  Black.  That's the amount that was transferred into the Issue

BLACK000941

37

```
 1   Trust.
 2        A     Correct.
 3        Q     That's the starting balance.  Okay.  Now, there was
 4   another account that held a Roth IRA, correct?
 5        A     Correct.
 6        Q     And where would we find what happened to that?
 7        A     On the next page, which is Exhibit A-2.
 8        Q     Schedule A-2?  Is that how I have it?
 9        A     Yes; it's tabbed as Schedule A-2.
10              MR. DAIN:  Okay, and it's Exhibit A-2.  Okay.
11              Now, Your Honor, these are already documents that
12   you have in filings.  Do you want to make these new exhibits,
13   or can we just refer to them as included within--in this case
14   it's a motion to request status conference re: accounting
15   matters.
16              THE COURT:  Right.  So, in Colorado they're not
17   technically evidence just because they've been filed with the
18   Court, and they have to be admitted into evidence formally--
19              MR. DAIN:  Okay.
20              THE COURT:  --unless stipulated.
21              MR. DAIN:  Okay, unless it's stipulated that that's
22   admitted into evidence, I'd like these two as the next in
23   order, either Exhibit or Schedules A-1 and A-2 to that
24   motion.
25              MR. THIESSEN:  What are you offering?
```

BLACK000942

38

```
1           MR. DAIN:  I'm offering what you're looking at as
2    Exhibits A-1 and A-2 to the Motion to Request Status
3    Conference Re: Accounting Matters filed by Ms. Kerr as the
4    exhibits next in order, which I believe would be E and F.
5           FEMALE SPEAKER:  Right.  A-1 would be E, and A-2--
6           MR. THIESSEN:  Well, Your Honor, I don't think I
7    have an objection except to the extent what I'm given by Ms.
8    Kerr in the notebook, Exhibit A-1 has some handwritten notes
9    at the top that were not included in the filing with the
10   Court--
11          THE COURT:  Okay.
12          MR. THIESSEN:  --which I'm holding.  So, I want to
13   be sure we have what the exhibit is, because obviously the
14   calculations could have been changed as well.
15          So what exactly are you offering?
16          THE COURT:  Well, first, before we do that--
17          THE WITNESS:  If you look at the date stamp on the
18   bottom, "7/14/2015, 7:29 p.m.," it hasn't been changed.
19          THE COURT:  In the red, handwritten things?
20          THE WITNESS:  And I just wrote the Tab E, Tab F for
21   my reference and your reference.  So I apologize; you can--
22          THE COURT:  Oh, relating to the other tabs in this
23   book?
24          THE WITNESS:  Correct.
25          THE COURT:  Okay.
```

BLACK000943

39

1            MR. DAIN:  So that handwriting would just relate to

2       what tab you would find in the book we submitted to the

3       Court, the background information from the account.

4            THE COURT:  Okay.  So you're looking to admit then

5       schedules of Exhibit C, Schedules A-1, A-2, and then D, E, F,

6       G, H, and I to support it?

7            MR. DAIN:  If those so far have been the ones that

8       have been referred to as supporting these accounts, yes.

9       Does that match so far, Ms. Kerr?

10           THE WITNESS:  Correct.

11           MR. DAIN:  Yes.

12           THE WITNESS:  And I apologize; Column D should

13      actually say Tab E.  I was arranging these last night.  So to

14      have them filed as exhibits, Exhibit A-1 and Exhibit A-2, B,

15      D, and E.

16           FEMALE SPEAKER:  So it would be E and F.

17           THE WITNESS:  Yeah.  And if you would like, we can

18      submit the accounting reconstructions and the supporting bank

19      statements as well.

20           MR. DAIN:  Yeah.  I think that would help the

21      Court.  So, the other tabs we'll have to admit as exhibits

22      next in order as well.

23           FEMALE SPEAKER:  Tony, could you just mark

24      (inaudible), because I upload them.  I want to make sure

25      (inaudible).

40

```
 1            MR. DAIN:  Yeah, so this--what was exhibit or
 2   schedule--
 3            FEMALE SPEAKER:  So, A-1 would be--
 4            MR. DAIN:  E.
 5            FEMALE SPEAKER:  --Exhibit E.  You would propose
 6   A-2 F.
 7            MR. DAIN:  Yes.
 8            FEMALE SPEAKER:  What would be--
 9            MR. DAIN:  D--or Tab D.  Is that right?  Or go
10   through them; I'm sorry.
11            THE WITNESS:  Tab D would be Exhibit G.
12            FEMALE SPEAKER:  And I don't have the same
13   notebook, so what is it.
14            THE WITNESS:  Accounting reconstruction for Account
15   number 0635 and the supporting bank statements.
16            MR. DAIN:  And then--
17            FEMALE SPEAKER:  So H would be the bank statements.
18            MR. DAIN:  H would be for Account number 2985.  I
19   would be for the Account number 3864.
20            FEMALE SPEAKER:  (Inaudible).
21            MR. DAIN:  Yeah, I'm marking them.  And then G,
22   this Tab G would be J.
23            Is that right so far?
24            THE WITNESS:  Correct.
25            MR. DAIN:  Okay.  So, we would offer those as
```

BLACK000945

41

1    exhibits, Your Honor.

2              THE COURT:  Okay.  Say it one more time.  A-1 and

3    A-2--

4              MR. DAIN:  Are--

5              THE COURT:  --E--

6              MR. DAIN:  E and F.

7              THE COURT:  E and F.

8              MR. DAIN:  Tab D becomes Exhibit G.  Tab E becomes

9    Exhibit H.  Tab F becomes Exhibit I, and Tab G becomes

10   Exhibit J.

11             THE COURT:  So, D through J.

12             MR. DAIN:  Right.

13             MR. THIESSEN:  Your Honor?

14             FEMALE SPEAKER:  E through J.

15             MR. THIESSEN:  If I could clarify--

16             MR. DAIN:  Well, we have D already--

17             FEMALE SPEAKER:  D's already (inaudible).

18             MR. DAIN:  Yeah.  So far that's (inaudible).

19             THE COURT:  Oh, D is the big one.

20             FEMALE SPEAKER:  D's the big one.

21             THE COURT:  Okay.

22             MR. THIESSEN:  We do not object to proffered

23   Exhibit E.  For clarification, have we ever been provided G

24   through J in any filing?

25             THE WITNESS:  It was provided on the CD ROM and the

42

1   Excel spreadsheet that I've given to Ms. Harper.

2          MR. THIESSEN:  Was it filed with the Court?

3          THE WITNESS:  Pardon me?

4          MR. THIESSEN:  Was it filed with the Court?

5          THE WITNESS:  No.

6          MR. THIESSEN:  I object to all the rest for lack of

7   foundation.

8          THE COURT:  Okay.  Mr. Thiessen, I'm just going to

9   say this once.  All right.  I understand what you're saying

10  and I understand why.  We're never going to get through all

11  of this if we don't get some cooperation.  So do you want to

12  take the hour then, because this is going to take eight hours

13  to do this.

14         MR. THIESSEN:  Sure, Your Honor.

15         MR. DAIN:  And just so I understand, what's the

16  lack of foundation if they were prepared by the expert and

17  they back up her schedules, and that just will go to weight.

18  If you want to cross-examine her on cross-exam, but

19  foundation is not a proper--

20         MR. THIESSEN:  I haven't seen them; they were not

21  revealed in advance of any hearing; she hasn't testified to

22  them.  I think it's an--

23         THE COURT:  Well they were revealed in advance--

24         MR. THIESSEN:  --appropriate foundation objection.

25         THE COURT:  They were revealed in advance of the

43

1    hearing.  She said you got them on the CD ROM and they're

2    dated in June.

3                MR. THIESSEN:  She did not file them with any

4    report on which she relied.  We had no notice that she was

5    going to be using them at the hearing.

6                THE COURT:  She produced them part of your

7    discovery.  We had hearing on this.

8                MR. THIESSEN:  I'm stating the objection, Your

9    Honor.

10               THE COURT:  I know you have them, because we had a

11   discussion about it on the record, because there was an

12   argument that you weren't getting the CD ROM because you were

13   saying Harper didn't have it, and there was a big whole mess

14   about that.

15               MR. THIESSEN:  I'm not going to withdraw my

16   objection, Your Honor.  We're happy to take the hour and try

17   and reach some stipulations.  My client can assert positions

18   that are reasonable.  We haven't seen--

19               THE COURT:  Well, the position is one thing, but

20   this is figuring out what the numbers are before we even get

21   to what the position is.  That's my problem I'm having is

22   you're asserting a position when we can't even get to the

23   foundational part of it.

24               MR. DAIN:  And as I said, again, Your Honor, that

25   would go to weight.  If he believes these numbers are wrong

BLACK000948

44

 1    or Ms. Harper did, they can speak to that, but foundation--I
 2    think Ms. Kerr has explained what these are.  These are the
 3    backup to her summary.  And if that's the case, there's
 4    foundation for them.  If he believes there's something in
 5    error, he can question that.  That goes to weight.
 6            THE COURT:  Well, that's the problem.  We can't get
 7    to whether they think there's an error because the posturing
 8    is getting in the way of that.
 9            So we'll take the hour, and this is what I want.  I
10    want you to nail down the number as to what was in the
11    original Vanguard accounts that were POD and whatever the
12    percentages were supposed to be based on Mrs. Black's
13    designation, because those are what we need to start working
14    with--
15            MR. DAIN:  Right.
16            THE COURT:  --because after that is where it
17    diverges as far as I can tell.
18            MR. DAIN:  Correct.
19            THE COURT:  All right?  So, we have to figure out
20    what those numbers are to begin with.  And it looks like
21    you've got them here on Schedule A-1.
22            MR. DAIN:  Yes.  And I think the problem is--it
23    doesn't matter if it wasn't filed with the Court.  Not
24    everything needs to be filed with the Court.
25            THE COURT:  No.

BLACK000949

45

```
 1          MR. DAIN:  I think what Mr. Thiessen should do is
 2   consult with Ms. Harper or Ms. Harper should talk with Ms.
 3   Kerr and see if after what they received they have an issue
 4   with schedules--or what are now Exhibits E and F if they have
 5   issue with the background documents, let's get that out and
 6   then we'll--
 7          THE COURT:  Okay, but I don't want this hour to be
 8   consumed with posturing over the effect of the disclaimer or
 9   the rest of it.
10          MR. DAIN:  Right.  Right.  I agree.
11          THE COURT:  Okay.
12          MR. DAIN:  Okay.
13          THE COURT:  All right.  We'll be in recess.
14          MR. DAIN:  Thank you, Your Honor.
15          (Whereupon, a recess was taken.)
16          THE COURT:  All right.  The record is now back on
17   and we will recall 12 PR 1772.
18          Any luck, Mr. Dain?
19          MR. DAIN:  Yes, Your Honor.  So, during the break
20   we have agreed on some numbers.
21          THE COURT:  Okay.
22          MR. DAIN:  And Counsel can correct me if I'm wrong,
23   and certainly Ms. Kerr or Ms. Harper can correct me if I'm
24   wrong.  And I'll explain the qualifications, but with respect
25   to the Vanguard funds not including the Roth IRA, because
```

BLACK000950

46

```
 1    I'll add them at the end, the amount that both parties agree
 2    would be under the Court's ruling would belong to Joanne
 3    Black 1,010,688.  Then separately the Roth IRA is 500,668.
 4    And I'll give you the total of that, but the reason we
 5    separated those was because we still have the issue on our
 6    side of civil theft, and I know there's a motion on the other
 7    side, so we wanted to make sure we had those separated.
 8              THE COURT:  Okay.
 9              MR. DAIN:  Now, looking at this, and I'm sorry that
10    the amount doesn't--when I'm adding this up--oh, I'm sorry.
11    I got it wrong.  That's why.  This--is it 506,000?
12              FEMALE SPEAKER:  500,000.
13              MR. DAIN:  Yeah, that's what I had (inaudible).
14              (Inaudible comments.)
15              MR. DAIN:  Okay.  Did you already get that
16    1,511,356.
17              THE COURT:  That's for the Vanguard account?
18              MR. DAIN:  That's for the Vanguard accounts, yes.
19              So, those the parties have agreed on subject to the
20    qualification I gave, Your Honor, where we--there are a
21    number of other issues we don't agree on, but again, those
22    can be identified, and I really think at the end it's not the
23    numbers, it's whether Your Honor says I believe that it
24    should either be a surcharge or that should be part of the
25    damages or that should be in the estate in New York, that
```

BLACK000951

47

1   should be an issue in the estate in New York.  And I can lay

2   those out for you if you'd like just briefly, and then we can

3   go into them.

4           For instance, there are legal fees that were paid

5   from the Supplemental Needs Trust accounts that are other

6   than the $115,000 that were reimbursed that we believe should

7   have been paid by other than Joanne Black, whether it's Mr.

8   Black or out of, you know, the portion of the estate that was

9   for him and his children.

10          So, there are those, and we can show the Judge--Ms.

11  Kerr could get up on the stand and go through the schedules

12  for those.  Those would include not only New York attorneys

13  such as Mr. Lamberti, who is Mr. Black's guardianship

14  attorney in New York--

15          THE COURT:  Okay.

16          MR. DAIN:  But Mr. Glatstein was also paid monies

17  out of the estate account.  And, again, we believe Mr.

18  Glatstein's fees should be either surcharged or part of

19  whatever the Court's order is in terms of damages.

20          There was a transfer from the Supplemental Needs

21  Trust to the estate.  Mr. Black's counsel argues that that

22  should be--that was justified, but we believe it has to be

23  credited in the estate litigation not in this litigation.

24          There are taxes on the Roth IRA tax-free

25  distribution that was paid to the children, because in other

BLACK000952

48

1   words, Mr. Black should have received those monies tax free
2   and obviously she didn't get those, because those were
3   distributed to the children, so Ms. Kerr can explain that.
4   There's a smaller amount for a bookkeeper that Mr. Black
5   charged--or paid that was really in answering--because he--as
6   I believe he'll state at answering questions from Ms. Kerr in
7   the forensic accounting.
8           THE COURT:  Okay.  And the tax, that was because--
9   so the tax was also paid from Ms. Black's funds?
10          MR. DAIN:  Well, the transfer--well, there are two
11  tax issues and I'll get to the other one too, so maybe--one
12  of the tax issues is that Ms. Black, yes, paid--the expenses
13  were paid out of the estate account rather than out of the
14  Supplemental Needs account so that Ms. Black didn't get,
15  through the Supplemental Needs, a deduction for expenses paid
16  out of the Supplemental Needs Trust, so she paid extra taxes
17  she should not have had to pay.  Ms. Kerr can discuss those.
18          But in addition, the Roth IRA is really post tax
19  money; taxes have already been paid on that amount.  That
20  went to Mr. Black's children not to Ms. Black.  Ms. Kerr can
21  explain the tax consequences of that to Ms. Black.  Because
22  now, for instance, if you surcharge and she gets money back,
23  she's not getting those--she's not getting tax-free assets.
24  But Ms. Kerr can explain that.
25          There are additional things, some of which can be

BLACK000953

49

1   determined I think post the Court's order, and I'll get to
2   those in a moment.  But preorder, Ms. Kerr's forensic
3   accounting costs that were paid by Ms. Black's estate should
4   be charged to Mr. Black because there wouldn't have been a
5   need to go through this forensic accounting had Mr. Black not
6   exercised his duties the way he did.
7           There are other costs that have not yet been
8   totaled.  Brad Frigon, the specialist in trusts that was
9   required to assist in how these things--how things will be
10  paid once Mr. Black was discharged of his duties--I paid that
11  so far, but I'm going to be making a claim to be paid back.
12  But I think that should be charged to Mr. Black.
13          In addition, Ms. DiPonio and Ms. Young's costs in
14  having to defend their position in this action are
15  extraordinary fees that normally would not be charged to Ms.
16  Black.  Those should be charged to Mr. Black.
17          And this does not include any of the overpayment in
18  the residual estate that both accountants, even after their
19  accountings, agree this two-thirds/one-third that was
20  residual it still was not met.  Mr. Black paid himself more
21  and his--him and his children more than the one-third.  But
22  it doesn't include that, because what we need to find out
23  from the Court if the Court feels that should be handled in
24  estate litigation in New York we'll do it that way.  My view
25  has always been that Mr. Black as conservator owes a

50

1   fiduciary duty wherever Mr. Black's money is.  Just the fact
2   that it's in an account called an estate account doesn't make
3   any difference.
4            THE COURT:  Yeah.
5            MR. DAIN:  So, we can address those.  It doesn't
6   include two other things:  The loss of sale on stock; for
7   instance, if Mr. Black could have--I mean, Mr. Black would
8   sell stock to pay certain things that we believe were
9   inappropriate or could have been handled otherwise, there may
10  have been a loss on those assets that was suffered by Ms.
11  Black.  And certain tax ramifications of non-distributions
12  and, again, Ms. Kerr will have to explain that, because I'm
13  not a--obviously not a tax expert.
14           So, these are the things we can go over.  I don't
15  think it will take that long.  Ms. Kerr can point to each of
16  the tabs in the binder, and we can make those exhibits.
17           THE COURT:  Okay.
18           MR. DAIN:  And then those will be disputed by Mr.
19  Black and his counsel and, again, I don't think the numbers
20  are in dispute; I think the issues are in dispute.
21           There is one number that is in dispute, and that's
22  as to a tax consequence.  Ms. Kerr will give you her expert
23  opinion, which has to be to a reasonable certainty or
24  probability based on an estimate, because she'll explain to
25  you there's an impossibility of exactly stating a tax

51

1  consequence because of the facts.  But, again, she can
2  explain that.
3           So, that's where we are.  And, again, if Mr.
4  Thiessen has--
5           THE COURT:  Okay.
6           MR. THIESSEN:  Let's circle back to the stipulation
7  initially, Your Honor.  Mr. Dain did state the number
8  correctly, 1,511,356.  That does include both the Vanguard
9  account that was to go 95 percent to Ms. Joanne Black and the
10  Roth IRA that was to go 100 percent POD to Joanne Black.
11  That includes both of those.  It also includes 8 percent
12  interest calculated from the date of transfer, so it includes
13  that amount as well.  There's no need to have an additional
14  amount.  We stipulate to those amounts without prejudice to
15  argue the merits going forward or on appeal.
16           THE COURT:  And the Roth IRA number?
17           MR. THIESSEN:  That is included in the 1,511,356.
18  The--
19           THE COURT:  Is that right, Mr. Dain?
20           MR. DAIN:  Yes, Your Honor.  The breakdown I gave
21  Your Honor was the non-Roth funds of 1,010,688.
22           THE COURT:  So the interest then is $10,688?
23           MR. DAIN:  No, I don't think the million was an
24  exact amount.  Yes.  I don't think--I can give you the amount
25  that initially went to the Issue Trust, but what we had to

BLACK000956

52

1    factor in the 3 percent that still had not been paid to the

2    children, and we gave them interest for a period of time or

3    the increase in asset value for the period of time

4    (inaudible) distribution.  So when that was all worked out,

5    with interest that's what it came out to, 1,010,688.

6            And if it doesn't make sense, Ms. Kerr can explain

7    it better.

8            THE COURT:  You gave me two numbers.

9            MR. DAIN:  Yes.

10           THE COURT:  You said it was 1,511,356, and then you

11   said the Roth IRA--

12           MR. DAIN:  Oh, no.

13           THE COURT:  --was 500,668.

14           MR. DAIN:  Oh, no, no.  I'm sorry, Your Honor.

15   what I'd started out with is 1,010,688 was the non-Roth IRA

16   funds, the Vanguard funds that were not the Roth.

17           THE COURT:  1 million--

18           MR. DAIN:  Ten thousand.  So, 1,010,688.

19           THE COURT:  Okay.

20           MR. DAIN:  And then the Roth IRA amounts, as Mr.

21   Thiessen said, with interest included was 500,688.  The total

22   I had given you was 1,511,356 I think was--

23           THE COURT:  Okay.

24           MR. THIESSEN:  Three fifty-six.  Correct, sir.

25           MR. DAIN:  So I apologize if I confused the Court.

BLACK000957

53

1          THE COURT:  Okay.

2          MR. DAIN:  Or, better yet, I apologize that I was

3    confused and gave that information to the Court, but that's

4    the correct statement.

5          THE COURT:  Okay.  Go ahead, Mr. Thiessen.

6          MR. THIESSEN:  Sure, Your Honor.  Again, Your

7    Honor, we were stipulating to that damages amount without

8    prejudice to argue the merits or appeal.

9          As to the remaining issues Mr. Dain brought forth,

10   I can give a list of our specific arguments as to why the

11   Court shouldn't address them today.  For example, the

12   expenses he said were paid out of the estate account to the

13   SNT I don't feel that--the Court doesn't have subject matter

14   jurisdiction to address that over either the Supplemental

15   Needs Trust or the estate.

16         I would make the same argument with respect to his

17   statement that there was an overpayment--

18         THE COURT:  So you do want to litigate this in

19   probate court in New York, right?

20         MR. THIESSEN:  We certainly want to preserve that

21   right, Your Honor, yes.

22         THE COURT:  Well it has to be litigated someplace.

23         MR. THIESSEN:  Well it--

24         THE COURT:  Can't just say you want to preserve it

25   and then not do it.

BLACK000958

54

1   MR. THIESSEN: To the extent Mr. Black would seek a

2 final accounting in the New York court and there were

3 outstanding claims that he'd breached his fiduciary duty at

4 that time, yes, those could be raised. I'm not seeing why--

5 yes, we want to litigate in the New York court.

6   THE COURT: All right.

7   MR. THIESSEN: Honestly, as part of the surcharge,

8 Your Honor, the only thing this Court has jurisdiction over

9 under the surcharge statute 15-10-603 would be the payments

10 of cost to Ms. Kerr. Of course, we would argue that that

11 should be addressed under the cost and compensation statute

12 as to whether or not that benefitted the estate of Joanne

13 Black. There would also be an argument that the attorneys'

14 fees for Ms. DiPonio and Ms. Young should be addressed in the

15 same fashion under 15-10-602 as to whether or not they

16 benefitted the estate. They're not properly before the Court

17 today. There was--

18   THE COURT: Why not?

19   MR. THIESSEN: --invoices and fees--we have no

20 idea, Your Honor, what the fees are for Ms. DiPonio and Ms.

21 Young. There's not an invoice that's submitted.

22   THE COURT: I thought the invoices were already

23 submitted.

24   MR. THIESSEN: No, Your Honor.

25   FEMALE SPEAKER: Your Honor, if I may--

BLACK000959

55

1          THE COURT:  Would I be able to finish?

2          THE COURT:  Well, Mr. Thiessen, the problem is is

3    that this is getting so convoluted, and it really just seems

4    like it's push off, and I'm really getting tired of it.

5          MR. THIESSEN:  With all due respect, Your Honor, I

6    think you made specific statements about lack of jurisdiction

7    this morning, and I'm just raising those to the fore here

8    again today with respect to specific things Mr. Dain's

9    arguing.  I think that's a legitimate argument, Your Honor.

10         THE COURT:  Well, what's clear to me is that this

11   man should have no responsibility at all over any money

12   having to do with Joanne Black--

13         MR. THIESSEN:  And he doesn't, Your Honor.

14         THE COURT:  --in any forum.  In any way, shape, or

15   form.  No trust, no estate, not as conservator, not as the

16   guardian, nothing.  And you need a neutral in the estate case

17   in New York, you need a neutral in New York.  Twenty-five

18   accounts.  Who does that?  I mean, it's just crazy.

19         MR. THIESSEN:  I understand your statements, Your

20   Honor, but I don't think that that necessarily gives the

21   Court subject matter jurisdiction over some of the things Mr.

22   Dain laid out.

23         THE COURT:  Well why don't we start with what you

24   think I do have jurisdiction over instead of arguing about

25   what you say I don't have jurisdiction over.

BLACK000960

56

1          MR. THIESSEN:  And I had identified those, Your

2  Honor.  The first was Ms. Kerr's costs would be--Your Honor

3  has jurisdiction to make those part of the surcharge under

4  15-10-502.  The second component would be attorneys' fees for

5  Ms. DiPonio and Ms. Young.  Your Honor would have

6  jurisdiction over that as well.  Those haven't been properly

7  brought forth before the Court under the cost and

8  compensation statute.

9          The remaining issues are all his alleged--breach of

10  fiduciary duty as executor or as trustee of the Supplemental

11  Needs Trust.  And, Your Honor, I think those are before the

12  New York courts and not this--

13          THE COURT:  Where is the trust registered?

14          MR. THIESSEN:  Trust--New York.

15          THE COURT:  Is it?

16          MR. THIESSEN:  I believe so.

17          THE COURT:  Mr. Dain is supposed to be the co-

18  trustee.

19          MR. THIESSEN:  He's refused to become--to sign onto

20  the account.

21          THE COURT:  That's not--well--

22          MR. THIESSEN:  Yes, he has.

23          THE COURT:  --he explained that.  And with good

24  reason I think.

25          MR. THIESSEN:  But he was provided with the

BLACK000961

57

1   opportunity to become an account holder.  We fulfilled our
2   obligation, Your Honor, to do that.  He didn't take advantage
3   of that obligation.
4           MR. DAIN:  Your Honor, just addressing that, the
5   accounts are the accounts.  Banks have--the Court has
6   jurisdiction over Mr. Black or has jurisdiction over the bank
7   accounts.  The Court has already addressed some of this money
8   went through the estate accounts.  It doesn't mean loses--
9   Court loses jurisdiction of any of this simply because it's
10  in a bank account that is titled "Trust for Joanne Black."
11          And it's a pick your poison--I think as the Court
12  said earlier either Mr. Black gets surcharged for these
13  activities because as conservator he had a fiduciary duty, or
14  the Court gets them unwound through these accounts.  But
15  things like Mr. Frigon, for instance, that I didn't hear and
16  I don't know how you argue there's no jurisdiction for that.
17  Mr. Glatstein is certainly an attorney in this jurisdiction
18  that's getting fees paid out of--I don't care if you call it
19  estate checking account, it's a checking account Mr. Black
20  holds authority over.  So to say there's not subject matter
21  jurisdiction I'd love to see the authority for that.  I just
22  can't believe there is any.  And legal fees paid from the
23  Supplemental Needs Trust checking account that Mr. Black has
24  authority over the Court, by Mr. Thiessen's logic, loses
25  subject matter jurisdiction merely because he wrote a check

BLACK000962

58

1  on an account that is in a bank that has branches here as
2  well as everywhere in the United States?  I'm not following
3  that.  There is a difference to say that the probate court in
4  New York might be better suited to address some things, but
5  it's not a jurisdiction issue.  I've never seen any authority
6  that says that.
7           THE COURT:  Okay.
8           MR. THIESSEN:  Two specific points with respect to
9  what he raised.  Mr. Frigon--and certainly Mr. Dain, is able
10  to submit a claim for those expenses.  He has not done so.
11  It's not right before the Court's review for any amounts to
12  be paid or reimbursed from the estate of Joanne Black to Mr.
13  Dain for paying Mr. Frigon's cost.  That's not appropriately
14  before the Court today; no such motion or claim has been
15  made.
16           MR. DAIN:  (Inaudible) I do want to be (inaudible)
17  interrupt, but there are always things when you have a
18  judgment or you have an order that the court can say, oh, the
19  actual amounts of those will be submitted and there will be a
20  post judgment order or post order order for the exact amount.
21  Mr. Frigon is still working on matters.  He's still being
22  consulted as Ms. Peterson filed a motion saying Mr. Frigon
23  should help determine which of these accounts is best suited
24  pay (inaudible).  So, we can submit this.  We can submit
25  this, we can submit Ms. DiPonio's, Ms. Young's costs.  That's

BLACK000963

59

1   a difference from saying he should pay them what the exact

2   amount is.

3          THE COURT:  Right.

4          MR. THIESSEN:  And with respect to Mr. Glatstein,

5   those expenses are still appropriately charged to the estate

6   of Joanne Black.  Joanne Black was benefitted from the

7   conservatorship filing.  It's unequivocal that Ms. Black

8   could not manage the funds on her own.  Mr. Black sought to

9   be appointed conservator; he obtained counsel through Mr.

