

IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
SEP 2 3 2019

| | | |
|---|---|---|
| KATHERINE BLACK, | : | |
| Plaintiff, | : | THOMAS G. BRUTON CLERK, U.S. DISTRICT COURT |
| | : | Case No. 1:17-cv-00101 |
| v. | : | |
| | : | Honorable Matthew F. Kennelly |
| CHERIE WRIGLEY and PAMELA KERR, | : | |
| Defendants. | : | |

## PLAINTIFF'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT UNDER F.R.C.P. 50(A)

Plaintiff, Katherine Black ("Katherine"), acting *pro se*, hereby moves this Court, under

Federal Rule of Civil Procedure 50(a), for judgment notwithstanding the verdict (JNOV). A

judgment should be entered in Katherine's favor on the Claims Two (Defamation Per Se, against

Kerr), Three (Aiding and Abetting Defamation, against Wrigley), and Four (Conspiracy, against

Wrigley and Kerr) because no reasonable jury could have found as it did based upon the evidence

and the instructions the jury was given. The evidence proved each element of those claims, and

that it was unreasonable for the jury to find otherwise.

### 1. Claim Two: Defamation Per Se (against Kerr)

#### I.    The Jury Instructions Given

In her second claim, Ms. Black alleges that Ms. Kerr committed defamation per se against

her. Under the instructions given to the jury, Ms. Black was required to prove each of the following

propositions by a preponderance of the evidence:

> 1. Ms. Kerr caused a statement of fact about Ms. Black to be made to Northwestern
> Law School.
>
> 2. Ms. Kerr's statement was false.

1

3. Ms. Kerr knew the statement was false, or she believed the statement was true but lacked reasonable grounds for this belief.

4. It was apparent from the words of the statement that it prejudiced Ms. Black in her profession.

The jury was further instructed that if it found that Ms. Black had proven each of these

propositions by a preponderance of the evidence, it:

must go on to consider Ms. Kerr's defense that the statement was substantially true. This does not require every detail of the statement to be accurate. To succeed on this defense, Ms. Kerr must prove by a preponderance of the evidence that the "gist" or the "sting" of her statement about Ms. Black was true.

## II. No Reasonable Jury Could Find that Kerr Did Not Cause a Statement of Fact about Ms. Black to be Made to Northwestern Law School.

A. "Statement of Fact" – Indisputably Met

Under this Court's decision on the motion to dismiss, the "statement of fact" in question

here is the following:

Page 15 of Ms. Litvak's letter states:

*"...and the Colorado Judge Found those Allegations credible Enough to Authorize an Investigation of Pinto's Conduct by a Forensic Accountant."*

Not only is this a 100% false statement... I would not have disclosed this information if Ms. Litvak had not filed this document with the New York Court with this completely false statement included.

The relevant statements, which this Court already held to be statements of fact, not opinion,

are Kerr's assertions that Katherine's quoted phrase is a "100% false statement" and a "completely

false statement." These statements are the basis for the claim of defamation per se.

B. "Made to Northwestern Law School" – Indisputably Met

It is undisputed that Kerr's signed letter, containing this statement was made to

Northwestern Law School. Kerr emailed her letter to Defendant Cherie Wrigley, who submitted

it through the Northwestern EthicsPoint system.

C. But-For Causation in Making this Statement – Indisputably Met

2

These Jury Instructions require the jury to determine whether Kerr's actions were a **but-for cause** for the submission of Kerr's statements to Northwestern. Not the sole cause, only a but-for cause. No reasonable jury could find that it was not. If Kerr had not written her letter, or had not made the defamatory statement of fact in her letter, or had not sent this letter to Wrigley, or had taken precautions to ensure this letter would not be forwarded to Northwestern, this statement would never have been made to Northwestern.

Kerr's defense attempted to confuse the jury by claiming that Kerr did not intend for her letter to be forwarded to Northwestern. However, the Jury Instructions contain no mental state requirement here. Kerr's intent is irrelevant. The defense further attempted to confuse the jury by claiming that Wrigley uploaded Kerr's letter to Northwestern by mistake. But Wrigley's intent is also irrelevant. The only thing that the jury could legally consider is whether but-for Kerr's actions, the statement of fact would have been made to Northwestern. The answer is clearly no.

In sum, all elements of point 1 of the instructions are clearly met, and no reasonable jury could have found otherwise.

### III.  No Reasonable Jury Could Find that Kerr's Statement to Northwestern Law School Was Not False.

Kerr's statement of fact – that the language she quoted from Katherine's letter is "100% false" and "completely false", it unquestionably false.

A. Court Authorized a Forensic Accountant to Investigate Pinto's Conduct – Undisputable

In the proceedings referenced in Ms. Black's letter, the Colorado court issued the following order: [Pl. Exh. 30; Mot. Exh. 4] (emphasis added)

> The parties have stipulated to a forensic accounting of the Conservatorship estate… **- in short, a complete review of all funds and assets related to Joanne Black both before and after the disclaimer, by Pamela Kerr, CPA**…
> 8. **Mr. Pinto shall provide a complete accounting with documentation of all funds that were held under his control to Ms. Kerr…**

If Pinto was **ordered** by the court to turn over "a complete accounting with documentation of all funds that were held under his control to Ms. Kerr", then, Kerr was at least **"authorized"** to inspect them. There is no other purpose to order someone to turn over all documentation to a forensic accountant than to at least authorize said forensic accountant to investigate this documentation and the conduct that it reflects.

Further, Kerr was required to perform "a complete review of all funds and assets related to Joanne Black." This included the "funds that were held under [Pinto's] control." Kerr's assigned task – a complete review – thus included those funds. Once again, Kerr was at least "authorized" to investigate Pinto's handling of those funds.

Kerr's defense attempted to confuse the jury by claiming that:

(1) the investigation of Pinto was not the only, or even the main, purpose of the Colorado court order (irrelevant);

(2) that Kerr was originally engaged by the Guardian-ad-Litem, and only later appointed by the court (irrelevant);

(3) that Kerr spent limited time investigating Pinto (irrelevant);

(4) that Kerr did not submit any reports or recommendations regarding Pinto (irrelevant).

None of this is relevant to the question of whether Kerr was authorized to investigate Pinto's conduct, as part of her assigned tasks.

B. Kerr in Fact Performed Extensive Investigation of Pinto's Conduct and Reported Her Preliminary Findings – Undisputable

The jury saw in evidence the letter from Kerr to several parties, including Bernard Black and Cherie Wrigley, Guardian-ad-Litem and several attorneys. In that letter, Kerr summarized the results of her extensive investigation of Pinto's conduct, requested more documents from several

4

parties, and concluded that Pinto diverted at least $41,000 to himself. [Pl. Exh. 44, Mot. Exh. 11]

The excerpts below give the flavor for how detailed Kerr's investigation of Pinto was:

- I absolutely need receipts for all of the Flight, Hotel/Motel, Rental Car, Gas, Motel, Storage, etc. etc. Since Joanne is a Protected Person and her funds are under jurisdiction of the Court, every expense has to be properly documented. I need receipts for all of these expenses in columns G through P. I have not included the column for tolls, but what are those for? Did Esaun actually go to see Joanne? The charges just say $39/week or along those lines. I realize that Column G is Esaun's time but we need to know exactly what service he was performing for Joanne.
- When exactly did Esaun get back to New York with Joanne? I see an ATM withdrawal in Ohio on 4/18/2013. However, he is charging 24 hours a day all the way through 5/7/2013.
- Where was she living when she got back to New York?
- What was Esaun doing for her from that time until she was picked up by the New Jersey on 6/3/2013?
- If Esaun was charging $5000 a week for Joanne at this point (5/20-6/3), I would want to see a daily log of when she was with him.
- If you look at lines 14 and 15 it looks like Esaun switched to a "Flat Rate of $5,000." It appears that he is charging her $5,000 a week.
- Did either of you know he was charging $5,000.00 a week?

In the same letter, Kerr stated that she will be seeking more information not only from Bernard Black and Cherie Wrigley, but also from Joanne's Guardian-ad-Litehm, Gayle Young, and from Joanne's New York counsel, Ira Salzman.

This constitutes undisputed evidence that Kerr **did** investigate Pinto. Obviously, Kerr would not have been investigating Pinto if she were not at least "authorized" to do so. And Kerr would not have been demanding more documentation from Bernard Black, Cherie Wrigley, Pinto himself, Gayle Young, and Ira Salzman, if she were not at least "authorized" to do so.

No reasonable jury could conclude that Kerr would engage in such extensive investigation if she were not authorized to do so, and if she did not think she was authorized to do so, and that other parties would be sharing confidential financial information related to Pinto's conduct with Kerr if they did not think she was authorized to do so.

5

C. Summary

All elements of this prong of the test are clearly met, and no reasonable jury could have found otherwise.

**IV.     No Reasonable Jury Could Find that Kerr Did Know that Her Statement Was False, or that She Did Not Lack Reasonable Grounds for this Belief.**

Kerr did not assert that she did not see the April 2015 order authorizing her to investigate several parties in the case, including Pinto. This order was the basis of her entire investigatory operation. At trial, Kerr did not dispute that she did conduct an investigation of Pinto and issued her preliminary findings, as reflected in Plaintiff Exhibit 44.

Obviously, when Kerr was doing all this investigatory work, she thought she was at least "authorized" to do so. Therefore, when Kerr told Northwestern that it is "100% false" that she was "authorized" by the court to investigate Pinto, she knew that her statement was false, or she lacked reasonable grounds for believing it was true.

All elements of this prong of the test are clearly met, and no reasonable jury could have found otherwise.

**V.     No Reasonable Jury Could Find that It Was not Apparent from Kerr's Words of the Statement that It Prejudiced Ms. Black in Her Profession.**

This Court already held that an accusation that a law professor lied to the court is per se defamatory because it is understood that it prejudices a person in her profession. Defendants did not dispute this fact at trial.

**VI.     No Reasonable Jury Could Find that Kerr's Statement was Substantially True.**

Finally, the Jury Instructions say:

> If you find that Ms. Black has proven each of these propositions by a preponderance of the evidence, you must go on to consider Ms. Kerr's defense that the statement was substantially true. This does not require every detail of the statement to be accurate. To succeed on this defense, Ms. Kerr must prove by a preponderance of the evidence that the "gist" or the "sting" of her statement about Ms. Black was true.

6

For the reasons discussed in Part 1.III, no reasonable jury could find that Kerr's statement (claiming that Plaintiff's cited passage was "100% false") was "substantially true". Kerr's statement was absolutely false.

No element of Kerr's defense is met. No reasonable jury could have found otherwise.

## VII. Conclusion: No Reasonable Jury Could Find the Defamation Claim for the Defendant

Plaintiff has fully satisfied all prongs of the test as listed in the Jury Instructions. No reasonable jury could have found otherwise. Therefore, this Court should rule for Plaintiff notwithstanding the jury verdict.

## 2. Claim Three: Aiding and Abetting Defamation (Against Wrigley)

### I. The Jury Instructions Given in this Case.

In her third claim, Ms. Black alleges that Ms. Wrigley aided and abetted Ms. Kerr in committing defamation against her. To succeed on this claim against Ms. Wrigley, Ms. Black must succeed on her first claim against Ms. Kerr and must also prove each of the following propositions by a preponderance of the evidence:

1. Ms. Wrigley knowingly and substantially assisted Ms. Kerr in her commission of defamation against Ms. Black.
2. Ms. Wrigley was aware of her role when she provided the assistance.

### II. No Reasonable Jury Could Find that Wrigley did not Knowingly and Substantially Assist Kerr in Her Commission of Defamation against Ms. Black.

Undisputed evidence showed that Wrigley's assistance to Kerr's writing of her defamatory letter was broad and multi-faceted. It included:

(a) Wrigley's pre-submission conduct (transmitting Katherine's letter to Kerr; encouraging Kerr to write her own letter; providing information for Kerr's letter; discussing strategies);

(b) Wrigley's submission of Kerr's letter to Northwestern; and

(c) Wrigley's post-submission conduct (refusal to retract Kerr Letter after Northwestern issued notice that it was submitted; filing a subsequent complaint to Northwestern against Katherine, claiming that Wrigley's complaint containing Kerr Letter was not properly resolved).

7

At trial, Wrigley did not dispute that she engaged in all of the above-listed conduct. As shown below, all of this conduct indisputably constituted "substantial" assistance to Kerr, and most of it was indisputably "knowing".

Wrigley's only defense was that she submitted Kerr's letter by accident. This claim itself is not credible, but, assuming, arguendo, that a reasonable jury could find it credible, it is irrelevant. Wrigley's aiding and abetting Kerr's defamation was not a single act of submission of Kerr's letter. Instead, it was an ongoing conduct, which included both pre- and post-submission actions. Wrigley's pre- and post-submission conduct aiding to Kerr's defamation was unquestionably intentional, constituted substantial assistance, and the facts of this conduct are not disputed.

### A. Wrigley's Actions Were "Substantial Assistance" to Kerr

*1. No Reasonable Jury Could Find Wrigley's Pre-Submission Assistance to Kerr Not to Be "Substantial"*

Wrigley's pre-submission actions were a but-for cause of Kerr's drafting and sending (to Wrigley) her letter. As such, they constituted substantial assistance to Kerr.

First, Wrigley (through her counsel) was the one who transmitted Katherine Letter to Kerr. [Pl Exh. 66; Mot. Exh. 12]. But for that transmission Kerr would have never received Katherine Letter (since Kerr was not a party to those proceedings and did not represent anyone in those proceedings]. Therefore but for Wrigley's actions, Kerr would not have been able to write her defamatory statement to Northwestern.

The transmission of Katherine Letter to Kerr cannot be blamed on Wrigley's counsel because it is undisputed that Wrigley fully endorsed the transmission. If Wrigley had informed Kerr that her attorney's transmission of Katherine Letter to Kerr was improper and unauthorized, Kerr would not have been able to proceed with her defamatory actions. But Wrigley did not do so.

Second, Wrigley actively solicited Kerr's defamatory statement through a string of emails on January 7th and 8th. [Pl. Exh. 66] After Kerr received Katherine Letter, Kerr immediately responded:

> Unreal. I wonder if someone should contact Northwestern and let them know that she is writing this letter (which I haven't read yet) on Northwestern letterhead as if Northwestern is supporting her position.

Wrigley replied:

> Totally agree!! … Melissa has contacted Northwestern and is doing all she can. I
> thank everyone for their feedback. This just makes me sick!!

In the emails that followed, Wrigley encouraged Kerr to contact Northwestern, provided details on how she (Wrigley) contacted various university officials, what exactly she said, and how Wrigley's prior complaints might be useful for Kerr's current complaint. In return, Kerr discussed with Wrigley how she (Kerr) called Northwestern; her plans for writing her defamatory letter; suggested her own ideas on how to make their joint defamatory actions more effective; encouraged everyone to write and call Northwestern, and even emailed everyone phone numbers and street addresses of senior administrators at Northwestern Law School, whom Kerr thought everyone should contact. [Pl. Exh. 66]

Wrigley's active encouragement culminated in Kerr's writing her defamatory letter on January 8th and sending it to Wrigley. The email string between Wrigley and Kerr had a telling subject line "Info for letter to dean & Investigational opening to ETHICS DEPT". [Pl. Exh. 66]

At trial, Wrigley did not dispute the evidence above and did not introduce any contrary evidence on these issues. No reasonable jury could find that Wrigley did not provide substantial assistance to Kerr in the pre-submission stage.

### 2. No Reasonable Jury Could Find Wrigley's Submission Assistance to Kerr Not Substantial

Wrigley submitted Kerr's letter to Northwestern. But for Wrigley's submission, Kerr's letter would not have ended up at Northwestern. Plainly this assistance is substantial.

### 3. No Reasonable Jury Could Find Wrigley's Post-Submission Assistance to Kerr Not Substantial

Both Wrigley and Kerr testified that when Northwestern notified everyone that Kerr Letter was uploaded to Northwestern, they both chose not to retract it. Wrigley testified that her decision not to retract the letter was deliberate, explaining that she did not retract it because "There was nothing wrong with the letter." [Trial transcript 3.8-22-19, p. 161:7]. When asked "Is there any

9

reason why you would have retracted the letter?", Wrigley responded: "No." [Trial transcript 3.8-22-19, p.166:2-4]

Undisputed evidence showed that after Northwestern notified everyone of the receipt of Kerr Letter, it continued to investigate Wrigley's complaint and Kerr Letter for several months, until the case was closed on July 26, 2016. [Pl. Exh. 71; Mot. Exh. 13].

If, upon receiving Northwestern's announcement in March of 2016 that Kerr Letter had been uploaded, Wrigley immediately retracted it, this would have eliminated significant amount of harm that Katherine suffered from it. Instead, Wrigley chose to not only keep Kerr Letter submitted, but also keep Wrigley's own complaints against Katherine active at Northwestern, and use those complaints to direct the attention of numerous Northwestern employees to Kerr's defamatory statements against Ms. Black.

Further, undisputed evidence showed that in 2017, Wrigley filed yet another complaint against Katherine with Northwestern. [included in Plaintiff Exh. 122; Mot. Exh. 8]. In that 2017 complaint, Wrigley named as wrongdoers not only Katherine, but also Northwestern's Chief Compliance Officer, the Dean of Northwestern Law School, and the Associate Dean of Northwestern Law School. In her 2017 complaint, Wrigley claimed, among other things, that her prior complaints were not handled properly. Wrigley's 2017 complaint triggered a renewed investigation of Katherine at Northwestern, and again brought attention to Kerr's defamatory statements, causing still more harm to Katherine.

At trial, Wrigley did not dispute the evidence listed above and did not introduce any contrary evidence on these issues. No reasonable jury could find that Wrigley did not provide substantial assistance to Kerr in the post-submission stage.

### B. No Reasonable Jury Could Find Wrigley's Actions not to be Knowing

#### 1. Summary

Wrigley's only defense on the knowledge requirement was that she submitted Kerr's letter to Northwestern by accident. This claim is absurd on its face, and no reasonable jury could believe it. But, assuming, arguendo, that Wrigley's submission of Kerr's letter was not knowing, this still leaves Wrigley's pre-submission and post-submission conduct. That conduct was indisputably knowing. Since that conduct was also substantial, that satisfies both parts of this prong.

### 2. No Reasonable Jury Could Find Wrigley's Pre-Submission Assistance to Kerr Not Knowing

It is undisputed that Wrigley knowingly (through counsel) transmitted Ms. Black's letter to Kerr. After learning about that transmission, Wrigley knowingly chose not to retract the transmission of Ms. Black's letter to Kerr and not to instruct Kerr that the transmission was not authorized and that Kerr was not allowed to read Ms. Black's letter or act on it. Instead, it is undisputed that Wrigley sent numerous emails to Kerr encouraging her to contact Northwestern and write her letter to Northwestern. No reasonable jury could find that Wrigley did not provide knowing assistance to Kerr in the pre-submission stage.

### 3. No Reasonable Jury Could Find Wrigley's Submission Assistance to Kerr Not Knowing

At trial, Wrigley's only defense was that she did not know that she submitted Kerr's letter to Northwestern. That assertion was patently not credible in light of other evidence of Wrigley's deliberate attacks on Ms. Black; no reasonable jury could believe it.

The evidence presented at trial showed that when Wrigley uploaded Kerr's letter to Northwestern, Wrigley wrote to Northwestern: "I have just uploaded another letter/complaint that was sent to your school regarding this matter." The file that Wrigley submitted to Northwestern was named "Letter to Northwestern Law School.pdf" – that was the file that Kerr sent to Wrigley.

At trial, Wrigley testified that she submitted no letters other than Kerr Letter. At trial, Wrigley presented no evidence of any other "letters" that she thought she could be uploading instead of Kerr Letter. The evidence is undisputed that the only "letter" that Wrigley could have been uploading to Northwestern was Kerr Letter. Wrigley wrote to Northwestern that she was uploading "a letter", and she simultaneously uploaded a letter – from Kerr.

Wrigley's only evidence that she did not mean to upload Kerr Letter was a single self-serving email that she sent to Kerr. [Pl. Exh. 108; Mot. Exh. 14]. When Northwestern notified two courts that Kerr submitted a letter along with a sealed court document, Kerr sent an angry email to Wrigley and others, threatening to quit their team if she finds out that one of them submitted Kerr Letter to Northwestern without clearing the details with Kerr.[1]

---

[1] Kerr wrote: "Please tell me who forwarded my letter to Northwestern. This will have a severe impact on my testimony next week."

Shortly thereafter, Kerr sends another email, explaining why she is so upset:"It did not come from me! That's a problem because now it looks like I sent them the letter from Kate."

Only after Kerr's persistent threats to quit Wrigley's litigation group and withdraw her testimony in an upcoming hearing, Wrigley comes up with an excuse – she claimed that she did not mean to submit Kerr Letter to Northwestern.

And yet, all evidence presented at trial showed that Wrigley lied. Wrigley submitted Kerr's letter to Northwestern with a written comment that she was submitting "a letter", and Wrigley presented no evidence of any other "letter" in existence that she thought she was submitting instead of Kerr Letter. No reasonable jury could find that Wrigley did not know she was submitting Kerr Letter to Northwestern.

### 4. No Reasonable Jury Could Find Wrigley's Post-Submission Assistance to Kerr to Be Not Knowing

It is undisputed that when Wrigley found out that Kerr's defamatory letter was sitting at Northwestern, she chose not to retract it. At trial, Wrigley testified that she did not see any reasons to retract Kerr's letter after learning it was submitted. [Trial transcript 3.8-22-19, p.166:2-4] It is also undisputed that Wrigley was the one who submitted yet another complaint against Katherine, in 2017, where she again drew attention to her prior complaints and to Kerr's defamatory letter.

At the moment when Wrigley learned that Kerr Letter was sitting at Northwestern and did not take an action to retract it, Wrigley's allegedly "not knowing" conduct turned into indisputably "knowing". No reasonable jury could have concluded otherwise.

### C. Summary: No Reasonable Jury Could Find Wrigley's Actions Not to Be both "Substantial" and "Knowing" Assistance to Kerr.

Wrigley's broad set of actions – transmitting Katherine Letter to Kerr, encouraging Kerr to write her own letter, receiving Kerr Letter, submitting Kerr Letter to Northwestern, demanding that Northwestern takes actions to investigate the accusations in Kerr Letter, and then, refusing to retract Kerr Letter when Northwestern notified everyone about having received it – clearly constitute "substantial assistance" to Kerr. But for Wrigley's assistance, Kerr would not have submitted her defamatory statement to Northwestern.

Wrigley presented no evidence for why her pre- and post-submission conduct was either not substantial or not knowing. Even if, arguendo, Wrigley's submission of Kerr Letter was not

---

Soon after that, Kerr writes yet another email: "I am seriously reconsidering testifying next week."

knowing, the rest of her assisting conduct unquestionably was. Thus, no reasonable jury could find that this prong of the test is not met.

III.   **No Reasonable Jury Could Find that Wrigley Was not Aware of Her Role when She Provided the Assistance to Kerr.**

For the reasons discussed in Part 2.II.B., no reasonable jury could find that Wrigley was not aware of her role when she provided the assistance to Kerr.

IV.   **Conclusion: No Reasonable Jury Could Find that Plaintiff Did Not Meet Her Burden Proving Aiding and Abetting Defamation Against Wrigley.**

Since no reasonable jury could find that either prong of the test is not satisfied, no reasonable jury could find that the claim of aiding and abetting defamation is not proven.

### 3.   Claim Four: Conspiracy (Against Wrigley and Kerr)

#### I.   The Jury Instructions Given in this Case

In her fourth claim, Ms. Black alleges that Ms. Kerr and Ms. Wrigley participated in a civil conspiracy to commit defamation against her. To succeed on this claim, Ms. Black must prove each of the following propositions by a preponderance of the evidence:

1. Ms. Kerr and Ms. Wrigley reached an agreement to accomplish, by concerted action, an unlawful purpose, or a lawful purpose by unlawful means. Ms. Black must prove that the participants shared this common purpose. She does not have to prove there was a formal agreement or plan in which all involved met together and worked out the details. She also does not have to prove that each participant knew all of the details of the agreement.

2. In furtherance of the agreement, either Ms. Kerr or Ms. Wrigley committed an act that was defamatory of Ms. Black.

3. As a result, Ms. Black was harmed.

#### II.   No Reasonable Jury Could Find that Kerr and Wrigley Did not Reach an Agreement to Accomplish, by Concerted Action, an Unlawful Purpose.

Undisputed evidence showed that Kerr and Wrigley engaged in extensive, detailed discussions on how to act in concert to attack Katherine at Northwestern. [Pl. Exhs. 66, 108]. They exchanged documents, drafts, strategies, information about each other's actions, and encouraged each other to act, passed phone numbers, names, and addresses of Northwestern employees to

13

contact, etc. No reasonable jury could find that their actions were not "concerted action", an "agreement", or that they did not share a common purpose. Undisputed evidence (several long email threads) plainly show that their actions were concerted and had a common purpose, and that Kerr, Wrigley, and the other participants in the email exchange agreed on that purpose. The unlawful purpose of their actions was to retaliate against a witness in an ongoing legal proceeding and to commit defamation. As discussed above, no reasonable jury could find that Kerr Letter was not defamatory, and no reasonable jury could find that Katherine was not a witness, or that Wrigley's and Kerr's actions were not in direct response to Katherine's offer to testify, because undisputed evidence plainly showed so.

III. **No Reasonable Jury Could Fail to Find that, in Furtherance of their Agreement, either Kerr or Wrigley Committed an Act that Was Defamatory of Ms. Black.**

For the reasons discussed in Claim Two, no reasonable jury could find that Kerr Letter was not defamatory of Katherine. That is already sufficient to meet this prong of the Instructions. But this claim is even stronger because Wrigley also committed her own defamatory act, not merely aided and abetted Kerr. Even though this Court erroneously removed from Jury Instructions the defamation per se claim against Wrigley,[2] the Instruction for Conspiracy plainly requires the jury to treat Wrigley's direct defamatory act (uploading Kerr Letter) a basis for the conspiracy claim.

Wrigley committed her own independent defamatory act: Wrigley submitted Kerr's letter to Northwestern; that submission constituted "publication" under the law of defamation. Wrigley is therefore the "publisher" of defamatory content (of Kerr's claim that Ms. Black's statement to the judge was "100% false"). Wrigley knew that Kerr's statement was false, or lacked reasonable grounds for believing otherwise, for the reasons discussed above. The fact that Kerr's letter was

---

[2] See Plaintiff's Motion for New Trial on the discussion for why it was an error not to allow the claim for defamation against Wrigley to be included into Jury Instructions.

written by Kerr, not by Wrigley, is irrelevant; Wrigley is the one who published it to Northwestern; it is immaterial who authored the contents. Wrigley's defense was that she submitted Kerr's letter by accident. But Wrigley's mental state is irrelevant for publication of defamatory conduct, since the claim for defamation has no mental state requirement for the act of publication.

Moreover, as discussed above, Kerr's and Wrigley's joint defamatory conduct included pre-, post-, and during-submission conduct. Both Kerr and Wrigley admitted that when they learned that Northwestern had Kerr's letter, neither of them sought to retract it (In March 2016). It is undisputed that Northwestern continued to investigate Wrigley's complaint, and Kerr's letter, until July 26, 2016. [Pl. Exh. 71] Therefore, it is undisputed that Northwestern's investigatory activity between March and July 2016 was due to Kerr's and Wrigley's intentional choice, and their mutual agreement not to retract Wrigley's complaint and Kerr Letter.

IV.  **No Reasonable Jury Could Find that Ms. Black Was not Harmed as a Result of Defamatory Actions by Either Kerr or Wrigley.**

This Court already held that an accusation that a law professor lied to the court is defamatory per se, as it obviously harmful to the career and reputation of such professional.

Dated: September 23, 2019

Respectfully submitted,

KATHERINE BLACK

*Pro se*

2829 Sheridan Place
Evanston IL 60201
kate.litvak@gmail.com

Katherine L. Black

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| KATHERINE BLACK, | : | |
| Plaintiff, | : | |
| | : | Case No. 1:17-cv-00101 |
| v. | : | |
| | : | Honorable Matthew F. Kennelly |
| CHERIE WRIGLEY and PAMELA KERR, | : | |
| Defendants. | : | |

Joint Exhibits to Katherine Black Motions for New Trial and Motion for
Judgment Nothwithstanding Verdict

(September 23, 2019)

# Exhibit 1

# Katherine Letter (full)



NORTHWESTERN UNIVERSITY SCHOOL OF LAW
Professor Katherine Litvak
357 East Chicago Avenue • Chicago, Illinois 60611-3069
k-litvak@northwestern.edu
http://www.law.northwestern.edu/faculty/profiles/KatherineLitvak/

**Via Email to:** Ricsupc2@nycourts.gov
Hon. Thomas P. Aliotta
Supreme Court, Richmond County
18 Richmond Terrace
Staten Island, NY 10301

RE: Guardianship of Joanne Black, Index No 80253/14

7 January 2016

Dear Justice Aliotta:

### A. Introduction.

I am Joanne Black's sister in law, the wife of Bernard Black. For years, I took an active part in Joanne's care, together with Joanne's mother, and without any participation from Wrigley, Dain, or any other member of their family. I was also an active participant in the process leading up to the guardianship hearing on October 1, 2015, including regular contact with the Court Evaluator, Bartholomew Russo.

