**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KATHERINE BLACK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 17 C 101** |
| ) | |
| **CHERIE WRIGLEY, MELISSA COHENSON,** ) | |
| **BRIAN A. RAPHAN, P.C., and PAMELA** ) | |
| **KERR,** ) | |
| ) | |
| **Defendants.** ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Katherine Black has been involved in acrimonious and sprawling litigation concerning the inheritance of her mother-in-law's estate. This case involves allegedly tortious conduct that took place during that litigation. Katherine[1] sued Cherie Wrigley, Pamela Kerr, and Melissa Cohenson, alleging a range of tortious conduct including defamation, intentional infliction of emotional distress (IIED), false light, publication of private facts, intrusion upon seclusion, interference with contractual relations, and civil conspiracy. She also sued Cohenson's former employer, the law firm Brian A. Raphan, P.C., alleging that the firm was vicariously liable for Cohenson's conduct.

A series of pretrial rulings resulted in the dismissal of all of the claims against

---

[1] The Court will refer to Katherine Black and her husband Bernard Black by their first names to avoid confusion. Katherine also goes by the last name Litvak.

Cohenson, the claim against Brian A. Raphan, P.C., and some of the claims against Wrigley and Kerr. Katherine proceeded to trial on four claims under Illinois law: an IIED claim against Wrigley, a defamation claim against Kerr, an aiding-and-abetting claim against Wrigley, and a conspiracy claim against Kerr and Wrigley. A jury found in favor of the defendants on all of those claims. Katherine, who is now proceeding *pro se*, has moved for judgment as a matter of law and for a new trial. Kerr has moved to recover costs.

## Background

The Court assumes familiarity with this case's factual and procedural background, which this Court has discussed in prior written opinions. *See, e.g.*, *Black v. Wrigley*, No. 17 C 101, 2019 WL 2433740 (N.D. Ill. June 11, 2019) ("*Summary Judgment Decision*"); *Black v. Wrigley*, No. 17 C 101, 2017 WL 8186996 (N.D. Ill. Dec. 8, 2017) ("*Motions to Dismiss Decision*"). The following background is relevant to the post-trial motions and largely is taken from the Court's summary judgment decision, *see Summary Judgment Decision*, 2019 WL 2433740, at *1–3, and the trial record.

Katherine and her husband Bernard Black are professors at Northwestern University Pritzker School of Law. In 2012, Bernard's mother passed away. He had expected to inherit one-third of her approximately $3 million estate in the form of an issue trust for himself, Katherine, and their two children. Instead, his mother disinherited him by making virtually her entire estate payable on death to his sister, Joanne, who suffers from mental illness. Bernard successfully petitioned in the probate court in Denver, Colorado—where Joanne was living—to become Joanne's conservator. He then exercised his powers as conservator to disclaim their mother's payment to

Joanne, effectively undoing the disinheritance of himself and Katherine. As a result, the original terms of Bernard and Joanne's mother's estate plan went into effect, such that one-third of her assets were redirected from Joanne to Bernard and Katherine's children.

Several years later, Joanne moved to New York, and Bernard filed a suit in New York state court in which he sought to be appointed guardian of her property. Wrigley, who is Bernard's cousin, filed a cross-petition in the New York lawsuit to be appointed Joanne's guardian in place of Bernard. Wrigley was represented by Cohenson, an attorney who at the time worked as an associate at Brian A. Raphan, P.C. Katherine alleges that Wrigley also retained a private investigator named Esaun Pinto purportedly to protect Joanne and supervise her affairs. At the trial, Wrigley testified that she was aware that Pinto was being paid to assist with Joanne's care but was "not really" aware that he was a private investigator. Trial Tr. at 572:24–25. She testified that she did not hire Pinto, *id.* at 573:24–574:12, but that Bernard gave her "permission" to "obtain" Pinto and told her to pay him a retainer, for which Bernard said he would reimburse her. *Id.* at 687:10–688:13.

In the Colorado probate court case, Joanne's guardian ad litem Gayle Young obtained information that Bernard had caused a significant amount of Joanne's inheritance to be diverted from Joanne to himself or his family. Young sought a forensic accounting of Joanne's accounts and retained Kerr. Kerr testified that Young hired her for the limited purpose of investigating Bernard's actions. Katherine contends that Kerr was supposed to be a neutral investigator and that the Colorado probate court authorized her to conduct a full accounting of all of Joanne's assets, including

investigating concerns that Pinto had been improperly receiving Joanne's social security payments and/or other funds.

In April 2015, Katherine and Wrigley attended a contentious hearing in the Colorado probate court. Katherine testified that before and after the hearing, Wrigley made remarks that Katherine interpreted as threats against her. These threats serve as the basis for Katherine's IIED claim against Wrigley.

Katherine's defamation claim against Kerr arises from a communication that Kerr made to Northwestern University Pritzker School of Law, where Katherine was employed as a law professor. In January 2016, Katherine submitted a lengthy letter to the judge in the New York state court case. Among other things, the letter discussed in detail Katherine's contentions regarding the events concerning Joanne and the Colorado probate litigation. Katherine wrote the letter on letterhead bearing Northwestern's name and an old version of its logo. On January 8, 2016—the day after Katherine submitted her letter to the New York judge—Kerr and Wrigley exchanged e-mails about Katherine's letter and copied Joanne's attorney Lisa DiPonio on the e-mails. Kerr wrote that she had just called the office of the dean of the law school and had spoken about Katherine. Kerr later relayed that she had told someone in the dean's office that Katherine had used Northwestern's letterhead to make a false statement to a court. In a later e-mail, Wrigley wrote that she had left messages with the deans of both Northwestern's law school and its business school—Bernard teaches in both. Wrigley also said that she planned to submit an ethics report to the university describing Katherine's actions.

In response, Kerr sent an e-mail to which she attached a letter she had written

and addressed to the dean of the law school. The letter quoted the following portion of a heading in Katherine's letter to the New York state court judge: "*and the Colorado Judge Found those Allegations credible Enough to Authorize an Investigation of Pinto's Conduct by a Forensic Accountant.*" Pl.'s Mot. for J. as a Matter of Law ("JMOL"), Ex. 2 at 1; *see also id.*, Ex. 1 at 17 (Katherine's unredacted letter). Kerr wrote in her letter to the dean that this claim was "100% false" and "completely false." *Id.*, Ex. 2 at 1. The letter was written on Kerr's professional letterhead and included her signature.

Later that day, Wrigley submitted to Northwestern an ethics report and attached Kerr's letter as supporting evidence, along with a description of the document. This communication served as the basis for Katherine's defamation claim against Wrigley. Specifically, Katherine alleged that Wrigley defamed her in a comment she submitted to Northwestern and by attaching Kerr's letter to her submission.

## B. Procedural background

In January 2017, Katherine filed the present lawsuit. The defendants moved to dismiss Katherine's claims; the Court dismissed certain claims but not others. *Motions to Dismiss Decision*, 2017 WL 8186996, at *14. The defendants subsequently moved for summary judgment on the remaining claims. The Court granted summary judgment on all of the claims against Cohenson and Brian A. Raphan, P.C. and on the false light claim against Wrigley and Kerr, but it otherwise denied Wrigley and Kerr's motions. *Summary Judgment Decision*, 2019 WL 2433740, at *11.

In July 2019, the Court issued two orders ruling on the parties' motions *in limine*. Dkt. nos. 366, 377. In August 2019, approximately one week before the case was set for a jury trial, Katherine moved to voluntarily dismiss her defamation claim against

Wrigley. The Court granted her motion and dismissed with prejudice the defamation claim against Wrigley and the associated conspiracy and aiding-and-abetting claims to the extent they related to that defamation claim. Dkt. no. 399. Katherine also moved to bifurcate the issues of liability and damages for trial, and the Court granted that motion. Dkt. no. 411 at 18. In the same order, the Court ruled on a number of evidentiary issues the parties disputed in light of Katherine's withdrawal of her defamation claim against Wrigley. *Id.* at 7–18.

In August 2019, Katherine proceeded to trial on the remaining claims, specifically, the IIED claim against Wrigley, the defamation claim against Kerr, the aiding-and-abetting claim against Wrigley, and the conspiracy claim against Kerr and Wrigley. Following a five-day trial, the jury found in favor of the defendants on all of those claims.

Katherine has filed a motion for judgment as a matter of law on her defamation claim against Kerr, her aiding-and-abetting claim against Wrigley, and her conspiracy claim. In addition, Katherine has moved for a new trial on all of the claims that went to trial and on the defamation claim against Wrigley, which did not go to trial. Kerr has filed a motion for the taxation of costs.[2]

### Discussion

### A. Motion for judgment as a matter of law

Katherine moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on Kerr's defamation claim, Wrigley's aiding-and-abetting claim, and

---

[2] Wrigley did not file a timely motion for taxation of costs.

6

the conspiracy claim.[3]  Rule 50 "allows the trial court to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'"  *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2521 (2d ed.1995)).  Under Rule 50(a), a party may move for judgment as a matter of law "at any time before the case is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).  After the entry of judgment, a party may "file a renewed motion for judgment as a matter of law."  Fed. R. Civ. P. 50(b).  But a party that did not make a motion for judgment as a matter of law in the first place, before the case went to the jury, has lost "the opportunity to make [a renewed motion] after the verdict."  *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 518 n.2 (7th Cir. 2012); *see also Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 939 (7th Cir. 2001); *Pierce v. Chicago Rail Link, LLC*, No. 03 C 7524, 2006 WL 3370343, at *3 (N.D. Ill. Nov. 20, 2006) (Kennelly, J.) (denying motion for judgment as a matter of law where plaintiff did not file such a motion until after the conclusion of trial).

Katherine cannot bring her motion under Rule 50(a)—the rule under which she brought her motion—because the case already has been submitted to (and decided by) the jury.  And she cannot bring her motion under Rule 50(b) because she did not move for judgment as a matter of law before the case was submitted to the jury.  Therefore, the Court has no authority to consider her motion for judgment as a matter of law.

Without citing to legal authority, Katherine asserts that the Court should be able

---

[3] Though Katherine has styled her motion as one seeking "judgment notwithstanding the verdict," such motions have been known as motions for judgment as a matter of law since the 1991 amendment to Rule 50.  *See, e.g.*, *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 939 n.1 (7th Cir. 2001).

to consider her motion because her failure to make a motion under Rule 50(a) at the proper time was due, she contends, to her trial counsel's incompetence. Unlike criminal defendants, however, "civil litigants have no constitutional right to the assistance of counsel and therefore no constitutional right to effective assistance of counsel." *Stroe v. I.N.S.*, 256 F.3d 498, 500 (7th Cir. 2001) (internal citations omitted). As a result, Katherine cannot seek to reverse the outcome of the trial on the ground that her lawyer's representation was incompetent or ineffective. *See, e.g.*, *id.*; *DeSilva v. DiLeonardi*, 181 F.3d 865, 869 (7th Cir. 1999).

Katherine contends that she should not be bound by her counsel's incompetence for, among other things, failing to move for judgment as a matter of law under Rule 50(a), because she tried to terminate him mid-trial and the Court did not allow her to do so.[4] But even if she had properly filed a motion under Rule 50(a), she would not be entitled to judgment as a matter of law for the following reasons.

Judgment as a matter of law is appropriate if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1), (b); *see Martin v. Milwaukee County*, 904 F.3d 544, 550 (7th Cir. 2018). In deciding whether to grant judgment as a matter of law, the Court may not assess credibility or weigh evidence, and it must "construe the evidence in favor of the party who won before the jury." *Id.* A jury verdict will be overturned only if the court concludes that "no rational jury could have found for the prevailing party." *Stragapede*

---

[4] The Court addresses Katherine's contentions regarding her counsel's alleged incompetence more fully in the section of this opinion on her motion for a new trial.

8

*v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (internal quotation marks omitted). "In other words, [the Court's] job is to decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013).

