```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
      KATHERINE BLACK,                    )    Docket No. 17 C 101
 4                                        )
                          Plaintiff,      )
 5                                        )
                vs.                       )
 6                                        )
      CHERIE WRIGLEY, et al.,             )    Chicago, Illinois
 7                                        )    August 23, 2019
                          Defendants.     )    9:18 o'clock a.m.
 8

 9                  TRIAL TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
10                          VOLUME 4-A

11
      APPEARANCES:
12

13    For the Plaintiff:      LAW OFFICES OF DONALD L. HOMYK
                              BY:  MR. DONALD LEE HOMYK
14                            6944 North Ionia Avenue
                              Chicago, IL  60646
15                            (773) 805-4393

16
                              SHARAN R. ABRAHAM, ESQ., PLLC
17                            BY:  MS. SHARAN RACHEL ABRAHAM
                              37 South Street
18                            Roslyn Heights, NY  11577
                              (516) 672-1039
19

20

21

22

23    Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Suite 2102
                              Chicago, Illinois  60604
25                            (312) 435-5639
```

```
 1   APPEARANCES CONTINUED:

 2
     For Defendant              MANDELL MENKES LLC
 3   Pamela Kerr:               BY:   MR. STEVEN P. MANDELL
                                      MR. STEVEN L. BARON
 4                                    MR. GEORGE V. DESH
                                One North Franklin, Suite 3600
 5                              Chicago, IL  60606
                                (312) 251-1000
 6

 7   For Defendant
     Cherie Wrigley:            MANCILLA & FANTONE, LLP
 8                              BY:   MR. ROBERT MARIO FANTONE, JR.
                                      MR. ANDREW MANCILLA
 9                              260 Madison Avenue, 22nd Floor
                                New York, NY  10016
10                              (646) 225-6686

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (The following proceedings were had in open court outside

2    the presence and hearing of the jury:)

3              THE CLERK:  Case No. 17 C 101, Black v. Wrigley.

4              THE COURT:  Good morning.  Can I get the lawyers'

5    appearances for the record, please.

6              MR. FANTONE:  Robert Fantone and Andrew Mancilla for

7    Ms. Wrigley.  Good morning, Judge.

8              MR. HOMYK:  Don Homyk for the plaintiff, sir.

9              MS. ABRAHAM:  Sharan Abraham.

10             MR. MANDELL:  Steve Mandell and Steve Baron on behalf

11   of Defendant Pam Kerr.

12             THE COURT:  Okay.  We are going to talk about the

13   instructions at the first break.  So we won't do that right

14   now.  We're just going to keep going with the witness.

15             Ms. Kerr, you can come back up.

16             And you can get the jury.  We are starting on time.

17             There is one that's apparently on their way here, so

18   just sit tight.

19     (The jury enters the courtroom.)

20             THE COURT:  Okay.  You can all have a seat.  I'm just

21   going to direct everybody's attention to the clock on the far

22   wall.  We are starting on time.  A tiny pat on the back to

23   myself.

24             Good morning.  We are ready to resume with Ms. Kerr's

25   testimony.

Kerr - cross by Mr. Baron

786

1       Do you understand that you're still under oath?

2       THE WITNESS:  Yes.

3       THE COURT:  All right.  Mr. Baron, you can go ahead.

4                           - - -

5          PAMELA KERR, CROSS-EXAMINATION (CONTINUED)

6   BY MR. BARON:

7   Q.  Good morning, Pam.

8   A.  Good morning.

9   Q.  When we left off yesterday, I had shown you Defendants'

10  Exhibit 30, which was the April 2nd, 2015, hearing order.  Do

11  you remember that?

12  A.  Yes.

13  Q.  And I asked you to look through the entirety of the order,

14  and you did that, correct?

15  A.  Yes.

16  Q.  And did you find anything in that order that authorized

17  you to investigate Esaun Pinto?

18  A.  No.

19  Q.  Did you find anything in that order where a court made

20  findings of misconduct against Esaun Pinto sufficient to order

21  you to investigate Esaun Pinto?

22       MR. HOMYK:  Objection, Judge.  I think we went over

23  this yesterday.

24       THE COURT:  To a very significant extent, we did.

25  That objection to that question is sustained.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 5 of 169 PageID #:16678
Kerr - cross by Mr. Baron
787

1  BY MR. BARON:

2  Q.  And did you find anything in that order that indicated you

3  were court appointed?

4  A.  No.

5  Q.  All right.  I want to take one step back for a moment,

6  Pam, and talk a little bit about your forensic investigation

7  of the conservatorship estate.  We talked a little bit about

8  that yesterday.

9       Now, in my opening, I talked about the

10  conservatorship as sort of like a box, right?  It held assets

11  and other funds.  And maybe for the jury's benefit, describe

12  what you did in the months-long investigation that you engaged

13  in.

14  A.  What I did was to review the beginning assets of the

15  conservatorship estate and then look at any of the

16  disbursements out of the conservatorship estate, whether it

17  was a transfer or an expense paid by the court-appointed

18  conservator.

19  Q.  And who had control over all of the entirety of the funds

20  that came in and out of the conservatorship estate?

21  A.  The court-appointed conservator, Bernard Black.

22  Q.  And you mentioned in your testimony I think yesterday that

23  there were somewhere around 25 bank accounts, correct?

24  A.  Correct.

25  Q.  And did you conduct an accounting involving those bank

Kerr - cross by Mr. Baron

788

 1   accounts?

 2   A.  Yes.  What we do is it's called reconstructing --

 3           THE COURT:  Yes is the answer.

 4           MR. HOMYK:  Judge, this is irrelevant.

 5           THE COURT:  Yes is the answer.  Ask another question,

 6   and then I'll take the objection to the next question.

 7           MR. BARON:  Okay.

 8   BY MR. BARON:

 9   Q.  So there were 25 bank accounts that you had to

10   reconstruct; is that correct?

11           THE COURT:  Can I see the lawyers at sidebar?

12           MR. HOMYK:  Objection.

13     (The following proceedings were had at sidebar outside the

14   hearing of the jury:)

15           THE COURT:  So I understand that it's important for

16   you to be able to prove the work that she did in order to

17   establish her state of mind regarding the truth or falsity of

18   the statement that's made about her.  I get that.  But we are

19   not going to, sort of by implication, essentially get in the

20   evidence that I excluded regarding Mr. Black.  So this is the

21   last I'm going to hear about the 25 accounts, okay?

22           MR. MANDELL:  One thing, your Honor.

23           THE COURT:  This is the last I'm going to hear about

24   the 25 accounts.

25           MR. MANDELL:  I understand.  The thing is is that she

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 7 of 169 PageID #:16680
Kerr - cross by Mr. Baron
789

1    also looked at statements from law firms, accountants to see

2    the funds.  Was she investigating those law firms and

3    accountants?  No.  So the fact that she looked at invoices and

4    things relating to Pinto does not establish that she was

5    investigating Pinto.  And we're entitled to put in evidence of

6    the other things, other service providers, that she looked at.

7           THE COURT:  Okay.  I get what you're saying.  Go

8    ahead.

9           MR. HOMYK:  There's nothing in that April -- the

10   April 2nd order is the only pivotal document here.  There is

11   nothing in that order that speaks to other accountants and

12   lawyers being looked at in any way, shape, or form.  The only

13   person, the only other person that's being looked at is Pinto.

14   They're just trying to sneak in this other stuff.

15          THE COURT:  I get what you're saying.

16          MR. HOMYK:  Pinto is the other guy in that order,

17   Judge.

18          THE COURT:  I get what you're saying.  But, look, so,

19   I mean, you relied in your examination of I think it was her

20   but also other witnesses on that general language at the

21   beginning of the April 2nd order about full investigation of

22   the conservatorship.  Okay.

23          MR. HOMYK:  True.

24          THE COURT:  As part of your pitch, that's, you know,

25   part of what she's doing is looking into Pinto.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 8 of 169 PageID #:16681
Kerr - cross by Mr. Baron
790

1    MR. HOMYK:  True.

2    THE COURT:  This is also part of that same thing, so

3  I don't think it's inappropriate.  What I said and what I'm

4  continuing to say is that we're not going to sort of get in by

5  implication, wink-wink, nod-nod, the stuff that I excluded.

6    We are not going to hear about the 25 bank accounts

7  anymore.  It's fine for you to elicit that she reviewed

8  transfers to law firms, transfers to this, transfers to that.

9  We are not going to get into what the conclusions of that

10 were.  And you can ask her, did you consider that to be an

11 investigation, or whatever your question is.  That's fine.  I

12 mean, I completely get that.  That's appropriate.  But if I

13 cut you off in the middle of something, it's because I think

14 we're getting too close to the line.  Okay?

15    MR. BARON:  All right.  Thank you.

16   (The following proceedings were had in open court in the

17 presence and hearing of the jury:)

18    THE COURT:  All right.  You can proceed, Mr. Baron.

19 BY MR. BARON:

20 Q.  Okay.  Pam, as part of your review of the conservatorship

21 estate, did you look at bills that the conservator paid to

22 attorneys?

23 A.  Yes.

24 Q.  Did you look at bills the conservator paid to accountants?

25 A.  Yes.

Kerr - cross by Mr. Baron

791

1  Q.  And did you look at bills that the conservator paid to
2  other service providers like Esaun Pinto?
3  A.  Yes.
4  Q.  And did you consider that investigating the attorneys?
5  A.  No.
6  Q.  Did you consider that investigating the accountants?
7  A.  No.
8  Q.  Did you consider that investigating Esaun Pinto?
9  A.  No.
10 Q.  Where did you get the invoices from relating to Mr. Pinto?
11 A.  Mr. Black.
12 Q.  It was Mr. Black who provided them to you?
13 A.  Correct.
14 Q.  Now, after you -- after the April 2 order, you continued
15 your investigation; is that correct?
16 A.  Correct.
17 Q.  Okay.  And did there come a time when you prepared a
18 written report about your forensic evaluation?
19 A.  Yes.
20 Q.  And did you submit that court -- that evaluation, that
21 written report to the Court?
22 A.  I submitted it to the -- my client, Gayle Young.
23 Q.  Do you remember how many pages it is?
24 A.  Between 15 and 17 without the schedules.
25 Q.  Would it be helpful to refresh your memory if I showed you

Kerr - cross by Mr. Baron

792

1   a copy of the report?

2   A.  Yes.

3   Q.  Okay.

4           THE COURT:  Hang on a second.  I got to flip it over

5   to your thing.  Sorry.

6           MR. BARON:  Judge, this is one I think --

7           THE COURT:  We are just going to show it to her.

8           MR. BARON:  Okay.

9           THE COURT:  All right.  You are on the far table?

10  You are running it back there?

11          MR. BARON:  This is Defense Exhibit 34.

12          THE COURT:  It's the second table, though?  I have a

13  different switch.

14          MR. BARON:  Second table.

15          THE COURT:  It's kind of like a roadie panel up here,

16  and I have to know which thing to click.

17          All right.  So let me just do this again.  All right.

18  There you go.

19          Now, the witness can see whatever you are going to

20  put up.  All right.

21  BY MR. BARON:

22  Q.  Okay.  So, Pam, just take a quick look.  Is this the cover

23  page of your report of June 2, 2015?

24  A.  Yes.

25  Q.  Okay.  And back to my last question, if we can scroll all

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 11 of 169 PageID #:16684
Kerr - cross by Mr. Baron
793

1 the way to the last page.  Does that help refresh your memory
2 about how many pages just the report itself was?
3 A.  Yes.
4 Q.  How many pages was it?
5 A.  17.
6 Q.  Okay.  And in any of the 17 pages of your report, did you
7 make any sort of finding or conclusion about misconduct of
8 Mr. Pinto?
9 A.  No.
10 Q.  In fact, did you make any sort of conclusion about
11 Mr. Pinto and the work that he did in this report?
12 A.  No.
13 Q.  Thank you.
14         Did you submit this report to Judge Leith in the
15 Denver probate court?
16 A.  Actually, Gayle Young submitted it as part of the court
17 proceedings.
18 Q.  All right.  The guardian ad litem?
19 A.  Correct.
20 Q.  And did Judge Leith of the Denver probate court ever come
21 back and indicate that she wanted more in your report about
22 Esaun Pinto?
23         MR. HOMYK:  Objection.  Hearsay.
24         THE COURT:  Sustained.  The objection is sustained.
25 BY MR. BARON:

Kerr - cross by Mr. Baron

794

