952

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3
      KATHERINE BLACK,                    )    Docket No. 17 C 101
 4                                        )
                        Plaintiff,        )
 5                                        )
               vs.                        )
 6                                        )
      CHERIE WRIGLEY, et al.,             )    Chicago, Illinois
 7                                        )    August 26, 2019
                        Defendants.       )    9:35 o'clock a.m.
 8

 9                  TRIAL TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
10                          VOLUME 5-A

11
      APPEARANCES:
12

13    For the Plaintiff:      LAW OFFICES OF DONALD L. HOMYK
                              BY:  MR. DONALD LEE HOMYK
14                            6944 North Ionia Avenue
                              Chicago, IL  60646
15                            (773) 805-4393

16
                              SHARAN R. ABRAHAM, ESQ., PLLC
17                            BY:  MS. SHARAN RACHEL ABRAHAM
                              37 South Street
18                            Roslyn Heights, NY  11577
                              (516) 672-1039
19

20

21

22

23    Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Suite 2102
                              Chicago, Illinois  60604
25                            (312) 435-5639
```

953

APPEARANCES CONTINUED:

```
For Defendant          MANDELL MENKES LLC
Pamela Kerr:           BY:   MR. STEVEN P. MANDELL
                             MR. STEVEN L. BARON
                             MR. GEORGE V. DESH
                       One North Franklin, Suite 3600
                       Chicago, IL  60606
                       (312) 251-1000


For Defendant
Cherie Wrigley:        MANCILLA & FANTONE, LLP
                       BY:   MR. ROBERT MARIO FANTONE, JR.
                             MR. ANDREW MANCILLA
                       260 Madison Avenue, 22nd Floor
                       New York, NY  10016
                       (646) 225-6686
```

1    (The following proceedings were had in open court outside

2  the presence and hearing of the jury:)

3          THE CLERK:  Case No. 17 C 101, Black v. Wrigley.

4          THE COURT:  All right.  Can I get the lawyers'

5  appearances for the record, please.

6          MR. MANCILLA:  Andrew Mancilla and Robert Fantone for

7  Ms. Wrigley.

8          MR. MANDELL:  Steve Mandell and Steve Baron on behalf

9  of Defendant Pam Kerr.

10         MR. HOMYK:  Don Homyk and Sharan Abraham for

11  Katherine Black.

12         THE COURT:  Okay.  Everybody ready to go?

13         MR. HOMYK:  Yes, sir.

14         THE COURT:  All right.  Let's get the jury out here.

15         Had I given you a hard copy of the instructions?  I

16  did, right?  The only thing I changed was the date on the

17  front.  It's the 26th.  Remember, I'm reading the instructions

18  first.

19         MR. HOMYK:  I'm sorry?

20         THE COURT:  I'm doing the instructions first.

21         MR. HOMYK:  Okay.

22    (The jury enters the courtroom.)

23         THE COURT:  Okay.  Everybody can have a seat.

24         First thing that's going to happen is I'm going to

25  read the instructions.  I just gave each of you a copy.

1    They're also going to be on your screens, and you can follow

2    along either in the hard copy, on your screens, or just by

3    listening.

4           Give me just a second here.  Okay.

5           Members of the jury, you have seen and heard all the

6    evidence, and you are about to hear the arguments of the

7    attorneys.  Now I will instruct you on the law.

8           You have two duties as a jury.  Your first duty is to

9    decide the facts from the evidence in the case.  This is your

10   job, and yours alone.

11          Your second duty is to apply the law that I give you

12   to the facts.  You must follow these instructions, even if you

13   disagree with them.  Each of the instructions is important,

14   and you must follow all of them.  You must also continue to

15   follow the instructions that I gave you at the start of the

16   trial that you may not communicate about the case or about

17   people involved in the case with anyone other than your fellow

18   jurors until after you have returned your verdict.

19          Perform these duties fairly and impartially.  Each

20   party to the case is entitled to the same fair consideration.

21   Do not allow sympathy, prejudice, fear, or public opinion to

22   influence you.  You should not be influenced by any person's

23   race, color, religion, national ancestry, age, or sex.

24          Nothing I am saying now, and nothing I said or did

25   during the trial, is meant to indicate any opinion on my part

about what the facts are or about what your verdict should be.

To the extent that these instructions differ from the instructions that I read you at the beginning of the case, the instructions that I am giving you now are the ones that govern your consideration of this case.  You should not draw any conclusions from any changes that were made to those instructions.

The evidence consists of the testimony and the exhibits.  Certain testimony was presented to you by reading or playing deposition.

Actually, that's not true.  We didn't have any of those, so don't worry about that.

You should give this testimony the same consideration you would give it if the witnesses had appeared and testified in court.

In determining whether any fact has been proved, you should consider all of the evidence bearing on that fact, regardless of who offered the evidence.

You must make your decision based on what you recall of the evidence.  You will not have a written transcript of the testimony to consult.

Certain things are not evidence.  I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record,

1  such testimony or exhibits are not evidence and must not be
2  considered.

3         Second, anything that you may have seen or heard
4  outside the courtroom is not evidence and must be entirely
5  disregarded.  This includes any press, radio, Internet, or
6  television reports you may have seen or heard.  Such reports
7  are not evidence, and your verdict must not be influenced in
8  any way by such publicity.

9         Third, questions and objections or comments by the
10  lawyers are not evidence.  Lawyers have a duty to object when
11  they believe a question is improper.  You should not be
12  influenced by any objection, and you should not infer from my
13  rulings that I have any view as to how you should decide the
14  case.

15         Fourth, the lawyers' opening statements and closing
16  arguments to you are not evidence.  Their purpose is to
17  discuss the facts and the evidence.  If the evidence as you
18  remember it differs from what the lawyers said, your memory is
19  what counts.

20         Any notes you have taken during this trial are only
21  aids to your memory.  The notes are not evidence.  If you have
22  not taken notes, you should rely on your independent
23  recollection of the evidence and not be unduly influenced by
24  the notes of other jurors.  Notes are not entitled to any
25  greater weight than the recollections or impressions of each

1    juror about the testimony.

2            You should use common sense in weighing the evidence

3    and consider the evidence in light of your own observations in

4    life.

5            In our lives, we sometimes look at one fact and

6    conclude from it that another fact exists.  In law we call

7    this an inference.  A jury is allowed to make reasonable

8    inferences, so long as they are based on the evidence in the

9    case.

10           You may have heard the phrases direct evidence and

11   circumstantial evidence.  Direct evidence is proof that does

12   not require an inference, such as the testimony of someone who

13   claims to have personal knowledge of a fact.  Circumstantial

14   evidence is proof of a fact, or a series of facts, that tends

15   to show that some other fact is true.

16           You are to consider both direct and circumstantial

17   evidence.  The law allows you to give equal weight to both

18   types of evidence, but it is up to you to decide how much

19   weight to give to any evidence in the case.

20           You must decide whether the testimony of each of the

21   witnesses is truthful and accurate, in part, in whole, or not

22   at all.  You also must decide what weight, if any, you give to

23   the testimony of each witness.

24           In evaluating the testimony of any witness, including

25   any party to the case, you may consider, among other things:

1    The ability and opportunity the witness had to see,
2    hear, or know the things that the witness testified about;
3    The witness' memory;
4    Any interest, bias, or prejudice the witness may
5    have;
6    The witness' intelligence;
7    The manner of the witness while testifying;
8    The reasonableness of the witness' testimony in light
9    of all the evidence in the case; and
10   Any inconsistent statements or conduct by the
11   witness.
12   It's proper for an attorney to meet with any witness
13   in preparation for trial.
14   The law does not require any party to call as a
15   witness every person who might have knowledge of the facts
16   related to this trial.  Similarly, the law does not require
17   any party to present as exhibits all papers and things
18   mentioned during this trial.
19   You may find the testimony of one witness or a few
20   witnesses to be more persuasive than the testimony of a larger
21   number of witnesses.  You need not accept the testimony of the
22   larger number of witnesses.
23   The plaintiff in this case is Katherine Black.  The
24   defendants in this case are Cherie Wrigley and Pamela Kerr.
25   Ms. Black is asserting four claims.  You should

1  consider -- you must consider each claim separately.

2      First, Ms. Black is suing Ms. Wrigley for intentional

3  infliction of emotional distress.  This claims concerns one or

4  more threats that Ms. Black alleges Ms. Wrigley made to her.

5  Ms. Black alleges that the threat or threats caused her severe

6  emotional distress.  Ms. Wrigley denies Ms. Black's allegation

7  that she made a threat or threats to Ms. Black.  Ms. Wrigley

8  also denies that she caused Ms. Black severe emotional

9  distress and alleges that any emotional distress that

10  Ms. Black experienced had other causes.

11      Second, Ms. Black is suing Ms. Kerr for defamation.

12  This claim concerns a false statement that Ms. Black alleges

13  Ms. Kerr made to Ms. Black's employer, Northwestern University

14  School of Law.  Ms. Kerr contends that her statements to

15  Northwestern were substantially true and were not defamatory

16  of Ms. Black.

17      Third, Ms. Black is suing Ms. Wrigley for aiding and

18  abetting Ms. Kerr's defamation of Ms. Black.  Ms. Wrigley

19  denies that any defamation took place and denies that she

20  aided and abetted any defamation of Ms. Black.

21      Fourth, Ms. Black is suing Ms. Kerr and Ms. Wrigley

22  for conspiring to commit defamation against her.  Ms. Kerr and

23  Ms. Wrigley deny this claim.

24      As I have told you, this trial is being conducted in

25  two phases.  I am giving you instructions at this point

1  regarding the first phase of the trial.  After you return your

2  verdict following the first phase of the trial, we will

3  proceed to the second phase.  And I will give you further

4  instructions at that time.

5         In these instructions, I'll use the term

6  "preponderance of the evidence."  When I say that a party has

7  to prove a proposition by a preponderance of the evidence, I

8  mean that the party must prove that the proposition is more

9  likely true than not true.

10        In her first claim, Ms. Black alleges that

11 Ms. Wrigley intentionally inflicted emotional distress upon

12 her.  To succeed on this claim, Ms. Black must prove each of

13 the following propositions by a preponderance of the evidence:

14        And there are four propositions.

15        Number one, Ms. Wrigley made one or more threats

16 against Ms. Black.

17        Number two, Ms. Wrigley's conduct was extreme and

18 outrageous.  Conduct is extreme and outrageous if it goes

19 beyond all possible bounds of decency and is regarded as

20 intolerable in a civilized society.

21        Number three, Ms. Wrigley either intended to inflict

22 severe emotional distress upon Ms. Black or knew that there

23 was at least a high probability that her conduct would cause

24 Ms. Black severe emotional distress.

25        And, number four, Ms. Wrigley's conduct caused

1  Ms. Black's severe emotional distress.  Emotional distress is
2  considered severe if no reasonable person would be expected to
3  endure it.
4          In her second claim, Ms. Black alleges that Ms. Kerr
5  committed what the law refers to as defamation per se against
6  her.  To succeed on this claim, Ms. Black must prove each of
7  the following propositions by a preponderance of the evidence:
8          Number one, Ms. Kerr caused a statement of fact about
9  Ms. Black to be made to Northwestern Law School.
10         Number two, Ms. Kerr's statement was false.
11         Number three, Ms. Kerr knew the statement was false,
12 or she believed the statement was true but lacked reasonable
13 grounds for this belief.
14         Number four, it was apparent from the words of the
15 statement that it prejudiced Ms. Black in her profession.
16         If you find that Ms. Black has proven each of these
17 propositions by a preponderance of the evidence, you must go
18 on to consider Ms. Kerr's defense that the statement was
19 substantially true.  This does not require every detail of the
20 statement to be accurate.  To succeed on this defense,
21 Ms. Kerr must prove by a preponderance of the evidence that
22 the gist or the sting of her statement about Ms. Black was
23 true.
24         In her third claim, Ms. Black alleges that
25 Ms. Wrigley aided and abetted Ms. Kerr in committing

1   defamation against her.  To succeed on this claim against

2   Ms. Wrigley, Ms. Black must succeed on her --

3           And there is a typo.  So I'm going to ask you to fix

4   it.  I just now noticed this.  Where it says "first," it

5   should say "second."  So it actually is both ways.  So

6   basically what -- the claims are numbered 1, 2, 3, and 4.

7   What we call the first claim is just against Ms. Wrigley.

8   What we call the second claim is against Ms. Kerr.  So when I

9   say her first claim against Ms. Kerr, that means Claim 2, if

10  you follow what I'm saying.  Okay?

11          So Ms. Black must succeed on that claim against

12  Ms. Kerr and must also prove each of the following

13  propositions by a preponderance of the evidence:

14          Number one, Ms. Wrigley knowingly and substantially

15  assisted Ms. Kerr in her commission of defamation against

16  Ms. Black.

17          Number two, Ms. Wrigley was aware of her role when

18  she provided the assistance.

19          In her fourth claim, Ms. Black alleges that Ms. Kerr

20  and Ms. Wrigley participated in a civil conspiracy to commit

21  defamation against her.  To succeed on this claim, Ms. Black

22  must prove each of the following propositions by a

23  preponderance of the evidence:

24          Number one, Ms. Kerr and Ms. Wrigley reached an

25  agreement to accomplish, by concerted action, an unlawful

1  purpose, or a lawful purpose by unlawful means.  Ms. Black

2  must prove that the participants shared this common purpose.

3  She does not have to prove that there was a formal agreement

4  or plan in which all involved met together and worked out the

5  details.  She also does not have to prove that each

6  participant knew all of the details of the agreement.

7       Number two, in furtherance of the agreement, either

8  Ms. Kerr or Ms. Wrigley committed an act that was defamatory

9  of Ms. Black.

10      And, number three, as a result, Ms. Black was harmed.

11      Once you are all in the jury room, the first thing

12  you should do is choose a presiding juror.  The presiding

13  juror should see to it that your discussions are carried on in

14  an organized way and that everyone has a fair chance to be

15  heard.  You may discuss the case only when all jurors are

16  present.

17      Once you start deliberating, do not communicate about

18  the case or your deliberations with anyone except other

19  members of your jury.  You may not communicate with others

20  about the case or your deliberations by any means.  This

21  includes oral or written communication, as well as any

22  electronic method of communication, such as by using a

23  telephone, cell phone, smartphone, iPhone, Android,

24  Blackberry, or any type of computer, by using text messaging,

25  instant messaging, the Internet, chat rooms, blogs, websites,

or social media, including services like Facebook, LinkedIn, Google+, YouTube, Twitter, Instagram, or Snapchat, or by using any other method of communication.

If you need to communicate with me while you are deliberating, send a note through the court security officer. Just so you know, at some point during the closing augments, you will see an officer come through the door and sit down here. And that person will be outside the jury room. So if you have a note, that's who you are going to give it to.

The note should be signed by the presiding juror or by one or more members of the jury. To have a complete record of this trial, it is important that you not communicate with me except by a written note. I may have to talk to the lawyers about your message, so it may take me some time to get back to you. You may continue your deliberations while you wait for my answer.

If you send me a message, do not include the breakdown of your votes. In other words, don't tell me that you are split six to six, eight to four, or whatever your vote happens to be.

You could tell me that based on the math, you couldn't do that because there's only 11 of you. But you get the point. Just don't tell me what the split is.

A verdict form has been prepared for you. You will take this form with you to the jury room. If you turn ahead

1    to the last page, you will see something that looks like this.

2    It's pretty simple.  It's entitled Verdict Form.  It says:

3    "We, the jury, find as follows on the plaintiff Katherine

4    Black's claims against Cherie Wrigley and Pamela Kerr."  The

5    claims are numbered the same way they are in the instructions.

6            For each claim, it gives the title of the claim over

7    here on the left.  And over on the right, you check off

8    whether you found for the plaintiff or whether you found for

9    the defendant.  That's true for each of the claims.  There is

10   a space for everybody to sign it below and for the form to be

11   dated.

12           When you've reached unanimous agreement, your

13   presiding juror will fill in and date the verdict form, and

14   each of you will sign it.

15           Advise the court security officer once you have

16   reached a verdict.  When you come back to the courtroom, I

17   will read that verdict out loud.

18           So there is one more instruction.  I am going to hold

19   that until after the closing arguments.  And so the way the

20   closing arguments work is that Ms. Black's lawyer will give

21   the first closing argument.  And each of the defendants'

22   lawyers, Ms. Wrigley's lawyer and Ms. Kerr's lawyer, will each

23   give a closing argument.  Then Ms. Black's lawyer will give a

24   rebuttal closing argument.

25           There's time limits on each of these, so you may hear

1    me saying to the lawyers, you know, you've used up 20 minutes,

2    you've used up 30 minutes, and so on.  They know how much time

3    they've got.  We'll probably take a break at some appropriate

4    point.  I'll just kind of figure out what the appropriate

5    point is.  It will be between somebody's and somebody's

6    closing arguments.  And then lunch will be on us today because

7    you'll be deliberating at that point.

8              Okay.  So we are going to start with the closing

9    argument on behalf of the plaintiff.

10             MR. MANDELL:  Your Honor, may we have a very brief

11   sidebar on one issue?

12             THE COURT:  Okay.

13     (The following proceedings were had at sidebar outside the

14   hearing of the jury:)

15             THE COURT:  Yes.

16             MR. MANDELL:  We did play.

17             THE COURT:  You got to talk louder.  She can't hear

18   you.

19             MR. MANDELL:  Sorry.  We did play video of --

20             THE COURT:  We did, okay.  Remind me.  I forgot.

21             MR. MANDELL:  Of Ms. Black's deposition.

22             THE COURT:  We did.  Okay.  I'll go back and say

23   something about it.  Thanks for catching that.  Okay.

24     (The following proceedings were had in open court in the

25   presence and hearing of the jury:)

1          THE COURT:  I was reminded that my memory is not

2    perfect.  There was some video.  You will recall there was

3    some video of Ms. Black's deposition.  So you will consider

4    that, as the instruction says, just as if it was testimony

5    given in court.

6          Okay.  Thanks for that reminder.

7          Mr. Homyk, you can go ahead.

8          MR. HOMYK:  Thank you, Judge.

9                            - - -

10              MR. HOMYK, CLOSING ARGUMENT

11          MR. HOMYK:  I trust you had a relaxing weekend.  And

12    the first thing that I want to do in all sincerity is thank

13    you for your participation.  It's been active.  I can see it.

14    Everyone can see it.  It's been active.  Whether it's been

15    active by taking notes or whether it's been active just by

16    paying attention.

17          There's some detours in the facts here, and I

18    appreciate, my client, Katherine, and my colleague, Sharan,

19    have extraordinary appreciation for what you've done here and

20    how you've been paying attention.  I've done this more than

21    once, and I have to tell you that your attention has been

22    extraordinary.

23          I thank the judge for his presiding wisely over this

24    case.

25          And now I again have the privilege and opportunity to

1    stand up before you very briefly, relatively briefly, and tell

2    you what the evidence showed.  That's then up to you.  Then

3    it's in your hands, completely in your hands.