10  Glatstein; they obtained benefits to Ms. Black in the form of

11  workers' compensation benefits as well as the Fidelity

12  accounts that went into the 2013 trust that benefitted her

13  estate.  Those are appropriate expenses as conservator.

14         THE COURT:  Okay.

15         MR. DAIN:  Mr. Glatstein testified before this

16  Court and actually said he didn't think it was a problem to

17  rewrite the estate, which is what he was doing.  Mr.

18  Glatstein was aware--made aware there was a Roth IRA, never

19  reported it.  Mr. Glatstein is responsible as Mr. Black for

20  issuing the order that was misused and not following

21  correctly the order of the Court.  His inventories were

22  improper.  How is that--and of course, through his actions

23  1.5-odd million was taken from Ms. Black.  How do we now

24  parse and say that was for her benefit?  That's why we're

25  including it.  If defense wants to say here's the amount,

BLACK000964

60

1    $800 if you think was proper, let them make that argument.
2             THE COURT:  Right.
3             MR. DAIN:  But in the meantime, Mr. Glatstein
4    should share--I mean--that should be Mr. Black's expense.
5    There was no benefit to Ms. Black by the actions he'd taken,
6    Your Honor.
7             MR. THIESSEN:  I would circle back to what I argued
8    previously.  I think it's valid.  I think it's absolutely
9    valid.  There was repeated testimony that Ms. Black could not
10   manage funds and they came before this Court to manage those
11   funds that wouldn't have otherwise been managed.  Mr.
12   Glatstein's expenses are appropriate.  He testified could the
13   disclosure have been better?  Your Honor rejected that
14   testimony, but it was still made.  I think it was still
15   valid, and I disagree.
16            THE COURT:  All right.  All right, so then with
17   these numbers, the stipulated numbers then basically is the
18   amount of the surcharge for the funds that were
19   misappropriated by the disclaimer, right?
20            MR. DAIN:  Correct.
21            THE COURT:  Okay.
22            MR. THIESSEN:  Your Honor, including interest.
23            THE COURT:  On the Roth.
24            MR. THIESSEN:  And the other account, Your Honor.
25            MR. DAIN:  And, sorry, Ms. Kerr--you're correct

BLACK000965

61

1   about the numbers, Your Honor, but--per disclaimer, but as

2   just a reminder that there is still the civil theft issue

3   that we'll have to determine whether those--the surcharges

4   (inaudible).  And most specifically we're focused on the Roth

5   IRA, because that is the one that was absolutely concealed

6   from this Court; inventories concealed from all the parties

7   in every way.

8           So, the number is right, but the Court can treble

9   the--at least the Roth IRA number under the civil theft

10  penalties.  So, just (inaudible).

11          THE COURT:  Okay.

12          MR. DAIN:  And that's why I gave them to you as two

13  separate numbers, Your Honor.

14          THE COURT:  All right.  So how do you want to go

15  through these other issues then?

16          MR. DAIN:  Ms. Kerr can take the stand again.  We

17  can go through--I'd like to go through the various tabs of

18  the binder you have and make each of those an exhibit, which

19  are the backup for her opinion, and we can just work through

20  them and at least the Court will have the numbers, it'd have

21  the issues before it, and with respect to once Mr. Frigon and

22  Ms. Kerr's further work and Ms. DiPonio, Ms. Young, I think

23  those are just for the Court to say whether those are

24  compensable or not.  I believe they are--

25          THE COURT:  Right.

1    MR. DAIN:  --and say that it's amended order and

2 the amounts.

3    THE COURT:  Okay.  And so there's still no

4 stipulation as to her ledgers?

5    MR. DAIN:  That's what I'm hoping, and that's what

6 I was hoping was going to be done through the rest of the

7 lunch hour is if there's no dispute over the numbers, then

8 let's just argue over whether or not this is part of the

9 Court's order.  Because I did not hear anything from Counsel

10 that they disputed any of these other numbers.

11    MR. THIESSEN:  Mr. Dain didn't approach us with any

12 kind of stipulation as to any specific amounts.

13    MR. DAIN:  You asked for it and we gave you the

14 numbers.

15    THE COURT:  No, we're talking about Exhibit C

16 Schedules A-1 and A-2, D, E, F, G, H, and I.  And J.

17    MR. DAIN:  And then all these other ones we gave

18 them like Glatstein's fees, the bookkeeper's fees, the taxes,

19 Ms. Kerr's accounting fees--they actually took a picture of

20 what we had written here and had those, and their point is

21 that they dispute the numbers.  If they don't, it's really

22 just an issue of whether your Court says yes or no--Your

23 Honor says yes or no.

24    THE COURT:  Well, I'm asking about the

25 admissibility.

63

```
 1              MR. DAIN:  Yes.  Yeah.
 2              FEMALE SPEAKER:  (Inaudible) sentence (inaudible).
 3              MR. DAIN:  Oh, I'm sorry.  I'll leave that to Mr.
 4    Thiessen.  I hope there's no dispute.  I've not heard any
 5    that there--
 6              MR. THIESSEN:  With all due respect, I think the
 7    amounts you're referencing speak to different schedules.
 8    They speak to Tab U or--
 9              MR. DAIN:  Yes, but you have those.
10              MR. THIESSEN:  --V, W.
11              FEMALE SPEAKER:  We'll all be talking about
12    (inaudible) not be (inaudible) E through J.
13              MR. THIESSEN:  I'm not sure why we would need to
14    get into it, but if you want to move for their admission--
15              MR. DAIN:  Already have.
16              FEMALE SPEAKER:  (Inaudible) into it (inaudible)
17    object to them or not.  That's--
18              MR. THIESSEN:  Right, object to their admission?
19              MS. DIPONIO:  Yes.
20              MR. THIESSEN:  No.
21              MR. DAIN:  So we're good so far on those.  I can
22    give the schedules to counsels right now that--ones that have
23    not yet been agreed to.  U and W really are the only other
24    ones that I see here.  We can go through them or you can look
25    at them right now.  I'm not hearing, again, there's an issue
```

BLACK000968

64

```
 1   with the numbers.
 2            THE COURT:  All right, well let's get Ms. Kerr back
 3   on the stand and get through this then.
 4            Okay, so I am admitting then Exhibit C, D--well,
 5   Exhibits C through J.
 6            (Whereupon, Respondent's Exhibits E through J were
 7   received in evidence.)
 8            MS. DIPONIO:  Your Honor, it's Exhibit D through
 9   Exhibit J.
10            THE COURT:  Okay.  I thought we were doing Exhibit
11   C.
12            MS. DIPONIO:  Exhibit C has already been--Exhibits
13   A, B, and C have already been offered, not objected to, and
14   uploaded (inaudible).  So, we're picking up where we left
15   off, and that would be with Exhibit--
16            MR. DAIN:  No, I know what Your Honor is saying,
17   because in the tab in the book it's C.
18            MS. DIPONIO:  Oh, I'm sorry.
19            MR. DAIN:  But those became--no, no, and that's
20   right.  Ms. DiPonio has correctly stated the schedules in
21   there became D and E.  So, yes, we have no A through--what
22   was it, J?
23            MS. DiPONIO:  A through J.
24            MR. DAIN:  Yeah, are all admitted.
25   DIRECT EXAMINATION BY MR. DAIN RESUMES:
```

BLACK000969

65

1      Q    Now--and then just going down the list of what I
2  was discussing with Your Honor, there were legal fees that
3  were paid from the Supplemental Needs checking account that I
4  believe are in Tab U, and we'll make that the proper exhibit
5  as soon as you can lay the foundation and explain what Tab U
6  is.
7      A    Tab U is the accounting reconstruction of the
8  Supplemental Needs checking account from the date that it was
9  opened, June 11th, 2013, through June 30th, 2014.
10     Q    And if you could show the Court where on that tab
11 the legal fees paid from the Supplemental Needs checking
12 account that you have determined should be part of the charge
13 against Mr. Black.
14     A    Column I under legal fees.  First payment is to
15 Schiff Hardin for 4,622.25.
16         THE COURT:  Who's that?
17         THE WITNESS:  Schiff Hardin is the attorney in
18 Chicago, I believe.
19         MR. DAIN:  And Schiff Hardin I believe, Your Honor,
20 is the law firm that drafted this Joanne Black 2013 trust
21 that you heard testimony about which--
22         THE COURT:  Okay.
23         MR. DAIN:  Yes, I'll leave it at that.
24         THE WITNESS:  And just to set the record, there are
25 copies of the invoices attached behind the schedule that list

BLACK000970

66

```
 1    out the charges for this $4,622.25 as well as the payment on
 2    Line 20 for $1,997.25.  Those two payments were made to
 3    Schiff Hardin.
 4           The next payment is $3,700, and that payment was a
 5    withdrawal from this Supplemental Needs checking account into
 6    the estate account to reimburse the estate, per Mr. Black,
 7    for $3,700 of the payment made to Anthony Lamberti in New
 8    York.  And that invoice is also attached.
 9       Q    (by Mr. Dain)  And so the totals, if I have those
10    correct, are ten thousand--well, let me make sure I do that.
11    Is it $10,320.50?
12       A    $10,319.50.
13       Q    Oh, $19.50.
14           THE COURT:  And you don't--
15           THE WITNESS:  On page 2.
16           MR. DAIN:  Okay.
17           THE COURT:  And you don't think that the
18    Supplemental Needs Trust had to be created?
19           MR. DAIN:  No, there was already a Supplemental
20    Needs Trust.  This was an additional trust.
21           THE COURT:  A second trust.
22           MR. DAIN:  Yes.  There's been testimony from no one
23    that this trust actually affected anything.  It was merely a
24    vehicle in which Mr. Black had intended to put the workers'
25    comp and social security funds into, but in the end this
```

BLACK000971

67

```
 1   trust ended up being like a $30,000 trust which has no other
 2   function.  It was not necessary to put the money in there.
 3   There's been no testimony from anybody that this trust was
 4   ever needed.  It's now virtually devoid of money and serves
 5   no purpose.
 6              THE COURT:  Okay.
 7              THE WITNESS:  May I state something?
 8              MR. DAIN:  Yes.
 9              THE WITNESS:  Just to set the record clear.  These
10   invoices are not for the establishment of the 2013 trust.
11   They are invoices, payments to--there were six different
12   attorneys.  There's a schedule behind the schedule here that
13   has attached copies of the invoices, and it actually
14   appears--it's quite redacted, but from what I can read on the
15   invoices, it appears that these fees were more related to the
16   guardianship appointment of Mr. Black over Joanne Black in
17   New York, and the total invoice was paid 50 percent out of
18   the Supplemental Needs Trust and 50 percent out of the 2013
19   trust.
20      Q    (by Mr. Dain)  Okay, so I guess even--if I'm
21   correct, it's even more stark that these fees from Schiff
22   Hardin were to provide advice to Mr. Black as to the New York
23   guardianship and not even in any way related to proceedings
24   here in Colorado from the invoices; is that what you're
25   saying?
```

BLACK000972

68

1 A  Correct.  The invoices are attached, and they're

2 quite redacted so I can't tell exactly what they're for, but

3 the timeframe is well after the 2013 trust was created.  The

4 invoices look like they're just conferences between the

5 attorneys, guardianship review, and revised documents.  So, I

6 can't tell specifically what these legal fees are for, but

7 they are in the same timeframe that Mr. Black was applying

8 for appointment of guardianship in New York.

9 Q  And if you look actually towards the--if you look

10 at the actual invoices, I notice they're titled, "Estate and

11 Trust of Renata Black."  Do you see that?

12 A  Yes, I do.

13 Q  Okay, so is there anything else on this tab that

14 relates to a cost or expense that in your opinion was not

15 properly charged to Ms. Black?

16 A  The $10,000 check that is also in this tab, it's a

17 copy of the $10,000 check to Anthony Lamberti, and Mr. Black

18 wrote that 9.25 hours on the TRO, which is the temporary

19 restraining order, at $400 an hour was to be paid by Joanne

20 Black rather than the estate.

21 Q  And the TRO that this is referring to was the

22 attempt to sell the McKeel house in the estate of Renata

23 Black in New York?

24 A  Correct.

25 Q  Okay.  So, the total amount of fees then that are

BLACK000973

69

1  contained in Tab U that you believe were improperly charged

2  to Ms. Black by Mr. Black total what?

3      A      $10,319.50.

4      Q      Okay, and that would include both the checks to Mr.

5  Lamberti and to Schiff Hardin?

6      A      Just to set the record straight, it wasn't a check

7  directly to Mr. Lamberti.  The check to Mr. Lamberti came out

8  of the estate.  Mr. Black transferred $3,700 into the estate

9  to reimburse the estate for the $3,700.

10     Q      Okay.

11     A      So, yes.

12     Q      Okay, so the total on this tab then is $10,319.50.

13     A      Right.

14            MR. DAIN:  And then what would the next exhibit be

15  in order?

16            THE COURT:  So we're not counting the 10,000 for

17  the house?

18            MR. DAIN:  You could explain the other 10,000 that

19  went to Mr. Lamberti.  How did those get--

20            THE COURT:  Right.  This is the one you just talked

21  about, Line 25?

22            MR. DAIN:  So are you asking for that or not?

23            THE WITNESS:  I did not include it, because it was

24  paid out of the estate.  And so whether the $10,000 that was

25  paid out of the estate--the balance that the estate incurred

BLACK000974

70

1    to fight the sale of the McKeel property is money that's come

2    out of the estate.  If you're going to rule on funds that

3    have been paid out of the estate, that would be a legal

4    argument.

5            THE COURT:  But this wasn't--came out of this

6    checking.

7            THE WITNESS:  $3,700 came out of Joanne's money,

8    and so that's what--my report here says that of the $10,319,

9    $3,700 went to Mr. Lamberti and the balance went to Schiff

10   Hardin.

11           THE COURT:  But you said that it went to Lamberti

12   for guardianship.

13           MR. DAIN:  And maybe if I could explain, Your

14   Honor.  Yes, Mr. Lamberti is a guardianship attorney and

15   there was a battle over the McKeel house in New York.  What

16   Ms. Kerr is saying is he was paid $10,000, but that was paid

17   out of the estate account.  But $3,700 was reimbursed to the

18   estate account by the Supplemental Needs Trust checking

19   account here, and that is what Ms. Kerr, in her opinion, is

20   charging back to Mr. Black because it came out of the

21   Supplemental Needs Trust.

22           THE COURT:  All right.

23           MR. DAIN:  I know--and, Your Honor, this is the

24   issue that concerns me.  I feel that because Ms. Black did

25   not receive all the money she should have in the estate and

BLACK000975

71

```
 1   that Mr. Black as conservator still has a fiduciary duty
 2   whether he wears the hat of executor or conservator--
 3            MR. THIESSEN:  Objection; do we have a question?
 4            MR. DAIN:  No, no.  I'll allow you to speak, but
 5   this is what I'm concerned about.  Are we going to address
 6   those, because I believe we should.  Defense counsel thinks
 7   there's no jurisdiction of that.  Are we just going to leave
 8   that for the litigation in New York?  And that's what Your
 9   Honor was asking Mr. Thiessen.
10            THE COURT:  Because you still haven't brought a
11   case to me, right?
12            MR. DAIN:  We have not yet.  That's correct.  We
13   brought a case for guardianship; have not yet brought a case
14   to challenge the accountings in New York and his function as
15   the executor.  We intend to; I'm just wondering whether this
16   Court addresses the entire shortfall to Ms. Black or we leave
17   part of that to the New York court.
18            THE COURT:  So it's the difference between the
19   3,700 and the 10,000?
20            THE WITNESS:  Correct.  The difference of 7,300 is
21   what Mr. Black--
22            THE COURT:  Sixty-three.
23            THE WITNESS:  Sixty-three--Excuse me--$6,300 is
24   what Mr. Black appears to have deemed to be an estate
25   expense.  The invoice from Mr. Lamberti says, "Guardianship
```

BLACK000976

72

1    of Joanne Black," but the last few hours of chargeable time
2    related to the sale of the property, so that's why I was
3    trying to make that distinction. So, this entire $10,000
4    related to Mr. Lamberti representing Mr. Black with regards
5    to both the guardianship and the sale of the McKeel property.
6            THE COURT: Okay.
7            MR. DAIN: Yeah. And, Your Honor, the reason that
8    I'm concerned about it is because in the end, all of the
9    money that's left in the estate account really belongs to Ms.
10   Black because she was shorted. So there's money owed back to
11   Ms. Black. It's either in the hundred thousand-some or two
12   hundred thousand-some, and that's why in my view it would be
13   the entire 10,000, because he's taking money from one hand or
14   the other, but it's all Ms. Black's.
15           But what Ms. Kerr is doing is just including the
16   part she believes is unrelated to the actual estate action,
17   which apparently will have to be litigated, because we can't
18   reach a stipulation.
19           THE COURT: Okay.
20           MR. DAIN: So that's--again, so I'd offer what's
21   behind Tab U as Exhibit--
22           THE COURT: K?
23           MR. DAIN: K.
24           THE COURT: Objections to U?
25           MR. THIESSEN: No objection.

BLACK000977

73

```
1            THE COURT:  U is admitted.
2            (Whereupon, Respondent's Exhibit K was received in
3  evidence.)
4            MR. THIESSEN:  I'm sorry, Your Honor.  It's
5  admitted as Exhibit K, correct?
6            MR. DAIN:  Yes.
7            MR. THIESSEN:  Yes.
8            THE COURT:  Why?  Why is it being admitted as K?
9            MR. DAIN:  Because this is a tab that was just for
10  Your Honor's benefit, I know, but we had already had some
11  exhibits A, B, and C that were in.  So we just need to take
12  these next in order.  My choice would have been to include
13  everything in this binder as an exhibit because it relates to
14  Ms. Kerr's testimony, but--
15            THE COURT:  Okay.
16            MR. DAIN:  --it would take too long and we reached
17  stipulations on some of the things.
18            THE COURT:  All right.
19            MR. DAIN:  So it is Exhibit K, and it will not come
20  in with that tab.  The document itself will come in.
21            THE COURT:  Will be coming in as K.
22            MR. DAIN:  Yes.
23            THE COURT:  All right.
24       Q    (by Mr. Dain)  And next there were some legal fees
25  that were paid from the 2013 Trust checking account that in
```

74

1    your expert opinion you believe should be charged to Mr.

2    Black.

3         A    Correct.

4         Q    And those are in Tab?

5         A    W.

6         Q    W.  And could you explain to the Court what those

7    are?

8         A    The document behind Tab W is the accounting

9    reconstruction for the 2013 Trust checking account from June

10   11th, 2013, through June 30th, 2015.  Column K lists the

11   details for the legal fees that were charged to Joanne Black.

12   The first two amounts are the same: 50 percent of what was

13   paid to Schiff Hardin, so again you'll see the $4,622.25 and

14   the 1,997.25.

15        Q    And then it goes to page 2 and also in Column K.

16        A    Correct.

17        Q    What are we--

18        A    The amount of Line 46 was again transferred to the

19   estate out of the 2013 Trust checking account and the

20   information associated with it by Mr. Black stated that this

21   was reimbursement to the estate for fees paid to Carl

22   Glatstein out of the estate.

23             THE COURT:  Why would money be paid to Carl

24   Glatstein out of the estate?

25             MR. DAIN:  If you could answer audibly--I assume

75

1    your answer is you have no idea.

2                THE WITNESS:  I do not know, Your Honor.  There

3    were multiple payments made to Mr. Glatstein out of the

4    estate.

5                THE COURT:  Okay.

6                MR. DAIN:  And then there would be later

7    reimbursements out of the conservatorship funds into the

8    estate.

9                THE WITNESS:  Just this one $6,000 from the 2013

10   Trust checking account to the estate.  So this is the only

11   time that Mr. Black reimbursed the estate for payments made

12   out of the estate to Carl Glatstein.

13               MR. DAIN:  And, Your Honor, when we get to--

14   ultimately we still haven't decided the contempt issue--there

15   were checks paid out of the estate to the attorneys here in

16   Colorado as well, so we're going to have that issue.  They

17   were paid from whatever account Mr. Black chose.  Some were

18   in the 2013 Trust, some were from the estate, some were from

19   the Supplemental Needs Trust.

20       Q     (by Mr. Dain)  So, the next one is a $6,000 payment

21   to Mr. Glatstein, and that was from the 2013 Trust checking

22   account.

23       A     Correct.

24       Q     And that was on what date?

25       A     February 26th, 2015.

BLACK000980

76

1    Q    Okay.  Then there is, following further down, a

2   check to Anthony Lamberti, the New York guardianship

3   attorney, paid out of the 2013 trust checking account,

4   correct?

5        A    Correct.  And this is a second $10,000 payment to

6   Mr. Lamberti.

7        Q    Okay.  We go to the third page--or no, the third

8   page is just the--what is the third page?

9        A    And there is one more payment under Column M, which

10   is the $15,000 payment made to Glatstein & O'Brien on April

11   2nd that was included in the contempt request that has not

12   been reimbursed to Joanne.  It's under Column M the payment

13   to Glatstein & O'Brien of $15,000 was made on April 2nd,

14   2015.  Mr. Glatstein stated that those funds are currently

15   being held in his COLTAF account.

16        Q    And April 2nd, 2015, was the date that this Court

17   ordered the freeze on payments out of the accounts to

18   attorneys.

19        A    Correct.  The check was actually dated April 1st,

20   and Mr. Glatstein stated that he deposited it into the

21   account--his administrative person deposited it into the

22   account on the day of the hearing.

23        Q    Okay.  And so if we total the legal fees:  the

24   15,000, the 10,000, that's 25; the 6,000 and 6,000 comes to

25   37; and then going back to page 1 the two entries there, do

BLACK000981

1   you have a total for what those fees rea?

2        A    The total would be--I don't.

3        Q    Okay.

4        A    I think it might be on the schedule.

5             MR. DAIN:  Do we have a calculator somewhere?  I

6   got to 37,000, then we just need to add the two on the first

7   page.

8             THE WITNESS:  Oh, it would be 43,619.50.

9             MR. THIESSEN:  I'm sorry, Ms. Kerr; could you

10  repeat that, please?

11            THE WITNESS:  $43,619.50.

12            MR. THIESSEN:  Thank you.

13            THE WITNESS:  And one last thing I want to point

14  out as well is the two payments made in Column N is a payment

15  to Anthony Lamberti of $10,000 and Schiff Hardin of $20,000.

16  That $30,000 is part of the $115,000 that was reimbursed to

17  Joanne.  So, these legal fees in Column K and M are outside

18  of the 115,000 that's already been reimbursed.

19            MR. DAIN:  And that 115,000 Your Honor may recall

20  is--so Your Honor does recall--was what Mr. Black paid to Mr.

21  Poskus's trust account which went to Ms. Peterson.

22            THE COURT:  All right, so it's 43--

23            THE WITNESS:  619.50.

24            THE COURT:  Okay.

25            MR. DAIN:  And so what is behind this Tab W will

78

 1    now become Exhibit L.  Am I right?  Good; I got one of them

 2    right.

 3              So will now be--

 4              THE COURT:  L?

 5              MR. DAIN:  --Exhibit L unless there's objection by

 6    Counsel.

 7              MR. THIESSEN:  No objection.

 8              THE COURT:  Thank you.  We'll admit it as L.

 9              (Whereupon, Respondent's Exhibit L was received in

10    evidence.)

11        Q    (by Mr. Dain)  Now, we're not quite done with the

12    legal fees, because Mr. Glatstein was paid again out of the

13    estate.  But I believe you have this in an exhibit that's

14    already in.  We go back--where is this?

15        A    Tab A, Schedule 2-A.

16        Q    Is that--this actually may not be in yet.

17        A    Schedule--it is not in.  Schedule 2-A is the

18    accounting reconstruction for the estate of Renata Black.

19              MR. DAIN:  Does the Court have that?

20              THE COURT:  Yes.

21              MR. DAIN:  Okay.

22        Q    (by Mr. Dain)  And so tell the Court where Mr.

23    Glatstein's fees are here that you believe should be properly

24    charged to Mr. Black.

25        A    The first payment is on page 14 of 24, Line 60.

BLACK000983

79

```
 1    And it's listed under "estate expenses," because it was

 2    included on the estate tax return as legal fees.  So that was

 3    the first $5,000 to Mr. Glatstein.

 4             The next payment is on page 16, Line 105, for

 5    $5,000.

 6        Q    And then?

 7        A    And the last payment is on page 24, Line 381, for

 8    $8,600.

 9        Q    And what is the total amount?

10        A    $18,600.  But from that amount you should deduct

11    the $6,000 that was included in the--I believe it was the SNT

12    checking account that was reimbursed from the SNT.  You can't

13    count that 6,000 twice.

14        Q    So, the net of that is 12,600?

15        A    Correct.

16        Q    Okay, so 12,600 is the total amount from this

17    schedule.  And, absent objection, we would move that into

18    evidence.

19             THE COURT:  As?

20             MR. DAIN:  M.

21             THE COURT:  M.

22             MR. THIESSEN:  No objection.

23             THE COURT:  Admitted.

24             (Whereupon Respondent's Exhibit M was received in

25    evidence.)
```

BLACK000984

1    Q    (by Mr. Dain)   Okay.   Now, I have here a transfer

2    from the trust to estate.

3    A    That's the $10,000 that was transferred out of the

4    Supplemental Needs Trust into the estate of $10,000.

5    Q    Okay.  Has that already been covered in anything?

6    A    The reason it's on that list is that it's my belief

7    that those funds should be coming back to Joanne.   The

8    explanation from Mr. Black was that Joanne owed the estate

9    that $10,000 for the $500 a week that he was paying her.  But

10   the estate still owes Joanne quite a bit of money, so the

11   $10,000 should go back to the Supplemental Needs Trust from

12   the estate.

13             THE COURT:  Okay.  I'm sorry; where are we at now?

14             MR. DAIN:  And where would you find that?  I don't

15   have a--is that also on--

16             THE WITNESS:  It's going to be under Tab U.

17             MR. DAIN:  Which was Exhibit--

18             THE COURT:  K.

19             MR. DAIN:  Exhibit K.

20             THE COURT:  All right.

21             THE WITNESS:  Under column J, Line 25.

22             MR. DAIN:  And then presumably there's litigation,

23   as there apparently will be in New York, then Mr. Black would

24   apply for a credit there.

25             THE COURT:  Okay, so say that again.  So, this

BLACK000985

81

1   $10,000 at Line 25 supposedly was a transfer from the Special

2   Needs Trust checking account to the estate.

3            THE WITNESS:  Correct.

4            THE COURT:  To reimburse the estate.

5            THE WITNESS:  Correct.

6            THE COURT:  For money Mr. Black paid to Joanne.

7            THE WITNESS:  Correct.

8            THE COURT:  As conservator?

9            MR. DAIN:  And I'm sorry; I don't know that Ms.

10  Kerr can answer that--

11           THE WITNESS:  I don't know the answer to that.

12           MR. DAIN:  --but that's the issue we're having with

13  the defense.  They'll say on the one hand that's his executor

14  duty, but on the other hand his conservator duty.  So if

15  they're going to argue this should be litigated in New York,

16  well then they have to pay it here because they had her

17  paying it into the estate account.  They should pay it back

18  here.

19           THE COURT:  Okay, this was paid on February 17th of

20  2015?

21           THE WITNESS:  Correct.

22           THE COURT:  So, clearly after he was appointed

23  conservator.

24           THE WITNESS:  Correct.

25           THE COURT:  All right.

BLACK000986

82

1      Q      (by Mr. Dain)  Then I had taxes on tax-free

2  distributions.  This is the Roth IRA distribution.

3      A      Correct.

4      Q      Now, I have this as tab--in our Tab C, Exhibit A in

5  Tab C.

6      A      Correct.

7      Q      And so that again is the motion to request status

8  conference, and you can direct the Court to where--

9      A      Under Exhibit A, this is the--under lines--on Lines

10  15 through 20 what I was presenting here is that a Roth IRA

11  is paid pre-tax, so when you make the distributions out of a

12  Roth IRA, you do not pay income taxes on those as the

13  recipient of those funds.