I write to correct some of the many outrageous lies and misleading statements made in recent submissions by Anthony Dain and Ira Salzman, Esq., which compound earlier lies to this Court made under oath by Cherie Wrigley. The lies and misleading statements that Wrigley and Dain have made to this Court are pervasive and severe. I, and other members of the Black family, seek a hearing, at which we can appear without threat of financial sanctions, to present evidence that Wrigley and Dain lied to this Court on material, relevant questions, to obtain a favorable result.

In addition to these lies, Wrigley and Dain have repeatedly employed illegal coercive tactics to prevent the Black family members from appearing in this Court and challenging their stories with evidence. Dain, acting as a trustee of the Black family trusts, repeatedly violated his fiduciary duties as trustee to prevent the Black family from hiring legal representation. Wrigley and Dain have been illegally withholding from the Black family information about the proceedings in this Court, for the specific purpose of covering up their perjuries and misleading statements, and their efforts to obtain illegal relief. Wrigley sent a formal certified letter to the Black family, falsely

1

claiming to have obtained, from this Court, legal rights with regard to unrepresented third parties (Bernard Black personally, and the Black family trusts) that she not only did not obtain, but never even sought. Wrigley also made threats and demanded asset transfers without having any legal right to make such demands.

The pattern of Wrigley's and Dain's misconduct includes perjury, suborning of perjury, witness tampering, blackmail, threats to counter-parties, threats to an attorney of the counter-parties, illegal withholding of documents, failure to comply with discovery requests in the related proceedings in Colorado; repeated efforts to obtain relief without proper notice or, as in the case in this Court, without any notice at all; repeated false and misleading statements made by an officer of the court (Dain); repeated efforts to persuade courts to act, not only without proper notice but without jurisdiction; bringing Dain and Wrigley as surprise witnesses after Dain repeatedly said they would not testify, and much more. We have seen this pattern in the Colorado proceedings, and they are repeating it here.

Their misconduct is severe and rises to the level of fraud on the court.

I am asking for an opportunity to present evidence of this misconduct. I ask the Court to take these allegations seriously and hold a hearing to evaluate them. I ask this Court not to make any determinations as to the appointment of Wrigley as guardian until such evidence is heard.

Please notice how passionately Dain and Wrigley are arguing against legally mandated disclosure and a hearing, and how they've been threatening us with sanctions if we dare to show up at a hearing, cross-examine their witnesses, and present our own. You Honor, please ask, why? Why is their sworn testimony, or their Proposed Orders, or their communications with Mr. Russo such a big secret? Why are they so afraid that the Black family members will testify, or that Wrigley and Dain will be subject to cross-examination? Because they know that their perjuries and other misconduct cannot withstand scrutiny, that's why. I am confident that, when we present evidence of Wrigley's and Dain's misconduct that they so fervently are trying to stop us from presenting, this Court will agree that Wrigley is not fit to be Joanne's guardian.

I also request to be recognized as an interested person in this matter, so that I will receive notice and have an opportunity to respond to their past and expected further lies and misstatements. My relationship with Joanne spans over a decade. During this decade, I have been more involved in Joanne's care than Wrigley has in her lifetime. For years, I personally assisted Joanne's mother with a multitude of everyday decisions and long-term plans for Joanne. In contrast, Wrigley's lifelong contact with Joanne was limited to an occasional phone call and a rare dinner during the limited periods when Wrigley was on good terms with Joanne's mother.

I specifically request to receive, as an interested person: (i) notice of any orders or proposed orders submitted, or to be submitted, in this matter, by any party; (ii) a copy of the transcript of the hearing held on October 1, 2015; (iii) all documents submitted to Mr. Russo by any party (many of these should have been turned over in discovery in Colorado but they were not) ; (iv) all documents submitted by Mr. Russo to this court, and (v) everything issued by this Court, including orders. Only then can I be in a position to fully respond to the repeated and outrageous lies perpetrated by Cherie Wrigley, Anthony Dain, and Esaun Pinto, and the misstatements by their respective counsel. As of now, because of Wrigley's and Dain's secrecy, I can only respond to the information I have, surely a small portion of the misstatements that they submitted.

2

I also request the right to participate in all formal and informal proceedings, representing myself, the same way as Dain has been doing. I have a JD and am a tenured, full Professor of Law at the Northwestern University School of Law. I have the same ability to appear at all proceedings, including lawyer-only conference calls and status conferences, as Anthony Dain has claimed, and this Court has approved for him.

The co-trustees of two trusts for the benefit of Joanne Black – Bernard Black (my husband) and Samuel Black (his son and my stepson) – should also be recognized as interested persons. As trustees, they have the same right to be recognized as interested persons as does Anthony Dain. Dain claimed interested person status based on being a co-trustee of these trusts, and was accepted as such by this Court. Samuel and Bernard Black should be granted the same rights.

This letter proceeds as follows. In Part B, I address some elements of Wrigley's and Dain's fraud on the Court. I show that they not only lied and misled this Court, but also impeded the Blacks' access to legal representation, threatened litigants and attorneys, tampered with witnesses, illegally concealed information, and otherwise undermined the integrity of these proceedings. In addition, Dain was acting as counsel and attended counsel-only conferences; as such, he should be considered an officer of the court. He repeatedly lied to this Court, made highly misleading statements, and wrongfully omitted material information. Such conduct by an officer of the court constitutes fraud on the court and requires a thorough investigation and hearing.

In Part C, I explain why the supposed urgency for this Court to act, which Dain and Salzman are now claiming, is a fabrication, and rests entirely on their failure to disclose material information to this Court. I show that Dain's attempt to advance this theory is yet another example of his effort to mislead this Court.

In Part D, I discuss the real issues at stake in this litigation, the ones that Wrigley and Dain are trying to hide from the Court by denying the Black family a hearing. I show how (1) following 15 years of family fighting over inheritance, Wrigley and Dain have concocted a scheme to strip the Black family trusts of assets and funnel those assets to the personal control of Wrigley; (2) how Dain breached many fiduciary duties and violated the law to pursue this scheme; (3) how Wrigley's guardianship over Joanne is a critical piece of that scheme, allowing her to take control of the assets that Dain is trying to strip from the Black family trusts. I also show how Wrigley and Dain have been sabotaging all family efforts to settle this ruinous litigation because such solutions, while highly beneficial for Joanne and the rest of the Black family, would not give Dain and Wrigley their desired outcome – personal control over the Black family assets.

In Part E, I show that Wrigley has many significant conflicts that disqualify her from serving as Joanne's guardian. In particular, Joanne's guardian would need to sue on Joanne's behalf, or at least dispassionately evaluate the need for suing, the following parties: (1) Wrigley herself and her associate Esaun Pinto for embezzlement and fraud; (2) Dain as a trustee of Joanne's trusts for breach of fiduciary duties, and Wrigley for aiding and abetting those breaches; and (3) Wrigley's litigation partners Gayle Young and Lisa DiPonio for legal malpractice. As I show below, these claims are very strong. If Wrigley is given guardianship over Joanne, she would sabotage all such efforts.

In Part F, I list several examples of Wrigley's perjuries, lies, and highly misleading statements to this Court. Those include outright falsehoods about: (1) Pinto's criminal history; (2) known facts and accusations of Pinto's embezzlement and fraud; (3) the legal ownership of assets

that Wrigley is seeking in this Court; (4) Wrigley's concealment of material information from this Court to obtain an illegal order, and so on.

Finally, in Part G, I address Wrigley's and Dain's reprehensible ongoing quest for secrecy, aimed at covering up their lies and other misbehavior in these proceedings.

### B. Dain and Wrigley Committed Fraud on the Court.

#### 1. Dain and Wrigley Committed Fraud on the Court though Threats to Witnesses and Counsel, Impeding Access to Legal Representation, Illegal Withholding of Material Information, and Other Misconduct.

In his recent letters to this Court, Dain is claiming that this Court should not hear evidence that he and Wrigley lied to the Court because the Black family should have presented this evidence earlier. His effort to cover-up his misdeeds must be rebuffed. The Black family had no chance to reveal Dain's and Wrigley's falsehoods earlier because Dain himself illegally concealed most of these falsehoods from the Black family, fervently fought against having to disclose them, and has only recently disclosed a portion of one relevant document, apparently under pressure from this Court.

Wrigley's and Dain's current position can only be described as chutzpah – illegally hide information from the opponent, and then, point to the fact that the opponent did not respond to the concealed information earlier as the grounds not to allow them to respond today. We again request that Wrigley and Dain disclose all communications that they submitted to this Court, including all proposed orders, the hearing transcript, and all communications with Mr. Russo.

In Section F below, I list some of the known lies that Wrigley and Dain submitted to this Court. We will present more at the hearing if we are allowed to have one. I am sure there are still more in the documents that Wrigley and Dain are so passionately fighting to conceal from us. Among their known lies are: (1) false claim that Esaun Pinto, who is currently Wrigley's core person to control and manipulate Joanne, is not a convicted felon; (2) false claim that Esaun Pinto has not been accused of wrongdoing with respect to Joanne; (3) false claim that the assets that Wrigley is seeking in her Proposed Order are Joanne's personal property; (4) deceitful failure to inform this Court that the assets that Wrigley is seeking in her Proposed Order are frozen by the Colorado court, and thus cannot be transferred to anyone; (5) deceitful failure to inform this Court that the assets that Wrigley is seeking for urgent transfer in her Proposed Order, ostensibly for Joanne, are the same assets that Wrigley has been long claiming to belong to Wrigley personally; (6) false claim that Joanne is in desperate need of money, which can only be fixed by the urgent appointment of Wrigley as a guardian; (7) false claim that Joanne's Colorado conservator has been refusing to pay Joanne's bills, necessitating the urgent appointment of Wrigley as a guardian. There is more. We will present more evidence at a hearing if we are allowed to have one.

The lies that Wrigley and Dain submitted to this Court are supplemented by their continuous coercive efforts to stop the Black family members from participating in these proceedings and in related proceedings in Colorado. Dain's coercive tactics are severe and rise to the level of witness tampering. To coerce the Black family members not to participate in the proceedings before this Court, and in related proceedings in Colorado, Dain repeatedly threatened to seek financial sanctions if they dare to appear, and to instigate frivolous actions for criminal contempt. Wrigley openly engaged in blackmail, threatening to reveal personally damaging

information about Bernard Black, threatening other members of the Black family, threatening Bernard Black's Colorado attorney, and so on. In a separate incident, Dain personally threatened Bernard Black's New York attorney as well. We request a hearing to present evidence of Wrigley's and Dain's efforts to tamper with witnesses in these proceedings.

To make Dain's and Wrigley's coercive tactics more effective, Dain took a series of illegal steps to foreclose the Black family members' access to legal representation. Dain, while acting as a trustee for the Black family trusts, vetoed all legal-defense spending by the trusts, explicitly stating that he was doing so to ensure that no trust assets are used to hire attorneys for the Black family. Later, Dain petitioned this Court and the Colorado court to freeze all Black family trust assets, again openly stating that the purpose of the asset freeze is to ensure that the Black family does not use any trust money for legal expenses. All of this violates Dain's fiduciary duties to the trust beneficiaries.

Dain's misconduct continues and impedes the Blacks' ability to participate in proceedings in this Court. Due to Dain's actions, we still have no access to our own trust funds to hire sufficient legal representation in this Court. When a trustee uses his trustee powers to deprive the beneficiaries of the opportunity to hire legal representation, in the proceedings against the trustee himself, this no doubt counts as "egregious and purposeful conduct designed to… impede a party's efforts to purse a claim or defense", and as such constitutes fraud on the court. CDR Creances S.A.S. v. Cohen, 23 NY3d 307 (2014).

But it gets worse. Dain, acting as a trustee for the Black family trusts, brought numerous legal actions, in two states, to defund the Black family trusts – in which he was a trustee! He breached numerous fiduciary duties while he was at it, including the duty of loyalty, duty of impartiality, duty to defend the trusts in litigation, duty to provide information, duty of confidentiality, and so on. Dain's goal? If the Black family trusts are defunded, the assets would flow directly into the control of Dain's sister Wrigley, acting as an ostensible guardian for the mentally ill Joanne Black. Wrigley already announced her plans to spend these assets lavishly on herself and her associates. To accomplish this asset-stripping goal, Dain obtained the freeze on the trusts' assets and deprived the Black family of funding for legal representation.

Dain's temporary success in Colorado was obtained through his own gross legal violations, combined with his and Wrigley's threats, blackmail, coercion, and outright perjury, in proceedings where neither the trusts nor beneficiaries individually were represented due to Dain's breaches of fiduciary duties. Dain's conduct was calculated to benefit himself and his sister Wrigley, who stood on the receiving end of asset removal.

Dain is now using this temporary success in Colorado to convince this Court to ignore all evidence of his and Wrigley's misconduct that the Black family is seeking to provide. These efforts must be rebuffed. The evidence of Wrigley's and Dain's fraud on the court and other misdeeds is critical for the Court's determination of Wrigley's fitness as a guardian.

Dain's efforts to deprive the Black family of legal representation continue in this Court. Despite Dain-instigated asset freeze, the Black family scrambled some money to hire a new attorney (Piper Hoffman, Esq.). As soon as Dain learned about it, he stalked Ms. Hoffman online, cited information from her personal website in his formal letter to her as a counsel, made personal threats against her, and pressured her to abandon her representation of the Black family in these proceedings.

Dain's and Wrigley's coercive tactics, taken together with the lies and misleading statements that they submitted to this Court, and with their continuous efforts to deprive the Black family of legal representation, constitute "egregious and purposeful conduct designed to undermine the truth-seeking function of the courts, and impede a party's efforts to pursue a claim or defense." CDR Creances S.A.S. v. Cohen, 23 NY3d 307 (2014).

As such, they constitute fraud on the Court. We seek full disclosure of information and a hearing to present this evidence to the Court.

### 2. Dain Committed Fraud on the Court by Engaging in Gross Misconduct as an Officer of the Court.

Dain lied to this Court, concealed material information from this Court, and made many highly misleading statements. Such actions by an officer of the court constitute fraud on the court. Kenner v. C.I.R., 387 F.3d 689 (1968).

Among Dain's known falsehoods are the following. Dain made false and highly misleading statements as to the contents of the disclosures that Bernard Black submitted to the Colorado court. Dain falsely claimed, or intimated, that a detailed disclosure that Bernard Black provided to the Colorado court (his plans for a disclaimer by Joanne Black of payable-on-death assets, so that they would flow into Renata Black's estate), and then copied from his filed Proposed Order to the Colorado court into his letter to this Court, somehow never existed. Dain falsely intimated that Bernard Black failed to submit that same detailed disclosure to all participants in the Colorado disclaimer proceeding. Dain made false and highly misleading suggestion that the Colorado judge never saw the detailed disclosure that Bernard Black submitted, even though the Colorado judge stated, in an open court where Dain was present, that she received, read, and understood Bernard Black's submitted language, and so on.

This letter is already too long. Exposing Dain's numerous misleading statements would take significant space because I would need to provide context and supporting documentary evidence. If we are allowed a hearing, we will present specific, step-by-step demonstrations that many statements that Dain made to this Court were highly misleading and some were outright lies.

In addition to a long list of highly misleading statements, Dain openly lied to this Court. For example, Dain lied as to the legal ownership of the assets (jewelry and savings bonds) that Wrigley is seeking to transfer into her hands. Upon the information and belief, Dain told this Court that the assets were Joanne's personal property. In reality, they were property of the Black family trusts, and Dain knew it. The lie was material and calculated – if this Court knew that the assets were not Joanne's personal property, it would not have directed their transfer to Wrigley.

When the Blacks caught Dain lying about the ownership of these assets it, Dain again attempted to mislead this Court by claiming that the distinction between trust assets and personal assets, which is fundamental to the relief he was seeking, is "semantic obfuscation" and "nonsense."

Further, Dain concealed from this Court the critical fact that he was seeking an order from this Court that would violate an existing order from the Colorado court. Dain and Wrigley ask this Court to order an immediate transfer of assets, knowing that those assets have been frozen by the Colorado court, by the order that Dain himself obtained. Dain did not inform either this Court or the Colorado court that he is seeking conflicting orders in two courts. Dain did, however, threaten

6

Bernard Black with contempt proceedings if Black violates either the two conflicting orders! Thus, Dain's failure to disclose material information to this Court is intentional, aimed at advancement of his litigation position, and aimed at threatening the opposing party with frivolous civil and criminal penalties.

"[A] fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases" constitutes fraud on the court. Kenner v. C.I.R., 387 F.3d 689 (7th Cir. 1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23. "[F]abrication of evidence by a party in which an attorney is implicated will constitute a fraud on the court." Weese v. Schukman, 98 F.3d 542, 552-53 (10th Cir. 1996). Dain is an officer of the court. He lied to this Court on material matters. He misled this Court, materially and repeatedly. We seek full disclosure and a hearing to demonstrate the full extent of Dain's fraud on the court.

Dain might claim that he is formally not an "officer of the court" in this case. If he does, it would be yet another case of chutzpah on his part. Dain has demanded to be treated as an officer of the court by this Court, and has been granted such privileges. Dain participated in a counsel-only telephone conference in September 2015, where no other litigants were admitted. Dain earlier attended another status conference held for counsel, where he made motions and sought substantive decisions. He submitted multiple letters and motions. He is using his law firm letterhead to add credibility to his submissions. Dain is, by every measure, the lead counsel for the Dain-Wrigley litigation team, both in New York and in Colorado. In Colorado, Dain personally ran the trial, examined and cross-examined witnesses, defended depositions, and so on.

If Dain acts like an officer of the court, and is granted the privileges of an officer of the court, he must be held to the standards of an officer of the court. Dain's lies and deliberate attempts to mislead this Court constitute fraud on the court per se. They require investigation, full disclosure of all submissions, a hearing, and, depending on the determination at the hearing, sanctions.

### C. Wrigley and Dain Have Manufactured a Crisis where None Exists, and Are Now Pointing to that "Crisis" to Avoid Investigation of Their Perjury and Other Misconduct.

Dain and Salzman are asking this Court to move in an extreme rush, without hearing evidence of the many false statements that Wrigley and Dain made to this Court in their quest for guardianship, and their other misdeeds. They justify this mad rush with a newly-discovered crisis – Joanne's alleged need for money. This "crisis" is a manufactured falsehood.

Dain and Salzman claim that Joanne is "penniless"; that Wrigley is Joanne's only source of money, and that Wrigley is running out of money, necessitating an urgent appointment of Wrigley as a guardian. The implication is that Wrigley's appointment as a guardian would solve Joanne's money problems. This is completely false and highly misleading.

Far from being "penniless", Joanne has tax free income of $68,000 per year, from her workers' compensation and Social Security Disability Insurance payments. Joanne's Colorado conservator has the power to use these funds to pay Joanne's documented expenses. In his letter to this Court, Saltzman confusingly tells this Court that he recalls some open-court conversation indicating that Joanne's Colorado conservator would not provide spending money to Joanne. After receiving Salzman's letter, we asked the Colorado conservator whether she has paid any of

Joanne's expenses and if not, why. She responded that she is authorized to pay Joanne's documented expenses, and is happy to do so, but nobody has sent her any bills!

Meanwhile, the Colorado court did not refuse to authorize payments directly to Joanne. Instead the court simply wanted Joanne's expenses and request for spending money to be documented. The Court responded to Mr. Salzman, said at a hearing on June 17, 2015:

> [M]y charge to you right now is to go to sit down and work through it [Joanne's need to pay bills and have spending money] and clarify what your perimeters of authority are, what can be paid, what you have an issue with paying, and then I'll deal with it.

> I've already advised, you know, come back by July 15th and advise me if you want a further status conference, we can do it [authorize payments for Joanne] by phone.

Dain and Wrigley never came back to request that bills be paid, or that Joanne receive spending money. Meanwhile, Bernard Black, as Joanne's conservator, received a number of medical bills for Joanne, forwarded them to Joanne's conservator, and the bills were paid in the normal course.

This is one of many examples of Wrigley's and Dain's chutzpah in these proceedings: deliberately create a problem, and then, point to that problem as grounds for relief. Here, Wrigley, Dain, and Salzman never came back to Joanne's Colorado conservator or to the court with bills to be paid or a request for spending money. Dain and Wrigley are now pointing to the fact that Joanne's conservator has not paid the bills that they did not submit as grounds for a mad rush in appointing Wrigley as a guardian.

In short, Wrigley's appointment as a guardian is not necessary to provide Joanne with funds. All they have to do is to send the bills to the Colorado conservator for payment. At most, they might need to seek court approval for spending money, which the court has indicated it is willing to provide.

There is an even more outrageous reason why Wrigley's appointment will not provide Joanne with more funds. In addition to her annual income, Joanne has two trust funds, from which she can request funds. Two of the trustees (Bernard and Samuel Black) have repeatedly offered to provide money to Joanne from the trusts. They did so without even receiving any bills. For Joanne's housing expense, the Blacks directly contacted Salzman, Joanne's landlord, and Joanne herself, and offered to pay Joanne's rent directly. In all instances, they were rebuffed by Wrigley and Salzman. Bernard Black also provided Joanne with $500 weekly in spending money, until Dain and Wrigley froze the Black family trusts and prevented further payments.

The Blacks are still happy, as trustees, to approve all legitimate spending on Joanne's living expenses and pocket money. But they cannot – because Wrigley and Dain personally sought and obtained the freeze on Joanne's trusts! All that Dain and Wrigley need to do is to petition the Colorado court to lift their own freeze on the trusts' assets. Until that happens, the vast bulk of Joanne's money is not accessible to anyone, whether Wrigley is appointed guardian or not.

Actions speak louder than words. If Dain and Wrigley were interested in Joanne's access to money, they could have asked her conservator to pay bills and provide spending money, and could have petitioned the Colorado court to lift the freeze from Joanne's trusts. If the freeze is lifted, Bernard and Samuel Black are ready to again use trust funds to pay Joanne's legitimate expenses and provide her with spending money, as they did before the freeze. Instead, Wrigley and Dain point to their own asset-freezing scheme and failure to ask Joanne's conservator to pay bills as a crisis that can only be solved by Wrigley's urgent appointment as a guardian.

The phony need for urgent action that Dain and Salzman manufactured in their recent letters is yet another example of the many falsehoods that they have unleashed on this Court. It underscores the need for full disclosure of their submissions to this Court, the need for a hearing, and Wrigley's unfitness to be a guardian.

### D. Wrigley's and Dain's Real Purpose in these Proceedings Is to Funnel the Black Family Assets to Themselves; Hearing Is Necessary to Present Evidence.

#### 1. Wrigley Stole Significant Assets from the Black Family, Was Estranged from the Blacks, and Has Fought with the Blacks Over Inheritance for Decades.

Wrigley's current quest for guardianship is a continuation of a decades-long family fight in which Wrigley has repeatedly stolen, or tried to steal, family assets that are not hers.

In the late 1990s, Wrigley's mother (Joanne's aunt) died. Wrigley's mother ran a real estate business in California, in which Joanne's mother and Joanne's and Wrigley's grandmother made large investments. After the death of Wrigley's mother, Wrigley took over the business and wrongfully refused to acknowledge the interests of the Black family, including her own elderly grandmother. A multi-year fight ensued. As part of that fight, I personally researched and drafted a fraud complaint on behalf of Joanne's mother and grandmother against Wrigley. That complaint detailed the specifics of the Black's investment and Wrigley's misappropriation thereof. Joanne's mother was planning to file a lawsuit, but wanted to talk to Wrigley first, hoping that she would settle. Wrigley told Joanne's mother that if she files a suit, Wrigley would bring in her litigator brother Dain, counter-claim against the Blacks on some bogus grounds, and ruin Joanne's mother financially.

Joanne's mother and grandmother had to abandon their plan to sue Wrigley. In retaliation for Wrigley's theft, the grandmother wrote a new will, in which she entirely disinherited Wrigley and her siblings, including Dain. All of grandmother's assets were bequeathed to the Black family. That includes valuable family jewelry. If you look at Wrigley's Proposed Order, on page 7, you will see the demand that Bernard Black transfers some jewelry to Wrigley. That's the jewelry that the grandmother left to the Black family after Wrigley stole the Black family's real estate investment. Wrigley has been trying to get that jewelry ever since. As discussed below, she is now using these guardianship proceedings to try again.

In 2004, Joanne's grandmother died; Wrigley appeared again, challenging the will and demanding the jewelry. The Blacks rebuffed this effort. Another multi-year fight ensued.

In 2012, Joanne's mother died; Wrigley appeared yet again, with the same demands. One day after the death of Joanne's mother (!), Wrigley wrote to Bernard Black, demanding the jewelry and claiming that it rightfully belongs to Wrigley. Wrigley made many more demands for that jewelry since then, as did her siblings. At the funeral itself, she insisted on talking about the jewelry and how it really belongs to her. It does not. Since then, Wrigley has repeatedly threatened that she would get "her" jewelry sooner and later.

If we are allowed a hearing, we will present significant evidence showing that Wrigley and Dain are using these guardianship proceedings to strip assets from the Black family and funnel

them to themselves. We will show that Wrigley has been trying to do this for decades. We will present evidence showing the many attempts that Wrigley has made at expropriating the Black family's assets, on many different occasions. This is exactly why Wrigley has been estranged from our family – because she is a greedy, manipulative thief and a liar. And this is exactly why Wrigley and Dain have been fighting so hard against giving us notice and hearing in this Court. At the hearing, we will present evidence showing that Wrigley and Dain have been using these guardianship proceedings to funnel assets from the Black family trusts into the hands of Wrigley, and that their current asset-stripping efforts are completely consistent with their pattern of prior malicious conduct.

The only thing that changed after Joanne's mother died is Wrigley's gall. In the past, Wrigley was careful in fighting with the Blacks because she would have to pay her own litigation expenses if a full-scale war broke out. But now, Wrigley is using Joanne as a pawn – she has manipulated Joanne into suing Joanne's own family, at Joanne's expense, to obtain a supposed "recovery" – to transfer all of the Black family's assets from family trusts into the hands of Wrigley, acting as Joanne's guardian. The perverse feature of Wrigley's litigation ploy is that, by using Joanne as a proxy, Wrigley is using the Black family assets to sue the Black family itself. We are paying litigation expenses on both ends of this scheme because, so long as Wrigley is acting ostensibly on Joanne's behalf, she is expecting to be paid from Black family assets. As such, this is a great free gamble for Wrigley. But it is financially ruinous for the Blacks.

### 2. Wrigley and Dain Use Joanne as a Proxy to Continue Decades-Long Effort to Strip Assets from the Blacks and Funnel Them to Wrigley.

Wrigley and Dain have represented to this Court that their only interest in these proceedings is Joanne Black, and that they, or at least Wrigley, had a lifelong close relationship with Joanne. This is completely false. Neither Wrigley nor Dain had any meaningful relationship with Joanne while Joanne's mother was alive. Nor could they, while they were fighting with Joanne's mother and the rest of the Black family over the inheritance that they stole or tried to steal. Wrigley suddenly developed an "interest" in Joanne only when Joanne's mother died, leaving Joanne a wealthy heir, and providing Wrigley with an opportunity to use Joanne and Joanne's money to instigate litigation with the Black family and funnel the Black family's assets to Wrigley herself.

Dain remained completely disengaged with Joanne's care for two and a half years after Joanne's mother's death. He totally ignored his fiduciary duties as a trustee of her trusts. He became interested and engaged when, and only when, his sister Wrigley began her active fight for control of the Black family assets, in the fall of 2014.

Immediately after Joanne's mother's death, Wrigley convinced Bernard Black to work with her for Joanne's benefit, and Bernard Black agreed. Wrigley and Bernard Black together conceived a plan to disclaim assets in Renata Black's accounts at Vanguard, which Renata Black had supposedly left directly to Joanne, so that they would flow through Renata Black's estate, with two-thirds of the assets going to Joanne's Supplemental Needs Trust, and one-third to an Issue Trust, principally for Renata Black's grandchildren. This disclaimer is the ostensible subject of the entire controversy. I say "ostensible" because it is merely a pretext for Wrigley's and Dain's asset-stripping efforts, as we will show at a hearing if we can have one.

Wrigley and Bernard Black both knew that the disclaimer and related actions were far more beneficial to Joanne than any alternative course of action. In a hearing, we will explain to this Court why this is so. Wrigley and Dain passionately oppose the hearing because they are afraid that the Court will learn that the disclaimer was not only beneficial to Joanne, but also actively supported by Wrigley. Indeed Wrigley's assistance was instrumental in obtaining the disclaimer.

Wrigley and Bernard Black continued to work together for Joanne's benefit until 2014, when Bernard Black discovered that Wrigley, to whom Bernard Black had entrusted some aspects of Joanne's care, and Wrigley's associate, convicted federal felon Esaun Pinto, have been embezzling money from Joanne's bank accounts and defrauded the Estate of Renata Black of hundreds of thousands of dollars through fraudulent billing.

When Bernard Black demanded that they return the money, Wrigley responded by blackmailing him. Wrigley told Bernard Black that she possessed some compromising information related to the disclaimer and his mother's will, and that Wrigley would release that information if Bernard Black did not start diverting significant Black family assets to Wrigley personally, and does not stop his investigation of Wrigley's theft of the Black family assets. When Bernard Black again refused, Wrigley contacted his attorney who performed the disclaimer, Carl Glatstein, and sought to threaten and blackmail him too, again demanding more money and to stop the investigation of hers and Pinto's theft.