As indicated, Katherine seeks judgment as a matter of law on three claims. First, she asserts that she is entitled to judgment as a matter of law on her defamation *per se* claim against Kerr. To prove defamation under Illinois law, a plaintiff must show "that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Green v. Rogers*, 234 Ill. 2d 478, 491, 917 N.E.2d 450, 459 (2009). Among the categories of statements that constitute defamation *per se*—meaning defamation whose harm is "obvious and apparent on its face"—are "words that impute a person lacks ability or otherwise prejudices that person in her or his profession." *Id.* at 491–92, 917 N.E.2d at 459. A statement cannot serve as the predicate for a defamation claim if it is substantially true—that is, if the "gist or sting of the allegedly defamatory material is true." *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 42, 984 N.E.2d 132, 146 (internal quotation marks omitted).

Katherine contends that, based on the evidence presented at trial, a reasonable jury could not have found in Kerr's favor on the defamation claim. Construing the evidence and drawing reasonable inferences in favor of Kerr, the Court is not persuaded. A reasonable jury could have concluded that Kerr's statement—in which she wrote that Katherine made a "100% false" and "completely false" statement when

9

she wrote to the New York judge that the Colorado probate court found the accusations against Pinto credible enough to authorize an investigation by a forensic accountant into his conduct—was substantially true. *See* Pl.'s JMOL, Ex. 2 at 1. This is because there was evidence showing that, contrary to Katherine's statement to the New York judge, the Colorado probate judge did not determine whether the allegations against Pinto were credible and thus did not authorize an investigation into his conduct on that basis. This evidence included the Colorado probate judge's order from April 2, 2015, in which the judge stated that Pinto should provide documentation to forensic accountants concerning all the funds he controlled—without making any express findings regarding whether or not the allegations against Pinto were credible. It also included Katherine's statement during her cross-examination at trial that the Colorado probate court's April 2, 2015 order did not contain a finding regarding the allegations against Pinto, Trial Tr. at 450:9–11, and the fact that no order containing an express finding from the Colorado probate judge on that issue was introduced at the trial.

Alternatively, there was sufficient evidence for a reasonable jury to conclude that Kerr's statement was substantially true based on a finding that, contrary to Katherine's statement to the New York judge, the Colorado probate judge did not authorize an investigation into Pinto's conduct. The evidence supporting this finding includes the Colorado probate judge's April 2, 2015 order, in which the judge directed Pinto to provide documentation to the forensic accountant but did not expressly state that direction pertained to an investigation into Pinto's conduct. Among other things, it also includes Kerr's testimony at trial in which she stated, "I was not authorized -- I was not ordered to investigate Mr. Pinto's conduct," Trial Tr. at 747:11–13, and said her

investigation focused narrowly on Bernard's conduct.

Katherine contends that the only reason the Colorado probate court could have directed Pinto turn over the documentation was because Pinto's conduct was being investigated. The Court disagrees. Kerr testified that she was hired to investigate Bernard's conduct. *E.g.*, Trial Tr. at 764:9–11. The jury reasonably could have inferred that Colorado probate court ordered Pinto to provide Kerr with documentation of Joanne's funds and assets in order to make more information available to Kerr regarding how, if at all, Bernard was using those funds and assets, not because Pinto's conduct was at issue. And though Katherine contends that Kerr actually investigated Pinto, the jury reasonably could have found that had no bearing on whether the Colorado probate court authorized such an investigation. Based on these and other findings, a rational jury could have concluded that Kerr's statement about Katherine's statement was substantially true and therefore that Kerr did not defame Katherine.

Katherine also contends that no rational jury could have found in favor of Wrigley on the aiding-and-abetting claim. In this claim, Katherine alleged that Wrigley aided and abetted Kerr's defamation claim. Thus the claim depended on a finding that Kerr defamed Katherine. As just explained, a reasonable jury could have found that Kerr did not defame Katherine. Accordingly, a rational jury also could have found that Wrigley did not aid and abet defamation.

Katherine finally argues that no rational jury could have found in favor of Wrigley and Kerr on the conspiracy claim, in which Katherine alleged that Wrigley and Kerr conspired to defame her. She bases this argument on two theories. First, Katherine contends that the jury would have been required to find that Wrigley and Kerr conspired

11

to have Kerr to defame Katherine in her letter to Northwestern. Alternatively, she contends that the jury would have been required to find that Wrigley and Kerr conspired to have Wrigley to defame Katherine by attaching Kerr's letter to the ethics report Wrigley submitted to Northwestern. Though that latter contention involves defamation by Wrigley, not Kerr, both contentions depend on a finding that Kerr's statement in her letter was defamatory. But there was sufficient evidence introduced at the trial for a reasonable jury to conclude that Kerr's statement was not defamatory, as the Court has indicated. As a result, a reasonable jury could have found that that neither Kerr nor Wrigley committed a defamatory act against Katherine and thus that Kerr and Wrigley did not conspire to defame Katherine. [5]

In sum, a reasonable jury could have found against Katherine on the defamation *per se*, aiding-and-abetting, and conspiracy claims. Even if Katherine had properly filed a motion under Rule 50(a), she would not be entitled to judgment as a matter of law on these claims.

For these reasons, the Court denies Katherine's motion for judgment as a matter of law.

## B. Motion for a new trial

Katherine also moves under Rule 59 for a new trial. A new trial is warranted

---

[5] Before the trial, Katherine withdrew her defamation claim against Wrigley. Prior to withdrawing that claim, Katherine also had alleged that Wrigley defamed her by writing a slanderous statement in the ethics report. In her motion for judgment as a matter of law, she has not contended that this allegedly slanderous statement supported her civil conspiracy claim, let alone that a rational jury would have been required to find based on the evidence introduced at trial that Wrigley and Kerr engaged in a civil conspiracy on that basis. Accordingly, the Court need not address whether the evidence established that Wrigley and Kerr committed a civil conspiracy in that regard.

under Rule 59(a) if the verdict was "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018). In making this determination, a court "has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012)**.** The Seventh Circuit has cautioned that a court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017).

Katherine first asserts that she is entitled to a new trial because, she contends, the jury's findings were contrary to the weight of the evidence. She bases this contention on the same grounds as her motion for judgment as a matter of law. For the reasons discussed earlier in this order with regard to that motion, the Court denies Katherine's motion for a new trial on these grounds. Katherine also contends that the trial was fundamentally unfair to her. She contends this was because the Court issued allegedly erroneous rulings with regard to certain jury instructions, and with regard to the admission and exclusion of certain evidence; Kerr's attorney made allegedly improper statements during his closing arguments; and Katherine's own attorney was allegedly incapacitated and ineffective. The Court addresses each of these contentions in turn.

### 1.  Attorney's alleged incapacity

Katherine asserts that a new trial is warranted because she alleges that her trial

counsel was incapacitated and ineffective.[6]  The Court addresses this argument at the threshold because, among other things, Katherine contends that her counsel's alleged incapacity caused her to fail to preserve errors that she contends warrant a new trial.

As the Court explained earlier in this opinion, however, "civil litigants have no constitutional right to the assistance of counsel and therefore no constitutional right to effective assistance of counsel." *Stroe*, 256 F.3d at 500.  And "[a] retrial is not a proper remedy for deficient representation in a civil action." *Cavoto v. Hayes*, 634 F.3d 921, 924 (7th Cir. 2011).  Though Katherine contends that she did not know that her attorney was allegedly incapacitated until after the trial commenced, that makes no difference in this regard.  *See Choice Hotels Int'l, Inc. v. Grover*, 792 F.3d 753, 756 (7th Cir. 2015) ("[C]ivil litigants are responsible for their own choices.").

As indicated, Katherine contends that she should not be bound by her attorney's actions because she tried to terminate him before closing arguments started and the Court did not allow her to do so.  If she had been permitted to terminate her counsel, Katherine contends, she would have, among other things, filed a timely motion for judgment as a matter of law under Rule 50(a), objected to certain jury instructions, asked the Court to reconsider certain evidentiary rulings, and objected to certain comments made during closing arguments by opposing counsel.  To be sure, one reason civil litigants must bear the costs of their counsel's shortcomings is because they

---

[6] In her reply brief, Katherine contends that this is not an independent ground on which she has sought a new trial but rather an argument in support of granting her a new trial on other grounds.  That is not how the Court reads her opening brief.  In order to address the contention in its entirety, the Court thus considers it both as an independent basis for a new trial and as an argument in support of her other arguments for a new trial.

"can hire replacement counsel freely." *Id.* But that does not mean that they have unlimited freedom to hire and fire new attorneys at any stage of the proceedings. *See, e.g.*, N.D. Ill. L.R. 83.17 (local rule in this district precluding an attorney of record from withdrawing from a case "without first obtaining leave of court").

Some principles from criminal law, where defendants have a right to choose their own counsel, are instructive here. In that context, a district court has "wide latitude to balance" the right to choose one's counsel "against the needs of fairness to the litigants and against the demands of [the court's] calendar." *United States v. Velazquez*, 772 F.3d 788, 797 (7th Cir. 2014). Importantly, a party does not have "the power to manipulate his [or her] choice of counsel to delay the orderly progress of [a] case," *id.* at 798 (alteration omitted), and requests for new counsel during a trial are rarely considered timely, *United States v. Golden*, 102 F.3d 936, 941 (7th Cir. 1996).

Similarly, as the Court explained at the trial, Katherine's attempts to terminate her counsel were attempts to game or manipulate the proceedings in a manner that would delay the trial. Soon after the parties rested their cases, on a Friday, Katherine sought to present her own closing argument. When the Court rejected that request, Katherine asked the Court if she could terminate her counsel and then present her own closing argument. The Court said it would not allow her to do so and explained that her request showed "gamesmanship," if not "manipulat[ion]." *See* Trial Tr. at 925:21–25. When Katherine later asked the Court to reconsider that decision or alternatively to continue the closing arguments until that Monday due to personal challenges faced by her counsel, the Court explained that it regarded these motions as "part of a continuing effort on [Katherine's] part to manipulate the proceeding[s] in the case." *Id.* at 934:14–

15

19. More than once, the Court expressed concern that if it granted a continuance, Katherine would terminate her counsel over the weekend in order to manipulate the proceedings. *E.g.*, *id.* The Court explained that it could not trust Katherine "to follow the rules" because, throughout the trial, she had repeatedly ignored or chose not to follow directions given by the Court, despite numerous express warnings not to do so. *Id.* at 941:15–942:6. The Court had ample reason, based on its familiarity with the extensive history of the case and Katherine's conduct at the trial and during the pre-trial proceedings, to consider her attempt to terminate her counsel mid-trial as an attempt to manipulate the proceedings and "delay the orderly progress" of her case. *See Velazquez*, 772 F.3d at 798. In short, the request was improper and untimely, and the Court had discretion to deny it.

In addition, Katherine's contentions that her failure to preserve errors should be excused due to her counsel's alleged incompetence hold no water. Again, "litigants are bound by the acts and omissions of their chosen agents, including lawyers." *Choice Hotels Int'l,* 792 F.3d at 754. An attorney's alleged ineffectiveness in a civil suit such as this one is not grounds to excuse the forfeiture or waiver of arguments or errors. *See id.* at 756. This is because, for litigants like Katherine, "monetary compensation via a malpractice action is an adequate recompense for an adverse judgment." *See id.*

Therefore, even if Katherine no longer wanted her counsel to represent her, her issues with his representation at the final stage of the trial are not grounds for a new trial or to excuse her failure to preserve some of the alleged errors the Court discusses next. The Court denies Katherine's motion for a new trial on those grounds.

## 2. Jury instructions

Katherine asserts that she is entitled to a new trial because, she contends, the jury instructions for five claims contained inadequate statements of the law. "To win a new trial based on an incorrect jury instruction, [a party] must show both that (1) the instruction inadequately states Seventh Circuit law; and (2) the error likely confused or misled the jury causing prejudice to the [moving party]." *O'Donnell v. Caine Weiner Co., LLC*, 935 F.3d 549, 552 (7th Cir. 2019) (alteration and emphasis omitted).