```
1   Q.  Were you ever informed --
2           THE COURT:  By the way, the jury is directed to
3   disregard the question.
4   BY MR. BARON:
5   Q.  Did you ever have an appreciation at any time, Ms. Kerr,
6   that you were to provide any additional information about
7   Esaun Pinto?
8           MR. HOMYK:  Objection.  "Appreciation of any kind"?
9           MR. BARON:  Her mental state, Judge.
10          THE COURT:  I understand.  State the question again,
11  if you would.
12  BY MR. BARON:
13  Q.  After you submitted your report to the Denver probate
14  court, did you ever have an appreciation after that point --
15          THE COURT:  Why don't you just ask was she ever asked
16  to provide more information about --
17  BY MR. BARON:
18  Q.  Were you ever asked for more information about Mr. Pinto?
19          MR. HOMYK:  Objection.
20          THE COURT:  Overruled.
21          You can answer.
22          THE WITNESS:  No.
23          MR. BARON:  Thank you.
24  BY MR. BARON:
25  Q.  Did you give testimony in the Denver probate court
```

Kerr - cross by Mr. Baron

795

1    sometime in 2015?

2    A.  Yes.

3    Q.  And time frame wise, when was that?

4    A.  September of 2015.

5    Q.  In your testimony in the Denver probate court --

6            MR. HOMYK:  Objection, irrelevant.

7            THE COURT:  At this point I think we've reached the

8    limit.  Rule 403.  Sustained.

9            MR. BARON:  Okay.

10   BY MR. BARON:

11   Q.  And I'm going to ask you one or two questions about an

12   order that Judge Leith entered in September of 2015.

13           MR. HOMYK:  Objection.

14           THE COURT:  I just want to get a preview of the

15   questions.  Can I see you at sidebar, please.

16     (The following proceedings were had at sidebar outside the

17   hearing of the jury:)

18           THE COURT:  Everybody is getting their steps in.

19           All right.

20           MR. BARON:  I am going to ask her if there was any --

21   if there was anything in Judge Leith's report -- order -- I'm

22   sorry -- making a finding against Esaun Pinto.

23           THE COURT:  Did Judge Leith make a finding involving

24   Esaun Pinto?

25           MR. HOMYK:  There's nothing in that order that's

Kerr - cross by Mr. Baron

1   relevant.  I mean, you're excluding that.

2        THE COURT:  403.  I'm sustaining it under 403.  I

3   mean, I get that there is some probative value to the fact

4   that the judge didn't then make a finding on it, but the

5   statement that was made that's alleged to be defamatory -- the

6   statement that's made that Ms. Kerr -- it's always hard to

7   describe this case to people because it's like a statement

8   within a statement.  So the statement that Ms. Black made that

9   Ms. Kerr says is not true is all -- it's forward looking.  He

10  was authorized to do this.  Okay?  It's not backward looking.

11  And I get the fact that there wasn't a finding in the later

12  order has some probative value.  I don't think it's huge, and

13  I'm going to exclude it on unfair prejudice.

14       MR. HOMYK:  Just, while we're here, so we don't have

15  to come back in a second again.

16       THE COURT:  Yeah.  It's so much fun, though.

17       MR. HOMYK:  While we're here.

18       THE COURT:  By the way, congratulations on your new

19  law firm.

20       MR. BARON:  Thank you.

21       THE COURT:  I'm sorry that you guys aren't in the

22  same firm anymore.

23       MR. HOMYK:  I sort of want to get an advisory ruling

24  on this, to be frank with you, so we don't keep doing this.  I

25  want to use the 4/2/15 transcript hearing transcript for a

Kerr - cross by Mr. Baron

1    limited purpose.

2              THE COURT:  To do what?

3              MR. HOMYK:  You excluded it.  That 4/2/15 hearing

4    transcript more specifically speaks to why that judge entered

5    the order --

6              THE COURT:  Can I ask you a favor?

7              MR. HOMYK:  -- as to Mr. Pinto.

8              THE COURT:  Can you go grab it and show me the part

9    that you want to use?

10             MR. HOMYK:  Can you grab it, please?

11             THE COURT:  Actually, I may have it.  I'm looking at

12   it off of an iPad.  So I just got to find it here.  I don't

13   remember what exhibit number it was.  Does anybody remember

14   what exhibit number it was, the transcript?

15             Got it.  Got it.

16             Okay.  So do you remember what page it's on?  You

17   know how to do this, right?  Whoops, it went to a different

18   page.  Actually, I bet I can tell you.  What you're looking

19   for is either going to be on page 29, page 42, or page 50,

20   because those are the parts that you wanted to put in.  I'm

21   guessing it's there.

22             MR. HOMYK:  Yes, sir.  29 for sure.  This is where

23   Mr. Black's lawyer, Mr. Gladstein, begins to talk about

24   Mr. Pinto.  He is the subject on 29.

25             THE COURT:  Okay.  Hold on a sec.

Kerr - cross by Mr. Baron

1        So tell me what you want to do with this when you

2   question.

3        MR. HOMYK:  What I want to do, this absolutely --

4   their whole claim is obviously this judge puts Pinto's name in

5   the order, but that didn't mean that he had to do anything

6   except hand over -- except hand over something or complete

7   accounting.  And they're taking the position that he didn't

8   need to do anything else.  This indicates the concern

9   regarding Mr. Pinto.  Okay?

10       So Bernard Black's lawyer indicates why it's a

11  concern.  The judge then agrees it's a concern, and he enters

12  the order.  And that's what you'll find on those pages -- let

13  me finish.  That's what you'll find on those pages I wanted

14  excluded.  Every one of them.  You are going to find this

15  discourse indicating there was indeed a concern about

16  Mr. Pinto.

17       THE COURT:  You said it three times.  I get it.

18       MR. MANDELL:  I'd like to respond.

19       THE COURT:  I'm going to give you a chance in a

20  second.  So let me just look at this.

21       Go ahead.

22       MR. MANDELL:  So this is where Mr. Gladstein makes

23  his comment.

24       THE COURT:  Gladstein is whose lawyer?

25       MR. MANDELL:  That's Bernard's lawyer, right?

Kerr - cross by Mr. Baron

1        And he talks about Mr. Pinto having funds for her

2   benefit, right?  And then the Court says, "I know there was a

3   big dispute about that," not whether or not he did anything

4   wrong.  And then the only thing she says --

5        THE COURT:  So then Mr. Gladstein says some more

6   things, and then the judge says --

7        MR. MANDELL:  The only thing she says is --

8        THE COURT:  -- "okay," and it goes over to page 40.

9        MR. MANDELL:  The only thing she says is I'm

10   satisfied at this point that he shouldn't be the --

11        THE COURT:  So --

12        MR. MANDELL:  If I could just finish.

13        THE COURT:  You are not going to need to, but go

14   ahead.  Go ahead.

15        MR. MANDELL:  Right.  She didn't find anything.  She

16   just said there is a dispute about this, so he is not going to

17   be the payee.  Get somebody else to be the payee.

18        THE COURT:  So here's the problem with putting in

19   this excerpt of this.  So what you're trying to do is put it

20   in to essentially flesh out in a way what the basis was for

21   the part of the order that says that she's to get information

22   from Pinto.

23        MR. HOMYK:  Of course.

24        THE COURT:  Right.

25        MR. HOMYK:  And that's purely --

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 18 of 169 PageID #:16691
Kerr - cross by Mr. Baron
800

1     THE COURT:  I excluded the rest of the transcript

2  which shows what the basis is for why the rest of the order

3  was entered, which you asked me to exclude.  And I just don't

4  see -- I just don't see a basis to let in one sliver of it and

5  not the whole thing.

6     MR. HOMYK:  Judge, they are making a huge deal out of

7  that order, out of the part of the order that says complete

8  accounting and minimizing what that means.  This is critical.

9  This is absolutely critical that I be permitted -- hey, we can

10  just take these pages, and I can introduce them into evidence

11  or let me cross her on them.  But it's absolutely critical

12  that I be permitted to put that into context.

13     THE COURT:  The pages in question, the comments that

14  are made are comments by Mr. Black's attorney.

15     MR. HOMYK:  Okay.  All right.  Actually, do you mind

16  if I look again, Judge?  This is that important.

17     THE COURT:  Is it the part that you want in?

18     MR. HOMYK:  This is that important.

19     MR. MANDELL:  We have the April 2nd order.

20     MR. HOMYK:  Yeah, here we go.  The Court is talking.

21     THE COURT:  That's page 50.  So she's taking him --

22     MR. HOMYK:  Social security representative pay needs

23  to be changed.  That was Mr. Pinto.  So the judge is saying --

24     THE COURT:  Page 42.

25     MR. HOMYK:  And the judge also says there was a big

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 19 of 169 PageID #:16692
Kerr - cross by Mr. Baron
801

1    issue.  When Gladstein first raises it, the judge says, "Yeah,
2    that was a big issue."
3              MR. MANCILLA:  Big dispute.
4              MR. HOMYK:  That's the judge talking.
5              THE COURT:  What she says was -- and this is on
6    page 29, she says, "Right.  I know there was a big dispute
7    about that."
8              MR. HOMYK:  Right.  So it's a dispute.  It's a matter
9    of concern.  And then she ends up entering an order knowing
10   that it's a big dispute.  It's a matter of concern, and she
11   acknowledges that.  It wasn't just a guy who was providing
12   documents to a forensic accountant.  Okay?  It was a matter of
13   a big concern, and she acknowledges it right there.
14             MR. MANDELL:  Judge --
15             THE COURT:  "She" being the judge.
16             MR. MANDELL:  Judge.
17             THE COURT:  Yeah.
18             MR. MANDELL:  This was the morning hearing.  And here
19   is the order entered at 1:07 p.m.
20             THE COURT:  Hang on a second.  Was -- I think I know
21   the answer to this, but I'm not sure.  Was Ms. Kerr at the
22   hearing?
23             MR. HOMYK:  No.
24             THE COURT:  Okay.  I'm excluding this.  She wouldn't
25   have heard any of this stuff.

Kerr - cross by Mr. Baron

802

1      MR. MANDELL:  She testified to that yesterday.

2      MR. HOMYK:  I can use it on cross-examination, Judge.

3      THE COURT:  Not if I say you can't.  I'm excluding

4  it.

5      MR. HOMYK:  Explain to me why I can't use it on

6  cross-examination in light of the testimony that's --

7      THE COURT:  I'll tell you why.  So first of all, if

8  what you're trying to do is eliminate what she understood that

9  she was supposed to do, which is what the relevant issue is,

10  what she understood that she was supposed to do --

11      MR. HOMYK:  No, no, that's not what I'm trying to

12  eliminate.  What I'm trying to eliminate --

13      THE COURT:  I'm in the middle of a sentence.

14      MR. HOMYK:  No -- I'm sorry, sir.

15      THE COURT:  I'm in the middle of a sentence.

16      MR. HOMYK:  I understand.

17      THE COURT:  Okay.  She wasn't at the hearing.  She

18  didn't hear what the judge said.  What she got was the order.

19  The order said what it said.  Okay?  That's the first thing.

20      The second thing is the judge doesn't make any

21  findings in here.  It just provides the background for why the

22  order is entered.  I'm not comfortable letting in a section --

23  look, no, I'm sorry, no, no, no.  Go stand over there.  Go

24  stand over there.  Go stand over there.  Go stand over there.

25      MR. HOMYK:  May I give you --

Kerr - cross by Mr. Baron

803

1    THE COURT:  No, you may not.  Go stand over there.

2    MR. HOMYK:  -- a hypothetical?

3    THE COURT:  You have argued this for ten minutes.  I

4  have ruled.  It's excluded, and I've heard reconsideration on

5  this for the third time.  I'm done with it.  It's excluded.

6    (The following proceedings were had in open court in the

7  presence and hearing of the jury:)

8    THE COURT:  All right.  Sorry for the long

9  discussion, folks.

10    Mr. Baron, go ahead.

11  BY MR. BARON:

12  Q.  Okay.  Pam, I want to flash-forward now.  You finished

13  your forensic examination of the conservatorship estate,

14  correct?

15  A.  Yes.

16  Q.  And now -- and Judge Leith made her ruling on that in late

17  September, correct?

18  A.  Correct.

19  Q.  Of 2015?

20  A.  Correct.

21  Q.  Okay.  So, now, there's also a proceeding in New York over

22  a guardianship.  Were you aware of that?

23  A.  Yes.

24  Q.  And did you have any role in the New York guardianship

25  proceeding?

Kerr - cross by Mr. Baron

804

1    A.  Not directly.  My report did.

2    Q.  And were you at any point in time asked to get involved or

3    potentially help out in the New York case?

4    A.  Potentially discuss my findings if there were any

5    questions with the New York court regarding my findings.

6    Q.  And what was the subject of the New York guardianship

7    case?

8    A.  Who was going to be appointed the guardian for Joanne

9    Black in New York.

10   Q.  And who were the people that were vying to be her

11   guardian?

12   A.  It was my understanding that Bernard Black had petitioned

13   as well as Cherie Wrigley had petitioned.

14   Q.  Petitioning, meaning they were both asking to be the

15   guardian?

16   A.  Yes, sir.

17   Q.  Did there come a time when you became aware that Katherine

18   had sent a letter to Judge Aliotta, who was the judge in the

19   New York guardianship case?

20   A.  Yes.

21   Q.  And did you receive a copy of that letter?

22   A.  Yes.

23          MR. BARON:  Let's put up Defense Exhibit 45, which is

24   not yet admitted, Judge.

25          THE COURT:  Okay.  Is there an objection?  It's just

Kerr - cross by Mr. Baron

805

1   the one page?  Can you make it smaller so people can see

2   what's on the whole page?

3            MR. BARON:  It's actually sort of a string.

4            THE COURT:  Oh, it's three pages.  I misread that.

5            MR. BARON:  Yeah.  If we can go to the bottom.

6            There we go.

7   BY MR. BARON:

8   Q.  All right.  Pam, I want you to look at this first email.

9            THE COURT:  So first of all, is there an objection to

10  this one?  It's 45.  Defense 45.  Is there an objection to it?

11           MR. HOMYK:  No objection, sir.

12           THE COURT:  All right.  I'll put it up for the jury.

13  It's admitted.  There you go.

14     (Above-mentioned exhibit was received in evidence.)

15  BY MR. BARON:

16  Q.  Okay.  So we're looking at the very first email in this

17  string of January 7, 2016, at 1:33 p.m., and it's to Melissa

18  Cohenson from Piper Hoffman.  And just to remind the jury, who

19  is Melissa Cohenson?

20  A.  Melissa Cohenson was the attorney representing Cherie

21  Wrigley in her petition to be Joanne Black's guardian in New

22  York.

23  Q.  And who was Piper Hoffman?

24  A.  Piper Hoffman was Bernard Black's attorney for -- in New

25  York.

Kerr - cross by Mr. Baron

806

1   Q.  Okay.  And so Ms. Hoffman, Bernard's lawyer, is writing to

2   the judge in New York.  And she says:  "On behalf of Katherine

3   Litvak, Joanne Black's sister-in-law, I send the attached

4   letter and three exhibits.  Respectfully submitted, Piper

5   Hoffman."

6           So is it your understanding that this is the email in

7   which Bernard's lawyer transmits Katherine's letter to Judge

8   Aliotta?

9   A.  Yes.

10          MR. HOMYK:  Objection, lack of foundation.

11          MR. BARON:  She's answered.  Okay.

12          THE COURT:  Hang on a second.  So I'll take that as a

13  motion to strike.

14          Overruled.  The answer can stand.

15  BY MR. BARON:

16  Q.  Okay.  So I want to focus your attention, now, Pam, on the

17  next email in this chain.  It's from Melissa Cohenson to you,

18  Lisa DiPonio, and Gayle Young with a carbon copy to Cherie

19  Wrigley.

20          Do you see that email?

21  A.  Yes.

22  Q.  And it's dated January 7, 2016, at 12:16 p.m.  Did you

23  receive this email?

24  A.  Yes.

25  Q.  And is this the first time that you became aware of

Kerr - cross by Mr. Baron

807

1   Katherine's letter?

2   A.  Yes.

3   Q.  And, again, just to remind the jury, Lisa DiPonio is

4   Joanne's attorney in Denver; is that right?

5   A.  Correct.

6   Q.  And Gayle Young is the guardian ad litem for Joanne in

7   Denver, correct?

8   A.  Correct.

9        MR. BARON:  Okay.  Let's scroll up, please.

10  BY MR. BARON:

11  Q.  Okay.  The next email in this chain, Pam, is from you to

12  Melissa Cohenson, Lisa DiPonio, Gayle Young, with a carbon, a

13  cc.  So were you responding then to the email below that that

14  we just read?

15  A.  Yes.

16  Q.  Okay.  And this is dated January 7, 2016, at 11:22 a.m.

17  You write:  "Unreal.  I wonder if someone should contact

18  Northwestern and let them know that she is writing this

19  letter, which I haven't read yet, on Northwestern letterhead

20  as if Northwestern is supporting her position."

21        What was your concern?

22  A.  That I received a letter from -- that was provided to a

23  judge in a case in New York on Northwestern letterhead that

24  involved my name and my role in a case in which I had been

25  hired.

Kerr - cross by Mr. Baron

808

1   Q.  Okay.  You go on in your email to say:  "The stuff with

2   Esaun is not smart on Kate's part since it is Bernard Black

3   who paid him and gave him an ATM card.  And that is the

4   only" -- in all caps -- "person that had control over what" --

5   Esaun -- "money into that account from the estate and claiming

6   it was for the benefit of Joanne, but he did nothing to

7   monitor it.  He was the only person that received these

8   statements."

9           Is the "he" you're referring to Bernard Black?

10  A.  Correct.

11  Q.  And then you end your note with the line:  "Yes, Joanne is

12  the person that is being harmed by all of this.  Does she not

13  think that Joanne will be able to testify about Kate's

14  involvement in Joanne's life?"

15          THE COURT:  Is there a question?

16          MR. BARON:  Yeah, I'm going to get to that, Judge.

17  BY MR. BARON:

18  Q.  This line about Esaun Pinto, what prompted you to write

19  this in your email?  Was there something --

20          MR. HOMYK:  Objection, Judge.

21  BY MR. BARON:

22  Q.  Was there something in Katherine's letter?

23          MR. HOMYK:  Objection, Judge.

24          THE COURT:  Sustained.

25          MR. BARON:  Okay.  Let's put up 65A, Plaintiff's 65A.

Kerr - cross by Mr. Baron

809

1    THE COURT:  This is the redacted version?

2    MR. BARON:  Is it redacted or not?

3    THE COURT:  I took it off the jury's screen.

4    MR. BARON:  So we have the right 65A up there now.

5    Okay.  Good.

6    BY MR. BARON:

7    Q.  All right.  So a moment ago, we were looking at that part

8    of your email where you were concerned about the letterhead.

9    Is this the letterhead you were referring to when you wrote

10    your email?

11    A.  Yes.

12    MR. BARON:  And if you scroll down to the one

13    sentence that's unredacted.

14    BY MR. BARON:

15    Q.  Okay.  The sentence that we have up on the screen now

16    says:  "The Colorado court found allegations of Pinto's

17    misconduct sufficiently credible and troublesome to order an

18    investigation of Pinto by the court-appointed forensic

19    accountant, Pamela Kerr."

20    In your email that we just looked at, is this the

21    sentence that you're referring to when you said the stuff

22    about Esaun?

23    A.  No.  Well --

24    Q.  What were you referring to?

25    A.  The contents of the entire letter.

1  Q.  Okay.  Well, I'm focusing specifically about the stuff

2  about Esaun.

3           MR. HOMYK:  Objection.

4           THE COURT:  So ask another question.

5           MR. BARON:  Okay.  All right.

6  BY MR. BARON:

7  Q.  Let me just focus you then on this particular sentence,

8  Pam, in Katherine's letter, right?

9           It says:  "The Colorado judge found allegations of

10  Pinto's misconduct sufficiently credible and troublesome."

11           My first question is, were you ever aware that the

12  Colorado court made such a finding?

13  A.  No.

14  Q.  She goes on to say:  "To order an investigation of Pinto."

15           Were you ever aware that you were ordered to

16  investigate Pinto?

17  A.  No.

18  Q.  And then she finishes it:  "By the court-appointed

19  forensic accountant, Pamela Kerr."

20           Were you ever aware that you were appointed by the

21  Court?

22  A.  No.

23  Q.  Okay.  So what was your reaction to the letter, Kate's

24  letter?

25  A.  I was very upset.

Kerr - cross by Mr. Baron

1  Q.  Did you decide you should do something about it?

2  A.  Yes.

3  Q.  And what were you thinking about doing?

4  A.  Asking Northwestern if they, in fact, were supportive of

5  Ms. Litvak's position and the statements that she made in this

6  letter.

7  Q.  Okay.  And did you ultimately contact Northwestern?

8  A.  Yes.

9          MR. BARON:  Can we go to Defense Exhibit 47 not yet

10  admitted, Judge?

11          THE COURT:  Okay.  Before you put it up, let me just

12  take it down.

13          Go ahead.  You're good.

14          I'm assuming there's no objection to this one.

15          MR. HOMYK:  No, sir.

16          THE COURT:  All right.  So this is admitted.  And,

17  again, there are parts of it that you'll see that are blacked

18  out or deleted.  That's because I've determined they aren't

19  relevant.  You shouldn't try to speculate on what's in there.

20     (Above-mentioned exhibit was received in evidence.)

21  BY MR. BARON:

22  Q.  Okay.  We are looking now, Pam, at Defense Exhibit 47,

23  another email string.

24          MR. BARON:  If you can scroll up just a little bit

25  more.

Kerr - cross by Mr. Baron

812

1  BY MR. BARON:

2  Q.  Okay.  I'm focusing your attention now, Pam, on the email

3  that is from you on January 8, 2016, at 9:45 a.m.

4       Do you see where I'm looking?

5  A.  Yes.

6  Q.  And it says:  "I just spoke to the dean's office at

7  Northwestern about this letter from Bernard's wife.  Today is

8  the first chance I have had to read the whole letter and saw

9  that she stated" -- and then it cuts off there.

10      Okay.  Did you make a call to the dean's office?

11 A.  Yes.

12 Q.  And do you remember who you communicated with?

13 A.  I do not.

14 Q.  And what did you say to whomever you did communicate with?

15 A.  I asked to speak to the dean, and he was not available,

16 and I stated that I had received a letter on their letterhead

17 which concerned me because it had statements regarding my role

18 in a case in Colorado, and I believed that they were

19 supportive of this letter that Ms. Litvak had written to the

20 judge in New York.

21 Q.  Okay.  And did you accuse Ms. Black, Katherine, of lying?

22 A.  No.

23 Q.  Okay.

24      MR. BARON:  Let's scroll up a little bit more.

25 BY MR. BARON:

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 31 of 169 PageID #:16704
Kerr - cross by Mr. Baron
813

1    Q.  Okay.  Here is an email at the very top of the page, if

2    you can see it, Pam.

3            MR. BARON:  Just scroll just a touch more.  Okay.

4    There we go.

5    BY MR. BARON:

6    Q.  From you to Lisa DiPonio and Gayle Young, copies to

7    Anthony Dain, Ira Saltzman, and Melissa Cohenson.  There's a

8    couple new names here, so I just want to refresh the jury's

9    recollection.

10           Who is Anthony Dain?

11   A.  Anthony Dain is the co-trustee of Joanne Black's trusts

12   and the brother of Cherie Wrigley and cousin of Bernard Black

13   and Joanne Black.

14   Q.  And who is Ira Saltzman?

15   A.  Ira Saltzman is Joanne Black's attorney in New York.

16   Q.  You indicate in your email:  "I called the dean's office."

17   And you give the number.  "I first asked if I could speak to

18   the dean, Daniel Rodriguez, and she said he wasn't available.

19   So I told her what" -- "who I was and what I was calling

20   about."

21           And then you have a section here in quotes.  I'm

22   going to just ask you, if you don't mind, just to read that to

23   the jury.

24   A.  "My name is Pam Kerr.  I'm a forensic accountant from

25   Denver.  I am looking at a letter on Northwestern Law School

Kerr - cross by Mr. Baron

814

1    letterhead, and it contains a false statement about me.  It is

2    unfortunate because it really appears that Northwestern Law

3    School is supporting the letter since it is on your

4    letterhead."

5    Q.  Okay.  To the best of your memory, were those the words

6    you used in that phone call that you had initially with

7    Northwestern on January 8th?

8    A.  Yes.

9    Q.  Okay.  You go on in this email to indicate that you were

10   put on hold.  And then she came back and indicated she had

11   gotten a call yesterday about the same thing.  And you said

12   that you were going to follow up with a letter to the dean.

13   And she said she wasn't sure if he would be the person

14   handling it, but would forward it to the person who would.

15           And then below that, Pam, you put the address for

16   Northwestern University Law School with Daniel Rodriguez's

17   attention there, right?  Do you see that?

18   A.  Correct.

19   Q.  Why did you include the address for the law school in your

20   message to these other folks?

21   A.  That's the address that I would have been sending my

22   letter to, and that's the address -- the contact information

23   for the dean of the law school.

24   Q.  Okay.  At that point in time, did you think that they

25   should potentially also contact the law school about this?

Kerr - cross by Mr. Baron

815

1    A.  If they chose.

2    Q.  Okay.

3         MR. BARON:  And let's scroll up just a little bit

4    more.

5    BY MR. BARON:

6    Q.  And then we have a response from Cherie Wrigley.  You see

7    that?  And Ms. Wrigley gave testimony about that yesterday,

8    correct?

9    A.  Yes.

10   Q.  All right.

11        MR. BARON:  And then scroll up all the way.  Okay.

12   Stop.

13   BY MR. BARON:

14   Q.  All right.  Now, we have another email from you, Pam, to

15   the same group of people.  This is a little bit later in the

16   day on January 8th, 2016, at 2:07 p.m.  And you write to this

17   group:  "Here is my letter that I plan to send to

18   Northwestern.  Any thoughts?"

19        All right?  So by this time on January 8th, had you

20   drafted a letter to Dean Rodriguez at Northwestern University

21   Law School?

22   A.  Yes.

23   Q.  All right.

24        MR. BARON:  Now, I think that letter is part of this,

25   so we can scroll all the way back to the bottom.

Kerr - cross by Mr. Baron
816

1   BY MR. BARON:

2   Q.  And this was an attachment to your email to the folks who

3   were listed there, correct?

4   A.  Correct.

5   Q.  And just to be clear, again, you sent this to Cherie who

6   was petitioning to be Joanne's guardian in New York, right?

7   A.  Correct.

8   Q.  And you sent this to Lisa DiPonio, who was Joanne's lawyer

9   in Colorado, right?

10  A.  Correct.

11  Q.  And you sent this to Joanne's guardian ad litem in

12  Colorado?

13  A.  Yes.

14  Q.  And Joanne's lawyer in New York, right?

15  A.  Correct.

16  Q.  And Tony Dain, who was her cousin and co-trustee of one of

17  her trusts, correct?

18  A.  Correct.

19  Q.  There was some talk yesterday when Mr. Homyk was asking

20  you questions about why it's on your letterhead, why it's

21  signed, right?

22          Can you tell the jury how you usually operate?  You

23  know, when you write letters, what your practice is in putting

24  together letters for your business.

25  A.  Yes.  I have what I call a template, a letterhead template

Kerr - cross by Mr. Baron

817

1   that just has the letterhead on it already and then my

2   signature block with my signature.  It's an electronic

3   signature so that I don't have to write a letter, sign it,

4   scan it in, and then put it back in my computer again.  So it

5   just has the signature block on it already, similar to my

6   email block -- my signature block on my email.

7   Q.  So this is kind of a practice that you use.  I assume it's

8   for ease or convenience, right?  That means you don't have to

9   print out the letter, sign it, scan it in somewhere?

10  A.  Correct.

11  Q.  You didn't intend this letter to be the final letter

12  necessarily?

13          MR. HOMYK:  Objection, Judge.  This is all leading.

14          THE COURT:  Sustained.

15          MR. BARON:  I'll ask it a different way.

16  BY MR. BARON:

17  Q.  Did you intend this to be your final letter that you, you

18  know, would send to the university?

19  A.  It was the letter that I would have sent to the

20  university.

21  Q.  But you didn't make a decision to send it on January 8th?

22  A.  That is correct.

23  Q.  Okay.  Now, besides Ms. DiPonio and Ms. Young and

24  Mr. Dain, Mr. Saltzman, and Melissa Cohenson, did you send the

25  letter to anybody else?

Kerr - cross by Mr. Baron

818

1    A.  Yes.

2    Q.  Who else did you send it to?

3    A.  My attorney in Colorado.

4    Q.  What's his name?

5    A.  Tom Burge.

6    Q.  And why did you send it to him?

7    A.  To ask his advice, whether I should send it and the

8    attachment to Northwestern.

9    Q.  Okay.  And did you get advice from Mr. Burge?

10   A.  Yes.

11   Q.  When you say "the attachment," what are you referring to?

12   A.  As the letter indicates, the -- it has an attachment,

13   which was Kate's letter to Northwestern.

14   Q.  And, you know, based on the advice of Mr. Burge, did you

15   make a decision about whether or not you were going to send

16   the letter?

17   A.  Yes.

18   Q.  And what was your decision?

19   A.  To not send the letter or the attachment.

20   Q.  And why did you make that decision?

21   A.  Because Tom told me --

22          MR. HOMYK:  Objection.

23          THE COURT:  What's the objection?

24          MR. HOMYK:  Hearsay.  It's her lawyer, what her

25   lawyer told her.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 37 of 169 PageID #:16710
Kerr - cross by Mr. Baron
819

1        THE COURT:  You are offering it to show what?

2        MR. BARON:  State of mind.

3        THE COURT:  Yeah, her reason for acting.  The

4 objection is overruled.  So you can only consider this, what

5 you are about to hear, to explain Ms. Kerr's reason for acting

6 why she says she did.

7        Go ahead.

8        THE WITNESS:  Tom recommended that I just not get

9 involved in this family matter.

10 BY MR. BARON:

11 Q.  Okay.  And you intended to follow his advice, I take it?

12 A.  Yes.

13 Q.  Now, did you ever have an agreement with anybody else that

14 some other party should upload your letter or present it to

15 Dean Rodriguez or Northwestern University?

16 A.  No.

17 Q.  Did you make any -- other than your one phone call that

18 you made on January 8th to the dean's office, did you make any

19 other contact to Northwestern University?

20 A.  No.

21 Q.  Did you ever receive any contact back from Northwestern

22 University Law School?

23 A.  Yes, from Northwestern.

24 Q.  From Northwestern University Law School, right?

25        MR. BARON:  Let's put up Defense Exhibit 49, not yet

Kerr - cross by Mr. Baron

820

1    admitted, your Honor.

2            THE COURT:  Okay.  So I'll take it off the jury's

3    screen.

4            Is there an objection to -- it's not up yet.  Sorry.

5            MS. ABRAHAM:  No objection.

6            THE COURT:  Okay.  It's admitted then.  I'll put it

7    up for the jury.  There you go.

8      (Above-mentioned exhibit was received in evidence.)

9            MR. BARON:  Okay.  Let's scroll down.  Can we get the

10   full email from Pam?

11   BY MR. BARON:

12   Q.  Okay.  Pam, I'm showing you what we've just admitted as

13   Defense Exhibit 49.  Did you have an email communication with

14   a woman named Rita Winters at Northwestern University?

15   A.  Yes.

16   Q.  And that took place around January 13, 2016?

17   A.  Correct.

18   Q.  And this is the email that you wrote to her; is that

19   right?

20   A.  Yes.

21   Q.  You say:  "Thank you for your phone call this morning.  I

22   am waiting for a call back from my attorney before I send you

23   the letter.  Given the situation, I have to be extremely

24   careful."

25           So I take it by this point in time, you hadn't yet

Kerr - cross by Mr. Baron

821

1   spoken to Mr. Burge, your lawyer, correct?

2   A.  Correct.

3   Q.  And why did you indicate you had to be extremely careful?

4   A.  Because as I indicated earlier, my letter would have

5   attached the letter from Katherine Litvak, and I wasn't sure

6   if that was -- if I was allowed to do that or not.

7   Q.  In other words, you were allowed to submit Katherine's

8   letter to Northwestern?

9   A.  Correct.

10  Q.  You write in your email to Ms. Winters:  "On another note,

11  Anthony Dain, who was mentioned numerous times in this letter,

12  will be sending you a copy of the letter and his

13  communication.  That should be coming in the next day or so.

14  We all very much appreciate your response to our concerns."

15          So was it your understanding at this point, Ms. Kerr,

16  or Pam, that Mr. Dain was going to send another communication

17  to the school?

18  A.  Yes.

19  Q.  And when you say he is mentioned numerous times in this

20  letter --

21          MR. HOMYK:  Objection.

22          THE COURT:  Basis?  I just need a basis.

23          MR. HOMYK:  It's been excluded, Judge.  Any other

24  talk has been excluded.

25          THE COURT:  Okay.  Let me hear the question.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 40 of 169 PageID #:16713
Kerr - cross by Mr. Baron
822

1    MR. BARON:  I'm trying to clarify with Pam what "this

2    letter" refers to.

3           THE COURT:  You hadn't finished the question.  I need

4    to know what the question is.

5    BY MR. BARON:

6    Q.  The full question will be this:  When you wrote:  "On

7    another note, Anthony Dain, who was mentioned numerous times

8    in this letter" --

9           THE COURT:  You're asking her what "this letter"

10   refers to?

11          MR. BARON:  Yes.  What is the "this letter" that

12   you're referring to.

13          THE COURT:  Overruled.

14          You can answer that.

15          THE WITNESS:  The letter that Kate Litvak wrote to

16   the New York judge.

17          THE COURT:  Okay.

18   BY MR. BARON:

19   Q.  Okay.  And then you go on to say that he'll "be sending

20   you a copy of the letter."

21          Again, is that Kate's letter?

22   A.  Yes.

23   Q.  "And his communication."

24          What did you mean by "his communication"?

25   A.  A letter from Anthony Dain to Northwestern.

Kerr - cross by Mr. Baron

823

1   Q.  Did you have an understanding that Mr. Dain was going to

2   be sending his own letter to Northwestern University Law

3   School?

4   A.  Yes.

5   Q.  Okay.  And then if we can scroll up to the top of the

6   exhibit.  Ms. Winters writes back to you that very same day,

7   January 13, 2016.  "Thanks, Pam.  I look forward to receiving

8   whatever information you can provide.  Best, Rita."

9        Is this the sum total of email exchange you had with

10  Ms. Winters?

11  A.  Yes.

12  Q.  And in your phone call with Ms. Winters, did you ever

13  accuse Katherine Black of lying to a judge?

14  A.  No.

15       MR. BARON:  This is now Defense Exhibit 50, which is

16  not yet admitted.  And it's the same as Plaintiff's

17  Exhibit 76, which was offered and then withdrawn yesterday.

18       THE COURT:  Okay.  All right.  So go ahead and put it

19  up.

20       MS. ABRAHAM:  We have an objection.

21       THE COURT:  So the jury can't see it.  Put it up so I

22  can see it.

23       If you wouldn't mind going to the very bottom of it

24  so I can kind of read it from the bottom up.

25       Okay.  Previous page.  Stop.  Can you make it smaller

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 42 of 169 PageID #:16715
Kerr - cross by Mr. Baron
824

1    so I can see the whole page at the same time?  Thank you.

2              Does somebody have this either on a hard copy or a

3    laptop?  Because we need to talk about this at sidebar.

4       (The following proceedings were had at sidebar outside the

5    hearing of the jury:)

6              THE COURT:  You got a hard copy?

7              MR. MANDELL:  Yes.  50?

8              THE COURT:  Yeah, 50.  So can you tell me what the --

9    first of all, tell me where -- can you flesh out the

10   objection, somebody?  Here is the document.  Give it back to

11   him later.

12             MR. HOMYK:  It refers to disclaimer.  It refers to

13   excluded material that relates to Bernie Black.

14             THE COURT:  Okay.

15             MR. HOMYK:  Every time they bring in Bernie Black

16   stuff, every single time.

17             THE COURT:  This thing here, it's a hand.  When I put

18   it up like that, it means stop.

19             MR. HOMYK:  I know.  But it's tiresome just because

20   they do it over and over.

21             THE COURT:  Just tell me when you're finished talking

22   so I can read it.  Are you finished talking?

23             MR. HOMYK:  Yes, sir.

24             THE COURT:  So what's problematic about this is that

25   the -- on page 2 of the email, what I'll call the third

Kerr - cross by Mr. Baron

1   paragraph, the one that starts with the sentence "The forensic

2   accounting included the payments to Esaun Pinto," the rest of

3   that paragraph includes stuff that I excluded.  So I don't

4   have a problem with you -- the first part of this where she

5   says that -- wait a second.  So she's sending this to whom?

6   The New York judge.  Can't she just testify about what her

7   state of mind was and what her understanding was?  I mean,

8   what's --

9           MR. HOMYK:  Judge, I don't have a problem --

10          THE COURT:  Will you just shut up?

11          MR. HOMYK:  I'm just telling you --

12          THE COURT:  I'm in the middle of a sentence, for

13  crying out loud.  Just shut up.  In a minute here, I'm just

14  going to tell you to go back and sit down.  I'm tired of being

15  interrupted by you.

16          MR. HOMYK:  Understood.

17          THE COURT:  I lose my train of thought, and then I

18  can't pick it up.  I was about to rule in your favor.  All

19  right?  Just shut your mouth.

20          So, first of all, this is a statement by her.  It's

21  hearsay.  She's essentially putting on a piece of paper what

22  her understanding was, but it's hearsay.  Okay?  She can

23  testify about what her understanding was.  She can testify

24  that -- consistent with the first line of the second page of

25  this thing, it looked like to me that what Ms. Black was

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 44 of 169 PageID #:16717
Kerr - cross by Mr. Baron
826

1    trying to say is that was the only thing I was asked to

2    investigate was Pinto.  And, actually, I was investigating all

3    sorts of other things.  But she's not going to be able to go

4    into the details that are in the second paragraph or this

5    third paragraph here.

6            MR. BARON:  Let me just remind you of one thing.  One

7    of the reasons that I wanted to put this in was that

8    yesterday, the plaintiff made a very big production out of

9    putting this in front of her and then withdrawing it, but then

10   saying, "Now, when you wrote to the judge, you said I want to

11   clarify a statement.  You didn't say it was false."

12           And that was incomplete, because if you look at the

13   second page of this email, at the very top, she says:  "I

14   believe the statement is made to insinuate my investigation"

15   -- which is a hundred percent not true.

16           THE COURT:  Fine.  Point taken.  I don't think that

17   opened the door to putting in the third paragraph.

18           MR. BARON:  Can I ask her about it?

19           THE COURT:  I don't think that opened the door to

20   putting in the contents of what is in the third paragraph.

21           MR. BARON:  That part I get.

22           THE COURT:  Oral, smoke signal, Morse code, or

23   anything else.

24           MR. BARON:  Okay.

25           THE COURT:  All right?  So clear enough?

Kerr - cross by Mr. Baron

827

1        MR. BARON:  So just to be clear, you admitted with

2   redaction or just I can question her on this top part?

3        THE COURT:  You can question her on the top part, and

4   you can elicit from her that she thought that the point was

5   being made that the only thing she was asked to investigate

6   was Pinto.  That wasn't true, and she was investigating all

7   sorts of other things.  But you won't be able to get into more

8   detail than that.

9     (The following proceedings were had in open court in the

10  presence and hearing of the jury:)

11        THE COURT:  All right.  So the objection is

12  sustained.  We are going to proceed in a different manner.

13        Go ahead.

14  BY MR. BARON:

15  Q.  Okay.  On the 13th, the same day that you had your

16  conversation with Ms. Winters, did you communicate with

17  anybody else -- well, let me ask you differently.

18        Did you communicate with the judge in New York, Judge

19  Aliotta?

20  A.  Yes.

21  Q.  And did you prepare an email for the judge?

22  A.  Yes.

23  Q.  And did you send the email?

24  A.  Yes.

25  Q.  And did you copy Ms. Litvak on that email?

Kerr - cross by Mr. Baron

828

1   A.  Yes.

2   Q.  Now, you remember yesterday Mr. Homyk asked you all kinds

3   of questions about that email and suggested to you that you

4   softened your approach with Judge Aliotta.  And you said, "I'm

5   just writing to clarify something."

6         Do you remember that?

7   A.  Yes.

8         MR. BARON:  Your Honor, may I approach the witness?

9         THE COURT:  That's fine.

10  BY MR. BARON:

11  Q.  So, Pam, I've just handed you Defense Exhibit 50, which

12  was also shown to you as Plaintiff's 76 yesterday, and ask you

13  if you wouldn't mind turning to the top of the second page of

14  the document.  If you wouldn't mind just reading that very

15  first line that you wrote to Judge Aliotta out loud for the

16  jury.

17  A.  "I believe that the statement is made to insinuate that my

18  investigation with regards to Mr. Pinto's actions solely" --

19  excuse me.  I read that wrong.

20        "I believe that the statement is made to insinuate

21  that my investigation was with regards to Mr. Pinto's actions

22  solely, which is 100 percent not true."

23  Q.  Okay.  Stop there.

24        So you did, in fact, tell Judge Aliotta that there

25  was something that was untrue in Katherine's letter, correct?

Kerr - cross by Mr. Baron

829

1    A.  Correct.

2    Q.  You weren't writing just to clarify, correct?

3    A.  Correct.

4    Q.  Did Katherine respond to your email?

5    A.  I don't believe so.

6    Q.  Now, we talked about one phone call you made to

7    Northwestern on January 8, a phone call you had back from

8    Ms. Winters on January 13 with a short email exchange

9    following that.  Did you receive any other communication from

10   Northwestern University?

11   A.  Yes.

12   Q.  And approximately when did that happen?

13   A.  I don't remember the exact date, but it was later in

14   January, towards the end of January.

15   Q.  Of what year?

16   A.  Excuse me, 2016.

17   Q.  And who did you hear from?

18   A.  A woman by the name of Marcia Isaacson.

19   Q.  And do you know who she is, what her role is?

20   A.  Now I do.

21   Q.  And what is her role?

22   A.  It's my understanding that she was from the -- she managed

23   the hotline for the ethics complaint -- excuse me --

24   EthicsPoint, which is the ethics complaint line at

25   Northwestern.

Kerr - cross by Mr. Baron

830

1   Q.  All right.  Was there anything in that call with
2   Ms. Isaacson that made you aware that Northwestern had your
3   letter at that point in time?
4   A.  No.
5   Q.  And, in fact, you told Northwestern you hadn't uploaded
6   the letter, right?
7   A.  Correct.
8   Q.  By that time, you had made the decision not to do that,
9   right?
10  A.  Correct.
11  Q.  So when did you become aware that your letter, the draft
12  letter you wrote to Dan Rodriguez on January 8th, made its way
13  to Northwestern University?
14  A.  On March 16th.
15  Q.  Of what year?
16  A.  2016.
17  Q.  So over two months later?
18  A.  Correct.
19  Q.  And how did you become aware that your letter made its way
20  to Northwestern University?
21  A.  Gayle Young had found it on what is called -- it's the
22  electronic reporting system with the courts of Colorado.  So
23  if somebody uploads a document in the case, it's recorded.
24  And if you're a party in the case, you get notification of it.
25  So Gayle Young received notification that a letter had been

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 49 of 169 PageID #:16722
Kerr - cross by Mr. Baron
831

1   sent to the Colorado court by Marcia Isaacson from

2   Northwestern University.

3   Q.  And how about Melissa Cohenson in New York?  Did she also

4   get a notice of that as well?

5   A.  She would have because it went to the judge in the New

6   York proceedings as well.

7          MR. BARON:  Let's put up Defense Exhibit 57, not yet

8   admitted.

9          THE COURT:  Okay.  Is there any objection to this

10  one?

11         MR. BARON:  My paralegal, Sarah, says she thinks this

12  may have been admitted, actually.

13         THE COURT:  I have a feeling it was.

14         MR. BARON:  Yeah.

15         THE COURT:  Is that right?

16         MS. ABRAHAM:  Yes.

17         THE COURT:  Yes.  Okay.

18         MR. BARON:  Sorry about that, your Honor.

19         THE COURT:  It's already in evidence.  It's all

20  right.  So I'll put it up for the jury to see.

21  BY MR. BARON:

22  Q.  All right.  So we've had some testimony already about this

23  email exchange, Pam, from Cherie Wrigley yesterday, but I want

24  to ask you about it now, if you don't mind.

25         MR. BARON:  Can we scroll up to the very bottom of

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 50 of 169 PageID #:16723
Kerr - cross by Mr. Baron
832

1   the document.

2   BY MR. BARON:

3   Q.  Okay.  So you see, Pam, your email at the bottom there

4   dated March 16, 2016, at 7:01 p.m.?

5   A.  Correct.

6   Q.  And does this help you to establish that this is the day

7   that you learned that the letter, your letter had actually

8   made its way to Northwestern?

9   A.  Yes.

10  Q.  And you write:  "I forwarded a copy of the letter I was

11  going to send to Northwestern but never did.  Somehow they

12  have a copy.  Please tell me who forwarded my letter to

13  Northwestern.  This will have severe impact on my testimony

14  next week."

15          So you were concerned?

16  A.  Very.

17  Q.  Why were you concerned?

18  A.  Because I had not sent my letter to Northwestern, and

19  Gayle had informed me through a filing that had been made to

20  the Colorado probate court that my letter had been received by

21  Northwestern.

22  Q.  Now, your concern, was it about your letter per se, or was

23  there something else that you were concerned about?

24  A.  It made it look like I had uploaded or sent a letter --

25  excuse me.  It made it look like I had sent the letter that

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 51 of 169 PageID #:16724
Kerr - cross by Mr. Baron
833

1   Kate Litvak wrote to Northwestern University.

2   Q.  Okay.  So if I understand you correctly, your concern was

3   that it made it look like you sent Kate's letter?

4   A.  Correct.

5           MR. HOMYK:  Judge, this is all leading.

6           THE COURT:  Stop leading.

7           MR. BARON:  Scroll up, please.

8           THE COURT:  Stop leading.

9   BY MR. BARON:

10  Q.  Melissa Cohenson writes:  "Pam, is that even your

11  signature?  I can't seem to even upload" -- "I can't even

12  upload or see the letter they are purporting was uploaded.

13  Melissa Cohenson."

14          Again, who is Melissa?

15  A.  Cherie Wrigley's attorney in the guardianship case in New

16  York.

17  Q.  Okay.  And now we have an email from Gayle Young, the

18  guardian ad litem, to you where she says:  "Pam, I just sent

19  out the letter" -- "I just sent out the letter from

20  Northwestern, and your letter was attached to both courts.

21  Gayle."

22          Okay.  Same day, right?  So was that what you were

23  referring to just a moment ago when you said you learned from

24  Gayle about the letter?

25  A.  Correct.

Kerr - cross by Mr. Baron

834

1    MR. BARON:  Let's scroll up.

2  BY MR. BARON:

3  Q.  Melissa then writes:  "I'm severely confused.  How did

4  Piper get this?  Bernard must have got it or Kate from NWL.

5  Don't they have access to the school?  Let's not let this

6  distract us from these liars."

7    Melissa, again, is Joanne's lawyer in New York,

8  right?

9  A.  Correct.

10    MR. HOMYK:  That's leading, Judge.

11    THE COURT:  Sustained.  The question is stricken; the

12  answer is stricken.  I'm not going to wait for an objection on

13  the next one.

14    MR. BARON:  Thank you.

15    THE COURT:  That's the fourth time I've told you.

16    MR. BARON:  Scroll up, please.  Let's go a little bit

17  further up just to get to the -- okay.  Here we go.

18  BY MR. BARON:

19  Q.  All right.  On the evening of March 16, 2016, you received

20  an email from Cherie Wrigley, right?

21  A.  Correct.

22  Q.  And I'm looking now at an email of 6:57 p.m.  Are you

23  looking at that as well?

24  A.  Yes.

25  Q.  And is this the email that you got -- well, is this how

Kerr - cross by Mr. Baron

835

1  you learned that the letter had been uploaded, your letter had

2  been uploaded?

3  A.  Yes.

4  Q.  Okay.  And up until this point in time on March 16, 2016,

5  did you at any point in time have any information that Cherie

6  Wrigley had uploaded your letter to an EthicsPoint portal at

7  Northwestern?

8  A.  No.

9  Q.  Okay.  Mr. Homyk asked you or asked Cherie yesterday about

10  some sort of a retraction.  Did you take any steps to retract

11  your letter from Northwestern to get it back from them?

12  A.  No.

13  Q.  Why not?

14  A.  Because the intent of my letter was to determine whether

15  Northwestern was supportive of the statements made in the

16  letter by Ms. Litvak to Judge Aliotta in New York, and the

17  letter from Marcia Isaacson clearly stated that they were not

18  supportive of her position in the letter to Judge Aliotta in

19  New York.

20  Q.  You mentioned the letter from Marcia Isaacson, and let me

21  just touch on that briefly.  This would be Defense Exhibit 56,

22  which has been admitted already.

23        So, Pam, a moment ago when you said the letter from

24  Marcia Isaacson to the judges, is this the letter you were

25  talking about?

Kerr - cross by Mr. Baron

836

1   A.  Yes.

2   Q.  And if I could call your attention --

3            MR. BARON:  Scroll up a little bit.  Stop.

4   BY MR. BARON:

5   Q.  So I guess it would be the third paragraph from the

6   bottom, the one that begins, "It is apparent that the parties

7   are engaged in an acrimonious legal battle."

8            Do you see that?

9   A.  Yes.

10  Q.  When Marcia Isaacson wrote to the judges:  "We hope it

11  goes without saying that notwithstanding the professor's use

12  of our letterhead, Northwestern is not a party to these

13  matters, nor does it take any position with regard to their

14  merits."

15           Were you satisfied that the judges got the message

16  that this was not backed in any way, shape, or form by

17  Northwestern?

18           MR. HOMYK:  Objection, leading.

19           THE COURT:  Sustained.  Leading.  The question is

20  stricken.  I'm not going to let you ask it again.

21  BY MR. BARON:

22  Q.  Okay.  Pam, even though you decided not to send your

23  letter to Daniel Rodriguez and it was sent by somebody else,

24  do you stand by the truth of the statements in your letter

25  concerning Katherine herself making a false statement?

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 55 of 169 PageID #:16728
Kerr - cross by Mr. Fantone
837