4          Taking that rule book the judge gave you, the law,

5    and applying the facts that you heard to each of these four

6    claims.  I can't emphasize enough how important it is that you

7    take a look at those claims, take a look at the burden of

8    proof that we have.  It's a burden of proof.  I acknowledged

9    it in my opening statement.  I'll acknowledge it again.  We

10   have the burden of proof on each of those four claims.  That

11   burden of proof is a burden of preponderance of the evidence,

12   which means on each of the elements of each of the claims, we

13   need to prove that that particular element is more likely true

14   than untrue.  That's the burden on each of those claims.

15         Again, we accept that burden, gladly accept that

16   burden, and look forward to you folks finally being able to

17   put your hands on paper.  You get to put your hands on paper.

18   You get to do the sort of mining that Defendant Kerr was

19   brought on to do in her forensic review.  That's going to be

20   your purview and your purview only.

21         When I stood up in front of you the first time, I

22   told you that this case was about the power of words.  That's

23   true.  Now that you've heard the evidence, I believe you

24   understand that the case based on the evidence is about the

25   destructive power of words.  It only takes a few words stated

1   the right way or the wrong way to destroy someone personally,

2   to destroy their family, to destroy their career.  That's what

3   happened here, both personally as well as attacks on the

4   employer of Katherine.

5        So what started out as a family dispute regarding

6   Joanne Black, the mentally disabled sister of Bernard Black,

7   in guardianship proceedings and probate proceedings boiled

8   over, like things happen in life, boiled over until it got so

9   intense in April of 2015 that it resulted in Defendant Cherie

10   Wrigley engaging in extreme and outrageous conduct directed

11   toward Katherine in a courtroom and then later that same day

12   in the airport.  That was the extreme and outrageous conduct.

13        That extreme and outrageous contact continued.  It

14   continued into 2016.  It continued into 2017 because it just

15   kept boiling, kept getting more intense, hotter and hotter.

16   It never dissipated, never once dissipated, only got worse.

17   And I think -- we'll go through some of the evidence quickly.

18   I'm going to remind you -- I'm going to ask you, I'm going to

19   suggest to you to take a close look at some of the evidence.

20   And when you do you that, I think you'll see that there was a

21   concerted effort on her part.  She was on a mission, on a

22   mission to attack Katherine both personally, her family, her

23   children, her children, and to attack her at her employer.

24        It also boiled over as a result of Pamela Kerr having

25   been hired actually that same day of the extreme and

1  outrageous conduct.  That was formalized when pursuant to a

2  request for an independent forensic review, there was a formal

3  order that was entered, and she was the forensic accountant,

4  forensic accountant hired.  Her clients, Joanne Black and the

5  Court, those were her two clients, Joanne Black and the Court.

6  She was hired to do a comprehensive, complete forensic review

7  of the entire conservatorship estate.  That's what she was

8  hired to do.

9        That's what she's been trained to do.  She's been

10 trained to mine for things.  She's been trained to look for

11 things.  She's been trained to determine what questions to

12 ask, get answers.  If there are more questions, get more

13 answers.

14       What started out very, very early, perhaps in January

15 when she was informally working on this matter, what started

16 out as her informal engagement turned into a formal engagement

17 on April 2nd, developed over time into boiling water, just

18 like Cherie Wrigley.

19       Cherie Wrigley and Pamela Kerr, by January of 2016,

20 worked together very closely in unison, in unison to attack

21 Katherine Black and Northwestern University Law School.  We

22 are going to go over a few things.  You'll see it in the

23 emails.  You will see it in things.  I'm not going to put up a

24 lot of things on the screen.  Don't have a lot of time.  I'm

25 going to suggest to you that you take a close look at some of

these things.  You heard them.  I know you've heard them.  So
I have every confidence, okay, that you understand exactly
what's going on with respect to some of the evidence I'm going
to suggest that you take a very, very close look at.

By January of 2016, there was a concerted effort, a
conspiracy, if you will -- not in the sense that you see on TV
where it's a political conspiracy and it's this and it's that.
No, no.  Look at the instructions.  Look at the instructions.
It's not that type of conspiracy.

It's a conspiracy that these two easily, easily
qualify for based on the evidence.  They aided -- there was
aiding and abetting, and most -- not most importantly, but
equally importantly, as this boiled over for Pamela Kerr, it
turned into defamation.  It turned into defamation.

She started out as someone with no stake in the game.
No stake in the game.  That turned.  She became someone who
had a very, very big stake in the game.  Very big stake.  And
refused to get out.  That's the key.  She could have gotten
out.  Instead, what she decided to do was defame my client and
then keep on going.

The first claim that we are going to take a short
look at is going to be the intentional infliction of emotional
distress claim.  And to sustain our burden of proof on the
emotional distress claim, what you need to know as background
is that before April 2nd of 2015, this was not the first time

1  that there had been threats by Cherie Wrigley against

2  Katherine Black.  In fact, Katherine, Kate, testified that

3  Wrigley would call her house to demand jewelry and money and

4  would threaten to send someone to her house to get it.  There

5  were previous threats.

6          There was also intense -- by April 2nd, intense

7  animosity of Cherie Wrigley for Kate.  You heard Wrigley --

8  Ms. Wrigley testify on the stand that she finds Kate

9  disgusting and disturbing.  That's animosity.  That was only

10  as of April 2nd.  It only got worse that day, and it got worse

11  in subsequent months.  And it got worse in 2016, and it got

12  worse in 2017.

13          Scary stuff, threats.  Scary stuff.

14          On April 1st, Kate was in Denver.  Kate was in Denver

15  on April 1 because she needed to be in Denver on April 1st for

16  the purpose of providing information, information to the

17  Denver attorney that she deemed to be important to Joanne and

18  that proceeding in Denver.  She was there.  She gave it to

19  them.  Wrigley knew that she gave it to them.  By April 2nd,

20  she knew that.  There was a very contentious hearing on

21  April 2nd.  You heard the evidence as to that.  Very, very

22  contentious hearing.

23          And then after, after that hearing -- not after that

24  hearing, during that hearing, the Court entered an order.

25  You're going to see the order.  And I'm going to direct your

1    attention specifically to paragraph 8 of that order, where

2    that court ordered that there be a number of things that be

3    investigated, investigated.  That's what Pamela Kerr does.

4    She investigates.  Don't get messed up in semantics here.  She

5    investigates.  That's her job.  That's what she does.  That's

6    what she was hired to do.  That's what that order required her

7    to do.

8              And among the people that she was required to

9    investigate who had to provide a full and complete accounting

10   was a gentleman by the name of Mr. Pinto.  Esaun Pinto.  He

11   was required to do that.  You'll see that in paragraph 8 of

12   that order when I briefly show it to you.

13             After a very brief and contentious hearing, Wrigley

14   went out of her way to approach Kate.  She went out of her way

15   to do that to threaten her.  And I'm not going to go through

16   those threats in any detail.  Here's why.  You heard it.  This

17   is paper.  This is black and white.  You can't get a flavor

18   for what was said or what was done or a reaction of Kate by

19   looking at the paper.  It's impossible.  That's why I love the

20   fact that you were so attentive and you're so -- and so into

21   it because you heard it.  You make your own assessments, your

22   own assessments as to the credibility of those comments that

23   were made by my -- by Wrigley, comments about "Stay away, stay

24   away, stay away from these proceedings.  This is not about

25   you.  This is not about your family.  Stay away, stay away.

1    And I'm going to have you get a sex change operation.  I'll

2    arrange it."

3         Really, really strange comments, right?  Disturbing

4    comments.  Aimed to create extreme and outrageous emotional

5    distress as to Kate.  Why?  Because Wrigley knew she could do

6    it.  She knew how to push buttons.  That's what she does.  She

7    pushes buttons, particularly Kate's button, because she knows

8    exactly, she knows exactly how to do that.

9         And that's what she did that day.  And she also never

10   wanted Kate to be involved in any way in those proceedings,

11   and she went out of her way in 15 seconds.  Remember, I

12   counted off 15 seconds.  She says she said two words during

13   that entire time.  "Nice shoes, Kate." Three words.  "Nice

14   shoes."  Not in 15 seconds.  I counted it out.  It was a long

15   time.  There was a lot more than that said.  So I suggest to

16   you the credibility in terms of what was said there, in terms

17   of the nature and the length of those comments leans towards

18   my client.

19        Now, also, use your common sense, which I encourage

20   you to do on every one of these claims.  Use your common

21   sense, please, and use your life experience.  Use your life

22   experience.

23        Who would make up something like that?  You don't

24   make up something like that.  Just like you don't make up

25   threats to your children.  My goodness, her children were the

1   most important thing in her life, period, end of story.  You

2   don't make up threats to your children.  But that's exactly

3   what happened in the airport a little later.

4          In the airport a little later, you heard about that.

5   They're in the airport -- and I want to try to get this right.

6   Again, I'm paraphrasing here because you heard it.  You heard

7   it.  And I know you internalized it.  I know you did.  And in

8   essence what she said was, "I have the" -- "I can take away

9   your kids.  Why?  Because I know how to do it.  I've been in

10  child protective services.  I've been in that area my entire

11  adult professional life.  That's what I've done.  And I know

12  how" -- "I know where to go.  I know how to file a report.  I

13  know what to do."  And what Kate remembers distinctly is her

14  telling her, "And at the end of all that, I'll tell you, I can

15  have your kids taken away for a year.  For a year I can have

16  your kids taken away."

17         That is extreme and outrageous conduct from a woman

18  who knew she could push Kate's buttons when her children meant

19  everything to her.  So what she did after that, she didn't

20  walk away.  No.  What Wrigley did later that day was sent a

21  text message and a voicemail to reinforce the threat.  "Your

22  wife needs a hearing aid."  Why would you do that?  Why would

23  you do that?  She did it to reinforce that threat.  Then she

24  left a voicemail.  The voicemail said, in part, "I understand

25  that you're assaulting me or whatever with your words."

1        Assaulting.  She made the connection on assaulting.

2    She made the connection to that sexual and physical assault

3    conduct that was done in the courtroom.  She, Cherie Wrigley,

4    made that connection.  Why would you do that unless you were

5    reinforcing that threat?

6        The second requirement of IIED is that Wrigley's

7    comment was extreme and outrageous.  Of course it was extreme

8    and outrageous.  It goes beyond all possible bounds of

9    decency.  To remind someone that their children -- so to

10    remind someone, with a background in child protective

11    services, that their children may be taken away from them for

12    a year, and I know how to fill out a report, and I can get it

13    done, that's extreme and outrageous conduct.

14        The goal and the text of the voicemail was to make

15    sure Kate would take that threat very seriously.

16        And then when Kate learned that Wrigley launched

17    another campaign against her in January 2016 -- and it was a

18    campaign.  Make no mistake about it.  It was a campaign.  She

19    was marching.  She was on a mission.  It was a campaign.  Kate

20    knew that when she launched that campaign, it became even more

21    clear to her that she had an intention to carry out her

22    previous threats.  She had the wherewithal.  She could do it,

23    and she would do it if you stood in her way.  Because you just

24    didn't stand in her way.  She didn't want anyone in the way of

25    these proceedings.  She wanted to be in the forefront of

1    Joanne's life.  It was all about her, all about her.

2         The third requirement, Wrigley either intended to

3    inflict severe emotional distress or knew there was a high

4    probability their conduct would cause Black severe emotional

5    distress.  Of course.  Of course she knew that.  She knew how

6    to push those buttons.

7         And as a parent, nothing, and I mean nothing, means

8    more to you than your kids.  Whether you have children or not,

9    I'm sure that you can appreciate that.  Absolutely nothing

10   means more to you than that.  You'll do anything to protect

11   your children.  That's what Kate did.  All that stuff about,

12   oh, why did you have people here and they were doing other

13   things?  Yeah, they were, but they were there to make sure

14   that every minute was accounted for, to protect her children

15   when she was trying to get on with her life and work.  She had

16   to work.  She was trying to work.

17        Now, in 2016, EthicsPoint complaint gets filed by

18   Wrigley as a part of all this continued conduct, her campaign,

19   her campaign.  An EthicsPoint gets filed against Katherine.

20   Forget about this nonsense about it being a letterhead issue.

21   Use your judgment and look at that EthicsPoint complaint.  I'm

22   not going to pull it up.  Please read it.  That letterhead was

23   a pretext.  That was a pretext for a reason for Wrigley to

24   continue to attack Kate.  And then she does it again.  She

25   does it again in 2017 when she files another EthicsPoint

1    complaint.

2            And in her testimony, she says, I wasn't computer

3    savvy.  I couldn't have filed that complaint.  She denied it.

4    That's why.  She filed it.  You know how we know she filed it?

5    Because she got an email from Pamela Kerr three months after

6    the filing of that EthicsPoint complaint where she says,

7    "Oops.  It was in my outbox.  Thought I gave you this."

8            She filed another EthicsPoint complaint not only

9    against Katherine but also against an official from

10   Northwestern University Law School because she was so unhappy

11   with the way Northwestern handled this and they didn't do

12   anything to Kate.  They didn't fire her.  They didn't

13   reprimand her.  They didn't discipline her.  She was so mad

14   she filed another EthicsPoint complaint after this case was

15   filed complaining about this case being filed.

16           Her conduct indeed caused severe emotional distress.

17   That severe emotional distress is where no reasonable person

18   would be expected to endure it.  Again, make your own

19   decisions.  Do your credibility assessments.  Take a look at

20   the evidence that you heard.  No reasonable person would be

21   expected to endure that campaign.  I suggest to you.

22           And her distress and fear for her children led to her

23   losing an extreme amount of weight, extreme amount of weight

24   between 2014 and 2016 during the scope of this campaign.

25           Now, Wrigley denied seeing any weight loss.  You saw

1    the photos.  You'll see the photos back with you in evidence.

2    You make your own decision whether there was an extreme,

3    extreme weight loss there.

4            And then after Wrigley began to carry out the threats

5    by contacting Northwestern as Kate's fear increased, those

6    child protective measures weren't even good anymore.  They

7    couldn't even help anymore.  She went to Israel.  She went to

8    Israel.  Left.  Left the country.

9            Second claim of defamation is a defamation claim

10   against Pamela Kerr.  First thing that we need to prove, the

11   first element we need to prove is that Kerr caused a statement

12   of fact about Kate to be made to Northwestern Law School.

13   You're going to see -- you're going to see that Exhibit

14   No. 69.

15           Sharan.

16           Is it up, folks?

17           THE COURT:  No, that's me.

18           It's up.

19           MR. HOMYK:  There you go.

20           You've seen this before.  You heard a lot of

21   testimony about this letter.  You heard a lot of testimony

22   about this letter.  And so I'm not going to belabor it.  But

23   when you have -- when you actually have it, okay, when you

24   actually have it in your hands, I want you to look at it.  I

25   want you to see what it feels like.  I want you to read it,

1   and I want you to make your own determinations about whether

2   this was a draft.  This was no draft.  This was no draft.

3   It's a signed letter by Pamela Kerr.  She wrote the letter.

4   She signed the letter.  She addressed the letter.  She sent

5   the letter to the entire group by that time that included

6   Cherie Wrigley's brother; that included Cherie Wrigley's

7   lawyer; that included -- that included a whole group of

8   people.  She sent it to all those people.  Did she mean to

9   send it to those people?  As a first element of defamation, it

10  doesn't matter.  It's irrelevant.  It doesn't matter.

11          She put that train in motion.  She put that train in

12  motion.  And, remember, she's a detail person, so she doesn't

13  do stuff like that, right?  I mean, when she does something,

14  she intends to do it because she is a detail person.  But in

15  this instance, think about it.  Why?  Why?  Why if you didn't

16  intend to send that letter and intend to have that letter

17  ultimately -- cause that letter to get to Northwestern Law

18  School, why would you do that?  You are permitted, and I ask

19  you to make a reasonable inference that when she sent that

20  letter out, she was doing exactly that, causing that letter to

21  get to Northwestern Law School.

22          She never took it back ever.  She never cared about

23  it, really.  She reached out to a lawyer, but she didn't care

24  about contacting him and determining what his legal opinion

25  was.  It's just sitting there.  And every day it sat there,

1   it's at Northwestern.  Every single day it say there, it's at

2   Northwestern.

3          Now, you're going to see a string of emails, a string

4   of emails that, again, I'm not going to put up for you.  Okay?

5   There's going to be a string of emails that you're going to

6   see from January 8 of 2016.  That, folks, that, folks, is

7   extraordinarily important in this case because from January 7

8   on through January 8, you're going to see an email string of

9   comments from people, Pamela Kerr and Cherie Wrigley

10  especially, and their group.  They are out to attack Kate.

11  They are vicious comments.  They're vicious.  It's not about

12  letterhead anymore.  It's not about that letterhead.  I mean,

13  they're vicious comments.  They're out to attack Kate.

14         Exhibit 66, please notice, please notice that.  The

15  time zones are a little messy.  Read it from the back, because

16  there is a mountain time zone, there is a California time

17  zone, and there is a New York time zone.  But if you read the

18  document from the back, you will get a real flavor of what

19  these folks were doing to Katherine Black on the 7th and 8th

20  of January.

21         You could reasonably find that Katherine intended

22  that -- that Kerr intended one of those letter's recipients to

23  send it to Northwestern.  You could, and I'm going to suggest

24  to you you should.

25         Then there's an affidavit days later from Melissa

Homyk - closing

983

1   Cohenson.  She thought the letter got there.  She thought the

2   letter got there.

3          Wrigley uploads it on January 23rd.  In that upload,

4   in that upload on that EthicsPoint complaint, read the entire

5   thing.  On that -- in that upload, she says, I'm sending

6   another letter.  I'm sending another letter.  Her actions were

7   deliberate.  Kerr's actions were absolutely deliberate.  She

8   meant it to get to Northwestern.  She knew it could be

9   transmitted to Northwestern.  Did nothing to prevent it.  She

10  didn't withdraw it.  She ensured that it would stay there.

11         Now, this is perhaps one of the biggest pieces of

12  evidence in this case.

13         Pull up Exhibit 67, please, Sharan.

14         I'm going to ask you to take a very close look at

15  this email.  This is the one witness in this case, the one

16  witness in this case that has zero bias, that has zero axes to

17  grind, nothing, totally objective person, employee at

18  Northwestern Law School.  And contrary to what Pamela Kerr

19  testified to, look at what happens here.  Pamela Kerr called

20  her on January 8th saying she's upset because she's mentioned

21  on letterhead.  Now, here's the key part.  She also mentioned

22  that the context in which she was mentioned was a lie, a lie.

23  She wouldn't make that up.  She heard it.  She put it in an

24  email.  She passed it along.  That is contemporaneous

25  evidence.

1    You heard a lot of evidence in this case that's way

2    after the fact.  It's easy to make up stories after the fact.

3    It's a whole lot harder to contradict contemporaneous evidence

4    from an unbiased witness, Aileen Reid.  Don't forget that

5    name.  Please don't forget that name.  Take a look at the

6    email.  Pamela Kerr acknowledged that the context in which she

7    was mentioned was a lie.  That became the defamation.

8    And, now, the question that you have to ask with

9    respect to the language, the relevant language of that

10   Exhibit 69 that you saw and the language about the Colorado

11   judge finding allegations credible enough to authorize an

12   investigation of Pinto's conduct -- "authorize," key word, key

13   word is "authorize."  You're going to find from the evidence

14   that there's going to be no -- no dispute by a preponderance

15   of the evidence that he was authorized -- she was authorized

16   to engage in an investigation of Pinto.