14              THE COURT:  Okay, what tab?

15              THE WITNESS:  Tab C.

16              THE COURT:  C.

17              MR. DAIN:  And it's just before--it's Exhibit A,

18  which is just before Schedules A-1 and A-2, which are already

19  exhibits.

20              THE WITNESS:  I apologize.

21              MR. DAIN:  I can give you my copy if you need it,

22  Your Honor.

23              THE COURT:  Okay, so--all right.  I think I'm

24  there.  So tell me where you are right now.

25              THE WITNESS:  So, when a person receives a Roth

BLACK000987

83

```
 1   IRA, especially in this case as a beneficiary of the Roth
 2   IRA, the distributions to that beneficiary are not taxable
 3   income.  Because the Roth IRA was distributed to Mr. Black's
 4   children, Joanne Black lost the amount of tax-free
 5   distributions.  Without knowing what her future tax rates
 6   will be, it's impossible to determine exactly what the amount
 7   would be.
 8        Q    (by Mr. Dain)  So, in your expert opinion can you
 9   give--
10        A    In my expert opinion the amount of the Roth IRA
11   that is nontaxable distributions is the amount that was on
12   the date of death, so it's $316,680.  So, if you take a 10
13   percent tax rate of that or a 15 percent--it's impossible to
14   tell.
15        Q    So what did you do?
16        A    I would state that the $316,000 times 15 percent
17   tax rate--potential tax rate would be what Joanne lost.
18   Again, the 15 percent is my expert opinion because there's no
19   way to know in the future what Joanne's tax rates may be.
20   She may have significant distributions out of the trust, out
21   of the Supplemental Needs Trust, which could increase her tax
22   bracket to 15 percent.  So, the full amount of the Roth IRA--
23   and I apologize, the computation on the schedule is only
24   based on two-thirds of the Roth IRA.  It should be 100
25   percent.  So, the loss to Joanne is anywhere between $31,764
```

BLACK000988

84

```
 1   or $47,646.  Those amounts are on Line 18 and 20.
 2        Q    And you chose the 15 percent bracket?
 3        A    Correct.
 4        Q    And why did you do that?
 5        A    Because it's not possible to determine what her
 6   taxable rate would be in the future.
 7        Q    Okay, but given the numbers that you were looking
 8   through and the data you were looking through, you believe a
 9   15 percent tax bracket is a fair bracket to apply?
10        A    I believe that's a reasonable tax bracket.
11        Q    And so your loss there through Mr. Black's
12   distribution to his children of the Roth IRA is $47,646?
13        A    Correct.
14             MR. DAIN:  Okay.  And so I would move this Exhibit
15   A in as next exhibit, which is N.
16             (Inaudible comments.)
17             MR. DAIN:  Okay.  Any objection?
18             MR. THIESSEN:  No.
19        Q    (by Mr. Dain)  The next item is a smaller item, but
20   it's going back to Tab W, which is I believe now Exhibit M,
21   is the Karen Lemon (phonetic) for $600, the bookkeeper, and
22   why did you believe that this is properly charged to Mr.
23   Black?
24        A    It was a payment made to a bookkeeper to prepare a
25   schedule that Mr. Black--I believe was trying to say the
```

BLACK000989

85

```
 1    dollar value of the stock transfers didn't matter as long as
 2    this stock was transferred to that stock.  I didn't quite--
 3              THE COURT:  You're talking about--
 4              THE WITNESS:  --I could not quite understand it.
 5              THE COURT:  You're talking about the Line 36
 6    number?
 7              THE WITNESS:  (No audible response.)
 8              THE COURT:  No?
 9              THE WITNESS:  I think it's under Tab U.
10              MR. DAIN:  Oh.  I have it under W.
11              THE WITNESS:  Wait a second.  It's line 58 under
12    Tab W, Column O.
13              MR. DAIN:  No, there we go.
14         Q    (by Mr. Dain)  Column D, Line 58, on page 2, Karen
15    Lemon, bookkeeper.
16         A    Correct.
17              THE COURT:  $600.
18         Q    (by Mr. Dain)  And this was February 25th, 2015, so
19    this was Mr. Black responding to your inquiries about certain
20    transactions?
21         A    Correct.  And it was--when I stated earlier that it
22    was impossible to tell how Vanguard transferred the assets
23    from the Vanguard estate account into the Issue Trust and the
24    Supplemental Needs Trust, I believe that was for a schedule
25    that she tried to put together to show me that it was fine.
```

86

1          THE COURT:  And what did he tell you the $600 was

2   for?

3          THE WITNESS:  Well, I got an invoice for $450, but

4   he paid $600, and it was for her to prepare the schedule to

5   try to show me that these transfers were fine.

6          THE COURT:  Okay.  Did you rely on that at all?

7          THE WITNESS:  No.

8          THE COURT:  Okay.

9      Q    (by Mr. Dain)  In other words, you viewed those as

10  defensive of Mr. Black rather than for the benefits of Ms.

11  Black.

12     A    Correct.

13     Q    Then the last--well, not the last one.  The next

14  one I have is your forensic accounting fees.  Do you know

15  what your bills are to date?

16     A    Through August 31st I think the balance due was

17  about 18,000.  Those were filed with the Court by Gail Young.

18     Q    No, not--the balance due is what?

19     A    The balance due--so, the total fees to date would

20  be 68,539, something like that.

21     Q    And then there, of course, will be additional

22  charges.  You're testifying here today, you had to prepare

23  for your testimony, there have been questions in the interim

24  including related, I believe, to responses to the contempt

25  action, other things that will be in a subsequent bill?

BLACK000991

87

```
 1      A    Correct.

 2      Q    Okay.  But currently that's the amount, 68,539?

 3      A    Approximately.

 4      Q    Approximately.  Okay.  Now this--in terms of the

 5  testimony, you've not included any residual in the estate

 6  that you believe was where the transfers did not go two-

 7  thirds/one-third but went more to Mr. Black than the one-

 8  third and Ms. Black was, my word, shorted?

 9      A    Correct.

10      Q    Okay.  And then I have this does not include any

11  loss on sale of stock or tax ramifications of non-

12  distributions and resulting--well, could you explain that?

13      A    Yes.

14      Q    Yes.

15      A    This relates more to the Supplemental Needs Trust.

16  The Supplemental Needs Trust document, Article 4, has a

17  specific paragraph that details that the trustee is to

18  minimize taxes and in order to do that, one of the potential

19  aspects is that funds are distributed out of the Supplemental

20  Needs Trust as a distribution to Joanne.  As a result of

21  those distributions, a deduction is given to the Trust to

22  reduce income; it's called a distributable net income

23  deduction.  Because the payments to Mr. Pinto were made

24  directly out of the estate, the Trust, the Supplemental Needs

25  Trust, did not get that deduction and therefore had to pay
```

BLACK000992

88

1 more taxes than was necessary.

2     Q   Now, you did not include that because it's a number

3 you can't calculate at this time, or is it because you

4 believe that should be litigated in the estate in New York?

5     A   I believe it isn't a Colorado issue, but it's not

6 possible.  I would have to recreate a tax return for Joanne

7 with the distributions to her being taxable as an individual

8 and compare the differences what the taxes would be.  Because

9 the tax rate for the estate is--excuse me, the tax rate for

10 the Supplemental Needs Trust is 39.6 percent.  An individual

11 tax rate is much lower than that.  So, it would be a lot of

12 tax computation to be able to determination exactly what that

13 amount would be.

14     Q   So, in your expert opinion where do you think that

15 should be resolved?

16     A   The total taxes paid between 2013 and 2014, which

17 are under Tab Y, is $40,710.  I apologize; that's not Y.  Tab

18 V as in Victor.

19         THE COURT:  Where does it say that?

20         THE WITNESS:  Well, I gave you a total amount.  So,

21 for instance, on the 2013 tax return Line 23 reflects a total

22 tax paid of $13,872.

23         THE COURT:  Okay.

24         THE WITNESS:  If distributions had been made to

25 Joanne Black of $25,000, as you see the income on Line 2A, it

BLACK000993

89

1    would have reduced the taxable income by $25,000.  I don't

2    want to get into taxes too much, but the Line 4 capital gains

3    and those are considered corpus income, so you can't reduce

4    those.  So, he could have distributed $25,000 to Joanne and

5    had a $25,000 reduction of the taxable income in 2013.

6        Q    (by Mr. Dain)  And is that a number then you could

7    calculate how much in tax savings that would be?

8        A    I don't prepare estate or trust tax returns, so I

9    could have it computed.  It would be approximately--it's hard

10   to say.  You would have to reduce the amount of taxable

11   income on the Trust and then compute a tax return for Joanne

12   including the distributions, and then you would have to

13   include her social security income.  It can be calculated; I

14   did not calculate that because I'm not a tax preparer.  But I

15   know--I've prepared 1041s; these are estate and trust tax

16   returns.

17       Q    I guess just asking your expert opinion if we had

18   to hire a tax preparer to do this calculation, in the end

19   would whatever the savings here be worth that calculation?

20       A    Yes.  My estimate would be--my expert opinion and

21   my estimate would be between $15,000 and $20,000.

22       Q    Okay.  So then if we just took the lower of that

23   would it be a reasonable probability that Ms. Black would

24   have saved $15,000 on these tax returns had Mr. Black

25   properly paid the expenses through the Supplemental Needs

BLACK000994

90

```
 1   Trust rather than through the estate?
 2       A    To correct that, just for factual--
 3       Q    Sure.
 4       A    --knowledge.  The distributions would have been
 5   made to Joanne out of the Supplemental Needs Trust and then
 6   she would have paid the expenses.
 7       Q    Okay.  So $15,000 would be a fair--
 8       A    Yes.
 9       Q    --estimate.
10       A    And as an estimate you can look at the $25,000 in
11   2013, 25,280, that could have been reduced by a distribution,
12   and the $42,000 in 2014 that could have been reduced by
13   distributions.  That's Line 2A on the 2014 tax return.
14       Q    Okay.  So, that's $15,000.  Now, in your expert
15   opinion then, the fees would also--should be charged to Mr.
16   Black would be the fees for Mr. Frigon in entering into this
17   litigation with respect to his duties as advising on
18   Supplemental Needs Trusts?
19            MR. THIESSEN:  Objection; beyond the scope of her
20   qualification as a forensic accountant.
21       Q    (by Mr. Dain)  Well, in terms of your reviewing all
22   the bills and records in this case, you're aware that there
23   are fees--there are still fees that are due Ms. DiPonio and
24   Ms. Young and Mr. Frigon?  I forgot to mention potentially
25   Ms. Peterson.  You're aware of those fees?
```

BLACK000995

91

```
 1      A    I am aware that they have incurred fees, yes.
 2      Q    Okay.  Those are not factored anywhere into the
 3   analysis in this report.
 4      A    Correct.
 5           MR. DAIN:  Okay.  So, actually I think that's a
 6   fair objection.  Those would be just for Your Honor to
 7   determine.
 8           THE COURT:  All right.
 9      Q    (by Mr. Dain)  Okay.  Were there any others that I
10   haven't covered?  I believe I have, but--
11      A    I believe that's it.
12           MR. DAIN:  Okay.  Then I have no further questions,
13   Your Honor.
14           THE COURT:  Okay.  Any questions--
15           MR. DAIN:  Oh, is there any exhibit I didn't move
16   into--
17           FEMALE SPEAKER:  I have (inaudible).
18           MR. DAIN:  Okay.
19           THE COURT:  Okay.
20           MR. DAIN:  Thank you, Your Honor.
21           THE COURT:  Mr. Thiessen.
22                       CROSS-EXAMINATION
23   BY MR. THIESSEN:
24      Q    You testified about payments to Mr. Lamberti,
25   correct?
```

92

1       A       Correct.

2       Q       And you also testified that those were to proceed

3  with the guardianship in New York?

4       A       The invoice has a line item that says,

5  "guardianship New York."

6       Q       Have you reviewed the New York pleadings that have

7  been filed?

8       A       With regards to?

9       Q       Guardianship.

10      A       No.

11      Q       How can you make a determination as to whether or

12  not that was an appropriate expense?

13      A       Let's--can we look at the invoice?

14              MR. THIESSEN:  Certainly.

15              THE COURT:  All right.  And where are you now?  Tab

16  U?

17              THE WITNESS:  Tab U, yes.

18              THE COURT:  Tab U.

19              THE WITNESS:  What we discussed under Tab U was the

20  $3,700 that was paid out of the Supplemental Needs Trust for

21  the payment to Mr. Lamberti that Mr. Black determined was an

22  expense of the Supplemental Needs Trust, the $3,700 that

23  related to the temporary restraining order on the sale of the

24  property.

25      Q       (by Mr. Thiessen)  Correct.  But you're making a

93

```
 1    determination that this should be appropriately charged to

 2    Mr. Black because Joanne Black did not benefit?

 3         A    Mr. Black is trying to sell a house that--

 4         Q    Please answer my question.

 5         A    Pardon me?

 6              MR. DAIN:  Objection.

 7              THE COURT:  Let her finish.

 8              THE WITNESS:  It is my understanding that--well,

 9    the will of Renata Black states that the house on McKeel

10    should go--Joanne can live in that or a similar home that is

11    suitable for her.  Mr. Black is trying to sell that home

12    against Ms. Black's wishes, and Mr. Black is charging Joanne

13    Black for the fees to fight the sale of that property.  I do

14    not believe that is to the benefit of Joanne Black.

15         Q    (by Mr. Thiessen)  And have you reviewed the

16    pleadings?

17         A    No, I have not.

18         Q    Okay.  And you've also testified as to some other

19    expenditures by Mr. Lamberti or some fees paid to Mr.

20    Lamberti; is that correct?

21         A    Correct.

22         Q    And are you aware that this--did Mr. Black file for

23    guardianship in New York; are you aware of that?

24         A    I am aware that Mr. Black has filed for

25    guardianship in New York.
```

BLACK000998

94

1     Q    And he's engaged counsel; he's engaged Mr.
2  Lamberti.
3     A    He has engaged Mr. Lamberti, yes.
4     Q    And so I'm failing to see the connection between
5  Mr. Black's engagement of Mr. Lamberti and the
6  appropriateness of his expenditure with respect to this
7  calculation.
8     A    The Guardian ad Litem report that was filed by Ms.
9  Young clearly stated that Ms. Black does not wish Mr. Black
10  to be her guardian.  To pay $10,000 for Mr. Black to be her
11  guardian is not in the best interest of Joanne Black.
12     Q    Isn't that for the New York court to determine?
13     A    He paid these fees out of the estate--excuse me,
14  out of the checking account of Joanne Black.  So if it's a
15  New York matter, it's not for the New York court to determine
16  when the funds came out of Joanne's conservatorship checking
17  account.
18     Q    But isn't it for the New York court to determine
19  which guardian is in Joanne Black's best interest?
20          MR. DAIN:  I'm going to have to actually object.
21  He's trying to get from Ms. Kerr rather than the subject
22  matter (inaudible).  She's not--she's certainly can't testify
23  as to the (inaudible).
24          MR. THIESSEN:  She--
25          THE WITNESS:  May I answer?

BLACK000999

95

```
 1          MR. THIESSEN:  Certainly.
 2          THE WITNESS:  My role in this was to point out the
 3   fees that have been paid out of Joanne's accounts.  I believe
 4   fully that it is up to the Judge to determine whether those
 5   fees are for the benefit of Joanne or not.  I've not made
 6   that determination; I believe that's the Judge's role to make
 7   that determination.  I merely pointed the payments out.
 8      Q    (by Mr. Thiessen)  Are you aware that Mr. Black
 9   made weekly payments to Joanne Black?
10      A    From?
11      Q    From the estate?
12      A    Yes, I am.
13      Q    And initially those amounts were $280 a week?
14      A    Correct.
15      Q    And then he increased that to $500 per week?
16      A    Correct.
17      Q    Have you accounted for that in any of your
18   schedules?
19      A    Yes.
20      Q    Would you mind identifying that?
21      A    Tab A, Schedule 2, Line 28.
22      Q    And the amount you're referencing is $56,180?
23      A    That's correct.
24      Q    And so when you--you believe that one of the
25   damages is the amount Mr. Black transferred from the
```

BLACK001000

96

1  Supplemental Needs Trust to the estate in the amount of
2  $10,000?
3      A    I didn't say it was damages; I stated that it was
4  funds that should go back to Joanne because Mr. Black
5  transferred $10,000 from the Supplemental Needs Trust
6  claiming that those were funds that Joanne owed the trust,
7  yet subsequent to that transfer he began making payments
8  directly to his daughter out of the estate.
9      Q    I'm not seeing how the connection--what is the
10  basis for the impropriety of the $10,000 transfer?
11     A    Ms. Black, as you will see on the Schedule 2, is
12  due in excess of $250,000 at a minimum from the estate, and
13  Mr. Black took $10,000 out of the Supplemental Needs Trust
14  saying Joanne owed the estate back money.
15     Q    Do you have any evidence that Mr. Black didn't
16  then--did not provide $10,000 worth of value to Joanne Black
17  in the form of weekly distributions?
18     A    After the $10,000 payment came out of Joanne's
19  account?  No, he did not.
20     Q    Or prior?
21     A    Prior is the two-thirds distributions out of the
22  estate.
23     Q    Let's go to your calculations with respect to the
24  Roth IRA.  Your testimony is that it's impossible to
25  determine?

BLACK001001

97

```
 1      A    Correct.

 2      Q    You also testified it's impossible to tell?

 3      A    To tell what?

 4      Q    The amount of any benefit she lost.

 5      A    The amount of the benefit she lost is whatever her

 6  tax bracket would be of the $316,870 that was the nontaxable

 7  Roth IRA that she inherited.

 8      Q    Right, but didn't you testify that it was

 9  impossible to tell that amount?

10      A    That's correct, because the future tax rate is

11  unknown.

12      Q    Right.  You said there was no way to know the tax

13  rate, correct?

14      A    Correct.

15      Q    Did you ever review any tax returns of Joanne

16  Black?

17      A    I'm sorry, but this would be future distributions.

18      Q    Right.  But couldn't you determine future--wouldn't

19  one want to evaluate prior tax returns to determine what the

20  future tax rate may be?

21      A    No, sir.  My tax rate has fluctuated significantly

22  over the last five years.

23      Q    So it wouldn't inform the decision whatsoever.

24      A    Did Ms. Black file a tax return in 2013 or 2014?

25      Q    I'm asking you; did she?
```

BLACK001002

98

1     A    Mr. Black did not file a tax return for Ms. Black
2  in 2013 or 2014.
3     Q    Why not?
4     A    That's a question for Mr. Black.
5     Q    Isn't it possible that it was because her income
6  was so low that she didn't need to file a tax return?
7     A    Then how would I look at her tax return to
8  understand what the tax rate would be?
9     Q    Fair enough, but isn't it safe--if he didn't file
10  it--let's assume he didn't file a tax return because her
11  taxable amount was very low.  Can you make that assumption
12  just for purposes of--
13     A    I'm not assuming anything.  I'm sorry, sir.
14     Q    Okay.  Did you see any evidence that Joanne Black
15  would have needed to file a tax return?
16     A    Based on her social security income, that is the
17  only taxable income, she would not have needed to file a tax
18  return.
19     Q    So, in other words, Mr. Black appropriately did not
20  file a tax return in 2013 or 2014 based on her social
21  security income.
22     A    And so how would I look at a previous tax return to
23  understand what her tax rate would be?
24     Q    Right, but you testified as to the value of her
25  social security not requiring her to file a tax return,

BLACK001003

99

1   correct?

2       A    I--

3            THE COURT:  So, the workman's comp isn't part of

4   all of that?

5            THE WITNESS:  It's my understanding that the

6   workman's comp is nontaxable, but it's Mr. Black's

7   responsibility to file a tax return if it's taxable or not.

8            THE COURT:  Okay.

9       Q    (by Mr. Thiessen)  What evidence do you have that

10  Ms. Black would fall within the 15 percent tax bracket?

11      A    Okay.  If she were to minimize her taxes, as is

12  required from the Supplemental Needs Trust, she would have

13  distributions equivalent to her ordinary dividend income.  We

14  don't know what that is.  It could be $200,000; it could be

15  $30,000.  We don't know what the future income of the

16  Supplemental Needs Trust will be that would therefore

17  determine what her distributions to reduce her taxable income

18  would be, and therefore we don't know what her tax bracket

19  would be.  It may be a year where her Supplemental Needs

20  Trust has $250,000 in ordinary income, which can be reduced

21  as taxable income by a distribution, which would be taxable

22  to Joanne at that tax--at that income amount her tax rate

23  could 25 percent.  We don't know.

24      Q    So, you're saying she's going to lose income tax

25  benefits.

BLACK001004

100

```
 1      A    I'm not saying that; that's a fact.
 2      Q    Where will she have to pay these income taxes?
 3  Where will these income taxes be owed from?
 4      A    Okay.  Let me explain how a Roth IRA works.
 5      Q    No, I don't need a tutorial on a Roth IRA.
 6      A    I don't understand your question.  I'm sorry.
 7      Q    You're saying that she's going to lose--she's going
 8  to owe income tax; is that not your testimony?  Will she
 9  owe--
10      A    That is not my testimony.
11      Q    --income tax?
12      A    My testimony is that Joanne has--Joanne was given a
13  Roth IRA in the value of $316,870.  When she made
14  distributions out of that Roth IRA, those funds would not be
15  taxable to her.  She no longer has $316,000 of nontaxable
16  distributions.  So, any money she takes out of now the
17  Supplemental Needs Trust will be taxable to her.
18      Q    But, again, you don't know what her tax rate will
19  be.
20      A    Of course I do not know what her tax rate will be.
21      Q    And you don't know how much amount would be taxed.
22      A    I know that $316,870 of income that comes to her
23  from her Supplemental Needs Trust will be taxed.
24      Q    But your calculation of 47,000 in damages is
25  speculative of best.
```

BLACK001005

101

```
 1      A    Fifteen percent is reasonable.

 2      Q    Why?

 3      A    Why?  What's your tax rate?

 4      Q    Let's circle back.  You've testified that Mr. Black

 5   would not be required to file tax returns because she was in

 6   a low income tax bracket, correct?

 7      A    Ms. Black.

 8      Q    Ms. Black.  Thank you.

 9      A    Last two years, yes.

10      Q    So wouldn't it be at least reasonable to infer that

11   if she hasn't filed taxes from the prior years she would

12   follow within a low tax bracket?

13      A    No, sir.

14      Q    Okay.  But, again, you testified it's impossible to

15   determine.

16      A    It's not--did I say impossible?

17      Q    Yes, you did.

18      A    I'm not sure that I meant impossible.  I'm saying

19   that it's not possible to determine what her future tax rate

20   will be, but it's guaranteed to be at least 10 percent if not

21   15 to 20 percent.  If Ms. Black has a very good year in the

22   Supplemental Needs Trust and has to have distributions to her

23   so that she reduces the Trust taxable income and therefore

24   has individual taxable income, her tax rate could be 25

25   percent.
```

BLACK001006

102

1      Q    But it's impossible to tell.

2      A    I just said it's not possible.

3      Q    Let's move on to the Karen Lemon issue.  You

4  received a second invoice from Mr. Black explaining those

5  charges, didn't you?

6      A    I don't believe it was for $150.

7      Q    Did you receive invoices that totaled $600 or more?

8      A    I do not remember the second amount of the invoice,

9  but it wasn't $150.  That's what I remember.  If you have

10  one, I'd be more than happy to look at it.

11      Q    Let's move on to your testimony with respect to

12  the--oh, you didn't give any value as to any loss on a sale

13  of stock of non-distributions, did you?

14      A    I did not.

15      Q    The payments made from the estate for--

16      A    Excuse me.  Could you ask me that last question

17  again?

18      Q    Sure.  With respect to any loss on the sale of

19  stock of non-distributions you didn't make any calculations

20  with respect to that.

21      A    That statement doesn't make sense.  The sale of

22  stock--when I was discussing the loss on the sale of stock,

23  Mr. Black sold stock out of the Supplemental Needs Trust

24  brokerage account to pay for the taxes and legal fees.  The

25  loss on those sales could be computed.  I did not compute

103

1   that.

2        Q       With respect to your testimony regarding the

3   payments out of the estate for things that benefitted Ms.

4   Black, for example CPI Investigations?

5        A       I did not testify about anything to do with that.

6        Q       You testified as to the estate not--excuse me, as

7   the SNT not getting a deduction for payments made from the

8   estate.

9        A       Correct.

10       Q       And one of those payments made was to CPI

11  Investigations and Mr. Pinto.

12       A       Correct.

13       Q       Were these payments deducted from the estate?

14       A       I haven't gotten a final accounting from the

15  estate, so I do not know that.

16       Q       But it's possible that they were deducted from

17  estate expenses so that Joanne Black received that deduction

18  benefit.

19       A       No, sir; they would not be estate expenses.  They

20  would not benefit the estate.

21       Q       But you haven't reviewed that issue.

22       A       I have reviewed that issue.

23       Q       You just said you had not reviewed that issue

24  because the estate hadn't provided a final accounting.

25       A       Okay.  You asked me if the payments to Mr. Pinto

BLACK001008

104

1    would have benefitted Joanne because the estate would have

2    gotten a deduction for those payments.  Is that what you

3    asked me?

4        Q    Yes.

5        A    I'm sorry, but payments to Mr. Pinto are not an

6    expense of the estate to reduce the taxable income.

7        Q    You provided testimony with respect to the

8    computation (inaudible) computations on the estate's return,

9    and you testified that you don't compute trust tax returns;

10   is that correct?   You don't prepare trust tax returns.

11       A    Could you  start--could you repeat the beginning of

12   that, please?

13       Q    Sure.  The latter part of your testimony you

14   provided testimony with respect to the estate tax returns.

15       A    No, sir.  The Trust tax returns.

16       Q    Well, let's go there.

17       A    Tab V as in Victor.

18       Q    Thank you.  Okay, the Trust tax returns.  And you

19   referenced Article 4 in the--no, it wasn't--Article 4 in the

20   Supplemental Needs Trust--

21       A    Correct.

22       Q    --is that correct?

23       A    Correct.

24       Q    Let's take a look at Article 4 in the Supplemental

25   Needs Trust.

BLACK001009

105

```
 1      A     Tab Z as in zoo.
 2            THE COURT:  And is this the original one or the new
 3   one?
 4            THE WITNESS:  This is the Supplemental Needs Trust,
 5   so this is the 1997--
 6            THE COURT:  The original.
 7            THE WITNESS:  The original.  The new one is called
 8   the "2013 Trust."
 9            THE COURT:  Okay.
10      Q     (by Mr. Thiessen)  And you referenced Article 4
11   saying there's a direction to minimize taxes.
12      A     Correct.
13      Q     Sorry; I'll let you get there.  You take a look at
14   Section 2.
15            Says, "Trustee Protected.  The trustee shall not be
16   accountable to any person interested in this trust with a
17   manner in which in good faith the trustee carries out this
18   direction and minimize overall taxes and expenses including
19   decision the trustee may make not to incur the expenses of
20   detailed analysis of the alternative choices."
21            Had you reviewed this section?
22      A     I believe what this is stating is that if there is
23   good faith in the actions of the trustee that he can't be
24   held accountable for damages that might occur as a result.
25      Q     Right.  So with respect to the estate--the Trust
```

BLACK001010

106

1    tax returns--

2         A    I did state "good faith."  Mr. Black had a duty to

3    the trustee's beneficiary to hire competent tax assistance to

4    understand the distribution deduction that would have

5    benefitted Joanne by not having to pay so much taxes.

6         Q    But do you have any evidence with respect to Tab V

7    that Mr. Black was not operating in good faith with respect

8    to the filing of these returns?

9         A    Only as a result of Joanne Black having to pay more

10   taxes.