Because Bernard Black did not acquiesce to Wrigley's blackmail, she developed a new scheme. In 2014, with the help of her litigator brother Dain, Wrigley devised a scheme to strip the Black family of their interests in their family trusts, take control over the Black family money, and spend a significant portion of it on herself, and convince Joanne to bequeath to Wrigley and Dain whatever Wrigley failed to spend. For this purpose, Dain and Wrigley proceeded in two directions simultaneously.

First, in late 2014 and early 2015, Dain, while serving as a trustee of all Black family trusts, initiated legal actions in courts in New York and Colorado, seeking to defund both trusts. Dain used his trustee status to claim that he was an "interested person" with respect to Joanne Black, and then used his interested person status to launch (and be the lead lawyer in) litigation seeking to defund the trusts.

In Dain's own words to this Court, "that issue trust needs to be – the money in it needs to be defunded." Transcript of New York hearing (Feb. 19, 2015, at 22). Dain was a co-trustee of the Issue Trust that he sought to defund! In fact, the remedy Dain sought would have defunded both family trusts set up by Joanne's mother (the family's Issue Trust and the Joanne's Supplemental Needs Trust, both of which have Dain as a co-trustee). If the two trusts were defunded, the money in these trusts would have flown directly to the mentally ill Joanne Black, who has no capacity to manage it.

At the same time that Dain was seeking to defund the Black Family trusts, Wrigley petitioned to secure guardianship over Joanne's person and assets in this Court. In her guardianship petition, Wrigley specifically requested the powers to manage all of Joanne's funds, dispose of Joanne's property, and make gifts. In sum, while Dain was using his trustee status to allow him to sue in multiple courts to defund the Black family trusts, and cause the assets from both trusts to flow directly to the mentally ill Joanne Black, Wrigley was petitioning to take control over Joanne Black's finances, and thus over these funds.

11

That is, Dain, while serving as a trustee, and using his trustee status to gain personal entry into litigation, worked to funnel the Black family assets into the hands of his sister Wrigley.

Even more egregiously, Dain used his position as a trustee to make it impossible for the beneficiaries of the Black family trusts to hire their own counsel to represent them during the asset-stripping proceedings that Dain initiated. While Dain was suing to move assets from the Black family trusts into the hands of his sister Wrigley, he sought court orders to freeze the trusts' assets, openly acknowledging that his goal was to ensure that trust assets are not used to pay the beneficiaries' legal defense fees. Dain succeeded in obtaining a freeze from the Colorado court on all trusts, plus the Estate of Renata Black. As a result of the freeze, neither the trusts themselves, nor the beneficiaries of the trusts were legally represented in the proceedings Dain brought to strip them of their assets.

In Colorado, nominally acting as an "interested person" representing himself, Dain completely ran the litigation to defund the Black family trusts in which he was a trustee. He fully controlled litigation strategies, directed the work of other members of what was ostensibly-Joanne's litigation team, defended depositions, conducted examinations and cross-examinations in open court, submitted documents, and so forth.

Dain's effort to defund the Black family trusts in Colorado failed. The disclaimer, which Wrigley actively solicited and then, perjuriously, claimed not to have understood, is final and irrevocable under the Colorado law, and thus the trusts cannot be defunded.

Undeterred, Dain and Wrigley are now seeking to defund the Black family trusts both in Colorado (on unclear grounds) and in New York. For one of the trusts, Dain recently stated, "The Issue Trust, of course, still holds funds that rightly belong to Joanne Black, and unless Bernard [Black] agrees to arrange for the return of those funds with interest, this will have to be the subject of separate litigation." Emails from Anthony Dain to Bernard Black's Colorado counsel, Bernard Poskus (Dec. 2 and Dec. 10, 2015).

For Joanne's Supplemental Needs Trust, which her mother created, Dain is advancing a different and bizarre approach to extracting assets, with no shred of a legal basis. He has announced his plans to seek a court order that would transfer the power to make distributions from Joanne's trust's trustees to Joanne Black's guardian, who, if this Court falls into his trap, would conveniently be his own sister Wrigley!

In this Court, Dain and Wrigley are also seeking an order directing turnover of assets held by two Black family trusts to Wrigley, while – amazingly – concealing from the trustees and beneficiaries of these trusts the text of their secret proposed order. To pressure the Black family into acquiescing to her demands, Wrigley wrote a formal demand letter to Bernard Black, falsely claiming that this Court had appointed her a trustee of Black family trusts as well.

After failing in his defunding efforts, Dain is now seeking in both states to persuade courts to simply ignore the trusts' existence and transfer trust assets to Wrigley's control. Dain is intentionally ignoring the fundamental legal distinction between trust assets and personal assets. He claimed to this Court that this significant distinction is "semantic obfuscation."

Dain's and Wrigley's efforts harmed, and were intended to harm, at least eight beneficiaries of the Black family trusts. Dain's and Wrigley's efforts harmed, and were intended to harm, the three trusts, to which Dain owed fiduciary duties. Dain and Wrigley claim to be acting in the interests of Joanne Black, but their efforts have harmed Joanne Black as well, as we will explain

in a hearing if we are allowed to have one. In particular, Dain and Wrigley have imposed massive litigation costs on Joanne Black, which have already substantially depleted her assets, and plan further litigation, which will further deplete her remaining assets. Dain and Wrigley also intentionally froze Joanne's access to her own money, leaving her at mercy of Wrigley and her felon associate Pinto. The only persons who stood to gain from Dain's and Wrigley's litigation were Dain and Wrigley.

Dain and Wrigley are pursuing multiple, increasingly strained litigation efforts, in two states, for the express purpose of *increasing* litigation costs. Early on, Dain threatened to make litigation "wildly expensive," to deter Bernard Black from investigating Wrigley's theft of the Black family assets. Dain continues to carry out that threat, in an effort to exhaust the financial resources of the trustees and beneficiaries to defend against his efforts to extract assets from the Black family trusts. Perversely, Dain and Wrigley are purposefully multiplying litigation costs to the Black family at no cost to themselves – so long as their asset-stripping scheme is conducted ostensibly on behalf of the mentally ill Joanne Black, they are demanding to have their own litigation expenses paid from the Black family assets.

### 3. Wrigley and Dain Rejected the Largest Settlement Offer that Joanne Could Possibly Collect Because the Offer Did Not Give Them Control over the Black Family Assets.

The litigation that Dain and Wrigley instigated has one critical perverse feature – Dain and Wrigley are using the Black family money (by using Joanne as an ostensible plaintiff) to sue the Black family itself, seeking to defund the Black family trusts and funnel all family assets into the hands of Wrigley. This litigation is free entertainment for Dain and Wrigley, who demand to be fully paid from the Black family funds for all outlays. This litigation is a financial disaster for the Black family, even if they beat Dain and Wrigley, because the Blacks will have wasted hundreds of thousands of dollars on legal expenses of both sides.

To stop the waste of family assets on litigation, in September 2015, the Black family offered to transfer the entire amount in the Issue Trust – the only amount in controversy – to Joanne Black's trust. We would rather have this money spent by Joanne than waste it on lawyers. We further offered to relinquish control over Joanne's trusts to a professional trustee.

This is the absolute best that Joanne can possibly do in any litigation. The Black family has no other significant assets that Joanne could realistically collect. The Blacks have only one collectible asset – the family trust fund, which was offered for the settlement.

This settlement would also save hundreds of thousands, perhaps millions, of dollars of legal expenses and delay. This is the absolutely most that the Black family could possibly offer to Joanne, and significantly more than Joanne can realistically collect.

But this offer gives nothing to Wrigley and Dain. Control over the assets would go to an independent trustee. That would undermine the whole point of this litigation for Wrigley and Dain. Consequently, Wrigley and Dain rejected this offer. As best we understand, they did not even present it to Joanne's Colorado conservator.

Actions speak louder than words. Wrigley and Dain would rather spend additional hundreds of thousands of dollars of Joanne's money, with very little realistic chance of recovery, on a highly speculative gamble to remove the assets from the Black family trusts – instead of

accepting an offer to transfer those same assets to Joanne's trust without further litigation. Their actions make clear that they are not seeking more money for Joanne. They seek control over whatever money Joanne has left, when the fighting stops.

### E. Wrigley's Many Conflicts that Make Her Unsuitable as a Guardian of Joanne Black.

Wrigley must not be appointed Joanne's guardian because she has many significant conflicts that make it impossible for her to perform her duties as a guardian.

First, as mentioned above, the Black family has collected substantial evidence that Wrigley, together with her associate, convicted federal felon Esaun Pinto, has embezzled Joanne's funds and defrauded Joanne of hundreds of thousands of dollars. It would be appropriate for Joanne to sue them to recover these funds. But if Wrigley is granted guardianship over Joanne, she will not sue herself. This conflict is sufficient to disqualify Wrigley from guardianship. An independent professional should decide whether Joanne has claims against Wrigley and Pinto for theft and misappropriation.

So that there can be no doubt, Pinto is indeed a convicted federal felon, despite Wrigley's false claim (under oath) that he is not. Please look for yourself. Just Google "Esaun G. Pinto" and see what comes up. His guilty plea is easy to find, either on the internet or under the docket number that Bernard Black provided in a prior submission to this court: United States District Court Western district of Washington at Tacoma under docket number CR 07 5775 RBL.

Second, as discussed in the preceding section, Dain, while acting as a trustee for the Black family trusts, sought to defund the Black family trusts, froze trust assets to foreclose the beneficiaries' access to funds for legal defense, personally led litigation to defund the trusts, and has attempted to funnel the defunded assets from the Black family trusts into the hands of his sister Wrigley. Dain's breach of fiduciary duty to the trusts is extreme and astonishing. For many of these breaches, a claim by the beneficiaries for breach of fiduciary duty should lead to straightforward summary judgment, since it is undisputed that Dain, while a trustee, in fact sought to defund the Black family trusts and harm multiple beneficiaries. Dain is still doing so. Joanne Black, along with other beneficiaries, was harmed by Dain's attempt to strip assets from the trusts and funnel them into the hands of Dain's sister Wrigley. Joanne's guardian would be expected to sue Dain on Joanne's behalf, and Wrigley for aiding and abetting. If Wrigley were appointed Joanne's guardian, she would no doubt sabotage this effort. This conflict should also disqualify Wrigley from being appointed a guardian. An independent professional should decide whether Joanne has claims against Dain for breach of fiduciary duty.

Third, during the Colorado proceedings, Joanne's Colorado counsel, Lisa DiPonio, and Joanne's Guardian ad Litem, Gayle Young, both admitted that they received Bernard Black's two-page proposed order describing the disclaimer, which stated that two-thirds of the disclaimed assets would go to Joanne's trust fund under a specific article of Renata Black's will; read the order; read Renata Black's will (which clearly states that two-thirds of her Estate goes to Joanne's trust and one third to a separate trust for the rest of the family); read the two trusts; billed for reading them (Young billed for two hours!); spoke to Bernard Black's counsel Carl Glatstein about them the next day; approved the disclaimer proposal in writing – but somehow did not understand what those documents say!

14

This conduct, unbelievable as it is, is prima facie legal malpractice. If they did not understand the trivially straightforward documents that they signed, after billing for hours for reading them, as they now claim, Joanne has an excellent claim against both DiPonio and Young. But if Wrigley is appointed Joanne's guardian, she will no doubt not bring such a lawsuit. Wrigley and Dain have announced that they will continue litigating in Colorado to continue their so far unsuccessful quest to strip assets from the Black family trusts, and they critically need cooperation and support from DiPonio and Young to succeed. An independent professional should decide whether Joanne should bring claims against Young and DiPonio for malpractice.

Note too that the Blacks have filed a very strong Motion for New Trial in Colorado, and there is a good chance it will be granted. If it is, cooperation from DiPonio and Young would be critical to continue Wrigley's and Dain's asset-stripping ploy in Colorado because both DiPonio and Young served as Wrigley's and Dain's main fact witnesses. Even if a new trial is not granted in Colorado, Wrigley and Dain need cooperation from DiPonio and Young because there is a very good chance that the Blacks will succeed on appeal, and at least some portion of the case will be sent back to the trial court. Thus, there is every reason to think that Wrigley will intentionally sabotage Joanne's claim against DiPonio and Young. This is yet another conflict that should disqualify Wrigley from guardianship.

I attach our Motion for New Trial to this letter. As you can see, the procedural improprieties that Bernard Black faced in Colorado are staggering, and include items like the judge testifying as a fact witness in her own case; ruling on a motion for civil theft without jurisdiction; freezing New York trusts and the New York Estate of Renata Black without jurisdiction; Dain and Wrigley testifying as surprise witnesses after Dain said repeatedly they would not (denying the Blacks the chance for effective cross-examination that we seek here); the judge allowing new claims to be brought mid-trial, without proper notice; the judge relying improperly on her prior knowledge of Joanne's guardian-ad-litem and court-appointed counsel to grant them credibility; the judge denying an emergency motion for continuance sought due to a counsel's severe and documented injury, and so on.

As you see, contrary to Dain and Wrigley's proclamations in this Court, their position in Colorado is far from certain and victorious. Their success critically depends on cooperation from Young and DiPonio. Wrigley can be fully expected to sabotage Joanne's claim against the members of Wrigley's litigation team and thus cannot be appointed as a guardian.

### F. Some Examples of Wrigley's False and Misleading Statements to this Court.

In this section, I only briefly discuss some of the examples of Wrigley's lies to this Court. These lies are material, and many are committed under oath. If we are allowed a hearing, we will present many more lies and highly misleading statements that Wrigley and Dain made in an effort to secure guardianship.

> 1. **Wrigley Committed Perjury by Stating to this Court, Under Oath, that Her Associate Esaun Pinto Is not a Convicted Federal Felon, when, as Wrigley Knew, Pinto Pled Guilty on March 31, 2009 to a Felony Violation of 18 U.S.C. §§ 641-642, Unlawful Conveyance of Government Records, in**

the U.S. District Court for the Western District of Washington (3:07-cr-05775-RBL).

In related proceedings in Colorado, Bernard Black presented evidence of Pinto's theft and misappropriation of Joanne Black's assets, and of his prior criminal conduct, and sought an investigation. I personally provided copies of Pinto's indictment and guilty plea to Joanne Colorado guardian ad litem, Gayle Young, and Joanne's Colorado counsel, Lisa DiPonio. Wrigley was closely cooperating with both of them. In New York, Bernard Black stated, in a prior submission to this Court on September 9, 2015, that Pinto was a convicted felon, and provided the precise docket number. Bernard Black stated, among other things, that:

10. Upon information and belief, Cherie Wrigley did not properly screen Pinto and evaluate his credentials and background.

11. A proper screening would have disclosed that Pinto is a convicted felon in United States District Court Western district of Washington at Tacoma under docket number CR 07 5775 RBL.

12. Pinto's conviction under this indictment involved fraudulently securing personal information of individuals and selling it to companies to determine financial holdings of litigants in civil actions.

In response, Cherie Wrigley falsely stated, in an affidavit submitted to this Court on September 21, 2015, that:

In point of fact, the felony charge against Mr. Pinto, to which [Bernard Black] refers, was dropped and he has never been convicted of a felony. Further, these events transpired twenty (20) years ago . . . .

The truth is simple. Pinto was indicted in the Western District of Washington in 2007 for aggravated identity theft, fraudulent elicitation of Social Security Administration information, and solicitation of federal tax information. He pled guilty in 2009, to a felony violation of 18 U.S.C. §§ 641-642, Unlawful Conveyance of Government Records. Copies of the indictment and Pinto's guilty plea are attached.

There is no possible way that Wrigley could have remained unaware of Pinto's criminal record even after I personally provided copies of the indictment and guilty plea to Wrigley's associate Young in Colorado, and Bernard Black provided the specific docket number in his filing in this Court.

A simple Google search for "Esaun G. Pinto" provided the following as the first hit: http://www.assetsearchblog.com/Torrellaindictment.pdf, which contains a photocopy of Pinto's criminal indictment. The third hit is: http://fraudwar.blogspot.com/2007/12/private-eyes-charged-with-aggravated.html ("Private Eyes charged with aggravated identity theft," discussing the criminal enterprise in which Pinto participated and listing him by name). The fourth hit is the U.S. Department of Justice page: http://www.justice.gov/archive/criminal/cybercrime/press-releases/2007/torellaIndictment.htm, again listing Pinto's name as a member of a criminal conspiracy.

A search for "'Esaun Pinto' felony" generates as a first hit: http://www.assetsearchblog.com/uploads/file/Torrelladocket.pdf, a criminal docket for Pinto's

case, showing the details of when he pled guilty and was sentenced. The first ten hits for a search for "'Esaun Pinto' criminal" provide details containing Pinto's indictment, the full docket, a plain-English discussion of the conspiracy that he was part of, and so on.

Thus, Wrigley committed perjury when she falsely denied that Pinto is a convicted federal felon. Wrigley knew that Pinto was a felon. Wrigley also knew that Pinto had stolen and misappropriated Joanne Black's assets. She succeeded in covering up those awkward facts in Colorado, and hoped to do the same in New York.

At the very least, Wrigley willfully avoided knowing that Pinto was indicted for aggravated identity theft, fraudulent elicitation of Social Security Administration information, and solicitation of federal tax information, and pled guilty to and was convicted of unlawful conveyance of government records. Wrigley gave this identity thief access to Joanne's identity and assets, which is just one more reason she is not suited to be Joanne's guardian.

Wrigley's false denial of Pinto's criminal record also says much about Pinto. He knows he was indicted and pled guilty, and is also seeking to conceal that information from this Court. Yet Wrigley proposes to rely on Pinto as her principal source of regular contact with Joanne, and to pay him lavishly for doing so.

> **2. Wrigley Committed Perjury by Falsely Stating to this Court, Under Oath, that "there is no assertion that [Esaun G.] Pinto has done anything improper with [Joanne Black] whatsoever," when, as Wrigley Knew, Serious Allegations Had Been Made in Related Colorado Proceedings about Pinto's Theft and Misappropriation of Joanne Black's Assets, and the Colorado Judge Found those Allegations Credible Enough to Authorize an Investigation of Pinto's Conduct by a Forensic Accountant.**

In related proceedings in Colorado, Bernard Black presented evidence of theft and misappropriation of Joanne's assets by Pinto, and sought an investigation. These allegations were made in an open court in which Wrigley was present, during proceedings in which Wrigley participated.

At the April 2, 2015, status conference, Bernard Black's Colorado attorney, Carl Glatstein, said the following: "There were a variety of concerns with respect to what was happening with [Joanne Black's] Social Security; that's part of what we think an evidentiary hearing would be good for the Court to know. Funds were being withdrawn from her account by Pinto not for her benefit that we could discern and he would not account to the conservator for those funds." [The Court interjected]: "Right. I know there was a big dispute about that." [Glatstein continued:] "And [forensic accountant] Ms. Kerr will be provided all that information so she can also from a forensic accounting perspective see where everything went, what the concerns and issues were. Funds were being withdrawn from Joanne's personal account by Mr. Pinto when she's on a locked psych unit. And no accountability on that to anybody. We would be very concerned about Mr. Pinto being put back into a position as a rep payee; there needs to be accountability on that as well as everything else for Joanne's benefit." Tr. 28-29, Case 2012 PR 1772, Probate Court for Denver County, Colo., April 2, 2015.

The Colorado court found allegations of Pinto's misconduct sufficiently credible and troublesome to order an investigation of Pinto by the court-appointed forensic accountant, Pamela

Kerr. The court ordered that "Mr. Pinto shall provide a complete accounting with documentation of all funds that were held under his control to Ms. Kerr and Ms. Peterson, who shall ensure copies are provided to Counsel of record including Mr. Saltzman, the GAL, Mr. Dain and Ms. Wrigley." Status Conf. Order ¶ 8 at 3, Case 2012 PR 1772, Probate Court for Denver County, Colo., April 2, 2015.

The Colorado court also reviewed Wrigley's and Dain's demand to allow Pinto to serve as a representative payee and receive Joanne Black's insurance checks, and rejected it on the basis of the significant accusations it heard. Judge Leith said: "At this point I am satisfied that I don't think Mr. Pinto should become--be the rep payee. There's too many issues surrounding whatever expenses--he's got to provide a full accounting." Transcript at 42.

Wrigley was present in the courtroom while the parties were speaking and while the judge was issuing these orders orally; Wrigley also received the judge's written order for an accounting by Pinto.

Following this hearing, Wrigley received detailed information about Pinto's misconduct, with specific amounts stolen, specific accounts from which assets were stolen, and specific channels of Pinto's theft and misappropriation of Joanne Black's assets, from submissions that Bernard Black made to the Colorado forensic accountant Pamela Kerr. All of those submissions were either forwarded or directly copied to Wrigley, Dain, and other members of their litigation team.

Wrigley was also aware that Pinto had been making unauthorized and unreported withdrawals from Joanne Black's Chase Account. In a July 7, 2013 email to Pinto, Wrigley referred to the ongoing theft, and described it as "double-billing":

How to bill going forward and [your] continued withdrawals from Chase if that is still happening? I fear he [Bernard Black] will blow a fuse. Thinking you might be double-billing.

Wrigley did nothing to monitor Pinto, or to cause his to cease making unauthorized and undisclosed withdrawals. The withdrawals continued. Bernard Black discovered some of them and wrote to Pinto on Nov. 17, 2013, with copy to Wrigley:

[I]t is not acceptable to me to receive a bill which does not reflect withdrawals of $1,665 from Joanne's [Chase] account in October, in any way. . . .

When Bernard Black terminated Pinto's services, on Sept. 30, 2014, by email with copy to Wrigley, he demanded return of his advance payment for October 2014, as well as "any amounts you withdrew from Joanne's checking account for payment, beyond those listed as deductions in your bill." No amounts were returned.

Thus, when Wrigley stated to this Court, under oath, that "there is no assertion that [Esaun G.] Pinto has done anything improper with [Joanne Black] whatsoever," she committed perjury. A hearing is necessary to determine the extent of Wrigley's perjury and the consequences, but whatever those are, Wrigley has demonstrated that she is not qualified to be Joanne Black's guardian.

Wrigley and Dain continue to do everything in their power to prevent the truth about Pinto's theft and misappropriation from being proven in this court. Wrigley continues to pay Pinto

large sums of money, which she plans to recover from Joanne Black's funds. The amounts paid to Pinto to date, or simply stolen by Pinto, exceed $400,000.

Wrigley continues to be beholden to Pinto, and to look for ways to shovel more of Joanne Black's money into his hands. Consider her e-mail statement on October 23, 2015 about Joanne's old clothes, which Bernard Black had packed up and moved from Renata Black's home to his own for safekeeping: "Nov.17th, 18th is when Esaun [Pinto] will likely come and pick up all of Joanne's boxes." Wrigley apparently proposes to use Joanne's funds to pay Pinto, at his usual hourly rate of $150, to drive from New York to Chicago, pick up boxes of old clothes, and drive back – instead of using a much lower-cost shipping service, or a courier who has not already inflated his charges and stolen funds in this case.

A hearing is urgently needed to allow us to provide to this Court evidence of Pinto's misconduct, and Wrigley's complicity in both this misconduct and in covering it up.

### 3. Wrigley Lied to this Court to Obtain an Illegal Order for the Transfer of the Black Family Jewelry to Herself.

The Proposed Order contains other illustrations of Wrigley's true motives. On page 7, the Proposed Order demands the transfer of the Black family jewelry to Wrigley. Wrigley deceived this Court on three critical matters.

First, Wrigley is intimating that she is seeking the possession of jewelry for the benefit of Joanne. This is odd on its face: Joanne lives in a halfway house and has little capacity to manage valuables. Why would she urgently need to possess tens of thousands of dollars worth of jewelry? Why is this demand so important that Wrigley is making it, as a separate line item, in her very first Proposed Order to this Court?

That's because Wrigley has been trying to wrestle this jewelry from the Black family since the late 1990s – for her personal use. As discussed above, the jewelry was a property of Joanne's (and Wrigley's) grandmother. In 1999, Wrigley stole significant real estate investments from her grandmother and from Joanne's mother. In response, the grandmother entirely disinherited Wrigley and her siblings. She bequeathed the jewelry to Joanne's mother, who then left it to her estate. Wrigley fought fervently to obtain the jewelry, first with the grandmother, then, with Joanne's mother, and lost both times. One day after Joanne's mother died, Wrigley started demanding the transfer of jewelry to herself. Her siblings did the same later.

Wrigley is now applying for guardianship of Joanne, and her *very first action* is to demand, ostensibly on Joanne's behalf, the transfer of the jewelry that she has been trying to steal from the Blacks for decades! We believe (but without the transcript that Wrigley and Dain are seeking to conceal from us, cannot prove) that Wrigley failed to inform this Court that the jewelry she is requesting for an oddly urgent transfer is the same jewelry that Wrigley has been claiming to be "hers" for decades. No doubt it is material for this Court that a guardian seeking to take personal possession of assets, ostensibly for her incapacitated ward, has been making public claims to be the rightful owner of those assets, for years. We also have no doubt that, once Wrigley gets the jewelry, the Black family will never see it again. That is why Wrigley so eagerly tried to conceal her Proposed Order from the Blacks.

Wrigley's second deception is the following. As best we can tell, Wrigley and Dain directly lied to this Court to obtain an order to transfer the jewelry. The Proposed Order states that the

jewelry is "personal property" of Joanne. This is false, and they know it. The jewelry was the property of Renata Black. It became the property of the Estate of Renata Black, and from there, was distributed to Joanne's trust by the executor, Bernard Black. The jewelry cannot be removed from the trust without a decision of trustees.

It was critical for Wrigley to lie to this Court about the legal ownership of the jewelry. If Wrigley disclosed to this Court that the jewelry belongs to a trust, this Court would have directed her to pursue legally required steps to get it – to seek trustee approval. If the trustees refused to give the jewelry to Wrigley, her legal remedy would be to appeal to Surrogates Court, which would review trustee decision for abuse of discretion. It would hardly be abuse of discretion for trustees to conclude that Joanne Black, who lives in a halfway house and cannot manage even moderate amounts of money, has no urgent need to personally possess tens of thousands of dollars worth of jewelry.

Wrigley made a third deception as well. As best we can tell, Wrigley concealed from this Court that the trust that owns the jewelry is currently frozen by the Colorado court, due to Wrigley's and Dain's own petition. Nobody is allowed to remove any assets from the trust until the Colorado court lifts the freeze. Wrigley was petitioning this Court to direct Bernard Black to perform an illegal action, in violation of a Colorado court order. Amazingly – but understandably! – Wrigley has tried hard to conceal this fact from Black family.

Given the vast amounts of falsehoods that Wrigley has submitted to this Court, all of hers and her associates' submissions need to be released to the Black family. Only then can we, and this Court, determine the full amount of fraud that Wrigley and Dain committed on this Court.

### 4. Wrigley Lied to this Court to Obtain an Illegal Order for the Transfer of Savings Bonds.

Wrigley made more false and misleading claims about the legal ownership of savings bonds, which she is also seeking in her Proposed Order (page 6). To convince this Court to issue an order to transfer savings bonds to herself, Wrigley (to the best of our knowledge) has claimed that these savings bonds are personal property of Joanne. Wrigley lied.

These savings bonds are not Joanne's personal property. Instead, they are held in Joanne Black's 2013 Trust, an Illinois trust. Wrigley and Dain are well aware of this, because they have been seeking in Colorado to remove the savings bonds and other assets from this trust. Wrigley is also well aware of the difference between personal property of Joanne and the property of Joanne's trusts, because Wrigley has just spent many months trying to funnel assets from the trusts into the "Joanne's personal property" status, where she could control them. Wrigley's misstatements to this Court were deliberate and intended to obtain an illegal order to transfer assets from an Illinois trust, without jurisdiction, without proper proceedings, and without notice to the trustees and beneficiaries.

Wrigley misled this Court on another matter as well. The 2013 Trust, like all Black family trusts, is frozen by the Colorado court, due to a petition from Wrigley and Dain. Nobody is allowed to transfer any assets that have been frozen by a court order. Wrigley failed to notify this Court that she was seeking an action in violation of another court's order. Wrigley asked this Court to direct Bernard Black to illegally remove frozen assets from a trust.

Bizarrely, Wrigley's Proposed Order also requests the power to seek contempt charges against Bernard Black should he refuse to violate the Colorado order and transfer the bonds to Wrigley! This is consistent with Wrigley's and Dain's prior efforts to wrongfully threaten contempt proceedings to coerce the Blacks not to pursue their claims in this Court and in Colorado.

Wrigley is assisted by a large team of attorneys, including her own litigator brother Dain. And yet, she is seeking an order from this Court that would explicitly require Bernard Black to violate an order from another court. If he transferred the assets, he would be in violation of the Colorado order, and if he did not, he would be in violation of the New York order.

Given the size of Wrigley's legal team, this is no doubt intentional. Wrigley chose to deceive this Court – by actively lying about the legal ownership of the bonds and by failing to disclose the material fact that the bonds are frozen by another court.

Still more bizarrely, Wrigley has been making these demands to force Bernard Black to engage in illegal actions at the threat of contempt sanctions, while keeping her Proposed Order secret from Bernard Black! Even now, Dain and Salzman have been claiming that they should not provide notice. Their goal is to impede the Blacks' ability to catch these sorts of lies and manipulations, and to reveal them to this Court. Wrigley's deceptive and manipulative behavior emphasizes why the full disclosure is critical in this case.