A party may assert that an instruction that the Court "actually" gave to the jury was erroneous if she or he "properly objected" to the instruction. Fed. R. Civ. P. 51(d)(1)(A). And a party may assert that "a failure to give an instruction" was erroneous if she or he "properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected." Fed. R. Civ. P. 51(d)(1)B). A party properly objects by, "on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). "The objection must be specific enough that the nature of the error is brought into focus," so that the district court is "made aware of" it and "can fix" it before instructing the jury. *Davis v. Wessel*, 792 F.3d 793, 802 (7th Cir. 2015). "Mere tendering of proposed instructions different from the instructions given is not sufficient to preserve an objection to the instructions that are given." *Walker v. Groot*, 867 F.3d 799, 803 (7th Cir. 2017) (internal quotation marks and alteration omitted).

Where, however, a party has not properly objected to an instruction, "[a] court may consider a plain error in the instructions . . . if the error affects substantial rights." Fed. R. Civ. P. 51(d)(2). That said, "[e]specially in civil cases, plain-error review of jury

instructions is quite limited and discretionary," and should occur only in exceptional circumstances. *Walker*, 867 F.3d at 803 (internal quotation marks omitted). Thus the "[a]pplication of Rule 51(d)(2) requires that '(1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 803 (quoting Fed. R. Civ. P. 51, 2003 note).[7]

### a. Defamation claim against Wrigley

Katherine contends that the Court erred by not instructing the jury with regard to her claim of defamation against Wrigley. But a week before the trial started, Katherine filed a motion seeking to voluntarily dismiss the defamation claim against Wrigley. Dkt. no. 394. The Court granted Katherine's motion and dismissed the claim. Dkt. no. 399. After withdrawing the defamation claim against Wrigley, Katherine did not request an instruction on it, and she did not object when the Court did not issue one. Accordingly, the plain-error standard applies. It cannot be a plain error for the Court to decline to instruct the jury on a claim that Katherine had withdrawn and was thus no longer part of the case.

In her reply brief, Katherine contends that she brought "two separate claims for defamation against Wrigley" and sought to dismiss only one of those claims. Pl.'s Reply

---

[7] In their response brief, the defendants contend that parties who fail to challenge a jury instruction waive any objections to that instruction, but they do not mention the just-described standard for plain-error review under Rule 51(d)(2). In her opening brief, Katherine does not mention the standards under Rule 51 at all. She contends in her reply brief, however, that defense counsel should be sanctioned for their failure to mention Rule 51(2)(d). This is not a proper way to request sanctions, and the Court disregards it. *See* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).").

Br. in Supp. of Mot. for a New Trial at 13. The Court understands Katherine to be contending that she brought two sets of allegations against Wrigley for defamation and sought to dismiss only her allegations concerning an allegedly slanderous statement that Wrigley made to Northwestern. But in its decision dismissing Katherine's defamation claim, the Court made clear that it was dismissing the claim against Wrigley in its entirety. Dkt. no. 399 at 2–3 ("[T]he Court grants plaintiff's motion to voluntarily dismiss with prejudice her defamation claim against defendant Wrigley and her associated conspiracy and aiding-and-abetting claims to the extent they relate to that defamation claim."). If Katherine felt that ruling went beyond the scope of her motion to dismiss, she could have asked the Court to reconsider it and could have objected to the exclusion of the defamation claim from trial. She did not do so. Her challenge to the lack of a jury instruction is not the proper means by which to assert her contention that the Court's order dismissing the claim was erroneous.

Regardless, even if the Court erred by not providing an instruction on the defamation claim against Wrigley, it would not amount to plain error. Katherine contends that she withdrew only her allegation that Wrigley slandered her; she asserts that she did not withdraw her allegation that Wrigley defamed her by attaching Kerr's letter to the ethics report Wrigley submitted to Northwestern. As the Court explained in the section of this opinion concerning Katherine's motion for judgment as a matter of law, however, this allegation depends on a finding that Kerr's statement in her letter was defamatory. Because the jury found that Kerr's statement was not defamatory, the jury could not have found that Wrigley defamed Katherine by transmitting Kerr's statement. As a result, if there was an error, it would not have "seriously affect[ed] the fairness,

19

integrity, or public reputation of judicial proceedings." *Walker*, 867 F.3d at 803 (quoting Fed. R. Civ. P. 51, 2003 note).

### b. Defamation claim against Kerr

Katherine next takes issue with the jury instructions on the defamation claim against Kerr. As relevant, those instructions said that to succeed on her defamation claim against Kerr, Katherine was required to prove by a preponderance of the evidence: (1) "Ms. Kerr caused a statement of fact about Ms. Black to be made to Northwestern Law School"; (2) "Ms. Kerr's statement was false"; (3) "Ms. Kerr knew the statement was false, or she believed the statement was true but lacked reasonable grounds for this belief"; (4) "it was apparent from the words of the statement that it prejudiced Ms. Black in her profession." Trial Tr. at 962: 4–15. Katherine objects to these instructions on several grounds.

First, Katherine argues that the instructions were erroneous because they did not tell the jury that Kerr's intent with regard to publication was irrelevant. She contends that the jury could have erroneously believed it needed to find that Kerr knew the statement was published to Northwestern. Katherine previously raised this objection, or at least a form of it, so the Court does not apply the plain-error standard. But nothing in the jury instructions told or suggested to the jury that the Kerr had to have knowingly published or caused publication of her statement. Katherine has offered no support for a contention that the Court had to specifically advise the jury that Kerr's intent regarding publication did not matter.

In addition, Katherine contends, without citing to legal authority, that the instructions were erroneous because the Court did not "explain" the concept of but-for

20

causation. Pl.'s Mot. for a New Trial at 5. Specifically, she asserts that the Court should have instructed the jury that they needed to find that "*but for* Ms. Kerr's conduct, [Kerr's] statement would not have been made to Northwestern." *Id.* at 6. She did not previously make this objection, so the Court applies the plain-error standard. Katherine has not explained why the Court should have provided that instruction, let alone offer any supporting authority. *See United States v. Wenzel*, 854 F.3d 957, 961 (7th Cir. 2017) (argument not developed in a party's opening brief is waived). Regardless, if Katherine is contending that the jury may have erroneously assumed that Kerr personally had to publish her statement to Northwestern, nothing in the jury instructions suggested to the jury that it was required to make such a finding. Katherine has not shown that the Court plainly erred by declining to "explain" but-for causation when instructing the jury on the defamation claim.

Third, Katherine contends that the Court erroneously instructed the jury to find that Kerr's statement caused Katherine actual harm. This is simply not true; the Court gave no such instruction. That aside, Katherine previously did not make this objection at trial, so she would have to show plain error, which she has not done.

Fourth, Katherine asserts, without citing to legal authority, that it was improper for the jury to determine whether the statement fell within a defamatory *per se* category. She previously did not make this objection, so the Court applies the plain-error standard. Katherine contends that whether a statement falls within a *per se* category is a determination to be made by the Court. Indeed, a court must resolve the legal question of whether a statement's meaning is reasonably capable of an innocent construction and thus does not fall within a *per se* category. *Lott v. Levitt*, 556 F.3d 564,

568 (7th Cir. 2009) (Illinois law).[8]  But where, as here, a court has found that the statement could not reasonably be innocently interpreted, a jury must decide whether "whether the statement was in fact understood to be defamatory." *Tuite v. Corbitt*, 224 Ill. 2d 490, 503, 866 N.E.2d 114, 122 (2006); *see also Summary Judgment Decision*, 2019 WL 2433740, at *4 (concluding, in Katherine's favor, that Kerr's allegedly defamatory statement could not reasonably be given an innocent construction).  That is what the jury instructions in this case called on the jury to do; the Court instructed the jury to determine, among other things, whether Kerr's statement was in fact understood to be defamatory because its words prejudiced Katherine in her profession.  If Katherine is contending that the Court instructed the jury to find whether she experienced actual harm or prejudice, not whether the statement's meaning was defamatory, that makes no sense.  As just indicated, the Court gave no instruction concerning actual harm.  The Court did not plainly err by instructing the jury to determine whether it was apparent from Kerr's statement that it prejudiced Katherine in her profession.

Finally, Katherine contends that the Court plainly erred by failing to instruct the jury on defamation *per quod* in addition to defamation *per se*.  To state a claim for defamation *per quod*, a plaintiff must plead special damages.  *Id.* at 501, 866 N.E.2d at 121.  This, again, was an objection that Katherine did not raise at trial.  Regardless, it could not possibly have been error, because the Court, at an early stage, found that Katherine had not alleged a viable claim of defamation *per quod.  Motions to Dismiss*

---

[8] Katherine contends in her reply brief that a jury can decide whether a statement is capable of a reasonable construction.  As indicated, that is incorrect.  She also contends that innocent construction was never an issue in this case.  That is incorrect as well; it was a ground on which Kerr sought summary judgment.  *Summary Judgment Decision*, 2019 WL 2433740, at *4.

*Decision*, 2017 WL 8186996, at *9. Thus no such a claim was legitimately at issue at the trial.

In sum, Katherine has failed to show any error in the jury instructions on the defamation claim that would entitle her to a new trial.

### c. Aiding-and-abetting claim

Katherine contends, without citing to legal authority, that the jury instructions for the aiding-and-abetting claim against Wrigley were "fatally infected by" the "instructions for the underlying offense," i.e. the instructions for the defamation claim against Kerr.[9] Pl.'s. Mot. for a New Trial at 7. She did not raise this objection at trial, so the plain-error standard applies. As the Court just explained, Katherine has failed to show any error (or, where required, plain error) in the instructions for the defamation claim. Accordingly, her claim that those instructions "infected" the aiding-and-abetting claim is similarly lacking in merit.

Katherine also contends that the instructions for the aiding-and-abetting claim against Wrigley were "fatally infected by . . . the absence of a jury instruction on defamation *per se* against Wrigley." *Id.* This contention makes no sense. Katherine alleged in her aiding-and-abetting claim that Wrigley aided and abetted *Kerr's* alleged defamation, not that Wrigley aided and abetted her own defamation. Thus the withdrawn defamation claim against Wrigley had no bearing on whether Wrigley aided and abetted defamation.

---

[9] In her reply brief, Katherine contends that the defendants did not respond to this contention, but that is incorrect. *See* Defs.' Resp. Br. at 5–6.

### d. Conspiracy claim

Katherine next contends that the jury instructions on the conspiracy claim were erroneous because the jury was instructed that they could find in her favor on that claim only if they found that Kerr and Wrigley conspired to defame her. She contends that her conspiracy claim also was based on other unlawful conduct, including Kerr and Wrigley's alleged intimidation of and retaliation against her for testifying against them.

Katherine contends that she previously objected to the instruction on this ground. That is not true. Katherine objected to an instruction stating that if the jury found for Kerr on the defamation claim, it need not consider the conspiracy claim. The basis for her objection was as follows: "The jury can find the defendants *coordinated to defame* Ms. Black and that Wrigley participated in satisfying some of the required elements." *Id.* at 912:5–9 (emphasis added). The Court agreed with Katherine on that point; it did not include the form of instruction to which she objected. In making that objection, however, Katherine did not suggest that the jury could find a conspiracy based on non-defamatory conduct, as she contends now. Indeed, as shown by the just-quoted language, she suggested the opposite. And her attorney specifically told the Court that it was "[f]ine" to instruct the jury that the conspiracy was based on defamation, not other unlawful conduct. Trial Tr. at 150:11–15. By affirmatively approving of the instructions, Katherine waived her right to challenge them as erroneous or plainly erroneous. *See Walker*, 867 F.3d at 804 (party waived challenge to jury instructions where he affirmatively stated he did not object to them). Further, Katherine has not shown that jury instructions on civil conspiracy misstated the law or created confusion or misunderstanding about the law; she merely contends that they did not describe the full

24

scope of her allegations. *See Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, 488 F.3d 739, 751 (7th Cir. 2007) (no plain error in jury instructions where there was "no reason to believe" that the jury's verdict "was the product of confusion or a misunderstanding of the law"). Therefore, Katherine has waived her challenge to the instructions on the civil conspiracy claim, and there was no plain error.