```
 1  A.  Yes.
 2          MR. BARON:  Nothing further from me.
 3          THE COURT:  Questions by you, Mr. Fantone?
 4          MR. FANTONE:  Thank you, Judge.
 5          Judge, I am going to plug in here.
 6          THE COURT:  You are plugging into the HDMI.
 7          MR. FANTONE:  Correct.  I just want to let you know
 8  that I may be using some documents solely to refresh
 9  recollection.
10          THE COURT:  Just tell me that when it happens.
11          MR. FANTONE:  Will do.
12                      - - -
13              PAMELA KERR, CROSS-EXAMINATION
14  BY MR. FANTONE:
15  Q.  Good morning, Ms. Kerr.
16  A.  Good morning.
17  Q.  How are you?
18  A.  Good.
19  Q.  You know our client, Cherie Wrigley?
20  A.  Yes.
21  Q.  How do you know her?
22  A.  From the proceedings for which I was hired.
23  Q.  Do you know roughly about when you met Ms. Wrigley?
24  A.  It probably would have been June of 2015.
25  Q.  Do you know the first time that maybe you became aware of
```

Kerr - cross by Mr. Fantone

838

1   her or her name or anything like that?

2   A.  Yes.

3   Q.  When was that?

4   A.  In January, early February of 2015 when I began the

5   investigation.

6   Q.  Was any -- well, are you aware that Ms. Wrigley filed

7   objections in relation to that proceeding?

8   A.  Objection to which proceeding?

9   Q.  In the Denver probate court proceedings.

10  A.  Yes.

11          MR. HOMYK:  Objection, relevance.

12          THE COURT:  To that question, the objection is

13  overruled.

14          MR. FANTONE:  Thank you.

15  BY MR. FANTONE:

16  Q.  Do you recall on or about what date those objections --

17  that she filed those objections?

18  A.  I believe it was in October of 2014 -- no, it would have

19  been January of 2015.

20  Q.  Right.

21  A.  But that's my recollection.

22  Q.  Is there something I can use maybe to refresh your

23  recollection on the specific day?

24  A.  Yes.

25  Q.  Okay.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 57 of 169 PageID #:16730
Kerr - cross by Mr. Fantone
839

1    MR. FANTONE:  Judge, I'm just going to plug in here.

2  All right?

3    THE COURT:  Okay.  I'll put it so only the witness

4  can see it.

5    MR. FANTONE:  Correct.

6  BY MR. FANTONE:

7  Q.  I'll just draw your attention to -- I just ask you to take

8  a look at that document and let us know if that refreshes your

9  recollection as to the day Ms. Wrigley lodged her objections.

10 A.  Yes.

11 Q.  Okay.  And what day was that?

12 A.  January 21st, 2015.

13 Q.  And did those objections, to your knowledge, essentially

14 result in you being hired?

15    MR. HOMYK:  Objection.

16    THE COURT:  Overruled.

17    THE WITNESS:  I believe it was all of the objections,

18 all of the documents that had been filed.

19 BY MR. FANTONE:

20 Q.  Do you know who else filed objections other than

21 Ms. Wrigley?

22 A.  Ms. Young and Mr. Dain.

23 Q.  Okay.  Do you recall the date that you were retained --

24 well, excuse me.  Strike that.

25    You were hired by Gayle Young, right?

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 58 of 169 PageID #:16731
Kerr - cross by Mr. Fantone
840

1  A.  Correct.

2  Q.  Okay.  Do you remember on or about what date that was?

3  A.  I believe it was January 27th, 2015.

4  Q.  That's right.

5         So that was only -- that was six days after

6  Ms. Wrigley filed her objections, right?

7  A.  Correct.

8  Q.  Okay.  Now, I've heard kind of in sum and substance --

9  maybe I am paraphrasing -- but you used this phrase that you

10 were investigating or doing an accounting of the

11 conservatorship, right?  Am I saying that right?

12 A.  Correct.

13 Q.  Okay.  Can you just explain, generally speaking, you know,

14 what that means?

15 A.  It means that I was hired to investigate the actions of

16 the court-appointed conservator and the assets of the

17 protected person and the funds that were expended by the

18 court-appointed conservator out of the protected person's

19 funds.

20 Q.  Okay.  And in that case that individual was Bernard Black?

21 A.  The conservator, yes.

22 Q.  Right.  And that's plaintiff's husband?

23 A.  Correct.

24 Q.  Okay.  Now, you've seen some of the email exhibits that

25 have been entered into this case, right?

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 59 of 169 PageID #:16732
Kerr - cross by Mr. Fantone
841

1  A.  Correct.

2  Q.  Do you typically use email as a way to, you know, move

3  along your investigation or as a tool in receiving

4  information, gathering information?

5  A.  Yes.

6  Q.  That's a typical tool that you use when you're performing

7  these accountings and investigations?

8  A.  Correct.

9  Q.  Okay.  With this particular case, you've seen the emails

10  that have been entered into evidence about Esaun Pinto,

11  correct?

12  A.  Correct.

13  Q.  What fraction -- well, let me ask it in a non-leading way.

14       What percentage do you think of all the emails you

15  used with this particular matter in the Denver probate court

16  do those emails make up, the Pinto emails?

17  A.  Maybe less than 1 percent.

18  Q.  Less than 1 percent.

19       Okay.  When plaintiff was testifying a couple days

20  ago -- you remember that, right?

21  A.  Yes.

22  Q.  Do you recall, generally speaking, her testimony about her

23  children attending Roycemore?

24  A.  Yes.

25  Q.  Do you know what Roycemore is?

Kerr - cross by Mr. Fantone

842

1     THE COURT:  You know what, I excluded questions about

2   this during the other examination, so let's just -- it is

3   absolutely -- it is so far irrelevant that it is beyond even

4   discussion at this point.

5     MR. FANTONE:  Okay.  I'll move on, Judge.

6   BY MR. FANTONE:

7   Q.  Let me show you what's in evidence as Plaintiff's 66.

8     MR. FANTONE:  And this can be shown to the jury,

9   Judge.

10     THE COURT:  It's in evidence?

11     MR. FANTONE:  It's in evidence.

12     THE COURT:  All right.  There you go.

13   BY MR. FANTONE:

14   Q.  Now, this is an email -- I'm sorry.  Can you describe what

15   that is just briefly?  We've already seen it.  The jury's

16   already seen it, but go ahead and describe it, if you don't

17   mind.

18   A.  It's an email from me to -- can you scroll a little bit?

19   Q.  Sorry.  I apologize.

20   A.  It's an email from me to Cherie Wrigley dated January 8th

21   stating:  "I would be careful about providing documents in

22   this case to anyone other than those involved."

23   Q.  Hold on.  Hold on.  I just want to ask you about the

24   times.

25     Do you see what time that email was sent?

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 61 of 169 PageID #:16734
Kerr - cross by Mr. Fantone
843

1  A.  Yes.

2  Q.  And what time was that?

3  A.  12:51 p.m.

4  Q.  And you wrote here the words:  "So you can see what I'm

5  writing."

6          Do you see that?

7  A.  Yes.

8  Q.  And what did you mean by that?

9          MR. HOMYK:  Objection.  Lack of foundation.

10          THE COURT:  What's the "that"?  What did you mean by

11  that?  What's the "that"?

12          MR. FANTONE:  "So you can see what I'm writing,"

13  those words.

14          MR. HOMYK:  It's an email from Ms. Kerr, Judge.

15          THE COURT:  What did you mean by that?  You can

16  answer that question.  What did you mean by that sentence?

17          MR. HOMYK:  Well, she didn't write it.

18          THE COURT:  I just ruled on the objection.  Yes, she

19  did.  It's "best regards, Pam Kerr."

20          MR. HOMYK:  I'm sorry, sir.

21          THE COURT:  You can answer that question.

22          THE WITNESS:  What I meant was to show Cherie what I

23  was writing to the dean of the law school.

24  BY MR. FANTONE:

25  Q.  Right.

Kerr - cross by Mr. Fantone

844

1          And that was, again, at 12:51, right?

2    A.  Correct.

3    Q.  Okay.  I mean, would you loosely consider that a draft at

4    that point?

5    A.  Yes.

6    Q.  Okay.  Now, let me show you what's been marked into

7    evidence --

8          MR. HOMYK:  I'm sorry.  I didn't hear that last

9    answer.  What was the answer?

10          THE COURT:  She said "yes."

11          MR. HOMYK:  She said "yes"?

12          THE COURT:  Yes.

13   BY MR. FANTONE:

14   Q.  This is Defense 47 that Mr. Baron just showed you, right?

15   Do you recognize that?

16   A.  Yes.

17   Q.  Okay.  And what time was this email written?

18   A.  2:07 p.m.

19   Q.  Okay.  And did you, in fact, attach another draft of your

20   letter to this email?

21   A.  It was the letter.

22   Q.  Okay.  And you wrote here:  "Here's my letter that I plan

23   to send to Northwestern.  Any thoughts?"

24          Right?

25   A.  Correct.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 63 of 169 PageID #:16736
Kerr - cross by Mr. Fantone
845

1   Q.  What was your intent in writing those words, "any
2   thoughts"?
3   A.  To see if anybody had any objection or if I was misstating
4   something or stating something that they felt was not
5   appropriate or, you know, just incorrect.
6   Q.  Right.
7           Now, this email and most -- this email is dated
8   January 8th, right?
9   A.  Correct.
10  Q.  And is that the same date as a lot of the other
11  communications that we've seen -- email communications that
12  we've seen in this case?
13  A.  Correct.
14  Q.  All right.  Do you recall what date Ms. Wrigley actually
15  uploaded your letter to Northwestern via the EthicsPoint?
16  A.  It's my understanding from yesterday that it was
17  January 23rd, 2016.
18          MR. FANTONE:  I'd like to show for the record what's
19  in evidence as Plaintiff's 71.
20          MR. HOMYK:  Judge, objection.
21          THE COURT:  Is the whole exhibit in evidence?
22          MS. ABRAHAM:  No.
23          MR. FANTONE:  There is a redacted version.  That's
24  not redacted.
25  BY MR. FANTONE:

Kerr - cross by Mr. Fantone

846

1  Q.  Does that document, to your recollection reflect --

2          THE COURT:  Stop.

3    (The following proceedings were had at sidebar outside the

4    hearing of the jury:)

5          THE COURT:  Everybody has made a bunch of mistakes in

6    this case, including me, but you can't say to me this is in

7    evidence and then put up something that isn't because you put

8    up the unredacted -- the redacted part.  You can't do that.

9    You lied to me.  You lied to me.

10         MR. FANTONE:  I made a mistake.

11         THE COURT:  I know.  I understand.  In this case, you

12   deliberately said it.  You deliberately said it.  It was clear

13   on its face.  It was untrue.

14         MR. FANTONE:  It was a hundred percent not true.

15         THE COURT:  It depends on what the knowledge has to

16   do with deliberately saying the knowledge is not true.  Don't

17   do that.

18         MS. ABRAHAM:  Did the jury see when it was scrolled

19   through?

20         THE COURT:  They saw it for two seconds.

21   (The following proceedings were had in open court in the

22   presence and hearing of the jury:)

23         THE COURT:  Whatever you saw on the screen, if you

24   saw anything because it was scrolling, just disregard it.

25   BY MR. FANTONE:

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 65 of 169 PageID #:16738
Kerr - cross by Mr. Fantone
847

1  Q.  All right.  So just to restate your testimony briefly,

2  what day do you understand Ms. Wrigley to have uploaded your

3  letter to Northwestern?

4  A.  January 23rd, 2016.

5  Q.  Okay.  And, in fact, to show you what's in evidence as

6  Defense 57, you didn't find out about that until what date?

7  A.  March 16th, 2016.

8          THE COURT:  Okay.  Is this in evidence?

9          MR. FANTONE:  This is in evidence, Judge, yeah.

10         THE COURT:  Okay.  There.

11  BY MR. FANTONE:

12  Q.  And that's reflected by this email here, correct?

13         MR. HOMYK:  Objection, leading.

14         THE COURT:  Sustained.  You are not entitled to lead.

15         MR. FANTONE:  Okay.

16  BY MR. FANTONE:

17  Q.  Can you tell us, the email that's in front of you, what

18  the date of it is?

19         THE COURT:  Which one are you talking about, the

20  first one or the second one?  There's two with different

21  dates.

22         MR. FANTONE:  Either-or.

23         THE COURT:  Okay.

24         THE WITNESS:  The one dated from Cherie Wrigley is

25  dated March 16th, 2016.

Kerr - cross by Mr. Fantone

848

1    BY MR. FANTONE:

2    Q.  Right.

3         And can you read the subject line of the one above

4    that.

5    A.  "Who sent my letter to Northwestern?"

6    Q.  Okay.  Between January 8th and January 23rd when

7    Ms. Wrigley uploaded your letter, are you aware of any

8    communications directly between you and Ms. Wrigley about your

9    letter?

10   A.  No.

11   Q.  Are you aware -- strike that.

12        Between January 8th and March 16th when you realized

13   that Ms. Wrigley had uploaded your letter, are you aware of

14   any communications between you and Ms. Wrigley between those

15   two dates about your letter?

16   A.  No.

17   Q.  Okay.  I just got one last thing.  I'm showing what's

18   marked in evidence as People's (sic) 66.

19        Do you see that email in front of you?  I think

20   Mr. Baron showed it to you not too long ago.

21   A.  Yes.

22   Q.  And can you describe who it's from and who it's to?

23   A.  It's from Melissa Cohenson, sent on Thursday, January 7th,

24   to me, Lisa DiPonio, Gayle Young, and Cherie Wrigley was

25   copied.

Kerr - cross by Mr. Fantone

849

1   Q.  And do you see the part where she says:  "My heart breaks

2   for Joanne"?

3   A.  Yes.

4   Q.  Did you share that sentiment at that time?

5   A.  Yes.

6          MR. FANTONE:  Nothing further, your Honor.

7          MR. HOMYK:  Judge, may we take our midmorning break,

8   ten minutes?  I want to get organized a little bit.

9          THE COURT:  Okay.  Take a ten-minute break right now.

10    (Short break.)

11         THE COURT:  I understand there's something you want

12  to discuss.

13         MR. HOMYK:  Can we do it at sidebar?

14         THE COURT:  Sure.  That's fine.

15    (The following proceedings were had at sidebar outside the

16  hearing of the jury:)

17         THE COURT:  Yes, sir.

18         MR. HOMYK:  We have been doing things out of order

19  here, I know.  And trust me, I know where I'm at in terms of a

20  redirect with Pam Kerr.  I have been directed in no uncertain

21  terms by my client to move for the admission of certain items

22  now.

23         THE COURT:  Okay.

24         MR. HOMYK:  And so I'm happy to, frankly, let these

25  guys see what I've been asked.

Kerr - cross by Mr. Fantone

850

1          THE COURT:  What is it you want to put in?

2          MR. HOMYK:  The video of Wrigley's deposition, these

3    deposition excerpts.

4          THE COURT:  So I'll just read these out.  I am going

5    to read these out to you, and you write them down.  Page 234.

6          MR. BARON:  Is this Cherie Wrigley?

7          THE COURT:  Yes.  234, lines 15 to 17; 240, 16 to the

8    end; and 241, 1 to 10.

9          MS. ABRAHAM:  I will go grab what the designations

10   are for the videos because it's different.

11         THE COURT:  245, lines 2 to 17.  Is this the same?

12   This is something else?

13         MR. HOMYK:  It's a portion of a Colorado transcript.

14         THE COURT:  Okay.  Is everything else in this note

15   too that you are going to move to admit?

16         MR. HOMYK:  Yes, your Honor.

17         THE COURT:  Okay.  Let's just go through the whole

18   thing.  Just take notes.

19         MR. HOMYK:  Okay.

20         THE COURT:  The rest of these are not Wrigley's

21   deposition.  It's other stuff.

22         MR. HOMYK:  Exhibit 29, page 3, line 17.  Just take

23   it.  You can have it.

24         THE COURT:  That's the April 2nd transcript, right?

25         MR. MANCILLA:  I will figure it out.

Kerr - cross by Mr. Fantone

1          THE COURT:  29 is the transcript.  29, page 3,

2    line 17 it looks like maybe to line 22.

3          Okay.  Then --

4          MR. HOMYK:  Exhibit 108, Kerr email.

5          THE COURT:  Okay.  I think that one's in.  That may

6    be in.  I don't know.

7          MR. HOMYK:  I think we just talked about that one.

8          THE COURT:  Exhibit 44.  That may be in.  The rest of

9    it -- some of this stuff in.  You don't want to give this to

10   them.  You don't want to give this to me either.

11         MR. HOMYK:  I know.  I know.  I just want to move on,

12   frankly.

13         MR. BARON:  These are all plaintiff's exhibits,

14   right?

15         MR. HOMYK:  Yes, sir.

16         THE COURT:  I am confident that I could echo that

17   last sentiment.

18         MR. MANDELL:  Is that a joke?

19         THE COURT:  He said, "I want to move on."

20         MR. HOMYK:  For you to write it down, it's going to

21   take quite a while.  I guess that's my only thing, Judge.  Why

22   don't we do this.

23         THE COURT:  No, no.  Okay.

24         MR. HOMYK:  I'll tell you what.  Here's my

25   suggestion.  Can we make a copy of this, and I can give it to

Kerr - redirect by Mr. Homyk

852

1    them?  Because this is what I want to move in.

2         THE COURT:  You don't want to give them your client's

3    notes.  So here's what you're going to do.  You are going to

4    move them in, but you are not going to move them in before

5    this testimony because I am going to get the jury back out

6    here.  And you can just tell your client that you insisted

7    on -- because it's going to be true, because you wanted to

8    move them in now, and I said we're going to do the testimony

9    now.  Okay?  If some of these things come up during the

10   testimony, I will address them one at a time.  All right?

11   That's what we're going to do.

12        MR. HOMYK:  They are going to come up, Judge.

13        THE COURT:  Fine.  Then they're going to come up.

14   Then I will deal with them as they come up.  Okay?

15        All right.

16     (The following proceedings were had in open court:)

17     (The jury enters the courtroom.)

18        THE COURT:  All right.  Everybody can have a seat.

19        And, Mr. Homyk, you can go ahead.

20                              - - -

21             PAMELA KERR, REDIRECT EXAMINATION

22   BY MR. HOMYK:

23   Q.  All right.  Ms. Kerr, I'm going to start with exhibit --

24   Defendants' Exhibit No. 50, please.

25        MR. HOMYK:  I was able to inquire about it.

1  Defendants' 50.  I made an inquiry.

2           MS. ABRAHAM:  Should I put it up?

3           THE COURT:  The jury will not see it, if it's not in

4  evidence.  I've already taken their screen down, so just go

5  ahead and put it up for the witness.

6  BY MR. HOMYK:

7  Q.  Ms. Kerr, this is the --

8           THE COURT:  Hang on a second.  Just wait for it to

9  come up on the screen.

10 BY MR. HOMYK:

11 Q.  This is --

12          THE COURT:  There you go.

13 BY MR. HOMYK:

14 Q.  -- (continuing) January 13 email from you to the Court.

15 Do you remember that, to the New York court?

16 A.  Yes.

17 Q.  January 13, where you were writing to clarify your

18 statement, right?  You were writing to clarify your statement

19 that Katherine Litvak made in her letter, and we all know

20 that's January 7 by this point.  That was the purpose of your

21 letter, correct?

22          MR. BARON:  Objection, misstates her testimony.

23          THE COURT:  Yeah, you said clarify her statement that

24 Katherine Litvak made in her letter.

25 BY MR. HOMYK:

Kerr - redirect by Mr. Homyk

1  Q.  To clarify the statement that Kate Litvak made in

2  Katherine Litvak's letter, correct?

3  A.  Correct.

4  Q.  And then you indicated in that email to that judge in New

5  York that "I believe that this statement" -- meaning Katherine

6  Litvak's statement -- "is made to insinuate that my

7  investigation was with regards to Mr. Pinto's actions solely,

8  which is 100 percent not true."

9          Do you remember telling that to a judge in New York?

10 Emailing that to a judge in New York?  Do you remember that?

11 A.  Can you pull it up on the screen?  I just want to verify

12 that.

13         Yes, I do remember that exactly.

14 Q.  You remember it exactly?

15         THE COURT:  She's just kind of flipping around on the

16 thing here.

17         MS. ABRAHAM:  Sorry.

18         THE COURT:  It's the top of the second page, please.

19 Second page.  There you go.  Top of the page.

20         Did Mr. Homyk say it correctly?

21         THE WITNESS:  Yes.

22 BY MR. HOMYK:

23 Q.  Do you have the second page now, ma'am?

24         THE COURT:  She just said that you were correct.

25 BY MR. HOMYK:

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 73 of 169 PageID #:16746
Kerr - redirect by Mr. Homyk
855

1   Q.  Okay.  And so in that statement, "I believe that this

2   statement is made to insinuate that my investigation was with

3   regards to Mr. Pinto's actions solely, which is 100 percent

4   not true," that was your statement, right, of clarification,

5   true?

6   A.  Yes.

7   Q.  So the statement that was 100 percent not true was a

8   statement that you believed was made to insinuate something,

9   right, not to state something, but to insinuate something,

10  true?

11  A.  That's exactly what it says.

12  Q.  Okay.  So your problem was -- with Katherine Black's

13  statement was with what you believed it insinuated, not what

14  it said, right?  That's what this says, right?

15  A.  That's exactly what it says, yes, sir.

16  Q.  So it was your problem with her statement was based on

17  your interpretation of that statement rather than the factual

18  basis of that statement, true, based on this email?

19  A.  Based on this email, that's what it says.

20  Q.  That's what it says, and those are your words, right?

21  A.  Right.

22  Q.  So just to be clear, that 100 percent not true as to

23  Mr. Pinto's actions solely was simply something that you

24  insinuated from her statement, correct?

25  A.  No, sir.  I said that --

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 74 of 169 PageID #:16747
Kerr - redirect by Mr. Homyk
856

1    Q.  Is that correct?

2            THE COURT:  She said "no."

3            THE WITNESS:  No.

4    BY MR. HOMYK:

5    Q.  That statement from Katherine Black that you're referring

6    to in this clarification email, that statement never said,

7    never anywhere in that statement did it say that your

8    investigation was with regards to Mr. Pinto's actions solely,

9    did it?  Do you need to see it again?

10   A.  This statement, it's in front of me.

11   Q.  Her statement.  Her statement of January 7th, 2016, it

12   nowhere, nowhere states that your investigation was with

13   regards to Mr. Pinto's actions solely, does it?

14   A.  Correct.

15   Q.  And so you went on to make your insinuation from that

16   statement, true?

17   A.  No.

18   Q.  Well, what you did was you did, indeed, believe that her

19   statement was made for the purpose of making an insinuation,

20   true?  That's what your language says, right?

21   A.  Exactly.

22           MR. HOMYK:  Let's pull up that exhibit of that

23   statement, the 1/7/2016 statement.  And I want to pull up

24   immediately after that her letter.

25           Excellent.  Can you put that up on the screen,

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 75 of 169 PageID #:16748
Kerr - redirect by Mr. Homyk
857

1   please.

2          THE COURT:  Okay.  These are both in evidence?

3          MR. HOMYK:  They are both in evidence, Judge.  Both

4   of these items are, indeed, in evidence.

5          THE COURT:  There you go.

6   BY MR. HOMYK:

7   Q.  Ma'am, would you look on your screen, please.

8          So Exhibit 65 is the statement in Katherine's July 7,

9   2016, letter to Judge Aliotta that we have been talking about,

10  right, that you reviewed and that made you so extraordinarily

11  upset, right?

12  A.  Correct.

13  Q.  And then if you look at your letter, your signed letter of

14  January 8, 2016, and you look at the statement that's made in

15  that letter, that's the statement that forms the basis of the

16  defamation claim here; isn't that true, ma'am?

17  A.  That's your statement.  Yes, sir.

18  Q.  That's why we're here today, is the statement in your

19  January 8, 2016, letter, correct?  Correct?

20  A.  Correct.

21         MR. BARON:  Objection, mischaracterizes the

22  testimony.

23         THE COURT:  Overruled.  The answer can stand.

24  BY MR. HOMYK:

25  Q.  So you gave testimony before -- you gave testimony before

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 76 of 169 PageID #:16749
Kerr - redirect by Mr. Homyk
858

1    indicating that what troubled you so much was that -- one of

2    the things that troubled you -- and this is why the words are

3    so important here, so let's -- I'm going to try to do this

4    carefully.  The words are just so important.

5              In that January 7, 2016, letter from Katherine, you

6    pointed specifically to what upset you as being the word "the

7    judge ordered," ordered something, right, that upset you,

8    right?

9    A.  That was part of it, yes.

10   Q.  Okay.  Let's just stick with that part.  That upset you

11   terribly, didn't it?

12   A.  That was part of it, yes.

13   Q.  That's one of the things that prompted you to be so angry

14   that you engaged in email communications and telephone

15   communications and all sorts of stuff the next two days that

16   ultimately resulted in you writing your letter of January 8,

17   2016, correct?

18   A.  That was part of it, yes.

19   Q.  Let's forget about whether it's a draft or not.  I'm not

20   going to go there right now.

21             Okay.  The defamatory statement as to that in your

22   letter doesn't use the word "order" anywhere, does it?

23             MR. BARON:  Objection to the characterization as

24   to --

25             THE COURT:  Rephrase the question, please.  You need

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 77 of 169 PageID #:16750
Kerr - redirect by Mr. Homyk
859

1    to take the word "defamatory" out of it because you're

2    asking --

3              MR. HOMYK:  I understand.  Understood, Judge.

4    BY MR. HOMYK:

5    Q.  Looking at the letter that you wrote and signed on

6    January 8th, is the word "order" anywhere in that statement?

7    A.  Not in this statement, no.

8    Q.  Oh, okay.  So the statement that brings us before this

9    jury today, in the last few days, and your problem with the

10   judge having ordered something doesn't even appear in the

11   letter that you wrote complaining about Katherine Black's

12   letter, true?

13   A.  It does not.

14   Q.  All right.  Now, there's another point that you made, and,

15   you know, your lawyers wanted to go through this with you

16   carefully, and they did.  The January 7, 2016, Katherine Black

17   letter that got you so angry, the little snippet there to the

18   left on your screen that got you so extraordinarily angry that

19   it caused you to write a letter that ultimately somehow, some

20   way got to Northwestern University and caused all kinds of

21   problems, in that letter on the left, it caused you a

22   court-appointed accountant, do you see that?  Do you see it?

23   A.  It says court appointed.  I'm not sure what you mean by it

24   caused me court appointed.

25   Q.  All I care about are the words, ma'am, because that's what

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 78 of 169 PageID #:16751
Kerr - redirect by Mr. Homyk
860

1    brings us here are the words.  The words on that -- the words

2    on that exhibit to the left are "court appointed," right?

3    A.  There is the phrase "court appointed," yes, sir.

4    Q.  And then when you look at the exhibit on the right that

5    has the defamatory statement that we allege, right, look at

6    that, where is "court appointed" in that statement?

7    A.  It is not in this statement.

8    Q.  It's not in there.

9         So what you did over the course of a day is you took

10   a statement from Katherine Black's letter, okay, that troubled

11   you so much, so much, and then you turned that into your

12   letter the next day, but chose to omit two of the central

13   words -- or "court appointed" is either one or two words, I