17   The question that you have to answer is did the

18   Colorado judge authorize Kerr to investigate Pinto's conduct?

19   The answer, it is an unequivocal yes.

20   Kerr repeatedly claims in that letter that

21   Katherine's statement is a hundred percent false.  Completely

22   false, completely false.  She couldn't stop once.  She had to

23   say it three times.  She had to ram that point home.  She had

24   to do that.

25   She wasn't concerned about the truth of Katherine's

1  letter at that point.  She's only trying to lash out.

2          So the only issue for you to decide is whether it was

3  a hundred percent false that Katherine was -- Kerr -- sorry --

4  was authorized to conduct any investigation of Pinto, any

5  investigation.  That doesn't mean -- that doesn't mean that

6  Kerr was court appointed.  That doesn't mean that the

7  investigation was ordered.  That doesn't mean that the

8  investigation was only related to Pinto.  That doesn't mean

9  any of that.  Don't be -- don't be deflected from defense

10  arguments as to that.

11          All that's important is whether she was authorized to

12  investigate Pinto.  You're going to see from that April 2

13  order, Exhibit 30 -- that's another important exhibit.  I'm

14  not going to pull it up now, but you're going to see it.

15  Paragraph 8.  Paragraph 8, please look at that.  Mr. Pinto

16  shall provide a complete accounting with documentation of all

17  funds that were held under his control with Ms. Kerr.  A

18  complete accounting.

19          If Kerr is not authorized to investigate Pinto, why

20  is Pinto ordered to provide a complete accounting?  What's he

21  going to do with those documents?  What's he supposed to do

22  with those things?  Ask yourself.  Common sense kicks in here.

23  You don't have to be a forensic accountant to answer this

24  question.  That's for sure.  Who else could have reviewed

25  Pinto's complete accounting?  She's the only accountant that

Homyk - closing

986

1  was involved in that Colorado case.

2          She was explicitly authorized to conduct a complete

3  review of the entire conservatorship estate and see where it

4  led.  Bottom line is Kerr's assertion that she wasn't

5  authorized is false.  She knew that the statement was false.

6  Or she believed the statement was true but lacked reasonable

7  grounds.  I mean, either way, all you have to look at is

8  Exhibit 44, another very important exhibit.  Please, it's an

9  email.  It's a May 8, 2015, email.  Extraordinarily important

10 exhibit here.  Okay?  Look at it.

11         This is an email, this is an email from Pamela Kerr

12 six weeks after she's formally brought on as a forensic

13 accountant to both Cherie Wrigley and Bernard Black.  She asks

14 all kinds of questions about Pinto.  She's asking a lot of

15 things.  She is not doing -- just doing a review of an

16 accounting to stick it on a spreadsheet.  No way.  She's

17 asking all kinds of questions.

18         Okay.  Please take a close look at that, especially

19 the questions that she asks on page 2.  She -- if that's

20 not -- ladies and gentlemen, if that's not an investigation, I

21 don't know what is.  Please look at that two-page document.

22         It was apparent from the words in the statement that

23 it prejudiced Ms. Black in her profession.  No question.

24 Pamela Kerr overstepped her bounds.  The court accusation here

25 was lying to a judge, that Katherine Black lied to a judge.

1  She's a law professor.  She's a law professional.  She lied to

2  a judge in New York?  My goodness, my goodness, does that

3  prejudice her in her profession?  Of course it does.  Well, of

4  course, it does.  It would be a very serious assertion as to

5  anyone, but it's far more serious and prejudicial to your

6  profession when you are a law professor.

7       Then, finally, as to the defamation, if you find that

8  Mr. Black's proven each of these propositions by a

9  preponderance of the evidence, and I suggest there's more than

10 ample evidence to do that here, you must then go on to

11 consider the defense that the statement was substantially

12 true.

13      Now, Kerr was authorized to investigate Pinto.  Kerr

14 engaged in investigative activities regarding Pinto.  It's

15 simply -- it's simply demonstrated by a preponderance of the

16 evidence at least that Kerr's claim was not substantially

17 true.

18      As to the aiding and abetting claim, that's the third

19 claim.  Need to prove that Wrigley knowingly and substantially

20 assisted Kerr in her commission of the defamation.  Again,

21 look at the 2016 EthicsPoint complaint.  She was aware of her

22 role.  She was aware of her role.  She filed an EthicsPoint

23 complaint on January 8th, uploaded several documents.  Four

24 days later, she uploads more.  Then she went back two weeks

25 later on January 23rd, and, again, as I told you, she said --

1    on that document, take a look at it -- "I just uploaded

2    another letter, complaint that was sent to your school

3    regarding this matter."

4         This satisfies the requirement that Wrigley knowingly

5    and substantially assisted by providing the letter to

6    Northwestern.

7         Requirement number two, Wrigley was aware of her role

8    when she provided that assistance.  Well, by specifically

9    noting in that complaint I just uploaded another letter, that

10   confirms that.  Two months later, after Kerr complained,

11   feigning distress, Wrigley did nothing, nothing to correct the

12   situation.

13        And then once Wrigley learned about Kerr's letter at

14   Northwestern, she chose not to retrieve it.  She was aware of

15   her role, satisfying the requirements for aiding and abetting.

16        Now, it was never an accident to begin with.  Okay?

17   It's much more plausible that Wrigley knew it was Kerr's

18   letter when she submitted it, but claimed it was an accident,

19   because Kerr had threatened not to go to New York hearings and

20   support Wrigley as a guardian for Joanne Black.  She was a

21   very important witness, very important witness.  She wanted

22   her there.  Perfectly plausible that that accidental act in

23   reality turned into another deliberate act.

24        Wrigley was worried she'd lose a witness, so she

25   conjured up a story for Kerr's consumption.  She didn't submit

1    Kerr's letter on purpose.

2           Fourth claim is a claim for conspiracy.  Last claim

3    is a claim for conspiracy.  And, again, the conspiracy

4    requirement is, number one, an agreement to accomplish by

5    concerted action, unlawful purpose, or lawful purposes by

6    unlawful means.  The concerted action here, folks, is clear

7    and simple.  It's a concerted effort in those emails on

8    January 7th and January 8.  Please look at those very

9    carefully.  They're the core of the conspiracy claim.

10          The unlawful purpose is to defame Kate, and the

11   defamation was a means.  That was the means.

12          Kate doesn't need to prove any formal agreement.  She

13   doesn't need to prove a plan or that they even participated in

14   every little detail of that.  But the last item that I want to

15   show you here about that agreement would be Exhibit No. 66.

16   And in particular, that portion of Exhibit 66 from Pamela Kerr

17   to the group where she says:  "I wonder if someone should

18   contact Northwestern and let them know that she is writing

19   this letter."

20          What's the immediate response from Cherie Wrigley?

21   See it up there?  "Totally agree."

22          "Totally agree."  That's an agreement.  That's an

23   agreement sufficient to comprise the agreement required under

24   conspiracy.

25          Then when you continue to look at the requirement,

1    the second requirement, in furtherance of the agreement,

2    either Kerr or Wrigley committed an act that was defamatory.

3    Well, we already talked about that.  We already talked about

4    that.  And you're going to look at the evidence, and you're

5    going to see, you're going to see that, indeed, there were --

6    there was a defamatory act that was committed.

7            Wrigley left multiple messages, opened up an

8    EthicsPoint complaint, uploaded Kerr's letter.  And there was

9    harm.  Kate's colleagues were discussing this.  It was all

10   over Northwestern.  There was a demonstrative.  There are 13

11   people at least at Northwestern University Law School who got

12   embroiled in all this, who were sucked into all this thing

13   because Kerr and Wrigley decided to conspire, get together to

14   destroy Kate's reputation with her employer.

15           At the end of the day, I'll be asking you -- I get to

16   come up again for a few more minutes.  At the end of the day,

17   I'll be asking you for a verdict in favor of Katherine Black

18   on all four claims here, both the intentional infliction of

19   emotional distress claim, defamation per se claim -- that

20   defamation per se claim, because the words are apparent.

21   They're apparent on their face.  100 percent false.

22   Completely false.  Completely false.  That all rolls into as

23   well both the aiding and abetting and conspiracy claims.  I'll

24   be asking for your verdict on all four of those claims.

25           THE COURT:  Okay.  Next, you'll hear the closing

Mancilla - closing

991

1    argument on behalf of Ms. Kerr.  Are you going to be using a

2    computer at all?

3           MR. MANCILLA:  We were going to start.

4           THE COURT:  Yeah, that's fine.

5           MR. MANCILLA:  Ms. Wrigley.

6           THE COURT:  On behalf of Ms. Wrigley.  My apologies.

7    Are you going to use the computer at all?

8           MR. MANCILLA:  Yes.

9           THE COURT:  Where are you running it from?

10          MR. MANCILLA:  From right here.

11          THE COURT:  I will leave it to you to decide when to

12   put stuff up, though.  I'm just going to switch it on.  So

13   they're going to see what you're seeing right now.  Okay.

14   Just so you know what the jury's --

15          MR. MANCILLA:  May I proceed?

16          THE COURT:  That's fine.  What the jury is seeing is

17   what's on that screen right in front of you.

18          MR. MANCILLA:  Okay.  Can you take that down?

19          THE COURT:  You got to do that.  Don't unplug it.

20   Just minimize it or something.  That little minus sign in the

21   upper right-hand corner.

22          MR. FANTONE:  Yeah.

23          MR. MANCILLA:  May I proceed, your Honor?

24          THE COURT:  Yes.

25                              - - -

Mancilla - closing

992

1              MR. MANCILLA, CLOSING ARGUMENT

2              MR. MANCILLA:  Ladies and gentlemen, good morning.

3    Again, my name is Andrew Mancilla.  I represent Ms. Wrigley

4    along with my colleague, Robert Fantone.

5              Counsel for plaintiff just stood up and told you a

6    bunch of stuff, but he didn't really refer to evidence, and

7    that's really what this case is about, you have to look at the

8    evidence here.  He made a lot of arguments.  Arguments are not

9    evidence.  When you go back to deliberate, remember that the

10   thing you have to pay attention to is the evidence.

11             I'm going to make some arguments.  You can trust me

12   or not trust me, but at the end of the day, I am going to show

13   you some evidence.  I am going to read you some of the

14   transcripts -- some of the evidence that came in during this

15   trial.

16             It's kind of ridiculous.  He said that -- "the power

17   of words."  You remember that's how he opened.  "Power of

18   words, destruction."  "The destructive power of words."  He

19   can't even get the words right.  I think throughout this trial

20   you've seen that.

21             And there's a reason for that.  There's a reason why

22   he keeps and Ms. Black keeps mistaking the words, because

23   that's not what this case is about.  This case is about what

24   my colleague, Robert Fantone, stood up and told you what it

25   was about.  It's about her being disinherited, her and her

Mancilla - closing

1  children being disinherited back in 2012 from her

2  mother-in-law.  And after she was disinherited, you heard her

3  testify that she was going to sue.  She was going to sue the

4  estate and Joanne, her sister-in-law, her mentally disabled

5  sister-in-law, to try to get what she believed her and her

6  children were entitled to.

7          She told you she didn't care about the money.  They

8  had their own money.  She decided she wanted to sue.  She did

9  research, and she wanted to actually sue for that.

10         And then you find out throughout this trial that

11  there was an alternative plan taken and that Ms. Wrigley and

12  that Pamela Kerr got in her way.  And, yes, there's tension

13  between them.

14         Mr. Black tried to sue Joanne who is mentally ill.

15  She suffers from schizophrenia.  That's disgusting.  You

16  heard -- you heard her testify that she was planning to sue

17  her and that she was expecting Joanne to default.  Please.

18  That's disturbing.  So that's what this case is about.

19  Ms. Wrigley got in her way, and Ms. Kerr got in her way.

20  That's why she's lying.  That's why she took the stand and she

21  lied right to your faces.

22         I'm going to tell you a little bit just about the

23  causes of action.  He went through it with you briefly.  I'm

24  going to do it again, and then we're going to talk about some

25  of the evidence that came in relating to that.

1    So, again, also, this is -- just so you guys know,
2  this is the last time I get to speak to you.  After this,
3  Ms. Kerr's counsel is going to make a statement.  And then
4  Mr. Homyk gets to stand up again and try to rebut some of
5  these statements, some of our arguments.  So I'm going to
6  present you with some arguments, and I ask that you write
7  things down that you think are important and hold Mr. Homyk to
8  that, hold plaintiffs to that.

9    So intentional infliction of emotional distress.
10  What is that?  Well, plaintiff has to prove to each and every
11  one of you that Ms. Wrigley actually made the statements.
12  There's -- I'm going to force you to have a sex change
13  operation.  And I'm going to report you to DCFS and have your
14  children taken away for a year.  So they have to prove to each
15  and every one of you that those statements were actually made.
16  And I submit to you that they haven't.  I submit to you she
17  took the stand, and I submit to you that she just lied.

18    After that they have to prove to you that those
19  statements are extreme and outrageous; that they go beyond all
20  possible bounds of decency, and they're regarded as
21  intolerable in a civilized society.  The judge will instruct
22  you -- the judge did instruct you on the law.  You have the
23  instructions.  And then they have to show to each and every
24  one of you that Ms. Wrigley's conduct caused, caused Ms. Black
25  to suffer extreme and emotional distress.  And I, again,

1  submit that they were unable to do that throughout the course

2  of this trial.

3          So let's look at some of the evidence.  The alleged

4  threats.  Let's talk about the "force her to have a sex

5  change" threat.  My colleague, I remember on his opening

6  statement, he said, what's that even mean?  What does that

7  mean?  So it was a little absurd, but this is what she

8  testified to.  This is the evidence.  Okay?

9          Page 277 of the transcript.

10         "QUESTION:  Status conference ends" --

11         This is -- by the way, this is on their direct case.

12 So this is Mr. Homyk asking the questions of his own client,

13 who is giving the answers.

14         "QUESTION:  Status conference ends, and you described

15 the courtroom and its size.  What happened next?

16         "ANSWER:  Cherie Wrigley gets up from her side.  So the

17 parties are on opposite sides as far as they could.  It's a

18 very contentious hearing.  So they were seated here, and we

19 were seated there.  Wrigley gets up from her seat, and she

20 walks across the courtroom straight to me.

21         "QUESTION:  She walks to you?

22         "ANSWER:  Yes.

23         "QUESTION:  Did she say anything at that point?

24         "ANSWER:  Yes.  She --

25         "QUESTION:  What did she say?

1    "ANSWER:  She was so angry.  She was just beaming with

2    this anger.  And just she was beaming.  And she says, 'I spoke

3    with Gayle.  I spoke with Lisa.  I know what you're doing.'"

4        Remember, Gayle and Lisa are the guardian ad litem

5    and the attorney for Joanne Black in Colorado.

6        "'I know what you're doing,' she said.  'You got to

7    stop.  You stop.  You stay away from this.  You stay away.

8    This is not your thing.  This is not your family, and you stay

9    out of this.  And you stay out of it.'  She just kept saying

10   this.  And then she said, you know, 'And if Bernie tries to

11   continue, he will be sorry.  We will bring so many actions

12   against him.  You will be so sorry.  And if he tries to reach

13   Joanne, he' -- you know, 'Esaun, will be there.  And Esaun is

14   watching.  You know, he doesn't want to do that.'  And then

15   she says, 'And you know, you know, you need a sex change

16   operation, and I will arrange this for you, whether you like

17   it or not.'"

18       What?  She's talking about keeping Kate away from

19   Gayle and Lisa in Colorado.  And then she just throws in

20   there, oh, and I'm going to force you to have a sex change?

21   What is going on?  That is absurd.  That's ridiculous.  Who

22   says that?  What's more likely that Ms. Wrigley said, "Hey,

23   nice shoes, Kate," and Kate took it the wrong way?  Maybe Kate

24   does need a hearing aid.

25       What's more likely?  Use your common sense.

Mancilla - closing

997

1

2          "QUESTION:  And then what did you do next?

3          "ANSWER:  I pulled out my phone, and I said, 'What did

4      you say?  What did you say?  You repeat it.  You repeat it to

5      the phone.  I am going to record it because it's witness

6      tampering.'

7          "QUESTION:  Did you say anything else at that time?

8          "ANSWER:  I said, 'Say it again.  Say it again.'

9          "And she's like, 'No, I'm not saying.'

10         "So I put the phone.  I said, 'Ladies and

11     gentlemen' -- to the court, because the marshal was still

12     there.  And I just thought, what do I do?  What do I do?  I

13     said, 'Ladies and gentlemen, look at Cherie.  She just said I

14     should have a sex change operation, and she will arrange it

15     for me.'"

16             The marshal is still there, and she's saying that

17     she's yelling in the courtroom so everybody can hear, "Hey,

18     everybody, Cherie Wrigley just said you should have a sex

19     change operation, and I'll arrange it for you."  And nobody

20     does anything?  Use your common sense.  If this was a real

21     threat, she'd say, marshal, marshal, arrest this woman

22     immediately.  She'd call the police.  She would do something

23     else.  Her husband, she testified that her husband was

24     standing right next to her; that her husband's attorney was

25     standing right next to her.  Where is he?  We brought you

Mancilla - closing

1    Anthony Dain, and it's not even our burden.  We don't even

2    have the burden.  They have the burden.  She couldn't bring

3    her own husband in here to testify?  Come on.  You deserve

4    more than that.

5          You guys have a duty.  This is a court of law.  There

6    has to be evidence.  She took the stand and tried to convince

7    you that all this stuff happened without any evidence

8    whatsoever.  It's just her word.  And it doesn't even make

9    sense.  Why couldn't she bring her husband in here?  You have

10   to hold her to that burden, and there is no explanation.

11   There is absolutely no explanation.

12         Do you have that April 30th?  Can you go up to the

13   top?

14         So who was in the courtroom?  Who was in the

15   courtroom?  You heard her testify about this courtroom.  She

16   took the stand.  She said "Oh, it's twice as big as this

17   courtroom."  And Bernard was there, her husband, and her

18   husband's attorney and Lisa and Gayle.  And, in fact, you can

19   see it here.  Gayle Young was there.  Lisa DiPonio.  Bernard

20   Black with counsel, Carl Glatstein.  Nancy Peterson.  Anthony

21   Dain.  Of course Ms. Wrigley was there.  She said there was a

22   marshal.  She said there was a court clerk.  We've got eight

23   people, eight people, and she can't bring one person in here?

24         She testified:

25         "QUESTION:  What were your emotions like at the time?"

Mancilla - closing

1      This is, again, on direct examination.

2      "QUESTION:  What were your emotions like at the time?

3      "ANSWER:  You know, I kept thinking what it feels like,

4  I went to law school.  I should know what to do."

5      You went to law school.  You are a law professor at

6  Northwestern.  Oh, my God.

7      "I should know what to do, but I don't know what to

8  do.  I mean, do I call the police?"

9      Maybe.  Maybe you did, yeah.  There is a marshal

10  right there in the courtroom.

11      "I mean, do I call the police?  Where?  In Colorado?