11             MR. THIESSEN:  One second, Your Honor.

12             No further questions, Your Honor.

13             THE COURT:  Okay.  Any redirect?

14             MR. DAIN:  Just briefly.

15                       REDIRECT EXAMINATION

16   BY MR. DAIN:

17        Q    Ms. Kerr, in terms of determining the tax loss to

18   Ms. Black from the distribution from the Roth IRA if I'm

19   understanding correctly, what you're saying is of course no

20   one could predict the future tax rate, but what you did is

21   take a reasonable estimate based on your knowledge of the

22   assets that are in there and the fact that those assets are

23   likely to earn income which would require distributions to

24   Ms. Black--

25             MR. THIESSEN:  Objection; leading, Your Honor.

BLACK001011

107

```
1            MR. DAIN:  --to minimize taxes; is that correct?
2            THE COURT:  All right.  Say that again; I'm sorry.
3            MR. DAIN:  Okay.  It might have been a mouthful.
4   Let me--
5            THE WITNESS:  Want me to say it?
6       Q    (by Mr. Dain)  Why don't you say in your own words
7   what was your basis for the reasonable estimate of a 15
8   percent tax rate.
9       A    As I mentioned to Mr. Thiessen, the distributions
10  out of the Supplemental Needs Trust should be equivalent to
11  the income that the Supplemental Needs Trust earns so they
12  don't pay a tax through the Trust, but rather the individual
13  pays the Trust.  So, given the value of the assets in the
14  estate--in the Supplemental Needs Trust, Ms. Black could very
15  well incur taxable income--significant amounts of taxable
16  income in the future as a result of distributions out of the
17  Supplemental Needs Trust based on earnings of the
18  Supplemental Needs Trust.
19      Q    And I know that Counsel asked you some questions
20  about whether the New York court would be the one to
21  determine whether Mr. Lamberti's efforts were on behalf of
22  Ms. Black.  But in terms of your expert analysis, you saw
23  that Mr. Lamberti was paid by checks from Mr. Black through
24  whichever account, the estate account or Supplemental Needs
25  Trust, but those were checks paid by Mr. Black, correct?
```

108

1       A    Correct.

2       Q    Did Mr. Black ever give you any orders from a court

3  in New York that set stated that these were reasonable fees

4  for a protected person such as Ms. Black?

5       A    No.  As a matter of fact, when I requested a copy

6  of the invoice, the last $10,000 paid to Mr. Lamberti, I was

7  told it was a retainer.

8       Q    Okay.  And you understand that in this case--you

9  witnessed the testimony that Ms. Black, as a protected

10 person, any fees that are paid to professionals by her would

11 require the court examine and approve those.

12      A    That's correct.

13      Q    You saw Mr. Black didn't give you anything from New

14 York in which a court ordered fees to be paid to Mr. Lamberti

15 for the protected person, Ms. Black.

16      A    That's correct.

17      Q    What you saw was checks paid for services to Mr.

18 Black, correct?

19      A    The invoices were--well, I can't answer that

20 question.

21      Q    The invoices that you looked at then were for

22 counseling given to Mr. Black.

23      A    Correct.

24           MR. DAIN:  Okay.  I have no further questions.

25           THE COURT:  Okay.  Anything else for Ms. Kerr?

BLACK001013

109

```
 1          MR. THIESSEN:  One or two quick questions, Your
 2   Honor.
 3                    RECROSS EXAMINATION
 4   BY MR. THIESSEN:
 5      Q    Ms. Kerr, you didn't see a court order from the New
 6   York court that said Mr. Black's payments to counsel were
 7   improper, did you?
 8      A    I don't know how they would know that the payments
 9   were made to any of the attorneys.
10      Q    But in other words, there's no court order you've
11   seen from a New York court that he wasn't allowed to pay his
12   counsel in New York those amounts.
13      A    Out of Joanne's funds?
14      Q    Correct.
15      A    I'm sorry; can you ask me that question again?
16      Q    Sure.  You haven't seen a court order from a New
17   York court that Bernard Black is not entitled to pay his
18   attorney fees for the guardianship proceedings from Joanne
19   Black's funds, have you?
20      A    The approval should have come from this court since
21   the fees were out of this court's funds.
22      Q    But would you answer my question?  Have you seen a
23   New York court order?
24      A    No, sir, I have not seen a New York court order
25   saying that the fees were inappropriate.
```

110

```
 1      Q    Correct.

 2      A    Is that what you asked me?

 3      Q    Yes.

 4      A    No, I don't believe that there's been any court

 5    action that a court could rule that the funds were

 6    inappropriate.

 7            MR. THIESSEN:  Nothing further.

 8            THE COURT:  Okay.

 9            MR. DAIN:  No questions for Ms. Kerr, but before we

10    get to the next witness, Your Honor, I do think this is

11    actually a legal question.  If the argument is that Mr.

12    Lamberti's fees were for Ms. Black's benefit, it's clear that

13    she's a protected person whether it's here or in New York if

14    she needs guardianship and no fees could be paid out of her

15    funds without a court's approval.  So I think this Court can

16    make a determination that Mr. Lamberti's fees were not for

17    the benefit of Ms. Black.  And it wouldn't require any

18    speculation, because she's the protected person not Mr.

19    Black.

20            THE COURT:  Okay.  Thank you.

21            MR. DAIN:  Okay, and we have no further witnesses,

22    so I assume that's (inaudible).

23            MR. THIESSEN:  Your Honor, if I could suggest a

24    brief recess?

25            THE COURT:  All right.  What, 10 minutes?
```

111

```
 1          MR. THIESSEN:  Yes, Your Honor.

 2          THE COURT:  All right.

 3          (Whereupon, a recess was taken.)

 4          THE COURT:  Okay, record's back on.

 5          MR. THIESSEN:  Your Honor, we weren't going to call

 6  any witnesses, but we were able to reach a stipulation with

 7  Mr. Dain with respect to Ms. Nancy Peterson receiving

 8  $115,700--confirmation that she received $115,700 from our

 9  client trust account that had been paid personally by Bernard

10  Black, and it is being held by the conservatorship for the

11  benefit of Joanne Black.

12          THE COURT:  Okay.

13          MR. DAIN:  Do we have a date on that just so we

14  (inaudible) our values to date?

15          THE COURT:  And that was from his personal funds,

16  not from the estate, right?

17          MR. THIESSEN:  That's correct, Your Honor.

18          Ms. Peterson, I'm frantically trying to get a date.

19          MS. PETERSON:  I can probably (inaudible) check

20  (inaudible) August 12th.

21          MR. THIESSEN:  And for the record, the check is

22  dated August 12, 2015.

23          THE COURT:  All right.

24          MR. THIESSEN:  And it was deposited August 15,

25  2015.
```

BLACK001016

112

```
 1              THE COURT:  Very good.
 2              All right, so you're not going to present any
 3    witnesses then?
 4              MR. THIESSEN:  No, Your Honor.
 5              THE COURT:  Okay.  So then Ms. DiPonio or Ms.
 6    Young, any other witnesses?
 7              FEMALE SPEAKER:  No, Your Honor, I have none.
 8    Thank you.
 9              THE COURT:  Okay.  So are we just down to argument
10    at this point?
11              FEMALE SPEAKER:  Yes, Your Honor, I think--I mean,
12    there's a couple things still pending.  There was the motion
13    for contempt that was filed in this case, there's the motion
14    for civil back damages that was filed and responded to just
15    this past Friday, so I don't know if the Court wants to hear
16    testimony on that or--
17              THE COURT:  Well, I think whatever you want to give
18    testimony on you should do it.
19              FEMALE SPEAKER:  --or argument on that--
20              THE COURT:  Really, I don't really--I'm not
21    inclined to issue the contempt citation.
22              FEMALE SPEAKER:  Okay.
23              THE COURT:  It's a fine or imprisonment if you
24    prove up enough for punitive damages.  If you prove up the
25    other then, Your Honor, he has to pay whatever hasn't been--
```

113

1   or, you know the amounts of money that he paid out and

2   shouldn't have, but it's really the same difference, isn't

3   it, it's the surcharge?

4           MR. DAIN:  Well, Your Honor, let me state the

5   reason that I think it's important.

6           First, there was no question on April 2nd that Your

7   Honor issued the order freezing those accounts.

8           THE COURT:  Right.

9           MR. DAIN:  Mr. Glatstein particularly was present

10  at that time.  Mr. Black was present at that time.  So,

11  there's no question that both of them knew that there were to

12  be no payments (inaudible) attorneys' fees.

13          What's most egregious is that subsequently when Mr.

14  Black was on the stand and I had raised the issue of a bond,

15  you said, Well, there's no need to discuss that because I've

16  frozen the accounts and there've been no payments out of

17  that.  And you looked to Mr. Black, who was on the stand, and

18  said, "You have made no payments?"  And he said, "Yes, Your

19  Honor, there have been no payments."  And he knew not only

20  that he had, but even subsequent to that he made additional

21  payments.

22          Mr. Poskus was here on that date, did not correct

23  that statement, and he, himself, received payments even

24  though none of the other attorneys have.  None of the other

25  attorneys were getting paid without asking your Court for

BLACK001018

114

1   permission.  And Mr. Poskus was clear that no other
2   professionals should get paid, including Ms. Kerr, and yet he
3   was getting paid.
4           And another reason this is so important is we are
5   going to be litigating this in New York, and I've received
6   word that this Attorney Cahill (phonetic) in New York intends
7   to file a complaint or a claim against me for breach of
8   fiduciary duty of the Issue Trust for not supporting Mr.
9   Black in his disclaimer of the funds to the Issue Trust
10  because that--I'm the trustee and therefore should be trying
11  to do everything to benefit--
12          THE COURT:  Well, that doesn't make any sense.
13          MR. DAIN:  It doesn't make any sense, and my point
14  is this is just more evidence of not getting it, of thumbing
15  his and his attorneys' thumbing their nose at the Court.  Mr.
16  Cahill received $25,000 that was from those monies that were
17  contentious.  Even though Mr. Black has now repaid that, Mr.
18  Cahill is using that money to waste that court's time on this
19  kind of a motion.
20          And even if the Court doesn't fine Mr. Black, the
21  evidence is so strong if the Court can issue a contempt
22  finding, it would be important so the court in New York would
23  know just what type of behavior is going on here, because
24  we're going to have to go to New York and litigate over this
25  money.  It wasn't properly distributed in this state whether

115

```
1    Ms. Kerr or Ms. Harper, you know, analyzed it.  But what we
2    shouldn't be doing is having to defend frivolous lawsuits
3    simply because Mr. Black refuses to believe that he did
4    anything wrong.
5            And if he's allowed to just say, Oh, it's okay as
6    long as I pay it back--and if you remember, by-the-way, he
7    specifically asked you, Your Honor, "Oh, it's okay then can I
8    pay my attorneys but subject to having to pay the Court back
9    if there's a negative finding?"  You said, "No."  It couldn't
10   have been more clear.  No, you're not to pay any
11   professionals; I'm holding that in abeyance.  He didn't care.
12   He did it.
13           He had his own money; we know that now, because he
14   paid it back to the attorneys--I mean to Mr. Poskus.  He just
15   chose not to do it.  And so it's just like this civil theft;
16   if there aren't strong findings against him, he's not going
17   to get it, he's just going to continue.  He thinks now the
18   fight just goes to New York and I'll still keep lobbing
19   bombs, and somewhere along the line someone will vindicate.
20   But the problem is we have to go through that.  I'm not being
21   paid for my time.  I'm just lucky if I get money back for
22   paying Mr. Frigon.
23           But I'm going to have to go to New York and I'm
24   going to have to fight this battle, and I'm telling the Court
25   right now that I'm going to resign from the 2013 trust.
```

116

1    Clearly there's no benefit to anybody being on that.  That
2    should just be closed out; has no money left and has no
3    purpose.
4            I'm going to resign from the Issue Trust, because
5    even though my aunt wanted me to oversee the funds to Mr.
6    Black and his children, I want no part of that because every
7    time I file something, a tax return, I'll be under attack.  I
8    want no part of it.  And so I'm telling the Court I'm going
9    to resign from that.  But what concerns me is that I'll be
10   under attack again in New York on frivolous suits if the
11   Court doesn't hold them to account.  I'm not concerned about
12   the Court fining him additional money, but the Court should
13   make a finding that you issued two orders that were clear and
14   he defied them, knowingly and willingly defied them, even
15   after he got clarification from Your Honor.  And we've made
16   that clear; it's just not fair to say, well, he's paid it
17   back, because he will not get it.  He does not understand.
18           THE COURT:  All right.
19           MR. THIESSEN:  Specifically with respect to
20   content, Your Honor, the--first of all, it's not properly
21   noticed before the Court.  Under Rule 107 citation must be
22   issued 21 days in advance.  No citation has been issued.  The
23   Court--it's not appropriately before the Court.
24           More fundamentally is what Your Honor alluded to in
25   terms of the--and the citation must be issued by the Court.

BLACK001021

117

1   The remedial aspect of it, Mr. Black--you just stipulated Ms.

2   Peterson received $115,700 of Mr. Black's personal funds.

3   The sanction for contempt would be repayment of the funds

4   improperly spent in violation of the Court order.  That would

5   be the remedial sanction.  That has already been enacted and

6   taken place and we've just stipulated to that.

7          Finally, Mr. Dain wants to make a lot of grandiose

8   arguments about the New York proceedings and his resignations

9   and various filings, but the fact of the matter is he can't

10   argue contempt to defend against the lawsuit that hasn't even

11   been filed.  He's just referencing it out of hand.  It hasn't

12   been filed; we don't know what's going to take place.  And

13   his remedy is to defend that when and if it's filed, and he

14   could do so through any number of procedural means.  It's not

15   through a contempt proceeding in this Court that's not

16   properly noticed with a citation and which has already been

17   remedied.

18          THE COURT:  Okay.

19          MS. DiPONIO:  Your Honor, if I may what Mr.

20   Thiessen is saying is not fully correct.  Mr. Poskus repaid

21   the $115,000.  Mr. Glatstein never returned any of the money

22   that was paid to him.  In fact, that check was dated, I

23   believe, April 2nd, April 1st, which was the same day that

24   the Court ordered no payments allowed to any counsel.  And in

25   fact, I think Mr. Dain has included in his motion Mr.

BLACK001022

118

1   Glatstein on the stand said that everything would be
2   inaccessible.
3           So, again, you know, his argument isn't fully
4   (inaudible), which has been the theme throughout  And that's
5   in addition to his response to the motion for (inaudible).
6   It's just--his citings are not correct; his facts are not
7   correct.
8           THE COURT:  Okay.  All right, anything on the civil
9   theft motion that you want to talk about?
10          MR. DAIN:  Well, yes.  I mean, obviously we got
11  this Friday afternoon, so we're--unless Mr. Thiessen expected
12  us to work over the weekend, we don't have a response.  And
13  we were working over the weekend, but on many different
14  things.
15          THE COURT:  Right.
16          MR. DAIN:  This motion is just--it should be
17  rejected for a number of reasons.  First, the two-year
18  statute can only begin to run first when the protected person
19  becomes aware of the issue, and that can't happen until Ms.
20  Black, because she's a disabled person, has counsel who's
21  aware of all the actions, or at least aware enough of the
22  actions to bring a civil theft claim.  And that didn't occur
23  till--and you heard the testimony; it clearly didn't occur
24  till at least Ms. Kerr did her financial forensic accounting,
25  and so the two-year statute can't have run.

BLACK001023

119

```
 1          Additionally, given the Court's earlier
 2    statements--and I believe the Court's finding will be that
 3    there is a failure to disclose.  You can't argue a two-year
 4    statute runs when you, yourself are using as a shield your
 5    failure to disclose material fact.  So, the motion to dismiss
 6    has to be rejected.  There clearly is no statutory violation.
 7    And it is an affirmative defense, so it is really the duty of
 8    the defendants--or of Mr. Poskus and Mr. Black to prove that
 9    the statute has run not to simply file a motion saying it's a
10    two-year hard statute that begins on the date of the
11    disclaimer.  That's nonsense.  So, that should be dismissed.
12          Now, with respect to civil theft, and I know Ms.
13    DiPonio has some arguments she wants to make on this.  I want
14    to focus on the Roth IRA, because that is one that not only
15    Mr. Black has no benefit from his argument of two-thirds/one-
16    third even though that was frivolous, but we start with he
17    never disclosed to the parties of this Court that that Roth
18    IRA even existed.  It was nowhere in the petition; it was
19    nowhere mentioned in the order; it was nowhere--proposed
20    order that he submitted.  It was nowhere mentioned in any
21    inventory he filed, so he absolutely failed to disclose it
22    and failed to disclose that he had taken 100 percent of it to
23    the benefit of his children, and all intentional acts.
24          Moreover, he didn't--his argument has always been--
25    and it was even in this motion, by-the-way, that once we've
```

120

 1   disclaimed the money, it goes by the estate and we have no

 2   control over it.  Well, if it went into the estate account,

 3   he gave it 100 percent to his children.  That's the

 4   antithesis of saying I had no control.  It had to go one

 5   third to the Issue Trust, two-thirds to the Supplemental

 6   Needs Trust.  It didn't go any such way; it went outright 100

 7   percent to his children.  How is that not a civil theft under

 8   the statute?

 9           And, again, whether the Court orders treble damages

10   or not to me, personally, is not the issue.  I believe the

11   Court should punish him for his actions and there should be

12   some sanction for this behavior, but it's more important to

13   me that the Court make that civil theft finding so it's clear

14   that this behavior is so egregious, so outrageous, that it

15   shouldn't be tolerated.

16           How can this Court protect the protected person as

17   the ultimate protector if Mr. Black never even made this

18   Court aware of the existence of the Roth IRA and of his

19   taking of 100 percent of it?  So, again, I think the Court

20   has to make the civil theft finding.  Whether it trebles the

21   damages or not I'll leave to the discretion of the Court.

22           THE COURT:  Okay.  Thanks.

23           Ms. DiPonio?

24           MS. DiPONIO:  Your Honor, in addition to that, I

25   agree wholeheartedly with what Mr. Dain said regarding the

BLACK001025

121

 1   statute of limitation, but I'd ask the Court to look at
 2   184-401, which talks about civil theft.  Mr. Thiessen made a
 3   big deal in his motion that the word "deception" was not
 4   used.  And if you look at that statute, it says, A person
 5   commits theft when he knowingly obtains, retains, or
 6   exercises control over anything of value of another without
 7   authorization or by threat or deception or on and on and on.
 8   And he also states that all the elements must be proven.
 9   That's not correct.  The statute clearly says in subparagraph
10   1D, it says, "or."  So, any of those provisions if shown
11   constitutes civil theft.
12          And, Your Honor, outlined in my motion case law
13   which sets forth the criteria for finding a civil theft--and
14   it's the intent to take something from somebody knowing it's
15   somebody else's and to deprive them of that property.  Even
16   if they repay that, it still constitutes civil theft, so I
17   would ask the Court to rely on 184-401, 184-405, which talks
18   about the trebled damages, as well as the case law that I
19   provided which sets forth the criteria for civil theft, which
20   has been that in this case, particularly with the Roth IRA.
21   Mr. Black permanently deprived my client of those funds with
22   the intent to deprive her of those funds.  And if that
23   doesn't constitute civil theft, Your Honor, I don't know what
24   does.
25          MR. THIESSEN:  I'll address one of Ms. DiPonio's

BLACK001026

122

1    points here first.  Specifically on the statute, Your Honor,
2    under 184-401, Number 1 states that a person commits theft
3    when he or she knowingly obtains, retains, or exercises
4    control over anything of value of another without
5    authorization or by threat or deception.  In other words, you
6    can commit civil theft either without authorization or by
7    threat or deception.

8            There's no argument of threat, so that's out.  So,
9    it's either without authorization or with deception.  Ms.
10   DiPonio wants you to believe that there's an argument related
11   to "or" with respect to A, B, C, D, and E.  And I agree that
12   she needs to prove one of the elements under A, B, C, D, or
13   E.  I think the most relevant is A, intends to deprive the
14   other person permanently of the use or benefit of the thing
15   of value, but there's no--the "or" that she references does
16   not in any way limit that she must either prove without
17   authorization or by deception.  She has to prove that he
18   knowingly made a transfer with one of those two criteria.
19           I would submit that our motion to dismiss is still
20   pending because she has failed to present evidence that prove
21   either one of those, and she failed to plead it specifically
22   in her motion.
23           To circle back with respect to Mr. Dain's first
24   argument regarding the two-year statute of limitation, the
25   cause of action accrues on a civil theft claim when a

BLACK001027

123

 1   person--the cause of action is either known or should have
 2   been known by the exercise of reasonable diligence.  That's
 3   under 13-80-108.  And here, although Your Honor has rejected
 4   our arguments with respect to Mr. Black's disclosures in
 5   advance of obtaining the March 5th, 2013, order, and said
 6   that they were not sufficiently disclosed, I think for
 7   purposes of the statute of limitations a cause of action for
 8   civil theft could have reasonably been known by Ms. DiPonio
 9   or Ms. Young in advance of him obtaining the March 5th, 2013,
10   order.  They could have made inquiry or otherwise determined
11   if they needed more information with respect to those
12   disclosures, and their failure to do so began the statute of
13   limitations for the civil theft claim.
14           He then made the transfers from the individual
15   accounts to the estate accounts in March of 2013, and Ms.
16   DiPonio did not raise the claim until June 15th, 2015.  I
17   think under that--she also didn't prove--plead a specific
18   date with respect to any alleged civil theft in her motion,
19   which is another failure to plead.  But be that as it may,
20   the two years accrued in the civil theft claim was barred by
21   the statute of limitations when it was raised.
22           With respect to Mr. Dain's arguments about the
23   level of disclosure, again, Your Honor, it's Ms. DiPonio's
24   burden to prove that Mr. Black knowingly committed civil
25   theft without authorization or by threat of deception.  So,

BLACK001028

124

1   he must be aware that his conduct is practically certain to

2   cause the result.  That's 18-1-501 (6).  He must be aware

3   that it's practically certain to cause the result, and I just

4   don't see how the Court can reach that finding on the record

5   as we have it with respect to without authorization.

6          The facts are that Mr. Black was aware of the

7   Court's March 5th order, which states that he's specifically

8   authorized to disclaim the interest in the--the POD

9   designated interest in the Vanguard account.  It specifically

10  uses that phrase, "specifically authorized."

11         I think the second thing that speaks to that, the

12  fact that he thought he had authorization or was not aware he

13  didn't, he lacked it, is with respect to Mr. Glatstein's

14  testimony regarding his statements to both Ms. Young and Ms.

15  DiPonio that he specifically told them of the two-thirds/one-

16  third distribution and then their subsequent testimony.

17         I believe Ms. DiPonio said she just didn't recall

18  the contents of that conversation, and Ms. Young's statement,

19  Well, I would never agree to that, but she didn't

20  specifically recall the conversation either.  It was

21  reasonable for Mr. Black to believe that his counsel had

22  adequately provided disclosure and obtained authorization

23  from Mr. Black's counsel.

24         Next, in Exhibit 81, which was admitted, Mr. Black

25  writes to Mr. Glatstein that with respect to Vanguard's

BLACK001029

125

1   statement to him that he needed to remove language from the
2   amended order and file a second amended order, and Mr. Black
3   states to Mr. Glatstein in that exhibit, "Maybe you can take
4   the deleted text and put it in a cover letter to the Court."
5   So, Mr. Black is there indicating *amens rea* that he wants
6   disclosure to the Court of the two-thirds and its removal is
7   being acknowledged by him.  The limited disclosure, and I
8   think Your Honor's statement in the prior hearing was--with
9   respect to this exhibit--was something recognized that there
10  was a reason for the changed language that you were unaware
11  of with respect to the amended order, and then the second--
12  excuse me, the proposed amended order, which contained the
13  two-third language, and then the second proposed amended
14  order that no longer contained the two-thirds language, which
15  is the one Your Honor ended up entering on March 5th, 2013,
16  that did not contain the two-thirds language.
17          But, again, in circling back, I think Mr. Black's
18  awareness of the disclosure that was required is demonstrated
19  by Exhibit 81.  Mr. Black also testified that he knew Mr.
20  Glatstein had filed the will and each trust with the Court as
21  of February 9th, 2012.  It was reasonable for him to feel
22  that the disclosure--he was obtaining the funds with
23  authorization and that he wasn't aware he lacked
24  authorization.
25          Now, with respect to any alleged deception, I would

126

1    resubmit my argument that Ms. DiPonio's pleading fails to

2    allege deception.  And since perhaps--the point was nuanced,

3    but she must either prove that it was with--he made knowingly

4    without authorization or he knowingly deceived.  And I don't

5    think, Your Honor, the preponderance of the evidence proves

6    he knowingly deceived Ms. DiPonio or Ms. Young or Ms. Black,

7    for that matter.

8            With respect to the inventory, which is Exhibit 27,

9    they've made many arguments that he should have disclosed a

10   different value to provide evidence with respect to the

11   disclaimer.  But the inventory and financial plan

12   specifically states the date the values are given.  It says

13   the accounts are valued at approximately 2.1 million as of

14   March 31, 2013.  He didn't say--he didn't omit a date from

15   that.  In fact, he specifically said, these are valued as of

16   March 31, 2013.  Note all parties were noticed--

17           THE COURT:  He was supposed to say the values of

18   the date of the appointment.

19           MR. THIESSEN:  I'm not saying, Your Honor, that

20   there wasn't an error in his--

21           THE COURT:  So now it's an error?

22           MR. THIESSEN:  No, Your Honor.  I'm not saying he

23   didn't--what I'm saying is he disclosed correct information.

24   There's no testimony that the value of those accounts were

25   not what he said they were on March 31, 2013.

BLACK001031

127

     1          THE COURT:  Right, but that's not the point of the
     2     exhibit.
     3          MR. THIESSEN:  However, we're talking about *mens*
     4     *rea* here, Your Honor.  We're talking about was he--were the
     5     funds obtained by deception.  He said on March 31, 2013, the
     6     funds were valued at this amount.  He didn't say the funds
     7     were valued at this amount and give another date that was
     8     incorrect.  If a party wanted a value as of a different date,
     9     they could have requested it from him.  And in fact, Your
    10     Honor, on July 16, 2013 this Court approved that inventory
    11     and financial plan.  So, again, he was not aware, he did not
    12     make a knowing deception.  He filed an inventory that
    13     contained correct information and it was approved by the
    14     Court without objection.  Did he follow the Court's order to
    15     provide an inventory as the date of appointment?  No, but
    16     there was no deception.
    17          THE COURT:  That is the deception.
    18          MR. THIESSEN:  I'm saying the deception's not
    19     proven.  It's Ms. DiPonio's burden to prove it by the
    20     preponderance of the evidence, and I'm giving all the facts
    21     that weigh against that.
    22          THE COURT:  So he refused to file the inventory as
    23     of the date of the appointment as required by the statute.
    24          MR. THIESSEN:  There's no testimony that he refused
    25     to file it, Your Honor.

BLACK001032

128

     1          THE COURT:  He didn't do it.

     2          MR. THIESSEN:  He didn't do it, but *mens rea* goes

     3     to what--his awareness of his conduct.

     4          THE COURT:  Well, make your record.  Go ahead.

     5          MR. THIESSEN:  Sure, Your Honor.

     6          He also disclosed the two-thirds/one-third split to

     7     Ms. Babcock.  He disclosed the two-thirds/one-third split to

     8     Dr. Aneil Shirke; that's specifically in the record.  Exhibit

     9     68 is the Chase account for the Issue Trust that was signed

    10     by Mr. Dain to open that account.  In other words, Mr. Black

    11     was not intending to deceive Mr. Dain through--because Mr.

    12     Dain was on that account and could have obtained information

    13     from it as of May 4th, 2013.

    14          Mr. Black also testified that at the time of the

    15     March 5th, 2013, order he thought he had the agreement of

    16     both Mr. Dain and Ms. Wrigley based on his prior

    17     conversations with them.  That was his specific testimony

    18     that he provided on August 5th.  He testified that he thought

    19     he had full agreement of Ms. DiPonio and Ms. Young based on

    20     Carl Glatstein's conversations with them.  That was

    21     specifically testified to on August 5th.