These lies and manipulations are consistent feature of Wrigley's behavior. She is using this guardianship to tunnel the Black family assets to herself. She is lying to this Court and deceiving this Court by omitting critical information, to get to her desired outcome.

Wrigley is not fit to be Joanne's guardian.

Because of this volume of falsehoods and deliberately misleading statements that we already see from the tiny amount of disclosed information, the Blacks should be allowed to receive all submissions that Wrigley and her associates made to this Court. And we need a hearing to present evidence properly.

### G. The Blacks Are Entitled to Notice; Wrigley and Dain Are Seeking Extreme and Illegal Secrecy to Cover-Up Evidence of their Perjury and Other Misbehavior.

Wrigley and Dain are seeking extreme and illegal secrecy of the proceedings in this Court. They seek to hide their formal submissions to this Court, proposed orders, sworn testimony, and so on. An honest litigant has no reasons to hide such documents. Wrigley and Dain seek secrecy to cover-up the many lies they submitted to this Court and prevent a formal investigation and possible perjury prosecution.

To justify their quest for secrecy, Wrigley and Dain, with the assistance of Salzman, have advanced numerous false defenses against the legal requirement to provide disclosure. Their efforts are specious. The disclosure is legally required.

First, Bernard Black is plainly entitled to notice under Mental Hygiene Law § 81.07(g)(1)(i) as Joanne's adult sibling. The statute does not provide for any exceptions to this notice requirement.

Second, the Proposed Order that we were able to obtain (after much fighting and delay, and apparently not the entire document anyway) contains demands to distribute assets currently

held in two Black family trusts. The jewelry that the Proposed Order demands is the property of the Supplemental Needs Trust for the Benefit of Joanne Black, and the savings bonds it demands are the property of the Joanne Black 2013 Trust. Any such distributions require notice to trustees and beneficiaries, and a hearing on the transfer of assets from the trusts. See Matter of Loretta I (2006 NY Slip Op 08134, 34 AD3d 480 (2d Dept. 2006)).

Third, Bernard Black is plainly entitled to notice and a hearing on any legal actions that require an action on his part, such as the payment of legal fees, transfer of assets that belong to third parties, and such. The partial version of the Proposed Order that we received also specifies a significant personal payment by Bernard Black to the court evaluator Mr. Russo. Such items cannot be assessed against Mr. Black without a notice and a hearing. The Proposed Order also bizarrely seeks contempt sanctions if Bernard Black fails to transfer to Wrigley property that belongs to a third party – savings bonds and jewelry that belong to trusts – even though Bernard Black did not even receive a notice that the action forcing him to transfer property is being considered, and never received an opportunity to be heard on the matter. And even though the trusts themselves are frozen, under a Colorado court order that Dain and Wrigley obtained!

Instead of giving the legally required notice, Dain and Wrigley play endless procedural games, delay and obfuscate, and now, point to the very fact of the delay that they caused as the reason not to inspect the full extent of their own falsehoods and therefore not to provide legally required notice.

## Conclusion

Wrigley and Dain have repeatedly lied to this Court, made many highly misleading statements, illegally concealed information, threatened the Black family against participating in legal proceedings, pressured the Black family counsel to abandon representation, and deprived the Black family of access to their own trust funds to defend against Dain's and Wrigley's efforts to funnel the Black family assets into the control of Wrigley. Dain has breached a litany of fiduciary duties to the beneficiaries of the Black family trusts. Wrigley, assisted by a convicted felon Esaun Pinto, embezzled and defrauded Joanne and the Black family. To secure their control over Joanne, Wrigley and Dain have frozen Joanne's access to her own money, making her completely dependent on Wrigley, and put Joanne under the thrall of a convicted felon specializing in fraud and manipulation.

Wrigley and Dain are now again seeking to illegally deprive the Black family of the required notice, so that the Blacks will not have the opportunity to demonstrate the full extent of Wrigley's and Dain's misconduct to this Court.

To convince this Court not to listen to the evidence of their gross misconduct, Wrigley and Dain are now claiming that (1) the Blacks should have acted earlier (which they could not do, both because Wrigley and Dain have illegally concealed information from them and because the Blacks faced a threat of sanctions for daring to appear), and (2) that any delay would harm Joanne (which is completely false, both because Joanne has a Colorado conservator who has the power to pay Joanne's bills, but Wrigley and Dain did not submit any bills to her, and because Joanne would also have access to her trust funds, but for the asset freeze that Dain and Wrigley themselves obtained).

22

Wrigley and Dain are now again seeking to illegally deprive the Black family of the required notice, so that the Blacks will not have the opportunity to demonstrate the full extent of Wrigley's and Dain's misconduct to this Court.

To convince this Court not to listen to the evidence of their gross misconduct, Wrigley and Dain are now claiming that (1) the Blacks should have acted earlier (which they could not do, both because Wrigley and Dain have illegally concealed information from them and because the Blacks faced a threat of sanctions for daring to appear), and (2) that any delay would harm Joanne (which is completely false, both because Joanne has a Colorado conservator who has the power to pay Joanne's bills, but Wrigley and Dain did not submit any bills to her, and because Joanne would also have access to her trust funds, but for the asset freeze that Dain and Wrigley themselves obtained).

Given the egregiousness of this misconduct, we request a hearing and a full access to necessary information. There is no urgent need to appoint Wrigley guardian. We believe that once you hear our evidence, you will decide that Joanne should have an independent, professional, local guardian instead. The phony need-for-urgency plea that Dain and Salzman manufactured last week is yet another example of the many falsehoods that they have already unleashed on this Court.

Very truly yours,

Katherine Litvak

Via email to:
Ira Salzman          salzman@seniorlaw.com
Melissa Cohenson     mcohenson@raphanlaw.com
Anthony Dain         anthony.dain@procopio.com
Bart Russo           btr@bzslaw.com

# Katherine Letter
# (redacted)
# Pl. Exh. 65



NORTHWESTERN UNIVERSITY SCHOOL OF LAW
Professor Katherine Litvak
357 East Chicago Avenue • Chicago, Illinois 60611-3069
k-litvak@northwestern.edu
http://www.law.northwestern.edu/faculty/profiles/KatherineLitvak/

**Via Email to:** Ricsupc2@nycourts.gov
Hon. Thomas P. Aliotta
Supreme Court, Richmond County
18 Richmond Terrace
Staten Island, NY 10301

RE: Guardianship of Joanne Black, Index No 80253/14

7 January 2016

Dear Justice Aliotta:

The Colorado court found allegations of Pinto's misconduct sufficiently credible and troublesome to order an investigation of Pinto by the court-appointed forensic accountant, Pamela

Kerr.

Very truly yours,

Katherine Litvak

<u>Via email to:</u>
Ira Salzman            salzman@seniorlaw.com
Melissa Cohenson       mcohenson@raphanlaw.com
Anthony Dain           anthony.dain@procopio.com
Bart Russo             btr@bzslaw.com

# Exhibit 2

# Kerr Forensic Accounting, PC

650 S. Cherry Street ♦ Suite 235 ♦ Denver, Colorado 80246 ♦ (303) 696-3700 ♦ Fax (303) 696-5711

January 8, 2016

Northwestern University
375 E. Chicago Avenue
Chicago, IL 60611
Attn: Mr. Daniel B. Rodriquez, Dean

> Re:  Letter from Professor Katherine Litvak
> on Northwestern University Law School
> Letterhead

Dear Mr. Rodriquez,

I am a forensic accountant that was retained by the Guardian ad Litem for a Protected Person under the jurisdiction of the Denver Probate Court. I received a copy of the attached letter that was submitted to the Honorable Thomas P. Aliotta, Supreme Court, Richard County, New York on letterhead of the Northwestern University School of Law by one of your professors, Katherine Litvak. I was shocked to receive this letter on your letterhead. I truly believed that Northwestern University Law School was supporting the statements made by Ms. Litvak. See copy of letter attached.

Page 15 of Ms. Litvak's letter states:

"...and the Colorado Judge Found those Allegations credible Enough to Authorize an Investigation of Pinto's Conduct by a Forensic Accountant."

Not only is this a 100% false statement, but in fact, the Colorado Court authorized me to conduct an investigation into the actions of her husband, another professor at Northwestern Law School, Bernard Black. I would not have disclosed this information if Ms. Litvak had not filed this document with the New York Court with this completely false statement included.

I do not feel that I am at liberty to disclose the outcome of my forensic investigation, but as I am sure, as a licensed attorney and the head of a very prestigious law school, you know that the facts are the facts. I am a licensed CPA, a Certified Fraud Examiner and a Forensic Certified Public Accountant and am required to provide a factual report based on the financial and other documents provided. I have provided such a report to the Denver Probate Court, who is the trier of fact in this matter. An Order was issued on September 28, 2015 with the results of many months of hearings in this matter. I can tell you unequivocally that the Order in no way reflect Ms. Litvak's

NW000427

# Kerr Forensic Accounting, PC

Letter to Northwestern Law School regarding letter from Katherine Litvak
January 8, 2016

allegations. As a matter of fact, Ms. Litvak testified at these hearings, and I can also tell you unequivocally that I have never, in my entire professional career, listened to a less credible testimony than Ms. Litvak's. However, that is a personal opinion but is relevant given Ms. Litvak's allegations in the attached letter.

Since Ms. Litvak has now involved Northwestern University Law School in this matter by filing a document with the New York Court as if Northwestern University Law School was a party to this case, I would imagine that if you so choose, you could be provided with a copy of my report of findings, the Court's Order of September 28, 2015 and transcripts from the hearings.

Since this letter with this completely false statement about what I was authorized to perform was provided to the New York Courts on Northwestern University Law School letterhead, as if you the school were in support of this letter, I would greatly appreciate if you would notify the New York Court whether or not Northwestern University Law School in fact, supports these statements made by your professor, Katherine Litvak.

As a matter of fact, I have literally hundreds of emails from Mr. Black from his Northwestern Law School email in response to my inquiries in this investigation as wells as letters he has written on Northwestern University Law School letterhead to both the New York Courts and the Denver Probate Court. I believe that given the appearance of the involvement of the Northwestern University Law School in this case, as a result of both Ms. Litvak's letter and Mr. Black's communications, it is my duty to inform you of these communications. As stated previously, had Ms. Litvak not included what I was and was not authorized to do to the New York courts on Northwestern University Law School letterhead, I would never have communicated this activity to you.

I look forward to your clarification in this matter.

Very truly yours,

Pamela M. Kerr

Pamela M. Kerr, CPA, FCPA, CFE

Attachments:
    Copy of Letter from Ms. Litvak on Northwestern Law School Letterhead

NW000428

# Exhibit 3

PROBATE COURT, CITY AND COUNTY OF DENVER, COLORADO

------------------------------------------------------------------------

TRANSCRIBER'S TRANSCRIPT

------------------------------------------------------------------------

CASE NO. 12 PR 1772

------------------------------------------------------------------------

IN THE INTEREST OF:

JOANNE BLACK, Respondent.

------------------------------------------------------------------------

        This matter came on for hearing before THE HONORABLE ELIZABETH D. LEITH, Judge of the Denver Probate Court, on Thursday, April 2, 2015. The following is a transcript of the audible portions of that hearing as requested by the ordering party.

APPEARANCES:    M. CARL GLATSTEIN, Esq., Reg. No. 13738 for Bernard Black

                LISA DiPONIO, Esq., Reg. No. 27707, for Joanne Black, Respondent

                GAYLE YOUNG, Esq., Reg. No. 17107. Guardian Ad Litem for Joanne Black, Respondent

                IRA SALZMAN, Esq., Attorney for Joanne Black, Respondent

                ANTHONY DAIN, Trustee/cousin

                CHERIE WRIGLEY, Cousin

BLACK016614

2

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Thank you, you may be seated.  All
 3    right.  The record is now on and the Court will call up 12 PR
 4    1772, the interest of Joanne Black.  And could I have
 5    appearances for the record, please.
 6              MR. GLATSTEIN:  Good morning, Your Honor, Carl
 7    Glatstein, registration 13738 here on behalf of Bernard
 8    Black, Conservator; Mr. Black is present.
 9              THE COURT:  He is?
10              MR. GLATSTEIN:  Where did he go?
11              UNIDENTIFIED SPEAKER:  (Inaudible).
12              MR. GLATSTEIN:  He is almost present.
13              THE COURT:  Okay.
14              MR. GLATSTEIN:  His spouse Kate Litvak is also
15    present.
16              THE COURT:  Okay.
17              MS. DiPONIO:  Good morning, Your Honor, Lisa
18    DiPonio, 27707, court appointed counsel for Joanne Black.
19    Your Honor, Ira Salzman who is Ms. Black's attorney in New
20    York in the proceedings there.  They--he is on the phone.
21              THE COURT:  Okay.
22              MS. DiPONIO:  And Ms. Black is present with him as
23    well.
24              THE COURT:  Okay.
25              MR. SALZMAN:  Also present--this is Ira Salzman--
```

BLACK016615

3

```
 1   also present is Mr. Esaun Pinto (phonetic).
 2              THE COURT:  Okay.
 3              MR. DAIN:  Your Honor, Anthony Dain, trustee of the
 4   various trusts and an interested party.
 5              THE COURT:  Very good.
 6              MS. YOUNG:  Good morning, Your Honor, Gayle Young,
 7   Guardian ad Litem for Joanne Black.
 8              THE COURT:  All right.  Anyone else who wants to
 9   enter an appearance?
10              MR. DAIN:  Yeah, go ahead.
11              MR. BLACK:  Bernard Black, Conservator.
12              THE COURT:  Very good.
13              MR. DAIN:  Cherie Wrigley, who is also an
14   interested party.
15              THE COURT:  All right.
16              MS. WRIGLEY:  Joanne Black's cousin.
17              THE COURT:  Right.  Okay.  All right.  So I've
18   reviewed the various reports and it's my understanding first
19   off that you have stipulated to the forensic review by Ms.
20   Kerr; is that correct?
21              MR. GLATSTEIN:  That is correct, Your Honor.
22              THE COURT:  All right.  So I'll sign off on that
23   order.  Did she estimate how long that was going to take?
24              MS. YOUNG:  I think she indicated in an e-mail
25   that--you know, she was supposed to call in and I don't know
```

BLACK016616

28

1    the 2013 Trust, I'm happy to use the 2013 Trust to pay the

2    $500 a week; that's fine. The Social Security--

3          THE COURT: So you're putting her monthly benefits

4    going into a trust, is that what I'm understanding?

5          MR. BLACK: So right now the Social Security

6    benefits were going to a representative payee whom I believe

7    to be Mr. Pinto. I arranged to have them come to me; they

8    came to me for one month. They went into the 2013 Trust from

9    which they could be spent on Joanne's benefit.

10         Joanne then arranged to have those benefits

11    suspended I believe and so right now they're piling up at

12    Social Security. There's plenty of money, the question is

13    what's a reasonable amount of money to pay to Joanne and

14    where should we pay it from and I don't have any strong view

15    on that.

16         MR. SALZMAN: Your Honor, may--may I be heard?

17         THE COURT: Yeah.

18         MR. SALZMAN: The--Mr. Pinto by the way is present

19    with me in my office at the moment, was the representative

20    payee on the Social Security until the beginning of this

21    year.

22         During the pendency of this proceeding and over my

23    client's objection Mr. Black arranged for himself to become

24    the representative payee of those funds. At this point we

25    lost track of them. This is the first we're hearing that

BLACK016641

29

1    the--that the payments of those funds have been suspended.

2              Now, we would be more than happy to have Mr. Pinto

3    return as the representative payee of the trust--of the

4    Social Security rather but certainly this is something that

5    needs to be investigated.  This is the first I'm learning of

6    it.

7              MR. GLATSTEIN:  Your Honor, there were a variety of

8    concerns with respect to what was happening with her Social

9    Security; that's part of what we think an evidentiary hearing

10   would be good for the Court to know.  Funds were being

11   withdrawn from her account by Mr. Pinto not for her benefit

12   that we could discern and he would not account to the

13   conservator for those funds.

14             THE COURT:  Right.  I know there was a big dispute

15   about that.

16             MR. GLATSTEIN:  Right.  And Ms. Kerr will be

17   provided all that information so she can also from a forensic

18   accounting perspective see where everything went, what the

19   concerns and issues were.

20             Funds were being withdrawn from Joanne's personal

21   account by Mr. Pinto when she's on a locked psych unit.  And

22   no accountability on that to anybody.  We would be very

23   concerned about Mr. Pinto being put back into a position as a

24   rep payee; there needs to be accountability on that as well

25   as everything else for Joanne's benefit.

BLACK016642

30

1          MR. SALZMAN:  Mr. Pinto has just advised me that he

2     will provide a full accounting of all the funds that he

3     withdrew to Ms. Kerr.

4          THE COURT:  Okay.

5          MR. BLACK:  Your Honor, if I may speak, I want to

6     ask that you think about what orders you want to issue and

7     try to explain some of the context behind that.  So one might

8     ask why do Anthony Dain and Cherie Wrigley care so much about

9     suspending my powers as conservator given that there's been

10    no showing and not even a claim that I have done anything

11    improper in spending money.

12         If you look at their objections to my 2013

13    accounting there is not a single substantive objection to

14    anything I did.  If you look at their objections to the 2014

15    accounting there's not a single substantive objection to

16    anything I did.  All you're hearing about is a complaint

17    about the disclaimers in 2012 which we believe were fully

18    disclosed and fully approved.

19         THE COURT:  Un-huh.

20         MR. BLACK:  As conservator I have very limited

21    tasks.  I get the weekly check from Travelers and I put it

22    into the new 2013 Trust.

23         THE COURT:  And what's the source of the Travelers

24    money?

25         MR. BLACK:  This is the worker's comp money that

BLACK016643

42