### e. IIED claim

Katherine contends that the jury instructions regarding the IIED claim were erroneous because they suggested that the IIED claim solely involved a threat Wrigley made to Katherine, not other conduct such as witness intimidation and retaliation.[10] The instructions stated that to succeed on the IIED claim, Katherine needed to prove by a preponderance of the evidence that, among other things, "Ms. Wrigley made one or more threats against Ms. Black." Trial Tr. 961:15–16.

In Katherine's motion for summary judgment, she pointed to three instances of allegedly extreme and outrageous conduct. *See Summary Judgment Decision*, 2019 WL 2433740, at *5. Specifically, she alleged that Wrigley engaged in extreme and outrageous conduct by telling Katherine that she would arrange for Katherine to have a sex change operation; by threatening to burglarize Katherine; and by threatening in April 2015 to file a false report to cause Katherine to lose custody of her children. *Id.* at *5–6. The Court found that the comment about a sex change operation did "not rise to the level of extreme and outrageous conduct, at least not by itself." *Id.* at *6. It found that

---

[10] Katherine contends—correctly—that the defendants did not respond to her arguments regarding the jury instructions for the IIED claim. But the defendants' failure to assert arguments on this point does not result in an automatic finding that the jury instructions were plainly erroneous.

no reasonable jury could find the alleged threat of burglary to constitute extreme and outrageous conduct but that Wrigley's threat to file a false report could withstand summary judgment. *Id.*

At the beginning and end of the trial, Katherine asked the Court to include language in the instructions stating that the jury needed to find "Wrigley made one or more threats against" Katherine. *See* Trial Tr. at 912:20–25. Her counsel explained that, based on the Court's summary judgment decision, Wrigley's alleged comments about the sex change operation and the false report could together support the IIED claim. *Id.* at 126:11–127:16. The Court agreed and included that language.

As indicated, Katherine now contends that other conduct—witness intimidation and retaliation—could serve as the basis for her IIED claim. She does not describe the claimed witness intimidation or retaliation in any detail. She merely references an attack by Wrigley against her at Northwestern in January 2016, which she contends "strongly intensified [her] fear for her children's safety." Pl.'s Mot. for a New Trial at 8. She does not explain what conduct that attack consisted of. The Court assumes she is referencing Wrigley's filing of the ethics report to Northwestern in January 2016, but without more information the Court cannot be sure that is what she is referencing.

Regardless, Katherine has waived her challenge to the jury instructions. This is because Katherine intentionally chose not to seek a jury instruction that the IIED claim encompassed conduct other than threats, even though she made arguments on multiple occasions regarding the scope of conduct the claim covered. *See United States v. Heon Seok Lee*, 937 F.3d 797, 819 (7th Cir. 2019) (party's "repeated decisions" not to pursue an argument during district court proceedings despite multiple opportunities

"evinced a tactical choice" that constituted waiver), *cert. denied sub nom. Lee v. United States*, 140 S. Ct. 1125 (2020); *see also United States v. Withers*, 960 F.3d 922, 930 (7th Cir. 2020) (evidence that a party made a "knowing and intentional choice not to challenge [an] issue [with jury instructions] at trial provides sufficient ground to find waiver" (internal quotation marks omitted)); *see also Higbee*, 440 F.3d at 409 (7th Cir. 2006) (principles of plain error in the criminal context provide guidance in the civil context). Katherine must have known of the alleged witness intimidation and retaliation at trial, because she contends it could have served at the basis for her IIED claim. The fact that the jury instructions referenced only threats could not have come as a surprise. Thus it appears that Katherine made a strategic choice not to object to this jury instruction, and she cannot contend now that this instruction is erroneous.

In sum, Katherine has not shown that any error in the jury instructions entitle her to a new trial.

### 3.    Evidentiary arguments

Katherine next argues that a new trial is warranted due to the Court's decisions to exclude or admit certain evidence.[11] A new trial is warranted due to erroneous evidentiary rulings "only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Burton v. City of Zion*, 901 F.3d 772, 776 (7th Cir. 2018). "In other words," if there was a "flawed" evidentiary ruling, "there must be a significant chance that [it] affected the outcome of the trial." *Id.* In this case, because the Court concludes that its rulings were

---

[11] Though Katherine raised her evidentiary arguments in separate sections of her brief, the Court addresses these arguments together because the same standard applies in part to evidence admitted at trial as to evidence excluded from trial.

not erroneous, it need not consider whether there was a significant chance that the rulings affected the outcome of the trial.

### a. Excluded evidence[12]

#### i. Language from Katherine's letter

Katherine asserts that the Court erroneously excluded certain language from the letter she wrote to the New York judge who was overseeing the probate proceedings. The Court admitted the following sentence from the body of the letter: "The Colorado probate court found allegations of Pinto's misconduct sufficiently credible and troublesome to order an investigation of Pinto by the court-appointed forensic accountant, Pamela Kerr."  Pl.'s JMOL, Ex. 1 at ECF p. 44–45 (redacted version); *see also id.*, Ex. 1 at 17–18 (unredacted version).  Katherine contends that the Court erroneously excluded language from the heading under which that sentence appeared. The heading concerned the allegations that Pinto misappropriated Joanne's assets and in relevant part stated:  "and the Colorado Judge Found those Allegations Credible Enough to Authorize an Investigation of Pinto's Conduct by a Forensic Accountant."  *Id.* at 17 (emphasis omitted).  As indicated, Kerr quoted that language from the heading and, in her allegedly defamatory statement, described it as "100% false" and "completely false."  Pl.'s JMOL, Ex. 2 at 1.

Katherine made neither a timely objection nor an offer of proof concerning the exclusion of the language.  *See* Fed. R. Evid. 103(a)(2) (to preserve a claim of error on

---

[12] In her reply brief, Katherine contends she should have been permitted to introduce evidence from a case in the Eastern District of New York concerning allegations against Pinto.  The Court declines to address the merits of this contention, however, because "[p]arties waive arguments which they develop for the first time in a reply brief." *Campos v. Cook County*, 932 F.3d 972, 976 n.2 (7th Cir. 2019).

a ruling that excludes evidence, a party must inform the court of the substance of the evidence by an offer of proof, "unless the substance was apparent from the context"). At the beginning of the trial, Kerr's attorney asked the Court to admit all of Katherine's letter or, in the alternative, parts of it, including the heading in question. Katherine's counsel objected and asked the Court to include only the portion of the letter "that constitutes the defamatory statement." Trial Tr. at 157:24–158:1. After hearing argument, the Court asked Katherine's counsel to identify the defamatory statement she wanted to have admitted. Counsel pointed to the bottom of page 17 (though he expressed some confusion over the specific page number, because he apparently did not have a numbered copy of the letter). The Court admitted that language and described it as "the carryover paragraph at the bottom of page 17 and the top of page 18." *Id.* at 164:19–22. Katherine's counsel did not indicate to the Court that he disagreed or that Katherine sought to admit the heading, which appeared in the middle of the seventeenth page, let alone that she objected to its exclusion. Thus Katherine has not preserved her claim of error. *See* Fed. R. Evid. 103(a)(2).

Katherine argues, however, that her counsel did not waive her objection about the exclusion of the heading. She contends that her counsel stated the correct guiding principle—that Katherine sought to admit the part of the letter that Kerr later quoted—and merely identified the wrong language in the letter as the language he sought to have admitted. That contention misses the mark, however. It was incumbent on Katherine's counsel to identify the specific language he sought to have admitted, because it was not apparent from the context. *See id.*

Because Katherine did not object to the exclusion of the portion of the letter, its

exclusion is reviewable only for plain error. *See* Fed. R. Evid. 103(a)(2), (e). As indicated, "[t]his review is extremely limited" and discretionary. *Sanchez v. City of Chicago*, 880 F.3d 349, 360 (7th Cir. 2018); *Walker*, 867 F.3d at 805 ("Federal Rule of Evidence 103(e) permits (but does not require) plain-error review when a party fails to object to [an evidentiary ruling].").  Courts need not engage in plain error review where, as here, the alleged error was the result of an error a party "committed, invited, induced the court to make, or to which it consented." *See Sanchez*, 880 F.3d at 360; *see also Walker*, 867 F.3d at 807. Though Katherine contends that the exclusion of the language in the letter was "material" and "prejudicial," Pl.'s. Mot. for a New Trial at 11, she has not attempted to show "extraordinary circumstances resulting in a miscarriage of justice," *Walker*, 867 F.3d at 807. Her contention that the heading's admission would have helped her to strengthen her case simply does not meet this high standard. *See Jimenez v. City of Chicago*, 732 F.3d 710, 720 (7th Cir. 2013) (defendants' arguments that excluded evidence affected their substantial rights because it showed weaknesses in the plaintiff's case did not establish a plain error).

For these reasons, the exclusion of the heading on the seventeenth page of Katherine's letter was not plain error and does not warrant a new trial.

### ii.    Other portions of Katherine's letter

Katherine also asserts that the Court erred by admitting only one sentence from the letter she wrote to the New York judge instead of other portions of the letter, including the section in which that sentence appeared. She contends that other portions of the letter, together with a transcript from the Colorado probate court, would have enabled her to establish the falsity of Kerr's statement.  As indicated, however,

Katherine did not ask for the Court to admit other portions of the letter and did not object to their exclusion, so she has forfeited this argument. *See* Fed. R. Evid. 103(a)(2).

Nor has Katherine explained how excluding the section was a plain error that would have affected "substantial rights and result[ed] in a miscarriage of justice." *Walker*, 867 F.3d at 805. She contends that there was no other evidence by which she could establish the truth of her statement. That is an inaccurate characterization of the evidence she presented at the trial and just another way of arguing that this evidence would have strengthened her case. Katherine did have other means by which to attempt to establish the truth of her statement, including through her own testimony. Her failure to ask the Court to admit evidence that she now contends is particularly strong does not establish plain error. *See Jimenez*, 732 F.3d at 720.

If Katherine is contending that the jury would have been required to find in her favor on the defamation claim if she had introduced this part of her letter at the trial, the Court disagrees. As explained in the section of this opinion regarding Katherine's motion for judgment as a matter of law, there was sufficient other evidence that permitted the jury reasonably to find in Kerr's favor. To the extent Katherine suggests that it would have been apparent to the jury from the excluded section of her letter that she was merely offering her interpretation of the Colorado probate court's order and not a definitive description of it, she had the opportunity to explain that characterization of her letter when she testified at the trial. *See id.* (on a motion for a new trial, the court cannot re-weigh the evidence by drawing inferences in the losing party's favor).

Further, in the section of the letter that Katherine contends should have been admitted, Katherine alleged that Pinto made unauthorized and unreported withdrawals

from a bank account belonging to Joanne. If these allegations had been admitted at trial, then evidence to rebut them would have been admissible. This would have consisted of allegations against Katherine's husband Bernard—namely, allegations that Bernard, not Pinto, misappropriated money from Joanne's bank accounts. This rebuttal evidence would have been highly prejudicial to Katherine (and the Court had excluded it on that basis at Katherine's request), so it was appropriate for the Court not to admit the section of the letter containing allegations against Pinto. *See* Fed. R. Evid. 403.

For these reasons, the non-inclusion of the full section of the letter does not warrant a new trial.

### iii. Colorado probate court transcript

Katherine next asserts that the Court erroneously excluded a transcript from a hearing the Colorado probate court held on April 2, 2015.[13] She contends this transcript would have enabled her to establish the falsity of Kerr's allegedly defamatory statement.