14   guess.  You chose to omit the words "court appointed," and you

15   chose to omit the words "order," right?  That was your choice,

16   correct?

17   A.  This is a phrase --

18   Q.  Yes or no?

19   A.  Those are my words, yes, sir.

20   Q.  And it was your choice to omit two very important terms

21   from Katherine Black's letter that she wrote when you decided

22   to write your letter the next day that brings us here today.

23   That was your decision to omit those two very important terms,

24   wasn't it?

25             MR. BARON:  Objection to the characterization.

Kerr - redirect by Mr. Homyk

1        THE COURT:  Sustained.  You got to rephrase it.  Take

2   out the word "very important."  I mean, you've already gotten

3   the answer to the question, honestly, with the previous

4   question.  If you want to ask it again, you are going to have

5   to take the words "very important" out, because then it's a

6   multiple compound question.

7   BY MR. HOMYK:

8   Q.  Well, all right.  Let me ask it this way.  You're a detail

9   person here.  You already confirmed that with me when we

10  talked before.  You are a detail person, right?

11  A.  Correct.

12  Q.  And you go out of your way to be detailed, and you go out

13  of your way to make sure that when you write a letter that it

14  includes the details that you want it to say and intend it to

15  say, true?  True?

16  A.  My answer --

17  Q.  Yes?

18  A.  Okay.  Can you say --

19  Q.  No.  Yes or no, ma'am?  You can answer that yes or no.

20  A.  Can you please repeat the question, or --

21  Q.  When you wrote -- let me be clear about it.

22        When you wrote that letter on January 8, 2016, that

23  brings us here today, okay, you intended to use the precise

24  words that you used in that letter, true?

25  A.  They are quote --

Kerr - redirect by Mr. Homyk

1   Q.  Yes or no?

2   A.  Yes.

3   Q.  Okay.  Because you're that detail person.  So you chose to

4   omit from that letter the words "order" and "court appointed,"

5   true?

6   A.  I did not choose --

7   Q.  Yes or no?  Yes or no, ma'am?

8   A.  My answer --

9   Q.  Yes or no, ma'am?  You can answer that yes or no.

10          You chose --

11  A.  I think that's a mischaracterization.

12  Q.  You chose -- oh, it was your decision not to put in the

13  word "court order" -- order -- I'm sorry.  Let me rephrase.

14          It was your decision and your decision alone not to

15  put the word "order" into your January 8 letter that you

16  italicized, the italicized portion, true?

17  A.  It is not included in there, true.

18  Q.  I'm sorry.  I didn't hear that, ma'am.

19          THE COURT:  She said, "It is not included in there,

20  comma, true."

21  BY MR. HOMYK:

22  Q.  So that's a "yes," I'm pretty sure, right?

23  A.  That is yes, sir.

24  Q.  All right.  Thank you.

25          And that was your decision and your decision alone

Kerr - redirect by Mr. Homyk

1   not to include the term "court appointed" in your letter of

2   January 8, true?

3   A.  This is a quote from --

4   Q.  True?  It was your decision and your decision alone not to

5   include the words "court appointed" when you wrote that letter

6   on January 8, true?

7   A.  Again, I say it's a mischaracterization.

8   Q.  Ma'am, is that true that it was your decision and your

9   decision alone?

10          THE COURT:  Sidebar, please.

11     (The following proceedings were had at sidebar outside the

12   hearing of the jury:)

13          THE COURT:  I know there's no objection over here,

14   but I only have to let this go on so far.  You're just arguing

15   with her at this point.

16          MR. HOMYK:  I just want an answer.

17          THE COURT:  You're just arguing with her at this

18   point.  You have asked this question, and she has said more

19   than once the obvious, which is that she chose the words in

20   the letter.  Okay?  I am cutting off this questioning at this

21   point.  You're moving on to another topic.  If you don't, I'll

22   do it in front of the jury.

23     (The following proceedings were had in open court in the

24   presence and hearing of the jury:)

25   BY MR. HOMYK:

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 82 of 169 PageID #:16755
Kerr - redirect by Mr. Homyk
864

1  Q.  Okay.  There was some testimony from you a while ago about

2  having received some documents or materials in any form -- in

3  any form during your forensic review of the conservatorship

4  estate from attorneys and accountants and other individuals in

5  addition to Mr. Pinto, correct?

6  A.  Correct.

7  Q.  Okay.  Mr. Pinto, however, was the only individual, only

8  individual among attorneys and accountants and private

9  investigators and you name it who is named by name in that

10  order, correct?

11  A.  Mr. Pinto is named by name in that order, yes, sir.

12          MR. HOMYK:  Exhibit 20, not in evidence, Judge.

13          THE COURT:  Okay.  So I have taken it off the jury's

14  screens.  You can go ahead and put it up.  Can you please put

15  the thing up on the screen so I can see it?  It is up on the

16  screen.  Okay.

17          Is there an objection to this?

18          MR. BARON:  Relevance.  This is a proposed order.

19          THE COURT:  Can you go to the second page?  Okay.

20          MR. BARON:  It's not signed.

21          THE COURT:  Sustained.  The objection is sustained.

22  BY MR. HOMYK:

23  Q.  Ms. Kerr, the order that was entered in this case

24  appointing you was an order for an independent forensic

25  review, wasn't it?

Kerr - redirect by Mr. Homyk

865

1  A.  That's what the order says, yes, sir.

2  Q.  And that's, in fact, true, that you were appointed by

3  order to conduct an independent forensic review, true?  Is

4  that true?  Yes or no?

5  A.  That is not true.

6        MR. HOMYK:  Exhibit 52.

7        MS. ABRAHAM:  And there are objections.

8        THE COURT:  Okay.  Just put it up so I can see it,

9  and I'll find out what the objections are.

10        MR. HOMYK:  And portions are redacted, Judge.

11        MR. MANDELL:  What number?

12        MR. HOMYK:  I'm sorry.

13        MR. MANDELL:  What number?

14        MS. ABRAHAM:  52.

15        MR. HOMYK:  52.

16        MR. FANTONE:  No objection to 52.

17        THE COURT:  I want to see it.  Keep going.

18        MR. HOMYK:  I'm sorry?

19        THE COURT:  Okay.  So this is a document, again, that

20  most of it has been deleted out or redacted out.  That's at my

21  direction because the remaining material I determined was

22  irrelevant.

23        Okay.  Go ahead.

24  BY MR. HOMYK:

25  Q.  Ma'am, you can see from this document that this was

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 84 of 169 PageID #:16757
Kerr - redirect by Mr. Homyk
866

1  actually a document that was filed -- appears to have been

2  filed with the Denver court, correct?

3          THE COURT:  Upper right-hand corner there.

4          THE WITNESS:  Correct.

5  BY MR. HOMYK:

6  Q.  And it's on your letterhead, right?

7  A.  Correct.

8  Q.  And you, in fact, signed it again, right?  Or you signed

9  it, correct?

10 A.  Correct.

11 Q.  And it's to Gayle Young, true?

12 A.  Correct.

13 Q.  Sent via email, right?

14 A.  Correct.

15 Q.  And it's with respect to the Joanne Black case --

16 conservatorship case, correct?

17 A.  Correct.

18 Q.  Okay.

19         MR. HOMYK:  Scroll down to the bottom, please.

20         MR. FANTONE:  Judge, I'm sorry.  We have to have a

21 sidebar on this.  I apologize.

22         THE COURT:  I was told there was no objection.

23         MR. FANTONE:  There was no objection, but I'd rather

24 have a sidebar.

25         THE COURT:  Okay.

Kerr - redirect by Mr. Homyk

1    (The following proceedings were had at sidebar outside the
2  hearing of the jury:)
3           THE COURT:  Well?
4           MR. FANTONE:  Exhibit 52 to my recollection --
5           THE COURT:  This is the non-redacted version.
6           MR. FANTONE:  To my recollection, there's been no
7  rulings on this.  This is what there's been no objection to.
8           THE COURT:  So wait a second.
9           MS. ABRAHAM:  I --
10          THE COURT:  Wait a second.  You don't talk until I
11 ask you to talk.  You understand?
12          MR. HOMYK:  Yes, sir.
13          MS. ABRAHAM:  Sorry.
14          THE COURT:  The document that is up on the screen is
15 a -- basically everything is redacted out of this 15-page
16 letter, okay, except for like one line.  I can't even tell
17 what page it's on.  Do you know what page it was on?
18          MS. ABRAHAM:  6.
19          THE COURT:  And the one line on page 6 is:  "The only
20 clients of Kerr are the protected person and the Court."
21 Right?
22          MS. ABRAHAM:  Yes.
23          THE COURT:  Tell me what you're going to ask about
24 that.  Just tell me right now.  Now you can talk.
25          MR. HOMYK:  Okay.  There's been a whole lot of

Kerr - redirect by Mr. Homyk

868

1    testimony.

2            THE COURT:  Just tell me what you're going to ask.

3            MR. HOMYK:  I'm going to ask -- no, I'm going to tell

4    her that her only clients were the protected person and the

5    Court.  There's been a lot of testimony about who her clients

6    were.

7            THE COURT:  Here's the deal.  This document is not

8    going to go into evidence.  Okay?  You're just going to show

9    it to her.  Just ask her a question:  Isn't it a fact that

10   your only clients were the protected person, namely, Joanne

11   Black, and the Court?  And if she says no, then you're going

12   to show her this, and you're going to say, didn't you say that

13   in a letter to Gayle Young on June 24th of 2015.  I don't

14   understand.  All you people do everything like five times

15   harder than it's supposed to.

16           By the way, I told the jury yesterday, based on you

17   telling me that you were at least halfway done with your

18   examination of Kerr, that they were going to be done today.

19   We are not even scratching the surface yet.  You're twice as

20   long as you said you were going to.  I'm getting fed up with

21   all you people.

22           MS. ABRAHAM:  Do you want me to put the full exhibit

23   up for the witness?

24           THE COURT:  Do just what I said.

25     (The following proceedings were had in open court in the

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 87 of 169 PageID #:16760
Kerr - redirect by Mr. Homyk
869

1  presence and hearing of the jury:)

2          THE COURT:  Just ask the question, and if there is an

3  issue after the question gets asked, then we are going to

4  proceed in the manner I said at sidebar.  And then we are

5  going to move on to something else.

6          Isn't it a fact that...

7  BY MR. HOMYK:

8  Q.  Ms. Kerr, your only clients in this matter were the

9  protected person and the Court, correct?

10  A.  My client in this matter is --

11  Q.  Your only -- is that true or not true?

12          THE COURT:  Just answer that yes or no.

13          THE WITNESS:  No.  Well --

14          THE COURT:  Okay.  Now you can show it to her.  Just

15  walk up there, hand it to her, and show it to her.  And you're

16  going to proceed in the manner that I said at sidebar so we

17  can get through this.  Page 6, Exhibit number -- I don't

18  remember what the exhibit number was.  It's directing your

19  attention to a particular sentence on the -- page 6, toward

20  the bottom of the page.

21  BY MR. HOMYK:

22  Q.  In a letter that you wrote, you did, indeed, in 2015,

23  ma'am, June 24th of 2015, in a letter that you wrote to

24  Ms. Young, you stated that your only clients in this matter

25  are the protected person and the Court, correct?

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 88 of 169 PageID #:16761
Kerr - redirect by Mr. Homyk
870

1  A.  Correct.

2          MR. HOMYK:  115.

3          THE COURT:  Put it up.

4          MR. HOMYK:  Is it up?

5          THE COURT:  It's up for me to see.  Is there an

6  objection to it -- what portion of this are you planning to

7  use?  What portion of this are you planning to use?  Everybody

8  focus your attention this direction.  What portion of this are

9  you planning to use?  Just tell me right now.

10          MR. HOMYK:  The portion that I am going to use,

11  Judge, is going to be...

12          THE COURT:  Okay.  So it's the email from Ms. Kerr

13  dated March 22nd at 10:58 in the morning, right?

14          MR. HOMYK:  Yes, sir.

15          THE COURT:  Not the rest of it.  Not the other stuff

16  on the page, correct?

17          MR. HOMYK:  Yes, sir.

18          THE COURT:  Okay.  Then move it so that we don't have

19  that email at the top of the page in there.

20          Is there an objection to his use of this email here,

21  which you're seeing on the screen?

22          MR. BARON:  No.

23          THE COURT:  Fine.  So this portion, this portion and

24  this portion only of this exhibit are admitted at this point.

25  Okay?  So you are going to have to redact that out of what

Kerr - redirect by Mr. Homyk

871

1   you've given to my clerk for use in the jury room.

2     (Above-mentioned exhibit was received in evidence.)

3           THE COURT:  Go.

4           MR. HOMYK:  Go?

5           THE COURT:  Yes.

6   BY MR. HOMYK:

7   Q.  Ms. Kerr, you told me when we spoke last time that you

8   acknowledged that part of your ethical obligations as a

9   certified fraud examiner was to never, never make a decision

10  on the guilt or innocence of any of the parties or any of the

11  people that you were conducting your forensic review

12  regarding, correct?

13  A.  Correct.

14  Q.  And now I want to direct your attention to your email

15  dated March 22nd of 2016 to a number of people where you --

16  where you state:  "I absolutely" -- in all caps -- "think we

17  need to ask for sanctions against Kate."

18          Do you see that?

19  A.  Yes, I do.

20  Q.  That was a breach of your ethical obligations as a

21  certified fraud examiner, wasn't it, to ask for sanctions

22  against Kate?

23          MR. BARON:  Objection, relevance.

24          THE COURT:  Overruled.  It's relevant on the question

25  of bias.

1        THE WITNESS:  I don't believe so, no, sir.

2    BY MR. HOMYK:

3    Q.  You were seeking to determine whether or not she had

4    engaged in any misconduct sanctionable by virtue of that

5    statement, true?  That's what you were seeking, right?

6    A.  With regards to --

7    Q.  Yes or no, ma'am?

8        THE COURT:  Excuse me.

9        THE WITNESS:  I'm sorry.

10        THE COURT:  You asked two questions.

11        MR. HOMYK:  Okay.

12        THE COURT:  I've told you repeatedly that you cannot

13   do that.  Okay?  I've told you repeatedly at sidebar you can't

14   do it.  Now I'm doing it here.  So one question, and then let

15   her answer it.  What's the question?

16   BY MR. HOMYK:

17   Q.  It was your intention to seek sanctions against Kate by

18   virtue of that sentence in that letter, true?

19   A.  True.

20        MR. HOMYK:  Can we get it back up there?

21        THE COURT:  No.  The jury has seen it.  Ask another

22   question about it, if you're going to, otherwise, no, the jury

23   has seen it.

24   BY MR. HOMYK:

25   Q.  Do you remember the email that you testified to earlier

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 91 of 169 PageID #:16764
Kerr - redirect by Mr. Homyk
873

1  regarding Cohenson, it was that string of emails, most of

2  Cohenson sent it, when you received the January 7, 2016, and

3  there was communications between you people, and then Melissa

4  Cohenson made the statement that the letter -- that it's

5  crazy, the letter is crazy?  Do you remember her using that

6  word?

7  A.  I do.

8  Q.  Okay.  And here's my question to you, ma'am:  That one

9  statement that Kate made in that January 7, 2016, letter that

10  you saw before side by side with your letter, was that a crazy

11  statement?

12           MR. BARON:  Objection, 403, Judge.

13           THE COURT:  Sustained.

14           MR. BARON:  Most of the document has been redacted.

15           THE COURT:  Sustained.

16  BY MR. HOMYK:

17  Q.  About sending that letter to your lawyer, you wrote it on

18  January 8th.  You signed it on January 8th.  You didn't send

19  it to them on January 8th to your lawyer, though, did you?

20  A.  I don't know what date I sent it to my lawyer.

21  Q.  Right.  And we won't see anything in this courtroom

22  anywhere, any time during this trial that indicates that you

23  reached out to your lawyer on that date, true?

24           THE COURT:  You mean on January 8?

25           MR. HOMYK:  Yes, sir.

Kerr - redirect by Mr. Homyk

874

1        THE WITNESS:  True.

2   BY MR. HOMYK:

3   Q.  So we don't know how long you waited until you reached out

4   to your lawyer about the letter that you were so troubled

5   about sending out.  We have no idea as we sit here today how

6   many days you waited.  It could have been one, two, three,

7   four, five -- it could have been many, many days, true?

8   A.  True.

9   Q.  Well, as a detail person, that was a really bad business

10  practice, wasn't it?

11       MR. BARON:  Objection.

12       THE COURT:  Sustained.  Argumentative.

13  BY MR. HOMYK:

14  Q.  You knew that the New York proceedings were sealed,

15  correct?

16  A.  I did not know that the New York proceedings were sealed,

17  sir.

18  Q.  But you testified that you had a concern -- that you had a

19  concern about Kate's letter -- one of your real concerns was

20  the transmittal of Kate's letter of January 7, 2016, correct?

21  A.  Correct.

22  Q.  And that concern that you had, at least in part, was based

23  on the fact that that New York guardianship proceeding was

24  sealed, and you didn't want to risk sending a document that

25  was intended for a sealed proceeding, true?

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 93 of 169 PageID #:16766
Kerr - redirect by Mr. Homyk
875

1  A.  Not true.

2  Q.  That had nothing to do with your thought process.  Is that

3  your testimony?

4  A.  My testimony is --

5  Q.  Is that your testimony, it had nothing to do with your

6  thought process?  Yes or no?

7  A.  Can you repeat the question?

8  Q.  Is it your testimony that that consideration had nothing

9  to do with your thought process, ma'am?

10  A.  That is correct.

11  Q.  There was a lot of discussion about the time frame between

12  January 8 and March when -- or January 8 and then January 23

13  and then March when people found out that the letter was

14  uploaded and then people found out about where the letter got

15  to Northwestern.  There was a lot of talk about that, an awful

16  lot of talk about that, about that time frame that that letter

17  didn't get there until -- for a substantial period of time.

18         Well, the fact that it didn't get there to

19  Northwestern -- to Northwestern and uploaded and you didn't

20  learn about it until March, that was all your fault, right?

21  A.  No, sir.

22  Q.  If you had taken the proper precautions, if you had done

23  what you should have done, which is ensure that it was a

24  draft, if that's what you're calling it, then you could

25  have -- you could have stopped all of that from happening, and

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 94 of 169 PageID #:16767
Kerr - redirect by Mr. Homyk
876

1  you could have stopped that letter from ultimately getting in

2  the hands of Northwestern, true?

3           MR. BARON:  Objection, argumentative.

4           THE COURT:  Overruled.

5           THE WITNESS:  I would say no.

6  BY MR. HOMYK:

7  Q.  Okay.  So what you're telling me -- I want to understand

8  this.  So what you're telling me is that no matter what you

9  would have done, as soon as you transmitted that letter two or

10 three times on January 8, okay, after that, no matter what you

11 did in terms of retracting it, no matter what your view is,

12 that letter was going to get to Northwestern, right?

13 A.  No, sir.

14 Q.  What are you saying, ma'am?  Go ahead and say it.

15 A.  I'm saying that I never asked anyone to send that letter

16 to Northwestern, so I'm not sure what your point is --

17 Q.  Here is my point.  Here is my point.  My point is that if

18 you hadn't sent that letter to those individuals on that day,

19 if you hadn't sent it out by email at least twice, maybe three

20 times, if you hadn't done that, if you hadn't done that, that

21 letter, that specific letter that brings us here today never

22 would have gotten to Northwestern through you, correct?

23 A.  The way you state it, sir, is correct.

24 Q.  By the time that your work was done on this matter, on

25 this probate matter, you and Ms. Wrigley were friends, right?

Kerr - redirect by Mr. Homyk

1    Had you become friends throughout the process?

2    A.  I wouldn't even call us friends to this day.

3    Q.  Okay.  Well, it was -- so is it your testimony that it was

4    a purely arm's length relationship without any sort of

5    friendship involved?  Is that your testimony, ma'am?

6    A.  It's a -- she would be a person that is involved in a case

7    just like anybody else that I've gotten to know in a case.

8    Q.  And you were very fond of her by the end, though, weren't

9    you, ma'am?

10   A.  I wouldn't use the word "fond."

11   Q.  Okay.  What word would you use?  You liked her, right?

12   A.  There's no reason that I didn't like her.

13   Q.  You had -- did you spark up a friendship with her during

14   that engagement?

15   A.  No, sir.

16   Q.  The percentage of your work that went to looking at the

17   Pinto emails, you said it was less than 1 percent, right?

18   A.  Correct.

19   Q.  Okay.  And you got a lot of emails in this case, right, a

20   whole lot, right?

21   A.  Over 300.

22   Q.  Over 300?

23   A.  Probably over 350.

24   Q.  His were less than 1 percent.  Did you make any further

25   mining, mining to determine whether or not there were any

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 96 of 169 PageID #:16769
Kerr - redirect by Mr. Homyk
878

1   other emails out there from Pinto given the fact that they

2   were so sparse?

3   A.  With regards to?

4   Q.  With regards to anything.  His activities?  Did you do any

5   other mining -- any other additional mining to see -- to

6   ensure yourself doing your job professionally that there

7   weren't other emails aside from the very, very few that he

8   gave you that wouldn't be helpful to you in performing the

9   work that you had to perform?  Did you engage -- that's it,

10  just one question.

11          MR. FANTONE:  Judge, I have an objection to lack of

12  foundation.

13          THE COURT:  Sustained.  She was not talking about

14  emails of the underlying participants.  She was talking about

15  the emails that were generated during the course of her

16  investigation.  So it misstates the evidence.

17  BY MR. HOMYK:

18  Q.  Okay.  During the course of the investigation.  During the

19  course of the investigation, there were -- of the total emails

20  that were generated, Pinto generated less than 1 percent,

21  right?

22  A.  That's what I stated, yes.  It could have been 2 percent.

23  Q.  Okay.  It could have been a little more.  But just based

24  on getting that 1 percent, you were satisfied that you didn't

25  need to mine and dig any further to ensure that you had all of

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 97 of 169 PageID #:16770
Kerr - redirect by Mr. Homyk
879

1  the emails that were relevant as to him to do your job,

2  correct?

3          MR. FANTONE:  Objection to the line.

4          THE COURT:  Sustained.  Misstates the evidence.  You

5  are misunderstanding what she's saying.  The best I can do is

6  sustain the objection.

7          I need to advice counsel of something at sidebar.

8          MR. HOMYK:  Almost done.

9    (The following proceedings were had at sidebar outside the

10  hearing of the jury:)

11          THE COURT:  It's only fair to give you fair warning.

12  Pretty much everything you do from here on in, you are eating

13  into your closing argument time.  So you're right at 8 hours

14  and 50 minutes right now.

15          MR. HOMYK:  Okay.

16    (The following proceedings were had in open court in the

17  presence and hearing of the jury:)

18          THE COURT:  Okay.  Go ahead.

19          MR. HOMYK:  110, not in evidence.

20          THE COURT:  Put it up so I can see it.

21          MR. HOMYK:  Pages 1 to 3.

22          THE COURT:  Put it up so I can see it.

23          MR. BARON:  Relevance, hearsay, 403.

24          THE COURT:  Hang on a second.

25          MR. HOMYK:  In fact, it's really just the top, Judge.

Kerr - redirect by Mr. Homyk

1   I'm only going to ask her about the first two sentences.

2   Yeah, just the first two sentences, sir.

3           THE COURT:  The first two sentences on page 1?

4           MR. HOMYK:  Yes, sir.  Let me make sure of that.

5   Yes, sir.  Just that.

6           THE COURT:  Okay.  Then what you're going to do is

7   you're just going to show it to her, and you're going to ask

8   her questions.  And then we'll figure out after that if the

9   exhibit needs to come in as an exhibit.  So I'm going to put

10  it up so the witness can see it.

11          Go ahead.

12  BY MR. HOMYK:

13  Q.  Ms. Kerr, you are looking at an email from Gayle Young,

14  Gayle Young being the guardian ad litem, correct?

15  A.  Correct.

16  Q.  And that's an email from her to you and Melissa Cohenson

17  and Cherie Wrigley and DiPonio.  And in this email, Young is

18  confirming a statement from Melissa Cohenson.  Okay?  Who is

19  Melissa Cohenson?  That's Wrigley's lawyer, right?

20  A.  Correct.

21  Q.  Young is confirming a statement from Melissa Cohenson

22  about retaining an independent expert.  Do you see that?

23  A.  Yes, sir.

24  Q.  Okay.  And it further says:  "And we agreed on Pam Kerr."

25          Do you see that?

Kerr - redirect by Mr. Homyk

881

1  A.  Yes.

2  Q.  And it confirms that Gayle Young signed your fee

3  agreement, right?

4  A.  Correct.

5  Q.  And then, finally, it states that there was a stipulation

6  to use Pam, and the Court approved using Pam as a forensic

7  accountant.

8          Do you see that?

9  A.  Yes, sir.

10          MR. HOMYK:  That's all I have, Judge.  That's all I

11  have.  And, however, we need to take up another matter.

12          THE COURT:  We are going to do the redirect first.

13  Redirect?

14          MR. MANDELL:  No, your Honor.

15          MR. BARON:  No.

16          MR. FANTONE:  No, your Honor.

17          THE COURT:  What's the other matter?  Let me see you

18  at sidebar.  Mr. Homyk.

19          Actually, do any of the jurors have any questions for

20  the witness?  Not seeing anybody writing.

21          Okay.  You can step down.  Let me see the lawyers at

22  sidebar.

23    (The following proceedings were had at sidebar outside the

24  hearing of the jury:)

25          THE COURT:  What's the matter you want to take up at

Kerr - redirect by Mr. Homyk

1    sidebar?

2            MR. HOMYK:  The motion, Judge.

3            THE COURT:  What motion?

4            MR. HOMYK:  From my client, introducing the exhibits.

5    That's all.  Before I close my case, I just want to be able

6    to --

7            THE COURT:  Come on.  Get it over here.  She knows

8    that everything -- hang on a second.  Let me make sure you

9    tell her that everything you do from here on in you are eating

10   into your closing argument time.

11           MR. HOMYK:  Give me a minute to do that.

12           THE COURT:  It takes 30 seconds.  It takes 30

13   seconds.  I'm going to wait right here, and then you are going

14   to come back and argue this stuff.

15     (Brief pause.)

16           THE COURT:  So let's just go through it.  Start

17   moving stuff into evidence.  I'm going to deal with it right

18   now.

19           MR. HOMYK:  We are moving to admit, along with the

20   video Wrigley deposition --

21           THE COURT:  Is the video something different?  I

22   don't even know what -- I don't even know what the testimony

23   is from the video that you're wanting to admit.

24           MR. HOMYK:  It's there.

25           THE COURT:  No, it's not.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 101 of 169 PageID #:16774