12  I don't live in Colorado.  She doesn't live in Colorado.  Do I

13  call the police in Chicago?  It didn't happen in Chicago.  She

14  lives in Los Angeles.  Like, what do I do?"

15      Please.  Use your common sense.  She is a law

16  professor.  The goal is if something happens to you like this,

17  number one, you remember the details of it.  Okay?  Number

18  two, you try to collect evidence of it.  Someone.  Someone

19  should have come in here or some evidence aside from her word.

20  "Like, what do I do?"  And if she took it seriously, she would

21  have done something.  She would have contacted somebody.  But

22  you heard her testify she didn't report it for nine months.

23      She continued testifying:  "It feels like, you know,

24  if she were like a nasty gang member who said, don't testify,

25  bad things will happen, then people would take it seriously.

 1    But then it's a rich white woman says it, if a rich white

 2    woman says it, everybody goes, oh, no big deal."

 3          So she goes to the airport.  You know why we know

 4    that she didn't take any of this seriously?  She goes to the

 5    airport, and she testified to you that she wanted to just run

 6    away.  I want to run away.  I wanted to get away from there as

 7    fast as possible.  It was terrifying her attorney opened on.

 8    This was terrifying to her, and she took the stand, and she's

 9    crying.  She's been crying during this closing argument of

10    mine.  "It was terrifying," she said.  And she's in the

11    Admirals Club.  She's at the airport.  She goes up to

12    Ms. Wrigley.  She approaches Ms. Wrigley.  Don't take my word

13    for it.

14          This is 280 of the transcript.  Again, on direct

15    examination:

16          "QUESTION:  So you go to the airport?

17          "ANSWER:  Yes.

18          "QUESTION:  Where in the airport did you go to?

19          "ANSWER:  I went to the Admirals Club.  It's American

20    Airlines -- American Airlines lounge.

21          "QUESTION:  Okay.  Did you have another contact with

22    Ms. Wrigley at that time?

23          "ANSWER:  Yes.  And then I look up from my computer,

24    and she is sitting in front of me in the same lounge.

25          "QUESTION:  Did she do anything, or did you do anything

Mancilla - closing

1001

1     at the time?

2           "ANSWER:  Yes.  She was trying to get my attention.

3     She was waiving at me and winking and making faces and like

4     looking like, you know, let's talk.  I don't know how to

5     interpret this," she testified.

6           "QUESTION:  Okay.  Visually did you interpret this as

7     being friendly gestures?

8           "ANSWER:  No, not really" -- "not friendly."

9            Sorry.

10          "ANSWER:  No, not friendly.  It was like -- I felt it

11    was like let's talk, let's talk, like we haven't finished our

12    business.

13          "QUESTION:  And what did you do at the time after

14    seeing the gestures from Cherie Wrigley?

15          "ANSWER:  I thought if she wanted to threaten me, I'm

16    going to record it because nobody would believe me, right?  A

17    rich white woman threatens, nobody believes.  So I walked by

18    her to the coffee machine, and so she's sitting in my way."

19          "She's sitting in my way."  No one is sitting in

20    anybody's away.  You stand up, and you get in front of

21    somebody and you get in their way.  If you're sitting in the

22    lounge, you're not in anyone's away.  You can certainly go

23    anywhere in the lounge to get coffee or to the bathroom

24    without being prevented by somebody sitting down.  That is

25    absurd.  Use your common sense.  What's she saying?  She went

1  over to Ms. Wrigley.  She admits it.  She goes over to

2  Ms. Wrigley.  She is not afraid of her.  Please.

3          And on cross-examination, my colleague, Robert

4  Fantone asked:

5          "QUESTION:  Okay.  But you saw Ms. Wrigley before going

6  to the bathroom, correct?  You said she was making some facial

7  gestures at you or something?

8          "ANSWER:  Yes.

9          "QUESTION:  Okay.  And you didn't get up and leave at

10  that point, right?

11          "ANSWER:  No.

12          "QUESTION:  Okay.  Even though you had just been

13  traumatized in the courtroom?

14          "ANSWER:  Correct.  I didn't know what to do."

15          Again, you're a law professor.  You don't go to the

16  person who just threatened you.  That doesn't happen.  If

17  you're that traumatized that you're crying, you leave.  You

18  put space between you and the person who just threatened you.

19  Or if she really wanted to, she could have kept an eye on

20  Wrigley and called the police.  I'm watching the woman who had

21  just threatened me earlier with a sex change operation.  Come

22  on.

23          "QUESTION:  You didn't leave?

24          "ANSWER:  No."

25          So then she says -- then she testified, so sometime

1    later I went to -- I step out of my seat.  I went to I

2    think -- I think the bathroom."

3              I think bathroom.  What?  I think?  You don't know?

4              Mr. Homyk stood up and argued on his opening, he

5    said, Katherine was either going into the bathroom or out of

6    the bathroom.  She'll tell you that.  She'll tell you that.

7    No, she didn't.  She couldn't tell you.  She goes, "I think

8    the bathroom."  She doesn't even know where this took place?

9    It didn't happen.

10             "And I see her there."  She continues to testify.

11   "And I see that she's there, and she said" --

12             "QUESTION:  So you had a conversation at that time?

13   Yes?

14             "ANSWER:  Yes.

15             "QUESTION:  She said what?

16             "ANSWER:  She was saying -- it's like I'm in a haze

17   every time I think about this."  This is her testifying.

18   "It's like I'm in a haze every time I think about this.  I

19   thought about this probably a hundred times.  A thousand

20   times.  And every time I think, I just see little elements of

21   this and the haze, and she was just saying, 'Stay out.  Stay

22   out.'  It's like, 'Don't talk to anybody.  You stay out.  And

23   you know what happens to people who don't stay out.'  And

24   she's -- she said that she -- she threatened my kids.  She

25   said she was going -- she was going to send me -- she was

Mancilla - closing

1  going to send me a report because she worked in child

2  protective services and she knows how to submit reports that

3  -- sorry, sorry -- she knows how to submit reports and she has

4  contacts.  I'm paraphrasing because it's like a haze."

5         That's what she testified to.  That is absurd.  "I'm

6  paraphrasing."  You know what he said on his opening?  "I'm

7  paraphrasing."  Kate's going to give you the full story.

8  She's going to give you real words that were said.  She can't.

9  She didn't.  She's paraphrasing.  She doesn't know what the

10  real words are.

11         "The power of words."  What a joke.

12         She goes, "Oh, the phrase I clearly remember she

13  said, 'If I get into this, you won't see your kids for a

14  year.'"

15         That's the one phrase, one phrase, ladies and

16  gentlemen, that she clearly remembers.  Everything else about

17  threatening to call CPS, as she testified, Child Protective

18  Services, or department of -- DCFS, all that, she doesn't

19  remember that.  She's admitting that to you.  She doesn't

20  remember if those words were actually said.

21         Mr. Fantone asked on cross-examination:  "But you

22  don't remember what she said before that?"

23         This is on page 282 of the transcript.

24         "ANSWER:  Do I remember specific words?  No.  The words

25  I remember is -- the words I remember is 'If I get into this,

1    you won't see your kids for a year.'"

2             And then, if you remember, she's crying, as she is

3    right now, on the stand, and she says -- in the midst of all

4    this, it's right before we had to take that break -- she says,

5    "You don't have enough money to threaten my kids.  You don't

6    have enough money to threaten my kids."

7             I don't even know what to do with that statement.  I

8    have no idea what it means.  I'm submitting it to you.  She

9    continued to testify as a rich white woman.  My client is a

10   retired schoolteacher for 32 years.  She works with the

11   homeless.  She's worked with people with mental illnesses her

12   whole life.  And Ms. Litvak is a law professor who lives up in

13   Evanston

14             MR. HOMYK:  Objection.

15             THE COURT:  Sustained.  Where she lives has nothing

16   to do with any issue involved in this case.  I have made a

17   ruling on that.  The jury is directed to disregard that

18   comment because it is completely inappropriate.

19             MR. MANCILLA:  She testified, "If you give me a

20   moment, I can.  Kept thinking, you don't have enough money to

21   threaten my kids."

22             Does that mean she doesn't think that Ms. Wrigley --

23             THE COURT:  Mr. Mancilla, you are too close to the

24   jury.  Podium.

25             MR. MANCILLA:  Sorry.

Mancilla - closing

1    So what evidence do they have?  Well, they have her

2    testimony, right?  Her testimony.  And they have I guess their

3    smoking gun here.  The only piece of evidence they have at all

4    is a voicemail.

5    Bobby, can we have Plaintiff's Exhibit 32, please.

6    This is their smoking gun.  "Well, Bernie, I'm

7    sitting here chuckling with my brother.  I think your wife

8    needs a hearing aid.  Very paranoid."

9    Remember, this may not be an exact transcription.

10   This is something that was created, I guess, by Bernard

11   Black's Kellogg's office.  They don't have -- I don't know why

12   they don't, but they don't have the actual recording.  They

13   don't have the actual recording.

14   It says:  "Very paranoid because I understand that

15   you're again assaulting me or whatever with your words."

16   Mr. Homyk just stood up and made an argument that

17   "that you're again assaulting me or whatever with your words"

18   was referring to Wrigley assaulting Kate with her words.  What

19   are you talking about?  "Very paranoid because I understand

20   that you're again assaulting me or whatever with your words."

21   And this is a voicemail to Bernard Black.  It's not

22   even to plaintiff.  It's to her husband.  "But, yes, Joanne is

23   looking at civil charges being brought up against you."

24   That's Joanne.  That's, remember, Bernard Black's sister, is

25   looking to bring up civil charges against him.  It has nothing

1   to do with her.

2           "I'm more than happy to tell you that.  As far as
3   legal fees," blah, blah, blah.  "But as far as your wife, and
4   bringing her to the hearing, I find that a little funny.
5   Whatever she heard, I think you need to work on that."

6           And then up at the top:  "Whatever she heard, I have
7   no idea."

8           That's not someone who is trying to say, as plaintiff
9   testified, you need a hearing aid so you know what my threats
10  to you were.  That's not someone who is trying to make you
11  understand what the threats were.  That's somebody who says,
12  whatever she heard, I have no idea.  She misheard me.  And
13  that's consistent with Ms. Wrigley's testimony.

14          Okay.  So she doesn't repeat or report any of these,
15  any of these incidences for nine months.  That, in and of
16  itself, ladies and gentlemen, I submit to you shows how
17  incredible it is.  If you take something seriously enough that
18  you're actually concerned about it, you should take reasonable
19  steps to report it, memorialize it, document it.  She didn't
20  do any of that.

21          But there's more than that.  There's various versions
22  of it.  So let's see how many versions we've got.

23          You've got the -- Mr. Homyk on his opening statement
24  said that the threat -- I'll just read it to you.  Page 202.

25          "Flash forward to April 2nd, the evidence will show.

1   After the status conference, you will hear evidence -- and I'm

2   going to summarize it.  You'll hear evidence that Katherine

3   Black, that she was on one side of the courtroom in Denver.

4   Cherie Wrigley was on the other side of the courtroom in

5   Denver.  After that court appearance, Cherie Wrigley came up

6   to Katherine and angrily started making comments to her.  I'm

7   just going to paraphrase."

8               THE COURT:  I need you to argue from the podium.

9   That's what I told you five minutes ago.

10              MR. MANCILLA:  Oh, I'm sorry.

11              "I'm just going to paraphrase.  You're going to hear

12  from Katherine herself."

13              Remember I told you earlier?  He said, "I'm just

14  going to paraphrase.  You'll hear it from Katherine."  And she

15  said, "I'm paraphrasing," because she can't remember the

16  words.

17              "'You stay away from New York.  Stay away from New

18  York.  It's none of your business.'"

19              So the threat is "Stay away from New York."  Okay?

20  That's one version.

21              And then you've got her declaration.  We introduced

22  this into evidence because Ms. Black seems to have forgotten

23  under oath at different times, she wrote, wrote down in a

24  declaration, which I submit to you is a little bit different

25  when you're writing the words, you're putting some thought.

1  It's not a spontaneous statement or something.  She took the

2  time to write these words down in a declaration.  She says:

3  "During a break in the hearing, at the Denver probate court on

4  April 2nd, Wrigley approached me in the hallway and said if I

5  continue to oppose her effort to become Joanne's guardian, it

6  will be bad for you."

7       Sorry, Joanne's guardian, the guardianship

8  proceedings, that's New York.  So her prior sworn statement is

9  consistent with what Mr. Homyk's opening was, that the threat

10  was -- the purpose of the threat was to prevent Ms. Wrigley --

11  or prevent Katherine from getting in her way in New York in

12  the guardianship proceedings.  Right?

13       But then, but then up on the stand, do you recall

14  what she testified?  This is page 277 of the transcript:

15       "QUESTION:  What does she say?

16       "ANSWER:  She was so angry.  She was beaming with

17  anger.  She was beaming and she says, "I spoke with Gayle.  I

18  spoke with Lisa.  I know what you're doing.  You better stop."

19       So now the threat is different.  Now the threat is

20  stop talking to Gayle or Lisa, who are Joanne's guardian ad

21  litem and her attorney in Colorado.  They're two different

22  purposes of the threat.  So those are two different versions

23  right there.  Okay?

24       Oh, there's follow-up questions on it.

25       "QUESTION:  Okay.  And, again, the substance of the

1  threat was stop talking to Gayle Young?"

2        Ms. Litvak testifies:  "Yes, the substance of the

3  threat was stop talking to a quasi judge whom we just spoke to

4  yesterday.  Stop providing information to her.  It was witness

5  tampering."

6        In a sworn declaration and in Mr. Homyk's opening --

7  his opening is not evidence, but he got it from somewhere --

8  he said that the purpose -- she said under oath the purpose

9  was to prevent -- Wrigley's threat was intended to prevent

10  Katherine from going to New York.  Two different versions.

11        Let's see if there's a third version.

12        And, again, ladies and gentlemen, the power of words.

13  This is important.  You don't forget these things.  If it made

14  such a difference, it was such a life-changing, life-altering

15  moment in your life, you should remember this.  You should

16  remember these details.

17        Version four, let's see.  She testified that this

18  happened -- you remember, she described the courtroom.  She

19  testified it happened at the end of the hearing on April 2nd,

20  2015.  Yet, in her sworn declaration, Mr. Fantone reminded her

21  of this, under oath she wrote it was during a break in the

22  hearing at the Denver probate court on April 2nd.  So there

23  you have two additional ones.  So that's version three and

24  version four.  You have the version where she's -- where the

25  threat is made at the end of the hearing.  And now you have

 1    the version where the threat is made in the middle of the

 2    hearing, at a break in the hearing.

 3              Now, let's see if there's more.  Yeah.

 4              Versions five and six.  Let's go to these.  Don told

 5    you and she testified that this happened in the courtroom.  Do

 6    we know if it's in the courtroom or not?  Her testimony was

 7    that it's in the courtroom.  She described the courtroom,

 8    people walking across it.  And everyone was there, and she

 9    held up her phone and she yelled, "Cherie Wrigley just

10    threatened," right?

11              And then in the same declaration under oath dated

12    May, May 7th, only a few months ago, she said that it was

13    actually in the hallway; that this entire thing took place in

14    the hallway.  How do you get that wrong?

15              And Mr. Fantone says, oh, was the marshal and the

16    court reporter out in the hallway?  Come on.  She can't even

17    get the location of this right.  It's not what happened.

18              And then there's another version.  Version seven,

19    which is brand-new, which just came out during testimony at

20    this trial.  She testified that Esaun Pinto was involved in

21    the threat.

22              Mr. Fantone asked her on cross-examination -- this is

23    page 398.  Again, don't take my word for it.  This is the

24    testimony.  Okay?

25              "QUESTION:  Did you ever mention Esaun Pinto in

1    connection with this threat?"

2         Nope.

3         "ANSWER:  No.  I did not mention Esaun Pinto.  I

4    mentioned Cherie Wrigley.

5         "QUESTION:  Okay.  I mean, this is a sworn declaration

6    under oath.  You left out Esaun Pinto, you got the substance

7    of the threat wrong, and you said it was in the hallway.

8         "ANSWER:  The substance was completely correct."

9         So now she's testifying under oath that, yes, she was

10   threatened about the New York proceeding and not Gayle Young.

11   What?  It's inconsistent on its face.  She testified to two

12   different things in front of you guys.  This is not something

13   you forget.

14        And there are two -- there are versions of the

15   Admirals Club.  I don't know if you remember this, but Don

16   opened.  And, again, this is not evidence.  Okay?  But he got

17   his information from somewhere.

18        Mr. Homyk opened.  "She's in the airport" -- this is

19   page 204.  "She's in the airport lounge.  She is waiting for

20   her plane.  She was in the airport lounge and happens to

21   make -- and I guess there's one lounge there or something, I

22   think -- I think there's just one lounge there.  She's in the

23   airport lounge, and she happens to look up from her computer.

24   She's an academic.  She is a scholar.  She is always on her

25   computer.  That's what she does.  Okay?  That's what she's

1  done for a living.  She looks up and makes eye contact with
2  Cherie Wrigley.  Well, she didn't want that at all.  She just
3  wanted to go home.  And then she'll tell you, she'll tell you
4  at that point that there were -- I'm not even going to go
5  there.  There were gestures that were being made by Cherie
6  Wrigley from, I don't know, 15, 20 feet away in a small
7  airport lounge.  And then Kate, Kate didn't want no part of
8  it.  Wanted no part of it.  So she just went back to what she
9  was doing on her computer."

10        You know that's not true.  That's one version.  But
11 Kate took the stand and testified that she went up to
12 Ms. Wrigley.  She went to get coffee, and Ms. Wrigley was
13 sitting in her way.  Please.

14        Mr. Homyk continued:  "And Cherie Wrigley started on
15 her, started on her.  And Katherine said at that point, 'Let
16 me get my phone.  I don't have my phone.  I should record
17 you."

18        That's not what the testimony was.  You guys remember
19 this.  The testimony was, "I have my phone.  I'm going to
20 record everything you say."

21        Then she says that later on that Cherie stalked her
22 into the bathroom or something to that effect.  And this is
23 Mr. Homyk again:  "You'll hear Katherine testify that Cherie
24 said something to the effect of, 'Oh, you don't have your
25 phone with you now.  You can't record me.'"

1    No, there was no testimony about that.  There's no

2    evidence about that.

3    "I'm paraphrasing because it's like a haze."  The

4    words, words, ladies and gentlemen, they are very important.

5    I submit to you that if you pay attention to the words, you

6    pay attention to the testimony, you're going to find her story

7    absolutely incredible.  Didn't happen.  Just a lie.

8    100 percent.  100 percent.

9    So now we've got the threat in Colorado.  These are

10   the different versions.  Right?  We have the version where the

11   threat is to stop talking to the people in Colorado.  Then

12   there's the version where there's the stop talking to the

13   people in New York.  Then there's the threat where it's during

14   a break in the hearing, and then you've got the threat at the

15   end of the hearing.  Those are two different versions.  And

16   then you've got the version where the threat is in the

17   courtroom.  And then you've got the version where the threat

18   is in the hallway.  And then you've got the version where

19   Esaun Pinto was mentioned.

20   And then you've got some various versions at the

21   Admirals lounge.  And then you've got my favorite version,

22   which is she doesn't even remember being there.  She doesn't

23   even remember being at that court hearing.  Do you remember

24   that?