    22          Mr. Black also testified that he tried to get Mr.

    23     Dain to serve as Joanne Black's guardian of her estate on at

    24     least three different occasions prior to seeking his own

    25     appointment.  That again speaks to his *mens rea* and the lack

BLACK001033

129

 1   thereof with respect to deception.  If he has some plan to

 2   deceive, he's not going to seek the appointment of another

 3   person to hold the fiduciary position.

 4         Mr. Black also testified that on June 16, 2015, he

 5   had Carl Glatstein provide more disclosure of the two-thirds

 6   distribution--excuse me, two-thirds to Joanne Black's SNT

 7   than Mr. Glatstein thought was sufficient.  That was

 8   specifically testified to on June 16, 2015.

 9         And also, Your Honor, I would specifically go to

10   the Exhibit 109, which was the May 25th, 2013, e-mail, which

11   was admitted, from Mr. Black to Carl Glatstein specifically

12   disclosing the assets for the inventory and the financial

13   plan.  And in that e-mail he specifically tells Mr. Glatstein

14   about the Roth IRA with respect to the inventory and

15   financial plan.  In other words, he was not knowingly

16   deceiving anyone; he was relying on his counsel to provide

17   the inventory and financial plan in accordance with Colorado

18   law, and he was telling his counsel this is the value of the

19   Roth IRA.  Again, that's Exhibit 109.

20         Thank you, Your Honor.

21         THE COURT:  Thank you.

22         MR. DAIN:  The Roth IRA, signed under penalty of

23   perjury--I mean the inventory signed under penalty of perjury

24   by Mr. Black did not include the Roth IRA.  So, let's talk

25   about deception.  The Roth IRA was 100 percent paid on death

BLACK001034

130

1    to Ms. Black.  There was no mention to any party, other than
2    internally if he mentioned it to Mr. Glatstein.  That's
3    between Mr. Black and Mr. Glatstein how neither of them put
4    it in the inventory, but Mr. Black signs under penalty of
5    perjury that these are all the assets.
6            The Roth IRA is not included in there, and he took
7    that Roth IRA 100 percent to his children, not two-
8    thirds/one-third.  So, all this disclosure which, by-the-way,
9    I think as the Court recognizes, there's ample evidence that
10   wasn't even disclosed properly, so there's no real
11   authorization because it was obtained in and of itself by a
12   failure to disclose.  But the Roth IRA he has no argument
13   that I even--you know, disclaimed that so I could go one-
14   third/two-thirds.  One hundred percent to his children.
15   Never disclosed a word of that.  How is that not deception?
16   How was that not obtained without authorization?  How could
17   Your Honor give him authorization for an asset you were never
18   told existed?  Never.  Until Ms. Kerr, in her forensic
19   accounting got to the bottom of it, we were never told.  This
20   e-mail between Mr. Black and Mr. Glatstein wasn't passed out
21   to anyone else.
22           Your Honor mentioned at one time that it's not Your
23   Honor's role or her clerk's role to fish around through all
24   these documents to try to piece the puzzle together, and
25   that's absolutely true.  That's the most important thing, the

BLACK001035

131

```
 1   failure to disclose to you.  But the fact that nobody else as
 2   well knew about this Roth IRA is deception.  Yours is a lack
 3   of authorization and deception, but it's deception and
 4   knowingly and willingly, because he took 100 percent of it.
 5   He didn't say, I followed the dictates of the will and
 6   one-third to the Issue Trust, two-thirds to Ms. Black.  That
 7   alone--I mean, I could argue the entirety of it, but on the
 8   Roth IRA alone there's no escaping civil theft.  It was
 9   proven.  It was proven way beyond preponderance of the
10   evidence.
11           Thank you.
12           MR. THIESSEN:  And with that specific point I'll
13   make one brief point, Your Honor.
14           Mr. Black did provide testimony that with respect
15   to the Roth IRA while it did go 100 percent to his children,
16   he, as executor, intended to provide other assets to Joanne
17   Black that would make up for that transfer.  And he had the
18   tax reason for--basis for doing so, because it was more tax
19   advantageous for his kids to receive it rather than Joanne
20   Black to receive it.
21           THE COURT:  All right.  Thank you.
22           Okay, I have indicated before that I'll issue a
23   written order on this case, and I intend to do that well in
24   advance of your hearing that's scheduled on October 1st.
25           Is there anything else you want me to do at this
```

BLACK001036

132

1   point other than get that order out?

2        MR. DAIN:  No, Your Honor, but again, just subject

3   to the understanding that with some of the fees of the

4   professionals that haven't been submitted that could be the

5   subject of an order to talk about Ms. DiPonio, Ms. Young--

6        THE COURT:  Right.

7        MR. DAIN:  --Mr. Frigon, Ms. Kerr, Ms. Peterson.

8   Those obviously--the amounts would have to be provided to,

9   but other than that, no.

10       MR. THIESSEN:  We don't have anything, Your Honor.

11       THE COURT:  Okay.  Very good then.

12       All right, I thank you all for your time and this

13   court will be in recess.

14       MR. DAIN:  Thank you.

15       MR. THIESSEN:  Thank you.

16       MS. DiPONIO:  Thank you.

17       (Whereupon, the proceeding was concluded.)

18

19

20

21

22

23

24

25

BLACK001037

133

```
------------------------------------------------------------
CERTIFICATE
------------------------------------------------------------

STATE OF COLORADO  )
                          :
COUNTY OF DENVER   )
```

       I, Marianne Sellers, Transcriptionist for the Denver Probate Court, in the State of Colorado, do hereby certify that the above and foregoing is a transcript of the recorded proceedings, based upon the quality of the recording and my ability to understand it, taken at the date and time set forth on Page One hereof.

       DATED at Denver, Colorado, this 24th day of October, 2015.

                   /s/Marianne Sellers
```
                    ------------------------------------
                    Marianne Sellers
                    Official Transcriber
                    Federal Reporting Service
                    17454 E. Asbury Place
                    Aurora, CO  80013
```

BLACK001038

# EXHIBIT 40

| District Court, Denver County, Colorado | |
| :--- | :--- |
| Court Address: | |
| 1437 Bannock Street, Denver, Colorado 80202 | DATE FILED: September 28, 2015 12:14 PM |
| | CASE NUMBER: 2012PR1772 |
| **In re the Interest of:** | |
| | |
| **JOANNE BLACK,** | |
| **Protected Person.** | |
| | ▲ COURT USE ONLY ▲ |
| Attorney or Party Without Attorney (Name and Address) | Case Number: |
| | 12 PR 1772 |
| Phone Number: Email: | |
| FAX Number: Atty. Reg. #: | Courtroom 224 |
| **HEARING ORDER** | |

THIS MATTER came before the Court for hearing June 16-17, 2015, August 5, 2015 and September 8, 2015. Present were Bernard Black represented by Counsel Bernard Poskus and Patrick Thiessen; Lisa DiPonio, Court Appointed Counsel ("CAC") for the Protected Person ("PP"); Gayle Young, Guardian *ad Litem* ("GAL") for the PP; Anthony Dain, Esq.; Cherie Wrigley; Nancy Peterson, Esq., Special Conservator. The PP appeared by telephone for portions of the hearings and her New York Counsel Ira Saltzman appeared by telephone for all of the proceedings. The Court heard testimony, statements and argument of Counsel, reviewed exhibits entered into evidence, the record and relevant authority. The Court takes judicial notice of the filings in its case file.

The Court finds the Conservator, Bernard Black, has breached his fiduciary duties as to the Protected Person, his sister, is removed as Conservator, and is surcharged. The Court revokes Mr. Black's Letters and recommends he not be appointed as a fiduciary in any capacity as to Joanne Black, be it guardian of her person or of her property and that he be removed as Executor for his mother, Renata Black's, probate estate.

### Case Background

Bernard Black is an attorney, admitted to practice in 1982 and is employed since 2010 as a professor of law, marketing and finance at Northwestern University in Chicago. Mr. Black testified he was educated at Stanford and Columbia Universities. Anthony Dain is an attorney who has practiced for 34 years in patents and banking in the State of California. Cherie Wrigley is a retired high school resource specialist who worked with special needs children and children with behavioral problems. Ms. Wrigley testified she holds two masters degrees and currently works with the mentally ill at a homeless shelter. Ms. Wrigley also worked as a CASA volunteer for two years. The Court finds these parties are highly educated and understand the role of a fiduciary. Interested persons

1


EXHIBIT 8
BLACK
8/23/2018
Tiffany M. Pietrzyk, CSR RPR CRR

BLACK017168

Anthony Dain and Cherie Wrigley are brother and sister, and are first cousins to Bernard and Joanne Black on each of their mother's side of the family. The Court understands that Ms. Wrigley and Bernard Black both have filed competing petitions for appointment as guardian with the Court in New York State where Joanne Black resides.

Bernard Black petitioned the Denver Probate Court ("DPC") on October 16, 2012 for appointment as his sister's conservator, the equivalent to a guardian of the property. As grounds for the appointment, Mr. Black asserted his sister suffered from schizophrenia, was in a psychotic state and homeless in Denver, Colorado and that she had recently inherited three million dollars ($3,000,000) from their mother, Renata Black. Specifically, Mr. Black advised the Court through his petition that Renata Black's Will had directed two-thirds (2/3) of her residuary estate to be placed into a Supplemental Needs Trust ("SNT") for Joanne Black's benefit; that Renata Black had changed the beneficiary designations on certain assets and as a result, those assets passed outright to Joanne Black rather than passing into the Supplemental Needs Trust. Mr. Black filed copies of Renata Black's Will, the SNT and Issue Trust with this Court. Mr. Black filed an amended petition for appointment as both permanent and special conservator on November 19, 2012 alleging the same grounds as the original petition. Both petitions describe Joanne Black's inheritance in Paragraph 15.a. as being in the sum of $3,000,000.00.

The fact of Joanne Black's long-standing mental illness is not disputed; nor is her inability to manage her financial affairs. The Court appointed Counsel and a GAL to both represent Joanne Black and to ensure her best interests were protected in these proceedings.

The evidence adduced at trial shows Renata Black set up a SNT for Joanne Black's benefit on December 19, 1997. The SNT named Renata Black and Anthony Dain as co-trustees, with Bernard Black to serve as a successor co-trustee in the event Renata Black was unable to serve. Also on December 19, 1997, Renata Black set up what is referred to as the "Issue Trust" to benefit Bernard Black and his children. Co-trustees for the Issue Trust are Renata Black, Bernard Black and Anthony Dain. Renata Black died on May 1, 2012 and Mr. Black was appointed as the Executor of her estate by the Surrogate's Court in New York State effective June 21, 2012.

Although not specifically pled in any petition or separate motion, Mr. Black's initial proposed order filed with the Court on November 13, 2012 stated that upon appointment as conservator he intended to disclaim Joanne Black's interest as beneficiary under all payable on death or transferable on death accounts ("POD" or "TOD") into Renata Black's estate "...allowing Respondent's share to pass under Article Fourth of the Last Will and Testament of Renata Black...under which two thirds of the estate of Renata Black will be contributed to a Supplemental Needs Trust for the Benefit of Joanne Black." Hearing for Mr.

BLACK017169

Black's appointment was held on December 11, 2012 and he was duly appointed as conservator for Joanne Black with unlimited authority. That same day the Court signed the order of appointment which stated at Paragraph 6 that as conservator, Mr. Black would place Joanne Black's assets into a Supplemental Needs Trust for Respondent's benefit. This order, dated December 11, 2012 directed the conservator to file the Inventory and Financial Plan with the Court by March 11, 2013 and to report Joanne Black's assets as they existed on the date of his appointment. Subsequent to his appointment, through Counsel, Mr. Black filed amended and second amended orders of appointment with the Court.

The amended order filed on January 29, 2013 included verbiage in Paragraph 6 that Respondent's assets "will be placed into a Supplemental Needs Trust for Respondent's benefit". Paragraph 9 specified that as conservator Mr. Black would have authority to disclaim Respondent's interest in POD or TOD accounts with Vanguard and Fidelity, with Joanne Black's share to pass under Renata Black's Will where two thirds of the estate was to be contributed to the SNT to benefit Joanne Black.

The second amended order filed on February 13, 2013 also stated at Paragraph 6 that Respondent's assets "will be placed into a Supplemental Needs Trust for Respondent's benefit". Paragraph 9 of the February 13, 2013 order states that as conservator Mr. Black would disclaim Joanne Black's interest as beneficiary under all POD or TOD accounts with Vanguard and Fidelity.

Another second amended order was filed with the Court on March 2, 2013. This order also contains verbiage which states at Paragraph 6 that Respondent's assets "will be placed into a Supplemental Needs Trust for Respondent's benefit". Paragraph 9 of the March 2, 2103 proposed order appears identical to verbiage contained in the second amended order filed February 13, 2013.

The Court signed an Amended Order filed on March 5, 2013. This order again requires the conservator to file an inventory and financial plan on March 11, 2013 to report Joanne Black's assets existing on the date of appointment, and directed the conservator at Paragraph 6 to place Respondent's assets "into a Supplemental Needs Trust for Respondent's benefit." Paragraph 9.a. authorizes the conservator to disclaim Respondent's interest as beneficiary under all POD or TOD accounts with Vanguard and Fidelity owned by Respondent's mother, Renata Black.

Mr. Black did not file the Inventory and Financial Plan with the Court until July 1, 2013. The Inventory listed the sum of $2,230,996.00 as the value of the PP's assets existing on the date of appointment, December 11, 2012. The court approved the Inventory and Financial Plan on July 16, 2013.

In 2014, Mr. Black failed to timely file the annual conservator's report which was due on March 11, 2014. As a result, his Letters were suspended and he was

BLACK017170

ordered to appear before the Court to show cause why his letters should not be revoked. Mr. Black then filed the annual report on June 23, 2014. The Court review process noted increased expenditures which were not approved on the financial plan and as a result, Mr. Black filed an amended annual report on September 8, 2014 with explanations for the increased expenditures. Mr. Dain filed an objection to the amended annual report on September 19, 2014. Mr. Dain's objection was primarily aimed at venue, noting the PP had by that time been a resident of New York State and he objected to Mr. Black's petition for guardianship, also filed during this time frame in the DPC. As pertinent to the issues before the Court at present, Mr. Dain asserted that Mr. Black had not responded to requests for an accounting of the SNT, had ignored questions regarding administration of the SNT and had inappropriately denied or restricted distributions from the SNT. The GAL filed a Supplemental Report on October 8, 2014 which recommended this Court deny the guardianship petition and stated she had concerns "...about Mr. Black's management of Joanne Black's financial affairs." The concerns raised by the GAL at this time were that Mr. Black had requested authorization to withhold the amended conservator's report from the PP and that he failed to respond to the Court's Order dated July 2, 2014 regarding significantly higher expenses on the financial plan.

As a result of the GAL's report with recommendations and the objections filed, the Court entered an Order on October 27, 2014 which denied the guardianship petition and ordered Mr. Black to show cause why the conservatorship should not also be dismissed and an accounting ordered. Mr. Black's response to the Court's order essentially outlined the New York State proceedings for guardianship of Joanne Black's person and property and requested the Colorado conservatorship remain in place until the fiduciary was appointed in New York State. Mr. Black also asserted that the GAL should not have addressed the continued need for a conservatorship in her report without first speaking with him. Mr. Dain filed a reply to Mr. Black's response and again asserted Mr. Black had not accounted to him in his position as co-trustee for the SNT and had not provided copies of the bank account statements despite requests for them. Mr. Black then filed a further response along with copies of bank statements and accountings.

After Mr. Black's further response was filed with the Court, Mr. Dain filed an objection which noted for the first time that Mr. Black was to "marshal and manage $3.5 million in assets held in brokerage accounts solely for the Protected person." Mr. Dain asserted that Mr. Black had failed to fully account and breached his duties by transferring the assets to a probate estate where he divided the assets one third to a trust for his children and two thirds to two trusts for the protected person without accounting to the Court for what has now been identified as the Issue Trust. Mr. Dain requested a forensic accounting be undertaken. Cherie Wrigley also filed an objection which asserted, *inter alia*, that Mr. Black had not accounted for all of the funds in the POD accounts the PP inherited from Renata Black.

4

BLACK017171

Coinciding with the objections and information that had been filed with the Court, the GAL filed a Motion for Independent Forensic Review of Financial Records. CAC filed a Motion to Void the Conservator's Disclaimers, to Deposit the Vanguard and Fidelity Assets in Trust with the Court and Request for a Status Conference. In a Supplemental Objection filed with the Court on March 25, 2015, Mr. Dain advised this Court that Mr. Black had, during adversary proceedings in New York, admitted that he had transferred approximately $1 million of the PP's assets into the Issue Trust. The GAL joined in Mr. Dain's concerns and objections through a report she filed with the Court on March 30, 2015. This Court held the Status Conference requested by CAC on April 2, 2015.

The parties stipulated to a forensic accounting. The Court suspended Mr. Black's authority to act as conservator and appointed a Special Conservator to act in the interim until a permanent conservator or guardian of the property was appointed by the Court in New York. This Court also entered an order to freeze Joanne Black's assets and all accounts in the conservatorship, pending final resolution. Mr. Black's request for release of trust and conservatorship funds to pay attorney fees and costs to defend this action was held in abeyance pending further proceedings. The Court then scheduled an evidentiary hearing and framed the hearing issues as:

a) whether the disclaimer obtained by Mr. Black as to the accounts at Fidelity and Vanguard POD to Joanne Black should have acted to divest Ms. Black of 1/3 of these non-probate assets; and

b) whether it was properly disclosed that Mr. Black intended or had authority to redirect one-third of the non-probate assets to persons other than Ms. Black.

Also before the Court are two other matters. Mr. Dain filed a Motion for Issuance of a Contempt Citation alleging that Mr. Black violated the Court's order freezing assets and used estate funds to pay his attorney fees in Colorado and New York and expert accounting witness. CAC filed a motion requesting the Court to consider civil theft based on findings reflected in the forensic accounting report. The forensic accounting reported that Mr. Black had failed to report all of Ms. Black's assets as of the date of his appointment and instead only reported her assets as listed after he used the order to disclaim the POD accounts.

The Court finds, after evidentiary hearing that Mr. Black did not properly disclose to this Court that he intended to use the disclaimer to redirect one-third of the non-probate assets to persons other than Ms. Black and as a result of his failure to disclose, did not have authority to redirect the assets. The Court finds the disclaimer was obtained without providing full disclosure and therefore should not have divested Ms. Black of one-third of the POD assets left to her. The Court finds Mr. Black's actions constitute a breach of his fiduciary duty as conservator

5

BLACK017172

and that the appropriate remedy is surcharge. The Court finds Mr. Black did violate the Court's order directing that estate funds not be used to pay attorney and other fees pending final hearing but also finds that Mr. Black did return the majority of funds he paid to his attorneys in violation of this Court's order, which funds were held in counsel's trust account. The Court finds Mr. Black's actions do meet all of the elements of civil theft and that as a sanction he should be assessed treble damages and pay for the costs of the action and reasonable attorney fees. Finally, the Court finds Mr. Black did not report Joanne Black's assets as they existed on the date of his appointment, December 11, 2012 but instead reported her assets as they existed *after* he disclaimed the POD funds on her behalf and redirected one-third of her assets into the Issue Trust.

*Disclaimer*

 As noted above, Mr. Black never specifically requested through petition or separate motion permission to disclaim assets. The only references to the disclaimer were made through verbiage inserted into the proposed orders of appointment. The petition stated that Renata Black had changed the beneficiary designations on certain assets and as a result, those assets passed outright to Joanne Black rather than passing into the Supplemental Needs Trust. Regardless of verbiage referencing the manner in which Renata Black's residuary estate was to be divided, the language regarding the POD designations states the assets passed outright to Joanne Black rather than passing into the SNT which is a clear indication of intent to transfer all POD assets into the SNT.

During the appointment hearing held on December 11, 2012, Mr. Black advised the Court that the basic purpose of the conservatorship would be to make sure Joanne Black had money from her mother put into a trust and that their cousin, Mr. Dain, would then be the trustee of the trust. (Hearing transcript, page 6, lines 23-25, page 7, lines 1-3). The only other reference to the PP's funds during the appointment hearing was made by the court where the court stated on page 17, lines 11-13 that "the process of moving the funds into the trust can be reported on…", referring to the conservator's obligation to file an inventory and financial plan within ninety days of appointment, reporting the value of assets as of the date of appointment and movement of the disclaimed funds into the SNT.

The Court finds its own memory and understanding based on the references to disclaimer made during the initial appointment phase was that Mr. Black intended to disclaim all assets held POD to Joanne Black in Vanguard and Fidelity accounts and move the funds into the SNT for the sole benefit of Joanne Black. This understanding was created by Mr. Black's statements in his initial petition which advised the Court that Renata Black had changed the beneficiary designations on certain assets and as a result, those assets in the sum of $3 million passed outright to Joanne Black rather than into the SNT and the statements made by Mr. Black at the appointment hearing that the funds would be placed into a trust with Mr. Dain as trustee. The Court signed two orders of

BLACK017173

appointment. The first Order signed December 11, 2012 specifically directs at Paragraph 6 that "Respondent's assets will be placed into a Supplemental Needs Trust for Respondent's benefit." As noted above, Respondent's assets were identified in the petitions as the sum of approximately $3 million.

The second amended order submitted by Mr. Black on January 29, 2013 was specifically not signed by the Court as it contained language referring to Renata Black's Will directing that two thirds of her estate would be contributed to a SNT for Joanne Black's benefit. This order was deliberately not signed by the Court at the time, as it did not comport with the Court's understanding of what Mr. Black intended to do once he disclaimed the funds in the Fidelity and Vanguard accounts. It was the Court's specific understanding that once Mr. Black disclaimed the funds, all of the funds would be placed into the SNT as directed by Renata Black's Will. At no time was it the Court's understanding that Mr. Black intended to divide the disclaimed funds and divert one-third of the funds into the Issue Trust. Neither the petition, amended petition nor any of the proposed orders actually state the disclaimed funds would be divided. The references given to the terms of Renata Black's will, when read together with the statements of the amounts left to the PP in the POD accounts, give the specific understanding that all of the POD account funds would be transferred into the SNT. This understanding is supported by the amended form of order submitted on March 5, 2013 which states at Paragraph 6 that Respondent's assets would be placed into a SNT for Respondent's benefit and at Paragraph 9.a. that Mr. Black had authority as conservator to disclaim the POD funds held in the Fidelity and Vanguard accounts. These two paragraphs on the order submitted and signed March 5, 2013 reflect the Court's understanding that all of Joanne Black's assets subject to the disclaimer would be placed into the SNT without division or diminution.

During trial, CAC, the GAL and Mr. Dain testified their understanding was the same as the understanding held by the Court. Through trial and review of the record, the Court finds that Bernard Black did not fulfill his duty of candor to the Court and at no time did he explain or represent his true intentions with regard to the funds held in the Vanguard and Fidelity accounts to either the Court, the GAL CAC or his co-trustee, Mr. Dain. Mr. Black's insistence that because he referenced Renata Black's Will, the SNT and Issue Trust and provided copies of those instruments his duty of candor and full disclosure were fulfilled falls far short of the mark. Mr. Black's position essentially states the Court had the primary duty to discern Mr. Black's intentions by reading the Will, SNT and Issue Trust instruments rather than having the intention fully disclosed by Mr. Black to the Court. Indeed, Mr. Black testified that the other one-third was implicitly going somewhere else. Mr. Black also admitted during his testimony that during the appointment phase he "in effect" disclosed the existence of the issue trust to the Court, thereby admitting he did not explicitly explain to the Court what the intended effect of the disclaimer would be.

BLACK017174

Because Mr. Black failed to plainly and fully disclose his intentions and the intended result of the disclaimer, the Court finds the order granting authority for the disclaimer was not obtained after full disclosure. In addition, it was revealed at trial that Mr. Black failed to disclose the existence of a Roth IRA account also left to the PP at any time prior to his appointment or on the Inventory filed with the Court. The existence of the Roth IRA was revealed by the forensic accounting performed by Pamela Kerr.

*Breach of Fiduciary Duty*

Bernard Black, through his petition for appointment as conservator and the Court's orders, is a fiduciary for Joanne Black. Bernard Black also had fiduciary responsibilities to Joanne Black as the Executor of Renata Black's Will and as a co-trustee for the SNT. Bernard Black failed to disclose to the Court, GAL, CAC, Mr. Dain and Respondent that he intended to divert one-third of the POD assets into the Issue Trust which benefitted himself and his children, thereby breaching his fiduciary duties to Respondent Joanne Black. As a result, the sum of $1,511,356.00 was not transferred into the SNT. Mr. Black's breach of his fiduciary duty was the sole reason these funds were not placed into the SNT.

Mr. Black was the sole signatory on the bank accounts holding estate and trust funds. Mr. Black has attempted to shift some of the blame for his actions onto his cousin, Anthony Dain. Mr. Dain was named as co-trustee for the SNT. As noted above, Mr. Dain complained to the Court in writing and through his testimony that he was unable to obtain an accounting from Mr. Black. At trial Mr. Dain explained that once he was unable to obtain an accounting or a bank statement from Mr. Black, he declined to be added as a signatory on any of the accounts due to the concerns he had developed and for fear that his professional license would be at risk. Based on the information adduced at trial the Court finds Mr. Dain's fears were justified. The Court finds none of the actions taken by Mr. Black had anything to do with what Mr. Dain did or did not do and any accusations to the contrary are reprehensible.

The Court finds the evidence shows Renata Black had a long-standing estate plan which generally provided that two-thirds of her estate would be placed into a SNT to benefit Joanne Black and that one-third of her estate would be placed in an Issue Trust to benefit Bernard Black and his children. The Court finds this generally was the understanding of Bernard Black, his wife, Mr. Dain and Ms. Wrigley. It was Mr. Black's further understanding that funds held in the accounts at Vanguard and Fidelity did not have designated beneficiaries and would pass through Renata Black's estate upon her death and then be distributed in accordance with the estate plan as expressed in her Will. Unbeknownst to Mr. Black, Renata Black altered her estate plan prior to her death and directed that POD designations be placed on the Vanguard and Fidelity accounts, with 95% of the funds given to Joanne Black directly and 1% to each of Mr. Black's five children from his first marriage. Although not disclosed at all initially, discovery

8

BLACK017175

confirmed at trial revealed the existence of a Roth IRA which was left POD to Joanne Black in its entirety. Mr. Black's second wife, with whom he has two children, testified that upon learning about the POD designations to accounts which previously were intended to pass through the estate and be divided two-thirds and one-third, she intended to initiate a lawsuit to recover funds since her children would not now receive an inheritance as all funding for the Issue Trust was dependent upon the monies held in the Vanguard and Fidelity accounts.

Mr. Black testified that faced with the knowledge that his wife intended to sue Renata Black's estate, of which he was executor, he sought a different resolution. Mr. Black also testified he thought there was a good argument which could be brought before the probate court to invalidate the POD designations. Rather than a straightforward request to the probate court, Mr. Black devised a plan to obtain disclaimers from his sister and each of his five older children so the funds could then be liquidated and passed through the decedent's estate as originally planned. There were no conversations with Mr. Dain about this plan. There were, however, discussions with Ms. Wrigley regarding the plan and she attempted to assist Mr. Black with obtaining a disclaimer directly from Joanne Black. Ms. Wrigley testified that although Mr. Black did not tell her how he came up with the concept of the disclaimer or what its effect would be, he assured her that he would put the funds received into the SNT with Mr. Dain as trustee, again not explaining the two-third, one-third division. Joanne Black was in a psychotic state at this time and homeless in Denver, and any attempt to have her sign a disclaimer had to be abandoned so the conservatorship case was filed in the DPC.

The Court finds Mr. Black had a clear conflict of interest regarding the funds held in the POD accounts. Mr. Black is also the Executor of the probate estate and a successor trustee for the SNT. Mr. Black and his children are beneficiaries under the Issue Trust. None of this information was disclosed to the Court, to the GAL or CAC. Based on Mr. Black's own testimony that he disclosed in the information "in effect" and that it was "implicit" displays his intention that the full facts not be plainly disclosed. Of even more concern, Mr. Black testified he deliberately chose to file the inventory and financial plan after he had already disclaimed the funds, despite the statutory requirement that the inventory reflect the PP's assets as of the date of appointment. At no time did Mr. Black disclose the entirety of the PP's estate to the Court. The Court finds the actions taken by Mr. Black based in part on his own testimony were deceptive and undertaken in bad faith.