```
1           THE COURT:  No, just a second.
2           MR. DAIN:  Okay.
3           THE COURT:  Mr. Salzman?
4           MR. SALZMAN:  Yes, Your Honor.
5           THE COURT:  Is there anyone in New York that can
6   handle being the rep payee and that sort of thing?
7           MR. SALZMAN:  An entity or--
8           THE COURT:  Or--is there some--he we have a trust
9   organization that--that does that sort of thing, is there
10  anything similar or a fiduciary relationship, entity or
11  person that you're aware of that can step in for that?
12          MR. SALZMAN:  Not just--not just to serve as rep
13  payee, no, Your Honor.
14          THE COURT:  All right.  All right.  At this--all
15  right--thank you, Ms. Wrigley.
16          MS. WRIGLEY:  Okay.
17          THE COURT:  At this point I am satisfied that I
18  don't think Mr. Pinto should become--be the rep payee.
19  There's too many issues surrounding whatever expenses--he's
20  got to provide a full accounting.  Someone needs to be the
21  rep payee and get any backed up funds as Mr. Black has
22  represented.
23          But what I'm ordering is that everything is frozen
24  except for the Social Security and the workmen's comp funds
25  from Travelers, they need to go into a separate
```

BLACK016655

50

1   inquiry?

2           THE COURT:  Just a minute.  The Social Security

3   representative payee needs to be changed either to Ms.

4   Peterson or another individual.  And the Social Security

5   funds and the workmen's comp funds are to be redirected into

6   a conservatorship account that Ms. Peterson will open so that

7   she can pay the--Ms. Black's monthly living expenses.

8           Any overage she'll manage and keep track of.  Mr.

9   Pinto will provide a full accounting of funds under his

10  control to Ms. Kerr and cooperate with transferring the

11  representative payee.

12          MR. BLACK:  Your Honor, may I request that the--you

13  allow the Supplemental Needs Trust, the Issue Trust, and the

14  2013 Trust to pay income taxes and to pay the reasonable fees

15  of an income tax accountant, those need to be paid?

16          THE COURT:  Any objections?

17          MS. DiPONIO:  No objection.

18          MR. DAIN:  Well, I would have no objection, Your

19  Honor, but Ms. Kerr in her report indicates there as a

20  payment of $20,000 to an accounting firm which she can't

21  understand for a tax return--why it was that significant.  So

22  as long as it's without prejudice and disgorgement and, in

23  fact, there is some overpayment of these accounting things--

24  or these tax returns.

25          THE COURT:  All right.  So that request is granted.

BLACK016663

# Exhibit 4



| District Court, Denver County, Colorado<br>Court Address:<br>1437 Bannock Street, Denver, Colorado 80202 | DATE FILED: April 2, 2015 1:07 PM<br>CASE NUMBER 2012PR1772 |
|---|---|
| In re the Interest of:<br><br>**JOANNE BLACK,**<br>               **Protected Peson.** | ▲ COURT USE ONLY ▲ |
| Attorney or Party Without Attorney (Name and Address) | Case Number:<br>12 PR 1772 |
| Phone Number:        Email:<br>FAX Number:        Atty. Reg. #: | Courtroom 224 |
| **STATUS CONFERENCE ORDER** | |

THIS MATTER came before the Court for a Status Conference on April 2, 2015.
Present in person were: Lisa DiPonio, Esq. Court Appointed Counsel for the
Protected Person (PP) Joanne Black; Conservator Bernard Black with Counsel
Carl Glatstein, Esq.; Guardian *ad Litem* (GAL) for the PP Gayle Young, Esq.;
Interested Persons and Cousins Anthony Dain, Esq. and Cherie Wrigley; Special
Conservator Nominee Nancy Peterson, Esq. Present by telephone were: PP
Joanne Black with New York Counsel Ira Saltzman, Esq.; Esan Pinto.

Discussion was held on the record to clarify the case status for this matter and
the cases in New York State Supreme Court and Surrogate Courts. The parties
represent there is no dispute as to the interpretation of Renata Black's Will.
Objections have been asserted as to Bernard Black's management of his sister's
funds and particularly with respect to the division of POD accounts left to Joanne
Black by her mother, Renata Black. The parties have stipulated to a forensic
accounting of the Conservatorship estate, including the affected trusts, the
disclaimer of Fidelity and Vanguard accounts, POD benefits for all accounts
which disclaimers were used to transfer funds into the Renata Black Estate, the
Roth IRA, all amounts paid to attorneys and accounts – in short, a complete
review of all funds and assets related to Joanne Black both before and after the
disclaimer, by Pamela Kerr, CPA. This Court has reviewed the record including
the various reports, responses, objections, exhibits and attachments, as well as
relevant authority and enters the following Orders pending an evidentiary
hearing:

1. Bernard Black is the subject of allegations of misconduct by the PP and
   her cousins which he vigorously denies. It appears to the Court to be
   prudent to suspend his authority pending an evidentiary hearing and the
   results of Ms. Kerr's forensic accounting review. This suspension is not a
   determination of misconduct, but rather an attempt by this Court to
   address concerns raised by the PP, her cousins, the GAL and Ms. Black's
   attorneys, and to allow the PP to continue to receive funds for her monthly

1

BLACK016676

living expenses and other necessary expenses without contributing to the family conflict.

2. This Court finds it should finalize the current allegations in Colorado prior to transfer of the conservatorship to New York State, where the PP resides. The Court is informed that a hearing for the appointment of a guardian and conservator (Guardian of the Person and Property) is scheduled in the New York Supreme Court on April 30 and May 1, 2015. This Court finds that proceeding should continue and it is proper for the New York Court to make a determination as to whether Mr. Black should continue to manage his sister's funds as guardian of her property, which is the equivalent of a conservator in Colorado, or whether Ms. Wrigley or a professional fiduciary or another individual should be appointed to that role going forward. There is no guardian/guardian of the person appointed for Joanne Black in the State of Colorado, as Mr. Black's petition for such appointment was dismissed by this Court on October 27, 2014 in deference to the New York Court's jurisdiction where Ms. Black resides.

3. Accordingly, the Court Suspends Bernard Black as Conservator, pending further hearing. Mr. Black's Letters expire April 11, 2015 and shall not be reissued.

4. The Court finds the appointment of a Special Conservator pursuant to 15-14-112, C.R.S. to serve in an interim capacity, pending the appointment of a permanent conservator or Guardian of the Property in New York is appropriate. The Court appoints Nancy Peterson, Esq. to serve as Special Conservator. Letters may issue and shall expire upon completion of these proceedings in Colorado and transfer to the fiduciary appointed by the Court in New York.

5. Ms. Peterson shall have the responsibility to manage Ms. Black's Social Security and Workmen's Compensation benefits and to pay Ms. Black's reasonable and necessary expenses. Ms. Peterson shall secure the benefits and cause them to be deposited into a conservatorship account, from which Ms. Peterson shall pay Ms. Black's monthly living and other reasonable expenses. Mr. Black shall cooperate with redirecting the funds from these two sources into the conservatorship account which Ms. Peterson shall establish. All funds managed by Ms. Peterson shall be turned over to the conservator/guardian of the property appointed by the Court in New York upon completion of the proceedings in Colorado. It is not this Court's intention that Ms. Peterson be required to obtain court approval for Ms. Black's regular monthly living expenses or for her necessary physician, mental health or similar expenses.

6. All other assets related to Ms. Black are frozen, pending final hearing. Should there be any requests for funds from the supplemental needs or

2

BLACK016677

other trust to benefit Ms. Black which cannot be paid from the conservatorship account, the request may be submitted to the Trustee, who shall in turn obtain permission from this court to disburse funds before any payment is made. All requests for funds to be paid from the conservatorship account or from any trust shall be supported by written documentation. Ms. Peterson shall obtain copies of any rental or other agreements to document Ms. Black's ongoing monthly living expenses.

   a. Mr. Black's request for an exception to pay for taxes is granted. Trust funds may be used to pay for legal and accounting fees related to the preparation of tax returns and to pay any taxes due for Ms. Black. Full documentation of the fees, costs and tax payments shall be provided to Ms. Kerr.

7. It has been suggested to the Court that no one is currently named as the Representative Payee for Ms. Black's social security benefits. It appears the former Representative Payee was Esan Pinto, but the funds were redirected by Mr. Black into one of the Trusts he established for Ms. Black. Mr. Black represents there are social security payments currently being held by the Social Security Administration due to the lack of a Representative Payee. The parties shall confer regarding who should serve as the Representative Payee or whether Ms. Peterson should serve in that capacity, pending a final determination. Regardless of who is named to serve as Representative Payee, that individual if other than Ms. Peterson, shall cooperate and ensure the social security benefits are retrieved and deposited into the conservatorship account to be managed by Ms. Peterson.

8. Mr. Pinto shall provide a complete accounting with documentation of all funds that were held under his control to Ms. Kerr and Ms. Peterson, who shall ensure copies are provided to Counsel of record including Mr. Saltzman, the GAL, Mr. Dain and Ms. Wrigley.

9. Mr. Glatstein has represented that he has obtained a transcript of the proceedings held before this Court to appoint Mr. Black as conservator. Mr. Glatstein shall file a copy of the transcript with this Court and provide copies to Counsel of record including Mr. Saltzman, the GAL, Mr. Dain and Ms. Wrigley.

10. Mr. Black has requested trust and/or conservatorship funds to pay for his attorney fees and costs for defending his actions as conservator. The GAL and CAC DiPonio also request funds to pay their fees. The Court finds there are sufficient funds in the conservatorship estate to pay these fees and costs, but finds it is more appropriate to resolve the fee issues after the results of the forensic accounting are known and the evidentiary hearing on the disclaimer issue has been held. Accordingly, the payment

3

BLACK016678

of attorney fees and costs is held in abeyance pending further proceedings in this Court.

11. Mr. Glatstein shall provide complete copies of all trusts involving Ms. Black to the Court, Counsel, GAL, Mr. Dain and Ms. Wrigley, including the Issue Trust, the 2013 Trust and the Supplemental Needs Trust, however they may be titled as well as any other trusts affecting Ms. Black.

12. Ms. Wrigley asserts she has been paying for Ms. Black's living expenses and needs from her own, personal funds, has provided documentation to Mr. Black but has not received any reimbursement. It is unclear to the Court why it would be necessary for Ms. Wrigley to pay any of Ms. Black's expenses from her own funds. Regardless, Ms. Wrigley is directed to provide an itemization of all amounts paid by her with copies of receipts, statements and the like to support those expenses to Ms. Peterson for review, and include copies to all counsel, the GAL and Mr. Dain. Objections shall be brought to Ms. Peterson's attention, who shall determine whether the expenses or any one of them should be reimbursed. Ms. Peterson may file a petition for approval before disbursing any of the funds under her control to Ms. Wrigley. Any reimbursements which cannot be paid from the funds under Ms. Peterson's control may be paid from Trust funds, after a specific request has been made to this Court by the Trustee as previously described.

13. The Court finds an evidentiary hearing is required to resolve what the Court has identified as the fundamental issues in this matter: whether the disclaimer obtained by Mr. Black as to the accounts at Fidelity and Vanguard POD to Joanne Black should have acted to divest Ms. Black of 1/3 of these non-probate assets. Hearing will also determine whether it was properly disclosed that Mr. Black intended or had authority to redirect one-third of these non-probate assets, left in their entirety to Ms. Black, to persons other than Ms. Black. As part of these proceedings, the Court will determine whether the allegations of breach of fiduciary duty are supported by the evidence and whether any disgorgement or unwinding of fiduciary actions, including the creation of trusts is appropriate. Hearing on these issues is scheduled on June 16 and 17, 2015 commencing at 9:00 a.m.

4

BLACK016679

14. It is this Court's intention to resolve the issues identified in this Order and to then transfer the conservatorship to the jurisdiction of the Court in New York, under the fiduciary appointed by that Court.

DONE IN OPEN COURT this 2nd day of April, 2015.

BY THE COURT:

Elizabeth D. Leith
JUDGE
Denver Probate Court

5

BLACK016680

# Exhibit 5

## IN THE UNITED STATES DISTRICT
## FOR THE EASTERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **KATHERINE BLACK,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 17- cv- 00101 |
| | ) | |
| | ) | Honorable Matthew F. Kennelly |
| **CHERIE WRIGLEY,** | ) | |
| **MELISSA COHENSON,** | ) | |
| **BRIAN A. RAPHAN, P.C.,** and | ) | |
| **PAMELA KERR,** | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF KATHERINE BLACK'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ringleader -- an enthusiastic participant and the intended beneficiary of the attack on a witness who opposed Wrigley's guardianship. There is ample evidence that Wrigley substantially assisted Kerr's and Cohenson's attacks. After Kerr sent her letter to Wrigley, in response to Wrigley's email seeking help in obtaining documents to provide to Northwestern, Wrigley submitted Kerr's letter to Northwestern. Ex. 28D, Defendants' Jan. 8 Emails; Ex. 25, Wrigley 2016 Ethics Point Complaint. This alone is substantial assistance for the defamation contained in Kerr's letter. Kerr did not herself submit her letter to Northwestern, which she asserts was based on legal advice. Ex. 9, NY Guardianship Transcript (March 22, 2016) at 365:15-18. A reasonable jury could find that by sending her letter to Wrigley, Kerr authorized Wrigley to submit it.

## IV. DEFENDANTS ACTED AS CIVIL CO-CONSPIRATORS IN ASSISTING THE UNDERLYING DEFAMATION OF KATHERINE

Last in this Response, but far from least in importance, are the civil conspiracy allegations against Defendants. "A conspiracy is almost never susceptible to direct proof. Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134, 720 N.E.2d 242, 258 (1999) (citations and internal quotation marks omitted).

A civil conspiracy claim requires that a defendant "knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner . . . A defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives . . . is liable as a conspirator for any tortious act committed in furtherance of the conspiracy." *Adcock*, 164 Ill. 2d at 64. Therefore, to be liable for the defamatory statements in the Kerr Letter, it is not necessary for Kerr or Cohenson to have directly published the Kerr Letter to Northwestern. Similarly, it is not

necessary for them to have directly published to Northwestern to be liable for Wrigley's defamatory Ethics Point complaints, to which they each encouraged Wrigley and provided documents to Wrigley.

"An express agreement among the conspirators is not necessary; the participants must simply share the same general conspiratorial objective." *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016) (citation omitted). Here, Defendants' unlawful objective for their attacks against Katherine at Northwestern was to intimidate her into not testifying against Wrigley's guardianship, which Katherine asked the New York Court for permission to do in her letter. Ex. 2, Katherine Letter. Defendants' also had a secondary goal, for Katherine to ███ ███████ and personally for opposing Wrigley's guardianship. Ex. 28C. This is witness tampering and intimidation, which is not only highly improper but criminal. Defendants' actions, with each of them calling Northwestern to complain about Katherine, amply meet the single "overt act" requirement for civil conspiracy.

Defendants have offered a variety of excuses for contacting Northwestern. They have said they needed to defend themselves to Northwestern. Ex. 49, Cohenson March Aff. & Reply ¶ 14 (Cohenson asserts that she contacted Northwestern ████████████████████ ███████████ ); Docket Entry No. 267-6, Kerr dep. at 158:23-24 ("When I wrote the letter, my duty was to defend my reputation."). These excuses are flimsy indeed. Cohenson had to "defend" Wrigley and Kerr had to "defend" herself to Northwestern against allegations that Northwestern would have never heard if Defendants had not provided Katherine's sealed letter to Northwestern. Moreover, nothing in Katherine's letter even remotely attacks Kerr's reputation; Katherine merely asserted neutrally – and truthfully – that Kerr was authorized to investigate Pinto. Ex. 2, Katherine Letter, at 17-18.

Wrigley asserts she contacted Northwestern because of her concern that Northwestern resources were being wasted. Docket Entry No. 261-11, Wrigley dep. at 143:7-17. But Wrigley had no genuine interest in the trivial cost, if any, to Northwestern from Katherine using an electronic Northwestern logo (not even printed letterhead paper), and imposed substantial costs on Northwestern through her complaints. Note too that, after contacting Northwestern, Cohenson reported to her co-Defendants that Northwestern was now ███████████████████

████████████ activity. Ex. 28B, Defendants' Jan. 8 Emails. A reasonable jury could find that Defendants' evolving explanations for contacting Northwestern were a pretext for their true goals, to defame and intimidate Katherine at her place of employment, and make her ███████████ for opposing Wrigley. A reasonable jury could find that Cohenson did not merely "inquire" about Northwestern policies, but in putting Northwestern ██████ threatened litigation. *See* Ex. 28B, Defendants' Jan. 8 Emails; *see also* Ex. 34 (Dean Rodriguez email (Jan. 20, 2016) ██████████

████████████████████████████████████████████████████

████████████████

Defendants had a conspiratorial objective, which extends liability "beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 62, 645 N.E.2d 888, 894 (1994). While a civil conspiracy can be established from circumstantial evidence alone, Defendants emails and close communication, summarized in Part I, provide ample direct evidence of joint planning and actions.

The extensive email correspondence among the Defendants and a few others, shows Defendants' knowledge and apparent approval, that:

(i)     Kerr had written a letter to Northwestern Law School;

(ii)    Cohenson, Kerr, and Wrigley had all called the Dean's offices and other people at Northwestern Law School and the Kellogg School of Management to complain about Katherine's letter;

45

     (iii)    Wrigley had filed a complaint with the Ethics Point system ████

     (iv)    The goal of the campaign against Katherine, as stated by in the email exchange, ████

Ex. 28A-D, Defendants' Jan. 7 and Jan. 8 Emails. Defendants offer no explanation for why a *witness*, who had written a letter to a Court, an absolutely protected activity, should pay professionally or monetarily for doing so.

Defendants planned to continue attacking Katherine even after she testified in the guardianship case, and the court found Wrigley unfit to be guardian, seeking to punish Katherine for her testimony. They discussed a plan to sue Kate and Northwestern. On March 22, 2016, Joanne's counsel, Ira Salzman wrote to Wrigley, Cohenson, Kerr, and others about this plan. Kerr responded that they needed ████

████ Ex. 51A, Defendants' March 22, 2016 emails about sanctions. Kerr and Cohenson also planned to seek sanctions against Katherine, apparently in the guardianship proceedings. Kerr wrote that ████ *Id.* To which Cohenson responded ████ *Id.*; *see also* Ex. 51B, Defendants' March 22, 2016 emails about sanctions (Wrigley responding ████

████ ).

In short, Defendants' email exchanges reveal that they worked together to attack Katherine at Northwestern, intimidate her against testifying against Wrigley, and make her pay for doing so. They provided each other with information that facilitated their joint attack. They reported back to each other about what each had said and might say. Ex. 28A-D, Defendants' Jan. 7 & Jan. 8 Emails. A reasonable jury could find from this and the other evidence recited above that Defendants conspired to attack Katherine at Northwestern to intimidate her and punish her for

46

Case: 1:17-cv-00101 Document #: 293 Filed: 05/08/19 Page 52 of 53 PageID #:6706

testifying in the New York guardianship proceeding. That attack included defamation, but the conspiracy for an unlawful purpose existed independently of the defamation, which was only one means that Defendants used toward their unlawful goal.

## V.    DEFENDANTS' PRIVILEGE ARGUMENTS REMAIN UNAVAILING

Defendants' various claims of privilege were addressed and rejected by this Court in its previous Order on Motions to Dismiss. Discovery has in no way altered the reasoning relied upon at that time, and these attempts to deflect attention from the facts in dispute should once again be rejected.

## VI.    FALSE LIGHT

Lastly, notwithstanding Defendants' actual malice and highly offensive conduct replete in this record, Katherine by this Response voluntarily dismisses her false light claims. This withdrawal will allow the Court and jury to fully focus on Katherine's remaining triable causes of action.

## CONCLUSION

Defendants' Motions for Summary Judgment rely on a combination of making disputed claims, asserting demonstrably false "facts," and ignoring other facts, many indisputable. When limited to actually undisputed facts, Defendants have no argument to support summary judgment, which should be denied.

Dated: May 8, 2019

Respectfully submitted,

Donald L. Homyk

47

# Exhibit 6

Message

| | |
|---|---|
| **From:** | Bernard Black [bblack@kellogg.northwestern.edu] |
| **Sent:** | 4/2/2015 2:13:25 AM |
| **To:** | Pamela Kerr [pam@kerrfa.com] |
| **CC:** | d.zen@q.com; Lisa Diponio [diponiolawfirm@comcast.net]; Carl Glatstein [Carl@denverprobatelaw.com] |
| **Subject:** | Joanne's Wells Fargo accounts |
| **Attachments:** | 2013-01-Joanne-checking.pdf; 2013-02-Joanne-checking.pdf; 2013-03-Joanne-checking.pdf; 2013-04-Joanne-checking.pdf; 2013-05-Joanne-combined.pdf; 2013-06-Joanne-combined.pdf; 2013-07-Joanne-combined.pdf; 2013-08-Joanne-combined.pdf; 2013-09-Joanne-combined.pdf; 2013-10-Joanne-combined.pdf; 2013-11-Joanne-combined.pdf; 2013-12-Joanne-combined.pdf; 2014-01-Joanne-combined.pdf; 2014-02-Joanne-checking.pdf; 2014-03-Joanne-checking.pdf; 2014-04-Joanne-checking.pdf; 2014-05-Joanne-checking.pdf; 2014-06-Joanne-checking.pdf; 2014-07-Joanne-checking.pdf; 2014-08-Joanne-checking.pdf; 2014-09-Joanne-checking.pdf; 2014-10-Joanne-checking.pdf; 2014-11-Joanne-combined.pdf; 2014-12-Joanne-combined.pdf |

Ms. Kerr: Here are all of the statements I was able to obtain from Wells Fargo for Joanne's checking and savings accounts there.
I do not have both checking and savings for all months; I'm not sure why, but this is what Wells Fargo could provide.

This is Joanne's own account, I do not control it.
All withdrawals from April 2013 through September 2014 were by Esaun Pinto while Joanne was hospitalized, were never disclosed to me, and are fraudulent.

Bernie
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

KERR0000620

Message

| | |
|---|---|
| **From:** | Bernard Black [bblack@kellogg.northwestern.edu] |
| **Sent:** | 4/4/2015 5:24:54 PM |
| **To:** | Pamela Kerr [pam@kerrfa.com] |
| **CC:** | peterson nancy (nancy@petersonlawllc.com) [nancy@petersonlawllc.com]; Carl Glatstein [Carl@denverprobatelaw.com]; Lisa Diponio [diponiolawfirm@comcast.net]; d.zen@q.com |
| **Subject:** | Esaun Pinto felony conviction |
| **Attachments:** | Esaun-guilty-plea-2009.pdf; Esaun-indictment.pdf |

Ms. Kerr: I attach public documents relating to the criminal indictment of Mr. Pinto and others in federal court, and his guilty plea.

Sincerely,

Bernie
*****************************************************************
Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*******************************************************************

KERR0000113

Message
| | |
|---|---|
| **From:** | Bernard Black [bblack@kellogg.northwestern.edu] |
| **Sent:** | 4/4/2015 5:21:17 PM |
| **To:** | Pamela Kerr [pam@kerrfa.com] |
| **CC:** | peterson nancy (nancy@petersonlawllc.com) [nancy@petersonlawllc.com]; Carl Glatstein [Carl@denverprobatelaw.com]; Lisa Diponio [diponiolawfirm@comcast.net]; d.zen@q.com |
| **Subject:** | Esaun Pinto misconduct |
| **Attachments:** | Pinto-misconduct summary-for-Kerr-2015-0404-bb.docx |

Ms. Kerr: I attach a summary of the misconduct and misappropriation of Joanne's funds by Esaun Pinto. Several of these items were specifically known to Cherie Wrigley. Others perhaps were not, but I believe that she is liable for them, if Mr. Pinto cannot pay.

Sincerely,

Bernie
***************************************************************
Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
***************************************************************

KERR0000216

**Bernard S. Black**
2829 Sheridan Place
Evanston IL 60201
(650) 773-0955 cell
bblack@northwestern.edu

Ms. Pamela Kerr
Kerr Forensic Accounting
[by email: pam@kerrfa.com

Cc:    Nancy Peterson
       Lisa DiPonio
       Gayle Young
       Carl Glatstein

4 April 2015

Ms. Kerr: This letter summarized what I know to date about misappropriation of Joanne's funds
by Esaun Pinto, including funds paid to him from the Estate of Renata Black; funds withdrawn
by him from Joanne Black's "debit account" at Chase Bank (ending x5372), and Joanne Black's
personal checking account at Wells Fargo Bank (ending x7482). I believe that these claims
should be pursued by Joanne's property guardian in New York (the equivalent of a Colorado
conservator). I have inquired, and I cannot bring them as a Colorado conservator until my
powers are transferred to New York. They may also be a proper subject for a report in Colorado
to Adult Protective Services.


### Item 1.  Failure to Return Advance Payment Following Termination of Services

I terminated Mr. Pinto's services to the Estate of Renata Black on Sept. 30, 2014. At that time he
had been paid $4,000 in advance for October 2014. I requested return of these funds. They have
not been returned.


### Item 2.  Unreported Withdrawals from Joanne Black's Chase Account

From April 2013 through September 2014, Mr. Pinto possessed Joanne's debit card and regularly
withdrew funds from Joanne's debit account at Chase Bank (ending x5372). He was
obligated, as part of his financial reporting to me as Executor, to account for those withdrawals,
and failed to do so. The amounts withdrawn during 2014, and not reported to me as withdrawn,
total $8,600 (see table below).

| Joanne Black checking account at Chase | |
|---|---|
| starting balance at 2014.0101 | $534.86 |
| deposits thru 2014.0925 ($500/week) | $19,000 |
| ending  balance at 2014.0925 | $1,290.74 |
| Esaun Pinto withdrawals | $19,755.88 |
| Rounded down to account for bank ATM charges, not later reversed by Chase Bank[1] | $19,700 |

---

1  Most of these charges were refunded to the account by Chase. A few were not. It was not cost-effective to

1

KERR0000217

| Reported on bills as credits | 8,000 |
|---|---|
| reported on bills as spent on Joanne | $3,100 |
| **Undocumented withdrawals** | **$8,600** |

During 2013, Mr. Pinto generally billed $50/week for incidental spending on Joanne. His actual spending is not known. If one assumes that actual spending was $50/week and allows a credit for similar spending during 2014, for periods in which Mr. Pinto did not directly report spending on Joanne to me, that would be 26 weeks * $50 = $1,300. This would still leave unexplained withdrawals of $7,300.

I have provided to you the account statements for Joanne's debit account, which show the withdrawals.

Mr. Pinto also made thousands of dollars in withdrawals from Joanne's debit account during 2013, but I caught these during my review of this account. He assured me that he would account accurately for withdrawals in the future, but in fact did not do so.

### Item 3. Mr. Pinto's Personal Time During Rescue Effort: April-May 2013

During the period in April 2013 between when Mr. Pinto and Ms. Wrigley attempted a "rescue" of Joanne and her hospitalization in June 2013, Mr. Pinto's bills regularly exceeded the amounts that Cherie Wrigley had advised me to expect. During this period, Mr. Pinto and Ms. Wrigley advised me that Mr. Pinto was *not* billing for his own time, only for the time of your associates.

Mr. Pinto later sent me a bill for his own time for this period for **$18,073**, which was a complete shock. This included billing for 24 hours per day during the period in which he returned with Joanne from Colorado to the East Coast. Mr. Pinto and Cherie Wrigley attempted to justify this bill with the thin justification that Mr. Pinto had always planned to bill, only later. But as both Mr. Pinto and Ms. Wrigley fully understood, I was never told this, and had no reason to expect this. I believed that when Mr. Pinto said, and Ms. Wrigley confirmed, that Mr. Pinto was not billing for his own time, they meant exactly that. Both Mr. Pinto and Ms. Wrigley understood that my concern at the time was the extraordinary level of total spending by Mr. Pinto, not the timing of payments. This was fraudulent and deceptive.

The later bill by Mr. Pinto left me in an impossible position, because at the time, Mr. Pinto was the principal contact with Joanne. If I had not acquiesced to his sudden demand for more money, I would have left Joanne helpless. I view this incident as akin to blackmail. I have provided Mr. Pinto's bills to you.

### Item 4. Amounts Withdrawn from Wells Fargo

During the period from June 2013 through June 2014,when Mr. Pinto was billing the Estate of Renata Black for $250,000 (in round numbers) and had access (known to me) to Joanne's debit card at Chase, he also had access (not known to me) to a debit card for Joanne's own checking account at Wells Fargo. Mr. Pinto withdrew $14,437 from these accounts, with no disclosure to me. The source of these funds was payments by the Social Security Administration to Joanne. I

---

compute the exact net amount of ATM withdrawal charges, but I am believe this amount does not exceed the $55.88 effective credit reflected in the table in text.

KERR0000218

only learned of these withdrawals, after I terminated Mr. Pinto's services, and began to investigate his conduct.

The monthly withdrawals (by Wells Fargo statement month) are as follows:

| Statement ending date | Withdrawal |
|---|---|
| 2013.0509 | 1,152.50 |
| 2013.0610 | 366.49 |
| 2013.0709 | 19.07 |
| 2013.0808 | 373.57 |
| 2013.0910 | 3,338.99 |
| 2013.1008 | 1,756.82 |
| 2013.1108 | 1,092.83 |
| 2013.1209 | 1,084.67 |
| 2014.0109 | 684.50 |
| 2014.0210 | 1,130.00 |
| 2014.0310 | 1,310.75 |
| 2014.0408 | 1,265.70 |
| 2014.0508 | 861.25 |
| **Total** | **$14,437.14** |

This was theft of federal government benefits. There can be no plausible claim that these amounts were spent properly. Mr. Pinto was already billing large amounts directly to the Estate of Renata Black, both for his own time and expenses, and for amounts that he claimed were spent directly on Joanne. In effect, Mr. Pinto double-billed for his services. He billed the Estate of Renata Black directly, and he separately and secretly withdrew funds from Joanne's account at Wells Fargo Bank. I have provided you with the Wells Fargo statements, showing the withdrawals.

I have traced the specific withdrawal locations for the Chase and Wells Fargo debit cards. Many of them are exactly the same. This provides strong evidence that the same person was using both cards. I can provide this detail to you, but a phone call would be useful for me to walk you through my analysis.

### Item 5. Demand for Repayment of Amounts Paid to Mr. Pinto as Representative Payee

Beginning in April 2014, Mr. Pinto improperly arranged to become the personal representative and payee for Joanne's SSDI checks, without notice to me. Mr. Pinto knew that I was paying him separately for spending on Joanne, knew that she was not capable of handling her own financial affairs, that I was her court-appointed conservator, and that I had been specifically authorized by the Colorado court to become Joanne's representative payee. If Joanne required a representative payee (in hindsight she did, now that we know that Mr. Pinto stole her Social Security benefits by withdrawing them from Wells Fargo Bank), that person could only be me or someone approved by me, as her conservator.

The application by Mr. Pinto to become representative payee was made with the approval and cooperation of Cherie Wrigley. The amounts paid to Mr. Pinto by the Social Security Administration, from May 2014 through January 2015, are as follows:

For 2014: 8 months * $1,217/month = $9,736

3

For Jan. 2015: $1,239

**Total: $10,975**

These amounts are subject to reduction for any documented amounts paid by Mr. Pinto to Joanne, or on her behalf, following her discharge from South Beach Psychiatric Center on or about Oct. 29, 2014.

### Item 6. Double Payment for July and September 2014.

Mr. Pinto was paid a flat amount of $8,000 for his services for July 2014. He charged an additional $2,300 to Cherie Wrigley during her trip to visit Joanne Black in July 2014, for unspecified "personal services." This was improper, and was made without notice to me or approval by me. Mr. Pinto was being paid a flat amount for all of his services. The overpayment of $2,300 should be returned.

Mr. Pinto was paid a flat amount of $4,000 for his services for September 2014. He charged an additional $3,950 (paid by Cherie Wrigley after I refused to pay this charge) related to her trip to visit Joanne Black in September 2014, for unspecified "personal services." This was improper. Mr. Pinto was being paid a flat amount for all of his services. The overpayment of $3,950 should be returned.

The combined improper payment for unspecified personal services was **$6,250.**

### Item 7. Esaun Pinto Failure to Visit Joanne 3x/week

Mr. Pinto was paid well, even lavishly, for visiting Joanne 3x/week in the hospital. I have reason to believe that he often visited less often than that, and have subpoenaed hospital records to confirm this.

During 2013, for each visit, Mr. Pinto charged $750 plus $46 in gas and tolls. Therefore, each visit not taken is a claim for $796.

During 2014, we switched from what was nominally hourly billing (although Mr. Pinto did not track actual hours and billed the same amount in each two-week period) to a monthly flat fee basis. The billing amount changed from $2,389/week to $8,000 per month. There are 4-1/3 weeks in an average month, and visit frequency was not changed. Therefore, the visit frequency for which I was paying was 13x/month, and Mr. Pinto's charge per visit was $8,000/13 = $615.

### Item 7. Undocumented Spending on Joanne

Mr. Pinto submitted no receipts for amounts he supposedly spent on Joanne. All amounts are round numbers; some are implausibly large. For example, for the week of April 16, he billed, with no documentation: $300 for gas; $800 for his own flight to Colorado; $1,000 for hotel, and $1,000 for car rental (a total of $3,100). To the extent that Mr. Pinto in fact incurred out of expenses on Joanne's behalf, those may be appropriate, but documentation is needed.

KERR0000220

## Summary of Specific Demands

The table below summarizes the specific demands for repayment listed above. These form part of the overall demand for repayment of all amounts paid to Esaun Pinto (less any amounts which can be documented as having been spent on Joanne's care).

| Item | Specific Demand | Amount |
|------|-----------------|--------|
| 1 | Unearned payment for October 2014 | $4,000 |
| 2 | Undocumented withdrawals from Chase Bank | $8,600 |
| 3 | Pinto bill for personal time during rescue | $18,073 |
| 4 | Improper withdrawals from Wells Fargo Bank | $14,437 |
| 5 | Improper payments to Pinto as representative payee | $10,975 |
| 6 | Double payment for July and September 2014 | 6,250 |
| 6 | Failure to visit 3x/week | To be determined |
| 7 | Excessive, undocumented expenses | To be determined |
|  | **Total of specific demands** | **$62,335, plus amounts to be determined** |

## General Demand for Repayment

The total amount paid to Esaun Pinto, or to Cherie Wrigley to reimburse amounts that Mr. Pinto and Ms. Wrigley advised me that she paid to Mr. Pinto, is **$279,300**. This includes (i) amounts paid directly from the Estate of Renata Black; (ii) amounts transferred from the Estate of Renata Black to a checking account at Chase Bank for Joanne Black, for which Mr. Pinto possessed the debit card and withdrew funds; (iii) amounts deposited in Joanne Black's bank accounts at Wells Fargo by the Social Security Administration, and then withdrawn by Mr. Pinto, who possessed the debit card for Joanne's Wells Fargo checking account; (iv) amounts paid by the Social Security Administration to Mr. Pinto during May 2014 through January 2015, after he wrongfully arranged to become Joanne's representative payee; and (v) amounts paid by Cherie Wrigley for "personal services" during July and September 2014.

As Executor, I paid Mr. Pinto substantial sums for services, which I believed were to me as Executor, without knowing of the misappropriation of funds noted above, and without knowing that Mr. Pinto had a recent federal felony conviction. Mr. Pinto and Ms. Wrigley have now advised me that Mr. Pinto's client was Ms. Wrigley, rather than the Estate of Renata Black. As Executor and Conservator, I would not have agreed to pay any amounts to Mr. Pinto under the circumstances. Therefore, all amounts were obtained under false pretenses, and should be returned to Joanne Black.

Because Mr. Pinto was working for Ms. Wrigley (or so he now claims), and because she was the primary person overseeing his actions, she should be liable to repay these amounts to Joanne Black if Mr. Pinto is unable to pay them (other than the $6,250 paid by Cherie Wrigley and not reimbursed by the Estate of Renata Black).

Very truly yours,

*Bernard S. Black*

Bernard S. Black

5

Message

| | |
|---|---|
| **From:** | Bernard Black [Bernard Black <bblack@kellogg.northwestern.edu>] |
| **on behalf of** | Bernard Black [bblack@kellogg.northwestern.edu] |
| **Sent:** | 5/11/2015 1:29:42 AM |
| **To:** | pam@kerrfa.com |
| **CC:** | d.zen@q.com; diponiolawfirm@comcast.net; Carl@denverprobatelaw.com |
| **Subject:** | Wells Fargo withdrawals |
| **Attachments:** | 2014-activity-Joanne-all-accounts-2015-0222-bb.xlsx |

Pam: For your review of Esaun Pinto's activity: The attached spreadsheet, in the Wells Fargo w'draw detail worksheet Shows matches between the \*exact\* locations from which Esaun Pinto withdrew money from Joanne's Chase account, to the locations from which money was withdrawn, without my knowledge or consent, from Joanne's Wells Fargo account. See column C of the worksheet

Bernie
****************************************************************

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
****************************************************************

KERR0001174

Message

| From: | Bernard Black [bblack@kellogg.northwestern.edu] |
|---|---|
| Sent: | 5/19/2015 2:30:29 PM |
| To: | Pamela Kerr [pam@kerrfa.com] |
| CC: | d.zen@q.com; Lisa Diponio [diponiolawfirm@comcast.net]; Carl Glatstein [Carl@denverprobatelaw.com]; Patrick Thiessen [thiessen@poskuscatonklein.com]; Bernie Poskus [poskus@poskuscatonklein.com] |
| Subject: | RE: Wells Fargo withdrawals |
| Attachments: | 2014-activity-Joanne-all-accounts-2015-0222-bb.xlsx |

Bernie

*************************************************************

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*************************************************************

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Friday, May 15, 2015 7:26 PM
**To:** Bernard Black
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** RE: Wells Fargo withdrawals

Bernard,

When I said she was on the road, I certainly meant through 6/3/2013. That was an error since some of these were made after she was "on the road." The total withdrawals out of the Wells Fargo account after 6/3/2012 are $10,734.14 to be exact.

> BSB: Through April 12, Joanne was on her own, and I attribute withdrawals to her. From April 12 through June 2, Joanne was not hospitalized, but was under the control of Esaun Pinto. Mr. Pinto had her Chase debit card, was using it, and was reporting to me, and billing me for, expenses on Joanne. Any additional withdrawals from the Wells Fargo account are highly likely to be fraudulent because if Joanne was spending money from Wells Fargo to cover her own expenses, Esaun Pinto should not have been billing me for the same expenses. The timing of the withdrawals is also inconsistent with this being spending on Joanne. The account was fully depleted on May 3, the day that the SSDI deposit hit. The same pattern recurs on June 3, the day she entered the hospital.

How do you know that these withdrawals out of the Wells Fargo account were made by Esaun and not by someone that had stolen or found Joanne's card? It is possible that she had written the PIN on a piece of paper attached to the card. Believe it or not, a lot of people do this.

> BSB: This is why I traced the exact locations of the withdrawals. The *someone* (other than Esaun Pinto) who hypothetically had Joanne's card *somehow* uses the EXACT SAME ATM LOCATIONS that Esaun Pinto used to withdraw funds from Joanne's Chase account.

Then on Octo 28, 2013, that someone (other than Esaun Pinto) hypothetically traveled to Ellenwood Georgia and withdrew funds from Joanne's Wells Fargo account there. And purely by coincidence, Esaun Pinto happened to be in Ellenwood Georgia on the exact same day and withdrew funds from Joanne's Chase account. Yeah, right!

The pattern of withdrawals from both accounts at the exact same locations, sometimes on the exact same day, continues. The details are in the spreadsheet I sent to you, in column C of the "Wells Fargo w'draw detail" worksheet of the spreadsheet. I attach it again.

I should note that I confirmed with Esaun Pinto at the time (mid-2013) that the Wells Fargo debit card was in Joanne's possession. I assumed that he was telling the truth. If he is now claiming someone else had it, that is not what he told me then, and is not consistent with the record of withdrawals from this account.

Esaun had Joanne's Chase debit card. This I knew.
Bernard, if you knew Esaun had Joanne's Chase debit card and was making withdrawals, why didn't you close the account or freeze the debit card? The ATM withdrawals after 6/3/2013 totaled $37,169.91. I have an email from you to Esaun dated 5/31/2013 reflecting the fact that you knew Esaun was making these withdrawals and you did not close the account or have the debit card frozen. This allowed Esaun to make withdrawals out of Joanne's funds when you were the Conservator. If Esaun wanted to get paid, he should have provided you with receipts and invoices to get paid. I have prepared a schedule of all of Esaun's invoices and the amounts he reflected as ATM withdraws that I will be analyzing once I'm done going through your emails. If he needed funds up front, you could have given him essentially a retainer that you could track and keep track of the receipts.

BSB: As long as I could track the withdrawals, I did not see why it mattered how he got paid, directly from me (from the Estate account) or by withdrawing funds from Joanne's Chase account). The total amount he would receive would be the same. Thus, I did not see the need to close the account, nor to instruct Esaun Pinto not to use the card. I later learned that he did not report his withdrawals honestly, but I did not know that at the time.

With benefit of hindsight, I regret that I did not require Esaun Pinto to provide backup for his claims on expenses. I believe that for any expenses that he cannot support, he should be liable to return those funds to Joanne Black and, if he cannot do so, then Cherie Wrigley should be liable to do so, since he claimed to be working for her.

I did not know he had the Wells Fargo card, I did not know he was making withdrawals, and was relying on him to honestly report his withdrawals from Chase. He didn't do that either, but at least the Chase withdrawals I knew about and could track. How were you tracking these withdrawals?

BSB: I was not tracking these withdrawals at the time. I treated this as Joanne's account, and assumed that the SSDI payments were simply piling up in Joanne's account. I confirmed with Esaun Pinto at the time (mid-2013) that the Wells Fargo debit card was in Joanne's possession. In the fall of 2014, after I developed reason to be suspicious of Esaun Pinto, I went to a local Wells Fargo branch and they provided me with past statements. They were willing to do this because I was Joanne's conservator.

I'm a little bit confused about this because on your 2013 Conservator Report, you listed all of these withdrawals out of Account #5372 (the Chase account) on Exhibit C but it doesn't appear that you included them in Step 3 Disbursements/Expenses by category. On Page 7 of the Amended Conservator Report for 2013 you listed a total of Disbursements/Expenses as $32,031.00 yet the total "Less: Total Amount Disbursed" on pages 3,4 & 5 (Exhibits A-C) total $40,365.18. If you deduct the $6,031.18 from the disbursements (payments to Accountant/CPA) the difference is the $26,000.00 that you listed as "Disbursements to Protected

Person." Essentially you reported that the ATM withdrawals were "Disbursements to Protected Person" yet you are saying in this email that these withdrawals were made by Esaun.

> BSB: I deposited $500 weekly ($26,000 for the year) to Joanne's Chase account(s). There was also a one-time transfer on April 20, 2013 from my personal Chase account, that I treated as Estate spending on Joanne, for which the Estate later reimbursed me. These disbursements were made to Joanne's bank account at Chase. Joanne, for her part, allowed Esaun Pinto to use her debit card, for various purposes, including spending on Joanne's own expenses. At least this is how I saw matters, when I completed my 2013 report. So I would say that the funds were indeed "disbursed to protected person."

I'm just trying to figure out all of these transactions so that I can get the right information in my report. I am using your replies as additional information.

I will send you a separate email regarding the accounts you reported on the 2013 Amended Conservator Report as compared to actual.

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235
Denver, Colorado 80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Thursday, May 14, 2015 8:06 PM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** RE: Wells Fargo withdrawals

Pam: The purpose of providing to you the Wells Fargo withdrawal locations: All withdrawals after June 4, 2013 took place when Joanne was a psychiatric inpatient! They were not made by Joanne. Joanne was not "on the road." **Esaun Pinto** was on the road, with Joanne's Wells Fargo debit card. Which he occasionally loaned to someone else.

Esaun had Joanne's Chase debit card. This I knew.
Esaun must have also had her Wells Fargo debit card – and withdrew cash from both accounts.
The Wells Fargo withdrawals were pure theft.

I did not know he had the Wells Fargo card, I did not know he was making withdrawals, and was relying on him to honestly report his withdrawals from Chase. He didn't do that either, but at least the Chase withdrawals I knew about and could track.

I will be happy to explain by phone why the matched locations of the Wells Fargo withdrawals and the Chase withdrawals are very strong proof of criminal fraud by Esaun Pinto, in the approximate amount of $15,000.

I will reply separately with regard to the Chase withdrawals from x5372.

Bernie
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Monday, May 11, 2015 4:42 PM
**To:** Bernard Black
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein; Anthony J. Dain (Anthony.Dain@procopio.com); Ira Salzman
**Subject:** RE: Wells Fargo withdrawals
**Importance:** High

Bernard,

What was the purpose of you preparing this schedule? It appears that this is activity in Account #7482. Based on my forensic accounting done to date, the total ATM withdrawals out of this account were $15,138.88 and it appears that the majority of the ATM withdrawals out of this account were done by Joanne when she was "on the road."

**Here is my question about the ATM withdrawals that you claim were made by Esaun that you did not know about out of Account #5372.** (I'm attaching a print out of the accounting reconstruction that I have prepared for this account)

From what I can tell you opened this account (Account #5372) in March of 2013 in your name but never really added Joanne's name to the account. (see copy of initial statement attached) You have stated that "she never went into Chase to add her name to the account." What was the purpose of opening this account? How would Joanne have gotten an ATM card for this account if her name isn't even on the account? How did she or Esaun get the PIN for it if her name isn't on the account?

The bank statements show that the majority of the funds into this account (#5372 in your name but not Joanne's) were transfers from the Estate checking account #6179. There is even a transfer into this account from your personal account in the amount of $3,000.00 in April 2013. Why were you funding this account with money from the Estate (co-mingling of funds) if there were sufficient funds in her 2013 Trust Account that you opened in June 2013 to receive her Workers Compensation funds. Were you reviewing the activity in the account at all during this time frame that the ATM withdrawals were being made? How do you know that these withdrawals

were being made by Esaun and not by someone who had stolen the card from Joanne? Were you aware of where Joanne lived during this time frame and the fact that she wouldn't have been making ATM withdrawals from this account if she was living in a hospital? How would anyone else have gotten access to the bank statements to know what was going on in this account? I'm attaching a copy of the first and third pages from this account for 12/31/2014 that shows that this account is and has always been in your name only and the statements for this account were addressed to you only.

Please let me know if I have it wrong that you have stated that you didn't know that Esaun was making ATM withdrawals out of this account. I would also wonder why funds were being transferred out of the Estate into this account and yet you are stating that you didn't know Esaun was making these withdrawals. What did you think was happening to the money you were transferring into this account?

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235
Denver, Colorado 80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Sunday, May 10, 2015 7:30 PM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** Wells Fargo withdrawals