In ruling on the parties' motions in limine, the Court found that this transcript was admissible with regard to "the truth or falsity of Kerr's statement accusing [Katherine] of lying to the New York judge about what Kerr was authorized to investigate by the Colorado judge." Dkt. no. 377 at 8. The Court reaffirmed that ruling after Katherine withdrew her defamation claim against Wrigley. Dkt. no. 411 at 14. Because the parties had not identified which parts of the transcript they contended were admissible, however, the Court declined to break down the transcript's admissible and non-

---

[13] Katherine did not provide a citation to this transcript or identify the date on which it occurred. Nonetheless, based on language she quoted from the transcript and her arguments about it, the Court infers that she is referring to the transcript of the hearing that took place on April 2, 2015 before the Colorado probate court.

admissible parts at that time.  *Id.* at 14–15.  It directed counsel to confer on the appropriate breakdown, but the parties were unable to reach an agreement, so on the first day of trial the Court directed them make submissions regarding their positions.

Meanwhile, after the Court issued its initial ruling on the motions in limine, Katherine stated in writing that she did not object to the admission of the order entered on April 2, 2015 by the Colorado probate judge.  Dkt. no. 403 at 13.  Relying on that statement, the Court found the order admissible.  Dkt. no. 411 at 15.

In a written ruling issued on the second day of the trial, referencing that finding and on the parties' submissions regarding the parts of the transcript they sought to admit, the Court excluded from trial the transcript of the April 2, 2015 proceedings because it found the transcript was "in large part, unnecessarily cumulative" of the April 2, 2015 order, "in a way that significantly outweighs its probative value."  Dkt. no. 416.  The Court stated that the non-duplicative material in the transcript was "largely irrelevant" or, if relevant, "unfairly prejudicial in a way that significantly exceeds its probative value."  *Id.*

During the trial, Katherine's counsel asked the Court to reconsider its decision to exclude the transcript.  Katherine sought to admit a portion of the transcript where that the Colorado probate judge indicated that there was a "big dispute" about Pinto's conduct.  *See* Trial Tr. at 801:5–7 (quoting Colorado probate court's transcript).  Katherine's counsel contended this language showed that the Court found, among other things, that the dispute "was a matter of big concern."  *Id.* at 801:8–13.  The Court ruled that the portion of the transcript was inadmissible because Kerr was not at the hearing, so she would have understood the scope of her investigation from the Colorado probate

judge's order, not the transcript. In addition, the Court ruled that the transcript was not admissible because the Colorado probate judge did not "make any findings," and the transcript "just provide[d] the background for why the order [was] entered." Trial Tr. at 802:20–22.

Katherine now asserts that the Colorado probate court's transcript would have been available to Kerr because, she contends, Kerr was a party to the proceedings. That does not accurately state Kerr's role in the Colorado proceedings. She was an accountant retained by a party to those proceedings, not a party herself. And Katherine has submitted no evidence indicating that Kerr had access to the transcript. More to the point, as the Court previously ruled, the Colorado probate judge did not make any findings in the transcript regarding the credibility of the accusations against Pinto. Thus, contrary to Katherine's contentions, the transcript had minimal probative value with regard to the issue of whether the Colorado probate court made findings on that point. *See* Fed. R. Evid. 403. And the transcript would not have enabled Katherine to definitively establish that the Colorado probate court authorized an investigation into Pinto's conduct, as she contends in her reply brief; the transcript does not reflect that the court expressly stated this. *See id.*

Further, Katherine does not explain why the Court's written ruling—that the proceedings were unnecessarily cumulative and otherwise unfairly prejudicial—was erroneous. Indeed, if anything, that ruling was beneficial to Katherine. By excluding the transcript, the Court also excluded testimony that was extremely and unfairly prejudicial to her, namely accusations that her husband Bernard had misappropriated Joanne's funds and testimony from Wrigley that Bernard maintained no relationship with Joanne.

34

*See id.*  For these reasons, the Court's exclusion of the transcript from the April 2, 2015 hearing before the Colorado probate court was not erroneous and does not warrant a new trial.

### iii.    E-mails between Bernard and Kerr

Katherine next contends that the Court erroneously excluded a series of e-mails sent between Bernard and Kerr.  In these e-mails, Bernard provided Kerr with information concerning Pinto and described some of the allegations against Pinto.  In response, Kerr asked questions about the information, including why Bernard was making his own withdrawals from Joanne's accounts.

Katherine contends that this information was "material" with regard to her defamation claim because it had a bearing on "whether Kerr was authorized to review Pinto's handling of Joanne's funds, whether she understood this to be her role, and the extensive work she actually did."  Pl.'s. Mot. for a New Trial at 16.  But, as the Court explained when ruling on a motion in limine filed by Katherine to exclude from the trial certain other evidence concerning Bernard, nothing about Bernard "has any bearing on the truth or falsity of Kerr's narrow and focused statement to the Northwestern dean." Dkt. no. 377 at 6.  When Katherine sought to introduce the e-mails at trial, the Court excluded the e-mails under Federal Rule of Evidence 403 as needlessly cumulative, because Kerr had already testified that she had received communications from Bernard during the course of her investigation, and unfairly prejudicial, because it was "a six- or seven-page single-spaced letter by [Bernard] that basically lays out all of his allegations about misconduct by Mr. Pinto."  *Id.* at 885:7–17.  The Court made a similar ruling with regard to other e-mails exchanged between Bernard and Kerr, finding that this evidence

was cumulative of questions and answers during Kerr's testimony and, alternatively, involved whether Pinto committed misconduct, which was not at issue at the trial. *Id.* at 885:20–886:2; *id.* at 886:5–9.

In her reply brief, Katherine contends that the Court should not have excluded these e-mails because they were not unfairly prejudicial to Kerr. The e-mails, however, raised a danger that the jury would infer that Kerr had been authorized by the Colorado judge to investigate Pinto from the fact Bernard was providing her information about Pinto. That substantially outweighed the probative value of the e-mails, which was minimal because they included no indication as to whether the court actually authorized Kerr to investigate Pinto's conduct. And their admission would have opened the door to evidence rebutting Bernard's allegations against Pinto—i.e., evidence regarding the conduct by Bernard that was at issue in the investigation—which would have been extremely and unfairly prejudicial to Katherine. This would have included an order issued by the Colorado court on January 4, 2018 in which, as this Court previously has described:

> the Colorado judge removed Bernard as trustee of certain trusts; stripped him of authority to make any decisions regarding funds or property of the trusts; ordered an accounting of assets to which he had access intended to benefit [Katherine]; directed him to disclose the source of his assets used to pay attorney's fees; and made findings that the actions of Bernard *and plaintiff Black* were 'shocking to the conscience.'

Dkt. no. 377 at 9–10 (emphasis added). The Court excluded that order from the trial because it was highly prejudicial to Katherine.

Admitting the e-mails Bernard sent to Kerr also would have opened the door to Kerr's forensic accounting report that addressed Bernard's alleged misconduct, which the Court excluded for similar reasons. *See* dkt. no. 411 at 15. Katherine cannot have

it both ways; she cannot contend that evidence concerning Pinto's alleged misconduct should have been admitted but that rebuttal evidence concerning her husband's alleged misconduct should have excluded.

Katherine also contends that these e-mails were not cumulative. That contradicts a statement her counsel made to the Court, indicating that Kerr had testified that she received information from Bernard during her investigation. Regardless, the presentation of these lengthy e-mails would have unnecessarily wasted time because, as indicated, they offered little probative value with regard to the scope of Kerr's investigation *as authorized by the Colorado probate court* and thus had no bearing on the truth or falsity of Kerr's allegedly defamatory statement to the New York judge. *See* Fed. R. Evid. 403.

For these reasons, the rulings were appropriate under Rule 403, and the Court's exclusion of the e-mails between Bernard and Kerr is not a basis for a new trial.

### iv. New York court's TRO and final order

Katherine contends that the Court erred in excluding "all evidence" relating to the guardianship proceedings in New York. Pl.'s. Mot. for a New Trial at 16. Specifically, she contends that the Court erred in excluding a temporary restraining order (TRO) the New York court issued against Wrigley and Kerr and a final order the New York court issued on June 7, 2016. Katherine has not submitted the TRO in connection with this motion or her motion for judgment as matter of law, but, as the Court described it during the trial, it precluded Wrigley and other people from contacting Katherine and her family. Trial Tr. at 297:23–25. In the relevant part of the New York court's June 7, 2016 order, the court declined to temporarily restrain Wrigley and others from contacting the Blacks

37

or Northwestern, and it discontinued the just-described TRO based on assurances that the parties and their attorneys would no longer contact Northwestern. Pl.'s JMOL, Ex. 9.

In her opening brief, Katherine contends that she sought to introduce this evidence to challenge Wrigley's credibility by showing that Wrigley broke an "express promise" she made to the New York court that she would not contact Northwestern again. Pl.'s. Mot. for a New Trial at 17. She contends this shows that Wrigley was motivated to lie in a deposition in this case to cover the alleged fact that she did contact Northwestern. That's not what Katherine's counsel said during the trial, though; he said Katherine sought to introduce the TRO because it would "confirm[] [Wrigley's alleged] extreme and outrageous conduct." Trial Tr. at 298:8–10. And, indeed, in her response brief, Katherine appears to change course by contending that the TRO would have helped her prove, among other things, "specific actions by Wrigley that served as a basis for the IIED claim." Pl.'s Reply Br. in Supp. of Mot. for a New Trial at 25. Regardless, as the Court explained during the trial, the TRO was highly and unfairly prejudicial because the jury would understand it as "some sort of third-party judicial confirmation of the accuracy of" the allegations in this case, which would have been misleading. *Id.* at 299:2–7. That ruling was appropriate, and Katherine has not shown otherwise. *See* Fed. R. Evid. 403.

The same is true for the New York court's June 7, 2016 order. Moreover, neither party has pointed to any part of the record indicating that Katherine previously sought to introduce that particular order at the trial, and, in reviewing the record, the Court has been unable to find any such indication either. Assuming Katherine did not seek to

introduce that order, she cannot claim that the exclusion of evidence was erroneous, let alone a plain error. *See* Fed. R. 103(a), (e).

In a footnote in her opening brief, Katherine also contends that a sworn answer to an amended petition that Wrigley filed before the New York court would have enabled her to show that Wrigley lied under oath. In that filing, Wrigley stated in relevant part that there were no allegations that Pinto had done anything improper with regard to Joanne. If Katherine is contending that this should have been admitted at the trial to challenge Wrigley's credibility, she has not shown that she asked the Court to admit it during her cross-examination of Wrigley, *see* Fed. R. Evid. 608, and the Court has found no indication in the record that she did. Thus, as with the New York court's order, Katherine cannot claim that the exclusion of evidence was erroneous, let alone a plain error. *See* Fed. R. 103(a), (e). Even if she had offered the evidence at trial, the filing's probative value in challenging Wrigley's credibility would have been substantially outweighed by the danger that it would have needlessly and unfairly misled the jury. *See* Fed. R. Evid. 403. This is because in the filing, Wrigley contended that a felony charge against Pinto was dropped and that he had never been convicted of a felony. As the Court previously ruled, evidence regarding Pinto's criminal history "has no bearing" on Katherine's claims. Dkt. no. 411 at 13. Admitting this filing would have opened the door to other evidence regarding Pinto's criminal history, which the Court excluded under Rule 403, ruling in favor of Katherine on a motion *in limine* she filed. Again, Katherine cannot have it both ways: she cannot seek to admit evidence concerning Pinto's criminal history where it favors her and to exclude other evidence concerning his criminal history where it undermines her case.

For these reasons, Katherine has failed to show that any error regarding the exclusion of the cited evidence from the New York court proceedings entitles her to a new trial.

### v.    Alleged perjury by Wrigley

Katherine next asserts that the Court erroneously excluded evidence that she contends shows that Wrigley committed perjury during discovery in this case.  Katherine appears to be referring to deposition testimony by Wrigley and a privilege log produced by the law firm where Wrigley's brother Anthony Dain works.  She contends this would have shown that Wrigley falsely testified about when she deleted an old e-mail account and when she began using a new one.  She further contends that, had the jury seen evidence of this and other alleged lies, it likely would not "have believed anything Wrigley said."  Pl.'s. Mot. for a New Trial at 18.