Kerr - redirect by Mr. Homyk
883

1     MS. ABRAHAM:  On here.

2          THE COURT:  I know, but that's just a list of pages.

3     Does somebody got a transcript for God's sake?

4          Thank you.  Okay.  So I'm looking at 234, 240, and

5     245.  So 245 is largely testimony about documents being lost,

6     and not everything was recovered.  That's irrelevant.  It's

7     unfairly prejudicial.  It's excluded.

8          240, didn't you already get this out during your

9     examination of Ms. Wrigley?  240 and 241, that testimony?  I'm

10    just asking.  You didn't you already get that?  It's a yes or

11    no.  I want a one-word answer.

12         MR. HOMYK:  Most of it.

13         THE COURT:  Why do you need to put this?

14         MR. HOMYK:  Because it's not the complete -- it's not

15    complete, and this is in a deposition video form, Judge.

16         THE COURT:  You had her on the stand.  You had the

17    chance.  No.  It's cumulative at this point.

18         234, to me, it adds nothing to the case.  That's

19    excluded.

20         Okay.  Let me see this.  138.  This is the video,

21    138, lines 1 to 25 and 139, line 19.  Let me just pull that

22    up, look at this here.

23         MR. FANTONE:  I'm going to grab --

24         THE COURT:  You don't need to.  Cumulative.  It's

25    excluded.  Take that back.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 102 of 169 PageID #:16775
Kerr - redirect by Mr. Homyk
884

1          Okay.  Next?  What's the next thing in here that you

2    want?  Just go through it.  Let's get it --

3          MR. HOMYK:  Exhibit 108.

4          THE COURT:  What's Exhibit 108?  Guys, you got to

5    know what Exhibit 108 is.

6          MS. ABRAHAM:  It's already in.

7          THE COURT:  I'm talking to both of you.  It's already

8    in.  Fine.

9          MR. HOMYK:  Exhibit 44.

10          THE COURT:  What is Exhibit 44?

11          MS. ABRAHAM:  It's already in.

12          MR. HOMYK:  Already in.

13          Exhibit 34.  Get them all right away, please.

14      (Brief pause.)

15          THE COURT:  What's the exhibit number?

16          MS. ABRAHAM:  Exhibit 34.

17          THE COURT:  This is an email?  This whole thing is

18    Exhibit 34?  This is a letter from Mr. Black alleging -- so

19    it's an email from Mr. Black dated 4/4/2015, addressed to

20    Ms. Kerr.  "I attach a summary of the misconduct and

21    misappropriation of Joanne's funds by Esaun Pinto.  These

22    items were specifically known to Cherie Wrigley.  These

23    perhaps were not, but I believe she is liable for them.

24    Mr. Pinto cannot pay."

25          MR. HOMYK:  This is information to the forensic

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 103 of 169 PageID #:16776
Kerr - redirect by Mr. Homyk
885

1  accountant in the course of her investigation -- in the course

2  of doing her investigation --

3  　　　　THE COURT:  Okay.  Can I just ask you?  Why didn't

4  you just ask her, did you receive information from Mr. Black

5  during the course of your inquiry?

6  　　　　MR. HOMYK:  She testified to that.

7  　　　　THE COURT:  Okay.  Then it's excluded as cumulative.

8  　　　　MR. HOMYK:  No, it's not cumulative.

9  　　　　THE COURT:  Yeah, it is.

10  　　　　MR. HOMYK:  Judge, it's not.  It's not.

11  　　　　THE COURT:  It is.  And it's also -- look, here's the

12  deal.  This is the way this works.  I rule on something, and

13  then we move on to the next thing.  It's also unfairly

14  prejudicial because it's a six- or seven-page single-spaced

15  letter by Mr. Black that basically lays out all of his

16  allegations about misconduct by Mr. Pinto.  It's unfairly

17  prejudicial.

18  　　　　Next.

19  　　　　MS. ABRAHAM:  39.

20  　　　　THE COURT:  39 is a -- so it's a string of emails

21  going back and forth between Mr. Black and Ms. Kerr in May of

22  2015.  Same thing.  It's excluded under Rule 403.  Cumulative

23  of questions that have been asked.  And to the extent that

24  it's not cumulative, it's unfairly prejudicial and would lead

25  us off into a long detour about whether Mr. Pinto did good

Kerr - redirect by Mr. Homyk

886

1   things or did bad things or committed misconduct, which is not
2   the issue in this case.
3           What's the next one?
4           MS. ABRAHAM:  40.
5           THE COURT:  This is another email by Mr. Black, same
6   time frame.  I guess it's a string of emails.  May of 2015.
7   Same issue, same ruling.  There's a little thing here that
8   says you want to offer some photos with time stamps.  What's
9   that all about?
10          MS. ABRAHAM:  Exhibit 139 and 140.
11          MR. HOMYK:  They just confirm the dates.
12          THE COURT:  What are the photos?
13          MS. ABRAHAM:  Of the photos that were already
14  admitted.
15          THE COURT:  Of the kids?
16          MS. ABRAHAM:  Ms. Black's weight loss.
17          MR. BARON:  That's for the damages.
18          THE COURT:  This actually permits me -- this actually
19  permits me to -- why in the liability phase of the case were
20  we talking about what this person weighs?  I mean, seriously?
21  In the liability phase of the case, why are we talking about
22  what this person weighs?
23          MR. HOMYK:  It goes to causation, causation.  It goes
24  to causation, Judge.  But there's more here as well, sir.
25          THE COURT:  Oh, good.  Okay.  Well, I'll come back to

Kerr - redirect by Mr. Homyk

887

1   that.  What else is there?

2          MR. HOMYK:  Is there anything else on here?

3          MS. ABRAHAM:  36 is already ruled on.

4          MR. HOMYK:  39 and 40.  Do you have those two?  Okay.

5   They're done.

6          THE COURT:  I just ruled on those.

7          MR. HOMYK:  Okay.  That's done.  This one as well,

8   131?

9          THE COURT:  Saltzman dep in the Dain case.  Wasn't

10  designated in the pretrial order.  It's too late.

11         Okay.  Do you have any problem with him putting in

12  the time-stamped versions of the photos?

13         MR. MANCILLA:  I think, Judge, that they're going to

14  argue --

15         THE COURT:  He was shaking his head no.  He was

16  shaking his head no.  And you got to say something?

17         MR. FANTONE:  We have a doctor that's saying she

18  intentionally lost the weight.

19         THE COURT:  Okay.  Fine.

20         MR. FANTONE:  I don't really care.

21         THE COURT:  Is he here?

22         MR. FANTONE:  He would have been had --

23         THE COURT:  If you want to call him today, that's

24  fine.  They're admitted.

25    (Above-mentioned exhibit was received in evidence.)

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 106 of 169 PageID #:16779
Kerr - redirect by Mr. Homyk
888

1     THE COURT:  Okay.  So based on the rulings at

2   sidebar, is there any further evidence that the plaintiff is

3   offering?  Is there any further evidence that the plaintiff is

4   offering?  Based on the rulings at the sidebar, is there any

5   further evidence that the plaintiff is offering?  Will

6   somebody please answer my question?

7     MR. HOMYK:  No, sir.

8     THE COURT:  Are you resting?

9     MS. ABRAHAM:  Exhibit 139A.

10     THE COURT:  I have admitted 139A and 140A, which are

11   the time-stamped versions of the two photos that were admitted

12   earlier.  Just make sure they are on the thumb drive.  So with

13   that, is the plaintiff resting?

14    (Above-mentioned exhibits were received in evidence.)

15     THE COURT:  It's a question.

16     MR. HOMYK:  No.

17     THE COURT:  You're not resting?  Okay.  Then call

18   your next witness.

19     MR. HOMYK:  Yes, sir.  Yes, sir.  We are resting.

20     THE COURT:  Okay.  Call the next witness on the

21   defense side.  I know -- there may be a motion to make.  We'll

22   deal with it at the lunch break.  We'll deal with it at the

23   lunch break.

24     MR. FANTONE:  We will call Anthony Dain.

25     THE COURT:  Okay.  Go get him.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 107 of 169 PageID #:16780
Dain - direct by Mr. Fantone
889

1        MS. ABRAHAM:  Your Honor?

2        THE COURT:  No.  Not going to do it right now.

3        Right up here, sir.  This way.

4     (Witness sworn.)

5        THE COURT:  Please proceed.

6                              - - -

7               ANTHONY J. DAIN, DIRECT EXAMINATION

8    BY MR. FANTONE:

9    Q.  Good morning, Mr. Dain.

10   A.  Good morning.

11   Q.  Start off by stating your name for the record, please.

12   A.  Anthony, A-n-t-h-o-n-y, J, Dain, D-a-i-n.

13   Q.  And what do you do for a living, Mr. Dain?

14   A.  I am an attorney.

15   Q.  How long have you been doing that?

16   A.  38 years.

17   Q.  All right.  And do you know our client, Cherie Wrigley?

18   A.  I do.  She is my sister.

19   Q.  All right.  And do you know the plaintiff?

20   A.  I do.  She's my sister-in-law -- I mean, my cousin's --

21   not sister-in-law -- my cousin's wife.

22   Q.  Cousin's wife.

23   A.  I'm tired.  I flew in last night.

24   Q.  That's all right.  We appreciate you being here today.

25          In maybe a rather concise summary, can you just sum

Dain - direct by Mr. Fantone

1    up your relationship with the plaintiff and her husband, just

2    generally speaking?

3    A.  Well, her husband is my cousin.  The plaintiff is my

4    cousin's second wife.

5           MR. HOMYK:  Objection.  This calls for a narrative

6    response, Judge.

7           THE COURT:  Sustained.

8    BY MR. FANTONE:

9    Q.  You're familiar with what we'll call the Denver court --

10   Denver probate court proceedings that took place related to

11   some of the parties that are here today?

12   A.  I am.

13   Q.  And you're familiar with the nature of those proceedings?

14   A.  I am.

15   Q.  How are you familiar with them?

16   A.  I took part in the hearings.  I took part in the trial.  I

17   am an interested party in that proceeding because I'm the

18   cousin of Joanne Black, a disabled protected person, and I am

19   the trustee of the supplemental needs trust for the benefit of

20   Joanne Black.

21          MR. HOMYK:  Judge, I have an objection.  I need a

22   sidebar.  I need it.

23          THE COURT:  Well, I need to wait for a question, and

24   then I'll deal with it.

25          MR. HOMYK:  It's based on the last answer, Judge.

Dain - direct by Mr. Fantone

1    THE COURT:  Are you moving to strike it?

2    MR. HOMYK:  Yes, sir.  Yes, sir, I am.

3    THE COURT:  Okay.  You're on the clock.  That's fine.

4    MR. HOMYK:  I know.  I know.

5   (The following proceedings were had at sidebar outside the

6   hearing of the jury:)

7    MR. HOMYK:  I know.  I understand.  He testified --

8    THE COURT:  You could have --

9    MR. HOMYK:  I know.

10    THE COURT:  -- objected before the guy came in the

11   room.

12    MR. HOMYK:  We tried.  Or, I mean, we were going to,

13   and you -- no, it's not your fault.  It's not your fault.

14   Trust me.  It's not your fault.

15    THE COURT:  Gosh darn right, it's not.

16    MR. HOMYK:  He already said the "trial."  That word

17   "trial" in Colorado has never come up before.  He's already

18   said it, and he's just going to keep doing it and doing it and

19   doing it.  That's what he's going to do.

20    THE COURT:  Okay.  Fine.  So nothing that's going to

21   elicit trial anymore.

22    MR. HOMYK:  What's he even here for then?  I mean, I

23   don't understand why he's here.

24    MR. FANTONE:  He is a percipient witness.

25    THE COURT:  What subjects is he going to testify

Dain - direct by Mr. Fantone

1    about?

2         MR. FANTONE:  What occurred in post proceedings on

3    April 2.

4         THE COURT:  You are talking about the events in the

5    courtroom after the proceeding ended?  Okay.

6         MR. FANTONE:  He had some level of involvement of

7    what happened in the airport.

8         THE COURT:  Airport.

9         MS. ABRAHAM:  Was he present, or was it only --

10        THE COURT:  You know what?

11        MS. ABRAHAM:  Sorry.  I apologize, sorry.

12        THE COURT:  Shut up.  I'm asking the questions here.

13        MS. ABRAHAM:  You're right.

14        THE COURT:  Next.

15        MR. FANTONE:  He has some general knowledge about

16   this litigation in general between the two families.

17        THE COURT:  That's off limits.  That's off limits.

18   Okay.  So he is going to testify about those two things, and

19   you're going to elicit whether he was there or not.  And if he

20   is not there, then you are going to object on the grounds that

21   it's hearsay.

22        MR. HOMYK:  Okay.  Fine.  Fair enough.

23     (The following proceedings were had in open court in the

24   presence and hearing of the jury:)

25        THE COURT:  All right.  You can proceed.

Dain - direct by Mr. Fantone

893

1  BY MR. FANTONE:

2  Q.  Getting back to your last answer, did -- we'll just call

3  it your involvement in the case cause you to be present at a

4  hearing on April 2, 2015, in Denver?

5  A.  Yes.

6  Q.  And can you tell us without getting into a lot of detail

7  just generally what the hearing was about?

8          THE COURT:  Sustained.  The objection is sustained.

9  Look, we just went over literally 30 seconds ago what you were

10 going to go into, and this wasn't part of it.

11         MR. FANTONE:  I will move on, Judge.

12         THE COURT:  If you had said this, I would have told

13 you at sidebar it's cumulative.

14         MR. FANTONE:  Okay.  Understood.

15 BY MR. FANTONE:

16 Q.  After the hearing.  Let's talk about after the hearing.

17 Can you just give us the layout of the courtroom?  Why don't

18 we start with that.

19 A.  The courtroom, it's a probate court, so -- in an older

20 courthouse, so it's probably half the size of this courtroom.

21 It's narrower, probably from the jury box to maybe the end of

22 the first table, and probably from the back wall here to the

23 first or second row of benches is the totality of the

24 courtroom.

25 Q.  How many days would you say you spent in the courtroom

Dain - direct by Mr. Fantone

894

1  over the course of your involvement in the proceeding?

2  A.  A dozen.

3  Q.  A dozen.

4       Would you say you're fairly familiar with it?

5  A.  Yes.

6  Q.  Okay.  Can you give us some idea of the court personnel

7  that were around?

8       THE COURT:  You're talking --

9       MR. HOMYK:  Objection.

10      THE COURT:  -- about after the hearing was over,

11 right?

12      MR. FANTONE:  After the hearing.

13      THE COURT:  Overruled.

14      THE WITNESS:  I can do it visually.  On the left side

15 from where I'm facing, Bernard Black was standing up behind

16 counsel table with his attorney, a gentleman named

17 Mr. Gladstein.  There were one or two other people with

18 Mr. Gladstein.  I'm not familiar with them.

19      Katherine Black was standing behind the rail of their

20 counsel table in close proximity.

21      There's a very narrow aisle, so the aisle you see

22 there in the back of the courtroom would be very narrow, so

23 maybe 2 feet, 2 and a half feet between the benches.

24      On the right side, my sister, Cherie Wrigley, was

25 sitting just behind the rail.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 113 of 169 PageID #:16786
Dain - direct by Mr. Fantone
895

1          The newly appointed special conservator, Nancy

2   Peterson, was sitting behind the rail.

3          The guardian ad litem's husband was sitting there.

4          The marshal was maybe a foot or two to the right of

5   them.

6          The guardian ad litem was sitting in front of the

7   rail just behind counsel table.  I was at counsel table.  Lisa

8   DiPonio, the court-appointed attorney for Joanne, was at

9   counsel table.

10         The court clerk was sitting in the general area where

11  the jury would be sitting.  And there may have been another

12  person, but that's all I recall.

13         MR. HOMYK:  Objection.  Speculation.

14         THE COURT:  Overruled.

15  BY MR. FANTONE:

16  Q.  Now, you mentioned the rail.  Can you just describe what

17  you mean by "the rail"?

18  A.  Yeah.  This courtroom doesn't have one, but usually

19  separating the well area from the spectator section, there

20  would be a railing where you would walk through.  That's what

21  I'm talking about.  So the rail would be generally in front of

22  the first set of benches.

23  Q.  So the purpose to kind of partition the parts of the

24  courtroom?

25  A.  Yes.

Dain - direct by Mr. Fantone

1  Q.  Okay.  Now, did there come a point where the proceedings

2  stopped and the judge left the bench?

3  A.  Yes.  After the hearing concluded.

4  Q.  Do you recall what you were doing in that moment?

5  A.  I think I may have said a few words to Ms. DiPonio.  Then

6  I turned around.  We were talking -- I was telling her, we'll

7  talk outside.  So I was turning around, walking towards the

8  rail to gather our side of the group to go outside and talk

9  about the upcoming proceedings.

10 Q.  Okay.  And were you in proximity with your sister, Cherie,

11 at that point?

12 A.  Yes.  Everybody was very close.  It's a small courtroom.

13 So I was maybe 2, 3 feet from her.

14 Q.  Okay.  And did you observe any interactions between Cherie

15 Wrigley and the plaintiff, Kate Litvak -- I'm sorry --

16 Katherine Black?

17 A.  I call her Kate sometimes, too.  So my sister, Cherie,

18 leaned over and said, "Nice shoes, Kate."

19 Q.  You're certain you heard that?

20 A.  I'm positive I heard that.

21 Q.  Okay.  Do you recall what kind of shoes Ms. Black was

22 wearing?

23 A.  The statement was kind of unusual.

24          MR. HOMYK:  Objection.

25          THE COURT:  Sustained.  The characterization is

Dain - direct by Mr. Fantone

1    excluded.  The jury is directed to disregard it.

2              THE WITNESS:  I'm sorry.  I looked down because of

3    that.  I did look down.

4              MR. HOMYK:  There is no question pending.

5              THE COURT:  There is no question pending.  You are

6    correct.

7              Ask another question, please.

8    BY MR. FANTONE:

9    Q.  Do you recall what kind of shoes she was wearing?

10   A.  I do.

11   Q.  Okay.  Can you describe what you saw for the jury?

12   A.  They weren't dress shoes.  They looked kind of like a

13   cross between some kind of black boot and orthopedic shoes.

14   Q.  Okay.  And what, if anything, did you observe at that

15   point between the plaintiff and Cherie Wrigley?

16   A.  Ms. Black started gesturing at her like this.  I think

17   there was something in her hand, but I don't know what it was.

18   It might have been a phone.  I don't know, but she was

19   gesturing at her somewhat emphatically for a few seconds.  She

20   may have said something, but I wasn't focused on that.

21   Q.  All right.  What, if anything, happened next?

22   A.  I told Cherie, Ms. Wrigley, "Cherie, don't talk to them.

23   Come on.  Let's go."  And I put my hand on her shoulder, and

24   we walked out with our group.

25   Q.  Now, when you just said previously that, quote, she might

Dain - direct by Mr. Fantone

1   have said something, who were you referring to when you said

2   "she"?

3   A.  Ms. Litvak.  She might have --

4             MR. HOMYK:  Objection to what she might have done.

5             THE COURT:  You've answered the question.  It was

6   about who.  Ms. Litvak.

7   BY MR. FANTONE:

8   Q.  Okay.  And did at any point in time, did you hear the

9   plaintiff scream anything?

10  A.  No.

11  Q.  So you were saying that you approached Ms. Wrigley.  And

12  can you finish with that testimony?

13  A.  I said, "Cherie, don't talk to them."  I put my hand on

14  her shoulder, turned her towards the door, and we walked out.

15  It was a very brief --

16            MR. HOMYK:  Objection, no question pending.

17            THE COURT:  Sustained.

18  BY MR. FANTONE:

19  Q.  Now, at that point in time, do you know where plaintiff's

20  husband, Bernard Black, was standing?

21  A.  Yes.

22  Q.  And where was that?

23  A.  Three feet to my left, maybe -- about 3 feet to my left at

24  counsel table, talking with his attorney.

25  Q.  Were there others in addition to Mr. Black in close

Dain - direct by Mr. Fantone

1  proximity?

2  A.  Yes.  Mr. Gladstein, the attorney; Ms. Peterson, who was

3  maybe a foot or two to Ms. Wrigley -- where I'm looking to,

4  the right, Ms. Wrigley's left; the guardian ad litem's

5  husband; the marshal.

6  Q.  Do you recall where the marshal or how close the marshal

7  was?

8  A.  Maybe 5 feet.  If you look from where the bench is to the

9  end where you're standing, if you go back.

10 Q.  Right here?

11 A.  No, no.  I'm sorry.  The benches.

12 Q.  The bench here.

13 A.  So that's where Ms. Wrigley is.  Go about 5 feet to your

14 right, and the marshal was there.

15 Q.  Okay.  Did you observe any reactions from anybody at this

16 time?

17 A.  No.

18 Q.  Did you observe anything at all?

19 A.  Other than we walked outside and our group walking and

20 Mr. Black still talking with his attorney, Ms. Black was just

21 standing there, nothing more.

22 Q.  Okay.  What, if anything, happened next?

23 A.  We walked outside where we began discussing what next

24 steps to take.

25 Q.  What do you mean by "next steps"?

Dain - direct by Mr. Fantone

900

1   A.  There was -- there were other hearings coming up.

2   Q.  You mean with respect to the case?

3   A.  Right.

4   Q.  Okay.  I mean, generally speaking, did you leave the

5   courthouse at that point and get onto the next part of your

6   day?

7   A.  No.  We left the courtroom --

8   Q.  Okay.

9   A.  -- but went just outside the courthouse, like out in the

10  hall, and the group of us were talking.

11  Q.  Okay.  And when you were in the hallway, did you encounter

12  Ms. Black again?

13  A.  Did I encounter her?  No.

14  Q.  Now, at a certain point later in the day, did you go to

15  the airport?

16  A.  Yes.

17  Q.  Okay.  Are you sure?

18  A.  No -- yes.  I'm sorry.  When you said "encounter," that

19  threw me last time, but, yes.

20  Q.  Sorry.

21          All right.  And did you see Cherie Wrigley at the

22  airport?

23  A.  I did.

24  Q.  Let me just rewind real quick.  Getting back to the

25  hallway --

Dain - direct by Mr. Fantone

1    A.  Yes.

2    Q.  -- in the courthouse.  Did you see Cherie and Kate

3    together in the hallway at all?

4    A.  No.  That's -- no.  I saw Cherie, and I saw Kate, but

5    separately.

6    Q.  Okay.  Thank you.  Thank you.

7           Let's fast-forward again.  So you're at the airport.

8    You said you saw Cherie Wrigley at the airport?

9    A.  I did.

10   Q.  Okay.  Where did you see Cherie Wrigley at the airport?

11   A.  She was at the American lounge.

12   Q.  Okay.  And can you just briefly describe the lounge for

13   us?

14   A.  It was under construction at the time, so it was more

15   open.  But you go inside, and there are a number of tables.

16   For business people, there's some work areas.  There's a small

17   like food and beverage area where you can get snacks and sodas

18   or I guess some alcoholic beverages, but generally like that.

19   It's, I guess, fairly large.  I don't know.  Overall it might

20   be two-thirds of the size of this courtroom.

21   Q.  Okay.  And that's where you found your sister, Cherie?

22   A.  As I was walking in, yes, she was approaching me.

23   Q.  Okay.  Did you observe anything about her demeanor at that

24   time?

25   A.  She seemed upset.

Dain - cross by Mr. Mandell

902

1  Q.  She seemed upset --

2          MR. HOMYK:  Objection to what she seemed.

3          THE COURT:  Overruled.

4  BY MR. FANTONE:

5  Q.  What do you mean by that?

6  A.  She came up to me and said, "Thank God you're here."  And

7  she was visibly upset.

8  Q.  Okay.  What did she tell you?  What, if anything?

9  A.  That Kate had followed her into the lounge.

10         MR. HOMYK:  Objection.  Hearsay.

11         THE COURT:  You're relating something that Ms. Black

12  said?

13         THE WITNESS:  No.  That Ms. Wrigley said.

14         THE COURT:  The objection is sustained.  The answer

15  is stricken.  The jury is directed to disregard it.  It's

16  inadmissible hearsay.

17         MR. FANTONE:  Just one moment, Judge.

18    (Brief pause.)

19         MR. FANTONE:  Nothing further, Judge.

20         THE COURT:  Mr. Mandell.

21                    - - -

22          ANTHONY J. DAIN, CROSS-EXAMINATION

23  BY MR. MANDELL:

24  Q.  Good morning, Mr. Dain.

25  A.  Good morning.

Dain - cross by Mr. Homyk
903

1   Q.  Was Pam Kerr a court-appointed expert in the Denver
2   probate court litigation?
3   A.  No.
4   Q.  Do you know the difference between an engaged expert and a
5   court-appointed expert?
6   A.  Yes.
7   Q.  And what was --
8              MR. HOMYK:  Objection, Judge.
9              THE COURT:  Sustained.  Rule 403.
10             MR. MANDELL:  No further questions, your Honor.
11             THE COURT:  Mr. Homyk.
12                              - - -
13             ANTHONY J. DAIN, CROSS-EXAMINATION
14  BY MR. HOMYK:
15  Q.  Mr. Dain, whatever you heard your sister say in that
16  courtroom, it wasn't complimentary of Kate, was it?  Yes or
17  no?
18  A.  I don't know.
19  Q.  You don't know?
20  A.  I --
21  Q.  You don't know.  Is that your testimony?
22  A.  No.
23             THE COURT:  That is what he said.  There is no need
24  to repeat it.
25  BY MR. HOMYK:

Dain - cross by Mr. Homyk

904

1   Q.  Your testimony is that you heard her say, "Nice shoes,
2   Kate," right?
3   A.  Yes.
4   Q.  And you have a memory of that, right?
5   A.  Yes.
6   Q.  Okay.  In your memory, did she say that complimentary or
7   sarcastically or smugly?  How would you, sir, characterize the
8   words that you testified your sister used in that courtroom?
9   A.  I would think it was more sarcastically.
10  Q.  Certainly not complimentary, correct?  Yes or no?
11  A.  I'm assuming not, yes.
12  Q.  And you did witness Kate making gestures, some type of
13  motion, correct, some type of motions, correct?  You saw that,
14  right?
15  A.  Yes.
16  Q.  And, in fact, Kate did say some words, correct?
17  A.  No.
18  Q.  Now -- okay.  So now you're certain Kate didn't say
19  anything?  A couple minutes ago you said she might have said
20  something.  Are you now certain that Kate didn't say anything,
21  sir?  Think about it.
22  A.  No, I don't have to think about it.  She may have said
23  something once she was gesturing.  That was what I said.
24  Q.  And so as you sit here today, you will agree with me that
25  she may have, indeed, said something, true?

Dain - cross by Mr. Homyk

905

1  A.  I just said that.

2  Q.  All right.  Okay.

3       But you, as you testified today, don't know what that

4  is, right?

5  A.  It was a few words.

6  Q.  You don't have any personal knowledge of what that may

7  have been, true?

8  A.  No.  I mean -- yes, that's true.

9  Q.  Do you have any personal knowledge, sir, of what those

10  words that Kate may have said may have been, personal

11  knowledge?

12       MR. FANTONE:  Object to form, Judge.

13       THE COURT:  Overruled.

14       THE WITNESS:  I have no idea what the few words she

15  said were.  I have no idea.

16       MR. HOMYK:  Thank you.  Thank you.

17  BY MR. HOMYK:

18  Q.  And whatever Kate may have said, Mr. Dain, those few words

19  weren't loud or anything, were they?

20  A.  No.  Not loud enough for me to hear them.

21  Q.  Thank you.

22       Because a lot of people were talking at the time,

23  right?

24  A.  No.

25  Q.  All right.  I'm going to direct you to your deposition.

Case: 1:17-cv-00101 Document #: 490 Filed: 03/18/21 Page 124 of 169 PageID #:16797
Dain - cross by Mr. Homyk
906

1   You had your deposition taken in this case, right?

2   A.  Yes.

3   Q.  You know what impeachment is, right?

4   A.  Yes.

5   Q.  I'm going to direct you to your -- let's pull it up.

6   Let's pull up his deposition at page 202, please.

7           THE COURT:  You are just going to show it to him at

8   this point.

9           Okay.  So only the witness is seeing this.

10  BY MR. HOMYK:

11  Q.  Take a look at this.  Take a look at this, Mr. Dain.

12  Page 202.

13          On page 202, I guess the question that was asked of

14  you by Mr. Schaalman...

15  A.  I see it.

16  Q.  The question was:  "Using your common sense, common sense,