25   This is incredible.  Page 404 of the transcript.  By

1    Mr. Fantone.  This is his cross-examination.

2          "QUESTION:  Isn't it true that at your deposition, you

3    actually forgot you were even in court that day?

4          "ANSWER:  I never -- no, I did not.  You're lying."

5               And then we played the video of her deposition.  Do

6    you remember that?  It was page 17 of her video deposition.

7    She said -- first of all -- well, sorry.

8          "QUESTION:  First of all, you're familiar with the

9    Denver probate court litigation, correct?

10              Answer from Ms. Litvak during her deposition:

11         "ANSWER:  Yes.

12         "QUESTION:  You wrote, you attended hearings in that

13   litigation, true?

14         "ANSWER:  One hearing, one day."

15              And what she was referring to then was when she

16   testified in the Denver probate court proceeding.

17              And then we showed you another video clip from that

18   same deposition, page 26:

19         "QUESTION:  I'll represent to you that that's the

20   transcript of the hearing of April 2nd, 2015.  Have you ever

21   reviewed that before?"

22              This is that hearing date, April 2nd, 2015.

23         "ANSWER:  Let me correct a mistake I made a couple of

24   minutes ago.  I said that I've only been -- I've been to only

25   one hearing in the Denver probate court.  I now recall I've

Mancilla - closing

1016

1  actually been there twice.  This very short hearing on

2  April 2nd, the one day sometime in August.  So I forgot about

3  this short one."

4       What?  "I forgot about the short one"?  Ladies and

5  gentlemen, we're here.  We're at a trial, and she testified in

6  her deposition she almost forgot about the short one where

7  Ms. Wrigley allegedly made these threats that were

8  life-altering.  Come on.

9       THE COURT:  You got a little under -- you got about

10  eight minutes left.

11       MR. MANCILLA:  Okay.  Ladies and gentlemen, I'll try

12  to go through this a little bit quicker.

13       They have no evidence.  She could have brought her

14  husband in here.  She could have brought her lawyer in here.

15  You heard all the people in the courtroom.  She even testified

16  that she shouted out.  Ms. Wrigley made this statement.

17  Ms. Wrigley threatened me with a sex change operation in front

18  of everybody in the courtroom.  Loud and clear.

19       And her husband, if you remember, Mr. Fantone was

20  standing over here.  Mr. Dain even testified about the

21  whereabouts of everybody.  It was about this far away, from

22  here to here, that's how close she was.  Ms. Black testified

23  that she made this statement loud and clear so everyone could

24  hear her.  Yet, there's nobody here.  Why couldn't she bring

25  her husband in?  You deserve better evidence.  Okay?  It's not

 1   our burden, but we brought somebody in.  We brought Mr. Dain

 2   in, and I submit to you he was credible.

 3          Now, causation.  One of the elements here is that

 4   they have to prove to each and every one of you that

 5   Ms. Wrigley caused Ms. Black to suffer extreme emotional

 6   distress.  Right?  You heard evidence about how Wrigley caused

 7   me to send my children to Roycemore private school, but then

 8   you found out that she had already been sending them to

 9   private school.  And she testified that, oh, but she was

10   planning on making the transition to public school, but she

11   decided not to.  And she was going to keep them in private

12   school.  Okay.

13          And then you heard her say -- then you heard

14   Ms. Black testify that Wrigley caused her to hire people to

15   monitor her children.

16          And Mr. Fantone asked, oh, like a security guard?

17   Someone of that nature.

18          No, no, no, she hired a piano teacher.  She hired a

19   chess teacher.  She was hiring those people anyway.  She had

20   her children in private school anyway.  She did nothing

21   different.  Ms. Wrigley didn't cause her to do anything.

22   There's no causation element in that.

23          The aiding and abetting and conspiracy, there's one

24   email -- write this down.  Look at D 57.  Mr. Homyk stood up

25   and said, oh, Kerr is feigning distress.  Do you have it up

1    there?  Take a look at this.

2         This is March 16th.  Okay?  This is why you know

3    there was no conspiracy, absolutely know it.  Mr. Fantone in

4    his opening statement stood up and said, you're going to see a

5    lot of emails back and forth, but there's one email that is

6    going to show you the exact opposite of what they're arguing.

7    And this is that email.  He can't get around this.  They

8    cannot get around this email.

9         This is Kerr before any lawsuit was filed against

10   her, so these are real emails.  She says, "Who sent my letter

11   to Northwestern?"  And then she says, "I forwarded a copy of

12   the letter I was going to send" -- "I was going to send to

13   Northwestern, but never did.  Somehow they have a copy.

14   Please tell me who forwarded my letter to Northwestern.  This

15   will have a severe impact on my testimony next week."

16        She doesn't know who sent the letter to Northwestern

17   because she didn't talk about it with anybody.  That defeats

18   their conspiracy claim.  They're saying -- their entire point

19   is that Kerr and Ms. Wrigley talked about this.  They planned

20   it; that Wrigley substantially assisted Kerr in doing this.

21   This email proves to you they didn't have any of those

22   conversations.

23        Remember, this is March.  And the letter was uploaded

24   by Ms. Wrigley accidentally back in January 23rd.  This email

25   proves to you that there was no substantial assistance.  There

1   was -- there was no role taking.  There was no conspiracy.

2   There was no agreement to upload the letter.  Otherwise, you'd

3   say, oh, yeah, I remember when Wrigley uploaded that letter.

4   She's saying, who uploaded the letter?  And he's trying to

5   make the argument, oh, you can confer there's other

6   communications out there where Ms. Wrigley wanted her to

7   upload the letter; that there's other communications maybe

8   that the flurry of activity of emails allows you to infer

9   there was something more.

10          No.  This email puts it to bed.  Absolutely.

11  100 percent.  This email shows you that Kerr did not know, had

12  no idea, had no idea that Wrigley had uploaded it.  And

13  Wrigley --

14          Go up to the top.  Go down a little bit.  Sorry.

15          Bobby, go up.  Down just a little bit.  Stop, stop,

16  stop.

17          And Wrigley writes --

18          Stop, please.

19          MR. FANTONE:  Sorry.

20          MR. MANCILLA:  And Wrigley writes:  "I could die.  My

21  brother called me and told me what happened.  It's an

22  anonymous site, complained about the school letterhead from

23  Northwestern.  I never intended to upload Pam's letter.  It

24  was a mistake.  I am beyond sorry."

25          She's apologizing to Pam.  If they conspired, she

1   wouldn't be apologizing to Pam now.  It's March.  If Pam knew,

2   had any idea that Wrigley was uploading this, there would be

3   no apology.  There would be no email that says, who uploaded

4   my letter?  Please.  Use your common sense.

5          So what is this case about?  You know what this case

6   is really about?  And he opened on it.  This case is about her

7   refusal to admit it wasn't Esaun Pinto who was being

8   investigated; it was her husband.  It was her husband who was

9   being investigated for what she, what she had researched and

10  figured out about getting the money she believed her kids were

11  entitled to.  That, that is what this is case about.  Don't

12  get confused by these red herrings.

13         He's going to say, oh, Esaun was the one who was

14  investigated.  No.  Her husband was investigated.  Esaun and

15  everybody else who was paid by her husband was collateral to

16  that.  It was part of.  Necessarily because her husband was

17  the primary target.  And she, to this day -- and this is

18  pathetic -- to this day -- and that's why we're here -- she's

19  refusing to admit it.  She can't even admit it to herself.

20  She should be ashamed of herself.  A Northwestern professor.

21  You all know better than that.

22         Don't let her persuade you with her crying, charades.

23  It's a show she put on.  I submit, ladies and gentlemen, that

24  after you consider all of this evidence, look at the emails,

25  that you will have no doubt in your mind.  You're going to

Mancilla - closing

1021

1    find in favor of Ms. Wrigley and Ms. Kerr.  Team Joanne.  Team

2    Joanne, the ones who are getting justice for Joanne.  The

3    woman she wanted to sue and knew that she was going to win

4    against because she's mentally disabled.  That's who this --

5    that's who she is.

6              Thank you.

7              THE COURT:  All right.  So we are going to take a

8    10-minute break, and then we will resume with the next closing

9    argument.

10             The jurors can come with me.

11      (Short break.)

12      (The following proceedings were had in open court outside

13   the presence and hearing of the jury:)

14             MR. MANCILLA:  Judge, we have one objection.

15             THE COURT:  Mr. Fantone -- or somebody said there's

16   an objection they wanted to address.  So go ahead.

17             MR. FANTONE:  Yes.  During plaintiff's summation,

18   Mr. Homyk mentioned -- he was kind of describing some of the

19   conduct that Ms. Wrigley took in contacting Northwestern and

20   then either directly -- I can't remember exactly what the

21   words were -- but connected it with extreme and outrageous

22   conduct.  And I believe even your Honor's had prior rulings

23   that that conduct is not connected to or cannot serve as a

24   basis for the IIED claim.  And I know we discussed this prior

25   to the --

1        THE COURT:  You lost me.

2        MR. FANTONE:  Yeah.

3        THE COURT:  So you're saying that in the closing

4   argument, Mr. Homyk included in the description of the IIED

5   claim the conduct that's the basis for the defamation claim?

6   Is that what you're saying?

7        MR. FANTONE:  Correct.

8        THE COURT:  Okay.  And basically arguing that that's

9   not part of the IIED claim.

10        MR. FANTONE:  Right.

11        THE COURT:  Okay.

12        MR. FANTONE:  The concern is what the jury --

13        THE COURT:  I get what you're saying.  What do you

14   want to say?

15        MR. HOMYK:  It's a pattern of continuing conduct,

16   Judge.

17        THE COURT:  Yeah, but, I mean -- first of all, I

18   don't think it was pleaded that way.  And, secondly, I

19   think -- I mean, I can look and see, but I thought there was a

20   ruling on that.

21        MR. MANCILLA:  Motion to dismiss.

22        THE COURT:  Okay.  It was in the motion to dismiss

23   ruling?

24        MR. MANCILLA:  Yes.

25        THE COURT:  Give me a minute.

1     Sorry.  Okay.  Here we go.

2     Sorry.  It's kind of a long one.  I got to get to the

3     end of it here.

4     Yeah, I concluded in connection with the IIED claim

5     that was originally pleaded against Ms. Kerr that it could not

6     be -- that the statements to Northwestern couldn't form the

7     basis for an IIED claim.

8     MR. HOMYK:  You said "Kerr."

9     THE COURT:  That's at page 29 of the ruling.

10    MR. HOMYK:  You said --

11    THE COURT:  Correct.

12    MR. HOMYK:  But the evidence -- the evidence that I

13    spoke of involved Ms. Wrigley, Judge.

14    THE COURT:  Yeah.  Okay.  So you're saying maybe by

15    itself not enough, but with other things, yes.

16    MR. HOMYK:  Correct.

17    THE COURT:  So what about that?

18    MR. FANTONE:  When we started this trial, I believe

19    an initial issue was whether or not we were going to hear

20    testimony with respect to the incident that occurred in the

21    courtroom, Ms. Wrigley's alleged threat, and then even in

22    addition to hearing testimony about it, whether that was going

23    to serve as a basis for liability on the IIED.  And I believe

24    your Honor left that question open at that time.  This was

25    with respect to the conversation regarding the preliminary

1   instruction, whether or not we were going to use the word "a

2   threat" or "one or more threats."

3          And I believe your Honor made a comment that at some

4   point you felt like you were predicting that you may have to

5   be more specific about specifically which conduct the jury was

6   going to be able to consider.

7          In the midst of all of those discussions related to

8   that, the defamatory conduct, alleged defamatory conduct was

9   never mentioned as a basis of liability.

10         THE COURT:  Is the -- after the original complaint --

11  is there an amended complaint, or are we still working off the

12  original complaint?

13         MR. MANDELL:  Amended, Judge.

14         MR. FANTONE:  Amended.

15         THE COURT:  Ballpark when was it?  I just need to

16  pull it up here.

17         MR. FANTONE:  What was the date of the amended

18  complaint?

19         THE COURT:  Yeah.  It's kind of a long docket.  I'm

20  kind of paging --

21         MR. BARON:  August of 2017, Judge.

22         THE COURT:  There we go.  There we go.

23         Sorry.  I got to go about this a different way.

24         Sorry.  It's going to take me a minute.

25         MR. FANTONE:  I think it was June 30th, if you

1    haven't found it, docket entry 64.

2              THE COURT:  That makes it easier.

3              MS. ABRAHAM:  July 10th, docket entry No. 71.

4              MR. FANTONE:  Okay.  Sorry, Judge.

5              THE COURT:  Ah.  That's why I can't find it as an

6    amended complaint.  It never actually got filed as an amended

7    complaint.  It was an exhibit to something, to the motion for

8    leave to file.

9              Now I'm there.  Let me just go down to the IIED

10   claim.

11             Does anybody remember off the top of your head what

12   count the IIED claim against Ms. Wrigley was?

13             MR. HOMYK:  I do not, Judge.

14             THE COURT:  That's okay.  I'll get there eventually.

15             MS. ABRAHAM:  Count 1.

16             THE COURT:  Count 1?  Thanks.

17             Okay.  So what I was looking -- what I'm looking for

18   is whether -- just as a threshold matter whether it was

19   pleaded as part of the claim.  So I'm just paging through

20   Count 1 right now to figure that out.

21             Just give me a minute.

22     (Brief pause.)

23             THE COURT:  Remind me the date of the ethics

24   complaint, the first one, ballpark.

25             MR. FANTONE:  January 8th.

1    THE COURT:  Of '16, right?

2    MR. FANTONE:  Correct.

3    THE COURT:  Yeah, so paragraph 313 fairly read

4  includes it.  "Wrigley repeatedly contacted plaintiff's

5  employer and made false and malicious complaints against

6  plaintiff and made false and numerous defamatory statements to

7  plaintiff's employer."

8    So can you respond to Mr. Homyk's argument that,

9  well, maybe by itself, not enough, but together with other

10  things, potentially?

11    MR. FANTONE:  Yeah, my response would be that our

12  understanding that this was an issue that was put to bed long

13  ago.  And at this point, it's even inconsistent with what the

14  jury is going to be instructed on, which says one or more

15  threats.  This conduct doesn't constitute a threat.

16    THE COURT:  Then the instruction says what it says,

17  so what are you worried about?

18    MR. FANTONE:  My other I guess more substantively

19  would be that, you know, the April 2nd conduct was, you know,

20  fairly confined to that date.  This is, you know, completely

21  separate.  This happened, what, almost like nine months later,

22  and there's really not anything in between to draw a

23  connection between the two instances.

24    THE COURT:  Okay.  The instruction says what it says.

25  It refers to threats.  Nobody objected to that.  I'm not

1 | changing it now.  That is what it is.  That doesn't mean that
2 | the other material is irrelevant.  It may have a bearing on
3 | state of mind and intent.  And so I'm not going to preclude
4 | the argument, so the objection is overruled.
5 |        MR. FANTONE:  Thank you, Judge.
6 |        THE COURT:  Can you bring the jury out, please.
7 |   (The jury enters the courtroom.)
8 |        THE COURT:  All right.  Everybody can have a seat.
9 |        And, next, you're going to hear the closing argument
10 | on behalf of Ms. Kerr by Mr. Mandell.
11 |        And, Mr. Mandell, you can go ahead.
12 |        MR. MANDELL:  Thank you, your Honor.
13 |            - - -
14 |         MR. MANDELL, CLOSING ARGUMENT
15 |        MR. MANDELL:  Good morning.
16 |        I think one of the beauties of the practice of law is
17 | that you can yell and scream at your opponent, but then
18 | sometimes you can agree on something.  And one thing that I
19 | think I agree on is we're blessed to have an incredibly
20 | diligent and attentive jury.  So I just want to say thanks on
21 | my behalf and obviously on behalf of my client, Pam Kerr.
22 |        I want to start with talking about Pam Kerr's
23 | January 8th, 2016, letter because, with all due respect, I
24 | think the plaintiff has kind of obscured the real primary
25 | purpose of that letter.  I think today Mr. Homyk called it the

1    pretext of the whole conspiracy or defamation.

2            But if we look at the letter, the primary purpose

3    is -- Pam says, "I am a forensic accountant that was retained

4    by the guardian ad litem, not the Court, the guardian ad litem

5    for a protected person.  I received a copy of the attached

6    letter that was submitted to Judge Aliotta on letterhead of

7    Northwestern University School of Law by one of your

8    professors, Katherine Litvak.  I was shocked to receive this

9    letter on your letterhead.  I truly believed Northwestern

10   University Law School was supporting the statements made by

11   Ms. Litvak."

12           And it's interesting that Pam Kerr also observed that

13   she had received similar letters from Bernard Litvak, Kate's

14   husband.  If you look at page 2:  "As a matter of fact, I have

15   literally hundreds of emails from Mr. Black from his

16   Northwestern Law School email in response to my inquiries in

17   this investigation, as well as letters that he has written on

18   Northwestern University Law School letterhead."

19           So the primary purpose was to bring to their

20   attention that she was getting letters on their letterhead and

21   to determine whether or not they were supporting the arguments

22   that were being made.  And why should Northwestern care?

23   Because one of the things that professor Litvak said in the

24   letter was false.

25           Now, you recall that Mr. Homyk in his opening

Mandell - closing

1029

1    statement said that Pam sent that letter to affect Kate's job.
2    He said, rhetorically, can you imagine contacting someone's
3    employer?  I think there's a better question.  Can you imagine
4    if you're taking a position or making an argument in a
5    personal matter using your employer's letterhead?  Pam didn't
6    involve Kate's employer in this situation.  Kate did.
7              And you know what Pam's -- Pam's concerns were
8    validated.  Take a look at Exhibit No. 95.  This is an email
9    from Dean Rodriguez, the dean of the law school, the head man,
10   Kate's boss, her husband Bernard's boss, right?  And what does
11   he say?
12             "As Rita has explained to one of you, Kate, persons
13   involved in this matter have been reaching out over the past
14   few weeks to share information and concerns with the
15   university.  In particular, it has been brought to our
16   attention that at least one document was submitted to a court
17   on Northwestern letterhead.  As has been discussed with one of
18   you, Bernie, previously" -- that's Kate's husband -- "and as
19   stated in the university's policy on conflict of interest" --
20   remember Kate's testimony?  Oh, there's no conflict of
21   interest here.  Here's her boss telling her, conflict of
22   interest -- "university resources are to be used only in the
23   interest of the university."  Here's the kicker.  "It is
24   particularly problematic when law faculty use university
25   letterhead in a court setting, given the likelihood of

Mandell - closing

1030

1  confusion between our professional and personal roles."