*Civil Theft*

The Court signed an Amended Order on March 5, 2012 appointing Mr. Black as Conservator for Joanne Black. As noted above, the issues regarding Mr. Black's misappropriation of the POD accounts was not identified until he filed the amended annual report on September 8, 2014. Mr. Black did not accurately represent the PP's assets on the inventory he filed July 1, 2013, as he did not

9

BLACK017176

disclose the existence of the Roth IRA account and he only reported the Vanguard and Fidelity account balances *after* he disclaimed and divided the funds. Only upon review of the amended inventory was it realized by others that one-third of the $3 million in assets claimed on the initial petition were missing. The Court finds the Motion for Civil Theft Damages, filed by CAC on June 15, 2015 was filed well within the two year limitation period.

Review of the record and the evidence reflects all of the elements for C.R.S. 18-4-401 are met in this case. Without a doubt, Mr. Black knew the funds designated in POD accounts to Joanne Black and his children did not belong to him. Mr. Black developed a plan to divest Joanne Black and his children of the funds specifically left to them by Renata Black. To carry out that plan, Mr. Black deliberately withheld full disclosure of his intention to this Court when he sought and received permission to disclaim the funds. Mr. Black never advised this court the POD accounts at issue were left in part to his children and he never advised this Court the Issue Trust or the Roth IRA existed. The dilemma Mr. Black found himself in was never explained to any Court until these contested proceedings were held. The Court therefore finds Mr. Black knowingly obtained and exercised control over the POD account funds without authorization and by deception.

The Court finds Mr. Black intended to permanently deprive Joanne Black of one-third of the POD funds. The Court does not so find with respect to Mr. Black's children, as they apparently received their funds as beneficiaries of the Issue Trust. Joanne Black, on the other hand, has been permanently deprived of her funds. Mr. Black has knowingly used Joanne Black's POD account funds to fund the Issue Trust set up under Renata Black's estate plan and it is clear from his own testimony that he intended to and still intends to permanently deprive her of those funds. Mr. Black deliberately concealed the POD account funds by failing to fully disclose their existence and amount on the inventory due March 11, 2013 which by Colorado statute is required to declare all assets held by the PP on the date of appointment which in this case was December 11, 2012. There is no doubt that Mr. Black's actions were knowing and willful and that he knew the result of his actions would be that one-third of Joanne Black's POD funds would be diverted to himself and his children through the vehicle of the Issue Trust.

Whether Mr. Black had a cause of action in the New York probate court to modify or invalidate the POD designations is not an issue for this Court's decision. Mr. Black did not give the New York Court (or this Court either, for that matter) the opportunity to review the situation or any of the facts testified to before this Court regarding Renata Black's state of mind or her intentions. It also appears Renata Black created another Will which was not offered for probate in New York. Mr. Black never sought advice from his co-trustee Mr. Dain as to whether he would consider an agreement to divide the funds as contemplated by the original estate plan. As pointed out by Counsel for Mr. Black, this Court does not have jurisdiction to make determinations within Renata Black's estate, as that power lies with the New York Court. Mr. Black's rationalizations for his actions cannot

BLACK017177

overcome the basic facts that he deliberately failed to fully disclose his intentions or the full facts to this Court. This Court therefore proceeds on the facts and evidence before it and finds Mr. Black has committed civil theft against Joanne Black beyond a reasonable doubt. Mr. Black had an independent legal duty to Joanne Black in a fiduciary capacity as her conservator and as co-trustee of her Special Needs Trust beyond his fiduciary duty to her as executor of Renata Black's estate. Mr. Black is not entitled to rely on his receipt of the funds, as he obtained them by deception and by extension, his children are not entitled to rely on their receipt of the funds in excess of the POD amounts given to them by Renata Black.

The Court finds by clear and convincing evidence that Renata Black intended funds be provided to Joanne Black after her death to provide for Joanne Black's welfare. Joanne Black has suffered from a debilitating mental illness for the majority of her life and is unable to work or sustain herself independently. C.R.S. 18-4-405 states the owner of funds obtained by theft may recover $200.00 or three times the amount of the actual damages sustained by him, whichever is greater, and may also recover costs of the action and reasonable attorney fees. The award of treble damages is not discretionary. *In re Krupka*, 317 B.R. 432 (Bankr.D.Colo. 2004).

### Damages, Costs and Attorney Fees

The Court finds significant expenses have been incurred to try this case at the expense of the Joanne Black and Renata Black estates. The Court finds Bernard Black has not made any efforts to mitigate the costs and fees incurred. The Court finds Pamela Kerr's report reflects a significant amount of work documenting Mr. Black's use of estate funds. Mr. Black chose to object to the forensic results, insisting the accounting should be based on his version of events. This position not only was inappropriate as it impeded the Court's attempts to determine the exact amount of funds which had been diverted to the Issue Trust from the POD accounts, but significantly increased the cost to the parties. Ultimately, on the date of the surcharge hearing and using the information provided by Ms. Kerr, the parties agreed the misappropriated funds from the Vanguard and Fidelity accounts totaled $1,010,688.00 and the funds misappropriated from the Roth IRA totaled $500,558.00. The parties further agreed that 8% interest was due from the date of transfer.

Ms. Kerr's accounting shows that Mr. Black transferred funds into an excessive number of different accounts, which can only be likened to a shell game. It took an extraordinary effort by Ms. Kerr to trace where funds were placed and the expenses paid by the funds. This is best shown by Summary Exhibit D, admitted into evidence on September 8, 2015. This exhibit shows 25 different accounts were created to hold funds related to this case, encompassing Renata Black's original accounts at Vanguard and Fidelity and accounts opened by Mr. Black as Executor, Trustee and conservator. The Court finds 15 of these accounts appear

BLACK017178

to be completely unnecessary. The Court further finds Mr. Black caused a new trust to be created for Joanne Black at a significant cost to Joanne Black's estate which also appears to be completely unnecessary. The evidence provided to the Court indicates Mr. Black failed to account for tax consequences when he caused the second SNT to be created and manipulated funds and transactions between Joanne Black's conservatorship estate and her trust and Renata Black's estate, so that Joanne Black would bear the brunt of any tax ramifications. As a result, tax consequences to Renata Black's estate were minimized and the benefit passed on to Bernard Black and his children to Joanne Black's detriment.

C.R.S. 15-10-605(1) states that if the court determines any proceedings were brought, defended or filed in bad faith, the court may assess the fees and costs, including reasonable attorney fees incurred against the estate, party, person or entity that brought or defended the proceedings in bad faith. C.R.S. 15-10-605(4) states that a fiduciary who is unsuccessful in defending the fiduciary's conduct in a proceeding alleging breach of fiduciary duty shall not recover the fees or costs of that defense as the court deems equitable.

The Court finds Bernard Black has breached his fiduciary duties and has defended this action in bad faith for the reasons discussed above. The Court finds Bernard Black should personally bear the cost for these proceedings, to include but not be limited to the full amount of attorney fees and costs for the Guardian *ad Litem* Gayle Young, Court Appointed Counsel Lisa DiPonio and Forensic Accountant Pamela Kerr. Invoices have been submitted and requests for further hearing as to the imposition of fees and costs or the reasonableness of the fees and costs charged must be filed with the Court within 14 days from the date of this order. The Court finds from the record before it that Joanne Black and her estate have derived a compensable benefit from the efforts of the GAL, CAC, Pamela Kerr and Anthony Dain, noting the amount at issue was a full one-third of the total estate left to Joanne Black by her mother. The Court finds Bernard Black should fully reimburse Joanne Black's estate for the amounts he spent creating a second trust.

IT IS THEREFORE ORDERED:

1. Bernard Black has breached his fiduciary duty as conservator for his sister Joanne Black and is REMOVED as conservator. Any Letters issued to Bernard Black are hereby REVOKED. The word revoked shall be written upon the face of the Letters.

2. Bernard Black is SURCHARGED the sum of $1,511,356.00 representing the full amount of disclaimed funds. Judgment enters in the sum of $1,511,356.00 against Bernard Black and in favor of Joanne Black. Interest shall accrue at the statutory rate of 8% per annum effective from the date the funds were transferred from Renata Black's Vanguard,

12

BLACK017179

Fidelity and Roth IRA accounts. The judgment entered this date is based upon breach of fiduciary duties and is not dischargeable in bankruptcy.

3. All costs, fees and attorney fees incurred to prosecute this matter shall be paid by and chargeable to Bernard Black, including GAL fees and fees for Pamela Kerr's accounting and services. Any such fees and costs, including attorney fees paid by Joanne Black or her estate shall be reimbursed by Bernard Black with interest.

4. The Motion Requesting the Court to Consider Civil Theft Damages is granted. Treble damages based in civil theft are awarded to Joanne Black in the sum of $4,534,068.00 and judgment is entered for this amount against Bernard Black and in favor of Joanne Black. Interest shall accrue at the statutory rate of 8% per annum from the date of this Order. This judgment is based in civil theft and is not dischargeable in bankruptcy.

5. This Court recommends that Bernard Black not be appointed as a fiduciary for his sister Joanne Black in any capacity and especially not in any capacity involving Joanne Black's funds. The Court recommends Bernard Black be removed as the Executor of Renata Black's estate and that his actions as Executor be closely reviewed and examined. The Court recommends Mr. Black be removed as a trustee or co-trustee for any trust of which Joanne Black is a beneficiary.

6. The Court, from the evidence before it, finds the actions of Cherie Wrigley and Anthony Dain have solely been for the benefit of their cousin, Joanne Black. Ms. Wrigley and Mr. Dain have been instrumental in bringing Mr. Black's defalcations to the attention of the Court. Ms. Wrigley, by virtue of her special relationship with Joanne Black and her training, is especially suited to be appointed as guardian over the person of Joanne Black. Mr. Dain was fully justified in his decision to not be added as a signatory to accounts set up by Mr. Black. Mr. Dain is fully qualified to continue to act as a sole trustee or as a co-trustee for any trust naming Joanne Black as a beneficiary.

7. The Court recommends a professional fiduciary be appointed to act as Joanne Black's conservator or guardian of her property in New York State.

8. The Special Conservator is granted full authority to act as Conservator for Joanne Black until a conservator or guardian of the property is appointed by the Court in New York State. The Special Conservator's authority is unlimited and includes the authority to pay outstanding fees and costs to the professionals identified in this action pending reimbursement or collection from Bernard Black until the time these duties are transferred to the permanent conservator or guardian of the property.

13

BLACK017180

9. All funds held by Counsel for Bernard Black shall be immediately paid to the Special Conservator to defray the costs of these proceedings and pay the GAL, CAC, Special Conservator and Pamela Kerr's fees if they have not already been paid.

10. This Court retains such jurisdiction over this action as is necessary while the protective proceeding remains pending in New York State and until the Court in New York makes a determination of who will serve as guardian and conservator or guardian of the property for Joanne Black. Because of the judgments entered, this Court retains jurisdiction until the judgments are paid in full. Retention of jurisdiction with regard to the judgments will not restrict, impede or prevent action taken by a fiduciary appointed by a Court in New York State to collect on any such judgment or take any actions as are necessary to fully and finally resolve any financial issues between Bernard Black and Joanne Black. It is this Court's intention that any jurisdiction retained run concurrently with the Court in New York.

11. It has been shown that Bernard Black paid funds to his attorneys after this Court entered its orders freezing the accounts. Bernard Black paid a portion of those funds back in the sum of $115,000.00 which were held in his counsel's trust account and were previously ordered to be paid over to the Special Conservator. The Court must find, however, that the motion for contempt citation was not filed in strict compliance with C.R.C.P. 107, in that an order for issuance of a citation and a citation were not filed with the court. The Court therefore declined to issue a citation. C.R.CP. 107 requires personal service upon a contemnor and without strict compliance of these requirements, the Court does not obtain jurisdiction to impose a fine or jail sentence. The Court does, however, retain jurisdiction to determine the full amount of funds withdrawn by Mr. Black in contravention of the Court's order freezing accounts. The Court will therefore entertain further motion to determine the amount which remains due, if any, to be repaid by Mr. Black as to his failure to abide by this order, including the entry of a judgment.

12. The Court will entertain further motion to determine the amounts to be repaid by Mr. Black for causing an unnecessary trust to be set up for Joanne Black using her conservatorship estate funds, including the entry of a judgment.

14

BLACK017181

13. This Court remains extremely concerned that its orders and intentions will be misrepresented by Bernard Black and Counsel appearing on his behalf to New York Courts as has apparently been done previously. This Court hopes that any questions which may arise as a result of this Order or any clarifications deemed necessary will be quickly brought to this Court's attention for resolution.

DONE this 28th day of SEPTEMBER, 2015.

BY THE COURT:

_Elizabeth D. Leith_

Elizabeth D. Leith
JUDGE
Denver Probate Court

15

BLACK017182

# EXHIBIT 50

**Bernard Black**

| | |
|---|---|
| **From:** | Yekaterina Valerie Litvak |
| **Sent:** | Wednesday, January 13, 2016 10:57 PM |
| **To:** | Bernard Black |
| **Subject:** | FW: Clarification of statement from Katherine Litvak - Index No 80253/14 |

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Wednesday, January 13, 2016 3:44 PM
**To:** Yekaterina Valerie Litvak
**Subject:** FW: Clarification of statement from Katherine Litvak - Index No 80253/14

**From:** Pamela Kerr
**Sent:** Wednesday, January 13, 2016 2:19 PM
**To:** 'ricsupc2@nycourts.gov' <ricsupc2@nycourts.gov>
**Cc:** 'k-litval@northwestern.edu' <k-litval@northwestern.edu>
**Subject:** Clarification of statement from Katherine Litvak - Index No 80253/14

Your honor,

I am the forensic accountant that was hired by the Guardian ad Litem for Joanne Black to perform a forensic accounting of the activity in the Conservatorship of Joanne Black.

I am writing to you solely as the Forensic Accountant to clarify a statement that Katherine Litvak made in her letter to you dated 1/7/2016. I am copying Ms. Litvak on this communication so that she does not claim that I am attempting to have any type of ex-parte communications with you. Unfortunately, the only email address I have for Ms. Litvak is the one on the Northwestern University School of Law letterhead on which the letter was sent to you, which is her work email address.

Page 15 of Ms. Litvak's letter states:

> *"…and the Colorado Judge Found those Allegations credible Enough to Authorize an Investigation of Pinto's Conduct by a Forensic Accountant."*

I believe that this statement is made to insinuate that my investigation was with regards to Mr. Pinto's actions solely, which is 100% not true. As stated on the Colorado Order of 4/2/2015:

> *"The parties have stipulated to a forensic accounting of the Conservatorship estate, including the affected trusts, the disclaimer of Fidelity and Vanguard accounts, POD benefits for all accounts, which disclaimers were used to transfer funds into the (Black) Estate, the Roth IRA, all amounts paid to attorneys and accounts (sic) – in short, a complete review of all funds and assets related to Ms. Black both before and after the disclaimer, by Pamela Kerr, CPA."*

This forensic accounting <u>included</u> the payments to Esaun Pinto. But, Ms. Litvak does not state the fact of the matter, which is that Mr. Black is the person who paid Mr. Pinto over $174,695.00 out of an account in the name of Bernard Black. The account was never put into the name of Joanne Black, Protected Person, Bernard Black Conservator. Further, the only person that would have knowledge of the alleged theft would be Mr. Black, as the bank statements were linked to his personal account with his personal address listed on the statements. Mr. Black should have been fully aware of any ATM withdrawals made out of this account. In addition, Mr. Black included these payments on the 2013 Conservator Report filed with the Denver Probate Court and when the Court requested additional information with regards to these payments listed as payments for the benefit of the Protected Person, Mr. Black chose to file an Amended Conservator Report stating:

> *"By order dated July 2, 2014, the Court rightly asked for further explanation of these expenses. In response, after discussion with counsel, Mr. Black chose to remove these expenses from his 2013 report because they had been made from funds of the Estate of Renata Black, which is subject to the jurisdiction of the New York Court where the probate is administered."*

I am a licensed CPA, a Certified Fraud Examiner and a Forensic Certified Public Accountant and am required to provide a factual report based on the financial and other documents provided. I have provided such a report to the Denver Probate Court, who is the trier of fact in this matter. An Order was issued on September 28, 2015 with the results of many months of hearings in this matter.

Please feel free to have your Court contact me if you have any questions or need any further clarification with regards to my role in this matter.

*Respectfully,*
*Pamela M. Kerr, CPA, FCPA, CFE*
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235
Denver, Colorado 80204
(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:**  This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

# EXHIBIT 56

Case: 1:17-cv-00101 Document #: 402 Filed: 08/15/19 Page 639 of 691 PageID #:4032

**University Compliance**
Northwestern University
2020 Ridge Avenue
4th Floor
Evanston, Illinois 60208-0801

**Marcia Isaacson**
Associate Vice President
Chief Compliance Officer

marcia.isaacson@northwestern.edu
Phone 847-467-6171
www.northwestern.edu/compliance

**FILED IN PROBATE COURT**
**CITY & COUNTY OF DENVER, CO**

**MAR 0 7 2016**


NORTHWESTERN
UNIVERSITY

DATE FILED: March 7, 2016
CASE NUMBER: 2012PR1772

March 2, 2016

The Honorable Thomas P. Aliotta
**Supreme Court – Richmond County**
26 Central Avenue, Court Room 230
Staten Island, New York 10301

The Honorable Elizabeth D. Leith
**Denver Probate Court**
1437 Bannock Street
Denver, Colorado 80202

*Re: Guardianship of Joanne Black, Index No. 80253/14 (New York)* and *In re the Interest of Joanne Black, 12 PR 1772 (Colorado)*

Dear Judges Aliotta and Leith:

I am writing to alert both courts that Northwestern University was provided with documents that may have been filed under seal in connection with the above captioned matters. I also am writing to clarify that, notwithstanding that Bernard Black and his spouse Katherine Litvak are professors at Northwestern Law School and used University letterhead for certain legal correspondence, the University takes no position with regard to the merits of issues that have been raised.

As the Chief Compliance Officer for Northwestern, it is my responsibility to manage the "hotline," a third-party, web-based system that allows persons to report activities that may involve misconduct or violations of University policy. Over the last nine months, Cherie Wrigley, a party in the above-captioned matters, has filed two complaints on the hotline and has uploaded numerous documents, some of which we believe are under seal.

The most recent complaint was on January 8, 2016; Ms. Wrigley wrote to report that Ms. Litvak had filed a letter with the court that was written on Northwestern letterhead. (In May 2015, Ms. Wrigley had complained about Black using Northwestern letterhead; the University investigated and addressed that complaint.)

On January 12, 2016, Ms. Wrigley uploaded the documents listed below to the hotline. Only the first document was relevant to Ms. Wrigley's complaint; the rest related confidential and sensitive details about a legal dispute between members of Mr. Black's family.

- Letter from Katherine Litvak to Hon. Thomas P. Aliotta referenced in Wrigley's January 8 complaint

- Transcripts from Guardianship Hearing, Supreme Court of the State of New York held October 1, 2015

- Hearing order from the District Court of Denver County, Colorado, filed September 28, 2015

Finally, on January 23, 2016, Ms. Wrigley uploaded another letter to the hotline. The letter was dated January 8, 2016 and was addressed to the dean of Northwestern Law School; it carried the signature of Pamela Kerr, who had served as the forensic accountant in the Colorado matter. The letter, which is attached, initially complained about Ms. Litvak submitting a letter to the court on Northwestern letterhead; Ms. Kerr stated that "she truly believed Northwestern University Law School was supporting the statements made by Ms. Litvak." The letter then continued on to attack the credibility of Ms. Litvak and to reveal that Ms. Kerr had conducted an investigation of Mr. Black.

Upon learning that the law school had not received this letter, I telephoned Ms. Kerr to find out if she had sent a letter to the law school. She told me that while she had written a letter, on the advice of counsel she had decided not to send it. I did not disclose to Ms. Kerr that a signed copy of the letter had been uploaded to our hotline. I will not speculate on how Ms. Wrigley was able to upload to our hotline a signed copy of letter that Ms. Kerr never mailed.

It is apparent that the parties are engaged in an acrimonious legal battle involving very sensitive and personal issues. We hope it goes without saying that, notwithstanding the professors' use of our letterhead, Northwestern is not a party to these matters nor does it take any position with regard to their merits. We have asked Professors Black and Litvak to notify us when the above matters are finally resolved so we may determine if any action by us is needed.

Ordinarily, we would not share the identity of a person who has filed a complaint with the hotline. However, given our concern that some of the documents listed above were filed under seal, we felt it was our obligation to share this information with both courts. Please let us know if you wish for us to destroy these materials or provide you with electronic copies of them.

If you have any questions, please do not hesitate to contact me at (847) 467-6171 or by email at Marcia.isaacson@northwestern.edu.

Sincerely,

Marcia Isaacson
Associate Vice President
Chief Compliance Officer

/attach.

Cc: Daniel B. Rodriguez, Dean, Northwestern Pritzker School of Law

BLACK017317

# EXHIBIT 63

1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - - - X
                                    :
3       BLACK,                      :  16-CV-430(CBA)
                                    :
4            Plaintiff,             :
                                    :
5                                   :  United States Courthouse
        -against-                   :  Brooklyn, New York
6                                   :
                                    :
7                                   :  May 18, 2017
        WRIGLEY,                    :  2:00 p.m.
8                                   :
             Defendant.             :
9
     - - - - - - - - - - - - - - - X
10
     TRANSCRIPT OF CIVIL CAUSE FOR CIVIL CAUSE FOR CONFERENCE
11              BEFORE THE HONORABLE CAROL B. AMON
                 UNITED STATES DISTRICT JUDGE
12
                     A P P E A R A N C E S:
13
     For the Plaintiff:  HALLING & CAYO, S.C.
14                            320 East Buffalo Street
                              Suite 700
15                            Milwaukee, Wisconsin 53202
                         BY:  MICHAEL H. SCHAALMAN, ESQ.
16
                         SHARAN R. ABRAHAM
17                            37 South Street
                              Roslyn Heights, New York 11577
18                       BY:  SHARAN R. ABRAHAM, ESQ., PLLC, ESQ.

19   For the Defendant:  MURRAY, MANCILLA & FANTONE, LLP
20                            260 Madison Avenue
                              22nd Floor
                              New York, New York 10016
21                       BY:  ROBERT M. FANTONE, ESQ.

22   Court Reporter:     Marie Foley, RMR, CRR
                         Official Court Reporter
23                            Telephone: (718) 613-2596
                              Facsimile: (718) 613-2648
24                            E-mail:  Marie_Foley@nyed.uscourts.gov

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

*Proceedings*                                                    2

1          (In open court.)

2          THE CLERK:  Docket number 16-CV-430, Black versus

3    Wrigley, on for oral argument.

4          THE COURT:  All right.  Would the parties please

5    state their appearances, first for the plaintiff.

6          MR. SCHAALMAN:  Good afternoon, Your Honor, Michael

7    Schaalman and Sharon Abraham for the plaintiffs.

8          MR. FANTONE:  Good afternoon, Judge, Robert Fantone

9    from Murray, Mancilla & Fantone for the defendants.  I also

10   have with me our assistant, Rebecca Conrad.

11         THE COURT:  All right.  Good afternoon.

12         Everyone can be seated.  Mr. Fantone, you want to be

13   heard on your motion?

14         MR. FANTONE:  Yes, Judge, thank you.  Obviously we

15   have a few --

16         THE COURT:  You can actually step up here to the

17   microphone.

18         MR. FANTONE:  Oh, sure.

19         THE COURT:  Because those microphones are kind of

20   low so it's hard.

21         MR. FANTONE:  That's no problem.

22         I'll start with the Rooker-Feldman doctrine relevant

23   to the supplemental submissions that Your Honor requested.  I

24   think it is a pretty straightforward analysis.  There was the

25   injury complained of --

*Proceedings*                                                    3

1        THE COURT:  What judgment that the Denver probate

2    court has made would be invalidated by anything that this

3    Court would do?

4        MR. FANTONE:  Well, I think two of them at least,

5    you have the September 28th, 2015 order.

6        THE COURT:  Which order was that?

7        MR. FANTONE:  That was the Denver probate order

8    issued after the three-day trial, the initial trial.

9        THE COURT:  What did that order have to do with the

10   reimbursements that are sought here?

11       MR. FANTONE:  The allegations with regard to the

12   reimbursements really generally are saying Cherie Wrigley

13   committed fraud, Esaun Pinto committed fraud.

14       THE COURT:  What order of the Denver court says that

15   neither of them committed fraud?

16       MR. FANTONE:  So, paragraph six specifically says

17   Cherie Wrigley did not do anything wrong.

18       THE COURT:  With regard to what though, what was

19   being considered?  Paragraph six of which order now are you

20   talking about?

21       MR. FANTONE:  That's the September 28, 2015 order.

22   I'll go through it.

23       THE COURT:  All right.

24       MR. FANTONE:  If you look at the history and what's

25   documented in the orders and transcripts leading up to that

*Proceedings*                                                              4

1   proceeding which resulted in that order, it will give you an

2   idea of what the court was considering and also what was, to

3   the extent not specifically mentioned, what was inextricably

4   intertwined with that judgment and I think really that's the

5   crux of the argument that I believe makes it -- you know,

6   without doubt there's merit to the argument.

7              The specific expenditures that are at issue in this

8   complaint, before we even get into what happened at the DPC,

9   I'd like to direct the Court to paragraph 574 of the complaint

10  where the plaintiff admits that he did provide all this

11  evidence to the court.  It's explicit right in there.

12             There's the January, I believe it was a January 2015

13  submission by Bernard Black specifically discussing -- it's an

14  pretty broad order but it does mention fraud on behalf of

15  Esaun Pinto and Cherie Wrigley and that order is where Bernard

16  Black said that he wasn't sure or that he thought maybe that

17  would be the issue of the New York State probate court.

18  Nevertheless, he's bringing these issues to the court's

19  attention.  This was related to the report, the conservator's

20  report that was supposed to detail all the expenses.

21             THE COURT:  All right.  So, he submitted documents

22  to the Colorado court --

23             MR. FANTONE:  Right.

24             THE COURT:  -- that dealt with Pinto's theft,

25  alleged theft, correct?

*Proceedings*                                                            5

1          MR. FANTONE:  Correct.

2          THE COURT:  Now, what did the court decide about

3    that, what was the decision of the Denver court with regard to

4    that?

5          MR. FANTONE:  I don't see a specific decision with

6    regard to that.  I will say it's clear --

7          THE COURT:  So, then how would I be invalidating a

8    judgment of a state court with regard to the claims of Pinto?

9          MR. FANTONE:  I believe it falls on the inextricably

10   intertwined portion of the Rooker-Feldman doctrine.  It is

11   inextricably intertwined.  What counts as that is anything

12   that the litigant had a full and fair opportunity.

13         THE COURT:  Well, that's res judicata, right?

14         MR. FANTONE:  I agree as well but I think there's an

15   element of the Rooker-Feldman doctrine.

16         THE COURT:  Well, what order decided that, decided

17   the legitimacy or the illegitimacy of Pinto's bills, can you

18   point to me an order that deals with that?

19         MR. FANTONE:  I would make the argument that the

20   March order more explicitly addressed it.

21         THE COURT:  Which exhibit is that?

22         MR. FANTONE:  That's Exhibit C to our initial

23   submission.  It did discuss Cherie Wrigley, expenses in the

24   total of 18,000 and change.