Pam: For your review of Esaun Pinto's activity: The attached spreadsheet, in the Wells Fargo w'draw detail worksheet Shows matches between the *exact* locations from which Esaun Pinto withdrew money from Joanne's Chase account, to the locations from which money was withdrawn, without my knowledge or consent, from Joanne's Wells Fargo account. See column C of the worksheet

Bernie
*****************************************************************
Bernard S. Black
bblack@northwestern.edu

Message

| | |
|---|---|
| **From:** | Bernard Black [bblack@kellogg.northwestern.edu] |
| **Sent:** | 5/15/2015 11:32:05 AM |
| **To:** | Pamela Kerr [pam@kerrfa.com] |
| **CC:** | d.zen@q.com; Lisa Diponio [diponiolawfirm@comcast.net]; Carl Glatstein [Carl@denverprobatelaw.com]; Anthony J. Dain (Anthony.Dain@procopio.com) [Anthony.Dain@procopio.com]; Ira Salzman [salzman@seniorlaw.com] |
| **Subject:** | RE: Wells Fargo withdrawals |

This reply concerns Chase debit account x5372. I replied separately with regard to the Wells Fargo account.

1. Joanne obtained cash, from 2012 until her hospitalization in June 2013, through weekly transfers to a debit account at Chase, for which she held the debit card. This practice was begun by my mother, and I continued it.
2. In early 2013, for reasons best known to Chase, my effort to "link" Joanne's "old" debit card account at Chase to my accounts at Chase caused Chase to close her account. In order to get money to her, I needed to open a new account, which would operate in substance in the same way as the old account. This new account was x5372.
3. I authorized Joanne as a co-owner of this account, and sent her the debit card and initial pin. She did not go to Chase to become a co-owner, so this account remaind in my name, but I treated it as Joanne's account, and Joanne's money.
4. The only possible account from which I could have transferred money to the Joanne account at the time was the Estate account x6179. The Supplemental Needs Trust had not yet been funded; it was funded in July 2013 with money from Vanguard. The Joanne Black 2013 Trust had not yet been funded. It was funded later with workers compensation money.
5. It could have been possible to stop transfers from the Estate, and replace them with transfers from the SNT or the 2013 Trust, once these Trusts were funded. But there was no urgency to doing so. The Estate had ample funds, and so I continued the weekly transfers from the Estate account to Joanne's account, and treated them as part of Joanne's 2/3rds share of the overall estate assets.
6. Once Joanne was hospitalized in June 2013, the Chase debit card was in the possession of Esaun Pinto. This is not in dispute. You will observe from his bills that he regularly reported withdrawals from the Chase account, as an offset to what I otherwise owed him.
7. Esaun reported dishonestly – he reported only some of the actual withdrawals. This annoyed me, but was not a disaster, because I could periodically "audit" the withdrawals by comparing the withdrawals he reported to those that were actually made, and deduce any excess withdrawals (made but not reported) form what I owed him. I did this on several occasions.
8. I knew Esaun was making withdrawals from Joanne's *Chase* account. I did not know that he also had Joanne's *Wells Fargo* card and was making unauthorized withdrawals from Wells Fargo.

I will be happy to walk you through my understand of these account by phone.

Bernie Black
***************************************************************

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
***************************************************************

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Monday, May 11, 2015 4:42 PM
**To:** Bernard Black
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein; Anthony J. Dain (Anthony.Dain@procopio.com); Ira Salzman

KERR0000859

**Subject:** RE: Wells Fargo withdrawals
**Importance:** High

Bernard,

What was the purpose of you preparing this schedule? It appears that this is activity in Account #7482. Based on my forensic accounting done to date, the total ATM withdrawals out of this account were $15,138.88 and it appears that the majority of the ATM withdrawals out of this account were done by Joanne when she was "on the road."

**Here is my question about the ATM withdrawals that you claim were made by Esaun that you did not know about out of Account #5372.** (I'm attaching a print out of the accounting reconstruction that I have prepared for this account)

From what I can tell you opened this account (Account #5372) in March of 2013 in your name but never really added Joanne's name to the account. (see copy of initial statement attached) You have stated that "she never went into Chase to add her name to the account." What was the purpose of opening this account? How would Joanne have gotten an ATM card for this account if her name isn't even on the account? How did she or Esaun get the PIN for it if her name isn't on the account?

The bank statements show that the majority of the funds into this account (#5372 in your name but not Joanne's) were transfers from the Estate checking account #6179. There is even a transfer into this account from your personal account in the amount of $3,000.00 in April 2013. Why were you funding this account with money from the Estate (co-mingling of funds) if there were sufficient funds in her 2013 Trust Account that you opened in June 2013 to receive her Workers Compensation funds. Were you reviewing the activity in the account at all during this time frame that the ATM withdrawals were being made? How do you know that these withdrawals were being made by Esaun and not by someone who had stolen the card from Joanne? Were you aware of where Joanne lived during this time frame and the fact that she wouldn't have been making ATM withdrawals from this account if she was living in a hospital? How would anyone else have gotten access to the bank statements to know what was going on in this account? I'm attaching a copy of the first and third pages from this account for 12/31/2014 that shows that this account is and has always been in your name only and the statements for this account were addressed to you only.

Please let me know if I have it wrong that you have stated that you didn't know that Esaun was making ATM withdrawals out of this account. I would also wonder why funds were being transferred out of the Estate into this account and yet you are stating that you didn't know Esaun was making these withdrawals. What did you think was happening to the money you were transferring into this account?

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235
Denver, Colorado 80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

KERR0000860

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Sunday, May 10, 2015 7:30 PM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** Wells Fargo withdrawals

Pam: For your review of Esaun Pinto's activity: The attached spreadsheet, in the Wells Fargo w'draw detail worksheet Shows matches between the **\*exact\*** locations from which Esaun Pinto withdrew money from Joanne's Chase account, to the locations from which money was withdrawn, without my knowledge or consent, from Joanne's Wells Fargo account. See column C of the worksheet

Bernie
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

KERR0000861

with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Saturday, May 16, 2015 7:03 AM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** RE: Esaun Pinto message 1

In some cases, I first received invoices from Mr. Pinto and then paid them.

At the beginning, Cherie Wrigley engaged Esaun Pinto without consulting with me, paid him without consulting with me, in some cases continued to pay him when I did not pay him *instantly* (and I do mean instantly), and put extreme pressure on me to pay Esaun's bills, and strongly opposed my efforts to bring down the extraordinary level of billing. I did so partly to avoid the *war* we are now in between me and Cherie Wrigley (and her allies, Esaun Pinto and Anthony Dain), which is hardly in Joanne's interests, and partly because Esaun was my only contact with Joanne. The alternatives to paying his bills seemed worse. The evidence for the pressure on me from Cherie Wrigley and Esaun Pinto will be presented in court.

Esaun Pinto also tried extremely hard to get me to pay him in advance, and in part I agreed to do so.
I tried extremely hard to bring his billing rate down, over Cherie Wrigley's strong objections.
I kept thinking they would come down further, but there was always *something*, as an excuse for a continued high level of billing.

So there is no simple answer to your question.

Mr. Pinto has never provided to me the backup for his supposed expenses, and I hope you will request this backup from him. Based on what I now know, I believe he will not be able to provide much of this backup, and will therefore owe substantial funds back to Joanne or the SNT.

I believe that it will also turn out that Mr. Pinto did not visit Joanne in hospital as often as he claimed to me that he did. I am seeking to obtain evidence on that question.

Bernie
*****************************************************************
Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*****************************************************************

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Tuesday, May 12, 2015 5:05 PM
**To:** Bernard Black

KERR0000700

# Bernard Black

| | |
|---|---|
| **From:** | Bernard Black |
| **Sent:** | Tuesday, May 19, 2015 4:30 PM |
| **To:** | Pamela Kerr |
| **Cc:** | d.zen@q.com; Lisa Diponio; Carl Glatstein; Patrick Thiessen; Bernie Poskus |
| **Subject:** | RE: Wells Fargo withdrawals |
| **Attachments:** | 2014-activity-Joanne-all-accounts-2015-0222-bb.xlsx |

Bernie

*************************************************************

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*************************************************************

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Friday, May 15, 2015 7:26 PM
**To:** Bernard Black
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** RE: Wells Fargo withdrawals

Bernard,

When I said she was on the road, I certainly meant through 6/3/2013. That was an error since some of these were made after she was "on the road." The total withdrawals out of the Wells Fargo account after 6/3/2012 are $10,734.14 to be exact.

BSB: Through April 12, Joanne was on her own, and I attribute withdrawals to her. From April 12 through June 2, Joanne was not hospitalized, but was under the control of Esaun Pinto. Mr. Pinto had her Chase debit card, was using it, and was reporting to me, and billing me for, expenses on

1

Joanne. Any additional withdrawals from the Wells Fargo account are highly likely to be fraudulent because if Joanne was spending money from Wells Fargo to cover her own expenses, Esaun Pinto should not have been billing me for the same expenses. The timing of the withdrawals is also inconsistent with this being spending on Joanne. The account was fully depleted on May 3, the day that the SSDI deposit hit. The same pattern recurs on June 3, the day she entered the hospital.

How do you know that these withdrawals out of the Wells Fargo account were made by Esaun and not by someone that had stolen or found Joanne's card?? It is possible that she had written the PIN on a piece of paper attached to the card. Believe it or not, a lot of people do this.

BSB: This is why I traced the exact locations of the withdrawals. The *someone* (other than Esaun Pinto) who hypothetically had Joanne's card *somehow* uses the EXACT SAME ATM LOCATIONS that Esaun Pinto used to withdraw funds from Joanne's Chase account.

Then on Octo 28, 2013, that someone (other than Esaun Pinto) hypothetically traveled to Ellenwood Georgia and withdrew funds from Joanne's Wells Fargo account there. And purely by coincidence, Esaun Pinto happened to be in Ellenwood Georgia on the exact same day and withdrew funds from Joanne's Chase account. Yeah, right!

The pattern of withdrawals from both accounts at the exact same locations, sometimes on the exact same day, continues. The details are in the spreadsheet I sent to you, in column C of the "Wells Fargo w'draw detail" worksheet of the spreadsheet. I attach it again.

I should note that I confirmed with Esaun Pinto at the time (mid-2013) that the Wells Fargo debit card was in Joanne's possession. I assumed that he was telling the truth. If he is now claiming someone else had it, that is not what he told me then, and is not consistent with the record of withdrawals from this account.

Esaun had Joanne's Chase debit card. This I knew.

Bernard, if you knew Esaun had Joanne's Chase debit card and was making withdrawals, why didn't you close the account or freeze the debit card? The ATM withdrawals after 6/3/2013 totaled $37,169.91. I have an email from you to Esaun dated 5/31/2013 reflecting the fact that you knew Esaun was making these withdrawals and you did not close the account or have the debit card frozen. This allowed Esaun to make withdrawals out of Joanne's funds when you were the Conservator. If Esaun wanted to get paid, he should have provided you with receipts and invoices to get paid. I have prepared a schedule of all of Esaun's invoices and the amounts he reflected as ATM withdrawals that I will be analyzing once I'm done going through your emails. If he needed funds up front, you could have given him essentially a retainer that you could track and keep track of the receipts.

BSB: As long as I could track the withdrawals, I did not see why it mattered how he got paid, directly from me (from the Estate account) or by withdrawing funds from Joanne's Chase account). The total amount he would receive would be the same. Thus, I did not see the need to close the account, nor to instruct Esaun Pinto not to use the card. I later learned that he did not report his withdrawals honestly, but I did not know that at the time.

With benefit of hindsight, I regret that I did not require Esaun Pinto to provide backup for his claims on expenses. I believe that for any expenses that he cannot support, he should be liable to return those funds to Joanne Black and, if he cannot do so, then Cherie Wrigley should be liable to do so, since he claimed to be working for her.

2

I did not know he had the Wells Fargo card, I did not know he was making withdrawals, and was relying on him to honestly report his withdrawals from Chase. He didn't do that either, but at least the Chase withdrawals I knew about and could track. How were you tracking these withdrawals?

BSB: I was not tracking these withdrawals at the time. I treated this as Joanne's account, and assumed that the SSDI payments were simply piling up in Joanne's account. I confirmed with Esaun Pinto at the time (mid-2013) that the Wells Fargo debit card was in Joanne's possession. In the fall of 2014, after I developed reason to be suspicious of Esaun Pinto, I went to a local Wells Fargo branch and they provided me with past statements. They were willing to do this because I was Joanne's conservator.

I'm a little bit confused about this because on your 2013 Conservator Report, you listed all of these withdrawals out of Account #5372 (the Chase account) on Exhibit C but it doesn't appear that you included them in Step 3 Disbursements/Expenses by category. On Page 7 of the Amended Conservator Report for 2013 you listed a total of Disbursements/Expenses as $32,031.00 yet the total "Less: Total Amount Disbursed" on pages 3,4 & 5 (Exhibits A-C) total $40,365.18. If you deduct the $6,031.18 from the disbursements (payments to Accountant/CPA) the difference is the $26,000.00 that you listed as "Disbursements to Protected Person." Essentially you reported that the ATM withdrawals were "Disbursements to Protected Person" yet you are saying in this email that these withdrawals were made by Esaun.

BSB: I deposited $500 weekly ($26,000 for the year) to Joanne's Chase account(s). There was also a one-time transfer on April 20, 2013 from my personal Chase account, that I treated as Estate spending on Joanne, for which the Estate later reimbursed me. These disbursements were made to Joanne's bank account at Chase. Joanne, for her part, allowed Esaun Pinto to use her debit card, for various purposes, including spending on Joanne's own expenses. At least this is how I saw matters, when I completed my 2013 report. So I would say that the funds were indeed "disbursed to protected person."

I'm just trying to figure out all of these transactions so that I can get the right information in my report. I am using your replies as additional information.

I will send you a separate email regarding the accounts you reported on the 2013 Amended Conservator Report as compared to actual.

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235
Denver, Colorado 80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" – Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Thursday, May 14, 2015 8:06 PM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** RE: Wells Fargo withdrawals

Pam: The purpose of providing to you the Wells Fargo withdrawal locations: All withdrawals after June 4, 2013 took place when Joanne was a psychiatric inpatient! They were not made by Joanne. Joanne was not "on the road." **Esaun Pinto** was on the road, with Joanne's Wells Fargo debit card. Which he occasionally loaned to someone else.

Esaun had Joanne's Chase debit card. This I knew.

Esaun must have also had her Wells Fargo debit card – and withdrew cash from both accounts.

The Wells Fargo withdrawals were pure theft.

I did not know he had the Wells Fargo card, I did not know he was making withdrawals, and was relying on him to honestly report his withdrawals from Chase. He didn't do that either, but at least the Chase withdrawals I knew about and could track.

I will be happy to explain by phone why the matched locations of the Wells Fargo withdrawals and the Chase withdrawals are very strong proof of criminal fraud by Esaun Pinto, in the approximate amount of $15,000.

I will reply separately with regard to the Chase withdrawals from x5372.

Bernie
**********************************************************

Bernard S. Black
bblack@northwestern.edu

4

Chabraja Professor, Northwestern University

Law School and Kellogg School of Management

Law School: 375 East Chicago Ave., Chicago IL 60611

Kellogg: 2001 Sheridan Road, Evanston IL 60208

tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599

papers on SSRN at: http://ssrn.com/author=16042

************************************************************

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Monday, May 11, 2015 4:42 PM
**To:** Bernard Black
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein; Anthony J. Dain (Anthony.Dain@procopio.com); Ira Salzman
**Subject:** RE: Wells Fargo withdrawals
**Importance:** High

Bernard,

What was the purpose of you preparing this schedule? It appears that this is activity in Account #7482. Based on my forensic accounting done to date, the total ATM withdrawals out of this account were $15,138.88 and it appears that the majority of the ATM withdrawals out of this account were done by Joanne when she was "on the road."

**Here is my question about the ATM withdrawals that you claim were made by Esaun that you did not know about out of Account #5372.** (I'm attaching a print out of the accounting reconstruction that I have prepared for this account)

From what I can tell you opened this account (Account #5372) in March of 2013 in your name but never really added Joanne's name to the account. (see copy of initial statement attached) You have stated that "she never went into Chase to add her name to the account." What was the purpose of opening this account? How would Joanne have gotten an ATM card for this account if her name isn't even on the account? How did she or Esaun get the PIN for it if her name isn't on the account?

The bank statements show that the majority of the funds into this account (#5372 in your name but not Joanne's) were transfers from the Estate checking account #6179. There is even a transfer into this account from your personal account in the amount of $3,000.00 in April 2013. Why were you funding this account with money from the Estate (co-mingling of funds) if there were sufficient funds in her 2013 Trust Account that you opened in June 2013 to receive her Workers Compensation funds. Were you reviewing the activity in the account at all during this time frame that the ATM withdrawals were being made? How do you know that these withdrawals were being made by Esaun and not by someone who had stolen the card from Joanne? Were you aware of where Joanne lived during this time frame and the fact that she wouldn't have been making ATM withdrawals from this account if she was living in a hospital? How would anyone else have gotten access to the bank statements to know what was going on in this

account? I'm attaching a copy of the first and third pages from this account for 12/31/2014 that shows that this account is and has always been in your name only and the statements for this account were addressed to you only.

Please let me know if I have it wrong that you have stated that you didn't know that Esaun was making ATM withdrawals out of this account. I would also wonder why funds were being transferred out of the Estate into this account and yet you are stating that you didn't know Esaun was making these withdrawals. What did you think was happening to the money you were transferring into this account?

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235
Denver, Colorado 80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Sunday, May 10, 2015 7:30 PM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** Wells Fargo withdrawals

Pam: For your review of Esaun Pinto's activity: The attached spreadsheet, in the Wells Fargo w'draw detail worksheet

6

Shows matches between the *exact* locations from which Esaun Pinto withdrew money from Joanne's Chase account, to the locations from which money was withdrawn, without my knowledge or consent, from Joanne's Wells Fargo account. See column C of the worksheet

Bernie
*************************************************************************

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*************************************************************************

7

**Bernard Black**

| | |
|---|---|
| **From:** | Bernard Black |
| **Sent:** | Wednesday, May 20, 2015 10:30 PM |
| **To:** | Pamela Kerr |
| **Cc:** | d.zen@q.com; Lisa Diponio; Carl Glatstein; Bernie Poskus; Patrick Thiessen |
| **Subject:** | RE: Wells Fargo withdrawals |

Replies below

Bernie

*****************************************************************

Bernard S. Black
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
375 East Chicago Ave., Chicago IL 60611
bblack@northwestern.edu
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*****************************************************************

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Friday, May 15, 2015 9:10 PM
**To:** Bernard Black
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein; Anthony J. Dain (Anthony.Dain@procopio.com)
**Subject:** RE: Wells Fargo withdrawals

Bernard,

Maybe I'm not seeing something, but my records show that there was a bank account already set up entitled Supplemental Needs ITF the Benefit of Joanne Black at Chase (Account #2425) as early as December 2012 (copy attached).

This was an old account, with minimal assets, around $500. Chase advised me that this was a business trust account, and that I needed to close it and create a new "personal trust" account. I did so, but that account was opened only in late May 2012. The principal reason for delay: I spent several months trying very hard to get Anthony Dain to sign account opening forms.

1

As you are saying below (and the bank records show it) you transferred money ($56,180) out of the Estate into Account #5372, which is not an SNT account. It's my understanding that the Will clearly says the funds for Joanne should go into the SNT out of the Estate.

Why didn't you transfer these funds ($56,180) out of the Estate into the SNT checking account and pay Cherie and Esaun the $227,082 that you paid them out of the SNT. I thought the whole purpose of the SNT was to shield Joanne's funds.

I chose to pay amounts on behalf of Joanne directly from the Estate, rather than moving funds first from the Estate to the SNT, and then pay amounts from the SNT. Joanne's funds would be protected either way; they were either Estate assets or SNT assets, but not my personal assets. I had what I thought were good reasons for that choice, but I am not sure that those reasons are part of your investigation. They will be a subject for testimony at a future hearing.

This is also part of the question I had about the taxes. Because the SNT earned income but had no distributions to Joanne, it paid $13k in taxes. Between the transfers to the Non-SNT account #5372, to Cherie and to or by Esaun the total was $283,262. Is it correct that these funds have now become non-protected since they didn't go through the SNT?

I do not understand this question. For amounts that were **spent*** by paying them to third parties, the question of "protection" is moot once they are spent.

Amounts transferred to x5372 were transferred on behalf of Joanne, to an account under Joanne's control [she chose to allow Esaun Pinto to use her debit card].

So that I don't have to spend Joanne's funds doing so, can you please send me your schedules where you "…because I could periodically "audit" the withdrawals by comparing the withdrawals he reported to those that were actually made, and deduce any excess withdrawals (made but not reported) form what I owed him. I did this on several occasions. These "audits" would be very helpful. I have also made it through all of the emails from you and the only invoices I have from Esaun were dated May 12, 2015 even though they are from 2013 and 2014. What did you use to pay Esaun? Could you please forward those along with any receipts he provided to you to substantiate the payments to him.

I believe that I replied separately on this question. Esaun Pinto's invoices redate automatically.

Thank you!!

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235

Denver, Colorado 80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see". - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Friday, May 15, 2015 5:32 AM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein; Anthony J. Dain (Anthony.Dain@procopio.com); Ira Salzman
**Subject:** RE: Wells Fargo withdrawals

This reply concerns Chase debit account x5372. I replied separately with regard to the Wells Fargo account.

1. Joanne obtained cash, from 2012 until her hospitalization in June 2013, through weekly transfers to a debit account at Chase, for which she held the debit card. This practice was begun by my mother, and I continued it.

2. In early 2013, for reasons best known to Chase, my effort to "link" Joanne's "old" debit card account at Chase to my accounts at Chase caused Chase to close her account. In order to get money to her, I needed to open a new account, which would operate in substance in the same way as the old account. This new account was x5372.

3. I authorized Joanne as a co-owner of this account, and sent her the debit card and initial pin. She did not go to Chase to become a co-owner, so this account remain in my name, but I treated it as Joanne's account, and Joanne's money.

4. The only possible account from which I could have transferred money to the Joanne account at the time was the Estate account x6179. The Supplemental Needs Trust had not yet been funded; it was funded in July 2013 with money from Vanguard. The Joanne Black 2013 Trust had not yet been funded. It was funded later with workers compensation money.

5. It could have been possible to stop transfers from the Estate, and replace them with transfers from the SNT or the 2013 Trust, once these Trusts were funded. But there was no urgency to doing so. The Estate had ample funds, and so I continued the weekly transfers from the Estate account to Joanne's account, and treated them as part of Joanne's 2/3rds share of the overall estate assets.

3

6. Once Joanne was hospitalized in June 2013, the Chase debit card was in the possession of Esaun Pinto. This is not in dispute. You will observe from his bills that he regularly reported withdrawals from the Chase account, as an offset to what I otherwise owed him.

7. Esaun reported dishonestly – he reported only some of the actual withdrawals. This annoyed me, but was not a disaster, because I could periodically "audit" the withdrawals by comparing the withdrawals he reported to those that were actually made, and deduce any excess withdrawals (made but not reported) form what I owed him. I did this on several occasions.

8. I knew Esaun was making withdrawals from Joanne's *Chase* account. I did not know that he also had Joanne's *Wells Fargo* card and was making unauthorized withdrawals from Wells Fargo.

I will be happy to walk you through my understand of these account by phone.

Bernie Black

*******************************************************************

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*******************************************************************

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Monday, May 11, 2015 4:42 PM
**To:** Bernard Black
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein; Anthony J. Dain (Anthony.Dain@procopio.com); Ira Salzman
**Subject:** RE: Wells Fargo withdrawals
**Importance:** High

Bernard,

What was the purpose of you preparing this schedule? It appears that this is activity in Account #7482. Based on my forensic accounting done to date, the total ATM withdrawals out of this account were $15,138.88 and it appears that the majority of the ATM withdrawals out of this account were done by Joanne when she was "on the road."

**Here is my question about the ATM withdrawals that you claim were made by Esaun that you did not know about out of Account #5372.** (I'm attaching a print out of the accounting reconstruction that I have prepared for this account)

4

From what I can tell you opened this account (Account #5372) in March of 2013 in your name but never really added Joanne's name to the account. (see copy of initial statement attached) You have stated that "she never went into Chase to add her name to the account." What was the purpose of opening this account? How would Joanne have gotten an ATM card for this account if her name isn't even on the account? How did she or Esaun get the PIN for it if her name isn't on the account?

The bank statements show that the majority of the funds into this account (#5372 in your name but not Joanne's) were transfers from the Estate checking account #6179. There is even a transfer into this account from your personal account in the amount of $3,000.00 in April 2013. Why were you funding this account with money from the Estate (co-mingling of funds) if there were sufficient funds in her 2013 Trust Account that you opened in June 2013 to receive her Workers Compensation funds. Were you reviewing the activity in the account at all during this time frame that the ATM withdrawals were being made? How do you know that these withdrawals were being made by Esaun and not by someone who had stolen the card from Joanne? Were you aware of where Joanne lived during this time frame and the fact that she wouldn't have been making ATM withdrawals from this account if she was living in a hospital? How would anyone else have gotten access to the bank statements to know what was going on in this account? I'm attaching a copy of the first and third pages from this account for 12/31/2014 that shows that this account is and has always been in your name only and the statements for this account were addressed to you only.

Please let me know if I have it wrong that you have stated that you didn't know that Esaun was making ATM withdrawals out of this account. I would also wonder why funds were being transferred out of the Estate into this account and yet you are stating that you didn't know Esaun was making these withdrawals. What did you think was happening to the money you were transferring into this account?

Pam

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street Suite 235
Denver, Colorado 80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such

attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Bernard Black [mailto:bblack@kellogg.northwestern.edu]
**Sent:** Sunday, May 10, 2015 7:30 PM
**To:** Pamela Kerr
**Cc:** d.zen@q.com; Lisa Diponio; Carl Glatstein
**Subject:** Wells Fargo withdrawals

Pam: For your review of Esaun Pinto's activity: The attached spreadsheet, in the Wells Fargo w'draw detail worksheet
Shows matches between the *exact* locations from which Esaun Pinto withdrew money from Joanne's Chase account, to the locations from which money was withdrawn, without my knowledge or consent, from Joanne's Wells Fargo account. See column C of the worksheet

Bernie
*******************************************************************

Bernard S. Black
bblack@northwestern.edu
Chabraja Professor, Northwestern University
Law School and Kellogg School of Management
Law School: 375 East Chicago Ave., Chicago IL 60611
Kellogg: 2001 Sheridan Road, Evanston IL 60208
tel: law: 312-503-2784; Kellogg 847-491-5049; cell: 847-807-9599
papers on SSRN at: http://ssrn.com/author=16042
*******************************************************************

6

# Exhibit 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
In the Matter of the Application of

    **BERNARD BLACK,**

              Petitioner,

for the appointment of a Guardian of
the Person and Property of

    **JOANNE BLACK,**

          A Person Alleged to be Incapacitated.
-------------------------------------------------------------------X

Index No. 80253/14

**ANSWER
TO AMENDED PETITION**

CHERIE WRIGLEY, being duly sworn, deposes and says:

1.    I am the first cousin of the alleged incapacitated person (hereinafter "AIP"), and cross-petitioner in the above captioned proceeding.

2.    I submit this Answer in response to Bernard Black's Amended Verified Petition and Opposition to Cross Petition, and to advise the Court with regard to how the proceedings in Colorado have unfolded.

16.     With regard to Petitioner's allegations about Mr. Pinto's background, this is of no consequence to this proceeding; it is simply a red herring. However, I spoke to Mr. Pinto at length regarding his criminal history, or lack thereof. In point of fact, the felony charge against Mr. Pinto, to which Petitioner refers, was dropped and he has never been convicted of a felony. Further, these events transpired twenty (20) years ago, and are patently irrelevant to the issues at

hand. Notably, there is no assertion that Mr. Pinto has done anything improper in connection with the AIP whatsoever. On the contrary, Mr. Pinto has been a tremendous advocate of the AIP and has helped immensely in her recovery. He is mentioned positively in her doctors' reports, as well as the reports of the Guardian ad Litem and Court Visitor in the Colorado proceeding. If I am appointed Guardian of the AIP's Person and Property, the Court can certainly fix Mr. Pinto's compensation at a desired amount. I will of course provide billing statements and receipts evidencing the services he provides. It is truly incomprehensible that Petitioner, who was found to have essentially stolen the AIP's assets in Colorado and transferred them to his own children, along with falsifying documents in two different jurisdictions, is asking that someone else's actions be scrutinized.

_Cherie Wrigley_
**CHERIE WRIGLEY**

Sworn to before me this
22 day of September, 2015

See Attach. J.R.
Notary Public

8

# Exhibit 8

Message

| | |
|---|---|
| **From:** | cherie wrigley [cheriewrigley@yahoo.com] |
| **Sent:** | 4/30/2017 10:14:29 PM |
| **To:** | Pamela Kerr [pam@kerrfa.com] |
| **Subject:** | OOPS |
| **Attachments:** | EthicsPoint.pdf |

I thought I sent this. It was in my outbox!!
I never received the other EMAIL from MK

KERR0003836

EthicsPoint                                         https://secure.ethicspoint.com/domain/EN/login_reporter_print.asp?...

This report has been closed.

Report Submission Date
2/1/2017

Reported Company/Branch Information

| Name | Northwestern University |
|------|------|
| Location | VARIOUS LOCATIONS |
| City/State/Zip | ILL, USA |

Violation   **Issue Type**
Information      Retaliation

**Relationship to Institution**

Other/Anonymous

**Please identify the person(s) engaged in this behavior:**

Katherine (Black) LITVAK – Law Professor
Marcia Isaacson - Chief Compliance Officer

**Do you suspect or know that a supervisor or management is involved?**

Yes

**If yes, then who?**

Marcia Isaacson gave NU employees confidential and sealed information to protect NORTHWESTERN.
She then wrote a letter to two Judges in two different states.
Mr. Dana and Ms. Schulte might hold supervisory positions also as they are mentioned in the attached
lawsuit.

**Is management aware of this problem?**

Yes

**What is the general nature of this matter?**

A report was made to ETHICS POINT to simply let the U know that a husband and wife professor team were
using school resources in a very private CIVIL matter. NONE of the members knew the docs were sealed
and are still IN DISBELIEF that docs could be sealed without anybody knowing!!!! THE MAIN POINT IS: No
retaliation
should EVER come from making an ANONYMOUS report. SEE ATTACHED!!!!!

**Where did this incident or violation occur?**

SEE ATTACHED

**Please provide the specific or approximate time this incident occurred:**

This retaliation and harassment has been going on for close to 2 years. There is NOT ONE statement in this
lawsuit that is completely factual or unbiased. It is based on misstatements, delusionary and paranoid
thoughts as well as complete falsehoods.

**How long do you think this problem has been going on?**

More than a year

**How did you become aware of this violation?**

Other

**If other, how?**

Found info on the internet

**Details**

KERR0003837

EthicsPoint                                    https://secure.ethicspoint.com/domain/EN/login_reporter_print.asp?...

        Lisa DiPonio...Colorado Attorney
        Gayle Young...GAL Colorado attorney
        Anthony Dain San Diego Attorney
        Esaun Pinto Private Investigator NYC
        Judge Alliotta Staten Island NY
        All of these people are mentioned in the lawsuit!!!!

Follow-Up Notes
There are no additional notes for this report.

Follow-Up Questions/Comments
**Mar 16, 2017, 3:09 PM**
**Comment:** This report and earlier EthicsPoint reports related to this matter were reviewed again independently of Ms. Isaacson's oversight. We determined that Ms. Isaacson handled the reports and information appropriately and did not violate any University policies or laws. This report will now be closed.

Chat Transcripts
There are no chat transcripts for this incident.

Close Window

©2017 NAVEX Global

KERR0003838

# Exhibit 9

At an IAS Part 12G of the
Supreme Court of the State of
New York, held in and for
Richmond County at 26 Central
Avenue, Staten Island, New York
on the 7 day of June, 2016.

**PRESENT:**

**THOMAS P. ALIOTTA,**
**J.S.C.**

In the Matter of the Application of
**Bernard Black,** Petitioner and
**Cherie Wrigley** Cross-Petitioner,
For the Appointment of a Guardian of
the Person and Property of

**JOANNE BLACK,**
an Alleged Incapacitated Person.

**AMENDED**
**DECISION AND ORDER**

Index No. 80253/14

**ORDERED,** that Mot #007 to temporarily restrain and enjoin Cherie Wrigley, her

Page 8 of 10

BLACK018450

attorney and the parties referred to as the "Wrigley group" from contacting the family of

Bernard Black and Katherine Litvak and Northwestern University Law School (their

employer), is denied and the temporary restraining order is discontinued based upon

the assurance of all parties and their attorneys, on the record, that they would cease

and desist any further contact with Northwestern University Law School, except as it

relates to the collection on any judgment emanating from the State of Colorado; and it

is further

# Exhibit 10

Katherine Black vs Cherie Wrigley, et al.

17-CV-101

Transcript of the Video Deposition of:

# CHERIE WRIGLEY

September 07, 2018





Page 74

1    A    A Mac.

2    Q    And does your -- do you have what's

3 called an "auto delete" -- a provision that

4 automatically deletes things from your computer?

5    A    The setting does delete some things. I

6 had a Yahoo! account at the time, which now has been

7 deactivated. So now everything's pretty much

8 deleted. I had it hacked into; okay? So I had

9 to -- there was some kind of -- I had hacking. What

10 can I say? That's all. This is, maybe, four months

11 ago, five months ago. So I use a new e-mail

12 address -- Gmail.

13        But the settings are that if something's

14 in, like, an arc -- I don't know if it's "archive";

15 I'm not sure what it's called -- they will get

16 periodically deleted. Like, not everything gets

17 saved.

18    Q    Okay. This exhibit was signed by your

19 attorneys in February of this year.

20    A    Hmm-hmm.

21    Q    And I'm asking whether your Yahoo!

22 account was changed before February or after

23 February?

24    A    After February.

25    Q    Okay. And when this document -- your

Page 75

1 response to the request for documents was prepared,

2 you had already provided the documents that you

3 found to your lawyers?

4    A    Yes.

5    Q    Now, in looking -- in searching for those

6 documents, you said you had recently learned to put

7 in search terms and then search your document --

8 your computer?

9    A    Yes.

10    Q    Did you -- when you say, "recently," was

11 that before February of 2018?

12    A    It was, like, three days ago.

13    Q    Okay. So when you were looking for these

14 documents, you didn't know how to search your

15 computer?

16    A    No. I mean, I knew how to search enough.

17 I mean, I could -- I still knew how to search

18 enough.

19    Q    How did you do the search?

20    A    I -- I mean, I know how to search by

21 date. I know how to search by -- I know how to

22 search by date. I know how to search by name. I

23 know -- I didn't know how to search -- like, narrow

24 the search to a particular word or topic,

25 necessarily. Like what I learned the other day was

Page 76

1 that I could actually put in a specific word and a

2 person's name, and it might pull up. It was

3 actually on my messages. So I don't know if it

4 works the same way on e-mails. It happened to be on

5 my messages that I learned something.

6    Q    All right. Let's -- let's focus on your

7 messages.

8        Did you search each of the mailboxes that

9 you had in your computer?

10    A    My --

11        MR. FANTONE: Object to form. I think

12 she's talking about her messages on her phone.

13        THE WITNESS: Yeah.

14 BY MR. SCHAALMAN:

15    Q    Put that aside.

16    A    Okay.

17    Q    I'm asking you a different question.

18    A    Okay.

19    Q    On your computer, did you search each of

20 the mailboxes you had?

21    A    Yes.

22    Q    Okay.

23    A    I don't have the -- very many e-mail

24 boxes.

25    Q    You have an inbox; correct?

Page 77

1    A    Yes, yes.

2    Q    It's where you receive e-mails?

3    A    Yes.

4    Q    And you searched that?

5    A    Yes.

6    Q    And what did you search? How did you

7 search that? What terms did you use?

8    A    I used the people's names.

9    Q    Okay. So you -- you looked for documents

10 that would have "Katherine Black" or "Katherine

11 Litvak" on it?

12    A    Yes.

13    Q    Did you look for documents you would have

14 had with Melissa Cohenson's name on it?

15    A    Yes.

16    Q    Did you look for documents with Brian

17 Raphan, PC, on it?

18    A    Yeah.

19        I actually had a folder of his, but it

20 was mostly invoices.

21    Q    Okay. Did you -- did you look for Pam or

22 Pamela Kerr in your inbox? Documents with her name

23 on it?

24    A    Um, yes.

25    Q    What other names did you search?

09/07/2018        CHERIE WRIGLEY        Pages 110–113

**Page 110**

1  before.

2  Q   But he doesn't represent you; right?

3  A   No.

4  Q   Let's go to the next page. And I want

5  you to look at Wrigley 38.

6  A   38. Yes.

7  Q   And there apparently is somebody named --

8  Akeli --

9  A   Yes.

10  Q   I'm not sure how to pronounce the last

11  name?

12  A   "Tautalaufa."

13  Q   "Tautalaufa." Thank you.

14  A   "Tautalaufa." Yeah.

15  Q   And who is that?

16  A   She's an administrative assistant. She

17  was a personal assistant of my brother's.

18  Q   Now, the "Re:" line for that is, "In the

19  matter of the application of Cherie Wrigley, for the

20  application of Cherie Wrigley, for the appointment

21  of guardian of the personal property of Joanne

22  Black."

23  A   Right.

24  Q   Do you remember what this e-mail is about

25  other than that description? And it is dated

**Page 111**

1  March 9, 2016.

2  A   Yeah. No, it makes sense, though.

3  Because it's March 9, 2016. And I think that's when

4  we had the additional hearing. If I'm not mistaken,

5  we had an additional hearing.

6  Q   And it's "cc'd" to your brother, Anthony

7  Dain. Was he representing you in the guardianship

8  proceeding?

9  A   No. He was appearing pro se.

10  Q   And you had separate counsel in the -- in

11  the guardianship matter, didn't you?

12  A   I had Melissa Cohenson. But as we talked

13  about before, my brother's always assisting me in

14  everything legal.

15  Q   Let's look at Wrigley number 40.

16  A   Yup. I see it.

17  Q   And you are the author of that document;

18  correct?

19  A   Yes.

20  Q   And you've sent it to Gail Young and Lisa

21  Diponio; right?

22  A   Yes.

23  Q   And the date is February 1, 2017;

24  correct?

25  A   Yes.

**Page 112**

1  Q   And neither Ms. Diponio or Ms. Young ever

2  represented you in any matter; correct?

3  A   Yeah, correct.

4  Q   And the subject matter is the retaliation

5  lawsuit. Do you see that?

6  A   Yes.

7  Q   And you were referring to the lawsuit

8  which you were sued in, in fact, this case in the

9  Northern District of Illinois; right?

10  A   I -- this is the first time I've seen

11  this except for yesterday when it came up, so I

12  actually hadn't seen that before. So I'm -- I don't

13  know. I'm really not sure what it's referring to,

14  because I haven't seen the e-mail.

15  Q   But you've used the word "retaliation

16  lawsuit" before, haven't you? -- in connection with

17  this case?

18      MR. FANTONE: Object to foundation.

19      THE WITNESS: I -- apparently, according

20  to this, I have. But, no, I don't remember.

21  BY MR. SCHAALMAN:

22  Q   I'm going to skip ahead in terms of the

23  numbers in this case. I'm going to show what you I

24  am marking as Wrigley Exhibit 6.

25      (Exhibit 6 marked)

**Page 113**

1  BY MR. SCHAALMAN:

2  Q   You can keep that. Don't put that away.

3  A   Okay. So it's not in order. This is 2?

4  Q   That's right.

5  A   Okay.

6  Q   I have already marked other documents.

7      MR. FANTONE: Thank you.

8  BY MR. SCHAALMAN:

9  Q   And I thought it would be -- make more

10  sense to do it this way.

11  A   Okay.

12  Q   And you can give Mr. Baron the extra

13  copy.

14  A   This is what you showed yesterday; right?

15      MR. FANTONE: Wait till there's a

16  question.

17  BY MR. SCHAALMAN:

18  Q   Again, please don't ask me any questions.

19  A   I'm sorry.

20  Q   It's not that I'm trying to be rude.

21  It's just not my job to give you an answer.

22      Exhibit 6 is a document that has a title,

23  "Ethics•Point. Issue and event manager." Have you

24  seen this before?

25  A   This looks like what I saw yesterday.

Page 114

1    Q     Okay.  And the date of the document is
2    February 1, 2017, the same date as the e-mail that
3    you sent to Ms. Young and Ms. Diponio, which you
4    have as a "Re:" line, "Retaliation Lawsuit."
5          Do you recall filing a complaint on the
6    Northwestern University Ethics•Point system --
7    A     No.
8    Q     -- on February 1st, 2017?
9    A     Sorry.  No, I don't.
10   Q     Do you remember making a complaint on the
11   Ethics•Point system about Marcia Isaacson?
12   A     No, I don't.
13   Q     Do you know who did?
14   A     No, I don't.
15   Q     Let's look on the second page.  At the
16   very bottom, there's a section called "Updated Files
17   From Reporter."
18   A     I see.
19   Q     Now, I'll tell you the reporter is the --
20         (Telephonic interruption at 12:57 P.M.)
21         MR. SCHAALMAN:  I'm sorry.  I thought I
22   turned that off.
23   BY MR. SCHAALMAN:
24   Q     The reporter is the person who makes the
25   complaint on this -- in this Ethics•Point system.

Page 115

1    And, apparently, that -- the reporter had uploaded
2    documents.  The second document being the Northern
3    District complaint .pdf, and it's labeled,
4    "Retaliation Lawsuit."
5          Does that refresh your recollection that
6    you would have uploaded the complaint in this case
7    on this Ethics•Point system, calling it a
8    "Retaliation lawsuit"?
9    A     No, it doesn't.
10   Q     Do you recall Pamela Kerr telling you
11   whether she had filed a complaint, which is
12   Exhibit 6?
13         MR. FANTONE:  I'm going to object and
14   just instruct you --
15         THE WITNESS:  What's Exhibit 6?  This
16   (Indicating)?
17   BY MR. SCHAALMAN:
18   Q     Yes.
19   A     Sorry.
20         MR. FANTONE:  You can testify as to the
21   existence of any conversations or if there was not
22   conversations, but don't discuss the details of any
23   privileged communication.
24         THE WITNESS:  Yeah.  So ask the question
25   again, please.

Page 116

1    BY MR. SCHAALMAN:
2    Q     Sure.  Sure.
3          Did you and Pamela Kerr ever discuss
4    Exhibit 6?
5    A     No --
6    Q     Did you ever --
7    A     -- not that I recall.
8    Q     Did you ever discuss with Pamela Kerr
9    whether she filed a complaint on February 1, 2017,
10   with the Northwestern University Ethics•Point
11   system?
12   A     Not that I recall.
13   Q     And how about Melissa Cohenson?  Did you
14   have a conversation with Melissa Cohenson first
15   about Exhibit 6?
16         MR. FANTONE:  Same objection.
17         THE WITNESS:  Not that I recall.
18   BY MR. SCHAALMAN:
19   Q     And did you have a conversation with her
20   about filing a complaint on the Ethics•Point system
21   on February 1, 2017?
22   A     That's the same date?
23   Q     This document.  Yes.
24   A     Same date?
25   Q     Same date -- with Melissa Cohenson?

Page 117

1    A     No.  Not that I recall.
2    Q     Do you recall filing a complaint against
3    Katherine Litvak on February 1, 2017?
4    A     February 1.  It's the same date.
5    Q     Yes.
6    A     Yeah.  No.
7    Q     Do you know who Marcia Isaacson is?
8    A     I don't know -- I know who she is from
9    this lawsuit, yes.
10   Q     And who is she?
11   A     I don't know her exact title, but I think
12   that she has something to do -- she describes
13   herself as a compliance officer.
14   Q     Under the "Details" section --
15   A     Where would that be?
16   Q     On page -- the second page, which has a
17   Northwestern --
18   A     Okay.  I got it.
19   Q     Document number 430, there are a number
20   of people listed.
21   A     I see that.
22   Q     And underneath it, it says, "All of these
23   people are mentioned in the lawsuit."
24         Do you recall whether in the complaint
25   filed in this case -- whether all these people are

Page 138