After Katherine's counsel examined Kerr on redirect, he asked to admit some of the evidence to which Katherine refers.  Some of it the Court excluded because it was "largely testimony about documents being lost, and not everything was recovered," which the Court found was irrelevant and unfairly prejudicial.  Trial Tr. at 883:4–7.  The Court excluded other exhibits because they were unnecessarily cumulative of Wrigley's testimony, and it indicated that Katherine's counsel had had the chance to address these issues when Wrigley was on the stand.  *Id.* at 883:8–17.  In asserting that the Court erroneously excluded this evidence, Katherine contends only that it was relevant and admissible to challenge Wrigley's credibility.  She does not attempt to explain how the evidence was not unfairly prejudicial to Wrigley, nor does she attempt to explain how it was not unnecessarily cumulative to Wrigley's testimony.  In other words, she

40

does not address the core of the Court's ruling.

The Court's exclusion of this evidence was appropriate. Wrigley's deposition testimony about the lost documents did not go to the merits of any of the claims against Wrigley. And though Katherine contends that the privilege log shows that Wrigley was lying about the dates when her e-mail account was hacked and she started using her new account, Katherine has not submitted the privilege log with her present motions, so the Court cannot determine whether it contradicts Wrigley's testimony. More importantly, even if the privilege log showed that Wrigley incorrectly testified as to when she stopped using her old account and started using her new one, that would not reasonably lead to the inference that Wrigley committed perjury in this case, as Katherine contends. *See, e.g.*, *United States v. Lathrop*, 634 F.3d 931, 940 (7th Cir. 2011) ("One commits perjury if, while under oath, he or she gives false testimony concerning a material matter with a willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."). The dates when Wrigley used her e-mail accounts are in no way material to this case. And it would have been unreasonable for a jury to infer on the basis of the transcript that Wrigley showed a willful intent to provide false testimony; the only reasonable inference would have been that she was confused or did not remember precisely when she switched e-mail accounts. In short, the evidence does not show what Katherine purports it does, and it was irrelevant to this case. *See* Fed. R. Evid. 401. For these reasons, the exclusion of this evidence does not warrant a new trial.

### b. Admitted evidence

Katherine asserts that the Court erroneously admitted the entirety of the

Colorado probate court's order dated April 2, 2015. She contends that passages in the order concerning accusations against Bernard were highly and unfairly prejudicial to her and irrelevant to the defamation claim against Kerr.

In a written response to the defendants' proffer of evidence, Katherine specifically stated that she did not object to the admission of the April 2, 2015 order issued by the Colorado probate court. Dkt. no. 403 at 13. The Court expressly relied on that statement when, in a written ruling it issued on August 18, 2019, it found the Colorado probate court's order admissible. Dkt. no. 411 at 15. The Court also noted that the order was relevant to the defendants' theory that Katherine allegedly had a motive or bias in bringing the present lawsuit. *Id.*; *see also id.* at 11.

The Court reaffirmed that finding after the first day of trial, when Katherine changed her position and contended that the order should be excluded. Dkt. no. 416. The Court stated that "[t]here is nothing wrong with seeking reconsideration of a ruling," but it declined to reconsider its decision, "particularly in light of the fact that the Court relied on the concession and the admissibility of this exhibit in making other rulings and was entitled to presume that plaintiff's decision not to object to admission of this exhibit was well-considered." *Id.* The Court also noted that Katherine's "attempt to change her position on this was made after opening statements, during which defendants were entitled to rely on the Court's ruling regarding admissibility." *Id.*

Those findings apply equally to this motion. Katherine waived her challenge to the Court's admission of the Colorado probate court's order by consenting to it. *See Sanchez*, 880 F.3d at 360; *Walker*, 867 F.3d at 805. And the Court acted appropriately in denying Katherine's attempt to seek reconsideration, because there was no manifest

42

error or change in the law (or the relevant background) that warranted re-examination of its initial ruling. *See, e.g.*, *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007); *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) ("A manifest error is not demonstrated by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." (internal quotation marks omitted)). Though Katherine contends that the Colorado probate court's April 2, 2015 order was unfairly prejudicial to her because it allowed the jury to see allegations against her husband, that does not amount to plain error. The Colorado court's April 2, 2015 order was highly probative because it bore directly on whether that court authorized an investigation into Pinto's conduct—an issue at the heart of the defamation claim—and this was not substantially outweighed by its potential for unfair prejudice against Katherine. *See* Fed. R. Evid. 403. Therefore, Katherine has waived the argument that the evidence was improperly admitted and has "failed to make a showing of the type of extraordinary circumstances required to establish plain error." *See* *Walker*, 867 F.3d at 805.

In sum, Katherine has not shown that the Court's evidentiary rulings were erroneous as to warrant a new trial.

### 4. Closing arguments

Katherine next contends that during closing argument, Kerr's counsel made four false statements to the jury concerning the contents of evidence that the Court excluded.[14] A party seeking a new trial based on alleged misconduct during closing

---

[14] To the extent Katherine also is contending in her reply brief that she is entitled to sanctions for Kerr's counsel's conduct during closing arguments, the Court disregards that request. As indicated, that is not the proper way by which to request sanctions.

arguments must clear a very high hurdle to obtain relief.  *See, e.g.*, *Smith v. Hunt*, 707

F.3d 803, 812 (7th Cir. 2013).  Specifically, a statement made during a closing

argument constitutes reversible error and warrants a new trial "only if the statement was

plainly unwarranted and clearly injurious."  *Id.* (internal quotation marks omitted).  The

Court addresses each statement that Katherine alleges is improper in turn.

First, Katherine contends that Kerr's counsel made a false statement regarding

the letter Katherine wrote to the New York judge.  Kerr's counsel said that Katherine

wrote in the letter that the Colorado probate court "ordered" Kerr to conduct an

investigation, not that the court "authorized" Kerr to do so, and he indicated that the jury

would not "find anything in there authorizing Kerr."  Trial Tr. at 1036:12–17.  Katherine

contends that this statement was false because, as indicated, she stated in a heading in

the letter, which was excluded from the trial, that the court authorized an investigation.

The difference between a court "ordering" and "authorizing" something seems

insignificant, as any authorization would have come in an order.  That aside, however,

Katherine did not object to this statement at the time, so she has waived this challenge.

*See Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008).  "[N]o plain error doctrine

exists to remedy errors which are alleged to have occurred during closing argument."

*Deppe v. Tripp*, 863 F.2d 1356, 1364 (7th Cir. 1988); *see also Kafka v. Truck Ins. Exch.*,

19 F.3d 383, 385 (7th Cir. 1994).

Regardless, even if review for plain error is appropriate, Kerr's counsel's

statement that the jury would not find language "authorizing Kerr" does not amount to

---

*See* Fed. R. Civ. P. 11(c)(2) ("A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b).").

plain error. *See Williams v. Dieball*, 724 F.3d 957, 964 (7th Cir. 2013) (finding that a party failed to preserve a challenge to comments made during opening arguments but nonetheless also finding that there was no plain error). This is because if the jury found that the Colorado probate court did not order an investigation of Pinto's conduct, as Kerr's counsel suggested, the jury nonetheless could have found that the court authorized Kerr to investigate Pinto's conduct, which would have confirmed the falsity of Kerr's defamatory statement and permitted a finding in Katherine's favor. Stated differently, despite Kerr's counsel's characterization of the issue, the jury could have found that the allegedly defamatory statement was false (i.e., that the Colorado court authorized such an investigation). In short, Kerr's counsel's statement was not "likely to have influenced the outcome." *See id.*

Second, Katherine contends that Kerr's attorney falsely stated that there was no order in which the Colorado probate judge made findings regarding Pinto's alleged misconduct. Katherine contends that the Colorado probate judge made such findings at a hearing on April 2, 2015, which she contends is reflected in the transcript and order from that hearing.[15] Again, Katherine did not object to this statement at trial, so she has waived this challenge. Regardless, to the extent the Colorado probate judge made such findings in the order from that hearing, contrary to Katherine's contentions in her briefs, that order *was* admitted at the trial. And the transcript, which was excluded from the trial, does not reflect that the Colorado probate judge made any findings regarding

---

[15] In her opening brief, Katherine describes this transcript and order only as the "Colorado Transcript" and provides no citation to it. Based on her reference to earlier arguments, her description of the transcript, and her reply brief, the Court infers that she is referring to the transcript of the proceedings before the Colorado court on April 2, 2015.

Pinto's alleged misconduct, as indicated. It therefore was appropriate for Kerr's counsel to note this apparent weakness in Katherine's case and did not amount to plain error. *See Soltys*, 520 F.3d at 745.

Third, Katherine contends that Kerr's counsel falsely stated that Katherine "invented another wrongdoer to deflect attention from" Bernard, implying that Katherine sought to cast the blame for Bernard's alleged misconduct on Pinto. Trial Tr. at 1034:14–16. Katherine objected to this statement, but the Court ruled that it was appropriate argument. That ruling was not erroneous; Kerr's counsel was suggesting an inference based on the evidence, which attorneys have leeway to do in their closing arguments. *See Soltys*, 520 F.3d at 745.

Finally, Katherine contends that Kerr's counsel falsely stated that Katherine wrote the letter to the New York court in an effort to influence that court's decision "to choose her husband" as Joanne's guardian. Trial Tr. at 1033:4–7. Without citing to any evidence, Katherine contends that some of the excluded evidence regarding the New York guardianship proceedings would have shown that this statement was false because Bernard had withdrawn his guardianship petition by that point. Katherine waived this objection by failing to make it at trial, but it lacks merit in any event. Even if this statement was incorrect, it was not "clearly injurious." *See Smith*, 707 F.3d at 812. This is because Katherine's motivation for writing the letter to the New York court was not at issue in the case. The issue for the jury's determination was whether Kerr's statement about what the letter said was false. Assuming Katherine's motivation in sending the letter had nothing whatsoever to do with an attempt to influence the New York court to choose Bernard as the guardian, that had no bearing one way or another

on whether Kerr mischaracterized the letter. Kerr's counsel's statement about Katherine's motivation is not a basis for a new trial.

In her reply brief, Katherine asserts several arguments regarding improper comments during closing arguments that she did not make in her opening brief. Specifically, she contends that Kerr's attorney's comments confused the jury and misled them about legal standard, apparently with regard to the publication element of the defamation claim and the knowledge element of the conspiracy claim. She contends that Kerr and Wrigley's attorneys told the jury that employees from Northwestern were not testifying because Katherine "lied about her injuries or [the] propriety of her behavior." Pl.'s Reply Br. in Supp. of Mot. for a New Trial at 5. And she contends that Kerr's attorney insinuated that she (Katherine) lied under oath. Because Katherine did not make these arguments in her opening brief, however, she has forfeited them, and the Court therefore disregards them. *See Campos v. Cook County*, 932 F.3d 972, 976 n.2 (7th Cir. 2019). Finally, even if any of Kerr's counsel's statements were improper, the Court mitigated any harm that those statements may have caused by instructing the jury that closing argument is not evidence. *E.g.*, *Soltys*, 520 F.3d at 745 ("[C]urative instructions to the jury mitigate harm that may otherwise have resulted from improper comments during closing argument."). There is no indication that "the jury was unable or unwilling to follow the court's instructions to refrain from treating the testimony of the attorneys as evidence." *Id.* at 744.

Katherine contends that the facts of this case are "eerily similar" to the facts of *Harbin v. Interlake Steamship Co.*, 570 F.2d 99 (6th Cir. 1978), where the Sixth Circuit found that a counsel's statement in his closing argument was improper because it "may

have had some influence" on the jury's verdict, *see id.* at 106. Pl.'s Reply Br. in Supp.
of Mot. for a New Trial at 1. The Court need not address any claimed factual similarities
between this case and *Harbin*, however, because the legal standard that the Sixth
Circuit adopted in that case does not apply here. In the Seventh Circuit, as indicated, a
counsel's statement in his or her closing argument warrants a new trial "only if the
statement was plainly unwarranted and clearly injurious," *Smith*, 707 F.3d at 812, not if
the statement "may have had some influence" on the jury's verdict, *Harbin*, 570 F.2d at
106.