17  did you, based on that, what you observed, that action that

18  you demonstrated, did you perceive it to mean anything at

19  all?"  Then there's an objection.

20          That was the question you were asked, correct, sir?

21  A.  Yes.

22  Q.  And your answer -- did you give the following answer:

23          "ANSWER:  The reason I can't say -- I can only get the

24  motion (indicating a motion).  I don't know if she had

25  anything in her hand -- was because based on Ms. Wrigley's

Dain - cross by Mr. Homyk

907

1   comment, I was looking down at her shoes.  So, peripherally, I

2   saw her doing something.  She may said a few words, not loud

3   or anything, because a lot of people were -- were talking.  A

4   few words."

5           Were you asked that question, and did you give that

6   answer under oath in your deposition in this case, sir?

7   A.  Yes.

8           MR. HOMYK:  That's all I have, Judge.

9           THE COURT:  Redirect?

10          MR. FANTONE:  Nothing for Ms. Wrigley, Judge.

11          THE COURT:  Do the jurors have any questions for the

12  witness?

13          You are excused.  Any further witnesses or evidence

14  other than -- we might have to deal with some exhibits, but

15  any further witnesses or evidence that you're calling?  No.

16  Okay.

17          All right.  So we're getting pretty close to the

18  lunch break.  The evidence has been completed.  I have to

19  spend a little time with the lawyers to make sure that they've

20  got all the exhibits admitted.  I got to spend a few minutes

21  with them on the instructions, but we're done with the

22  evidence.  And we're going to start right after lunch with me

23  giving you the instructions, which I'll both read to you and

24  give to you, on the law that you follow in deciding the case.

25  And then you'll hear the lawyer's closing arguments, so we

1    will be finishing today.  It's going to get pretty far into

2    the afternoon, though.  So we'll figure out exactly what time

3    that's going to be.  You've heard all the evidence, but you

4    haven't heard my instructions and you haven't heard the

5    arguments.  So don't start deliberating.  Continue to keep an

6    open mind.  Continue not to discuss the case.

7           Have a good lunch, and we'll see you back here at

8    1:30.

9      (The jury leaves the courtroom.)

10          THE COURT:  Are there any other exhibits on the

11   defense side that we need to take care of that we haven't

12   taken care of yet?

13          MR. FANTONE:  I don't believe so, Judge.

14          THE COURT:  Okay.  So we are going to talk about the

15   instructions now.

16          I sent them out last night.  I got comments back from

17   both sides, for which I thank you.  I am going to put them up

18   on the screen, and we're going to go through them.

19          Actually, before we do that, if there's going to be

20   any Rule 50 motions, why don't you make them now so we can get

21   that done.

22          So you can go first.

23          MR. FANTONE:  Pursuant to Rule 50(a), Judge, with

24   respect to the two claims against Ms. Wrigley, start with the

25   intentional infliction of emotional distress, I believe the

1    evidence on the record at this point would be legally

2    insufficient for a reasonable juror to find that the plaintiff

3    has satisfied those elements.  There's been some testimony

4    elicited with respect to Ms. Wrigley's alleged conduct.  I

5    don't believe that rises to the level of beyond human decency

6    that's required to constitute extreme and outrageous conduct.

7    Likewise, and particularly with the requirement of

8    establishing severe emotional distress.  I believe there's

9    been limited testimony on that.  And, again, that it's legally

10   insufficient at this point.

11             THE COURT:  Go ahead.

12             MR. FANTONE:  With respect to the aiding and

13   abetting, I think the standard has not been met by the

14   evidence that's on the record.  We did see some communication

15   via email between the parties, the defendants.  However, it's

16   insufficient to satisfy the standard of substantial assistance

17   that's required in a aiding and abetting, as well as agreement

18   and the other language related to the standards and those

19   causes of action.

20             For that reason, we respectfully move for a directed

21   verdict under Rule 50(a).

22             THE COURT:  Mr. Mandell.

23             MR. MANDELL:  Thank you, Judge.

24             Pam Kerr also moves for a directed verdict under

25   Rule 50(a).  We don't believe that there's been sufficient

1    evidence presented as to whether or not Pam Kerr caused a

2    statement of fact about Ms. Black to be made to Northwestern.

3         In terms of falsity, I think the April 2nd, 2015,

4    order is clear.  There was no findings regarding Mr. Pinto.

5    There was no order or authorization to investigate.  And

6    there's no evidence that Ms. Kerr is court appointed.

7         Also, there's no evidence that Ms. Kerr either knew

8    the statement was false.  In fact, the evidence in light of

9    the April 2nd, 2015, order is that she had good reason to

10   believe that her statement in her January 7th -- I'm sorry --

11   January 8th, 2016, letter was true.  And, also, finally,

12   there's no evidence that's been presented that Ms. Black was

13   prejudiced by the statement in Ms. Kerr's letter in her

14   profession.

15        Going back to the statement made, I think the

16   testimony is uniform that Ms. Kerr did not upload the letter,

17   that she had no involvement in -- there was no agreement that

18   the letter be uploaded, and so for that reason, I think

19   Ms. Kerr -- Ms. Litvak testified that she had no evidentiary

20   basis to establish that Ms. Kerr had foresaw that the letter

21   would be published.  Ms. Kerr was careful.  The emails with

22   Ms. Winters established that she informed Northwestern that

23   she did not want to upload the letter.

24        And so for those reasons, we move for a directed

25   verdict.

1     THE COURT:  The motions are taken under advisement.
2   We are going to talk about the jury instructions next.

3       So as I said, I circulated a draft of them last
4   night.  I got comments back from both sides.  One of the
5   comments from defendants was essentially a typo.  I fixed
6   that.  That's on page 13, the instruction for the conspiracy
7   claim.

8       Since I got the defendants' thing in front of me,
9   there's one other -- obviously, you can make any points you
10  want to make.  It doesn't have to be limited to what was in
11  your email, but do you want to go through whatever other
12  issues you have on the defense side with the instructions?

13      MR. BARON:  The one that I remember, Judge, was just
14  on the verdict form.  We thought that --

15      THE COURT:  Let me just read what's on here.  This is
16  what you're talking about.  The written statement was with
17  respect to the verdict form.  Because items 3, aiding and
18  abetting, and 4, conspiracy, cannot stand without a finding
19  for plaintiff on item 2, defamation, we suggest the following
20  language after item 2, defamation.  And this is a reference to
21  the verdict form.

22      Quote, if you find for Defendant Kerr on the claim of
23  defamation, you need not consider Claims 3 and 4.  However, if
24  you find for Plaintiff Black on the claim of defamation, go on
25  to consider Claims 3 and 4, close quote.

1          And I gather from the email I got from the plaintiff
2     that you don't agree to that change?
3          MR. HOMYK:  That's correct.
4          THE COURT:  Okay.  Do you want to flesh it out for
5     me?  I can read what you wrote in an email.  "Plaintiff
6     objects to any restriction on the jury from finding for
7     Ms. Black on civil conspiracy.  The jury can find the
8     defendants coordinated to defame Ms. Black and that Wrigley
9     participated in satisfying some of the required elements."
10         Does that sort of capture the issue?
11         MR. HOMYK:  That's correct.
12         THE COURT:  I don't think there has to be a finding
13    against Defendant Kerr on defamation for there to be a finding
14    on conspiracy, so I don't agree with the premise of the
15    defendants' argument.
16         What other points do the defendants have?
17         MR. BARON:  I think that was it.
18         MR. FANTONE:  That was it, your Honor.
19         THE COURT:  Okay.  Your turn.
20         MR. HOMYK:  Judge, as you can see from the email,
21    that essentially lays it out.  The first one I think is the
22    easy one.  In the preliminary instruction, it should be -- in
23    the IES instruction, it should be revised to reflect one or
24    more threats, just as it is in the substantive instruction for
25    the claim.

1    THE COURT:  Okay.  So let's talk about that for a

2  second.  And, actually, you correctly pointed out the

3  inconsistency between the two things.  I don't recall whether

4  I fixed that in the preliminary instruction or not, which

5  really doesn't matter at this point.

6    MR. HOMYK:  Yeah.

7    THE COURT:  So the way the elements instruction

8  reads -- this is instruction on Claim 1.  Element 1 says:

9  "Ms. Wrigley made one or more threats against Ms. Black."

10    There's been no objection to that, so it seems to me

11  to make sense to change the introductory page, which is

12  page 8, the parties and the claims, to say "one or more

13  threats" as well, so I'm doing that.

14    And I'm going -- so the first -- the sentence will

15  say:  First, Ms. Black is suing Ms. Wrigley for intentional

16  infliction of emotional distress, period.  First changed

17  sentence is the next one, which reads now:  This claim

18  concerns one or more threats that Ms. Black alleges

19  Ms. Wrigley made to her, period.  Ms. Black alleges that

20  the -- I'm just going to say -- I hate doing stuff like this.

21  I'm going to say threat, parentheses, s.

22    MR. HOMYK:  Correct.

23    THE COURT:  Ms. Black alleges that the threat(s)

24  caused herself severe emotional distress.

25    MR. HOMYK:  Fine.

1    THE COURT:  The next sentence will need to be

2    modified to say:  Ms. Wrigley denies Ms. Black's allegation

3    that she made a threat or threats -- threat(s) to Ms. Black.

4    And that's the only thing I have to change.

5        Okay.  So next point.

6        MR. HOMYK:  I think the best way to do this, Judge,

7    is to look at your email first, and that indicates the premise

8    of our objection.  Sharan has the case law that supports that

9    as well.

10        THE COURT:  Okay.  But I'm not -- so this is -- the

11   other objection is an objection to the defamation instruction.

12   Let me put it up on the screen so you can all see it.  Just a

13   second.

14        Okay.  So you're seeing it now.  Let me make it a

15   little bit bigger.

16        MR. FANTONE:  It's page 11, Judge.

17        THE COURT:  Can you see it there?  Why is it not

18   coming up on the screen?  This is weird.  Are you guys seeing

19   anything on your screens?

20        MR. HOMYK:  No.

21        THE COURT:  Oh, boy.

22        MR. FANTONE:  Judge, we have a paper copy.

23        THE COURT:  Yeah, that's fine.  They have done it to

24   me again, though.

25        MR. BARON:  Do you want to try the ELMO, Judge?

1      THE COURT:  Yeah, that's fine.

2      ELMO.  It takes a second for it to come up.

3      Okay.  So it's not clear to me what all I would need

4  to change on this instruction.  So can you kind of walk

5  through it with me?

6      MS. ABRAHAM:  Well, if Ms. Kerr was disregarded --

7  Ms. Black --

8      THE COURT:  Just tell me what the change is you want

9  first.

10      MS. ABRAHAM:  The change is that she --

11      THE COURT:  You want number one to say what?

12      MS. ABRAHAM:  The change is that she published the

13  statements to a person or party other than Ms. Black.

14      THE COURT:  So it should say:  Caused a statement of

15  fact about Ms. Black to be made to -- what you're going to

16  propose it to be is someone other than Ms. Black.

17      MS. ABRAHAM:  Correct.

18      THE COURT:  So I'm just doing it in redline so I can

19  either do it or undo it.

20      Okay.  All right.  And that's the only change you're

21  really asking for?

22      MS. ABRAHAM:  Correct.

23      THE COURT:  Okay.  Defense views?

24      MR. MANDELL:  That's objectionable because --

25      THE COURT:  I believe we talked about this in the

1   preliminary instructions, but I need a refresher.

2           MR. BARON:  This is how we got to where we were.

3           THE COURT:  Yeah.  Understood.  My recollection is is

4   that the defense position was -- if it says that, we got to

5   include stuff in there about privilege.

6           MR. MANDELL:  Right.

7           MR. BARON:  Correct.

8           THE COURT:  So if it says this -- if it says:

9   Ms. Kerr caused a statement of fact about Mr. Black to be made

10  to someone other than Ms. Black, your position would be that

11  it would have to be -- it should say "not a statement of fact

12  but..."

13          MR. MANDELL:  A non-privileged statement.

14          THE COURT:  An unprivileged statement of fact.  And

15  then we would have to define that privilege.

16          MR. BARON:  Have an instruction on privilege.

17          THE COURT:  And the definition of privilege would

18  be -- hang on a second.  It's the litigation privilege is the

19  one you were talking about, correct?

20          MR. BARON:  Right.  Yes.

21          THE COURT:  So let me just -- I want to pull up

22  your -- the draft jury instructions here.

23          MR. MANDELL:  This is a little bit of a slippery

24  slope, your Honor.

25          THE COURT:  Yeah.  I understand.

1          Okay.  So defendants' proposed instruction 32-A,
2    entitled Absolute Litigation Privilege, and this is part of
3    the pretrial order, so presumably you all have copies.  I'm
4    just going to read it.  This was the proposed defense
5    instruction:  A person is absolutely privileged to publish
6    defamatory matter concerning another in communications
7    preliminary to a proposed judicial proceeding or as part of a
8    judicial proceeding in which she's testifying if it has some
9    relation to the proceeding.  If you find that Pamela Kerr
10   published her letter only to a limited group of lawyers and
11   participants in ongoing litigation involving the Black family
12   and if her letter had some relationship to those proceedings,
13   then you cannot find Kerr liable for defamation.
14          Now, I probably worded it a little bit differently,
15   but the gist of that instruction, if you will, is that if I
16   were to define unprivileged -- I'd probably say
17   non-privileged, frankly -- I'd tell -- your position is I
18   should tell the jury that if Ms. Kerr -- I don't want to use
19   the word "published."  If Ms. Kerr communicated her statement
20   about Ms. Black only to a limited group -- only to lawyers and
21   participants in the ongoing proceedings involving the Black
22   family, and if the letter had some relationship to those
23   proceedings, then it was privileged.  Correct?
24          MR. MANDELL:  Correct.
25          THE COURT:  That's basically your point.

1          Okay.  So tell me what's wrong with that if you think

2     there's something wrong with that.

3          MS. ABRAHAM:  Well, we don't believe that there was a

4     privilege, but to the extent --

5          THE COURT:  Tell me why you don't believe there was a

6     privilege.

7          MR. HOMYK:  I can address that.

8          THE COURT:  Okay.  I don't care who does it.  Just

9     somebody.

10         MR. HOMYK:  In your summary judgment opinion, in your

11    summary judgment opinion, you actually addressed this, I

12    believe, when you said if a privilege applies, the plaintiff

13    has to show the defendant abused the privilege.  That is, the

14    plaintiff bears the burden of proving that the defendant acted

15    not just negligently but intentionally or recklessly.

16         THE COURT:  What page are you looking at?

17         MR. HOMYK:  That's page 18.  I think the evidence

18    that's in is a textbook definition of Pam Kerr acting

19    recklessly.

20         THE COURT:  Wouldn't I still have to instruct the

21    jury on it, though?

22         MR. HOMYK:  Yes, sir.  You certainly do.

23         THE COURT:  Privilege is a jury question, typically,

24    right?  Unless, like anything else, there is no disputed

25    issues.

1          MR. HOMYK:  But let me --

2          THE COURT:  Hang on a second.  Is it a jury question?

3  Yes or no?  I mean, it's something that -- if there's disputed

4  facts about it, it's something you instruct a jury that they

5  have to decide, correct?

6          MR. MANDELL:  Correct.

7          MR. BARON:  Yes.

8          MR. MANDELL:  But he's talking about a conditional

9  privilege, which is a different kind of privilege.  Right?

10         THE COURT:  Okay.  So the discussion that you were --

11  that you're reading from is a discussion of qualified

12  privilege.

13         MR. HOMYK:  Correct.

14         MR. MANDELL:  Right.

15         THE COURT:  And that was -- and that, if I'm

16  recalling correctly -- and let me just look at this to be

17  sure.  The qualified privilege there was the -- I don't

18  remember what it's called.  It's like the public interest

19  thing or something like that, if you're making a report of

20  some sort of improper conduct to a body that's authorized to

21  investigate it or something like that.

22         MR. MANDELL:  Right.

23         THE COURT:  That's what I was discussing, so it's a

24  different issue.

25         MR. HOMYK:  I don't know.  You literally ruled,

1    Judge, that a reasonable jury could find that she abused the

2    privilege because there could be a reasonable inference that

3    Wrigley knew the statement in Kerr's letter was false or

4    consciously disregarded the risk of its falsity.  And then you

5    went on to say -- you went on to say that a reasonable jury

6    could find that there wasn't any privilege.

7              MR. MANDELL:  See, Judge --

8              MR. HOMYK:  I think it's very confusing to insert any

9    kind of privilege into this instruction, extremely, extremely

10   confusing.

11             MR. MANDELL:  He's talking about Wrigley's qualified

12   privilege, which is subject to being overcome by a showing of

13   actual malice.  That's totally different from the absolute

14   litigation privilege, which is not qualified.

15             THE COURT:  So, again, though, is absolute

16   privilege -- is that a jury question?  Or is it a judge

17   question?

18             MR. BARON:  I think --

19             THE COURT:  Can you guys stop talking for a second

20   while I get an answer to this question?

21             MR. BARON:  Judge, I think it's a mixed question of

22   law and fact.  What happened on summary judgment on the

23   absolute litigation privilege, your Honor, is that what you

24   found is that.

25             MR. HOMYK:  Judge, I'm --

1          THE COURT:  Don't interrupt.

2          MR. HOMYK:  No, no.  I'm only interrupting to say

3    that I am advised that we can accept the original instruction.

4          THE COURT:  Okay.  So we will go with it as is.  So

5    the original instruction, the one that said Ms. Kerr caused a

6    statement of fact about Ms. Black to be made to Northwestern

7    Law School.

8          MR. HOMYK:  Yes?

9          MS. BLACK:  Yes.

10         THE COURT:  Okay.  That was the plaintiff saying

11   "yes," just so it's clear.

12         MR. HOMYK:  So we are in agreement.

13         THE COURT:  All right.  Fine.  Then we don't have any

14   other issues on that one.  So are there any other issues on

15   the jury instructions?

16         MR. HOMYK:  No, sir.  I don't believe so.

17         Anything else?

18         THE COURT:  Since I did make the one change -- did

19   you have something else?

20         MR. MANDELL:  I have something else regarding the

21   motion for directed verdict that I am not sure that I

22   mentioned, and that is, if you go to the email, it's

23   Plaintiff's Exhibit No. 67.

24         THE COURT:  Which email are we talking?  Remind me.

25         MR. MANDELL:  This is the email from someone at

1    Northwestern, Aileen Patricia Reid to Katherine Schulte that
2    said:  "We received a call from Pam Kerr.  She is upset
3    because she mentioned in a letter on NU letterhead sent to the
4    judge in New York.  She also mentioned that the context in
5    which she was mentioned was a lie."
6              Do you remember that one?
7              MR. HOMYK:  And you ruled on already.
8              THE COURT:  So tell me -- you want to add something
9    to your Rule 50 motion.  Go ahead and do it.
10             MR. MANDELL:  Right.  Which is this email does not
11   mention Ms. Litvak-Black at all by name.
12             THE COURT:  Okay.  Thanks.  Like I said, the Rule 50
13   motions are taken under advisement.
14             MR. MANDELL:  Thank you, Judge.
15             THE COURT:  I just printed out -- I am printing out
16   right now hard copies of the instructions.  Since I made -- I
17   made like the one change, do you need me to email them to you
18   again?  I can.  It's not a problem.
19             MR. BARON:  Maybe just for --
20             THE COURT:  Okay.  Fine.  I'll email them to you
21   again.
22             And a party to the case is raising her hand, and the
23   party to the case that's raising her hand is not pro se in
24   this case.  So if she wants to say something, she's -- it's
25   going to be one of the lawyers that says it.

1          MR. HOMYK:  I understand.

2          THE COURT:  So you may want to go talk to your client

3   before I walk out the door, because when I walk out the door,

4   I am not coming back for a bit.

5          MR. HOMYK:  You're not allowed to talk, Kate.  You're

6   not allowed to talk.

7          THE COURT:  No, but she can tell you what to tell me.

8          MS. BLACK:  I am telling you what you need to tell

9   the judge.

10          MR. FANTONE:  Judge, if I had a brief issue

11   regarding --

12          THE COURT:  Just wait a second.

13          MR. HOMYK:  Judge, I have to walk outside the room to

14   hear what Kate is telling me.  Can I have a moment so that I

15   can communicate?

16          THE COURT:  Then go ahead and say what you wanted to

17   say, Mr. Fantone.

18          Mr. Homyk, can you listen to Mr. Fantone for a

19   second?

20          MR. HOMYK:  Yes, sir.

21          MR. FANTONE:  If I just had a brief issue regarding

22   the closing, would now be a good time to bring it up?

23          THE COURT:  Wait until he comes back in.

24          Go ahead and have your conversation.  Let's make it

25   quick, please.

924

1     (Brief pause.)

2          THE COURT:  Okay.  Mr. Homyk, go ahead.

3          MR. HOMYK:  Judge, I've been advised by my client

4     that she elects to present her own closing argument.  I don't

5     know whether that means, frankly, procedurally whether I can

6     sit there.  I've been terminated.  I'm not quite sure what

7     that means, but I do believe that it's her right to be a pro

8     se plaintiff.

9          THE COURT:  She's not a pro se plaintiff.  Never has

10    been.

11         MR. HOMYK:  I understand.  But she's requesting,

12    strongly requesting that she elect to make her own closing

13    argument.  She'll comply with the time limitations that we

14    have left that you set, but she strongly wants to make her own

15    closing argument in this matter.

16         THE COURT:  The word "elect," did that come from you,

17    or did that come from Mr. Black?

18         MR. HOMYK:  I'm sorry, sir?

19         THE COURT:  The word "elect," did that come from you,

20    or did that come from Mr. Black?

21         MR. HOMYK:  The word what?

22         THE COURT:  "Elect."  You said she elects.  Is that

23    her word or yours?

24         MR. HOMYK:  That's my word, I guess.  She demands.

25    She demands.  I don't know what the word is.

1          THE COURT:  Okay.

2          MR. HOMYK:  She wants to.  She demands.  She's

3    adamant that she make --

4          THE COURT:  So here's the deal.

5          MR. HOMYK:  -- her own closing argument.

6          THE COURT:  Ms. Black, why don't you just come on up

7    here.  And you can say something to me if you want.  You want

8    to say something to me?

9          MS. BLACK:  Your Honor, if you permit, I would like

10   to present my own closing argument.  I know the rules.  I

11   promise not to violate any rules, not to say anything that's

12   not admitted, and I understand the responsibility.  And I

13   promise to comply with the rules.

14         THE COURT:  Okay.  Well, I don't permit because you

15   are not a pro se litigant.  You're represented by counsel.

16   You have been since day one.  He is your counsel.  She's your

17   counsel.  They are your counsel of record.  They are the

18   people who are going to make the closing argument in the case.

19         MS. BLACK:  Your Honor, what if I fire my counsel

20   now?

21         THE COURT:  Yeah, so that would be what I would call

22   playing games.  That would be what I would call gamesmanship.

23   And I say that actually because it's pretty much the nicest

24   word that I can come up with to describe it.  We can kind of

25   go downhill from there.  Bottom of the hill is manipulative.

1      MS. BLACK:  Your Honor, I promise --

2      THE COURT:  So the answer is no.  So that will give

3 you one more thing to appeal if you lose.  No.  You cannot

4 manipulate the proceedings in that way.  That's the answer.

5      MS. BLACK:  Thank you.

6      THE COURT:  I just sent out the final version of the

7 jury instructions by email.  I will give you a printed copy in

8 a second.  Ms. Black, you can go back and have a seat.  The

9 amount of time that you have left on the plaintiff's side is

10 whatever 1.2 hours is.  That's an hour and -- you've got 72

11 minutes total, and you can divide it up between your opening

12 and your rebuttal however you want.  If you want me -- if you

13 want to save a certain amount of time for rebuttal and tell me

14 now, then I'll give you a cue at some point.

15      MR. HOMYK:  I don't know, Judge.

16      THE COURT:  Okay.  So what I'll do is I'll just let

17 you know -- I'll butt in at some point, say like you've used

18 up 40 minutes or something like that, and you can make your

19 own judgments about that.  Okay?  Thanks.

20      MR. BARON:  How about the defendants, Judge?

21      THE COURT:  You have the amount of time that I gave

22 you yesterday, which is an hour and a half.

23      MR. BARON:  Perfect.  Thank you.

24      MR. FANTONE:  Thank you, Judge.

25      Should I wait till after the break to mention that

1   issue?

2          THE COURT:  Oh, no.  You had an issue.  I'm sorry.

3   Yeah.  Go ahead.

4          MR. FANTONE:  Just with respect to mention the TRO

5   that was issued against Wrigley in Richmond County, I don't

6   think any of the parties in here misunderstand the Court's

7   ruling on that.  It was mentioned many times throughout the

8   proceedings.  I think most of the --

9          THE COURT:  That's something you're planning to

10  discuss in your closing argument?

11         MR. HOMYK:  I'm sorry?

12         THE COURT:  The temporary restraining order?

13         MR. HOMYK:  My mind is not quite --

14         THE COURT:  Believe me.  I feel your pain.  At least

15  some of it.

16         Is the temporary restraining order something you're

17  planning to mention in your closing argument?

18         MR. HOMYK:  Temporary restraining order?

19         THE COURT:  The TRO from New York?

20         MS. BLACK:  No.

21         THE COURT:  Okay.  Fine, it's not -- in your closing

22  argument, are you planning to mention the TRO that was issued

23  by the judge in New York?

24         MR. HOMYK:  Oh.  No, no.

25         MR. FANTONE:  Satisfied, Judge.  Thank you.

1          THE COURT:  All right.  Thanks.

2          MR. BARON:  Thank you.

3       (The trial was adjourned at 12:50 p.m. until 1:30 p.m. of

4   this same day and date.)

929