2       So he admonished both of them.  That was Kate's --

3  Pam's concern, and it was validated.

4       Here's another interesting fact.  In Pam's letter,

5  she writes:  "Since this letter with the completely false

6  statement about what I was authorized to perform was provided

7  to the New York courts on Northwestern University Law School

8  letterhead, as if you, the school, were in support of this

9  letter, I would greatly appreciate if you would notify the New

10 York court whether or not Northwestern University Law School,

11 in fact, supports these statements made by your professor,

12 Katherine Litvak."

13      That's what she requests -- requested.

14      And lo and behold, that's exactly what Northwestern

15 did.  Defendants' 56, Melissa Isaacson.  I've got it

16 highlighted.  She writes to Judge Aliotta in New York and

17 Judge Leith in Denver.  And it says:  "Notwithstanding that

18 Bernard Black and his spouse, Katherine Litvak, are professors

19 at Northwestern University Law School and used university

20 letterhead for certain legal correspondence" -- legal

21 correspondence in her argument to Judge Aliotta -- "the

22 university takes no position with regard to the merits of

23 issues that have been raised."

24      Then on page 2:  "We hope it goes without saying that

25 notwithstanding the professors' use of our letterhead,

Mandell - closing

1031

1  Northwestern is not a party to these matters and does not nor

2  does it take any position with regard to their merits."

3          So Pam had a legitimate purpose to contact

4  Northwestern.  Her concerns were validated and acted upon by

5  Northwestern.  And she shouldn't be a defendant in a

6  defamation lawsuit because of that.

7          So let's get to this defamation claim.  Okay?  Here

8  are the elements that the judge instructed you on.

9          To succeed on this claim, Ms. Black must prove each

10  of the following propositions by a preponderance of the

11  evidence:

12          One, Ms. Kerr caused a statement of fact about

13  Ms. Black to be made to Northwestern Law School.

14          Two, Ms. Kerr's statement was false.

15          Three, Ms. Kerr knew the statement was false, or

16  believed the statement was true but lacked reasonable grounds

17  for this belief.

18          Four, it was apparent from the words of the statement

19  that it prejudiced Ms. Black in her profession.

20          And then even if she proves those, you have to

21  consider Pam's defense that the statement was substantially

22  true, and the law doesn't require a statement to be accurate

23  in every detail.  It only needs to be substantially true,

24  meaning that the gist of the statement, the gist or sting of

25  the statement needs to be true.

Mandell - closing

1    So I want to focus on the second element first,

2  Ms. Kerr's statement was false, because that's the easiest one

3  to deal with here because plaintiff cannot prevail based upon

4  this element alone.

5    Now, do you remember Kate's statement to Judge

6  Aliotta?  Here it is.

7    THE COURT:  This comes from somebody who lifted the

8  thing up without using the ring, so the whole thing is

9  cockeyed at this point.  You got to just sort of readjust it,

10  the aim of the thing.  You got a little thing that's on this

11  other arm here.

12    MR. MANDELL:  Like that?

13    THE COURT:  That's what went wrong.  Or just go with

14  it as it is.

15    MR. MANDELL:  All right.  "The Colorado court found

16  allegations of Pinto's misconduct sufficiently credible and

17  troublesome to order an investigation of Pinto by the

18  court-appointed forensic accountant, Pamela Kerr."

19    Now, you remember that Kate testified that when she

20  was talking about what the Colorado court found and ordered,

21  she was referring to the April 2nd, 2015, order.  That's this

22  one that's Defendants' Exhibit 30.

23    First of all, that letter, that statement she made to

24  Judge Aliotta, okay, you don't need to know why Kate made that

25  statement to know the statement is false, but the evidence

Mandell - closing

1033

regarding why she made it came in loud and clear.  You
remember that things were focused in Denver and then they
shifted to New York because that's where Joanne Black moved?
And Judge Aliotta was about to make a decision regarding who
as between her husband, Bernard Black, and Cherie Wrigley was
going to be the guardian, right?  And she wanted to influence
Judge Aliotta to choose her husband.  You remember, that's why
she used the letterhead.  Remember?  She wanted to boost her
credibility with the judge.  But she had a problem.  The
problem was that in the Colorado litigation, if you will
recall, there were allegations of misconduct against her
husband, Bernard.

See, it says it in the order.  "Bernard Black is the
subject of allegations of misconduct by the PP, protected
person" -- that's Joanne Black -- "and her cousin" -- that's
Cherie Wrigley."

And then later in the order, on paragraph 13, she
says -- Judge Leith says:  "The fundamental issues in the case
are whether the disclaimer obtained by Mr. Black, Kate's
husband, as to the accounts should have acted to divest
Ms. Black, Joanne Black, of one-third of the non-probate
assets."

Another issue, whether it was properly disclosed that
Mr. Black intended or had authority to redirect those assets.

And, finally, whether the allegations of breach of

1   fiduciary duty are supported by the evidence.  Those are all

2   allegations against her husband.  And how does she deal with

3   convincing Judge Aliotta to choose her husband in light of

4   that, right?  Well, she did two things.

5               MR. HOMYK:  Objection, Judge.

6               THE COURT:  What's the basis for the objection?  I

7   need a basis.

8               MR. HOMYK:  Irrelevant, 403.

9               THE COURT:  Overruled.

10              MR. MANDELL:  So she did two things.

11              MR. HOMYK:  It's not in evidence.

12              MR. MANDELL:  Judge, it's --

13              THE COURT:  The objection is overruled.

14              MR. MANDELL:  Okay.  She did two things.  One, she

15  invented another wrongdoer to deflect attention from Bernard

16  Black.  That's poor Mr. Esaun Pinto.  And the other thing she

17  did to convince Judge Aliotta that this story had some legs,

18  she --

19              MR. HOMYK:  Objection.

20              MR. MANDELL:  -- exaggerated --

21              THE COURT:  The objection is overruled.  It's

22  argument.  It's appropriate argument.

23              MR. MANDELL:  She exaggerated what Judge Leif did.

24  She said Judge Leif found allegations of misconduct by

25  Mr. Pinto sufficiently credible to order an investigation by a

Mandell - closing

1    court-appointed expert.  And why did she say "court

2    appointed"?  To convey this notion, like, oh, Judge Leif must

3    be really concerned.  She appointed her own expert to do this

4    investigation.

5        But the main issue in this case, if we go back to

6    Exhibit 65A is, is this statement that Kate made to Judge

7    Aliotta true or false?  I think when you look at the evidence

8    and you test this statement against Judge Leif's order, you'll

9    see that it's absolutely false and that Pam Kerr's statement,

10   that it's false, is absolutely true.

11       Now, first of all, Kate admitted on the stand that

12   Judge Leif made no findings regarding Esaun Pinto's

13   misconduct.  Remember that?  She said, "Not in this order," as

14   if there's some other order out there that made those

15   findings.  There is no such order.

16       I asked her:

17       "QUESTION:  In this April 2nd, 2015, order, there's no

18   finding regarding allegations of Mr. Pinto's conduct, true?

19       "ANSWER:  Not in this order."

20       She alluded to some other order that's not in the

21   case simply because she got caught in another falsehood.

22       You can break this down into essentially three parts.

23   The Colorado court found allegations of Pinto's misconduct

24   sufficiently credible and troublesome, no such finding.

25   Remember, we went through this order, the April 2nd order, and

1    I highlighted every time that the judge made a finding, every

2    time she made an order.  There's about 20 times.  I'm not

3    going to take you through it again.  There's numerous times.

4    I mean, Judge leaf knows how to make a finding, and she knows

5    how to make an order.  And there's certainly no finding in

6    here.  And there's no order, too.

7            So we've got the one segment about the finding.

8    We've got the second segment about ordering the investigation

9    by Pinto.  And we've got the third segment, court-appointed

10   forensic accountant, Pamela Kerr.

11           By the way, on his closing, I heard a lot of

12   semantics about authorization.  What does her letter say?  It

13   doesn't say "authorized."  It says "ordered."  Pam was ordered

14   to investigate.  Now, you're not going to find anything in

15   there authorizing Pam either, but talk about sleight of hand.

16   The fact of the matter is, you're not going to find that

17   language in there.

18           On the stand, by the way, Kate tried to suggest that

19   this was an order, this language.  Judge Leif notes:  "The

20   parties have stipulated to a forensic accounting of the

21   conservatorship estate.  In short, a complete review of all

22   funds and assets related to Joanne Black both before and after

23   the disclaimer by Pamela Kerr."

24           Okay?  That's a recognition.  The parties have

25   stipulated to a review by Pam Kerr.  That doesn't order her --

 1    that doesn't even mention Pinto.  It doesn't order her to do

 2    anything.  It doesn't authorize her to do anything.

 3           No matter how loud you say it and how much bluster

 4    you put behind it, you're not going to find that language in

 5    the order.  You'll have an opportunity, obviously, in

 6    deliberations to examine it more closely.

 7           Then there's the third clause, right?  Pam Kerr was

 8    not court appointed.  You saw her engagement letter.  Which,

 9    by the way, her engagement letter was in January of 2015.  All

10    of a sudden I hear counsel say, oh, well, that was informal,

11    and she wasn't really hired until April 2nd, 2015.  That's

12    bunk.  Look at the engagement letter.

13           You saw the engagement letter.  She was hired by

14    Gayle Young, the guardian ad litem, the person who, for some

15    reason, Ms. Litvak refers to as a quasi judge, whatever that

16    means.  A guardian ad litem representing Joanne's interest,

17    that's who hired Pam Kerr.

18           You heard from Pam Kerr who said, "I was not court

19    appointed."

20           You heard from Tony Dain who said she was not court

21    appointed.  There's no document, no appointment by the Court.

22           The fact that the parties stipulated that Pam Kerr,

23    in recognition of her stature, would do the examination

24    doesn't make her court appointed.  The fact that she has to

25    apply to the Court for payment, for approval of payment from

1    the conservatorship estate doesn't make her court appointed.

2           That should end the inquiry, members of the jury.

3    The statement is false on all three assertions.  The jury

4    instruction says we only have to show substantial truth, but

5    it's true.  It's not even substantially true, it's true, Pam's

6    letter.

7           Even if it weren't true in every respect, freedom of

8    speech gives us breathing space.  You don't file a defamation

9    suit in this situation based on something like this.

10          You know, at worst, at worst, Kate has her

11   interpretation of the order and Pam has her own different

12   interpretation.  That's their opinion.  Defamation cases are

13   based on false statements of fact, not competing opinions.

14          So plaintiff argues, all right, maybe -- maybe it

15   doesn't say exactly that, but, you know, semantics, semantics.

16   And, look, you know, look at Exhibit 44.  It shows that Pam

17   Kerr was looking at Esaun Pinto.  She was investigating him.

18   But that's misleading.  You heard Pam Kerr.  That's twisting

19   the facts.  Her job -- you remember when my colleague got up

20   and talked about the box of assets and that the job of Pam

21   Kerr, the forensic accountant, investigating the

22   conservatorship estate has to look at all of the moneys that

23   flow in and all the moneys that flow out and account for that?

24   She looked at payments to lawyers.  She looked at payments to

25   accountants.  She looked at payments to Esaun Pinto.  She

1   looked at payments to other service providers, right?  That

2   doesn't mean she's investigating the law firms, the

3   accountants, or even Esaun Pinto.

4           The proof is in the pudding.  It's not disputed that

5   Pam did a report and made no findings regarding Esaun Pinto,

6   and the judge, Judge Leith, took that report, rendered a

7   decision, which itself made no findings regarding Esaun Pinto.

8   What, everybody's investigating Esaun Pinto, but nobody says

9   anything about him?  I mean, that just doesn't make sense.  So

10  what do we have on that element, falsity?  We have no findings

11  by Judge Leif regarding misconduct by Esaun Pinto, we have no

12  order.  And we have no court appointment.  It's not semantics.

13  It's Kate's statement to Judge Aliotta is simply false.

14          All right.  Let's go to the -- actually, the first

15  element.  Ms. Kerr caused a statement of fact about Ms. Black

16  to be made to Northwestern Law School.

17          Okay.  This is really another basis upon which you

18  can render a verdict for Pam.  In fact, Kate testified --

19  there should be no dispute here now -- that it was Cherie

20  Wrigley who uploaded Pam 's letter to Northwestern.  Pam

21  didn't send it.  In fact, Kate had no evidence.  Remember, I

22  played her deposition video.  She had no evidence of any sort

23  of agreement or any notion that the agreement -- that Pam's

24  letter was uploaded at Pam's behest.  She tried to stray from

25  her deposition testimony, but we had it on videotape.  She

Mandell - closing

1040

1  couldn't do that.

2        Let's look at -- I think I'll be short with this

3  because I think Mr. Mancilla talked about this, but this is

4  Defendants' 57.  Look at Pam's reaction.  By the way, Pam

5  finds this out in March.  So Pam writes her letter -- here's

6  your conspiracy.  Okay?  Pam writes her letter on January 8th

7  and circulates it to the group.  Can you imagine, like, hey,

8  I'm going to write this letter.  And then you're going to take

9  it, and you're going to send it to Northwestern, okay?  When

10 does the letter get uploaded to Northwestern?  January 23rd.

11 That's over two weeks later.  And then Pam -- Pam Kerr finds

12 out about the letter in March, right?  That's some conspiracy.

13 Hey, I uploaded the letter on January 23rd, but I'm sorry I

14 forgot to tell you about it and you had to find out about it

15 from somebody else in March.  If that's a conspiracy, it's a

16 Keystone Cops conspiracy because it just doesn't make sense.

17        I mean, he talks about all this email traffic on

18 January 7th and January 8th, and then nothing happens for over

19 two weeks.  That's the conspiracy?  And Pam Kerr doesn't even

20 know about it until March?  That's a conspiracy?

21        And then look at Cherie Wrigley's response.  "I could

22 die.  I never intended to send Pam's letter.  I am beyond

23 sorry."

24        Does anybody think that this was all feigned because

25 they knew that a year from then that they would get sued?  I

mean, that's ludicrous.  Obviously, it was a mistake.  And
certainly -- oh, by the way, Cherie doesn't say, well, your
letter was signed, I thought that was free game for everybody
to send it anywhere.  It doesn't say "draft" on it.  No.  I
mean, it's ludicrous to think that just because someone -- you
remember Pam Kerr sends the letter and says, "Any thoughts?"
Is that now a license for anybody to send her letter as if
it's her final letter?  That doesn't make sense either.

        Okay.  Now let's talk about this.  I wrote it down.
Counsel said, "This is the biggest piece of evidence in the
case."  It's an email from Aileen Patricia Reid to Katherine
Schulte at Northwestern.  Okay?

        "We received a call from Pam Kerr, a forensic
accountant.  She's upset because she's mentioned in the letter
on NU letterhead sent to a judge in New York.  She also
mentioned that the context in which she was mentioned was a
lie."

        First of all, how do we know that this Aileen Reid
correctly accounts what Pam Kerr said?  Okay?  Well, you heard
her from the stand -- oh, wait a second.  She didn't testify,
did she?  Maybe it's because Northwestern University Law
School is so far away from here.  I think it's almost a mile.
Okay?  Do you think the biggest most important document,
evidence in the case, do you think that she could have called
her to the stand to see -- first of all, Aileen Reid doesn't

1   even say, I received a call.  We received the call.  We don't

2   know whether somebody else received the call and told her and

3   she wrote the email.  Right?  And we'll never know because

4   Ms. Litvak didn't see fit to call her to testify about the

5   biggest piece of evidence in this case.

6           And even more significant, right, you remember the

7   jury instruction.  They have to show Ms. Kerr caused the

8   statement of fact about Ms. Black.  Is there a mention of

9   Ms. Black in this email?  No.  This statement, even if it were

10  reliable, which it's not, doesn't even mention Ms. Black,

11  right?  And if I want to call and say, you know what, a

12  professor did something bad, but I don't mention the

13  professor's name, it's not defamatory of the professor.  The

14  judge has instructed you that the statement has to be about

15  Ms. Black.  And nothing in here is about Ms. Black.

16          Consider this.  Look at Plaintiff's Exhibit No. 70.

17  Pam Kerr is writing to the other litigants in Colorado and New

18  York, right?  And this is after they received Kate's letter,

19  which Kate testified was extremely critical of Cherie Wrigley,

20  right?  So, of course, they're going to be talking about it,

21  and she writes them to recount her call to Northwestern,

22  right?

23          So this is team Joanne, right?  If you wanted to talk

24  smack and say what you said, yeah, I called her, and I said,

25  that woman -- that Professor Litvak, she's a liar.  Does she

1    do that?  No.  She puts her comments in quotes.  "My name is

2    Pam Kerr.  I'm a forensic accountant from Denver.  I am

3    looking at a letter on Northwestern Law School letterhead, and

4    it contains a false statement about me.  It's unfortunate

5    because it really appears that Northwestern Law School is

6    supporting this letter since it's on your letterhead."

7           The same consistent message.  Does it call her a

8    liar?  No.  Does it mention her name?  No.  This Exhibit 65 --

9    67 isn't worth the paper it's written on.

10          THE COURT:  You've used up a smidgen more than a half

11   an hour.  I'm letting you know.

12          MR. MANDELL:  Thanks, Judge.

13          Okay.  Third element, plaintiff must prove that

14   Ms. Kerr knew the statement was false or she believed the

15   statement was true but lacked a reasonable grounds for this

16   belief.

17          To the contrary, the evidence is that Pam believed

18   the statement to be true, and all of the evidence is that she

19   had a reasonable basis for it.  She complained about the

20   letterhead, and the law school agreed with her.  And it took

21   action, both in terms of admonishing Bernard Black and Kate

22   Litvak and notifying the New York Court.  Her reasonable

23   grounds for belief are the April 2nd, 2015, order.  I am not

24   going to harp on it again.  There's no findings.  There's no

25   order, and she's not court appointed.

1    And what's really important here is no one other than

2  Kate Litvak has come forward to support the notion that her

3  statement to Judge Aliotta was true.  I mean, not her husband

4  who was with her, who is at Northwestern.  How about the

5  colleagues?

6    Oh, that's another thing.  Yeah, you got this list,

7  13 people were involved, whatever the number is.  Yeah,

8  because you did something wrong.  You breached the conflict of

9  interest policy.  You used Northwestern letterhead for your

10  own personal use.  Okay?  She hasn't called a single witness

11  in the case that isn't a defendant, right?  Where's the

12  colleagues?  Where is Aileen Reid?  Where is her husband?

13  Where is anybody to say that this has been so damaging to her

14  or that this is false or that she's right.  It's no wonder

15  she's crying.  She is an island by herself.  I feel for her.

16  But don't make her problem our problem in the form of a

17  federal lawsuit.

18    It was -- element 4, it was apparent that the words

19  of the statement prejudiced her in her profession.

20    First, there's no testimony.  I mean, it's the same

21  thing.  Like, does her boss come in?  Does her colleagues come

22  in and say, oh, well, jeez, the poor thing.  Like, she can't

23  get, you know, assignments.  She can't get speaking

24  engagements, what, none of that.  Even she failed to testify

25  that it prejudiced her in her profession.

1    Destroyed her career?  If anything hurt her career,

2    it was her own conduct, violating that policy.  I mean, it's a

3    law school.  That's important, right?  You don't -- conflict

4    of interest is important to lawyers.

5    Putting that aside, I mean, has it come to that point

6    in our society where if someone makes an argument to the Court

7    that you think is false that you can't say, no, that's false.