25         THE COURT:  They're not the same expenses.

*Proceedings*                                                          6

1          MR. FANTONE:  I understand.  Judge, my understanding

2     of the law is that they had the full and fair opportunity and

3     if you look at the April 2 order which is --

4          THE COURT:  I'm sorry, exhibit what, C?

5          MR. FANTONE:  That was Exhibit C, yes.  If look at

6     the April 2, 2015 order which is what the court kind of zeroed

7     in on in its preliminary order, in addition to transcripts

8     from that day, Bernard Black's counsel is making the same

9     allegations against Mr. Pinto and Ms. Wrigley.  The Court

10    orders a forensic audit from Ms. Kerr, the forensic

11    accountant.  It was agreed to, the documents were submitted,

12    Ms. Kerr reviewed those documents.  To the extent that the

13    plaintiffs want to argue that wasn't at issue at the hearing,

14    that was because Bernard Black for whatever reason decided not

15    to continue to contest those at that time.  That still means

16    that they're inextricably intertwined with that order, with

17    the September 28th order.

18         THE COURT:  The September 28th order is what

19    document, exhibit what?

20         MR. FANTONE:  Exhibit A to their motion to dismiss.

21         THE COURT:  But they're not referred to there

22    because they weren't at that point the subject of dispute.

23         MR. FANTONE:  Well, if you look at I believe it's

24    Exhibit 8 to Bernard Black's declaration, and I think I have

25    an actual docket entry number, I believe it was 55-8, it does

1   describe -- it's a motion by one of the litigants on behalf of

2   Joanne Black but in there it's quoting the record from

3   April 2nd which is describing the scope of that hearing.

4           THE COURT:  All right.  I've got Exhibit A which is

5   the hearing order.

6           MR. FANTONE:  Right.

7           THE COURT:  So, where are the Wrigley payments

8   and/or Pinto payments referred to there?

9           MR. FANTONE:  They're not, Judge.  I would argue

10  that that was the platform, that was the venue where

11  plaintiffs on behalf of the Supplemental Needs Trust had a

12  full and fair opportunity to litigate those claims and they

13  chose not to.

14          THE COURT:  So, you agree then that neither Pinto's

15  nor the other expenditures by Ms. Wrigley were the subject of

16  any specific order by the court?

17          MR. FANTONE:  I would by extension of Cherie

18  Wrigley -- Cherie Wrigley is named as having done nothing

19  wrong.

20          THE COURT:  Where is that?

21          MR. FANTONE:  I believe it's paragraph six and it's

22  in the order, it's not just dicta, it's actually a numbered

23  finding in the order.

24          THE COURT:  "The Court from the evidence before it

25  finds the action of Shirley Wrigley and Anthony Dain to have

*Proceedings*                                                    8

1    been solely for the benefit of their cousin, Joanne Black."

2              MR. FANTONE:  And, again, you have --

3              THE COURT:  Were all of these other expenditures

4    that are now being raised part of the evidence before it?

5              MR. FANTONE:  Yes, and that's what I think is

6    established through the proceeding on April 2nd.

7              THE COURT:  Prior to this order?

8              MR. FANTONE:  Right.  The April 2nd order is when

9    the Denver probate court ordered Mr. Pinto to submit his

10   financials, for Ms. Wrigley to submit her financials and for

11   any objections to be raised and meted out --

12             THE COURT:  But that's after.

13             MR. FANTONE:  -- at an evidentiary hearing.

14             THE COURT:  Right -- oh, I'm sorry.

15             MR. FANTONE:  No, that's fine.

16             THE COURT:  That was after -- this order is the 28th

17   of September, 2015.

18             MR. FANTONE:  Correct.  The April order I'm

19   referring to really was the status conference that they

20   decided the scope of the hearing, she issued the order

21   requiring Mr. Pinto and Ms. Wrigley to submit their

22   financials.  If Mr. Black on behalf of the Supplemental Needs

23   Trust wanted to contest -- if he wanted to bring the same

24   claims he's bringing now, that was the time to do it.

25             THE COURT:  So, he didn't make that the subject of

*Proceedings*                                                    9

1    the hearing is what you're saying?

2          MR. FANTONE:  He didn't, but he had a full and fair

3    opportunity to the do it.  They submitted financials, they

4    were reviewed, Ms. Kerr reviewed them.

5          THE COURT:  But under the Rooker-Feldman doctrine

6    why does full and fair opportunity come into play?

7          MR. FANTONE:  I believe it's the case of Remy v.

8    New York State Department of Taxation and Finance, that's

9    507 Fed. Appx. 16 and I'll give you the pin cite, (pause) I

10   believe it's 18.

11         THE COURT:  So, were all of these charges that are

12   alleged here submitted by Mr. Pinto even if they weren't

13   contested?

14         MR. FANTONE:  Correct.

15         THE COURT:  All of them were?

16         MR. FANTONE:  Yes.

17         THE COURT:  In what form?

18         MR. FANTONE:  I don't know -- what I've seen is

19   Ms. Kerr's spreadsheet that --

20         THE COURT:  Does it show all the bank withdrawals?

21         MR. FANTONE:  Yes, for Wells Fargo as well as Chase,

22   absolutely.  I actually have the e-mail attachment with me if

23   you'd like to review it.

24         THE COURT:  So, this is all part and parcel of the

25   review that Ms. Kerr did that was -- and then certain of those

*Proceedings*                                                        10

1   things were challenged which resulted in a hearing?

2            MR. FANTONE:  Correct.  What was really challenged

3   was her findings as to Mr. Black's fraud and the issues

4   related to the disclaimer but those issues were ripe, they

5   were right there and for whatever reason they chose not to do

6   them -- to argue them.

7            THE COURT:  All right.  Is there anything else that

8   you --

9            MR. FANTONE:  I think a lot of the issues with the

10  other claims are related as far as the full and fair

11  opportunity related to res judicata, as Your Honor mentioned.

12  I just wanted to talk very briefly about the probate

13  exception.

14           THE COURT:  Right.

15           MR. FANTONE:  I think the real issue there is

16  custody, was the trust in the custody of the Denver probate

17  court.  I don't believe that the plaintiffs will argue that

18  even if it was in the custody, the probate exception doesn't

19  apply.  I think they concede if it was in the custody, it does

20  apply.  What they argue is that it wasn't in the custody of

21  the Denver probate court.

22           THE COURT:  You're talking about the Special Needs

23  Trust?

24           MR. FANTONE:  Yes, it's referred to by the Denver

25  probate court as the Special Needs Trust, I believe it is

1   actually the Supplemental Needs Trust.  We can call it the SNT

2   just to make it easier but, yes, that's the same trust.  It

3   was certainly in the custody of the Denver probate court.

4   There's ample evidence of it in the documents that the Court

5   has before it.  I'll give some examples, I'll first refer to

6   their submission, plaintiff's submission in opposition at page

7   18, footnote --

8              THE COURT:  So you say even if -- you believe that

9   it would be plaintiff's position that the probate exception

10  applies if the Special Needs Trust was subject to the Denver

11  probate --

12             MR. FANTONE:  Correct.

13             THE COURT:  Let me just see if that's correct.

14             Do you concede that?

15             MR. SCHAALMAN:  Well, for two reasons it wouldn't

16  have been.

17             THE COURT:  Forget about whether it would or

18  wouldn't have been, I'm asking you a very straightforward

19  question; assuming that the Special Needs Trust had been under

20  the jurisdiction of the Denver probate court, do you agree

21  that the probate exception would apply to these --

22             MR. SCHAALMAN:  No.

23             THE COURT:  -- proceedings before the Court?

24             MR. SCHAALMAN:  We do not.

25             THE COURT:  Okay.

*Proceedings*                                                    12

1        MR. FANTONE:  I'd still like to make the argument

2   despite -- because I believe that under a reading of the law,

3   and I'll bring to the Court's attention the case that really

4   describes it well, it's Mercer v. Bank of --

5        THE COURT:  Well, Mercer was a different case,

6   Mercer was a case brought against the trustees of a trust.

7        MR. FANTONE:  That's true.

8        THE COURT:  It had to do with removing money from

9   the trust.

10       MR. FANTONE:  There were two Mercer cases, I'm

11  referring to the one in the Second Circuit dated 2015.  They

12  were similar allegations but I think fundamentally it was

13  discussing disbursements that were made from a trust which was

14  in the custody of the probate court at that time and trying

15  to --

16       THE COURT:  But these were disbursements made by the

17  trustee, correct?

18       MR. FANTONE:  Correct, as they were in this case.

19  Bernard Black as trustee, conservator, as fiduciary okayed

20  every single one of these payments that are now at issue so

21  it's really not that far removed.

22       THE COURT:  Let me ask you if you agree the flip

23  side of it, that if the Special Needs Trust is not within the

24  custody of the Denver probate court, that there's no probate

25  exception?

*Proceedings*                                                    13

1          MR. FANTONE:  I would agree to that, it is just

2    hard -- yes, I would agree with that.  It's just very hard for

3    me to see how it's not.  I would even like to reference the

4    supplemental submission in the related case of Anthony Dain.

5    It was in response to the plaintiff's in that case submission

6    of an order from New York County related to the trust, the

7    jurisdiction of the trust and New York State's ability.  I

8    have copies of it, I have three copies if the Court would like

9    to see it.

10         THE COURT:  I'm sorry, what does that have to do

11   with anything?

12         MR. FANTONE:  In the submission Mr. Dain included

13   some documents from the appellate proceedings in Denver.  The

14   named party in the appellate proceedings is Bernard Black on

15   behalf of the SNT, the Supplemental Needs Trust.  He is

16   disputing the Denver probate court's exercise of jurisdiction,

17   and getting back to what I was saying, I don't even think in

18   their papers they actually dispute that the Denver court had

19   jurisdiction.  If you look at a couple of footnotes, it's

20   footnote ten on page 18 and footnote eight on page 16, what

21   they're saying is the court did exercise jurisdiction, it just

22   did it incorrectly and based on that position, they're

23   appealing that issue to the appellate court.  It's before the

24   appellate court right now.  So, I don't really see how they

25   can argue that the trust wasn't under the jurisdiction,

*Proceedings*                                                    14

1    they're just arguing that the court improperly exercised that

2    jurisdiction.  And as I understand it, even today if there's a

3    request for money to be removed, a special request from that

4    trust, it has to be approved by the court.

5            THE COURT:  By the Denver probate court?

6            MR. FANTONE:  Right, Mr. Schaalman could probably

7    speak more intelligently on that but that's my understanding

8    of it.  So, again, I don't think they really substantively

9    dispute that the trust was in the custody of the Denver

10   probate court.

11           THE COURT:  So, what do you understand the relief to

12   be here though?  The relief here seeks damages from Wrigley

13   and Pinto, correct?

14           MR. FANTONE:  Correct, for a return of funds that

15   were -- actually they were from the estate, they were paid

16   from the estate.

17           THE COURT:  And the estate wasn't subject to the

18   Denver probate court, correct?

19           MR. FANTONE:  It's alleged they were paid from the

20   estate.  To be honest, it is kind of hard to track exactly

21   what Mr. Black was doing.

22           THE COURT:  Well, if they came out of the estate,

23   then the probate exception doesn't apply because there was

24   no --

25           (Continued on following page.)

*Proceedings*                                                    15

1      MR. FANTONE:  On that reasoning, if they purely came

2   out of the estate, then there's no reason that Westchester

3   should abstain from observing these claims, or, I'm sorry,

4   deciding these claims.

5      THE COURT:  I know, but no one piece brought these

6   claims before the Westchester.

7      MR. FANTONE:  They -- other issues related to the

8   trust were -- there was attempts by Joanne Black to bring

9   those claims, which resulted in the -- the Surrogate's Court

10  issuing a decision.  I don't know if it's a decision.  I've

11  seen it was referenced in some of the submissions here that it

12  can't decide the claims because it doesn't have jurisdiction

13  over the trust.  It's advantageous in this argument now and as

14  well as in the Surrogate's Court to avoid, you know,

15  litigating the issue to argue that the Denver court, it was an

16  estate matter, when -- or, I'm sorry, that it was a trust

17  matter and that the Surrogate's Court doesn't have

18  jurisdiction over the trust.  When Mr. Black was before the

19  Denver court, he argued that these were estate matters.  It's

20  really whatever position is benefitting him at the time.

21     THE COURT:  What is your position with regard to the

22  Special Needs Trust?

23     MR. FANTONE:  He fraudulently disclaimed the assets,

24  and at that point, he created trusts, he was the executor of

25  the estate.  There's really no concrete, it was almost like

*Proceedings*                                                    16

1  things were just in flux and labels weren't -- it wasn't

2  properly done and it wasn't done in an organized fashion.

3           THE COURT:  Are you disputing that -- I mean, where

4  the Denver court ultimately came out was that all the money

5  should have gone to that, to the Special Needs Trust and not

6  to the other trust, right?  And is that accurate?

7           MR. FANTONE:  Correct.  Right, what it found was

8  that -- I mean --

9           THE COURT:  Or is it your position it should have

10 gone out right to the disclaimer was --

11          MR. FANTONE:  Yeah, there's really two issues.  I

12 think everyone recognized the fact that at that time, Joanne

13 Black maybe was not in her best interest that all the money

14 went out right to her.  So I agree with that.  But to the

15 extent that Bernard Black took the money, a third of -- at

16 least a third.  By the way, it was really, if you look at Ms.

17 Kerr's reports, it was a third plus there was an IRA that was

18 completely unaccounted for, but yes, that that money was

19 improperly diverted into a different trust and it should have

20 been in the SNT.

21          THE COURT:  Well, did the disclaimer, was it not

22 clear from the application for the disclaimer that part of it

23 was going into the other trust?

24          MR. FANTONE:  Exactly.

25          THE COURT:  It wasn't clear.  Everyone thought with

*Proceedings*                                                          17

1   the disclaimer it would all go into the Special Needs Trust.

2          MR. FANTONE:  Correct, that was the finding that the

3   Court issued, that they weren't on notice, that Mr. Black was

4   being deceptive and misguiding the court.

5          THE COURT:  Got it.

6          Anything else?

7          MR. FANTONE:  No, that's it.

8          Did you want copies of the -- Mr. Dain's submission?

9   It's on -- it is on ECF.

10          THE COURT:  Which submission is this?

11          MR. FANTONE:  Where he's talking about the issues on

12   appeal right now in Denver, which specific are dealing with

13   the court's --

14          THE COURT:  This was a submission in the other case?

15          MR. FANTONE:  Correct.

16          THE COURT:  Was it a recent submission?

17          MR. FANTONE:  Yeah.  Let me grab it.  I'll give you

18   the docket number.  I have it.

19          (Pause.)

20          MR. FANTONE:  So, it's 1:16:CV-01238.

21          THE COURT:  And I'm sorry, just remind me what your

22   point about this document is?

23          MR. FANTONE:  This really shows, I believe, that the

24   Denver Probate Court did take custody of the trust at that

25   time, and it has a caption Appellant Bernard Black in his

*Proceedings*                                                          18

1    Capacity As Trustee for the Supplemental Needs Trust, and Mr.

2    Dain in his submission discussed how the Denver Probate Court

3    did take custody of the trust.

4              THE COURT:  All right.  Thank you.

5              Counsel?

6              MR. SCHAALMAN:  I've been sitting here, Your Honor,

7    trying to think how I could help the Court by simplifying

8    things.  So let me start with the last item that counsel just

9    raised about whether it makes a difference what the caption of

10   the appeal is and whether there was custody or jurisdiction of

11   the SNT in the Denver case.

12             THE COURT:  Let me just ask you a quick question

13   before I forget.

14             MR. SCHAALMAN:  Please.

15             THE COURT:  This money that you want back.

16             MR. SCHAALMAN:  Yes, ma'am.

17             THE COURT:  Where does it go?

18             MR. SCHAALMAN:  It would going into the Special

19   Needs Trust.

20             THE COURT:  The Special Needs Trust.

21             MR. SCHAALMAN:  Correct.

22             THE COURT:  For Joanne.

23             MR. SCHAALMAN:  Correct.

24             THE COURT:  All of the money now from the POD is now

25   in that Special Needs Trust and you agree it should stay

*Proceedings*                                                    19

1    there.

2              MR. SCHAALMAN:  Yes.

3              THE COURT:  So the other trust shouldn't be

4    receiving any of the money?

5              MR. SCHAALMAN:  Let me answer that a little bit more

6    completely.

7              THE COURT:  Okay.

8              MR. SCHAALMAN:  The answer is yes.  The will created

9    two inter vivos trusts.

10             THE COURT:  Right.

11             MR. SCHAALMAN:  One an issue trust with one-third of

12   the assets and then the Supplemental Needs Trust with

13   two-thirds of the assets.  This whole confusion and horrific

14   set of litigation truly occurred because neither the guardian

15   ad litem nor the court read the will.  That's what this whole

16   confusion is.  When Mr. Black made his petition to disclaim,

17   the court agreed and he submitted the will along with the

18   petition.  The -- and the guardian ad litem read the will.

19   The judge had the will, and she blamed Mr. Black for lack of

20   candor because the petition itself didn't state that one-third

21   of the monies after the disclaimer would go into the issue

22   trust, even though in the court record it was very clear what

23   would happen.  Mr. Black was only saying, I don't want to go

24   forward with the POD, payment on death.  I think that was a

25   mistake by my mother.  Joanne is on the streets of Denver.

*Proceedings*                                                    20

1   People have to find her, have to help her, and she should not

2   get all these -- monies should not go all to her.  The will

3   had been in affect since 1997, and Ms. Renata Black had this

4   one-third, two-thirds split and these were all inter vivos

5   trusts.

6            THE COURT:  But this POD eliminated the one-third.

7            MR. SCHAALMAN:  It did.

8            THE COURT:  It all went to her.

9            MR. SCHAALMAN:  It all went to her.  And nobody

10  objected to the disclaimer, nobody.  Not the guardian ad

11  litem, not Ms. Wrigley, not Mr. Dain.

12           THE COURT:  Did the disclaimer make plain that a

13  third of this was going into the issue trust?

14           MR. SCHAALMAN:  Of course.  It attached the will.

15           THE COURT:  But why isn't -- by attaching the will,

16  that's how it did it.

17           MR. SCHAALMAN:  And Mr. -- there's all kinds of

18  statements.

19           THE COURT:  But just now you told me you believe all

20  of the money should be in the Special Needs Trust and none of

21  it in the issue trust; is that correct?

22           MR. SCHAALMAN:  Then I misunderstood your question.

23           THE COURT:  That was my question.  Should all of the

24  money be in the Special Needs Trust.

25           MR. SCHAALMAN:  I thought you were asking what we

*Proceedings*                                              21

1    are trying to recover should all go into the Special Needs

2    Trust, absolutely.  So the money that we're trying to get back

3    from Mr. Pinto and CPI as authorized by Ms. Wrigley will all

4    go into the Supplemental Needs Trust, all of it.  Will not go

5    to Mr. Black in the issue trust.  The position on appeal is,

6    number one, the reason the caption lists Mr. Black as a

7    trustee is because of this question which I don't fully

8    understand the difference between custody and jurisdiction.  I

9    don't think there is a difference.  I think the Denver Probate

10   Court incorrectly exercised jurisdiction over the Supplemental

11   Needs Trust.

12          THE COURT:  But you agree it did exercise

13   jurisdiction in the Special Needs Trust.

14          MR. SCHAALMAN:  It did.  It made some records, not

15   with regards to any of the disbursements.

16          THE COURT:  So your claim is not that it did not

17   exercise jurisdiction over it.  Your claim is that it

18   shouldn't have.

19          MR. SCHAALMAN:  It shouldn't have.

20          THE COURT:  Well, what should it have done?  I mean,

21   Mr. Black himself brings this issue to the Denver -- brings an

22   issue to the Denver Probate Court.

23          MR. SCHAALMAN:  But all he brought, Your Honor, only

24   thing he brought was a disclaimer and he was already appointed

25   conservator by the Denver Probate Court and he then came to

*Proceedings*                                                            22

1    the court and said --

2         THE COURT:  What was in the conservancy estate,

3    nothing?  Because sometimes the papers refer to a

4    conservancy - I can't say the word - estate.  Was there

5    nothing in that?

6         MR. SCHAALMAN:  I think there were monies had been

7    collected, I think.  I don't want to be certain about that,

8    but I think there was some monies being collected that were

9    paid to her for her immediate needs.

10        Joanne Black's mother sent her with a credit card

11   money every week for years so that she could take care of

12   herself and there were social security payments and workman

13   compensation payments.

14        THE COURT:  Well, tell me what the interplay is from

15   the POD, which obviously gave all the money to her.

16        MR. SCHAALMAN:  Yes.

17        THE COURT:  How does then Mr. Black decide that the

18   money shouldn't go all to Joanne, it should go part to a needs

19   trust and then part to an issue trust?  I can see him saying,

20   you know, coming before the Denver Probate Court and saying

21   she can't handle this money.  But then how does he switch

22   around and get money into the issue trust?  How do you do

23   that?

24        MR. SCHAALMAN:  Because when you disclaim, Your

25   Honor, as I understand it, I'm not an estate and trust lawyer,

1    but my understanding is when you go to a court and say I am

2    disclaiming this POD, then automatically you revert back to

3    the will.  The will is what controls.  You don't then get to

4    set up a new system.  You go back to what was the testator,

5    what was Renata Black really trying to accomplish.  The

6    assumption is when you disclaim, that there's been a mistake,

7    that Renata Black at the end of her life makes a mistake.

8              THE COURT:  But the disclaimer was effectively

9    reversed by the Denver court.

10             MR. SCHAALMAN:  No, it was not effectively reversed.

11   Under Colorado law you cannot reverse.

12             THE COURT:  Well, what did the judge say though?  I

13   mean, the judge said that the money shouldn't go to the issue,

14   correct?

15             MR. SCHAALMAN:  No, she didn't say that.

16             THE COURT:  So what was the outcome?  What was the

17   outcome, and what are you appealing?

18             MR. SCHAALMAN:  We're appealing principally the

19   civil theft finding.  We're not appealing from the question of

20   whether there could be -- the disclaimer was appropriate,

21   because the judge said I can't touch the disclaimer.  I made a

22   decision on the disclaimer.  Colorado law is very clear that

23   once the court has said there shall be a disclaimer, the will

24   now controls, the court doesn't have the power to re-do that.

25   So we're appealing basically the fact that the court found,

*Proceedings*                                             24

1  without any evidence, without any hearing, that somehow Mr.

2  Black had been less than candid with the court and therefore

3  committed civil theft.  That's what's on appeal.

4       THE COURT:  Is the civil theft his taking the money

5  and putting it in the special issue trust?  Is that the nature

6  of the --

7       MR. SCHAALMAN:  Yes, she is saying when I agreed to

8  the disclaimer, even though there were these records in the

9  court, and it was more than that, Your Honor.  Mr. Black's

10 attorney told the guardian ad litem this is how it goes, this

11 is what the will is all about.  When you get rid of the POD,

12 you don't have a choice.  It goes as to the will instructs the

13 parties.  If you wanted then to redo that, you would have to

14 somehow invalidate the will.  You'd have to contest the will.

15 Nobody was contesting the will.  No one has ever contested the

16 will.

17      There are a couple of things I just want to go back

18 to that the Court started with.

19      There is no order from the Denver probate court that

20 deals with the expenditures we are challenging here.  There

21 simply is no order.  And in our brief, we contest and there's

22 absolutely no evidence in the record that these charges that

23 Mr. Pinto and CPI incurred were ever reviewed by Joanne --

24 Pamela Kerr, they were not.  We have in a letter and she even

25 writes in a footnote.

*Proceedings*                                                          25

1          THE COURT:  So the report doesn't mention anything

2    about these withdrawals by Pinto or anything?

3          MR. SCHAALMAN:  Apparently, I haven't seen this

4    spreadsheet, but her report to the court does not.  She did

5    not review these.  She did not.  She reviewed the Wrigley

6    reimbursements.  That's what Ms. Wrigley was pushing, and

7    those were approved by the court.  There is simply no order

8    and there's no way to take a totally distinct set of facts and

9    to throw them into the September 28 order when that's not what

10   the court was about.  The court was not doing that.  So I

11   think counsel's answer to you was there is no order, and I

12   think that is the right answer.  So Rooker-Feldman couldn't

13   possibly apply.

14         Let me make one other comment about Rooker-Feldman.

15   The Second Circuit has ruled, as did the United States Supreme

16   Court in the Exxon case, that inextricably linked is not a

17   separate category to be determined by the court.  It simply is

18   a restatement of the factors.  And we cite the case, the

19   McLamb case out of the Second Circuit, which reversed some of

20   the Second Circuit district court holdings that said

21   inextricably linked is a separate analysis or a separate test

22   the court has to apply.  It didn't.  You have to go through

23   the four Rooker-Feldman tests.

24         Let me talk, briefly address the probate exception.

25   The probate exception, of course, it doesn't apply here

*Proceedings*                                                    26

1   because we have inter vivos trusts, not testamentary trusts.

2   The --

3          THE COURT:  Well, if a probate court was taking

4   jurisdiction over the trust, why does that make a difference?

5          MR. SCHAALMAN:  Well, because the inter vivos trusts

6   are exactly that device to avoid probate.  Probate lawyers go

7   ahead and create inter vivos trusts which are created during

8   the lifetime of the decedent in order to avoid the probate.

9   It's exactly what it's supposed to happen.  And for some

10  reason, even though we brought this to their attention, this

11  is a mistake that they repeat over and over and over in their

12  briefs and the Mercer case and the cases they rely on are all

13  testamentary trust cases, and they don't address that in their

14  reply brief.  So it's clear that there was no jurisdiction

15  over the SNT.  There was certainly no jurisdiction over Mr.

16  Pinto.

17         THE COURT:  You agree that the court took actions

18  with regard to the SNT and took jurisdiction over it.  You've

19  agreed to that.

20         MR. SCHAALMAN:  What she did, Your Honor, she didn't

21  make a ruling.  There's no ruling in there "I have

22  jurisdiction over this trust."

23         What she did was she said --

24         THE COURT:  Did anyone ever argue before her that

25  she didn't?

*Proceedings*                                                              27

1        MR. SCHAALMAN:  Yes, and they claimed you have no

2   jurisdiction.  That's why Mr. Black finally had to hire an

3   attorney to say you have no jurisdiction over the SNT.

4        THE COURT:  But she must have rejected that because

5   then she took actions regarding it, correct?

6        MR. SCHAALMAN:  What she did was she said on one

7   occasion that Mr. Dain could take money out of the SNT.  So

8   that was considered to be taking jurisdiction over it and she

9   said that monies could come out of the -- actually, they came

10  out of the estate.  They were destined for the SNT and those

11  monies that came out of the estate were paid to Ms. Wrigley,

12  and Mr. Black agreed to those charges.

13       THE COURT:  So the estate paid Wrigley.

14       MR. SCHAALMAN:  Yes.

15       THE COURT:  Not the SNT.

16       MR. SCHAALMAN:  That's correct.

17       THE COURT:  And what about Pinto, was that the

18  estate?

19       MR. SCHAALMAN:  Yes, not the SNT.

20       THE COURT:  So none of the money that's at issue

21  here came from the SNT.

22       MR. SCHAALMAN:  That's my understanding.

23       Now, Mr. Dain has taken money out of the SNT, but

24  that's not before this Court.  But I wanted to tell you that

25  that was an example of Judge Leith, the Denver Probate Court,

*Proceedings*                                                          28

1    of extending jurisdiction over the SNT, permitting him to take

2    monies out of the SNT, authorizing him to do that.  That's

3    what's on appeal, that she had no business having jurisdiction

4    over the SNT.  She had no jurisdiction over Mr. Black as a

5    trustee.  She had no jurisdiction over Mr. Pinto.

6                THE COURT:  What was her jurisdiction?  Black

7    brought this matter to her.  What was her jurisdiction?

8                MR. SCHAALMAN:  It was simply as over the

9    conservancy.  And the question --

10               THE COURT:  What is the conservancy?  Tell me.

11               MR. SCHAALMAN:  Well, he became her financial

12   conservator.

13               THE COURT:  Joanne's.

14               MR. SCHAALMAN:  Joanne's.  Bernie Black went to the

15   court and said my sister --

16               THE COURT:  All right.  So, what is that conservancy

17   at the point that he went there, what did it consist of?

18               MR. SCHAALMAN:  It's to conserve her financial

19   assets and to make allocations to her for her needs.