```
1      A    Yeah.
2      Q    So has your memory now been refreshed,
3  Ms. Wrigley, that Exhibit 6 is your third complaint
4  that you filed?
5      A    No. There's several things -- I'm not
6  even going to get into it why it's not mine.
7      Q    But your memory is that you did file
8  three complaints?
9      A    No. I said --
10          MR. FANTONE: Object to form.
11          THE WITNESS: No.
12          MR. FANTONE: She said, "A complaint,
13  follow-up, and then this complaint."
14          THE WITNESS: My complaints were done
15  over the phone.
16  BY MR. SCHAALMAN:
17      Q    And what makes you think that Exhibit 6
18  wasn't done over the phone?
19      A    It says, "Report 437, Internet."
20      Q    And you don't believe you -- you used the
21  Internet to make this complaint?
22          MR. FANTONE: Objection. Form.
23          THE WITNESS: Do I answer?
24          Yeah.
25          I am not savvy enough. I had to be
```

Page 139

```
1  walked through every single process of this and told
2  exactly what to do while somebody was asking me
3  questions.
4          MR. FANTONE: I just would like the
5  record to reflect when she said, "this," she was
6  referring to Exhibit 7.
7          THE WITNESS: Excuse -- yes. And there's
8  an earlier complaint.
9  BY MR. SCHAALMAN:
10      Q    We'll get there.
11      A    Okay.
12      Q    I'm going to read further from the
13  complaint that you remember now filing, which was
14  Exhibit 7. Do you have that in your hand?
15      A    Yes.
16      Q    Okay. And you've already testified that
17  the language at the top of the page is, in fact,
18  language that you gave to the call center and they
19  typed out on your behalf; correct?
20      A    You know --
21          MR. FANTONE: Object to form.
22          THE WITNESS: I don't want to say
23  100 percent, because there were -- there was
24  something that they did with me. But I'm -- I would
25  say, pretty sure, they did have me at times -- say:
```

Page 140

```
1  Go down to this space, press a button, and you can
2  type in some things.
3          But on this particular one, I can't tell
4  if it's their writing or mine to be honest with you.
5  There are some times I can tell when it was their
6  writing, but they were on the phone with me the
7  entire time, whenever I made a complaint.
8  BY MR. SCHAALMAN:
9      Q    The writing continues -- the typing, "He
10  has continued to use school letterhead, e-mail
11  address, phones, and other resources to fight his
12  personal battle."
13          The "he" is you're referring to Bernard
14  Black; right?
15      A    Hmm-hmm.
16      Q    What examples did you have in January of
17  2016 that Mr. Black was using Northwestern
18  letterhead to fight his legal battles?
19      A    That's why I know that there was a
20  previous report, because they had asked me to
21  upload, and they showed me how -- examples of that.
22      Q    And I'm -- the previous complaint that
23  you filed was in May -- of 2015; correct?
24      A    I guess.
25      Q    We're now talking about seven months
```

Page 141