For these reasons, the statements by Kerr's counsel during his closing argument
do not warrant a new trial.

### 4. Cumulative error

Katherine contends in her reply brief that the cumulative effect of the allegedly
erroneous jury instructions, erroneous evidentiary rulings, and improper comments
during closing arguments caused cumulative prejudice that warrants a new trial. She
did not make this argument in her opening brief, however, so she has forfeited it. *See
Campos v. Cook County*, 932 F.3d at 976 n.2. Regardless, because Katherine has not
shown the existence of multiple plain errors or errors that she preserved for review, she
has not shown that "multiple errors so infected the jury's deliberation that they denied
[her] a fundamentally fair trial." *Sanchez*, 880 F.3d at 361 (alteration omitted).

In sum, for the reasons stated above, the Court denies Katherine's motion for a
new trial.

### C. Costs

Finally, the Court turns to Kerr's motion to recover costs. "Unless a federal

48

statute, [the Federal Rules of Civil Procedure], or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "There is a presumption that the prevailing party will recover costs, and the losing party bears the burden of an affirmative showing that taxed costs are not appropriate." *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 893 (7th Cir. 2019). "This presumption is difficult to overcome," and, in deciding whether to award costs, a "district court's discretion is narrowly confined." *Id.*

### 1. Entitlement to costs

Katherine argues that Kerr is not entitled to costs. The Seventh Circuit has recognized "only two situations in which the denial of costs might be warranted: the first involves misconduct of the party seeking costs, and the second involves a pragmatic exercise of discretion to deny or reduce a costs order if the losing party is indigent." *Mother & Father v. Cassidy*, 338 F.3d 704, 708 (7th Cir. 2003). Katherine contends that both situations apply here.

### a. Misconduct

Courts have denied costs due to misconduct only in "exceptional circumstances," *Overbeek v. Heimbecker*, 101 F.3d 1225, 1228 (7th Cir. 1996), in which the prevailing party's extreme and repeated misconduct "needlessly extended or delayed the litigation." *Merix Pharm. Corp. v. Clinical Supplies Mgmt., Inc.*, 106 F. Supp. 3d 927, 941 (N.D. Ill. 2015) (Kennelly, J.). Katherine describes several circumstances she contends show extreme misconduct. [16]

---

[16] In her response brief, Katherine contends that any costs the Court awards should be offset by the legal fees she incurred for responding to Kerr's and Kerr's counsel's

First, Katherine contends that Kerr's counsel's allegedly improper statements in his closing arguments provide a basis for denying costs. But, as explained earlier in this opinion, Kerr's counsel's statements were not improper and did not harm her in any cognizable way. And even if they were improper, the statements were not so extreme as to be "worthy of penalty." *Smith v. DeBartoli*, 769 F.2d 451, 453 (7th Cir. 1985).

Second, Katherine contends that Kerr attempted to get an order from the Colorado probate judge ruling on the truthfulness of Kerr's statement to Northwestern, which Katherine characterizes as an attempt to "preempt" the jury's determination about the truthfulness of the statement in this case. Pl.'s Br. in Resp. to Kerr's Mot. for Costs at 8. Katherine is referring to a motion Kerr filed to extend fact discovery so that she could, among other things, obtain an order from the Colorado probate judge or testimony from the judge regarding whether she ordered or merely authorized Pinto's investigation. Katherine contends that the Court "made clear that this was inappropriate" at a hearing it held on September 13, 2018. *Id.* at 5.

That, however, mischaracterizes the Court's statements and ruling at the hearing. The Court said that it was "bizarre" for a party to ask a judge to explain a ruling she made more than three years after she made it, and it asked Kerr to explain how she planned to use that evidence if she was able to obtain it. *See, e.g.*, Sept. 13, 2018 Hr'g Tr. at 18:19–20:8. But the Court made no finding that Kerr's strategy was inappropriate. Instead, the Court denied Kerr's request to extend the discovery cutoff for this purpose because Kerr had not shown diligence in seeking to depose or obtain an order from the

---

misconduct. This is not a proper request to make in a response brief, and Kerr cites no law to support it. Therefore, the Court disregards it.

Colorado probate judge. Though Katherine contends that Kerr had unsavory intentions in seeking an order or testimony from a judge, she has cited no authority suggesting that Kerr's plan constituted misconduct that would warrant denial of costs. And, regardless, the plan did not delay the case, because, as indicated, the Court did not permit Kerr to obtain a discovery extension for that purpose.

Third, Katherine alleges that Kerr's counsel lied to the Court regarding his motivation to seek the just-described order or testimony from the Colorado probate judge. She points to a statement by Kerr's counsel that he did not know that the order or testimony from the Colorado probate judge would be necessary until he took Katherine's deposition, a statement that Katherine contends was undermined by counsel's later statement that he took actions to obtain such an order *before* Katherine's deposition. Although the Court agrees that, based on counsel's second statement, his first statement was false, this conduct is not so egregious that it would justify denying costs. *See Merix Pharm*, 106 F. Supp. 3d R 941 (attorney's improper comments did not warrant the denial of costs).

Fourth, Katherine alleges that Kerr improperly obtained an order from the Colorado probate court that she says contained critical remarks about her. Katherine contends that Kerr sought to introduce these allegedly improper remarks as evidence in this case and that the Court indicated that it would allow the remarks to be admitted at the damages stage of the trial if Katherine had prevailed on liability. But allegedly improper conduct in a separate case cannot serve to offset costs in this case. *See Mother & Father*, 338 F.3d at 708. And Kerr did not commit misconduct by attempting to introduce an order from the Colorado probate court as evidence in this case. In any

event, the present case never got to a damages phase in light of the jury's finding of no

liability.  This conduct does not warrant denying costs.

Fifth, Katherine alleges that Kerr knew that Wrigley was engaging in alleged

witness tampering and perjury and did nothing to stop this.  The Court need not address

whether Wrigley engaged in witness tampering or perjury, because even if she did,

Katherine has not attempted to explain how that misconduct is fairly attributable to Kerr

or Kerr's attorneys.  Only misconduct *by the party seeking costs* can warrant the denial

of costs.  *Mother & Father*, 338 F.3d at 708.

In sum, Katherine has not shown that Kerr or her attorneys engaged in

misconduct that renders the denial of costs appropriate.

### b.    Inability to pay costs

Katherine also contends that she is unable to pay costs.  "To deny costs based

on indigency, the court must first make a threshold factual finding that the losing party is

incapable of paying the court-imposed costs at this time or in the future."  *Richardson*,

926 F.3d at 893 (7th Cir. 2019) (internal quotation marks omitted).  "The burden is on

the losing party to provide the district court with sufficient documentation to support

such a finding."  *Id.*  "This documentation should include evidence in the form of an

affidavit or other documentary evidence of both income and assets, as well as a

schedule of expenses."  *Rivera v. City of Chicago*, 469 F.3d 631, 635 (7th Cir. 2006).

Katherine has submitted an affidavit to the court regarding her inability to pay

costs, but she provided no information in it regarding her income or assets, nor a

schedule of expenses.  Instead, she states that the Court "already has all financial

information about my income and other financial matters from discovery in the

underlying case," and she describes some of her financial responsibilities and the size of her legal bills.  Pl.'s Br. in Resp. to Kerr's Mot. for Costs, Ex. A ¶ 2.  Those statements do not come close to carrying her burden to prove her inability to pay costs.

For these reasons, the Court finds that Kerr is entitled to costs.

## 2.     Amount of costs

Courts may award specific litigation-related costs under 28 U.S.C. § 1920.  The statute specifically enumerates certain costs that are taxable:

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.  The party seeking costs has the burden of establishing that, where appropriate, the costs it incurred were reasonably necessary to the litigation.  *See Nat'l Org. for Women, Inc. v. Scheidler*, 750 F.3d 696, 698 (7th Cir. 2014); *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 702 (7th Cir. 2008).  But, in this context, "necessary" does not mean "indispensabl[e]"; rather, the party seeking costs must simply that costs were incurred for more than attorney preference or convenience.  *See Scheidler*, 750 F.3d at 698; *Majeske v. City of Chicago*, 218 F.3d 816, 825 (7th Cir. 2000).

Kerr seeks costs for the fees for the service of summons and subpoenas, fees for printed or electronically record transcripts, costs of exemplification and copies, and docket fees.  The Court addresses each in turn.

### a.     Service of summons and subpoenas

Kerr seeks $1,012.00 for fees to serve summons and subpoenas. This includes $200 in rush service fees. A prevailing party may recover costs paid to private process servers that do not exceed the marshal's fee. *Collins v. Gorman*, 96 F.3d 1057, 1060 (7th Cir. 1996). Katherine does not contend that Kerr seeks costs for serving summons and subpoenas in excess of the marshal's fees.

Katherine, however, contends that it is unreasonable for Kerr to recoup rush or expedited service fees. The Court agrees. "[A]dditional fees associated with rush service are not appropriately compensable without explanation for why they were necessary." *GC2 Inc. v. Int'l Game Tech.*, No. 16 C 8794, 2019 WL 3410223, at *2 (N.D. Ill. July 29, 2019) (Kennelly, J.). In her opening brief, Kerr contends rush service was necessary due to upcoming discovery deadlines, but then in her reply brief she contends that three of the rush fees applied to the service of subpoenas for witnesses at trial, not depositions. Either way, she has not attempted to explain why she did not serve the subpoenas earlier, so she has not shown that rush service was necessary. Therefore, the Court declines to award her costs for rush service.

Katherine contends that Kerr should not be awarded costs for service of subpoenas upon Northwestern or individuals affiliated it without presenting evidence that university administrators refused to be served via e-mail. Parties are not required to attempt service via e-mail before attempting in-person service. *See* Fed. R. Civ. P. 45(b). Katherine has cited no case suggesting otherwise. Therefore, the Court declines to reduce Kerr's costs on this basis.

Katherine also contends that Kerr should not receive costs for service to Bernard Black in Illinois at a time when Kerr's counsel allegedly knew he was living in Israel.

The Court disagrees. Even if that was a valid basis for reducing costs (which the Court need not decide), Katherine has not carried her burden of showing that costs were not appropriate for this service. This is because she has not submitted evidence showing that Bernard was living in Israel at that time or that Kerr knew he was living there. *See Richardson*, 926 F.3d at 893 ("[T]he losing party bears the burden of an affirmative showing that taxed costs are not appropriate.").

Katherine contends that all of Kerr's costs for service of process should be divided by four because there were four defendants at the times of service and that she should be taxed only for Kerr's one-fourth share of the expenses. But the invoices Kerr has submitted reflect that she was charged the amounts for the process service fees that she requested. Though Katherine contends that Kerr is seeking to be awarded more than her fair share of the costs, Katherine has not carried her burden of affirmatively showing that is the case. *See id.*

For these reasons, the Court awards Kerr $812 for the service of summons and subpoenas—the amount she requested less the rush fees for the service of certain subpoenas.

### b. Transcripts and records

Kerr seeks a total of $30,621.44 in costs related to transcription and recording.[17] This request is broken down into (1) transcription, videography, and other costs related to depositions and (2) transcription costs related to court proceedings.

---

[17] In her opening brief, Kerr stated that she sought $30,541.44 for these costs. As explained in more detail in the next footnote, she miscalculated the sum of the costs she requested for one deposition. After adjusting that calculation, the amount she seeks is $30,621.44.

### i.    Depositions

Kerr seeks $20,322.54 for costs associated with depositions.[18]  This includes costs for standard transcriptions ($11,223.24), real-time electronic transcriptions ($3,319), videography ($2,762.50), appearance fees for court reporters ($1,260), fees associated with the use of exhibits during depositions ($982.80), video synchronization fees ($400), and processing fees ($375).  Katherine disputes some of these requests.