```
  1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
  2                      EASTERN DIVISION

  3
     KATHERINE BLACK,                    )    Docket No. 17 C 101
  4                                      )
                         Plaintiff,      )
  5                                      )
                 vs.                     )
  6                                      )
     CHERIE WRIGLEY, et al.,             )    Chicago, Illinois
  7                                      )    August 23, 2019
                         Defendants.     )    1:30 o'clock p.m.
  8

  9              TRIAL TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
 10                        VOLUME 4-B

 11
     APPEARANCES:
 12

 13  For the Plaintiff:      LAW OFFICES OF DONALD L. HOMYK
                             BY:  MR. DONALD LEE HOMYK
 14                          6944 North Ionia Avenue
                             Chicago, IL  60646
 15                          (773) 805-4393

 16
                             SHARAN R. ABRAHAM, ESQ., PLLC
 17                          BY:  MS. SHARAN RACHEL ABRAHAM
                             37 South Street
 18                          Roslyn Heights, NY  11577
                             (516) 672-1039
 19

 20

 21

 22

 23  Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
 24                          219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
 25                          (312) 435-5639
```

930

```
1   APPEARANCES CONTINUED:

2
    For Defendant              MANDELL MENKES LLC
3   Pamela Kerr:               BY:   MR. STEVEN P. MANDELL
                                     MR. STEVEN L. BARON
4                                    MR. GEORGE V. DESH
                               One North Franklin, Suite 3600
5                              Chicago, IL  60606
                               (312) 251-1000
6

7   For Defendant
    Cherie Wrigley:            MANCILLA & FANTONE, LLP
8                              BY:   MR. ROBERT MARIO FANTONE, JR.
                                     MR. ANDREW MANCILLA
9                              260 Madison Avenue, 22nd Floor
                               New York, NY  10016
10                             (646) 225-6686

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (The following proceedings were had in open court outside

2    the presence and hearing of the jury:)

3         THE COURT:  We are back on the record.  All the

4    lawyers are present as is Ms. Black and Ms. Wrigley -- not

5    Ms. Kerr.  I just want to have everybody in the room before we

6    do anything.

7    (Ms. Kerr entered the courtroom.)

8         THE COURT:  Can I see the lawyers at sidebar, please.

9    (The following proceedings were had at sidebar:)

10        THE COURT:  Okay.  What's up?

11        MR. HOMYK:  Judge, I'm about to make two motions.

12   Hmm.  Two motions that I've never made before.  Now I'm --

13        THE COURT:  Go ahead.  It's fine.  Get over it.

14        MR. HOMYK:  The first motion is for you to reconsider

15   Ms. Black's -- I'm sorry, Sharan -- strong, strong will and

16   desire to do her own closing argument.  She reiterated it.