8    I mean, look at our political system, right?  Rauner says

9    Pritzker is a liar.  Pritzker says Rauner is a liar.  We

10   discount that because it's politics.  This is litigation.  She

11   is writing legal correspondence, making an argument.  It's not

12   a subject of a defamation suit.

13   All right.  Word about conspiracy.  For conspiracy,

14   you got to have an unlawful act, right?  I've talked about

15   this.  Counsel made a big deal about all these emails, but

16   nothing happens.  And they're entitled to be talking about --

17   they're on the same side of a litigation.  They are entitled

18   to be talking about that.

19   You read those emails, like, everybody is saying,

20   like, oh, this hurts Joanne.  Everybody is like working for

21   Joanne.  Which, by the way, Pam Kerr, I heard him say, "She's

22   got a big stake in this now."  Like what stake?  Her lawyer --

23   her lawyer told her, I wouldn't send that letter because, man,

24   that's not -- don't get involved in that.  Well, she's

25   involved because she was doing her job.  I haven't heard a

1   stake yet.

2          This family -- I mean, look, everybody knows a family

3   that's got issues like this, right?  But this family is

4   fighting over estate assets.  And here Pam Kerr is like trying

5   to do an accounting, and she gets roped into this.

6          All right.  So we heard this power of words thing,

7   right?  And, admittedly, as lawyers, we strive or sometimes we

8   struggle to come up with like a catch phrase that sums up our

9   theory of the case.  And one of the most famous ones, the late

10  Johnnie Cochran came up with this:  "If the glove don't fit,

11  you must acquit."  Right?  That goes down in the history of

12  trial lore as one of the greatest ones, right?

13         The power of words here just falls flat in my view.

14  And I'm no Johnnie Cochran.  If I was going to come up with a

15  saying, I would say, if the shoe fits, wear it.  Kate Litvak

16  mischaracterized Judge Leif's order, and she did it to further

17  her litigation position in New York.  Okay?  And she got

18  called on it by Pam Kerr, appropriately and accurately.  Admit

19  it and move on.  Don't file a defamation lawsuit.

20         Make no mistake about it.  Words can be powerful.  I

21  won't dispute that.  But there's something that's more

22  powerful than words, and that's the truth.  Okay?  And that's

23  where you come in.  That's why you're so important.  What are

24  the words, and what's the truth?  So when you deliberate,

25  you're going to analyze, you're going to be able to analyze

1   the words of Kate's statement in 65 that she wrote to Judge

2   Aliotta, right?  And you're going to be able to compare those

3   words to what Judge Leif actually wrote, what she actually

4   ordered, what she actually found.

5          And you're going to be able to analyze Kate's

6   testimony, how many times she strayed from her deposition

7   under oath, how many times she said, "oh, that was a mistake.

8   That was a mistake."  How many mistakes do you get before

9   you're out?

10          You're going to be able to analyze Kate's demeanor,

11  right, the shrinking violet that took the stand that said, "I

12  didn't know what to do.  I didn't know who to call."  Or are

13  you going to compare that against Stanford grad, number one in

14  her class?  Look at her demeanor at counsel table.  Look at

15  her rush the podium, okay?  Shrinking violet.  Look at her

16  take on Cherie Wrigley in the Admirals Club.

17          And, finally, you can analyze Pam Kerr's testimony

18  and her emails, right?  Read the emails, because it shows an

19  unwavering commitment to do her job and to do what's best for

20  the people who hired her, Joanne Black, somebody who's special

21  needs, that's her stake, special needs.  And after you do

22  that, I hope that you will reach the truth.  And in doing

23  so -- sorry -- you'll find in favor of Pam Kerr.

24          The way the system is set up, counsel has the last

25  word.  Plaintiff has the burden, and, therefore, he has the

Homyk - final

1048

1  last word.  So counsel's going to be able to say things that I

2  can't respond to.  So I'm relying on you to challenge what he

3  says.  And hopefully you'll reach a verdict in favor of Pam.

4          I thank you for your attention.

5          MR. HOMYK:  Judge, can I have a few minutes?

6          THE COURT:  Two.  Two.  We are going to take a

7  two-minute break.  Two.  Don't get too ensconced back there.

8    (The jury leaves the courtroom.)

9          THE COURT:  Okay.  Go ahead.  I'm just going to wait.

10         MR. HOMYK:  Now?

11         THE COURT:  Yeah.

12   (Short break.)

13   (The jury enters the courtroom.)

14         THE COURT:  All right.  Everybody can have a seat.

15  Now you will hear the rebuttal argument on behalf of the

16  plaintiff.

17         Mr. Homyk, you can go ahead.

18                          - - -

19              MR. HOMYK, FINAL ARGUMENT

20         MR. HOMYK:  Thanks for permitting me, folks, to talk

21  to you again.

22         I'm going to deal with the defamation first.  There's

23  just so much to say.  And I agree that if I say anything that

24  you find contrary in that evidence, you call me on it, and you

25  make your own determinations.  Okay?

1    But the letterhead -- and I'm going to hit a lot of

2    topics here.  The most important topic that I want to hit --

3    and this is what I would suggest you go back and look at when

4    you're in that jury room.  Ms. Kerr picked the words that she

5    wanted to use that constitute the defamatory words in her

6    letter.  She picked them.  Kate didn't pick them.  She picked

7    them.  And the words that are in the defamatory letter are not

8    the words that defense counsel keeps harping on.  They're just

9    not.

10   Pam Kerr picked those words.  She picked out, she

11   chose the words to put into that letter.  There's nothing in

12   that letter that speaks to court appointed.  There's nothing

13   in that letter that speaks to orders, nothing.  It's all about

14   authorizing an investigation of Mr. Pinto.  That's the

15   defamation.  And she's saying that saying that, that saying

16   that is a hundred percent false.  It's got nothing to do with

17   court ordered.  Look at it.  Look at it.  Look at the words in

18   that letter.  I don't even know where he's coming from.  I

19   don't even know where this is coming from.  He's in a

20   different lawsuit.

21   Look at the words in that letter.  "Authorized."

22   That's why I keep saying the word "authorized."  And when you

23   get back, and you can take a look at this, you're going to

24   understand too.  The words that he wants to harp on from that

25   January 7th letter of Kate's are not the words that are

1     alleged to be defamatory here.

2              So to a certain extent, I kind of want to go back,

3     and I want to be able to show you, folks, that the defamatory

4     words are the Colorado judge found those allegations credible

5     enough to authorize an investigation of Pinto's conduct.

6     Well, that's exactly what happened here.  That's exactly what

7     happened here.

8              This isn't about court appointed.  This isn't about

9     an investigation was ordered.  This isn't about an

10    investigation as to Pinto only.  No one ever said that.  We

11    readily acknowledged here based on that order, we readily

12    acknowledged here based on that order that Mr. Black was also

13    a part, even a primary part of that complete forensic review.

14    Why?  Well, because he was a conservator, and he had a role.

15    No question.  We didn't hide from that.  We never hid from

16    that.  That's the truth.

17             But you must focus.  You must focus on that letter.

18    And the Colorado judge found those allegations credible enough

19    to authorize an investigation of Pinto's conduct by a forensic

20    accountant.

21             Can you pull up that order, please.

22             Got it?

23             THE COURT:  Sorry.  My mistake.  I need to switch it.

24    There you go.

25             MR. HOMYK:  You folks have it yet?

1       THE COURT:  Yep, they do.

2       MR. HOMYK:  Okay.  There we go.  There we go.

3       That's the paragraph.  That's the paragraph.

4   Paragraph 8.  "Mr. Pinto shall provide a complete accounting

5   with documentation of all funds that were held under his

6   control to Ms. Kerr and Ms. Peterson, who shall ensure copies

7   are provided to counsel of record, including Mr. Salzman, the

8   GAL, Mr. Dain, and Ms. Wrigley."

9       Okay?  He's specifically mentioned there,

10  specifically mentioned.  This business about, oh, she was

11  looking at other accountants and other lawyers and other this

12  and other that.  No one else, no one else has their name

13  dedicated to them in an order from this judge where this judge

14  is saying what Pam Kerr is obligated, obligated to investigate

15  in her role as a forensic accountant, obligated.

16      They can't get around that.  He talks about things

17  you can't get around.  You can't get around that.  He's the

18  only person whose name -- now Glatstein -- was Bernard Black's

19  lawyer, and this is just talking about getting a transcript,

20  so he's not one of those guys who is going to be investigated

21  by Pamela Kerr.

22      The only one who stands out in that order as being

23  investigated specifically in addition to the overall

24  conservatorship estate is Mr. Pinto.  Now, go back to that --

25  go back to the letter.  Go back to the letter.  The only

1   language that's at issue here.  Colorado judge found

2   allegations credible enough to authorize an investigation of

3   Pinto's conduct.  Authorization of an investigation.  There's

4   the letter.  This is the defamatory letter.  That's it.  You

5   look at page 15 of Ms. Litvak's letter states, and the

6   Colorado judge found those allegations credible enough to

7   authorize an investigation of Pinto's conduct by a forensic

8   accountant.

9           Now, not only was it authorized, but she engaged in

10  activities.  We didn't go over this with any specificity the

11  first time around, so I want to get into it in a little more

12  detail.  That's the 5/18/15 email.  And what I did say about

13  this was -- I alluded to it, and I alluded to the things that

14  she was doing to investigate Mr. Pinto because she was

15  authorized to do that as a part of her work.  No one ever said

16  that he was the sole person.  No one ever said he was the sole

17  party.  Where does that come from?  You are not going to see

18  that anywhere.  That's not the defamation, no way.  Let's keep

19  your eye on the ball, please.  It's like being in a blizzard

20  and, you know what, you're getting detoured left and you're

21  getting detoured right.  You are going to get in real trouble,

22  I suggest, if we don't keep our eyes on the road straight

23  ahead.  And keeping your eyes on the road straight ahead means

24  that you need to know exactly what Pamela Kerr was authorized

25  to investigate.

1    When we look at this letter, we look at this letter

2    here -- not letter, email.  If we look at that email here,

3    you'll find that she's raising specific questions.  This isn't

4    just about payments made to Mr. Pinto.  Look at page 2.

5         Put page 2 up there, please.

6         "Wow.  If you look at lines 14 and 15, it looks like

7    Esaun switched to a flat rate of 5,000.  It appears he's

8    charging her 5,000 a week.  Did either of you know he was

9    charging 5,000 a week?  I will be asking Gayle and/or Ira to

10   request documentation from the hospital and Joanne's doctors

11   regarding Esaun's involvement, Esaun's involvement in Joanne's

12   life as well.  We'll need the information in order to prepare

13   an accurate financial plan.  I didn't see any line item on the

14   financial plan for Esaun.  I don't have any invoices from

15   Esaun.  I don't have any invoices from Esaun from 11/1 to

16   current.  Is he not doing anything with Joanne anymore?"

17        Does that sound like an investigation to you?  It

18   sounds like an investigation to me.  Again, it doesn't mean he

19   was the sole target.  It doesn't mean he was the only guy

20   being investigated, but doggone it, that sure sounds like

21   investigative activity to me.

22        Go back to page 1, please, very quickly.

23        You go back to page 1, there are all kinds of

24   questions here.  Look at the bullet points on the bottom,

25   please.

1    "When exactly did Esaun get back to New York with
2  Joanne?  I see ATM withdrawals.  However, he's charging 24
3  hours a day."
4        Investigating.  She's digging.  She's mining.  That's
5  what she does.  That's her job.  It's on her website.  She's
6  mines for things.  She's mining for one of the people that she
7  was authorized to investigate by a court order dated April
8  2nd, 2015.
9        Next bullet point:  "Where was she living when she
10  got back to New York?"
11        Next bullet point:  "What was Esaun doing for her
12  from that time until she was picked up by the New Jersey
13  police on 6/3/2013?"
14        Last bullet point on that page:  "If Esaun was
15  charging 5,000 a week for Joanne at this point, I would want
16  to see a daily log of when she was with him, please."
17        Don't even try to tell me that's not investigation.
18  It's pretty good investigation.  I got to give you props.  You
19  did a good job of beginning your investigation as to him.  You
20  did.  You were very thorough.
21        Now, we do not have to, based on that statement,
22  okay, investigation, we don't have to prove that there was a
23  court order against him.  We don't have to prove there were
24  any findings against him.  We don't have to prove she
25  concluded anything about Esaun Pinto, nothing.  Absolutely

Homyk - final

1055

1  nothing.  All we have to prove to substantiate the false

2  statement in the defamation is that she was authorized to

3  investigate Esaun Pinto as part of her activities.  That's it.

4  And we did.  So don't get confused.  Don't get confused.

5      He called it sleight of hand that we were engaging

6  in.  I call it a shell game.  You take one document.  You want

7  to make that your document.  This is a shell game.  Don't be

8  confused by that.  The only defamatory statement at issue in

9  this case is the one in this document that you have before you

10 that we're calling the Kerr letter.

11     Put that back up so the jury can continue to see it,

12 please, Sharan.

13     The letterhead was a pretext, absolute pretext.  If

14 Kerr really only -- if Kerr really only cared about

15 letterhead, she only had to submit the first page.  Why?  I

16 mean, why does she have to submit anything else?  Just submit

17 the letterhead if that was really her problem.  I think what's

18 really instructive is she was impeached on the stand by virtue

19 of what her duty was.  What was your duty?  Oh, I had a duty.

20 I had a duty.  And, you know, in her deposition -- I impeached

21 her with her deposition.  Okay?  Wait, what was your duty?  To

22 go to Northwestern and advise Northwestern?  Or was your duty

23 to defend your reputation?  We went back and forth a little

24 bit.  She got impeached, meaning she had a prior inconsistent

25 statement in her deposition.

1    She didn't even know what her duty was.  She didn't
2    even know.  She's a forensic accountant.  She's a detail
3    person.  She's been doing this a long time.  She didn't even
4    know what her duty was.  Do you know what her duty was?  Her
5    duty, along with Cherie Wrigley, was to attack Kate Black at
6    Northwestern.  That was her duty at that time.  She was
7    blinded, she was blinded by what at that point in time was her
8    own animus against Katherine Black.  She didn't even know what
9    her duty was.

10    And then in terms of -- I'm sorry.  Put up
11    Exhibit 67, please.

12    This is what counsel, defense counsel himself called
13    the most important piece of evidence in this case.  He called
14    it that.  Okay?  And to a certain extent, I don't disagree
15    with that.  You know why?  Because this came from a person who
16    had zero reason to be biased, zero reason to do anything other
17    than be completely accurate and truthful and contemporaneous
18    and pass along information that was passed along to her by Pam
19    Kerr on the morning of January 8 where Kerr and Wrigley and
20    the group spent an entire day, literally from 9:00 to 9:00 at
21    night, 12 hours, almost, exchanging emails.  Exhibit 66,
22    Exhibit 66, please remember that number in your head.  Go back
23    and look at them.  They spent an entire day exchanging emails.

24    At the end of that day, Cherie Wrigley files an
25    EthicsPoint complaint.  By the end of that day, Pam Kerr

1  caused -- and she caused it.  Let's face it.  She caused her

2  letter, her defamatory letter to be issued to a whole lot of

3  people, not once, but twice.  She sent it out twice on that

4  day to these people.  Without a draft stamp, without anything.

5  Come on.  She didn't care.

6         This thing about a draft.  That letter was not a

7  draft.  Just like Wrigley's uploading of that letter was not

8  accidental.  It wasn't a draft, and it wasn't a draft that

9  Kerr caused to be sent.  And it was not accidental that

10 Wrigley uploaded that letter on the 23rd.

11        Aileen Reid.  Now, hey, come on.  This letter

12 wouldn't be here if this wasn't talking about Katherine Black.

13 Come on.  Let's be serious.  I mean, this wouldn't be in

14 evidence if we didn't know who we were talking about here.

15 These are pretty good lawyers, right?  So it wouldn't even be

16 in evidence if it wasn't crystal clear who this is referring

17 to.

18        And Northwestern letterhead.  Come on.  This is all

19 about Katherine Black.  And here is Aileen saying the context

20 in which Pam Kerr was mentioned was a lie.  A lie.  Not

21 mistaken, not inaccurate, you know, not even false, not even

22 kind of false, not even sort of false.  Okay?  Even a little

23 more.  It corroborates what's in her letter where she calls

24 Kate's statement about the judge authorizing an investigation

25 of Pinto 100 percent false.  I have to tell you, 100 percent

1   false means lie, but it doesn't say the l-i-e. Completely

2   false. I have to tell you completely false in my mind -- and

3   you're certainly capable of making your own reasonable

4   inferences -- means lie, l-i-e. She said it again in her

5   letter, completely false. She said it a third time.

6          But if you needed to know anything else, you have,

7   yes, this important piece of evidence from a person at

8   Northwestern Law School who confirmed in no uncertain terms

9   what Pam Kerr's state of mind was on that date. Pam Kerr's

10  state of mind on that date was that the context in which she

11  was mentioned was a lie, a lie. And that impacted Kate, and

12  that impacted Kate's everything at Northwestern. That

13  impacted her at Northwestern. That's -- she's a professor of

14  law. And now -- now the dots are connected. Now the dots are

15  completely connected because now you have this professor of

16  law being accused of lying to a Court. That is serious.

17         And, also -- this is a minor point, but defense

18  counsel said that at the time of Kate's letter, January 7,

19  2016, Bernard, her husband, was seeking to be a guardian. No,

20  he wasn't. Come on. This case is not about Bernard. Again,

21  let's keep our eyes on the road, on the road. There is a

22  blizzard. Keep your eyes on the road. This case is not about

23  Bernard. They want to make it about Bernard. They have done

24  their doggone best to make a case about Bernard. It's not.

25  It's just not. It's about Kate. It's about Kate being

1  defamed, and it's about those things that happened to Kate on
2  April 2nd after that hearing.

3        Again, they keep going back to this notion about who
4  the clients were here, court appointed.  It's immaterial.  I
5  mean, it's absolutely immaterial.  I said it before; I'll say
6  it again.  I showed it to you.  It's in evidence.  The only --
7  and she said it.  Pam Kerr said it.  "My only clients in this
8  matter are the protected person and the Court."

9        "The protected person and the Court."  The truth of
10  the matter is Wrigley intentionally uploaded that letter and
11  then lied to Kerr about it because Kerr was going to quit.
12  Kerr said, hey, maybe I don't testify in these proceedings in
13  New York.  Maybe I don't testify.  She said it twice.  Maybe I
14  don't testify.

15        Wrigley knew exactly what she was doing when she
16  uploaded that document.  There is no evidence here, none,
17  zero, none, that in any way, shape, or form says that she
18  mistakenly sent it or she accidentally sent it or there's
19  something else she meant to send.  None.  There is absolutely
20  none.  You won't find it.  You won't find it.

21        To get back to Aileen Reid for a second, why didn't
22  we call her?  Why isn't she here?  Why isn't she a witness?
23  She doesn't need to be.  Her email is the clearest evidence in
24  this case.  Why?  Why does she have to be here?  Waste
25  precious time of hers?  Didn't need to.  It's crystal clear.

1   Mr. Mandell said that -- he harkens back to that

2   5/18/15 email where it's an email to both Bernard and to

3   Cherie from Pam Kerr with all those lists of line items, all

4   those investigatory things.  And he said -- and he said,

5   "Yeah, proof is in the pudding.  Proof is in the pudding."