20               THE COURT:  So her financial assets under the POD,

21   correct?

22               MR. SCHAALMAN:  Well, the POD was disclaimed and the

23   court agreed with that, as the conservator, he came and --

24               THE COURT:  So then her assets are the SNT trust.

25   He's saying take control over her assets, then the assets are

*Proceedings*                                                    29

1    the SNT trust, that's her assets.

2              MR. SCHAALMAN:  There were other assets in the

3    conservancy -- conservator's estate.  I know this is all very

4    technical, and I wish I could diagram it for you, would

5    probably be easier, but by moving as the conservator, he did

6    not subject all of her assets to the jurisdiction of the

7    Denver probate court.

8              THE COURT:  So what assets were submitted to the

9    jurisdiction of the Denver probate?

10             MR. SCHAALMAN:  There were probably none that were

11   submitted to her.

12             THE COURT:  So he's there for nothing?

13             MR. SCHAALMAN:  He was there because she was there,

14   because where she is, if she were in California, he would have

15   gone to California, because where she is is where he needs to

16   take protection over her and become the conservator.  That was

17   number one.  And then to go to the court and say because

18   there's jurisdiction over her, I'm here to disclaim the POD.

19   It had nothing to do with the other trusts in terms of the

20   court making a decision.  The court didn't make a decision

21   about the other trusts at all, either the SNT or the issue

22   trust.

23             THE COURT:  So then the judge, once there was a

24   disclaimer, the judge had no authority whatsoever to talk

25   about whether money should or should not have been paid out of

1  any of these trusts or estates or anything else?

2  MR. SCHAALMAN: That's correct, Your Honor. She

3  exceeded her authority because during the hearing on which

4  they were trying Mr. Black's motion for the disclaimer, she

5  then learned for the first time that, oh, what the disclaimer

6  means is a two-thirds, one-third split because of the will,

7  and her -- you can read her decision. It's full of vitriol,

8  but it's basically Mr. Black was candid enough with me. I

9  didn't know this. I wouldn't have granted the disclaimer.

10  So at that point, the guardian ad litem raises the

11  question of well, we think Mr. Black has basically stolen

12  these monies and there are we want the court to rule that in

13  fact he is liable for civil theft. And of course that's all

14  on appeal. That will be argued this July in the Denver Court

15  of Appeals. But there's no decision, and she should have not

16  taken any decisions on where the assets of this went or who

17  had control over what. You have to have jurisdiction over

18  these trusts. She didn't have it. The assets were never in

19  Colorado, ever.

20  THE COURT: And when all of this issue came out

21  about whether money should come out or not come out, didn't

22  Black put some of these issues to her?

23  MR. SCHAALMAN: No. He was asked what about these

24  monies, because Cherie Wrigley, again not as a party, but she

25  was there as a witness, and said I've got these expenses. And

*Proceedings*                                                    31

1   the judge, I don't even understand why, took it on herself to

2   say okay, tell me what these expenses are.  I'll have the

3   accountant look at them.  And for her expenses, that's what

4   happened.

5          For Pinto, he never submitted his expenses, never.

6   He never submitted the expenses.  Kerr never made a report

7   saying these expenses seem appropriate to me.

8          THE COURT:  Did Black contest the jurisdiction of

9   the probate court to discuss Wrigley's expenses?  Did he ever

10  contest the jurisdiction to address that issue?

11         MR. SCHAALMAN:  I can't answer that question

12  specifically.  I can tell you he contested the jurisdiction of

13  the court over the SNT.  These monies were coming out of the

14  estate.  In addition to being the conservator, he was also the

15  executor of the estate.  He at that point said Ms. Wrigley has

16  performed services for which she ought to be compensated.  So

17  he didn't object.  But this was never the business of the

18  Denver Probate Court.  Her business was limited.

19         THE COURT:  Well, who had to make the decision that

20  she be paid, Wrigley?

21         MR. SCHAALMAN:  The Denver court undertook that

22  decision, but it certainly could have come in the Surrogate's

23  Court in New York and it certainly --

24         THE COURT:  Well, as the executor, does he contest

25  that she's making these decisions about money being paid to

*Proceedings* 32

1 Wrigley?

2       MR. SCHAALMAN:  He did not contest those because he

3 thought those monies was appropriate.

4       THE COURT:  But he's still letting her take

5 jurisdiction over money that he says she has no business

6 taking jurisdiction over.

7       MR. SCHAALMAN:  He made it very clear during the

8 proceedings that she did not have jurisdiction over the

9 trusts.  I don't know, I don't know, Your Honor --

10       THE COURT:  But she also didn't have jurisdiction

11 over the money in the estate, right?

12       MR. SCHAALMAN:  She did not and --

13       THE COURT:  So the money's coming from one of these

14 two places, and nobody at that point in time is saying she

15 can't do that, right?  Neither side is saying she can't do

16 this.

17       MR. SCHAALMAN:  I can't answer that conclusively,

18 Your Honor.

19       THE COURT:  I mean, he only gets upset when she

20 determines that the money shouldn't have gone into the other

21 trust and charged him with, in effect, civil theft.

22       MR. SCHAALMAN:  That's what the case was about and

23 that's what he was there to do was to make sure that the will

24 was honored after the disclaimer was done.  He was not there

25 to give the Denver probate court -- the Denver probate court

*Proceedings*                                                                33

1   was not dealing with the estate.  The estate was being handled

2   in New York.

3           And when you think about it, so what would the

4   Denver probate court, if we're wrong, what would the Denver

5   probate court have a right to do?  The answer is nothing.

6           THE COURT:  So, did the disclaimer -- he put the

7   disclaimer before the Denver court, right?

8           MR. SCHAALMAN:  Yes.

9           THE COURT:  Did the disclaimer mention the two

10  trusts?

11          MR. SCHAALMAN:  It attached the will.  It

12  mentioned --

13          THE COURT:  What did it say in the disclaimer

14  itself?  What did it say?

15          MR. SCHAALMAN:  The petition said that instead of

16  the payment on death, two-thirds of the assets will go into

17  the Supplemental Needs Trust.

18          THE COURT:  That's what the disclaimer said?

19          MR. SCHAALMAN:  That's the petition for the

20  disclaimer, yes.

21          THE COURT:  It said two-thirds of it would go?

22          MR. SCHAALMAN:  Right.

23          THE COURT:  Does it mention where the rest of it?

24          MR. SCHAALMAN:  It's silent as to the one-third.

25  But the will was attached to the same document.

*Proceedings*                                                    34

1          So, you know, in reading Judge Leith's opinion, this

2   is a train wreck, in my opinion.  But that's really not here

3   nor there for this Court.

4          But I think what's very important is the questions

5   that you ask and the answers you got, that there was no order

6   that also with these reimbursements that should be made to the

7   SNT, none.  And I think that's clear.  And counsel is wrong

8   when he said that those -- that there was a review by Pamela

9   Kerr, the accountant.  Did not happen.

10         THE COURT:  Well, it's listed in her --

11         MR. SCHAALMAN:  Well, apparently he has a

12  spreadsheet.  I haven't seen that spreadsheet.  It's not part

13  of this Court's record.  So, I mean, if there's a spreadsheet

14  out there, I haven't seen it.  And if I'm wrong it's in the

15  Court's record, then there's a lot in this Court's record I

16  would agree that I missed, but I don't think it's there.  And

17  we say in our brief, and we're pretty darn careful about the

18  facts that we allege, we said she never engaged in a review of

19  Pinto or CPI's expenses and reimbursements.  She didn't.

20         So, the court in September 28th, when it issued this

21  lengthy opinion, was not dealing with Mr. Pinto.  And again,

22  she really had no power over Pinto or his company or Wrigley

23  or Dain.  None of these people had subjected themselves to the

24  jurisdiction of the court.  They weren't parties.

25         THE COURT:  Well, she could hold, assuming she had

*Proceedings*                                                    35

1    jurisdiction over the trust, she could say that no payments

2    will be made out of the trust to these individuals.  She

3    didn't need jurisdiction over the individual people.

4            MR. SCHAALMAN:  Yeah, but she needed jurisdiction

5    over the trust to say that, which she took.

6            THE COURT:  By your accounts, she took jurisdiction

7    over that.

8            MR. SCHAALMAN:  And she needed jurisdiction over the

9    trustee, which she didn't have.

10           THE COURT:  Mr. Black was the trustee.

11           MR. SCHAALMAN:  But he was there as a conservator.

12   He came in specifically as that.  He never appeared as a

13   trustee.

14           THE COURT:  Well, once she took jurisdiction over

15   the trust, she took jurisdiction over the trustee, correct?

16           MR. SCHAALMAN:  I don't believe so.

17           THE COURT:  Whether she should have or shouldn't

18   have, she did.

19           MR. SCHAALMAN:  I don't believe so.  I think she

20   ordered him to -- to make -- to make the payment of the civil

21   theft as a conservator, not as a trustee of the special -- the

22   Supplemental Needs Trust or of the issue trust.

23           Let me turn briefly, if the Court still has patience

24   on this, to the probate exception.  I actually am done with

25   the probate exception.  I could certainly talk more about it.

*Proceedings*                                                36

1  But we submitted to the Court the most recent opinion of

2  Justice Reid, an interpleader action brought by Chase Bank.

3  It's part of the, we referred to it in our brief and it's now

4  part of the court record in 16-C-1238.  The Court asked us to

5  submit that decision, and we so did, and it's dated May 8th

6  where Justice Reid in this interpleader action said there is

7  no jurisdiction in New York, either in the Supreme Court of

8  New York or in the Surrogate's Court, for these trusts, and

9  goes through the factors and says absolutely no jurisdiction

10 in New York over these trusts.  Principally because they're

11 inter vivos trusts and the creator, the grantor of the trust

12 has to be alive at the time the court would exercise

13 jurisdiction over these trusts and Ms. Black died in 2012.  So

14 there's no question that there's no probate.

15         THE COURT:  So no one has jurisdiction over those?

16         MR. SCHAALMAN:  Not in New York and not in Colorado.

17 Those trust --

18         THE COURT:  How would someone get jurisdiction?

19         MR. SCHAALMAN:  Trust assets are in Illinois where

20 the trust accounts are and where the trust assets for both the

21 SNT and the issue trust are in Illinois.  So if somebody wants

22 to fight about those trusts, that's where they do it.  But

23 again, these are inter vivos trusts.

24         THE COURT:  That would be, let's see, the only state

25 where there is no pending litigation.

*Proceedings*                                                    37

1          MR. SCHAALMAN:  There is no pending litigation in

2    Illinois, you are correct.

3          THE COURT:  Isn't that interesting?

4          Okay.

5          MR. SCHAALMAN:  Your Honor, as to res adjudicata.

6          THE COURT:  There's no financial judgment, right?

7          MR. SCHAALMAN:  There's no final judgment.  And

8    unfortunately defendants cited a case which has been reversed

9    by the Colorado Supreme Court.  They cite the Lumen case and

10   that was a case in I believe in 1985 and it was reversed by a

11   2005 case which we cite in our brief Rantz, R-A-N-T-Z.  And

12   that decision specifically says that even if there were a

13   final order, if it's on appeal, there can be no res adjudicata

14   or collateral estoppel under Colorado law.

15         So, all of these defenses fail and this case should

16   go forward, and it's really a very simple case in front of

17   this Court is whether these expenditures were appropriate,

18   whether they were taken fraudulently or with honesty, and

19   that's what this case is all about.  It's a very

20   straightforward, simple case.

21         THE COURT:  What is the total amount of these

22   expenditures?

23         MR. SCHAALMAN:  I think it's about $300,000.

24         THE COURT:  There's never been any attempt to

25   resolve this, this small portion of this case?

*Proceedings*                                                                    38

 1          MR. SCHAALMAN:  We have attempted, Your Honor, on

 2   many occasions to ask for both -- we've asked now for

 3   mediation even in Colorado.  We've attempted to go through

 4   mediation in this court, and both cases were subject to

 5   mediation.  It's very difficult.

 6          THE COURT:  I mean, it seems like a somewhat simpler

 7   issue than the other cases.

 8          MR. SCHAALMAN:  I completely agree with the Court,

 9   and we would be delighted to mediate this case at any time.

10          THE COURT:  What is your position with respect to

11   resolving this?

12          I mean, this isn't quite as complicated as the case

13   involving Dain.  This is you represent Wrigley and Pinto.  I

14   recognize they are defendants in the other action.

15          MR. SCHAALMAN:  They are, Your Honor, correct.

16          THE COURT:  But is it anything that's more extensive

17   than here?

18          MR. SCHAALMAN:  They're totally separate issues,

19   Your Honor.  This case could be resolved totally --

20          THE COURT:  Well, you're not going to resolve a case

21   piecemeal.  If this case is going to be resolved with

22   regarding Wrigley and Pinto, I guess Pinto is not named.

23          MR. SCHAALMAN:  That's correct.

24          THE COURT:  So with regard to Wrigley, you're going

25   to have to resolve everything.  Nobody's going to resolve one

*Proceedings*                                                      39

1   case and not another.

2          MR. SCHAALMAN:  I'm not sure that that really

3   applies here, but certainly Pinto, and Wrigley is only a bit

4   player in this case.  Pinto is the one who received these

5   monies and his firm, and I don't see any reason why we

6   couldn't resolve those with Mr. Pinto and his firm.

7          THE COURT:  What are the broader allegations against

8   Ms. Wrigley, that she somehow assisted this --

9          MR. SCHAALMAN:  Yes, that she assisted in the fraud

10  to get these monies away from the estate to Mr. Pinto and his

11  firm, that's right.  But if Mr. Pinto would make financial

12  offers to return these funds to the SNT, then in fact I would

13  think some settlement would be possible with Ms. Wrigley as

14  well, at least in this case, 'cause that's her liability in

15  this case.  Her liability is quite different in the other

16  case.  It's a breach of fiduciary duty.

17         THE COURT:  I can't imagine that someone would

18  settle one case and not another case.  It just doesn't make

19  practical sense.  I mean, the total amount of damages here is

20  $300,000.

21         MR. SCHAALMAN:  Actually, it's in our brief, Your

22  Honor.  We listed all the --

23         THE COURT:  I just don't recall the total number.

24         MR. SCHAALMAN:  Yeah, we listed all the payments

25  there.  Under the circumstances about 250,000, if I just add

*Proceedings*                                                                40

1   it up right now.

2          THE COURT:  And how much would you be seeking from

3   Ms. Wrigley in the other case?

4          MR. SCHAALMAN:  That has to do with the damages that

5   are incurred by the Blacks in pursuing their claims in

6   Colorado and elsewhere.  That has to do with the withdrawal of

7   funds from the SNT.  It has to do with the breach of fiduciary

8   duties that have exhibited and caused the Black's family

9   damage, including the loss of funds even to the issue trust.

10         THE COURT:  What fiduciary duty did Ms. Wrigley owe

11  to the funds, or to the Blacks?

12         MR. SCHAALMAN:  She was a conspirator with the other

13  defendants, with Mr. Dain who had the specific fiduciary duty.

14  Mr. Dain at one time was a trustee of the issue trust and

15  continues to be a trustee of the SNT.

16         THE COURT:  Counsel, is there any settlement posture

17  that you see here?

18         MR. FANTONE:  I think before we discuss any

19  settlement posture, we'd have to discuss Mr. Black returning

20  the $1.5 million that he stole from Joanne Black.  Before we

21  can actually address that, along with the funds from the Roth

22  IRA that were given in distributions to his seven children.

23         THE COURT:  How many children?

24         MR. FANTONE:  Seven.

25         That Roth IRA that was specifically designated for

*Proceedings*                                                        41

 1    Ms. Black, Joanne Black.  You know, along with --

 2              THE COURT:  But you don't represent Joanne Black.

 3              MR. FANTONE:  We don't.  But, I mean, these expenses

 4    were reviewed.  I'd just like to make a point with respect to

 5    Mr. Schaalman's assertion, representation, that these expenses

 6    were not reviewed by Ms. Kerr, that she never reviewed these

 7    expenses, I'd like to read from a complaint right now pending

 8    in Illinois federal court.

 9              THE COURT:  Well, no.  What's on the record before

10    this Court?

11              MR. FANTONE:  Judge, this complaint is signed by Mr.

12    Schaalman, I understand that this is a motion to dismiss

13    posture, but at some point, counsel's obligation, ethical

14    obligation to correct the record has to come into play, okay.

15              In paragraph 219 of this complaint, quote:

16    Further, not only did the court instruct Kerr to investigate

17    Pinto, but Kerr in fact conducted an investigation of Pinto.

18    Kerr summarized her preliminary findings in a letter that she

19    sent to numerous parties to the Colorado proceedings.

20              This is signed by Mr. Schaalman.

21              THE COURT:  Was it sent to the judge?

22              MR. FANTONE:  I don't know that it was.  But for

23    there to be a representation now that Kerr never reviewed

24    these, it's cont -- it's not true and it's contradicted by

25    documentation that he submitted.

*Proceedings* 42

1      THE COURT:  I thought the point, maybe I missed it,

2  I thought the point was that it wasn't put before the judge as

3  having been reviewed.

4      MR. SCHAALMAN:  That is the point.

5      THE COURT:  So the judge didn't -- the question, if

6  we're talking about res adjudicata or Rooker-Feldman or

7  anything else, is whether the judge actually reviewed it and

8  made a determination about it.

9      So, the question was her review of these put before

10 the judge such that you could assume that the judge determined

11 that these were legitimate expenditures, because the judge

12 doesn't say anything about it.

13     MR. FANTONE:  Why would the judge review it if

14 Bernard Black never asked the court to review it?  He chose

15 not to ask the court.  Ms. Kerr reviewed that.

16     THE COURT:  All right.  So the judge didn't review

17 it?

18     MR. FANTONE:  I don't know that.

19     THE COURT:  The judge didn't make a statement?

20     MR. FANTONE:  I don't see a finding in the record

21 with respect to these.  However --

22     THE COURT:  So it may not have been brought before

23 the attention of the judge to review.

24     MR. FANTONE:  That's possible.  But what we have is

25 we have the court directing the parties to submit their

*Proceedings*                                                                43

1    financials to Ms. Kerr, Ms. Kerr reviewing those financials,

2    the court setting a hearing to determine issues related to

3    those submissions of financials, and Bernard Black choosing

4    not to bring these claims, these complaints before that court.

5              THE COURT:  But what's the legal argument as a

6    result of that conduct?  Why is it that Rooker-Feldman or res

7    adjudicata as opposed to waiver or something like that?

8              MR. FANTONE:  Judge, the Rooker-Feldman doctrine,

9    it's very clear.  It's not just issues that were determined by

10   the court.  It's issues that were inextricably intertwined.

11   That's language quoted in cases.  And issues that a litigant

12   had a full and fair opportunity to litigate fall within the

13   inextricably intertwined theory.  That's it.  He chose not to

14   bring these claims.

15             THE COURT:  Okay.  Is there anything else either

16   side wants to add?

17             MR. SCHAALMAN:  Yes, Your Honor.  Just I think in

18   the record, because I think it's important we stay within this

19   record, in our submission on Rooker-Feldman in footnote 4 we

20   refer to a letter to Northwestern University dated January 8,

21   2016, and Ms. Kerr described that letter and it's an Exhibit C

22   to our submission and she described that letter as 100 percent

23   false, a statement by Catherine Litvak, Mr. Black's wife, in a

24   New York guardianship proceeding that the Denver court had,

25   quote, authorized an investigation of Pinto's conduct by a

*Proceedings* 44

1    forensic accountant.

2          This is a statement that Ms. Black made and Ms. Kerr

3    says is absolutely false.

4          THE COURT:  That Ms. Black made or Ms. Wrigley made?

5          MR. SCHAALMAN:  Ms. Black.  She was a -- she was a

6    person who was --

7          THE COURT:  Who said it was false?

8          MR. SCHAALMAN:  Ms. Kerr.  And it's footnote 4 and

9    we have an exhibit which makes it clear what it is that Ms.

10   Kerr is saying is false and what she is saying is false, that

11   she was authorized to create a forensic report, an

12   accountant's forensic report, for the Denver court.  She

13   didn't do that.  She did not do that.

14         THE COURT:  Well, she submitted something to the

15   Denver court.

16         MR. SCHAALMAN:  No, she submitted it to the parties.

17   She never submitted it to the court.  Mr. Pinto's and CPI's

18   expense, those were not submitted to the court.

19         THE COURT:  What did she submit to the court?

20         MR. SCHAALMAN:  She submitted things about Ms.

21   Wrigley's expenses which were not contested.  And as proof of

22   the fact that she didn't, in this record, we cite Ms. Kerr's

23   statement, that that was not -- she was not authorized, or not

24   ordered to perform a forensic accountant report with regard to

25   Mr. Pinto.

*Proceedings* 45

1          The last thing I would said about this inextricably

2    intertwined, and I made this comment before, but in the McLamb

3    case, which is a Second Circuit case 280 Fed Appellate 107,

4    the court wrote:  Contrary to the district court's decision in

5    this case, Rooker-Feldman does not apply merely because the

6    federal court plaintiff's constitutional claims are

7    inextricably intertwined with a state court decision.  To the

8    extent that our cases reflect that standard, and they refer to

9    Copelincki as one of the cases, C-O-P-E-L-I-N-C-K-I, they did

10   not survive the Supreme Court's decision in Exxon Mobil.

11          So, that is no longer a separate consideration.  It

12   is part and parcel of the Rooker-Feldman elements.  This is a

13   case dated in June 2008.

14          THE COURT:  All right.  Thank you.

15          MR. SCHAALMAN:  Thank you, Your Honor.

16          MR. FANTONE:  I just have a cite to give the Court

17   from a Second Circuit case dated 2013 approving that

18   inextricably intertwined.  I'll cite it.  It's Remy, I

19   mentioned it before.

20          THE COURT:  Remy.

21          MR. FANTONE:  Remy.

22          THE COURT:  R-E.

23          MR. FANTONE:  R-E-M-Y v. New York State Department

24   of Taxation and Finance and the pin cite is 507 Fed. Appx. --

25   well, I'll give you the full cite.  It's 507 Fed. Appx. 16 at

*Proceedings*                                                    46

1    18 to 19.  And it's discussing the litigant's opportunity,

2    full and fair opportunity to bring the claims.

3              THE COURT:  Okay.  Thank you, very much.

4              MR. FANTONE:  Thank you, Judge.

5              (Time noted:  3:22 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 66

| Denver Probate Court, Colorado<br>Court Address:<br>1437 Bannock Street, Denver, Colorado 80202<br><br>**In re the Interest of:**<br><br>**JOANNE BLACK,**<br><span style="float:right">**Protected Person.**</span> | ~~DATE FILED~~: January 4, 2018 4:49 PM<br>CASE NUMBER: 2012PR1772<br><br><br>▲ COURT USE ONLY ▲ |
|---|---|
| | Case Number:<br>12 PR 1772<br><br>Courtroom 224 |
| **HEARING ORDER** | |

THIS MATTER came before the Court for hearing January 4, 2018 to address issues relating to the Court Order issued November 3, 2017 granting an injunction and enjoining Bernard Black from transferring funds from the Supplemental Needs Trust ("SNT") except to return funds previously removed, the status of actions occurring in the states of Illinois and New York, and the Forthwith Motion for an Order Authorizing Withdrawal of Funds filed by Counsel for Joanne Black on December 5, 2017.

Present at hearing today were Lisa DiPonio, Counsel for Joanne Black; Gayle Young, GAL for Joanne Black; Successor Conservator Jeanette Goodwin; Appellate Counsel Matthew Skotak; Pamela Kerr, accountant; Shannon Wells and Paul Swanson, Counsel for Bernard Black, who does not appear; Anthony Dain, cousin and co-trustee for the SNT appearing by telephone.

The Court heard statements from Mr. Dain and argument from Ms. DiPonio and Ms. Wells. The Court has reviewed the record in this matter and relevant authority. The Court has reviewed trustee standards as contained within *Bogert on Trusts* and *Goss v. McCart,* 847 P.2d 184 (Colo.App. 1992) as it relates to a trustee's abuse of discretion and self-interest.

The Court finds the actions of Bernard Black are shocking to the conscience of the Court, especially given Mr. Black's position as a professor of law at a respected law school in this country. Similarly, the Court finds the actions of Mr. Black's wife, also a law professor, are shocking as together their actions only serve to dramatically increase attorney fees and costs and otherwise reduce or eliminate the funds that are due to Joanne Black apparently for no reason.

As a co-trustee, both Bernard and Samuel Black are bound to administer the trust and funds at issue in this matter solely in the interest of the beneficiary Joanne Black; to observe a duty of loyalty only to her; to refrain from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and his personal interests. (*Third Restatement of Trust*, Chapter 15). See, for example, *In re Estate of Klarner,* 98

1



EXHIBIT 19<br>BLACK<br>8/23/2018<br>Tiffany M. Pietrzyk, CSR RPR CRR

P.3d 892 (Colo.App. 2003), *Vento v. Colorado National Bank-Pueblo*, 907 P.2d 642 (Colo. App. 1995).

The Court finds that Bernard Black agreed to the entry of two judgments in the State of Illinois encumbering assets of the SNT in favor of his wife, Kate Litvak and Ms. Litvak's cousin Olga Dal. Neither Bernard nor Samuel Black gave any notice to co-trustee Anthony Dain of Bernard Black's intention to encumber trust funds. The Court finds these actions directly implicate Bernard Black and Samuel Black's duty of undivided loyalty as trustees to the beneficiary. These actions appear to create a conflict of interest as well as constitute a breach of their fiduciary duties. This Court is advised that proceedings are under way in Illinois to set aside these judgments and the related liens and garnishments initiated by Ms. Litvak and Ms. Dal. Joanne Black's only source of funds to pay her attorneys to initiate proceedings to set aside the judgments, liens and garnishments is the SNT which Bernard and Samuel Black have effectively frozen by the litigation they continue to initiate.

The Court finds it is unable to adequately express how shocking these actions taken by Joanne Black's brother and his family are to the conscience of the Court. The Court finds Bernard Black's apparent agreement to the entry of significant money judgments in favor of his wife and her family against the SNT is, if true, a flagrant breach of his fiduciary duties and his duty of loyalty to the beneficiary. Bernard Black has disregarded the Orders of this Court in both fact and in spirit.

Through Counsel, Bernard Black agrees to the injunctions entered by this Court in the Order entered November 3, 2017.

IT IS THEREFORE ORDERED:

1. Bernard Black and Samuel Black are hereby SUSPENDED as co-trustees of the SNT and any other trusts which benefit Joanne Black, pending the removal proceedings referenced in the State of Illinois.

2. Neither Bernard Black nor Samuel Black shall have any authority or take any actions with respect to trust funds or funds that are ultimately meant for or to benefit Joanne Black. Similarly, neither Bernard Black nor Samuel Black shall make any decisions regarding the use or placement of trust funds or property. Both Bernard Black and Samuel Black are ordered to identify any and all trust documents, funds, or accounts to which they have access and which are meant to benefit Joanne Black, and to provide that information directly to Anthony Dain and to Joanne Black's attorney Lisa DiPonio.

3. The only trustee with authority from this Court to serve and take action as trustee is Anthony Dain. Mr. Dain is authorized by this Court to make

2

BLACK008373

payment from the SNT or any other trust set up to benefit Joanne Black on which he is named as trustee to pay for her attorney fees and costs as previously ordered by this Court and for any new fees and costs necessitated by the reprehensible actions of Bernard Black and his family, and for other items which are properly paid pursuant to the trust agreement.

4. Bernard Black shall disclose with particularity to this Court and to counsel the source and amount of all funds he has used to pay his attorney fees and costs or those for Samuel Black or for any other persons for all actions he has initiated or is involved in Colorado, Illinois, New York and any other state which may be as yet unidentified relating to litigation involving Joanne Black.

5. Bernard Black is ordered to personally appear before this Court for any further proceedings which may be scheduled.

DONE IN OPEN COURT this __4th____ day of __January__, 2018.

BY THE COURT:

Elizabeth D. Leith
Judge
DENVER PROBATE COURT

3

BLACK008374