```
1  later.
2      A    Oh, that he continued to --
3      Q    Yes.
4      A    -- use school letterhead.
5      Q    What evidence did you have when you filed
6  this complaint -- your second complaint -- that, in
7  fact, he was continuing to use Northwestern
8  University Law School letterhead?
9      A    He had sent out a letter to Judge Ali --
10  not Judge Aliotta -- Judge Leith; okay? And if I
11  did not upload it, it could easily be found.
12      Q    The typing goes on another sentence
13  below, "I cannot in all good conscience allow this
14  to continue. Something must be done to save the
15  integrity of your school. How can something like
16  this go on for almost three years?"
17          Would you agree that that is an accurate
18  typing of the statement that you gave to the call
19  center?
20      A    Close enough.
21      Q    Okay. Now, how would the use of
22  Northwestern letterhead, e-mails, phones, and other
23  resources affect your conscience?
24      A    Okay. I'll calmly start. Where do I
25  begin?
```

# Exhibit 11

## Bernard Black

| | |
|---|---|
| **From:** | Pamela Kerr <pam@kerrfa.com> |
| **Sent:** | Monday, May 18, 2015 9:39 PM |
| **To:** | cherie wrigley; Bernard Black |
| **Cc:** | d.zen@q.com; Lisa Diponio; Carl Glatstein; Nancy Peterson |
| **Subject:** | CPI Investigations invoices, payments, etc. |
| **Attachments:** | Schedule of Esaun Pinto's Invoices and payments made.pdf |

Bernard & Cherie,

I am sending this schedule and information to both of you because between the two of you, I need better documentation. Cherie, it seems like you hired Esaun and paid him initially but Bernard you continued to pay him. Unfortunately, it looks like he was overpaid by $41,470.50. Some of this overpayment was due to duplicate charges by Esaun and maybe some is because I'm including all ATM withdrawals made after 4/11/2013. If Esaun wants to dispute that, he will have to be able to show me proof that Joanne took the money out of the ATM.

I am attaching a schedule of the details of the invoices I have received from Esaun, the duplicate payments noted, the payments made by Cherie and Bernard and all ATM withdrawals after 4/11/2013 out of Joanne's accounts.

I would absolutely dispute some of the charges, especially the 2 weeks before Joanne's hospitalization and a flat fee of $8,000.00 a month. I have clients that pay much less than that for 100% 24/7 care in a Memory Unit. Unless he can give us detailed days and times he was with her, I would not pay $5,000.00 a week or $8,000.00 a month. Ultimately it will not be up to me to decide about these charges-it will be up to the Judge. But, as noted below, whenever a fiduciary is making payments on behalf of a Protected Person, the documentation regarding those payments have to be provided. Without further documentation, a flat fee of $5,000.00 a week or $8,000 a month is not a reasonable charge. The Judge and attorneys will know it better than me, but there is Statute regarding payment of professional fees in the State of Colorado. This would fall under that Statute.

- As you can see, based on the invoices provided by Esaun, the total charges from 4/13/2013 - 10/31/2014 is $258,350.00 (Line 84 column S).

    - I absolutely need receipts for **all** of the Flight, Hotel/Motel, Rental Car, Gas, Motel, Storage, etc. etc. Since Joanne is a Protected Person and her funds are under jurisdiction of the Court, every expense has to be properly documented. I need receipts for all of these expenses in columns G through P. I have not included the column for tolls, but what are those for? Did Esaun actually go to see Joanne? The charges just say $39/week or along those lines. I realize that Column G is Esaun's time but we need to know exactly what service he was performing for Joanne.

    - When exactly did Esaun get back to New York with Joanne? I see an ATM withdrawal in Ohio on 4/18/2013. However, he is charging 24 hours a day all the way through 5/7/2013.
    - Where was she living when she got back to New York?
    - What was Esaun doing for her from that time until she was picked up by the New Jersey police on 6/3/2013?
    - If Esaun was charging $5,000 a week for Joanne at this point (5/20 - 6/3) I would want to see a daily log of when she was with him.

1

EXHIBIT 9
Kerr
8-31-18 5/2D

- o If you look at lines 14 and 15 it looks like Esaun switched to a "Flat Rate of $5,000." It appears that he is charging her $5,000 **a week**.
- o Did either of you know he was charging $5,000.00 a week?

I will be asking Gayle and/or Ira to request documentation from the hospital and Joanne's doctors regarding Esaun's involvement in Joanne's life as well. We will need the information in order to prepare an accurate Financial Plan for her. I did not see any line item on the Financial Plan for Esaun.

I don't have any invoices from Esaun from 11/1 - to current. Is he not doing anything with Joanne anymore?

If you need copies of the invoices I have been provided, please let me know. I doubt we will have this information before I write the report so I will just report it as it is. I will be listing a receivable from Esaun for $41,470.50 at a minimum.

## *Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street  Suite 235
Denver, Colorado  80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

# Exhibit 12

Message

| | |
|---|---|
| **From:** | cherie wrigley [cherie wrigley <cheriewrigley@yahoo.com>] |
| **on behalf of** | cherie wrigley [cheriewrigley@yahoo.com] |
| **Sent:** | 1/8/2016 9:11:17 PM |
| **To:** | pam@kerrfa.com; sjp9pg6em7i6f7pwb6dbeup7.1452209370582@email.android.com |
| **Subject:** | Re: Guardianship of Joanne Black: Katherine Litvak Letter |

Pam,
I am very interested!! My brother wants me to hold off for a little bit
due to dwindling funds but I am so angry. I would at least like to pay for
a consultation.
Cherie

**From:** Pamela Kerr <pam@kerrfa.com>
**To:** Young/Zen <d.zen@q.com>; cherie wrigley <cheriewrigley@yahoo.com>
**Cc:** Melissa Cohenson <mcohenson@raphanlaw.com>; Lisa Diponio <diponiolawfirm@comcast.net>
**Sent:** Thursday, January 7, 2016 3:29 PM
**Subject:** RE: Guardianship of Joanne Black: Katherine Litvak Letter

Yep. I can give you some names of attorneys for liable and slander.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------
From: Young/Zen
Date:01/07/2016 3:46 PM (GMT-07:00)
To: cherie wrigley
Cc: Pamela Kerr , Melissa Cohenson , Lisa Diponio
Subject: Re: Guardianship of Joanne Black: Katherine Litvak Letter

Time to bring out the big guns.

> On Jan 7, 2016, at 2:15 PM, cherie wrigley <cheriewrigley@yahoo.com> wrote:
>
> Totally agree!! I spent an hour talking to Joanne. She is holding up well. Melissa has contacted
Northwestern and is doing all she can. I thank everyone for their feedback. This just makes me sick!!
> Cherie
>
>
>
> From: Pamela Kerr <pam@kerrfa.com>
> To: Melissa Cohenson <mcohenson@raphanlaw.com>; Lisa Diponio
<diponiolawfirm@comcast.net>; Young/Zen <d.zen@q.com>
> Cc: cherie wrigley <cheriewrigley@yahoo.com>
> Sent: Thursday, January 7, 2016 11:22 AM
> Subject: RE: Guardianship of Joanne Black: Katherine Litvak Letter
>
> Unreal. I wonder if someone should contact Northwestern and let them know that she is writing this
letter (which I haven't read yet) on Northwestern letterhead as if Northwestern is supporting her

KERR0002508

position.
>
> This stuff with Esaun is not smart on Kate's part since it is Bernard Black who paid him and gave him an ATM card that the ONLY person that had control over what Esaunmoney into that account from the Estate and claiming it was for the benefit of Joanne, but he did NOTHING to monitor it. He was the only person that received these statements.
>
> Yes, Joanne is the person that is being harmed by all of this. Does she not think that Joanne will be able to testify about Kate's involvement in Joanne's life?
>
> Best regards,
> Pam Kerr
>
> Pamela M. Kerr, CPA, FCPA, CFE
> Kerr Forensic Accounting PC
> 650 S. Cherry Street Suite 235
> Denver, Colorado 80246
> (303) 696-3700 - phone
> (303) 696-5711 - fax
> www.kerrfa.com
>
> "Kindness is the language which the deaf can hear and the blind can see" - Mark Twain
>
> Privileged/Confidential Information and IRS Disclosure: This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.
>
> From: Melissa Cohenson [mailto:mcohenson@raphanlaw.com]
> Sent: Thursday, January 07, 2016 12:16 PM
> To: Pamela Kerr <pam@kerrfa.com>; Lisa Diponio <diponiolawfirm@comcast.net>; Young/Zen <d.zen@q.com>
> Cc: cherie wrigley <cheriewrigley@yahoo.com>
> Subject: FW: Guardianship of Joanne Black: Katherine Litvak Letter
>
> Received this today. It is, for lack of better word, crazy.
>
> Lisa and Gayle, she mentions you two-think it is relevant you read (as this matter is becoming inappropriate). My heart breaks for Joanne.
>
> Melissa I. Cohenson, Esq.
>
> Brian A. Raphan, P.C.
> 7 Penn Plaza, 8th Floor
> New York, New York 10001

KERR0002509

> Tel. 212-268-8200, ext. 238
> Fax. 212-244-3075
> www.raphanlaw.com
>
> CONFIDENTIALITY NOTICE:
> This e-mail and any attached files from Brian A. Raphan, P.C., may contain information that is
> privileged, confidential and/or exempt from disclosure under applicable law. If you are not the
> intended recipient, you are hereby notified that any dissemination, distribution or copying of this
> communication is strictly prohibited. If you received this e-mail by accident, please notify the sender
> immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to
> and from our servers to ensure regulatory compliance to protect our clients and business.
>
>
> From: Piper Hoffman [mailto:phoffman@mail187-6.suw11.mandrillapp.com] On Behalf Of Piper
> Hoffman
> Sent: Thursday, January 07, 2016 1:33 PM
> To: Melissa Cohenson <mcohenson@raphanlaw.com>
> Subject: Guardianship of Joanne Black: Katherine Litvak Letter
>
> Dear Justice Aliotta,
>
> On behalf of Katherine Litvak, Joanne Black's sister-in-law, I send the attached letter and three
> exhibits.
>
> Respectfully submitted,
> Piper Hoffman, Esq.
>
> ****************************************
> Piper Hoffman
> Attorney at Law
> Piper Hoffman, Esq., PLLC
> 718-487-9839
> phoffman@piperhoffmanesq.com
> ****************************************
>
>


_____ Information from ESET NOD32 Antivirus, version of virus signature database 12840 (20160108)
_____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com



From: **Pamela Kerr** pam@kerrfa.com
Subject: RE: Info for letter to dean
Date: January 8, 2016 at 12:35 PM
To: Melissa Cohenson mcohenson@raphanlaw.com, Young/Zen d.zen@q.com, Lisa Diponio diponiolawfirm@comcast.net,
Anthony J. Dain (Anthony.Dain@procopio.com) Anthony.Dain@procopio.com, cherie wrigley cheriewrigley@yahoo.com,
Ira Salzman salzman@seniorlaw.com

I will also be following up with a letter to the Judge in New York. I don't know if it's appropriate or not, but I can't let someone write a letter with my name in it and saying what I was hired to do when that is simply NOT the case.

**From:** Melissa Cohenson [mailto:mcohenson@raphanlaw.com]
**Sent:** Friday, January 8, 2016 9:59 AM
**To:** Pamela Kerr <pam@kerrfa.com>; Young/Zen <d.zen@q.com>; Lisa Diponio <diponiolawfirm@comcast.net>; Anthony J. Dain (Anthony.Dain@procopio.com) <Anthony.Dain@procopio.com>; cherie wrigley <cheriewrigley@yahoo.com>; Ira Salzman <salzman@seniorlaw.com>
**Subject:** RE: Info for letter to dean

I also put a call in and I did not divulge the name of the person but I did say that they should be on notice that this is going on and it is completely inappropriate. Carolina my assistant is currently preparing the fed ex overnights

Melissa I. Cohenson, Esq.

*Brian A. Raphan, P.C.*
7 Penn Plaza, 8th Floor
New York, New York 10001
Tel. 212-268-8200, ext. 238
Fax. 212-244-3075
www.raphanlaw.com

CONFIDENTIALITY NOTICE:
This e-mail and any attached files from Brian A. Raphan, P.C., may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.

**From:** Pamela Kerr [mailto:pam@kerrfa.com]
**Sent:** Friday, January 08, 2016 11:42 AM
**To:** Young/Zen <d.zen@q.com>; Lisa Diponio <diponiolawfirm@comcast.net>; Anthony J. Dain (Anthony.Dain@procopio.com) <Anthony.Dain@procopio.com>; cherie wrigley <cheriewrigley@yahoo.com>; Ira Salzman <salzman@seniorlaw.com>; Melissa Cohenson <mcohenson@raphanlaw.com>
**Subject:** RE: Info for letter to dean

WRIGLEY0113

Subject: RE: Info for letter to dean

I just spoke to the Dean's office at Northwestern about this letter from Bernard's wife. Today is the first chance I've had to read the whole letter and saw that she stated that I was hired to investigate Esaun, which is 100% not true. I also informed them that it appears that Northwestern is supporting Ms. Litvak by having this letter on Northwestern letterhead, and the woman I spoke to seemed to be quite bothered by that. I will be following up with a letter to the Dean.

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street  Suite 235
Denver, Colorado  80246

(303) 696-3700 - phone
(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Pamela Kerr
**Sent:** Friday, January 08, 2016 9:32 AM
**To:** Pamela Kerr <pam@kerrfa.com>
**Subject:** Info for letter to dean

**Northwestern University**
**375 E. Chicago Avenue**
**Chicago, IL  60611**
**Attn:  Mr. Daniel B. Rodriquez, Dean**

*Pam*

Pamela M. Kerr, CPA, FCPA, CFE
*Kerr Forensic Accounting PC*
650 S. Cherry Street  Suite 235

Message

| | |
|---|---|
| **From:** | cherie wrigley [cherie wrigley <cheriewrigley@yahoo.com>] |
| **on behalf of** | cherie wrigley [cheriewrigley@yahoo.com] |
| **Sent:** | 1/8/2016 9:03:07 PM |
| **To:** | pam@kerrfa.com; |
| | BN3PR08MB19557A9E9ACA56E670931B80C0F60@BN3PR08MB1955.namprd08.prod.outlook.com |
| **Subject:** | Re: Info for letter to dean & Investigational opening to ETHICS DEPT> |

Excellent job!!! Do you mean I can't download the decision from Judge
Leith IN SEPT?
I was just about to do it.

**From:** Pamela Kerr <pam@kerrfa.com>
**To:** cherie wrigley <cheriewrigley@yahoo.com>
**Sent:** Friday, January 8, 2016 12:51 PM
**Subject:** RE: Info for letter to dean & Investigational opening to ETHICS DEPT>

I would be careful about providing documents in this case to anyone other than those involved. You may want to check with Melissa as to what you can and cannot provide. I think the letter itself will be incriminating enough.

I'm attaching my letter to the Dean so you can see what I'm writing.

*Best regards,*
*Pam Kerr*

Pamela M. Kerr, CPA, FCPA, CFE
**Kerr Forensic Accounting PC**
650 S. Cherry Street Suite 235
Denver, Colorado 80246
(303) 696-3700 - phone
(303) 696-5711 - fax
**www.kerrfa.com**

*"Kindness is the language which the deaf can hear and the blind can see" - Mark Twain*

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** cherie wrigley [mailto:cheriewrigley@yahoo.com]
**Sent:** Friday, January 08, 2016 1:44 PM
**To:** Pamela Kerr <pam@kerrfa.com>; Lisa Diponio <diponiolawfirm@comcast.net>; Young/Zen <d.zen@q.com>
**Cc:** Anthony J. Dain (Anthony.Dain@procopio.com) <Anthony.Dain@procopio.com>; Ira Salzman <salzman@seniorlaw.com>; Melissa Cohenson <mcohenson@raphanlaw.com>
**Subject:** Re: Info for letter to dean & Investigational opening to ETHICS DEPT>

KERR0003692

HI All,

Just an update.

I left a message earlier for the Dean of the Law school and the Business School of Management so that they are aware of the new investigation I have re-opened from May 15, 2015. This one will include Kathryn Litvak and also lets them know I was disturbed with their ineffective closure and resolution of BB's previous case. The independent organization that they have hired to follow up on staff ethic code violations is Ethicspoint.com. It took me quite a while to make the report but they were VERY RESPONSIVE!

I am going to be able and they want me to download docs that will back my case.

Gayle,

Do you have Judge Leith's courtroom transcripts where Kate says some very unflattering and unprofessional remarks regarding Joanne and herself. Then later the Judge admonishes her for NOT helping her husband's case. That's what I remember....ANYWAY>>HELP.

Cherie

---

**From:** Pamela Kerr <pam@kerrfa.com>
**To:** Lisa Diponio <diponiolawfirm@comcast.net>; Young/Zen <d.zen@q.com>
**Cc:** "Anthony J. Dain (Anthony.Dain@procopio.com)" <Anthony.Dain@procopio.com>; cherie wrigley <cheriewrigley@yahoo.com>; Ira Salzman <salzman@seniorlaw.com>; Melissa Cohenson <mcohenson@raphanlaw.com>
**Sent:** Friday, January 8, 2016 9:25 AM
**Subject:** RE: Info for letter to dean

I called the Dean's office at (312) 503-3100. I first asked if I could speak to the Dean himself (Daniel Rodriquez) and she said he wasn't available. So, I told her who I was and what I was calling about. "My name is Pam Kerr, I'm a forensic accountant from Denver. I am looking at a letter on Northwestern Law School letterhead and it contains a false statement about me. It is unfortunate because it really appears that Northwestern Law School is supporting this letter since it is on your letterhead"....she put me on hold and came back and said she had gotten a call yesterday about the same thing. I said I was going to follow up with a letter to the Dean and she said she wasn't sure if he would be the person handling this but it would be forwarded to the person who will be "handling it." I would recommend that anyone whose name is in the letter do the same. I cannot believe what is in this letter!

Here is the mailing address:

Northwestern University
375 E. Chicago Avenue
Chicago, IL 60611
Attn: Mr. Daniel B. Rodriquez, Dean

## *Pam*

Pamela M. Kerr, CPA, FCPA, CFE
**Kerr Forensic Accounting PC**
650 S. Cherry Street Suite 235
Denver, Colorado 80246

(303) 696-3700 - phone

(303) 696-5711 - fax
www.kerrfa.com

*"Kindness is the language which the deaf can hear and the blind can see"* - Mark Twain

**Privileged/Confidential Information and IRS Disclosure:** This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**From:** Lisa Diponio [mailto:diponiolawfirm@comcast.net]
**Sent:** Friday, January 08, 2016 9:53 AM
**To:** Young/Zen <d.zen@q.com>
**Cc:** Pamela Kerr <pam@kerrfa.com>; Anthony J. Dain (Anthony.Dain@procopio.com)
<Anthony.Dain@procopio.com>; cherie wrigley <cheriewrigley@yahoo.com>; Ira Salzman
<salzman@seniorlaw.com>; Melissa Cohenson <mcohenson@raphanlaw.com>
**Subject:** Re: Info for letter to dean

Who did you talk to? Maybe another call is in order....I want them to pay professionally for this as well as monetarily.

Sent from my iPhone

> On Jan 8, 2016, at 9:45 AM, Young/Zen <d.zen@q.com> wrote:
>
> Pam, you are absolutely fearless.
>
>> On Jan 8, 2016, at 9:41 AM, Pamela Kerr <pam@kerrfa.com> wrote:
>>
>> I just spoke to the Dean's office at Northwestern about this letter from Bernard's wife. Today is the first chance I've had to read the whole letter and saw that she stated
>>
>>
>>
>> Pam
>>
>>
>>
>> Pamela M. Kerr, CPA, FCPA, CFE
>>
>> Kerr Forensic Accounting PC
>>
>> 650 S. Cherry Street Suite 235
>>
>> Denver, Colorado 80246
>>
>>
>>
>> (303) 696-3700 - phone
>>
>> (303) 696-5711 - fax
>>
>> www.kerrfa.com
>>
>>

>>
>> "Kindness is the language which the deaf can hear and the blind can see" - Mark Twain
>>
>>
>>
>>
>>
>> Privileged/Confidential Information and IRS Disclosure: This message (including any attachments) contains
confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with
requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any
attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related
penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or
matter addressed herein (or in any such attachment). In addition, the information contained in this message may be
protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in
error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the
taking of any action based on it, is strictly prohibited.
>>
>>
>>
>> From: Pamela Kerr
>> Sent: Friday, January 08, 2016 9:32 AM
>> To: Pamela Kerr <pam@kerrfa.com>
>> Subject: Info for letter to dean
>>
>>
>>
>> Northwestern University
>>
>> 375 E. Chicago Avenue
>>
>> Chicago, IL 60611
>>
>> Attn: Mr. Daniel B. Rodriquez, Dean
>>
>>
>>
>> Pam
>>
>>
>>
>> Pamela M. Kerr, CPA, FCPA, CFE
>>
>> Kerr Forensic Accounting PC
>>
>> 650 S. Cherry Street Suite 235
>>
>> Denver, Colorado 80246
>>
>>
>>
>> (303) 696-3700 - phone
>>
>> (303) 696-5711 - fax
>>
>> www.kerrfa.com
>>
>>
>>
>> "Kindness is the language which the deaf can hear and the blind can see" - Mark Twain
>>
>>
>>

>>
>>
>> Privileged/Confidential Information and IRS Disclosure: This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. To ensure compliance with requirements imposed by the IRS (IRS Circular 230), we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). In addition, the information contained in this message may be protected by the accountant-client privilege. Please immediately reply to the sender of this e-mail if you have received it in error, then delete it. In addition, you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.
>>
>>
>>
>>
>>
>> _____ Information from ESET NOD32 Antivirus, version of virus signature database 12839 (20160108)
_____
>>
>> The message was checked by ESET NOD32 Antivirus.
>>
>> http://www.eset.com
>>
>>
>> _____ Information from ESET NOD32 Antivirus, version of virus signature database 12839 (20160108)
_____
>>
>> The message was checked by ESET NOD32 Antivirus.
>>
>> http://www.eset.com
>>
>>
>>
>> _____ Information from ESET NOD32 Antivirus, version of virus signature database 12839 (20160108)
_____
>>
>> The message was checked by ESET NOD32 Antivirus.
>>
>> http://www.eset.com
>


_____ Information from ESET NOD32 Antivirus, version of virus signature database 12839 (20160108) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com


_____ Information from ESET NOD32 Antivirus, version of virus signature database 12839 (20160108) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

KERR0003696

_____ Information from ESET NOD32 Antivirus, version of virus signature database 12840 (20160108)

_____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

KERR0003697

# Exhibit 13

Issue and Event Manager - Standard

# ethics·point Issue and Event Manager
*Standard*

Date Submitted

  1/8/2016

Status

  Closed

## *Reported Organization/Tier Information*

Original Organization/Tier Name from Reporter

  Northwestern University

Is the reporter an employee?

  No

Users with access to this report

  Dana Bradley
  Janet Bice
  Marcia Isaacson
  Melanie Earle
  Pamela S Beemer
  Stephanie Griffin

## *Report Information*

Report Summary

  No summary available.

Issue Type

  Employee Relations

Relationship to Institution

  Other/Anonymous

Please identify the person(s) engaged in this behavior:

  Bernard Black - Chabraja professor
  Katherine Litvak - law professor

Do you suspect or know that a supervisor or management is involved?

  Yes

If yes, then who?

  Bernard Black - Chabraja professor

Is management aware of this problem?

  Yes

What is the general nature of this matter?

> follow up on a closed report.

How long do you think this problem has been going on?

> More than a year

How did you become aware of this violation?

> I observed it

Details

> On 05/07/15, Cherie filed a report regarding Bernard misusing and abusing organizational resources. The matter was submitted and closed, but Bernard continues his misconduct. The previous report had an unsatisfactory resolution and needs to be looked at again. Furthermore, Katherine, Bernard's wife, sent a letter to a judge in New York using stationary from the school, and she used her professional status at the school and affiliation with the university as leverage regarding a personal civil matter.

> Again, the university handled the previous report in an inept manner, and moving forward, Cherie would like to be provided more updates on the status of the report.

*Reporter Contact Information*

Reporter Identified

> Yes

Reporter Name

> Cherie Wrigley

Phone Number

> 805-492-1502

E-mail Address

> cheriewrigley@gmail.com

Contact Availability

> Anytime after 12:00 PM

*Uploaded Files From Reporter*

| #1: | K Litvak to J Aliotta re Guardianship of Joanne Black 010716.pdf<br>Professor from your school using your letterhead to slander people and fight a personal case. |
|---|---|
| #2: | |
| #3: | Hearing.10.1.2015.NYSupreme.pdf.95-105.pdf<br>These are a few pages from the transcript with opinions from the Judge that vastly differ from Kate Litvak's emotional diatribe. |
| #4: | |
| #5: | Letter to Northwestern Law School.pdf |

*Additional Notes From Reporter*

1/12/2016 posted by Reporter

2/27/2018                                    Issue and Event Manager - Standard

I have filed a report before about your employee Bernard Black and nothing was done. I was not going to pursue anything more until the case was finished in Westchester County,NY and we had removed him as executor and trustee of my cousin Joanne Black's Special Needs Trust. He has continued to use school letterhead,email address,phones and other resources to fight his personal battle. Now his wife is doing the same. I cannot in all good conscience allow this to continue. Something must be done to save the integrity of your school. How can something like this go on for almost three years?

### 1/12/2016 posted by Reporter

My other REPORT KEY was 665513072701
The case was closed and I was told nothing. The misuse of resources continued.....OBVIOUSLY>

### 1/23/2016 posted by Reporter

I have just uploaded another letter/complaint that was sent to your school regarding this matter.

## Follow-ups to Reporter

### Jan 08, 2016, 2:36 PM posted by Janet Bice

**Comment:** Thank you for using the Ethics Point reporting system. We have received your report and are in the process of reviewing it. We will contact you if we need further information and when our investigation is complete.

### 1/19/2016 posted by Reporter

**Reply:** I would like to know who at the university is in charge of reviewing the uploaded files? I do not feel it would be appropriate to have the same person working on this case as the previous case I had opened.REPORT KEY:665513072701..Thank you.

### Jan 26, 2016, 9:57 AM posted by Janet Bice

**Comment:** This confirms receipt of the documents you uploaded in support of your report. Thank you for using the Ethics Point system.

### 1/29/2016 posted by Reporter

**Reply:** Thank you. Please note that I had a question on Jan. 19th. that still has not been addressed.

### Jul 26, 2016, 11:33 AM posted by Janet Bice

**Comment:** The University has reviewed the information you provided in your report and has taken appropriate action to address the concerns you raised. This report will now be closed.

## Chat Transcripts

There are no chat transcripts for this incident.

## Report Notes

There are no report notes.

# Exhibit 14

Message

| | |
|---|---|
| **From:** | Young/Zen [Young/Zen <d.zen@q.com>] |
| **on behalf of** | Young/Zen [d.zen@q.com] |
| **Sent:** | 3/17/2016 1:28:01 AM |
| **To:** | cheriewrigley@yahoo.com; 1806491612.1205820.1458176229702.JavaMail.yahoo@mail.yahoo.com |
| **CC:** | pam@kerrfa.com; mcohenson@raphanlaw.com; Anthony.Dain@procopio.com; salzman@seniorlaw.com |
| **Subject:** | Re: WHO sent my letter to Northwestern |

Cherie, Pam's letter was fine as sent. It's just that she had changed her mind about sending it, and she nor you didn't know it was inadvertently sent to Northwestern. I think we all have pressed the 'send' button too soon.


> On Mar 16, 2016, at 6:57 PM, cherie wrigley <cheriewrigley@yahoo.com> wrote:
>
> All,
> I just got online. I have been busy with my paperwork , phone calls etc. I COULD DIE!! My brother called me and told me what happened. The anonymous site ETHICSPOINT.com that I used to complain about the use of school letterhead from N.W. had me upload Kate's letter. I was told it was not a sealed doc. I uploaded several docs that I thought were portions of the transcripts from the Colorado court showing some examples that disputed Kate's evaluations of me and my brother. I sent the last order from Judge Leith and the order from the NY court.
> I NEVER INTENDED TO SEND PAM'S LETTER!!
> It was uploaded by mistake and I never would have known.
> I left Pam a long message.
> I AM BEYOND SORRY!!!
> I hope there is something thatI can do to clean up this mess.
> I think they are again trying to distract from the real issue.
> CHERIE
>
> From: Pamela Kerr <pam@kerrfa.com>
> To: Melissa Cohenson <mcohenson@raphanlaw.com>; Young/Zen <d.zen@q.com>
> Cc: cherie wrigley <cheriewrigley@yahoo.com>; "Dain, Anthony J." <Anthony.Dain@procopio.com>; Ira Salzman <salzman@seniorlaw.com>
> Sent: Wednesday, March 16, 2016 4:32 PM
> Subject: RE: WHO sent my letter to Northwestern
>
> I am seriously reconsidering testifying next week.
>
>
> Sent from my Verizon Wireless 4G LTE smartphone
>
>
> -------- Original message --------
> From: Melissa Cohenson
> Date:03/16/2016 5:31 PM (GMT-07:00)
> To: Pamela Kerr , Young/Zen
> Cc: cherie wrigley , "Dain, Anthony J." , Ira Salzman
> Subject: RE: WHO sent my letter to Northwestern
>
> I am trying to comprehend Piper's recent filings (4) today...
>
> Melissa I. Cohenson, Esq.
>
> Brian A. Raphan, P.C.
> 7 Penn Plaza, 8th Floor
> New York, New York 10001
> Tel. 212-268-8200, ext. 238
> Fax. 212-244-3075
> www.raphanlaw.com
>
> CONFIDENTIALITY NOTICE:

> This e-mail and any attached files from Brian A. Raphan, P.C., may contain information that is privileged, confidential and/or
exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender
immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure
regulatory compliance to protect our clients and business.
>
>
> From: Pamela Kerr [mailto:pam@kerrfa.com]
> Sent: Wednesday, March 16, 2016 7:27 PM
> To: Melissa Cohenson <mcohenson@raphanlaw.com>; Young/Zen <d.zen@q.com>
> Cc: cherie wrigley <cheriewrigley@yahoo.com>; Dain, Anthony J. <Anthony.Dain@procopio.com>; Ira Salzman
<salzman@seniorlaw.com>
> Subject: RE: WHO sent my letter to Northwestern
>
> It did not come from me! That's a problem because now it looks like I sent them the letter from Kate.
>
>
> Sent from my Verizon Wireless 4G LTE smartphone
>
> -------- Original message --------
> From: Melissa Cohenson
> Date:03/16/2016 5:11 PM (GMT-07:00)
> To: Young/Zen , Pamela Kerr
> Cc: cherie wrigley , "Dain, Anthony J." , Ira Salzman
> Subject: RE: WHO sent my letter to Northwestern
>
> I am severely confused. How did Piper get this...Bernard must have got it or Kate from NWL...don't they have access to the school?
>
> Let's not let this distract us from these liars.
>
> Melissa I. Cohenson, Esq.
>
> Brian A. Raphan, P.C.
> 7 Penn Plaza, 8th Floor
> New York, New York 10001
> Tel. 212-268-8200, ext. 238
> Fax. 212-244-3075
> www.raphanlaw.com
>
> CONFIDENTIALITY NOTICE:
> This e-mail and any attached files from Brian A. Raphan, P.C., may contain information that is privileged, confidential and/or
exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender
immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure
regulatory compliance to protect our clients and business.
>
>
>
> -----Original Message-----
> From: Young/Zen [mailto:d.zen@q.com]
> Sent: Wednesday, March 16, 2016 7:10 PM
> To: Pamela Kerr <pam@kerrfa.com>
> Cc: Melissa Cohenson <mcohenson@raphanlaw.com>; cherie wrigley <cheriewrigley@yahoo.com>; Dain, Anthony J.
<Anthony.Dain@procopio.com>; Ira Salzman <salzman@seniorlaw.com>
> Subject: Re: WHO sent my letter to Northwestern
>
> Pam:
>
> I just sent out the letter from Northwestern and your letter that was attached to both courts.
>
> Gayle
>

KERR0002356

>> On Mar 16, 2016, at 5:08 PM, Pamela Kerr <pam@kerrfa.com> wrote:
>>
>> I'm heading to a meeting so I can't get to my computer but this is the letter that I sent to people on this team saying it's what I was going to send that I never ever sent.
>>
>>
>> Sent from my Verizon Wireless 4G LTE smartphone
>>
>>
>> -------- Original message --------
>> From: Melissa Cohenson
>> Date:03/16/2016 5:04 PM (GMT-07:00)
>> To: Pamela Kerr , 'cherie wrigley' , "'Dain, Anthony J.'" , Ira Salzman , Young/Zen
>> Subject: RE: WHO sent my letter to Northwestern
>>
>> Not me. This comes to a surprise to me. Do you guys think Bernard or Kate uploaded it?
>>
>>
>> Pam, is that even your signature?
>>
>>
>> I cant seem to even upload or see the letter they are purporting was uploaded...
>>
>>
>> Melissa I. Cohenson, Esq.
>>
>>
>> Brian A. Raphan, P.C.
>>
>> 7 Penn Plaza, 8th Floor
>>
>> New York, New York 10001
>>
>> Tel. 212-268-8200, ext. 238
>>
>> Fax. 212-244-3075
>>
>> www.raphanlaw.com
>>
>>
>> CONFIDENTIALITY NOTICE:
>> This e-mail and any attached files from Brian A. Raphan, P.C., may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.
>>
>>
>>
>> From: Pamela Kerr [mailto:pam@kerrfa.com]
>> Sent: Wednesday, March 16, 2016 7:01 PM
>> To: 'cherie wrigley' <cheriewrigley@yahoo.com>; Melissa Cohenson <mcohenson@raphanlaw.com>; 'Dain, Anthony J.' <Anthony.Dain@procopio.com>; Ira Salzman <salzman@seniorlaw.com>; Young/Zen <d.zen@q.com>
>> Subject: WHO sent my letter to Northwestern
>>
>>
>>
>> I forwarded a copy Of the letter I was going to send to Northwestern but never did. Somehow they have a copy Please tell me who forwarded my letter to Northwestern. This will have a severe impact on my testimony next week.
>>
>>
>> Sent from my Verizon Wireless 4G LTE smartphone