Katherine contends that real-time transcripts are not reasonably necessary and thus not recoverable.  The Court agrees.  At least in the present case, the record reflects that "real-time transcription services are a *convenience*, not a necessity." *Cascades Computer Innovation, LLC v. Samsung Elecs. Co.*, No. 11 C 4574, 2016 WL 612792, at *4 (N.D. Ill. Feb. 16, 2016) (Kennelly, J.).  The Court declines to tax Katherine for Kerr's choice to pay for real-time transcription.

Katherine also disputes the costs Kerr seeks to recover for the videography of Katherine and Bernard's depositions.  Kerr seeks to recover $1,787.50 for the video of Katherine's deposition, $400.00 for the synchronization of that video, and $975.00 for the video of Bernard's deposition.  A prevailing party can recover costs for both video and stenographic transcription of a deposition where those costs were "reasonable and necessary to the litigation."  *Little*, 514 F.3d at 702.  Kerr contends the video of Katherine's deposition was necessary so that the jury could compare her deposition with

---

[18] In her opening brief, Kerr states that she seeks $20,242.54 in costs, but as indicated, there is an error in the calculation of the costs relating to the deposition of Jason Jared. Kerr stated that she sought $508.50 for that deposition, but the total costs she listed actually add up to $588.50 ($384.40 for the transcripts, $80 for the court reporter's attendance, $112.50 for real-time transcripts, $12.60 for exhibits, and $35 for processing).

her demeanor at trial.  The Court disagrees.  Kerr knew Katherine would be testifying at the trial, so the video of her deposition was not necessary but rather was a strategic means by which Kerr sought to bolster her case.  The Court declines to award costs for the video or its synchronization.

The Court, however, awards costs for the video of the deposition of Bernard.  He was on sabbatical in Israel at the time of the deposition, so it was reasonable for Kerr to presume that he might not be within the Court's subpoena power at the time of trial. *See Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, No. 13 C 321, 2016 WL 316865, at *2 (N.D. Ill. Jan. 26, 2016) (Kennelly, J.) (reasonable for party to request both printed transcripts and a recording of a deposition where the deponent was outside the subpoena power of the Court and therefore could not have been compelled to testify at trial).  Though Katherine responds that Kerr had no reason to believe that Bernard would not return to Illinois before the trial, the determination of whether a deposition-related cost is necessary "must be made in light of the facts known at the time of the deposition." *See Mother & Father*, 338 F.3d at 712.

Katherine also disputes the taxation of certain fees related to depositions, including the fees for the court reporter's attendance, processing, and exhibits, because she contends these are fees that should have been split among the defendants.  The invoices Kerr has submitted show that she paid these fees in the depositions for which she requested their reimbursement.  As with the fees for the service of summons and subpoenas, Katherine contends that the parties shifted all of their costs to Kerr and thus that Kerr is requesting more than her fair share.  But she has provided no evidence in support of this contention and thus has not carried her burden to prove that these costs

are not appropriate. *See Richardson*, 926 F.3d at 893. Accordingly, the Court declines to reduce Kerr's costs on this basis.

Katherine further disputes Kerr's requests for the costs of transcripts for depositions that Katherine ordered, for which Katherine paid for the original or first copy of the transcripts. She contends Kerr should be reimbursed only for the lower fees associated with copies of those originals. But, for the at-issue depositions, Kerr has sought either the rate established by the Judicial Conference or the amount she incurred (where it was lower than the rate established by the Judicial Conference). Local Rule 54.1 allows for recovery of the full charge of the transcript, "so long as it does not exceed the highest maximum rate as established by the Judicial Conference." *Gallagher v. Gallagher*, No. 07 C 4196, 2010 WL 2610192, at *4 (N.D. Ill. June 24, 2010) (Kennelly, J.). Accordingly, the Court declines to reduce the amount of costs in this regard.

For depositions the defendants ordered, Katherine contends that the costs of the transcripts should be divided by the number of defendants who were involved in the case at the time of the deposition. This is because, she contends, there is a "good chance" Wrigley (and, apparently, the other defendants) did not pay for the transcripts for those depositions and received them for free from Kerr. Pl.'s Br. in Resp. to Kerr's Mot. for Costs at 21. At the same time, Katherine appears to contend that Wrigley paid Kerr for at least some transcripts at a rate she refers to as the "Wrigley Rate," which Katherine appears to have presumed by basing it on the rate for copies of transcripts. *See id.*; *see also id.* at 23. She has, however, presented no evidence that either of these arrangements were in place, and Kerr asserts that each party paid for its own

transcripts.  Because Katherine has presented no evidence to the contrary, the Court

declines to reduce the costs of the transcripts on this basis.[19]  *See Richardson*, 926

F.3d at 893.

For these reasons, the Court awards Kerr $14,816.04 for transcript and recording

costs associated with depositions—the amount she requested less the cost of real-time

transcripts, the videography of Katherine's deposition, and the synchronization of the

video of Katherine's deposition.

### ii.    Court proceedings

Kerr seeks $10,298.90 for transcripts of court proceedings—$1,278.35 for

transcripts of ten pretrial hearings, $6,515.85 for same-day transcripts of the trial, and

$2,504.70 for real-time transcripts of the trial.  With regard to the pretrial hearings, Kerr

seeks costs for expedited, three-day, and/or same-day transcripts.

Katherine contests the costs of expedited, three-day, or same-day transcripts for

the pretrial hearings.  "Courts in this District have generally awarded costs for

transcripts of such proceedings only when the prevailing party articulates some specific

necessity—for example, where the written record of the status call or motion hearing

was the basis for, or relevant to, some subsequent motion or filing, or to supply out-of-

state counsel with a record of the proceedings."  *Hillman v. City of Chicago*, No. 04 C

6671, 2017 WL 3521098, at *7 (N.D. Ill. Aug. 16, 2017) (Kennelly, J.).  Katherine points

out that Kerr has not specifically explained why it was reasonably necessary to

---

[19] Katherine contends that "the right solution" to the question of whether Wrigley paid for
her own transcripts "could be to demand that Wrigley" produce bills for those costs.
Pl.'s Br. in Resp. to Kerr's Mot. for Costs at 21.  It is not clear who Katherine is
contending should make that demand.  If she is asking the Court to make it, she has not
filed a motion making such a request, so the Court disregards it.

purchase expedited transcripts for certain hearings. All Kerr has said is that there was a "short turnaround time for copying with certain discovery instructions" or preparing for trial; she has not explained what information each transcript contained that she needed within a short timeframe. *See* Kerr's Mem. at 11. The Court agrees that this is not a sufficiently specific articulation for why Kerr needed expedited transcripts. *Cf. GC2*, 2019 WL 3410223, at *3 (party articulated a sufficiently specific explanation where it explained that it needed a particular expedited transcript because the court had explained its ruling at the hearing). Therefore, the Court declines to award the costs of expedited transcripts for the pretrial hearings and reduces the amount of the costs she requested for pre-trial by one-third, amounting to a total of $852.23.

The Court also is persuaded that the costs stemming from the transcription of the trial must be reduced. As indicated, Kerr seeks reimbursement for same-day transcripts and real-time transcripts of the trial. Because the trial involved a reasonable degree of complexity, the Court concludes that it was reasonably necessary for Kerr to purchase some form of transcript for her counsel's use during the trial. *See id.* at *3. But Kerr has not explained to the Court why she needed two different forms of transcripts, and the Court is not persuaded that both were reasonably necessary as required for an award of costs. For that reason, the Court will award Kerr only the cost of the first transcript she received—the electronic real-time version. *See id.* Under different circumstances, the Court "might be moved to award the cost of fully corrected daily transcripts," but Kerr has made no attempt to persuade the Court that she needed to pay for a same-day transcript when she already had received a real-time electronic one. *See id.*

As with the costs of the deposition transcripts, Katherine contends that the costs

60

of the trial transcripts should be reduced for the occasions Kerr purchased a copy of the transcript and not the original. The Court disagrees. For the occasions when Kerr purchased a copy of a transcript, as she did for the hearing on May 29, 2019, for example, she has requested only the amount she paid for that copy. In other words, the receipts she has submitted do not reflect that she has requested to be reimbursed more than she paid, and the Court declines to reduce her award on this basis.

In addition, as with the costs of deposition transcripts and service and summons of subpoenas, Katherine contends that the costs of the transcripts should be divided by the number of defendants involved in the case at the time of the corresponding hearing or the trial. Alternatively, she contends that the Court should permit Kerr to recover only the "Wrigley Rate," the rate, as indicated, that Katherine presumes Wrigley paid Kerr to buy copies of the transcripts. Because, as explained above, Katherine has provided no evidence that Kerr divided the costs of the transcripts with any of the defendants or that Wrigley paid Kerr for transcripts, the Court declines to reduce the award on that basis.

In sum, for the transcripts of court proceedings, the Court awards Kerr $3,356.93—the reduced cost of the transcripts of pretrial hearings ($852.23) and the cost of real-time transcripts during the trial ($2,504.70).

### c. Exemplification and copies

Kerr seeks reimbursement for the costs she paid to copy case files from other litigation proceedings involving the Black family ($852.00) and to create two demonstrative exhibits she presented at trial ($7,443.76). Expenses for copying materials and creating demonstrative exhibits are recoverable costs where those materials were reasonably necessary at the time the costs were incurred. *Srail v.*

61

*Village of Lisle*, No. 07 C 2617, 2008 WL 5272459, at *5 (N.D. Ill. Dec. 15, 2008) (Kennelly, J.).

Katherine disputes the cost of the case file copies. Among other things, she contends those files not reasonably necessary for this case, because they involved unrelated litigation. Kerr contends that the documents she copied were related to this case because they involved proceedings that were relevant to the defamation claim in this case. But Kerr has not shown, and does not appear to contend, that these documents related only to the proceedings concerning the issues raised by the defamation claim. Instead, in her reply brief, she contends that information about other litigation involving Katherine generally was related to this case because Katherine put her reputation at issue in this case. Though the Court agrees that Kerr does not need provide an overly detailed description of the documents she copied, *see Northbrook Excess & Surplus Insurance Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991), the Court is not persuaded that the copies were reasonably necessary for Kerr's defense in this case. *See Cascades Computer Innovation*, 2016 WL 612792, at *6 (declining to award costs for copies where "no detail contained in any documentation or invoice that indicates what documents were produced or why they were necessary"). Therefore, the Court declines to award any costs for those copies.

Katherine also disputes the cost of Kerr's demonstrative exhibits. "To determine whether an exemplification was necessarily produced, the Court considers 'whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed. In other words, is exemplification vital to the presentation of that information, or was it merely a convenience or, worse, an

extravagance?'" *Id.* at *7 (quoting *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 428 (7th Cir. 2000)). Kerr's exemplifications consisted of a very simple map of the location of related litigation proceedings—i.e., a map showing the locations of Illinois, New York, and Colorado—and a chart showing the various individuals involved in the case. Kerr asserts that the cost for these two very simple posters was $14,887.52, which she split evenly with Wrigley, and that they helped the jury understand the facts of the case. Katherine contends that these costs are excessive and that the exemplifications were not necessary. The Court agrees; in fact, the term "excessive" does not quite capture the exorbitant amount claimed. The Court is not persuaded that a map or chart was reasonably necessary to help the jury understand the facts. Rather, they were extravagances, at least at the price that was charged. The Court declines to award costs for these demonstratives.

### d. Docket fees

Kerr also seeks $20 for docket fees, to which Katherine does not object. Accordingly, the Court awards that cost to Kerr.

### e. Summation

For the reasons stated above, the Court limits Kerr's award of costs to $19,004.97. This award consists of $812 for the costs of service of summons and subpoenas, $14,816.04 for the costs of transcripts and recording associated with depositions, $3,356.93 for the costs of transcripts of court proceedings, and $20 for docket fees.

## Conclusion

For the foregoing reasons, the Court denies Katherine Black's motions for

judgment as a matter of law [dkt. no. 437] and for a new trial [dkt. no. 435].  The Court

grants Pamela Kerr's motion for costs in part [dkt. no. 442] and awards Kerr $19,004.97

in costs.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 3, 2020