17   The word "elect" was mine.

18        THE COURT:  No, no, that's fine.  I did not rely on

19   that.

20        MR. HOMYK:  That's the motion to reconsider.

21        The second one would be, sir -- and I know I've never

22   done this before.  And I apologize to these guys -- I would

23   ask for an emergency motion to continue the closing arguments

24   until Monday morning, only until Monday morning.

25        THE COURT:  Why?

1    MR. HOMYK:  There is a reason for that.  The reason

2  for that is because I think reason may prevail between now and

3  then.  Only until Monday morning, first thing Monday morning,

4  sir.

5    THE COURT:  What does that mean?

6    MR. HOMYK:  It means -- in my view, I believe it

7  means that I will be conducting the closing arguments rather

8  than Kate.

9    THE COURT:  Well, you're going to be.

10    MR. HOMYK:  And I will be conducting the closing

11  arguments rather than Kate.

12    And then the third thing is -- I guess I might as

13  well put it on the record.  I was prepared, Judge.  I'm not

14  sure I'm prepared now.  I mean prepared emotionally to do

15  this, and I'm just not.  I mean, in the last hour, I've done

16  everything and Sharan has as well in our power to attempt to

17  do our absolute best on behalf of this client in a lengthy

18  piece of litigation that, needless to say, everyone has put

19  enormous time and energy into.  And I would really -- I think

20  it's not fair to anyone to -- I don't know.  I'm not sure what

21  else to say, Judge.  I mean, I think I would -- I would -- I

22  guess I would strongly --

23    THE COURT:  So look --

24    MR. HOMYK:  -- request that we have an emergency

25  motion to continue only the closing arguments only until

1    Monday morning, and I think that -- I think that I can more

2    properly represent -- we -- we can more properly represent my

3    client if that's what you do.  And I also think that --

4    that -- that's all.

5           THE COURT:  Well, I need to go back to something you

6    said, because I don't quite completely understand it.  The

7    comment that reason will prevail.  You think she --

8           MR. HOMYK:  I do.

9           THE COURT:  What?  What does that mean?  Whose reason

10   will prevail about what?

11          MR. HOMYK:  You indicated -- I think that you're

12   adamant that -- well, at this point in time, I can't either be

13   terminated nor can I withdraw.  Understood.  Understood.

14          THE COURT:  Finish the thought, and then I'm going to

15   tell you --

16          MR. HOMYK:  I mean, I believe I think it's your

17   strong view, and you make the calls here, that I can -- that

18   we can not either withdraw nor be terminated, and as a result

19   of that, I do believe -- I do believe -- I do believe that

20   with that, I'll be permitted to conduct the closing arguments

21   on Monday, Judge.  I strongly --

22          THE COURT:  When you say "permitted," by whom?

23          MR. HOMYK:  By you.  No, by you.  By you.

24          THE COURT:  I'm already permitting you.

25          MR. HOMYK:  I know.  I'll do it.  I'll do it.

```
 1          THE COURT:  So let me tell you -- and I'm not
 2   entirely comfortable saying all of this without your client's
 3   presence.
 4          MR. HOMYK:  I understand.
 5          THE COURT:  She'll eventually get the transcript.
 6   I'm just going to tell you that some of this I am going to
 7   repeat.
 8          MR. FANTONE:  Sorry.
 9          THE COURT:  What?  What?
10          MR. FANTONE:  I am talking to myself, Judge.
11          THE COURT:  Okay.  So the way I war game this out is
12   if I do that --
13          MR. HOMYK:  Yes, sir.
14          THE COURT:  -- what's going to happen is you are
15   going to get formally terminated over the weekend, and
16   Ms. Black is going to come in here on Monday and say, Judge, I
17   don't have a lawyer.  Now I'm going to do the closing
18   argument.  I regard this -- I regard this as honestly part of
19   a continuing effort on her part to manipulate the proceeding
20   in the case, which, by the way, none of that is to be repeated
21   to the jury by anybody in their closing arguments.  That's the
22   first thing.
23          The second thing is -- and this is the part I'm going
24   to say in her presence -- when she came up to the podium
25   before and told me, oh, I'll abide by every rule, she just
```

935

 1   cannot be trusted to do that.

 2          MR. HOMYK:  I understand.

 3          THE COURT:  Because of her performance during her

 4   testimony as a witness where she basically -- and she was not

 5   the only person that did this, but she was the first --

 6   essentially ignored every instruction I gave her repeatedly at

 7   least a dozen and a half times.

 8          Thirdly, it's not my business -- it's not in her

 9   interest to give the closing argument.  It's just really not

10   in her interest to give the closing argument in her case.

11          The motion to reconsider is denied.

12          MR. HOMYK:  If you --

13          THE COURT:  I don't think reason is going to prevail

14   on anybody.

15          MR. HOMYK:  Judge, if you order -- I am just talking,

16   you know.

17          THE COURT:  Yeah.

18          MR. HOMYK:  If you order -- if your order is that the

19   emergency motion to continue the trial to first thing Monday

20   only for closing arguments, Mr. Homyk will deliver the closing

21   arguments, and the Court will not entertain any, any motions

22   on behalf of the plaintiff to terminate counsel between now

23   and Monday.  I --

24          THE COURT:  So then -- okay.  Fine.  Then what are we

25   talking about, just to be blunt about it here?  Are we talking

1    about your emotional preparedness to do this?

2           MR. HOMYK:  Well, I guess set me up for malpractice.

3    Whatever.  I am now talking to you.  Set me up.  I don't care

4    anymore.  I really don't care anymore, Judge.  Because the

5    truth of the matter is -- the truth of the matter is I do

6    believe that I will be -- I do believe that I will be the

7    person who would be delivering the closing argument.  I

8    believe that.  And so I hesitate -- I would prefer not to have

9    my emotional preparedness on the record, to be perfectly

10   honest.

11          THE COURT:  You put it on the record before.  Okay?

12   I'm just -- you put it on the record before, and so that's

13   what I'm trying -- I'm trying to get at how much of the --

14   that is and how much of it was your client's --

15          MR. HOMYK:  No.

16          THE COURT:  -- intention, desire, or adamants on

17   doing the closing argument herself.

18          MR. HOMYK:  I mean, I'm not going to deny it threw me

19   off big time.  Okay?  I mean, they're interconnected.  I'm not

20   going to deny it that there is a causal connection there,

21   Judge, for sure.  I mean, for sure.  But, again, yeah, so no

22   way.  I am not going to deny that.  I tried -- I tried in this

23   last hour to kind of -- we tried to pull ourselves together.

24   And I know we can do that by Monday.  But the truth is I don't

25   believe we can now.  I don't.  I don't know how else to phrase

1    it.  So phrase it any way that you think -- phrase it any way

2    that you think is appropriate.  I know they have their -- they

3    have their views.  I mean, they're certainly entitled to their

4    views.

5              THE COURT:  Okay.  Let me hear their views then.

6              MR. MANDELL:  I object to it.  I mean --

7              MR. FANTONE:  I object.  We are ready to go.

8              MR. MANDELL:  Yeah.  I really -- I mean, no

9    disrespect --

10             MR. HOMYK:  I understand.

11             MR. MANDELL:  -- but I haven't heard anything

12   really --

13             MR. HOMYK:  I understand.

14             MR. MANDELL:  -- and you're upset because --

15             MR. HOMYK:  I understand.

16             THE COURT:  Talk to me.  Okay?

17             MR. MANDELL:  Okay.  Sorry.

18        He's upset because his client wants to do the closing

19   argument and tried to fire him.  I get that.  But, you know,

20   from our perspective, this whole proceeding isn't fair.

21             THE COURT:  Okay.  Fine.

22        Next.  You guys want to say anything more, add to

23   what he said?

24             MR. FANTONE:  I will just add that, you know, from

25   what I've seen from Mr. Homyk throughout the trial, he's been

1    more than capable.

2          THE COURT:  So let me ask you a question.  I would

3    have to assume -- and you will correct me if I'm wrong -- that

4    because it was anticipated at the end of the day yesterday we

5    were going to end sometime today, including the closing

6    arguments, that you prepared your closing last night, right,

7    or yesterday afternoon?  You prepared your closing?  It's not

8    like you don't have a closing prepared.

9          MR. HOMYK:  True.  True, Judge.  It's just that --

10         THE COURT:  Okay.  Finish the sentence.  Finish the

11   sentence.  I'm not setting you up for anything, my friend.

12         MR. HOMYK:  I know you're not.  I'm making my

13   emotional preparedness, Judge.  At this point, I'm more than

14   willing to acknowledge that.  I am.  I'm more than willing to

15   acknowledge that.  This has never happened to me before.  I

16   hope it never happens again.  I hope it never happens again.

17   I'm not emotionally ready to do this right now.

18         THE COURT:  Okay.  So let me ask you this.  So what's

19   going to happen when you come in on Monday and you tell me the

20   same thing?

21         MR. HOMYK:  No, I won't.

22         THE COURT:  Or Tuesday?

23         MR. HOMYK:  I won't.

24         THE COURT:  If I had asked you -- if I had asked you

25   three hours ago whether you were going to do this, you would

1  have said no.  Okay?  So how do I know it's going to happen on
2  Monday?

3         MR. HOMYK:  I'm -- I'm -- I mean, all I can do is
4  tell you.  All I can do is tell you.  Sharan and I will both
5  be here.  Because Sharan, I don't think -- she can speak for
6  herself certainly, but I think she's a bit shaken at this
7  point as well.  And I can tell you that we will both be here
8  first thing Monday morning prepared only for closing
9  arguments -- just for the closing arguments.  We will be here.
10  No question, sir.

11         And I would suggest, in the event that you're still
12  entertaining this, Judge, that you make it crystal clear on
13  the record that it's an emergency motion.  I don't care what
14  you say about the grounds for it, but make it crystal clear
15  that if you grant this motion, I -- Sharan and I will be
16  conducting the closing arguments, and we will be doing them
17  first thing Monday morning.  And you won't entertain any other
18  motions from the plaintiff.  None.  Zero.  None.  Zero.

19         THE COURT:  Is the plaintiff aware you're making the
20  request to move it over to Monday?

21         MR. HOMYK:  Yes.

22         THE COURT:  Yes?  Is that right?

23         MR. HOMYK:  She is aware of the motion.

24         THE COURT:  She is aware you are asking me to move
25  the closing arguments to Monday?

1    MR. HOMYK:  I told her that I was going to make a
2   two-fold request, motion to reconsider and then motion to --
3   emergency motion to move the closing arguments to Monday.
4   And, yes, her preference was that she do it.  Obviously,
5   that's not a good idea.  The motion to reconsider.  Her
6   preference is she do it, but, yes.
7        If I could just have another word with her.
8        THE COURT:  Oh, no.  I'm going to do it.  I'm going
9   to do it.
10       MR. HOMYK:  Okay.
11       THE COURT:  And I just want to say one thing.  So
12  first of all, I'm going to say I have locked horns with pretty
13  much everybody in this case, okay, and Mr. Homyk as much as
14  everybody.  I will say this.  You know, I've ruled against you
15  on some things.  I've ruled in favor of you on other things.
16  You've done a more than competent job of getting the evidence
17  in.  I've reconsidered things that I've ruled against you on
18  your motion.  I've allowed them in.  That happened yesterday
19  afternoon that I recall on one item that I had excluded.
20       So you -- and, obviously, my dealings have been with
21  you, not with Ms. Abraham, so I assume she's been in the
22  background.  And you've done, you know, everything I can think
23  of that you could appropriately do to represent Ms. Black.
24  But I want -- I want her to say on the record what her view is
25  about continuing the trial until Monday -- continuing the

1    closing arguments to Monday.  I am not going to make that

2    dispositive.  I want to ask her on the record.

3     (The following proceedings were had in open court outside

4    the presence and hearing of the jury:)

5           THE COURT:  Okay.  So I need Ms. Black to be

6    listening very carefully to this.  In a moment, I am going to

7    address a question to you, Ms. Black.

8           So, first of all, Mr. Homyk made a motion to

9    reconsider having Ms. Black make the closing argument.  I

10    denied that motion.  And by the way, to what I said before, I

11    do need to add this.  And I know that Ms. Black stood in front

12    of me, you know, about an hour ago and assured me a couple of

13    times that she would, you know, follow all the rules and knows

14    the rules of the game and knows the boundaries and so on.

15           I denied the motion for the reasons that I said, but

16    I will say as an additional reason, I just don't think that

17    can be trusted, and I'm just going to tell you why.

18           Now, there are plenty of witnesses -- plenty of

19    people in this case, witnesses, who have ignored or not

20    followed instructions that they have been given by me, and you

21    were the first and probably the most repeated violator.  And I

22    am going to repeat what I said at sidebar.  That's not going

23    to be repeated by me saying it, it's not going to be repeated

24    by anybody in front of the jury.

25           You know, I repeatedly instructed you not to

1   volunteer.  You just kept doing it anyway, even after multiple
2   instructions.  So to be perfectly blunt with you, I can't
3   trust you to follow the rules, even if it were appropriate for
4   you to do your own closing argument in a case in which you are
5   represented by counsel.  That's the first thing.  So I am
6   denying the motion to reconsider.
7           The second request that Mr. Homyk made was to put off
8   the closing arguments until Monday, and I want to find out
9   from you directly whether you support that or oppose it.
10          MS. BLACK:  I support it.
11          THE COURT:  Okay.  So now I want to add one or two
12  more things to that, and I do this, you know, advisedly.  If I
13  put it off -- and I'm not saying your supporting it or
14  opposing it is dispositive in any way, and I know you know
15  what that means because you are a lawyer -- I will say this.
16  If I do that, it's going to be on the condition that I don't
17  get any motions over the weekend or Monday morning or any
18  other time between now and when the closing arguments are
19  concluded to terminate Mr. Homyk's services, withdraw him from
20  the record, anything like that, because I will tell you when I
21  said this to the lawyers at sidebar, my concern is if I put
22  the case over until Monday, what you're going to do is you're
23  going to attempt to pull the rug out from under him over the
24  weekend and try to create some facts on the ground, if I can
25  use a phrase advisedly, and kick Mr. Homyk out of the case,

1    and then come back in and say, well, Judge, now it's only me.
2    I get to do the closing argument.
3           I need verbal statements from you, not just shakes
4    and nods of the head.
5           MS. BLACK:  May I ask a question?
6           THE COURT:  Sure.
7           MS. BLACK:  Is your worry that it's --
8           THE COURT:  My worry is exactly what I said.  So we
9    are not going to engage in some sort of a back and forth where
10   you try to revise or rephrase my question.  My worry is
11   exactly what I said.  So if you'd like me to repeat it, I'll
12   pull the transcript up, and I'll just reread it back to you.
13   You are not going to rephrase my question.  This is not some
14   sort of a Sunday morning talk show where you just answer
15   whatever question you want or redo the question.
16          So you want to have my question again so that you
17   have it in mind before you answer it?
18          MS. BLACK:  No.  May I ask a question?  Okay.  Yes, I
19   will not -- I will not be pro se for sure, no.  I will not
20   represent myself.
21          THE COURT:  So I'm not going to get something between
22   now and Monday morning where you say I've now fired Mr. Homyk
23   and/or Ms. Abraham and so they can't appear for me anymore?
24          MS. BLACK:  No.  May I ask a question?  I will not be
25   appearing pro se, no.

1    THE COURT:  What's your question?  You are going to

2  bring in some other lawyer?

3    MS. BLACK:  Unless you object.

4    THE COURT:  Ha, ha, ha.  That's why I'm not

5  continuing it.  This is why I'm not continuing the closing

6  argument.  To me -- and I know that Mr. Homyk made the request

7  to me, and I know that Mr. Homyk has his own reasons for doing

8  this.  This is all part of an effort to manipulate things --

9    MS. BLACK:  No.

10    THE COURT:  -- by Ms. Black.  No.  The request is

11  denied.  We are starting the closing arguments in ten minutes.

12  That's it.

13    Let me say one other thing, and I would remiss if I

14  did not say this.  Over the -- and I want you to listen to me

15  very carefully, Ms. Black.  You may recall yesterday -- and I

16  don't know if it was morning or afternoon where I made a

17  comment.  "They can hear what you're saying over there."

18  Okay?  Over the past day and a half, you -- and I mean -- by

19  "you" I mean you, Katherine Black, have been displaying, about

20  15 feet from the jury, your dissatisfaction with what's going

21  on.  And I don't -- I can't tell, because I can't get inside

22  your head, whether that's dissection with me, which is

23  perfectly fine, you have a First Amendment right, or whether

24  it's your dissatisfaction with testimony, or whether it's your

25  dissatisfaction with your lawyer.  Whatever it is, the jury is

1   seeing and hearing every bit of it, every bit of it.  And so
2   I'm just giving you a fair warning that during the closing
3   arguments --
4           MR. HOMYK:  Judge, right now --
5           THE COURT:  Don't you interrupt me, Mr. Homyk.
6           I am giving you fair warning, Ms. Black, that during
7   the closing arguments, you can do whatever you want.  You can
8   have whatever body language or rolls of the eyes or anything
9   like that that you want to do, but it's not going to help you.
10  And you may be a very smart person who went to a top-notch law
11  school, graduated first in your class, and clerked for some
12  very top-notch judges.  Okay?  But one thing I got over you is
13  I have dealt with lots of jurors, 17 years as a practicing
14  lawyer, 20 years as a judge.  And just -- you know, old
15  Saturday Night Live --
16          MR. HOMYK:  Judge, I want to put this on -- this
17  on --
18          THE COURT:  -- hear me now and believe me later.
19  Anything that you do in front of the jury, it's completely
20  your First Amendment right to do it.  But it's not going to
21  help you.
22          MR. HOMYK:  Judge, I need to put this on the record
23  right now, Judge.  I'm physically ill right now.  I'm
24  physically ill right now, Judge, on what's transpired.  I
25  don't know what else to say except to put that on the record,

 1  sir.  I'm physically unable to continue with the closing

 2  argument today.  I am.  I hate to --

 3          THE COURT:  And how do I know that that's going to

 4  change on Monday, Mr. Homyk?

 5          MR. HOMYK:  Kate --

 6          THE COURT:  How do I know that you're going to just

 7  not show up on Monday or come in and say, Judge, I'm still

 8  ill.  We can't do this?

 9          MR. HOMYK:  Tell him it's not going to happen, Kate,

10  please.

11          THE COURT:  This is you saying you're really ill.

12          MR. HOMYK:  I'll tell you, Judge.  Hold me in

13  contempt.  I'm physically ill right now.  I am.  I'm sorry.  I

14  hate to say that in front of a courtroom full of people.  I

15  can't do it right now.  I will for sure be able to do it on

16  Monday.  I need -- I'm pretty good at composing myself under

17  unusual circumstances.  This is far more than unusual

18  circumstances, sir.  Far more.

19          THE COURT:  I am just going to tell you -- I mean, I

20  don't doubt that you feel physically ill right now.  My

21  overwhelming thought is I am being played here.

22          MR. HOMYK:  No, no, sir.  No, sir, not going to

23  happen.

24          THE COURT:  I am being played here.

25          MR. HOMYK:  No, you are not getting played, Judge.

1    You can hold me in contempt.

2           THE COURT:  Oh, you can bet your bottom dollar that

3    that's going to happen if you are not in this courtroom on

4    Monday morning at 9:30 ready to deliver a closing argument.

5           MR. HOMYK:  I understand, sir.

6           THE COURT:  What's going to happen is that a warrant

7    is going to be issued to hold you in contempt.

8           MR. HOMYK:  Sir, I understand.  I understand.

9           THE COURT:  If that makes you physically sick, too,

10   then so be it.  That's the price you pay by filing an

11   appearance in a case in court, you know, and going to trial in

12   the case.

13          MR. HOMYK:  Never done this before.

14          THE COURT:  You are going to be here on Monday,

15   right?

16          MS. BLACK:  Yes, sir.  Yes, your Honor.

17          THE COURT:  Okay.  And I'm not going to have some

18   other lawyer filing an appearance over the weekend or Monday

19   morning or tonight or anything like that coming in to say that

20   they're wanting to do a closing argument for you, right?

21          MS. BLACK:  No, sir.

22          THE COURT:  Okay.  The evidence is closed.  I am

23   going to fudge some sort of explanation to the jury.

24   Unanticipated circumstances have come up.  I have to continue

25   the case until Monday morning.  I apologize for that.  And

1   that's what we're going to do.

2        I'm just going to tell you it's -- honestly, it's

3   against my better judgment, and there's going to be hell to

4   pay.  If something -- if something goes wrong between now and

5   then, there's going to be hell to pay.

6        MR. HOMYK:  I hear every word you're saying, Judge.

7        THE COURT:  Everybody take a seat.

8        Pam, bring the jury out.

9        My suggestion is everybody does their best right at

10  the moment to compose themselves in front of the jury.

11  They're only going to be out here for two minutes.

12   (The jury enters the courtroom.)

13       THE COURT:  All right.  You can all have a seat.

14       So, folks, if I could just get your attention for a

15  second here.

16       So as you notice, I said 1:30 and now I'm kind of

17  back to my old ways here not starting on time.

18       Issues came up during the break that were -- let's

19  say some of them unanticipated, but let's just say more

20  complicated than what I expected, which is what required us to

21  work probably until close to 1:00 and then again starting a

22  little bit before 1:30 until now.  It's a little bit before

23  2:00 o'clock right now.  And if I add up the time, the time

24  for the plaintiff to argue, the time for Mr. Fantone to argue,

25  the time for -- the time for Mr. Homyk to argue, the time for

1    Mr. Fantone to argue, the time for Mr. Mandell or Baron -- I'm
2    not sure which one is doing the arguing -- the time for
3    Mr. Homyk to give his rebuttal, and the time for my
4    instructions, what that's going to be doing is running us
5    right up to the end of the day.  And one of the things I have
6    to be concerned about in that situation -- this is all on me,
7    okay -- is I have to be concerned about a jury thinking, okay,
8    it's 5:00 o'clock.  Let's decide this case really quickly and
9    get out of here.
10            It's been my practice, honestly, for most of my
11   career here, which goes back 20 years, to not send juries out
12   to deliberate on Friday afternoons kind of for that reason.
13            So with my apologies -- and it's really my humble
14   apologies -- we are going to finish this on Monday morning.
15   We are in the -- as I said at the beginning about this
16   trickling over, this is the part that's going to trickle over
17   to Monday morning.
18            I need to take one second here to just double-check
19   on what I got up on Monday morning and see if I can try to
20   move some of it.
21            Yeah, we're going to start -- I have other things set
22   for 9:30.  I am going to try to move all but one of them
23   because there's one I can't move up to earlier times.  If you
24   can be ready to go at 9:30, it should like be 9:35 or 9:40.
25   And, again, I apologize.

 1          Is there an issue?  Write me a note.

 2          A JUROR:  Is it the time to ask a question about

 3   that?

 4          THE COURT:  Sure.

 5          A JUROR:  As far as where -- as jurors understanding

 6   about what phase two would be exactly?

 7          THE COURT:  I'm glad you're asking that question.  So

 8   don't concern yourselves with what phase two would be.  That's

 9   the issue.  It's not something you should speculate on.  It's

10   not something you should discuss.  Don't concern yourselves

11   with that at all.  The overall length of this is not going to

12   be any longer than I said it would be at the beginning.

13          The phase one part I said would finish on Friday or

14   might trickle over to Monday morning.  It's now going to

15   trickle over to Monday morning.  We should be able to start at

16   like 9:35 or 9:40, so if you can be ready to go at 9:30 on

17   Monday.  Yeah, I can move everything else that's on my call

18   for that time, and that's what we're going to do.  Again, with

19   my apologies.

20          On the other hand, it's great weather in the

21   afternoon.  Go over to Navy Pier or something like that.  So

22   I'll take you out, and then I'll come back out and talk to the

23   lawyers.  Don't begin deliberating, obviously, and don't

24   discuss the case.

25     (The jury leaves the courtroom.)

951

1          THE COURT:  I want all -- I want everybody in the
2    room at counsel table on Monday morning ready to go at 9:25,
3    in the room ready to go at 9:25.  I need a verbal yes from
4    each party and each lawyer that says "I agree."
5          MR. HOMYK:  I agree.
6          MS. ABRAHAM:  I agree.
7          MS. BLACK:  I agree.
8          MR. FANTONE:  I agree.
9          MR. MANCILLA:  I agree.
10         MR. MANDELL:  I agree.
11         MR. BARON:  I agree.
12         MS. KERR:  I agree.
13         MS. WRIGLEY:  I agree.
14         THE COURT:  Everybody in the room, all nine of them,
15   said "I agree."  Okay.  See you Monday morning.
16      (The trial was adjourned at 2:00 p.m. on August 23, 2019,
17   until 9:30 a.m. on August 26, 2019.)
18
19
20
21
22
23
24
25