6   The proof is in the pudding.  I mean, it really is in

7   the pudding.  The pudding is all those questions that Pam Kerr

8   was asking as her role of an investigator as to Mr. Pinto.

9   We don't need -- we don't need -- here's our burden,

10  no question.  We don't need to demonstrate intent.  We don't

11  need to demonstrate intent as to cause.  We don't.  We need to

12  demonstrate that she caused that letter to be sent, and she

13  did.  And she didn't care.  That's all we need to demonstrate.

14  Again, to be crystal clear, Kerr threatened to

15  withdraw, so Wrigley lied and tried to tell her that it was a

16  mistake.  It was accidental that she uploaded the letter.  So

17  there was a lot of, oh, I'm so sorry.  Oh, my goodness.  Oh,

18  my goodness.  There was a lot of that.  There was a lot of

19  that.

20  Back in March of 2016.  When you look in January 7,

21  January 8, 2016, it's crystal clear what their intention --

22  what -- it's crystal clear what they were doing there just

23  based on the words they were using.  Let's contact

24  Northwestern.  Let's call Northwestern.  Here's my letter.

25  Any thoughts?  This is the letter I intend to send to

1    Northwestern.  This is the letter.  Here's the letter.  There

2    was no -- there was really no doubt that letter was going to

3    get to Northwestern.  And you know what happened?  It got

4    there.  It got there.

5         She did it on purpose.  Wrigley did it on purpose.

6    They were working together by then.  That group on that day

7    was working together.  There is little doubt about that.

8    Little doubt about that.

9         Let me see that, Sharan, please.

10        What exhibit is this, Sharan?

11        MS. ABRAHAM:  Defendants' 57.

12        MR. HOMYK:  I'm sorry?

13        MS. ABRAHAM:  Defendants' 57.

14        MR. HOMYK:  Defendants' 57.  You will be able to take

15   this back with you.  In fact, you saw it up twice.  You saw it

16   up twice where Pam is saying, "I'm seriously reconsidering

17   testifying next week."  She was going to quit.  She was going

18   to quit.  That's where the feigned apology comes in.  That's

19   where it comes in.

20        Our elements have been satisfied.  Our elements have

21   all been satisfied.  I would encourage you to go back and look

22   at those elements, and you'll determine that Pam Kerr

23   intended -- Pam Kerr caused that to be sent, didn't have to

24   intend it, caused it to be sent; that Mr. Pinto was authorized

25   to be investigated, and he was indeed investigated at least in

1    part by Pam Kerr, no doubt about that.  There's no doubt about

2    that.  Every element, every element that I told you folks

3    about when I first stepped up in front of you in terms of the

4    defamation has, indeed, been satisfied, every single element.

5           Pam Kerr caused the statement about Kate.  That's the

6    letter to Northwestern.  That's the letter.

7           Then we have the email exchanges where on

8    January 8th, for example -- on January 8, for example, Cherie

9    Wrigley writes that she's uploading documents to this

10   EthicsPoint complaint against Kate and asks for documents.

11   Help.  She says, help, help, I need documents today,

12   January 8, I need documents.  What's the immediate response

13   from Kerr to that?  1:44 p.m. mountain standard time, Wrigley

14   says that.  Minutes later, 12:51, minutes later, Kerr's time,

15   she says -- what does she do?  She sends the letter.  She

16   sends it.  Wrigley is asking for documents to put on

17   EthicsPoint.  What does Kerr do immediately, literally

18   minutes, seven minutes later? She sends the letter.  Come on.

19   Come on.  She wanted -- she caused it.  She caused that letter

20   to be sent to where she wanted it to be sent.  And it got

21   there.

22          And it went to the whole group, and not one in that

23   group was told, don't send it, don't do anything, hold on to

24   this.  Oh, my goodness.  Come on.  We can't be doing this.

25   It's a draft letter.

1    Come on.  You want to talk about common sense?  I

2    don't think there's a single one of you who has sent out a

3    draft letter on that kind of letterhead signed.  Hmm.  Now,

4    that's common sense.  More than anything else in this case,

5    common sense says you don't do that.  You just don't do that.

6    Bad things are going to happen.  You know?  You're asking for

7    trouble.  Bad things happen.

8    And Pam Kerr was asking for trouble.  She jumped in

9    here.  You know, look, she started out as a forensic

10   accountant, and then she jumped in the water with Cherie

11   Wrigley.  And they got together, and they were determined,

12   they were determined to be able to go after Katherine at her

13   employer's -- knowing, knowing that that -- knowing that that

14   would satisfy what their real intent was in those emails.

15   In those emails with the group, Lisa DiPonio -- and

16   not meant by, no, no, no, that's not what we want to do.  Lisa

17   DiPonio says on January 8, I want to make them pay, Bernie and

18   Kate, Kate, Kate, Kate.  I want to make them pay personally

19   and professionally.  My goodness.  That's what she said.

20   That's how vicious that got.

21   Now, does Kerr -- was there any push back from

22   Wrigley or Kerr as to that?  No, none, zero, period.  Because

23   that was their goal, making Kate pay professionally and

24   personally.  That was always their goal.

25   So the only relevant language in that letter is the

1  language that I told you about in that the only relevant

2  language in Kerr's letter that's the basis for the defamation

3  here is that language.  Please, take a close look at that.

4  The other stuff is a shell game.  Take a close look at that.

5  We've satisfied that element.  This claim is not about

6  anything else.  It's not about court appointed.  It's not

7  about orders.  It's not about findings against this guy,

8  Pinto.  It's not about any of that.  It's whether he was

9  authorized.  I am going to say it again.  The word

10  "authorized."  We've proven that by a preponderance of the

11  evidence.  There's zero doubt, I believe.  And I believe

12  you'll agree with me on that.

13        No, no attempt to ever pull that letter back.  Think

14  about that.  Think about that.  They made no attempt to ever

15  pull that letter back, none, none whatsoever.  Please keep

16  that in your mind as well.  None of them ever made any attempt

17  to keep that letter back.

18        And by the way, Kate's deposition in this case was

19  taken before the defendants' emails even came to light.  So,

20  you know, those are those little things -- you know, those

21  little nuances that you may not be aware of.  But the truth of

22  the matter is when she gave her deposition testimony --

23        MR. MANDELL:  It's not in evidence.

24        MR. HOMYK:  It's in evidence.  If it was in evidence,

25  then you can argue it.

1    MR. MANDELL:  I think it's suggesting that evidence
2  was withheld.

3    MR. HOMYK:  No.  No.

4    THE COURT:  I didn't hear it that way.

5    Go ahead.

6    MR. HOMYK:  I didn't use the word "withheld."

7    Hadn't been produced is what I said.  Hadn't been
8  produced.

9    There was new evidence later between Kate's
10  deposition and this trial, new evidence, called evidence,
11  facts, new facts.

12    So I absolutely agree with Mr. Mandell on the
13  defamation counts, including the conspiracy count, including
14  the aiding and abetting count, that you should read those jury
15  instructions.  I disagree with his reading of those
16  instructions without question, disagree with it, and you will
17  too once you take a look at what we're really talking about
18  here.

19    Our burden of proof on every one of these items is
20  51 percent, more likely true than not true.  Not 95 percent.
21  It's not beyond a reasonable doubt.  It's 51 percent.  And
22  when you take a look at that evidence in the jury room, you're
23  going to agree with me, I believe, that we've satisfied every
24  element of our burden of proof.

25    Pam Kerr -- last point on this.  Pam Kerr also

1   indicated, you know, that she was going to follow up with the

2   letter to the dean, and I recommend that anyone else whose

3   name is in that letter do the same.  Here is the mailing

4   address.  Here is the mailing address.

5          You know, so, of course, I'm not going to even

6   suggest that Kerr can't say that Kate's letter was false to

7   the -- you don't call her employer.  You just don't.  They

8   said -- I heard from Mr. Mancilla a lot, you just don't do

9   this.  You just don't do that.  Let me tell you something.

10  You just don't reach out to an employer and do that.  They did

11  that because they were on a mission to make her pay

12  professionally.  That's why they did it.

13         And, again, going back to Mr. Mancilla's comment

14  about, you know, what do you do with that?  Well, I don't know

15  what to do when defense counsel and Mr. Mandell relies on

16  politics for a defense.  Frankly, I don't know what to do with

17  that.  I mean, to say that these governors lie to each other

18  all the time.  I mean, I don't even know what to do with that.

19         What I do know is that Aileen Reid, her use of that

20  word in that context in that letter is powerful, powerful

21  evidence here, powerful evidence that goes a long way to

22  carrying that defamation count.

23         I am going to rely in large part on your ability to

24  remember the testimony that you heard with respect to Kate on

25  the intentional infliction count and what transpired on

1   April 2nd in both of those places.  You heard it.  I know you

2   heard it.  I know you internalized it.  I'm fine with that.

3          There are nuances, there are things, there are things

4   that you can't remember over time, details.  And she was in a

5   haze.  She was in a haze.  Hey, we're here because she

6   suffered severe emotional distress.  That's why we're here.

7   So is it that unusual that over the course of time that you

8   would have certain of the details would not be crystal clear

9   in your mind?  No, not unusual.  Hey, Wrigley didn't have all

10  the details in her mind, right?  She didn't have them either.

11  But the core details, the core details, Katherine remembered

12  explicitly.

13         THE COURT:  You've got about three minutes left.

14         MR. HOMYK:  Core details she remembered explicitly.

15  Get out of here.  You remember all that.  Sex change

16  operation.  Hey, you don't make that up.  So contrary to

17  counsel, this is argument.  You're right.  I'm arguing.  But

18  you can use your common sense about that.  You just don't make

19  that sort of thing up.

20         And then, most importantly, that encounter in the

21  airport where her children, her children were threatened.

22  Wrigley knew how to do it.  She knew what to say.  She knew

23  how to push the buttons.  I'm going to suggest to you, you're

24  right, we didn't bring another witness to that, to those

25  conversations in here.

1   　　　　Mr. Dain, by the way, okay, did not testify to
2   anything inconsistent with Kate's story.  And that's her
3   brother.  I impeached him.  Remember?  That's impeachment.  He
4   is a lawyer.  He got impeached.  You know what he got
5   impeached with?  Because he tried to say -- he tried to say
6   that everybody -- everybody can hear everything.  Well, no,
7   no, no, no, no.  You were telling me that people were talking.
8   That's what he said in his deposition.  So you missed words.
9   He had to acknowledge sitting on the stand that he missed
10  words.  So he didn't hear everything.  And there were
11  15 seconds.  If you get a chance, just count out 15 seconds in
12  the deliberation room, please.  You can make a lot of
13  statements in 15 seconds.
14  　　　　So I'm going to leave that to you.  And what I'm
15  going to ask you to do, folks, is after taking another close
16  review at all of the evidence that's been submitted on both
17  sides -- I want you to look at their evidence.  No doubt about
18  it.  I want you to look at their evidence.  But after you've
19  looked at all the evidence that's been submitted by everyone,
20  I will suggest to you that by a preponderance of the evidence,
21  51 percent, we've proven all four claims; defamation per se,
22  intentional infliction of emotional distress, aiding and
23  abetting, and conspiracy.
24  　　　　And I'll just end with this.  Again, thank you so
25  much for your active participation.  You're what makes this

1  thing go.

2          THE COURT:  All right.  If you can turn to the page

3  of the instructions that's right before the verdict form, I'm

4  going to read that last instruction.

5          Let me put it up on the screen here.  There you go.

6          You can just follow along on the screen if you'd

7  like.

8          The verdict must represent the considered judgment of

9  each juror.  Your verdict must be unanimous.

10          You should make every reasonable effort to reach a

11  verdict.  In doing so, you should consult with each other,

12  express your own views, and listen to your fellow jurors'

13  opinions.  Discuss your differences with an open mind.  Do not

14  hesitate to re-examine your own view and change your opinion

15  if you come to believe it is wrong.  But you should not

16  surrender your honest beliefs about the weight or effect of

17  evidence just because of the opinions of your fellow jurors or

18  just so that there can be a unanimous verdict.

19          The eleven of you should give fair and equal

20  consideration to all the evidence.  You should deliberate with

21  the goal of reaching an agreement that is consistent with the

22  individual judgment of each juror.

23          You are impartial judges of the facts.

24          So as I said before when we break, lunch is going to

25  be on us.  My suggestion is you should do that first because,

1  you know, we are a little later than our normal lunch break.

2  The officer will take you down to the second floor.  Get

3  lunch.  We pay for it.  And then bring it back up here.

4          The exhibits, as you know, you'll all be able to see

5  on the screen in there.  I think there's instructions on that

6  that will allow you to call up the exhibits.  You all have a

7  copy of the verdict form.  I'm going to give one to the

8  officer in a minute here to give to you, which you can use as

9  the official one.  And I think that basically covers it.

10         So I need to swear in the officer.

11   (Court security officer sworn.)

12         THE COURT:  All right.  Here is the official copy of

13  the verdict form.  The jury is now excused to deliberate on

14  the verdict.

15   (The jury leaves the courtroom.)

16         THE COURT:  Okay.  So just make sure that before you

17  leave, you've got your exhibits all to Pam on flash drives,

18  and then you need to give her a cell phone number for all the

19  attorneys here.  So if we can't get somebody, if we can get

20  the other person.

21         The deal is you have to be here within 15 minutes of

22  when you get the phone call from me.  That means when we place

23  the call, not when you happen to pull it out of your

24  voicemail.  So be watching your phones so we don't have to

25  make the jury wait too long.

1    Okay.  Thanks.

2    (The trial was adjourned at 1:00 p.m. until 4:25 p.m. of

3    this same day and date.)

1072

1   IN THE UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF ILLINOIS
2   EASTERN DIVISION

3

KATHERINE BLACK,                        )    Docket No. 17 C 101
4                                        )
                    Plaintiff,           )
5                                        )
        vs.                              )
6                                        )
CHERIE WRIGLEY, et al.,                  )    Chicago, Illinois
7                                        )    August 26, 2019
                    Defendants.          )    4:25 o'clock p.m.
8

9            TRIAL TRANSCRIPT OF PROCEEDINGS
    BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
10                    VOLUME 5-B

11
APPEARANCES:
12

13  For the Plaintiff:      LAW OFFICES OF DONALD L. HOMYK
                            BY:  MR. DONALD LEE HOMYK
14                          6944 North Ionia Avenue
                            Chicago, IL  60646
15                          (773) 805-4393

16
                            SHARAN R. ABRAHAM, ESQ., PLLC
17                          BY:  MS. SHARAN RACHEL ABRAHAM
                            37 South Street
18                          Roslyn Heights, NY  11577
                            (516) 672-1039
19

20

21

22

23  Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                            Official Court Reporter
24                          219 S. Dearborn Street, Suite 2102
                            Chicago, Illinois  60604
25                          (312) 435-5639

1 | APPEARANCES CONTINUED:

2

3 | For Defendant            MANDELL MENKES LLC
    Pamela Kerr:             BY:   MR. STEVEN P. MANDELL
4 |                                MR. STEVEN L. BARON
                                   MR. GEORGE V. DESH
                             One North Franklin, Suite 3600
5 |                          Chicago, IL  60606
                             (312) 251-1000
6

7 | For Defendant
    Cherie Wrigley:          MANCILLA & FANTONE, LLP
8 |                          BY:   MR. ROBERT MARIO FANTONE, JR.
                                   MR. ANDREW MANCILLA
9 |                          260 Madison Avenue, 22nd Floor
                             New York, NY  10016
10 |                         (646) 225-6686

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had in open court outside
2    the presence and hearing of the jury:)
3              THE CLERK:  Case No. 17 C 101, Black v. Wrigley.
4              THE COURT:  Same lawyers are here.  The jury has
5    reached a verdict.
6              Pam, you can have the officer bring them out.
7      (The jury enters the courtroom.)
8              THE COURT:  Okay.  Everybody can have a seat.
9              I understand the jury has reached a verdict; is that
10   correct?
11             THE FOREPERSON:  Yes, we have.
12             THE COURT:  Please hand it to the officer.
13             Thank you.
14             Okay.  I'm going to read the verdict into the record.
15   It says:  "We, the jury, find as follows on Plaintiff
16   Katherine Black's claims against Defendant Cherie Wrigley and
17   Pam Kerr," and on each of the four claims, the finding is for
18   the defendants.
19             Judgment will be entered on the verdict.  I need to
20   see the lawyers briefly at sidebar.  If I can just see you for
21   a second right here.
22     (The following proceedings were had at sidebar outside the
23   hearing of the jury:)
24             THE COURT:  So I'm going to tell them that given
25   their -- in light of the verdict on phase one, there will not

1   be a phase two.  Does anybody have a problem with me doing
2   that?  I can't imagine why you would.
3            MR. MANDELL:  No.
4            MR. FANTONE:  No, Judge.
5            MR. HOMYK:  No.
6            THE COURT:  All right.  Okay.  Then just stick around
7   for a second.
8     (The following proceedings were had in open court in the
9   presence and hearing of the jury:)
10           THE COURT:  So, ladies and gentlemen, given the
11  verdict on phase one, there will not be a phase two.  So that
12  completes your service in this case.
13           I want to thank you again for your diligence and your
14  willingness to serve.  And I said it before.  I'll say it
15  again.  I really meant what I said at the beginning of the
16  trial, and, that is, that the system does not work unless
17  there are people like you who are willing to step up to the
18  plate and serve.  You have been, and I very much appreciate
19  it.  And I thank you on behalf of our court.
20           I got to spend about two minutes with the lawyers.  I
21  know it's late in the afternoon.  If anybody needs to get out
22  of here in the next two minutes, that's just fine, go ahead
23  and go.  But I'd like to come back there and thank you
24  personally and get any suggestions you might have on how we
25  can improve the process.  So if you can wait around just a

1   couple minutes, I'll be back there pretty quickly.  But if you

2   need to go, that's fine.  You're excused.  Since your week is

3   done, you don't have any further service in the case.  So

4   thank you very much.

5     (The jury leaves the courtroom.)

6         THE COURT:  Okay.  We'll enter a judgment in favor of

7   the defendants on the remaining claims in the case, and so

8   that kicks in the time for whatever post-trial motions you

9   have.

10        If you don't -- if you can't get your stuff out of

11  here today, tomorrow is fine, but thanks very much.

12        MR. HOMYK:  Thank you, Judge.

13        MR. FANTONE:  Thank you.

14        MR. MANDELL:  Thank you.

15        MR. FANTONE:  Judge, I have one question, if it's

16  possible.  Not that we have any intention of pressuring jurors

17  or anything, but I like to wait around.

18        THE COURT:  There is a rule of the court that says

19  you cannot talk to jurors unless the judge let's you.  And I

20  don't because, as your kindergarten teacher may have told you

21  at one point, there was one lawyer in one case about ten years

22  ago who ruined it for everybody.

23        MR. FANTONE:  Okay.  So stay away from them?

24        THE COURT:  It's against the rules to talk to them.

25        MR. FANTONE:  Thank you.

1077

1     (Which were all the proceedings had in the above-entitled

2   cause on the day and date aforesaid.)

3     I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

4

5   Carolyn R. Cox                          Date
    Official Court Reporter
6   Northern District of Illinois
    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25